IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Marous Brothers Construction, LLC, a corporation, and Gil Berry, an individual, d/b/a Gil Berry & Associates, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No.: 2:07-cv-00384-ID-CSC<br>) |
| Alabama State University, a public corporation; W. Ken Upchurch, III, an individual; Percy Thomas, an individual; TCU Consulting Services, LLC, a corporation; Joe A. Lee, individually and in his official capacity as President of Alabama State University; Elton N. Dean, Sr., individually and in his individual capacity as Chairman of the Board of Trustees of Alabama State University, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## BRIEF IN SUPPORT OF GIL BERRY'S MOTION TO DISMISS

**COMES NOW** Plaintiff/Counterclaim Defendant Gil Berry (hereinafter "Berry") appearing by and through counsel, and submits this his Brief in Support of his Motion to Dismiss the Counterclaim against him for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Defendants/Counterclaim Plaintiffs are limited-purpose public figures, and they have failed to sufficiently allege in their Counterclaim that Berry acted with actual malice in the alleged publication of defamatory statements.

## INTRODUCTION

Defendants/Counterclaim Plaintiffs TCU Consulting Services, LLC, W. Ken Upchurch, III, and Percy Thomas (collectively hereinafter referred to as "Counterclaim Plaintiffs") filed their Counterclaim against Plaintiffs/Counterclaim Defendants Berry and Marous Brothers Construction

(hereinafter "Marous") on September 5, 2007. Berry asserts that he is under no obligation to raise all applicable affirmative defenses in this Motion to Dismiss as it does not constitute a responsive pleading for purposes of the federal rules. Chilivis v. S. E. C., 673 F.2d 1205, 1209 (11th Cir. 1982).

## STANDARD OF REVIEW

Dismissal is proper under Fed. R. Civ. P. 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994). As set out in more detail below, it is clear that the Counterclaim Plaintiffs are limited-purpose public figures and that they have not sufficiently alleged in their complaint that Berry acted with actual malice. It is further clear that no relief can be granted under any set of facts that the Counterclaim Plaintiffs can prove. Accordingly, the Counterclaim in this matter should be dismissed for failure to state a claim upon which relief can be granted.

## ARGUMENT

In defamation cases, plaintiffs can be characterized as either: 1) public officials or figures; 2) limited-purpose public figures; or 3) private individuals. Little v. Breland, 93 F.3d 755, 757 (11th Cir. 1996). The court must determine the plaintiff's characterization as a matter of law. White v. Mobile Press Register, Inc., 514 So. 2d 902, 904 (Ala. 1987).

In Silvester v. American Broadcasting Cos., Inc., the United States Court of Appeals for the Eleventh Circuit stated that:

> The test for determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern. If the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability.

2

839 F.2d 1491, 1493 (11th Cir. 1988).

1. **THE COUNTERCLAIM PLAINTIFFS ARE LIMITED-PURPOSE PUBLIC FIGURES IN THE PUBLIC CONTROVERSY AT ISSUE.**

There are two alternative bases upon which one will be considered to be a public figure to whom the actual malice standard will apply:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). Thus, under Gertz, there are two types of public figures: all-purpose public figures, and limited-purpose public figures. Rebozo v. Washington Post Co., 637 F.2d 375, 378 (5th Cir. 1981).

An otherwise private individual "is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 167 (1979). "[I]t is the plaintiff's role in the controversy, not the controversy itself, that determines whether a person is a limited-purpose public figure with regard to the alleged defamatory statements." Cottrell v. Nat'l Collegiate Athletic Ass'n, Civ. Nos. 1041858, 1050436, and 1050437, 2007 WL 1696564 at *20 (Ala. June 1, 2007). "In general, to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute. From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure." Id. at 25 (quoting Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1083 (3d Cir. 1985)).

In Little, the United States Court of Appeals for the Eleventh Circuit recognized that in Silvester, 839 F.2d 1491 (11th Cir. 1988) the court adopted the three-pronged test from Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C. Cir. 1980) to determine whether a plaintiff in a

3

defamation action is a limited-purpose public figure in regards to a public controversy. 93 F.3d at 757. The Alabama Supreme Court recognized that "[t]he three-pronged test applied in Little provides a workable means of determining whether a plaintiff in a defamation action is a limited-purpose public figure because of his role in a public controversy . . . ." and adopted the three-pronged test. Cottrell, 2007 WL 1696564 at *20. Under this test, a court determining whether a plaintiff is a limited-purpose public figure must "'(1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation [was] germane to the plaintiff's participation in the controversy.'" Little, 93 F.3d at 757 (quoting Silvester, 839 F.2d at 1494 (in turn citing Waldbaum, 627 F.2d at 1297)).

### a. The controversy surrounding the renovation of dormitories at Alabama State University is a public controversy.

Speaking to the first prong of the three-prong test, "isolating the public controversy," the Waldbaum Court stated:

> As the first step in its inquiry, the court must isolate the public controversy. A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . . [A] public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants. To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice . . . [The Court] should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

Cottrell, 2007 WL 1696564 at *20 (quoting Waldbaum, 627 F.2d at 1296-98 (footnotes omitted)).

The controversy surrounding the renovation of student residences at Alabama State University (hereinafter "ASU") is clearly a matter of public concern. The Student Residence Project (hereinafter "SRP") was to include the renovation of six student dormitories, and was

designed to provide modern, suite-style living quarters for ASU students. (Doc. 1, pgs. 3-4). As a result of the controversy surrounding the SRP and the resulting delay in the renovation, according to the July 22, 2007 articles in *The Montgomery Advertiser* referenced in the Counterclaim (hereinafter the "July 22nd Articles," attached hereto as Exhibit "A") some ASU students are living off-campus in hotels. Clearly, the ramifications of this dispute are being felt by the students of ASU, who are not direct participants in the controversy. A reasonable person would have expected that the students who were scheduled to live in newly renovated dormitories would have felt the impact of a dispute that resulted in a delay of the opening of those dormitories. Furthermore, the increased cost of the project since the selection of the Counterclaim Plaintiffs to handle the SRP – according to the July 22nd Articles the initial bids were $13 million more than the Marous-Berry budget – will directly impact taxpayers. The housing of students in hotels off-campus has also increased security and transportation costs for ASU. The very newspaper articles cited by the Counterclaim Plaintiffs show that the issue was being debated publicly, and the dispute has unmistakably had substantial ramifications for non-participants, most notably, ASU students and taxpayers. Because the dispute surrounding the SRP is a public controversy, the Counterclaim Plaintiffs meet the first prong of the limited-purpose public figure test.

### b. The Counterclaim Plaintiffs voluntarily injected themselves into the public controversy.

As to the second prong, the court in Waldbaum stated:

Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of Gertz is clear that plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution . . . . They must have achieved a 'special prominence' in the debate . . . . The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of the press coverage, and the public reaction to his conduct and statements.

627 F.2d at 1297 (footnotes omitted).

An individual's position or actions can "voluntarily inject" the individual into a public controversy. See., e.g., Oaks v. City of Fairhope, 515 F. Supp. 1004 (S.D. Ala. 1981) (finding that a librarian voluntarily injected herself into a controversy by presenting her case in press); White, 514 So. 2d at 904 (finding the plaintiff to be a public figure because of "his choice of career as a high level executive in an industry that is the subject of much public interest and concern" where his choice of career was "a voluntary decision to place himself in a situation where there was a likelihood of public controversy"); Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F. Supp. 2d 158 (D. Me. 2007) (finding director of judicial affairs at state university to be a limited-purpose public figure in regards to a controversy about the student-disciplinary process at the university). In Greenbelt Co-op. Pub. Ass'n v. Bresler, the court found Bresler's counsel's concession that Bresler was a public figure in the community to be "clearly correct" where he was deeply involved in the future development of the city of Greenbelt, had entered into agreements with the city for zoning variances in the past and was again seeking variances, and was engaged in "negotiations of significant public concern" with school officials and the city council regarding construction of a school. 398 U.S. 6, 8 (1970).

Like Bresler, the Counterclaim Plaintiffs have voluntarily inserted themselves into this public controversy. They are "deeply involved" with the SRP at ASU, and have been since the time of their selection to serve as ASU's Owner's Representatives to act on behalf of ASU President Joe in matters related to the SRP, including but not limited to the review of the proposed Development Agreement provided by Marous and Berry. (Doc. 1, p. 7). Their position as Owner's Representatives also gave the Counterclaim Plaintiffs the opportunity to impact the resolution of the SRP controversy. The Counterclaim Plaintiffs' involvement deepened in September 2006, when

they began providing the very development and construction management services for the SRP that were to have been provided by Marous and Berry. (Id. at 9).

According to the July 22nd Articles, the Counterclaim Plaintiffs' past conduct included overseeing construction of a $75 million jail in Montgomery and managing the Montgomery school district's $300 million construction plan. Their past conduct of soliciting contracts and jobs that involve public funds, as well as the extent of the media coverage of this dispute, help to show that the Counterclaim Plaintiffs have gone beyond a "trivial or tangential participation" in this dispute. Because the Counterclaim Plaintiffs have voluntarily injected themselves into the public controversy surrounding the SRP, they meet the second prong of the limited-purpose public figure test.

    c. **The alleged defamation was germane to the Counterclaim Plaintiffs' roles in the public controversy.**

In Cottrell, the court quoted the definition of "germane" from Black's Law Dictionary 708 (8th ed. 2004): "relevant" and "pertinent." Cottrell, 2007 WL 1696564 at *28. The Cottrell Court went on to find that statements made by the NCAA in the penalty-summary report "were germane to the public controversy because a central issue of the public dispute was the nature of the penalties imposed by the NCAA against The University, its employees, and its representatives." Id. The Silvester Court found it to be "self-evident" that the allegedly defamatory statements were "germane to the plaintiffs' participation in the controversy" as "[t]he primary concern" of the statements was the "alleged corruption in the jai alai industry and the plaintiffs' role in it." Silvester, 839 F.2d at 1497.

Similarly, the July 22nd Articles and the allegedly similar statements are germane to the issue of the public controversy surrounding the SRP at ASU. The July 22nd Articles identified in the Counterclaim address budgetary and timing concerns, as well as the fact that ASU students would

be living in hotel rooms off-campus because the SRP had not been completed. Furthermore, the July 22nd Articles outlined both the issues surrounding the Counterclaim Plaintiffs' selection for the SRP and also addressed some of the issues in the instant lawsuit. Because the allegedly defamatory statements in the July 22nd Articles and, any similar statements, are germane to the public controversy surrounding the SRP, the statements meet the third and final prong of the limited-purpose public figure test.

2. **THE COUNTERCLAIM PLAINTIFFS HAVE FAILED TO SUFFICIENTLY ALLEGE IN THEIR COMPLAINT THAT THE ALLEGED DEFAMATION WAS COMMITTED WITH ACTUAL MALICE.**

In New York Times Co. v. Sullivan, the United States Supreme Court held that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that the defendant acted with "actual malice" in publishing the defamatory statement, or "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279-280 (1964). The Sullivan Court further held that in order to prevail, the plaintiff must prove this "actual malice" with "convincing clarity," 376 U.S. 285-286, or through "clear and convincing evidence" Cottrell, 2007 WL 1696564 at *31. A defendant acts with "reckless disregard" if, at the time of the publication, he or she "'entertained serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of . . . [its] probable falsity.'" Cottrell, 2007 WL 1696564 at *34 (quoting McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1508 (C.A.D.C. 1996)). "'The actual malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt.'" Cottrell, 2007 WL 1696564 at *34 (quoting McFarlane, 91 F.3d at 1508)). These Sullivan requirements have since been extended to libel suits brought by public figures as well as public officials. See, e.g., Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967).

Multiple courts across the country have applied the "actual malice" or Sullivan standard to non-media libel defendants. For example, in Barnett v. Mobile County Personnel Board the

Alabama Supreme Court applied the "actual malice" standard to a defamation claim by a former town clerk against the county personnel board, its director, and the town's mayor. 536 So. 2d 46, 47, 54 (Ala. 1988). In Woy v. Turner, the court held "that the non-media individual defendant could be accorded the rights provided in Sullivan" and that "[w]hether the standard is in fact applicable depends on whether the plaintiff is a public figure." 533 F. Supp. 102, 104 (N. D. Ga. 1981).

Because the Counterclaim Plaintiffs are limited-purpose public figures, the Sullivan or "actual malice" standard applies to the allegedly defamatory comments. The Counterclaim Plaintiffs fail to sufficiently allege in their Counterclaim any facts upon which to base the requisite "clear and convincing evidence of actual malice" on the part of Berry and Marous. The Counterclaim merely provides conclusory descriptions that the Counterclaim Defendants "falsely and maliciously accused the Counterclaim Plaintiffs" of various actions, without identifying the specific allegedly defamatory statements and without providing any evidence that the alleged publication was made with "actual malice." (Doc. 29, p. 2). Furthermore, there is nothing in either of the July 22nd articles that reflects a quote, letter, or reference to a prior discussion with Berry or Marous that refers to any of the four categories of statements (Id.) that the Counterclaim Plaintiffs allege Berry and Marous "falsely and maliciously" made.

The Counterclaim goes on to state that the Counterclaim Defendants "intentionally, recklessly, maliciously, and/or negligently published" the allegedly defamatory statements. Id. Again, the Counterclaim Plaintiffs make only conclusory allegations with no supporting factual assertions, fail to identify the specific statements contained within the July 22nd Articles which they allege are defamatory, and further fail sufficiently allege in their Counterclaim that Berry "entertained serious doubts as to the truth of their publication" or acted "with a high degree of awareness of the probable falsity" of the statements. Because the Counterclaim Plaintiffs have

9

failed to sufficiently allege in their Counterclaim that Berry acted with "actual malice" in allegedly publishing defamatory statements, the Counterclaim is due to be dismissed.

## CONCLUSION

Under the three-prong test adopted by the Eleventh Circuit, Counterclaim Plaintiffs TCU Consulting Services, LLC, W. Ken Upchurch, III, and Percy Thomas are properly classified as limited-purpose public figures. As limited-purpose public figures, the Counterclaim Plaintiffs fail to sufficiently allege in their Counterclaim that the allegedly defamatory statements were made with actual malice, and thus their claims must fail. Based on his Motion to Dismiss and this accompanying brief, Berry has demonstrated that the Counterclaim Plaintiffs have failed to state a claim upon which relief can be granted and furthermore can prove no set of facts in support of their claim which would entitle them to relief.

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Counterclaim Defendant Gil Berry respectfully requests that this Court grant his Motion to Dismiss the Counterclaim in this matter.

RESPECTFULLY SUBMITTED, this the 25th day of September 2007.

/s/ **KATHERINE R. BROWN**
AUGUSTA S. DOWD
STEVEN R. ARNOLD
JULIA S. ROTH
KATHERINE R. BROWN
Attorneys for Plaintiffs
Marous Brothers Construction, Inc. and Gil Berry

OF COUNSEL:
**WHITE ARNOLD ANDREWS & DOWD P.C.**
2025 Third Avenue North, Suite 600
Birmingham, Alabama 35203
Telephone: (205) 323-1888
Facsimile: (205) 323-8907
adowd@waadlaw.com
sarnold@waadlaw.com
jroth@waadlaw.com
kbrown@waadlaw.com

OF COUNSEL:
STANLEY J. MURPHY
Attorney for Plaintiffs
Marous Brothers Construction, Inc. and Gil Berry
**MURPHY & MURPHY LLC**
PO Box 3163
Tuscaloosa, AL 35403-3163
Telephone: (205) 349-1444
Facsimile: (205) 349-1445
murphyandmurphy@bellsouth.net

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on the following counsel of record via U.S. Mail and email on this the 25th day of September 2007.

J. Lister Hubbard
R. Brooke Lawson, III
Capell & Howard, P.C.
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama 36102-2069
jlh@chlaw.com
rbl@chlaw.com

Kenneth L. Thomas
Christopher K. Whitehead
Ramadanah M. Salaam-Jones
Thomas, Means, Gillis, & Seay, P.C.
Post Drawer 5058
3121 Zelda Court
Montgomery, Alabama 36103-5058
klthomas@tmgslaw.com
ckwhitehead@tmgslaw.com
rsjones@tmgslaw.com

/s/ **KATHERINE R. BROWN**
OF COUNSEL

# Montgomery Advertiser

EXHIBIT A

Estimated printed pages: 7

July 22, 2007
**Section:** NEWS
**Correction:** **THIS STORY MAY CONTAIN ERRORS -- PLEASE DO NOT USE ANY OF THE INFORMATION IN THIS STORY FOR RESEARCH PURPOSES**

### ASU lands in court over housing projects
*Josh Moon*

By Josh Moon
Alabama State University has spent $1.6 million on a campus housing project still in the bid stage and is looking at hefty legal and hotel bills connected with the work, which will be completed -- at best -- at least a year behind schedule.

University officials announced the renovation of six dilapidated dormitories nearly two years ago; so far, two of the buildings have been gutted. Plans used by the university last year to obtain financing show the same two dorms restored at this point.

Some of the students who would be living in those dormitories will stay at a hotel when they return for the fall semester in two weeks. The board of trustees is expected to approve a proposal to rent 100 hotel rooms at a meeting next month.

The university asserts it doesn't have a dollar figure for the hotel rooms because the contract isn't finalized. It's paying for the housing project with a $25 million bond it secured last year; that amount was guaranteed to cover everything from inside demolition work to new furniture.

Of the $25 million, more than $600,000 has gone to TCU Consulting Inc. for overseeing the project, now stuck in the bidding phase for more than six months. The rest of the $1.6 million was spent on architectural fees and gutting the two dorms.

TCU picked up the project after ASU fired the project's creators, Ohio-based Marous Brothers Construction and Pennsylvania developer Gil

Berry Associates. The university contended Marous Brothers and Berry inflated their fees and underestimated the project's total cost.

With TCU handling the project, the first bids came in three months ago at more than $13 million over the Marous Brothers-Berry budget. To attract lower bids, ASU pushed the completion date back six months and re-bid the project. Renovation work now won't begin until at least late next month. Even if completed on time, the first renovated dorm rooms will be more than a year behind the original timetable.

"It's not accurate to say that we're behind schedule and over budget," ASU spokeswoman Janel Bell said. "The project calendar was extended to address high bids. It's premature to say it's over budget."

The Montgomery Advertiser made numerous requests for a face-to-face interview with ASU President Joe Lee over the last month. Lee, through Bell, declined every request, citing pending litigation.

Marous Brothers Construction and Gil Berry are suing ASU for more than $600,000 in punitive damages, alleging fraud and breach of contract. Student Suites, one of the original partners on the project, elected not to join the suit. Berry and Marous Brothers claim ASU refused to pay for several months of planning and used their work to obtain financing.

The chairman of Gov. Bob Riley's commission overseeing historically black colleges and universities who helped ASU get the dorm project off the ground is struggling to understand the lack of progress.

"I can't tell you how much this saddens me," said Malcolm Thomas. "It's just pitiful that we don't know how to do business any better than this."

The beginning

In late 2005, Thomas helped ASU administrators find Berry, who has renovated dormitories at other colleges across the country. After a few conversations with ASU officials, Berry and another construction company, Student Suites Inc., provided the school with a rough draft of the renovation work and a preliminary cost analysis.

A few weeks later, the trustees authorized Berry and Student Suites to provide a detailed plan. It was at this point that Berry brought in Marous Brothers Construction, which has done high-ticket jobs including the $112 million renovation of the Books

Cadillac Hotel in Detroit.

A team from Marous came to Montgomery to assess the condition of the dorms and to lay out a step-by-step plan for the work to be done. At the request of Lee, the Marous team flew to Savannah State University in Georgia to review the design of SSU's new dormitories.

Marous submitted a 130-page booklet that detailed all of the renovations needed for all six buildings in May 2006. The booklet included architectural drawings of the buildings by floor, even by room. The timeline called for two dorms to be completed before the fall 2007 semester.

In June 2006, ASU obtained $42 million in Series 2006 bonds using the Marous Brothers-Berry-Student Suites plans. Based on a resolution passed by the trustees in November 2005, the project managers should have been paid for their work at that point.

"It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this resolution will become void with no expense to (ASU)," the resolution reads.

"We had no problem working in good faith to help them out, but nobody's going to work for free from now on," Berry said in a September interview.

Neither Berry, who said he had been reprimanded by his attorneys for saying too much in previous interviews, nor representatives from Marous Brothers would comment specifically about the ASU project. Attempts to reach Student Suites representatives were unsuccessful.

Working for free is exactly what ASU attorney Kenny Thomas says Berry and Marous Brothers agreed to do. The resolution, Thomas said, proves the school never agreed to pay for the preliminary work.

"They brought this resolution to us that said they would do all this upfront work for us for no charge," Thomas said. "We didn't ask them for that. They came to us with it."

Several e-mails obtained by the Montgomery Advertiser show at least one ASU trustee intended for Berry and Marous Brothers to be paid.

Berry and Freddie Gallot, ASU's vice president of fiscal affairs, exchanged e-mails in May 2006, just before ASU arranged its financing. In one, Berry discusses several invoices, totaling over $600,000, and states he has spoken with trustee Marvin Wiggins, who agreed the bill should be paid.

"The president called me and said, 'Gil, it would really help us out if you could wait until we get the financing,' " Berry said. "I told him that was fine, whatever would help the school out. But they knew we should be paid for this."

In addition, the work by Marous Brothers is referenced several times in the bond documents ASU submitted when requesting its financing. The project description is almost exactly what Marous Brothers submitted, including work being done on the same dorms and the same sort of renovation work being completed.

In an interview last fall, Berry said those documents prove he and Marous Brothers helped ASU obtain financing.

A slow go

So far, two dorms have been gutted and prepped for renovations -- a task that took less than a month -- and a second round of bid proposals have gone out.

The cheapest estimate from the first round came in at more than $2 million per dorm over budget. Total cost for the project at that price: more than $38 million.

"We've had to slow the process some, but I think we're OK," trustee Buford Crutcher said. "There have been some problems, but we're working through them."

Now charged with overseeing the project are Ken Upchurch and Percy Thomas, who make up TCU Consulting Inc., a Montgomery-based consulting firm formed less than two years ago.

ASU originally hired TCU to review the work by Berry and Marous Brothers. After the review, TCU recommended Lee remove Berry and Marous Brothers because of perceived inconsistencies in the cost estimates.

"Our people (TCU) took a look at the paperwork and realized that these dorms only cost $18.6 million (to renovate)," said Kenny Thomas. "So, where's the other $7 or $8 million coming from? We also found out that (Berry and Marous Brothers) couldn't do the job for $25 million. The actual cost would've been over $26 million. So, we would've been in litigation with them no matter what."

Documents sent by Berry and Marous Brothers to ASU officials explain the discrepancies. While the renovation work would cost less than the total, the difference is made up in the cost of furniture ($1.9 million), architectural fees ($1.4 million), Berry's fees ($2.4 million) and Marous Brothers' fees ($2 million).

Berry explained he and Marous Brothers couldn't complete the job for under $25 million because Upchurch sent him a list of changes and asked for a new estimate. A copy of that document shows numerous changes and additions.

"This guy sends us a letter asking to do things like take the (original air conditioner) boiler out of one of the buildings," Berry said after the trustees' September meeting, where he was removed from the project. "That was a $100,000 job right there. And it was worthless, because we weren't using that boiler. It was just gonna sit in the basement and do nothing. So, we give him the new estimate (with all the additional charges) and he then goes to them and tells them we can't do the job for what we say. It was all a big game."

Lee, the university president, accepted TCU's recommendation. He removed Berry and Marous Brothers and hired TCU.

"How's that for a conflict of interest -- the guys overseeing the job get the job?" Berry said outside the meeting. "I really hope people can see how wrong all of this is."

The last year

Under the Berry-Marous Brothers timeline, ASU would have two renovated dorms, a new dorm already housing students and two in the process of being restored.

As it is, though, trustees announced at a committee meeting last week that one window is in place. They also discussed housing students in hotel rooms for the second consecutive year and heard an update on the second round of bids.

"We're confident the process will work out," trustee Crutcher said. "Hindsight's 20-20 on a lot of things, but I feel certain we can get things handled properly and within budget. It might just take a little longer than expected."

The new bids should be in by the end of the month. If they're not lower, ASU might have to make sweeping changes to the plan or try to come up with more money.

The project managers already have made cost-cutting changes.

In an e-mail dated May 31, TCU's Tommy Lawrence asked the architects to make 41 modifications -- ranging from rehanging the old dorm room doors to using plastic PVC piping instead of steel for the fire sprinkler system.

Despite the cost-cutting efforts, the expenses continue. TCU is receiving more than $60,000 a month. The students tapped to live in the hotel rooms -- the number was 130 last year and could be the same this fall -- need security and transportation. Estimates aren't available, but ASU will have to hire additional security guards and extend university transportation off campus. Then, of course, there are the lawyers who have to be paid to handle the lawsuit from Berry and Marous Brothers.

Perahps the cost of the lawsuit isn't in dollar amounts but public embarrassment.

In court papers, Berry claims trustee Chairman Elton Dean and state Rep. John Knight were looking for kickbacks from the dorm project and Berry's refusal to provide them is what led to his removal from the project.

"It was a constant thing, every time I talked to (Dean)," Berry said. "And he kept asking me to call John Knight and work out how we're going to share this money. That's just not something I get involved with. I've got jobs worth $200 million. I'm making pretty decent money doing honest work. I don't need any extra and have to go to jail for it."

Dean has called the claims by Berry "lies." Upchurch and Percy Thomas, who Berry claimed provided Dean and Knight with the kickbacks they were after, also denied any wrongdoing.

Berry insists he regrets the project is languishing because he cares about the students.

"You know, had the school come to us and said there were problems, we would've worked with them," Berry said. "More than anything, I really wanted to help these people (at ASU) get a good deal and do something good for those kids."

Copyright (c) Montgomery Advertiser. All rights reserved. Reproduced with the permission of Gannett Co., Inc. by NewsBank, inc.

# Montgomery Advertiser

Estimated printed pages: 3

July 22, 2007
**Section:** NEWS
**Correction:** THIS STORY MAY CONTAIN ERRORS -- PLEASE DO NOT USE ANY INFORMATION IN THIS STORY FOR RESEARCH PURPOSES**

## TCU Consulting Services locally owned
*Josh Moon*

By Josh Moon
When the Montgomery County commissioners decided they needed a company to oversee construction of a $75 million jail, they interviewed at least three companies -- two that had more than 100 employees. They hired TCU Consulting Services.

When former Montgomery schools superintendent Carlinda Purcell went looking for a firm to manage the school district's $300 million construction plan, the list of candidates was long. She chose TCU Consulting Services.

When Alabama State University began its $25 million dorm project, it hired Pennsylvania developer Gil Berry to oversee the project. Then it fired Berry, who has everything from sports arenas to schools to office buildings on his resume. Now, TCU Consulting Services has the job.

TCU, started by a pair of Montgomery general contractors less than two years ago, has received nine local jobs worth more than $450 million -- all in the past 18 months.

"I don't want to say something stinks, but something stinks," Berry said minutes after he was removed from ASU's dorm project last September. "I've been doing this a long time and I don't think I've ever heard of a company doing this work for such a short period of time and being this successful."

In a lawsuit against ASU and TCU Services, Berry and his collaborator, Marous Brothers Construction, allege that TCU owners Ken Upchurch and Percy Thomas are giving kickbacks to some individuals associated with the jobs and that illegal activity played a major role in TCU landing the jobs. Upchurch and Thomas have denied those allegations.

"There's nothing illegal or corrupt happening here," Upchurch said. "We formed this company because we saw that there was a need in Montgomery for program managers and that need wasn't being met. No one else does this here. That's our pitch. We get a lot of attention when we say, 'You're using local dollars, you should hire local people.'"

Upchurch and Thomas have a staff of eight. They manage three jobs from ASU worth $51 million, five jobs from the Montgomery County Commission worth almost $100 million and the public schools project that should total well over $300 million when completed.

All the projects have an ASU connection. Elton Dean serves on the university's board of trustees and is vice chairman of the Montgomery County Commission. State Rep. John Knight is head of communications at ASU and was a staunch defender of Purcell when she was fighting the school board last year.

"I don't think it's hard to figure out what's happening," Berry said. "The only big-time jobs (TCU) has gotten has been connected to these same people."

Upchurch points out TCU received its first few jobs because it made the lowest bid and was the only local company. After that, he said, those two factors plus the experience of working on high-dollar jobs landed the other work.

"When you're talking about the County Commission, you've got an entire board there who are voting on us and we were approved unanimously, I believe," Upchurch said. "No one from ASU had anything to do with the Montgomery schools job. I think on some of these jobs they were pleased with the way we handled things the first time so they came back to us."

In the lawsuit, Berry cites specific incidents in which he was asked for money, and even offers documentation to back up his claims. Marous Brothers Construction claims in a letter forwarded to Gov. Bob Riley's office that Upchurch lied repeatedly to get Marous Brothers and Berry removed from the job.

Dated Sept. 27, 2006, the letter from Marous Brothers' Arne Goldman states Upchurch -- who as an owner representative was reviewing the proposals from Marous and Berry for ASU -- intentionally misrepresented how much the job would cost, made last-minute requests for changes to drive up the price and never indicated to Marous and Berry that there were problems.

"Mr. Upchurch assured me that he was 'entirely comfortable' with the information we provided," Goldman wrote. "If the information was not properly presented (to ASU officials) exactly as (Marous Brothers) prepared it, then there is a whole different problem concerning ethics that needs to be, and will be, addressed by us in short order."

Upchurch declined to comment directly on the lawsuit but pointed out the lawsuit presents only one side of the story. He wants the public to be patient and reserve judgment until TCU presents its side.

"I think it would be a shame for one lawsuit like this to damage over 30 years of work that me and my partner have done in this town," he said. "There's an explanation out there and we'll be happy to share it when the time is right."

Copyright (c) Montgomery Advertiser. All rights reserved. Reproduced with the permission of Gannett Co., Inc. by NewsBank, inc.