IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MAROUS BROTHERS CONSTRUCTION, L.L.C., a corporation, and GIL BERRY, an individual and d/b/a GIL BERRY & ASSOCIATES, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| ALABAMA STATE UNIVERSITY; W. KEN UPCHURCH III; PERCY THOMAS; TCU CONSULTING SERVICES, L.L.C.; JOE A. LEE, Individually and in his official capacity as President of Alabama State University; ELTON N. DEAN, SR., individually and in his official capacity as Chairman of the Board of Trustees of Alabama State University, | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:07-CV-00384-ID-CSC |
| Defendants. | ) ) | |

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Defendants/Counterclaim Plaintiffs TCU Consulting Services, LLC ("TCU"), W. Ken Upchurch III ("Upchurch"), and Percy Thomas ("Thomas") oppose Plaintiffs/Counterclaim Defendants Gil Berry, d/b/a Gil Berry & Associates ("Berry"), and Marous Brothers Construction, LLC's ("Marous") motions to dismiss as follows:

### BACKGROUND FACTS

1.     In 2005, a study was conducted by defendant Alabama State University ("ASU") regarding the feasibility and cost of renovating six student housing buildings on its campus (the "Project"). (*See* Plaintiffs' Complaint, ¶ 11).[1]

---

[1] Counterclaim Plaintiffs accept as true the referenced allegations of Plaintiffs' Complaint only for the limited purpose of responding to their motions to dismiss and do not waive any of the denials, demands for proof or other affirmative defenses previously raised in their Answers.

2.      Berry contacted ASU about the services he could provide as a developer specializing in the design, construction, renovation, and financing of student housing such as that found at ASU.  (*See* Answer of President Joe A. Lee and Chairman Elton N. Dean, Sr., p. 2).

3.      On November 15, 2005, the ASU Trustees Property Committee passed a resolution allowing Berry (and his partner, Student Suites, Inc.) to put together a proposal for the dorm renovation project.  The resolution stated that its terms would become null and void and that no money would be owed by ASU to Berry if a final agreement between ASU and Berry was not reached.  (*See* Complaint, ¶ 13; Answer of President Joe A. Lee and Chairman Elton N. Dean, Sr., p. 2).

4.      Thereafter, Berry hired Marous to document existing conditions, prepare design documents, and outline the intended scope of the Project.  (*See* Complaint, ¶ 14).  It was expected that Marous would serve as Construction Manager for the Project if ASU eventually accepted their proposal.

5.      In May 2006, Berry and Marous submitted a proposal to ASU for review (the "proposal").  (*See* Complaint, ¶ 15).

6.      In late July 2006, ASU retained TCU to serve as an owner's representative to assist it with reviewing the proposal submitted by Berry and Marous.  As part of its agreement with ASU, TCU also served as the owner's representative on other projects owned by ASU, including the New Education Building project and the Student Union Facility project.

7.      TCU reviewed the proposal and had several discussions with representatives of Marous regarding the fees and costs included in it.  Marous provided TCU with a summary of the fees that would be earned by Marous and Berry should their proposal for the Project be

accepted.  The analysis of those fees prepared by TCU for ASU contained the exact figures provided by Marous to TCU.  TCU did not alter, change, modify or even comment on the reasonableness of the fees that Marous and Berry would earn.

8.      On September 21, 2006, TCU informed ASU that it was of the opinion that the proposal met each of ASU's five criteria for the Project.  (*See* Exhibit "A").  The decision of whether or not to hire Berry and Marous was left entirely to ASU.

9.      On September 22, 2006, the Board of Trustees of ASU met to consider and vote upon Berry and Marous' proposal for the Project.   Upon the recommendation of President Joe A. Lee, the ASU Trustees decided not to accept their proposal or enter into a contract with Berry or Marous.   President Lee also recommended to the Board that ASU pursue a more traditional approach of procurement for the Project, which the Board voted to accept.

10.     After electing not to accept Berry and Marous' proposal, ASU decided to modify the dorm renovation project.  Berry and Marous' proposal called for "suite-style" housing units.  ASU's revised plans called for true dormitory suites with living and restroom facilities between two bedrooms.  Other changes or modifications were made to the Project by ASU.

11.     On or about June 1, 2007, asbestos abatement and demolition was completed on the Project.  On or about April 30, 2007, a Notice to Proceed was issued to Champion Construction to replace the windows in the ASU dormitories.  That work was scheduled for completion on October 8, 2007.  On or about October 1, 2007, a Notice to Proceed was issued to the low bidder, Rabren Construction, for the general construction of the Project.   The scheduled completion date for the Project is July 31, 2008.

**ARGUMENT**

**I.      Standard of Review**

Dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure is proper only if it is "clear that no relief could be granted under ***any*** set of facts that could be proved consistent with the allegations." Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994) (emphasis added). Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff or non-movant. Gorman v. Roberts, 909 F. Supp. 1493, 1496 (M.D. Ala. 1995). On a Rule 12(b)(6) motion to dismiss, the movant "sustains a very high burden," Jackam v. Hospital Corp. of America Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986), whereas the threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. See Ancata v. Prison Health Svcs., Inc., 769 F.2d 700, 703 (11th Cir. 1985). "[M]otions to dismiss for failure to state a claim should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims." Jackam, 800 F.2d at 1579.

In the present case, Berry and Marous failed to meet the very high burden required to dismiss a complaint under Rule 12(b)(6), and, accordingly, their respective motions to dismiss should be denied.

**II.      TCU, Upchurch, and Thomas Are Not Limited-Purpose Public Figures.**

Plaintiffs in defamation cases can be characterized as either (i) public officials or public figures, (ii) limited purpose public figures, or (iii) private individuals. A limited purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a

4

particular public controversy and thereby becomes a public figure for a limited range of issues." <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974).

In <u>Silvester v. American Broadcasting Co. Inc.</u>, 839 F.2d 1491 (11th Cir. 1988), the Eleventh Circuit adopted a three part test to determine if a plaintiff is a limited purpose public figure. Under the court's test, a court must (1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. <u>Silvester</u>, 839 F.2d at 1494. The United States Supreme Court provided that it is the "nature and extent" of an individual's involvement in a public controversy, i.e., the extent to which the individual's participation is voluntary, the extent to which the individual has access to the media to counteract the false statements, and the prominence of the individual's role in the public controversy, that determines whether an individual is a limited-purpose public figure. <u>Gertz</u>, 418 U.S. at 344-345. In other words, it is the plaintiff's role in the controversy, not the controversy itself, which determines whether a person is a limited-purpose public figure with regard to the alleged defamatory statements. See <u>Gertz</u>, 418 U.S. at 352 (attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive extensive media exposure); <u>Hutchinson v. Proxmire</u>, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) (scientist's applications for and receipt of federal grants and publications in journals did not elevate him to public figure status); <u>Wolston v. Reader's Digest Ass'n</u>, 443 U.S. 157, 168, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (individual did not use contempt citation "as a fulcrum to create public discussion" or arouse public sentiment).

**A.    The Controversy at Issue is not a Public Controversy.**

A public controversy or dispute is not one that is simply a matter of interest to the public or newsworthy, and a "private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention". Wolston, 443 U.S. at 167.   It must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.   Waldbaum v. Fairchild Pub., Inc., 627 F.2d 1287, 1296 (D.C.Cir. 1980).

Berry and Marous claim that ASU's decision not to hire them to renovate the six dormitory buildings on its campus is a public controversy, the outcome of which impacts the general public.   According to Berry and Marous, the "ramifications of this dispute are being felt by" an unknown number of ASU students who are living off-campus in hotels but who would allegedly be living in newly renovated dorms if only Berry and Marous' proposal for the Project had been accepted.

Berry and Marous' argument is not persuasive.   A dispute is not a matter of public concern unless there are "foreseeable and **substantial** ramifications for nonparticipants." Waldbaum, 627 F.2d at 1296-97 (emphasis added).   Berry and Marous offer no evidence of what the "substantial ramifications" are for the ASU students allegedly living in hotels, and there is no evidence that the students themselves are concerned with the living arrangements provided by ASU. [2]

Berry and Marous also claim a public controversy exists because the overall cost of the Project is now greater than the cost included in their proposal, a burden which they claim

---

[2] In fact, a number of ASU students lived in hotels during the 2006-07 academic year, well before the present dispute, because of increased and late student enrollment.  With dormitories being taken "off-line" for renovations, there would have been students living in hotels this school year whether or not ASU entered into a contract with Berry and Marous for the Project.

the Alabama taxpayers must bear.[3]  A general concern about public expenditures is not sufficient to create a public controversy for the purpose of making TCU, Upchurch or Thomas a limited-purpose public figure.  Hutchinson, 443 U.S. at 135.  If it were, everyone who received or benefited from public services or funds or who was employed by a governmental agency could be classified as a public figure – a conclusion the United States Supreme Court has rejected.  See Time, Inc. v. Firestone, 424 U.S. 448, 456, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); see also, Hutchinson, 443 U.S. at 135.  Berry and Marous' alleged concern about the well-being of ASU students and Alabama taxpayers does not transform this dispute into a public controversy. [4]

The dispute at issue in this case is really nothing more than a private dispute between Berry and Marous on the one hand and ASU and TCU on the other hand.  Berry and Marous assert claims for breach of contract, fraud, conversion, and loss of business opportunity for which they seek monetary damages and the return of their work product.  They do not seek injunctive or equitable relief on behalf of ASU students or Alabama taxpayers or an order setting aside any of the contracts related to the Project.  Thus, even if a judgment were entered in favor of Berry and Marous in this lawsuit, the ASU students currently living in hotels would not be moved into on-campus dormitories, the completion date of the Project would not be moved up, and there would be no refund for the taxpayers of Alabama.  Berry is a private individual and Marous a private company attempting to collect money they claim is owed for work on a project that happens to be owned by a public university.  To be "public", the dispute must affect more than its immediate participants.  Marcone v. Penthouse Int'l

---

[3] The cost has increased because the scope of the Project has changed significantly from what was proposed by Berry and Marous.

[4] Their altruistic concern for Alabama taxpayers is curious, given that Berry is a citizen of the State of Pennsylvania and Marous is a limited liability company organized under the laws of the State of Ohio.

Magazine for Men, 754 F.2d 1072, 1083 (3rd Cir. 1985).  In this case, only Berry and Marous

would feel the impact of the resolution of the dispute.

Berry and Marous also claim "[t]he very newspaper articles cited by the Counterclaim

Plaintiffs show that the issue was being debated publicly . . ." In determining whether a public

controversy exists, "[t]he court can see if the press was covering the debate, reporting what

people were saying and uncovering facts and theories to help the public formulate some

judgment," though a general concern or interest will not suffice.  Waldbaum, 627 F.2d at

1296-1298 (citations omitted); see also Cottrell v. National Collegiate Athletic Assoc., 2007

WL 1696564 (Ala. June 1, 2007) (public discussion of risk that University of Alabama

football program was facing potential termination was "rampant").

The alleged "public debate" in this case started only *after* Berry and Marous made

their outrageous and defamatory statements about TCU, Upchurch, and Thomas to *The

Montgomery Advertiser*.  There was no press coverage, public debate or discussion, or public

protest about the alleged public controversy before Berry and Marous defamed TCU,

Upchurch, and Thomas.   "The public controversy must have *preexisted* the alleged

defamation."  See Little v. Breland, 93 F.3d 755, 757 (11th Cir. 1996) (emphasis added).

TCU, Upchurch, and Thomas were first brought to public attention by the very defamation

that is the subject of their counterclaim.  "Clearly, those charged with defamation cannot, by

their own conduct, create their own defense by making the claimant a public figure."

Hutchinson, 443 U.S. at 134-135.   Absent the existence of a *pre-defamation* public

controversy, TCU, Upchurch, and Thomas cannot be considered limited-purpose public

figures.  Hutchinson, 443 U.S. at 134-136; Wolston, 443 U.S. at 167-168; Lundell Manuf.

Co., Inc. v. American Broadcasting Co., Inc., 98 F.3d 351, 363-64 (8th Cir. 1996); Silvester, 839 F.2d at 1496; Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 688 (4th Cir. 1989).

Berry and Marous clearly fail to satisfy the first prong of the test for determining whether TCU, Upchurch, and Thomas are limited-purpose public figures, namely, that a public controversy exists. Their defamatory statements relate to the conduct of TCU, Upchurch, and Thomas' business affairs and are private in nature; thus, the heightened evidentiary requirements for public figures required by Gertz do not apply and their motions to dismiss should be denied. See Gertz, 418 U.S. at 340 ("there is no constitutional value in false statements of fact"); see also New York Times Co. v. Sullivan, 376 U.S. 254, 301-302, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (Goldberg, J., concurring) ("the balance should be struck in favor of the private plaintiff where his reputation has been injured by a non-media defendant in a purely private context").

### B.    The Counterclaim Plaintiffs Did Not Voluntarily Inject Themselves into a Public Controversy.

Should a court determine that a public controversy exists, it must still examine the defamation plaintiff's involvement or role in the controversy before the plaintiff can be characterized as a limited-purpose public figure. "Trivial or tangential participation is not enough . . . [P]laintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution." Waldbaum, 627 F.2d at 1297. The plaintiff either "(1) must purposely [try] to influence the outcome of the public controversy, or (2) could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." Silvester, 839 F.2d at 1496 (quoting Waldbaum, 627 F.2d at 1297).

Berry and Marous claim TCU, Upchurch, and Thomas are "deeply involved" with the Project and have been since TCU was retained to serve as the owner's representative on the

Project.  At the time TCU was retained by ASU, however, there was no dispute, public or otherwise.  In fact, Berry and Marous welcomed TCU's involvement and approved TCU's reviewing the proposal, as evidenced by email correspondence from Berry to ASU (attached hereto as Exhibit "B").

Berry and Marous also claim TCU, Upchurch, and Thomas' position as owner's representative gave them the "opportunity to impact the resolution of the SRP controversy". However, Berry and Marous present no evidence of how TCU, Upchurch or Thomas took advantage of such opportunity to impact the public controversy as they define it in their motions to dismiss.  TCU was hired to assist ASU in reviewing Berry and Marous' proposal for the Project, but TCU did not have the authority to accept or reject Berry's proposal or to enter into contracts with others for renovations to the ASU dormitories.  That decision was left to the discretion of ASU's Board of Trustees, a fact admitted by Berry and Marous in their Complaint!  (*See* Complaint, ¶ 32).

Berry and Marous further claim TCU, Upchurch, and Thomas' involvement "deepened in September 2006, when they began providing the very development and construction management services for the [Project] that were to have been provided by Marous and Berry."  ASU hired TCU to serve as an owner's representative to assist it with reviewing the proposal submitted by Berry and Marous and to assist it in implement several projects, one of which includes the dorm renovation project.  TCU's role differs significantly from Berry's proposal to be the "developer" for the Project and Marous' proposal to be Construction Manager.  In fact, TCU's agreement expressly provides that TCU will "not in any respect serve as a Construction Manager" for the Project.  Berry and Marous' complaint

that TCU is allegedly providing the same services that Berry and Marous proposed to provide

ASU further highlights the fact that this is nothing more than a private dispute.

Finally, Berry and Marous claim TCU, Upchurch, and Thomas' participation in the

alleged dispute goes beyond the "trivial or tangential" based upon TCU having "solicit[ed]

contracts and jobs that involve public funds", including the new Montgomery County

detention facility and the Montgomery County Board of Education's school construction

projects.  Exactly how other, unrelated projects not owned by ASU have anything to do with

the present dispute is not explained, and there is certainly no evidence presented that either of

those jobs attracted any media coverage of their own.  Work on public projects involving

public funds does not make a private company or individual a public figure.  Hutchinson, 443

U.S. at 135.

According to Berry and Marous, the alleged "public controversy" is that ASU students

are living in off-campus hotels and that the Project will cost Alabama taxpayers more than

originally proposed.  TCU, Upchurch, and Thomas "at no time assumed any role of public

prominence in the broad question of concern about expenditures."  See Hutchinson, 443 U.S.

at 135.  There is no evidence that TCU, Upchurch, or Thomas "thrust themselves to the

forefront" of the alleged public dispute, that they tried to influence the outcome of the alleged

dispute or sway public opinion in their favor by holding press conferences, or that they had

"regular and continuing access to the media" so as to impact resolution of the dispute.

Hutchinson, 443 U.S. at 135 (merely answering alleged defamation is not "trying to influence

the outcome" of a controversy); Firestone, 424 U.S. at 457 (individual does not forfeit

protections against defamation accorded private persons simply because he is forced to

respond publicly to defamatory statement itself); Lundell, 98 F.3d at 364 ("it is the plaintiff's

role in the controversy, not the controversy itself, that is determinative of pubic figure status"); Wolston, 443 U.S. at 168 (plaintiff who "did not in any way seek to arouse public sentiment in his favor" not limited-purpose public figure).    Berry and Marous' entire argument can be characterized as "sour grapes" over ASU's decision to not accept their proposal for the Project, which is nothing more than a private dispute, the outcome of which will not impact ASU students or Alabama taxpayers in any discernable way.[5]

### C.    The Defamatory Statements Made by Berry and Marous were not Germane to TCU, Upchurch, and Thomas' Role in the Alleged Public Controversy.

Berry and Marous claim "the July 22nd Articles and the allegedly similar statements are germane to the issue of the public controversy surrounding the SRP at ASU", but they fail to explain exactly how the *defamatory statements* are germane to the alleged public

---

[5] The cases cited by Berry and Marous in support of their claim that TCU, Upchurch, and Thomas voluntarily injected themselves into a public controversy are easily distinguished. In Waldbaum, the plaintiff held press conferences and there were articles written about the dispute prior to the defamation. The plaintiff was considered an "activist" by the court. 627 F.2d at 1298-1300. In Oaks v. City of Fairhope, 515 F. Supp. 1004, 1026 (S.D. Ala. 1981), the court found that the plaintiff had "maintained her status as a prominent news figure due, in large part, to her own actions", which included numerous newspaper and magazine articles about her, giving speeches before various associations, and writing her own columns about the incident. Berry and Marous admit in their own parenthetical that the Oaks plaintiff voluntarily injected herself into a controversy by "presenting her case in press", an allegation they do not make with respect to TCU, Upchurch or Thomas. In Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F. Supp. 158 (D. Me. 2007), the court found the plaintiff to be a public *official*. It also found the plaintiff's frequent use of and access to the media made him a limited-purpose public figure. Berry and Marous do not claim TCU, Upchurch, and Thomas were public officials or that they have unfettered access to the media. As Fiacco itself makes clear, media access as a result of this litigation cannot serve to make TCU, Upchurch, or Thomas limited-purpose public figures. Fiacco, 484 F. Supp. 2d at 169. Finally, in Greenbelt Co-op Pub. Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), the Supreme Court found that *prior to* the defamatory statements, there was widespread public debate, controversy, and news coverage concerning the plaintiff. The type of statement made by the defendant was considered mere "hyperbole" and rhetoric, which the Court concluded would not be perceived as actually alleging the commission of a criminal offense. Bresler, 398 U.S. at 14. In the present case, as noted above, there was no pre-defamation public debate, controversy or news coverage, and there is no mistaking an allegation of illegal kickbacks as anything other than the commission of a criminal offense.

controversy. It is defamatory statements themselves, not the newspaper articles, which must be germane to the alleged public controversy.

Berry and Marous' statements about TCU, Upchurch, and Thomas focus on their honesty and personal integrity. The "public controversy" as defined by Berry and Marous does not concern the character or integrity of TCU, Upchurch or Thomas. Their honesty and integrity do not give rise to the type of issues contemplated by Gertz as being sufficiently "public" to justify deeming them limited-purpose public figures. See Cottrell, 2007 WL 1696564 at p. 21.[6] Even if there is a public controversy surrounding ASU students living in hotels or a project that is more expensive than originally considered, Berry and Marous' accusation that TCU, Upchurch, and Thomas provided illegal kickbacks and are otherwise dishonest is way outside the scope of that controversy. See Roffman v. Trump, 754 F. Supp. 411 (E.D. Pa. 1990). The defamatory statements made by Berry and Marous were made in retaliation for ASU having rejected their proposal, which they blame in part on TCU, Upchurch, and Thomas, and are in no way related to the alleged public controversy. A private individual is not deemed a limited-purpose public figure for purposes of defamation actions that are based on statements that do not relate to the public issue in which the plaintiff became involved. See Marcone, 754 F.2d 1072.

Berry and Marous fail to establish the third prong of the test for making a private individual a limited-purpose public figure in a defamation suit. Thus, their motions to dismiss should be denied.

---

[6] Berry and Marous assert in their briefs that "[t]he Cottrell Court went on to find that statements made by the NCAA in the penalty-summary report "were germane to the public controversy". What they fail to mention to this Court, however, is the fact that there was more than one defendant in Cottrell and that the Alabama Supreme Court found that defamatory statements made by the other defendant regarding Cottrell's character and integrity were *not* germane to the public controversy at issue. See Cottrell, 2007 WL 1696564 at pp. 21 and 29.

## CONCLUSION

Plaintiffs Gil Berry and Marous Brothers Construction, LLC failed to sustain the very high burden necessary for dismissal under Fed.R.Civ.P. 12(b)(6). The dispute at issue in this case is a private dispute between a private individual and company on the one hand and a public university on the other hand involving alleged unpaid contract sums. There is no "public" dispute which affects the general public in some appreciable way. Moreover, TCU, Upchurch, and Thomas did not "thrust themselves" into the alleged public dispute to try to affect the outcome of such dispute. TCU merely served as owner's representative to assist and advise ASU in implementing its goal of renovating six student dormitories. Finally, the defamatory statements made by Berry and Marous about the honesty and integrity of TCU, Upchurch, and Thomas are not germane or related in any way to the public dispute as defined by Berry and Marous. TCU, Upchurch, and Thomas are not limited-purpose public figures and no showing or allegation of actual malice in their counterclaim is required. Thus, Berry and Marous' motions to dismiss should be denied.

/s/          R. Brooke Lawson III
**J. LISTER HUBBARD (HUB007)**
**R. BROOKE LAWSON III (LAW026)**

Attorneys for Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama 36102-2069
334/241-8000

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the following was served on the following by electronic filing, on this the 15th day of October, 2007:

Augusta S. Dowd, Esq.
Katherine R. Brown, Esq.
White Arnold Andrews & Dowd, P.C.
2025 Third Avenue North, Suite 600
Birmingham, Alabama 35203

Kenneth L. Thomas, Esq.
Christopher K. Whitehead, Esq.
Ramadanah M. Salaam-Jones, Esq.
Thomas, Means, Gillis & Seay, P.C.
P.O. Drawer 5058
Montgomery, Alabama 36103-5058

Stanley J. Murphy, Esq.
Murphy & Murphy, LLC
P.O. Box 3163
Tuscaloosa, Alabama 35403-3163

/s/            R. Brooke Lawson III
Of Counsel

Ken

| From: | Ken [wkuiii@wkupchurch.com] |
| Sent: | Thursday, September 21, 2006 7:22 AM |
| To: | Joe Lee (E-mail); Kenneth Thomas (E-mail) |
| Cc: | Percy Thomas (E-mail) |
| Subject: | ASU Dorms |



**EXHIBIT**

**A**

Dr Lee:

After reflecting on Gil Berry's e-mail of yesterday, I thought it might be helpful in your decision making process concerning the Dorm issue if I summarized my thoughts for you.

As I have previously stated, a deal:
1) in the $26,0000,000 (+/-) range that provides the University with the scope of work that it wants,
2) with a Maximum Not to Exceed guarantee,
3) with proper financial security from the developer,
4) with protection against late completion (i.e. a liquidated damages provision),
5) that complies with the Alabama competitive bid,

is what the University should be working toward.

The Development Agreement, as modified by negotiations, in my opinion meets the five criteria noted above as follows:
1) the cost of the deal is now some where between $25.6M and $27M, depending on the final scope of work that ASU requires. See my Memo dated September 19, 2006 of project cost analysis. This cost is down from the $27.5M - $30M estimated cost noted in our August 15, 2006 report
2) the developer is still offering a Maximum Not to Exceed guarantee
3) Gil Berry's offer for the University to hold $1,000,000 (approximately 50%) of his fee until the University is satisfied is probably the best financial security the University could expect. Based on the e-mail, the University could theoretically hold the $1M until the completion of all of the work. This is in addition to the requirement that all trade contractors be bonded.
4) there is now a liquidated damages clause in the development agreement (the cost/per day and time schedule has not been agreed to) that will require some final negotiations.
5) after numerous discussions with Marous, they clearly understand and are willing to comply with the AL competitive bid law requirements.

Also, as a part of my negotiations with Arne Goldman of Marous, he has agreed that the $1,445,945.00 of CM General Conditions/Reimbursable be fixed at a guaranteed not to exceed amount, with the expenditures from this account to be monitored monthly and approved by the Owner's Representative for payment. We have also agreed that any expenditures of the $765,000.00 construction contingency receive approval of the Owner's Representative prior to the expenditure of funds from this account.

These agreements will have to be formalized in the Development Agreement but should provide ASU an additional level of oversight to control the expenses on this project. Remember the project must be cost certified upon completion by an independent auditor and that all savings revert back to ASU.

The remaining concern that I have previously stated is the ability of Marous to attract a competitive number of quality trade contractors to bid on the various bid packages on the projects. I have discussed this concern on several occasions with Marous and they are fully aware of the issue. They feel confident, based on their work on similar projects in other states, that they can overcome this very real potential problem. As the Owner's Rep, we have agreed to help Marous recruit and pre-qualify trade contractors for the project to attempt to mitigate this issue. The developer's MNEP, the financial security, including trade contractor bonds and the liquidated damages provision give ASU protection against this concern.

Finally, I know that this is a difficult decision given the politics and personalities that have surrounded this issue. Your leadership has taken a proposal that was originally not a good deal for ASU to the point that your decision can go literally go either way, depending on your comfort level. Percy and I are prepared to defend your decision and to work for you to make the dorm projects a success regardless of the way that you chose to proceed.

If you have any questions, let me know.

**TCU-00045**

**From:** gil berry
**To:** Thomas, Kenneth; Dr.Charles Smith; Freddie Gallot Jr.; John Chambless; Leon Frazier; Marvin Wayne Wiggins; President Lee; Wyatt Haskell
**Date:** Saturday, July 29, 2006 9:18:30 AM
**Cc:** Arne Goldman; Dick Davis
**Subject:** Re: Proprietary Information Review

Good Morning Kenny,

I have no problem with Ken and Percy assisting the President with reviewing the scope of work that the Development Team will be performing for ASU. This falls under professional services, which was voted on by the board, and does not fall under any bid process. Again, I have no objections to Ken and Percy reviewing the scope of work outlined by MBC with President Lee.

I would also like to suggest that you, President Lee, Ken, and Percy use the following link www.marousbrothers.com and review the long list of major projects and wide scope of construction management services provided by MBC. They are one of Ohio's largest Construction Manager/ General Contractors and have won numerous awards including the Prestigious Award for Who's Who Worldwide. They have received their general contracting license in the state of Alabama, scoring extremely high on the exam. With their large bonding capacity they can bid any size job there in the state of Alabama. I would match their credentials against anyone.

If you have any further questions please aways feel free to reach me on my cell phone.

Sincerely,

Gil


Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, Pa., 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com



----- Original Message ----
From: "Thomas, Kenneth" <KLThomas@tmgslaw.com>
To: gil berry <gilberry@verizon.net>; Dr.Charles Smith <charlessmith@alasu.edu>; Freddie Gallot Jr. <fgallot@alasu.edu>; John Chambless <jchambless@brownchambless.com>; Leon Frazier <frazier@alasu.edu>; Marvin Wayne Wiggins <marvin.wiggins@alacourt.gov>; President Lee <leejo@alasu.edu>; Wyatt Haskell <wrh@hsy.com>
Cc: Arne Goldman <agoldman@marousbrothers.com>; Dick Davis <davis@discoverynet.com>
http://us.f842.mail.yahoo.com/dc/launch?action=welcome&YY=897441817&.rand=8mrj0g...   3/9/2007

CONFIDENTIAL      GBA 000634

Sent: Friday, July 28, 2006 7:04:57 PM
Subject: RE: Proprietary Information Review

Gill: This e-mail will further confirm our telephone conference this evening during which I advised you that President Lee has engaged W. Ken Upchurch and Percy Thomas, TCU Consultant Service LLC, to assist him as a part of his due diligence/review of the documents and the Development Agreement provided by SSGBA. You informed me that you had no objection to the President moving forward as planned. If I have failed to accurately state our understanding and your approval, please advise immediately. Thanks. KLT

**From:** gil berry [mailto:gilberry@verizon.net]
**Sent:** Friday, July 28, 2006 2:52 PM
**To:** Thomas, Kenneth ; Dr.Charles Smith; Freddie Gallot Jr.; John Chambless; Leon Frazier; Marvin Wayne Wiggins; President Lee; Wyatt Haskell
**Cc:** Arne Goldman; Dick Davis
**Subject:** Re: Proprietary Information Review

Kenny,

If it is not a Program Manager that is reviewing our documents I would like you to supply me with a list of who is reviewing the documents, as well as what company they may be working for or with, and what their affiliation is with the University. I also would like to ensure that our documents are being reviewed there at the University.

I look forward to working with you and the administration on this project. If there are any questions that you, the administration, or the board may have please feel free to contact me or any member of the development team.

Sincerely,

Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills , Pa. , 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com


----- Original Message ----
From: " Thomas, Kenneth " <KLThomas@tmgslaw.com>
To: gilberry@verizon.net; buford@jbladi.com; charlessmith@alasu.edu; fgallot@alasu.edu; jchambless@brownchambless.com; frazier@alasu.edu; marvin.wiggins@alacourt.gov; leejo@alasu.edu; wrh@hsy.com
Cc: agoldman@marousbrothers.com; davis@discoverynet.com
Sent: Friday, July 28, 2006 12:06:43 PM
Subject: Re: Proprietary Information Review

Gill: I am headed to my meeting with the President to further discuss your earlier e-mail and brief him

http://us.f842.mail.yahoo.com/dc/launch?action=welcome&YY=897441817&.rand=8mrj0g...   3/9/2007

CONFIDENTIAL    GBA 000635

on our telephone conference. At no time during our discussion did I say or represent to you that the University had hired a program manager for this proposed project. The reference to a program/progect manager was illustrative of the types of consultants that could review the documents in light of your e-mail. As I stated to you, once I have consulted with the President I will advise you accordingly of the University's response to the e-mail. Thanks. KLT

--------------------------

Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: gil berry <gilberry@verizon.net>
To: Buford Crutcher <buford@jbladi.com>; Dr.Charles Smith <charlessmith@alasu.edu>; Freddie Gallot Jr. <fgallot@alasu.edu>; John Chambless <jchambless@brownchambless.com>; Thomas, Kenneth <KLThomas@tmgslaw.com>; Leon Frazier <frazier@alasu.edu>; Marvin Wayne Wiggins <marvin.wiggins@alacourt.gov>; President Lee <leejo@alasu.edu>; Wyatt Haskell <wrh@hsy.com>
CC: Arne Goldman <agoldman@marousbrothers.com>; Dick Davis <davis@discoverynet.com>
Sent: Fri Jul 28 10:33:17 2006
Subject: Proprietary Information Review

Good Afternoon Gentlemen:

I have spoken with Attorney Kenny Thomas, and assured him that the development team and I have no problem with the University reviewing the scope of work, and other documents left in their possession in order to allow them due diligence. Again, the development team and I are giving permission to Alabama State University, or those affiliated with the University, to review all documents in their possession pertaining to the renovation project, allowing them due diligence. We welcome the Program Manager on board and look forward to his input.

Sincerely,

Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills , Pa. , 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com

CONFIDENTIAL        GBA 000636