**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **MAROUS BROTHERS CONSTRUCTION, L.L.C., a corporation, and GIL BERRY, an individual and d/b/a GIL BERRY & ASSOCIATES,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **ALABAMA STATE UNIVERSITY, a public corporation; W. KEN UPCHURCH III, an individual; PERCY THOMAS, an individual; TCU CONSULTING SERVICES, L.L.C., a corporation; JOE A. LEE, individually and in his official capacity as President of Alabama State University; ELTON N. DEAN, SR., individually and in his official capacity as Chairman of the Board of Trustees of Alabama State University,** | ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 2:07-CV-00384-ID-CSC** |
| **Defendants.** | ) ) ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AS TO PLAINTIFF MAROUS BROTHERS CONSTRUCTION'S
COMPLAINT and IN SUPPORT OF MOTION FOR FEES AND COSTS**

Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas (collectively "Defendants") submit the following brief in support of their motion for summary judgment on all claims asserted against them by Plaintiff Marous Brothers Construction, LLC ("Marous") in its First Amended Complaint (hereinafter the "Complaint") and their motion for fees and costs, filed contemporaneously herewith.

**I.    STATEMENT OF UNDISPUTED FACTS**

1.    In 2005, defendant Alabama State University ("ASU") decided to study the possibility of renovating six of its student housing buildings. (Complaint, Doc. # 59, ¶ 11).

Plaintiff Gil Berry ("Berry"), working with Student Suites, Inc. entered into discussions with ASU about the renovation project. (*Id*. at ¶ 12).

2.      Berry hired plaintiff Marous Brothers Construction to assist him in the preparation of a formal proposal for the project. (Complaint, Doc. # 59, ¶ 14).  On or about September 20, 2005, Berry and Marous submitted their initial proposal to ASU. (Exhibit "A", Deposition of Arne Goldman, Marous' corporate representative, p. 200, lines 4-15).

3.      From the period December 2005 until May 15, 2006, Marous performed a number of preconstruction services for Berry on the ASU project. (Ex. A, p. 199, lines 16-23; p. 200, lines 1-3).  On May 15, 2006, Berry and Marous submitted to ASU their Scope of Work for the project, which detailed the proposed renovations, including pricing and layout. (Ex. 1, p. 204, lines 13-23; p. 205, lines 1-6; p. 206, lines 6-11).

4.      On or about July 28, 2006, defendant TCU Consulting Services, LLC was retained by ASU to serve as the owner's representative. (Complaint, Doc. # 59, ¶ 26).

5.      On or about September 22, 2006, the ASU Board of Trustees elected not to accept the proposal submitted by Berry and Marous for the dorm renovation project. (Exhibit "B', letter from ASU to Berry).

## II.    ARGUMENT

**I**n determining the propriety of summary judgment, the court must test the elements of each cause of action against the materials before it to determine whether genuine issues of material fact exist.   In the instant case, Marous asserts six claims against Defendants: Quantum Meruit (Count Two); Fraudulent Misrepresentation (Count Three); Tortious Interference with Business Relations (Count Five); Conversion (Count Six); Conspiracy (Count Seven); and Loss of Business Opportunity (Count Eight).   As established herein,

Defendants are entitled to summary judgment as a matter of law on all claims asserted against them by Plaintiff Marous.

**A.    COUNTS TWO (QUANTUM MERUIT), SIX (CONVERSION), AND EIGHT (LOSS OF BUSINESS OPPORTUNITY):  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MAROUS' QUANTUM MERUIT, CONVERSION, AND LOSS OF BUSINESS OPPORTUNITY CLAIMS BECAUSE MAROUS VOLUNTARILY RELINQUISHED SUCH CLAIMS IN ITS DEPOSITION.**

During his deposition, Arne Goldman, Marous' designated corporate representative, and his counsel voluntarily relinquished Marous' claims for quantum meruit (Ex. A, p. 321, line 23; p. 322, lines 1-9), conversion (*Id*. at p. 377, lines 3-11; p. 379, lines 5-12), and loss of business opportunity (*Id*. at p. 380, lines 18-23; p. 381, lines 1-6).

> Q:    So, conversion, which is Count Six, I believe, and Count Eight, which is loss of business opportunity and I believe Count Two, which is quantum meruit, those three claims are not being made by Marous against the TCU defendants; is that correct?
>
> MR LYONS:  Yes.
>
> THE WITNESS:  Yes.

(Ex. A, p. 381, lines 10-17).  Accordingly, Defendants are entitled to summary judgment as a matter of law as to Counts Two, Six, and Eight of Marous' Complaint.

**B.    COUNT THREE (FRAUDULENT MISREPRESENTATION):  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MAROUS' FRAUDULENT MISREPRESENTATION CLAIM.**

In order to survive a summary judgment on its fraud claim, Marous must present substantial evidence indicating that there is a genuine issue of material fact as to whether Defendants (1) made a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  *Fisher v. Comer Plantation, Inc*., 772 So. 2d 455, 463 (Ala. 2000)

(quoting *Baker v. Bennett*, 603 So. 2d 928, 935 (Ala. 1992)).  *See also Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997); *Ala. Code* § 6-5-101 (1975). [1]

> **1.    EXPRESSIONS OF OPINION CANNOT FORM THE BASIS OF A FRAUD CLAIM.**

The crux of Marous' claim for fraudulent misrepresentation is that Defendants represented "that they believed that the Plaintiffs' proposal was the best and most fair proposal and that ASU should move forward with the Plaintiffs' proposal immediately." (Complaint, Doc. # 59, ¶ 55). [2]  While these representations may have occurred, the Alabama Supreme Court has made it clear that representations of "opinion" are not actionable under Alabama's fraud law and are due to be dismissed on summary judgment.  As noted in *Jones v. McGuffin*, 454 So. 2d 509, 512 (Ala. 1984), "it is axiomatic that mere statements of opinion are not material facts upon which actions for a legal fraud can be maintained."  *See also, Crowne Investments, Inc. v. Bryant*, 638 So. 2d 873, 877 (Ala. 1994) ("expression of opinion is not treated as a statement of an 'existing fact' under the fraud statute"); *Ray v. Montgomery*, 399 So. 2d 230, 232 (Ala. 1980) (seller's representation to plaintiff buyer that house was "a nice house" and "in good condition" was mere opinion and not actionable fraud); *Cornelius v. Austin*, 542 So. 2d 1220, 1222 (Ala. 1989) (fraud action cannot be maintained where seller expressed opinion that there were "no problems" with house).  The representations alleged by Marous are of a similar nature – mere expressions of opinion.  In fact, Marous admits that the alleged misrepresentations were matters of opinion.

---

[1]  *See Brushwitz v. Ezell,* 757 So. 2d 423, 429 (Ala. 2000) (in order to satisfy the reliance element of a fraud claim, the plaintiff must show not only that he relied on the alleged misrepresentation, but also that the reliance was *reasonable* in light of the facts surrounding the transaction in question).

[2]  Marous conceded in its deposition that it is not pursuing any fraud claims against defendant Percy Thomas. (Ex. A, p. 324, lines 7-20).  Accordingly, Thomas is entitled to summary judgment as a matter of law as to Count Three of Marous' Complaint.

Q:    So, on September 20th, he told you that it's TCU's opinion
      that your proposal was the best and most fair?

A:    Yes.

(Ex. A, p. 332, lines 20-23).

Q:    TCU and Ken Upchurch are entitled to their opinions, aren't
      they?

A:    They sure are.

Q:    And you'll admit, won't you, that stating that your proposal
      is the "best" and "most fair" proposal is a matter of opinion,
      wouldn't you?

A:    It's certainly a matter of opinion.

(Ex. A, p. 333, lines 5-13).    In *Jones*, the Alabama Supreme Court held that plaintiff's

testimony admitting that the defendant's representations were matters of "professional

opinion" conclusively established that the plaintiff was not justified in treating such

statements as material facts upon which he could rely.  *Jones*, 454 So. 2d at 512.  Thus, based

on Marous' own admissions, and the clear mandate of *Jones v. McGuffin*, Defendants are

entitled to summary judgment as a matter of law.

       Similarly, Marous' claim that Defendants committed fraud by representing that ASU

"should move forward" with Plaintiffs' proposal does not constitute actionable fraud.  "A

mere statement of opinion or prediction as to events to occur in the future is not a statement of

a 'material fact' upon which individuals have a right to rely and, therefore, it will not support

a fraud claim.  *Bryant*, 638 So. 2d at 877; *see also Lawson v. Cagle*, 504 So. 2d 226, 227 (Ala.

1987) ("Ordinarily, a prediction as to events to occur in the future is to be regarded as a

statement of opinion only, on which the adverse party has no right to rely"); *Birmingham

Broadcasting Co. v. Bell*, 68 So. 2d 314 (Ala. 1953).

**2.    MAROUS ADMITS THE ALLEGEDLY FRAUDULENT STATEMENTS ARE NOT FALSE.**

During its deposition, Marous admitted that the allegedly fraudulent statements were not, in fact, false.

> Q:    . . . Count Three, fraudulent misrepresentation, Paragraph 55, you said the false representations made by TCU and Upchurch are that they believed that the plaintiffs' proposal was the best and most fair proposal and that ASU should move forward with the plaintiffs' proposal immediately.
>
> A:    That's not fraudulent.
>
> Q:    Okay.  None of that is fraudulent?
>
> A:    None of that is fraudulent.

(Ex. A, p. 336, lines 18-23; p. 337, lines 1-5); (*see also* p. 335, lines 12-23; p. 336, lines 1-8).

> Q:    So, no longer a part of Count Three is the allegation that TCU or Upchurch made a false representation to Marous that they believe that the plaintiffs' proposal was the best and most fair proposal and that ASU should move forward with the plaintiffs' proposal immediately; is that correct?   It's paragraph 55.
>
> A:    Yes.

(Ex. A, p. 354, line 23; p. 355, lines 1-8).  Based on Marous' admissions, Defendants are entitled to summary judgment as to Marous' fraudulent misrepresentation claim (Count Three).

**3.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ANY PROMISSORY FRAUD CLAIM ASSERTED BY MAROUS.**

Although Marous did not specifically plead promissory fraud in its Complaint, and it never sought leave of this Court to amend its Complaint to include such a cause of action, Marous testified in its deposition that TCU promised that it would recommend that ASU accept Plaintiffs' proposal. (Ex. A, p. 297, lines 18-19; p. 326, lines 15-22; p. 327, lines 12-

15; p. 328, lines 15-17; p. 561, lines 22-23; p. 562, lines 1-3).[3]  Marous also testified that TCU told Marous that it would not take the project away from Marous because it would be "illegal". (Ex. A, p. 418, lines 11-18); (*see also* Ex. A, p. 341, lines 4-9).[4]  Even if the Court were to allow Marous to so amend its Complaint, Defendants are entitled to summary judgment as a matter of law because there is no evidence that Defendants lacked the requisite intent to perform the alleged promises at the time they were made or that they intended to deceive Marous.

In order to survive a summary judgment on a promissory fraud claim, Marous must, in addition to proving each of the four elements of a fraud claim, present substantial evidence establishing two additional elements: (5) proof that at the time of the misrepresentation, Defendants had the intention not to perform the act promised, and (6) proof that Defendants had an intent to deceive.  *See Mantiply v. Mantiply,* 951 So. 2d 638, 653 (Ala. 2006); *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003); *Hillcrest Center, Inc. v. Rone*, 711 So. 2d 901, 904 (Ala. 1997) (holding that promissory fraud involves a promise to do, or to abstain from doing, an act in the future).

---

[3]  Marous admits that Defendants told ASU that Plaintiffs' proposal met each of ASU's five criteria for the project (Ex. A, p. 293, lines 11-15; p. 294, lines 4-7), and Marous knew the decision of whether or not to accept the proposal was ASU's, not TCU's. (Ex. A, p. 81, lines 15-17; p. 82, lines 11-22).

[4]  Marous claims that in reliance on this promise it provided cost analyses, schedules, and other information to TCU, as the owner's representative, that it would not otherwise have provided.  (Ex. A, p. 347, lines 9-18).  Marous admits, however, that ASU would have been entitled to that same information whether it or its owner's representative asked for it. (*Id.* at p. 347, lines 19-23).  Thus, Marous fails to satisfy the requirements of reasonable reliance and damage as a proximate result of such misrepresentations.

>   **a.   THERE IS NO EVIDENCE THAT TCU OR UPCHURCH LACKED THE PRESENT INTENT TO PERFORM THE PROMISED ACT OR THAT THEY HAD AN INTENT TO DECEIVE MAROUS AT THE TIME THEY MADE THE ALLEGED PROMISE.**

As noted above, "a present intent to deceive is an essential element of promissory fraud." *See Gardner v. State Farm Mut. Auto. Ins. Co*., 822 So. 2d 1201, 1209 (Ala. 2001). "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive." *Goodyear Tire & Rubber Co. v. Washington,* 719 So. 2d 774, 776 (Ala. 1998); *see also Byrd v. Lamar*, 846 So. 2d 334, 246 (Ala. 2002).  The Supreme Court of Alabama has further stated that, unless the plaintiff puts forth some proof that there was something more than a failure to perform, something upon which a jury could infer that at the time the promise was made the defendant had no intention of performing, it is error to submit a fraud claim to the jury.  *Standard Furniture Mfg. Co., Inc. v. Reed*, 572 So. 2d 389, 392 (Ala. 1990) (internal quotations omitted).

In the instant case, Marous admits it has no evidence that TCU or Upchurch lacked the present intent to perform the promised act or that they intended to deceive Marous at the time they allegedly promised they would recommend ASU accept Plaintiffs' proposal.

>   Q:   TCU allegedly told you that it would recommend that ASU accept Marous/Gil Berry/Student Suites proposal?
>
>   A:   Yes.
>
>   *            *            *            *            *
>
>   Q:   Do you have any evidence that at the time TCU allegedly promised to you to recommend that ASU accept your proposal that TCU or Upchurch had no intention of actually making that recommendation?
>
>   A:   I have no idea one way or the other.

(Ex. A, p. 562, lines 14-17 and 23; p. 563, lines 1-6).  Marous also admits the only "evidence"

it has that TCU did not recommend approval of Plaintiffs' proposal as promised is the fact

that ASU ultimately did not accept the proposal. (Ex. A, p. 298, lines 17-20; p. 289, lines 9-

12).  "The plaintiff cannot meet his burden [of proof] merely by showing that the alleged

promise ultimately was not kept; otherwise, *any* breach of contract would constitute a fraud."

*Goodyear*, 719 So. 2d at 776.

Likewise, Marous admits it has no evidence that TCU intended to deceive Marous or

that it did not intend to keep its promise that it would not take the project away from Marous.

> Q:    Mr. Goldman, you testified when I was asking you about the
> fraudulent misrepresentation claim that the fraudulent
> statement allegedly made by TCU was that it promised that it
> wouldn't take you – or wouldn't take the job or take the
> project; is that correct, because it would be illegal?
>
> A:    Yes.
>
> *          *          *          *          *
>
> Q:    When Mr. Upchurch allegedly made the statement, do you
> have any evidence that he had no intent to fulfill that promise
> not to take the job at that time?
>
> A:    I have no idea one way or the other.
>
> Q:    Okay.  So, you as we sit here today, don't have any evidence
> that at the time Mr. Upchurch allegedly made that statement
> to you he had no intent to fulfill that promise?
>
> A:    I have no idea one way or the other.

(Ex. A, p. 418, lines 11-18; p. 419, lines 9-21); (*see also* Ex. A, p. 421, lines 12-17).[5]

---

[5]   Marous admits that it has no evidence that TCU is serving as anything other than the owner's
representative on the dorm renovation project, which is the position it has occupied from the outset.
(Ex. A, p. 343, lines 22-23; p. 344, lines, 1-7).  Thus, Marous has no evidence that TCU "took" the
project from Marous.

Absent any evidence of a present intent to deceive or evidence that Defendants did not intend to perform the promised act, Defendants are entitled to summary judgment on any promissory fraud claims asserted by Marous.

**C.    COUNT FIVE (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MAROUS' TORTIOUS INTERFERENCE CLAIM BECAUSE TCU WAS AT ALL TIMES ACTING AS AN AGENT AND REPRESENTATIVE OF ASU AND BECAUSE MAROUS WAS AN UNLICENSED, UNQUALIFIED GENERAL CONTRACTOR ILLEGALLY ENGAGED IN CONSTRUCTION IN ALABAMA.**

Marous claims Defendants tortiously interfered with the business relations and implied contract between Marous and defendant ASU to the detriment of Marous.

In order to survive a motion for summary judgment on its tortious interference claim, Marous must present substantial evidence of (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) the absence of justification for the defendant's interference; and (5) damage to the plaintiff as a result of the interference. *Parsons v.* Aaron, 849 So. 2d 932 (Ala. 2002). After proving the existence of a contract or business relation, "it is essential to a claim of tortious interference . . . that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract [or business relation] with which the defendant allegedly interfered." *Parsons*, 849 So. 2d at 946 (quoting *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001).

**1.    DEFENDANTS WERE NOT STRANGERS TO THE CONTRACT OR BUSINESS RELATION.**

In the present case, Defendants were retained by ASU to serve as the owner's representative for the dorm renovation project at issue herein. Marous admits it knew that Defendants were involved in the business relationship between Marous and ASU as ASU's

owner's representative and that Defendants would be reviewing Plaintiffs' proposal, making

various recommendations to ASU, and overseeing Plaintiffs' work.

> Q:    What do you understand TCU's role or position on this
>       project to be? I believe you said they came to the project late
>       July of 2006.
>
> A:    They were – I was told that they were working on several
>       other projects at Alabama State University's campus and they
>       were asked to provide some review and that they would be
>       retained as the owner's representative on the project.

(Ex. A, p. 177, lines 11-20).

> Q:    And what did you understand owner's rep work to be?
>
> A:    That he would represent Alabama State in their interest in the
>       project and provide some review and oversight of the work
>       that we had done so far, make recommendations to the – on
>       behalf of the [ASU] board.

(Ex. A, p. 178, lines 20-23; p. 179, lines 1-3).

> Q:    Now, you knew TCU was involved in the business
>       relationship between you, Gil Berry, Student Suites and ASU
>       because you knew they were the owner's representative,
>       didn't you?
>
> A:    Yes.
>
> Q:    So, you knew they had some role in all of this, that they were
>       going to help perform a due diligence review of your scope
>       of work and proposal, didn't you?
>
> A:    Yes.

(Ex. A, p. 370, lines 4-14); (*see also* Complaint, Doc. # 59, ¶¶ 26, 29, 71).  Marous had

numerous discussions with TCU and Upchurch about Marous' proposal, modifications to the

proposal, pricing, schedules, fees, and the dorm renovation project in general. (Ex. A, p. 135,

lines 4-9; p. 370, lines 22-23; p. 371, lines 1-2; Complaint, Doc. # 59, ¶ 29).  Marous admits it

welcomed the opportunity to discuss and clarify its proposal during these discussions with Defendants. (Ex. A, p. 136, lines 5-23).

Certainly, as owner's representatives, Defendants were not "strangers" to the business or contractual relationship between Marous and ASU. *See Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1156 (Ala. 2003) ("one cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract"); *BellSouth*, 814 So. 2d at 212 ("one is not a stranger to the contract just because one is not a party to the contract"); *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443 (Ala. 2004) (party to "interwoven set of contracts" or business relations cannot be liable for tortiously interfering with contract or business relation to which it is a party). Because Defendants were not strangers to the implied contract or business relation between Marous and ASU, they cannot be liable for allegedly interfering with such contract or business relation.

Marous further admits in its Complaint that all of the alleged acts of interference were done within the scope of Defendants' duties as agent of ASU. (*See* Complaint, Doc. # 59, ¶ 71 ("used their confidential relationships as owner's representatives") and ¶ 72 ("abused their position as owner's representatives")). A defendant cannot be liable for the tort of tortious interference where all of his acts of interference were done within the scope of his duties as agent to a party to the contract or business relation. *See Waddel,* 875 So. 2d at 1152, *quoting with approval, Atlanta Market Ctr. Mgmt. Co. v. McLane*, 503 S.E.2d 278, 282 (Ga. 1998) ("alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the *agent for one of the parties to the contract* . . . and all the

purported *acts of interference were done within the scope of the interferer's duties as agent*")
(emphasis added); *Parsons*, 849 So. 2d at 947 (agent for party to contract or business relation
cannot be liable for tortiously interfering with such contract or business relation); *BellSouth*,
814 So. 2d at 214 (defendant is party in interest to a relationship if defendant has any
beneficial or economic interest in, or control over, that relationship).

Based upon the undisputed facts, Defendants are entitled to summary judgment as a
matter of law as to Marous' tortious interference claim (Count Five).

### 2.   THERE IS NO EVIDENCE THAT DEFENDANTS TORTIOUSLY INTERFERED WITH MAROUS' BUSINESS OR CONTRACTUAL RELATIONSHIP WITH ASU.

Marous claims in its Complaint that Defendants tortiously interfered with his business
or contractual relationship with ASU by misrepresenting the fees Plaintiffs would receive
under Plaintiffs' proposal. (Complaint, Doc. # 59, ¶¶ 30 and 70).  However, Marous admits
in its deposition that it has <u>no</u> evidence that TCU, Upchurch or Thomas ever misrepresented
to ASU the amount of fees Plaintiffs would earn.

> Q:   Is it your contention that at any point TCU misrepresented
> the numbers for fees that you provided to TCU?
>
> A:   I have no idea what they represented or didn't represent.  I
> have no idea what they represented.

(Ex. A, p. 258, lines 10-15).

> Q:   So, Paragraph 70, they did not interfere with your business
> relationship then by misrepresenting your fees because
> you've just said that any misunderstanding with respect to
> your fees was cleared up.
>
> A:   Ultimately, I believe that it was cleared up.

(Ex. A, p. 364, lines 14-20); (*see also* p. 265, lines 5-10; p. 363, lines 6-16).  Based on Marous' admission, Defendants are entitled to summary judgment on Marous' tortious interference claim.

      3**.**    M**AROUS WAS NOT QUALIFIED TO DO BUSINESS IN** A**LABAMA, THUS RENDERING ITS IMPLIED CONTRACT WITH** ASU **VOID AND UNENFORCEABLE.**

Alabama Code § 10-2B-15.01 states that "[a] foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." *Ala.Code* § 10-2B-15.01.  "All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation . . ." *Ala.Code* § 10-2B-15.02.

Marous submitted its first proposal to ASU on September 20, 2005.  (Ex. A, p. 200, lines 4-9).  By May 15, 2006, Marous had performed what it claims was $297,500 in "Design/Build Preconstruction Services" on the ASU dorm renovation project. (Exhibit "C", Marous invoice; Ex. A, p. 236, lines 17-23; p. 237, lines 3-7; p. 396, lines 18-21).  However, Marous, a foreign corporation incorporated under the laws of the State of Ohio was not qualified to do business in Alabama until May 15, 2006. (Ex. A, p. 396, lines 3-7; Exhibit "D", license to conduct business).[6]  Alabama courts hold that a "foreign corporation doing business in this state without qualifying cannot use our courts to enforce its contracts." *Brown v. Pool Depot, Inc.*, 853 So. 2d 181, 184-85 (Ala. 2002); *see also, Sanjay, Inc. v. Duncan Constr. Co., Inc.*, 445 So. 2d 876, 879 (Ala. 1983) (foreign corporation cannot enforce contract to be performed in Alabama, even if entered into elsewhere, if it failed to

---

[6]  Marous states in its Complaint that it is a limited liability corporation organized to do business in Ohio. (Complaint, Doc. # 59, ¶ 1).  However, its license to conduct business in Alabama (Ex. D), its application to practice general contracting (Exhibit "E"), and its Prime Renewal Form for a general contractor's license (Exhibit "F") all evidence that Marous was at all times transacting business in Alabama as a corporation, not a LLC.

qualify to do business in state "on or before" the date the contract is made); *Alabama Western RR Co. v. Talley-Bates Constr. Co.*, 50 So. 341, 344 (Ala. 1909) (foreign corporation must be qualified in Alabama before "transacting *any* business in this state") (emphasis added).  Thus, because Marous' alleged implied contract with ASU is unenforceable, Defendants cannot be liable for tortiously interfering with a void contract.  *See Birmingham Television Corp. v. DeRamus*, 502 So. 2d 761, 766 (Ala. Civ. App. 1986) ("right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid, enforceable contract").

### 4.   MAROUS WAS NOT A LICENSED GENERAL CONTRACTOR IN ALABAMA, THUS RENDERING ITS IMPLIED CONTRACT WITH ASU VOID AND UNENFORCEABLE.

The Code of Alabama prohibits any person from engaging in the business of general contracting without a license. *Ala.Code* § 34-8-1 et seq.  Express or implied contracts entered into by an unlicensed general contractor are null and void as a violation of public policy.[7] Moreover, such contracts are illegal and unenforceable by the unlicensed general contractor. *J & M Ind., Inc. v. Huguley Oil Co.*, 546 So. 2d 367 (Ala. 1989); *Goodwin v. Morris*, 428 So. 2d 78, 79 (Ala. Civ. App. 1983); *Hawkins v. League*, 398 So. 2d 232 (Ala. 1981).

It is undisputed that Marous performed work as a general contractor in Alabama without a general contractor's license.  According to Marous, it prepared (i) schematic drawings; (ii) quantity takeoffs; (iii) material estimates; (iv) schedules; (v) draw schedules; and (vi) scope of work narratives as part of the ASU proposal.  (Ex. A, p. 133, lines 4-23; p. 134, lines 1-23; p. 135, lines 1-18).  Marous also performed on-site field video and survey

---

[7]   A "general contractor" is defined to be "one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more . . ." *Ala.Code* § 34-8-1.

work, architect supervision, and general manager supervision, and it prepared preliminary suite layouts and exterior elevations documentation.  (invoice, Ex. C); (*see also* Complaint, Doc. # 59, ¶¶ 14, 23, 48, 58, 59).  Marous claims in its May 15, 2006 invoice to Gil Berry that Marous performed $297,500 worth of preconstruction services as a "design/builder" during the period December 2005 to May 2006. (Ex. C).  After submitting its May 15 invoice, Marous continued to provide preconstruction services in connection with its proposal and scope of work for the ASU dorm renovation project.  (Ex. A, p. 385, lines 4-10).[8]  Marous claims throughout its complaint that the work it performed for ASU was performed pursuant to an implied contract with ASU. (Complaint, Doc. # 59, ¶¶ 42, 44, 70).

Despite allegedly performing over $297,500 worth of preconstruction services in Alabama between December 2005 and May 15, 2006 (as well as additional, though not yet quantified, work after May 15), Marous did not receive a general contractor's license from the Alabama State Licensing Board for General Contractors until August 16, 2006, nearly ten months after it claims to have started work on the ASU dorm renovation project. (Exhibit "G").

> Q:    Okay.  So, all of these things that you've described for me as preconstruction services – and we've gone through quite a few of those today – you were performing all of that work prior to being licensed by the licensing board for general contractors in Alabama?

---

[8]  Marous' decision to change its status from design/builder to construction manager in the summer of 2006 did not eliminate the requirement that it obtain a general contractor's license before performing any such work.  *See Ala.Admin.Code* § 230-X-1-.10 ("In order to perform as a construction manager, a person must be licensed as a general contractor in the major classification under which he/she intends to perform . . ."); Ex. A, p. 129, lines 15-23; p. 131, lines 20-23; p. 132, lines 1-13).

> A:      We were – any work that we performed prior to August 16[th],
>         2006, was performed prior to our obtaining the license.

(Ex. A, p. 400, lines 20-23; p. 401, lines 1-6); (*see also* p. 399, lines 15-23; p. 400, lines 1-2).[9]

Marous cannot avoid the licensing requirement by obtaining a license subsequent to entering into the implied contract. *Huguley*, 546 So. 2d at 371.   Marous' implied contract with ASU is void and unenforceable due to Marous' failure to comply with state licensing laws for general contractors.   Therefore, Defendants are entitled to summary judgment as a matter of law as to Marous' tortious interference claim (Count Five).[10]

**D.      COUNT SEVEN (CONSPIRACY):      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MAROUS' CONSPIRACY CLAIM BECAUSE THE UNDERLYING TORT CLAIM FAILS.**

Marous claims in Count Seven of its Complaint that the Defendants "conspired together to intentionally interfere with the business relationship and implied contract between Plaintiffs and ASU." (Complaint, Doc. # 59, ¶ 81).

For the reasons stated above, Marous' implied contract or business relationship with ASU is void and unenforceable as a matter of public policy in Alabama.   Moreover, as agents of ASU, Defendants cannot be liable for tortious interference as alleged by Marous.   Under Alabama law, "[a] civil conspiracy cannot exist in the absence of an underlying tort," as the civil conspiracy itself furnishes no cause of action. *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006); *O'Dell v. State ex rel. Patterson*, 117 So. 2d 164, 168 (Ala. 1959).  Because the underlying tortious interference claim fails, Defendants are entitled to summary

---

[9]   Marous did not disclose on its application to the licensing board that it had been performing work in Alabama without the required general contractor's license.   (Ex. A, p. 402, lines 16-23; p. 403, lines 1-14; p. 404, lines 2-7).

[10]   Marous also admittedly provided architectural services without being registered to do so in Alabama. (Ex. A, p. 91, lines 13-19; p. 92, lines 15-23; p. 93, lines 1-4; p. 401, lines 12-22).   Arne Goldman did not receive his license to practice architecture in Alabama until June 7, 2006, several months after having provided such architectural services. (Ex. A, p. 89, lines 19-21).

judgment as a matter of law as to Marous' conspiracy claim. *See Massengill v. Malone Freight Lines, Inc.*, 538 So. 2d 784, 786 (Ala. 1988) (conspiracy claim fails where plaintiff failed to establish prima facie case of tortious interference).

**E.    DEFENDANTS ARE ENTITLED TO THEIR FEES AND COSTS PURSUANT TO THE ALABAMA LITIGATION ACCOUNTABILITY ACT.**

The Alabama Litigation Accountability Act provides:

> (a) . . . [I]n any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, or interposed a defense, that a court determines to be without substantial justification, either in whole or in part;

> (c)  The court shall assess attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action or any part thereof, or asserted any claim or defense therein, that is without substantial justification . . .

*Ala.Code* § 12-19-272(a) and (c).[11]

As discussed more fully above, the claims brought by Marous against Defendants were groundless both in law and in fact.  Accordingly, Defendants' fees and costs should be taxed against Marous pursuant to the Alabama Litigation Accountability Act.

---

[11]  "Without substantial justification" means that such action or claim is frivolous or "groundless in fact or in law".  *Ala.Code* § 12-19-271.

## IV.    CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment on all claims asserted against them by Plaintiff Marous Brothers Construction in its First Amended Complaint:  Quantum Meruit (Count Two); Fraudulent Misrepresentation (Count Three); Tortious Interference with Business Relations (Count Five); Conversion (Count Six); Conspiracy (Count Seven); and Loss of Business Opportunity (Count Eight).  Further, Defendants' fees and costs should be taxed against Marous pursuant to the Alabama Litigation Accountability Act.

/s/          R. Brooke Lawson III
**J. LISTER HUBBARD  (HUB007)**
**R. BROOKE LAWSON III  (LAW026)**

Attorneys for Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama  36102-2069
334/241-8000

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the following was served on the following by electronic filing, on this the 5th day of March, 2008:

     Kenneth L. Thomas, Esq.
     Ramadanah M. Salaam-Jones, Esq.
     Thomas, Means, Gillis & Seay, P.C.
     P.O. Drawer 5058
     Montgomery, Alabama 36103-5058

     Jock M. Smith, Esq.
     Cochran, Cherry, Givens & Smith, P.C.
     306 North Main Street
     P.O. Box 830419
     Tuskegee, Alabama 36083

     Champ Lyons, III
     King, Horsley & Lyons, LLC
     One Metroplex Drive
     Suite 280
     Birmingham, Alabama 35209

     David E. Allred, Esq.
     D. Craig Allred, Esq.
     David E. Allred, P.C.
     P.O. Box 241594
     Montgomery, Alabama 36124-1594

     /s/      R. Brooke Lawson III
     Of Counsel

# Exhibit A

## FREEDOM COURT REPORTING

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4   MAROUS BROTHERS              )
                                  )
 5   CONSTRUCTION, LLC, a         )
                                  )
 6   corporation, and GIL        )
                                  )
 7   BERRY, an individual        )
                                  )
 8   d/b/a GIL BERRY &            )
                                  )
 9   ASSOCIATES,                  )   CIVIL ACTION NO.
                                  )
10             Plaintiffs,        )   2:07-CV-384-ID-CSC
                                  )
11   -vs-                         )
                                  )
12   ALABAMA STATE UNIVERSITY,    )
                                  )
13   a public corporation,        )
                                  )
14   et al.,                      )
                                  )
15             Defendants.        )
16               S T I P U L A T I O N S
17             IT IS STIPULATED AND AGREED, by
18   and between the parties through their
19   respective counsel, that the deposition of:
20               ARNE F. GOLDMAN,
21   may be taken before Belinda S. Brewster,
22   Commissioner and Notary Public for the State
23   of Alabama at Large, on the 20th day of
```

COPY

FREEDOM COURT REPORTING

81

1    recommendation telling Marous Brothers, who

2    has been in business, as I understood it,

3    since the 1980s and who does hundreds of

4    millions of dollars worth of work each year,

5    is that the same thing as telling you that you

6    will be awarded the contract?

7         A.    That's an impossible question for

8    me to answer.

9         Q.    No, no.  You can answer --

10        A.    And I think you know why.

11        Q.    No, I don't -- I don't really

12   think it is.

13        A.    Yes, you do, sir.

14        Q.    A favorable --

15        A.    Mr. Upchurch was not in a

16   position to be able to -- he was not the

17   awarding authority.

18        Q.    Okay.  So, that answers my

19   question.

20              He couldn't tell you that you

21   would be awarded that contract because he or

22   TCU Construction was not the party responsible

23   for awarding the contract, was it?

## FREEDOM COURT REPORTING

82

1        A.        No, but he represented that he

2    had considerable say-so and that he had the

3    president's ear.  I'm characterizing not using

4    exact words.

5                  But that he had the president's

6    ear, which is why we worked so diligently to

7    provide him in short order a lot of

8    information over the last couple of months

9    prior to September.

10                 So, that's -- that's my answer.

11       Q.        Well, my question is did he ever

12   tell you that you would be awarded the

13   contract?

14       A.        No.

15       Q.        And you knew that TCU was not the

16   party responsible for awarding that contract,

17   correct?

18       A.        Yes.

19       Q.        You knew that decision was a

20   decision for ASU?  That was the owner of the

21   project, right?

22       A.        Yes.

23       Q.        And it was ASU's decision as to

## FREEDOM COURT REPORTING

89

1          A.      No.

2          Q.      Where did you go to work after

3    graduating from Cornell?

4          A.      I worked for two architectural

5    firms in Boston.

6                  And then after I was registered

7    as an architect in the Commonwealth of

8    Massachusetts in 1984, I went to work for a

9    contractor, a design/builder in 1985 based in

10   Boston with satellite offices in New

11   Hampshire.

12         Q.      What states are you a registered

13   architect in?

14         A.      Massachusetts is my home state of

15   registration, Ohio, Pennsylvania, Connecticut,

16   Alabama, New York pending.  And I'm NCARB

17   certified.  So, I can get reciprocal

18   registration anywhere.

19         Q.      When were you first licensed or

20   registered in Alabama?

21         A.      On June 7th, 2006.

22         Q.      Why did you seek registration or

23   a license in Alabama?

# FREEDOM COURT REPORTING

91

1    addition so.

2         Q.      In Alabama?

3         A.      In Alabama.

4         Q.      So that was the only other

5    project in Alabama that you thought you might

6    need --

7         A.      Yes.

8         Q.      -- your architectural license

9    for?

10        A.      Well, in Alabama, you know, we --

11   at that point, you know, we didn't know what

12   was going on with Alabama A&M so.

13        Q.      Did you provide any sort of

14   architectural services for the Alabama State

15   project?

16        A.      I provided some oversight just in

17   terms of the schematic design and design

18   development drawings that we did so that we

19   could base our work product on.

20        Q.      Who actually did that work, the

21   schematic design?  You said you had oversight

22   of it.

23        A.      I worked with Dick Cooper and

# FREEDOM COURT REPORTING

92

1    with Kirk Schuttenburg and Tony Lazar.

2         Q.     They were in-house for Marous?

3         A.     Yes.  And then when we -- then we

4    met with John Chambliss several times.  So, I

5    was the courier of the Autocad files and the

6    -- and I met with John and we discussed the

7    aspects of our design.

8         Q.     Where any of these other

9    individuals licensed or registered architects

10   in Alabama?

11        A.     Not in Alabama.

12        Q.     So, that's why you provided the

13   oversight then?

14        A.     Yes.

15        Q.     When was the schematic design

16   prepared by Marous Brothers for the ASU

17   project?

18        A.     The schematic design was prepared

19   sometime between January -- well, during the

20   times of January to May.

21        Q.     Of 2006?

22        A.     Yes.

23        Q.     Was that schematic design

# FREEDOM COURT REPORTING

93

1    ultimately included and made a part of the

2    scope of work that was submitted for the ASU

3    project?

4         A.    Yes, part of our proprietary work

5    product.

6         Q.    Do you have any other sort of

7    licenses or registrations?  You've identified

8    a few states where you are a registered

9    architect.

10             Any other sort of licenses that

11   you hold?

12        A.    NCARB certified.

13        Q.    And what --

14        A.    N-C-A-R-B.  Member of the

15   American Institute of Architects.  That's our

16   licensed professional affiliation.  About to

17   be LEED certified.

18        Q.    What does that mean?

19        A.    LEED is the certification given

20   for extra training and education with regard

21   to sustainable design that is administered by

22   the United States Green Building Council.

23        Q.    Are you involved in any sort of

# FREEDOM COURT REPORTING

129

1      as the design/builder back then?

2             A.       Originally.

3             Q.       Did that change over time?

4             A.       Yes.

5             Q.       Okay.  When did Marous -- when

6      did its role change from that of a

7      design/builder to something else, and what did

8      it change to?

9             A.       Well, it changed, I think, in the

10     spring because we started having conversations

11     -- I believe we asked Dick Davis to have

12     conversations with local counsel about

13     contract structures and project delivery

14     modes.

15             And the services we were

16     providing from January -- from January until,

17     you know, essentially September of '06 were

18     really no different because the type of due

19     diligence we were doing whether we're the

20     design/builder or the general contractor or

21     construction manager, we used exactly the same

22     process.  We'd still videotape.  We'd still

23     prepare our own plans.

FREEDOM COURT REPORTING

131

1       A.      Because public -- if the funds

2    were not pulling for a not-for-profit

3    foundation, but instead were funded directly

4    through Alabama State University, we could not

5    serve at risk on the project.  We would have

6    to serve in an agency role.

7       Q.      So, beginning in approximately

8    January of 2006, Marous' role changed from

9    that of design/builder to construction manager

10   agent?

11      A.      I didn't say that --

12      Q.      Well, I'm asking.

13      A.      You're asking -- no.  You've made

14   a statement.

15      Q.      Well, is that a correct

16   statement?

17      A.      No.

18      Q.      Okay.  When?

19      A.      I think in March or April.

20      Q.      So, up to March or April then you

21   were -- before that point in time you still

22   considered yourself a design/builder on the

23   ASU project?

## FREEDOM COURT REPORTING

132

1    A.    I think we -- yeah.  The due

2    diligence was the same.  So, it really didn't

3    matter.

4          I think more was the question of

5    were we going to be working at risk in bonding

6    the job ourselves, or were we going to be

7    working as agent in which we're not bonding

8    the job and we're not at risk.

9    Q.    So, sometime around April is when

10   Marous understand its role on the project to

11   have changed from that of design/builder to

12   construction manager agent?

13   A.    When the financing changed, yes.

14   Q.    Up to September 22nd, 2006, did

15   you still believe that you would serve as

16   construction manager agent, or did your role

17   change again?

18   A.    We assumed that we were -- we

19   absolutely counted on and assumed that we

20   would be the agency construction manager on

21   the project, up to and including September

22   22nd, till I talked to Mr. Upchurch at about

23   3:30 or 4:00 o'clock in the afternoon our

## FREEDOM COURT REPORTING

133

1    time.

2           Q.      On September 22nd?

3           A.      Yes.

4           Q.      Describe for me, if you will, the

5    specific activities or tasks that Marous did

6    in furtherance of its role as a design/builder

7    on the ASU project.

8           A.      We have previously covered video

9    survey, digital photographic documentation,

10   laser field measurement, room by room, floor

11   by floor, building by building, Alabama Code

12   review in terms of constructability.

13                  We prepared schematic drawings so

14   that we could prepare digital on-screen

15   takeoffs for area quantity takeoffs.  We went

16   to the Associated General Contractors -- it's

17   a group that we belong to; I believe Mr.

18   Upchurch belongs to it as well and Mr. Thomas

19   -- to get a list of potential subcontractors

20   in the area.

21                  We met with a contractor out of

22   North Carolina who had done some student

23   housing work and had previously worked with

# FREEDOM COURT REPORTING

134

1    Dick Davis and Gil Berry on a project to find

2    out about pricing.  Because we wanted to get a

3    little more flavor of local pricing.  We'd

4    worked down south, but we wanted to know a

5    little bit more specific about pricing down

6    here.

7                    We did very, very comprehensive

8    estimating.  We went through historical

9    databases.  We did extensive material of

10   quantity takeoffs.  We went through scheduling

11   exercising and various scenarios.

12                   I'm glad I'm keeping Mr. Thomas

13   up.  And various -- sorry, I'm boring you,

14   sir.

15                   MR. THOMAS:  No, you're okay.

16   I'm fine.

17                   THE WITNESS:  Various scheduling

18   scenarios to see how Alabama State University

19   could be delivered student beds in the most

20   expeditious manner without defeating their

21   income stream too badly.

22                   We did draw schedules.  We redid

23   draw schedules so that bond counsel could do

## FREEDOM COURT REPORTING

135

1    their interest calculations.  We prepared

2    written scope of work narratives that we

3    worked and reworked.

4              Then when Mr. Upchurch and Mr.

5    Thomas were involved, we had lengthy phone

6    calls regarding scope items and scope

7    clarifications, inclusions, exclusions,

8    breakdowns of fees, representations of what

9    was fee and what was cost.

10             And I'm sure you've probably seen

11   all of that documentation.

12        Q.    Okay.  So, all of the activities

13   that you described for me that Marous provided

14   on this project, up to the point in time when

15   financing was ultimately provided through

16   bonds, those were -- would you characterize

17   those as preconstruction services?

18        A.    I would.

19        Q.    Now, after TCU got involved, you

20   said the activities or the work that was

21   provided by Marous included phone calls

22   regarding exclusions, fees, costs.  What else?

23        A.    Schedule.

## FREEDOM COURT REPORTING

136

1          Q.        Anything else?

2          A.        Presentation format in terms of

3     what Mr. Upchurch needed to go to the board

4     with.

5          Q.        Did you consider it unusual that

6     you would be having discussions with an

7     owner's representative regarding exclusions or

8     fees or costs or schedules?

9          A.        Would I find it unusual?

10         Q.        Uh-huh (affirmative).

11         A.        No.

12         Q.        Okay.  Those are questions that

13    ASU prior to TCU's involvement didn't ask of

14    you; is that correct?

15         A.        They didn't ask.  They'd had the

16    documents since May so they --

17         Q.        I understand.  But they didn't

18    ask you questions?

19         A.        No.

20         Q.        They didn't seek clarification of

21    --

22         A.        No.  We welcomed the

23    clarification and responded.

FREEDOM COURT REPORTING

177

1    sure that he's already previously answered

2    that.  But you say you have and that the

3    answer was yes?

4           A.     Ask me the question again,

5    please.

6           Q.     TCU could not, itself, award you

7    that contract?

8           A.     Yes.  That's my understanding.

9           Q.     Okay.

10          A.     As previously testified.

11          Q.     What do you understand TCU's role

12   or position on this project to be?  I believe

13   you said they came to the project late July of

14   2006.

15          A.     They were -- I was told that they

16   were working on several other projects at

17   Alabama State University's campus and they

18   were asked to provide some review and that

19   they would be retained as the owner's

20   representative on the project.

21          Q.     Who told you that?

22          A.     What?

23          Q.     Who told you all of this?

# FREEDOM COURT REPORTING

178

1      A.      Ken Upchurch.   I've never spoken

2   to Percy Thomas.

3      Q.      Well, I didn't know if Gil Berry

4   maybe told you or somebody at ASU.

5      A.      No.   This was Ken Upchurch.   So

6   then --

7              MR. LYONS:   Let him ask you a

8   question.

9      Q.      (By Mr. Lawson)   Did he call you

10  out of the blue and say, hey, Mr. Goldman, we

11  have been retained as an owner's

12  representative, or did Gil Berry tell you

13  beforehand that ASU had decided to hire TCU?

14     A.      I think Gil Berry told me that I

15  needed to be on a phone call with -- I needed

16  to call a number -- I think was Kenny Thomas'

17  office -- because I needed to speak to Percy

18  Thomas and a Mr. Upchurch who were going to be

19  doing owner's rep work on the project.

20     Q.      And what did you understand

21  owner's rep work to be?

22     A.      That he would represent Alabama

23  State in their interest in the project and

# FREEDOM COURT REPORTING

179

1    provide some review and oversight of the work

2    that we had done so far, make recommendations

3    to the -- on behalf of the board.

4         Q.        Did you understand them to be

5    providing a level of expertise that perhaps

6    ASU board members or trustees did not have?

7         A.        I don't know.  I wasn't privy to

8    what those conversations were about, why they

9    were engaged.

10        Q.        Did you object to TCU serving as

11   an owner's representative?

12        A.        I objected to providing Mr.

13   Upchurch with detailed proprietary work until

14   such time as he assured me that it would be

15   unlawful for TCU to take the project from us,

16   which is in his words.

17              When I said to him, why should I

18   send you all our proprietary work?  How do I

19   know you're not going to steal the project

20   from us?  He says we -- first of all, I'm a

21   gentleman, I wouldn't do it.  And second of

22   all, we cannot by law do that because we're

23   being retained as the owner's rep, which

## FREEDOM COURT REPORTING

199

1    to look at it over a period of a few days.

2                    MR. LAWSON:  Do y'all want to

3    break for lunch real quick?

4                    MR. LYONS:  We might as well.

5                    MR. LAWSON:  Twenty minutes?

6                    MR. LYONS:  That's fine.

7                    (Whereupon, the taking of the

8    deposition was recessed from approximately

9    1:32 p.m. to approximately 2:00 p.m., after

10   which the following proceedings were had and

11   done:)

12                    (Whereupon, said document was

13                    marked for identification as

14                    Defendant's Exhibit No. 10 to the

15                    deposition of Arne F. Goldman.)

16        Q.    Mr. Goldman, you've described for

17   me your marketing efforts and your

18   preconstruction efforts.

19                    When did the marketing end and

20   the preconstruction begin on this project?

21        A.    As far as we're concerned, when

22   that resolution marked --

23        Q.    Exhibit 5, I believe?

# FREEDOM COURT REPORTING

200

1          A.      When that exhibit -- around that

2    time.  But say starting in December of 2005,

3    into January and then on.

4          Q.      Now I'm going to show you

5    Defendant's Exhibit No. 10 and ask if you can

6    identify that for me, please?

7          A.      This is the original PowerPoint

8    presentation that we assembled for Alabama

9    State that we presented on September 20th.

10          Q.      It says Student Housing

11    Redevelopment Master Plan.  This is, though,

12    the PowerPoint presentation that you

13    referenced earlier?

14          A.      That's one of the PowerPoint

15    presentations.

16          Q.      You would consider any work that

17    went into this to be marketing efforts?

18          A.      You've got -- I'm not sure that

19    this -- I need to check.  I want to make sure

20    that this was the original thing we presented.

21                  Yes, this was -- yes, this was

22    the initial -- this was the initial

23    presentation.

# FREEDOM COURT REPORTING

204

1    they're submitting it on our behalf.  It says

2    they're submitting it on their behalf.  They

3    just happened to put our logo on it.

4         Q.    Okay.  Were you aware that they

5    were submitting --

6         A.    No.

7         Q.    -- it to ASU with your logo?

8         A.    No.

9               (Whereupon, said document was

10              marked for identification as

11              Defendant's Exhibit No. 12 to the

12              deposition of Arne F. Goldman.)

13        Q.    Defendant's Exhibit No. 12, can

14   you tell me what that is, Mr. Goldman?

15        A.    This appears to be the

16   proprietary work product that we produced for

17   the project that documented our intended scope

18   of work, drawings, there are some on-screen

19   takeoffs, there's general program information,

20   some very detailed on-screen takeoffs that

21   helped us in our estimating, as well as

22   existing conditions, demo plans, proposed

23   plans.

# FREEDOM COURT REPORTING

205

1          Q.        When was this prepared by --

2          A.        Between January and May of --

3     January and the end of April of 2006.

4          Q.        Between January and April of 2006

5     this was prepared by Marous Brothers?

6          A.        By Marous Brothers.

7          Q.        Did Gil Berry have any input into

8     this?

9          A.        Very little.  I mean, we knew

10    what we were -- we understood that we had been

11    given a budget that we had to design and build

12    to.  So, I don't -- I don't recall that Gil

13    had much input in the preparation of this

14    document at all.

15         Q.        When was it provided to Gil

16    Berry?  Or was it provided to Gil Berry?

17         A.        It was provided to him, I

18    believe, the end of April.

19         Q.        Was it ever provided to ASU?

20         A.        They asked us for -- Dr. Lee

21    apparently had asked Gil Berry for copies

22    because he didn't have one.

23                    But in May we attended a meeting,

# FREEDOM COURT REPORTING

206

1    either a board meeting or a building committee

2    meeting, and we brought some copies for -- I

3    know Judge Wiggins.  I handed Judge Wiggins

4    one, and so I know he had it.  We brought

5    several.

6        Q.    So, this document then, Exhibit

7    No. 12, was provided to Gil Berry and then

8    ultimately provided to ASU --

9        A.    Yes.

10       Q.    -- by May of 2006?

11       A.    Yes.

12       Q.    Does this -- and I refer to it as

13   the scope of work.  Is that how you refer to

14   this document?  Or do you call it something

15   else?  That's just what I've called it.

16       A.    Whatever you want to say.

17       Q.    How does Marous refer to it?

18       A.    Scope of work documents.  It's

19   our work product, our deliverable.

20       Q.    This deliverable or the scope of

21   work, does it include the schematic or the

22   architectural work that you described earlier

23   as having been done by Marous?

# FREEDOM COURT REPORTING

236

1    Mr. Berry?

2         A.    And Mr. Davis.

3         Q.    And Mr. Dick Davis.

4               (Whereupon, said document was

5               marked for identification as

6               Defendant's Exhibit No. 17 to the

7               deposition of Arne F. Goldman.)

8         Q.    You submitted a number of

9    invoices in this case, or at least a couple of

10   invoices, didn't you?

11        A.    Yes, we did.

12        Q.    Defendant's Exhibit No. 17, can

13   you identify that for me?

14        A.    That's an invoice that we had

15   prepared at the request of Gil Berry for the

16   work we had performed to-date.

17        Q.    So, as of May 15, 2006, Marous

18   Brothers contends that it provided

19   preconstruction and design/build services in

20   the amount of $297,500?

21        A.    Contends we have provided at that

22   point Part 1 design/build and preconstruction

23   services.    And that's not even inclusive of

# FREEDOM COURT REPORTING

237

1   my time, which up to that point was several

2   hundred hours.

3           Q.      Okay.  But whatever you may

4   believe should have been included, at this

5   point in time what was included totaled

6   $297,500?

7           A.      Yes.

8           Q.      And it was submitted to Gil

9   Berry?

10          A.      I guess, yeah.

11          Q.      Well, it's Marous -- is that a

12  Marous invoice?

13          A.      Yes.

14          Q.      So, you guess.  Is that -- is

15  that the correct number?

16          A.      I didn't -- yes.

17          Q.      And this was for work performed,

18  up to and including, May 15, 2006?

19          A.      That's -- I believe so.

20                  (Whereupon, said document was

21                  marked for identification as

22                  Defendant's Exhibit No. 18 to the

23                  deposition of Arne F. Goldman.)

# FREEDOM COURT REPORTING

258

1      A.      I have no idea.  I haven't seen

2    what I transmitted.

3      Q.      Well, do they look out of line

4    with what you provided to TCU?

5      A.      I don't -- I'm not being coy.  I

6    don't remember because a lot of numbers went

7    back and forth between us and TCU, and I don't

8    have the document in front of me that I sent

9    to --

10      Q.      Is it your contention that at any

11   point TCU misrepresented the numbers for fees

12   that you provided to TCU?

13      A.      I have no idea what they

14   represented or didn't represent.  I have no

15   idea what they represented.

16           I know that Ken Upchurch said to

17   me you've got $7 million in fees.  You've got

18   too much in fees on this project.  And I said,

19   we don't have $7 million in fees, and I

20   provided breakdowns.  That's the basis.

21           And he said, well, Kenny Thomas

22   thinks that there's $7 million in fees, too.

23   And I said, there isn't $7 million because

## FREEDOM COURT REPORTING

265

1    you provided to Ken Upchurch?  Are the numbers

2    provided by TCU to ASU different than what you

3    provided to TCU?

4         A.     The numbers match.

5         Q.     Okay.  So, it appears that TCU

6    has provided the exact numbers that you

7    provided to TCU, correct?

8         A.     As of September --

9         Q.     As of September 5, 2006?

10        A.     As of September 5.

11        Q.     Okay.  And, in fact, you asked

12   Ken to provide these numbers to ASU, didn't

13   you?

14        A.     Yes, I did.

15        Q.     Do you have any evidence --

16        A.     No.  I asked for his review prior

17   to this meeting with Dr. Lee.  That's what it

18   says.  I didn't say review.  I said prior to

19   your meeting with Dr. Lee.  It was per his

20   request.

21        Q.     Did you expect that he would

22   provide to ASU the numbers that you provided

23   to TCU?

# FREEDOM COURT REPORTING

289

1    breakdown, he said -- I asked him, are you

2    comfortable that we've covered the scope --

3    and I'm paraphrasing -- that we've covered the

4    scope and that we have a project that you can

5    favorably recommend to Alabama State

6    University.

7                And he said, yes, I'm satisfied,

8    or something to that effect.

9         Q.    And is it your contention that

10   TCU did not recommend to ASU or tell ASU that

11   your proposal was acceptable?

12        A.    We didn't get the job.  So, I

13   don't -- whatever happened.  Mr. Upchurch

14   represented that he had the president's ear to

15   us and that he was a trusted advisor to the

16   president.

17        Q.    Okay.

18        A.    So, we don't know what other

19   kinds of backroom dealings may have been going

20   on.

21        Q.    If any.  You don't know, do you?

22        A.    If any.  If any.  But all I know

23   is ultimately -- the University still had the

# FREEDOM COURT REPORTING

297

1    know what work is going on out there, if

2    anything.

3              You've not seen any contracts

4    between TCU and ASU, have you?

5         A.    No.

6         Q.    You don't know what is going on

7    at that project.

8              As we sit here today looking at

9    this E-mail, the only thing that you can say

10   is that TCU did what it told you it was going

11   to do over the telephone, which is tell ASU

12   that your proposal met each of the five

13   criteria, correct?

14        A.    No.  Mr. Upchurch -- that's not

15   correct.

16        Q.    Okay.  Well, tell me what's not

17   correct about that statement.

18        A.    Mr. Upchurch also stated that he

19   would recommend approval of our proposal.

20              Where in this document -- and I

21   know you're the one asking the questions.  So,

22   here's my statement.

23              Nowhere in this document does it

# FREEDOM COURT REPORTING

298

1    state I believe that it's in the best interest

2    of Alabama State University to move forward

3    with this proposal, and that's what he told me

4    would be in the document.

5        Q.    Do you know that he didn't do

6    that in conversations with the trustees or --

7        A.    It's not in the document.

8        Q.    Do you know that he -- you don't

9    know, do you?

10        A.    You just got done saying if I

11    wasn't there, I don't know.  Well, you don't

12    know either.  It's not in the document, and

13    only Mr. Upchurch knows if he had those

14    conversations with people from Alabama State.

15        Q.    That's right.  Only Mr. Upchurch

16    knows.

17        You don't know whether or not TCU

18    ever recommend to ASU that they retain the

19    services of Marous, do you?

20        A.    No.

21        Q.    Now, you've made the allegation

22    in your compliant, but you have no evidence to

23    support that allegation, do you?

## FREEDOM COURT REPORTING

321

1          Q.      Who asked you to prepare

2    invoices?

3          A.      Marvin Wiggins asked Gil Berry to

4    prepare invoices, and Gil Berry asked us to

5    prepare invoices.

6          Q.      Anyone else?

7          A.      Directly, no.

8          Q.      Well, indirectly?

9          A.      Indirectly Gil Berry told us that

10   Freddie Gallot on several occasions -- Dr. Lee

11   represented to him that -- communication,

12   submit our invoices.

13                 Freddie Gallot purportedly told

14   Gil Berry that once the bond closed that we

15   would be paid, and that's why he wanted our

16   invoices.  So, we started preparing invoices.

17         Q.      Did you ever confirm any of what

18   Gil Berry was telling you?

19         A.      Well, at that point once we saw

20   judge -- the Honorable Judge Wiggins' E-mail,

21   we had no reason to doubt it.  I'm not in the

22   habit of doubting judges.

23         Q.      Count Two is a quantum meruit

# FREEDOM COURT REPORTING

322

1    claim, and your counsel previously stated that

2    does not apply to the TCU defendants.  Is that

3    true --

4            A.      It's not --

5            Q.      -- for Marous as well?

6            A.      Yes, yes.

7            Q.      I mean, I can look at your

8    counsel, but --

9            A.      Yes.

10           Q.      Count Three is a fraudulent

11   misrepresentation claim.  Marous alleges in

12   Count Three that Upchurch, Percy Thomas and

13   TCU made false representations to plaintiffs

14   regarding material facts in this matter.  Do

15   you see that in Paragraph 55?

16           A.      I do see it.

17           Q.      Okay.  What discussions or

18   conversations did you ever have with Percy

19   Thomas?

20           A.      I had none about this project.

21           Q.      Okay.  Well, if you had none with

22   Percy Thomas, then how did he make a false

23   representation to you?

# FREEDOM COURT REPORTING

293

1      A.      Apparently.

2      Q.      And Mr. Upchurch states as I have

3 previously stated, a deal -- and he summarizes

4 a deal -- is what the University should be

5 working toward.

6           He goes on to say that the

7 development agreement as modified by

8 negotiations, in my opinion, meets the five

9 criteria noted above as follows.  And he

10 spells it out.

11           So, it appears that TCU has, in

12 fact, informed ASU that the proposal submitted

13 by Marous, Gil Berry, Student Suites met the

14 five criteria that ASU had, correct?

15      A.      At the top, yes.

16      Q.      Mr. Upchurch informed you that he

17 was going to send this E-mail to ASU before he

18 sent it, didn't he?

19           He spoke to you on the telephone

20 about it, didn't he?

21      A.      He did speak to me on the

22 telephone.

23      Q.      And he told you what was going to

# FREEDOM COURT REPORTING

1    be included in that E-mail, didn't he?

2    A.    He did not tell me the last

3    paragraph was going to be included.

4    Q.    He told you that he was going to

5    tell them that the five criteria had been met,

6    correct?

7    A.    Yes.

8    Q.    And he did it, didn't he?

9    A.    Yes.

10    Q.    And he, in fact, asked you if you

11    wanted anything included in there, and you

12    said yes.

13    And in the second to the last

14    paragraph, as the owner's rep, we have agreed

15    to help Marous recruit and prequalify trade

16    contractors.

17    That's language that you wanted

18    in that E-mail?

19    A.    Absolutely because we absolutely

20    were hoping to collaborate with TCU on the

21    project and would count on their assistance as

22    we have with owner's reps in other markets

23    we've worked at.

## FREEDOM COURT REPORTING

324

1              THE WITNESS:  Will you ask me the

2    question again, please?

3              Q.      (By Mr. Lawson)  Yes.  In Count

4    Three, Paragraph 55, the allegation is made

5    that Percy Thomas made false representations

6    to plaintiffs.

7              My question for you is what false

8    representation was made by Percy Thomas to

9    Marous?

10             A.      I'm not aware of any false

11   allegations.

12             Q.      Or representations --

13             A.      Or representations that Percy

14   Thomas made unless Mr. Berry has had some.

15   But Marous is not aware of it.

16             Q.      So, as far as Marous is

17   concerned, then, Count Three, the fraudulent

18   misrepresentation claim, does not apply to

19   Percy Thomas individually?

20             A.      That's what I believe.

21             Q.      Okay.

22             MR. LYONS:  Just to Marous only?

23             MR. LAWSON:  That's correct.

# FREEDOM COURT REPORTING

326

1          A.       I see that.

2          Q.       And that ASU should move forward

3    with the plaintiffs' proposal immediately.  Do

4    you see that?  Paragraph 55.

5          A.       Yes.

6          Q.       Are there any other false

7    representations that you claim TCU or Upchurch

8    made to Marous?

9          A.       Previously testified.

10         Q.       I have to know.  If you

11   previously testified, I'm sorry.

12              But with respect to fraudulent

13   misrepresentation, Count Three, I need to know

14   what those are.

15         A.       It was represented to us -- to me

16   that Mr. Upchurch would be putting in his

17   recommendation that Marous be -- that the

18   Marous proposal -- the Gil Berry/Student

19   Suites/Marous proposal be approved.

20              And that did not appear.  So, I

21   would say that was fraudulently misrepresented

22   to us.

23         Q.       Okay.  TCU would recommend -- let

# FREEDOM COURT REPORTING

327

1    me see if I have this right -- to ASU that the

2    Marous/Gil Berry/Student Suites proposal --

3         A.    Be approved.

4         Q.    -- be approved?

5         A.    And I did not see that language

6    in the letter.

7         Q.    Okay.  So, you're hanging your

8    hat now on one E-mail dated September 21 that

9    you had not previously before today seen.  Is

10   that what your allegation is based on?

11        A.    Absolutely.

12        Q.    Okay.  When did Mr. Upchurch tell

13   you or TCU tell you that TCU would recommend

14   to ASU that the proposal be accepted?

15        A.    On the 20th of September.

16        Q.    On September 20th?

17        A.    Yes.

18        Q.    How was that conveyed to you?

19   How was that statement made to you?

20        A.    A phone call.

21        Q.    Okay.

22        A.    At that point I was under a lot

23   of pressure from my boss, Chip Marous, since

# FREEDOM COURT REPORTING

328

1    we had expended so much money.  He wanted to

2    know what the status of the project was so we

3    knew if we had to hire additional personnel.

4                And I pushed Mr. -- I pressed

5    Mr. Upchurch in the phone call.  And that's

6    what he told me.

7        Q.      Okay.  So, on September 20th,

8    2006, TCU told you in a phone call -- with you

9    or with somebody else at Marous?

10       A.      With me.

11       Q.      With Arne Goldman that TCU would

12   recommend to ASU that the proposal be

13   accepted?

14       A.      Yes.

15       Q.      And you allege that that is a

16   false statement?

17       A.      I allege that it never happened.

18       Q.      Okay.  So --

19       A.      That he never -- he did put that

20   in his written -- he said he would do

21   something, and he didn't do it.

22       Q.      Did he tell you he was going to

23   put it in his E-mail, or did he say he would

# FREEDOM COURT REPORTING

332

1    wasn't there.

2         Q.    (By Mr. Lawson)  He never told

3    you that he was, did he?

4         A.    I don't believe so.

5         Q.    And Marous certainly was not

6    present or privy to any of the conversations

7    between TCU and ASU prior to the open board

8    meeting, was it?

9         A.    No.

10         Q.    Now, you state in Paragraph 55

11    that TCU and Upchurch falsely represented that

12    they believed that plaintiffs' proposal was

13    the best and most fair proposal.  Do you see

14    that?  Paragraph 55.

15         A.    Yeah.

16         Q.    Who told you that?

17         A.    Ken Upchurch.

18         Q.    When did he tell you that?

19         A.    The 20th of September.

20         Q.    So, on September 20th, he told

21    you that it's TCU's opinion that your proposal

22    was the best and most fair?

23         A.    Yes.

## FREEDOM COURT REPORTING

333

1          Q.      Was that TCU's opinion?

2          A.      I'm assuming since Mr. Upchurch

3    is one of the principals of TCU that that

4    would be their opinion.

5          Q.      TCU and Ken Upchurch are entitled

6    to their opinions, aren't they?

7          A.      They sure are.

8          Q.      And you'll admit, won't you, that

9    stating that your proposal is the "best" and

10   "most fair" proposal is a matter of opinion,

11   wouldn't you?

12         A.      It's certainly a matter of

13   opinion.

14         Q.      And you've already said they're

15   entitled to their opinion.  Was your proposal

16   the best and most fair proposal?

17         A.      Given the circumstances at the

18   time, the scope of work, the definition, I

19   think it was.

20         Q.      Okay.  So, if TCU or Ken Upchurch

21   said that your proposal was the best and most

22   fair, then it's not a misrepresentation of

23   fact, is it?

# FREEDOM COURT REPORTING

336

1    statement?

2         A.       There is no false statement here.

3         Q.       Okay.  So, the fact that they

4    told you that it's the best and most fair

5    proposal is not a false statement?

6         A.       Yes, that is not a false -- it is

7    -- I agree with you.  It's not a false

8    statement.

9         Q.       Okay.  You go on to say that TCU

10   and Upchurch made a false representation to

11   Marous that ASU should move forward with the

12   plaintiffs' proposal immediately.  Do you see

13   that?  Paragraph 55.

14        A.       Yes.

15        Q.       What is false about that?

16        A.       Nothing.

17        Q.       Okay.  So, help he out here.

18   Count Three, fraudulent misrepresentation,

19   Paragraph 55, you said the false

20   representations made by TCU and Upchurch are

21   that they believed that the plaintiffs'

22   proposal was the best and most fair proposal

23   and that ASU should move forward with the

# FREEDOM COURT REPORTING

337

1    plaintiffs' proposal immediately.

2        A.      That's not fraudulent.

3        Q.      Okay.  None of that is

4    fraudulent?

5        A.      None of that is fraudulent.

6        Q.      Then what is fraudulent?  I'm at

7    a loss to figure out what exactly is

8    fraudulent.

9        A.      Mr. Upchurch stated to me that

10   under no circumstances could TCU be retained

11   to do the construction of the project.

12                In fact, at the board meeting

13   when -- allegedly and per his recounting of

14   the situation to me when I asked him, that the

15   University asked him if he could do the job

16   for less than our number.  He said, no, he

17   could do it for the same number.  And that he

18   -- and I asked him, well, what did they do?

19   He said, they elected to give me the project.

20                That's what he -- those are his

21   words.  So, on one hand you're saying it

22   couldn't happen.  A couple -- you know, a

23   month and half earlier when I asked him why

# FREEDOM COURT REPORTING

341

1          Q.       I'm asking you.

2          A.       I understand that, but he's the

3     one who made the claim --

4          Q.       So, your claim is that TCU told

5     you that it couldn't take your project from

6     you because it would be against the law?

7          A.       Yes.

8          Q.       And that that statement is false?

9          A.       Because he got the project.

10         Q.       Okay.

11         A.       He told me he got -- they gave --

12    they voted to give him the project instead.

13         Q.       Okay.  What other false

14    statements were made to you?  What other

15    fraudulent misrepresentations were made by TCU

16    or Upchurch to you?

17         A.       Well, that's -- that's one that I

18    recollect.

19         Q.       Well, I have to know every single

20    one.

21         A.       Well, that's the one that I

22    recollect.

23         Q.       Okay.  So, there are no others?

# FREEDOM COURT REPORTING

343

1      Q.      Well --

2      A.      That's enough.  There's the --

3   there's the false misrepresentation.

4      Q.      All right.  So, that's it?

5      A.      That's it.

6      Q.      That's the only false

7   misrepresentation?

8      A.      Yes.

9      Q.      And your reliance on that

10  statement that was allegedly made when?

11     A.      On September 22, 2006.

12     Q.      So, It was on September 22nd that

13  TCU told you that it couldn't take your

14  project?

15     A.      No.

16     Q.      Well, when was it?

17     A.      He told me the end of July or end

18  of August that -- end of July or beginning of

19  August that he couldn't take the project.  And

20  on September 22nd, he in fact stated that he

21  was awarded the project.

22     Q.      Have you ever seen the contract

23  between TCU and ASU?

# FREEDOM COURT REPORTING

344

1          A.      No.

2          Q.      You have no idea what it says, do

3    you?

4          A.      No.

5          Q.      So, you don't know in what

6    capacity TCU is working for ASU, do you?

7          A.      No.

8          Q.      What did you do in reliance on

9    that statement that Mr. Upchurch allegedly

10   made to you?

11         A.      We released -- I continued to

12   talk to him in great detail of the inner

13   workings of the project, the details of the

14   scope, details of the schedule.  I shared with

15   him the information we had prepared.

16         Q.      That information had already been

17   provided to ASU, hadn't it?

18         A.      There's additional information

19   about developer's fees and other -- and

20   profits and costs and asbestos and other scope

21   items that Mr. Upchurch stated that Alabama

22   State thought should be added, like hard tile

23   and electronic locks to doors, scope items.

# FREEDOM COURT REPORTING

347

1    of the Board of Alabama State University and

2    its President, he would have had to have prior

3    knowledge, pretty extensive knowledge, of the

4    project and the scope, which he only could

5    have gotten from the conversations and

6    information that was provided to him by and

7    through us.

8              That's how we were injured.

9         Q.    In his capacity as an owner's

10   representative of ASU?

11        A.    Yes.

12        Q.    So, in reliance on this alleged

13   false statement that they couldn't take the

14   project because it would be illegal, you

15   provided various information, cost analyses,

16   schedules, to TCU who was serving as owner's

17   representative of ASU?

18        A.    Yes.

19        Q.    ASU would be entitled to that

20   information whether they hired TCU or not,

21   wouldn't they?

22        A.    If they asked -- certainly, if

23   they asked for it.

## FREEDOM COURT REPORTING

354

1    and leave your deposition open because we have

2    a right to examine you regarding the damages

3    that you claim as a result of anything that

4    TCU did or did not do.

5              So, you'll need to provide that

6    to your counsel, and I will need to keep your

7    deposition open.

8              MR. LYONS:  If you can give your

9    best estimate today, go ahead and do that.

10             THE WITNESS:  My best estimate is

11   -- I already said it's $12,000.

12        Q.    (By Mr. Lawson)  Well, we'd still

13   like to break down the specific numbers that

14   you attribute to TCU and that you claim from

15   TCU as a result of this statement that they

16   allegedly made to you.

17             That's the only fraudulent or

18   false statement that you claim TCU made to

19   you?

20        A.    That was enough.

21        Q.    Is that a yes?

22        A.    Yes.

23        Q.    So, no longer a part of Count

## FREEDOM COURT REPORTING

355

1    Three is the allegation that TCU or Upchurch

2    made a false representation to Marous that

3    they believe that the plaintiffs' proposal was

4    the best and most fair proposal and that ASU

5    should move forward with the plaintiffs'

6    proposal immediately; is that correct?

7                It's Paragraph 55.

8        A.      Yes.

9        Q.      Your decision to submit the

10   master plan back in September or the scope of

11   work in May or to perform the preconstruction

12   services that are shown in your May 15, 2006,

13   none of those things were done on reliance on

14   anything that TCU, Upchurch or Thomas said or

15   didn't say, correct?

16       A.      Any work that was performed prior

17   to July 28th, 2006, had no part and parcel

18   relationship to TCU or Upchurch or Thomas.

19       Q.      Paragraph 32 of your complaint.

20   You state that the Board hired its previously

21   designated owner's representative to perform

22   all of the services required for the project

23   that were to be provided by plaintiffs.

# FREEDOM COURT REPORTING

363

1          Q.      Well, that may be your

2     explanation now.  But you do refer to certain

3     things as fees that you now say are costs,

4     correct?

5          A.      Yes.

6          Q.      You have admitted that ASU was

7     provided with the correct breakdown on

8     analysis of your fees and costs?

9          A.      Yes.

10          Q.      By TCU?

11          A.      Yes.

12          Q.      So, if there was a

13     misunderstanding, as you called it, it was

14     cleared up and clarified, correct?

15          A.      By September 19th it was cleared

16     up and clarified.

17          Q.      Well, look at, for instance,

18     Exhibit No. 27, which is an analysis of your

19     fees prepared by TCU.  And it's on TCU

20     letterhead and that's dated September 7th,

21     2006.  That's an accurate --

22          A.      Yeah.  I also testified that I

23     have no idea, nor do you, that that document

# FREEDOM COURT REPORTING

364

1    ever went to Dr. Lee.

2        Q.      I may have an idea, but you say

3    you don't have an idea.

4        A.      Well, you can't show me --

5        Q.      But looking at --

6        A.      You can't show me on that

7    document any evidence that it went to Dr. Lee.

8        Q.      Looking at the face of that

9    document, however, that is an accurate

10   representation of your fees and costs --

11       A.      Yes.

12       Q.      -- dated September 7, 2006?

13       A.      Yes.

14       Q.      So, Paragraph 70, they did not

15   interfere with your business relationship then

16   by misrepresenting your fees because you've

17   just said that any misunderstanding with

18   respect to your fees was cleared up.

19       A.      Ultimately, I believe that it was

20   cleared up.

21       Q.      In Paragraph 71 you say they used

22   their confidential relationship and using that

23   information misrepresented plaintiffs'

## FREEDOM COURT REPORTING

370

1    allegedly interfered with your business

2    relationship?

3        A.    No.

4        Q.    Now, you knew TCU was involved in

5    the business relationship between you, Gil

6    Berry, Student Suites and ASU because you knew

7    they were the owner's representative, didn't

8    you?

9        A.    Yes.

10       Q.    So, you knew they had some role

11   in all of this, that they were going to help

12   perform a due diligence review of your scope

13   of work and proposal, didn't you?

14       A.    Yes.

15       Q.    And you knew that they were

16   looking at all of this information that you

17   claim is proprietary, correct?

18       A.    Yes.  And they wouldn't have been

19   looking at any of it if they didn't make that

20   representation to us.  They wouldn't have seen

21   that information.

22       Q.    You had numerous discussions and

23   E-mails with TCU about the project and the

**FREEDOM COURT REPORTING**

371

1    proposal, didn't you?

2          A.      Yes.

3          Q.      And you used the word

4    "intertwined" a little while ago in discussing

5    another relationship.  Would you characterize

6    the relationship between ASU, TCU, Gil Berry &

7    Associates, Student Suites, Inc. and Marous

8    Brothers as intertwined?

9          A.      No.

10         Q.      You wouldn't?

11         A.      No.  We're all separate entities.

12         Q.      Okay.  I didn't say you related.

13    Intertwined, the relationships.  All the

14    parties were all working on the same project

15    and working towards a student renovation

16    project?

17         A.      I'm not sure we were all working

18    on the same -- for the same ends.  Clearly

19    since we didn't end up with the project,

20    neither did Mr. Berry, we weren't all working

21    for the same ends.

22         Q.      Well, you don't know why Mr.

23    Berry was not retained, do you?

# FREEDOM COURT REPORTING

377

1   legal technical term of conversion because I'm

2   not an attorney so...

3         Q.      All right.  Well, let's do it

4   this way.  Do you think and do you have any

5   evidence that the TCU defendants wrongfully

6   appropriated your proprietary work product to

7   their own use and beneficial enjoyment?

8              Not ASU, but the TCU defendants.

9         A.      Only TCU?

10        Q.      Only TCU, Upchurch and Thomas.

11        A.      I believe no.

12        Q.      Let's go down to the next

13   paragraph.  You say defendants wrongfully

14   appropriated work product after representing

15   that plaintiffs would be compensated for their

16   work product.

17              And you've already said that the

18   TCU defendants didn't tell you that?

19        A.      They did not tell us that.

20        Q.      And you submitted invoices, but

21   those were submitted to Gil Berry for

22   submission to ASU?

23        A.      Yes.

# FREEDOM COURT REPORTING

379

1    does.  I can't speak for Mr. Berry.

2          Q.    Correct.  We've already deposed

3    Mr. Berry about this.  I'm talking about just

4    Marous.

5                So, am I correct in understanding

6    that --

7          A.    Yes.

8          Q.    -- Marous does not believe that

9    the allegations of conversion, the wrongful

10   appropriation of its work product, apply to

11   the TCU defendants?

12         A.    Yes.

13         Q.    Okay.  And we're not going to

14   come back later and here that that's changed,

15   are we?

16         A.    No.

17         Q.    Does Marous maintain its scope of

18   work and the work product that it developed in

19   this case in computer form?

20         A.    Yes.

21         Q.    You have Autocad?

22         A.    Yes.

23         Q.    And so you at all times had

## FREEDOM COURT REPORTING

380

1    copies of all of this material?

2         You didn't provide your only

3    copies of this scope of work to ASU or TCU or

4    Gil Berry or anybody else?

5         A.    No.

6         Q.    So, you've always been able to

7    use this material for whatever purpose you

8    wanted, even during the pendency and after

9    this project?

10        A.    Question of clarification.  What

11   other purpose besides building this project

12   would we --

13        Q.    Well, I don't know that there is

14   one.  But you could at all times use this, and

15   you were never denied use of this material,

16   correct?

17        A.    No.

18        Q.    Count Eight is loss of business

19   opportunity.

20        A.    This is -- this is not a Marous

21   issue.

22        Q.    So, Count Eight is not a claim

23   made by Marous against the TCU defendants or

# FREEDOM COURT REPORTING

381

1    ASU defendants?  And we've deposed Gil Berry

2    about it.  As far as --

3                    MR. LYONS:  Marous doesn't have a

4    claim for loss of business opportunity other

5    than the project that's the subject of the

6    lawsuit obviously, but nothing separate.

7            Q.      (By Mr. Lawson)  So, the

8    conversion --

9            A.      No likely claim.  Okay.

10           Q.      So, conversion, which is Count

11   Six, I believe and Count Eight, which is loss

12   of business opportunity and I believe Count

13   Two, which is quantum meruit, those three

14   claims are not being made by Marous against

15   the TCU defendants; is that correct?

16                   MR. LYONS:  Yes.

17                   THE WITNESS:  Yes.

18           Q.      (By Mr. Lawson)  The damages that

19   Marous claims in this case total what?

20           A.      You're asking for an exact

21   amount?

22           Q.      Yes.

23           A.      I've got to look.  It's our

385

1    preconstruction, of which -- I actually forget

2    what the number was incurred prior to TCU's

3    involvement.

4         Q.    Well, as of May 15th, $297,500

5    was billed or invoiced by you?

6         A.    Right.

7         Q.    Between May 15 and July 28, are

8    we to assume that there were more

9    preconstruction fees incurred?

10        A.    Yes.

11        Q.    Do you know how much?

12        A.    We'll have to get back to you

13   with that.

14        Q.    Do we have any way of knowing?

15        A.    We will go back through time

16   records and other travel expenses and whatever

17   else we need to.

18        Q.    Well --

19             MR. LYONS:  You need to go ahead

20   and tell him your current understanding of

21   what it is to the best of your knowledge.

22             THE WITNESS:  Right now --

23             MR. LYONS:  This is his chance to

## FREEDOM COURT REPORTING

396

1          Q.      Have you ever seen this before?

2          A.      Yes.

3          Q.      And so this is from the Secretary

4    of State's office in the State of Alabama

5    giving you authority to transact business in

6    the State of Alabama as of May 15, 2006?

7          A.      Yes.

8          Q.      "You" being Marous Brothers

9    Construction?

10         A.      Yes.

11         Q.      Did you make the application?

12         A.      No.

13         Q.      Who did?

14         A.      I'm sorry?

15         Q.      Who did?

16         A.      Allen Bundy, assistant

17   controller.

18         Q.      As of May 15, 2006, you had

19   already submitted your proposal and scope of

20   work in this project, hadn't you?

21         A.      Yes.

22         Q.      And you had made numerous trips

23   to Alabama, hadn't you?

# FREEDOM COURT REPORTING

399

1    Board for General Contractors.

2            Other than the first few pages,

3    which is a cover letter to me and a subpoena

4    requesting this information, if you'll flip

5    through that and tell me if you've ever seen

6    those documents?

7        A.    I have seen the license document.

8    I didn't see the renewal forms.  I've seen

9    this document, "this" being the Alabama great

10   seal for -- where we can continue to be

11   licensed.  I've clearly seen our financials.

12   I'm aware of our financials.

13           And I have not seen the rest of

14   these documents, except the licenses.

15       Q.    Okay.  Well, about halfway

16   through that stack -- and I'll find it for you

17   if you want, it would be easier -- is a

18   license certifying that Marous Brothers

19   Construction is hereby licensed as a general

20   contractor in the State of Alabama as of

21   August 16, 2006.

22           That's the first time that Marous

23   Brothers Construction was a licensed general

# FREEDOM COURT REPORTING

400

1    contractor in the State of Alabama, correct?

2    A.    Yes.

3    Q.    So, prior to April -- excuse me,

4    August 16, 2006, Marous was performing

5    preconstruction services and other

6    construction work in the State of Alabama

7    without being licensed by the board of general

8    contractors?

9    A.    That is incorrect.

10    Q.    Well, did you have a license?

11    A.    We were not performing

12    construction work in Alabama.

13    Q.    What were you -- were you

14    performing preconstruction services?

15    A.    Yes.

16    Q.    Do you know what the state

17    licensing board for general contractors, how

18    they define construction work?

19    A.    I do not.

20    Q.    Okay. So, all of these things

21    that you've described for me as

22    preconstruction services -- and we've gone

23    through quite a few of those today -- you were

# FREEDOM COURT REPORTING

401

1    performing all of that work prior to being

2    licensed by the licensing board for general

3    contractors in Alabama?

4        A.    We were -- any work that they we

5    performed prior to August 16th, 2006, was

6    performed prior to our obtaining the license.

7        Q.    You knew you had to be a licensed

8    general contractor, didn't you?

9        A.    When we were doing the -- I

10   assumed we would be when we were planning to

11   do the construction, yes.

12       Q.    You also performed architectural

13   work in the State of Alabama prior to being a

14   registered certified architect in the State of

15   Alabama, didn't you?

16       A.    We performed the architectural

17   work in Cleveland, Ohio for a project in

18   Alabama.

19       Q.    For a project in Alabama prior to

20   being a registered architect in the State of

21   Alabama, correct?

22       A.    Yes.

23       Q.    Are you aware that it's a

# FREEDOM COURT REPORTING

402

1    criminal violation in Alabama to perform work

2    as a general contractor without a license?

3         A.    I previously testified that I

4    wasn't sure of the contractor requirements and

5    what's defined as construction work.

6         Q.    So, you're not -- you don't know

7    whether or not it is a criminal violation to

8    perform construction -- or perform work as a

9    general contractor without a license in

10   Alabama?

11        A.    I'm not the designated

12   representative in Alabama for our company.

13        Q.    Well, you're here today

14   testifying as Marous, at least as I understood

15   at the beginning.

16             The application which is at the

17   end of that exhibit, the application for the

18   general contractor's license --

19        A.    Uh-huh (affirmative).

20        Q.    -- on what is listed as Page 5 --

21   noted as Page 5 of that application under

22   accounts receivable, uncompleted contracts and

23   then other accounts receivables. Do you see

## FREEDOM COURT REPORTING

403

1    that?

2         A.      Yes.

3         Q.      I don't see anything in there

4    that list any of the monies that you claim

5    were owed for preconstruction services for

6    your work on this project.  Why is that?

7         A.      I didn't prepare the schedule.

8    So, I can't --

9         Q.      You're here today as Marous.

10        A.      But I'm not the accountant for

11   Marous.

12        Q.      Do you see it listed on there as

13   an account receivable?

14        A.      I don't.

15        Q.      If you'll flip over the Page 12

16   for me.  Actually, let's look at Page 14

17   first, which is the very last page, affidavit

18   for corporation.  It says the president.  Is

19   that Chip Marous?

20        A.      Yes.

21        Q.      So, he has verified under oath

22   that the statements made in this application

23   are accurate; is that correct?

# FREEDOM COURT REPORTING

404

1          A.      Yes.

2          Q.      Now, if you'll look at Page 12,

3    it says list major projects you currently have

4    under contract.  I don't see anything in there

5    that list this ASU project.  Is there a reason

6    for that?

7          A.      I don't know.

8          Q.      There are a number of other

9    projects listed.  Can you, as Marous, tell me

10   why it is that you don't list the ASU project?

11   It didn't ask for --

12          MR. LYONS:  If you don't know,

13   don't guess.

14          Q.      (By Mr. Lawson)  It didn't ask

15   for some of the projects.  It says list major

16   projects you currently have under contract.

17          A.      I don't know.

18          Q.      Could it be perhaps because you

19   were performing services --

20          MR. LYONS:  He said he doesn't

21   know.

22          Q.      (By Mr. Lawson)  -- services in

23   Alabama without being a licensed contractor?

# FREEDOM COURT REPORTING

418

1    but while I'm looking at this stuff, if you

2    want them to go so you're not waiting on me.

3                    MR. LYONS:  You want to take five

4    while you --

5                    MR. LAWSON:  That's fine.

6                    (Whereupon, the taking of the

7    deposition was recessed from approximately

8    5:30 p.m. to approximately 5:48 p.m., after

9    which the following proceedings were had and

10   done:)

11        Q.      Mr. Goldman, you testified when I

12   was asking you about the fraudulent

13   misrepresentation claim that the fraudulent

14   statement allegedly made by TCU was that it

15   promised that it wouldn't take your -- or

16   wouldn't take the job or take the project; is

17   that correct, because it would be illegal?

18        A.      Yes.

19        Q.      Okay.

20        A.      That they couldn't take the job

21   from us.

22        Q.      Couldn't or wouldn't?

23        A.      Well, he said he wouldn't, and he

## FREEDOM COURT REPORTING

419

1    said they couldn't.

2         Q.    Okay.  And me made that statement

3    allegedly end of July or first of August?

4         A.    Yes, in a phone conversation

5    between Ken and I.

6         Q.    Okay.  Was anybody else on the

7    phone?

8         A.    No.  Ken and I.

9         Q.    When Mr. Upchurch allegedly made

10   the statement, do you have any evidence that

11   he had no intent to fulfill that promise not

12   to take the job at that time?

13        A.    I have no idea one way or the

14   other.

15        Q.    Okay.  So, you as we sit here

16   today, don't have any evidence that at the

17   time Mr. Upchurch allegedly made that

18   statement to you he had no intent to fulfill

19   that promise?

20        A.    I have no idea one way or the

21   other.

22        Q.    You did not send any E-mail or

23   letter or prepare any document confirming Mr.

# FREEDOM COURT REPORTING

421

1          Q.      And you didn't object to Mr.

2     Berry's E-mails?

3          A.      No.  Once I received that

4     assurance from Mr. Upchurch, I had no

5     objection?

6          Q.      So --

7          A.      I'm listening.  I apologize.  Go

8     ahead.

9          Q.      No.  I'm pausing not for you but

10    because I'm thinking.

11         A.      Smelled wood burning.

12         Q.      So, there's no evidence then that

13    at the time Mr. Upchurch allegedly made that

14    statement to you he did not intend to fulfill

15    that promise; is that correct?

16         A.      I have no evidence one way or the

17    other.

18                 MR. LAWSON:  Okay.  That's all I

19    have.

20    EXAMINATION BY MR. ALLRED:

21         Q.      Mr. Goldman, one of the purposes

22    of the TCU defendants taking your deposition

23    today was to find out what the relationship is

FREEDOM COURT REPORTING

561

1    criteria?

2        A.      Yes.

3        Q.      And he told ASU that?

4        A.      Yes.

5        Q.      But he didn't tell you that ASU

6    had decided to accept your proposal, did he?

7    He didn't use those words, did he?

8        A.      He did not use those words.

9        Q.      Okay.  He just told you --

10       A.      Nor did I testify to that.

11       Q.      Okay.  I'm just clarifying making

12   sure that I didn't misunderstand something you

13   said because I thought I heard you say that he

14   told you that there was a final agreement on

15   the design.

16       A.      I think he told me -- I think

17   what I testified to several hours ago was that

18   I asked Mr. Upchurch if the design was where

19   it needed to be, did it have the components in

20   it that needed to be there and was the scope

21   where it needed to be.  And he said yes.

22       Q.      Okay.  And you've also testified

23   that he then told you that he would recommend

## FREEDOM COURT REPORTING

562

1    that ASU accept your proposal; is that

2    correct?

3         A.    Yes.

4         Q.    You testified that that statement

5    was made by TCU on September 20th, 2006, and

6    in a phone conversation; is that correct?

7         A.    The 19th or 20th.  I don't

8    remember --

9         Q.    So, either September -- it was

10   either September --

11        A.    The 19th or 20th, yes.

12        Q.    2006?

13        A.    Yes.

14        Q.    TCU allegedly told you that it

15   would recommend that ASU accept Marous/Gil

16   Berry/Student Suites proposal?

17        A.    Yes.

18        Q.    And THAT was in a phone

19   conversation with you?

20        A.    Yes.

21        Q.    Did you confirm that in writing?

22        A.    No.

23        Q.    Do you have any evidence that at

# FREEDOM COURT REPORTING

563

1    the time TCU allegedly promised to you to

2    recommend that ASU accept your proposal that

3    TCU or Upchurch had no intention of actually

4    making that recommendation?

5          A.      I have no idea one way or the

6    other.  I took -- like I said, I took Mr.

7    Upchurch at his word.

8          Q.      You testified, I believe, that

9    sometime after September 22nd, TCU or Ken

10   Upchurch called you to ask if you would be

11   interested as serving as the CM on the

12   project?

13         A.      We talked if we consider -- if

14   that was something that -- you know, that

15   independent of Gil Berry and Student Suites,

16   something to the effect of would we consider

17   or want to be considered serving as the CM for

18   the project.

19         Q.      When did that conversation occur?

20         A.      After the board meeting?

21         Q.      On that day or just some day

22   afterward?

23         A.      I don't know if it -- I don't

# Exhibit B



# ALABAMA STATE UNIVERSITY

MONTGOMERY, ALABAMA 36101 · 334 / 229-4200

OFFICE OF THE PRESIDENT

September 28, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As President of Alabama State University, I am charged with the stewardship of both public and private funds in the execution of my fiduciary responsibility. One immediate and challenging responsibility is the renovation of selected student housing units here on the ASU campus.

As you are already aware, because you were in voluntary attendance, I made a recommendation to the Alabama State University Board of Trustees, at its September 22, 2006 meeting, that we not engage Student Suites/Gill Berry & Associates for this proposed project.

Under separate cover, I am returning all documents provided ASU relating to your proposals regarding this project. I sincerely regret that we could not arrive at acceptable terms on matters associated with this project.

Thank you so much for your interest in student housing at Alabama State University.

Sincerely,

Joe A. Lee
President

Cs:    Mr. Elton Dean
       Mr. Kenneth Thomas, Esq.
       Mr. Ken Upchurch

# Exhibit C



# Marous Brothers
## CONSTRUCTION

May 15, 2006

Gil Berry & Associates and Student Suites, Co-Developers
c/o Gil Berry, President
Gil Berry & Associates
721 Acorn Lane
Jefferson Hills, PA 15025

**Re: Alabama State University - Student Dormitory Renovations**

**INVOICE FOR PART 1 DESIGN/BUILD PRECONSTRUCTION SERVICES**

| | |
|---|---:|
| a) On-site field video and survey work | $ 27,550.00 |
| b) General Manager's supervision | 9,900.00 |
| c) Preparation of existing conditions base plans | 42,940.00 |
| d) Principal Architect's supervision | 9,225.00 |
| e) Preliminary suite layouts | 39,750.00 |
| f) Principal Architect's supervision | 9,800.00 |
| g) Exterior elevations documentation | 21,125.00 |
| h) Design development plans | 38,625.00 |
| i) Design development details | 16,225.00 |
| j) Principal Architect's supervision | 10,500.00 |
| k) Preparation of scope of work narrative | 14,850.00 |
| l) Cost estimating | 18,650.00 |
| l) General Manager's supervision | 9,500.00 |
| m) Presentation materials | 2,295.00 |
| m) Travel expenses (airfare, meals, lodging) | 26,565.00 |

| | |
|---|---:|
| TOTAL AMOUNT NOW DUE | $297,500.00 |

Please remit payment for the above amount now due for Part 1 Design/Build services

Thank you…

Marous Brothers Construction, Inc.

General Contractor

Design/Build

Special Projects Group

Construction Manager

Site Contractor

Concrete Contractor

Carpenter Contractor

or Finishes Contractor

02 Joseph Lloyd Parkway

Willoughby, OH 44094

440.951.3904

fax 440.951.3781

vw.marousbrothers.com

DEFENDANT'S
EXHIBIT

18-GOLDMAN

MAR 000253

# Exhibit D

NANCY L. WORLEY
SECRETARY OF STATE



First Floor, State Capitol
Suite S-105
600 Dexter Avenue
P.O. Box 5616
Montgomery, Alabama 36103-5616

## State of Alabama
May 23, 2006

**RECEIVED**

MAY 26 2006

MAROUS BROTHERS

Marous Brothers Construction
1702 Joseph Lloyd Pkwy
Willoughby OH 44094

Re: Marous Brothers Construction, Inc.,
    an Ohio Corporation

Dear Sir or Madam:

This letter acknowledges receipt of your Application for Certificate of Authority and $175.00 filing fee. Your authority to transact business in the State of Alabama has been granted as of May 15, 2006.

Enclosed you will find a certified copy of your Application for Certificate of Authority. Thank you for doing business in Alabama.

You are required to file the Business Privilege Tax Return (BPT) with the Alabama Department of Revenue. You have two and a half months from the date the Certificate of Authority is granted in the State of Alabama to file the BPT forms. You may download a copy of the BPT forms from the Alabama Department of Revenue website address located at www.ador.state.al.us. For additional information or specific instructions, please call the Alabama Department of Revenue at (334) 353-7923.

If you are unable to download a copy of the BPT forms or if you do not have Internet access, you may obtain the BPT forms from the Alabama Department of Revenue, Privilege Tax Division or from the Corporations Division of the Alabama Secretary of State's Office.

For further assistance in this or any other matter, please feel free to contact this office at (334) 242-5324

Sincerely,

Nancy L. Worley
Secretary of State

NLW/rb
Enclosures

**DEFENDANT'S EXHIBIT**

40 - Goldman

OFFICE (334) 242-7206, FAX (334) 242-4993, E-MAIL SOS@SOS.AL.GOV • ELECTIONS (334) 242-7210, FAX (334) 242-2444
CORPORATIONS (334) 242-5324, FAX (334) 240-3138 • UCC (334) 343-5231, FAX (334) 353-8269 • LEGAL (334) 242-7476, FAX (334) 242-4993
LANDS & TRADEMARKS (334) 242-5325, FAX (334) 240-3138

GBA 000133

FILED IN OFFICE

MAY 15 2006

SECRETARY OF STATE

## STATE OF ALABAMA

### APPLICATION FOR CERTIFICATE OF AUTHORITY
### OF A FOREIGN CORPORATION TO TRANSACT BUSINESS IN ALABAMA

TO THE SECRETARY OF STATE OF THE STATE OF ALABAMA,

PURSUANT TO THE PROVISIONS OF THE ALABAMA BUSINESS CORPORATION ACT, THE UNDERSIGNED CORPORATION HEREBY APPLIES FOR A CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS IN ALABAMA AND, FOR THAT PURPOSE, SUBMITS THE FOLLOWING STATEMENTS.

1. The exact name of the corporation:
   Marous Brothers Construction, Inc.

2. If your corporate title does not include "Corporation," "Corp," "Incorporated" or "Inc.", one of these must be added for use in Alabama.  Please list your exact corporate title with the addition of one of these words.

3. State or Country of incorporation:    Ohio

4. Date of incorporation:    1/12/1981        Duration of corporation:    Perpetual

5. Street address of principal office:
   1702 Joseph Lloyd Parkway   Willoughby, OH  44094

6. Name and street address (NO PO BOX) of registered agent in Alabama:
   The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, AL 36109

7. The names and addresses of its directors and officers are:

| NAME | OFFICE/TITLE | MAILING ADDRESS |
|------|-------------|-----------------|
| Adelbert Marous Jr. | President | 7190 Eagle Rd. Waite Hills, OH  44094 |
| Scott P. Marous | Chief Oper. Officer | 7480 Mountain Quail Pl. Concord OH  44060 |
| Ken J. Marous | Vice President | 10240 Sawmill Dr. Chardon, OH  44024 |

8. This application is accompanied by a copy of articles of incorporation and all amendments thereto, duly certified by the proper official of the state under the laws of which it is incorporated, together with the filing fee of $175.00.  The non-profit corporation filing fee is $75.00.  The certification by the Secretary of State or the equivalent in your state must be an original and "current" (within six months).

9. Date:    May 9, 2006

Adelbert Marous Jr.    President
Type or Print Corporate Officer's Name and Title

Signature of Officer

RECEIVED

MAIL DUPLICATE ORIGINALS OF THIS APPLICATION, A CERTIFIED COPY OF THE CHARTER AND THE FILING FEE TO:
SECRETARY OF STATE, CORPORATIONS DIVISION, POST OFFICE BOX 5616, MONTGOMERY, ALABAMA 36103-5616
(334)242-5324

CD.2 Rev. 4/2000

AL 015 - 6/05/2002 © T System Online

SECRETARY
OF STATE

CBA 000134

Nancy L. Worley
Secretary of State

P.O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

**I, Nancy L. Worley, Secretary of State of the State of Alabama, having custody
of the Great and Principal Seal of said State, do hereby certify that**

the foreign corporation records on file in this office

disclose that Marous Brothers Construction, Inc., an Ohio

corporation, qualified in the State of Alabama on May 15,

2006. I further certify that the records do not disclose

that said Marous Brothers Construction, Inc. has been

withdrawn.



**In Testimony Whereof, I have hereunto set my hand
and affixed the Great Seal of the State, at the Capitol,
in the City of Montgomery, on this day.**

May 24, 2006
_____
**Date**

_Nancy L. Worley_
_____
Nancy L. Worley            **Secretary of State**

# Exhibit E



## *APPLICATION FOR PRIME TO PRACTICE GENERAL CONTRACTING*

TE: ALABAMA LAW DOES NOT ALLOW FOR THE REFUND OF APPLICATION FEES (1986 Legislative Amendment: Section 34-8-2(b);
*Application Fees are for Administration and Enforcement)*
Application Forms may be downloaded @ GENCONBD.STATE.AL.US

25 FAIRLANE DRIVE
GOMERY, ALABAMA 36116

PHONE (334) 272-5030
FAX (334) 395-5336

*TO THE STATE LICENSING BOARD FOR GENERAL CONTRACTORS:* Application is hereby made for license to
in the practice of GENERAL CONTRACTING in Alabama, under the provisions of Title 34, Chapter 8, Code of Alabama,
nd the *Rules and Regulations* adopted and promulgated by the State Licensing Board for General Contractors under authority
in it by the said act. This application is accompanied by a Certified Check, Cashier's Check or Money Order for $300 dollars,
: to the order of the State Licensing Board for General Contractors, the application fee as provided for by the Act. I understand
lure to fully answer all of the following questions and/or to furnish the required supporting papers, completely executed, will be
nt grounds for rejecting this application. I further understand that submission of this application fee provides me one year
late of receipt by Board) to meet the above requirements.

The Undersigned hereby represent(s) that the following statements and answers to interrogatories are true to the best of his
dge, information and belief:

PROPRIETORSHIP: _____
          (owner's signature)                    (company name)

NERSHIP: _____  MEMBERS: _____
          (name of firm)                         (signature)    (signature)

DRATION: Marous Brothers Construction  BY: _____
          (corporate name)                       (President's signature)

ant's Trade Name Marous Brothers Construction    Phone(440) 951-3904   Fax(440) 942-7884
Address 1702 Joseph Lloyd Parkway          City Willoughby      State OH Zip  44094

OARD SHALL CLASSIFY CONTRACTORS ACCORDING TO THE TYPE OR TYPES OF CONTRACTS ON
H THEY MAY PERFORM , WITHIN MAXIMUM BID LIMITS AND BASED UPON DOCUMENTED WORK
IENCE (see page 13 *Confidential Financial Statement, Work Experience & Equipment Booklet*) Classification of licenses
: requested within the four MAJOR CLASSIFICATIONS of Building Construction, Highways & Streets, Municipal &
and Heavy & Railroad. Applicants must have a minimum of three projects completed for each
SSIFICATION listed in order to qualify for that Major Classification. Applicants not qualifying for a Major Classification
uest specific sub-classifications and/or Specialty Classifications (below) for which their work experience qualify.

ING CONSTRUCTION: Construction of commercial or industrial *building structures* intended for use for shelter, protection,
or convenience; *Excavation* and *Foundations* for building construction; and *work incidental to Building Construction.*
Structures_____ /Excavation & Foundations` /work incidental to Building Construction

VAYS & STREETS: Construction of *Roads, Streets, Alleys, Sidewalks, Curb & Gutter, Guardrails, Fences, Parkways, Parking*
*unways, Bridges, Grading, Drainage, Landscaping, and all work incidental to Highway and Street Construction*

IPAL & UTILITY: *Clearing, grubbing, grading, paving, curbs, gutters, walks, driveways, swimming pools, sewer projects, water*
*gas projects, electric projects, telephone projects, and all work incidental to Municipal and Utility Construction*

' & RAILROAD: Construction of *Railroads, Bridges, Foundations, Pile Driving, Piers, Abutments, Retaining Walls, Viaducts,*
*Subways, Drainage Projects, Aqueducts, Irrigation Projects, Flood Control Projects, Water Power Development, Hydro-Electric*
*ment, Transmission Lines, Pipe Lines, Locks, Dams, Dikes, Levees, Revetments, Channels, Breakwaters, Docks, Harbors, Industrial*
*Excavation, Clearing, Grubbing, and all work incidental Heavy and Railroad Construction..*
_____ /_____ /_____

LTY CLASSIFICATIONS are assigned for construction, erection, alteration, modifications or additions requiring specific
d/or trade or crafts for any particular part of the work, and work incidental thereto. Applicants with qualifying work
ce may request one or more Specialty(s) (below) or a specific sub-classification(s) (above).

Mechanical
HVAC
Electrical
Plumbing
Swimming Pools
Sprinkler Systems
Sheet Metal
Roofing/Siding
Painting
Masonry
Underground Piping
Construction Manager
Demolition
Course
Recreational Areas
Landscaping
Remodeling
Renovations
asbestos
Maintenance, Repair and Alterations
ridges
treets

☐ Drainage
☐ Concrete
☐ Clearing/Grubbing
☐ Earthwork
☐ Excavation
☐ ROW Maintenance
☐ Traffic Control and Safety
☐ Erection of Structural Steel
☐ Miscellaneous Steel
☐ POL Dispensing Systems
☐ Environmental
☐ Metal Buildings
☐ Equip. Handling Systems
☐ Structural Concrete
☐ Other_____

RECEIVED
JUN 0 5 2006

2006 0926
ENT'D JUN 0 7 2006

ITIONAL
MENTS:_____
_____
_____

e No.( if previously licensed by this Board) _____    State and License No. of each general
ctors license you currently hold: _____

## LIST ALL MAJOR CONTRACTS CURRENTLY BEING PERFORMED

| SSIFICATION OF WORK | CONTRACT AMOUNT | OWNER - CITY, STATE | % OF WORK COMPLETED |
|---|---|---|---|
| eral Contractor | $47,905,613.00 | The Ferchill Group/ Pittsburgh, PA | 95% |
| eral Contractor | $18,117,148.00 | Arbor Park Ph III / Cleveland, OH | 95% |
| ior Finishes Contractor | $18,500,000.00 | Cleve. Clinic Foundation / Cleveland, OH | 2% |
| eral Contractor | $13,891,460.00 | KM Yarus, Inc. Pepper Pike / OH | 95% |

ERENCES WILL SERVE AS A MEANS FOR THE BOARD TO VALIDATE THE WORK EXPERIENCE YOU
'E PROVIDED ON PAGE 13 OF THE *CONFIDENTIAL FINANCIAL STATEMENT, WORK EXPERIENCE &
'IPMENT QUESTIONNAIRE* BOOKLET. Please identify below reference contacts for each reference requirement.
ress, Phone and Fax information must be provided for each.

hitect    Name: City Architecture _____
OR    Contact Person:  Mark Dodds _____
ineer    Address:  3634 Euclid Avenue   Suite 100 _____  City: Cleveland ____  State: OH  Zip: 44115
       Phone ( 216)  881-2444 _____  Fax (216)  881-6713 _____
ANK:  First Merit _____
ter Of  Contact Person:  Steve Baldini  Vice President _____
ent    Address:  7800 Reynolds Road _____  City: Mentor _____  State: OH Zip: 44060
o   Phone ( 440) 953-2227 _____  Fax ( 440)  953-3690 _____
pplicant
erial Supply Dealer:    Whole Builders Supply _____
       Contact Person:  Greg Bronson _____
       Address:  1261D Industrial Parkway _____  City: Brunswick ____  State: OH  Zip: 44121
       Phone (330) 350-1993 _____  Fax (330)  220-0654 _____
l Contractor: _____  License No: _____
       Address: _____  City: _____  State: _____  Zip: _____
       Phone ( ) _____  Fax ( ) _____

here any liens for labor or materials filed on any of your work anywhere?  YES____    NO  X
statement of particulars MUST be attached.

you ever defaulted on a contract?                        YES___    NO  X
statement of particulars MUST be attached.

a furnish bonds, give the names and addresses of your sureties:  Hotaling and Associates _____
 Rockside Road Suite 250  Independence, OH 44131 _____

N INDIVIDUAL - State your contracting experience, giving number of years:
contractor:    Where: _____    When: _____
superintendent::  For Whom: _____    Where: _____    When: _____
 engineer::    Where: _____    When: _____
r:    Explain: _____

you attended any scientific, professional or technical school? If so, give name of school, years attended and whether or not
raduated.

_____
_____

you ever compromised with any of your creditors, become bankrupt, or in any way become discharged from your debts
wise than by payment in full? YES _____    NO _____    If so, state full details in confidential letter and attach.

PARTNERSHIP: (list each Co-Partner's name, age, and address below)    DATE FORMED: _____
_____
_____
_____

rship General ___ or Limited___   If Limited, explain fully:_____

ny members engaged in any other line of business? YES ___  NO ___  If so, give particulars.  (attach details)
 the technical training of each partner
_____

 the contracting experience of each partner, giving the number of years

s a contractor: _____ yrs.          Where: _____    For Whom: _____
s a superintendent: _____ yrs.    For Whom: _____    Where: _____
s an engineer: _____ yrs. Where:_____
ther: _____ yrs. Explain:_____

▸ he firm, or any member thereof, ever compromised with its or his creditors, become bankrupt, or in any way become
scharged from his debts other than by payment thereof in full? YES ____    NO ____    If so, full details must be stated in
nfidential letter and attached.

**ORPORATE INFORMATION:** State of Incorporation __OH__ , County __Lake__ , Date of Incorporation __1/21/1981__

| OFFICERS | ADDRESS |
|---|---|
| resident  Adelbert Marous Jr. | 7190 Eagle Road Waite Hills, OH  44094 |
| ceePresident   Scott Marous | 7480 Mountain Quail Place  Concord, OH  44077 |
| cretary   Ken Marous | 10240 Sawmill Drive  Chardon, OH  44024 |
| reasurer   Ken Marous | 10240 Sawmill Drive  Chardon , OH  44024 |

ajor Stock Holder's    Adelbert ___ / _45_ %    Scott ___ / _45_ %    Ken ___ / _10_ %    _____ %

s the Corporation, any of its officers, or any corporation, firm / individual of which this corporation is a successor ever
mpromised with creditors, become bankrupt, or in any way become discharged from  debt other than by payment in
ll?

ES _____    NO _X_    If yes, attach details in  confidential letter.

s the corporation, any of its officers, or any corporation, firm or individual of which this corporation is a successor, ever
mpromised with creditors, become bankrupt, or in any way become discharged from debts other than by payment in full.
ES _____    NO _X_          If YES, give details in full confidential letter attached.

t each surety company that has paid a loss on: You as an Individual___  Any firm member __  Any Corporate Officer __
d provide full particulars including amount ($) and Name/Address of Banks in an attached statement.

es applicant have an established (bank) line of credit:  YES _X_    NO ___    If so, indicate amount $ 12,000,000.00
me of Bank  First Merit_____          Address  7800 Reynolds Road  Mentor, OH  44060

t applicant's financial statements audited by a certified public accountant or a public accountant? YES _X_    NO ___
me of Accountant    Kowall & Company          Date of last Audit, Review or Compilation   12/31/2005

∩vide the name(s) of any **Individual, Responsible Managing Employee, Officer,** or **Member of the Executive Staff** of your
ganization who has plead guilty or been convicted of any charges relating to bid rigging.  Full details must be attached in a
nfidential letter to the Board.

_____

t No. 91-473, Acts of Alabama (1991), requires the collection of $100 fee to " be distributed by the State Licensing Board for General
ntractors at the end of each licensing period to all accredited public institutions of higher education of American Council for
nstruction Education accredited courses in building science and to all accredited public institutions of higher education offering courses
uilding science who are in the candidate status of the American Council for Construction Education and to institutions of higher
cation offering courses leading to a Bachelor of Civil Engineering degree which offers courses in highway engineering and construction of
undergraduate and graduate levels whose civil engineering program is accredited by the Engineering Accreditation Commission of the
reditation Board for Engineering and Technology (ABET)".

PLEASE SELECT (X) ONE OF THE FOLLOWING TO INDICATE THE PROGRAM
YOU WISH YOUR $100 FEE TO SUPPORT:
_X_ Building Science (general construction)    _____ Civil Engineering (highway engineering and/or construction)

_____

**The Undersigned hereby represent(s) that the foregoing statements and answers to
interrogatories are true to the best of his knowledge, information and belief.**

__5-31-06__                                          __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__
Date              Signature              Social Security No. of Signer

IDAVIT

STATE OF _Ohio_____    CITY OF _Willoughby_____    COUNTY OF ___Lake_____

Subscribed and sworn to before me, the undersigned Notary Public, in and for the State and City or County aforesaid
this __31st__ day of __May_____ in the year __2006__ .  My commission expires: _____

Notary Public

_Michelle L. Roof_

MICHELLE L. ROOF
Notary Public
In and for the State of Ohio
My Commission Expires
June 15, 2008

# Exhibit F



# 2007 PRIME RENEWAL FORM
## ALABAMA LICENSING BOARD FOR GENERAL CONTRACTORS
2525 Fairlane Dr. (Executive Park) Montgomery, Alabama 36116
PH. (334) 272-5030  FAX (334) 395-5336  WEB: WWW.GENCONBD.STATE.AL.US

**(A)**

COMPANY NAME MAROUS BROTHERS CONSTRUCTION, INC.    LICENSE NO. 41183

MAILING ADDRESS    1702 JOSEPH LLOYD PARKWAY

CITY    WILLOUGHBY    STATE    OHIO    ZIP 44094

TELEPHONE ( 440 )  951-3904    FAX ( 440 )  942-7884    E-MAIL WWW.MAROUSBROTHERS.COM

FOR CORPORATIONS AND LL ENTITIES ONLY:  Incorporation/Formed Date: 1/81  State: OHIO
SUBMIT PROOF OF EXISTENCE FROM ALABAMA SECRETARY OF STATE

**(B)**

1.  Have any changes occurred in the style, name, ownership, composition or nature of your business? (if "yes" attach explanation)    yes: ____ no: X

ALL ENTITY CHANGES MUST BE DONE BY SUBMITTING A NEW APPLICATION
CONTACT YOUR LICENSE SPECIALIST

2.  Has an individual, manager, officer, or member of the executive staff of your organization been convicted or pled guilty to any bid rigging related charge, not previously reported to this board?    yes: ____ no: X

3.  Has your test qualifier changed?    yes: ____ no: X

**(C)**  Financial Information (Insert Figures and Attach Appropriate Financial Statement)

Total Net Worth: $10,307,000.00    Working Capital $8,605,000.00

Line of Credit: $12,000,000.00    Personal Statement: _____
(if needed)                        (if needed)

I certify the above financial information is correct. I understand this information determines my company's bid limit.

Owner/Principal (print): ADELBERT MAROUS, JR.    Date: 7/2/2007

Owner/Principal (signature): _____    Date: 7/2/2007
If an extension is granted, another renewal form must accompany the Financial Statement with the Financial Information portion completed.

State of OHIO    City of WILLOUGHBY    County of LAKE

Subscribed and sworn to before me, the undersigned Notary Public, in and for the State and County aforesaid this

2 day of July in the year 2007 My commission expires _____

Notary Public _____
ORIGINAL SIGNATURES REQUIRED

Notary Public. State of ___
My Commission Expires Jan ___
(Recorded in Lake Coun__)

**(D)**    Subsection 34-8-28 Of The Title 34, Code Of Alabama, 1975 Provides For A Portion Of Your Renewal Fee To Be Distributed By This Board To Institutions Of Higher Education. Please Indicate The Education Program You Wish To Support With Your Renewal Fee:    Building Science: _____    Civil Engineering: _____

**(E)**    PERSONAL and COMPANY CHECKS ARE NOT ACCEPTED
MONEY ORDERS, CERTIFIED OR CASHIER'S CHECKS ONLY

**(F)**    THE UNDERSIGNED REPRESENTS THAT THESE ANSWERS ARE CORRECT TO THE BEST OF HIS/HER KNOWLEDGE

Printed Name: _____    SOC SEC#: _____
Printed Name and Social Security Number (not FEIN) of the Individual Signing Application

Signature: _____    DATE _____
CHECK COMPANY STATUS AND SIGN ☐INDIVIDUAL☐PARTNER ☐ LLC MEMBER☐OFFICER OF CORPORATION

ALL SECTIONS MUST BE COMPLETED    RECEIVED

Page 1    JUL 0 9 2007

Organization Name: MAROUS BROTHERS CONSTRUCTION, INC.          License No: 41183

Applicant Holds Current GC Licenses in the following states: OHIO, MICHIGAN

**SIGNATORY**

The undersigned hereby declares that the following is a true statement of the experience of the corporation, partnership, limited liability entity or individual herein first named, as the data herein first given and that this statement is for the express purpose of renewing the general contractors license with the State of Alabama, State Licensing Board for General contractors.

Printed Name: ADELBERT MAROUS, JR.          Title: PRESIDENT

Signature: _____          Date: _____

---

## ENTITY INFORMATION

The above signing (Signatory) guarantees the truth and accuracy of all answers to interrogatories hereinafter made.

1. How many years have your organization been in business as a general contractor under your present business name? 26 YRS.

2. How many years experience in _____ construction work has your organization had:
   (a) As a general Contractor _____   (b) As a Sub-Contractor _____

## CORPORATION

Total authorized Capital _____   Capital Paid _____

| Officer | Name | Shares Owned | % | Address |
|---------|------|--------------|---|---------|
| President | ADELBERT MAROUS, JR. | | | 7190 EAGLE, WAITE HILL, OHIO |
| V-President | KEN MAROUS | | | 10240 SAWMILL, CHARDON, OHIO |
| Secretary | | | | |
| Treasury | | | | |

Major Stockholders: (percent of each ownership)

1. _____     3. _____
2. _____     4. _____

## PARTNERSHIP/LLC/LLP

Partners/Members: (percent of each ownership)

Form Date _____

Type Partnership _____

1. _____     3. _____
2. _____     4. _____

## PARENT, SUBSIDIARY AND AFFILIATED COMPANIES

| NAME AND ADDRESS | EXPLAIN DETAILS OF YOUR AFFILIATION |
|------------------|-------------------------------------|
| | |
| | |
| | |

RECEIVED

APR 2 4 2007          Page 2

# STATE LICENSING BOARD FOR GENERAL CONTRACTORS

2525 FAIRLANE DR. (EXECUTIVE PARK) MONTGOMERY, AL 36116
(WEBSITE: WWW.GENCONBD.STATE.AL.US)

## 2007 LICENSE RENEWAL EXTENSION

### THIS IS TO CERTIFY THAT

# MAROUS BROTHERS CONSTRUCTION, INC
## WILLOUGHBY, OH  44094

# LICENSE # 41183

### IS GRANTED AN EXTENSION OF THEIR 2006 LICENSE

### THIS EXTENSION WILL EXPIRE ON JULY 31, 2007
(ATTACH TO 2006 LICENSE CERTIFICATE)

JOSEPH C. ROGERS, JR.
EXECUTIVE SECRETARY

NOTE:  THIS VERIFICATION IS PROVIDED TO ALLOW THE CONTRACTOR TO PULL PERMITS, BID AND/OR NEGOTIATE PROJECTS WHILE AWAITING THE RENEWAL OF THEIR LICENSE.

# Exhibit G

`

2525 Fairlane Drive
Montgomery, AL 36116
334/272-5030 phone
334/395-5336 fax
www.genconbd.state.al.us

**Alabama Licensing Board for General Contractors**

# Fax

**To:** Contractors *Marous Brothers Deborah Vender*     **FROM:** Kristi Whynott, ext. 236

**Fax:** See attached *440-942-7884*     **# pages** 2, including cover

**Ph:**     **Date:** *8/17/04*

**RE:** Your Contractors License *# 41183*  **cc:**

☐ **Urgent** ☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Recycle**

## Congratulations!

*Kristi*

Kristi Whynott,

License Specialist

Extension 236

STATE OF ALABAMA

# State Licensing Board for General Contractors



## THIS IS TO CERTIFY THAT

MARCUS BROTHERS CONSTRUCTION

WILLOUGHBY, OH 44094

is hereby licensed a General Contractor in the State of Alabama and is authorized to perform the following type(s) of work:

BC: BUILDING CONSTRUCTION

until    April 30, 2007    when this Certificate expires.

Witness our hands and seal of the Board, dated Montgomery, Ala.,

16 th    day of AUGUST

_____
SECRETARY-TREASURER

_____
CHAIRMAN

021318

LICENSE NO: 41183
TYPE:   ORIGINAL

BID LIMIT:    U
AMOUNT:   UNLIMITED