IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Marous Brothers Construction, LLC,<br>a corporation, and Gil Berry,<br>an individual d/b/a Gil Berry & Associates,<br><br>PLAINTIFFS,<br><br>v.<br><br>Alabama State University, et al., | )<br>)<br>)<br>)<br>)C.A.N.: 2:07-cv-00384-ID-CSC<br>)<br>)<br>)<br>)<br>)<br>) |

DEFENDANTS ALABAMA STATE UNIVERSITY,
PRESIDENT JOE A. LEE AND CHAIRMAN ELTON N. DEAN, SR.'S
MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i-iii
TABLE OF AUTHORITIES.............................................................................
STATEMENT OF MATERIAL UNDISPUTED FACTS......................................1-11
ARGUMENT..............................................................................................11-13

I.      STANDARD OF REVIEW...................................................................13-14

II.     ALABAMA'S SUBSTANTIVE LAW IS APPLICABLE
        IN THIS CASE.................................................................................14-15

III.    THE PLAINTIFFS CANNOT SUCCEED ON A BREACH OF CONTRACT
        CLAIM BECAUSE THERE IS NO VALID AND EXISTING CONTRACT
        BETWEEN THE PLAINTIFFS AND ASU AND THERE WAS NO
        BREACH      ON      THE      PART      OF
        ASU.............................................................................................15

        A.    THERE   WAS   NO   VALID   AND   EXISTING   CONTRACT
              BETWEEN ASU AND THE PLAINTIFFS BECAUSE   THERE
              WERE        NO        AGREED        UPON
              TERMS....................................................................15-18

B.    THE RESOLUTION RECOMMENDED BY THE PROPERTY COMMITTEE AND ADOPTED BY THE BOARD OF TRUSTEES DOES NOT FORM THE BASIS OF ANY LIABILITY AGAINST ASU FOR BREACH OF CONTRACT...................................................................................18-20

C.    THE PLAINTIFF MBC WAS NEVER A PARTY TO ANY PROPOSED CONTACT WITH ASU.............................................................................................20-21

IV.   THE PLAINTIFFS' CLAIM OF QUANTUM MERUIT MUST FAIL BECAUSE ASU DID NOT ACCEPT ANY SERVICES RENDERED BY THE PLAINTIFFS NOR DID THE PLAINTIFFS HAVE A REASONABLE EXPECTATION OF PAYMENT......................................................................................21-22

A.    THE SERVICES THAT WERE ALLEGEDLY PERFORMED BY THE PLAINTIFFS WERE NEVER "ACCEPTED" BY ASU.............................................................................................22-25

B.    THE PLAINTIFFS HAD NO REASONABLE EXPECTATION OF PAYMENT FROM ASU.............................................................................................25-27

V.   THE PLAINTIFF GIL BERRY CANNOT SUCCEED ON A FRAUD CLAIM AGAINST PRESIDENT LEE BECAUSE HE COULD NOT HAVE REASONABLY RELY ON THE ALLEGED STATEMENTS OF PRESIDENT LEE.........................................................................................................27-29

VI.   THE PLAINTIFFS CANNOT ESTABLISH A PRIMA FACIE CASE OF CONVERSION AGAINST THE ASU DEFENDANTS..................................................................................29-31

VII.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE ASU DEFENDANTS AGAINST THE PLAINTIFFS CIVIL CONSPIRACY CLAIM BECAUSE THE PLAINTIFFS HAVE NOT PROVEN AN UNDERLYING WRONG.....................................................................................................31-32

VIII. THE ASU DEFENDANTS ARE DUE SUMMARY JUDGMENT AGAINST PLAINTIFF GIL BERRY'S LOSS OF BUSINESS OPPORTUNITY CLAIM BECAUSE THERE IS NO ACTUAL LOSS AND THE ALLEGED LOSS IS NOT THE RESULT OF ANY ACTIONS TAKEN BY THE ASU DEFENDANTS.................................................................................32-34

IX.    INJUNCTIVE RELIEF IS IMPROPER AS A MATTER OF LAW
       BECAUSE THE PLAINTIFFS CAN NOT DEMONSTRATE SUCCESS ON
       THE
       MERITS..................................................................................................34-35

X.     PRESIDENT LEE AND CHAIRMAN DEAN SHOULD BE GRANTED
       SUMMARY JUDGMENT AGAINST THE PLAINTIFFS' FAILURE TO
       AUTHORIZE
       PAYMENT...............................................................................................35-36

XI.    THE PLAINTIFF MBC ILLEGALLY PERFORMED CONSTRUCTION
       AND ARCHITECTURAL SERVICES AND THUS NEITHER PLAINTIFF
       ARE ENTITLED TO COMPENSATION FOR THESE SERVICES AND
       WORK              RELATED              TO              THESE
       SERVICES...............................................................................................36-37

XII.   ASU IS ENTITLED TO SOVERIGN IMMUNITY AGAINST ALL OF THE
       PLAINTIFFS'
       CLAIMS..................................................................................................37-39

       A.   SOVEREIGN     IMMUNITY     IS     A     JURISDICTIONAL
            BAR..............................................................................................39-40

       B.   THE PLAINTIFFS CANNOT RECOVER ANY MONETARY
            DAMAGES                        AGAINST                        THE
            UNIVERSITY..............................................................................40

            1.   The    Plaintiffs    cannot    recover    any    compensatory
                 damages................................................................................40

            2.   The    Plaintiffs    cannot    recover    any    punitive
                 damages................................................................................40

XIII.  PRESIDENT LEE AND CHAIRMAN DEAN ARE ENTITLED TO
       DISCRETIONARY    FUNCTION    IMMUNITY    AGAINST    THE
       PLAINTIFFS'
       CLAIMS..................................................................................................41-42

CERTIFICATE OF
SERVICE.......................................................................................................43

## TABLE OF AUTHORITIES

### CASES

*Alabama Department of Environmental Management v. Town of Lowndesboro,*
　　555 So. 2d 81, 83 (Ala. 1989)……………………………………………..37-38

*Alabama Electric Cooperative, Inc. v. Bailey's Construction Co., Inc.,*
　　950 So. 2d 280, 283-284 (Ala. 2006)……………………………..……….28

*Alabama State Docks Terminal Ry. v. Lyles,*
　　797 So. 2d 432, 435 (Ala. 2001)……………………………………………..39

*Anderson v. Liberty Lobby, Inc.,*
　　477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)…………………14

*Architectura, Inc. v. Miller,*
　　769 So.2d 330, 334 (Ala.Civ.App. 2000)…………………………………….15

*Brushwitz v. Ezell,*
　　So. 2d 423, 429 (Ala. 2000)…………………………………………………..28

*Celotex Corp. v. Cattrett,*
　　477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) …………………13

*Crown Life Ins. Co. v. Smith,*
　　657 So. 2d 821, 823 (Ala. 1994)……………………………………………..29

*Draughon v. General Fin. Credit Corp.,*
　　362 So.2d 880, 884 (Ala.1978)………………………………………………37

*Ex parte Alabama Dept. of Mental Health and Retardation*
　　837 So. 2d 808 at 810 (Ala. 2002)…………………………………………...39

*Ex parte Alabama Dep't of Transp.,*
　　764 So. 2d 1263, 1271 (Ala. 2000)…………………………………………..31

*Ex parte Cranman,*
　　792 So. 2d 392 (Ala. 2000)………………………………………….............41

*Ex parte Grant,*
　　711 So. 2d 464, 465 (Ala. 1997).....................................................................15

*Ex parte HealthSouth Corp.,*
　　2007 WL 2405685, *6 -7 (Ala. 2007)………………………………………..37

*Ex Parte Troy University,*
    2006 WL 3759341 at *3-4 (Ala. 2006)...........................................38

*Gonzalez v. Lee County Housing Authority,*
    161 F.3d 1290, 1294 (11th Cir.1998).............................................14

*Hendrix, Mohr and Yardley v. City of Daphne,*
    359 So. 2d 792, 795 (Ala. 1978)..................................................22

*Herbert v. Birmingham-Jefferson Civic Center Authority,*
    694 F.2d 240 (11th Cir. 1982)...................................................36-37

*Hooper v. Columbus Regional Healthcare System, Inc.,*
    956 So. 2d 1135, 1141 (Ala. 2006)..............................................31

*Keith v. Witt Auto Sales, Inc.,*
    578 So. 2d 1269, 1274 (Ala. 1991)..............................................31

*Levine v. Levine,*
    262 Ala. 491, 494, 80 So.2d 235, 237 (1955)...................................37

*Lyons v. River Road Construction, Inc.,*
    858 So. 2d 257, 261 (Ala. 2003).................................................40

*Mantiply v. Mantiply,*
    951 So. 2d 638, 656 (Ala. 2006)................................................17

*Matsuhita Electric Industrial Co. v. Zenith Radio Corp.,*
    475   U.S.   574,   586-87,   106   S.Ct.   1348,   89   L.Ed.2d   538
    (1986).........................................................................13-14

*Matthews v. Alabama A&M Univ.,*
    787 So. 2d 691, 696-97 (Ala. 2000)............................................38

*McDuffie v. Roscoe,*
    679 So. 2d 641, 642-43 (Ala. 1996).............................................41

*Moody v. University of Alabama,*
    405 So. 2d 714, 717 (Ala. Civ. App. 1981)......................................40

*Morris v. SSE, Inc.,*
    912 F.2d 1392, 1394-95 (11th Cir. 1990).......................................14

*Nance v. Matthews,*
    622 So. 2d 297, 302 (Ala. 1993)................................................41

*Phillips v. Thomas,*
    555 So. 2d 81, 83 (Ala. 1989)……………………………………………38

*Shoals Community College v. Colagross,*
    674 So. 2d 1311, 1314 (Ala. Civ. App. 1995)……………………………38

*Smiths Water Authority v. City of Phenix City,*
    436 So. 2d 827, 831 (Ala. 1983)…………………………………………19

*State Farm Fire & Cas. Co. v. Slade,*
    747 So.2d 293, 303 (Ala. 1999)…………………………………………15

*Strength v. Alabama Dep't of Fin., Div. of Risk Mgmt.,*
    622 So. 2d 1283, 1289 (Ala. 1993)………………………………………15

*Swindler v. Mid-Continent Life Ins. Co.,*
    768 S.W.2d 331, 334 (14th Dist. 1989)…………………………………28

*Taylor v. Troy State Univ.,*
    437 So. 2d 472, 474 (Ala. 1983)…………………………………………38

*TFT, Inc. v. Warning Systems,*
    751 So. 2d 1238, 1242 (Ala. 1999)………………………………………34

*Thompson v. Wiik, Reimer & Sweet,*
    391 So.2d 1016 (Ala.1980)………………………………………………37

*Trotta v. Lighthouse Point Land Co., LLC,*
    2008 WL 413962, *1 -2 (S.D.Fla. 2008)…………………………………14

*Twickenham Station Inc. v. Beddingfiled,*
    404 So. 2d 43 (Ala. 1981)………………………………………………37

*Twine v. Liberty Nat'l Life Ins. Co.,*
    294 Ala. 43, 50, 311 So.2d 299, 305 (1975)……………………………20

*Utah Foam Prods. v. Polyte,*
    584 So. 2d 1345 (Ala. 1991)……………………………………………22

**STATUTES**

Ala. Code § 6-11-26 (1975)…………………………………………………40

Ala. Code § 16-50-22 (1975………………………………………………35

Ala. Code § 34-2-31 (1975)...................................................................36

Ala. Code § 34-2-32 (1975)...................................................................36

Ala. Code § 34-8-6 (a) (1975)................................................................36

**CONSTITUTION**

Article 1 § 14 of the Constitution of Alabama (1901)......................37

**RULES OF PROCEDURE**

Fed.R.Civ.P. 56(c)..............................................................................13

Fed.R.Civ.P. 56(e)..............................................................................14

## STATEMENT OF THE MATERIAL UNDISPUTED FACTS

1.      The Plaintiff Gil Berry is the owner of Gil Berry and Associates ("GBA"). Exh.
1, Berry Depo., p. 44-5, ln. 12-10. GBA is a Pennsylvania corporation whose principal
source of business is consulting. Exh. 1, Berry Depo., p. 436-37, ln. 23-1.

2.      The Plaintiff Marous Brothers Construction ("MBC") is an Ohio corporation
whose principal source of business is historic renovations, the construction of multi-
family residences and hospitality-related projects. Exh. 2, Goldman Depo., p. 35, ln. 9-
21. Arne Goldman is the Director of Business for MBC. Goldman testified in this case
as MBC's Rule 30(b)(6) Representative.

3.      Student Suites, Inc. ("Student Suites") is a Missouri corporation that develops and
finances new student housing for universities across the country. Dick Davis is the
Director of Development, Acquisition and Finance for Student Suites. Exh. 3, Davis
Affidavit at ¶ 3. Student Suites is not a party to this lawsuit.

3.      Alabama State University ("ASU") is a public institution of higher education
operating under the laws of the State of Alabama.

4.      Chairman Elton N. Dean, Sr. is the Chairman of the ASU Board of Trustees. He
has served in this capacity since 2005.

5.      President Joe A. Lee is the President of ASU. He has served in this capacity since
2001.

6.      TCU Consulting Services, Inc. ("TCU") serves as the owner's representative for
several construction projects at ASU, including the University's dormitory renovations.
Ken Upchurch ("Upchurch") and Percy Thomas ("Thomas") are principals of the TCU.

7.     Sometime in the summer of 2005, Gil Berry was informed by James Harrell that there were some housing needs at ASU.  Harrell told Berry that he should contact Dr. Leon Frazier or Freddie Gallot at ASU to discuss student housing.  Exh. 1, Berry Depo., p. 58, ln. 9-22.

8.     During this time, Berry informed Student Suites and MBC that he had a lead on a project at ASU.  Exh. 3, Davis Affidavit at ¶ 4.; Exh. 2, Goldman Depo., p. 425, ln. 10-18.  Based upon this information, Student Suites, GBA, and MBC partnered to present a proposal to ASU to renovate six of its dormitories and to build a new student housing facility on the campus.  Exh. 3, Davis Affidavit at ¶ 4.

9.     Berry was introduced to the ASU officials charged with improving student housing in July of 2005.  Following this introduction, ASU allowed GBA, Student Suites and MBC to tour its dormitories so the companies could present a proposal to ASU's staff and administrators regarding the development of student housing at ASU.  GBA, Student Suites and MBC described their analysis of ASU's dormitories as a "two-month comprehensive study."  *See generally* Exh. 1, Berry Depo., pp. 133-41.

10.     On September 20, 2005, GBA, MBC along with Student Suites presented a proposal to renovate existing dormitories and to build a new dormitory at ASU.  Exh. 4, 9/20/05 Proposal.  The proposal was presented to Dr. Leon Frazier, the former Vice President of Administrative Services at ASU, and several other ASU officials charged with improving student housing at the University.  The ASU officials informed the Plaintiffs that ASU was interested in creating suite-style housing in six of its existing dormitories similar to the student housing at competing HBCU's.  Exh. 2, Goldman Depo., p. 472-74, ln. 19-1.  The ASU officials expressed the need for modern technology,

wireless internet and state-of-the art security in its student housing. Exh. 2, Goldman Depo., p. 472-74, ln. 19-1.

11.     Following this proposal on November 9, 2005, Davis wrote a letter to Circuit Court Judge Marvin Wayne Wiggins, a member of the ASU Trustee Board. Exh. 5, Davis Letter to Wiggins dated 11/9/05. The letter enclosed a revised plan regarding the proposal to redevelop the student housing at ASU. Davis requested that the ASU Board of Trustees pass a resolution drafted by Student Suites, GBA and MBC so that the companies could "work with Alabama State University Staff to further define the exact scope of work along with the most attractive financing packages available." Exh. 5, Davis Letter to Wiggins dated 11/9/05.

12.     The resolution drafted on stationary with the logos of Student Suites, MBC and GBA stated in pertinent part:

> BE IT RESOLVED that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developer for the purpose of Designing, Building, Renovating, and Financing a proposed Student Housing Redevelopment Master Plan per the proposal submitted October 28, 2005.
>
> *It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.*

Exh. 5, Davis Letter dated 11/19/05 at attached Resolution (emphasis added).

13.     The resolution submitted to ASU was the same type and form of resolution that Student Suites commonly presented to universities during the proposal and negotiation phase. Exh. 3, Davis Affidavit at ¶ 9. GBA and MBC knew and consented to Davis forwarding this resolution to ASU. Exh. 3, Davis Affidavit at ¶ 9.

3

14.    Goldman drafted a Letter of Intent to define the relationship between Student Suites, GBA and MBC.  The Letter of Intent designated Student Suites and GBA as the developer and MBC as the designer/builder.  The Letter of Intent provided that

> 8) *If the Developer or Alabama State University elect to abandon the Project after the lump sum fixed fee contract amount has been determined by the Design/Builder and prior to the construction for any reason*, or if the Developer elects to select another entity for the construction of the Project, *then the Developer shall promptly remit payment of $248,000.00 plus travel expenses to the Design/Builder for pre-construction services rendered as payment-in-full*.

Exh. 6, Letter of Intent (emphasis added).

15.    The Letter of Intent was dated November 18, 2005 and included signature lines for Student Suites, GBA and MBC.  ASU was not a proposed party to the Letter of Intent.  The Letter of Intent was never signed by either party, and MBC proceeded in its proposal to ASU without the protections afforded in the Letter of Intent.  Exh. 6, Letter of Intent.

16.    On November 23, 2005, Frazier wrote a letter to Davis informing him that the ASU Board of Trustees Property Committee approved a proposed resolution for presentation to the full board.  The proposed resolution read: "...that the Board of Trustees hereby authorizes the President of the University to engage Student Suites, Inc., and Gil Berry and Associates as developer for the purpose of developing a Student Housing Redevelopment Master Plan for designing, building, renovating and financing student housing on campus.  It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University."  Frazier also confirmed that the parties would meet at ASU on November 29, 2005 "to begin working out details of procedure." Exh. 7, Frazier Letter dated 11/23/05.

4

17.    Berry and MBC both received copies of this letter. Exh. 1, Berry Depo, p. 197-98, ln.1-20; Exh. 2, Goldman Depo., p. 439-40, ln. 22-9.

18.    On January 24, 2006, Davis and Berry wrote a letter to Frazier detailing conversations between Wyatt Haskell, counsel for Student Suites and GBA, and Fred Gray, former counsel for ASU, regarding a plan to conform to Alabama's public bid laws. Exh. 8, Davis and Berry Letter dated 1/24/06. The letter also detailed discussions between Student Suites, GBA, Freddie Gallot, ASU Vice President for Fiscal Affairs, and Bill Blount of Blount Parrish regarding the financial plan for the building of a new student housing building. At the close of Davis' letter, he requested that the ASU Board of Trustees pass an attached resolution at its February 2006 Board Meeting. Exh. 8, Davis and Berry Letter dated 1/24/2006.

19.    The resolution again drafted on stationary with the logos of Student Suites, MBC and GBA stated in pertinent part:

> BE IT RESOLVED that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developer for the purpose of Designing, Building, Renovating, and Financing a proposed Student Housing Redevelopment Master Plan per the proposal submitted October 28, 2005.
>
> It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.

Exh. 8, Davis and Berry Letter dated 1/24/2006 at attached Resolution (emphasis added).

20.    The ASU Board of Trustees did not pass the Resolution at its February meeting.

21.    At its May 5, 2006 meeting, the ASU Board of Trustees did approve the resolution to engage Student Suites and GBA as the developers of the student housing

renovation project. The terms of this engagement was detailed in that resolution drafted

on the stationary containing the logos of Student Suites, GBA and MBC as follows:

> BE IT RESOLVED: that the Board of Trustees designates Student Suites,
> Inc. and Gil Berry and Associates as its developers for the purpose of
> presenting a plan to design, build, renovate and finance a proposed
> Student Housing Redevelopment Master Plan per the proposal presented
> on October 28, 2005 and revised November 9, 2005. All of the services,
> which will be performed by said developer will be without cost to the
> University.
>
> It is mutually understood that the Board will incur no financial obligation
> by adoption of this Resolution but will review the Proposal when finally
> submitted.

Exh. 9, Minutes of the ASU Board of Trustees 5/5/06 Meeting.

22.    Also at the May 5, 2006 meeting of the ASU Board of Trustees, the Board voted

to approve a resolution to secure a bond issue in the amount of $41 million.    The

proceeds of the bond issue would be used to pay the costs of renovating six of ASU

dormitories, constructing a new Student Center, and renovating Girard Apartments

(campus apartments). Exh. 9, Minutes of the ASU Board of Trustees 5/5/06 Meeting.

23.    At some point after the May 5, 2006 board meeting, ASU decided against

building new student housing and decided to only renovate six dormitories.

24.    Sometime during January 2006 and the end of April 2006, MBC prepared a

scope of work in an 11 x 17 spiral bound format. MBC refers to this scope of work as its

proprietary work. *See* Exh. 2, Goldman Depo., p. 205, ln. 1-6. The scope of work was

given to Gil Berry to distribute. Exh. 2, Goldman Depo., p. 520, ln. 22-23.

25.    On May 15, 2006, at Berry's request, MBC forwarded an invoice for ASU in the

amount of $297,500 for "pre-construction and design build services." Exh. 10, Goldman

Email to Berry dated 5/15/06. On May 23, 2006, GBA invoiced ASU in the amount of

6

$76,729.49 for "supervision of design/build preconstruction services." Exh. 11, Berry Invoice dated 5/23/06. These invoices were not paid.

26.     Sometime in May 2006, Davis incorporated the entity "Student Suites Gil Berry Associates, LLC" ("SSGBA") as an Alabama corporation.     This was done so that SSGBA could transact business in the State of Alabama. Exh. 3, Davis Affidavit at ¶ 15.

27.     MBC was not a licensed general contractor or architect in the State of Alabama during this time period for which MBC and GBA invoiced ASU. Exh. 2, Goldman Depo., p. 501, ln. 7-12; p. 556, ln. 1-9. Exh. 12, MBC General Contractors Application and License.

28.     On July 9, 2006, Davis forwarded a draft of the development agreement to Gil Berry with statement that the draft should be forwarded to counsel for ASU and Frazier for their review as soon as possible. Exh. 13, Email from Davis to Berry dated 7/9/06 forwarding development agreement.     The development agreement detailed how the proceeds for the dormitory renovation would be used to pay the fees of the developer, the architect, and MBC, the costs of hard construction, and the amount of contingencies. The amount of contingencies and fees were approximately over $7 million. Exh. 14, Marous Internal Note.

29.     The development agreement included a guaranteed not to exceed price ("GMP") for the dormitory renovation project. The MNEP was listed at $25 million. Additionally, the Development Agreement provided that ASU would be in contract with SSGBA. SSGBA was to serve as the developer for the renovation of six of ASU's dormitories. MBC was identified as an entity that SSGBA intended to use as its construction management agent. Under the contract, ASU was to pay SSGBA for its services. There

7

was no obligation for ASU to pay MBC. *See generally* Exh. 13, Email from Davis to Berry dated 7/9/06 forwarding development agreement.

30.    The development agreement went through several revisions after its submission, but was never signed. Exh. 3, Davis Affidavit at ¶ 18.

31.    On July 25, 2006, a Preliminary Official Statement ("POS") for ASU's $41 million bond issue was released. Exh. 15, POS for 2006 Bond Issue. The POS details student housing in two separate sections. The first section on page 2 of the POS states the following:

> Campus Housing Facilities. Approximately $25,000,000 of the proceeds from the sale of the Series 2006 Bonds will be used to pay a portion of the cost of renovations to six (6) existing student housing facilities on the University's campus. The campus housing facilities being renovated with a portion of the proceeds of the Series 2006 Bonds will be converted to "suite-style" accommodations and will feature modern communications, wireless internet, enhanced security and other amenities currently favored by college students. The University has closed two dormitories for renovation and has acquired a nearby apartment complex to house students displaced by the dormitory renovation project, which is expected to take place in three phases. While there can be no assurance thereof, the University expects to complete the first two dormitories by fall semester 2007 and to complete two additional dormitories by the beginning of each semester thereafter until all six are fully renovated by fall semester 2008. See "ALABAMA STATE UNIVERSITY – Campus Housing" herein.

The second section is the Campus Housing Section referenced on page 2 and is found on page 15 of the POS. This section gives a table showing the ASU's "residence halls, the type of accommodations, capacity and per-semester cost for each, plus the occupancy statistics for the fall 2005 and spring 2006 semesters." Exh. 15, POS for 2006 Bond Issue.

32.    On July 26, 2006, ASU informed Gil Berry that it had engaged TCU to assist ASU and President Lee in performing due diligence in reviewing the Plaintiffs' proposal

to renovate the dormitories at ASU. Further, ASU requested permission for TCU to review the proprietary work of the Marous Brothers. Exh. 16, Emails from K. Thomas re: review of proprietary work. Berry responded that ASU had permission to allow TCU to review the proprietary work of the Marous Brothers. Exh. 17, Email from Berry re: review of proprietary work. The proprietary work to be reviewed was the scope of work prepared by MBC. Exh. 18, Scope of Work.

33.    On July 28, 2006, Goldman sent an email to Berry giving conditions upon the use of MBC's proprietary work. Exh. 19, Email from Goldman to Berry re: use of proprietary work. These conditions set forth by Goldman were not communicated in Berry's emails to ASU giving TCU permission to review the scope of work. Exh. 2, Goldman Depo., p. 532, ln. 19-22. Goldman's email also acknowledged that SSGBA did not have a development agreement with ASU at that time. Goldman further stated that MBC would execute its construction management agreement with SSGBA once the development agreement had been closed. Exh. 19, Email from Goldman to Berry re: use of proprietary work.

34.    The scope of work detailed a number of exclusions to the dormitory renovation project. Specifically, the scope of work excluded environmental remediation, major dewatering, power company charges, the cost of a performance bond, unknown underground fees, sewer tap fees, and asbestos abatement. Exh. 2, Goldman Depo., p. 211-214. The amount of the excluded items, such as utility costs would be over and beyond the MNEP. Exh. 2, Goldman Depo., p. 215, ln. 9-14; p. 217, ln. 19-22.

35.    Pursuant to the MBC scope of work, some of the dormitory rooms were designed in such a way that one student would have to go through the bedroom of another student

to get to his bedroom. Also, one student would have to go through the bedroom of another student to get to the restroom. Exh. 2, Goldman Depo., p. 157-58, ln. 13-5. This design proposed by MBC has been eliminated in ASU's current design for its dormitory renovations. Exh. 2, Goldman Depo., p. 160, ln. 15-21.

36.    As owner's representative, TCU reviewed the proposed development agreement and scope of work prepared by Student Suites, GBA and MBC. TCU posed questions to Arne Goldman as the representative for MBC regarding the scope of work for the dormitory renovation. Exh. 2, Goldman Depo., p. 198-99, ln. 5-1. The scope of work went through several revisions during this time. Exh. 3, Davis Affidavit at ¶ 18.

37.    In a letter dated August 18, 2006 from Davis and Berry to President Lee, Davis and Berry stated that SSGBA could not accept ASU's proposal that SSGBA be responsible for fees and expenses of project managers hired by ASU and that it could not accept the delay of the initial four percent of fees for SSGBA until the commencement of construction. Exh. 20, Letter from SSGBA to Pres. Lee dated 8/18/06.

38.    On September 19, 2006, counsel for ASU informed Berry that President Lee was expecting that the developer's fee be reduced by $1 million not $600,000 as proposed by Berry. Exh. 21, Email re: Fee Reduction. On September 20, 2006, in a letter drafted by Arne Goldman, Berry responded that he could not agree to reducing the developer's fee any more than the $600,000 that he already proposed. Exh. 22, Berry Email re: fee reduction.

39.    On September 22, 2006, the ASU Board of Trustees met. At that meeting, President Lee recommended that the Board not accept the proposal of GBA and Student

Suites. The Board accepted President Lee's recommendation. Exh. 23, Minutes of ASU Board Meeting 9/22/06.

40.    On October 1, 2006, Berry forwarded invoices for GBA, MBC and Student Suites to ASU Trustee, Judge Marvin Wiggins. Exh. 24, Email from Berry to Wiggins dated 10/1/2006. GBA invoiced ASU in the amount of $196,585.68 for "supervision of design/build preconstruction services." Student Suites invoiced ASU in the amount of $95,975.00 for "pre development expenses for Alabama State University student housing development master plan." MBC invoiced ASU in the amount of $455,000 for preconstruction services. These invoices were not paid by ASU.

41.    On October 28, 2006, President Lee sent a letter to Berry explaining his decision not to recommend GBA and Student Suites proposal for the dormitory renovation. Exh. 25, Lee Letter dated 9/28/06. Following that letter on October 30, 2006, President Lee forwarded copies of the proposals, blueprints and scope of work to Berry. Exh. 26, Transmittal Letter from Lee. After this lawsuit was filed, undersigned counsel forwarded to Plaintiffs' counsel an additionally copy of the scope of work found in the files of a former ASU employee. Exh. 27, Transmittal Letter from R. Salaam-Jones.

42.    The Plaintiffs filed this action against ASU, President Lee, and Chairman Dean as well as the TCU Consulting Services, LLC, Ken Upchurch and Percy Thomas on May 3, 2007. The Plaintiffs filed an Amended Complaint on February 11, 2008.

## ARGUMENT

The Plaintiffs in this action have no basis for the claims asserted against ASU, President Lee and Chairman Dean (collectively referred to as the "ASU Defendants"). Based upon the pleadings and the discovery taken to date in this case, there are no

11

genuine issues of material fact existing in any of the Plaintiffs' claims, and the ASU Defendants are entitled to summary judgment.  Because this is a diversity action involving basic tort and contract claims, substantive Alabama law is controlling as it relates to the analysis of the Plaintiffs' causes of action.  Pursuant to Alabama law, the ASU Defendants are entitled to judgment as a matter of law.   The Plaintiffs cannot identify a valid and existing contract between them and the ASU Defendants to establish a breach of contract claim.  The allegations that there was an implied contract between the Plaintiffs and the ASU Defendants should also fail as a matter of law because there were no mutually agreed upon terms among the parties.  The quantum meruit claim must fail because the Plaintiffs drafted a Resolution which precluded them compensation from ASU if no final agreement was reached on the financing and design of the dormitory renovation project.  In fact, no final agreement was ever reach between the parties; therefore, the Plaintiffs are due no compensation.  Further still, the Plaintiffs have not identified a benefit that was given to ASU as a result of their work.  The Plaintiffs' fraud claims are fit for summary judgment because even if the alleged statements by President Lee were made, the Plaintiffs can not establish a "reasonable reliance" upon these statements because they had knowledge of the true facts.  The Plaintiffs cannot succeed on a conversion claim against the ASU Defendants because the Plaintiffs admit that the work being done on ASU's dormitories is different than the work detailed in their scope of work. The Plaintiffs' loss of business opportunity claim is based upon their inability to contract with another Alabama HBCU as a result of that University's knowledge of *this lawsuit* not any direct actions of the ASU Defendants.  The ASU Defendants are entitled to summary judgment against the Plaintiffs' claim for injunctive relief because 1) the

12

Plaintiffs do not even know who they gave their proprietary work to and 2) the Plaintiffs have not shown that the plans detailed in their proprietary work is not being used by the ASU Defendants.   Similar to the Plaintiffs' breach of contract claim, the Plaintiffs "failure to authorize payment" claim must fail because the Plaintiffs cannot identify a valid and existing contract that would obligate ASU and would necessitate any responsibilities on the part of Lee and Dean. The Plaintiffs' conspiracy claim should fail because the Plaintiffs cannot succeed on any underlying claim of wrongdoing, specifically the tortious interference with a business relationship claim. The Plaintiffs are claiming payment for services that were performed illegally and without a contractor's license. As such, the Plaintiffs are not entitled to payment. Additionally, ASU is entitled to sovereign immunity and President Lee and Chairman Dean are entitled to state-agent immunity against all of the Plaintiffs' claims. All of the deficiencies with the Plaintiffs' claims are reasons that preclude them from judgment against the ASU Defendants as a matter of law.

## I.    STANDARD OF REVIEW

The moving party is entitled to summary judgment if the pleadings and affidavits, show that there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The record is viewed in the light most favorable to the non-moving party, and the burden is upon the moving party to show that it is entitled to summary judgment. *See Matsuhita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the moving party bears the burden of proof, the non-moving party

must "come forward with 'specific facts showing that there is a *genuine issue for trial.*' "
*Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). "An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The existence of a mere scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on the basis of which a jury could reasonably find for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Trotta v. Lighthouse Point Land Co., LLC*, 2008 WL 413962, *1 -2  (S.D.Fla. 2008). Summary judgment must be granted to the moving party upon the non-moving party's failure to provide proof on any essential element.   *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir.1998).

## II.    ALABAMA'S SUBSTANTIVE LAW IS APPLICABLE IN THIS CASE

The Plaintiffs filed this action against all Defendants based upon this Court's federal diversity jurisdiction.  The Plaintiffs have not alleged any federal statutory or constitutional claims against the Defendants.  The Plaintiffs' claims are grounded in theories of tort and contract.  The alleged violations of tort and contract occurred in Alabama. The analysis of the Plaintiffs' claims and the ASU's Motion for Summary Judgment against them should be governed by the laws of the State of Alabama. *See Morris v. SSE, Inc.*, 912 F.2d 1392, 1394-95 (11th Cir. 1990) (holding that the Alabama substantive law controlled tort and contract claims in an Alabama diversity action).

Pursuant to the substantive Alabama law on tort and contract, the ASU Defendants are entitled to summary judgment against the Plaintiffs' claims.

## III.  THE PLAINTIFFS CANNOT SUCCEED ON A BREACH OF CONTRACT CLAIM BECAUSE THERE IS NO VALID AND EXISTING CONTRACT BETWEEN THE PLAINTIFFS AND ASU AND THERE WAS NO BREACH ON THE PART OF ASU

To succeed under a claim of breach of contract the Plaintiffs must show "(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *State Farm Fire & Cas. Co. v. Slade,* 747 So.2d 293, 303 (Ala. 1999). The elements of a valid contract are 1) an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract. *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997) (*quoting Strength v. Alabama Dep't of Fin., Div. of Risk Mgmt.*, 622 So. 2d 1283, 1289 (Ala. 1993).

In the Plaintiffs' Amended Complaint, they do not state that they had an express contract with ASU. Instead, the Plaintiffs refer to this alleged contract as an implied contract. Exh. 28, Amended Complaint at ¶¶ 44 and 45. The elements for a breach of an implied contract are the same as those for an express contract. "Proof of an implied-in-fact contract requires proof of the same elements that proof of an express contract requires." *Architectura, Inc. v. Miller*, 769 So.2d 330, 334 (Ala.Civ.App. 2000). There was no valid and existing contract between the Plaintiffs and the ASU Defendants which form the basis for liability of a breach of contract claim. Even if the "contract" identified by the Plaintiffs is deemed as valid, there was no actual breach of this contract by ASU.

### A.  THERE WAS NO VALID AND EXISTING CONTRACT BETWEEN ASU AND THE PLAINTIFFS BECAUSE THERE WERE NO AGREED UPON TERMS

The Plaintiffs assert that "Plaintiffs and Defendant ASU entered into an agreement whereby ASU would pay Plaintiffs for development work to design, build, renovate, and procure financing for the Student Residence Project." Exh. 28, Amended Complaint at ¶ 42.  The Plaintiffs make this assertion but they admit that the terms of how they were to be paid were never even discussed with ASU officials.

> Q:    What amount of the $25 million were you to get?
>     ...
> Q:    You're saying you're going to get paid?
> A:    Yes sir.
> Q:    Now, my question to you, what rate were you're going to get paid?
> A:    Me and Dick were getting ten percent.
> Q:    Now, where is that stated?  Show me a document that you told somebody at ASU I'm going to get ten percent of this $25 million you all have restricted me on.
> A:    The bottom line is—
> Q:    No, no.  That's the question.  Show me a document that somebody was briefed on the fact that Gil Berry & Associates is going to get ten percent of $25 million.
> A:    It doesn't matter.

Exh. 1, Berry Depo. p. 208-209, ln. 4-2.

> Q:    Did you negotiate the terms and conditions of what this would cost, how it would be delivered?  Did you negotiate that with anybody at Alabama State?
> A:    We told Alabama State in the presentation in September exactly what we would expect to do and how we would deliver the information in September.  We did outline terms at that meeting.
> Q:    And you never told them how much it would it cost?
> A:    No.

Exh. 2, Goldman Depo. p. 486, ln. 3-14.

> Q:    Now, you spoke about an implied contract with Alabama State University?
> A:    Uh-huh (affirmative).
> Q:    What were the terms of that contract?
> A:    That we would produce – provide enough work to support the efforts to get financing and to get a design that could be done within the budget as stipulated.
> Q:    And did you negotiate this implied contract?  Did you negotiate any terms of this contract with anybody from Alabama State?

A:    We didn't – we thought the terms were pretty clear.

Exh. 2, Goldman Depo., p. 485, ln. 3-17.

Further still, the Plaintiff MBC states that ASU officials were informed about the

services that MBC needed to perform but at that time MBC did not even know the costs

of these services. The Plaintiff MBC submitted an invoice for $455,000 to ASU. That

invoice itemized several costs associated with pre-construction services.

> Q:    Okay.    But all the way down someone at Alabama State University
> authorized you to perform these
> duties. And I want to know who.
> A:    We told Alabama State what we needed to do to be able to provide the
> information they needed. We told them that in September, and then we – told
> them in the presentation in September what we needed to do and what we would
> produce for them.
> Q:    And at that presentation September 20, 2007, did you say that the
> preparation of the scope of work narrative is going to cost you $14,850?
> A:    No, we didn't because we didn't have – at that point we [didn't] have an
> idea of what these services would cost.
> Q:    So, if you didn't have an idea of what the services would cost, how would
> Alabama State have an idea of what the services would cost?
> A:    At that point they wouldn't, nor did I say they did.

Exh. 2, Goldman Depo., p. 544-45, ln. 21-20.

In *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006), the Court held that an

agreement to perform services with "no identifiable and enforceable measure of a term

essential to the agreement – [the Plaintiff's] compensation" was neither an expressed

contract or a contract implied in fact.    The Plaintiffs submitted invoices totaling

$651,362.68 to ASU for their services under this alleged "implied contract".  However,

neither Plaintiff can identify when and how ASU was told about the cost of their services

notwithstanding any agreement by ASU to this cost.    Surely a price tag as high as

$651,362.68 would be one that ASU's Board of Trustees would need to know about and

agree to before a contract would exist.    The Plaintiffs' failure to inform ASU about the

17

cost of their services, and the lack of ASU's agreement to these costs prior to their performance renders the alleged implied contract invalid as there was no mutual assent on the essential term of price.

### B. THE RESOLUTION RECOMMENDED BY THE PROPERTY COMMITTEE AND ADOPTED BY THE BOARD OF TRUSTEES DOES NOT FORM THE BASIS OF ANY LIABILITY AGAINST ASU FOR BREACH OF CONTRACT

In addition to their allegations in the Amended Complaint that the Plaintiffs and ASU had an implied contract, the Plaintiffs also cite to the ASU Board of Trustees Property Committee and the ASU Board of Trustees passage of a resolution naming of Students Suites and Gil Berry as developers of plan for student housing renovation at ASU as the basis of a contract between the Plaintiffs and ASU. The Plaintiffs make this assertion although they acknowledge that the resolution recommended to and adopted by the ASU Board of Trustees included the following language: "It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University." *See* Exh. 28, Amended Complaint at ¶ 21; Exh. 7, Frazier Letter dated 11/23/05; Exh. 1, Berry Depo., p. 198, ln. 6-14; Exh. 2, Goldman Depo., p. 439-40, ln. 22-9.

The conditions set forth in the language of the resolution prevent the formation of a contract between the parties for which compensation is due unless and until a final agreement is reached on the design and financing. Even if the Resolution is deemed to be a "contract", then by the clear language of the contract, there was no breach by ASU. ASU was relieved of paying any expenses when the parties could not come to terms on the financing and design of the project.

18

ASU never agreed to the financing of the Plaintiffs' proposal specifically as it related to the payment of the developer's fee. ASU requested that the developer's fee be reduced by $1 million, but Berry stated that he could not reduce the developer's fee any more than $600,000. Exh. 21, Email re: fee reduction; Exh. 22, Berry Email re: fee reduction. Therefore, the parties never agreed to a developer's fee and thus never agreed to financing structures. The inability of the parties to come to terms on the development agreement voided the Resolution and precluded the Plaintiffs from receiving any expenses from ASU.

The Plaintiffs have asserted that ASU's procurement of bond financing was the final agreement on more detailed financing structure. If the Plaintiffs' assertion was accurate, then there would be no need for Davis to prepare a development agreement which detailed the costs of construction and the payment of fees for ASU's approval. As testified by Davis, the parties were merely in negotiations for a contract from September 2005-September 2006. Exh. 3, Davis Affidavit at ¶ 22. It is well-settled in Alabama law that negotiations alone do not form a valid contract. *See Smiths Water Authority v. City of Phenix City*, 436 So. 2d 827, 831 (Ala. 1983) (holding that negotiations alone do not constitute mutual assent among the parties).

Likewise, ASU never agreed upon the Plaintiffs' proposed scope-of-work. ASU had TCU to review the scope-of-work as a part of its due diligence, but the ASU Board of Trustees never approved the final design submitted by MBC as an acceptable plan for its dormitory renovation.

> Q:    Okay. If a final agreement was reached on the design of the dormitory renovation, why were there continuous negotiations about that scope of work up and until September 21st of '06.
> A:    That's a good question.

19

...

Q:      And to your knowledge, did the design then go on to Alabama State
University's Board of Trustees for approval?
A:      To us it was immaterial because Mr. Upchurch has represented to us that
he was the owner's rep and that he was an agent and representative of
Alabama State.
***Q:      And did Mr. Upchurch tell you that he could make a final decision on
behalf of the University?***

***As far as the design did he tell you that he could make the final
decision?***
***A:      He didn't say one way or the other.  He said that he was comfortable,
comfortable enough to state that he would give us a favorable
recommendation to the board.***

Exh. 2, Goldman Depo. pp. 493-94, ln. 19-1; pp. 495-96, ln. 16-8 (emphasis added).  A

favorable recommendation from Upchurch does not constitute Board approval.

### C.      THE PLAINTIFF MBC WAS NEVER A PARTY TO ANY PROPOSED CONTACT WITH ASU

"One not a party to, or in privity with a contract, cannot sue for its breach." *Twine*

*v. Liberty Nat'l Life Ins. Co.,* 294 Ala. 43, 50, 311 So.2d 299, 305 (1975).  The Plaintiff

MBC was never a party to any proposed contract with ASU and thus can not now sue for

a breach of contract.

The Resolution passed by the ASU Board of Trustees states that the ASU

Board of Trustees designated "Student Suites, Inc. and Gil Berry and Associates as its

developer."  MBC is not listed as a developer.  Further, the proposed development

agreement stated that the contract was to be between ASU and SSGBA. Exh. 13, Email

from Davis to Berry dated 7/9/06 forwarding development agreement.  MBC was to be

hired by SSGBA as its construction management agent.  Exh. 13, Email from Davis to

Berry dated 7/9/06 forwarding development agreement.  As such, MBC was to be in

contract with SSGBA, not ASU.  Exh. 2, Goldman Depo., p. 308-09, ln. 16-16.  This

relationship between SSGBA and MBC is further evidenced by a Letter of Intent drafted

by Arne Goldman with signature lines for representatives of MBC, GBA and Student Suites. The Letter of Intent was never executed, but if it had it would have given MBC a clear breach of contract action against SSGBA. Specifically, the Letter of Intent stated

> 8) If the Developer or Alabama State University elect to abandon the Project after the lump sum fixed fee contract amount has been determined by the Design/Builder and prior to the construction for any reason, or if the Developer elects to select another entity for the construction of the Project, then the Developer shall promptly remit payment of $248,000.00 plus travel expenses to the Design/Builder for pre-construction services rendered as payment-in-full.

Exh. 6, Letter of Intent. Goldman admits that MBC would not have been hired by ASU under the proposal submitted to ASU.

> Q:    Well, we've discussed a couple of scenarios, one where you would be under contract with ASU and another where you would be under contract with Gil Berry.
> So, as of September 25, did you – was it your understanding that Marous would have contracted with Gil Berry –
> A:    Yes.
> Q:    As opposed to with ASU?
> A:    Yeah, [With] Gil Berry or Student Suites, whatever the –
> Q:    Right. Whatever their name is called, whatever that is?
> A:    Yes.

Exh. 2, Goldman Depo., pp. 308-09, ln. 16-6.

It is clear from the Resolution, proposed development agreement, MBC's proposed Letter of Intent that MBC, and Goldman's testimony that MBC was never to be in contract with ASU. This lack of privity between MBC and ASU warrants summary judgment against the Plaintiff MBC's breach of contract claim against ASU.

## IV.    THE PLAINTIFFS' CLAIM OF QUANTUM MERUIT MUST FAIL BECAUSE ASU DID NOT ACCEPT ANY SERVICES RENDERED BY THE PLAINTIFFS NOR DID THE PLAINTIFFS HAVE A REASONABLE EXPECTATION OF PAYMENT

21

The theory of quantum meruit is applicable when "one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered." *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (quoting *Hendrix, Mohr and Yardley v. City of Daphne*, 359 So. 2d 792, 795 (Ala. 1978). Additionally, "the plaintiff must show that it had a reasonable expectation of compensation for its services." *Id.* (quoting *Utah Foam Prods. V. Polytec, Inc.*, 584 So. 2d 1345 (Ala. 1991). The Plaintiffs have not shown that ASU accepted its services. Further, the Plaintiffs could not have had a reasonable expectation of payment.

## A.   THE SERVICES THAT WERE ALLEGEDLY PERFORMED BY THE PLAINTIFFS WERE NEVER "ACCEPTED" BY ASU

The key element in the theory of quantum meruit theory is that the defendant knowingly accepted the services of the plaintiff. It is clear from the testimony of Goldman that the "pre-construction services" were never identified to ASU prior to performance and the services were never authorized by ASU prior to performance. Further, these services were never accepted by ASU. It is undisputed that the ASU Board of Trustees voted not to accept the proposal of GBA and Student Suites to develop student housing at ASU. Exh. 23, Minutes of ASU Board of Trustees Meeting 9/22/06. It is also undisputed that ASU's current dormitory renovation plan is different than that which was designed by MBC. Exh. 2, Goldman Depo. p. 160, ln. 15-21

Further, the Plaintiffs also allege that their "work product" was used by ASU to procure bond financing. However, the Plaintiffs can not articulate what part of their work was included in the POS nor can they place a value on the alleged benefit bestowed to ASU.

Q:    It says as noted, ASU received copies of Marous' proprietary work product in late May 2006. Thereafter, and utilizing Marous' proprietary work for which Marous has never been paid. When did ASU use Marous' proprietary work after late May 2006?

A:    For bond financing purposes.

...

Q:    So it is your contention that ASU supplied this scope of work to bond counsel or –

A:    I know –

Q:    -- to underwriters?

A:    I know that it was supplied to bond counsel.

*Q:    Okay. And do you know what bond counsel did, what if anything, they did with it?*

*A:    I have no idea.*

*Q:    Okay. It says Marous' proprietary work product is referenced as an exhibit in the bond documents. Have you seen the bond documents?*

*A:    That's not something – you have to talk to Gil Berry about that. We have not seen – we did not see the final bond documents.*

Exh. 2, Goldman Depo., p. 466-67, ln. 4-14 (emphasis added).

When question regarding whether the POS included any of the Plaintiffs' work or services, Gil Berry responded as follows:

Q:    Okay. If you would, just briefly identify for me anywhere in this very thick document [referring to the POS] any reference to Gil Berry & Associates, Marous Brothers and/or Student Suites or any combination thereof.

*Have you had a chance to look at it?*

*A:    I had a chance to look at it.*

*Q:    Could you identify for the Court any reference within the four corners of the document that references Gil Berry & Associates?*

*A:    No.*

*Q:    And references to Marous Brothers Construction?*

*A:    No.*

*Q:    Student Suites?*

*A:    No.*

Exh. 1, Berry Depo., p. 288-89, ln. 21-16 (emphasis added). When asked to identify which part of the quoted language from the POS was taken from the services or work product of MBC, Goldman responded as follows:

Q:    But what I'm asking you, are these items unique to this scope of work?

23

A:      The schedule was.[1]

Q:      The schedule was. We went over that. But you also told me that this modern communications, wireless Internet, enhanced security were things that the University conveyed to you that they wanted in their renovated dorms

A:      And that we put in the scope of work.

Q:      Any that you would put in the scope of work?

A:      Uh-huh (Affirmative).

Q:      So, it was not anything that was independently created by Marous Brothers?

A:      We didn't say that it was independently created. We said this work product was independently created.

Q:      But you don't know whether this was incorporated in any presentation that ASU did to go to the bond market, do you?

A:      That, I don't know.

Q:      Any you don't know whether this scope of work is actually in any of the bond documents?

A:      I have not seen the bond documents. So, I don't know if it is or isn't.

Exh. 2, Goldman Depo., p. 472-74, ln. 19-1.

Attorney M. Frederick Simpler prepared the POS. Exh. 29, Simpler Affidavit at ¶ 4. He has testified in a sworn affidavit that he did not use the Plaintiffs' scope of work or any other documents prepared by the Plaintiffs in preparing the POS. Exh. 29, Simpler Affidavit at ¶ 8. He further testified that no work prepared by the Plaintiffs is referenced as an exhibit to the POS. Exh. 29, Simpler Affidavit at ¶ 8. Additionally, Simpler testified that the no extensive scope of work was needed for ASU to procure bond financing – what was important was that ASU demonstrated credit worthiness and the ability to repay the money borrowed. Exh. 29, Simpler Affidavit at ¶ 9. ASU was able to demonstrate those qualities to the bond market. Simpler's testimony is undisputed given the fact that the Plaintiff MBC has never reviewed the bond documents and can not

---

[1] Goldman testified that a sentence stating that "the University expects to complete the first two dormitories by fall semester 2007 and to complete two additional dormitories by the beginning of each semester thereafter until all six are fully renovated by the fall semester 2008" was a schedule developed by MBC. When asked what the value of this schedule was to MBC, Goldman could not give an answer. Exh. 2, Goldman Depo., p. 487-89, ln. 15-1.

testify what is and what is not included. Likewise, the Plaintiff GBA has reviewed the documents and admits that there are no references to GBA, MBC and/or Student Suites.

The Plaintiffs' inability to show that ASU accepted their services prohibits them from establishing a prima facie claim of quantum meruit against ASU. As such, summary judgment should be granted to ASU on the Plaintiffs' claim of quantum meruit.

**B.    THE PLAINTIFFS HAD NO REASONABLE EXPECTATION OF PAYMENT FROM ASU**

The ASU Board of Trustees Property Committee voted to recommend a resolution to the ASU Board of Trustees regarding the engagement of GBA and Student Suites as the developer of a student housing plan at ASU. The terms of the resolution provided that "It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University." The ASU Board of Trustees subsequently adopted the recommendation of the Property Committee at its May 5, 2006 meeting. The Plaintiff Berry admitted that he was aware of the language of the resolution and that there was no final agreement between his company and ASU.

> Q:    And there appears to be again, quoted language from the resolution that talked about "it is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University."
>        Did you see that in the document?
> A:    Yes, sir.

Exh. 1, Berry Depo., p. 198, ln. 6-14.

> Q:    And my question to you: Based on your dealings, negotiations, revisions and so on, do you know of any agreement that has been signed between Alabama State University and Student Suites Gil Berry Alabama, LLC?
> A:    No, sir.
> Q:    Never been executed?
> A:    No, sir.

Exh. 1, Berry Depo., p. 310, ln. 6-13.

The Plaintiff GBA's expectation of payment was far less than reasonable given these facts. GBA not only knew about the voiding language in the Resolution, his company forwarded it to ASU for its adoption. Exh. 8, Davis and Berry Letter dated 1/24/06. Furthermore, after negotiations and revisions of a contract between ASU and SSGBA, a final agreement was never reached. Exh. 3, Davis Affidavit at ¶ 22. The refusal of terms on the proposed agreement not only came from ASU but also from the Plaintiff itself. In a letter dated August 18, 2006 from Davis and Berry to President Lee, Davis and Berry stated that SSGBA could not accept ASU's proposal that SSGBA be responsible for fees and expenses of project managers hired by ASU and that it could not accept the delay for the initial four percent of fees for SSGBA until the commencement of construction. Exh. 20, Letter from SSGBA to Pres. Lee dated 8/18/06.

The Plaintiff MBC's expectation of payment is just as unreasonable because MBC was never even to be in contract with ASU. MBC was to be in contract with SSGBA. This evidenced by MBC's proposed Letter of Intent and the proposed development agreement between ASU and SSGBA, and Goldman's testimony. Exh. 6, Letter of Intent; Exh. 13, Davis Email to Berry dated forwarding development agreement; Exh. 2, Goldman Depo., p. 308-09, ln. 16-16.

Berry also alleges that it expected to be paid based upon statements made to him by President Lee and Chairman Dean. Berry testified that President Lee told him that the Plaintiffs would be paid for their expenses once the bond issue closed. Exh. 1, Berry Depo., p. 368-69, ln. 10-6. Berry also testified that Chairman Dean always told him that he would be paid. Exh. 1, Berry Depo. p. 369, ln. 7-11. Accepting Berry's allegations as

true, the fact that President Lee or Chairman made these statements did not create a reasonable expectation of payment. As evident by his actions of requesting board approval of the initial resolution, Berry was fully aware of the fact that ASU operated through its Board of Trustees, not President Lee or Chairman Dean as an individual board member.

The Plaintiff MBC admits that no one from ASU ever told MBC that ASU would pay it for its services.

> Q:    But no representations were made by President Lee or ASU or TCU to
> Marous that those invoices would be paid?
> A:    Not directly to us. Just purportedly through Gil Berry.

Exh. 2, Goldman Depo., p. 318, ln. 17-21. MBC's reliance upon Berry's statements and its use of Berry's statements to fashion allegations against ASU are unreasonable given Goldman's statements that he is unsure whether Berry has been truthful to MBC during this process and that MBC is currently considering litigation against Berry as it relates to the ASU dormitory renovation project. Exh. 2, Goldman Depo., p. 78-9, ln. 18-10; p. 84-5, ln. 20-2; p. 109-11, ln. 16-9.

As a matter of law, the Plaintiffs had no reasonable expectation of payment from ASU for the work that they performed in hopes of obtaining a final agreement with ASU for the renovation of ASU's dormitories. Summary judgment should be granted in favor of the ASU Defendants on the Plaintiffs' quantum meruit claim.

## V.    THE PLAINTIFF GIL BERRY CANNOT SUCCEED ON A FRAUD CLAIM AGAINST PRESIDENT LEE BECAUSE HE COULD NOT HAVE REASONABLY RELY ON THE ALLEGED STATEMENTS OF PRESIDENT LEE[2]

---

[2] The Plaintiff MBC testified that the fraud claim was not one that it was asserting against President Lee or the ASU Defendants. Exh. 2, Goldman Depo., p. 513, ln. 12-19.

To succeed on a fraud claim the plaintiff must show "1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly without knowledge or mistakenly, 3) *that was reasonably relied on by the plaintiff under the circumstances*, and 4) that caused damage as a proximate consequence." *Brushwitz v. Ezell*, 757 So. 2d 423, 429 (Ala. 2000) (emphasis added). In *Alabama Electric Cooperative, Inc. v. Bailey's Construction Co., Inc.*, 950 So. 2d 280, 283-284 (Ala. 2006), the Court stated that "reasonable reliance was an essential element of a misrepresentation claim." The Court further held that the Alabama Electric Cooperative could not show that it reasonably relied upon the statements made by Bailey when there was an existing insurance policy with a clear disclaimer contrary to the alleged false representations. The Court stated that 'a claim for misrepresentation can not stand when the party asserting the claim is legally charged with knowledge of the true facts.' *Alabama Electric Cooperative, Inc.*, 950 So. 2d at 284 (quoting *Swindler v. Mid-Continent Life Ins. Co.*, 768 S.W.2d 331, 334 (Tex.App.-Houston [14th Dist.] 1989) (additional internal citations omitted). Although stated in the context of insurance transactions, the knowledge of the true facts is applicable to Gil Berry's reasonable reliance upon the alleged misrepresentations of President Lee.

Berry alleges that President Lee falsely represented "that they would be compensated for completing work for ASU on the Student Residence Project."[3] Accepting Berry's allegation as true, his reliance upon President Lee's statement is not reasonable because Berry had knowledge of the true facts. As stated previously, the ASU Board of Trustees Property Committee recommended and the ASU Board of Trustees

---

[3] The ASU Defendants do not concede that this statement is false. Had ASU and SSGBA reached a final agreement, Berry would have been paid for completing work on the ASU student housing project.

adopted a resolution drafted by the Plaintiffs. This resolution precluded any payment to the Plaintiffs or any liability for ASU to bear expenses unless and until a final agreement was reached between ASU and SSGBA. Berry knew about the language in the resolution and he also knew that there was no final agreement between the parties.    Exh. 1, Berry Depo., p. 198, ln. 6-14; p. 310, ln. 6-13.  Furthermore, Berry knew that the President could not make this guarantee without Board approval by his acknowledgement and adherence to the Board approval process as it related to the passage of the resolution naming SSGBA as developers for a student housing plan.  Under these circumstances, Berry did not reasonably rely upon the alleged statements made by President Lee. Summary judgment should be granted in favor of President Lee against Berry's claim of fraud.

## VI.    THE PLAINTIFFS CANNOT ESTABLISH A PRIMA FACIE CASE OF CONVERSION AGAINST THE ASU DEFENDANTS

A plaintiff can establish a conversion claim by presenting proof of either of the following:

1) a wrongful taking,
2) an illegal assumption of ownership,
3) an illegal use or misuse of another's property, or
4) a wrongful detention or interference with another's property.

*Crown Life Ins. Co. v. Smith*, 657 So. 2d 821, 823 (Ala. 1994). The Plaintiffs appear to be making a conversion claim based upon theories 3 and 4. The Plaintiffs allege that the Defendants have committed conversion by the following acts:

1) appropriating the Plaintiffs' proprietary work "to their own use and beneficial enjoyment in exclusion of Plaintiffs' rights of ownership and compensation" Exh. 28, Amended Complaint at ¶ 75;

2) withholding "possession of Plaintiffs' work product from Plaintiffs without compensation after Plaintiffs requested the return of their proprietary work product" Exh. 28, Amended Complaint at ¶ 77; and

3) "using Plaintiffs' proprietary work product to their own use and beneficial enjoyment in that they are using Plaintiffs' proprietary work product in the renovation of the Student Residence Project without properly compensating Plaintiffs." Exh. 28, Amended Complaint at ¶ 78.

The Plaintiffs allegations are unfounded.

Goldman testified that MBC produced 21 copies of the 11 x 17 proprietary work and that two copies are still missing. These copies were given to Berry for distribution. Two copies of MBC's proprietary work are still with Berry and Davis. MBC does not know who is in possession of the proprietary work.

> Q:     Who does Marous Brothers contend is in possession of its proprietary work product?
> A:     We don't know that – we had issued in total 21 copies of that work product at various times. We received 17 back.
> ...
> Q:     And who did Marous Brothers Construction give 21 copies to?
> A:     We produced 21 copies – we provided some copies at the May 6th meeting...we gave Dick Davis and Gil Berry the remaining copies, but there have been 21 copies.

Exh. 2, Goldman Depo., p. 520, ln. 7-23.

> Q:     Okay. So, you really don't know where your work product went that Gil Berry had, do you?
>        You don't know what Gil Berry did with the 21 copies that you gave to him.
> A:     We know – all we know is that we don't have 21 copies returned.
> Q:     But you don't know that anyone at Alabama State University has those copies?
> A:     We know that Dick Davis retained a copy and that Gil Berry retained a copy. So, we know that – in all it we count those out of the four because we didn't ask for them to return those. We know that there's two outstanding copies. So, who has it, we don't know.

Exh. 2, Goldman Depo., p. 523-24, ln. 11-5. If the Plaintiffs do not know to whom and how their proprietary work was distributed, then surely they can not establish a

conversion claim against ASU. Further, it is undisputed that President Lee returned copies of Plaintiffs' proprietary work in October 2006 and that an additional copy found in files of a former ASU employee was returned by undersigned counsel. Exh. 26, Transmittal Letter from President Lee; Exh. 27, Transmittal Letter from R. Salaam-Jones.

More importantly, the Plaintiff MBC admits that the design of the current dormitory renovation at ASU is different from the design proposed in its proprietary work. Exh. 2, Goldman Depo., p. 160, ln. 15-21. Although MBC is aware of this difference, MBC still assumes and alleges with no evidence that the ASU Defendants are using its proprietary work in ASU's current dormitory renovation. Likewise, the Plaintiff Berry does not even know what the current design of the ASU dormitory renovation is and has no evidence of what is being built at ASU. Exh. 1, Berry Depo., p. 659-70, ln. 21-10. These baseless assumptions and allegations can not survive summary judgment.

## VII.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE ASU DEFENDANTS AGAINST THE PLAINTIFFS CIVIL CONSPIRACY CLAIM BECAUSE THE PLAINTIFFS HAVE NOT PROVEN AN UNDERLYING WRONG

Civil conspiracy is defined as "a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Hooper v. Columbus Regional Healthcare System, Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006) (quoting *Keith v. Witt Auto Sales, Inc.,* 578 So. 2d 1269, 1274 (Ala. 1991) (additional internal citations omitted)). However, the liability for civil conspiracy is based upon "the existence of the underlying wrong and [that] if the underlying wrong provides no cause of action, then neither does the conspiracy." *Hooper*, 956 So. 2d at 1141 (quoting *Ex parte Alabama Dep't of Transp.*, 764 So. 2d 1263, 1271 (Ala. 2000)).

31

The Plaintiffs have alleged that "Defendants Upchurch, Percy Thomas, TCU, President Lee and Dean conspired together to intentionally interfere with the business relationship and implied contract between Plaintiffs and ASU to cause injury and harm to Plaintiffs." Exh. 28, Amended Complaint at ¶ 81. Plaintiffs' Counsel admitted on the record of Goldman's deposition that the tortious interference with a business relationship did not apply to the ASU Defendants. Exh. 2, Goldman Depo, p. 513-14, ln. 20-1. As such, the ASU Defendants have no liability for a conspiracy claim grounded in a cause of action that does not even apply to them. Because there is no alleged underlying wrong of the ASU Defendants for tortious interference, summary judgment should be granted in their favor against the Plaintiffs' conspiracy claim.

## VIII.   THE ASU DEFENDANTS ARE DUE SUMMARY JUDGMENT AGAINST PLAINTIFF GIL BERRY'S LOSS OF BUSINESS OPPORTUNITY CLAIM[4] BECAUSE THERE IS NO ACTUAL LOSS AND THE ALLEGED LOSS IS NOT THE RESULT OF ANY ACTIONS TAKEN BY THE ASU DEFENDANTS

Berry alleges that his company has lost significant business opportunities as a result of some actions of the Defendants. When questioned regarding what business opportunity he has lost, Berry responded as follows:

> Q:    What significant business opportunities did ASU, President Lee, Elton Dean cause you to lose?
> A:    When the President of Alabama A&M tells you that I heard what has happened. I have got a call. Wouldn't say from who. He just said I got a call from Alabama State about what is occurring up there.
>        That, to me, is a lost opportunity that I am still trying to retrieve at this moment.
> Q:    Well, now you currently – well, earlier today you testified that the situation at Alabama A&M you were still talking with Trustee Avery, I think it was.
> A:    I said I'm still trying to retrieve it.

---

[4] Goldman testified that MBC did not have a loss of business opportunity claim against the ASU Defendants. Exh. 2, Goldman Depo., p. 516, ln. 16-19.

Exh. 1, Berry Depo., p. 390, ln. 3-19. Upon further examination, Berry stated:

> Q:    Okay.  Now, you haven't lost the job because you said that you're still
> talking to them?
> A:    Exactly.

Exh. 1, Berry Depo., p. 672, ln. 17-20.

Berry can not attribute any actions to any of the ASU Defendants as the cause of

this alleged loss.

> Q:    Okay.  Retrieve it.  And it's your testimony here today that Dr. Jennings
> President of Alabama A&M University, said what to you now?
> A:    That he had got a call from someone from – he never said who – Alabama
> State University to tell him about what is occurring; that they have been sued.
> Q:    Now how do you attribute that to President Lee or Elton Dean?
> A:    I didn't.

Exh. 1, Berry Depo., p. 390-91, ln. 20-7.

> Q:    Okay.  Now, did Dr. Jennings say that President Lee had called him?
> A:    No, he didn't.
> Q:    Did he say that Chairman Elton Dean called him?
> A:    No, he did not.

Exh. 1, Berry Depo., p. 392, ln. 7-12.  Upon further questioning, Berry admitted that

President Jennings was actually concerned about this litigation.

> Q:    And you claim that Alabama A&M's president, President Jennings –
> A:    Uh-huh (affirmative).
> Q:    -- knew about the lawsuit?
> A:    Uh-huh (affirmative).
> ...
> Q:    And the lawsuit – correct me if I'm wrong – but it was filed by you, not by
> the defendants?
> A:    Yes.
> Q:    So, if you lost something as a result of the lawsuit having been filed, that
> lawsuit was filed by you?
> A:    That's correct.

Exh. 1, Berry Depo., p. 672-73, ln. 9-9.

By Plaintiff's own admission, he has not lost a business opportunity with

Alabama A&M University.  Additionally, any alleged loss at Alabama A&M University

was caused by President Jennings knowledge of this lawsuit which was filed by the Plaintiffs. The alleged loss can not be attributed to any of the ASU Defendants. As such, summary judgment should be granted against the Plaintiff's claim of loss of business opportunity.

## IX.    INJUNCTIVE RELIEF IS IMPROPER AS A MATTER OF LAW BECAUSE THE PLAINTIFFS CAN NOT DEMONSTRATE SUCCESS ON THE MERITS

The Plaintiffs have requested an injunction to enjoin "Defendant's from using Plaintiff's work product" and to order "the return of Plaintiffs' proprietary work." To successfully state a claim for permanent injunctive relief, a plaintiff must show the following:

1)    success on the merits;
2)    a substantial threat of irreparable injury;
3)    that the threatened injury to the plaintiff outweighs the harm the injunction may cause to the defendant; and
4)    that the granting of an injunction will not disserve public interest.

*TFT, Inc. v. Warning Systems*, 751 So. 2d 1238, 1242 (Ala. 1999). The Plaintiffs request for injunctive relief should not be granted as a matter of law because the Plaintiffs can not demonstrate that they will have any success on the merits.

As it relates to the ASU Defendants' alleged conversion and use of the Plaintiffs' proprietary work, the Plaintiffs can not show that they will have success on the merits. Goldman testified that MBC gave its proprietary work to Berry and that MBC does not know who is in possession of that proprietary work. Exh. 2, Goldman Depo., p. 523-24, ln. 11-5. Given these facts, the Plaintiffs can not succeed on a conversion claim. Similarly, the Plaintiffs can not show that it will succeed on their claim that the ASU Defendants are "using" their proprietary work. This claim is also based upon mere

34

assumptions and is not related to any evidence. Exh. 1, Berry Depo., p. 659-70, ln. 21-10. The ASU Defendants are entitled to summary judgment, and they should not be ordered to return or refrain from using something that they do not have.

## X.     PRESIDENT LEE AND CHAIRMAN DEAN SHOULD BE GRANTED SUMMARY JUDGMENT AGAINST THE PLAINTIFFS' FAILURE TO AUTHORIZE PAYMENT[5]

The Plaintiffs have alleged that "Dean and Lee had the responsibility to follow established procedures for the payment of ASU's contractual obligations and debts due and owing, and also to follow guidelines and established accounting procedures to ensure that established obligations, such as those owed to Plaintiffs, were paid." Exh. 28, Amended Complaint at ¶ 90. The basis of this claim as articulated by Berry is that if the Plaintiffs submitted invoices to the proper party, then the invoices should have been paid. Exh. 1, Berry Depo., p. 399, ln. 1-6. The Plaintiff MBC relied on Berry to submit its invoices and does not know what procedures ASU should have taken in paying the invoices. Exh. 2, Goldman Depo., p. 524-25, ln. 20-18.

ASU is governed by its Board of Trustees. "The Board of Trustees shall have exclusive jurisdiction, supervision and control of Alabama State University." Ala. Code § 16-50-22 (1975). The ASU Board of Trustees passed a resolution naming SSGBA as the developers for ASU student housing project. That resolution stated that should no final agreement be reached between the parties, then ASU should bear no cost. The ASU Board of Trustees never approved a final agreement between ASU and SSGBA. The ASU Board of Trustees never even considered a proposed agreement between ASU and MBC. Under these facts, President Lee and Chairman Dean could not have legally

---

[5] The ASU Defendants do not concede that "failure to authorize payment" is a cognizable cause of action.

authorized payment to the Plaintiffs. Therefore, President Lee and Chairman Dean are entitled to summary judgment against the Plaintiffs' failure to authorize payment claim.

## XI.    THE PLAINTIFF MBC ILLEGALLY PERFORMED CONSTRUCTION AND ARCHITECTURAL SERVICES AND THUS NEITHER PLAINTIFF ARE ENTITLED TO COMPENSATION FOR THESE SERVICES AND WORK RELATED TO THESE SERVICES

Ala. Code § 34-8-6 (a) (1975) provides that "*any person, firm, or corporation not being duly authorized who shall engage in the business of general contracting in this state, except as provided for in this chapter...shall be deemed guilty of a Class A Misdemeanor...*" Emphasis added. Additionally, Ala. Code § 34-2-31 (1975) provides that "no person shall practice architecture in this state, or use the title 'architect' or any title, sign, card or device to indicate that such person is practicing architecture or is an architect unless such person shall thereafter comply with the provisions of this chapter. Compliance with that chapter requires that an architect be registered with the Alabama Board of Architects to perform architectural services. Ala. Code § 34-2-32 (1975). The Plaintiff MBC has admitted that it was neither a licensed contractor nor a licensed architect at the time that it allegedly performed "preconstruction" and "design/build" services for ASU. Exh. 2, Goldman Depo., p. 501, ln. 7-12; p. 556, ln. 1-9.

The Plaintiff MBC submitted invoices to ASU for design/build services which included fees for architectural design and preconstruction services. The Plaintiff GBA submitted invoices to ASU for its supervision of MBC's design/build services. Alabama jurisprudence is clear that the failure of a contractor to obtain a license in the State of Alabama precludes the contractor from receiving payment on his services. In fact, the case law provides that contracts, express or implied, with non-licensed contractors are null, void and unenforceable. *Herbert v. Birmingham-Jefferson Civic Center Authority*,

36

694 F.2d 240 (11th Cir. 1982); *Twickenham Station Inc. v. Beddingfiled*, 404 So. 2d 43 (Ala. 1981). Pursuant to this authority, MBC and GBA would not have an express or implied contract with ASU to pay for design/build services and the supervision of design/build services that were performed by non-licensed contractors.

As a general principle, a party may not enforce a void or illegal contract either at law or in equity. *Thompson v. wiik, Reimer & Sweet,* 391 So.2d 1016 (Ala.1980). Further, "a party seeking equitable relief, however, must have acted with equity and must come into court with clean hands. *Levine v. Levine,* 262 Ala. 491, 494, 80 So.2d 235, 237 (1955)...The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights 'contrary to equity and good conscience.' *Draughon v. General Fin. Credit Corp.,* 362 So.2d 880, 884 (Ala.1978)." *Ex parte HealthSouth Corp.,* 2007 WL 2405685, *6 -7 (Ala. 2007).

The Plaintiffs did not enter into this action with clean hands. They seek payment for services performed unlicensed and unlawfully in the State of Alabama. The laws of the State of Alabama and the laws of equity mandate summary judgment in favor of the ASU Defendants.

## XII.    ASU IS ENTITLED TO SOVERIGN IMMUNITY AGAINST ALL OF THE PLAINTIFFS' CLAIMS

Article 1 § 14 of the Constitution of Alabama (1901) provides that "the State of Alabama shall never be made a defendant in any court of law or equity." This provision is termed as the doctrine of sovereign immunity. The doctrine of sovereign immunity applies to the State as well as its agencies. *Phillips v. Thomas,* 555 So. 2d 81, 83 (Ala.

1989). Sovereign immunity is an absolute immunity and a total bar to recovery against a plaintiff's claims against the State. As commonly quoted, "the wall of immunity erected by § 14 is nearly impregnable." *Alabama Department of Environmental Management v. Town of Lowndesboro*, 2005 WL 791239 at * 6 (Ala. Civ. App. 2005). It is evident from Alabama jurisprudence that this immunity is also extended to the State's educational institutions. *See Taylor v. Troy State Univ.*, 437 So. 2d 472, 474 (Ala. 1983); *see also Matthews v. Alabama A&M Univ.*, 787 So. 2d 691, 696-97 (Ala. 2000) (holding that summary judgment was properly granted to the university against an employee's state-law tort claims because it was absolutely immune to suit based upon the doctrine of sovereign immunity).

In *Shoals Community College v. Colagross*, 674 So. 2d 1311, 1314 (Ala. Civ. App. 1995), the Alabama Court of Civil Appeals, stated that "[i]t is undisputed that Shoals was a post-secondary educational institution operating under the authority and supervision of the State Board of Education. Therefore, it is clear that Shoals is entitled to absolute immunity from suit. Accordingly, the action against Shoals is barred by sovereign immunity."

Here, it is also undisputed that ASU is an institution of higher learning operating under the supervision of the State Department of Education. In fact, the Plaintiffs even assert in its statement of the parties that ASU is an instrumentality of the State of Alabama. Therefore, the University is an agency of the State. As an agency of the State, the University is entitled to absolute immunity from suit.

In *Ex Parte Troy University*, 2006 WL 3759341 at *3-4 (Ala. 2006), the Alabama Supreme Court detailed factors that should be used in determining whether an entity is an

agency of the State and should be afforded sovereign immunity. The Court stated that whether an entity receives funds from the State and whether a judgment against the entity would result in loss to the State's treasury are significant factors in determining immunity. Further, the Court stated that the powers delegated to the entity from the State; the relationship between the entity and the State and the nature of the functions performed by the agency are also determinative. Using these factors, the Court held that Troy University was entitled to immunity "because the University is a State institution of higher learning and entitled to the absolute immunity of § 14."

Likewise, ASU is an institution of higher learning; and it is operating under the control and supervision of the State of Alabama. Any judgment obtained against ASU would be satisfied from funds originating from the State's treasury. Therefore, ASU is entitled to sovereign immunity against the Plaintiff's claims, and summary judgment should be granted.

## A.    SOVEREIGN IMMUNITY IS A JURISDICTIONAL BAR

"This constitutionally guaranteed principle of sovereign immunity, acting as a jurisdictional bar, precludes a court from exercising subject-matter jurisdiction. Without jurisdiction, a court has no power to act and must dismiss the action." *Ex parte Alabama Dept. of Mental Health and Retardation*, 837 So. 2d 808 at 810 (Ala. 2002) *(*quoting *Alabama State Docks Terminal Ry. v. Lyles,* 797 So. 2d 432, 435 (Ala. 2001)). As noted in Alabama case law, the presence of sovereign immunity acts as a jurisdictional bar. When a plaintiff sues a state agency cloaked in sovereign immunity, no subject matter jurisdiction exists. *Ex parte Alabama Dept. of Mental Health and Retardation,* 837 So. 2d 808 at 810.

Such is the case here. The Plaintiffs have sued ASU, a state agency with the benefit of sovereign immunity. Further, the Plaintiffs have not asserted any claims which would pierce ASU's immunity. Because of this immunity, this Court has no subject matter jurisdiction, and summary judgment should be granted in favor of ASU.

**B.    THE PLAINTIFFS CANNOT RECOVER ANY MONETARY DAMAGES    AGAINST THE UNIVERSITY**

### 1.    The Plaintiffs cannot recover any compensatory damages

Alabama courts do not allow claims that would "touch the state treasury by requiring the disbursement of state funds." *Moody v. University of Alabama*, 405 So. 2d 714, 717 (Ala. Civ. App. 1981). Further, the courts recognize actions against the State's officials and agencies as claims that "would directly affect the financial status of the State Treasury." *Lyons v. River Road Construction, Inc.*, 858 So. 2d 257, 261 (Ala. 2003). ASU is entitled to summary judgment on the Plaintiffs' claims for compensatory damages.

### 2.    The Plaintiffs cannot recover any punitive damages

In addition to the Alabama Constitution's statement of immunity, the Alabama Code § 6-11-26 (1975) provides that "punitive damages may not be awarded against the State of Alabama ...or any agency thereof." To the extent that the Plaintiffs seek punitive damages against ASU, its request is forbidden by the doctrine of sovereign immunity and Ala. Code § 6-11-26. This Court should uphold the same and dismiss the Plaintiffs' claims for punitive damages.

With the presence of sovereign immunity and related statutes, the Plaintiffs cannot state a viable claim against ASU for which relief can be granted. As such, ASU should be granted summary judgment in its favor against all of the Plaintiffs' claims.

## XIII. PRESIDENT LEE AND CHAIRMAN DEAN ARE ENTITLED TO DISCRETIONARY FUNCTION IMMUNITY AGAINST THE PLAINTIFFS' CLAIMS

State-agent or discretionary immunity is intended to encourage public officials and employees to act on the basis of policy, rather than "with the goal of avoiding personal liability or vexatious suits." *Nance v. Matthews*, 622 So. 2d 297, 302 (Ala. 1993). The Alabama Supreme Court has expounded on the doctrine of state-agent immunity in the following manner: "Discretionary function immunity is just what its label implies: immunity from tort liability [that is] afforded to public officials acting within the general scope of their authority in performing functions that involve a degree of discretion." *McDuffie v. Roscoe*, 679 So. 2d 641, 642-43 (Ala. 1996). In sum, state agent immunity is "necessary to preserve the decision making function of government." *McDuffie*, 679 So. 2d at 643. Furthermore, whether an official is entitled to state-agent immunity is question of law to be decided by the trial court. *Id.*

To further clarify the issue of state agency immunity, the Alabama Supreme Court, in *Ex parte Cranman*, adopted the Restatement (Second) of Tort § 895D's formula for determining whether a state actor is immune from liability. 792 So. 2d 392 (Ala. 2000). The issue presented in *Cranman* was whether state-employed physicians enjoyed immunity from tort actions arising from their performance of their duties. According to the Alabama Supreme Court, state agents are immune from suit when exercising discretion if his or her duties fall under at least one of the following categories:

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

(a) making administrative adjudications;

41

(b) allocating resources;
(c) negotiating contracts;
(d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Id.* at 405 (Emphasis added).

The Plaintiffs claim that President Lee and Chairman Dean failed to authorize payment of their invoices. The payment of invoices would involve President Lee and Chairman Dean exercising their administrative judgment in the allocation of the ASU's resources. Further, the Plaintiffs can not show that President Lee and Chairman Dean were somehow acting outside of the general scope of their employment/position by not directing the invoices to be paid because 1) the Plaintiffs can not show that the invoices were even a valid debt owed by ASU and 2) President Lee and Chairman Dean had no authority to authorize payment. President Lee and Chairman Dean should be afforded state-agent immunity and summary judgment against the Plaintiffs' claims.

**WHEREFORE, PREMISES CONSIDERED** the ASU Defendants respectfully request that this Court grant summary judgment in its favor against all of the Plaintiffs' claims.

Respectfully Submitted,

/s/ Ramadanah M. Salaam-Jones

42

**KENNETH L. THOMAS (THO043)**
**RAMADANAH M. SALAAM-JONES (SAL026)**

**OF COUNSEL:**
**THOMAS, MEANS, GILLIS, & SEAY, P.C.**
POST OFFICE DRAWER 5058
3121 ZELDA COURT
MONTGOMERY, ALABAMA 36103-5058
(334)270-1033
Fax: (334)260-9396

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following counsel of record via this Court's electronic filing system on this the 5th day of March, 2008:

Jock M. Smith, Esq.
**COCHRAN, CHERRY, GIVENS & SMITH, P.C.**
P.O. Box 830419
Tuskegee, Alabama 36083

Champ Lyons, III, Esq.
**KING, HORSLEY & LYONS, LLC**
One Metroplex Drive
Suite 280
Birmingham, Alabama 35209

J. Lister Hubbard, Esq.
R. Brooke Lawson, Esq.
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
Montgomery, Alabama 36102-2069
(334) 241-8000
Fax: (334) 323-8888

/s/ Ramadanah M. Salaam-Jones
**OF COUNSEL**

43

# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | |
|---|---|
| MAROUS BROTHERS ) | |
| ) | |
| CONSTRUCTION, LLC, a ) | |
| ) | |
| corporation, and GIL ) | |
| ) | |
| BERRY, an individual ) | |
| ) | |
| d/b/a Gil Berry & ) | |
| ) | |
| Associates, ) | CIVIL ACTION NO. |
| ) | |
|     Plaintiffs, ) | 2:07-CV-384-ID |
| ) | |
| -vs- ) | |
| ) | |
| ALABAMA STATE UNIVERSITY,) | |
| ) | |
| a public corporation, ) | |
| ) | |
| et al., ) | |
| ) | |
|     Defendants. ) | |

VOLUME I

DEPOSITION OF GILBERT C. BERRY

Page 2

```
 1          S T I P U L A T I O N S
 2          IT IS STIPULATED AND AGREED, by
 3  and between the parties through their
 4  respective counsel, that the deposition of:
 5          GILBERT C. BERRY,
 6  may be taken before Belinda S. Brewster,
 7  Commissioner and Notary Public for the State
 8  of Alabama at Large, on the 24th day of
 9  January, 2008, commencing at approximately
10  9:07 a.m., at the law offices of Capell &
11  Howard, P.C., 150 South Perry Street,
12  Montgomery, Alabama; said deposition taken
13  pursuant to the Federal Rules of Civil
14  Procedure.
15          IT IS STIPULATED AND AGREED, by
16  and between the parties through their
17  respective counsel, that the reading of and
18  signature to the deposition by the witness is
19  waived, said deposition to have the same force
20  and effect as if full compliance had been had
21  with all laws and rules of Court relating to
22  the taking of depositions.
23          IT IS STIPULATED AND AGREED that
```

Page 3

```
 1  it shall not be necessary for any objections
 2  to be made by counsel to any questions, except
 3  as to form or leading questions, and that
 4  counsel for the parties may make objections
 5  and assign grounds at the time of the trial,
 6  or at the time said deposition is offered in
 7  evidence, or prior thereto.
 8          In accordance with Rule 5(d) of
 9  The Alabama Rules of Civil Procedure, as
10  amended, effective May 15, 1988, I, Belinda S.
11  Brewster, am hereby delivering to Kenneth L.
12  Thomas the original transcript of the oral
13  testimony of Gilbert C. Berry taken on the
14  24th day of January, 2008, along with
15  exhibits.
16          Please be advised that this is the
17  same and not retained by the Court Reporter,
18  nor filed with the Court.
19
20
21
22
23
```

Page 4

```
 1          A P P E A R A N C E S
 2  CHAMP LYONS, III, Attorney-at-Law, of the law
 3          firm of KING, HORSLEY & LYONS,
 4          LLC, 1 Metroplex Drive, Suite 280,
 5          Birmingham, Alabama 35209;
 6          appearing as counsel for the
 7          Plaintiff Gil Berry & Associates.
 8  D. CRAIG ALLRED, Attorney-at-Law, of the law
 9          firm of DAVID E. ALLRED, P.C.,
10          7030 Fain Park Drive, Suite 9,
11          Montgomery, Alabama 36117;
12          appearing as counsel for the
13          Plaintiff Marous Brothers
14          Construction, LLC (counterclaim).
15  KENNETH L. THOMAS and RAMADANAH M.
16          SALAAM-JONES, Attorneys-at-Law,
17          of the law firm of THOMAS, MEANS,
18          GILLIS & SEAY, P.C., 3121 Zelda
19          Court, Montgomery, Alabama 36103;
20          appearing as counsel for the
21          Defendant Alabama State
22          University.
23
```

Page 5

```
 1          A P P E A R A N C E S (Cont'd.)
 2  R. BROOKE LAWSON, III and J. LISTER HUBBARD,
 3          Attorneys-at-Law, of the law firm
 4          of CAPELL & HOWARD, P.C., 150
 5          South Perry Street, Montgomery,
 6          Alabama 36104; appearing as
 7          counsel for the Defendant TCU
 8          Consulting Services, LLC.
 9  ALSO PRESENT:
10  JOE A. LEE, President, Alabama State
11          University
12  FREDDIE GALLOT, JR., Vice President of Fiscal
13          Affairs, Alabama State University
14  ELTON N. DEAN, SR., Chairman, Alabama State
15          University Board of Trustees
16  JOHN KNIGHT, Special Assistant to the
17          President, Alabama State
18          University
19  W. KEN UPCHURCH, III, TCU Consulting Services,
20          LLC
21  PERCY THOMAS, TCU Consulting Services, LLC
22
23
```

**Page 6**

```
 1              I N D E X
 2   Witness:                    Page
 3   GILBERT C. BERRY
 4       Examination by Mr. Thomas        9
 5   – – – – – – – – – – – – – – – –
 6         E X H I B I T S
 7   Defendant's
 8   Exhibit No.   Description         Page
 9     1      Letter Dated 10-17-05    104
10     2      Complaint Filed 5-3-07   124
11            (20 Pages)
12     3      Letter Dated 9-20-05     129
13     4      Student Housing          153
14            Redevelopment Master Plan,
15            MAR 670 through MAR 751
16            with Attachments (84 Pages)
17     5      Letter Dated 11-9-05 with 164
18            Attachment (2 Pages)
19     6      Minutes, ASU Board of    193
20            Trustees Property Committee
21            Meeting, 11-15-05 (4 Pages)
22     7      Letter Dated 11-23-05    196
23            (2 Pages)
```

**Page 7**

```
 1         E X H I B I T S (Cont'd.)
 2   Defendant's
 3   Exhibit No.   Description         Page
 4     8      Plans, Marous Brothers   230
 5            Construction, GBA 1050
 6            through GBA 1197
 7            (139 Pages)
 8     9      Minutes, ASU Board of    253
 9            Trustees, 5-5-06 with
10            Attachment (15 Pages)
11    10      Student Housing          258
12            Redevelopment Master Plan,
13            Revised 11-9-05, GBA 415
14            through GBA 421 (7 Pages)
15    11      Letters Dated 5-23-06    271
16            and 5-15-06 (2 Pages)
17    12      ASU General Tuition and  288
18            Fee Revenue Bonds, Series
19            2006 (107 Pages)
20    13      Memorandum Dated 1-19-06 295
21            with Attachments (10 Pages)
22    14      E-mail Dated 6-22-06     302
23
```

**Page 8**

```
 1         E X H I B I T S (Cont'd.)
 2   Defendant's
 3   Exhibit No.   Description         Page
 4    15      Letter Dated 8-18-05 with 306
 5            Attachments (12 Pages)
 6    16      E-mails Dated 9-7-06 and 342
 7            9-8-06 (4 Pages)
 8    17      E-mail Dated 9-6-06      353
 9    18      Letter Dated 6-5-06      356
10    19      W I T H D R A W N
11    20      Letter Dated 9-28-06     394
12    21      Letter Dated 10-23-06    395
13    22      First Amended Complaint  397
14            (21 Pages)
15    23      E-mails Dated 7-28-06 and 400
16            7-29-06 (3 Pages)
17    24      E-mail Dated 8-28-06     404
18    25      E-mails Dated 9-19-06    406
19    26      Memo Dated 9-20-06       408
20            (2 Pages)
21
22
23
```

**Page 9**

```
 1        I, Belinda S. Brewster, as
 2   Commissioner and Notary Public for the State
 3   of Alabama at Large, certify that pursuant to
 4   Rule 30 of the Alabama Rules of Civil
 5   Procedure and the foregoing stipulations of
 6   counsel, there came before me at the law
 7   offices of Capell & Howard, P.C., 150 South
 8   Perry, Montgomery, Alabama 36104, on the 24th
 9   day of January, 2008, commencing at
10   approximately 9:07 a.m., Gilbert C. Berry,
11   witness in the above cause, for oral
12   examination and the following proceedings were
13   had:
14        GILBERT C. BERRY,
15   a witness of lawful age, having sworn or
16   affirmed to tell the truth, the whole truth,
17   and nothing but the truth, was examined and
18   testified as follows:
19   EXAMINATION BY MR. THOMAS:
20      Q.   For the record, would you state
21   your full name.
22      A.   My name is Gilbert Charles Berry.
23   And that's spelled B-E-R-R-Y.
```

Page 10

1    Q.    Mr. Berry, my name is Kenneth
2 Thomas. And I, along with Ramadanah
3 Salaam-Jones, represent the defendants named
4 in your lawsuit as Alabama State University,
5 President Joe Lee and Elton Dean, as chairman
6 of the ASU Board of Trustees. Okay.
7          Before we get started with your
8 deposition, the court reporter has kind of
9 asked that we on the record identify ourselves
10 so that the record would be clear as to who's
11 in attendance.
12         So, if you don't mind, would you
13 start with your name, and we'll just go around
14 the table.
15   A.    Again, my name is Gilbert Charles
16 Berry, B-E-R-R-Y.
17         MR. LYONS:  I'm Champ Lyons.  I
18 represent the plaintiffs.
19         MR. ALLRED:  I'm Craig Allred,
20 and I represent Marous Brothers on the
21 counterclaim only.
22         MR. THOMAS:  Percy Thomas with
23 TCU Consultants.

Page 11

1          MR. HUBBARD:  Lister Hubbard of
2 the Capell & Howard firm.  I'm representing
3 TCU, Ken Upchurch and Percy Thomas.
4          MR. UPCHURCH:  I'm Ken Upchurch,
5 TCU Consultants.
6          MR. GALLOT:  Freddie Gallot of
7 Alabama State University.
8          MR. LEE:  Joe Lee, President,
9 Alabama State University.
10         MR. DEAN:  Elton Dean, Chairman
11 of the Board, Alabama State Board of Trustees.
12         MR. KNIGHT:  John Knight, Alabama
13 State University.
14         MR. LAWSON:  Brooke Lawson,
15 Capell & Howard, representing TCU, Ken
16 Upchurch and Percy Thomas.
17         MS. JONES:  Ramadanah Jones
18 representing Alabama State University,
19 President Joe Lee and Chairman Elton Dean.
20         MR. THOMAS:  Again, Kenneth
21 Thomas as I've identified myself.
22   Q.    Mr. Berry, if I may, just to
23 confirm for the record, you are a plaintiff in

Page 12

1 the lawsuit that is styled Marous Brothers
2 Construction, LLC and Gil Berry, an individual
3 doing business as Gil Berry & Associates
4 versus Alabama State University, et al., and
5 other named defendants; is that correct?
6    A.    That is correct.
7    Q.    And that is presently pending in
8 the United States District Court for the
9 Middle District of Alabama?
10   A.    That is correct.
11   Q.    We have requested your presence
12 here today to ask you some questions regarding
13 your lawsuit.  Have you ever given a
14 deposition before?
15   A.    Yes, I have.
16   Q.    Could you identify for me those
17 occasions in which you gave depositions and
18 things of that sort?
19   A.    Okay.  Twice.  Gil Berry versus
20 Ford Motor Company and Gil Berry versus
21 Trafalgar House Construction Company.
22   Q.    The first lawsuit that you
23 mentioned was Gil Berry versus Ford Motor?

Page 13

1    A.    Ford Motor Company.
2    Q.    Okay.  And where was that lawsuit
3 filed?
4    A.    In U.S. District Court in
5 Pittsburgh, Pennsylvania.
6    Q.    Okay.  And what was basically the
7 claims of your lawsuit?
8    A.    I had -- Ford had asked me to
9 become a dealer development rep.  And as some
10 time went by, the representation that Ford had
11 made to me as far as the dealership was -- in
12 other words, Ford and Chrysler had -- Ford and
13 the Chrysler dealer that I was looking at was
14 under one roof.  It had been grandfathered in
15 many years ago.
16         And Ford was having problems
17 getting Chrysler out of the dealership, and
18 Chrysler wanted Ford to move out of the
19 dealership.
20         And based on that ongoing
21 argument was going on for some time, we
22 decided that it wasn't in our best interest to
23 pursue that dealership, that we were led that

Page 14

1 we would actually get the dealership early on
2 and we sued Ford Motor Company.
3    Q.    When was that lawsuit filed if
4 you can recall?
5    A.    Oh, maybe in 1995 or something of
6 that era.
7    Q.    What was the final disposition or
8 resolution of that lawsuit?
9    A.    I received a settlement from Ford
10 Motor Company.  It never went to court.
11    Q.    What type of settlement did you
12 receive?
13        MR. LYONS:  Was that
14 confidential?
15        THE WITNESS:  I would have to
16 say.  And I was -- you know, I wasn't supposed
17 to talk about the settlement, and they did
18 offer me another dealership at any time I
19 chose to get another dealership.
20    Q.    (By Mr. Thomas)  So, you're
21 representing to the Court that that settlement
22 is confidential?
23    A.    Yes.

Page 15

1    Q.    But you do have documentation
2 regarding that particular matter?
3    A.    I don't have any in my presence,
4 but the -- probably the law firm that
5 represented me probably still has the
6 documentation.
7    Q.    Now, the second lawsuit you
8 referenced, Gil Berry -- and I didn't get the
9 complete name of the defendant or defendants
10 in that lawsuit.
11        Could you state that again?
12    A.    Yes.  Trafalgar House out of
13 England.
14    Q.    Could you spell that?
15    A.    I couldn't really spell that.
16 It's Trafalgar House.  They own Trafalgar
17 Square, you know.
18    Q.    Phonetically, would it start with
19 a T?
20    A.    Yes, sir.
21    Q.    And where was that lawsuit filed?
22    A.    In Allegheny County in
23 Pittsburgh, Pennsylvania.

Page 16

1    Q.    And what was the nature of that
2 lawsuit?
3    A.    An unpaid balance on a
4 construction job that I had done.
5    Q.    And when was that lawsuit filed?
6    A.    Probably about '95, '96,
7 something like that.
8    Q.    And you said Alleghany County,
9 Pennsylvania.  I assume that would be a state
10 court?
11    A.    Yeah, commonwealth court.
12    Q.    Got you.  Okay.  And the lawsuit
13 against Ford Motor Corporation would have been
14 in federal court?
15    A.    Yes.
16    Q.    Got you.  What was the final
17 disposition -- what was the nature of your
18 claims against this corporate defendant.  I
19 can't pronounce it.
20    A.    Trafalgar House.
21    Q.    Trafalgar House.
22    A.    It was an unpaid balance on work
23 that was performed.

Page 17

1    Q.    And what was the disposition or
2 resolution of that particular litigation?
3    A.    I received a settlement.
4    Q.    And what was the nature of the
5 settlement?
6    A.    As far as -- when you say nature,
7 would you explain --
8    Q.    What was it?  I mean, what was
9 resolved?  Were you paid monies or --
10    A.    Yes, I was paid -- I was paid
11 money.
12    Q.    About how much?
13        MR. LYONS:  Was that
14 confidential?
15        THE WITNESS:  I really can't even
16 remember the amount, but it was less than what
17 the lawsuit was filed for.
18    Q.    (By Mr. Thomas)  And, again, do
19 you have any type of guesstimate on it?
20    A.    No, sir.
21    Q.    Do you have any paperwork on that
22 particular matter?
23    A.    Probably the lawyers do.  I don't

Page 18

1  have any.
2      Q.    But would you have access to
3  paperwork on it?
4      A.    No.
5      Q.    Well --
6      A.    I mean, I guess if I asked the
7  lawyers to give me copies of the paperwork,
8  yes.
9      Q.    Okay. You do have the name of
10  the law firms that represented you in both --
11      A.    It's the same law --
12      Q.    -- of these --
13      A.    It's the same law firm.
14      Q.    What was the name of the law
15  firm?
16      A.    It was Evans, Portnoy & Quinn.
17      Q.    And where are they located?
18      A.    Pittsburgh, Pennsylvania.
19      Q.    Now, are those all the lawsuits
20  that you have been involved in?
21      A.    Yes, sir.
22      Q.    Okay. You've never been sued?
23      A.    I think once or twice.

Page 19

1      Q.    And what were the circumstances
2  regarding lawsuits that were filed against
3  you?
4      A.    A lawsuit was filed against a
5  company that I represented as a consultant,
6  Global Consultants. And it was an unpaid
7  subcontract I think. And since I was the
8  representative, a settlement was made of, I
9  think, $14,000.
10          And in that same company, Global,
11  one of the other subs after that settlement
12  was made sued, and the lawyer just said just
13  go ahead and pay the other one. And I think
14  that was -- if my memory serves me, that was
15  $16,000.
16          That was it. I wasn't the owner,
17  I wasn't the principal, but I was a
18  representative.
19      Q.    And you were named as a defendant
20  in those lawsuits?
21      A.    Yes, sir.
22      Q.    Any other lawsuits you've been
23  named as a defendant in?

Page 20

1      A.    No, sir.
2          MR. LYONS: Other than the
3  counterclaims by the TCU defendants in this
4  case?
5          MR. THOMAS: Pending litigation.
6          THE WITNESS: That's it.
7      Q.    (By Mr. Thomas) That's it.
8  Okay. We kind of got along that road because
9  I had asked if you had ever given a
10  deposition. Okay?
11      A.    Yes, sir.
12      Q.    You pretty much know from what, I
13  would assume, your experience with litigation,
14  you know what a deposition is all about?
15      A.    Yes, sir.
16      Q.    Okay. I've requested your
17  presence because I want to ask you some
18  matters that concern some questions and seek
19  some responses to things that you have raised
20  in your lawsuit. Okay?
21          I'll do my very best to make my
22  questions as clear as possible. Okay. But
23  admittedly, sometimes I fail to do that. So,

Page 21

1  at any point in time you do not understand any
2  question that I ask you, don't hesitate to ask
3  me to rephrase, restate it or do it any way
4  that can enable you to give the best response
5  that you can as you've given your oath to do.
6          Okay?
7      A.    Yes, sir.
8      Q.    Obviously, you see a bunch of
9  lawyers around the the table, right?
10      A.    Yes, sir.
11      Q.    They from time to time may have
12  some objection or some other remarks they may
13  want to put on the record for the Court to
14  review. I would ask that you allow them time
15  to do so. Okay?
16          But after that has been
17  exhausted, then the question would be
18  presented back to you for answering. Okay?
19          Do you agree with that?
20      A.    Yes, sir.
21      Q.    Now, the court reporter has to
22  have some type of verbal response from you.
23  So, from time to time I may have to just

Page 22

1  remind you to give an answer. You know,
2  certain nods and things like that don't
3  reflect well in the record. Okay?
4      A.    Correct.
5      Q.    Okay. Thank you.
6          Are you under any type of
7  medication? I know it's the flu season.
8  Could you have taken something that may have
9  affected or may have some affect on answers or
10 responses you may give today?
11     A.    I do want to put on the record
12 that I do take a high blood pressure pill.
13 That is the correct spelling. As far as -- it
14 really doesn't affect -- you know, I do have
15 to urinate because I have to drink a lot of
16 water --
17     Q.    I understand.
18     A.    -- with the high blood pressure.
19 I'll makes trips to the bathroom very brief.
20     Q.    I understand.
21     A.    But that's the only thing. I'm
22 not on any other medication.
23     Q.    If you don't mind, I'm going to

Page 23

1  give this to the court reporter so that she
2  can -- can you pronounce it for me?
3      A.    I call it Altace. It's A-L --
4  that's why I gave you the packet.
5      Q.    It's A-L-T-A-C-E; is that
6  correct?
7      A.    Yes.
8      Q.    Any other medication you might
9  have been taking or anything that might affect
10 your testimony given here today?
11     A.    No, sir.
12     Q.    And as you've referenced, at any
13 point that you desire to take a break, just
14 kind of raise your hand a little bit and we'll
15 do a consensus and we'll take it at that time.
16         Okay?
17     A.    All right.
18     Q.    If you don't mind -- and, again,
19 this is just for the record. How old are you?
20     A.    I am 55 years old.
21     Q.    And what's your date of birth?
22     A.    May 3rd, 1952.
23     Q.    And a little about your family

Page 24

1  background. Are you married?
2      A.    No. Single.
3      Q.    Any children?
4      A.    Yes. Two.
5      Q.    And could you give me their
6  names?
7      A.    Gilbert, Jr. And my daughter's
8  name is Gilisha, G-I-L-I-S-H-A.
9      Q.    Gilbert, Jr. is how old?
10     A.    He is 30.
11     Q.    And your daughter?
12     A.    She's 28.
13     Q.    And where do they reside?
14     A.    My daughter lives in Los Angeles.
15     Q.    And your son?
16     A.    And my son lives in Pittsburgh.
17     Q.    From what I have read about your
18 complaint, you have, I think, demanded a jury
19 trial. And so my next question is to garner
20 from you do you have any relatives that live
21 in the State of Alabama?
22     A.    No.
23     Q.    Particularly any relatives or

Page 25

1  family relationships. Are you familiar with
2  Alabama?
3      A.    Not really.
4      Q.    Not really. Okay. But let me
5  just limit it to Montgomery County. No
6  relatives whatsoever?
7      A.    No, sir.
8      Q.    No distant relatives?
9      A.    No distant, no.
10     Q.    Got you. Your educational
11 background. And if you could, could you start
12 with your high school diploma.
13     A.    Yes. I graduated from Jeannette
14 High School in Jeannette, Pennsylvania. I
15 went two years at Robert Morris. No degree.
16     Q.    Now, Jeannette High School, where
17 is that located?
18     A.    In Jeannette, Pennsylvania.
19     Q.    Can I assume from this that
20 Pennsylvania is your home state?
21     A.    .I was born and raised in
22 Jeannette, yes.
23     Q.    Okay. And Robert Morris, where

1 is it located?
2    A.   In Pittsburgh, Pennsylvania.
3    Q.   What was your major there at
4 Robert Morris?
5    A.   Liberal arts. I played
6 basketball.
7    Q.   What were your years of
8 attendance at Robert Morris?
9    A.   Let's see. I graduated from
10 Jeannette High School in '71. So, I went to
11 Robert Morris right after graduation.
12    Q.   So, you would have been there the
13 '71-'72 school year?
14    A.   Yes, sir.
15    Q.   And then '72-'73 school year?
16    A.   No, it was only two years.
17    Q.   Two years. Okay.
18    A.   And I have no degree from there.
19    Q.   Got you. Have you had any other
20 course of study, training or anything?
21    A.   Not formal. I lived next door as
22 a youth in high school to a company that did
23 roofing, and I was a roofer for years, in high

1 school and in college.
2    And, basically, that's how I
3 supported my -- coming from a big family,
4 supported my clothing and stuff to -- in high
5 school and in college.
6    Q.   So, as far as your formal
7 educational training, it would basically be
8 your high school diploma and your two years at
9 at Robert Morris?
10    A.   Yes, sir.
11    Q.   If I may, as I'm reminding
12 myself, we have a large room here with a lot
13 of people. So, I think both of us need to be
14 mindful we're going to have to speak up so
15 that everyone can hear.
16    A.   Very good.
17    Q.   And from time to time, if you
18 don't hear me, don't hesitate to ask me to
19 speak up, and I'll do the same for you. Okay?
20    A.   Yes, sir.
21    Q.   Starting with your -- I guess
22 immediately following your two years at Robert
23 Morris, what was your first, and I would like

1 to say maybe, substantial or gainful
2 employment?
3    A.   Well, basically I supported
4 myself over the years by just kind of doing
5 odd jobs right after college. You know, I was
6 born and raised and bought up in the church.
7 So, as most small communities, you would have
8 church members that would ask you to do small
9 jobs and roofing. Of course, they knew I did
10 roofing. And, you know, window installments,
11 drywall, that kind of stuff.
12    So, basically, that's how I
13 supported myself.
14    Q.   Could we characterize that as
15 maybe a laborer type scenario?
16    A.   No, a tradesperson.
17    Q.   A tradesperson?
18    A.   Uh-huh (affirmative).
19    Q.   And after this particular phase
20 in your employment career, what did you do
21 next?
22    A.   Well, coming from Jeannette,
23 which is a mixed community, I decided if I was

1 going to make a living in the trades that I
2 would -- needed to join a contractor's
3 association. And I joined the United Minority
4 Contractor's Association, which is located in
5 Pittsburgh, Pennsylvania.
6    Jeannette and Pittsburgh are
7 about 24 miles apart. So, we don't have a lot
8 of minority contractors in Jeannette,
9 Pennsylvania, what we call Westmoreland
10 County, which is an adjacent county to
11 Allegheny where Pittsburgh is.
12    Q.   When did you join that particular
13 organization?
14    A.   Probably in 1990.
15    Q.   Now, at this time, had you held
16 yourself out in any particular trade or
17 occupation as it relates to construction?
18    A.   Probably more roofing because I
19 had a better grasp of the roofing component.
20    Q.   Did you have any trade name or
21 doing business --
22    A.   No, sir.
23    Q.   -- name?

Page 30

1    A.    No, sir.
2    Q.    Pretty much like an independent?
3    A.    Pretty much.
4    Q.    Someone is doing a construction
5   job in a subdivision.  You would contact them
6   and do work for them?
7    A.    No, that's not correct.
8   Basically, as I said early on, I kind of just
9   did things in the community for either members
10  of the church or the community people early
11  on.
12   Q.    If you don't mind, let's say in
13  1990 when you joined the trade association,
14  what amount of income did you report to the
15  federal government?
16   A.    Maybe $50,000, something in that
17  range.
18   Q.    Okay.  How long did this type of
19  trade work continue?
20   A.    Basically, until I joined the
21  United Minority Contractor's Association.  And
22  I actually felt that because we had some type
23  of minority programs basically in the City of

Page 31

1   Pittsburgh, which was more predominantly -- we
2   had -- had more African Americans and more
3   women that I thought that I needed to belong
4   to an organization that had a lot more maybe
5   organization skills that could assist me in
6   getting more work.
7    Q.    And, again, just for sequence, at
8   this time are you doing work as Gil Berry &
9   Associates?
10   A.    I was doing work as Berry
11  Construction.
12   Q.    Okay.  Well, that's why I was
13  asking you if you were doing business as --
14   A.    Oh, okay.
15   Q.    And that's Berry Construction?
16   A.    B-E-R-R-Y, Construction.
17   Q.    And so we know you would have
18  begun concentrating in roofing?
19   A.    Yes, sir.
20   Q.    That would be a fair statement?
21   A.    Yes, sir.
22   Q.    And this would have begun,
23  according to your testimony, when you joined

Page 32

1   the Minority Contractor's Association around
2   1990?
3    A.    Yes, sir.
4    Q.    Okay.  Now, how long did you
5   conduct business as Berry Construction?
6    A.    Probably until 1993.
7    Q.    Now, what happened in 1993?
8    A.    Well, in -- as I joined the
9   Minority Contractor's Association, I realized
10  that minorities in the association really
11  didn't have the grasp that I thought that they
12  had on getting employment.
13       So, I wrote a letter to our
14  mayor.  Her name was Sophie Masloff.
15   Q.    Is that Pittsburgh or Jeannette?
16   A.    Pittsburgh.  She was Pittsburgh's
17  mayor.  And basically -- our mayor had died.
18  His name was Mayor Caliguiri.  He had died of
19  Legionnaire's disease.
20       And I wrote a letter to our mayor
21  because she was president of city council.
22  So, she took over the mayor's position after
23  he died.  And I just explained to her in the

Page 33

1   letter that I had followed her career, that
2   she was a committed person, worked hard to get
3   to where she got to, I was an African American
4   trying to make a living in the construction
5   industry.
6        And, basically, I thought I would
7   never hear from her.  And she wrote me a
8   letter -- she didn't write me a letter.  She
9   had her solicitor, which was Joe Mistic, call
10  me about three weeks later, said she wanted to
11  speak to me.
12       And while that was happening I
13  had went to the controller's office there in
14  the city and realized that African Americans
15  and women had got less than one percent of the
16  contracts of the City of Pittsburgh.  I
17  presented that to her, And I ended up in 1991
18  writing her executive order that started
19  minority programs in the City of Pittsburgh.
20   Q.    All right.  At this time are you
21  still conducting business as Berry
22  Construction Company?
23   A.    Yes, sir.

Page 34

1    Q.    How many employees did you have?
2    A.    I think it was just me and maybe
3 one other.  Actually, it was a neighbor.
4    Q.    So, at this time Berry
5 Construction Company has two people working
6 for it?
7    A.    Yes, sir.
8    Q.    Got you.  Were you licensed in
9 Pittsburgh and Jeannette?
10    A.    You're not licensed in
11 Pennsylvania.  It does not require a license.
12    Q.    Do you have to get a business
13 license then?
14    A.    Yes.  You get a business license
15 through the City of Pittsburgh.
16    Q.    Okay.  And that's where you had
17 your business license?
18    A.    Yes, sir.
19    Q.    Where were your offices located?
20    A.    Still out of my home.
21    Q.    Now, again, how long did you
22 continue to work under the name Berry
23 Construction Company?

Page 35

1    A.    Probably until 1993.
2    Q.    And, again, I had asked you about
3 what happened in 1993, and you gave me the
4 information relating to your contact with the
5 mayor.
6        What happened as far as your
7 business operation in 1993?
8    A.    Well, in the City of Pittsburgh
9 and in Allegheny County if you're going to get
10 any major jobs, you have to be -- you have to
11 join the union.
12        So, I joined the union, and
13 that's when I formed Berry Enterprises,
14 Incorporated.
15    Q.    And that would have been in 1993?
16    A.    Yes, sir.
17    Q.    You said that you incorporated.
18 Would that be under the laws of the State of
19 Pennsylvania?
20    A.    Yes, sir.
21    Q.    And did you have to have a city
22 business license?
23    A.    Yes, sir.

Page 36

1    Q.    And that would have been in
2 Pittsburgh?
3    A.    Yes, sir.
4    Q.    And in 1993, how many employees
5 did you have?
6    A.    Well, at that time I had -- I
7 think -- let me see.  Two engineers, Tony
8 Watson, Nidra Mosely; an office manager,
9 Rhonda Dukes; a secretary, Vickie -- I think
10 her -- Gattas, Gattas.
11        And, of course, as a union
12 person, you hire from the union hall.  My
13 biggest hire ever out of the union hall was --
14 on one project, of course, which was the
15 Allegheny County Jail, I had 400 employees.
16    Q.    Now, again, this is Berry
17 Enterprises that you said was created in 1993;
18 is that correct?
19    A.    Correct.
20    Q.    And I think my last count you had
21 about, what, ten employees?
22    A.    Actually in-house probably about
23 five or six employees.

Page 37

1    Q.    Okay.  Five or six employees.  Is
2 that including yourself?
3    A.    Yes, sir.
4    Q.    Okay.  And what type of work did
5 Berry Enterprises focus on?
6    A.    Well, at that time we -- the two
7 engineers were structural engineers.  We did a
8 lot of concrete work, sidewalks.  We started
9 doing a lot of building as far as structural
10 building.
11    Q.    I guess for, let's say 1994,
12 maybe one year into your business as Berry
13 Enterprises, what type of income did you
14 generate?
15    A.    Well, after I wrote the mayor's
16 executive order, it mandated that 25 percent
17 of all contracts go to minorities.
18        Well, because I had authored the
19 program every major construction company
20 started calling me because; one, I had the
21 relationship with the city; two, because it
22 was a new mandate, and I guess they wanted to
23 be politically correct.

Page 38

1    My business went from that small
2  business to probably about $5 to $8 million
3  that next year.
4    Q.    How long did you conduct business
5  as Berry Enterprises, Inc.?
6    A.    Probably -- up till probably
7  maybe '97, somewhere around there.
8    Q.    Returning back to Berry
9  Enterprises, Inc., were there any other
10  incorporators other than yourself?
11    A.    No, sir.
12    Q.    Any other shareholders?
13    A.    No, sir.
14    Q.    So, you were the sole principal
15  of Berry Enterprises?
16    A.    Yes, sir.
17    Q.    What happened in 1997 from a
18  business point of view?
19    A.    Well, of course the Allegheny
20  Jail project came up. And over the years I
21  had done some high-profile projects. There
22  was --
23    In Pittsburgh we had an emergency

Page 39

1  runway accident that killed everyone on the
2  plane. I was -- I partnered and built the new
3  runway. It was probably about $10 million.
4  We built the new airport. Our company built
5  the cargo buildings for, I think, Fed X and a
6  few other companies.
7    We had actually became -- I
8  became the premiere minority contractor, well
9  documented in the City of Pittsburgh.
10    And there was the $142 million
11  prison, and I -- my company was chosen to be
12  the minority company to participate on the
13  building of the prison.
14    Q.    Is that the Allegheny Jail
15  project?
16    A.    Allegheny County Jail.
17    Q.    Got you.
18    A.    Our company built the super
19  structure on there, which was approximately 24
20  stories high, about a million three square
21  feet.
22    Q.    And, again, that is Berry
23  Enterprises?

Page 40

1    A.    Yes, sir.
2    Q.    All right. From a business
3  designation point of view what happened in
4  1997? Did you change your business name or
5  something?
6    A.    Yes, I did.
7    Q.    And what's the name in 1997?
8    A.    We changed the name to Global
9  Consultants.
10    Q.    Global Consultants?
11    A.    Uh-huh (affirmative).
12    Q.    And if you would, who made up or
13  who were the principals in Global Consultants?
14    A.    At first it was -- it was just me
15  and --
16    Q.    That's Gil Berry?
17    A.    Uh-huh (affirmative)
18    Q.    All right.
19    A.    And my engineers, of course,
20  stayed with me because we seen that there was
21  a movement in the construction industry and
22  that we were -- we then -- after we built the
23  jail and actually had major knowledge, we

Page 41

1  decided to be more of program managers and
2  construction managers.
3    Q.    And that was the focus of Global
4  Consultants?
5    A.    Uh-huh (affirmative).
6    Q.    Was it incorporated?
7    A.    Yes, it was.
8    Q.    Under the laws of the State of
9  Pennsylvania?
10    A.    Correct.
11    Q.    Who were the incorporators or
12  principals?
13    A.    It was just me at the time.
14    Q.    Okay.
15    A.    And then what happened was I sold
16  the company to two of the engineers.
17    Q.    Okay. And who were the engineers
18  that you sold the company.
19    A.    Tony Watson and -- I can't
20  remember who the other African American
21  gentleman was right at the present. I'll
22  probably think about it as we go along.
23    Q.    And if you don't mind, just so I

Page 42

1  can make sure on the record, I would request
2  of you that when you think of that other
3  person, even if it's not today, if that name
4  should come to you, would you provide it to
5  your attorney so that he can share that
6  information with me?
7      A.    I will be glad to.
8      Q.    Okay.  What was the sales price
9  for Global Construction -- I'm sorry, Global
10  Consultants to Tony Watson and the other
11  person?
12     A.    At this time, really, I couldn't
13  tell you what that sales price was.
14     Q.    No guesstimate?
15     A.    Not right now, no.
16     Q.    Under $5 million?
17     A.    I couldn't tell you right now.
18     Q.    Under a hundred thousand?
19     A.    I couldn't tell you right now,
20  sir.
21     Q.    Do you have access to any
22  information that could give you that
23  information?

Page 43

1      A.    I could contact the attorneys and
2  get you that information.
3      Q.    Would that be the same law firm
4  that represented you in the Ford Motor
5  Corporation and the --
6      A.    They represented me in the sale,
7  yes, uh-huh (affirmative).
8      Q.    Got you.  After leaving or after
9  selling Global Consultants, what did you do
10  next or where did you move next?
11     A.    I was just a consultant.
12     Q.    Doing business as?
13     A.    As Gil Berry & Associates.
14     Q.    In what year?
15     A.    Probably '97, '98, somewhere
16  around that.
17     Q.    Okay.  Now, you've testified
18  earlier that Global Consultants was created in
19  1997.
20     A.    Okay.
21     Q.    So, when would the --
22     A.    It would be shortly after the
23  sale of Global.

Page 44

1      Q.    So, we're talking about
2  1997-1998?
3      A.    Yes, sir.
4      Q.    And the name is Gil Berry &
5  Associates?
6      A.    Yes, sir.
7      Q.    Is Gil Berry & Associates that
8  you're referencing that was created in
9  1997-1998 the Gil Berry & Associates that is a
10  party to this lawsuit in 2008?
11     A.    Yes, sir.
12     Q.    Okay.  So, up to this time we
13  have been doing business from 1997-1998 to
14  2008 as Gil Berry & Associates?
15     A.    Somewhere in that range.
16     Q.    Got you.  Now, is Gil Berry &
17  Associates incorporated?
18     A.    It is now.
19     Q.    When was it incorporated?
20     A.    Probably three, four months ago.
21     Q.    Three or four months ago?
22     A.    Yes, sir.
23     Q.    That roughly appears to me to be

Page 45

1  November of 2007?  Earlier?
2      A.    Yeah.  I mean, it's somewhere in
3  that range.
4      Q.    So, October 2007 to November 2007
5  would be the incorporation of Gil Berry &
6  Associates?
7      A.    Yes, sir.
8      Q.    Incorporated under the laws of
9  the State of Pennsylvania?
10     A.    Correct.
11     Q.    Where is your -- who are the
12  principals in Gil Berry & Associates,
13  Incorporated?
14     A.    Just me.
15     Q.    This might have some sense of a
16  legal question, but under the laws of the
17  State of Pennsylvania one person can
18  incorporate?
19     A.    Yes, sir.
20     Q.    Okay.  Did you have any
21  particular law firm incorporate you or --
22     A.    The same law firm.
23     Q.    What's the location for Gil Berry

1  & Associates?
2      A.    721 Acorn Lane.
3      Q.    And is that in any particular
4  business district or industrial area?
5      A.    No.
6      Q.    Where is it?
7      A.    It's in my home.
8      Q.    Oh, it's your home?
9      A.    Uh-huh (affirmative).
10     Q.    Would it be a fair statement that
11 the businesses of Berry Construction Company,
12 Berry Enterprises, Inc., Global Consultants
13 and now Gil Berry & Associates, Gil Berry &
14 Associates, Incorporated, have all been done
15 out or your home?
16     A.    No.  I have had several major
17 offices that have been well-documented as
18 offices like this.
19     Q.    Well, again, where would the
20 office be for Berry Construction Company that
21 you referenced that you started maybe -- I
22 think according to my notes here, 1993?
23          Where were they located?

1      A.    That was in my home.
2      Q.    Okay.  Berry Enterprises that you
3  described, where was its offices located?
4      A.    It was Jefferson Borough.
5      Q.    And the street address?
6      A.    What's the street address?  It
7  was in an industrial park.  I can't really
8  think of it right now.
9      Q.    Do you have any stationery or
10 anything?
11     A.    Oh, yeah.  Yes, definitely.
12     Q.    And you were licensed in the City
13 of Pittsburgh?
14     A.    Yes, sir.
15     Q.    And that location would be on
16 that business license?
17     A.    Yes, it would be.
18     Q.    Got you.  Global Consultants,
19 what was the location of it?
20     A.    It was located in Rostraver,
21 Pennsylvania.  Don't ask me to spell it.
22     Q.    Was it licensed to do business in
23 Pittsburgh?

1      A.    Yes, it was.
2      Q.    Okay.  So, that license would
3  have the --
4      A.    Address.
5      Q.    -- location?
6      A.    Yes, it would.
7      Q.    Got you.  Now Gil Berry &
8  Associates is what you described to me as
9  starting probably in 1997-1998 to the present.
10 How long has it been located in your home at
11 721 Acorn Lane?
12     A.    Probably -- probably the last
13 maybe three years.
14     Q.    The last three years?
15     A.    Uh-huh (affirmative).  Prior to
16 that, it was at 296 State Street, Clairton,
17 Pennsylvania.
18     Q.    Two?
19     A.    296 State Street, Clairton,
20 C-L-A-I-R-T-O-N, Pennsylvania.
21     Q.    And, again, not being a
22 Pennsylvanian, is that close to Pittsburgh or
23 a suburb?  Help me.

1      A.    Yeah.  It's very close.  Probably
2  ten miles away.
3      Q.    And what city license would you
4  have, Clairton or Pittsburgh?
5      A.    I didn't have any license as a
6  consultant.
7      Q.    Okay.  Currently how many
8  employees does Gil Berry & Associates have?
9          And if I may, when I say Gil
10 Berry & Associates, I am also incorporating
11 this Gil Berry & Associates, Incorporated.
12     A.    Right now it's just me.
13     Q.    And since its creation in say
14 1998 to the present, how many employees has
15 Gil Berry & Associates had?
16     A.    Probably a total at any time of
17 three or four.
18     Q.    Three or four.  And what would
19 have been the nature of the employment of
20 these three or four employees?
21     A.    Office manager, secretary and a
22 diversity coordinator.
23     Q.    I'm pretty comfortable with the

1 other job descriptions. A diversity
2 coordinator --
3     A.    Uh-huh (affirmative).
4     Q.    -- what type of position is that
5 in Gil Berry & Associates?
6     A.    Well, it's a consulting firm, and
7 we consult for a lot of companies. Our last
8 big project was for the casino owners, Isle of
9 Capri, to build a $1.3 billion casino in the
10 City of Pittsburgh.
11     Q.    How long have you been the sole
12 employee of Gil Berry & Associates?
13     A.    Since the creation. I mean --
14 excuse me. I thought you were talking about
15 -- the sole employee of Gil Berry &
16 Associates?
17     Q.    Yes.
18     A.    Since I incorporated.
19     Q.    And that would have been,
20 according to my notes --
21     A.    A few months ago.
22     Q.    Yeah. Somewhere around
23 October/November 2007 to the present?

1     A.    Correct.
2     Q.    Got you. When was the last time
3 you had a diversity coordinator?
4     A.    Probably after the Isle Of Capri
5 contract. That was probably -- it ended maybe
6 March of last year.
7     Q.    That would have been March of
8 2007?
9     A.    Uh-huh (affirmative).
10    Q.    The calendar fiscal year just
11 having ended on December 31, 2007, what were
12 the gross receipts of Gil Berry & Associates
13 for calendar year 2007?
14    A.    I would have to check with my
15 accountant. I don't -- I don't know what
16 those are.
17    Q.    You can't give the Court a
18 guesstimate or an approximation with that
19 understanding that that's what it is?
20        MR. LYONS: Let me interject.
21 You're talking about the corporation or the
22 pre-incorporation period of '07?
23        I think the corporation would

1 have separate books.
2        MR. THOMAS: And I'll follow up
3 on it, counsel.
4     Q.    From January '07 to October '07,
5 what were the gross receipts of Gil Berry &
6 Associates?
7     A.    I couldn't answer that without
8 documentation from my accountant.
9     Q.    Do you have any objection to
10 getting that information for me?
11    A.    If my counsel doesn't.
12    Q.    Okay. If you would, would you --
13 and I'll make this in a request or an
14 interrogatory of sorts.
15        Could you get for me the gross
16 receipts for Gil Berry & Associates from
17 January 2007 to October/November 2007,
18 whatever month that would be that you
19 incorporated?
20    A.    Not a problem.
21    Q.    Now, a similar question for the
22 period of November 2007 to the end of the
23 calendar year December 2007, what were the

1 gross receipts for Gil Berry & Associates,
2 Incorporated?
3     A.    Would you repeat that one more
4 time, please?
5     Q.    I understand that you
6 incorporated Gil Berry & Associates at some
7 period during October/November 2007. That was
8 your testimony.
9     A.    Yes, sir.
10    Q.    So, I'm asking now for the gross
11 receipts for Gil Berry & Associates,
12 Incorporated from November '07 to the end of
13 the calendar year, December '07.
14    A.    Okay. I think there's no
15 receipts if I can recall.
16    Q.    And if I may, let me just go
17 ahead and expand that request to include the
18 gross receipts for Gil Berry & Associates for
19 2006 and for 2005.
20    A.    Not a problem.
21    Q.    Thank you.
22        And as soon as you get that
23 information, if you would, would you give it

Page 54

1  to counsel.
2      A.    I will be glad to.
3      Q.    And we'll make our inquiries to
4  him. Okay?
5      A.    Very good.
6      Q.    From my notes it appears that you
7  have been in some business endeavor since
8  about 1990 to the present. And, again, I'm
9  thinking about Berry Construction Corporation
10  -- I'm sorry, Berry Construction Company to
11  Gil Berry & Associates, Inc. now, right?
12     A.    Yes, sir.
13     Q.    Okay. At any time have you
14  personally filed any bankruptcy proceeding?
15     A.    Never.
16     Q.    Have any of -- excuse me, have
17  any of your companies, be it partnerships,
18  corporations or limited corporations, whatever
19  form of business you may have been doing
20  business in, ever filed any type of
21  bankruptcy?
22     A.    Never.
23     Q.    I'll just ask it. How did you

Page 55

1  get to Alabama?
2      A.    I was asked to come to Alabama to
3  take a look at a project by James Harold.
4      Q.    Now, if you don't mind, who is
5  James Harold?
6      A.    James Harold is a friend of mine.
7  We met many years ago. He was the president
8  of the Minority Contractor's Association. He
9  was our national president.
10     Q.    And if I may ask, where is the
11  headquarters site of the Minority Contractor's
12  Association?
13     A.    The headquarters at that time was
14  out of Washington, D.C.
15     Q.    And where is it now if you know?
16     A.    I really don't know. I haven't
17  been a member for some years.
18     Q.    And when you say that James
19  Harold is a friend of yours, could you define
20  that for me?
21     A.    A friend to me is a gentleman who
22  you've never have an argument with and has
23  always been a friend to you. How do you

Page 56

1  explain a friend? A friend is a friend.
2      Q.    Well, again, you know, it could
3  take on -- are you-all social friends?
4      A.    I haven't seen James prior to
5  coming to Alabama. I have talked to him on
6  several occasions, but hadn't seen him in I
7  don't know how many years.
8      Q.    Okay. You could belong to
9  certain civic organizations, professional
10  organizations, associations. So, that's why I
11  was trying to get the dimension of your
12  friendship. That's all.
13     A.    Yeah. The friendship was as --
14  as him as the president. And at that time I
15  was the president of -- I was the president --
16  excuse me, I was the vice president of the
17  Black Contractor's Association in Pittsburgh.
18          And then when our organization
19  joined the National Association of Minority
20  Contractor's, I was the president of the
21  Pittsburgh Chapter of the National Association
22  of Minority Contractor's.
23     Q.    Why are you no longer a member of

Page 57

1  the Minority Contractor's Association?
2      A.    Well, I feel that -- basically,
3  that I have done more as an individual to
4  promote minorities and women in the form of my
5  achievements with the City of Pittsburgh and
6  the University of Pit Medical and the highway
7  department with Rodney Slaughter. I think I
8  have promoted African Americans more as an
9  individual than as an organization.
10     Q.    Now, James Harold, the invitation
11  he extended for you to come to Alabama, what
12  was it about?
13     A.    He said he was doing some work at
14  the University, Alabama State.
15     Q.    He was doing work at Alabama
16  State University?
17     A.    Uh-huh (affirmative).
18     Q.    Do you know what type of work
19  James Harold was doing at Alabama State
20  University?
21     A.    I guess it dealing with energy
22  savings for the University.
23     Q.    Energy savings?

Page 58

1    A.    Uh-huh (affirmative).
2    Q.    Now, James Harold also does
3 business as Arrow Construction Company; is
4 that correct?
5         Have you ever heard that name
6 associated with him?
7    A.    Oh, yeah, yeah.  Uh-huh
8 (affirmative).
9    Q.    Okay.  And what type of -- what
10 was expected of you, I guess, as it relates to
11 James inviting to you to Alabama, to do what?
12    A.    James had contacted me to say
13 that there were some needs -- some housing
14 needs that could be potentially at Alabama
15 State.
16    Q.    When was that invitation extended
17 to you by James Harold?
18    A.    It wasn't extended.  He told me
19 that there was a gentleman that I needed to
20 contact.  He said either contact Dr. Leon
21 Frazier or Freddie Gallot that would lead me
22 to the proper party to talk to.
23    Q.    Now, is that the same Leon

Page 59

1 Frazier who is now the former director of
2 administrative services at Alabama State
3 University?
4    A.    Doctor -- I think he was head of
5 -- I don't know what his title was.  I think
6 he was the vice president of like
7 administration or -- you know.
8    Q.    Okay.
9    A.    It was like 2005 when we met, you
10 know.
11    Q.    And is that the same Freddie
12 Gallot, who is vice president for fiscal
13 affairs at Alabama State University?
14    A.    Correct.
15    Q.    Got you.  Now, what did James say
16 about housing needs to you?
17    A.    He just said that there were some
18 discussions of some potential housing needs on
19 campus.
20    Q.    And did James Harold say that he
21 would do anything for you in conjunction with
22 connecting you with Dr. Frazier and Dr.
23 Gallot?

Page 60

1    A.    No.  He just said they were like
2 contact people that I needed to try to
3 contact.
4    Q.    When is the last time you talked
5 to James?
6    A.    Last night.
7    Q.    And that would have been January
8 23rd, right?
9    A.    Correct.
10    Q.    And what did you and James talk
11 about?  Did you tell him you were fixing to
12 give a deposition?
13    A.    No.
14    Q.    Have you ever shared with James
15 Harold that you have filed a lawsuit against
16 Alabama State University?
17    A.    Have I ever shared with James
18 Harold, have I ever filed a lawsuit against --
19    Q.    Yeah.  Have you ever said to
20 James, James, you know I have sued Alabama
21 State University?
22    A.    No.
23    Q.    Okay.  Is it your testimony that

Page 61

1 James Harold has no information about your
2 lawsuit through you?
3    A.    I guess besides what he read in
4 the paper.  We have discussed that.
5    Q.    Got you.  So, what did you say to
6 James last night?
7    A.    I seen him in the club, in your
8 brother's club.
9    Q.    And that club is?
10    A.    The Rose.
11    Q.    How long were you-all there?
12    A.    I think I arrived probably around
13 maybe 7:30.
14    Q.    And was James there?
15    A.    Yes.
16    Q.    And how long did y'all stay?
17    A.    I don't know how long James
18 stayed.  I stayed there probably until about
19 maybe 10:00.
20    Q.    Got you.  And it's your
21 testimony, as I have attempted to solicit from
22 you, you've never discussed with James Harold
23 any matters or issues regarding your lawsuit

16  (Pages 58 to 61)

Page 62

1  against Alabama State University which we're
2  here today on?
3      A.   No.
4      Q.   Now, Student Suites, what's your
5  relationship with Student Suites?
6          And, again, let me give some
7  introduction to that. Student Suites is a
8  corporation I think from Missouri?
9      A.   Yes.
10     Q.   And one of its contact persons is
11 a Dick Davis?
12     A.   Correct.
13     Q.   Do you know Dick Davis?
14     A.   I do.
15     Q.   And if you could, could you
16 explain the relationship or the knowledge that
17 you have of Dick Davis?
18     A.   Dick Davis, I met him probably
19 somewhere in the '90s. Dick Davis had a
20 company called Municipal Finance. They did --
21 they financed projects for municipalities that
22 maybe could not afford to fund a project, a
23 parking garage or whatever.

Page 63

1          He also used to give seminars to
2  construction companies on financing for
3  construction companies. I met him through a
4  company called Mellon-Stuart. They were from
5  Pittsburgh. And Dick had a relationship with
6  Mellon-Stuart on, I guess, funding of some of
7  their projects.
8          I was a joint venture partner of
9  Mellon-Stuart on several major projects back
10 in Pittsburgh, and so I had met Dick through
11 his relationship with Mellon-Stuart. And Dick
12 and me talked on several occasions, and he
13 said if you ever need me for any financing or
14 any way I could be helpful, please, let me
15 know.
16     Q.   Now, I think my question was in
17 relationship to Dick Davis. Is he still with
18 Student Suites?
19     A.   As far as I know, he is.
20     Q.   Now, what would Dick Davis'
21 capacity be with Student Suites when you knew
22 him?
23     A.   Dick Davis actually started

Page 64

1  Student Suites based on a project that I
2  introduced him to. It was at North Carolina
3  A&T. I had a call from a friend of mine named
4  Jim Patterson who -- his family, Patterson,
5  started the Negro college fund, and said that
6  there was a housing need at North Carolina
7  A&T.
8          And me and Dick -- I called Dick,
9  asked Dick did he want to take a look at this
10 project. And it intrigued him because he had
11 never done student housing financing before,
12 and he felt it would be a great opportunity to
13 take a look at the project.
14     Q.   And so Dick Davis and Student
15 Suites are pretty much like financing -- a
16 financing service entity?
17     A.   Dick's background was financing.
18 And like I said, that project was the first
19 one that me and him looked at and ever looked
20 at, and we didn't get the project. I mean, we
21 got it years later, but we didn't get the
22 project at that time.
23     Q.   When you talk about Student

Page 65

1  Suites -- and I think I heard you correctly
2  that Dick Davis started Student Suites, right?
3      A.   As far as I know.
4      Q.   Yeah. When you talk about in
5  this industry financing, what does that mean?
6          I mean, what type of services in
7  financing would Dick Davis or Student Suites
8  bring to any particular project or job as you
9  know it?
10     A.   As I know it, Dick Davis has had
11 the capacity to finance projects with
12 municipalities.
13         And so, basically, his financing
14 ability reaches out to a lot of people who --
15 in the finance world who look at projects and
16 look at debt service and look at how the
17 project can perform a cash flow and actually
18 offset the debt by different sources, by the
19 students paying the rent, offsets the debt and
20 also tries to generate a cash flow for the
21 client, which is usually the university or the
22 school.
23         And that's basically -- you know.

17 (Pages 62 to 65)

1  And I know he has worked with George K. Baum
2  who -- you know, has gotten a lot of private
3  financing for him and --
4      Q.    He's kind of a guru in creative
5  financing, isn't he?
6      A.    Well, he's been very successful
7  in doing it. I don't know if you want to call
8  him a guru, but he's been very successful in
9  doing it.
10     Q.    Okay. When is the last time you
11 talked with Dick?
12     A.    Probably this summer.
13     Q.    This summer?
14     A.    Yeah.
15     Q.    What did y'all talk about?
16     A.    His wife was sick, Alabama A&M.
17 That's probably all I can remember.
18     Q.    You testified that you had
19 contacted Dick and you-all had looked into the
20 A&T situation, right?
21     A.    Yes, sir.
22     Q.    But you-all didn't get it?
23     A.    No, sir.

1      Q.    What projects have you worked
2  with Dick Davis, Student Suites on?
3      A.    North Carolina A&T.
4      Q.    I thought you-all didn't get it?
5      A.    We didn't get it until years
6  later.
7      Q.    You got it two years later?
8      A.    No, several years later. What
9  happened was the raw sewage came up through
10 the floors, and they televised it years later,
11 maybe five or six years later.
12          And we got another call from Jim
13 Patterson that says the news teams are down at
14 the school. It would be -- I think there was
15 some new administration changes in place,
16 maybe a new president or chancellor or
17 whatever, and thought it would be a good time
18 to revisit that issue.
19     Q.    From your answers to
20 interrogatories it states that Gil Berry
21 previously performed work with Student Suites
22 on one additional project, North Carolina A&T,
23 Greensboro, North Carolina, and the dates that

1  are given are 1999 to 2000; is that about
2  right?
3      A.    That's correct.
4      Q.    Other than the A&T project, did
5  you and Student Suites ever collaborate on any
6  particular project?
7      A.    I wrote -- on all their projects
8  I wrote their diversity portion, which also
9  was in the packet of information that was
10 given to North -- I mean to Alabama State. I
11 invented and created a minority women student
12 internship program.
13          So, every project that they go
14 on, my work product is in their literature and
15 is actually performed by the individuals at
16 that university when they sign the resolution.
17          So, the bottom line is I might
18 not be there physically, my product is there
19 physically and the work product that I put
20 together on diversity is part of their
21 presentation.
22     Q.    There is also in your response to
23 interrogatories that Gil Berry previously

1  performed preliminary work with Student Suites
2  on the Alabama A&M student housing,
3  Huntsville, Alabama project I assume in 2006.
4  Is that accurate?
5      A.    That's correct. I mean, when you
6  say -- explain what you're calling --
7      Q.    I'm reading your answer to
8  interrogatories and let me --
9      A.    Well --
10     Q.    -- just apologize. Yeah. I'll
11 call your attention to interrogatory number
12 seven and the answer that you provided.
13          And if you would, take your time.
14 And, also, let me say, Mr. Berry, let your
15 lawyer -- I should have offered it to him
16 first. So, let him take a peep at it.
17     A.    Okay. That's why I'm sharing it
18 with him.
19     Q.    So, let him take a peep at it.
20          MR. LYONS: He knows what it is.
21          MR. THOMAS: Okay.
22          THE WITNESS: Correct.
23     Q.    (By Mr. Thomas) Right. So, tell

Page 70

1  me about it then because I may not have been
2  articulating it clearly.  What is that about,
3  the Alabama A&M --
4      A.    Why don't you read it again, and
5  then I can kind of follow it.
6      Q.    Okay.  Gil Berry previously
7  performed preliminary work with Student Suites
8  Inc.; one, Alabama A&M (student housing,
9  Huntsville, Alabama in the year 2006).
10        That's what you responded?
11     A.    Correct.
12     Q.    So, what was that -- if it's a
13 project or it was an effort.  I don't care.
14 What was it?
15     A.    Basically, we had -- me and Dick
16 had looked at Alabama A&M when they had an
17 interim president, and I can't think of her
18 name right now.  She was a female.  And she
19 was just the interim president.
20        And she asked us to take a look
21 at the housing and actually set up a little
22 tour for us.  She indicated that she could not
23 make any decision because she was only there

Page 71

1  as the interim president.
2        When the president was selected,
3  Dr. Jennings, we were -- we had a meeting
4  scheduled to meet with him.  It was myself, it
5  was Dick Davis and it was Arne Goldman and
6  Glen Sherbert from Marous Brothers.  Dr.
7  Jennings was very cordial, but he was very
8  blusterous to me because basically he had said
9  that we should not have looked at the project
10 because it didn't give the other contractors
11 an opportunity to -- the same opportunity.
12        I explained to him that there was
13 a method to pursue the project by using the
14 foundation and working through the foundation,
15 that the project didn't have to go out to bid.
16 It could be leased back, and I told him it was
17 the same scenario that was done at Alabama --
18 I mean, at North Carolina A&T.  And he was
19 very intrigued by that.  He said he had came
20 from A&T.  He was familiar with the project.
21 And there was some discussion made.
22        And to be truthful, now that I
23 think about it, Dick Davis wasn't even at that

Page 72

1  meeting.  Dick was at the previous meeting
2  after that.  And I immediately called Dick and
3  told Dick that the president was very
4  interested in the presentation that he made
5  and that we needed to set up a subsequent
6  meeting.
7        And because he was intrigued by
8  the way that we could approach this thing to
9  fast track it.
10     Q.    Now, your response to your
11 interrogatory states the project did not
12 proceed beyond the preliminary review stage.
13        Okay.  Let me make sure you look
14 at that.
15     A.    Uh-huh (affirmative).
16     Q.    And, again, now, I'm limiting my
17 question to you only to the Alabama A&M
18 project --
19     A.    Correct.
20     Q.    -- but when I paraphrase your
21 response, I'm saying to you you're also
22 stating that project, the Alabama A&M project,
23 did not go past the preliminary review stage

Page 73

1  as you've stated.
2      A.    Uh-huh (affirmative)
3      Q.    What does that mean, Mr. Berry?
4      A.    That really we -- we never -- we
5  never, you know, started any work on the
6  project.
7      Q.    Okay.  Now, also in your
8  interrogatory you say that Gil Berry and
9  Student Suites previously performed
10 preliminary work on Oakwood University.
11     A.    Oakwood College.  It should have
12 been college, not university.
13     Q.    No problem.
14     A.    Yeah.
15     Q.    And, again, I'm just reading your
16 answer now.  Okay?
17     A.    Okay.
18     Q.    Student housing, Greensboro,
19 South Carolina, 2006.  What was that project
20 about?
21     A.    Would you repeat that?  I
22 actually have a bad ear.
23     Q.    Don't worry.

Page 74

1    A.    And that's why I --
2    Q.    And I've got a light voice.
3  Don't worry.  You don't have to apologize.
4    A.    Okay.
5    Q.    Number two.  And it picks up with
6  the same preface.  But go to number two, paren
7  two, and just flip the page.
8    A.    Okay.  Uh-huh (affirmative).
9    Q.    Now, what was the project about?
10    A.    Which one are you --
11    Q.    I'm on Oakwood College now.
12    A.    Okay.
13    Q.    And if you don't mind, I can
14  scratch through university and put college
15  here, right?
16    A.    Okay.  That's fine.
17    Q.    Per your amendment.
18    A.    Yes.  We took a look at the
19  project and just made a brief presentation.
20  And they said that they would consider it and
21  get back to us.
22    Q.    Got you.
23    A.    Uh-huh (affirmative).

Page 75

1    Q.    Now, that project did not proceed
2  beyond the preliminary review stage either,
3  right?
4    A.    All it was, it was a
5  presentation.
6    Q.    It was just a presentation?
7    A.    That's all it was.
8    Q.    Now, I guess my question to you,
9  have you ever worked with Student Suites on a
10  project that ran the full course from
11  initiation, construction, to getting paid?
12    A.    North Carolina A&T.
13    Q.    Okay.  And that's the one that's
14  listed at the end of your interrogatories.
15  What was the monies that you earned from the
16  A&T project?
17    A.    I think it was somewhere maybe
18  $200,000 or $300,000.
19    Q.    And, again, I'm trying to recall
20  your testimony as best I can.  This was
21  dealing with some of the --
22    A.    Diversity issues.
23    Q.    Diversity issues.

Page 76

1    A.    Uh-huh (affirmative).
2    Q.    That's what you did for the
3  project?
4    A.    Yes, sir.
5    Q.    And Student Suites did the
6  financing concepts?
7    A.    Correct.
8    Q.    Got you.  When we -- and let me
9  just go back just a moment just to clean up a
10  housekeeping chore.
11        You had mentioned, I think on
12  several occasions, the Allegheny County Jail
13  project.
14    A.    Uh-huh (affirmative).
15    Q.    Was there any litigation arising
16  out of that project between --
17    A.    That's the part I told you where
18  I didn't get paid.  There was a premium that
19  was still owed to me.
20    Q.    Did you --
21    A.    I said with Trafalgar House.
22    Q.    So, they were the underwriters?
23    A.    No.  Trafalgar House was the --

Page 77

1  my joint venture partner.
2    Q.    Right, okay.
3    A.    Uh-huh (affirmative).
4    Q.    And so that's the litigation that
5  you --
6    A.    That I had a previous balance
7  owed to me.
8    Q.    Got you.  That arises out of the
9  Allegheny County --
10    A.    Jail project.
11    Q.    -- project?
12    A.    Uh-huh (affirmative).
13    Q.    Okay.  I got you.  And that's the
14  one you're going to supply me some information
15  on regarding what the settlement or resolution
16  was, right?
17    A.    I don't think that's --
18        MR. LYONS:  Well --
19        MR. THOMAS:  Well, that one was
20  not confidential.  I think the Ford Motor
21  Corporation was the one he said that was
22  "confidential."
23        THE WITNESS:  The Ford one is.

Page 78

1    Q.    (By Mr. Thomas)  All right.  So,
2  what kind of money did you get out of
3  Allegheny?
4    A.    I think it was $141,000 that was
5  still owed.
6    Q.    And that was paid to you?
7    A.    It was paid to me.
8    Q.    As a part of a settlement of it?
9    A.    Yes, it was.
10    Q.    Got you.  Now, who are the Marous
11  Brothers Corporation -- I'm sorry.  Marous
12  Brothers Construction, who are they?
13    A.    They are a firm out of Ohio.
14    Q.    Do you know what particular part
15  of Ohio?
16    A.    I think it's Willoughby, Ohio.
17  Willoughby, Ohio.  I call it Cleveland because
18  it's right on -- you know, it's right on the
19  edge and --
20    Q.    And I promise you I need your
21  help on it.
22    A.    Okay.
23    Q.    So, don't worry about it.  And

Page 79

1  what do they do?  Well, let me ask this
2  question.
3         Do you or have you ever worked
4  with the Marous Brothers?
5    A.    Just on this project here at
6  Alabama State and the preliminary work we did
7  at Alabama A&M.
8         And we are looking at a project
9  together at -- for Penn State University --
10  for Penn State University presently that we
11  have done some preliminary work on.
12    Q.    When did that start?
13    A.    Well, we have made a presentation
14  probably back in July of this year.
15    Q.    Of this year?
16    A.    Of last year.  Excuse me.  I keep
17  forgetting we're at 2008.
18    Q.    Don't worry.  That would be
19  Pennsylvania State University?
20    A.    Penn State.
21    Q.    Pennsylvania State.  Penn State.
22  Okay.  College Park, Pennsylvania?
23    A.    Yeah.  Well, it's their small

Page 80

1  campus located in McKeesport, Pennsylvania.
2    Q.    And you-all did a presentation,
3  you and the Marous Brothers?
4    A.    Yes, we did.
5    Q.    Now, according to your answer to
6  the interrogatory that I just showed you
7  regarding Student Suites, for Marous Brothers
8  you entered the same project, Alabama student
9  housing and Oakwood College student housing
10  that you worked with them on.
11    A.    Could I see that?
12    Q.    Oh, don't hesitate.  Again, now,
13  I'm taking you back to interrogatory number
14  seven --
15    A.    Okay.
16    Q.    -- which states list the name,
17  address, date of all projects on which you
18  have worked with or been associated with
19  Marous Brothers Construction, LLC.  And you
20  can look at your answer.
21    A.    Okay.
22    Q.    Mr. Berry --
23    A.    Yes, sir.

Page 81

1    Q.    -- so, the Marous Brothers was
2  also a part of some preliminary work with
3  Alabama A&M and Oakwood College; is that
4  correct?
5    A.    They were at the presentation,
6  uh-huh (affirmative).
7    Q.    Again, is presentation synonymous
8  with performed preliminary work?
9    A.    A presentation is just a
10  presentation that you make; and if they like
11  your presentation, then you are invited to
12  come back and perform other activities.
13    Q.    I'm a novice in the industry, and
14  I'm just having to stick with the language you
15  provided to me.  So, I'm not trying to trip
16  you up or nothing.
17         But your response says Gil Berry
18  previously performed preliminary work on two
19  projects with Marous Brothers, Alabama A&M
20  student housing and Oakwood College student
21  housing.
22         And I'm just trying to make sure
23  what your definition of preliminary work is.

Page 82

1  That's all.
2      A.    Okay.
3      Q.    And that's it, just a
4  presentation?
5      A.    Yes.
6      Q.    You-all didn't --
7      A.    Now, I've got to backtrack.  On
8  Alabama A&M we did a presentation.
9          The president wanted some changes
10 done on the layout of the configuration of the
11 student housing.  We -- Marous Brothers went
12 back and made those changes, E-mailed them to
13 him, and he okayed them.
14         And then they put them in a final
15 preliminary drawing.  And that was part of the
16 package that was submitted for his approval,
17 which then went to the board.  And we got a
18 unanimous resolution there that then went down
19 to the foundation board for their -- to give
20 us a resolution.
21     Q.    So, my question, did you-all do
22 the project?
23     A.    No.

Page 83

1      Q.    And why you-all didn't do the
2  project?
3      A.    At this point, it's still some
4  conversation about the project going on as of
5  just a week ago.
6      Q.    And who is that conversation
7  with?
8      A.    Different board members.
9      Q.    What board members?
10     A.    I'm not privy to talk about that
11 right now.
12     Q.    Why not?  It's not an
13 attorney-client relationship.  Did you talk to
14 a board member?
15     A.    I talked to several board
16 members.
17     Q.    What board member?  And this
18 would be a board of trustee member with
19 Alabama A&M University in Normal, Alabama.
20         What board member did you talk
21 to?
22     A.    I talked to Robert Avery.
23     Q.    Robert Avery.  Any others?

Page 84

1      A.    And -- I talked to Robert Avery.
2      Q.    And what did you discuss with
3  Robert Avery?
4      A.    The resolution.
5      Q.    And what would be the resolution?
6      A.    That was signed by the
7  foundation.
8      Q.    When did you have this discussion
9  with Trustee Robert Avery?
10     A.    The 26th of December.
11     Q.    And what did he say to you?
12     A.    He said he would look into the
13 matter.
14     Q.    And what matters were you asking
15 him to look into?
16     A.    Why we're not proceeding with the
17 resolution that was signed.
18     Q.    Did Trustee Avery at A&M say to
19 you when he was going to get back with you on
20 it?
21     A.    It was, of course, the holiday.
22 He said give him some time to do some
23 investigations, and he would get back.

Page 85

1      Q.    Now, you use the date here of
2  2006.  So, if we use 2008, this project is
3  easily a year and half to two years old at
4  Alabama A&M; is that correct?
5      A.    I would have to say so.
6      Q.    Are you contemplating any
7  litigation against Alabama A&M University
8  board of trustees or to president -- Mr.
9  Jennings -- Dr. Jennings?  Excuse me.
10     A.    No.
11     Q.    Now, on both of these projects,
12 the Alabama A&M project and the Oakwood
13 College project student housing, what does Gil
14 Berry bring to the projects?
15     A.    What does Gil Berry bring to --
16     Q.    Gil Berry & Associates,
17 Incorporated, you.  What do you bring to those
18 two projects?
19     A.    A wealth of knowledge about
20 construction, a diversity work force,
21 implementing students to participate on the
22 projects so they can have knowledge when they
23 go out to the work force.  We pay a stipend,

Page 86

1  and then they can say that they worked on a
2  multi-million dollar project when they go out
3  into the work force, to be able to participate
4  in the presentations, to be able to answer any
5  questions dealing with the project, to be able
6  to make presentations without anyone else
7  being involved to -- just like I did with Dr.
8  Jennings to let him have an understanding on
9  how we can proceed on these projects, you
10  know, by the way of foundation, being awarded
11  the ability to award us the contract and then
12  lease back to -- to the college.
13        I bring a host of things to the
14  project.
15      Q.   That lease back piece that you
16  just testified to --
17      A.   Uh-huh (affirmative).
18      Q.   -- has that been done anywhere in
19  the State of Alabama?
20        Has that particular type of lease
21  and buyback, whatever you were describing, has
22  that been done at any university in the State
23  of Alabama?

Page 87

1      A.   It has been.
2      Q.   Which ones?
3      A.   Actually, I was sent by a
4  gentleman by the name of Charly Lynn down in
5  Birmingham where Alabama A&M had done it.
6      Q.   Got you.
7      A.   So, I have those documents, and
8  I'll be glad to give them to my attorney if
9  you want to review them.
10      Q.   Now, when you say you bring a
11  work force, I mean -- you say you bring work
12  force to the project.  What do you mean by
13  that?
14      A.   I said I bring a wealth of
15  knowledge.
16      Q.   I got that too now.
17      A.   Okay.
18      Q.   I was going to get to that next.
19      A.   Okay.
20      Q.   But you also said that you bring
21  a work force.
22      A.   Well, I usually partner with
23  someone who understands what the project is,

Page 88

1  if it's new construction or if it's
2  renovation.  That's why I felt it was very
3  important to bring a company like Marous
4  Brothers to Alabama A&M and to Alabama State.
5      Q.   And to -- so, Oakwood College,
6  they were on the project with you at Oakwood,
7  right?
8      A.   Yeah.  They made a presentation.
9      Q.   Yeah, okay.  So, in the work
10  force area you just partner with somebody?
11      A.   Correct.
12      Q.   All right.  Now, this wealth of
13  knowledge, okay, what areas are they in?
14      A.   I didn't hear you.
15      Q.   What's your wealth of knowledge
16  in, what areas?
17      A.   Diversity.
18      Q.   And when you say diversity, what
19  do you mean?
20      A.   Making sure that African
21  Americans, people of color, women, are
22  represented and meaningful relationships on
23  construction.

Page 89

1      Q.   Give me an example.
2      A.   If a person -- someone of
3  minority status that is skilled in a trade, to
4  make sure that they have an opportunity to
5  participate on a project, which their scope of
6  work is represented on that project.
7      Q.   And again, Mr. Berry, I have to
8  apologize.  I'm just a novice at the industry.
9  I mean, I -- that's why my questions might be
10  somewhat elementary, and that's why I asked
11  you for an example.
12        So, when you say a trade, what
13  type of trade would be related to student
14  housing at Alabama A&M?
15      A.   It was a total renovation similar
16  to what we looked at here at Alabama State.
17      Q.   Again, what trades?  I means,
18  carpenters, plumbers?  I mean, I'm just trying
19  to guess up on what you're talking about.
20      A.   All that.
21      Q.   Okay.  Give me some other
22  examples.
23      A.   I mean, you've got concrete

Page 90

1  floors, which are basically at Alabama State,
2  which you would have to, of course, find out
3  where the bearing walls are --
4       Q.    Got you.
5       A.    -- to be able to run your
6  plumbing. We're changing lavatories that are
7  down the hall and showers that are down the
8  hall and we're turning them into suite-style
9  units.
10      Q.    And what you bring to the table
11 is making sure that African Americans and
12 other minorities and disadvantaged groups get
13 a chance to participate in those work trades?
14      A.    And I understand the construction
15 trade. It's well-documented in the City of
16 Pittsburgh where I became the first African
17 American who ever built a major structure. I
18 had 400 union workers of all different kinds
19 of trades working on the project.
20            The bottom line is the building
21 is still standing. It's over a million and
22 something square feet. So, I bring a wealth
23 of that -- which I am certified back home.

Page 91

1  You don't have to be licensed. You get
2  certified in the field of construction --
3  program management, general contracting and
4  subject as subcontracting electrical or
5  whatever.
6       Q.    Now, again, as a novice, though,
7  you're not going to be in there measuring
8  walls and water pipes? You, Gil Berry, will
9  not be; am I correct?
10      A.    That's correct.
11      Q.    All right. So, what you're doing
12 then is just coordinating and making sure that
13 those people or companies that do that would
14 be representative of everybody, African
15 Americans, minorities, disadvantaged groups
16 like women; am I correct?
17      A.    That is correct.
18      Q.    Got you. Now, partnering with
19 work force, the wealth of knowledge with
20 diversity. What else do you bring to a
21 project?
22      A.    Student involvement.
23      Q.    And is that the program by which

Page 92

1  you -- you pay students stipends to work on
2  various projects?
3       A.    I incorporate students to work in
4  various and insist -- and promote -- I should
5  say promote, not insist. Promote the
6  subtrades to also do the same.
7            Because there are different
8  components. I mean, it could be in marketing.
9  It could be in engineering. It could be a
10 architectural student. It could be different
11 components that we try to place in the proper
12 area when we do these projects.
13      Q.    So, potentially a junior at
14 Alabama A&M who is in business management
15 would be given an opportunity to work with
16 some company or contractor or subcontractor
17 that handles that on the project?
18      A.    Correct.
19      Q.    Got you. What type of -- who
20 pays the stipend, Gil Berry & Associates, or
21 how is it paid?
22      A.    Well, we would -- we would
23 promote that the different trades who utilize

Page 93

1  these individuals would pay it, and also
2  Marous Brothers had committed to do that, Dick
3  Davis had and I had also committed to do that.
4       Q.    Could you give me an example of
5  what that junior in business management might
6  make working with somebody on this project?
7       A.    It would -- they would be paid a
8  stipend. I mean, it would probably be
9  somewhere in the range of eight or nine
10 dollars an hour.
11      Q.    Got you. Now, on the Alabama A&M
12 project, who introduced you to the A&M family?
13      A.    Malcolm Thomas.
14      Q.    Now, who is Malcolm Thomas?
15      A.    Malcolm Thomas is Governor
16 Riley's liaison to the historical, I guess,
17 black colleges in Alabama.
18      Q.    The acronym is HBCUs?
19      A.    Yes, sir.
20      Q.    Historically Black --
21      A.    Yes, sir.
22      Q.    -- Colleges and Universities?
23      A.    Yes, sir.

1    Q.    And you say he's Governor Riley's
2  liaison?
3    A.    I would have to say that was my
4  understanding.
5    Q.    How did the introduction take
6  place between you and Mr. Thomas?
7    A.    James Harold introduced us.
8    Q.    James Harold?
9    A.    James Harold said that a good guy
10 that probably could help me get acclimated
11 into the Alabama area would be Malcolm Thomas.
12   Q.    And how did the introduction take
13 place between you, James and Malcolm Thomas?
14   A.    If I do remember, James gave me
15 Malcolm's number. I was in Pittsburgh. And I
16 called Mr. Thomas and just left a message on
17 his cell phone, I think, or his office phone.
18 I don't even remember what number.
19   Q.    And he called you back?
20   A.    Yes, he did.
21   Q.    And what did he say to you?
22   A.    I explained to him that me and my
23 partner, Dick Davis at Student Suites, were

1  looking at trying to do some business in the
2  Alabama area. And he, you know, asked a few
3  questions. And I think we sent him -- Dick
4  did a brochure.
5    Q.    And how did the introduction take
6  place between you and the A&M contacts?
7    A.    Malcolm introduced us to at that
8  time I told you was the interim president.
9  And then when Dr. Jennings --
10   Q.    Go ahead.
11   A.    When Dr. Jennings became the
12 president, we were introduced to him by
13 Malcolm Thomas.
14   Q.    And was that an on-site
15 introduction there in Normal, Alabama,
16 Huntsville?
17   A.    Yes, sir.
18   Q.    Present was President Jennings,
19 you and Malcolm?
20   A.    And Marous Brothers.
21   Q.    And Marous Brothers?
22   A.    Uh-huh (affirmative).
23   Q.    And when did that take place?

1    A.    I think what happened -- Dr.
2  Jennings gave Malcolm Thomas a time that he
3  could meet with us, and it was a scheduled
4  meeting.
5    Q.    Got you. And when was it -- you
6  have listed here in your answer to
7  interrogatory that the project or the
8  preliminary work was done in 2006.
9         So, using the 2006 date, when was
10 this meeting between you, Malcolm Thomas and
11 President Jennings?
12   A.    I really couldn't tell you a
13 time. I know it was shortly after the
14 president had, you know, been formally put in
15 place. I know it was shortly after his
16 permanent -- he was brought on as the
17 permanent president.
18   Q.    And what did Mr. Thomas say to
19 you and President Jennings?
20   A.    What did he say?
21   Q.    Yes.
22   A.    He just said this is Gil Berry.
23 He does college dormitories. He's a

1  contractor. And that was basically the
2  introduction.
3    Q.    And what did you say to President
4  Jennings?
5    A.    I said that we had previously
6  been on the campus, me and Student Suites
7  under the previous administration and that --
8  that we had looked at the facilities.
9         And I said, you know, you had
10 some leakage and some roof damage. You had
11 some leaking windows and kind of talked about
12 what we had seen visually, you know.
13   Q.    Did you-all make any
14 presentations to any -- to any committees of
15 the A&M Board of Trustees?
16   A.    My -- one -- because I was down
17 here at the same time at Alabama State.
18 Rodney Morse who worked for me made the
19 presentation to the board when we got the
20 board approval. Rodney made the presentation.
21        I couldn't make it that day
22 because I think there was something going on
23 at Alabama State at the same time.

Page 98

1    Q.    And is that the full board of
2    trustees or a committee of the board of
3    trustees of A&M?
4    A.    It was the full board of the
5    trustees.
6    Q.    Do you have a copy of that
7    resolution that was approved by the Alabama
8    A&M Board of Trustees?
9    A.    I have a copy of -- I have a copy
10   of the resolution that was approved by the
11   foundation.  The board gave the foundation
12   approval to -- for them to move forward with
13   Gil Berry & Associates, but I have -- my
14   resolution is with the foundation.
15   Q.    Okay.  If I could, could I
16   request that you give a copy of that
17   resolution that was approved by the board or
18   the foundation or whatever you have described
19   and give it to your attorney?
20   A.    I'll be glad to.
21   Q.    Thank you.
22         Now, from your previous
23   testimony, it appears that you bring the

Page 99

1    wealth of knowledge and diversity, work force
2    and programs for students.
3         Student Suites brings the
4    financing to a project; is that a fair
5    characterization?
6    A.    Yes, that's a fair
7    characterization.
8    Q.    What does the Marous Brothers
9    bring to a project?  And more particularly,
10   let's focus on the Alabama A&M student housing
11   project and also the Oakwood College student
12   housing project that you've answered in your
13   interrogatories.
14   A.    Well, what Marous Brothers brings
15   to Alabama A&M, their knowledge of historical
16   renovations.  And, of course, as you are
17   dealing with historical buildings, there are
18   certain stipulations that you can do and you
19   can't do.
20         And Marous Brothers have a wealth
21   of knowledge in the understanding on the do's
22   and don'ts of dealing with historical
23   buildings.

Page 100

1    Q.    Got you.  A more simplistic
2    characterization is that the Marous Brothers
3    actually do the work.  Is that a fair
4    assessment?
5    A.    Yes.
6    Q.    Now, this triad of entities, Gil
7    Berry & Associates, Student Suites and the
8    Marous Brothers, are there any percentages of
9    how the money is prorated between these three
10   entities when you are making these preliminary
11   work assessments for Alabama A&M and Oakwood
12   College?
13   A.    In the case of -- what job are
14   you talking about?
15   Q.    Well, again, now -- and I don't
16   mean to -- let me just repeat myself.  In your
17   answer to interrogatories --
18   A.    Uh-huh (affirmative).
19   Q.    -- where you were asked to list
20   all projects which you have worked with or
21   been associated with with the Marous Brothers
22   and Student Suites, you responded now Alabama
23   A&M student housing, 2006, and Oakwood College

Page 101

1    student housing, Greensboro, South Carolina,
2    2006.
3         And I have gone over with you
4    what you brought to the table, what Student
5    Suites would bring to the table, what Marous
6    Brothers would bring to the table on these two
7    projects.
8         Now I'm asking you how is the
9    money to be divided between the three of
10   you-all when a project goes to fulfillment?
11   A.    Well, I thought we also listed
12   Alabama State.
13   Q.    You didn't list it in your
14   interrogatory here.  And, again, my --
15   A.    Okay.
16   Q.    -- questions are focusing on
17   these two projects.
18   A.    Okay.  How is the money --
19   Q.    Yes.
20   A.    Well, first of all, the
21   calculations of Marous Brothers on how they
22   would attack the job and how they would --
23   what kind of manpower they would need to do

26 (Pages 98 to 101)

Page 102

1  the job and -- is calculated by Marous.
2      Q.   Okay.
3      A.   Our fees are based on a
4  percentage as a developer.
5      Q.   And you said "our." Would that
6  be Gil Berry & Associates?
7      A.   Yes.
8      Q.   And you would be cataloged as a
9  developer?
10     A.   Yes, I am a developer.
11     Q.   I'm just asking, Mr. Berry.
12     A.   Okay.
13     Q.   I'm just not familiar with the
14  industry. So, that's why my questions are so
15  elementary now. Okay?
16     A.   Okay.
17     Q.   So, bear with me. I'm going to
18  catch up before we get through with this
19  deposition.
20     A.   I'm quite sure you will.
21     Q.   But right now I've got to be a
22  school boy. Okay?
23     A.   All right. Go ahead.

Page 103

1      Q.   Now, you would be considered a
2  developer?
3      A.   Yes, sir.
4      Q.   And you would get a fee?
5      A.   Correct.
6      Q.   And it would be based on a
7  percentage?
8      A.   Correct.
9      Q.   And my question now to you, for
10  the A&M project what was your percentage?
11     A.   In all honesty, I don't remember.
12  I mean, I have it somewhere documented. It
13  probably was between -- somewhere between --
14  probably close to nine or ten percent.
15     Q.   And that would be kind of like of
16  the total price or the hard cost price or
17  what?
18     A.   The total price.
19     Q.   Total price?
20     A.   Uh-huh (affirmative).
21     Q.   And for the project with Oakwood
22  College, as a developer your fee would be
23  based on what percentage?

Page 104

1      A.   Never got to that point.
2      Q.   Never got to that point?
3      A.   Huh-uh (negative).
4      Q.   But now as you testify today, for
5  the A&M project it would be anywhere between
6  nine and ten percent of the total price?
7      A.   Yes, sir.
8      Q.   And is that nine or ten percent
9  that you would be paid that would be
10  representing the wealth of knowledge you bring
11  to the table, the ability to partner with a
12  work force and student stipends?
13     A.   And putting the team together.
14     Q.   Got you. Now, if I may, let me
15  ask you this. I'll have to give it to the
16  court reporter and let her mark this.
17     A.   Okay.
18         (Whereupon, said document was
19          marked for identification as
20          Defendant's Exhibit No. 1 to the
21          deposition of Gilbert C. Berry.)
22     Q.   And now I have to show it to you
23  and your counsel. You take a peep.

Page 105

1         Now, this is a letter, and I call
2  your attention to the bottom notation there.
3  Excuse me. I'm sorry. There at the bottom is
4  a Bates stamp that says MAR 196. Do you see
5  that?
6      A.   Yes, sir.
7      Q.   And I'll represent to you that
8  these are documents that were produced in
9  response to the defendants' request for
10  production of documents. Okay?
11     A.   Okay.
12     Q.   And I assume that this MAR
13  represents Marous, but for purposes of your
14  deposition I'm focusing on your signature.
15  Okay?
16     A.   All right.
17     Q.   So, that's why I'm -- I wanted
18  you to know where the document came from first
19  of all. Okay?
20     A.   Okay.
21     Q.   Now, it is a letter dated October
22  17th, 2005, and it's from Gil Berry,
23  Construction Manager and Developer, to a Chip

Page 106

1   Marous; is that correct?
2       A.    That is correct.
3       Q.    And who is Chip Marous?
4       A.    Chip is the president of Marous
5   Brothers.
6       Q.    Okay.  Now, this letter goes on
7   to talk about -- and I'll direct you really to
8   the third paragraph.
9       A.    Okay.
10      Q.    We had an October 18 -- and I
11  assume that to be 2005, right?
12      A.    I would have to say so.
13      Q.    Meeting scheduled with the
14  president of Allen University in Columbia,
15  South Carolina.  Do you recall that?
16      A.    Yes.
17      Q.    What type of project was that?
18      A.    A student housing project.
19      Q.    And Allen University, is that an
20  HBCU?
21      A.    Yes, sir.
22      Q.    Got you.  In the next paragraph
23  there's a reference to The Alumni Association

Page 107

1   president at Meharry University.  You and Dick
2   were to make a presentation there for November
3   4th, 2005, to the Alumni Executive Committee;
4   is that correct?
5       A.    That's correct.
6       Q.    What was that project about?
7       A.    That project was about graduate
8   housing there at Meharry University for grad
9   students.
10      Q.    And Meharry is an HBCU, isn't it?
11      A.    Yes.
12      Q.    Got you.  Then, also, there is
13  the alumni president of Oakwood College.  Is
14  that the Oakwood College that is in Carolina,
15  or is that the Oakwood College that is in
16  Huntsville, Alabama?
17      A.    That is the Oakwood College that
18  is in Huntsville, Alabama.
19      Q.    Right.  Okay.  I think those are
20  Seventh-Day Adventists?
21      A.    They are Seventh-Day Adventists.
22      Q.    Got you.  Now, if I may, let me
23  ask this.  It appears to me with the

Page 108

1   universities that I have been privy to thus
2   far in this litigation that they're mostly
3   HBCUs?
4       A.    Correct.
5       Q.    Okay.  Alabama A&M, both of the
6   Oakwood Colleges, Meharry --
7       A.    There's only one Oakwood College
8   that we're talking about.
9       Q.    Well, you did an Oakwood College
10  that was in Greensboro, North Carolina I
11  thought.
12      A.    No, that was North Carolina A&T.
13      Q.    Well, excuse me.  Now, again, I
14  go back to your answer.  Okay.  You've got
15  Oakwood College student housing, Greensboro
16  South Carolina.  Now, that's in your answer at
17  the top there.
18      A.    Well, that's -- that's not
19  correct.
20      Q.    All right.  So, now I can amend
21  it from Oakwood University to Oakwood College
22  and --
23      A.    Yeah.  In Huntsville, Alabama.

Page 109

1       Q.    Right.  See, the Seventh-Day
2   Adventists, they have an Oakwood College up in
3   Silver Springs, Maryland.
4       A.    Okay.
5       Q.    So, that's one of their names.
6   Okay.
7       A.    Okay.
8       Q.    And that's why I didn't --
9       A.    That's not correct.
10      Q.    So, now I'm free to amend your
11  answer to interrogatory number seven to
12  reflect Oakwood College, Huntsville, Alabama?
13      A.    Yes, sir.
14      Q.    And I can do that with your
15  approval?
16      A.    Yes, sir.
17      Q.    Okay.  All right.  Now, at this
18  Oakwood College that's in Huntsville, did you
19  ever meet with President Delbert Baker?
20      A.    Yes, I have.
21      Q.    And how long have you known
22  President Baker?
23      A.    I had met him on several

1 occasions.
2    Q.   Where did you meet him at?
3    A.   Actually, Elder McCoy, who was
4 actually, I guess, the president of the
5 Seventh-Day Adventist, I had -- I had worked
6 with him previously on -- they have a -- they
7 have like a camp.
8      And I had did some preliminary
9 work for him on that project, and he
10 introduced me to Mr. Delbert Baker, President
11 Baker.
12    Q.   Do you know Elder C.C. Rock,
13 R-O-C-K?
14    A.   No, sir.
15    Q.   Was Malcolm Thomas involved in
16 that introduction?
17    A.   Later he was, but I had met Mr.
18 Baker -- President Baker. Excuse me. I had
19 met him probably a year and a half or
20 something earlier than that. And actually --
21 Dedrick Blue was his name, was the vice
22 president of student housing.
23    Q.   At Oakwood College?

1    A.   At Oakwood College in years
2 earlier, you know.
3    Q.   Now, let me just ask you
4 outright. Is Malcolm Thomas a friend of
5 yours?
6      Whatever definition you use as a
7 friend is fine with me. But is he a friend
8 yours?
9    A.   Is he a friend of mine?
10    Q.   Yes.
11    A.   He's someone that I see socially
12 if I run into him. I seen him last night for
13 five minutes. He came in, sat over there in
14 the corner for about five minutes.
15    Q.   Where was that?
16    A.   At the Rose. I said hello, and
17 that was it. I went back and sat in my seat.
18    Q.   Got you.
19    A.   He was over there talking to some
20 -- you know, some people I didn't know, you
21 know. Out of respect I said hello.
22    Q.   Returning back to Defendant's
23 Exhibit 1, the October 17th, 2005, letter, is

1 it a fair statement whenever you-all are a
2 team, Gil Berry & Associates, Student Suites
3 and Marous Brothers, that you're kind of like
4 the advance person?
5      Is that a fair assessment?
6    A.   Well, I guess you could say that.
7    Q.   Is that also some of what you
8 bring to a project?
9    A.   I have a lot of contacts.
10    Q.   And contacting people, as
11 probably in every profession, is a premium
12 commodity, isn't it?
13    A.   Well, I would have to say so.
14    Q.   Because based on your testimony,
15 you have the ability to talk with decision --
16 persons on boards, like for instance Avery at
17 Alabama A&M?
18      You were introduced to him, and
19 you've had dialogue with him during the course
20 of that project, haven't you?
21    A.   My guy Rodney Morse had more
22 contact with him than I did, yeah.
23    Q.   If I may ask, did we go to

1 finality on any of these housing projects that
2 are set forth or alluded to in your October
3 17th, 2005?
4      For instance, with Allen
5 University, did you do any work for them?
6    A.   Yes, we did.
7    Q.   What did you do for them?
8    A.   We did drawings, we made
9 presentations. And actually they had signed
10 the resolution, and what happened was they had
11 borrowed some money. And actually we had met
12 with, I guess, the Bishop, took photos with
13 him, he had his board there.
14      They had borrowed money and the
15 bank at the last moment didn't want them to
16 enter into anymore debt and would not release
17 them. They were very upset about it. They
18 tried to work around it. They tried to -- we
19 tried to even buy the debt from the bank, and
20 they would not even release the debt to us to
21 buy them out of debt.
22      And, basically, that's what
23 happened with the project.

Page 114

1    Q.    So, I guess you did not do a
2   project for them?  I mean, a structure was not
3   built --
4    A.    No, sir.
5    Q.    -- for Allen University?
6    A.    No, sir.
7    Q.    Got you.  Again, just preliminary
8   work?
9    A.    I mean, we took it all the way up
10  to where we could take it.  Like I said, we
11  had the financing.  The bank would not let
12  them out of the commitment that they had and
13  would not even let us reduce their debt or
14  retire their debt for them to do the project
15  with us.  So, they were kind of --
16    Q.    Now, with Meharry University,
17  what did you do for them?
18    A.    Did a major rendering, did
19  drawings, put together the financial package.
20  That's still ongoing.  It's not a -- you know,
21  the president -- in a minute I'll tell you his
22  name -- has now gone to Morehouse.  He's
23  actually a friend of mine.  I'll think of him.

Page 115

1        And, actually, they have received
2   a new president.  I'm still in contact with
3   one of the major board members that's been
4   there a long time.  That project was -- the
5   key individual, the chairperson of the grounds
6   and facilities, that had been there for a long
7   time, Dr. Hood, he was jogging and had a heart
8   attack.  And so that put a -- and then the
9   president got transferred to Morehouse
10  University where he took a position.
11       They got a new president.  The
12  board members have contacted me probably two
13  months ago, want to make some small changes.
14  They want the grad housing to still be for the
15  grad students, but because the hospital is
16  adjacent from the university they want to put
17  senior citizens now on the other side so they
18  can utilize the hospital.
19       And so there are some changes
20  going on there.
21    Q.    But a project has not been built
22  or completed?
23    A.    That's correct.

Page 116

1    Q.    Got you.  Now, what did you do
2   for Oakwood College?
3    A.    Just made a presentation, never
4   did anything but -- no more than a
5   presentation.
6    Q.    Okay.  And when you say a
7   presentation, that's the PowerPoint thing and
8   -- you know, I'm Gil Berry, here's Student
9   Suites, Marous Brothers and this is what we
10  do.  Is that what a presentation is?
11    A.    Yes, sir.
12    Q.    Okay.  Now, when you talk about
13  drawings, is that an actual schematic scheme
14  or design?  I don't know if I'm using the
15  right architectural words, but is that what a
16  drawing is, how it would look?
17    A.    Yes.  It's a layout of --
18    Q.    A layout.  Okay.
19    A.    Yeah.  It's a layout.
20    Q.    Now, a drawing was done for Allen
21  University, right?
22    A.    Yes, it was.
23    Q.    And a drawing was also done for

Page 117

1   Meharry University?
2    A.    Yes, it has.
3    Q.    Got you.  Now, I would offer
4   that.
5    A.    Did you want this back?
6    Q.    Yes.  We'll give it to the court
7   reporter.
8    A.    Okay.
9        MR. THOMAS:  If there's no
10  objection, I will make Defendant's Exhibit 1 a
11  part of his deposition.
12       MR. LYONS:  Mr. Thomas, excuse me
13  for interrupting, but we've been going about
14  two hours.  Can we take a five-minute break?
15       MR. THOMAS:  I've been waiting
16  for you to say so.  No problem whatsoever.
17       (Whereupon, the taking of the
18  deposition was recessed from approximately
19  11:01 a.m., to approximately 11:14 a.m., after
20  which the following proceedings were had and
21  done:)
22    Q.    Mr. Berry, after returning from a
23  short needed break, we are back.  I had asked

Page 118

1 you regarding the -- if you recall the name of
2 the president of Meharry University?
3     A.    Correct.
4     Q.    And have you had a chance to, I
5 guess, recall who that particular person would
6 be that was in question at the time when you
7 were contacting Meharry?
8     A.    Yes. It was Dr. John Moppin.
9     Q.    Okay. Do you have any sense of
10 spelling for that last name, Moppin?
11     A.    No, sir.
12     Q.    Got you. But he has since left
13 Meharry University?
14     A.    Yes, sir.
15     Q.    And is now president of --
16     A.    Morehouse.
17     Q.    -- Morehouse?
18     A.    In Atlanta.
19     Q.    In Atlanta. Got you.
20          Now, for Alabama A&M, in the
21 preliminary matters that you did with it, were
22 there drawings that were done there?
23     A.    There was floor plans prepared.

Page 119

1     Q.    Do we consider those to be
2 drawings that are similar to the ones you gave
3 to Meharry and to Allen University?
4     A.    Allen's were more detailed
5 because they wanted some new and some
6 renovations. Alabama A&M's were just more
7 floor plans and some detailed descriptions of
8 -- you know, some brick pointing and roof work
9 and that kind of stuff.
10     Q.    And Meharry, again, was just
11 basically --
12     A.    No, that was floor plans --
13     Q.    Floor plans.
14     A.    -- renderings. It was a big 2x4
15 rendering of actual -- what the building would
16 look like. They had some storefronts. They
17 wanted retail on the bottom floor.
18     Q.    For Allen University, the
19 drawings were prepared by Marous I'm assuming?
20     A.    No, they were not. Dick Davis
21 was using a company that he uses that were
22 going to do the work.
23     Q.    But I thought that Marous was a

Page 120

1 part of the Allen University project, too?
2     A.    Well, they were going to do the
3 renovation portion, and the new construction
4 was going to be done by Dick's crew. But we
5 were working out the details on that.
6     Q.    And the reason I say that is
7 because in your letter, your writing
8 specifically from Chip Marous of the Marous
9 Brothers is making reference to your meeting
10 with Allen University.
11     A.    That's because, again, the
12 renovation portion that the company that Dick
13 uses does not do historical renovations. They
14 do new construction.
15     Q.    Okay. So --
16     A.    We were working out the details
17 that if Marous Brothers were there, it would
18 probably be advantageous to us to just let
19 them do the new construction because, of
20 course, if you can do renovations, you can do
21 new construction.
22     Q.    For the drawings that were done
23 for Meharry University, was that done by

Page 121

1 Marous Brothers?
2     A.    No. That was done by a local
3 architect from the City of Pittsburgh.
4     Q.    And for the -- again, you just --
5 for Alabama A&M, did the Marous Brothers
6 prepare the floor plans for that?
7     A.    Yes, they did with direction from
8 the president.
9     Q.    For the work that you-all had
10 provided to Allen University, have you been
11 paid?
12     A.    Have we been paid?
13     Q.    Yes.
14     A.    No. We're still working to try
15 to get them some type of -- some type of
16 financing.
17     Q.    Got you. For the work that
18 you-all have done for Meharry University, have
19 you been paid?
20     A.    No, because it's still ongoing
21 negotiations.
22     Q.    And for the work thus far with
23 Alabama A&M University, have you been paid?

1    A.    No, sir.

2    Q.    And for whatever you did with
3 Oakwood College, have you been paid?

4    A.    That was just a presentation.
5 No, sir.

6    Q.    Have you invoiced Allen
7 University for any fees or costs?

8    A.    I haven't.

9    Q.    What about Marous Brothers?

10    A.    I don't know.

11    Q.    What about Dick Davis?

12    A.    I don't know.

13    Q.    Have you invoiced Meharry
14 University, Gil Berry & Associates?

15    A.    No, sir.

16    Q.    What about Marous Brothers, have
17 they invoiced --

18    A.    Somebody was coughing. I didn't
19 hear what you said.

20    Q.    That's okay. To your knowledge,
21 has an invoice been sent to Meharry University
22 from the Marous Brothers?

23    A.    No.

1    Q.    Again, for Oakwood College, that
2 was just a presentation?

3    A.    That was just a presentation.

4    Q.    Have you done an invoice to
5 Alabama A&M for floor plans and other designs?

6    A.    No.

7    Q.    As it relates to Alabama A&M, is
8 that still considered to be in negotiations?

9    A.    I would say so.

10    Q.    Based on?

11    A.    Conversations that I have had
12 with Mr. Avery.

13    Q.    That's Trustee Avery?

14    A.    Yes, sir.

15    Q.    Robert Avery?

16    A.    Yes, sir.

17    Q.    Does he hold any position like
18 chairman of the A&M Board of Trustees or
19 chairperson of any particular committee or
20 anything?

21    A.    I don't know.

22    Q.    One other little housekeeping
23 chore with James Harold. Are you in any

1 business relationship or joint venture or
2 other connection with James Harold or Arrow
3 Construction?

4    A.    No, sir.

5    Q.    Have you ever been?

6    A.    No, sir.

7    Q.    Just friends?

8    A.    Just friends.

9         (Whereupon, said document was
10         marked for identification as
11         Defendant's Exhibit No. 2 to the
12         deposition of Gilbert C. Berry.)

13    Q.    Let me show you what has been
14 marked as Defendant's Exhibit No. 2. Mr.
15 Berry, this is a document that is about 20
16 pages long, and I represent to you that this
17 is the complaint that has been filed by you,
18 on your behalf or by your lawyers in this
19 lawsuit.

20         And I would ask you to take a
21 moment or two to review. And when you have
22 finished your review, let me know that you've
23 completed that, and I'll begin to ask you a

1 few questions about it.

2         Mr. Berry, have you had a chance
3 to complete your review?

4    A.    Yes, sir.

5    Q.    Is this the complaint that you
6 authorized to be filed on your behalf in the
7 lawsuit styled Marous Brothers Construction
8 and Gil Berry & Associates against Alabama
9 State University and other defendants?

10    A.    I have.

11    Q.    If you would, would you look at
12 the first page. There at Paragraph 2 there is
13 a description of Gil Berry, and I was trying
14 to get a feel for Jefferson Hills,
15 Pennsylvania.

16    A.    Uh-huh (affirmative).

17    Q.    Somehow I'm just associating
18 Pittsburgh with you. Where is Jefferson
19 Hills?

20    A.    Probably roughly 12 to 13 miles
21 from Pittsburgh.

22    Q.    Got you. And that's your home?

23    A.    Yes, it is.

Page 126

1    Q.    And is that where currently you
2  are operating Gil Berry doing business as Gil
3  Berry & Associates, also now Gil Berry &
4  Associates, Inc.?
5    A.    Correct.
6    Q.    And if I may, you have identified
7  several parties and entities as defendants,
8  three of which I represent, Alabama State
9  University, President Joe A. Lee and Elton N.
10  Dean, Sr.; is that correct?
11    A.    Correct.
12    Q.    Mr. Hubbard and Mr. Lawson
13  represent the other defendants, Percy Thomas,
14  TCU Consulting Services and Ken Upchurch.  Are
15  you aware that those are the lawyers who are
16  also here?
17    A.    To the best of my knowledge.
18    Q.    Let me ask this question if I
19  may.  In Paragraph 11 at Page 3 it is averred
20  that in 2005, ASU decided to undertake the
21  renovation of six student housing buildings on
22  its campus.  And the six are listed there.
23       There is also stated here ASU

Page 127

1  intended to obtain financing for the Student
2  Residence Project by offering general revenue
3  bonds.  What do you base that on?
4    A.    Would you explain to me?  I --
5    Q.    Well, again, it's in your
6  complaint, and I'm assuming that your attorney
7  who filed this on your behalf had --
8    A.    Uh-huh (affirmative).
9    Q.    Well, let me ask you this.  What
10  knowledge, if any, do you have of ASU's
11  intention to obtain financing for the Student
12  Residence Project by offering general revenue
13  bonds?
14    A.    Well, me and Dick Davis had a
15  subsequent meeting with Freddie Gallot and
16  Bill Blunt about doing the financing.
17       We had offered to do the
18  financing ourselves, and Freddie -- Mr. Gallot
19  had said that the school had an excellent bond
20  rating and that they could probably borrow the
21  money cheaper than we could do the financing
22  for and that he'd set up a meeting with at
23  that time Attorney Gray, himself, Bill Blunt

Page 128

1  and me and Dick Davis were present.
2    Q.    Now, let me ask this.  When you
3  say "we," could you define the we that you
4  make reference to?
5    A.    On what we?
6    Q.    The we you used.  You said we
7  could do the financing, and I'm just asking
8  you what we?
9    A.    Dick Davis.
10    Q.    So, again, this is Dick Davis
11  vis-a-vis Student Suites?
12    A.    Correct.
13    Q.    Which you had previously
14  described as the team, he handled pretty must
15  the financing piece?
16    A.    Dick handled the financing piece,
17  correct.
18    Q.    What, if anything, did Mr. Gallot
19  share with you about this bond matter?
20    A.    Well, our previous bid after the
21  information that was given to us by Dr.
22  Frazier was that the -- we asked what were the
23  needs of the University at our previous

Page 129

1  meeting, at our first meeting.
2       And Dr. Frazier indicated that
3  they needed 3,000 beds.  And our initial cost
4  to the school was -- to do the 3,000 beds and
5  us doing the financing was $51 million.
6       MR. THOMAS:  If I may, let me
7  have this marked as Defendant's Exhibit No. 3.
8       (Whereupon, said document was
9       marked for identification as
10       Defendant's Exhibit No. 3 to the
11       deposition of Gilbert C. Berry.)
12    Q.    Mr. Berry, I have marked here
13  Defendant's Exhibit No. 3, which purports to
14  be a letter from Dick Davis to Dr. Leon
15  Frazier dated September 20th, 2005.
16    A.    Yes, sir.
17    Q.    And I would ask if you would
18  review it.  And if you would, after your
19  review, let me know if you recall this
20  particular letter.
21    A.    Okay.  Yes, I do recall reviewing
22  this document.
23    Q.    Thank you.  If I may, let me ask

Page 130

1  you a few questions about it.
2          It appears from the first
3  paragraph in the letter that you and Student
4  Suites were reporting to Dr. Frazier the
5  findings of your two-month comprehensive study
6  of the current housing on the campus of ASU;
7  is that correct?
8      A.    Correct.
9      Q.    All right.  Now, if you would,
10 tell me how you came to do a comprehensive
11 study of the housing situation at ASU?
12     A.    Well, first of all, we did a
13 walk-through that was set up by Dr. Frazier
14 with some staff that dealt with the housing
15 there on campus.
16         Me, Marous and Dick walked
17 through every one of the units of the six
18 buildings and actually looked at the status.
19 We seen numerous problems that I noticed right
20 off the bat.  There was some black mold that
21 was growing on the walls.  There was some
22 actual toilets that could not flush.  There
23 was actually lead-based paint that were

Page 131

1  identified.
2          And, actually, as we did the
3  walk-through, we set up some subsequent
4  meetings after that.  And we asked that we --
5  the staff, head of facilities, if they had any
6  existing drawings of the existing buildings
7  and they did and they supplied us with that
8  information.
9          Marous Brothers took it back,
10 made copies and Fed X'd it back to the school
11 the previous day.  And then after that we set
12 up -- Marous did, set up a team of staff
13 project managers to come down and videotape
14 and take actual field measurements.
15         They have a unique way of doing
16 -- doing that, which they can actually go into
17 a room and sort of with a laser system it will
18 actually measure the accurate room size, and
19 then they'll go back and they will put that
20 footprint on the actual existing architectural
21 drawings to see if there was any variations in
22 the dimensions of the room because of maybe a
23 renovation at some time from the existing

Page 132

1  building to the current building to make sure
2  of accurate measurements of bearing walls and
3  that kind of stuff.
4          They spent probably -- they came
5  down I know at least several times, stayed
6  overnight several -- several nights with a
7  team of individuals to kind of methodically go
8  through the buildings, talk to the staff
9  there, as far as the physical plant people to
10 gain more knowledge and actually documented
11 their findings and reported back to me and
12 Dick.
13         And on several occasions I met
14 them down here to do the walk-throughs and
15 actually had went to their offices up in Ohio
16 after they got back to sit with them and -- to
17 discuss the proper way and the approach on --
18 they would take to actually, you know, bring
19 the utilities and the different services to
20 the individual units.
21     Q.    Now, you said that on one of the
22 earlier walk-throughs it was yourself, Marous
23 and Dick.  I know there are several Marouses.

Page 133

1  So, which one was it?
2      A.    Actually, the president, Chip,
3  came down.
4      Q.    So, it's Chip Marous that you
5  made reference to there?
6      A.    Yes.  And, actually, Arne
7  Goldman.  And I think it was also Glen
8  Sherbert.
9      Q.    Now, the letter is dated
10 September 20th, 2005.
11     A.    Okay.
12     Q.    If you don't mind, step back with
13 me and try as best you can to explain to me
14 how you came to even do a comprehensive study.
15 I mean --
16         Well, let me just start off with
17 what led you to Alabama State University?  Let
18 me start there with the simple question.
19     A.    Well, actually it was Malcolm
20 Thomas who -- he told me he had contacted the
21 president and the president had told him to
22 speak to Dr. Frazier, who was handling the
23 project.

Page 134

1    Q.    So, this is Malcolm Thomas again,
2  right?
3    A.    Yes, sir.
4    Q.    Introducing you to the ASU
5  family?
6    A.    Yes, sir.
7    Q.    Who had introduced you to the
8  Oakwood College family?
9    A.    No.
10    Q.    Well, subsequent to you meeting
11  the president?
12    A.    I met the president years prior
13  to that.
14    Q.    I know.  But Malcolm at some
15  point in time, according to your testimony,
16  was a part of an introduction?
17    A.    Years later.
18    Q.    Okay.  Years later?
19    A.    Uh-huh (affirmative).
20    Q.    He did the introduction for
21  Alabama A&M?
22    A.    Correct.
23    Q.    Got you.  Now, were you in any

Page 135

1  meeting with Malcolm Thomas, yourself and some
2  ASU official that you can recall?
3    A.    Malcolm introduced me to the
4  president.
5    Q.    And talk to me about that
6  introduction.  When and how was that done?
7    A.    It was -- it was very brief.  I
8  mean, me and Chip Marous were meeting with Dr.
9  Frazier on -- I think it was the second
10  meeting.
11    Q.    And I want to cut you off.
12    A.    Uh-huh (affirmative).
13    Q.    I want you to describe for me as
14  best you can your first meeting with any ASU
15  official.  In other words, just paint --
16    A.    Okay.
17    Q.    The canvass is blank.
18    A.    Okay.
19    Q.    So, just paint it now with your
20  first contact with an ASU official.
21    A.    It was -- the first initial
22  meeting was me and Dick Davis meeting with
23  Freddie Gallot and Dr. Leon Frazier.

Page 136

1    Q.    Got you.  Now, who set that
2  meeting up?
3    A.    Malcolm Thomas.  And now that you
4  mentioned it, I think Malcolm Thomas was
5  present.  I know he was present because we
6  wouldn't have known how to get there.
7    Q.    And where did it take place?
8    A.    I think it was in a little side
9  office of Dr. Frazier's, like a -- you know, a
10  little board room or something that he had off
11  his office.
12    Q.    At the ASU campus?
13    A.    Yes, sir.
14    Q.    And if you don't mind returning
15  back to that letter, it's September 20th,
16  2005.  In conjunction with this date, when did
17  that meeting take place?
18    A.    I would have to say it was in
19  July.
20    Q.    Okay.
21    A.    I just kind of remember it was a
22  hot day, and July just kind of sticks in my
23  mind.

Page 137

1    Q.    Welcome to Alabama.
2    A.    Yeah.  Somewhere around there.  I
3  don't even know if -- maybe it wasn't.
4    Q.    But you do recall Mr. Thomas was
5  there?
6    A.    Yeah.  I do recall Mr. Thomas was
7  there.
8    Q.    Dick Davis and yourself?
9    A.    Yeah.
10    Q.    And Mr. Gallot?
11    A.    Uh-huh (affirmative)  Maybe it
12  wasn't July.  I can't -- I just remember it
13  was a hot day.
14    Q.    I got you.
15    A.    Yeah.  But those were the people
16  that were present.
17    Q.    What, if anything, did Malcolm
18  Thomas say during this meeting?
19    A.    Just did the introduction.
20    Q.    And what did he say regarding --
21    A.    This is Gil Berry and Student
22  Suites.  They do dormitory housing.  And this
23  is Dr. Frazier and Freddie Gallot.  And I

Page 138

1  think he just kind of sit and listened to what
2  we had to say.
3      Q.    And what did Dr. Frazier and Dr.
4  Gallot have to say to you?
5      A.    Well, Dr. Frazier said that he
6  had a mandate to get some housing done, and he
7  said that the -- I just kind of want to use
8  the right words. I think he said the property
9  committee headed up by -- I can't say headed
10  up, but I know he said --
11     Q.    Chaired?
12     A.    -- Judge Wiggins was very
13  diligent on getting some proper housing there
14  on campus for the students. Judge Wiggins was
15  very upset about the living conditions of the
16  students, and he had a mandate to get
17  something done about it.
18     Q.    Now, if I may, right at this
19  point in time, July '05, your discussions with
20  James Harold about some housing needs of the
21  University would have taken place at what
22  posture using this date that you're meeting
23  with Thomas, Gallot and Frazier?

Page 139

1      A.    Maybe a couple of months prior to
2  that or something.
3      Q.    So, that may have been more like
4  May of '05?
5      A.    I can't even -- you know, I'm
6  saying July. It might -- you know, we're
7  talking 2005. I don't really remember. I can
8  remember that Dr. Frazier and Freddie were the
9  initial people that we met with.
10          You know, I mean to hold me to
11  July -- I said July, but to hold me to that,
12  it was somewhere prior, of course, to
13  September.
14     Q.    Okay. Now, if you don't mind,
15  explain to me how the contact was made with
16  Malcolm Thomas before the meeting.
17     A.    Like I said, James told me that
18  this is a guy that might be able to introduce
19  us to some, you know, colleges in the Alabama
20  area. I think he said that he -- he was head
21  of historical colleges here in Alabama for the
22  governor.
23     Q.    And so the chronology, the time

Page 140

1  line, would be James Harold advising you about
2  the needs for housing at ASU, the possible
3  needs for housing, James Harold introducing
4  you to Malcolm Thomas, right?
5      A.    Yes.
6      Q.    Then Malcolm Thomas coordinating
7  the meeting with Frazier and Gallot?
8      A.    Yes. He said that he had spoke
9  to the president, Dr. Lee, and advised him to
10  -- that Dr. Frazier was the guy he needed to
11  speak to.
12     Q.    So, again, you got to this
13  situation from the James Harold and the
14  Malcolm Thomas connection. Is that a fair
15  statement?
16     A.    That's a fair statement.
17     Q.    Got you. Now, what did Frazier
18  and Gallot explain to you, if anything, about
19  needs of the University?
20     A.    Well, Dr. Frazier, of course, you
21  know, when you go in, you ask what are the
22  needs. Dr. Frazier felt in his heart of
23  hearts that they needed approximately 3,000

Page 141

1  beds.
2      Q.    A total of 3,000 beds?
3      A.    Yes, sir.
4      Q.    Okay. What else was said during
5  this meeting?
6      A.    That we needed to work quickly
7  and to get a team of people down there to
8  evaluate what the needs were because they had
9  a -- I want to say a property meeting or
10  something coming up or that he needed to get
11  this information to the property committee.
12     Q.    Got you.
13     A.    Of the findings.
14     Q.    In the letter -- and let's go if
15  me way to the -- I'm assuming the two-month
16  comprehensive study, right?
17     A.    Yes, sir.
18     Q.    I think I got a copy of it. And
19  I'll introduce it in a moment or two. Does
20  that resemble it a little bit, Mr. Berry?
21     A.    Yes, sir.
22     Q.    And the reason I'm going here is
23  because it's dated September 20th, 2005, as is

Page 142

1 the letter dated, too. So, I just -- and
2 we'll get to this. Okay?
3     A.    Okay.
4     Q.    Now, in the second paragraph it
5 says Student Suites and Gil Berry & Associates
6 have been fortunate to develop several Student
7 Housing Projects for HBCUs over the past ten
8 years. Okay?
9     A.    Uh-huh (affirmative).
10    Q.    Now, I have asked you as a
11 follow-up to your answer to interrogatories
12 about the projects that you, Gil Berry &
13 Associates and Dick Davis as Student Suites
14 have worked on.
15    A.    Correct.
16    Q.    And at no time did you-all -- or
17 did you say to me that these projects were
18 successful and fully occupied?
19    A.    Well, there was Central State
20 and --
21    Q.    Well, hold on a second now.
22    A.    Okay.
23    Q.    I'm just trying to make sure I

Page 143

1 got my information correct. In this
2 interrogatory -- okay --
3     A.    I mean, you're asking -- you're
4 asking me a question, and I'm answering it.
5 There is Central State. There is Pine Bluff
6 where I had input with Dick Davis that were
7 successful.
8          I mean, you're asking me a
9 question, and I'm answering it.
10    Q.    Okay. I don't have any problem.
11    A.    Okay.
12    Q.    I just want to talk about some
13 previous questions you had been asked.
14    A.    Uh-huh (affirmative).
15    Q.    In the interrogatories that were
16 served on you -- and they bear a date of
17 August 31, 2007.
18    A.    Yes, sir.
19    Q.    The question was asked list the
20 name, address, date of all projects which you
21 have worked with Student Suites on.
22    A.    Uh-huh (affirmative).
23    Q.    And your response was other than

Page 144

1 the project that is at issue in this matter,
2 which I assume is your lawsuit --
3     A.    Uh-huh (affirmative).
4     Q.    -- Gil Berry previously performed
5 preliminary work with Student Suites on
6 Alabama A&M, Huntsville, Alabama and Oakwood
7 College, Huntsville, Alabama.
8     A.    Uh-huh (affirmative).
9     Q.    Now, I don't see any Central
10 State or anything in this response.
11    A.    In my previous testimony here
12 today I authored Dick Davis' Student Suites
13 internship program there that he uses every
14 time he goes to a college.
15          So, if I have input in the
16 document that he uses when he goes to
17 different colleges, and I might not do work on
18 the colleges or might not make a presentation,
19 he is still using a document that I have
20 prepared to get a job.
21    Q.    What are the universities that
22 you say that you and Student Suites have been
23 fortunate to develop several student housing

Page 145

1 projects for HBCUs over the past ten years?
2          MR. LYONS: Hold on a second.
3 That's Dick Davis' statement, not Gil Berry's
4 statement.
5     Q.    (By Mr. Thomas) Well, let me
6 just ask you. Have you and Student Suites
7 been fortunate enough to develop several
8 student housing projects for historically
9 black colleges and universities over the last
10 ten years?
11    A.    I have wrote a document that Dick
12 uses in his presentation that is part of his
13 presentation when he goes to colleges.
14    Q.    And would you identify those
15 colleges that you have done documentation for,
16 a presentation for, Student Suites that Dick
17 Davis has used for HBCUs over the last ten
18 years starting 2005 going back?
19    A.    All I know is he -- I know he
20 used it at Central State. Any other places
21 where Dick Davis has been that I have -- I'm
22 not aware of. I don't know where he has used
23 it at.

Page 146

1    Q.    So, let me ask you this. If Dick
2 Davis is at Cheny State today, you're getting
3 -- are you on that project?
4    A.    I prepared a document for him.
5 No, I'm not on the project.
6    Q.    Okay. Again -- well, let me just
7 get to the bottom line. You got paid for
8 whatever Dick Davis did for Central State?
9    A.    He paid me for the document I
10 prepared for him.
11    Q.    How much he pay you?
12    A.    I don't remember. That's been
13 years ago.
14    Q.    Well, give the Court some
15 estimate.
16    A.    I really don't remember.
17    Q.    If anybody knows, it's you.
18    A.    Well, I don't remember.
19    Q.    Are there any materials, resource
20 materials, you could look at to find out what
21 remuneration you received?
22    A.    I don't remember. I really
23 don't. I mean, I don't remember. I'm telling

Page 147

1 you the truth. I don't remember.
2    Q.    Well, I guess what my question
3 is: If you don't recall how much you got paid
4 and you don't know how many projects you were
5 involved in, how can you say that you have
6 worked with Student Suites to develop several
7 student housing projects for historical black
8 colleges and universities over the last ten
9 years?
10    MR. LYONS: He hasn't said that.
11    Q.    (By Mr. Thomas) You just
12 prepared a document?
13    A.    Thank you.
14    Q.    All right. Well, let me ask you
15 this then. You have not then been fortunate
16 enough to work with Student Suites in
17 developing student housing projects for HBCUs
18 over the last ten years?
19    A.    All except North Carolina A&T.
20    Q.    Okay. So, this statement here by
21 Gil Berry is not accurate as it relates to Gil
22 Berry & Associates?
23    MR. LYONS: It's Dick Davis.

Page 148

1    THE WITNESS: It's not by Gil
2 Berry.
3    Q.    (By Mr. Thomas) Okay. It's not
4 accurate as relates to Gil Berry?
5    A.    You would have to ask Dick that.
6    Q.    We will.
7    A.    Okay.
8    Q.    But, again, now I guess -- if I
9 may, before we leave this paragraph, kind of
10 as best you can identify for me the HBCUs that
11 you say that your document has been by used
12 by --
13    A.    I just answered it. North
14 Carolina A&T and Central State to my
15 knowledge.
16    Again, I have to use the
17 bathroom. I'll make it real brief.
18    Q.    Oh, take your time.
19    A.    Okay.
20    (Brief recess.)
21    Q.    Somewhere in my notes I have the
22 -- I referenced Arkansas at Pine Bluff -- or
23 Arkansas Pine Bluff, what you said.

Page 149

1    Did you-all do any work, you and
2 Student Suites, at Arkansas campus?
3    A.    I know Student Suites did. I
4 didn't do any.
5    Q.    Oh, you didn't do that?
6    A.    No, sir.
7    Q.    Now, did they use your document?
8    A.    I don't know. I couldn't tell
9 you.
10    Q.    Describe for me generally the
11 document that you're saying that Student
12 Suites would be using.
13    A.    I think you have it in that --
14 that packet of information that you have --
15    Q.    Here?
16    A.    Yeah. It's probably in there.
17    Q.    I'm going to let your lawyer know
18 that I flagged the fact that you were a
19 basketball player. But other than that,
20 that's all I did.
21    A.    Okay.
22    Q.    Is that the document you're
23 talking about?

Page 150

1     A.    Yeah.  It's probably in there.
2  It talks about -- it says the student
3  internship program.  Do you see it?  And I
4  don't want to mess your files up, you know,
5  because I'm notorious for doing that.
6           It says MBE student internship
7  program.
8     Q.    If you don't mind, Mr. Berry --
9     A.    Yes, sir.
10    Q.    -- what I'm going to do is hand
11 you back the complete document.
12    A.    Okay.
13    Q.    But I am going to pull out to the
14 side several sheets --
15    A.    Not a problem.
16    Q.    -- that reference an internship
17 program, but I want to make sure you have the
18 complete document.
19    A.    Okay.  Yeah.
20    Q.    You can just insert it back.
21    A.    Okay.
22    Q.    So, when we talk about what you
23 were making reference to as far as your

Page 151

1  document, we're talking about these?
2     A.    Yeah.  It should be authored by.
3  Does it say it on there at the bottom or
4  somewhere?
5     Q.    Authored by Gil Berry.
6     A.    Okay.
7     Q.    So, this would be Pages 1 through
8  6?
9     A.    If --
10    Q.    If it's there?
11    A.    Yeah, if it's there.
12    Q.    Okay.  Now, let me ask you this
13 then so I can understand the protocol.
14          When these things are presented
15 to various HBCUs, basically we just change the
16 front cover sheet and put Arkansas, Pine
17 Bluff; Central State; Allen University,
18 package it and send it on?
19          Is that what we're talking about
20 conceptually?
21    A.    Well, Dick does that, yeah.
22    Q.    Okay.  Got you.  So, this is what
23 you attribute to your participation in a

Page 152

1  successful project?
2     A.    It all depends.
3     Q.    Well, like at North Carolina A&T,
4  I'm assuming a facility was built?
5     A.    Oh, yes.
6     Q.    And this was a part of what was
7  presented by Student Suites and Gil Berry &
8  Associates?
9     A.    Yes.
10    Q.    Was Marous Brothers a part of it?
11    A.    No, they weren't.
12    Q.    Do you have any recall of what
13 type of fee you got out of that North Carolina
14 --
15    A.    I think I stated -- I think it
16 was around $300,000 if I do remember.
17    Q.    Got you.  Now, going to the
18 fourth paragraph, there is --
19    A.    Uh-huh (affirmative).
20          MR. LYONS:  Exhibit 3 for the
21 record?
22          MR. THOMAS:  Yes.  Thank you.
23    Q.    There is a figure of $51,362,000,

Page 153

1  which includes total renovation of
2  approximately 1,200 beds; is that correct?
3     A.    Yes.  That's what it says here.
4     Q.    And I'm looking at a renovation
5  of 1,200 beds, remodel of another 900 beds as
6  well as an additional 900 new beds.
7           So, that's how you get to your
8  3,000 beds?
9     A.    Yes.
10    Q.    Okay.  Got you.  And I guess this
11 is a good time to show you your document.  And
12 if you don't mind, Mr. Berry, I'm going to
13 take the clip away because you've pretty much
14 testified to your bio.
15          MR. THOMAS:  And I'm going to
16 have this marked as the next in line, which is
17 Defendant's Exhibit No. 4.
18          (Whereupon, said document was
19          marked for identification as
20          Defendant's Exhibit No. 4 to the
21          deposition of Gilbert C. Berry.)
22    Q.    Okay.  And as I asked earlier, it
23 was my understanding that proposed Defendant's

Page 154

1 Exhibit No. 4 accompanied Defendant's Exhibit
2 3?
3     A.    If I do remember, it did.
4     Q.    Got you.
5          MR. THOMAS:  And I would ask that
6 both Defendant'S Exhibit 3 and 4 be made a
7 part of his deposition.
8          MR. LYONS:  No objection.
9     Q.    (By Mr. Thomas)  Now, returning
10 back to the letter that's dated September
11 20th, 2006, that's authored by Dick Davis --
12          MR. LYONS:  2005.
13     Q.    (By Mr. Thomas)  2005.  Did you
14 review that letter before it was sent to Dr.
15 Frazier?
16     A.    I've got to say I have seen the
17 letter.  I don't remember if I reviewed the
18 letter.
19          MR. THOMAS:  Okay.  Again, we'll
20 ask that it be made a part of his deposition.
21     Q.    Now, let me ask you this.  For
22 this comprehensive study, what were the terms
23 and conditions for you-all doing what you did

Page 155

1 in preparing it?
2     A.    Would you repeat that one more
3 time?
4     Q.    What were the terms and
5 conditions for what you and Student Suites did
6 in preparing this Student Housing
7 Redevelopment Master Plan?
8     A.    Would you explain what your -- I
9 wonder --
10     Q.    Did anybody talk to you about
11 getting paid?  Let's just get right to that.
12     A.    Okay.
13     Q.    Yeah.  Did anybody talk to you
14 about getting paid?
15     A.    That's what I thought you were
16 saying.  I just wanted to make sure.
17          It was -- Dr. Frazier had
18 indicated that if we were able to prepare the
19 documents in a timely fashion, get them to the
20 different committees for approval, this was
21 something that Judge Wiggins and the committed
22 wanted to happen, the students were in
23 desperate need, they were losing students

Page 156

1 because of the poor conditions of the housing
2 and that he -- he knew -- he felt in his heart
3 of hearts that if we could get it to where we
4 could make a presentation and get it in the
5 form that they would approve a request and we
6 could get started.
7     Q.    Now, is this the nature of a
8 presentation?  Is that what this is?
9          Because when we talked about your
10 other universities like Allen, Oakwood College
11 and A&M, you talked about making a
12 presentation.
13          Is this a presentation?
14     A.    Could I see the document, and
15 I'll be glad to answer that.
16     Q.    And when I speak in terms of
17 documents, that would be Defendant's Exhibit
18 4.
19     A.    This I would say is part of a
20 PowerPoint presentation where people could
21 follow.  It has schedules.  You know, this is
22 not -- this is not a -- I don't see any floor
23 plans.  I don't see any floor layouts.  I

Page 157

1 don't see none of that.  I just see schedules
2 right now.
3          So, I think it would be part of
4 just a PowerPoint presentation where if you're
5 sitting in the audience you can follow it, you
6 can take it with you, review it later, you
7 know, if you have any questions.
8     Q.    Got you.  And for which you did
9 not expect any compensation for, this document
10 here?
11     A.    I would think not at that time.
12     Q.    Got you.  Now, would the same
13 hold true, to your knowledge, for Student
14 Suites?  Did they expect remuneration for
15 this?
16     A.    In all honesty, I can't speak for
17 Student Suites.
18     Q.    Well, you-all were a "team."  I
19 mean, I see -- well, let me just ask you point
20 blank.  This proposal, was it developed by Gil
21 Berry & Associates and the Marous Brother?
22     A.    This was prepared by Marous
23 Brothers.

1    Q.    Okay.  Prepared by Marous
2  Brothers?
3    A.    Yeah.
4    Q.    And if I'm not mistaken --
5    A.    Go ahead.
6    Q.    Let me take this.
7    A.    Uh-huh (affirmative).
8    Q.    And transmitted to Dr. Frazier
9  via a letter dated September 20th, 2005, from
10  Dick Davis, Student Suites?
11    A.    Correct.
12    Q.    This packet here?
13    A.    Yes, sir.
14    Q.    No --
15    A.    As far as -- I mean, on the --
16  for what I see the documentation of the dates
17  and everything, I would have to agree with
18  you.
19    Q.    And his letter says that we are
20  pleased to submit our findings.  "Our,"
21  plural.
22    A.    Uh-huh (affirmative).
23    Q.    All right.  Now, my question to

1  you, at this time was there a team consisting
2  of Gil Berry & Associates, Marous Brothers and
3  Student Suites for housing at ASU?
4    A.    There was a team assembled, yes.
5    Q.    And as a member of that team --
6  and I think you've just testified -- you were
7  not expecting any compensation or remuneration
8  or money for what was submitted on September
9  20th?
10    A.    Yes, me personally.
11    Q.    Okay.  Can you -- or do you have
12  any knowledge of what the expectations of
13  Marous Brothers would be?
14    A.    I have no idea.
15    Q.    Even though they were a team
16  member?
17    A.    Even though they were a team
18  member.
19    Q.    And what about Student Suites?
20    A.    I have no idea.
21    Q.    All right.  Now, when you-all did
22  the same thing up there at Allen University,
23  did you-all expect payment because y'all did a

1  presentation at Allen?
2    A.    Uh-huh (affirmative).
3    Q.    And I'm assuming all you did was
4  change the cover, put Allen University housing
5  needs, right?
6    A.    Well, a bit more than that.
7    Q.    I mean --
8    A.    Yeah.  More than that.
9    Q.    Yeah.  But at the end of --
10    A.    You've got to put schedules and
11  the --
12    Q.    At the end of the day --
13    A.    Yeah.
14    Q.    -- the core of it was the same?
15    A.    Basically.
16    Q.    Do you know if Gil Berry &
17  Associates was paid for that presentation?
18    A.    No, sir.
19    Q.    Do you know if Marous Brothers
20  was paid for that presentation?
21    A.    Not to my knowledge.
22    Q.    Do you know if Student Suites was
23  paid for that presentation?

1    A.    Not to my knowledge.
2    Q.    Now, at some point in time this
3  same presentation was submitted to Alabama A&M
4  University at some point?
5    A.    Uh-huh (affirmative).
6    Q.    And it consisted, according to
7  your previous testimony, of Gil Berry &
8  Associates, Student Suites and Marous
9  Brothers?
10    A.    Correct.
11    Q.    To your knowledge, did Gil Berry
12  & Associates get paid for what they submitted
13  to Alabama A&M as far as the presentation?
14    A.    No.
15    Q.    To your knowledge, do you know if
16  Student Suites got paid for what was presented
17  to Alabama A&M?
18    A.    As far as my knowledge, no.
19    Q.    What about your knowledge as far
20  as Marous Brothers?
21    A.    As far as my knowledge, no.
22    Q.    And the same would hold true for
23  Meharry?

Page 162

1    A.    Correct.
2    Q.    The same would hold true for --
3  I'm assuming at that point in time you did it
4  for North Carolina A&T, you and Student
5  Suites?
6           You did a presentation?
7    A.    Yes, we did.
8    Q.    And you didn't get paid for doing
9  the presentation?
10   A.    No.
11   Q.    Got you.  Dr. Leon Frazier nor
12 Dr. Gallot said anything about paying you-all
13 at any meetings that you had about this
14 presentation, did they?
15   A.    No.
16   Q.    So, it would be a fair statement,
17 based on what you've just testified, that at
18 least for Gil Berry & Associates you wouldn't
19 be expecting remuneration for a presentation?
20   A.    For a presentation, correct.
21   Q.    Now, returning back -- and you
22 might need to keep this handy.
23   A.    Okay.

Page 163

1    Q.    Paragraph 12.  Gil Berry and
2  Student Suites were hired by ASU at ASU's --
3  I'm sorry.  Page 3, Paragraph 12.
4    A.    Okay.
5    Q.    Are you there, Mr. Berry?
6    A.    Yes, sir.
7    Q.    Paragraph 12.  Gil Berry &
8  Associates and Student Suites were hired by
9  ASU and at ASU's request began working as
10 developer for the purpose of designing,
11 building, renovating and financing the Student
12 Residence Project.  Is that correct?
13   A.    Correct.
14   Q.    Now, I need for to you describe
15 for me in detail when and how Gil Berry &
16 Associates and Student Suites were hired by
17 ASU as you have so alleged in Paragraph 2.
18        MR. LYONS:  Paragraph 12.
19        THE WITNESS:  We were given a
20 board resolution.
21   Q.    (By Mr. Thomas)  Given a board
22 resolution?
23   A.    Correct.

Page 164

1    Q.    When?
2    A.    I'm looking at Paragraph 13, and
3  it's saying on November 15th, 2005.  So, you
4  know.
5    Q.    You're on what now?
6    A.    I'm on Paragraph 13, Page 4.
7    Q.    Okay.  Let me ask, if I may, to
8  follow-up on that suggestion.
9    A.    Yes, sir.
10   Q.    Let me show you what I would like
11 the have marked as Defendant's Exhibit No. 5.
12        (Whereupon, said document was
13        marked for identification as
14        Defendant's Exhibit No. 5 to the
15        deposition of Gilbert C. Berry.)
16   Q.    Mr. Berry, you and Mr. Lyons take
17 a peek at that.  And I'll pass some of these
18 down.
19   A.    Okay.
20   Q.    Now, what I've shown you,
21 Defendant's Exhibit 5, is a letter dated
22 November 9, 2005, right?  The letter is dated
23 November 9th, 2005?

Page 165

1    A.    Yes, sir.
2    Q.    And it bears the signature of Gil
3  Berry and Dick Davis?
4    A.    That's correct.
5    Q.    And you-all are aware of this
6  letter?
7    A.    Yes.
8    Q.    And you prepared this letter?
9    A.    That's my signature.
10   Q.    Okay.  Well, did you prepare it?
11   A.    Dick prepared it.
12   Q.    With your review and approval?
13   A.    Yes, sir.
14   Q.    Now, in the letter there is --
15 it's addressed to Judge Wiggins?
16   A.    Correct.
17   Q.    Why did you-all send this letter
18 to Judge Marvin Wiggins, who is a member of
19 the ASU Board of Trustees?
20   A.    Because I had numerous
21 conversations -- I did, anyway.  And I think
22 Dick had a few, but I can't speak for Dick
23 with Judge Wiggins.

Page 166

1     And Judge Wiggins, after meeting
2 with him, wanted to stay abreast of the
3 progress or lack of progress on the project.
4     Q.    And where did you meet --
5     A.    And probably -- I don't know.  We
6 had early on set up a distribution list of
7 individuals.  When documents went out, no
8 matter who they went out to, that they would
9 also get an E-mail from either Dick or myself
10 of any documents that went out to anybody.
11     So, I don't know if Dick did this
12 on this occasion, but I can tell you that it
13 was normal practice for me, anyway.
14     Q.    When did you first meet with
15 Judge Wiggins, the very first meeting?
16     A.    I met with Judge Wiggins at a
17 meeting at the Tutwiler for your -- when
18 Alabama State plays Alabama A&M, in that area,
19 in that time element.
20     Q.    That football game is normally
21 the last Saturday in October of every year.
22     A.    Okay.
23     Q.    So, would it be around whatever

Page 167

1 that last Saturday would be in October of
2 2005?
3     A.    Yes, sir.
4     Q.    Okay.  And y'all met at the
5 Tutwiler Hotel in Birmingham?
6     A.    Yes, sir.
7     Q.    Where about, hotel room --
8     A.    No.
9     Q.    -- lobby, coffee area, where?
10     A.    They had a board room.
11     Q.    A board room.  Who were in
12 attendance at this meeting.
13     A.    Chairman Elton Dean, I brought a
14 host of people.  I brought people from -- the
15 chairman and the president from Knology, the
16 cable company.  There was members of Marous
17 there.  There was Dick Davis, myself, Rodney
18 Morse from my staff, Lorren Berry from my
19 staff.  Knology brought probably four or five
20 individuals from their staff besides the
21 president and the chairman.
22     They had most of their board
23 members there that I can -- Buford Crutcher,

Page 168

1 Joe Lee -- I mean, Joe Reed wad not present.
2     Q.    He was not present?
3     A.    No, sir, he was not present.
4     Q.    So --
5     A.    And we made a presentation.  We
6 did a PowerPoint presentation to them, the
7 board members.
8     And I had explained to them that
9 Knology -- I had talked to them about -- they
10 had already had the cable on campus and if
11 they were able to negotiate with them on the
12 fiberoptics and the phone service and others
13 that they could build a football stadium at no
14 cost to the University.
15     And we also talked about -- I
16 think either -- I think it was the cafeteria.
17 Because Rosa Parks had just died.  We were
18 going to name it after her, and we were going
19 to roll it into our financing if we were going
20 to do the financing and it wouldn't cost the
21 school any money.
22     So, we made a full-blown
23 presentation to the Board that was assembled

Page 169

1 there at the Tutwiler.
2     Q.    Now, hold on a second.  I've got
3 to get some definition of the board.  So far
4 the only members of the ASU Board of Trustees
5 at that time who you have identified was a
6 trustee by the name of Crutcher?
7     A.    Yes.
8     Q.    Elton Dean a trustee?
9     A.    Correct.
10     Q.    Judge Wiggins a trustee?
11     A.    Correct.
12     Q.    What other board members?
13     A.    I don't really know their names.
14 I would know their faces, but there was
15 probably an additional -- it was a
16 light-skinned, big, husky guy.  There was
17 probably two or three other people in the
18 room.
19     Q.    Now, is this a presentation to
20 board members or to the ASU Board of Trustees?
21     A.    They told -- they told me it was
22 to board members.
23     Q.    Board members.  Okay.  Now, you

43  (Pages 166 to 169)

Page 170

1 recognize there's a lingo distinction between
2 board members and the ASU Board of Trustees?
3    A.    Well, they told me the chairman,
4 Judge Wiggins and them would all be present
5 and so I just took it for granted that --
6    Q.    Well, your lawyer will confirm
7 this further for you, but for the Alabama
8 State Board of Trustees to meet there has to
9 be a quorum of 13 board members.
10          And so that's why I'm trying to
11 with some particularity get you to identify
12 for me at least six or seven trustees.
13    A.    Well, I'm quite sure that if you
14 could -- all I can tell you is that the room
15 was filled. They had -- the board room around
16 the table was filled. We all had to stand up.
17 So, there was no seating for us. So, you can
18 figure it out from there.
19    Q.    Not really.
20    A.    Okay.
21    Q.    You're going to have to describe
22 it to the Court. Okay?
23    A.    Okay. Well, I think I described

Page 171

1 it as best as I can.
2    Q.    Was there any notice of a board
3 meeting of the ASU Board of Trustees that you
4 know of?
5    A.    It was set up for us to be
6 present there, and that's why I had the
7 chairman of Knology, I had the president of
8 Knology, I had their internal staff that could
9 run the fiberoptic cables and their
10 engineering. We were all present.
11    Q.    Now --
12    A.    So, it was the formal meeting
13 that was prepared and presented for us to be
14 there.
15    Q.    Got you. Now, following your
16 presentation to those who had assembled what,
17 if anything, was said from those who were
18 affiliated with ASU?
19    A.    They were very upset that Dr.
20 Frazier had not presented the information to
21 them that we had did in our PowerPoint
22 presentation because when we had did the
23 PowerPoint presentation, the next day they had

Page 172

1 a -- I guess a property -- a property meeting.
2          And they couldn't understand why
3 we wasn't there to present that information at
4 that time. And I had had several
5 conversations after that meeting with Judge
6 Wiggins.
7          And Judge Wiggins was very upset
8 that we was not given the opportunity to make
9 the presentation and asked that I get him a
10 copy of that document that you have or one of
11 -- a document of what was presented at that
12 time.
13    Q.    But what we have identified in
14 Defendant's Exhibit 4 was a PowerPoint
15 presentation to those who had assembled,
16 right?
17    A.    Yes. It was a PowerPoint
18 presentation, and it was more in-depth detail
19 than that because what we were able to do --
20 Marous, was able to take buildings off
21 line and show the new --
22    Q.    I understand.
23    A.    -- construction in great detail.

Page 173

1    Q.    Got you.
2    A.    I mean, it was very
3 well-prepared.
4    Q.    So, Judge Wiggins' request was
5 for a personal copy of it?
6    A.    Well, Judge Wiggins was -- his
7 request was the presentation and the
8 information that we had prepared for Dr.
9 Frazier that they never got an opportunity to
10 see.
11          So, he suggested that we -- he
12 would assemble the members and we come and
13 make the presentation.
14    Q.    Who was that now?
15    A.    Judge Wiggins.
16    Q.    So, Judge Wiggins is the person
17 who invited you?
18    A.    Yes, sir. We had to be invited.
19    Q.    Okay. That's what I'm just
20 saying. Like that is the last -- this is the
21 weekend of the last Saturday in October of
22 2005, right?
23    A.    He said it was very important to

1  him and that he thought since the most --
2  well, he said he thought that since the board
3  members would be present that he would
4  assemble them, for us to come in and make a
5  presentation.
6        He said that they would be
7  staying at the Tutwiler Hotel. I told him
8  that I would be bringing Knology who I had
9  talked to. He said that Chairman Elton Dean
10 was a big football player. I told him I had a
11 surprise for the chairman.
12       I told him that I had some
13 previous talks, never told him what it was
14 about because I kind of wanted it to be after
15 the presentation to say, hey, not only can we
16 do this, but Knology. Because Knology had
17 told me that they are capable of -- they owned
18 a baseball team called the Biscuits. And I
19 said would you entertain building a stadium at
20 ASU, and they said under the right
21 circumstances.
22   Q.   I understand.
23   A.   Yes, sir.

1    Q.   Now, again, in conjunction with
2  that meeting on that Saturday weekend, when
3  did Judge Wiggins invite you?
4    A.   It had to be shortly after he was
5  sent information on -- on the earlier
6  presentation that we had given to Dr. Frazier.
7    Q.   Now, attached to this -- and you
8  make reference to it in the body of your
9  letter. This is the November 9th, 2005,
10 letter.
11   A.   Uh-huh (affirmative).
12   Q.   To begin this aggressive -- and
13 this is the third paragraph.
14       To begin this aggressive schedule
15 we would request the Board of Trustees to pass
16 the attached resolution by November 25, 2005.
17 Do you recall using that language?
18   A.   This document was prepared by
19 Dick Davis, but I remember reviewing the
20 document, yes, sir.
21   Q.   For all intents and purposes, you
22 ratified the letter, right?
23   A.   If I signed it, yes.

1    Q.   Yeah. You adopt it as your own,
2  right? You adopt this letter as your own,
3  right? You wrote it?
4    A.   If I signed it, yes.
5    Q.   Now, on the second part of it is
6  the resolution, right?
7    A.   Correct.
8    Q.   At the bottom of it I see Student
9  Suites, Marous Brothers and Gil Berry &
10 Associates, right?
11   A.   Correct.
12   Q.   Is it a fair statement to say
13 that this was prepared by this team of Student
14 Suites, Marous Brothers and Gil Berry &
15 Associates?
16   A.   In all honesty, I have seen this.
17 I don't think Marous Brothers had any input in
18 any of this document.
19   Q.   Well, what about Gil Berry &
20 Associates?
21   A.   If I signed it, I would have to
22 say I did.
23   Q.   What about Student Suites?

1    A.   Of course. They prepared it.
2    Q.   Got you. Now, in writing this
3  language here, you state: "Be it resolved
4  that the Board of Trustees designates Student
5  Suites, Inc. and Gil Berry and Associates as
6  its developer for the purpose of Designing,
7  Building, Renovating, and Financing a proposed
8  Student Housing Redevelopment Master Plan per
9  the proposal submitted October 28, 2005."
10       Okay. Now, do you have that
11 proposal that was submitted October 28th,
12 2005, because I -- I just have not seen it?
13   A.   Do we have that proposal prepared
14 --
15   Q.   Yes. Do you have a copy of it?
16   A.   No.
17   Q.   Who would have it?
18   A.   I don't know. I don't have it
19 and -- you know, that's all I can speak for.
20 I don't have it.
21   Q.   Well, again, now when you read
22 this language here --
23   A.   Uh-huh (affirmative).

Page 178

1    Q.    -- it talks about something
2  that's prepared by Student Suites and Gil
3  Berry?
4    A.    Correct.
5    Q.    And it says something that was
6  submitted by October 28th, 2005.
7         And I have gone over your request
8  -- I'm sorry, your responses to requests of
9  all documents.
10   A.    Uh-huh (affirmative).
11   Q.    And I can't put my hands on it.
12   A.    I don't have a copy of it.
13   Q.    Do you have access to it?
14   A.    No, sir.
15   Q.    Do you know who might have access
16 to it?
17   A.    If anybody, it would be Dick. I
18 don't have it.
19   Q.    So, see Dick on this?
20   A.    Yes, sir.
21   Q.    All right. Let me just go ahead
22 on the record and just ask if you would do
23 some type of review or search whatever records

Page 179

1  you may have regarding designing, building,
2  renovating and financing for a proposed
3  Student Housing Redevelopment Master Plan per
4  the proposal submitted by Gil Berry &
5  Associates and Student Suites on October 28th,
6  2005, would you?
7    A.    I would be glad to do that.
8    Q.    And if you locate it, would you
9  give it to your attorney?
10   A.    I would be glad to do that.
11   Q.    Thank you. Now, do you recall
12 anything about this proposal that you and
13 Student Suites were submitting?
14   A.    Well, in this document here,
15 number one, it was suggested that -- number
16 one, that the school could do their own
17 financing and had a great bond rating.
18        It was suggested that, number
19 one, the school would never entertain a $51
20 million debt even if they could do their own
21 financing because they at that time -- that
22 was indicated to me and Dick that he had
23 already had borrowed $60 million. They never

Page 180

1  would want to go over the $100 million dollar
2  mark and that they would probably be looking
3  for a project in the neighborhood of a lot
4  lesser number.
5         And so we were told after this
6  was presented and after several negotiations
7  that this number -- that this number would
8  have to be reduced because the school was
9  going to borrow some money to do some other
10 projects on campus, and they would never go
11 over $20,000 to $25,000. So, we had to back
12 --
13   Q.    Twenty-five million?
14   A.    Excuse me. $25 million. I'm
15 glad you corrected me. So, we were -- we were
16 then -- we are then mandated not to exceed the
17 $20 to $25 million number.
18        So, we then started backing into
19 that number to prepare our documents as far as
20 the six dormitories because we then said that
21 we could then personally finance -- get
22 financing, excuse me, for additional new
23 housing there on campus.

Page 181

1         And we are told by Dr. Frazier to
2  look at several locations to put the new
3  housing there, and Dr. Lee suggested that we
4  go and look at Savannah where he thought the
5  housing that was done in Savannah was great
6  because it kind of was a mixture of women, men
7  on another side. And we sent a team down to
8  do that and came back with a rendering of what
9  it would look like to do the new housing.
10        We walked the campus with John
11 Chambless, their master planner.
12   Q.    I think you've gotten a little
13 beyond my question.
14   A.    Well, you asked the question and
15 I was -- you were talking about how did we get
16 to where we got there.
17   Q.    Well, here though --
18   A.    Okay.
19   Q.    -- as of September 9th, 2005.
20 You hadn't done all of that by this letter
21 here. You had not gone to Savannah by
22 September 9th, 2005?
23        MR. LYONS: November.

1    Q.    (By Mr. Thomas) November. Not
2  by this time you had not.
3    A.    Okay. Well --
4    Q.    So, that's why I'm trying to keep
5  you in time specific.
6    A.    Okay. Okay. That's fine.
7    Q.    So, at the end of your
8  deposition, it will all flow. You're going to
9  get a chance to say everything you want to
10 say.
11   A.    Okay. I'm just telling you --
12   Q.    But I'm just saying at this point
13 in time here -- you signed this letter. This
14 is your signature. So, you adopted this
15 resolution?
16   A.    That is so correct.
17   Q.    Now, returning back to the
18 resolution --
19   A.    Uh-huh (affirmative).
20   Q.    -- flip it over. The last --
21   A.    I want to -- you said something I
22 signed the resolution. I didn't sign the
23 resolution.

1    Q.    No. You signed the letter --
2    A.    I signed the letter. I didn't
3  sign the --
4    Q.    -- that incorporates the
5  resolution?
6    A.    That talks about the resolution.
7    Q.    Well, it does a little bit more
8  than talk about it.
9    A.    Okay.
10   Q.    Because after you signed the
11 letter, you state in your letter to begin this
12 aggressive schedule we would request the Board
13 of Trustees to pass the attached resolution by
14 November 25, 2005. Signed Gil Berry. You
15 said that?
16   A.    I said that.
17   Q.    Right. Now, so you -- this is
18 your document?
19   A.    That's my document.
20   Q.    Got you. Now, that's why I'm
21 asking you to explain the last paragraph. "It
22 is mutually understood that if final agreement
23 is not reached on more detailed design and

1  financing structures that this Resolution will
2  become void with no expense to Alabama State
3  University."
4        I need for you to define for me
5  your usage of if final agreement is not
6  reached on more detailed design and financing
7  structure. What did you mean by those words?
8    A.    Well, we had the financing put in
9  place. There is a letter documenting that we
10 had all of the financing put in place. The
11 school decided that they would do their own
12 financing. My -- I'm going to give you my
13 scenario of what you just asked me.
14   Q.    These are your words. So, feel
15 free.
16   A.    Okay. I'm going to give you my
17 words.
18        If we can come up with the
19 financing or we can agree with the party who
20 we're doing work for that we agree that their
21 financing could be used. If we prepare
22 documents, work product, that can help you get
23 the financing that you are seeking and you get

1  the financing.
2        Now, final drawings. To me if
3  you go out and get the financing based on our
4  work product and you get the financing, that
5  means that financing was obtained by using our
6  documents. What are final drawings? Final
7  drawings are just stamped drawings from an
8  architect in the state that you're doing
9  business in. We have hired -- we hired John
10 Chambless to do that. He was already on board
11 to stamp the drawings and get them approved
12 because Marous Brothers, even though they are
13 approved in several states, had taken the
14 license in Alabama, had not been approved yet.
15        So, if you used our work product
16 to get the financing, that means that whoever
17 your financing institution that gave you the
18 financing thought that the drawings were good
19 enough to actually be able to give you the
20 financing based on the preliminary drawings
21 that we had given them.
22        And I've got to call them
23 preliminary until they're stamped by a

Page 186

1 certified licensed architect in the state of
2 what you're doing business in. They're just
3 in the preliminary stages until they have
4 final approval.
5         But it was enough to get the
6 financing. So, that was the financing piece.
7 And final drawings means just that the state
8 approved the drawings that we had prepared and
9 you have got the financing and that we have an
10 architect of that state or if we're licensed
11 in that state stamp them and get them approved
12 by the state in which we were doing business
13 in.
14         That's my interpretation of this
15 document.
16    Q.    But you would agree with me,
17 would you not, that all of those contingencies
18 that you have expounded upon are not -- that's
19 not what this language says.
20    A.    That's what it means.
21    Q.    But that's not what it says.
22    A.    Well, maybe not to you, but
23 that's what it means to me.

Page 187

1    Q.    Again, would you agree with me
2 that that is not stated here in this document
3 that you prepared?
4    A.    I do not agree.
5    Q.    Well, just show me in the four
6 corners where all of that is said. I'll be
7 more than happy to read it.
8         To me, it says unequivocally, "It
9 is mutually understood that if final agreement
10 is not reached on more detailed design and
11 financing structures that this resolution will
12 become void with no expense to Alabama State
13 University."
14         There is nothing here,
15 parenthetically or otherwise, talking about
16 any contingencies, if the drawings were used
17 under these circumstances or if the designs
18 had to be more detailed.
19         That's not here, Mr. Berry. It's
20 not here.
21    A.    Well, that's your interpretation,
22 and I respect it.
23    Q.    Okay. You also testified that

Page 188

1 you hired John Chambless. Now, I know a
2 Chambless who is an architect. Why don't you
3 just go ahead and tell me who John Chambless
4 is.
5    A.    John Chambless is an architect
6 that is here. Did we hire him? Verbally he
7 had agreed to work with us. It was a verbal
8 agreement.
9    Q.    Okay. Did you pay him?
10    A.    No, we didn't pay him.
11    Q.    So, your definition of hiring is
12 a verbal agreement? Is there a retainer
13 agreement?
14    A.    It was a verbal commitment from
15 John. He had reviewed our work product on
16 several occasions. I think Mr. Goldman had
17 even sent him the disk on which it was
18 prepared. Me and John had several meetings.
19 Me, him and Arne Goldman had several meetings.
20 John thought that the work
21 product we prepared was a good work product
22 and had agreed to be part of the team.
23    Q.    Now, if I may, as of September

Page 189

1 9th, 2005, when the attached was sent to Judge
2 Wiggins --
3         MR. LYONS: November.
4    Q.    (By Mr. Thomas) Excuse me.
5 November 9th, 2005, when the attached was sent
6 to Judge Wiggins, the resolution, this is the
7 only documentation that was forwarded to
8 anybody with ASU; is that correct, by you and
9 Dick Davis, this resolution?
10         Is there some other agreement
11 outlining conditions for payment, terms and
12 circumstances for payment, submission of
13 invoices? At this time now.
14    A.    Oh, at this time?
15    Q.    Yes. Again, this is November
16 9th, 2005.
17    A.    Nothing that I can think of.
18         MR. THOMAS: Off the record.
19         (Whereupon, an off-the-record
20 discussion was held.)
21    Q.    Mr. Berry, Defendant's Exhibit
22 No. 5, I would ask that that be made a part of
23 your deposition. That's the one over there.

1    A.    Oh, okay.  That is fine.
2          MR. THOMAS:  We'll take 30
3    minutes.
4          MR. LYONS:  Yeah.
5          (Whereupon, the taking of the
6    deposition was recessed from approximately
7    12:36 p.m. to approximately 1:15 p.m., after
8    which the following proceedings were had and
9    done:)
10   Q.    (By Mr. Thomas)  Mr. Berry, if we
11   may, let me return you back to the exhibit
12   that's before you, which is the complaint.
13   A.    Yes, sir.
14   Q.    And if I may, let me direct you
15   to Page 4.  And, again, for background
16   purposes flip back to Page 3.
17   A.    Uh-huh (affirmative).
18   Q.    Go to the last sentence where it
19   is averred on your behalf Student Suites is a
20   Missouri-based student housing development
21   company that works with colleges and
22   universities --
23   A.    Oh, excuse me.  I was on Page 2.

1    I'm very sorry.
2    Q.    The last sentence.
3    A.    Okay.
4    Q.    Student Suites is a
5    Missouri-based student housing development
6    company that works with colleges and
7    universities to design, build and assist in
8    the procurement of financing for the finance
9    suite-style student housing.
10         Okay.  And and I think that's
11   pretty much the way you have described Dick
12   Davis and Student Suites, the financing piece
13   on the project, right?
14   A.    Correct.
15   Q.    Now, your last averment is
16   Student Suites is not a party to this civil
17   action.  I guess my question simply to you,
18   what happened to Student Suites?
19   A.    What happened to Student Suites?
20   Student Suites decided that it would be in
21   their best interest not to pursue the lawsuit
22   based on that they were trying to pursue other
23   work in the historical black college arena.

1    Q.    Gil Berry & Associates does not
2    have any desires to continue efforts with
3    working with HBCUs?
4    A.    Yes, I do.
5    Q.    Did you have any discussions with
6    Dick Davis regarding the lawsuit before you
7    filed it?
8    A.    I think early on I told Dick that
9    I was going to pursue the lawsuit, and early
10   on I think he was in agreement.  And as I was
11   looking for, you know, firms to take a look at
12   the suit I kept him abreast.
13   Q.    And, again, I think from your
14   earlier testimony you said that your last
15   discussion with Dick Davis could have been
16   back in the summer of '07?
17   A.    That is correct.
18   Q.    Did you ever confirm with Dick
19   Davis that you, in fact, had filed the
20   lawsuit?
21   A.    If I didn't, I think the attorney
22   had.  He knew I was pursuing the lawsuit, yes.
23   Q.    Now, in Paragraph 13, at Page 4

1    it is alleged that on November 15th, 2005, the
2    ASU Trustees Property Committee passed a
3    resolution naming Gil Berry and Student Suites
4    as developers to design, build, renovate and
5    assist in the procurement of financing for the
6    Student Residence Project; is that correct?
7    A.    That is correct.
8          MR. THOMAS:  If I may, let me
9    have the court reporter to mark this as
10   Defendant's Exhibit 6.
11         (Whereupon, said document was
12         marked for identification as
13         Defendant's Exhibit No. 6 to the
14         deposition of Gilbert C. Berry.)
15   Q.    If you would, take a look at it.
16   And this purports to be the minutes of the ASU
17   Board of Trustees Property Committee meeting,
18   November 15th, 2005.  And it's a four-page
19   document.
20         Have you ever seen this document
21   before?
22   A.    No, I have never seen it.
23   Q.    Were you at the November 15th,

Page 194

1  2005, property committee meeting for ASU?
2      A.    Could I take a minute to look at
3  it and refresh myself?
4      Q.    I'm sorry. I didn't mean to rush
5  you.
6      A.    I just was trying to, you know,
7  familiarize myself with it.
8      Q.    Take as much time as you need.
9      A.    Okay. I have reviewed it.
10     Q.    Were you at this board meeting?
11     A.    I don't think so.
12     Q.    Okay.
13     A.    I don't recall none of this.
14     Q.    If you don't mind, on the first
15  page you see present was Trustee Buford
16  Crutcher, who is the committee chair?
17     A.    Correct.
18     Q.    Was that your knowledge at that
19  time?
20     A.    Yes, it was.
21     Q.    You've already made several
22  references to Trustee Judge Marvin Wiggins?
23     A.    Uh-huh (affirmative).

Page 195

1      Q.    So, can I assume that you were
2  aware he, too, was also a member of the
3  property committee, Judge Wiggins?
4      A.    Yes.
5      Q.    Okay. Did you have any
6  discussions with Trustee Oscar Crawley, who is
7  also a member of the committee, the property
8  committee?
9      A.    None that I can remember.
10     Q.    If I may, would you, please, turn
11  to Page 3. That's the next to the last page.
12     A.    Okay.
13     Q.    And there you'll see under Roman
14  Number VII --
15     A.    Okay.
16     Q.    -- Discuss Options to Upgrade
17  Student Housing.
18     A.    Uh-huh (affirmative).
19     Q.    And do you see the language here
20  that Trustee Crutcher called for a motion
21  regarding the development of Student Housing
22  Plan from Student Suites to be approved by the
23  committee for recommendation to the Board of

Page 196

1  Trustees?
2      A.    Uh-huh (affirmative).
3      Q.    Now, you've never seen these
4  minutes before, you have not?
5      A.    No.
6      Q.    Okay.
7      A.    Not to my knowledge.
8      Q.    Now, if I may -- now, let me also
9  show you this document.
10         MR. THOMAS: And I'll have that
11  marked as Defendant's Exhibit No. 7.
12         (Whereupon, said document was
13         marked for identification as
14         Defendant's Exhibit No. 7 to the
15         deposition of Gilbert C. Berry.)
16     Q.    Let me give you this so that you
17  and Mr. Lyons can look at it.
18     A.    Okay.
19     Q.    Mr. Berry --
20     A.    Yes, sir.
21     Q.    -- this is a November 23rd, 2005,
22  document.
23     A.    Correct.

Page 197

1      Q.    And it's from Dr. Frazier, who
2  you've made reference to, and it's addressed
3  to Dick Davis. And it was, as you can see at
4  the bottom, Bates Marous Document No. 12. Do
5  you see that at the bottom?
6      A.    Yes, sir.
7      Q.    It was produced in response to
8  Defendant Marous Brothers Construction's
9  response to our requests for production of
10  documents.
11         My question to you, have you ever
12  seen this document?
13     A.    Yes, I have.
14     Q.    So, you have seen it?
15     A.    Uh-huh (affirmative).
16     Q.    Okay. Good. Now, it's addressed
17  to Dick Davis. Would you explain to me how
18  you came to see this document?
19     A.    Dr. Frazier had sent it to Dick
20  Davis, and Dick Davis had forwarded it to me.
21     Q.    And that would have been at times
22  contemporaneous with November 23rd, 2005?
23     A.    I would have to say correct.

Page 198

1    Q.    Now, again, if you notice here,
2  there is discussions regarding a proposed
3  Student Residence Project at ASU. And, again,
4  I refer you to Paragraph a, little a.
5    A.    Uh-huh (affirmative).
6    Q.    And there appears to be, again,
7  quoted language from the resolution that
8  talked about "it is mutually understood that
9  if final agreement is not reached on more
10  detailed design and financing structures that
11  this Resolution will become void with no
12  expense to Alabama State University."
13         Did you see that in the document?
14    A.    Yes, sir.
15    Q.    Did you have any discussions with
16  Dick Davis regarding this language?
17    A.    No.
18    Q.    Now, did you or Mr. Davis or any
19  of you-all's representatives meet with Dr.
20  Frazier on November 29th as is set forth in
21  Paragraph b?
22    A.    Uh-huh (affirmative).
23    Q.    Were you present in a meeting

Page 199

1  with Dr. Frazier on November 29th, 2005?
2    A.    I don't -- I wasn't at that
3  meeting. My fiance's mother was sick, and she
4  ended up dying. That was around Thanksgiving.
5    Q.    Did you send a designee or a
6  representative or anything?
7    A.    If I do remember, Dick and them
8  had me on speaker phone, yeah.
9    Q.    So, Dick Davis was present --
10    A.    Yes.
11    Q.    -- on behalf of Student Suites?
12    A.    Uh-huh (affirmative).
13    Q.    Was anybody present from Marous
14  Brothers?
15    A.    I don't think so.
16    Q.    If you were on speaker phone,
17  what, if anything, do you recall being
18  discussed at the November 29th, 2005, meeting?
19    A.    It was very short. I just
20  explained that due to some illnesses and some
21  circumstances, I couldn't be present at the
22  meeting, I hoped that everybody there at the
23  meeting could -- could accept my apologies for

Page 200

1  not being there and that Dick was going to be
2  there and would relay to me the outcome of the
3  meeting due to circumstances that were out of
4  my control.
5    Q.    Were you ever briefed by Dick
6  Davis regarding anything relating to working
7  out details or procedures as is set forth in
8  Paragraph b?
9    A.    Well, Dick told me that -- that
10  the details to be worked out were basically
11  that we were to continue onto the project and
12  that he had some reassurances what we would be
13  paid and that -- that we had to prepare
14  working documents and that basically they
15  talked about that the school wanted to move
16  forward with this product that we were
17  proposing. And basically that was it.
18    Q.    When Dick shared with you
19  "reassurances that we would be paid," what
20  were his direct words that he used?
21    A.    That we would be paid. He didn't
22  -- it wasn't direct words.
23    Q.    I mean, it was direct words. We

Page 201

1  would be paid.
2    A.    I mean, but you -- yes, you're
3  correct.
4    Q.    Okay. We would be paid. Now,
5  talk to me about what your understanding was
6  about how and under what set of circumstances
7  you would be paid.
8    A.    My understanding was that we
9  would continue to work with the school to
10  assist the school in preparing the documents.
11  As I stated earlier, when we first -- excuse
12  me. I need to look at this document. When we
13  first --
14    Q.    What document are you looking at?
15    A.    Exhibit 5.
16    Q.    Okay.
17    A.    When we first met with Dr.
18  Frazier and the group, we presented this
19  document and that package, which was $51
20  million. And that was rejected in principle
21  because, number one, they had spoke, as I
22  spoke here earlier, that their bonding -- they
23  wanted to do their own financing and that

Page 202

1  their bonding was -- they had already borrowed
2  $60 million.  And Dr. Frazier and Mr. Gallot
3  had indicated that the school -- and I --
4  excuse me, and Mr. Blunt, that the school did
5  not want to go into anymore debt because they
6  had a project that they had on board of
7  roughly around $16 million and they had a
8  price already, a contract or a price for the
9  $16 million.
10      So, that we had to be in the
11  neighborhood of $20 to $25 million.  So, we
12  had to back into this number.  So, this
13  document was totally eliminated.  We didn't
14  even discuss it no more because, as you see,
15  we were talking about new housing and a $51
16  million project.
17      So, we were faced with a $20 to
18  $25 million project that we had to come up and
19  prepare documents and -- that they could take
20  to the bond market because they at no time
21  said that they wanted to go past the hundred
22  million dollar mark; or if they did, they
23  would very little go past the hundred million

Page 203

1  dollar mark.
2      So, this resolution and this
3  document was just disregarded, and we had to
4  -- now had new marching orders to go back and
5  come up with a project between the $20 and $25
6  million.
7      Q.  Now, I want to make sure I
8  understood you clearly.  The resolution that
9  the property committee passed pursuant to the
10  letter and resolution that you and Dick Davis
11  prepared and sent to Judge Wiggins and what is
12  set forth in Dr. Frazier's letter to Dick
13  Davis that you subsequently saw, you're saying
14  that it had been completely, I guess for lack
15  of a better word, eliminated?
16      A.  Well, they told us that on this
17  November 9th that this would be unacceptable.
18      Q.  Now, who is the they?
19      A.  Mr. Gallot.
20      Q.  Okay.  And we're talking about at
21  times in November of 2005, right?
22      A.  We're talking about around the
23  November 9th date.

Page 204

1      Q.  Okay.  Now, but my question here,
2  though, to you is that I have shown to you an
3  exhibit that you have in front of you.  The
4  board met on November 15th?
5      A.  Uh-huh (affirmative).
6      Q.  And it passed a resolution per
7  that particular note from the property
8  committee, okay, for Student Suites to develop
9  a plan for development of student housing on
10  the campus of Alabama State University.
11      A week later on November 23rd,
12  2005, Dr. Frazier writes Dick Davis in a
13  letter which you saw, again reemphasizing
14  Student Suites, Gil Berry & Associates as
15  developers for developing of a Student Housing
16  Redevelopment Master Plan.  It it mutually
17  understood that if final agreement is not
18  reached on more detailed design and financing
19  structures that this resolution will become
20  void with no expense to Alabama State
21  University.
22      And you're saying to me that at
23  some point in time in November of 2005 this

Page 205

1  was completely disregarded?
2      A.  Yes, because if you look in your
3  document it said that -- what you read, we had
4  to develop a plan.  If you look at this
5  document on November 23rd, it doesn't even
6  talk about new housing anymore.  It just talks
7  about the renovation portion now.  So, this
8  document on November 9th was totally
9  disregarded at that time.
10      That's why there's not any
11  mention of new housing in this document.  And
12  in that what you just read it talked about we
13  had to go back and develop the plan.
14      Q.  Got you.  Now, I want to
15  follow-up on your reference to Dick Davis
16  conveying to you the phrase we would be paid.
17      A.  Correct.
18      Q.  So, as of November 23rd, 2005, or
19  thereabouts -- because obviously if Dick got
20  the letter dated November 23rd, 2005, and
21  briefed you on it, it would have either been
22  on that date or some date thereafter, right?
23      A.  Correct.

Page 206

1    Q.    So, if you would, tell me on or
2  about November 2005, December 2005, what you
3  wanted to be paid?
4    A.    Well, the bottom line is we had a
5  plan that we prepared for $51,000 in new
6  housing --
7    Q.    $51 million.
8    A.    $51 million.  Excuse me.
9         Now, we're asked to go back and
10 prepare another plan, eliminate the new
11 housing.  We can't go over the $20 to $25
12 million mark because of the restraints that
13 they put on us.
14         I mean, it's like I've got to go
15 back now and tell the Marouses that we've got
16 to start all over again, and we've got to
17 prepare another document.
18         So, now I said, Dick, the bottom
19 line is at some point we're going to -- he
20 said, they -- Dr. Frazier told him that we're
21 going to get paid, but we can't go over the
22 $20 to $25 million mark.
23    Q.    Now --

Page 207

1    A.    So, we're now re -- we're backing
2  into a number that we didn't create that was
3  created by the University given to us to back
4  into that number to create a renovation
5  project that we would have to prepare and be
6  able to renovate these six dorms based on a
7  number that was given to us.
8         And that's why we said, okay, if
9  that's the number, we will present where we
10 have to build 388 new beds and that we're
11 going to have to bring the financing to do
12 that.
13         Because we were only allowed to
14 have the $20 or $25 million because we knew
15 the way our plan was set up that when we
16 started renovating two dormitories that we had
17 to move the kids into a place where -- while
18 we worked on the two dorms, that they could be
19 placed at so that we could do the work that we
20 needed to do to renovate the two dorms.
21 That's why we set the schedule.  That's why we
22 talked about the new dorms.
23         We told them that it would only

Page 208

1  take about six months to stick build the
2  dorms, get them up and then the kids could be
3  able to be moved into those dorms.
4    Q.    What amount of the $25 million
5  were you going to get?
6    A.    Does it -- I mean --
7    Q.    I mean --
8    A.    Okay.
9    Q.    You're saying you're going to get
10 paid?
11    A.    Yes, sir.
12    Q.    Now, my question to you, what
13 rate you're going to get paid?
14    A.    Me and Dick were getting ten
15 percent.
16    Q.    Now, where is that stated?  Show
17 me a document that you told somebody at ASU
18 I'm going to get ten percent of this $25
19 million you-all have restricted me on.
20    A.    The bottom line is --
21    Q.    No, no.  That's the question.
22 Show me a document that somebody was briefed
23 on the fact that Gil Berry & Associates is

Page 209

1  going to get ten percent of $25 million.
2    A.    It doesn't matter.
3    Q.    It does.
4    A.    It doesn't matter.  If I tell you
5  that I can do a project for you for $25
6  million and you are getting what you requested
7  from me, if I make one dollar or if I make
8  $250,000, it doesn't matter.  You got what you
9  wanted.  It doesn't matter.  It really doesn't
10 matter.
11    Q.    It does.  Hold on a second.
12    A.    No, it doesn't.
13    Q.    You are comfortable in the fact
14 that some of these attorneys in here might get
15 paid more than others.  You're comfortable
16 with that, aren't you?  Everybody who's in
17 some professional service has a rate of pay.
18         I guess my question to you:  Are
19 you suggesting that ASU at these times in
20 November of 2005 told you go do whatever you
21 need to do and we'll pay whatever you bill us?
22 Are you saying that to the Court?
23    A.    I'm telling you that ASU gave us

53 (Pages 206 to 209)

Page 210

1 a figure to renovate six dormitories at a
2 price that they gave us. We didn't give them
3 the price. They gave us a price to renovate
4 six dormitories that they could take to the
5 bond market, get paid, get approved by the
6 bond market and we did that.
7     Q.    Okay. Again, in detail explain
8 for me the "they" that you make reference to
9 when you say ASU. Who are the "they"?
10     A.    ASU?
11     Q.    Yes.
12     A.    That told us to go for the $25
13 million?
14     Q.    Yes.
15     A.    That was Freddie Gallot --
16     Q.    Freddie Gallot.
17     A.    -- and Attorney Fred Gray was
18 there.
19     Q.    Did he say that, though. I want
20 you to tell me who told you to go do what you
21 need to do for $25 million?
22     A.    Told us to go and put together a
23 project to renovate the dorms for the $20 to

Page 211

1 $25 million mark. That was Mr. Gallot.
2     Q.    And when did Mr. Gallot tell you
3 that?
4     A.    That was told to us when this $51
5 million was rejected.
6     Q.    Now, you've got to help me with
7 that because the $51 million is first
8 identified in a letter, I think, dated
9 November 9th -- hold on a second. Let me
10 look.
11     A.    It's November 9th, I think.
12     Q.    No, no. It's not then.
13     A.    Do I have it? No.
14     Q.    This is September 20th, 2005.
15 And there is $51 million mentioned there.
16     A.    Okay. Well, it's somewhere in
17 that time zone. We submitted this, and it was
18 rejected.
19     Q.    Again, and when you say rejected,
20 who rejected it?
21     A.    They said -- I mean, the bottom
22 line --
23     Q.    Not the bottom line. Who? What

Page 212

1 person? Because ASU is an entity and it
2 cannot speak for itself. So, I need to know
3 what person.
4     A.    We were told by Mr. Gallot that
5 $51 million would not be acceptable.
6     Q.    Got you. And that was in?
7     A.    In that time zone when this was
8 submitted.
9     Q.    And the letter bears the date of
10 September 20th, 2005?
11     A.    Well, it had to be somewhere in
12 that time that $51 would not be acceptable,
13 that the school could not take on that kind of
14 debt and --
15     Q.    Now, that's the so-called we
16 won't do $51 million. That's what Mr. Gallot
17 said, right?
18     A.    That's what was said.
19     Q.    Now, tell me who the "they" were
20 that told to you've got to back it down to $25
21 million?
22     A.    That would have been Mr. Frazier.
23     Q.    Dr. Frazier?

Page 213

1     A.    Dr. Frazier.
2     Q.    And when did Dr. Frazier tell you
3 that?
4     A.    Somewhere in that time zone.
5     Q.    Do you have any document that is
6 going to confirm or even relate to that?
7     A.    The only document would be that
8 our number was drastically reduced from $51
9 million, and we submitted a proposal for $25
10 million.
11          Anybody would want to do a $51
12 million project versus a $25 million project.
13 So, someone had to tell us that the $51
14 million project ain't working.
15          So, it was Dr. Frazier who told
16 us that it doesn't work. So, we need to go
17 back and back into a project around $20 to $25
18 million because the school cannot accept that
19 kind of debt.
20     Q.    And when did you explain to Dr.
21 Frazier that for -- in order for you-all to do
22 that that Gil Berry & Associates would charge
23 X, Marous Brothers would charge Y and Student

Page 214

1  Suites would charge Z?  When was that
2  discussed?
3      A.    Oh, we couldn't tell him that
4  until, number one, that we started working on
5  calculating how we're going to do the $25
6  million project that was put on our plate.
7          MR THOMAS:  If I may, Mr. Lyons,
8  he -- I want to offer to be made a part of his
9  deposition that letter that he said he did
10 receive.  I don't think there should be any
11 problem with that.
12         THE WITNESS:  That one there?
13         MR. LYONS:  Exhibit 7?
14         MR. THOMAS:  Exhibit 7.
15         And I'll just ask you, given that
16 he's never seen Defendant's Exhibit 6, any
17 objection to admitting it with his deposition
18 or just hold it until I can find somebody who
19 can recall it?
20         MR. LYONS:  I mean, it is what it
21 is.
22         MR. THOMAS:  It's okay?
23         MR. LYONS:  I have no objection.

Page 215

1          MR. THOMAS:  Well, with that in
2  mind, I thank you.  I would offer that Exhibit
3  6 and 7 be made a part of his deposition.
4      Q.    Now, turning back to the
5  complaint, Page 4, Paragraph 14.  At the
6  request of ASU and GBA, Gil Berry &
7  Associates, Marous was hired to document
8  existing conditions, prepare design documents
9  and prepare documents outlining the intended
10 scope of the renovation work.
11         Who at ASU requested Marous to
12 document existing conditions, prepare design
13 documents and prepare documents outlining the
14 intended scope of the renovation?
15     A.    That was Dr. Frazier.
16     Q.    That's Dr. Frazier?
17     A.    We couldn't enter into the
18 buildings unless someone supplied us with the
19 individuals to be able to go through the
20 building that -- you know, we couldn't --
21     Q.    I understand that.  I'm just
22 asking you who?
23     A.    Okay.  Dr. Frazier.

Page 216

1      Q.    See, your averment is at the
2  request of ASU.
3      A.    Dr. Frazier.
4      Q.    And as I've said to you, ASU
5  can't speak.
6      A.    Dr. Frazier.
7      Q.    Dr. Frazier?
8      A.    Dr. Frazier.
9      Q.    Got you.  Is there any document
10 or letter of intent or something describing or
11 confirming this?
12     A.    No.  He set up -- we set up the
13 meeting.  He had the facilities people there.
14 He had -- there were several women who -- he
15 told us that they would take us through the
16 buildings along with Dorothy Smith, who was
17 head of facilities or acting director of
18 facilities.
19         And another gentleman who -- he
20 was a white gentleman who was -- I think
21 Dorothy's assistant.  I think he was a retired
22 military guy that took us through the
23 buildings and kind of gave us details of some

Page 217

1  of the problems in the buildings.
2      Q.    Now, if you don't mind, we time
3  wise are in November of 2005, possibly
4  spilling over into December 2005.
5          And so my question would be,
6  Dr. Frazier, when did he make this request --
7  well, when did he request Marous Brothers
8  Construction to start this, at what time
9  period?
10     A.    I couldn't say.  Of course, he
11 met Marous when they came down to make their
12 presentation.  So, I don't -- I don't remember
13 when that was.
14     Q.    Well --
15     A.    I mean --
16     Q.    You've got to help me now because
17 these are your averments, and I was not there.
18 And so I'm saying to you we have gotten to
19 November 15th, 2005.
20         So, are you saying that this
21 request that Marous Brothers be hired to
22 document existing conditions, was that made
23 prior to November 15th, 2005, or after

Page 218

1 November 15th, 2005?
2    A.    I couldn't tell you. I mean, I
3 don't know. We're talking about 2005. We're
4 on 2008.
5    Q.    Well, let me just help you with
6 this now. As stated, at the request of ASU
7 and GBA -- and that's you?
8    A.    Correct.
9    Q.    So, my question is to you. When
10 did you hire the Marous Brothers?
11    A.    Shortly after we met with Dr.
12 Frazier.
13    Q.    And is that in the first meeting
14 in September of '05 or after this meeting
15 following the Board of Trustees Property
16 Committee meeting?
17    A.    It would have been shortly after
18 the meeting in '05.
19    Q.    Okay.
20    A.    The first meeting with Dr.
21 Frazier, shortly after.
22    Q.    Did you at any point in time send
23 to Marous Brothers an engagement letter

Page 219

1 outlining what they were supposed to do and
2 the scope of what they were supposed to do?
3        MR. ALLRED: Object to the form.
4        MR. THOMAS: Noted. Go ahead.
5    Q.    Did you understand the question?
6    A.    No, I didn't.
7    Q.    Did Gil Berry, did you, ever
8 write anyone with Marous Brothers outlining
9 the scope and line and dimensions of what they
10 were supposed to do?
11    A.    No.
12    Q.    Why not?
13    A.    I verbally explained that it was
14 some historical buildings that were on campus,
15 that Dr. Frazier said he had some other
16 contractors that looked at the buildings, a
17 couple of contractors told him that the
18 buildings -- this is just what Dr. Frazier
19 told me and Dick Davis.
20        A couple of contractors told him
21 that the buildings needed to be raised. And I
22 explained to Dr. Frazier that some of these
23 buildings are historical buildings. How are

Page 220

1 you going to raise historical buildings?
2        But I knew a company named Marous
3 Brothers who had a long history in historical
4 renovations. And at that initial meeting I
5 told him when we had the subsequent meeting
6 that I would bring the Marous Brothers down.
7 And that's what I did.
8    Q.    But now Dr. Frazier never talked
9 with anyone with the Marous Brothers to say
10 this is what you're going to do. It's what
11 you did, isn't it?
12    A.    That's correct.
13    Q.    Okay. I just want to make it
14 clear. Because that's what your pleadings
15 make clear, that it's your allegation that
16 Dr. Frazier, through you, had you to contact
17 the Marous Brothers to do the work.
18    A.    I told Dr. Frazier that I knew a
19 company that I could bring down. He said
20 bring them down. And that's when I had Chip
21 Marous, the president, come down personally.
22 He was met by Dr. Frazier.
23        We met Dr. Lee for a short

Page 221

1 minute. He walked in. He introduced hisself,
2 he shook our hands and he walked back out and
3 told us we were in good hands with Dr.
4 Frazier.
5    Q.    Got you. Now, at the last part
6 of Paragraph 14, "and at ASU's request
7 prepared floor plans, elevations and detailed
8 costs estimates for each of the six subject
9 dormitory buildings included in the Student
10 Residence Project, as well as corresponding
11 subject scope of work narratives."
12        Okay. Now, again, who is the --
13    A.    I don't mean to interrupt you,
14 but at lunch I had several bottles of water.
15    Q.    Any time.
16    A.    I'll make it very brief.
17    Q.    You don't have to explain.
18        (Brief recess.)
19    A.    I want to thank you for your
20 courtesy.
21    Q.    No problem.
22    A.    Go ahead, please.
23    Q.    Mr. Berry, returning back to Page

Page 222

1    4 --
2        A.    Uh-huh (affirmative).
3        Q.    -- Paragraph 14 in the last part
4    of the paragraph, "and at ASU's request
5    prepared floor plans, elevations and detailed
6    cost estimates."
7            Now, this is, I guess, activity
8    that the Marous Brothers were doing, right?
9        A.    Correct.
10       Q.    And, again, if you would identify
11   for me who is making this request of Marous
12   Brothers to do these floor plans, elevations
13   and detailed cost estimates?
14       A.    Dr. Frazier when we were told
15   whatever we needed to do, whatever we needed
16   to do, quote, that he would make it available.
17           As I stated before, we needed
18   copies of their existing building plans, and
19   we were given these plans.  Dr. Frazier called
20   down, told Dorothy Smith, head of facilities,
21   to turn over the plans to us, give us any
22   information that he had on the building, which
23   he did, about damages on the buildings,

Page 223

1    anything that they had done recently, like any
2    roofing work, any new updates, turn over all
3    documents.  And that was given to us.
4            That was documented and sent back
5    to Mr. Smith, head of facilities, by the
6    Marous Brothers.  But Dr. Frazier gave strict
7    orders for whatever we needed to turn it over
8    to us.
9        Q.    Again, now, is that Dr. Frazier
10   speaking to you and -- is it Chip Marous?
11       A.    He was speaking to me and Chip
12   Marous.
13       Q.    And, again, I'm trying to make
14   sure I understand Dr. Frazier's testimony from
15   your point of view.  He is telling you-all do
16   whatever you need to do, and I will pay you?
17       A.    He's telling us to do whatever we
18   need to do to be able to prepare the
19   documents, what we needed to prepare to be
20   able to establish what kind of work that
21   needed to be done on the dormitories.
22       Q.    When did you, Gil Berry, ask Dr.
23   Frazier specifically and directly, I am going

Page 224

1    to charge you X for doing this?
2        A.    I never said that to Dr. Frazier.
3        Q.    When did the Marous Brothers, be
4    it Chip Marous or Arne Goldman or anybody with
5    MBC, say to Dr. Frazier, I'm going to charge
6    you this for doing that?
7            MR. LYONS:  Don't answer unless
8    you specifically know what someone from Marous
9    has talked about with them.
10           THE WITNESS:  I don't know what
11   Marous has talked about with them.  Are you
12   talking about -- and I need to know what time
13   -- what time element are you talking about.
14   Any time or --
15       Q.    (By Mr. Thomas)  No.  That's why
16   I'm trying to get you focused with me on a
17   time --
18       A.    Okay.
19       Q.    -- because we do know that up
20   until the meeting of the property committee,
21   you were not expecting any remuneration.
22       A.    I always was expecting --
23       Q.    No, no, no.

Page 225

1        A.    I always was.
2        Q.    And let's clear this up right
3    now.
4        A.    No.  We need to --
5        Q.    When you said you did the
6    presentation, this right here.  I showed you
7    this document right here.
8        A.    Uh-huh (affirmative).
9        Q.    That there, right there.  You
10   called it a presentation?
11       A.    Yes, I did.
12       Q.    And you told me without any
13   equivocation you did not expect any payment
14   for doing that?
15       A.    Yeah, in September.
16       Q.    Right.  And that's what I'm
17   trying to get you to --
18       A.    Yeah.  That is totally correct.
19       Q.    Okay.  All right.  So, now we
20   agree that in September of 2005 you're not
21   looking for payment?
22       A.    No.
23       Q.    All right.  Now, we move into the

Page 226

1  November of 2005 time frame.
2     A.    Uh-huh (affirmative).
3     Q.    Are you now expecting payment?
4     A.    Well, we -- I was expecting
5  payment shortly after they rejected the $51
6  million in -- I think it was November 9th.
7     Q.    Okay. Hold on a second now. And
8  we're going to go back through this because
9  we've got to follow this very carefully.
10    A.    Uh-huh (affirmative).
11    Q.    $51 million is identified
12 September 20th, 2005.
13    A.    Okay.
14    Q.    You see $51 million, right?
15    A.    Okay. Well, September 20th.
16    Q.    The 20th. Okay?
17    A.    Uh-huh (affirmative).
18    Q.    And that's the same time you sent
19 your presentation?
20    A.    Uh-huh (affirmative).
21    Q.    All right. You're not expecting
22 money now?
23    A.    No.

Page 227

1     Q.    So, it's after this?
2     A.    Because that was our
3  presentation.
4     Q.    Your presentation?
5     A.    Uh-huh (affirmative).
6     Q.    Now, so, when is it that you're
7  expecting payment?
8     A.    Shortly after that this was
9  rejected --
10    Q.    By Mr. Gallot?
11    A.    -- the 51 million, and we were
12 requested to back into a number between $20 to
13 $25 million.
14    Q.    Now, what time period do you put
15 on that?
16    A.    It was somewhere in between --
17 after September 20th and early November.
18    Q.    Okay. So, that's September of
19 '05 to November '05. And who is -- who did
20 you say to at ASU that you were expecting
21 payment for work to be done?
22    A.    At that time I can't recall
23 saying it to anyone, but I expected payment.

Page 228

1     Q.    Well, again, but --
2     A.    I mean, you asked me, and I told
3  you.
4     Q.    Okay.
5     A.    At that time I didn't speak to
6  anyone.
7     Q.    Well, did you at any point in
8  time when Dr. Frazier was giving you access to
9  the six dormitories --
10    A.    Uh-huh (affirmative).
11    Q.    -- at any time when you had
12 contacted the Marous Brothers to come on site
13 --
14    A.    Uh-huh (affirmative).
15    Q.    -- did you inform anyone at ASU
16 that payment would have to be remitted for
17 services to be performed?
18    A.    I was waiting, you know. I mean,
19 there's documents --
20    Q.    No. Don't worry. We're okay on
21 this side.
22    A.    Okay.
23    Q.    Did you?

Page 229

1     A.    No.
2     Q.    Now, Mr. Berry, if I may,
3  Paragraph 15. You aver that in May 2006, upon
4  reliance on the representations and resolution
5  of the Board of ASU and President Lee, Marous
6  provided its proprietary work product to ASU
7  in spiral-bound, 11x17 format; is that
8  correct?
9     A.    Correct.
10    Q.    Who provided that information to
11 ASU, the spiral bound, 11x17 format? How was
12 it given to ASU and by whom?
13    A.    It was given to me to give to
14 ASU. Arne Goldman brought several. I gave
15 Dr. Frazier several of them. I'm trying to
16 think. Charles Smith.
17    Q.    Dr. Smith?
18    A.    Yes.
19    Q.    You gave them out?
20    A.    Yes.
21    Q.    Okay.
22    A.    Arne Goldman was with me.
23    Q.    But, again, my question to you

1  Gil Berry gave the document to Dr. Frazier?
2    A.   Correct.
3    Q.   Gil Berry gave the document to
4  Dr. Smith?
5    A.   Correct.
6    Q.   All right.  Who else did you give
7  it to?
8    A.   Dr. Lee, President Lee, asked for
9  one because he said he didn't get one, and
10 then he realized that he did have one.
11   Q.   Let me show this to you for
12 identification purposes.  As you can see, it
13 is a -- it has a Gil Berry Bates stamp on it.
14 Do you see it at the bottom there?
15   A.   Yes.
16   Q.   Do you recognize it?
17   A.   Yes, I do.
18        MR. THOMAS:  If I may, let me
19 have the court reporter to mark this.
20        (Whereupon, said document was
21        marked for identification as
22        Defendant's Exhibit No. 8 to the
23        deposition of Gilbert C. Berry.)

1    Q.   Again, Mr. Berry, let me show you
2  what has been marked as Defendant's Exhibit 8.
3  And I only have one copy.
4        Is that the document that you
5  gave to Dr. Frazier, Dr. Smith and President
6  Lee?
7    A.   Yes.  This was Marous Brothers'
8  work product.
9        MR. THOMAS:  Okay.  We'll ask
10 that that be made a part of his deposition.
11   Q.   Now, in Paragraph 15 there is a
12 reference to reliance on representations.  As
13 Gil Berry and Gil Berry & Associates, what
14 representations were made to you and by whom?
15   A.   Of course -- well --
16        MR. LYONS:  Let me clarify
17 something.  I think 15 speaks only to what
18 Marous did in reliance on representations.
19   Q.   (By Mr. Thomas)  Well, let me ask
20 this question.  Is Paragraph 15 a -- I guess
21 an allegation that's being made by Gil Berry &
22 Associates, or is that Plaintiff Marous
23 Brothers Construction?

1    A.   I would say I'm -- I'm making
2  that.
3    Q.   You're making that?
4    A.   Uh-huh (affirmative).
5    Q.   All right.  Now, having answered
6  as such, what reliance on representations are
7  you making reference to in this averment?
8    A.   Judge Wiggins told me that we
9  would get paid.
10   Q.   Hold on a second now.  Judge
11 Wiggins?
12   A.   Uh-huh (affirmative).
13   Q.   Told you you would get paid?
14   A.   Yes.
15   Q.   And when did Judge Wiggins tell
16 you that?
17   A.   On several occasions.  I mean, I
18 can't tell you how many times he's told me,
19 but it was numerous times.  President Lee
20 called me personally and told me.
21   Q.   We'll do it one at a time.  We'll
22 do it one at a time.
23   A.   Okay.

1    Q.   This is Judge Wiggins?
2    A.   Yes.
3    Q.   May 2006 is the way you start the
4  allegation.  Okay?
5    A.   Okay.
6    Q.   As it relates to May 2006, when
7  did Judge Wiggins tell you you would get paid?
8    A.   On numerous occasions.
9    Q.   Did he tell you in May of 2006?
10   A.   I can't tell what the dates are,
11 but on numerous occasions Judge Wiggins
12 reassured me that I would be paid for the work
13 that me and Marous and Student Suites were
14 doing.
15   Q.   Did you on any occasion tell
16 Judge Wiggins what your fees for professional
17 services would be?
18        Did you on any occasion tell
19 Judge Wiggins what your professional services
20 -- what your fees for professional services
21 would be?
22   A.   The time we were talking at
23 first, he said that we would be paid our

Page 234

1  expenses and that we needed to submit our
2  expenses, which we did.
3      Q.    Judge Wiggins told you that?
4      A.    Yes.  I made -- and I brought it
5  up again at the meeting where you were
6  present, Mr. Gallot was present, the president
7  was present, your associate was present, me
8  and Dick and Rick were sitting -- Dick's
9  partner, Steve Pappa was sitting there.
10         Prior to taking this document and
11  these documents up to New York for the bonds,
12  I made a -- I said when -- because Mr. Blunt
13  made a statement I'm not doing this work.  I
14  need to get paid.  I said, guys, we need to
15  get paid for our expenses also.  I said we
16  will be submitting our expenses at that
17  meeting with your bond counsel, everyone.  I
18  made the statement.  I made the statement.
19         You said that we -- and Dick
20  needed to go and get incorporated because we
21  were individuals.  And that's how we knew that
22  we needed to go get incorporated as -- and
23  that's what we did.  We got incorporated as an

Page 235

1  Alabama licensed company because it was
2  brought up at that meeting for us to actually
3  be able to do that we had to be incorporated.
4      Q.    We'll get to it later on.  But
5  you're --
6      A.    Okay.
7      Q.    -- saying that I gave you -- did
8  you pay me for my legal advice?
9      A.    No.  But if you want to charge
10  me, put it on the bill with everything else.
11      Q.    Well, I'm just trying to say.  Is
12  it your testimony her under oath that I
13  advised you and Dick Davis on how to do
14  business in Alabama?  Is that what you're
15  telling the Court?
16      A.    Well, that's what I'm saying.
17      Q.    Do you have anything in writing?
18  Did I write you a legal opinion?
19      A.    No.  You said it at the table
20  with everybody else.
21      Q.    And who you say heard it?
22      A.    Everybody at this -- Dr. Lee was
23  there, Mr. Gallot was there, the bond counsel

Page 236

1  that ASU had, Steve Pappa.
2         And if you notice, shortly after
3  that we went and did that.  We hadn't done it
4  prior to that.
5      Q.    Let me get this straight at this
6  point.  Do you know Wyatt Haskell?
7      A.    Do I know Wyatt Haskell?
8      Q.    Yes.  Haskell, Slaughter.
9      A.    Yes, I know Wyatt Haskell.
10      Q.    And isn't it a fact that the
11  Haskell, Slaughter law firm has been
12  representing you on your ventures with ASU all
13  this time?
14      A.    That's correct.
15      Q.    And you know Wyatt Haskell has a
16  wonderful reputation as a lawyer?
17      A.    Correct.
18      Q.    Throughout maybe the Southeast,
19  but throughout the nation?
20      A.    I don't know about all of that,
21  but I understand he has a good reputation.
22      Q.    And you're trying to say to me
23  that Kenneth Thomas advised you and you took

Page 237

1  that advice over your -- notwithstanding you
2  had a lawyer named Wyatt Haskell who was
3  representing you?
4      A.    I'm telling you the statement was
5  made at the meeting, and shortly after that me
6  and Dick went and got incorporated in the
7  State of Alabama.
8      Q.    Okay.  Again -- and we'll get to
9  this later -- but you don't dispute that all
10  of these times that you were having
11  relationships with ASU you were represented by
12  lawyers?
13      A.    We were represented by Mr.
14  Haskell, correct.
15      Q.    Got you.
16      A.    Okay.
17      Q.    Now, after Judge Wiggins, who
18  else made a representation to you that you
19  relied upon?
20      A.    Mr. Crutcher.
21      Q.    Is that Buford Crutcher?
22      A.    Uh-huh (affirmative).
23      Q.    And what did Trustee Crutcher say

Page 238

1  to you?
2      A.    Shortly that we would be able to
3  start the project, and that we had have the
4  contract. On numerous occasions.
5      Q.    Using the May 2006 date that you
6  have in your complaint, can you kind of guess
7  when Trustee Crutcher may have made that
8  statement to you?
9      A.    No. But I do remember one
10  instance when he called me and said that he
11  tried to get it passed at a property meeting
12  and Herbert Young --
13      Q.    Did you ever tell Trustee
14  Crutcher what your fees are or expenses would
15  be for professional services?
16      A.    No, sir.
17      Q.    Trustee Wiggins and Trustee
18  Crutcher are telling you that you will get
19  paid, but you're not telling them how much
20  you're charging?
21      A.    We had a -- we had a -- we had --
22  we were asked to do a $20 to $25 million
23  back-in agreement to do six dormitories.

Page 239

1  Again, we completed that request with this
2  work product, and all other documents that
3  were requested, schedules and everything, to
4  go up to the bond market to get the $25
5  million to renovate six dormitories.
6          No one ever asked us what our
7  fees were. But when asked by you to me what
8  our fees were -- you asked me to put it in
9  writing because they wanted to know -- we
10  immediately did that.
11          Our process has always been an
12  open, transparent process. Even when you
13  didn't want us -- you asked Dick Davis to tell
14  me do not have an open process any longer.
15  When I contacted President Lee, you said tell
16  Gil.
17          And Dick called me, and I said,
18  Dick, we have always had an open process. He
19  said Kenny wants you not to be sending out
20  E-mails to everybody. I said our process has
21  always been open and transparent, and I will
22  continue to do that. I have always done it.
23          The bottom line is, no, I didn't

Page 240

1  tell him what my fees were because they were
2  never asked. When asked, we immediately put
3  the fees in writing and sent them to you. I
4  had no problem doing it.
5      Q.    Who else told you or made
6  representations to you that you rely upon?
7      A.    Chairman Dean.
8      Q.    And what did Chairman Dean say to
9  you?
10      A.    That he was working out the
11  details of the project. He said that the
12  president was -- wanted to get his arms around
13  the project and thought that we had jumped
14  over the president and went strictly working
15  with the board and that he was going to bring
16  Mr. Upchurch and Mr. Thomas on to get the
17  president up to -- up to par.
18          And shortly after this, we could
19  put this all to bed and we can get started on
20  the work.
21      Q.    Did you ever share with Chairman
22  Dean what your fees would be?
23      A.    I never was asked. And, no, I

Page 241

1  never shared them.
2      Q.    Now, who else made
3  representations to you that you relied upon?
4      A.    Like I said, the president. He
5  called one afternoon and said, Mr. Berry, I
6  have been asked by Mr. Gallot that you have
7  made requests for your expense payments.
8          First of all, he told me, he
9  said, I called your number and your number
10  ain't working. And it was I guess my
11  answering service. And then he -- or he
12  called a number and it wasn't working, and I
13  think my answering service -- they did, they
14  called me and said the President of Alabama
15  State was trying to get in touch with me.
16          I immediately called him back,
17  apologized if he had any problems with the
18  number. We briefly talked about it. And he
19  said, Mr. Berry, he says, I got these requests
20  for your payments on your and Marous'
21  expenses. He says we have money in the
22  budget, but it's not that much money. He
23  says, you know, we're looking to sometime in

Page 242

1   July to get the bonds, close on the bonds.
2          And I'll pay you everything that
3   I owe you and you guys can actually start the
4   work. And I went on to tell him that if it
5   was any problem, if was going to cause the
6   school any problem on paying us right now,
7   that I would -- me and Marous would hold out
8   until they got the money. We didn't want to
9   put any restraints on the college.
10         And he said, thank you. And I
11  told him if there was anything that I could
12  ever do, please, do not hesitate to call me.
13  He thanked me and I thanked him, and we hung
14  up.
15     Q.    Who else made representations to
16  you that you relied upon?
17     A.    Basically, I talked to Judge
18  Wiggins. Me and Judge Wiggins would at least
19  talk two or three times a week. We probably
20  talked over that 15-month period probably in
21  the neighborhood of 70 times.
22         Buford Crutcher, probably 50.
23  Elton Dean, probably -- I don't know. Maybe

Page 243

1   ten times by phone. I seen him several times.
2          Alfred Seawright, I talked to
3   Alfred on many occasions. Me and Alfred would
4   probably talk two or three times a week, and
5   he would inform me that the process of the
6   dormitories was moving in a positive
7   direction, that he had talked to Chairman Dean
8   and to Buford and to others.
9      Q.    Now, who's Alfred Seawright?
10     A.    Alfred Seawright is a gentleman
11  who I met several years ago.
12     Q.    That would have been 2001 or so?
13     A.    No. That was probably in 1993.
14     Q.    That would have been a little bit
15  more than several?
16     A.    Okay.
17     Q.    A decade and a half.
18     A.    Okay.
19     Q.    Okay. And who is he, other than
20  being a gentleman?
21     A.    Alfred Seawright is a gentleman
22  who was -- James Harold called me up, said he
23  had a friend that sold medical supplies. His

Page 244

1   name was Alfred Seawright. He was coming to
2   Pittsburgh. He said would I assist him. He
3   was trying to secure some contracts in the
4   City of Pittsburgh in the medical supply
5   business. And I did.
6      Q.    Do you consider Mr. Seawright to
7   be a friend of yours?
8      A.    I consider Alfred Seawright to be
9   a talking associate. We never had a problem.
10  I assisted him. When I came here to Alabama,
11  he was very cordial to me. In return, I
12  thought I had been very cordial to him.
13     Q.    Well, how would Alfred Seawright
14  know how the housing needs at ASU were
15  progressing? I mean, how would he know?
16     A.    Because him and Chairman Dean are
17  dear friends, and several times I have talked
18  to Chairman Dean from Alfred Seawright's
19  telephone at his office.
20     Q.    Define dear friend.
21     A.    Huh?
22     Q.    Define dear friend.
23     A.    I can't say that. He said that

Page 245

1   they're dear friends. I didn't say that. He
2   said it.
3      Q.    Who said that?
4      A.    Alfred Seawright. He said they
5   had business relationships, that chairman sold
6   -- excuse me, Mr. Dean sold real estate. He
7   bought real estate from him.
8      Q.    Again, if you don't mind,
9   representation from people who are officials
10  at ASU. Because I think your lawsuit is
11  against ASU, right?
12     A.    Well --
13     Q.    I mean, Alfred Seawright at the
14  times that you're describing had no
15  affiliation with ASU, am I correct?
16     A.    Well, he told me he was going to
17  be on the board of ASU. And from my
18  understanding, he's now on the board. So, I
19  guess he had a lot of --
20     Q.    When did you last talk to Alfred
21  Seawright?
22     A.    Well, since the lawsuit he hasn't
23  called me anymore, but up until that point we

Page 246

1  talked on a regular basis.
2      Q.    You filed your lawsuit in May of
3  2007.
4      A.    We talked shortly after that. He
5  called me several times after that and was
6  trying to -- he told me he was trying to work
7  it -- work it out for me.
8      Q.    He told you that in May 2007?
9      A.    Shortly after the lawsuit, he
10 called me several times and had went to
11 several individuals, that he told me, to try
12 to work it out.
13     Q.    What else did Mr. Seawright tell
14 you?
15     A.    Had said that he was going to
16 talk to John Chambless to see if John could
17 talk to Mr. Knight and Mr. Dean about working
18 this problem out.
19     Q.    You said Mr. Knight. Who is
20 that?
21     A.    Senator Knight.
22     Q.    Is he in this room?
23     A.    Yes, he is.

Page 247

1      Q.    Representative Knight?
2      A.    State Representative Knight.
3      Q.    Okay. John Knight?
4      A.    John Knight.
5      Q.    Have you ever had any
6  communication with John Knight?
7      A.    No. Just one communication
8  briefly.
9      Q.    When?
10     A.    Right after the board meeting.
11     Q.    What, if anything, did he say to
12 you.
13     A.    I just told him that a friend
14 that was -- used to be a TV anchor said to
15 tell him hello and mentioned their name. And
16 that was it. I never had any other
17 conversations with him.
18     Q.    What did Representative Knight
19 say to you?
20     A.    He said he knew her. And that
21 was it.
22     Q.    Mr. Knight ever had any
23 discussion with you about ASU housing needs?

Page 248

1      A.    Never.
2      Q.    Did Mr. Seawright, I guess, make
3  any other referrals or references for you?
4      A.    He said he was going to talk to
5  Chairman Dean. He said he was going to talk
6  to one of your partners in your law office
7  that he knew. I can't remember who -- who he
8  named. He said that he was a friend of his.
9      Q.    And what was he going to talk to
10 him about?
11     A.    He said he would try to see if he
12 could get the case where we could get -- get
13 the contract back.
14     Q.    What else did Mr. Seawright tell
15 you?
16     A.    That was basically it.
17     Q.    We're in litigation now. It's
18 got to be a little bit more than basically. I
19 can't have generalities.
20     A.    Okay. Well, that's --
21     Q.    What else did he tell you?
22     A.    That's all he told me.
23     Q.    Got you. Okay. Because at trial

Page 249

1  I don't want you to come up with nothing new.
2      A.    Well, trust me, I'm not coming up
3  with nothing new.
4      Q.    I mean, if you come up with
5  anything new, now you're obligated to tell
6  your attorney so he can tell me before you
7  take the witness stand.
8      A.    That is fine.
9      Q.    You understand that, right?
10     A.    I totally understand.
11     Q.    Okay. And that's regarding
12 everything you've told me here today.
13     A.    Everything. Trust me.
14     Q.    That what you've told me and that
15 what you're going to tell me.
16     A.    And I'll be glad to tell it
17 again.
18     Q.    Got you. All right. Now,
19 anybody else who is affiliated -- I'm sorry,
20 who is an ASU official who made a
21 representation that you say you relied on?
22     A.    No.
23     Q.    Okay. Do you know Joe Reed?

1    A.    Yes, I know Joe.
2    Q.    When is the last time you talked
3  to Joe Reed?
4    A.    The first time I ever talked to
5  Joe Reed was at --
6        MR. LYONS:  He asked you the last
7  time.
8        THE WITNESS:  Oh.  That was over
9  a year ago.
10   Q.    (By Mr. Thomas)  A year ago would
11  be 2007.
12   A.    Yes.
13   Q.    And what did you discuss with
14  Trustee Joe Reed?
15   A.    I was just -- I was introduced to
16  him.
17   Q.    By whom?
18   A.    I think Q.  I guess -- that's all
19  I know him by.  He owned the bar down there.
20  At the State House there was a bar that was on
21  the lower level.  I just know him by Q.
22   Q.    Q?
23   A.    Uh-huh (affirmative).

1    Q.    And what did you and Joe Reed
2  talk about?
3    A.    He introduced me to Joe.  I said,
4  how you doing, Mr. Reed?  And that was it.
5    Q.    Have you ever talked with Joe
6  Reed about housing needs at ASU?
7    A.    Never.
8    Q.    Have you ever had James Harold to
9  talk with Joe Reed about housing needs at ASU?
10   A.    Never.
11   Q.    Have you ever had James Harold to
12  pitch Gil Berry & Associates to Joe Reed for
13  housing services at ASU?
14   A.    Never.  It was indicated to me
15  not to talk to Joe Reed.
16   Q.    Who indicated that to you?
17   A.    Alfred Seawright told me that Joe
18  Reed wasn't a friend of Elton Dean's and
19  others on the board and that I should not talk
20  to Joe Reed because that I definitely would
21  not get any work at ASU if I talked to Joe
22  Reed.
23   Q.    You sure Mr. Seawright said that

1  to you?
2    A.    I'm positive Mr. Seawright said
3  that to me.
4    Q.    Now, who are some of the others?
5    A.    He said that Mr. Crutcher and
6  Judge Wiggins would not like that.  He said
7  that they're trying to get rid of Joe.  He
8  said they were trying to get rid of Cathy
9  Wright.  He said that Joe has been a thorn in
10  the side.
11       Joe is no longer going to be on
12  the board because Joe is -- I guess somehow
13  Joe was turning 70 or something, and they were
14  going to get Joe off the board.
15   Q.    Okay.  Have we pretty much gone
16  through all of the representations?
17       Did you mention to Joe Reed
18  anything about your fees when you met him up
19  there with Q?
20   A.    I just said, hello, Mr. Reed.
21  And I shook his hand, and that was it.  I have
22  never had a conversation in my life besides
23  what I just told you with Joe Reed.

1    Q.    Okay.  Now if I may, let me show
2  you --
3        MR. THOMAS:  Let me have that
4  marked as Defendant's Exhibit No. 9.
5        (Whereupon, said document was
6        marked for identification as
7        Defendant's Exhibit No. 9 to the
8        deposition of Gilbert C. Berry.)
9    Q.    And if you and Mr. Lyons would
10  take a look at that.  And, again, I'm sorry,
11  Mr. Berry.  Whenever you're finished just look
12  up.
13   A.    Okay.
14       MR. LYONS:  And is there anything
15  particular you want him to look at?  It's
16  several pages.
17       MR. THOMAS:  Yeah.  Why don't you
18  take him to -- if you would, take him to Page
19  5.
20   Q.    Now, after you're finished, Mr.
21  Berry, just look up.
22   A.    Yes, sir.  Go ahead.
23   Q.    Now, as you will see here,

Page 254

1  especially at the bottom, you'll see the Bates
2  stamp says --
3         Have you ever seen this document
4  before?
5     A.   No, sir.
6     Q.   This purports to be the Board
7  minutes from the May 5th, 2006, meeting of the
8  Board of Trustees for Alabama State
9  University.
10    A.   Okay.
11    Q.   Now, after looking at Page 5, if
12 you would, flip back toward the end toward
13 Page 9.
14    A.   (Complies).
15    Q.   The next page.  That's nine.
16    A.   Okay.
17    Q.   Now, this is a document that is
18 styled resolution.  And if you will look at
19 the bottom, it says Student Suites, Marous
20 Brothers, Gil Berry & Associates?
21    A.   Correct.
22    Q.   Have you ever seen this before?
23    A.   I think I -- yes, I think I have

Page 255

1  seen this.
2     Q.   Now, if I may ask -- and let me
3  ask just ask this.
4     A.   Let me just take one minute here.
5     Q.   Take your time.  I'm sorry.
6     A.   Okay.
7     Q.   Have you ever seen this?
8     A.   Yes, sir.
9     Q.   Now, what I have gathered from a
10 lot of the documents going back and forth, the
11 team had a standard type of stationery -- and
12 when I say the team, Student Suites, Marous
13 Brothers and Gil Berry -- because I've seen
14 this little decal on a lot of things that have
15 been circulated here.
16        Is that generally correct?
17    A.   Yeah.  I think Dick had put this
18 together in his office, correct.
19    Q.   Got you.  Had this ever been --
20 did you prepare this?
21    A.   Never.
22    Q.   You know who prepared it?
23    A.   It would probably be Dick.

Page 256

1     Q.   Dick Davis of Student Suites?
2     A.   Uh-huh (affirmative).
3     Q.   And this whole project that
4  you-all were proposing at ASU was supposed to
5  be done by Student Suites, Marous Brothers and
6  Gil Berry; is that a fair statement?
7     A.   That is a fair statement.
8     Q.   Okay.  Are there any type of
9  engagement agreements or intent agreements
10 between the three of you-all on this project
11 for ASU?
12    A.   The only agreements that I would
13 say is that they -- Marous Brothers prepared
14 the scope of work and what the fees were, and
15 me and Dick prepared ours.
16        And we compiled that information
17 to come up with the price that was given to
18 the University, yes, sir.
19    Q.   Got you.  Now, on this document
20 -- have you had a chance to review it?
21    A.   This whole document?
22    Q.   Uh-huh (affirmative).
23    A.   No, sir, I haven't.

Page 257

1     Q.   No, no.  The resolution.
2     A.   Oh, oh, yeah.  The resolution,
3  yes, sir.
4     Q.   It says be it resolved that the
5  Board of Trustees designates Student Suites,
6  Inc. and Gil Berry and Associates as its
7  developers for the purpose of presenting a
8  plan to design, build, renovate and finance a
9  Proposed Student Housing Redevelopment Master
10 Plan per the proposal presented on October 28,
11 2005, and revised November 9, 2005.
12        Now, I had asked you earlier
13 about a proposal dated October 28th, 2005.  Do
14 you recall that earlier this morning?
15    A.   Yes, sir.
16    Q.   Okay.  And I shared with you I've
17 never seen the document.
18    A.   Uh-huh (affirmative).
19    Q.   But I do have and I have seen
20 some documents that came from you, Gil Berry.
21 And I'll show you this.
22        MR. THOMAS:  Let's go ahead and
23 have this marked as Defendant's Exhibit No.

Page 258

```
 1   10.
 2              (Whereupon, said document was
 3         marked for identification as
 4         Defendant's Exhibit No. 10 to the
 5         deposition of Gilbert C. Berry.)
 6    Q.    Take a look at that, Mr. Lyons,
 7   with Mr. Berry.
 8         MR. LAWSON:  While he's looking
 9   at that, do you want me to get a couple of
10   copies of that made real quick?
11         MR. THOMAS:  Yeah.
12         (Brief recess.)
13    Q.    Again, Mr. Berry --
14    A.    Yes, sir.
15    Q.    -- again, I think I had you at
16   the point of the resolution that is before you
17   on Defendant's Exhibit 9.
18    A.    Correct.
19    Q.    And I have marked -- before you
20   is Defendant's Exhibit 10; is that correct?
21    A.    That is correct.
22    Q.    Right.  And at the resolution,
23   which is back, earlier I had asked you about a
```

Page 259

```
 1   master proposal that was presented October
 2   28th, 2005, and I think you said that you
 3   would try to look at whatever records you may
 4   have to see if you have that.
 5    A.    Yes, sir.
 6    Q.    And this is something that's
 7   dated November 9th, 2005?
 8    A.    Yes, sir.
 9    Q.    And if you notice at the bottom
10   it has a Gil Berry production number of 415.
11    A.    That is correct.
12    Q.    So, this is something you-all
13   produced.  Okay?
14    A.    Yes, sir.
15    Q.    Now, you're familiar with this
16   document?
17    A.    I'm really not familiar with this
18   document, and I have a discrepancy in this
19   document.
20    Q.    Okay.
21    A.    First of all, if you look on page
22   -- the first page, on November 9th this
23   document is talking about -- if you would go
```

Page 260

```
 1   to the second paragraph, it's talking about
 2   3,000 beds.
 3         Now, if you flip over, the
 4   document that's talking about student housing
 5   plan, all this document is talking about is
 6   388 beds with a renovation of existing units.
 7         So, the renovation of the
 8   existing units were only 2,200 beds with new
 9   construction of 388 beds.  So, it has nothing
10   to do with a letter in front of this thing
11   stating 3,000 beds.
12         So, there are two different
13   documents put together by somebody, and I
14   don't know who put those together.
15    Q.    Now, follow me on this.
16    A.    Okay.
17    Q.    Look at the bottom.  It says Gil
18   Berry 415.  Do you see that at the bottom?
19    A.    Yes, sir.
20    Q.    The next page is 416.
21    A.    Uh-huh (affirmative).
22    Q.    The next one is 417?
23    A.    Okay.
```

Page 261

```
 1    Q.    418, 419, 420 and 421, all
 2   consecutively stamped.  And I'm not trying to
 3   take issue with you, but I need to explain to
 4   you why I am presenting it to you in this
 5   format.
 6    A.    Okay.
 7    Q.    Because that's the way your
 8   lawyers presented it to it to me.
 9    A.    Okay.
10    Q.    And like I explained to you, I
11   had never seen the one dated October 28th,
12   2005.  So, when I ran across the one that said
13   November 9th, 2005, I just thought this was
14   the right document.  I have no knowledge of
15   it, is what I'm saying.
16    A.    Okay.  Well, I agree on the
17   letter, but I don't agree that these two --
18   the letter and the comments in the back of it
19   coincide together because they really don't
20   coincide.
21         If you do the math, we're talking
22   about in the letter 3,000 beds; and if you
23   turn to the student housing plan, that's a
```

1 totally different -- different document
2 altogether. And even if you calculate it, you
3 wouldn't calculate 3,000 beds.
4    Q.    Well, let's do this if you don't
5 mind.
6    A.    Yes, sir.
7    Q.    Would you have any objections
8 with getting with your lawyer to compose the
9 correct document and get it to me?
10    A.    If --
11    Q.    I mean, you-all were the ones
12 that -- in other words, not you-all. I didn't
13 meant to say it like that.
14        But the document was produced to
15 me in this format. Okay?
16    A.    Okay.
17    Q.    And all I'm saying to you, to
18 make it reflect what you think it should be.
19 I think the burden is on you to correct it,
20 and just let me look at it again. That's all.
21    A.    Okay.
22    Q.    Is that all right?
23    A.    I have no problem with that.

1    Q.    So, if you don't mind --
2        MR. THOMAS: And Mr. Lyons, if I
3 could, could I have it like admitted with that
4 understanding that the plaintiff is to
5 reformat and get it back?
6        MR. LYONS: To the extent we can.
7        THE WITNESS: Yeah.
8    Q.    (By Mr. Thomas) I got you. But,
9 again, I think we all will accept for purposes
10 of today that this is not the document that
11 you submitted?
12    A.    No, it's not. No, sir.
13        MR. THOMAS: Okay. Well, we'll
14 have that one attached to it with those
15 comments a part of it.
16    Q.    Now, returning back to the
17 resolution, again, we got the common
18 stationery here. So, I'm assuming you, Dick
19 Davis or Chip Marous prepared this?
20    A.    It would probably have to be Dick
21 Davis.
22    Q.    Now, did you ever see it before
23 it was submitted?

1    A.    I can't say I have. I really
2 can't say I have.
3    Q.    All right. Let me ask you this.
4 Going now to the last part of the resolution.
5    A.    Okay.
6    Q.    All of the services, which will
7 be performed by said developers, Student
8 Suites and Gil Berry & Associates, will be
9 without cost to the University. Are you
10 familiar with that language?
11    A.    I see it here.
12    Q.    Now, my question to you: This
13 resolution was prepared by, according to you,
14 Dick Davis?
15    A.    Correct.
16    Q.    Now, Dick Davis was on your team
17 that was making the proposal?
18    A.    At that time until we all came
19 together Dick Davis was -- he was on our team,
20 but he was an individual owned -- Student
21 Suites was a separate corporation from Gil
22 Berry and Marous.
23    Q.    Right. All of you -- as you have

1 explained all day, the three of you-all
2 brought three different pieces to the table?
3    A.    Correct.
4    Q.    You brought the wealth of
5 knowledge?
6    A.    Uh-huh (affirmative).
7    Q.    Dick brought the financing?
8    A.    Uh-huh (affirmative).
9    Q.    Marous brought the construction?
10    A.    Uh-huh (affirmative).
11    Q.    You were a team?
12    A.    Uh-huh (affirmative).
13    Q.    You proposed the plan. Now, my
14 question to you: As a member of the team,
15 wherein a resolution was prepared by a member
16 of the team, all of the services, which will
17 be performed by said developers, will be
18 without cost to the University --
19    A.    Uh-huh (affirmative)
20    Q.    -- is that the language of the
21 team?
22    A.    That's not the language of mine.
23    Q.    So, this doesn't relate to Gil

Page 266

1  Berry?
2      A.    If it did, it would be a
3  signature of Gil Berry's.  As you've pointed
4  out in the letters, if I had my signature on
5  it, I have a knowledge that that is what I
6  agree upon.
7      Q.    Okay.  Well, let me ask you this
8  though.
9      A.    Okay.
10     Q.    It is a fair statement that Dick
11 Davis and Student Suites interfaced, had
12 contact with, ASU's officials just as much as
13 you did?
14     A.    If you would just give me a
15 minute.  That's true.
16     Q.    Okay.  So, when -- I guess -- did
17 Dick ever explain to you why he submitted this
18 to the University to review and approve?
19     A.    This usually accompanied the
20 initial proposal.
21     Q.    Uh-huh (affirmative).
22     A.    And final agreement and final
23 financing isn't really part of it until the

Page 267

1  financing is complete and the -- the actual
2  documents are submitted for financing and the
3  plans are approved or either accepted by the
4  University.
5      Q.    Okay.  Let me take you back to
6  Defendant's Exhibit 5.
7      A.    Okay.
8      Q.    And this is a letter, November
9  9th, 2005, Dick Davis, Gil Berry.
10     A.    Uh-huh (affirmative).
11     Q.    Resolution.
12     A.    Can I see that?
13     A.    Yes.  I'm sorry.
14     A.    And then, again, we're talking
15 about the 3,000 beds for $51 million --
16     Q.    I understand.
17     A.    -- which was rejected.
18     Q.    Again, but what I'm talking --
19     A.    So --
20     Q.    Excuse me.
21     A.    Uh-huh (affirmative).
22     Q.    What I'm talking about, though,
23 is your resolution.

Page 268

1      A.    Yes.
2      Q.    And your resolution, although we
3  had some interpretive differences about the
4  language, there is there it is mutually
5  understood that if a final agreement is not
6  reached on more detailed design and financial
7  structures that this resolution will become
8  void with no expense to ASU, right?
9      A.    And it did become void because we
10 -- it was the $51 million deal that got
11 rejected.
12     Q.    Got you.
13     A.    But the $25 million deal got
14 accepted and got financed and was approved.
15     Q.    And in this resolution here
16 that's on the team stationery it talks about
17 all of the services which will be performed by
18 said developers, Gil Berry and Student Suites,
19 will be without cost to the University, right?
20 That's what it says?
21     A.    That's what it says.
22     Q.    Okay.  So, when you're trying to
23 get the deal, you prepare the resolutions that

Page 269

1  make it attractive, am I correct?
2      A.    Dick prepared the resolutions.
3      Q.    No, no.  You prepared -- what
4  now?
5      A.    He's the finance guy.  It talks
6  about financing, and Dick is the finance guy.
7      Q.    I understand that.  And I don't
8  run from that.
9      A.    Okay.
10     Q.    That version of it.  But you have
11 already agreed that the September 9th --
12 November 9th 2005, where your name appeared --
13     A.    Uh-huh (affirmative).
14     Q.    -- with this resolution there's
15 that understanding that ASU doesn't owe you
16 anything unless things were consummated?
17     A.    That's because we were bringing
18 our own financing with this.  The game changed
19 when ASU said that they would come up with
20 their own financing, and that's what they did.
21     Q.    So, now in May of 2006, we
22 understand what we're doing; am I correct?  We
23 got six dormitories.

Page 270

1      A.    Uh-huh (affirmative).
2      Q.    You're doing your schemes and
3  your designs, am I correct?
4      A.    Correct.
5      Q.    Marous Brothers on board?
6      A.    Uh-huh (affirmative).
7      Q.    Dick Davis, Student Suites?
8      A.    Correct.
9      Q.    Gil Berry & Associates?
10      A.    Correct.
11      Q.    And you-all are telling the
12  University all your services will be performed
13  by said developers without cost to the
14  University?
15      A.    But then we're supposed to be
16  building 388 new ones approved by the
17  president by saying go ahead and look at the
18  land, go down to Savannah, go do this.  And
19  you know what?  That don't happen either
20  because that gets rejected.
21      Q.    So, now we're at a point in time,
22  notwithstanding your resolutions,
23  notwithstanding whatever you've told people

Page 271

1  what your fees are, you're saying that there's
2  some right for ASU to pay you?
3      A.    Correct, correct, correct.
4      Q.    All right.  Let's go to Paragraph
5  16, back to the complaint.
6      A.    Okay.  Let me give you that back.
7      Q.    Yeah.
8      A.    Do you want this one back, too?
9      Q.    You can just stack it there for
10  the court reporter.  She'll keep all of these.
11      A.    Okay.
12      Q.    On May 23rd, 2006, Gil Berry
13  submitted to Freddie Gallot, Jr., Vice
14  President of Fiscal Affairs for ASU, an
15  invoice related to Part One Preconstruction
16  Services.
17          (Whereupon, said document was
18           marked for identification as
19           Defendant's Exhibit No. 11 to the
20           deposition of Gilbert C. Berry.)
21      Q.    Let me show you what has been
22  marked Defendant's Exhibit 11.  And that
23  appears to a letter to Freddie Gallot from

Page 272

1  you; is that correct?
2      A.    Correct.
3      Q.    And, again, I go to the first
4  page.
5      A.    Uh-huh (affirmative).
6      Q.    And then attached to that is a
7  document dated May 15th, 2006, and it's Gil
8  Berry & Associates, and it's from Marous
9  Brothers.
10      A.    Uh-huh (affirmative).
11      Q.    Now, when you sent your May 23rd,
12  2006, letter to Freddie Gallot, right?
13      A.    Uh-huh (affirmative).
14      Q.    Did you also send attached to
15  that the Marous Brothers Construction invoice?
16      A.    I'm almost positive I did.
17      Q.    And if you will notice, this is a
18  document that was produced by GBA.
19      A.    That is correct.
20      Q.    And they're consecutively Bates
21  stamped?
22      A.    Correct.
23      Q.    Got you.  Now, why is Marous

Page 273

1  Brothers sending to Gil Berry & Associates
2  care of Gil Berry, President, an invoice for
3  $297,500?
4          MR. ALLRED:  Object to the form.
5          MR. LYONS:  You can go ahead.
6          THE WITNESS:  Oh, okay.  I didn't
7  -- I didn't hear what you said.
8      Q.    (By Mr. Thomas)  Okay.  Why did
9  Marous Brothers Construction, Inc. send to you
10  under a letter dated May 15th, 2006, their
11  invoice for Part 1, Design/Build
12  Preconstruction Services?
13      A.    Because Judge Wiggins told me to
14  submit the bills to Freddie.  So, I told
15  Marous Brothers to send me the bill so I could
16  submit the bills to Mr. Gallot.
17          And I'm sorry I called him
18  Freddie.  It's Mr. Gallot.
19      Q.    And where is the invoice from
20  Student Suites?
21      A.    Dick said that he needed more
22  time to prepare his invoice.
23      Q.    Is this the communication that

Page 274

1  you make reference to in Paragraph 16 where
2  you say on May 23rd, 2006, Gil Berry submitted
3  to Freddie Gallot an invoice?
4      A.    I would have to say so.
5      Q.    And it also says here it also
6  included a copy of the invoice submitted by
7  Marous?
8      A.    Correct. And this was shortly
9  after that meeting that I spoke about prior to
10 these guys going up to New York, that I stated
11 at that meeting that we needed to be paid for
12 expenses.
13          And I don't know when that date
14 was that we had that Board meeting, but you'll
15 find that that date was prior to the date that
16 I submitted these documents prior to going to
17 New York to the bond counsel.
18     Q.    Now, when you say a board meeting
19 --
20     A.    It's not a board meeting.
21     Q.    -- the ASU Board of Trustees met
22 on May 5th.
23     A.    No. Excuse me. I'm talking

Page 275

1  about the meeting that bond counsel, yourself,
2  Freddie, the president, and everybody was
3  present at that I stated that we would be
4  submitting the bills to be paid for our
5  expenses that I said at the round table with
6  everybody present.
7          I don't know when that date was;
8  but if you go back, you'll find out this
9  followed shortly after they went to New York
10 to secure the bonds. I told you that I would
11 be submitting this because I think in --
12 somewhere it was told to me in that meeting
13 that it was $3 million ASU had for some
14 renovation, some painting or something that it
15 wasn't going to use now.
16          And I said, good, this can pay my
17 expenses. And I said I would be submitting
18 them. And you'll find out if you go back that
19 we submitted this shortly after that.
20     Q.    Now, also, in Paragraph 16 it
21 also included a copy of the invoice submitted
22 by Marous to GBA and Student Suites. Okay.
23 Let me ask this, if I may.

Page 276

1      A.    Uh-huh (affirmative).
2      Q.    I guess did anybody tell you to
3  submit an invoice? I know your testimony was
4  that you said that you would be submitting
5  one, but did anybody tell you to submit one?
6      A.    Nobody didn't tell me not to
7  submit one. That's for sure.
8      Q.    Why don't you maybe try my
9  question.
10     A.    Okay.
11     Q.    Did anybody tell you to submit
12 one?
13     A.    No.
14     Q.    Okay. Now --
15     A.    But no one told me not to submit
16 one. And we submitted one based on that --
17 that Judge Wiggins told me to submit our
18 invoices to get paid.
19     Q.    Now, again, it's Judge Wiggins
20 that told you to submit the invoice?
21     A.    Yes.
22     Q.    Okay. And when did he tell you
23 that?

Page 277

1      A.    Somewhere before this May date
2  because we submitted it based on that he told
3  us to submit them.
4          MR. THOMAS: We move to have that
5  a part of his deposition.
6      Q.    On Paragraph 17, now you've got
7  on June 15th, 2006, Gil Berry had a telephone
8  discussion with President Lee concerning the
9  May 23rd invoice and the invoice submitted by
10 Marous.
11          Now, what did doctor -- what did
12 President Lee say to you during that telephone
13 conference?
14     A.    Basically, what I stated here
15 earlier, he had tried to call me and somehow
16 the number had -- the one that he had phoned
17 was somehow -- I guess on my behalf somehow
18 the number was messed up that he had for me.
19          He ended up calling my 1-800
20 answering service who had called me and told
21 me that Dr. Lee was trying to get in touch
22 with me. So, of course, I immediately called
23 him.

1     And he indicated that Freddie had
2 brought some invoices to him for payment, and
3 he called me to tell me that if I -- that
4 right now the school had very little funds in
5 the coiffeurs and if I could wait, they would
6 be closing on the bonds in -- sometime in
7 July, that he could pay me in full for the
8 invoices and we could get started with the
9 work.
10     And I told him if it would cause
11 the school any kind of problems or put any
12 kind of restraints on the school that me and
13 Marous would be glad to wait. We didn't want
14 to cause the school any problems.
15     Q.    What about team member Student
16 Suites? What about their money?
17     Your other team member, Student
18 Suites, want about their money? You didn't
19 ever say nothing about that?
20     A.    I don't know if -- at that time
21 if they had submitted their invoice.
22     Q.    Also, in Paragraph 17 you've got
23 here, "Berry confirmed this agreement in an

1 email dated June 5, 2006." Again, I've gone
2 through the productions that you've submitted
3 to us, and I have not seen that E-mail.
4     My question to you: Do you have
5 that E-mail?
6     A.    I turned over all of the
7 documents that were in my possession to my
8 attorneys.
9     Q.    Well, if I may -- and let me just
10 ask you on the record. If you would, would
11 you review any and all records that you may
12 have where you say supports an E-mail from you
13 to President Lee dated June 5, 2006,
14 confirming some representation that you'd be
15 paid in full?
16     A.    And I'll even go one step further
17 and have my answering service pull the message
18 sent by Dr. Lee for me to call him on that
19 date to -- that he called me. I'll go as far
20 as that. I will look for that document.
21     Q.    But right now -- and just so
22 you'll understand my request.
23     A.    I got your --

1     Q.    I want the E-mail.
2     A.    I got your request.
3     Q.    Okay. I want my E-mail. Okay?
4     A.    Okay.
5     Q.    Thank you. Now, in Paragraph 18
6 ASU received copies of the Marous', I guess,
7 Brothers Construction proprietary work
8 product.
9     Now, based on what you know, is
10 this the proprietary work product here that's
11 been identified as Berry Exhibit 8?
12     A.    Looking on the face of what I see
13 without the cover and, you know, I haven't
14 gone through all the documents, I would have
15 to say that is a resemblance of what they had
16 submitted.
17     Q.    Okay. And the only reason I
18 asked that question, Mr. Berry, is that this
19 is what you-all produced. And so --
20     A.    Well, we wouldn't have produced a
21 -- the blue covers and some other stuff that
22 was attached to it. So, I'm saying based on
23 what I see in front of me without the covers

1 and going through every document, I would have
2 to say that it is the document.
3     Q.    Paragraph 18. You further state
4 that -- or it's stated ASU instructed Gil
5 Berry & Associates and Student Suites to
6 assist ASU's bond counsel in obtaining
7 financing for the Student Residence Project.
8     And who is this ASU bond counsel
9 that you're referencing?
10     A.    It was actually the -- whoever
11 was hired to represent the bond -- to go up to
12 New York to get the bonds. We presented these
13 guys with these documents and schedules.
14     Q.    I'm just trying to get the names
15 of the guys.
16     A.    I don't know who that was. I
17 have -- and, of course, we have the cards that
18 was present that day. But the bottom line is
19 this --
20     Q.    No, no. Don't go to the bottom
21 line. Who are the guys?
22     A.    I don't know what their names
23 are.

Page 282

```
 1     Q.    Okay.  You gave to it them,
 2  right?
 3     A.    No.  I gave it to the president,
 4  and I gave it to -- he was no longer here, but
 5  Dr. Frazier, Charles Smith.  At that time
 6  Elton Dean got a copy out of respect.  Judge
 7  Wiggins had a copy.
 8     Q.    Now, hold on a second, Mr. Berry.
 9  I want to know who did you give -- ASU
10  instructed Gil Berry to assist ASU's bond
11  counsel.
12         And I'm just asking you as it
13  relates to this averment who was the bond
14  counsel that you allegedly assisted?  That's
15  all.
16     A.    Whoever was hired to do the bonds
17  present there at that day.  We have -- I have
18  their cards.  I can't tell you what their
19  names are right now.  So --
20     Q.    Okay.  Well, let me ask you this.
21  Did you assist them?
22     A.    We assisted by giving them this
23  information.  I gave it to President Lee,
```

Page 283

```
 1  which President Lee gave to them and --
 2     Q.    I understand.
 3     A.    And this was taken as far as my
 4  knowledge and what I read up to New York.
 5     Q.    And that is the extent of your
 6  assisting bond counsel, giving them a
 7  document?  See, this is your complaint now.
 8  All I'm saying is I want you to interpret it
 9  for me.  ASU instructed GBA.  That's you?
10     A.    Yes.
11     Q.    To assist ASU bond counsel.  I'm
12  trying to find out who that is.
13         In obtaining financing for the
14  Student Residence Project.  So, I'm just
15  asking you to fill in the variables.
16         One, who did you assist?
17     A.    Number one, you were there at the
18  meeting.
19     Q.    No, no.
20     A.    So, you know who the bond counsel
21  is.
22     Q.    Number two, you know that me,
23  Dick and his partner, Steve Pappa, had input
```

Page 284

```
 1  in the discussions prior to going to New York.
 2         So, the bottom line is we did
 3  assist.  We turned over all documents, all
 4  schedules, all -- everything that was
 5  requested of us prior to going to New York, we
 6  turned it over.
 7     Q.    And, again, I'm just asking you
 8  to define assist.  Is it just the giving of
 9  the document here, Defendant's Exhibit 8, or
10  did you sit down, discuss things with people
11  or whatever?  I don't know.  And that's why
12  I'm asking you.
13     A.    We turned over the documents and
14  had discussions on what would occur there,
15  what would take place there.  There was
16  discussion that -- basically, that the new
17  construction would not be brought up because
18  they would want the renovated dorms to be top
19  priority.  They would want -- they would be
20  upset knowing that we would be building new
21  dormitories and the kids would be in the new
22  dormitories and not utilizing the renovated
23  dormitories.
```

Page 285

```
 1         So, those are the kind of
 2  discussions that were going on because we
 3  brought up that the new dormitories still had
 4  to be built so that the kids could be
 5  transferred when the renovations started into
 6  the new dormitories so they wouldn't have to
 7  be living in hotels.  They wouldn't have to be
 8  scattered and being bused and all of that kind
 9  of stuff, that this had to take place.
10         We could build the new dorms
11  within six months, have them up.  That's why
12  we were looking at the land.
13         It was talked about that the bond
14  people would not want that discussion because,
15  number one, they wouldn't want the kids to be
16  utilizing the new dorms instead of the
17  renovated dorms because they wanted to make
18  sure that the old dorms were renovated before
19  any discussion of new dorms would be built.
20         So, yes, we had plenty input.
21  Yes, we turned over documents, and we had
22  substantial conversation with everybody at the
23  table.
```

Page 286

1    Q.    You did not go to New York, did
2  you?
3    A.    No.
4    Q.    Did Dick Davis go to New York?
5    A.    No.
6    Q.    Did the Marous Brothers go to New
7  York?
8    A.    No, but you took our product.
9    Q.    But, again, though, just answer
10  my question so we can get --
11    A.    I did answer it.  No, we didn't
12  go --
13    Q.    Otherwise, we're going to be here
14  two or three days now.  So, I can do the best
15  I can.
16    A.    Okay.  Well, go for it.
17    Q.    All right.  Now, again, who
18  instructed you to assist ASU bond counsel?
19    A.    The president.  We were invited
20  to be at the meeting and to be present for any
21  questions and input and turn over documents.
22    Q.    And in the last part of Paragraph
23  18 you say in reliance upon representations

Page 287

1  made by ASU.  Again, ASU is an entity that
2  cannot speak.
3        So, you have listed here
4  President Lee.  Is there anybody else that you
5  are attributing to ASU?
6    A.    I have already named them.  Elton
7  Dean, Chairman; Buford Crutcher; Judge
8  Wiggins.  That's it.
9    Q.    Now, Paragraph 19.  Is it Gil
10  Berry & Associate's contention that you-all
11  were instrumental in Alabama State University
12  getting a bond issue for $25 million?
13    A.    Very much so.
14    Q.    In what ways?
15    A.    Number one, before we got to the
16  campus and before -- when we were invited to
17  come to the campus, there was no RFP given to
18  us.  So, the renovation of the dormitories was
19  -- there was no documentation prepared.
20        We prepared all documentation on
21  the renovation of the dormitories.  We
22  prepared the cost analysis.  We prepared the
23  work product.  We did the analysis on what it

Page 288

1  would take based on the $25 million number
2  that was given to us that we had to utilize to
3  actually back into the number to renovate the
4  six dormitories.
5        That wasn't a number that we
6  created.  That was a number that was created
7  and given to us, the $25 million.
8    Q.    Let me show you --
9        MR. THOMAS:  And I'll have this
10  marked as the next exhibit, Defendant's
11  Exhibit 12.
12        (Whereupon, said document was
13        marked for identification as
14        Defendant's Exhibit No. 12 to the
15        deposition of Gilbert C. Berry.)
16    Q.    And, again, Mr. Lyons and Mr.
17  Berry, at the bottom you'll note that this was
18  produced to us by GBA.  So, I'm assuming some
19  kind of way you're familiar with the document?
20    A.    Yes.
21    Q.    Okay.  If you would, just briefly
22  identify for me anywhere in this very thick
23  document any reference to Gil Berry &

Page 289

1  Associates, Marous Brothers and/or Student
2  Suites or any combination thereof.
3        Have you had a chance to look at
4  it?
5    A.    I have had a chance to look at
6  it.
7    Q.    Could you identify for the Court
8  any reference within the four corners of the
9  document that references Gil Berry &
10  Associates?
11    A.    No.
12    Q.    And references to Marous Brothers
13  Construction?
14    A.    No.
15    Q.    Student Suites?
16    A.    No.
17        MR. THOMAS:  I would ask that be
18  made a part of your deposition.  Just stack it
19  there.
20    Q.    Returning back to the complaint.
21    A.    Uh-huh (affirmative).
22    Q.    Now, in Paragraph 20, you
23  conclude in that particular paragraph, upon

Page 290

1  information and belief, ASU has used and
2  continues to use plaintiffs' -- and that's
3  plural -- work product.
4        Does that plaintiffs include Gil
5  Berry & Associates?
6     A.    I had input in the -- in working
7  with Marous on the final design of the $25
8  million, spent numerous hours with them
9  outlining how the penetrations would be made,
10 how to keep the cost down to the $25 million
11 umbrella that we were given to work with.
12    Q.    Now, it's concluded here upon
13 information and belief, ASU has used and
14 continues to use plaintiffs' work product.
15       I think what you just alluded to
16 was how ASU has used the plaintiffs' work
17 product allegedly, right?
18    A.    Yes, sir.
19    Q.    What's the basis of the
20 allegation that ASU continues to use
21 plaintiffs' work product?
22    A.    Well, if I do remember reading
23 that document, when I did read it -- I can't

Page 291

1  say I read it recently -- it talked about that
2  $25 million would be used to renovate six
3  dormitories, suite-style units.
4        That's what we did.  We prepared
5  a document giving the number of $25 million to
6  prepare suite-style units, six of them.
7        Now, continue to be used.
8  Continue to be used because our work product
9  was reviewed by individuals who are
10 representatives of the school that basically
11 had privilege and knowledge of how we were to
12 do work on that project.
13       And if I give you a road map, you
14 might take a different direction, but you
15 still know how to get to where you need to get
16 to.
17       I mean, the bottom line is if it
18 was so easy for anybody to figure out how we
19 got and did this work, they would have went
20 and got somebody that they already had on
21 campus that was already doing work or that was
22 already locally in the town, and they would
23 have went and got them and would have never

Page 292

1  dealt with some guys from Pittsburgh and Ohio
2  for 15 months preparing documents.  They would
3  have just said, hey, we don't need your
4  services.  We already got knowledgeable people
5  here that can do this work, and you don't have
6  to spend no more time, no more energy, no more
7  nothing.  We've got knowledgeable people here.
8        It was very obvious that we had
9  the capability, the knowledge to put this
10 together based on a number that we had that we
11 were giving by the school of $25 million to
12 back into it and make it work for the six
13 dormitories.  We didn't have a blank check.
14 We had a $25 million number that we had to
15 work with, and we could not exceed that
16 number.  It was given to us.
17    Q.    And ASU gave you the $25 million
18 figure?
19    A.    Yes, they did.
20    Q.    Let's go Paragraph 21.
21    A.    They didn't want to go over the
22 $100 million, and they were borrowing $16 or
23 $17 million --

Page 293

1     Q.    I understand.
2     A.    -- for that.  And if you add the
3  numbers up --
4     Q.    I understand.
5     A.    -- they're at $100 million right
6  now.
7     Q.    We've done that at least four
8  occasions.
9     A.    Okay.
10    Q.    I got the point.
11    A.    Okay.  Thank you.
12    Q.    Paragraph 21.  You aver here as
13 stated, the November 14, 2005, resolution
14 provided that its terms would become null and
15 void if a final agreement was not reached on
16 the design of and financing for the Student
17 Residence Project.
18       Is that correct?  That's what you
19 put in your complaint, right?
20    A.    Uh-huh (affirmative).
21    Q.    So, again, you are adopting that
22 is what that November 15th, 2005, resolution
23 said?

Page 294

1    A.    Yes, sir.
2    Q.    Got you.  And, again, the
3  contingencies that you spoke about earlier in
4  the day when I asked you about that
5  resolution, it's not stated here either, is
6  it?
7    A.    No, sir.
8    Q.    Paragraph 22.  And I'm going to
9  be kind of quick with this because --
10    A.    Okay.
11    Q.    -- I just want to document a few
12  things to confirm that that law firm of
13  Haskell Slaughter was your lawyer and Kenneth
14  Thomas wasn't advising you.
15          So, we can do that real quick.
16  Okay?
17    A.    That's -- that's fine.
18    Q.    We won't take a lot everybody's
19  time on that.
20    A.    Yes, sir.
21    Q.    Let me show you --
22          MR. THOMAS:  This will be a
23  composite exhibit, Exhibit 13.

Page 295

1          (Whereupon, said document was
2          marked for identification as
3          Defendant's Exhibit No. 13 to the
4          deposition of Gilbert C. Berry.)
5          THE WITNESS:  And I want to state
6  on the record that they were advising us on --
7  to make sure that we followed -- because it
8  was -- it was very important to the
9  University, it was important to us and it was
10  important to -- to the school that we followed
11  Alabama state law.  And we were asking that
12  Haskell Slaughter make sure that we followed
13  Alabama state bid laws.
14    Q.    (By Mr. Thomas)  And if you don't
15  mind, Wyatt Haskell is a commercial
16  transaction lawyer; am I correct?
17    A.    I don't know what that --
18    Q.    Well, he is.
19    A.    Okay.
20    Q.    And he handles business
21  organizations, LLCs, partnerships and other
22  commercial transactions.  Okay?
23    A.    Okay.

Page 296

1    Q.    All right.  The business that you
2  and Student Suites went into is a commercial
3  transaction.  It's a business organization?
4    A.    That's correct.
5    Q.    Do you know what Kenneth Thomas
6  does?
7    A.    I don't know what --
8    Q.    I have nothing to do with
9  commercial transactions.  I don't even know
10  what a commercial transaction is.
11    A.    Okay.
12    Q.    Okay.  So, based on that, are you
13  still prepared to tell the Court that Kenneth
14  Thomas advised you on how to do business in
15  the State of Alabama?
16    A.    No.  You suggested that the
17  school couldn't pay two separate entities, Gil
18  Berry & Associates and Student Suites, that we
19  would have to come together as one corporation
20  because you just wasn't cutting two different
21  checks to two different individuals.
22          And so we formed Gil Berry --
23  excuse me, Student Suites, Gil Berry &

Page 297

1  Associates Alabama, LLC.
2    Q.    Got you.
3    A.    Okay.
4    Q.    And, again, Kenneth Thomas never
5  billed you?
6    A.    Never billed me.
7    Q.    You never paid me?
8    A.    Not a dime.
9    Q.    All right.  Let's follow this.
10  The first part -- and all of these are
11  documents produced by Gil Berry & Associates.
12  So, I'm generally assuming that you're
13  familiar with them?
14    A.    Are we on --
15    Q.    This one.
16    A.    -- on 13?
17    Q.    Yes, 13.  You can set this to the
18  side for the moment.
19    A.    All right.
20    Q.    This is January 19th from Wyatt
21  Haskell to Gil Berry; am I correct?
22    A.    Yes, sir.
23    Q.    All right.  The second one is a

Page 298

1  letter dated January 24th, 2006, right?
2  A.  Give me a minute.  I'm a little
3  slow.
4  Q.  Just flip on over.
5  A.  Okay.
6  Q.  Next page.
7  A.  Okay.
8  Q.  This is -- look at the next page.
9  I just want to confirm that you signed this.
10  A.  Okay.  Give me a minute.  I'd
11  like to read the -- refresh myself and
12  read those letters.
13  Q.  Take your time.
14  A.  That is correct.
15  Q.  Got you.  And you state very
16  clear here we have discussed with Wyatt
17  Haskell of Haskell Slaughter, Attorney-at-Law,
18  a development plan, correct?
19  A.  Correct.
20  Q.  And Haskell Slaughter was
21  advising you, am I correct?
22  A.  Correct.
23  Q.  The next page.

Page 299

1  A.  The same document?
2  Q.  The next page -- right.
3  A.  Okay.
4  Q.  This is dated June 28th, 2006,
5  right?
6  A.  That is correct.
7  Q.  I'm Kenneth Thomas.  You're
8  familiar with Tommy Gallion, right?
9  A.  Uh-huh (affirmative).
10  Q.  And turn to the back page.  The
11  last page.
12  A.  (Complies).
13  Q.  You see Charly Lynn?  The last
14  page.
15  A.  Another page here.  Is that it?
16  Q.  Yeah.
17  A.  Okay.
18  Q.  You see Charly Lynn?
19  A.  Yes, I do.
20  Q.  He's with Haskell, Slaughter.
21  You're familiar with him, right?
22  A.  I don't -- Charly Lynn's not with
23  Haskell, Slaughter.

Page 300

1  Q.  Who is he with?
2  A.  He worked at Capital Bank.
3  Q.  SouthTrust?
4  A.  I think so.
5  Q.  Got you.  Gil Berry, that's you?
6  A.  Correct.
7  Q.  Wyatt Haskell?
8  A.  Uh-huh (affirmative).
9  Q.  Look at the front page.
10  A.  Okay.
11  Q.  And it says Dear Kenny.  Our firm
12  represents Gil Berry and Associates, am I
13  correct?
14  A.  That is so correct.
15  Q.  All right.  And I am accurate,
16  right?
17  A.  You got it.
18  Q.  Okay.  And we've got a bunch of
19  E-mails here where you continued to
20  communicate and with cc: on E-mails, Wyatt
21  Haskell, right?
22  A.  Correct.
23  Q.  And in light of all of this,

Page 301

1  having such an outstanding and well-reputed
2  law firm, you took little advice from little
3  old me who knows nothing about commercial
4  transactions?
5  A.  You made a suggestion.  We
6  followed up on a suggestion.  I thought it was
7  a good suggestion.
8  Q.  Well, how about paying me?
9  MR. LYONS:  (Inaudible).
10  MR. THOMAS:  Let me show you --
11  and I would ask that that be made a part of
12  his deposition.
13  THE WITNESS:  I would ask that
14  you also enter into the record that I worked
15  with Wyatt Haskell and the legal team to
16  prepare documents and everything since we're
17  talking about my scope of work.
18  Q.  (By Mr. Thomas) I'm not
19  following you on that.  That's your attorney,
20  isn't it?
21  A.  He's my attorney, but you're
22  saying what was my involvement in the project.
23  So, I just want it to be noted that I worked

Page 302

1  with Wyatt Haskell as part of the team as part
2  of my scope of work also.
3      Q.    Your going out hiring a lawyer is
4  a part of your work?
5      A.    No.
6      Q.    Is that what you're saying?
7      A.    If you notice, we had several
8  discussions and meetings.
9      Q.    Okay.
10     A.    But I just -- you know, since you
11 wanted to ask what my scope of work was, I
12 just want to add that to it.
13          (Whereupon, said document was
14          marked for identification as
15          Defendant's Exhibit No. 14 to the
16          deposition of Gilbert C. Berry.)
17     Q.    Now, this is an E-mail from Gil
18 Berry to Marvin Wayne Wiggins, June 22nd,
19 2006, and the subject is attorney general's
20 decision.
21     A.    Uh-huh (affirmative).
22     Q.    What is this about?
23     A.    That the school -- let me back

Page 303

1  up. Attorney Fred Gray wanted us to make sure
2  that we got an attorney general's opinion on
3  how we wanted to proceed.
4      Q.    And what do you mean by proceed?
5      A.    How me and Marous and Student
6  Suites wanted to proceed on the project.
7      Q.    And I guess what were you seeking
8  from the attorney general?
9      A.    An opinion on how he wanted us to
10 structure our relationship with the
11 University.
12     Q.    And what did the attorney general
13 opine?
14     A.    As far as I know, Wyatt Haskell
15 was seeking an opinion on how he wanted --
16 Wyatt Haskell had, I guess, wrote his opinion
17 and asked the attorney general to respond to
18 his opinion on how we were to proceed.
19     Q.    And, again, what did -- how did
20 you-all proceed, I guess, is what I'm
21 interested in? What did the attorney general
22 say?
23     A.    I never found out.

Page 304

1      Q.    You didn't call your lawyer?
2      A.    Yes.
3      Q.    And what did -- and, again,
4  that's attorney-client. So, I want you to
5  zealously guard that.
6      A.    Yeah.
7      Q.    But were you advised? And don't
8  tell me what he said, but --
9      A.    Okay.
10     Q.    But were you advised?
11     A.    Yes, we were.
12     Q.    Do you consider Wyatt Haskell to
13 be your lawyer now?
14     A.    No.
15     Q.    All right. Well, you're free to
16 tell me as long as you want to.
17     A.    I don't want to.
18     Q.    Paragraph 23.
19     A.    Did you want this back?
20     Q.    Yeah. We'll make that a part of
21 his deposition.
22     A.    Okay. I don't want to get them
23 mixed up.

Page 305

1      Q.    Now, I didn't advise you on the
2  attorney general's opinion, did I?
3      A.    No, no.
4      Q.    I just want to make sure.
5      A.    No. You had nothing to do with
6  that.
7      Q.    Okay.
8      A.    I've got to say that Wyatt
9  Haskell and them did say you were a great
10 attorney. I just want to put it on the record
11 that they spoke very highly of you.
12     Q.    I appreciate it. Thank you.
13     A.    All right.
14     Q.    Let's go to Paragraph 23. That's
15 at Page 7, Mr. Berry.
16     A.    Yes. I'm here with you.
17     Q.    ASU, Marous and Student Suites,
18 Gil Berry & Associates continued to revise the
19 Development Agreement. And if I may, let me
20 show you --
21          MR. THOMAS: Let's mark this as
22 the next exhibit, Defendant's Exhibit No. 15.
23          # # # # #

Page 306

```
 1        (Whereupon, said document was
 2     marked for identification as
 3     Defendant's Exhibit No. 15 to the
 4     deposition of Gilbert C. Berry.)
 5     A.    Okay.
 6     Q.    Mr. Berry, this is dated August
 7  18th, 2006.  The second sheet there -- if you
 8  would flip over.  No, no.  Right there.
 9     A.    Oh, okay.
10     Q.    That's your signature, Gil Berry;
11  is that correct?
12     A.    That is correct.
13     Q.    This is your letter, right?
14     A.    That is a letter.  Yes, a
15  combined letter from me and Dick.
16     Q.    Okay.  That you sent to President
17  Lee?
18     A.    Correct.
19     Q.    And attached to it is an E-mail
20  dated Tuesday, July 11th?
21     A.    I've got to correct you.  This
22  was sent by Dick, but it was approved by me to
23  President Lee.
```

Page 307

```
 1     Q.    Okay.  The attached E-mail that
 2  follows that letter, the two-page letter.
 3     A.    Oh, okay.
 4     Q.    Right there.
 5     A.    Okay.
 6     Q.    That's July 11th, isn't it?
 7     A.    Yes, sir.
 8     Q.    And that's from Dick Davis.  Who
 9  is Tom Saunders?
10     A.    Tom Saunders was -- has Destin
11  Energy.
12     Q.    Destin Energy?
13     A.    Yes.
14     Q.    Is James Harold with them also?
15     A.    Correct.
16     Q.    What does James Harold do with
17  Destin Energy?
18     A.    I don't know what James Harold --
19  I think he's an owner, one of the owners.
20     Q.    Of Destin Energy?
21     A.    Yes, sir.
22     Q.    What did Tom Saunders have to do
23  with this, and why is he a part of this
```

Page 308

```
 1  communication circle?
 2     A.    Can I look at the document, and
 3  then I'll be able to answer your question.
 4     Q.    Well, the next question is the
 5  document, the development agreement.
 6     A.    Okay.  I mean -- but can I look
 7  at it?
 8     Q.    Oh, yes.  By all means.
 9     A.    All right.  Then I'll be able to
10  answer your question.  Okay.
11     Q.    Now, why is Tom Saunders in this
12  circle?
13     A.    Tom had --
14        MR. LYONS:  If you know.  Since
15  Dick is the one who included him.  You can
16  answer if you know, but Dick may be the best
17  one to answer that.
18        THE WITNESS:  I'll leave it at
19  Dick's the best one to answer it.
20     Q.    (By Mr. Thomas)  Do you know?
21     A.    No, I don't know.
22     Q.    Now, go to page -- to the first
23  page.
```

Page 309

```
 1     A.    Of what?
 2     Q.    The letter, August 18th.
 3     A.    August 18th.  Okay.
 4     Q.    Which is the Defendant's Exhibit
 5  15.  Now, it's stated here in the letter to
 6  President Lee that some of the revisions that
 7  have been discussed between Kenneth Thomas,
 8  Gil Berry and Dick Davis at Student Suites
 9  were kind of tweaking out satisfactorily; am I
10  correct?
11     A.    Correct.
12     Q.    However, there were -- at least
13  on this letter from you and Dick, there were
14  some things that were not acceptable, right?
15     A.    Correct.
16     Q.    And one was SSGBA being
17  responsible for the fees and expenses of
18  consultants or project managers hired by ASU,
19  right?
20     A.    Correct.
21     Q.    And second was that it was not
22  acceptable in the delay of the initial four
23  percent to SSGBA until construction
```

Page 310

1  commencement, right?
2      A.    Correct.
3      Q.    Got you.  And I'll take you to
4  the very last page of the agreement.  Not the
5  very last page, but the signature page.
6          And my question to you:  Based on
7  your dealings, negotiations, revisions and so
8  on, do you know of any agreement that has been
9  signed between Alabama State University and
10  Student Suites Gil Berry Alabama, LLC?
11     A.    No, sir.
12     Q.    Never been executed?
13     A.    No, sir.
14     Q.    And isn't it a fair statement
15  that all the parties have done is exhausted
16  negotiations?
17          MR. LYONS:  Object to the form.
18     Q.    (By Mr. Thomas)  You can answer
19  if you can.
20     A.    Well, I disagree because even --
21  even up until August 18th and even past August
22  18th, even into September, oh, I'd have to say
23  20th, me, you and Dr. Lee were still

Page 311

1  negotiating.
2      Q.    Yes, sir.
3      A.    I mean, the bottom line is no one
4  ever told us that we did not have the project.
5  No one ever told us that we wasn't going to
6  get paid.  No one never told us -- all we were
7  at is that we were finalizing the agreement.
8  Some things we would agree on.  Some things we
9  would not agree on.
10          But in good faith we agreed on
11  mostly 90 percent of everything that you came
12  back at us and asked us.  Dr. Lee called me on
13  -- somewhere around September 20th and said,
14  Gil, I can make this happen.  Can you reduce
15  your fees?
16          And, of course, you know I
17  immediately sent him an E-mail and said, Dr.
18  Lee, if it will be able to help the school,
19  help the students be able to move the project
20  forward, I'll reduce the fees $600,000.
21          You sent me an E-mail back that
22  next morning saying Dr. Lee didn't ask for
23  $600,000.  He wants a million dollars.

Page 312

1          The bottom line is we had an
2  agreed price of $25 million that I submitted.
3  You took our price, our work product and got
4  funded and we had agreed that we would with
5  them in good faith.
6          I mean, they you gave us the
7  number of $25 million that we had to use.  I
8  did everything in my power that I could do
9  without hurting anyone, not the University,
10  not the students, most important not the
11  students, to make sure that the project went
12  off.
13          I gave when no one else from the
14  University would give because you know what --
15     Q.    What you gave?
16     A.    I gave $600,000 to the
17  University.  That's what I gave.
18     Q.    Mr. Berry, weren't you
19  negotiating terms and conditions of a contract
20  between two potential parties?
21     A.    You're --
22     Q.    That's all people were doing,
23  were negotiating, am I correct?

Page 313

1      A.    You're wrong.  You are dead
2  wrong.
3      Q.    But if you don't mind --
4      A.    We had -- we had an agreement
5  that if we did our part that the University
6  would honor our work, our expenses.  And I
7  relied on your gentlemen out of respect,
8  especially dealing as African Americans that
9  we would come together as brothers and agree,
10  that we would -- if we did the right thing,
11  they would do the right thing.
12          But the bottom line, the only
13  person that did the right thing in this room
14  was us.
15     Q.    Let me ask you this since there
16  was an agreement.  What was the amount of
17  money to be paid to Gil Berry & Associates?
18     A.    It doesn't matter.
19     Q.    Answer my question.
20     A.    It doesn't matter.
21     Q.    Mr. Berry --
22     A.    It doesn't matter.
23     Q.    -- we can't be here all day.

Page 314

1     A.    Okay.
2     Q.    I don't need that. You need to
3  answer --
4     A.    And you don't need to raise your
5  --
6     Q.    -- my question.
7     A.    You don't need to raise your
8  voice either.
9     Q.    But you've got to --
10    A.    If we're going to talk as
11 gentlemen --
12    Q.    We're under a time table now.
13    A.    Okay.
14    Q.    Let me explain this here.
15    A.    Okay. Well, go ahead.
16    Q.    We are under a time table.
17    A.    Fine.
18    Q.    I can't sit here two or three
19 days with you. It's not permissible. So,
20 that's why I'm trying to get you to answer the
21 question.
22        And that is, please, identify for
23 me what was to be paid to Gil Berry &

Page 315

1  Associates out of this so-called agreement?
2     A.    I sent you -- you asked me to
3  break the fees down. We broke the fees down.
4  A $2.5 million development fee split by me and
5  Dick Davis.
6        I went as far as to break it down
7  even after that. I reduced the fee $1.9
8  million. And if you calculate the 15 months
9  that we worked on the project and didn't get
10 paid and the 36 months that we had to finish
11 the project, I was making $20,000 a month,
12 probably more than --
13    Q.    Now, Mr. Berry, politely --
14    A.    Yes, sir.
15    Q.    Politely, Mr. Berry. That's what
16 you reduced the fee to. Tell me where ASU
17 agreed to pay you $1.9 million. Just tell me
18 where they agreed to do that.
19    A.    They never asked me what my fees
20 were. When we supplied them with the
21 information -- we supplied them the
22 information. They got funded. When we -- I
23 was asked for the first time to supply the

Page 316

1  information was by you, and I sent it
2  immediately the same day.
3        The only time I was asked and you
4  got the response that you needed and you
5  wanted.
6     Q.    You are comfortable with the fact
7  that the resolutions that were prepared by
8  you, Student Suites and the Marous Brothers
9  said that if things were not finalized, that
10 it would be at no cost or expense to the
11 University?
12        You're aware of the documents
13 that you-all prepared, aren't you?
14    A.    If final -- what it says if
15 financing and final drawings.
16    Q.    According to the resolution that
17 you-all prepared, it is mutually understood
18 that the board will incur no financial
19 obligation by adoption of this resolution, but
20 will review the proposal when finally
21 submitted.
22        That is what you-all submitted to
23 Alabama State University. And I'm saying from

Page 317

1  the four corners of that resolution where is
2  it an obligation for Alabama State University
3  to pay you, Student Suites and Marous
4  Brothers?
5     A.    There was many, numerous
6  references made by Judge Wiggins, Buford
7  Crutcher, Elton Dean, President Lee that we
8  would be paid.
9     Q.    Got you.
10    A.    We went on their reliance that we
11 would be paid. We -- at no time do you see
12 that they send us anything that said that we
13 was not going to be paid. So, show me where
14 it says that we was not going to be paid by
15 any individuals from ASU.
16    Q.    Where is your document that you
17 would get paid?
18    A.    We relied on your reliance. You
19 think we'd work for 15 months for free?
20    Q.    Where is the mutual assent
21 between the two contracting parties? And I
22 don't mean to get legal on you, but where is
23 it?

Page 318

1    A.    Well, you are.
2    Q.    Well, I am.
3    A.    Okay.
4    Q.    But, again, where is the mutual
5 assent to contract between Gil Berry, Student
6 Suites, Marous Brothers and Alabama State
7 University if you can't come to terms on what
8 the monies are?
9    A.    It probably was in the --
10 probably the 80 or 90 phone calls between me
11 and Judge Wiggins, the 70 or 80 between me and
12 Buford Crutcher, the ones between me and
13 Chairman Elton Dean.
14          You know, somewhere in that.  I'm
15 quite sure we had numerous -- once a week,
16 several times a week phone calls to each
17 other.
18    Q.    Are you comfortable -- and I
19 represent this to you.  Under Alabama law the
20 only way Alabama State University can act is
21 pursuant to an action of the board of
22 trustees.
23          And I'm saying to you what action

Page 319

1 of the ASU Board of Trustees took that you are
2 relying on?  And I've heard your discussions
3 about Dean, Wiggins, Crutcher, President Lee.
4          But now I want you to tell me
5 what are the actions of the entity ASU,
6 Alabama State University, that you are relying
7 on.
8    A.    I'm relying on -- on board
9 members who verbally told me that we would get
10 paid and that the contract was ours.  I'm
11 relying on those -- on those gentlemen that I
12 respected and to this day still respect.  I
13 relied on them.
14    Q.    And I want to make sure I get the
15 correct name of those fine gentlemen.  Judge
16 Wiggins, Buford Crutcher, Elton Dean and
17 President Lee.
18          Anybody else?
19    A.    No, sir.
20    Q.    Okay.  Got you.  Now, if we may,
21 let's make those a part of your deposition,
22 that letter along with the E-mail and the
23 proposed agreement.

Page 320

1    A.    Okay.
2    Q.    Now, let's return back to that
3 document.
4    A.    Okay.
5    Q.    And if I may, I would like to
6 direct you to Paragraph 25.
7    A.    Paragraph 25.
8    Q.    Page 7, Mr. Berry.
9    A.    Okay.  Uh-huh (affirmative).
10    Q.    It avers that during or about
11 July 2006, Dean -- and I'm assuming that's
12 Elton Dean?
13    A.    Correct.
14    Q.    Requested that Berry meet with
15 him and Percy Thomas at the Holiday Inn in
16 Prattville, Alabama.  Did that meeting take
17 place?
18    A.    Yes, it did.
19    Q.    And who were in attendance?
20    A.    Well, first of all, I had left
21 Alabama, Montgomery headed -- headed to
22 Nashville, Tennessee, got a phone call.  It
23 was James Harold.  He said that Chairman Dean

Page 321

1 wanted to speak to me.  I said feel free to
2 have him call me.
3          He called me, and he told me that
4 he needed to talk to me.  I asked him was
5 there anything that we could talk about over
6 the phone.  He said, no.  I asked him did he
7 want me to come back to Montgomery?  He said,
8 no.  He said, where are you at?  I told him my
9 location.  He told me that there was a Holiday
10 Inn in Prattville, not too far, to kind of
11 turn around.  And basically he stayed on the
12 phone and gave me directions on how to get
13 there.
14    Q.    And who all were -- did you do
15 it?
16    A.    Yes, I did.
17    Q.    And there was a meeting?
18    A.    There was a meeting.
19    Q.    Who was in attendance?
20    A.    Me; my office manager, Johnette
21 Anderson.
22    Q.    Johnette?
23    A.    Yes.  Anderson.

Page 322

1    Q.    Okay.  And as set forth here in
2  the complaint, was Percy Thomas there?
3    A.    Percy Thomas was there.
4    Q.    Okay.
5    A.    They were -- I guess we kind of
6  pulled up at the same time.  Percy was
7  driving.  He was driving I think like a Yukon
8  truck, and Mr. Dean was on the passenger side.
9    Q.    July 2006.  Obviously, I have to
10 go to this question.  Was it before or after
11 July 4th?  Just as some identification of when
12 it took place.
13         MR. LYONS:  If you remember.
14         THE WITNESS:  I don't remember.
15    Q.    (By Mr. Thomas)  Did you-all
16 order dinner, get a round of drinks?
17    A.    No.  We had lunch.
18    Q.    You had lunch?
19    A.    Yes, sir.
20    Q.    Who picked up the tab?  Or did
21 y'all go dutch?
22    A.    No.  I think it was -- it was
23 either Elton or Percy.  I think it might have

Page 323

1  been Percy.  I don't know.
2    Q.    I got you.  And so it's the four
3  of y'all, Dean, Thomas, Berry and Addison?
4    A.    Anderson.
5    Q.    Anderson.  My bad.  Anderson.  Is
6  that correct?
7    A.    Anderson.  Johnette Anderson.
8    Q.    All right.  And during this
9  meeting, what did Mr. Dean say to you?
10    A.    First of all, we had some
11 introductions.  He introduced me to Percy
12 Thomas.  That was outside -- they got out of
13 his truck and we talked briefly outside.
14 Basically, Percy Thomas, good friend of mine.
15 He's family.
16         And we walked into the
17 restaurant.  He made some small talk with a
18 car dealer he knew.  And I basically came over
19 to the table and we got seated.  Mr. Dean did,
20 talked to a car dealer that he knew.
21         And we were seated and talked
22 briefly.  The waitress came over, and we
23 ordered lunch.

Page 324

1    Q.    What did -- what else did Mr.
2  Dean say?
3    A.    Told me that Percy Thomas was --
4  was family; that he had -- Percy was the guy
5  who he had got the jail project for and he was
6  one of the main minority contractors in town;
7  that me and him should become better
8  acquainted to be doing business together.
9    Q.    What else?
10    A.    He went on to say that Percy -- I
11 don't know if he -- he mentioned something
12 that Percy -- a brother or relative or
13 something that was -- I guess also a state
14 representative.  For some reason that sticks
15 out in my mind.
16         He said that we were all family
17 and when one eats steak, we all have to eat
18 steak and that this project of mine was a very
19 significant project and that Percy was the guy
20 that I needed to get acquainted to, that Percy
21 would be the point guy for him.
22    Q.    And you conclude this allegation
23 in your complaint by saying Berry rejected

Page 325

1  Dean's entree?
2    A.    Correct.
3    Q.    Kind of define that for me.  I'm
4  a little lost.
5    A.    Well, he -- well, he gave --
6  Percy and me talked.  Percy was talking about
7  the jail project.  And, of course, I had
8  completed a jail project.  Percy was talking
9  about how President Lee was dragging his feet
10 assigning him and Ken Upchurch's project
11 management contract.
12         And, of course, I chimed in that
13 basically, you know, it's been a long delay on
14 our behalf also on getting anything
15 accomplished.
16         He went on to say that Percy and
17 Ken had received a major job.  I think it was
18 like a $75 million jail project.  Me and Percy
19 talked about the project.  He said he was the
20 project manager.  I spoke to Percy Thomas
21 about the project.  And really in my
22 conversation with Percy, I didn't find him to
23 be too enlightening on really the inner

Page 326

1  workings of the project. That was my opinion,
2  though.
3      Q.    Well, I guess my question: As
4  alleged here, you took offense to the alleged
5  remark that Berry needed to learn that we keep
6  all of this in the family?
7      A.    Well, he told me that we needed
8  to keep it all of the family and that the
9  project that I had was a major project at
10  Alabama State. Percy would be the point guy.
11  If I wanted to talk to him or get to him that
12  I had to go through Percy.
13      Q.    And, again, question to you: Is
14  that offensive to you?
15      A.    Yeah, that's offensive to me.
16      Q.    Okay. And explain that to me.
17      A.    Why would I have to go through
18  Percy on a project at Alabama State
19  University? Why would I have to go through
20  Percy, a guy that he had said that he had
21  given the $75 million project to him and Ken
22  Upchurch, the county jail project, and that
23  they were looking to get a major project, a

Page 327

1  school project and then they ended up getting
2  a school project?
3          And why would I have to go
4  through Percy Thomas on something that me and
5  Marous and Student Suites had put together for
6  over 15 months without the input of Percy
7  Thomas on the project? Why?
8          And why would we have to meet in
9  Prattville, that he couldn't tell me that over
10  the telephone. I couldn't understand that.
11  Why did we have to meet there privately? Why
12  -- when I offered to come to Montgomery, he
13  said, no, don't come to Montgomery.
14          When I asked can we talk about it
15  over the phone -- because I was headed out --
16  that we couldn't talk about it over the phone.
17      Q.    Did you ask Elton Dean those
18  questions while you were sitting there with
19  him?
20      A.    No.
21      Q.    Why not?
22      A.    Because I knew in my heart of
23  hearts what he was insinuating.

Page 328

1      Q.    And that was in your impression?
2      A.    My impression, that I had to deal
3  with Percy to make sure that if any -- if I
4  was to receive the project, that Percy was the
5  guy that I had to go through to make sure that
6  it met the criteria of what I needed to do to
7  get the project.
8      Q.    Okay. But those --
9      A.    The bottom line is why would I
10  have to talk to Percy Thomas about a project
11  dealing with me and Student Suites and Marous
12  Brothers?
13          Why would I have to talk to him?
14  What was so important that Percy Thomas had to
15  deal -- I had to deal with Percy Thomas? And
16  then Percy told me later on that I had to deal
17  with Ken Upchurch.
18          And it ended up that we did end
19  up dealing with Ken Upchurch. You know,
20  shortly after that, we were thrown in the
21  realm of dealing with Ken Upchurch.
22      Q.    You had objections to that?
23      A.    I had objections to that.

Page 329

1      Q.    Weren't you advised that TCU
2  Consulting Services, Ken Upchurch and Percy
3  Thomas were going to assist the president with
4  doing his due diligence as it relates to the
5  development agreement?
6      A.    They hadn't had their agreement
7  signed. That's what he was talking about. He
8  had -- they had no relationship with the
9  president at that time.
10      Q.    But let me ask you this question
11  if I may.
12      A.    I mean, they didn't have any
13  signed document with the president at that
14  time.
15      Q.    So, you are suggesting that
16  President Lee could not resource with people
17  to learn about this industry and what things
18  could fare better, things under construction,
19  you're just saying he couldn't consult with
20  people like that?
21      A.    Why didn't he never consult with
22  us in the 15 months? I think we were best
23  knowledgeable to tell him about a project that

Page 330

1  we put the pricing together for and prepared
2  the documents for and had worked with
3  individuals from the school on versus someone
4  who just come in and spoke to him in a few
5  weeks to advise him on.
6      Q.    To-date you have never done a
7  project in the State of Alabama, have you,
8  to-date?
9      A.    No, sir.
10     Q.    You know nothing about the
11 intricacies or nuances of the Alabama
12 Competitive Bid Law, do you?
13            That's why your lawyer, Tommy
14 Gallion, was calling me, to see if I could
15 file a lawsuit to get things defined, wasn't
16 it?
17            You remember when you wrote me
18 and said, Kenny, I want you to participate
19 with me and get a declaratory judgment from
20 the Circuit Court of Montgomery County about
21 what you could do under the Alabama
22 Competitive Bid Law?
23     A.    That's because the school wanted

Page 331

1  us to make sure that we complied by the
2  Alabama State Bid Law.
3      Q.    But you had never worked under
4  the Alabama Competitive Bid Law, had you?
5      A.    We were very capable of --
6      Q.    You've got to answer my question.
7  You have never --
8      A.    We were very capable of preparing
9  --
10     Q.    You have never --
11     A.    -- documents for Alabama --
12     Q.    -- done a project --
13     A.    -- State.
14            MR. LYONS:  Let him finish his
15 answer, Mr. Thomas.
16            THE WITNESS:  We were very
17 capable of preparing documents for Alabama
18 State.  We had got licensed as developers at
19 that time for -- to be developers here in the
20 State of Alabama.
21            Marous Brothers had been licensed
22 to be contractors in the State of Alabama and
23 had one of the highest license that you could

Page 332

1  get.
2            So, based on the state approving
3  Marous Brothers as a licensed contractor and
4  Gil Berry and Student Suites as a developer,
5  we thought that we had met all the criteria
6  that the State of Alabama had asked for us --
7  asked of us, excuse me.
8      Q.    (By Mr. Thomas)  Let me ask you
9  this question if I may.  If you will, flip to
10 Page 9.
11     A.    Uh-huh (affirmative).
12     Q.    And also while I'm at it, to your
13 knowledge, Student Suites has never done a
14 project in Alabama, have they?
15     A.    Not to my knowledge.
16     Q.    And to your knowledge, Marous
17 Brothers have never done a project in Alabama?
18     A.    I can't speak for where Marous
19 have done projects.
20     Q.    Paragraph 32.  Do you see that on
21 Page 9?
22     A.    Uh-huh (affirmative).
23     Q.    On September 22nd, 2006, the

Page 333

1  plaintiffs -- and I assume that includes Gil
2  Berry & Associates, right?
3      A.    Uh-huh (affirmative).
4      Q.    Were informed that the ASU Board
5  had voted not to continue to utilize
6  plaintiffs' services on the Student Residence
7  Project; is that correct?
8      A.    Uh-huh (affirmative).
9      Q.    How were you notified?
10     A.    I was present at the meeting, at
11 the board meeting.
12     Q.    And this particular paragraph is
13 a part of your allegation, isn't it, Paragraph
14 32?  That relates to Gil Berry & Associates,
15 doesn't it?
16     A.    Would you -- you want to read it
17 and --
18     Q.    Well, upon information and belief
19 these representatives -- and I assume that's
20 Upchurch, Thomas and TCU -- are using Marous'
21 proprietary work product to perform the work
22 on the Student Residence Project outlined in
23 the bond offering.

Page 334

1    A.    I want to go back to the first
2  paragraph you asked me to read.
3    Q.    The first sentence?
4    A.    The first sentence where we were
5  denied.  You asked how I knew we were denied.
6  We were denied because I was present at the
7  board meeting.
8        Judge Wiggins asked when it was
9  -- the project was given to Mr. Upchurch
10 because the president said financially,
11 fiscally, that he could not go forward with
12 Gil Berry and Student Suites.
13        Judge Wiggins asked Mr. Upchurch
14 can you do the project for the same price as
15 Gil Berry and Student Suites?  Can you do it
16 lower?  And Mr. Upchurch's statement was --
17 because I was standing right by him -- that he
18 could do it for the same price as -- he said
19 but there would be a time delay.
20        So, I want the record to indicate
21 and reflect that Mr. Upchurch said he could do
22 our project for the same price or less.  I
23 want it to show that that statement was made.

Page 335

1  And so --
2    Q.    And that was on September 22nd?
3    A.    Yes, sir.
4    Q.    2006?
5    A.    Yes, sir.
6    Q.    And what was it made at?
7    A.    It was made at the board meeting
8  at ASU and the request was made by Judge
9  Wiggins to Ken Upchurch.  We were standing --
10 we and Mr. Upchurch were standing by each
11 other.
12        I was trying to speak and wasn't
13 allowed.  But the judge asked him could he do
14 it for less money.  He said, no, I can do it
15 for the same amount that Berry can.
16   Q.    Now, returning back to the last
17 part --
18   A.    Yes, sir.
19   Q.    -- that I was asking you about --
20   A.    Yes, sir.
21   Q.    -- before you now, what are you
22 basing your belief and information that the
23 proprietary work product is being used for the

Page 336

1  Student Residence Project?
2    A.    I'm basing it on the comment I
3  just made --
4    Q.    Oh, that comment?
5    A.    -- that he said that he could do
6  the job.  And it's very obvious that he had
7  not prepared any documents at that time that
8  that statement was made; that there was no new
9  drawings, there was no architectural plans,
10 there was no new floor plans, there was no new
11 nothing.
12        And he made the statement that he
13 could do the project for the same price that
14 we were going to do it for.
15   Q.    Okay.
16   A.    There was no architect hired at
17 that time.  There was no other individuals
18 brought on.  But he said that they could do
19 the project.  So, that's why that statement
20 was made.
21   Q.    Flip back to Page twenty -- I'm
22 sorry, to Page 8.
23   A.    Eight.  Uh-huh (affirmative).

Page 337

1    Q.    And Paragraph 28.
2    A.    Paragraph 28.
3    Q.    It says Judge Marvin Wiggins, an
4  ASU Board member, instructed Marous, GBA and
5  Student Suites send invoices for the work they
6  had performed to Freddie Gallot.
7        When and where did Judge Wiggins
8  instruct GBA to send invoices to Mr. Gallot?
9    A.    When?
10   Q.    Yes.
11   A.    I don't know the time element.
12 And we -- I had talked to the judge even after
13 we were dismissed from the project, and he
14 asked -- he had called me.  And he asked to
15 resend the invoices again to him, and I resent
16 them, Marous resent them and Dick Davis resent
17 them to judge with a nice thank you letter.
18   Q.    To Wiggins?
19   A.    Yes, sir.
20   Q.    Now, going forward to Page 10.
21   A.    Yes, sir.
22   Q.    Paragraph 38.
23   A.    Uh-huh (affirmative).

Page 338

1    Q.    Based on plaintiffs' reliance on
2  the assurances of ASU and its representatives.
3  Are we going back to those gentlemen you have
4  already identified?
5    A.    Yes, sir.
6    Q.    Okay.  I was particularly
7  concerned about including but not limited to
8  President Lee, Upchurch, Dean, TCU, and Percy
9  Thomas.
10         Are there others that you have
11 not named?
12   A.    No.
13   Q.    Got you.
14   A.    I just want to say that -- on the
15 record that, you know, we -- I was asked by
16 Chairperson Dean to meet with Mr. Upchurch at
17 your offices, and we did.
18   Q.    At who's office?
19   A.    At your office.
20   Q.    Where are my offices?
21   A.    I don't know, but I was at your
22 office.
23   Q.    Well, where are they?

Page 339

1    A.    I don't know where your office
2  is.  I was directed on how to get there.
3    Q.    Well, you know where you drove
4  to?
5    A.    I didn't drive.  My cousin drove.
6    Q.    Well, what did the office look
7  like then?
8    A.    It was a beautiful office.
9    Q.    All right.  Well, what did it
10 look like?  I mean, I'm just saying.
11   A.    I'm not trying to be funny.
12   Q.    You've never been to my office.
13 So, I'm just --
14   A.    Yes, I have.
15   Q.    -- taken aback on it.  That's
16 all.
17   A.    Would you, please, tell him I
18 have been at your office?  Ask your assistant.
19 She -- she hosted us.
20   Q.    But, again, you said I was there.
21   A.    I didn't say you were there.  I
22 said I had been to your office.
23   Q.    And who was there?

Page 340

1    A.    Your assistant hosted us.
2    Q.    And what was said?
3    A.    I said that -- we went through
4  the project, me and Mr. Upchurch and Percy
5  with me, my cousin, Lorren.
6          And, basically, Mr. Upchurch had
7  said that -- as he went through the fees and
8  the cost that he thought that Marous' fees
9  were a little high, and he thought that John
10 Chambless' fees were high.
11         And your assistant can attest to
12 this.  I stated that their fees were their
13 fees, and I would not ask them to reduce their
14 fees.  And I told him that anybody that I team
15 with, if anybody was going to go without, I
16 would go without.  I even stated that I was so
17 sure that we could do the project for the $25
18 million that I did not want to get paid until
19 after the project was completed.
20         Mr. Upchurch told me that under
21 State rules that I could not do that.  He said
22 that your fees -- you would have to be paid as
23 the process went along.

Page 341

1          I told him that John Chambless
2  was a good architect.  I felt that he
3  understood the project in-depth.  I knew that
4  Marous was very capable of doing an excellent
5  job and that their fees were their fees and
6  that Gil Berry did not have to be paid until
7  the project was completed.  Even if it took
8  the three years, I will wait for payment.  All
9  I was asking for at that time was my expense
10 money of $197,000 that would carry me over
11 until the project was completed.
12         And I had told Mr. Upchurch that
13 I would put that in writing for the school,
14 and he told me that that would not happen
15 because under the State rules and regulations
16 that I could not go without payment.
17         COURT REPORTER:  Excuse me, Mr.
18 Thomas.  May I have a minute to replenish my
19 paper supply?
20         MR. THOMAS:  Yes.
21         (Whereupon, the taking of the
22 deposition was recessed from approximately
23 3:55 p.m. to approximately 4:03 p.m., after

Page 342

```
 1  which the following proceedings were had and
 2  done:)
 3          (Whereupon, said document was
 4          marked for identification as
 5          Defendant's Exhibit No. 16 to the
 6          deposition of Gilbert C. Berry.)
 7      Q.   Let me share this with you for a
 8  second.
 9      A.   Okay.
10      Q.   Mr. Berry --
11      A.   Yes, sir.
12      Q.   -- if I may, again, I preface my
13  questions to you, these are documents that
14  were produced by Gil Berry & Associates.
15      A.   Yes, sir.
16      Q.   As you see from the Bates stamps.
17      A.   Yes, sir.
18      Q.   So, I just wanted to ask you some
19  questions.  And given that they were produced
20  by you, I'm assuming that you're generally
21  familiar with them.  Okay?
22      A.   Correct.
23      Q.   And you can take your time and
```

Page 343

```
 1  review them.
 2      A.   I had just read this one here.
 3      Q.   The first one on top is an E-mail
 4  from Gil Berry to Dick Davis and it's
 5  September 7th, 2006.
 6      A.   Uh-huh (affirmative).
 7      Q.   And it says from Dick Davis,
 8  September 7th, 2006.
 9          I will be happy to tell Kenny to
10  negotiate the final contract with you should
11  he call.  It is my thought that we do not
12  release the info of our departure until
13  contacts are finalized and money has changed
14  hands.
15          Now, why is Dick Davis writing
16  this to you?
17      A.   Dick at this point was just fed
18  up with ASU.  He just --
19      Q.   Fed up?
20      A.   Yes.  That's what he said.  He
21  said, Gil, I'm just fed up.  He said, you
22  know, this is crazy.  We've got Ken Upchurch
23  and Percy Thomas negotiating our contract.
```

Page 344

```
 1  You know, reliances that were made by
 2  individuals.  Dick just felt that -- that we
 3  were being snookered.
 4      Q.   Are those his words that he used
 5  to you, that he felt like you-all were being
 6  snookered?
 7      A.   I don't really want to say what
 8  Dick said.  But basically --
 9      Q.   Well, no.
10      A.   No.  I don't want to say because
11  it would not be appropriate here with women.
12  I'm not cussing.
13      Q.   They're grown.
14      A.   I don't care.  I'm -- I do not
15  cuss in front of women.
16      Q.   Would you write it down then?
17      A.   No.  I will not write it down.
18      Q.   I'm going to ask you on the
19  witness stand.
20      A.   I don't care.
21      Q.   And you're going to tell Judge
22  DeMent you're not going to answer?
23      A.   No.  I'll be glad to mention it.
```

Page 345

```
 1      Q.   Well, go ahead now.
 2      A.   I'm not saying it.
 3      Q.   I have a right to know it.
 4      A.   No.
 5      Q.   I do.
 6      A.   Okay.
 7      Q.   You may want to consult with your
 8  lawyer.
 9      A.   All right.
10          MR. LYONS:  You need to tell him
11  if you know.
12          THE WITNESS:  Okay.  Dick said,
13  I'm tired of this bullshit.
14      Q.   (By Mr. Thomas)  Okay.  That
15  didn't hurt so bad.
16      A.   Well, you know, I try to be
17  respectful when --
18      Q.   You okay?
19      A.   -- when I can be respectful.
20      Q.   You all right?
21      A.   Because I tell you what.  Anybody
22  cuss around my sisters, they got a problem.
23  Okay.  And I treat all women the same way I
```

Page 346

1 treat my sisters.
2     Q.    But don't forget the First
3 Amendment now.  Everybody has a right of
4 freedom of expression.
5     A.    Okay.  But the bottom line is I
6 don't disrespect women.
7     Q.    Now, then it's -- the bottom of
8 like, E-mails run, I assume, this again is
9 September 7th, 2006, from you to Dick Davis.
10     And it says that I wanted to let
11 you know that Ken Upchurch and Percy Thomas
12 are scheduled to present the information that
13 Ken and Arne put together to President Lee at
14 2:00 p.m. today.  You may or may not receive a
15 phone call from Kenneth Thomas at some point
16 afterwards.
17     If so, would you, please, refer
18 him to me and give him your permission for me
19 to negotiate the finalization of the contract
20 for the both of us (no one else is yet aware
21 of your departure from the deal).
22     And I guess since this is coming
23 from you, why are you not wanting it to be

Page 347

1 known that Student Suites was pulling out?
2     A.    Because at this point I felt that
3 we had worked very hard to negotiate a deal
4 with the school.  Dick's involvement had
5 always been financing.  The school had got the
6 financing.  The nuts and bolt of the
7 transaction would be done, anyway, by me and
8 Marous Brothers.
9     So at this point I just didn't
10 feel that it was appropriate to notify the
11 school, and I was asking Dick's permission to
12 let me finalize the negotiations.
13     Q.    Okay.  And then you go on to say
14 that I wanted to confirm the receipt of your
15 E-mail.  Pending closing of this contract, Gil
16 Berry & Associates will pay Student Suites the
17 amount of $100,000, plus $1.00 to hold all
18 rights to the corporation.
19     Is that correct?
20     A.    That is correct.
21     Q.    And the corporation being SSGBA?
22     A.    Yes.  The Alabama LLC
23 corporation.

Page 348

1     Q.    Got you.  You, in fact, have paid
2 that amount of money to --
3     A.    I had given Dick a dollar.
4     Q.    Okay.  What about the $100,000?
5     A.    No.  Dick wanted the $100,000.
6 That was his expenses that he had spent when
7 he was traveling back and forth.  That was his
8 expense.  He just really wanted his expense
9 money back.
10     Q.    Okay.  Have you paid that to him?
11     A.    No, I haven't paid that to him.
12     Q.    Has he made any requests to you
13 for payment?
14     A.    No, because me knows I ain't been
15 paid.
16     Q.    Got you.  The second part of this
17 exhibit, again, is from Gil Berry to Dick.
18 And it's dated September 7th.
19     A.    The second -- wait a minute.
20     Q.    And that appears to be the same
21 -- the second E-mail.  It just looks like it's
22 a copy of the same.
23     A.    Oh, okay.  Okay.

Page 349

1     Q.    Right?
2     A.    I got you.
3     Q.    Now, the next page.  And this is
4 from Arne Goldman to Gil Berry.  I'll get back
5 to you later today about Alabama A&M.  As I
6 understand it from Ken Upchurch, Ken Thomas is
7 meeting with Dr. Lee about the ASU deal and
8 that they will be calling you (and Dick,
9 because I don't believe that they know that
10 Dick bowed out yet) to discuss.
11     I guess my question is why -- you
12 didn't consider that to be a material element
13 that Student Suites was about to pull out of
14 the deal?
15     A.    That is saying Alabama A&M.
16     Q.    But what I was referencing here
17 is --
18     A.    Oh --
19     Q.    -- Ken Thomas is meeting with Dr.
20 Lee.  Now, Dr. Lee is President of ASU.
21     A.    Okay  Where are we at?
22     Q.    I'm sorry.
23     A.    Okay.

Page 350

1    Q.    Flip over.  Right here.  Right
2  there.  That's Ken Thomas.
3    A.    Yes, sir.
4    Q.    And Dr. Lee.  Now, he's president
5  of ASU, right?
6    A.    Yeah.
7    Q.    Okay.  Now --
8    A.    But, it's -- the reference is
9  saying -- at the top it's Alabama A&M.
10    Q.    Well, I'm going on what is
11  written.
12    A.    Okay.  Well, I'm just saying that
13  -- I just wanted to make sure we were on the
14  same page.
15    Q.    We're on the same page.
16    A.    Okay.
17    Q.    Ken Thomas is meeting with Dr.
18  Lee (president of ASU) about the ASU deal,
19  right?
20    A.    Uh-huh (affirmative).
21    Q.    It says that very clear, the ASU
22  deal?
23    A.    Uh-huh (affirmative).

Page 351

1    Q.    And that they will be calling you
2  (and Dick, because I don't believe that they
3  know that Dick bowed out yet) to discuss.
4    A.    Uh-huh (affirmative).
5    Q.    Now, I guess my question is why
6  was it -- so, you didn't consider it to be a
7  material fact that Student Suites was about to
8  pull out the deal before things were
9  finalized?
10    A.    No.  I mean, if they want to pull
11  out the deal and as you've stated and as we've
12  stated here today, their job was to get the
13  financing.  And the financing had been put
14  together by the University.
15          And the bottom line is I didn't
16  want Dick to negotiate a portion of what me
17  and Marous was going to do considering that
18  the financing had already been put in place.
19          And plus I didn't really want
20  Dick to say anything that might be negative to
21  any official of Alabama State that might cause
22  us repercussions on finalizing the deal.  Dick
23  was very upset that he had spent a lot time,

Page 352

1  effort and actually acted in good faith to try
2  to get this deal put together.
3          And in all honesty, Dick and Dr.
4  Frazier had turned out to be good pen pals,
5  writing back and forth.  And that was fine
6  with me because, you know, there's always
7  somebody in -- you know, in any negotiations
8  that you have a rapport with.  And as long the
9  rapport is working, I had no problem with it.
10  And kind of when Dr. Frazier left, it kind of
11  put Dick kind of on the back burner a little
12  bit.
13    Q.    Got you.  Now, as Dick's E-mail
14  will show, no contract had been finalized
15  between anybody, ASU, Marous Brothers, Gil
16  Berry & Associates or Student Suites?
17    A.    That's correct.
18    Q.    I'll ask that Defendant's Exhibit
19  16 be made a part of his deposition.
20    A.    Okay.
21    Q.    Put that right there on the
22  stack.
23    A.    Okay.  Uh-huh (affirmative).

Page 353

1          MR. THOMAS:  Then I have another
2  E-mail, and this will be Defendant's Exhibit
3  No. 17.
4          (Whereupon, said document was
5          marked for identification as
6          Defendant's Exhibit No. 17 to the
7          deposition of Gilbert C. Berry.)
8    Q.    Now, this, again, was produced by
9  GBA.
10    A.    Uh-huh (affirmative).
11    Q.    And I assume --
12    A.    No.  This was -- this was
13  produced by Dick Davis.
14    Q.    Huh-uh (negative).  Right there.
15  That's by you.
16    A.    Oh, okay.
17          MR. LYONS:  In the lawsuit we
18  produced it on his behalf.
19          THE WITNESS:  We produced the
20  document, but Dick Davis produced the
21  contents.
22    Q.    (By Mr. Thomas)  I know he wrote
23  it.

1    A.    Okay.
2    Q.    And so I don't --
3    A.    That's why I didn't want to get
4 it mixed up on what we were talking about.
5    Q.    Got you.  Dick writes hi, Gil,
6 per our conversations.  So, there had been
7 some discussion --
8    A.    Uh-huh (affirmative).
9    Q.    It's dated September 6th, 2006.
10 I have determined that with the direction
11 Alabama State University is leaning, that it
12 might be better for both you and I if Student
13 Suites released our interest in the project to
14 you.
15        What direction is ASU leaning in
16 2006 that you're familiar with or know of?  If
17 you know.
18    A.    I really don't know what was --
19 what Dick interpreted that ASU was leaning.
20    Q.    Okay.  Because per your complaint
21 you were not advised that ASU was not going
22 forward with Gil Berry, Student Suites and the
23 Marous Brothers until the Board meeting on

1 September 22nd, 2006, right?
2    A.    Correct.
3    Q.    So, this is some two weeks
4 earlier?
5    A.    Uh-huh (affirmative).
6    Q.    So, you didn't know of any
7 direction ASU was leaning at this time on
8 September 6th, 2006?
9    A.    Well, you've got to understand
10 that Dick Davis is a gentleman.
11    Q.    Well, what about Gil Berry?
12    A.    I'm also a gentleman.
13    Q.    Okay.
14    A.    Until somebody upsets me.
15        But Dick Davis is a gentleman
16 that -- number one, he does financing.  And
17 those guys are always early on that -- they
18 have to almost be in control of the situation.
19        I told you when Dr. Frazier left,
20 he really wasn't -- really didn't have a true
21 contact person at that time.  And things were
22 kind of dragging.  And there really wasn't an
23 appointed person at that time.  No one had

1 really replaced Dr. Frazier at that time.
2    A.    Dick was kind of feeling like the
3 project was kind of getting bogged down a
4 little bit.
5    Q.    Got you.  Let me show you --
6    A.    Did you want this on the pile?
7        MR. THOMAS:  Yes.  I'd ask that
8 this be made a part of his deposition,
9 Defendant's Exhibit 17.
10        And if I may, would you mark this
11 Defendant's Exhibit 18.
12        (Whereupon, said document was
13        marked for identification as
14        Defendant's Exhibit No. 18 to the
15        deposition of Gilbert C. Berry.)
16    Q.    Let me show you and Mr. Lyons
17 Defendant's Exhibit 18.
18    A.    Uh-huh (affirmative).
19    Q.    And this was produced by Marous
20 because it bears that Bates stamp at the
21 bottom?
22    A.    That is correct.
23    Q.    Have you -- well, is this your

1 signature at the bottom?
2    A.    That is my signature.
3    Q.    So, you've seen it?
4    A.    Uh-huh (affirmative).
5    Q.    It's dated June 5, 2006?
6    A.    Uh-huh (affirmative).
7    Q.    And it's from Adelbert?
8    A.    Albert.  I guess that's Adelbert.
9    Q.    Adelbert Marous?
10    A.    Yes.  You said that correct, the
11 way I'm reading it.
12    Q.    Got you.  Okay.
13    A.    I call him Chip.  So, I don't
14 really use --
15    Q.    So, this is Chip Marous?
16    A.    Yes.
17    Q.    And it talks about you receiving
18 an advance payment of $60,000 on your referral
19 fee?
20    A.    That is correct.
21    Q.    Now, help me define this.  I
22 thought from this development agreement that
23 you and Student Suites were developers?

1     A.    We are developers.
2     Q.    So, what is a referral fee?  I
3   mean -- and, again, I'm a novice in the
4   industry.  And I'm just trying to say you got
5   -- you get two fees?
6     A.    No.  A referral fee from Marous
7   Brothers was a referral on projects that I
8   referred to them.
9     Q.    Okay.  And this one talks about
10  an advance on referral fee for Alabama State
11  University?
12    A.    Uh-huh (affirmative).
13    Q.    So, I'm just trying to understand
14  the money arrangement.  In the developer's
15  agreement --
16    A.    Uh-huh (affirmative).
17    Q.    -- you said in earlier
18  examination that you had reduced your fee from
19  $2.5 million to $1.9 million?
20    A.    That is correct.
21    Q.    That was some of the
22  negotiations?
23    A.    That I did with -- with you and

1   the school.
2     Q.    Right, right.
3     A.    Uh-huh (affirmative).
4     Q.    So, that's $1.9 million as a
5   developer's fee?
6     A.    That is correct.
7     Q.    Then you also have a side
8   agreement with Marous Brothers to get a
9   referral fee for bringing them in on a
10  project?
11    A.    That's what they named it.  And
12  if you notice, the payment is to be paid back.
13  There's no -- it's not a -- it's not free
14  money.
15    Q.    Well, let me see if I can
16  understand that now.  Marous Brothers,
17  Paragraph 1, will advance Gil Berry $60,000
18  upon your signature below.
19    A.    Uh-huh (affirmative).
20    Q.    And it's signed June 6, 2006?
21    A.    Uh-huh (affirmative).
22    Q.    Did you get the money?
23    A.    Yes, I did.

1     Q.    Now, the $60,000 payment will
2   accrue against the total referral fee due and
3   payable to Gil Berry in the mount of two
4   percent of the hard construction cost of the
5   renovations at ASU's student dormitories.  Two
6   percent times $17,360,000 comes out to
7   $347,200, right?
8     A.    Go ahead.
9     Q.    According to the arithmetic.
10    A.    Okay.
11    Q.    So, your total fee for referring
12  this to the Marous Brothers would be $347,000?
13    A.    That's what it says.
14    Q.    Okay.  Now, again, my question is
15  if the deal had gone through, you would have
16  received, based on the last negotiations, $1.9
17  million under the development agreement; is
18  that correct?
19    A.    That is correct.
20    Q.    And also from Marous Brothers on
21  a side deal a referral fee of $347,200?
22    A.    I wouldn't call it a side deal.
23  I would call it a business transaction.

1     Q.    I'm sorry.  A business
2   transaction.
3     A.    Uh-huh (affirmative).
4     Q.    And as they referred to it,
5   referral fee.
6     A.    Okay.
7     Q.    Now, did y'all have -- is this
8   normally y'all protocol with Allen University,
9   Meharry and all of these other HBCUs you be
10  working with?
11    A.    Of course.
12    Q.    Okay.  Got you.  Now, if you
13  don't mind, Paragraph 4, it says if for any
14  reason the ASU transaction fails -- and that's
15  the dormitories, right?
16    A.    Uh-huh (affirmative).
17    Q.    To close.
18    A.    Uh-huh (affirmative).
19    Q.    And as of June 6th when you-all
20  entered into this agreement by your signature,
21  the ASU transaction had not closed at that
22  time, right?
23    A.    Uh-huh (affirmative).

Page 362

1    Q.    Or if the Marous Brothers does
2  not receive the contract for the design and
3  construction of the work.
4    A.    Uh-huh (affirmative).
5    Q.    Then GBA shall immediately remit
6  $60,000 advance back to Marous Brothers; is
7  that correct?
8    A.    That is correct.
9    Q.    Have you returned or remitted
10  that money back to Marous Brothers?
11    A.    Not yet.
12    Q.    And any plans to?
13    A.    Yes.
14    Q.    When?
15    A.    When I get $60,000.
16    Q.    Okay.  Paragraph 5.  In
17  consideration of the advance of $60,000 toward
18  the referral fee, Gil Berry warrants that Gil
19  Berry will be the sole Owner's Representative
20  representing the development entity created
21  between Gil Berry & Associates and Student
22  Suites.
23    A.    Uh-huh (affirmative).

Page 363

1    Q.    What does that mean?
2    A.    That if Dick was pulling out, I
3  would have to be the sole representative of
4  the development group.  Me and Dick were
5  partners in the development team.  If Dick
6  pulls out --
7    Q.    But Dick didn't put out until
8  September, three months later.
9    A.    If Dick pulled out.
10    Q.    It don't say if to me.
11    A.    Well, that's what it means.
12    Q.    It says in consideration of the
13  advance of $60,000, which he gave you on June
14  6th, '06 or thereabouts.
15    A.    Uh-huh (affirmative).
16    Q.    You are warranting at that time
17  that you will be the sole Owner's
18  Representative representing the development
19  entity created between Gil Berry & Associates
20  and Student Suites?
21    A.    Yes.
22    Q.    Okay.  I move that that be made a
23  part of his deposition.

Page 364

1    A.    Uh-huh (affirmative).
2          (Whereupon, said document was
3          marked for identification as
4          Defendant's Exhibit No. 19 to the
5          deposition of Gilbert C. Berry.)
6    Q.    I'll share that with you and Mr.
7  Lyons and ask you if you can review this.
8  And, again, I preface it with this was
9  produced by Marous Brothers as so indicated at
10  the marking below.
11    A.    Okay.
12    Q.    Have you ever seen this before?
13    A.    I've never seen it before.
14    Q.    Flip to the last page.
15    A.    Uh-huh (affirmative).
16    Q.    It says November 18th, 2005.
17    A.    Uh-huh (affirmative).
18    Q.    Is any of that ringing a bell
19  with you or refreshing your recollection?
20    A.    No, sir.
21    Q.    Okay.  If you would, let's go
22  back to the front page.  It's styled a letter
23  of intent.

Page 365

1    A.    Okay.
2    Q.    Given that you've never seen
3  this, I assume further that you've never seen
4  a signed copy of this?
5    A.    No, sir.
6    Q.    And do you have -- can you
7  confirm whether or not you ever signed a
8  document like this?
9    A.    Not to my knowledge.
10    Q.    Got you.  Well, if it doesn't
11  exists, there's no sense in asking you about
12  it.  I'll withdraw that.
13    A.    No.  In all honesty, I had never
14  seen it.  Never signed it, no.
15    Q.    Between now and the time we go to
16  trial on this case if you run across a signed
17  copy, you're going to give it to Mr. Lyons,
18  aren't you?
19    A.    I'll be glad to give it to Mr.
20  Lyons.
21    Q.    Okay.  And you're going to tell
22  him to get it to me?
23    A.    Immediately.

Page 366

1    Q.    Okay. I don't want to see it at
2  trial now.
3    A.    Okay. All right. I promise you,
4  you won't see it at trial.
5    Q.    Because I would have asked you a
6  bunch of questions about it today.
7          So, you've never seen it?
8    A.    I've never seen the document.
9    Q.    Okay. Go back to the complaint,
10 Page 11.
11   A.    Uh-huh (affirmative).
12   Q.    And I'm going to try to wrap this
13 up real quick. Breach of contract. Do you
14 see that at Page 11? That's your Count One.
15   A.    Okay.
16   Q.    As it relates to the ASU
17 defendants, there is no signed contract
18 between Gil Berry, Student Suites, Marous
19 Brothers and Alabama State University that you
20 know of; is that correct?
21   A.    Signed contract, correct.
22   Q.    Yes. A signed contract.
23   A.    Uh-huh (affirmative).

Page 367

1    Q.    Count Two is quantum meruit.
2  Again, I think when you talk about it in
3  Paragraph 48, at defendants' direction, who
4  are you referring to there?
5    A.    Would you finish reading the rest
6  of the statement?
7    Q.    I'm sorry. Paragraph 48.
8    A.    Uh-huh (affirmative).
9    Q.    Plaintiffs have, at Defendants'
10 direction, expended numerous hours on the
11 development work for the design, building,
12 renovation and procurement of financing for
13 the Student Residence Project at ASU.
14         And I'm just asking you what
15 defendants?
16   A.    It would be Dr. Lee.
17   Q.    Anybody else?
18   A.    Elton Dean.
19   Q.    Okay.
20   A.    Judge Wiggins.
21   Q.    Now, Judge Wiggins is not a
22 defendant in this case.
23   A.    Well, I mean -- excuse Judge

Page 368

1  Wiggins then.
2    Q.    So, what defendants?
3    A.    And you're right. It would be
4  Elton Dean and Dr. Lee.
5    Q.    And you're saying that Dr. Lee
6  told you to go out and expend hours on the
7  development for the design, building and
8  renovation and procurement? President Lee
9  told you that?
10   A.    Dr. Lee told me that we would be
11 paid. We had phone conversations. He told me
12 -- he called me personally to tell me that --
13         Again, that as soon as -- that
14 the bonds were secure, the money, that we
15 would be paid our expenses and that we could
16 start work. He would pay us for everything at
17 one time. They had some money, but he said he
18 needed to hold on to the money.
19         And, of course, I told him,
20 again, that, you know, if it was going to
21 cause the school any detriment, we didn't want
22 to do that.
23   Q.    And this would have been in the

Page 369

1  May/June 2006 time frame?
2    A.    Yes, sir. Yes. Because he spoke
3  -- and how I say that because he said that
4  they would probably close in July on the
5  bonds. And that's why I'm saying that they
6  -- it rings true.
7    Q.    And Chairperson Dean, he told you
8  you would get paid, too?
9    A.    Chairman Dean always reassured us
10 that we would get the contract and would be
11 paid, yes, sir.
12   Q.    Was that at Prattville?
13   A.    Huh?
14   Q.    Well, I mean, when? I mean --
15   A.    I mean, on numerous occasions. I
16 spoke to him on numerous occasions.
17   Q.    But you don't know what time
18 spans or when and where?
19   A.    I have -- I have seen him out
20 socially on several occasions, have talked to
21 him on the phone, yes.
22   Q.    But, again, though, Mr. Berry, I
23 can't let you get away with generalities.

Page 370

1  I've got to try to lock you down as best I
2  could.
3          If you saw Chairperson Dean at
4  the Rose and you-all are drinking cranberry
5  juice, you could be talking about a lot of
6  things other than you getting paid.
7          And so I want you as best you can
8  to identify for me when you met with him and
9  he said, Mr. Berry, you will get paid.
10     A.    Well, on the occasion that I
11 spoke about when he spoke about Ken and Percy
12 would sit with the president to move this
13 process along because the president felt that
14 he was left out of -- that we were dealing
15 with the board members and not him personally.
16         And many occasions I always told
17 the president that if -- if he had any
18 concerns, to please contact me.  If we needed
19 to -- you know, if there was anything that I
20 could do, I'd be glad to do it for him.
21     Q.    Well, I'm talking about Chairman
22 Dean now.
23     A.    Well, I'm trying to get to that

Page 371

1  if you will let me.  The president, I always
2  told him.
3          So, Mr. Dean told me that the
4  president felt that he was left out of the
5  process and that the board had acted without
6  him being fully abreast on the events that
7  were occurring, he needed to be brought up to
8  speed.  And so he had asked Percy and Ken to
9  bring him up to speed so we can move this
10 process along so that we could start the
11 project.
12     Q.    And is that the only occasion he
13 made a representation that you're relying on?
14     A.    No, no.
15     Q.    What others?
16     A.    On many occasions.
17     Q.    I'm not going to let you get away
18 with many.
19     A.    Okay.  Well, that's --
20     Q.    I mean, because at some point in
21 time these defendants have a right to defend
22 themselves.
23         And so if you're saying to me

Page 372

1  very clearly that they told you in May 2006,
2  he has a right to defend himself on that.
3      A.    And I agree.
4      Q.    And so I'm saying to you, help me
5  defend him.  When did he tell you these things
6  about which you say you relied on?
7      A.    The time that he spoke to me at
8  Alfred Seawright's office.
9      Q.    That's better.  Okay.  Was Mr.
10 Seawright there?
11     A.    Mr. Seawright placed the call and
12 put him on the telephone.
13     Q.    And Mr. Seawright heard Elton
14 Dean say that you would get paid?
15     A.    I don't know what Mr. -- if he
16 was still present in the room, or did he just
17 hand him the phone.  Me and him talked --
18     Q.    You said he was on speaker phone.
19     A.    I didn't say he was on speaker.
20     Q.    You got him on the phone.
21     A.    I said Mr. Seawright got him on
22 the phone.
23     Q.    Okay.  What other occasions would

Page 373

1  you say that Mr. Dean represented to you that
2  you would get paid other than Alfred
3  Seawright's office on his phone?
4      A.    If you give me a minute.  Let me
5  think.  When we went to VictoryLand.
6      Q.    Talk to me about VictoryLand.
7  That's the dog track, ain't it?
8      A.    I found out it was the dog track.
9  I don't gamble.
10     Q.    All right.  What happened there?
11     A.    Alfred Seawright -- it was on a
12 Sunday -- picked me and my cousin, Lorren, up
13 at the Hampton Inn and drove us to eat at Ruby
14 Tuesday right there by the Hampton Inn off of
15 Taylor Road.
16         He had informed me that we would
17 be meeting with Chairman Dean after church.
18 Chairman Dean arrived probably maybe an hour
19 later after we had got there.
20         Mr. Seawright, I think he paid
21 the dinner.  We talked and we -- me and Mr.
22 Dean and my cousin, Lorren, drove to the dog
23 track because I -- we had talked about -- we

Page 374

1  had looked at an opportunity -- when I say
2  "we," me and several others, had looked at an
3  opportunity that we were going to pursue to
4  try to get application for a license for a
5  electronic bingo.
6         And Mr. Dean asked me had I ever
7  been to the track and ever had seen the
8  facility.  And I said, no, I had never been
9  there.  So, Mr. Seawright said that he wasn't
10 going and asked Mr. Dean to take us out there
11 because Mr. Seawright said that he was going
12 to Atlanta to see his girlfriend.  And he
13 called her on the telephone.
14     Q.    And so who drove?
15     A.    Mr. Dean.
16     Q.    Okay.  And what did Mr. Dean say
17 to you, if anything, on the trip?
18     A.    Well, he drove me and my cousin,
19 Lorren.  At that time he had a black
20 Navigator, a Lincoln Navigator.  And he talked
21 about how old the Navigator was and -- you
22 know, that -- basically, that that Navigator
23 had a lot of miles on it and that project of

Page 375

1  ours was going to get us a lot of money and
2  hoped that we remembered him when we got a lot
3  of money.
4      Q.    And what was your impression of
5  those statements?
6      A.    I didn't know what to think of
7  the statements in all honesty.  I had a
8  thought.  I didn't want to conclude that that
9  was the thought that I had in my mind.
10         But after we went to the track,
11 basically he showed me around the track,
12 talked to a few people that he knew at the
13 track, played the dogs.  We watched him.  He
14 showed me around the facility.  And,
15 basically, he drove me and my cousin back to
16 the hotel.
17     Q.    Anything that Mr. Dean allegedly
18 said to you on that trip to the dog track or
19 at the dog track or on the return trip back
20 that offended you in any manner?
21     A.    He stated that it was an old
22 vehicle and we were making a lot of money on
23 the project and he would hope that we would

Page 376

1  remember him.  That's what he said so --
2      Q.    Well, I guess --
3      A.    Did it offend me?
4      Q.    Uh-huh (affirmative).
5      A.    I didn't know how to take it
6  because I'm in a -- I'm in place, in a state
7  where I don't know if my integrity is being
8  questioned, am I just being evaluated to see
9  if I would respond to these kind of -- what I
10 felt was allegations.  I don't know.
11         I'm caught in the crosshair of
12 thinking what is really going on here?  Is
13 someone just seeing that if I'm given the
14 project, will I be an honest steward of the
15 project, or is somebody telling me that they
16 would like for me to remember them when I get
17 the project?
18         So, I don't know what to think at
19 this point because I had told you before, I
20 personally think -- like Mr. Dean.  I
21 personally like -- I mean, I personally like
22 him.
23         I mean, even after this has been

Page 377

1  -- the lawsuit has been filed, I have seen him
2  on several occasions.  We shake hands.  You
3  know, we don't go into any detail, but we
4  speak and we are very cordial to each other.  I
5  will continue to be that way as long as people
6  are that way towards me.  So, I personally
7  like Mr. Dean.
8      I personally like Judge Wiggins.
9  Me and Judge Wiggins had a lot of religious
10 conversations on the phone.  I mean, probably
11 more than any conversations we had was about
12 the Lord.
13         Me and Mr. Buford had numerous
14 conversation, and I personally like him.  I
15 mean, to be truthful, it's --
16     Q.    Well, what I was just going to
17 say, we're good folks in Alabama.
18     A.    I think there's a lot of good
19 folks in Alabama and --
20     Q.    Now, returning back to this, did
21 you consider with Mr. Dean, anything he said
22 going to Shorter, at the dog track or
23 returning back to Montgomery offensive?

Page 378

1     A.    I'd have to say yes because the
2  bottom line is I didn't understand why we were
3  having a lot of private meetings and a lot of
4  private conversations when really I wasn't
5  having them with any -- any other board
6  members.
7     Q.    Okay.
8     A.    And really I didn't understand
9  that process considering that I was pursuing a
10  project at Alabama State.
11     Q.    Now, in your complaint under
12  substantive averments you pled the -- the
13  alleged incident up in Prattville.
14         But nowhere in your complaint did
15  you plead anything about on a trip to Shorter,
16  old Navigator, I hope you remember me.
17         Any reason for why your lawyers
18  didn't put that in the lawsuit?
19     A.    I don't know why.  I'd put it in
20  a written document to my previous lawyers.  I
21  stated it, the times and the dates and the
22  information.
23     Q.    Okay.  Other than the Prattville

Page 379

1  and now the VictoryLand situation, any other
2  things Mr. Dean said to you that --
3     A.    The last time --
4         MR. LYONS:  Well, let him finish
5  the question.
6         THE WITNESS:  Okay.
7     Q.    (By Mr. Thomas)  Anything other
8  than those two incidents?
9     A.    Yeah.  The last --
10         MR. LYONS:  Any conversations at
11  all or what?
12         MR. THOMAS:  Well, about he
13  getting paid that he relied upon.
14         THE WITNESS:  No.
15     Q.    (By Mr. Thomas)  Now, if you
16  would, go to Page 13, Count Three.  That's
17  fraudulent misrepresentation.
18     A.    Uh-huh (affirmative).
19     Q.    As I read each and every one of
20  those allegations, it appears that most of
21  those references are to other defendants in
22  this lawsuit.
23     A.    I would -- I would have to say

Page 380

1  yes.
2     Q.    Okay.  However, though, in
3  Paragraph 61 at Page 14 --
4     A.    Sixty-one?
5     Q.    Yes.
6     A.    Uh-huh (affirmative).
7     Q.    It's averred here that defendant
8  ASU continues to benefit from plaintiffs' --
9  and that's plural -- efforts.
10         Would that include Gil Berry &
11  Associates?
12     A.    Yes.
13     Q.    And the continuance of ASU's
14  benefit is what you've previously testified
15  to?
16     A.    Yes, sir.
17     Q.    The drawings and things of that
18  sort?
19     A.    Yes.
20     Q.    Got you.  Fraud.  That appears to
21  be focused on Defendant President Lee.
22     A.    Uh-huh (affirmative).
23     Q.    What are the false

Page 381

1  misrepresentations?  Are there any others that
2  you've not previously identified?
3     A.    No, sir.
4     Q.    And you're going to send me that
5  E-mail, right?
6     A.    Yes.
7     Q.    You remember the one back in
8  June?
9     A.    Yes.
10     Q.    Where you say that he says he's
11  going to pay you, right?
12     A.    If I can find it, yes.
13     Q.    Thank you.
14     A.    And I will send you the
15  transcripts from the phone company where he
16  called.
17     Q.    Thank you.
18     A.    Uh-huh (affirmative).
19     Q.    Paragraph 64.  Defendant
20  President Lee made these false
21  representations.  Again, that was you would be
22  paid?
23     A.    Yes, sir.

1    Q.    Got you.  Now Count Five,
2  Tortious Inference With Business Relations.
3  That appears to be relating to other
4  defendants --
5    A.    I would have to say --
6    Q.    -- not including ASU?
7    A.    Yes, sir.
8    Q.    Conversion.  You used in
9  Paragraph 75 the global term defendants.  Is
10  ASU included in that?
11    A.    I would have to ask my attorney.
12         MR. LYONS:  I'm just going to --
13  you testify on what your knowledge is.  I
14  think the pleadings -- you correctly identify
15  that it does include the defendants without
16  any exception.
17         THE WITNESS:  Yes.
18    Q.    (By Mr. Thomas)  Okay.  So, ASU
19  is in that, right?
20    A.    Correct.
21    Q.    And the proprietary -- what are
22  the proprietary work products?  That's just
23  these schemes?  I mean, this here?

1  President Joe A. Lee do other than acts that
2  are attributable to presidents of universities
3  in the State of Alabama?
4    A.    After we did not get the project,
5  I went to the Rose that night.  And shortly
6  after, Chairman Dean walked in the door.
7         And he said, I hope that you
8  didn't think I had anything to do with you not
9  getting the project.  And James Harold said
10  why don't you two gentlemen talk outside.
11         And me and the chairman went
12  outside.  And he said, Gil, I hope I don't
13  think I had anything to do with you not
14  getting the project.  I said, I would be less
15  than a man to say that I didn't.  I told him.
16         He said that John Knight met with
17  the president prior to the board meeting and
18  told him not to give us the project.
19    Q.    The meeting was September 22nd,
20  2006?
21    A.    That is correct.
22    Q.    So, John Knight, according to
23  your testimony, met with the president --

1    A.    That's not a scheme.
2    Q.    Well, again, I'm a novice.
3    A.    Okay.
4    Q.    What is it?  What is it, a
5  drawing?
6    A.    Those are detailed descriptions
7  of what will take place in every corner of the
8  building that we would be performing work.
9    Q.    And what are the specific acts
10  that you allege that these documents were
11  used?
12    A.    That was basically more input
13  from Marous Brothers.
14    Q.    Okay.  You next count is
15  conspiracy.  In there you make reference to
16  Defendants President Lee and Chairman Dean.
17    A.    Uh-huh (affirmative).
18    Q.    President Lee, isn't it a fair
19  statement all he did was negotiate through his
20  lawyer about these matters?  Isn't that
21  correct?
22    A.    No, that's not correct.
23    Q.    Okay.  What else -- what else did

1    A.    Prior to the board meeting making
2  the request that we did not get the project,
3  correct.
4    Q.    What else did Mr. Dean say?
5    A.    That was it.  He walked back
6  inside.
7    Q.    Now, again, my question to you
8  was what did President Lee do other than
9  conduct himself in his capacity as president
10  of an educational institution here in Alabama?
11    A.    Well, President Lee said he
12  fiscally could not give us the project.  And
13  based on my knowledge that we had a product
14  that I felt that was a -- a good product for
15  the number that we were forced to use of $25
16  million.  It would have done everything that
17  we said that it was going to do.
18         The scope has been changed, and I
19  know -- I know in my heart of hearts because I
20  am a contractor that that same six dormitories
21  is going to cost a lot more money.  Fiscally,
22  he said that he could not vote on our proposal
23  because he was under the impression that we

Page 386

1  were charging too much for our product and
2  that fiscally he as a steward of the school
3  could not sanction us to have the project.
4      Q.    Isn't that what presidents do,
5  make discretionary decisions, some right, some
6  wrong, some good, some bad?
7              That's what they do.  And that's
8  what I'm trying to say.  What did he do
9  outside of being president of a university
10 that harmed you?
11     A.    Well, what he did is he did not
12 keep his word as steward of the school, a man
13 that was put in place as the president to
14 protect the integrity of the University.
15             He was asked -- we worked in good
16 faith with the president and the University
17 and the board members to produce a product
18 that they would -- the school would be proud
19 of.  We exhausted our resources and worked in
20 good faith with reliances on individuals from
21 the school that we would be paid.
22             And when a president of an
23 institution that happens to be an African

Page 387

1  American like myself calls me on the phone and
2  says, Mr. Berry, if you would bear with us, we
3  can't pay you right now.
4              And in truthfulness, you know,
5  I'm not Marous Brothers.  I'm not Upchurch.  I
6  can't afford -- I'm a small company.  I tell
7  you, I work out of my house.  I'm a small guy
8  that started a company with $500 a $40 station
9  wagon and God has blessed me to be able to do
10 some great things and for a lot of people that
11 look like me.  I made a lot of black
12 millionaires back home.
13             And I -- I trusted that he would
14 live up to the statements that he made that we
15 would be paid.  I have a lot of respect for
16 Dr. Lee, and he can tell you on numerous
17 occasions I told him -- and I sat right here.
18 I said if we get the project and if there's
19 anything at that school that happens where you
20 need our services, I will send the guys over.
21 If there's something, a leak in the roof or
22 something, I said, you don't have to worry.
23 We'll never bill you.  I promise.  I'll send

Page 388

1  the work force over there to straighten it
2  out.  And he can tell you I had those
3  conversations with him.
4              So, when we don't get paid, you
5  don't live up the your word, you know.
6      Q.    Okay.  I got you.  And you're
7  saying that as president of the University, in
8  your opinion, he should have paid you
9  notwithstanding the resolutions that you-all
10 prepared that said there would be no cost to
11 the University if the deal didn't go through
12 and that he should pay you when there hasn't
13 been any clearly defined amount of what you
14 should be paid and agreed upon and he should
15 have expended state funds to pay you without
16 those other items, the service checks and
17 balances?
18     A.    We had sent -- we had sent to
19 Freddie Gallot our expenses.  He had agreed to
20 pay us our expenses.
21     Q.    Who now?
22     A.    The president.
23     Q.    Got you.

Page 389

1      A.    At least be a man of your word.
2  If you say that you're going to do something,
3  do it.  I mean, as individuals -- and if you
4  can't believe the president of a historical
5  black university, who can you believe?
6  Seriously.
7      Q.    The president of Harvard.
8      A.    Huh?
9      Q.    The president of Harvard,
10 Virginia, Stanford.  It's a lot of them you
11 can believe.
12     A.    Well, God has put him in a place
13 of ability to be a president of a historical
14 black institution that has a lot of great
15 history.
16             And to not honor his word, I
17 think, is -- does not speak well of the great
18 school that he represents.
19     Q.    If I could, let's go back to
20 Count Eight, and that's Page 18.  Page 18.
21     A.    Yes, sir.
22     Q.    Loss of business opportunities.
23 In Paragraph 85, you say defendants.  Does

1 that include the ASU defendants?

2    A.    Uh-huh (affirmative).

3    Q.    What significant business
4 opportunities did ASU, President Lee, Elton
5 Dean cause you to lose?

6    A.    When the president of Alabama A&M
7 tells you that I heard what has happened. I
8 have got a call. Wouldn't say from who. He
9 just said I got a call from Alabama State
10 about what is occurring up there.

11    That, to me, is a lost
12 opportunity that I'm still trying to retrieve
13 at this moment.

14    Q.    Well, now you currently -- well,
15 earlier today you testified that the situation
16 at Alabama A&M you were still talking with
17 Trustee Avery, I think it was.

18    A.    I said I'm still trying to
19 retrieve it.

20    Q.    Okay. Retrieve it. And it's
21 your testimony here today that Dr. Jennings,
22 President of Alabama A&M University, said what
23 to you now?

1    A.    That he had got a call from
2 someone from -- he never said who -- Alabama
3 State University to tell him about what is
4 occurring; that they have been sued?

5    Q.    Now, how do you attribute that to
6 President Lee or to Elton Dean?

7    A.    I didn't.

8    Q.    Well, your thing here says
9 defendants' actions directly and proximately
10 caused plaintiffs to lose significant business
11 opportunities.

12    And my question to you was what
13 defendants. And I asked is that defendants
14 ASU, President Lee and Elton Dean.

15    A.    ASU was on the paper right here.

16    Q.    I understand.

17    A.    We sued ASU. He said someone
18 from ASU called him.

19    Q.    Hold on a second. And you've got
20 to identify who that person is.

21    A.    I don't know who it is.

22    Q.    See, ASU can't speak.

23    A.    I understand ASU can't --

1    Q.    Nobody around here is named ASU.
2 Okay? So, it can't speak. So, you have to
3 tell me with some specificity --

4    A.    I don't know who that --

5    Q.    -- who.

6    A.    I don't know who that is.

7    Q.    Okay. Now, did Dr. Jennings say
8 that President Lee called him?

9    A.    No, he didn't.

10    Q.    Did he say that Chairman Elton
11 Dean called him?

12    A.    No, he did not.

13    Q.    Okay. Now, what other
14 opportunities have you lost that have been
15 caused by defendants ASU, President Lee and
16 Elton Dean?

17    A.    None that I can think of right
18 now.

19    Q.    Now, if you think of any others
20 before now and the day you get in trial in
21 federal court, you're going to let me know,
22 aren't you?

23    A.    I'll be glad to.

1    Q.    Okay. You're going to let your
2 lawyer know so he can let me know?

3    A.    I'll be glad to.

4    Q.    Okay. Otherwise, I'm going to
5 defend the ASU defendants on Dr. Jennings.

6    A.    That is no problem.

7    Q.    Okay.

8    A.    Look forward to it.

9    Q.    Now, Count Nine, it is alleged
10 here that you-all want the Court to enjoin in
11 any other relief, to order the return of
12 plaintiffs' proprietary work product.

13    A.    Uh-huh (affirmative).

14    Q.    Isn't it a fact that that has
15 been returned to you?

16    A.    And I think there was a -- a
17 letter sent to our previous attorneys that
18 there was -- they found another document that
19 had not been returned.

20    Q.    And it has been returned now?

21    A.    I don't know if it has or not.
22 They didn't return --

23    Q.    Well, we'll represent to you --

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Marous Brothers Construction, LLC, | ) | |
| a corporation, and Gil Berry, | ) | |
| an individual d/b/a Gil Berry & Associates, | ) | |
| | ) | |
| PLAINTIFFS, | )C.A.N.: 2:07-cv-00384-ID-CSC | |
| | ) | |
| v. | ) | |
| | ) | |
| Alabama State University, et al., | ) | |
| | ) | |
| | ) | |

## DEFENDANTS ALABAMA STATE UNIVERSITY,
## PRESIDENT JOE A. LEE AND CHAIRMAN ELTON N. DEAN, SR.'S
## EVIDENTIARY SUBMISSIONS IN SUPPORT OF MOTION FOR SUMMARY
## JUDGMENT

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 1 | Deposition of Gil Berry |
| 2 | Deposition of Arne Goldman |
| 3 | Affidavit of Dick Davis |
| 4 | Proposal Dated 9/20/05 |
| 5 | Davis Letter to Wiggins Dated 11/9/05 |
| 6 | Letter of Intent |
| 7 | Frazier Letter Dated 11/23/05 |
| 8 | Davis and Berry Letter Dated 1/24/06 |
| 9 | Minutes of the ASU Board of Trustees 5/5/06 Meeting |
| 10 | Goldman Email to Berry Dated 5/15/06 |
| 11 | Berry Invoice Dated 5/23/06 |
| 12 | MBC General Contractors Application and License |
| 13 | Email from Davis to Berry Dated 7/9/06 forwarding development agreement |
| 14 | Marous Internal Note |
| 15 | POS for 2006 Bond Issue |
| 16 | Email from K. Thomas re: review of proprietary work |
| 17 | Email from Berry re: review of proprietary work |
| 18 | Intentionally Omitted |
| 19 | Email from Goldman to Berry re: use of proprietary work |

| 20 | Letter from SSGBA to Pres. Lee Dated 8/18/06 |
| 21 | Email re: Fee Reduction |
| 22 | Berry Email re: fee reduction |
| 23 | Minutes of ASU Board Meeting 9/22/06 |
| 24 | Email from Berry to Wiggins dated 10/1/2006 |
| 25 | Lee Letter Dated 9/28/06 |
| 26 | Transmittal Letter from Lee |
| 27 | Transmittal Letter from R. Salaam-Jones |
| 28 | Amended Complaint |
| 29 | Affidavit of M. Fredrick Simpler, Jr. |

Respectfully Submitted,

/s/ Ramadanah M. Salaam-Jones
**KENNETH L. THOMAS (THO043)**
**RAMADANAH M. SALAAM-JONES (SAL026)**

**OF COUNSEL:**
**THOMAS, MEANS, GILLIS, & SEAY, P.C.**
POST OFFICE DRAWER 5058
3121 ZELDA COURT
MONTGOMERY, ALABAMA 36103-5058
(334)270-1033
Fax: (334)260-9396

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following counsel of record via this Court's electronic filing system on this the 5th day of March, 2008:

Jock M. Smith, Esq.
**COCHRAN, CHERRY, GIVENS & SMITH, P.C.**
P.O. Box 830419
Tuskegee, Alabama 36083

Champ Lyons, III, Esq.
**KING, HORSLEY & LYONS, LLC**
One Metroplex Drive
Suite 280
Birmingham, Alabama 35209

J. Lister Hubbard, Esq.
R. Brooke Lawson, Esq.
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
Montgomery, Alabama 36102-2069
(334) 241-8000
Fax: (334) 323-8888

/s/ Ramadanah M. Salaam-Jones
**OF COUNSEL**

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | | |
|---|---|---|
| MAROUS BROTHERS | ) | |
| CONSTRUCTION, LLC, a | ) | |
| corporation, and GIL | ) | |
| BERRY, an individual | ) | |
| d/b/a Gil Berry & | ) | |
| Associates, | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 2:07-CV-384-ID |
| -vs- | ) | |
| ALABAMA STATE UNIVERSITY, | ) | |
| a public corporation, | ) | |
| et al., | ) | |
| Defendants. | ) | |

VOLUME II

DEPOSITION OF GILBERT C. BERRY

Page 422

```
 1        S T I P U L A T I O N S
 2        IT IS STIPULATED AND AGREED, by
 3   and between the parties through their
 4   respective counsel, that the deposition of:
 5        GILBERT C. BERRY,
 6   may be taken before Belinda S. Brewster,
 7   Commissioner and Notary Public for the State
 8   of Alabama at Large, on the 25th day of
 9   January, 2008, commencing at approximately
10   9:00 a.m., at the law offices of Capell &
11   Howard, P.C., 150 South Perry Street,
12   Montgomery, Alabama; said deposition taken
13   pursuant to the Federal Rules of Civil
14   Procedure.
15        IT IS STIPULATED AND AGREED, by
16   and between the parties through their
17   respective counsel, that the reading of and
18   signature to the deposition by the witness is
19   waived, said deposition to have the same force
20   and effect as if full compliance had been had
21   with all laws and rules of Court relating to
22   the taking of depositions.
23        IT IS STIPULATED AND AGREED that
```

Page 423

```
 1   it shall not be necessary for any objections
 2   to be made by counsel to any questions, except
 3   as to form or leading questions, and that
 4   counsel for the parties may make objections
 5   and assign grounds at the time of the trial,
 6   or at the time said deposition is offered in
 7   evidence, or prior thereto.
 8        In accordance with Rule 5(d) of
 9   The Alabama Rules of Civil Procedure, as
10   amended, effective May 15, 1988, I, Belinda S.
11   Brewster, am hereby delivering to Kenneth L.
12   Thomas the original transcript of the oral
13   testimony of Gilbert C. Berry taken on the
14   25th day of January, 2008, along with
15   exhibits.
16        Please be advised that this is the
17   same and not retained by the Court Reporter,
18   nor filed with the Court.
19
20
21
22
23
```

Page 424

```
 1        A P P E A R A N C E S
 2   CHAMP LYONS, III, Attorney-at-Law, of the law
 3        firm of KING, HORSLEY & LYONS,
 4        LLC, 1 Metroplex Drive, Suite 280,
 5        Birmingham, Alabama 35209;
 6        appearing as counsel for the
 7        Plaintiff Gil Berry & Associates.
 8   D. CRAIG ALLRED, Attorney-at-Law, of the law
 9        firm of DAVID E. ALLRED, P.C.,
10        7030 Fain Park Drive, Suite 9,
11        Montgomery, Alabama 36117;
12        appearing as counsel for the
13        Plaintiff Marous Brothers
14        Construction, LLC (counterclaim).
15   KENNETH L. THOMAS and RAMADANAH M.
16        SALAAM-JONES, Attorneys-at-Law,
17        of the law firm of THOMAS, MEANS,
18        GILLIS & SEAY, P.C., 3121 Zelda
19        Court, Montgomery, Alabama 36103;
20        appearing as counsel for the
21        Defendant Alabama State
22        University.
23
```

Page 425

```
 1        A P P E A R A N C E S (Cont'd.)
 2   R. BROOKE LAWSON, III and J. LISTER HUBBARD,
 3        Attorneys-at-Law, of the law firm
 4        of CAPELL & HOWARD, P.C., 150
 5        South Perry Street, Montgomery,
 6        Alabama 36104; appearing as
 7        counsel for the Defendant TCU
 8        Consulting Services, LLC.
 9   ALSO PRESENT:
10   JOE A. LEE, President, Alabama State
11        University
12   ELTON N. DEAN, SR., Chairman, Alabama State
13        University Board of Trustees
14   JOHN KNIGHT, Special Assistant to the
15        President, Alabama State
16        University
17   W. KEN UPCHURCH, III, TCU Consulting Services,
18        LLC
19   PERCY THOMAS, TCU Consulting Services, LLC
20
21
22
23
```

1             I N D E X
2  Witness:                    Page
3  GILBERT C. BERRY
4    Examination by Mr. Lawson      429
5    Examination by Mr. Thomas      768
6    Examination by Mr. Allred      772
7  – – – – – – – – – – – – – – – – – –
8          E X H I B I T S
9  Defendant's
10 Exhibit No.  Description        Page

11  27    Letter Dated 12-5-07      432
12        (2 Pages)
13  28    Letter Dated 4-24-06      448
14  29    E-Mails Dated 7-3-06      459
15        (2 Pages)
16  30    Letter Dated 9-6-06 with  462
17        Attachments (3 Pages)
18  31    Hand Drawn Diagram        480
19        (Front and Back)
20  32    Letter Dated 1-24-06      499
21        with Attachment (3 Pages)
22  33    Letter Dated 2-24-06      502
23        with Attachment (2 Pages)

1        E X H I B I T S (Cont'd.)
2  Defendant's
3  Exhibit No.  Description         Page

4    46     E-Mail Dated 7-21-07    752
5           (2 Pages)

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1        E X H I B I T S (Cont'd.)
2  Defendant's
3  Exhibit No.  Description         Page

4    34     Letter Dated 3-9-06     504
5    35     Letter Dated 4-12-06    505
6           with Attachments (3 Pages)
7    36     E-Mail Dated 5-8-06     506
8    37     Letter Dated 5-23-06    678
9    38     E-Mails Dated 10-3-06   683
10         with Attachments (5 Pages)
11   39     E-Mail Dated 10-5-06 with  691
12         Attachment (2 Pages)
13   40     Letter Dated 8-1-07     719
14   41     Letter Dated 8-8-07     719
15   42     Letter Dated 8-3-07     721
16         (2 Pages)
17   43     Article, TCU Consulting  738
18         Services is Locally Owned
19   44     Article, ASU says Hotel  744
20         Rooms would be for Overflow
21   45     E-Mail Dated 7-21-07    748
22         (3 Pages)
23

1        I, Belinda S. Brewster, as
2  Commissioner and Notary Public for the State
3  of Alabama at Large, certify that pursuant to
4  Rule 30 of the Alabama Rules of Civil
5  Procedure and the foregoing stipulations of
6  counsel, there came before me at the law
7  offices of Capell & Howard, P.C., 150 South
8  Perry, Montgomery, Alabama 36104, on the 25th
9  day of January, 2008, commencing at
10 approximately 9:00 a.m., Gilbert C. Berry,
11 witness in the above cause, for oral
12 examination and the following proceedings were
13 had:
14        GILBERT C. BERRY,
15 a witness of lawful age, having previously
16 sworn or affirmed to tell the truth, the whole
17 truth, and nothing but the truth, was examined
18 and testified further as follows:
19 EXAMINATION BY MR. LAWSON:
20    Q.   Mr. Berry, my name is Brooke
21 Lawson.  I'm with the law firm Capell &
22 Howard, and I represent TCU Consulting, Ken
23 Upchurch and Percy Thomas, and I'm going to

Page 430

1  ask you several questions today about your
2  claims against my clients.
3        And I apologize in advance if I
4  jump around some, but it's kind of the nature
5  of being the clean up hitter to Mr. Thomas. I
6  may bounce around a little bit, and I
7  apologize. He did a fine job of covering a
8  lot of things that we were going to cover.
9        Could you tell me what your home
10 phone number is, please, and what it was in
11 2006?
12     A.    It has always been the same.  412
13 --
14     Q.    Go ahead.
15     A.    412-384-5962.
16     Q.    What is your cell phone number,
17 and what was it in 2006?
18     A.    It's always been the same.
19 412-720-1448 and 412-965-0466.
20     Q.    You have two cell phones?
21     A.    Yes, sir.
22     Q.    What about -- do you have an
23 office phone?

Page 431

1      A.    No, I don't.
2      Q.    Do you have any fax numbers?
3      A.    Yeah.  412-384-5980.
4      Q.    80?
5      A.    80.
6      Q.    What about your E-mail addresses?
7      A.    Gilberry@verizon.net.  I had to
8  think about it.
9      Q.    Any others?
10     A.    No.
11     Q.    Was that your E-mail address back
12 in 2006?
13     A.    I don't know.
14     Q.    You don't know?
15     A.    I really don't.  My secretary
16 would change it from occasion to occasion.
17     Q.    Okay.  Who is your secretary?
18     A.    Johnette Anderson, my office
19 manager/secretary.
20     Q.    We're going to mark exhibits.
21 We're going to pick up where we left off,
22 except that we're going to put a T on our
23 exhibits just so it will be obvious that it's

Page 432

1  an exhibit introduced by the TCU defendants.
2      A.    Okay.
3            (Whereupon, said document was
4            marked for identification as
5            Defendant's Exhibit No. 27 to the
6            deposition of Gilbert C. Berry.)
7      Q.    And I'm going to start with what
8  has been marked as Defendant's Exhibit No. 27.
9  I'm going to ask you to take a look at that
10 for me, please, and tell me if you've ever
11 seen that document.
12     A.    Yes, I have seen it, sir.
13     Q.    Okay.  In this letter dated
14 December 5, 2007, to your lawyers we've asked
15 for a number of additional documents that we
16 believe were not produced in the original
17 production in response to our request for
18 production of documents, and we've listed
19 those documents, including, you know, several
20 by Bates stamp number GBA, which you
21 understand to be Gil Berry documents.
22           Have you done anything to try to
23 find those documents?

Page 433

1      A.    I had notified Brian early on
2  that any documents that we had were turned
3  over to our previous attorneys.  Those
4  documents when I delivered them -- when they
5  were sent back to me that we had turned over,
6  Brian can tell you were delivered in full
7  capacity.  I never unfolded those documents
8  even though they were large boxes.  Brian can
9  tell you I kept everything intact.
10           So, you know -- lawyers usually
11 kind of do things chronologically and
12 everything.  I didn't want to go through the
13 files that were sent to me.  So, when they
14 were delivered to him from my previous
15 attorneys, I never removed any documents that
16 we sent.
17     Q.    Okay.  So, you haven't, though,
18 since we sent this letter done any additional
19 search of your files or your office or
20 anything else to try to determine if something
21 may have inadvertently been left out?
22     A.    I did do that, and there was no
23 -- no files.  When I got the actual, you know,

Page 434

1  new attorneys, I actually went through my --
2  my old files.  And even things that I knew
3  were duplicates, I even compiled those
4  separately and left the ones from the
5  attorneys intact and still gave all of those
6  to Brian.
7      Q.    What did you do to search your
8  E-mail records for any E-mails related to this
9  project or this litigation?
10     A.    I had my office manager go
11 through the E-mails and print, reproduce and
12 actually send those documents even though they
13 had been done before.  I just wanted to make
14 sure.  And anything that I might have had
15 laying around or I knew that were duplicates,
16 I still compiled those and --
17     Q.    Did she search your sent box and
18 your in box and your delete box, all three?
19     A.    Every document that I told her --
20 I don't care what it was about or unrelated or
21 we thought it was related please gather.  We
22 compiled and actually -- they have those.
23     Q.    Okay.  Did she look at your sent

Page 435

1  box?
2      A.    I don't know.
3      Q.    You don't know which -- which
4  folders in your E-mail account she looked at?
5      A.    I really don't.  But I can tell
6  you everything that I possibly had, everything
7  has been turned over.
8      Q.    Have you deleted any E-mails --
9      A.    No.
10     Q.    -- since this litigation began?
11     A.    No, no.
12     Q.    And do you still have all of the
13 E-mails that you've produced to us on your
14 computer?
15     A.    Yes, sir.
16     Q.    And you've not since then --
17     A.    No.
18     Q.    -- deleted those?
19     A.    No.  I have no reason to.
20     Q.    A number of documents were
21 identified yesterday under questioning from
22 Mr. Thomas that he's asked you to produce to
23 your lawyers to provide to us.  Do you recall

Page 436

1  that?
2      A.    Yes, sir.
3      Q.    And I'm assuming when you get
4  back to Pittsburgh, you're going to search for
5  those documents?
6      A.    I'd be glad to.
7      MR. LAWSON:  And we'd like to
8  keep his deposition open pending production of
9  all of those documents and reserve the right
10 to examine the witness about these documents
11 that he produces.
12     MR. LYONS:  I'll just state for
13 the record that I'm going to object to doing
14 that, but we can agree or disagree on that at
15 a later date.
16     Q.    (By Mr. Lawson)  Mr. Berry, what
17 is your -- who are you currently employed by?
18     A.    As I said yesterday, I'm
19 self-employed.
20     Q.    And that's Gil Berry and
21 Associates, Inc. now?
22     A.    Yes, sir.
23     Q.    What do you do?

Page 437

1      A.    I'm a consultant.
2      Q.    Who are you currently consulting
3  with or for?
4      A.    Right now I am currently
5  consulting for myself.  I'm developing a
6  project in Pittsburgh.
7      Q.    What kind of project is that?
8      A.    Condominiums.
9      Q.    How big of a project is this?
10     A.    Probably when -- I'm building ten
11 condominiums, probably in the neighborhood --
12 construction.wise it will probably be close to
13 about $5 million.
14     Q.    When you say ten condominiums, is
15 that ten condominium buildings or just ten
16 condominium units?
17     A.    Ten condominium units.  It's
18 going to be five stories high, two condos on
19 each floor, underground garage, roughly 20-car
20 garage, two cars per unit.
21     Q.    Is this in Pittsburgh?
22     A.    That's in Pittsburgh.
23     Q.    What's the address?

Page 438

1    A.    That is on Losken Street.  It's
2  on what we call the West End Overlook, sort of
3  like the view area of Pittsburgh.  We have a
4  mountain wash, and then it kind of overlooks
5  the city and -- but it's on Losken.
6    Q.    How do you spell Losken?
7    A.    L-O-S-K-E-N.
8    Q.    Do you own this property?
9    A.    No.
10   Q.    Who owns it?
11   A.    Actually, the Loskens own it.  We
12  have a -- I have site control of the property.
13   Q.    What do you mean by site control?
14   A.    I have a letter of intent from
15  the Loskens saying that -- giving me the
16  rights to develop the property and at the time
17  of closing they are paid $250,000.
18   Q..   Do you have a partner in this?
19   A.    No.
20   Q.    Who's going to provide financing
21  for it?
22   A.    Well, that's what we're looking
23  for right now.

Page 439

1    Q.    Have you talked to Dick Davis
2  about that?
3    A.    No.
4    Q.    Have you talked to Marous
5  Brothers about it?
6    A.    No.
7    Q.    Who have you talked to other the
8  Losken family?
9    A.    We have a big real estate firm.
10  We have Prudential back home of course.  We
11  have (inaudible) Hannah.  We're looking at
12  doing some presales based on the final
13  drawings and renderings from the architect.
14   Q.    Are you involved in any other
15  projects as a consultant, whether for yourself
16  or someone else?
17   A.    I have been asked by the City of
18  Harrisburg to come up there on Tuesday to look
19  at a housing project for the City of
20  Harrisburg.  It's 360 units, student housing.
21   Q.    What have they asked you to do?
22   A.    To actually develop that property
23  for them.

Page 440

1    Q.    So, you're going to provide them
2  some sort of proposal for the development of a
3  360-bed unit?
4    A.    Yes, sir.
5    Q.    Have you talked to Dick Davis or
6  Marous about this?
7    A.    No.
8    Q.    Do you not plan on working with
9  Dick Davis or Marous Brothers in the future?
10   A.    Well, of course, I am.  But I'm
11  --
12   Q.    Just not on this project?
13   A.    Not on this project.
14   Q.    Who do you intend to work with on
15  this project?
16   A.    It's a company called Prudential
17  back home.  We're going to look at the
18  project.  They have done work in that area.
19  They had renovated a Harrisburg hotel up
20  there.  I know the area.  We know of the same
21  people, the mayor, you know, council people up
22  in that area.
23   Q.    All right.

Page 441

1    A.    So, it's a better fit.
2    Q.    Are there any other projects that
3  you're working on or that are in the works?
4    A.    I named yesterday the project
5  over with Penn State.  I'm working with Marous
6  Brothers.  We have a proposal in to Penn
7  State.
8    Q.    Have you already submitted a
9  proposal?
10   A.    The proposal has been submitted.
11  It has state money in it.  Our governor is
12  involved in that project.  The City of
13  McKeesport is involved in the project.
14   Q.    When did you start work on that
15  project?
16   A.    We gave the proposal in July.
17   Q.    Of 2007?
18   A.    Yes, sir.
19   Q.    When did you first visit the site
20  and do your due diligence and look at the --
21   A.    Well, it's an existing old bank
22  building, eight stories high.  And what my
23  concept is, it's a -- McKeesport is a town

Page 442

1  that's been -- had a steel mill there. And,
2  of course, the steel mill is no longer there.
3  So, it's been hard hit.
4         And I was asked to come there by
5  the mayor to kind of look at some marina type
6  projects there, actually building some
7  townhouses right there on the water. I told
8  him I didn't think it was a good idea because
9  right next to it is where -- actually a waste
10 water treatment plant. So, I didn't really
11 think anybody wanted to live there.
12        So, on the way back I asked -- I
13 told him that I needed to go into this
14 building.
15    Q.    And when was this that you first
16 looked at this project?
17    A.    June.
18    Q.    Of 2007?
19    A.    Uh-huh (affirmative).
20    Q.    Okay. So, you've identified the
21 condo development that you're working on for
22 yourself, the Harrisburg project and the Penn
23 State project.

Page 443

1         Are there any other projects
2  you're currently involved in or that you
3  intend to be involved in in the near future as
4  Gil Berry & Associates, Inc.?
5    A.    Yes. There is a project I have
6  on the table, P&C Back in Jeannette,
7  Pennsylvania.
8    Q.    Okay. That's your hometown,
9  right?
10   A.    That's my hometown.
11   Q.    Okay.
12   A.    And there is -- P&C closed a
13 bank, and I made a proposal to buy the bank
14 off of P&C and to develop that.
15   Q.    Any other projects?
16   A.    No, not at this time.
17   Q.    Do you have a contract on any of
18 these projects?
19   A.    I have a contract with P&C Bank.
20   Q.    A contract to purchase the
21 property?
22   A.    Yes, I do.
23   Q.    And what are you going to develop

Page 444

1  it as?
2    A.    Well, I have a minister who has a
3  mental health program, will be my anchor
4  tenant. His name is Elder James Gray. He has
5  some multi-million-dollar contracts with
6  Allegheny County.
7    Q.    Is he currently your minister?
8    A.    He's my -- he's my minister, yes.
9    Q.    Tell me about your church
10 involvement growing up. You grew up in
11 Jeannette, Pennsylvania. And what church did
12 you go to?
13   A.    Hopewell Baptist.
14   Q.    Hopewell?
15   A.    Hopewell Baptist.
16   Q.    All right.
17   A.    Uh-huh (affirmative).
18   Q.    Do you still go there?
19   A.    Yes.
20   Q.    How often do you attend church?
21   A.    I don't -- I attend church more
22 at Elder Gray's church, but I still go to
23 Hopewell Baptist. My grandmother who had

Page 445

1  recently died, and we still have family there.
2  I might attend there once a month.
3    Q.    What about Elder Gray's, where is
4  that?
5    A.    His is in Braddock, Pennsylvania.
6    Q.    Now, Elder Gray is a person,
7  correct? Didn't I see him identified in a
8  letter?
9    A.    Elder Gray, yes. He is an elder
10 of the church. His father is --
11   Q.    What church is his?
12   A.    First Church of God and Christ.
13   Q.    And where is that?
14   A.    His father is a bishop, and he's
15 the elder there.
16   Q.    Where is First Church of God and
17 Christ?
18   A.    In Braddock, Pennsylvania.
19   Q.    How often do you attend that
20 church?
21   A.    Quite often. Probably -- if I'm
22 in town, it will be every Sunday.
23   Q.    So, every Sunday if you're in

Page 446

1 town -- do you go on Sunday nights or
2 Wednesday nights?
3      A.    No.  Services start at 11:00, and
4 usually you get out of there, by the time you
5 shake hands and everything, by 2:00 o'clock.
6      Q.    Are you involved in the church?
7 Are you a deacon or --
8      A.    No.  I'm -- if they have a
9 problem, they call me as far as construction
10 related.
11      Q.    But you're not on the vestry or a
12 deacon --
13      A.    No.
14      Q.    -- or anything like that?
15      A.    No.
16      Q.    Yesterday we were looking at some
17 exhibits that Mr. Thomas wanted to show you,
18 and Defendant's Exhibit No. 18 was one of
19 those.  I'll let your counsel pull that out
20 for you.  Just take a quick look at that for
21 me.
22         Do you recall looking at that
23 letter yesterday?

Page 447

1      A.    Yes, sir.
2      Q.    It talks in there about a
3 referral fee arrangement that you and Marous
4 Brothers had; is that correct?
5      A.    That's correct.
6      Q.    It's in paragraph number two I
7 believe.  Was Dick Davis aware of this
8 referral fee arrangement that you had with
9 Marous?
10      A.    I don't know if he was or not.
11      Q.    Did you ever tell him?
12      A.    I never told him about it.
13      Q.    But he was part of the team, one
14 of the partners in this ASU proposal, wasn't
15 he?
16         MR. LYONS:  Object to the form.
17      Q.    (By Mr. Lawson)  That's how you
18 characterized him yesterday, as part of the
19 team, right?
20      A.    We're all individuals, but part
21 of the team.
22      Q.    So, you don't recall ever telling
23 him that you had a side agreement with Marous

Page 448

1 for a referral fee, do you?
2      A.    I have an agreement with Marous
3 on all projects.
4      Q.    But you don't recall ever telling
5 him about this referral fee arrangement that
6 you had with Marous?
7      A.    I had no reason to tell him.
8      Q.    So, that would be a no?
9      A.    Yes, sir.
10         (Whereupon, said document was
11         marked for identification as
12         Defendant's Exhibit No. 28 to the
13         deposition of Gilbert C. Berry.)
14      Q.    I'm going to show you what we've
15 marked as Defendant's Exhibit No. 28 and ask
16 you to take a look at that for me, please.
17         Have you ever seen that letter?
18      A.    I'm still reading it.
19      Q.    Okay.
20      A.    Uh-huh (affirmative).
21      Q.    Is that your signature at the
22 bottom?
23      A.    That is.

Page 449

1      Q.    And that's a letter dated April
2 24, 2006, to Chip Marous at Marous Brothers
3 Construction?
4      A.    That is correct.
5      Q.    And down in the last paragraph
6 you write I am requesting you send my monthly
7 fee as I will be leaving for Alabama a few
8 days prior to meeting up with Arne and Glenn.
9         Did I read that correctly?
10      A.    Correct.
11      Q.    What is the monthly fee
12 arrangement that you had with Marous Brothers?
13      A.    It was $6,000 a month.
14      Q.    For what?
15      A.    For travel expenses, looking at
16 projects for us.
17      Q.    Okay.  So, Marous Brothers was
18 advancing you $6,000 a month for your travel
19 expenses?
20      A.    Yes.
21      Q.    Did they advance you that $6,000
22 every month?
23      A.    Yes, they did.

Page 450

1    Q.    And this project -- I believe you
2  testified yesterday you were involved in this
3  project for approximately 15 months?
4    A.    Uh-huh (affirmative).
5    Q.    Did they advance you $6,000 every
6  one of those 15 months?
7    A.    No.
8    Q.    Why not?
9    A.    They just didn't.
10   Q.    Did you ask them to?
11   A.    No.
12   Q.    Did you have an arrangement or a
13 written agreement with them that they would
14 advance you that money?
15   A.    I had a written agreement with
16 them, but it was for, I think, one year.
17   Q.    I've not seen that written
18 agreement in discovery. I would ask that you
19 provide that to your counsel to provide to us.
20   A.    Okay.
21   Q.    What does that written agreement
22 say?
23   A.    It says that they'll pay me

Page 451

1  $6,000 a month as a consultant to review and
2  look at properties.
3    Q.    When did you enter into that
4  written agreement?
5    A.    I think sometime in -- if I do
6  remember, in October.
7    Q.    Of what year?
8    A.    Maybe 2005.
9    Q.    So, if it is a one-year
10 agreement, then they should have been paying
11 you almost every month that you say you worked
12 on the ASU project?
13   A.    Yes.
14   Q.    And did they?
15   A.    Yes, they did.
16   Q.    Is that in addition to the
17 $60,000 they advanced you?
18   A.    Yes, it was.
19   Q.    So, the $6,000 monthly fee you
20 did not have to reimburse them?
21   A.    No.
22   Q.    That was just part of doing
23 business?

Page 452

1    A.    Part of doing business.
2    Q.    If I'm not mistaken, in this --
3  some of your invoices that you've submitted to
4  ASU in this case include your travel expenses;
5  is that correct?
6    A.    That's correct.
7    Q.    Even though you were being
8  reimbursed for those under an agreement with
9  Marous Brothers, you're still requesting that
10 ASU pay for your travel expenses?
11   A.    Well, I looked at other projects
12 for Marous. This wasn't the only project that
13 I looked at for Marous.
14   Q.    I understand.
15   A.    Why would I --
16   Q.    We talked about those yesterday,
17 didn't we?
18   A.    Why would I take money that I
19 have -- already have contracted with Marous,
20 the $6,000, and you use that money, which is
21 my money, and not be able to get reimbursed by
22 Alabama State for working on a project that
23 they requested me to work on?

Page 453

1    Q.    Okay.
2    A.    That's ludicrous.
3    Q.    So, Marous Brothers has paid your
4  $6,000 per month travel expenses, correct?
5    A.    Yes, they have. They have paid
6  my $6,000 for me to use for whatever purposes
7  I want to use it for.
8    Q.    And we've identified yesterday
9  those projects that you had ongoing during the
10 ASU project, correct?
11   A.    That's right.
12   Q.    So, you would use that $6,000 as
13 you saw fit to reimburse your travel expenses?
14   A.    That is correct.
15   Q.    And some of those would be travel
16 expenses related to the ASU project, wouldn't
17 they?
18   A.    Probably.
19   Q.    Did Dick Davis also have an
20 arrangement with Marous Brothers for a monthly
21 fee of $6,000?
22   A.    I can't speak for Dick Davis.
23   Q.    Did you ever tell Dick Davis that

1  you had an arrangement with Marous Brothers to
2  be reimbursed and paid $6,000 for your travel
3  expenses?
4      A.    I never told Dick Davis that.
5      Q.    Do you think Dick Davis might be
6  interested in knowing that?
7      A.    I'm sure Dick Davis has
8  arrangements he's never told me about.
9      Q.    Okay.  So, Dick Davis is not
10 aware -- at least you've never told him about
11 the $60,000 advance or the referral fee or the
12 monthly fee arrangement that you had with
13 Marous Brothers?
14     A.    That is correct.
15     Q.    And Dick Davis was a team member
16 on this ASU project?
17     A.    Dick Davis is an individual that
18 owned his company that was a member of our
19 team, yes.
20     Q.    And at one point you set up --
21 you and Dick Davis established Student Suites
22 GBA, correct?
23     A.    At the recommendation of Alabama

1  State's legal counsel.
2      Q.    I understand.
3      A.    Yes, sir.
4      Q.    You claim Mr. Thomas told you to
5  do that.
6          But at some point you and Dick
7  Davis combined your ventures into Student
8  Suites, Gil Berry & Associates, correct?
9      A.    That is correct.
10     Q.    At that point was Dick Davis
11 getting any part of this monthly $6,000 travel
12 expense that Marous Brothers was paying you?
13         MR. LYONS:  Object to the form.
14         THE WITNESS:  No.
15     Q.    (By Mr. Lawson) At any point
16 after you established Student Suites, Gil
17 Berry & Associates, was he getting any part of
18 this referral fee or the $60,000 advance from
19 Marous Brothers?
20     A.    He never got it from me, no.
21     Q.    Because you never told him,
22 right?
23     A.    No, I never told him.

1      Q.    Okay.  And when you started this
2  project or started looking into this project,
3  I guess it was back in July roughly of 2005?
4      A.    That's correct.
5      Q.    Were you looking at it as Gil
6  Berry & Associates?
7      A.    No.  I looked at it as Gil Berry
8  and partnering with Student Suites.
9      Q.    Okay.  So, even as far back then,
10 you partnering with Student Suites?
11     A.    Yes.
12     Q.    But you, yourself, you were
13 looking at it as Gil Berry d/b/a Gil Berry &
14 Associates?
15     A.    Yes.
16     Q.    You weren't licensed in Alabama
17 to do business, were you?
18     A.    No, not at that time.
19     Q.    You weren't licensed as a general
20 contractor in Alabama?
21     A.    I wasn't doing general
22 contracting work.
23     Q.    I understand that, but answer the

1  question.  You weren't licensed as a general
2  contractor in Alabama, were you?
3      A.    No.
4      Q.    And you're not a registered or
5  licensed architect or engineer in Alabama or
6  anywhere else, are you?
7      A.    No.
8      Q.    At one time didn't you consider
9  serving in the role of construction manager on
10 this project?
11     A.    I talked to your firm and your
12 partner down there about it, yes.
13     Q.    And you also talked to Arne
14 Goldman about that, didn't you?
15     A.    Yes.  I talked to several members
16 of your firm, also, about representing me on
17 construction management, had extensive
18 conversations with the gentleman down there
19 about how we -- we were asked how we wanted to
20 set the company up.
21         He asked me how.  I told him the
22 role that Marous would play.  I told him the
23 role that I would play.  I asked for

Page 458

1  directions. I told him about Marous. Marous
2  was asked to contact your firm. I don't think
3  that ever happened. I just had an engagement
4  letter, of course, from your firm.
5          We never signed the engagement
6  letter. It was asking for a $10,000 retainer.
7  I probably had three or four phone
8  conversations in length about how we felt the
9  project would go and that -- it was told to us
10  about your expertise in writing legislation on
11  -- on different things here at the State of
12  Alabama on construction, I guess, management
13  and that type of stuff, yes.
14     Q.   You were ultimately told that you
15  couldn't serve in the role of construction
16  manager, is that correct?
17     A.   I told you -- I said that I had
18  got a document I told you from -- Dr. Leon
19  Frazier had sent me a document on how
20  construction management was set up here in
21  Alabama. He had faxed it over to Dick, and
22  Dick had sent that copy to me.
23     Q.   Okay.

Page 459

1     A.   Uh-huh (affirmative).
2     Q.   And you requested that Arne
3  Goldman investigate how you could get licensed
4  in Alabama, didn't you?
5     A.   Licensed for what? As a general
6  contractor or as a what?
7     Q.   As construction manager.
8     A.   Yes.
9          (Whereupon, said document was
10         marked for identification as
11         Defendant's Exhibit No. 29 to the
12         deposition of Gilbert C. Berry.)
13     Q.   I'm going to show you what I've
14  marked as Defendant's Exhibit No. 29 and ask
15  you to take a look at that. That's an E-mail
16  from you to Arne Goldman dated July 3rd, 2006?
17     A.   That is correct.
18     Q.   Okay. And you've asked him to
19  investigate how you can become licensed in
20  Alabama as a construction manager, correct?
21     A.   Correct. Because Arne is an
22  architect also.
23     Q.   Why would he know how to get

Page 460

1  licensed as a construction manager just
2  because he's an architect?
3     A.   Because he -- they're in a --
4  they're in a network, Marous Brothers, as you
5  know, that have -- it's networked over all the
6  United States. And all he would have to do is
7  pick up the phone and call one of his network
8  partners here in Alabama to get the
9  information.
10     Q.   So, Arne Goldman did, in fact,
11  get that information for you, didn't he?
12     A.   No, he didn't.
13     Q.   He didn't? Over on the next page
14  attached to your E-mail, which is Exhibit No.
15  29, is an E-mail from Allen Bundy to you
16  copying Arne Goldman, and it states that it
17  appears as though this is not a viable
18  alternative based upon number one below,
19  number one being Section 230-X-1-.10 of the
20  Alabama Administrative Code regarding
21  construction managers.
22          Is that correct?
23     A.   Uh-huh (affirmative).

Page 461

1     Q.   So, it does appear that Allen
2  Bundy -- now, who is Mr. Bundy?
3     A.   I couldn't tell you who --
4     Q.   You don't know who that is?
5     A.   No, sir.
6     Q.   You don't know that he works at
7  Marous Brothers?
8     A.   I don't know Mr. Bundy.
9     Q.   Okay. Well, he copied you or
10  sent an E-mail to you regarding --
11     A.   He sent an E-mail to me, but I
12  don't know him.
13     Q.   Do you know who he is?
14     A.   He works at Marous, but I don't
15  know him personally.
16     Q.   I understand you don't personally
17  know him, but you know him to work at Marous?
18     A.   I know him to work at Marous.
19     Q.   Okay. So, it appears that
20  somebody at Marous answered your question
21  about licensing or becoming licensed as a
22  construction manager, correct?
23     A.   That's correct. You asked did

Page 462

```
 1  Arne --
 2    Q.    Okay.
 3    A.    -- did Arne answer that, and I
 4  said, no, Arne didn't.
 5    Q.    Somebody at Marous did?
 6    A.    Okay.
 7    Q.    And you did answer yes to that
 8  question?
 9    A.    Yes.
10          (Whereupon, said document was
11          marked for identification as
12          Defendant's Exhibit No. 30 to the
13          deposition of Gilbert C. Berry.)
14    Q.    And I'm going to mark Defendant's
15  Exhibit No. 30 and ask you to take a look at
16  that for me, please.
17    A.    Correct.
18    Q.    Have you ever seen that document?
19    A.    Yes.
20    Q.    And it appears to be a cover
21  letter and a license from the State of
22  Alabama, secretary of state's office, dated
23  September 6th, 2006 providing -- on the second
```

Page 463

```
 1  page it says Student Suites and Gil Berry &
 2  Associates Alabama, LLC is registered to do
 3  business in the State of Alabama as of August
 4  31, 2006; is that correct?
 5    A.    That is correct.
 6    Q.    Prior to August 31, 2006, Student
 7  Suites and Gil Berry & Associates Alabama, LLC
 8  was not registered or licensed or qualified to
 9  do business in Alabama, was it?
10    A.    No.
11    Q.    This document has a Bates stamp
12  from Marous, MAR 483.  Do you see that on the
13  first page?
14    A.    Yes.
15    Q.    This was not produced by you.  Is
16  there some reason why you would not have had
17  this or would not have produced this in
18  discovery to us?
19    A.    I have a copy of this in my -- my
20  attorney's file, yeah.
21    Q.    It is possible I overlooked it,
22  but I don't believe it was produced.
23    A.    Well, I can tell you that it's in
```

Page 464

```
 1  there.
 2    Q.    So, this was the first license
 3  that you had or the first permit you had or
 4  registration of any kind to operate or do
 5  business in Alabama, correct?
 6          MR. LYONS:  Object to the form.
 7    Q.    (By Mr. Lawson)  Is that correct?
 8    A.    That is correct.
 9    Q.    Because you've already testified
10  that Gil Berry & Associates was not licensed
11  or registered or qualified to do business in
12  Alabama, correct?
13    A.    That is correct.
14    Q.    Okay.  Who helped you form the
15  LLC with Student Suites?
16    A.    Dick Davis.
17    Q.    Dick Davis took care of that?
18    A.    Yes.
19    Q.    Who did he get to help him?
20    A.    I don't know.
21    Q.    Was that somebody at the Haskell,
22  Slaughter firm?
23    A.    I don't have any idea.  I really
```

Page 465

```
 1  don't.
 2    Q.    You don't know what lawyer helped
 3  you form the LLC?
 4    A.    I don't know who Dick hired or if
 5  he hired anybody.
 6    Q.    Did you have to sign anything?
 7    A.    Yeah.  I had to sign the
 8  corporation papers.
 9    Q.    Now, you had already been doing
10  work in the State of Alabama prior to August
11  31, 2006, correct?
12    A.    You want to explain what you call
13  work?
14    Q.    Well, I think yesterday we heard
15  petty extensive testimony from you about all
16  the work you claim to have done on the ASU
17  project.
18    A.    It wasn't a claim.  I did it
19  on that project.
20    Q.    Okay.  So, the answer to my
21  question then is, yes, you did do work in the
22  State of Alabama prior to August 31, 2006?
23    A.    That is correct.
```

1    Q.    Did you disclose on any of your
2  applications that you had already been doing
3  work in the State of Alabama prior to getting
4  a license to qualify to do business in the
5  State of Alabama?
6        MR. LYONS: Object to the form.
7        THE WITNESS: I haven't, no.
8    Q.    (By Mr. Lawson) The case is
9  styled -- your lawsuit is styled as Gil Berry
10  d/b/a Gil Berry & Associates, correct?
11    A.    That is correct.
12    Q.    And you've already said that Gil
13  Berry & Associates wasn't licensed or
14  qualified to do business in Alabama, correct?
15    A.    That is correct.
16        MR. LYONS: Object to the form.
17    Q.    (By Mr. Lawson) Why was it not
18  styled as Student Suites and Gil Berry &
19  Associates Alabama, LLC?
20    A.    That was something that my
21  attorneys determined at that time. That was
22  their input.
23    Q.    Have you dissolved that LLC?

1    A.    No.
2    Q.    It's still a going venture?
3    A.    It's still existing.
4    Q.    Is Dick Davis involved in it?
5    A.    He's -- it's still existing.
6    Q.    So, who did the work then that
7  you claimed to have done on the ASU project?
8        Was that you d/b/a Gil Berry &
9  Associates, or was it Student Suites and Gil
10  Berry & Associates Alabama, LLC?
11    A.    It was Gil Berry.
12    Q.    Just you?
13    A.    Yes, sir.
14    Q.    And then Student Suites, Inc.
15  separately?
16    A.    Correct.
17    Q.    So, Student Suites and Gil Berry
18  & Associates Alabama, LLC didn't do any work
19  on this project?
20    A.    Not at that time, no.
21    Q.    At any time?
22    A.    No.
23    Q.    What was your role on the

1  project? And when I say the project, we're
2  going to be referring to obviously the ASU
3  project.
4    A.    First of all, I did the
5  communications to get the meeting. That was
6  put together by Dr. Leon Frazier. I --
7        MR. LYONS: Y'all keep talking.
8  I'm going to get a cup of coffee.
9        THE WITNESS: Okay. I met with
10  Dr. Frazier, asked what the needs were of the
11  school. That's when Dr. Frazier and Mr.
12  Gallot said that -- I pointed down there, and
13  Mr. Gallot's not here today. I didn't know he
14  wasn't.
15        What the needs were. They said
16  they needed -- Dr. Frazier said he needed
17  3,000 beds. There was some discussion about
18  that. He felt that with the renovation and
19  the enrollment -- because basically they had
20  to turn away some students because of some of
21  the conditions there.
22        He asked me to take a look at the
23  dormitories. We physically looked at the

1  dormitories, never went inside. He asked me
2  what my determination was of the dormitories
3  at that time. I told him that, you know, some
4  of the dorms looked like they would be on the
5  historical register. I didn't know that much
6  about it. I was there for the first time.
7        I told him that we would have to
8  evaluate that because he said that -- I guess
9  they had someone previously that said that the
10  dorms have to be torn down. And I said, well,
11  if they're on the historical register, you
12  can't tear the dorms down.
13    Q.    (By Mr. Lawson) Would it be fair
14  to say that you did the initial interviews and
15  investigation to determine what ASU's needs
16  were? Is that --
17    A.    I would have to say that.
18    Q.    Okay. And yesterday I think you
19  described in your questioning from Mr. Thomas
20  the role of the various team members, that
21  being Gil Berry & Associates and Student
22  Suites, Inc. and Marous Brothers on the
23  Alabama A&M project. Do you recall that?

Page 470

```
 1      A.    Yes, sir.
 2      Q.    Would those same roles -- or
 3  would those entities' roles be the same on the
 4  Alabama State project?
 5      A.    Would those same roles be the
 6  same on --
 7      Q.    Would the role of Student Suites
 8  and Marous and Gil Berry & Associates be the
 9  same on the Alabama State project as you
10  described them to be on the Alabama A&M
11  project?
12      A.    Yes.
13      Q.    Were there any differences
14  between your roles on one project versus the
15  other?
16      A.    No, because Dick does finance.
17  He does have a company that does new
18  construction.  Dick doesn't have a lot of
19  knowledge of renovations.  He's never done a
20  renovation.  When I say "he," the firm that he
21  uses to do his new construction, which is in
22  Missouri, has never did a renovation.
23      Q.    Has never what?
```

Page 471

```
 1      A.    Done renovation work.
 2      Q.    Okay.  So, he was primarily on
 3  the financing side of the project?  That's his
 4  --
 5      A.    Yes.
 6      Q.    What he brings to the table?
 7      A.    That's his expertise.
 8      Q.    Okay.  And Marous Brothers, I
 9  guess, would bring design, construction?  They
10  were going to be a design/building; is that --
11      A.    Correct.
12      Q.    And you -- I think you've already
13  talked extensively with Mr. Thomas about what
14  you brought to the table as well, correct?
15      A.    Correct.
16      Q.    And those things were the same on
17  Alabama A&M and Alabama State?  You brought
18  the same things to that project as you did to
19  the ASU project?
20      A.    We looked at it that way.
21      Q.    And Dick Davis is not a party to
22  this lawsuit, correct?
23      A.    That is correct.
```

Page 472

```
 1      Q.    Are you seeking from any of these
 2  defendants any monies that Dick Davis claims
 3  he is owed for his work on this project?
 4      A.    No.
 5      Q.    He's not assigned to you any of
 6  his rights, has he?
 7      A.    No.
 8      Q.    Has he filed lawsuit against you
 9  to collect any monies he claims are owed?
10      A.    No.
11      Q.    Has Marous Brothers filed a claim
12  against you or made a demand against you for
13  the $60,000 they advanced you?
14      A.    No.
15      Q.    Have you-all discussed repayment
16  of that money?
17      A.    No.
18      Q.    Have you discussed with Dick
19  Davis payment of any monies he claims he's
20  owed?
21      A.    No.
22      Q.    When was the last time you talked
23  to Mr. Davis?
```

Page 473

```
 1      A.    Probably, like I said, this
 2  summer.
 3      Q.    What did you talk about?
 4      A.    His wife, she had an operation,
 5  my girl had an operation.  He talked about his
 6  grandkids.
 7      Q.    Did you talk about this project,
 8  the ASU project?
 9      A.    No.
10      Q.    Did you talk about the lawsuit?
11      A.    No.
12      Q.    Have you ever talked to him about
13  the lawsuit?
14      A.    Yeah.  I talked to him when we
15  were talking about filing the lawsuit.
16      Q.    What did you talk to him about?
17      A.    First of all, when it first
18  happened, I told him that I was looking at
19  recovery, and I told him that I would keep him
20  abreast of what firm.  He said, please, do
21  that.
22            And like I said, when we were
23  looking at different firms, he was aware of
```

14 (Pages 470 to 473)

Page 474

1 the firms we were looking at.
2    Q.    Why would he be interested in
3 what firm you were hiring?
4    A.    Because at the time he was going
5 to enter into the lawsuit as well.
6    Q.    Why did he decide not to, do you
7 know?
8    A.    Because he felt that -- he does a
9 lot of colleges and -- mainly historical black
10 colleges. He thought that it would tarnish
11 his reputation.
12    Q.    Any other reasons that he stated
13 to you as to why he wouldn't join your lawsuit
14 against these defendants?
15    A.    No.
16    Q.    This project that you and Marous
17 and Dick Davis and Student Suites proposed,
18 describe for me, if you will, what is meant by
19 suite style. I heard you say that several
20 times yesterday. Can you tell me what that
21 means?
22    A.    Suite style units are units that
23 are -- usually we do them in -- they're done

Page 475

1 in a quad or -- you can have a single, or you
2 can have a double.
3         Usually in the quads there are
4 two full baths, and they're usually shared by
5 two individuals. There's common living space.
6 There's a common kitchen area. We do not put
7 any stoves in there because, of course, the
8 schools like the kids to use the cafeteria.
9 So, we might -- we usually put a refrigerator
10 and microwave oven.
11         There is a common living room
12 area, and it's usually -- that's what we call
13 a suite style unit.
14    Q.    Now, when you say quad, that's
15 two bedrooms with two beds each? Is that what
16 you mean by that?
17    A.    A quad, yes. It's actually four
18 people in a quad.
19    Q.    But in two bedrooms?
20    A.    Yes. Yes, sir. And they share
21 -- two people share one bathroom, and the
22 other two share another bathroom that they
23 have access to.

Page 476

1    Q.    The suite style that you proposed
2 for ASU in this quad setup, did all of them
3 have a private bath?
4    A.    No, they don't have private
5 baths. I mean --
6    Q.    Well, private for the two
7 bedrooms?
8    A.    Or if it's -- if it's a double,
9 there's only one bath in there.
10    Q.    And did each have a living room,
11 each of the suite style configurations that
12 you proposed for ASU?
13    A.    Did they -- yeah, they had --
14    Q.    They had their own living --
15    A.    They had common living quarters,
16 yeah.
17    Q.    Now --
18    A.    I mean, they had a common area.
19    Q.    -- in looking at a drawing of
20 this, would we see a bedroom and then another
21 bedroom and then the living and bathroom on
22 the end? Is that how it was?
23         Or would the living and bathroom

Page 477

1 area be between the two bedrooms?
2    A.    Well, in the configuration that
3 Marous did it was a mixture of both.
4    Q.    So, some of the suite style
5 bedrooms would have a bedroom, then another
6 bedroom and then the living and bathroom on
7 the end; is that correct? Not in between the
8 two bedrooms?
9    A.    Say that one more time.
10    Q.    Okay. Some of the suite styles
11 developed or proposed by you and Marous
12 Brothers, you would have a bedroom --
13    A.    Uh-huh (affirmative).
14    Q.    -- and then another bedroom, and
15 then you'd have a bathroom and living room on
16 the end; isn't that correct?
17    A.    You would have -- you would have
18 two bedrooms, a bath, you would have a common
19 living space, you'd have a common kitchen
20 area, what we call a kitchen area.
21    Q.    But the bathroom and living room
22 or kitchen area was not between the bedrooms,
23 was it?

1    A.    Say that one more time.  I'm not
2 trying to be funny.
3    Q.    I understand.
4    A.    I have a bad ear.
5    Q.    The bathrooms and the living
6 room, those were not between the two bedrooms
7 of the suite, were they?
8    A.    The bathroom and the living room
9 were not between --
10        MR. LYONS:  Brooke, this is
11 certainly your deposition, but it may be
12 helpful if you could just draw a little sketch
13 of what you're trying to ask him.
14        MR. LAWSON:  Sure.  I would love
15 to.
16        MR. LYONS:  And that will make it
17 clear for the record what we're talking about.
18        MR. LAWSON:  Let's see.  I'm no
19 architect.
20        MR. LYONS:  We won't hold you to
21 the dimensions of it, but we'll get the idea.
22    Q.    (By Mr. Lawson)  I'll show you
23 what I'm talking about, which is a bedroom and

1 then a bedroom and then a bath and living
2 room.  Is that the configuration for the suite
3 style proposed by Marous?
4    A.    Can I see your drawing?
5    Q.    Sure.
6    A.    We have done them like this.
7 That's a bedroom, bedroom.
8        MR. LYONS:  Why don't you write
9 it on there so we can --
10        THE WITNESS:  Okay.
11        MR. LYONS:  Write bed and bed
12 just so we'll know later what you're talking
13 about.
14        THE WITNESS:  And we have a
15 bathroom area.  And then we have another
16 bathroom back to back for plumbing purposes.
17 We have a bedroom.  And then we've got a
18 common living area over here, and over here we
19 have a kitchen.
20    Q.    (By Mr. Lawson)  Now, is that
21 what all of the --
22    A.    No.  I mean, we're talking about
23 a building that you have to utilize the space

1 that is given.  If you had a building that you
2 could stick build and everything is all common
3 and -- we were asked to do so many units.  So,
4 the configuration might change at any time in
5 any of the units.
6    Q.    Okay.  Now, how many -- how many
7 of the units looked like this?
8    A.    I couldn't -- I couldn't tell
9 you.
10        MR. LAWSON:  And I'm going to
11 mark this just so we'll know.  I'm going to
12 mark this as Defendant's Exhibit 31.
13        (Whereupon, said document was
14        marked for identification as
15        Defendant's Exhibit No. 31 to the
16        deposition of Gilbert C. Berry.)
17    Q.    Were there not also some units or
18 some suite styles developed as I drew it where
19 you had bedroom, bedroom and then living room
20 and bath on the end?
21    A.    I'm quite sure that there was.
22    Q.    Okay.
23    A.    You know, I --

1    Q.    Were they accessed to the living
2 room and bathroom from the farthest bedroom
3 and you had to walk through that bedroom?
4    A.    Is there a set of plans that I
5 can look at?
6    Q.    I'm just asking you, do you know?
7    A.    No.
8    Q.    You don't know?
9    A.    I don't know.
10    Q.    So, what does suite style mean to
11 you?  Why do you keep saying suite style
12 instead of suite?
13    A.    Suite style.
14    Q.    Okay.  And what's the difference
15 in a suite style and a suite?
16    A.    The style of the unit.
17    Q.    Okay.  Well, what --
18        MR. LYONS:  If there is a
19 difference.
20        THE WITNESS:  To me, there's no
21 difference.
22    Q.    (By Mr. Lawson)  Okay.  So, when
23 you say suite style, that's synonymous with

Page 482

1 just suite?
2    A.    Yes.
3    Q.    And what I think of in a
4 traditional suite is bathroom with a bathroom
5 and living area in between and then another
6 bedroom.  Is that --
7    A.    That's your opinion.
8    Q.    Yes, it is my opinion.
9    A.    Okay.
10   Q.    Were any of those type suites
11 included in your proposal to ASU?
12   A.    I don't know.
13   Q.    You don't really know what Marous
14 was proposing as far as --
15   A.    There are different -- if you
16 look at the drawings we had, there were
17 different configurations on it.  We were to
18 get as many maximized units out of there, and
19 we did.
20   Q.    Okay.  And Marous actually
21 prepared the schematic that would show --
22   A.    They did the design/build of the
23 units, yes.

Page 483

1    Q.    Okay.  So, they prepared the
2 drawings or the schematic that showed what
3 type of suite would be found in each of the
4 renovated dormitories, correct?
5    A.    That is correct.
6    Q.    Did any of the suites designed by
7 Marous or proposed by Marous have kitchens?
8    A.    I don't know.
9    Q.    That would be a question for
10 Marous?
11   A.    Yes.  That would be a question --
12   Q.    So, you're not really certain as
13 we sit here today what was included in Marous'
14 proposal as far as the layout of the suite
15 style units?
16   A.    My role as the developer is to
17 develop the project and to develop the team.
18 Marous Brothers' role were the design/builders
19 and the contractors or head of the
20 construction management team.
21       As the developer, you develop the
22 project, you put the team together and you
23 present the proposal.  That's what I did.

Page 484

1    Q.    So, that was -- the role -- what
2 you would call yourself would be a
3 "developer"?
4    A.    Yes, I'm a developer.
5    Q.    And the role of the developer is
6 to put the team together, in this case Marous
7 and Student Suites --
8    A.    People that have an understanding
9 of -- in that case it's historical renovation.
10 That's why it was Marous.  It if it would have
11 been new construction, Dick had --
12       When we were going to do the 388
13 beds, Dick was going to actually bring his
14 team to do the 388 beds while Marous did the
15 renovation portion so that at the same time
16 there would actually be work going on
17 simultaneously on both projects.
18   Q.    I understand.  So, as the
19 developer, you were pulling these entities
20 together with their specialties, Davis in the
21 financial end of it and Marous in the
22 design/build end of it?
23   A.    Correct.

Page 485

1    Q.    And you pulled them together and
2 helped facilitate a proposal to pitch to ASU
3 for this work?
4    A.    That is correct.
5    Q.    And that was your role as the
6 developer?
7    A.    And to make sure that the project
8 was done on time and in budget.
9    Q.    So, if we want to find out what
10 was actually being proposed to ASU in terms of
11 suites and the layout of those and the
12 configuration of those, that's a question left
13 for Marous Brothers?
14   A.    I would have to say it is.
15   Q.    Now, yesterday -- Exhibit No. 19.
16 If you could pull that out.  That was an
17 exhibit shown to you by Mr. Thomas.
18       MR. LYONS:  I think this is the
19 one -- is that the letter of intent?
20       MR. LAWSON:  We didn't offer it?
21       MR. LYONS:  Mr. Thomas didn't
22 offer it.
23   Q.    (By Mr. Lawson)  Okay.  The

Page 486

1  letter of intent. And I believe you said
2  you'd never seen that, right?
3       A.    That is correct.
4       Q.    Okay. And you've never seen any
5  sort of contract or agreement between Gil
6  Berry and Marous Brothers pertaining to the
7  ASU project?
8       A.    That is correct.
9       Q.    And the only contract that you've
10 identified between you and Marous Brothers is
11 the contract whereby Marous agreed to pay you
12 in -- pay you a $6,000 monthly fee for your
13 travel expenses?
14      A.    A $6,000 fee for whatever I -- I
15 need the money for.
16      Q.    Okay. So, it could be used for
17 things other than travel?
18      A.    That's correct.
19      Q.    So, not just travel?
20      A.    That's correct.
21      Q.    That's the only written contract
22 or agreement between you and Marous?
23      A.    That's correct.

Page 487

1       Q.    And you're going to provide that
2  to your lawyer to provide to us?
3       A.    Yes.
4       Q.    You did retain Marous' services
5  on this project as the developer, didn't you?
6       A.    We had a -- yes, we had a verbal
7  agreement.
8       Q.    They weren't hired by TCU or
9  Upchurch or Thomas or ASU, were they?
10      A.    No. They were asked to bid the
11 project by TCU or Ken Upchurch.
12      Q.    Was your referral agreement put
13 in writing? I know we have a letter that
14 we've seen that we've already looked at today,
15 but was there any sort of written agreement or
16 contract?
17      A.    I don't think there was.
18      Q.    That was not included in the
19 agreement, in the written agreement between
20 you and Marous for the $6,000 monthly fee?
21      A.    I can't speak on that today.
22      Q.    Did you promise to pay Marous for
23 its work on this project?

Page 488

1       A.    Did I promise to pay Marous for
2  their work on this project?
3       Q.    Yes.
4       A.    That's the team, yes. They were
5  -- they were going to be paid. Of course.
6       Q.    When did you make that promise to
7  them?
8       A.    When we looked at the project.
9       Q.    Did you tell Marous when you
10 first contacted them about the ASU job back in
11 2005 that you would pay them for any of their
12 work that went into the September proposal or
13 the November revised proposal?
14      A.    Their proposal?
15      Q.    Yes.
16      A.    No. We were looking at the
17 school pass for the -- for the work he had
18 performed.
19      Q.    Well, I believe you testified
20 yesterday that you did not expect payment for
21 that September proposal and the work that went
22 into that?
23      A.    I said that.

Page 489

1       MR. LYONS: Objection.
2       THE WITNESS: For the
3  presentation.
4       Q.    (By Mr. Lawson) Yeah. It's
5  called a proposal, I believe, if I'm not
6  mistaken?
7       A.    It's called a proposal, but it's
8  a presentation that we made.
9       Q.    Okay. But you didn't expect
10 payment for that, did you?
11      A.    I didn't. I don't know --
12      Q.    Did you promise to pay Marous for
13 its work that went into that?
14      A.    No, I didn't promise to pay
15 Marous.
16      Q.    Did you ever promise to pay
17 Marous anything on this project?
18      A.    I don't know what you mean by
19 anything.
20      Q.    Well, for any of the work that
21 they performed on this project at any time.
22      A.    They were looking to be paid by
23 the school like I was.

Page 490

1    Q.    Okay.  So, they were looking to
2  be paid if you got a contract to do the work
3  on this project?
4    A.    And our expenses.  That was
5  promised by Dr. Lee and -- and Judge Wiggins
6  that we would be paid.
7    Q.    And yesterday I believe you
8  testified several times that it was President
9  Lee and Judge Wiggins who promised to pay you
10  for your expenses?
11    A.    That is correct.
12    Q.    Anyone else?
13    A.    And, of course, Mr. Dean said
14  that we would get paid.
15    Q.    Okay.  So, Judge Wiggins,
16  President Lee and Elton Dean promised that you
17  would get paid your expenses?
18    A.    Yes, sir.
19    Q.    So, at no time did you promise
20  Marous that you would pay Marous for its work
21  whether or not you got the ASU contract?
22    A.    It was our understanding that we
23  were asked to send our expense report in to

Page 491

1  Mr. Gallot, which we did.  And even after the
2  fact, Judge Wiggins contacted -- even after we
3  didn't get the job and said, please, send me
4  your expense reports.  I will get them paid.
5        We sent them.  Dick sent his.
6  Dick even sent a nice letter to Judge Wiggins
7  appreciate getting -- getting us paid.
8    Q.    Okay.  I understand that you
9  claim that Judge Wiggins and Elton Dean and
10  President Lee promised to pay you your
11  expenses.
12        Leaving that aside, did you ever
13  promise Marous that you would pay Marous'
14  expenses whether or not ASU paid them --
15    A.    No.
16    Q.    -- or whether or not you got --
17    A.    No.
18    Q.    -- the contract with ASU?
19    A.    No.
20    Q.    And it's your contention that
21  Judge Wiggins, President Lee and Elton Dean
22  promised not only you, but Marous that your
23  expenses would be paid?

Page 492

1    A.    They used their work product,
2  yes.
3    Q.    What about if they hadn't used
4  your work product, did they still agree to pay
5  your expenses?
6    A.    I didn't hear you.
7    Q.    Well, you said they used our work
8  product as if that's why they should pay your
9  expenses.
10        Back in May when you submitted
11  that invoice, that first invoice, you hadn't
12  even given them the scope of work at that
13  point, correct?
14    A.    Hadn't given them the scope of
15  work.  They knew we were working --
16    Q.    This, Exhibit 8.
17    A.    Well, they knew we were working
18  there.  They had gave us access to the
19  building.
20    Q.    I understand.
21    A.    They had allowed us to go in
22  there and film and document the building.  We
23  had worked with them to determine that the $25

Page 493

1  million number that was given to us for us to
2  back into, that we had to make it work for us
3  to be able to get the contract.
4        So, the bottom line is it was
5  ongoing because they had rejected our $51
6  million that we had put on the table that we
7  would finance via Dick Davis that it would not
8  cost the school to go out and borrow any
9  money.
10        So, when that was rejected, they
11  gave us a $25 million number not to exceed
12  that we had to make work on six dormitories.
13  That's why we said we would finance the 388
14  new beds on campus because we knew that the
15  school didn't want to go past the $25 million
16  number.
17    Q.    But the agreement that you say
18  you had for them to reimburse your expenses,
19  when was that made?  Can you tell me?
20    A.    Who's that?
21    Q.    Well, you said Judge Wiggins,
22  President Lee and Elton Dean promised to --
23    A.    Well, we're talking --

Page 494

1    Q.    That's where we were. We were
2  talking about your expenses, and then you --
3    A.    Okay.
4    Q.    Then you go off and start telling
5  me about backing into the $25 million, which
6  is fine.
7          But as far as the expenses go,
8  when were those promises made to you?
9    A.    After the changes were made from
10 us not doing the financing.
11   Q.    Which was when?
12   A.    Early on.
13   Q.    Early when?
14   A.    I mean, after they told us that
15 we had a $25 million cap that we had to work
16 with.
17   Q.    When did they tell you that?
18   A.    They told us that when we had the
19 meeting with Freddie Gallot and Mr. Bill Blunt
20 and Attorney Fred Gray.
21   Q.    What year was that?
22   A.    It had to be 2005.
23   Q.    So, at some point in 2005 you

Page 495

1  were told because you were no longer going to
2  be financing the project that you would get
3  your expenses reimbursed?
4    A.    Of course.
5    Q.    And was that to be -- was that to
6  come out of the $25 million ultimately, your
7  expenses, whatever reimbursement there was of
8  your expenses, or was that on top of the $25
9  million?
10   A.    That was on top of the $25
11 million.
12   Q.    So, in addition to the $25
13 million, you were going to get all of your
14 expenses back?
15   A.    That's why President Lee said we
16 had to wait until he got the money because he
17 had money already. I think they had like $3
18 million. They were going to do some painting
19 and patching in a building.
20         And, basically, we told them that
21 -- that we could do a lot of that work if we
22 had the new -- got the new -- if we were going
23 to build the new.

Page 496

1    Q.    So, am I correct that it's your
2  opinion that you were going to give them a $25
3  million project, but it would also cost
4  whatever your expenses were on top of that?
5    A.    That is correct.
6    Q.    So, it wouldn't really be $25
7  million? It would be something more than that
8  $25 million?
9    A.    That's correct.
10   Q.    Okay. And you don't have
11 anything in writing where anybody has promised
12 to pay those travel expenses or any other
13 expenses, do you?
14   A.    Just verbal commitments.
15   Q.    That's right. And then there are
16 several E-mails from you requesting payment,
17 correct?
18   A.    On the request that Judge Wiggins
19 said to send the requests to Freddie Gallot,
20 who was the property person we were supposed
21 to send the requests to.
22   Q.    And nobody responded to you,
23 yeah, you're right, I'll get you paid, did

Page 497

1  they?
2    A.    President Lee called and said --
3    Q.    By E-mail? Did anybody respond
4  to your E-mail requests for payment?
5    A.    No one didn't respond saying they
6  wasn't going to pay it either.
7    Q.    Okay. The development agreement,
8  which was Exhibit No. 15 yesterday, did you
9  have any role in creating that?
10   A.    Can I go to the men's room if you
11 don't mind?
12   Q.    Excuse me?
13   A.    Can I go to the men's room?
14   Q.    Sure. Help yourself.
15   A.    I'll be right back.
16         (Brief recess.)
17   Q.    All right. Exhibit No. 15 from
18 yesterday, do you have that in front of you?
19   A.    Yes, I do.
20   Q.    And over on about the -- it looks
21 like one, two, three -- fourth page is a
22 development agreement dated July 10, 2006.
23   A.    Uh-huh (affirmative).

Page 498

1    Q.    And it has your Bates stamp
2    number GBA 215?
3    A.    Correct.
4    Q.    Was this something sent to ASU by
5    you?
6    A.    I think it was actually sent by
7    Dick Davis.
8    Q.    Had you reviewed it prior to his
9    sending it to ASU?
10   A.    Yes, I did.
11   Q.    Was this ever signed by ASU?
12   A.    No.
13   Q.    Was any sort of written agreement
14   ever executed or signed by ASU?
15   A.    No. We were in negotiations with
16   Mr. Kenny Thomas, no.
17   Q.    So, you never had any sort of
18   final agreement with ASU, did you?
19   A.    No, sir.
20   Q.    One of the exhibits that Mr.
21   Thomas showed you yesterday was Defendant's
22   Exhibit No. 7, which is the November 23, 2005,
23   letter from Leon Frazier to Dick Davis. Do

Page 499

1    you see that?
2    A.    Yes.
3    Q.    And it had attached to it -- or
4    it had, excuse me, referenced in it a
5    resolution. Do you see that?
6    A.    Uh-huh (affirmative).
7    Q.    Okay. Had you submitted, along
8    with Dick Davis, the proposed resolution to
9    ASU?
10   A.    I told you at that time I wasn't
11   present.
12   Q.    Okay.
13   A.    I had a death in the family.
14   Q.    But were you aware that Mr. Davis
15   had submitted a resolution to Alabama State?
16   A.    I think Dick did tell me he did.
17         (Whereupon, said document was
18         marked for identification as
19         Defendant's Exhibit No. 32 to the
20         deposition of Gilbert C. Berry.)
21   Q.    Let me show you what's been
22   marked as Defendant's Exhibit No. 32 and ask
23   if you've ever seen that document?

Page 500

1    A.    Yes, I have seen this document.
2    Q.    Is that your signature on the
3    second page?
4    A.    Yes.
5    Q.    And this is dated January 24,
6    2006, correct? Is that correct, is that the
7    date of the letter?
8    A.    That's the date of the letter.
9    Q.    Okay. In the second to the last
10   paragraph on the first page you talk about
11   having reduced the debt portion to
12   approximately $25 million rather than $39
13   million. Do you see that?
14   A.    Correct.
15   Q.    So, was there at some point when
16   the debt went from $51 million to $39 million?
17   A.    Yes. That's because we were
18   going to bring our own financing to do the new
19   dorms.
20   Q.    And then as of January 24, you've
21   gotten it down to $25 million, correct?
22   A.    No. The school gave us a $25
23   million cap, and then we were going to build

Page 501

1    the new dorms out of private money from George
2    K. Baum.
3    Q.    I got you. And attached to this
4    letter on the last page is another resolution
5    that you asked ASU to adopt, correct?
6    A.    I don't see a date on here.
7    Q.    I didn't say there was a date.
8    But in your letter if you'll look at the
9    second page of the last full paragraph, you
10   say we feel that we can open the new facility
11   during the fall semester of 2006 if the Board
12   will allow us to proceed by the attached
13   resolution.
14         Do you see that?
15   A.    Uh-huh (affirmative).
16   Q.    And then attached to your letter
17   is a resolution, correct?
18   A.    There is a resolution, but it's
19   not dated.
20   Q.    And down at the bottom it says
21   Student Suites and Gil Berry & Associates,
22   right?
23   A.    That is correct.

Page 502

1    Q.    And it has that same paragraph,
2  the last paragraph of the resolution, where it
3  says it is mutually understood that if final
4  agreement is not reached on more detailed
5  design and financing structures that this
6  resolution will become void with no expense to
7  Alabama State University, correct?
8    A.    And, again, the price that is
9  indicated here is $39,919,000.
10   Q.    I understand.  Did I read that
11 correctly, though?
12   A.    You read it correctly.
13   Q.    And that was submitted attached
14 to a letter that you signed, correct?
15   A.    That is correct.
16         (Whereupon, said document was
17         marked for identification as
18         Defendant's Exhibit No. 33 to the
19         deposition of Gilbert C. Berry.)
20   Q.    Let me show you Defendant's
21 Exhibit No. 33 and ask you to take a look at
22 that.
23   A.    Okay.

Page 503

1    Q.    Have you ever seen that letter?
2    A.    I've never seen that letter.
3    Q.    Well, it has a GBA Bates stamp on
4  it down at the bottom.  So, it was produced by
5  you in this lawsuit.  You've never seen it?
6    A.    Unless it came by the way of --  I
7  haven't -- I don't remember seeing it in all
8  honesty.
9    Q.    Do you know who wrote this
10 letter?
11   A.    I don't.  And I don't see a name
12 on it.
13   Q.    Does it appear that it would be
14 something written by Dick Davis, or do you
15 know?
16   A.    I can't say.
17   Q.    It does reference Gil Berry and
18 Gil Berry & Associates several times in the
19 letter, doesn't it?
20   A.    Dick has no letterhead.  That's
21 -- there's nothing on here.  So, I can't speak
22 to that letter.
23   Q.    You can't speak to that letter?

Page 504

1    A.    No.
2          (Whereupon, said document was
3          marked for identification as
4          Defendant's Exhibit No. 34 to the
5          deposition of Gilbert C. Berry.)
6    Q.    Let me show you what we're
7  marking as Defendant's Exhibit 34 and ask if
8  you can speak to this one?
9    A.    Okay.
10   Q.    Is that your signature on the
11 letter?
12   A.    That is.
13   Q.    Dated March 9, 2006?
14   A.    That is.
15   Q.    And you're, again, asking that
16 ASU pass the resolution that you previously
17 presented in February?
18   A.    That's what it says.
19   Q.    And we've already looked at the
20 February letter that had the resolution
21 attached, correct?
22   A.    Yes, sir.
23   Q.    And you or Dick Davis drafted

Page 505

1  that resolution?
2    A.    Dick did.
3    Q.    It wasn't drafted by ASU or TCU
4  or Ken Upchurch or Percy Thomas, was it?
5    A.    No.
6    Q.    And it provides that if final
7  agreement is not reached, there's no cost to
8  ASU, right?
9    A.    That's what it says.
10         (Whereupon, said document was
11         marked for identification as
12         Defendant's Exhibit No. 35 to the
13         deposition of Gilbert C. Berry.)
14   Q.    Let me show you Exhibit 35 and
15 ask if you've ever seen that.  Is that your
16 signature at the bottom?
17   A.    That is it.
18   Q.    And dated April 12, 2006?
19   A.    Correct.
20   Q.    Again, requesting passage of the
21 resolution that you and Dick Davis had
22 proposed?
23   A.    Correct.

Page 506

1    Q.    And it, again, attaches the draft
2  resolution, correct?
3    A.    There's one attached.
4    Q.    And, again, stating should final
5  agreement not be reached, Alabama State will
6  incur no expenses, correct?
7    A.    And, again, it's talking about
8  $39,919,000.
9    Q.    But it does include the language
10  that I just said?
11    A.    Yes, it does.
12           (Whereupon, said document was
13           marked for identification as
14           Defendant's Exhibit No. 36 to the
15           deposition of Gilbert C. Berry.)
16    Q.    Defendant's Exhibit No. 36, can
17  you tell me what that is?
18    A.    Yes.
19    Q.    That's an E-mail from you to
20  Judge Wiggins?
21    A.    That is correct.
22    Q.    And you're, again, requesting
23  assistance this time from Judge Wiggins in the

Page 507

1  passing of what you say is "our" resolution?
2    A.    Yes.
3    Q.    And that's the same resolution
4  we've been looking at, correct?
5    A.    Yes.
6    Q.    And by this time, by May 8, 2006,
7  you had proposed a $25 million project,
8  period; is that correct?
9    A.    No.
10    Q.    No?
11    A.    The school -- oh, we had
12  submitted a $25 million project, which was
13  mandated by the school.
14    Q.    Now, in your complaint, which I
15  believe Mr. Thomas looked at yesterday with
16  you -- and you might want to pull out a copy
17  of that for me.  It's Defendant's Exhibit 22.
18  And I believe -- the original complaint, if
19  you want to look at that, that's fine as well.
20           Paragraph 13.  Are you there?
21    A.    Uh-huh (affirmative).
22    Q.    If you'll take a look at that
23  paragraph for me real quick.

Page 508

1    A.    (Complies).
2    Q.    Down at the last sentence of that
3  paragraph it says the resolution stated that
4  its terms would become null and void if a
5  final agreement was not reached on the design
6  of and financing for the Student Residence
7  Project, correct?
8    A.    Correct, sir.
9    Q.    That's what you allege in your
10  complaint; is that right?
11    A.    That is correct.
12    Q.    But the resolution also states
13  that if there's not a final agreement, there
14  will be no expense or charge to ASU, doesn't
15  it?
16    A.    That's what it says.
17    Q.    Okay.  You didn't include that in
18  your complaint, though, did you?  You include
19  that language, but --
20    A.    Well, the bottom line is we
21  completed -- we gave you the work product that
22  ASU went to the bond market and got the
23  financing for the $25 million for six

Page 509

1  suite-style units.  We were doing the final
2  drawings by getting John Chambless to stamp
3  the drawings, get them approved by the state.
4  The same architect that Mr. Upchurch and Mr.
5  Thomas are using.  It's the same architect.
6    Q.    But to answer my question, your
7  complaint doesn't include all of the language
8  of the resolution?
9           You didn't include in your
10  complaint that part of the resolution which
11  says if there's no final agreement, there's no
12  expense to ASU, did you?
13    A.    My lawyers drafted the complaint.
14    Q.    Okay.
15    A.    I signed off on the complaint.
16    Q.    But that's correct what I just
17  said, isn't it --
18    A.    I don't see --
19    Q.    -- that you didn't include that
20  language?
21    A.    I don't see it in here.
22    Q.    You signed off on the complaint?
23    A.    That is right.  I signed off on

Page 510

1 it.
2    Q.    And you've already testified
3 there was no final agreement. So, by the
4 language of the resolution, there should be no
5 expense for ASU?
6    A.    There should be because the
7 bottom line is I was told that we would be
8 paid, and we were told that we if we could
9 produce the product of the $25 million mandate
10 from the school given to us, not to exceed, to
11 renovate the six dormitories in a turn-key
12 project, that it was our project.
13    Q.    Who told you that?
14    A.    Who told us that? Everybody told
15 us that.
16    Q.    Who's everybody?
17    A.    Elton Dean, the president, Mr.
18 Frazier, the whole board.
19    Q.    Anyone else?
20    A.    I think that's --
21    Q.    Anyone else?
22    A.    No.
23    Q.    Kent UpChurch never told you

Page 511

1 that, did he?
2    A.    Kent Upchurch wasn't part of the
3 process of the $25 million.
4    Q.    Right. So, he didn't tell you
5 that, did he?
6    A.    No.
7    Q.    Okay. Neither did Percy Thomas?
8    A.    No.
9    Q.    No one at TCU?
10    A.    No.
11    Q.    Well, what did you understand
12 TCU's role to be in July or August of 2006?
13    A.    Their role was to -- that was
14 indicated by Elton Dean and Judge Wiggins and
15 Mr. Buford that their role would be to review
16 the documents only because the president,
17 again, felt that the board had left him out of
18 the process and that he needed to be brought
19 up to par on the project.
20        And so Ken Upchurch and Percy
21 Thomas was brought on to enlighten the
22 president on the project. That was their
23 role, that was supposed to be.

Page 512

1    Q.    Enlighten the president?
2    A.    Enlighten the president.
3    Q.    So, you understood then at the
4 time they came on, "they" being TCU, that
5 their role was to review the proposal, the
6 scope of work and any other documents you and
7 Marous had submitted for President Lee to
8 enlighten him as to what was in those
9 documents?
10    A.    Yes, sir.
11    Q.    And in enlightening President
12 Lee, were they to look at it critically?
13        Were they to -- if they saw
14 something in there that jumped out at them
15 that just wasn't right, were they to enlighten
16 President Lee about that, or were they only to
17 enlighten President Lee about the good points
18 or the highlights of the documents in the
19 proposal?
20    A.    Well --
21    Q.    Or do you know?
22    A.    I don't -- I don't know.
23    Q.    You just know they were going to

Page 513

1 review those documents for whatever purposes?
2    A.    That's all that was told to me.
3    Q.    You don't know what the
4 arrangement really was because you weren't
5 privy to any of the discussions between ASU
6 and TCU, were you?
7    A.    No. I was just told by Mr. Dean,
8 Judge Wiggins and Mr. Buford that they were
9 just going to review the documents so we can
10 get past the point of this delay.
11    Q.    And you knew that it was going to
12 review your documents, your proposal, your
13 scope of work?
14    A.    That's correct.
15    Q.    And you knew its role was to ask
16 questions and to critique it for President
17 Lee, correct?
18    A.    I assume that.
19    Q.    Okay. And you welcomed TCU's
20 involvement if I remember correctly from your
21 E-mails, didn't you?
22    A.    I did.
23    Q.    And you consented to TCU's review

Page 514

1  of your materials, your proposal, your scope
2  of work?
3      A.    I did.
4      Q.    Okay.  And we looked at exhibit
5  --
6      A.    On review.  On review --
7      Q.    I understand.
8      A.    -- only.
9      Q.    As opposed to what?
10     A.    As opposed to them taking our
11 project.
12     Q.    And we'll get to that.
13     A.    Yes, sir.
14     Q.    Exhibit 23, if you want to look
15 at it.  You don't have to.  But it was a bunch
16 of E-mails from you where you've consented and
17 welcomed TCU and --
18     A.    I know what you're --
19     Q.    You remember the E-mails?
20     A.    Yeah.
21     Q.    You had no problem with TCU
22 serving as a representative of ASU?
23     A.    No.  Serving as a review --

Page 515

1  reviewing the documents for the president.
2      Q.    Okay.  But it's not your position
3  to dictate what role TCU would serve ASU in,
4  is it?
5      A.    Well, the bottom line is that the
6  chairman and the trustees tell me that it's in
7  a review process and that they would not have
8  any -- any more scope of work past the review
9  process.  No, I didn't have a problem with
10 that.
11     Q.    Okay.  But --
12     A.    If it was anything else, I would
13 have had a problem with it.
14     Q.    Okay.
15     A.    And when I thought that there
16 were -- that it was going past that, I spoke
17 to the chairman, I spoke to Judge Wiggins, I
18 spoke to Mr. Buford and said, do you know what
19 this is -- and the chairman's sitting there.
20         I said, this is turning into -- I
21 know the difference between chicken shit and
22 bullshit.  One is this high, and one is --
23     Q.    A lady's in the room.

Page 516

1      A.    -- and one is this high.  They
2  said yesterday -- Mr. Thomas said it was okay
3  because they've got thick skins.
4      Q.    Okay.
5      A.    So, I told the chairman that,
6  that I knew --
7      Q.    When did you tell him that?
8      A.    Over the telephone.
9      Q.    Well, when?
10     A.    Around the time that -- when Mr.
11 -- Mr. Upchurch sent 87 questions or somewhere
12 around there that had nothing to do with what
13 we had submitted and what they had got funded
14 for.
15     Q.    Was that in August of 2006?
16     A.    It was probably around that time.
17     Q.    Is that when you told Elton Dean
18 that they were stealing your project?
19     A.    Yes.
20     Q.    Who else did you tell that to?
21     A.    I told it to Mr. Buford, and I
22 told it to Judge Wiggins.  And they both said,
23 no, that's not happening.  I guarantee you

Page 517

1  that's not happening.  I said, gentlemen, it
2  is happening.
3      Q.    So, you said that they were
4  stealing your project?
5      A.    That's correct.
6      Q.    What else did you say to them?
7      A.    I didn't say nothing negative as
8  far as -- they're still on the project.  What
9  else is there to say?
10     Q.    I don't know.  You tell me.  Did
11 you tell Elton Dean anything else?  Did you
12 say anything else about them other than they
13 were stealing your project?
14     A.    No.
15     Q.    You didn't have any sort of
16 contract or agreement with TCU, Ken Upchurch
17 or Percy Thomas, did you?
18     A.    No.
19     Q.    And you had nothing signed by
20 them?
21     A.    No, I didn't have anything signed
22 by them.
23     Q.    And you didn't submit your

1  proposal or scope of work to TCU, Upchurch or
2  Thomas, did you?
3      A.    I submitted -- the documents were
4  given to the president that they had.  Now, I
5  don't know what Marous has given to Mr.
6  Upchurch.
7              Mr. Thomas really was null and
8  void.  I mean, he really had no input in
9  anything.  I haven't ever heard him testify
10  about the project, had never heard him say
11  anything about the project.  I've been to
12  board meetings and have -- he's never at any
13  board meetings that I have been present or
14  even know about that he's ever even commented
15  on even the ongoing work right now.  So, you
16  know.
17      Q.    Does that bother you that he
18  hasn't said anything about it?
19      A.    Well, you know, the bottom line
20  is that I think all of these gentlemen here
21  can tell you no matter what you try to finite
22  my role was, I was a real individual in the
23  project.

1      Q.    As opposed to what?
2      A.    I don't really see Mr. Upchurch
3  -- I mean, Mr. Thomas doing anything but just
4  sitting back and --
5              I mean, if you are an African
6  American at a black school and you are -- got
7  a contract with a partner, no matter what the
8  partner is, and you have never made a
9  statement at a board meeting, never been asked
10  a question, when I hear the president say,
11  Ken, I work with Ken very closely.  The bottom
12  line is -- you know, we're -- we're trying to
13  show our people, young people, that we all
14  have meaningful roles.
15              Mr. Upchurch has a role, Mr.
16  Thomas has a role and we need to let the
17  student body know that there are people that
18  look like us that have meaningful roles and
19  work like we do.
20      Q.    Okay.  So, you don't like the
21  fact that Percy Thomas doesn't speak up at a
22  board meeting?  That bothers you --
23      A.    I have a --

1      Q.    -- just because he's an African
2  American that he doesn't speak up?
3      A.    No.  I have a problem that he's
4  never asked to speak up at a board meeting,
5  and he never does speak up at a board meeting.
6              When I was there defending why we
7  didn't get the contract standing by Mr.
8  Upchurch, he'll tell you, I speak up, and I --
9      Q.    Some people speak up too much --
10      A.    Well, that's fine.
11      Q.    -- Mr. Berry.
12      A.    That's fine.
13      Q.    Were you present at every meeting
14  that Percy Thomas attended with any member of
15  the ASU Board or President Lee?
16      A.    No.
17      Q.    Okay.  So, you don't know whether
18  Percy Thomas spoke up or not, do you?
19      A.    I said when I'm present.
20      Q.    So, it just bothers you that the
21  perception among the students at ASU is that
22  you have an African American man who's sitting
23  there and he's not speaking up?

1              Is that the problem you have with
2  Percy Thomas?
3      A.    Well, I have -- I have a problem
4  when African Americans don't speak up for each
5  other, period.
6      Q.    Who is he supposed to be speaking
7  up for, you?
8      A.    No.  For the school that he's
9  representing.
10      Q.    How do you -- by sitting there
11  silently how is he not defending the school?
12  How is he not defending ASU?
13      A.    Well, I mean, if he is in charge
14  of -- if he's the owner's rep or one of the
15  owner's rep, at some point he needs to let the
16  body know that he is very knowledgeable about
17  what is going on and that -- when President
18  Lee says at that meeting when we were
19  rejected, I have worked very close with Ken,
20  he never even mentioned Percy.
21      Q.    Okay.  Do you know what the
22  relationship between Percy Thomas and his
23  other venture in ASU is?

Page 522

1     A.    I have no idea.
2     Q.    You have no idea, do you?
3     A.    No.
4     Q.    Okay. So, it bothers you that
5  President Lee in front of the student body
6  asked a question of Ken Upchurch because he's
7  white? Is that what you're saying?
8     A.    No. He said that he worked with
9  Ken very closely to determine that this
10 project can be fast tracked, it could be put
11 on there, it could be done at -- at a cheaper
12 -- not a cheaper rate. I'll never say
13 cheaper. At a less rate.
14       I mean, he could have said I have
15 worked with TCU. I have worked with Percy and
16 Ken. I mean --
17    Q.    Okay. So, it's not the -- it's
18 not the fact of what President Lee said that
19 bothers you, is it?
20       It's the fact that he singled out
21 Ken because Ken's not African American?
22    A.    No. They're a team. Aren't they
23 supposed to be a team?

Page 523

1     Q.    Sure.
2     A.    The bottom line is why is it just
3  one person that -- one person, Ken, that the
4  president said he confided in?
5     Q.    Well, I'm trying to figure out
6  why that bothers you so much.
7     A.    Well, it bothers me as an African
8  American.
9     Q.    Why?
10    A.    Well, you'll never understand.
11 So, ain't no need in me trying to go down the
12 line here and explain it to you because,
13 really, you -- you wouldn't understand. You
14 just wouldn't understand.
15    Q.    Maybe not. And I'm at a loss to
16 figure out why it is that you're so concerned
17 about what Percy Thomas does. You know that
18 TCU is part of his company, don't you?
19    A.    And that's correct.
20    Q.    Is partly his company?
21    A.    And that's what I'm saying. If
22 it's part of your company, then be part of the
23 company in -- in showing that at the school

Page 524

1  that is a historical black college that you
2  are a partner.
3     Q.    Okay.
4     A.    I mean -- and don't get me wrong.
5  I think Ken -- and I have had conversations
6  with Ken. Ken is a very intelligent guy.
7  Trust me. Trust me. I believe that.
8        But the bottom line is, as Ken
9  can tell you, when I sat there at Kenny
10 Thomas' office and me and him and Percy met,
11 when it got to the point where Ken wanted to
12 talk about -- me and him and Percy went into
13 detail about the events, how we got to where
14 we got to.
15       But when it got to the part when
16 he asked me about Marous Brothers and their
17 involvement, I can't speak for Marous
18 Brothers. He'll tell you I called Arne
19 Goldman on the phone, and those two talked.
20 And from that time on they communicated
21 together.
22    Q.    Okay. Percy Thomas spoke up
23 enough for you to name him as an individual

Page 525

1  defendant in this case, didn't he?
2     A.    He spoke up enough? Maybe he
3  didn't speak up enough. Maybe that's the
4  problem.
5     Q.    So, you named him as a defendant
6  because he didn't say enough?
7     A.    No, no. That's not it. The
8  bottom line is --
9     Q.    Well, we'll get to why it is that
10 you named --
11    A.    Okay.
12    Q.    -- Percy --
13    A.    That's fine.
14    Q.    -- and Ken in this lawsuit.
15       But I'm just a little curious as
16 to why it bothers you so much that Percy
17 doesn't speak perhaps as much as you do.
18    A.    Okay.
19    Q.    Tell me about any meeting or
20 conversation or phone call that you've ever
21 had with Ken Upchurch or Percy Thomas.
22    A.    Percy gave his card the time that
23 I met with him and Elton Dean in Prattville.

Page 526

1    Q.    At the Holiday Inn?
2    A.    At the Holiday Inn.  He told me
3  to call him.
4    Q.    Did you?
5    A.    No.  I didn't call him until --
6  until -- I think we had the meeting at Kenny's
7  office with Mr. Upchurch, and Percy was
8  present.
9    Q.    Okay.
10   A.    And I think that's the first time
11  I had called -- I called him because at that
12  point they -- they were reviewing the
13  questions.  It was around the period they were
14  reviewing the questions.
15         And I was asking him why is this
16  taking so long, and he said, you need to talk
17  to Ken.
18   Q.    Who said that?
19   A.    Percy.
20   Q.    Okay.
21   A.    He said Percy -- he said Ken's
22  handling that.  I don't really have anything
23  to do with that.  Ken's putting the questions

Page 527

1  together.  Because I think that -- and he gave
2  me Ken's number and told me to call Ken.
3    Q.    Did that bother you?
4    A.    No.  I called Ken.
5    Q.    So, the only two meetings you've
6  ever attended where Percy Thomas was in
7  attendance was the Holiday Inn and then at
8  Kenny's office?
9    A.    I seen him at several occasions
10  at the -- at a bar, that one over at the State
11  House.
12   Q.    The one at State House?
13   A.    Uh-huh (affirmative).
14   Q.    Okay.
15   A.    I've probably seen him there
16  three or four times.
17   Q.    Anywhere else that you've met
18  Percy?
19   A.    No, none that I can think of.
20   Q.    Okay.  You referred to the
21  meeting at the Holiday Inn, and yesterday
22  Mr. Thomas looked at the complaint with you
23  where you had made some allegations that Elton

Page 528

1  Dean said he was like family and like his
2  brother.  Do you recall that?
3    A.    That's correct.
4    Q.    And that's in Paragraph 25 of
5  your complaint if you want to look at it.  Who
6  else was present at that meeting besides Elton
7  Dean and Percy and you?
8    A.    Johnette Anderson.
9    Q.    And she works for you?
10   A.    Yes, she does.
11   Q.    Nowhere else in the complaint do
12  I see any allegation respecting those facts as
13  you allege.  In other words, you allege those
14  facts in Paragraph 25, but they don't seem to
15  form the basis of any of your causes of action
16  against TCU.
17         Why did you put that in the
18  complaint?  What's the relevance of that?
19   A.    Repeat your question again.
20   Q.    Okay.
21   A.    I think I know what you're
22  saying, but I just want to --
23   Q.    Well, you state in the complaint

Page 529

1  that Elton Dean said that Percy is like family
2  or like his brother.
3    A.    Uh-huh (affirmative).
4    Q.    What's the relevance of that to
5  your causes of action against TCU, Ken
6  Upchurch and Percy Thomas?
7    A.    Well, he said that he's like his
8  brother, and he told me that -- Elton did,
9  that they had received a job, he had got the
10  job for Percy, the jail project.
11   Q.    Which has nothing to do with your
12  company, right?
13   A.    Huh?
14   Q.    Which has nothing to do with your
15  company?
16   A.    No.  He told me that Ken was dear
17  friends with the chairman of the county
18  commissioners.  And, of course, him and Percy
19  are personal friends.
20   Q.    Okay.
21   A.    And that it was a job -- that
22  they formed their company to actually get that
23  job.  And -- because what had come up, I

Page 530

1 think, at a meeting or something that there
2 needed to be more of a presence of African
3 American participation. That kind of was --
4 that company was formed to take advantage of
5 some opportunities. And --
6    Q.    How did the statement that he's
7 like his brother -- what relevance is that to
8 any of the claims that you make against TCU,
9 Upchurch or Thomas?
10    A.    It was more than a claim that
11 he's like his brother. He said he was family.
12    Q.    Okay. Well, how is that in any
13 way relevant to the claims that you make, the
14 fraud or the tortious interference or the
15 conversion?
16         How does that have any bearing on
17 any of those claims?
18    MR. LYONS: Let me just state a
19 general objection that Mr. Berry is not an
20 attorney and --
21    MR. LAWSON: I understand.
22    MR. LYONS: -- and doesn't
23 understand all of the intricacies of every

Page 531

1 claim we have --
2    MR. LAWSON: The objection the
3 noted.
4    MR. LYONS: If he can answer,
5 I'll let him, but I want to point out that --
6    MR. LAWSON: Objection noted.
7    Q.    Were you insinuating something
8 that just because he's close to Mr. Dean that
9 there's some problem with that?
10    A.    Yeah, there is a problem because
11 Mr. Dean went on to say that they would --
12 they were pursuing a school project together
13 and that -- I guess the superintendent was
14 having some problems and that him and Mr.
15 Knight was going to support the superintendent
16 on that.
17         And her -- I guess there were
18 some issues with her -- I don't know in detail
19 what the issues are. I think it was some --
20 maybe -- I want to use the right term. Some
21 gender issues. And that what would come of it
22 is a great opportunity because they wanted to
23 -- Ken and even Percy asked that we do school

Page 532

1 work, meaning Marous Brothers and stuff.
2         So, I learned not too long after
3 that they ended up with the school project.
4 And that's when I started getting concerned
5 about my project because it seemed like they
6 were telling me --
7         I mean, I felt that what was
8 happening is anywhere that TCU and Ken was and
9 Elton and when he would mention Mr. Knight, it
10 seemed like they got the projects. And it was
11 the jail project. They formed this company to
12 get the jail project. They were going to
13 support the superintendent. I understand that
14 -- to get that project.
15         And then here is my project. And
16 the common dominator, to me, is that where
17 there is Mr. Dean, Mr. Knight, that they end
18 up with the project.
19    Q.    Okay.
20    A.    And so when he says we're family
21 and you look at the common denominators, it
22 seems like these guys -- when he says we are
23 family, I guess you look out for your family.

Page 533

1         So, here are these projects, the
2 jail project, the school project, and now my
3 project. And that's why I said, hey -- that's
4 why I called Elton. I said, Elton --
5    Q.    They're trying to steal my
6 project?
7    A.    They're trying to steal my
8 project. And I -- he said, Gil, they will not
9 have your project.
10    Q.    It's not unusual for somebody to
11 want to do business with somebody they're
12 familiar with and have done business with in
13 the past, is it?
14         You try to, yourself, develop
15 those type of relationships, don't you?
16    A.    Do you know how much these
17 projects are worth?
18    Q.    I'm just asking you.
19    A.    I'm asking --
20    Q.    Do you try -- I'm not here to
21 answer questions.
22         Did you try to develop
23 relationships with people so that they'll

Page 534

1  trust you and come back to you on a regular
2  basis?
3      A.    That's correct.
4      Q.    And I believe in one of the
5  exhibits we looked at yesterday you discussed
6  the fact that two of the colleges or
7  universities that you've worked with have
8  called you -- called you back; isn't that
9  correct?
10     A.    That's correct.
11     Q.    Okay.  So, it's not unusual then
12 for somebody to be -- if you're familiar with
13 their work to want to work with them, is it?
14         To want to work with them again.
15 That's not unusual, is it?
16         And, in fact, you try to -- you
17 hope that your work will lead somebody -- a
18 customer or a client to come back to you
19 again, don't you?
20     A.    But why would you --
21     Q.    Is that true?
22     A.    Why would you tell me --
23     Q.    Is that true?

Page 535

1      A.    Why would you tell me -- why
2  would Mr. Dean tell me that anywhere he put
3  his input in that they usually ended up with
4  the project?
5      Q.    I don't know.  Is it true that
6  you try to develop relationships so that the
7  owner will come back --
8      A.    And he let me know that Ken was
9  dear friends with the chairman of the county
10 commissioner.  I don't even know who the
11 chairman is.
12     Q.    Okay.  Your lawyer has to leave
13 at 2:00 o'clock today he says.
14     A.    Okay.
15     Q.    So, if you'll answer my
16 questions, maybe we can get him out of here.
17     A.    Uh-huh (affirmative).
18     Q.    You try to develop relationships
19 with your customers or clients so that they'll
20 want to come back to you?  They're familiar
21 with you, they know you, they trust you,
22 correct?
23     A.    Yeah, but --

Page 536

1      Q.    So, there's nothing unusual about
2  that, is there?
3      A.    I don't know.
4      Q.    You don't know.  But you're
5  trying to develop that sort of a relationship
6  with these universities that you're working
7  with, aren't you?
8      A.    That's correct.
9      Q.    Okay.  You remember sending some
10 E-mails out or telling Ken Upchurch when he
11 had questions about your proposal that he'll
12 have to go ask Arne Goldman?
13     A.    Yeah.
14     Q.    You remember that?
15     A.    I mean, if Arne developed -- if
16 the Marous Brothers developed the work
17 product, the drawings and the specifications,
18 I can't speak for their drawings and
19 specifications.
20         And if he needed to know how they
21 were going to make a penetration or if he had
22 a question -- and time was supposed to be of
23 the essence to get these because he gave us a

Page 537

1  short window to get his 87 questions back.  I
2  forget.  It was something ridiculous, 48 hours
3  or something after we'd waited all this time.
4  And it was a rush to get them back.
5          And we were dealing with things
6  like removing the boiler downstairs in the
7  basement.  Meanwhile, he had looked at
8  removing the boiler downstairs in the
9  basement.
10     Q.    Okay.  But you didn't have a
11 problem telling Ken to go talk to Arne, did
12 you?
13     A.    I had no problem.
14     Q.    But you do have a problem with
15 President Lee singling out Ken instead of
16 talking to Percy?
17     A.    Was Ken his partner?  Is Ken
18 presently his partner?
19     Q.    I believe Marous was your partner
20 on this project as well, part of the team.
21     A.    Is Ken President Lee's partner?
22 Is he?
23     Q.    I'm not here to answer the

Page 538

1 questions.
2     A.    I don't know.  You asked me one.
3 I figure I can ask you one.
4     Q.    Well, that's not the way a
5 deposition works.  And if you want to sit here
6 for the rest of the day, we can, with or
7 without your lawyer.
8     A.    It's not a problem.  Trust me.
9 I'm not in a hurry to go.
10     Q.    Well, your lawyer is.
11     A.    Okay.  Well, then I guess I have
12 to sit without him.
13         MR. LYONS:  You want to take a
14 break, Brooke?
15         MR. LAWSON:  We can.
16         MR. LYONS:  We've been going an
17 hour and a half.
18         (Whereupon, the taking of the
19 deposition was recessed from approximately
20 10:38 a.m. to approximately 10:42 a.m., after
21 which the following proceedings were had and
22 done:)
23     Q.    (By Mr. Lawson)  Mr. Berry, you

Page 539

1 knew --
2     A.    I want to state for the record --
3 I think you see me.  I just took my high blood
4 pressure medicine.
5     Q.    Okay.
6     A.    So, sometimes I get lightheaded.
7 I'll let you know.
8     Q.    Please, do.
9     A.    I will have to take a small break
10 if I do.
11     Q.    Not a problem.
12     A.    I just -- you know, you see me
13 take it.
14     Q.    Okay.  You knew TCU to be the
15 owner's representative on this project; is
16 that correct, in late July, August and
17 September of 2006 when you were still
18 involved?
19     A.    I didn't -- when I had met with
20 them, they had not had their contract signed.
21     Q.    I understand.  But you -- what
22 you understood their role to be was the
23 owner's representative, ASU's representative?

Page 540

1     A.    No.  I understood your role to be
2 the review.  Because when I had met with Ken
3 and Percy over there at -- at Mr. Thomas'
4 office, they had not had their contract signed
5 I don't think.
6     Q.    Okay.
7     A.    And they were, you know,
8 complaining that President Lee had been
9 dragging his feet about signing.
10     Q.    If you'll look at the complaint
11 again real quick for me in Paragraph 29.
12     A.    Uh-huh (affirmative).
13     Q.    Do you see that?  The very first
14 sentence, Marous' Arne Goldman had extensive
15 communications with Upchurch, ASU's designated
16 owner's representative.
17         Do you see that?
18     A.    Well, when this was filed, they
19 were their representative.
20     Q.    Okay.
21     A.    But I think your question was to
22 me were they the owner's representative in the
23 time they were talking about.  At that time

Page 541

1 they were not.
2     Q.    I got you.
3     A.    They were just reviewing
4 documents --
5     Q.    That's your understanding of what
6 they were doing?
7     A.    Well, that's what he told me.
8     Q.    Okay.  But you didn't see any
9 sort of agreement or you weren't present
10 during any discussions between TCU and ASU?
11     A.    Well, I was at a -- I was at a
12 meeting, a board meeting, where I think they
13 -- well, shortly after that they finally did
14 get board approval to be the owner's
15 representative.
16     Q.    Okay.
17     A.    But at the time they were
18 reviewing the documents, they were just
19 reviewing the documents, not actually hired by
20 the college.
21     Q.    As far as you knew?
22     A.    Well, they -- they hadn't -- they
23 told me.

Page 542

1    Q.    What?  They told you --
2    A.    They had not been hired by the
3  company.
4    Q.    Who told you that?
5    A.    Mr. Upchurch.  We had --
6    Q.    Did he tell you he was doing that
7  for free?
8    A.    Huh?
9    Q.    Did he tell you he was just doing
10  it for free?
11    A.    He told me they were doing it pro
12  bono.
13    Q.    So, it wasn't until the board
14  meeting sometime in August; is that when it
15  was?
16    A.    I don't know that -- that their
17  contract had got approved.
18    Q.    Okay.  So, until they had a
19  contract, then they weren't an owner's
20  representative?
21    A.    No, they weren't an owner's
22  representative.  They were reviewing the
23  documents.

Page 543

1    Q.    And they had to have that
2  contract to become the owner's representative?
3       MR. LYONS:  If you know?
4       THE WITNESS:  Okay.
5    Q.    (By Mr. Lawson)  Well, do you
6  know?
7    A.    I don't know.
8    Q.    Okay.  So, you don't know what
9  their arrangement with ASU was at any point,
10  do you?
11    A.    They told me --
12    Q.    "They" being?
13    A.    Ken.  When we met over there at
14  Kenny Thomas' office that they were waiting to
15  get their contract signed, they had not been
16  contracted by the school, they were just
17  reviewing the information for the president.
18       Elton Dean, Judge Wiggins and Mr.
19  Crutcher told me that they had -- all they
20  were going to do is review the documents and
21  -- as a courtesy to the school.
22    Q.    You understood at some point they
23  became the owner's representative?

Page 544

1    A.    Yes, sir.
2    Q.    The proposal and the scope of
3  work and the development agreement and
4  invoices, all of those exhibits that we've
5  already seen in this case, all of those were
6  prepared and submitted before TCU became
7  involved in this project, correct?
8    A.    Say that one more time.  I'm not
9  trying to be funny.
10    Q.    No, no.  I understand.  The
11  proposal back in September of '05 --
12    A.    Yes, sir.
13    Q.    -- and the revised proposal in
14  November and then scope of work and proposal
15  in May of 2006 and the invoices that you
16  submitted in May of 2006 and the invoices you
17  submitted on July 10, 2006, all of those
18  things were prepared and submitted before TCU
19  became involved?
20    A.    That is correct.
21    Q.    Okay.  And all the work that went
22  into those things, those proposals, the scopes
23  of work, the invoices, all of those things

Page 545

1  occurred before TCU became involved, correct?
2    A.    That is correct.
3    Q.    You never got approval from the
4  building commission for your proposal or scope
5  or work, did you, from the local building
6  commission?
7    A.    No, I don't think so.
8    Q.    You never even submitted it to
9  the local commission, did you?
10    A.    No.  That was going to be
11  submitted by the architect, John.
12    Q.    The invoices that you submitted
13  to ASU back in May, May 23rd, 2006, I believe,
14  that was for work performed by Gil Berry &
15  Associates and Marous Brothers?
16    A.    That is correct.
17    Q.    And that work was performed for
18  ASU, correct?
19    A.    That is correct.
20    Q.    It wasn't performed for TCU?
21    A.    That is correct.
22    Q.    And it wasn't performed at the
23  direction of TCU or Upchurch or Thomas, was

Page 546

1  it?
2      A.    That is correct.
3      Q.    Likewise, the invoices that you
4  submitted to ASU for payment on July 10, 2006,
5  that work was performed for ASU?
6      A.    That is correct.
7      Q.    As you allege, anyway.  I know
8  there's a dispute about that.  But you allege
9  that you performed that work.  And if you did,
10  you performed it for ASU?
11      A.    That is correct.
12      Q.    You didn't perform it for TCU or
13  at the direction of TCU, did you?
14      A.    That is correct.
15      Q.    And TCU and Ken Upchurch and
16  Percy Thomas never told you that they would
17  pay those invoices, did they?
18      A.    That is correct.
19      Q.    And they've never said that to
20  you, have they?
21      A.    That is correct.
22      Q.    Now, if you would, I believe Mr.
23  Thomas made an exhibit yesterday of your

Page 547

1  amended complaint, Exhibit No. 22.  You might
2  take that out just so you and I are working
3  from the same exhibit.
4          I believe you've already
5  testified that you reviewed this before it was
6  filed?
7      A.    Yes.
8      Q.    And you approved it?
9      A.    Yes, sir.
10      Q.    And these are your allegations in
11  this complaint?
12      A.    That is correct.
13      Q.    Over in Paragraph No. 18, which
14  is on Page 5 -- let me back up real quick.
15          The invoices, you've never
16  submitted an invoice of any kind for payment
17  to TCU, Upchurch or Thomas, have you?
18      A.    No.
19      Q.    Paragraph 18.  You state that ASU
20  instructed you and Student Suites to assist
21  its bond counsel; is that correct?
22      A.    That's correct.
23      Q.    TCU didn't instruct you to do

Page 548

1  that, did they?
2      A.    No, sir.
3      Q.    And this was back in May of 2006,
4  I believe, that that occurred?
5      A.    Somewhere around there.
6      Q.    According to your allegations in
7  your complaint?
8      A.    Uh-huh (affirmative).
9      Q.    And that's before TCU.
10          The financing of this project was
11  for the benefit of the ASU project as you
12  allege?
13      A.    Yes, sir.
14      Q.    And you provided the proposal and
15  your scope of work to bond counsel or the
16  underwriters, didn't you?
17      A.    That's correct.
18      Q.    And according to your allegation
19  in Paragraph 19, the bond was issued on August
20  1, 2006; is that correct?
21      A.    That is correct.
22      Q.    TCU didn't instruct you to send
23  anything to the bond counsel, did they?

Page 549

1      A.    No, sir.
2      Q.    They didn't have any role in any
3  of the workings or any of the relationships or
4  dealings that you had with bond counsel or
5  underwriters or anyone else, did they?
6      A.    That's correct.
7      Q.    If you'll flip over in the
8  complaint a little bit farther --
9      A.    You want to give me a page
10  number?
11      Q.    Yeah, I sure will.
12      A.    Okay.
13      Q.    Page 7, Paragraph 26.  You state
14  that on July 28, 2006, Mr. Thomas, who you
15  understood to be counsel for ASU, told you
16  that TCU had been selected by ASU to assist
17  President Lee as part of the due diligence for
18  review of the documents; is that correct?
19      A.    That is correct.
20      Q.    So, that's -- the first notice
21  that you had of any involvement by TCU was on
22  July 28th, 2006?
23      A.    No, I disagree.

Page 550

1    Q.    Okay. Tell me.
2    A.    That was -- Judge Wiggins called
3  me after a property meeting or a meeting and
4  said that Elton, I guess, had suggested that
5  Ken and Percy be brought on to review the
6  documents to help the president make a -- to
7  have a better understanding of what was
8  occurring on the project, that the president
9  felt that he had been left out of the process
10  as I stated --
11    Q.    When did this occur, sometime
12  prior to July 28th?
13    A.    It would have to be because I
14  didn't -- I didn't -- I didn't know Ken and
15  them at that time, you know. I mean, I had
16  never -- you know, I didn't know them.
17          Judge Wiggins just called me. He
18  said, Gil, I don't want you to get upset, he
19  said, but Ken and Percy -- he said Ken
20  Upchurch and Percy Thomas were brought on by
21  the suggestion of Chairman Dean. He said --
22  he said it has nothing to do with you getting
23  the project or you working on the project. He

Page 551

1  said, all they're going to do is review it.
2  He said don't worry about it, and I think he
3  -- I think he mentioned the pro bono. They
4  were doing it pro bono.
5    Q.    Do you know when that
6  conversation occurred?
7    A.    No, I don't. I mean, it had to
8  be -- it had to be -- he said it was after a
9  property meeting or a property board meeting.
10  I'm quite sure they do minutes there.
11    Q.    Was that before or after July
12  28th?
13    A.    I don't know.
14    Q.    Was it right around that time?
15    A.    It would have to be before I
16  would -- I would think it had to be before.
17    Q.    But you don't remember it?
18    A.    I don't remember.
19    Q.    That's fine.
20    A.    I just got the phone call.
21    Q.    Okay. But at some point on July
22  28th, anyway, Mr. Thomas informed you that
23  they had been selected to assist the

Page 552

1  president?
2    A.    Exactly.
3    Q.    And that's --
4    A.    And --
5    Q.    Go ahead.
6    A.    Let me just -- yes. As stated
7  here, it was to assist the president as part
8  of their due diligence review process.
9    Q.    And at some point later you
10  learned that they had been hired as the
11  owner's representative as you allege in
12  Paragraph 29?
13    A.    Yes, sir.
14    Q.    And you're not certain when that
15  was or when TCU received its engagement
16  letter, are you?
17    A.    No, I don't know when they
18  received it.
19    Q.    You just know it was sometime
20  after July 28th?
21    A.    I would have to say so.
22    Q.    Over on the next page in
23  Paragraph 30 --

Page 553

1    A.    Are we on Page 8?
2    Q.    Yes.
3    A.    Okay.
4    Q.    Paragraph 30.
5    A.    Uh-huh (affirmative).
6    Q.    You state that Ken Upchurch,
7  Percy Thomas and TCU took the information from
8  the Marous memorandum and abusing their
9  position as the owner's representatives
10  advised the ASU board that the fees ultimately
11  earned by plaintiffs would be approximately $7
12  million.
13          Do you see that?
14    A.    Yes, sir.
15    Q.    Okay. What do you base that
16  allegation on?
17    A.    Well, I think that my partner --
18  I think Marous Brothers who -- who could speak
19  to that as me and Mr. Thomas talked about it
20  yesterday, this is information that I think
21  that they had supplied the attorneys.
22    Q.    You think. You, as we sit here
23  today -- I'm looking at this complaint. You

Page 554

1    said you reviewed it and that you approved it.
2        A.    That's correct.
3        Q.    I'm asking you what evidence do
4    you have to support your allegation that TCU,
5    Ken Upchurch or Percy Thomas abused their
6    position as the owner's rep by advising ASU
7    that you would be earning $7 million in fees?
8            Do you have any evidence to
9    support that?
10       A.    Arne Goldman told me that this
11   was the information that they supplied.
12       Q.    Okay.  So, the only evidence to
13   support your allegation in Paragraph 30, the
14   first sentence, is that Arne Goldman told you
15   that?
16       A.    The reason why, I'm thinking
17   someone else told me that also.  It was either
18   a board member.  If you'll give me a minute
19   and let me think about it.
20       Q.    Take your time.
21       A.    It was either Buford Crutcher or
22   Judge Wiggins told me that they had -- Ken had
23   made allegations that we were going to receive

Page 555

1    $7 million, yes.
2        Q.    So, either Crutcher or Wiggins --
3        A.    Correct.
4        Q.    -- told you that Ken Upchurch had
5    said you were going to get $7 million in fees?
6        A.    That is correct.
7        Q.    Now, you had provided, or at
8    least Marous on your behalf had provided, a
9    breakdown of what your fees were going to be
10   on this project, correct?
11       A.    Yes, because --
12       Q.    Multiple times?
13       A.    Yeah.  And I think we even --
14   Arne even sent a subsequent letter to
15   President Lee saying -- outlining what those
16   fees were to prove that we were -- was not
17   making $7 million because of what was supposed
18   to be presented.
19       Q.    Now, you've seen transmittals of
20   your breakdown of those fees?
21       A.    Uh-huh (affirmative).
22       Q.    Transmittals from TCU to ASU of
23   those exact fees, haven't you?

Page 556

1        A.    I haven't seen TCU's breakdown on
2    it.
3        Q.    You haven't?
4        A.    No, sir.
5        Q.    Okay.  Well, the flip side of
6    that is you've not seen any document
7    whatsoever from TCU to ASU which says you're
8    going to make $7 million in fees, have you?
9        A.    I haven't seen that.
10       Q.    And you weren't present during
11   any discussion when Ken Upchurch or Percy
12   Thomas or anyone associated with TCU said
13   these guys are going to make $7 million in
14   fees?
15           You never heard that, either, did
16   you?
17       A.    I never heard that from them.
18       Q.    So, the only evidence you have as
19   we sit here today is that Arne Goldman told
20   you that, that that occurred, and that Buford
21   Crutcher or Judge Wiggins told you that?
22       A.    That is correct.
23       Q.    And you don't remember which one

Page 557

1    told you that?
2        A.    No.
3        Q.    Okay.  And when did they tell you
4    that?
5        A.    I guess at a meeting where he
6    presented that information.
7        Q.    What meeting would that be?
8        A.    I guess at a property meeting or
9    a board meeting or some kind of setting --
10       Q.    Okay.
11       A.    But it was told to me.
12       Q.    When did they tell you that?  And
13   which one told you, both of them or one or the
14   other?
15       A.    I can't remember right now.
16       Q.    You can't remember what, who told
17   you?
18       A.    Yes, sir.
19       Q.    Okay.  It's your belief that it
20   was either Crutcher or Wiggins?
21       A.    Yes, sir.
22       Q.    And you don't know which one?
23       A.    I'll think about it.  If I can

1  come up with it, I'll let you know.
2      Q.    When did Mr. Crutcher or Wiggins
3  tell you that?
4          MR. LYONS:  If you don't remember
5  which told you.  I don't want you guessing as
6  to when it happened.
7          THE WITNESS:  No.
8      Q.    (By Mr. Lawson)  You don't know
9  when it happened either?
10     A.    No, no.
11     Q.    Okay.  Do you remember if it was
12 on the telephone or in-person or by letter or
13 E-mail?
14     A.    It was on -- by telephone.
15     Q.    Well, how do you know that?  How
16 can you be so sure that it was by telephone?
17     A.    Because I remember one of them
18 calling me and telling me.  We talked on a
19 regular basis.
20     Q.    Okay.  So, at some point one of
21 those two gentlemen called you to say that Ken
22 Upchurch or TCU or Percy Thomas had abused
23 their position and told ASU that you would be

1  earning $7 million in fees?
2      A.    I can't say he said that they
3  abused, all that, but they said that Ken --
4      Q.    That's your terminology.
5      A.    No, that's not my terminology.
6      Q.    It's in your complaint.
7      A.    It's in the complaint, and I
8  signed off on it.
9      Q.    So, it's your terminology.
10     A.    Okay.  Then it's my terminology.
11     Q.    Okay.  And you never heard
12 anybody with TCU say you're going to get $7
13 million in fees, correct?
14     A.    No.
15     Q.    You've seen no document that they
16 generated where they told ASU you're getting
17 $7 million in fees, have you?
18     A.    No.
19     Q.    Is there a difference between
20 fees and profits?
21     A.    Is there a difference --
22     Q.    Yes.
23     A.    -- between fees and profits?

1      Q.    And profits.
2      A.    Yes, it's a difference between
3  fees and profits.
4      Q.    What's the difference?
5      A.    Profit is the profit you make
6  that is yours.  A fee is a fee that is paid to
7  you paid for -- you might have several people
8  on staff.  It's a fee that is paid.  You might
9  not get all the money.
10         In other words, you might have
11 four lawyers, you're charging a fee, a set
12 fee.  A profit is money that you have earned
13 that is yours.
14     Q.    And out of that you'd be paying
15 your expenses and your personnel and what's
16 left over, by my definition, is the profit?
17     A.    Yes.
18     Q.    What were your fees to be on this
19 project?
20     A.    I was to split my fees at that
21 time with Dick Davis of ten percent.
22     Q.    Would that include the $6,000
23 monthly fee and the $60,000 advance, or would

1  what just be the fees that were part of the
2  $25 million contract that you proposed?
3      A.    That would have been -- are you
4  talking about with ASU?
5      Q.    Yeah.
6      A.    That would have been the --
7      Q.    What were your fees on that, the
8  ASU job that you proposed?
9      A.    We were to split $2.5 million,
10 ten percent of the total.
11     Q.    You and Dick Davis?
12     A.    Yes.
13     Q.    And you said yesterday I believe
14 that you reduced your $2.5 million fee down to
15 $1.9 million; is that right?
16     A.    Yes, which was rejected.
17     Q.    Would that have also reduced the
18 total contract price down to $24,400,000, or
19 was that $600,000 shifted and moved around
20 into other contingencies?
21     A.    No, it wasn't shifted and moved
22 around.  Kenny Thomas -- the president had
23 called me and said, Gil, we're very close.  I

Page 562

1  need be able to go to the board and let them
2  know that we have got this reduced down. And
3  can you work with me?  He said -- and I said,
4  Mr. President, if there's anything I can do to
5  help, I will help.  I reduced the fee down to
6  $1.9 million.
7      Q.     Did you reduce the total of the
8  $25 million contract proposal down to
9  $24,400,000?
10     A.     I reduced my fee down to $1.9
11 million.
12     Q.     I understand that, but did that
13 -- was there a deduct of $600,000 from the
14 total contract price?
15     A.     The bottom line is it was a phone
16 conversation that me and him had that I
17 reduced my fee down to $1.9 million.
18     Q.     So, I take that as no then, the
19 total contract price didn't come down to
20 $24,400,000?
21     A.     It would have had to come down to
22 $24,400,000.
23     Q.     Okay.  Well, I asked you that.

Page 563

1  Did it or would it have?
2      A.     I reduced my fee.  If he had to
3  go to the board and tell them there was a
4  reduction --
5      Q.     Uh-huh (affirmative).
6      A.     -- then I would have had to
7  reduce my fee.
8      Q.     And the total contract price?
9      A.     I reduced my fee.
10     Q.     Not the total contract price?
11     A.     I reduced my fee.
12     Q.     Okay.  Keeping it in Paragraph
13 30, your second sentence in there you say
14 Upchurch, Thomas and TCU recommended to the
15 board that you and Marous not be awarded the
16 professional services contract due to this
17 alleged abusive fee submission.
18            Do you see that?
19     A.     Uh-huh (affirmative).
20     Q.     What do you base that allegation
21 on?
22     A.     That -- just what I told you,
23 that basically I had got a phone call that Mr.

Page 564

1  Upchurch had made representation that we were
2  going to make $7 million on this project.
3      Q.     Okay.  Did Mr. Upchurch say to
4  the ASU board that because of that they should
5  not award the contract to you?
6      A.     I don't know what he told them.
7  I wasn't present at the meeting.
8      Q.     Okay.  Did anybody tell you that
9  he said that?
10     A.     No.
11     Q.     Okay.  So, the allegation then in
12 the second sentence of Paragraph 30, that Ken
13 Upchurch, Percy Thomas and TCU recommended to
14 the ASU board that SSBGA and Marous should not
15 be awarded the professional services contract
16 due to this alleged abusive fee submission,
17 you don't have any evidence whatsoever to
18 support that allegation in your complaint, do
19 you?
20     A.     I don't.
21     Q.     Okay.  Well, it's included in
22 your complaint.
23     A.     Well, okay.

Page 565

1      Q.     But you don't -- as we sit here
2  today, you have no evidence whatsoever to
3  support that claim, do you?
4      A.     No, all except what was told,
5  that he made that allegation.
6      Q.     Right.  I understand that you
7  were told by either Mr. Crutcher or Judge
8  Wiggins that Ken Upchurch had said you were
9  going to make $7 million in fees?
10     A.     That's correct.
11     Q.     Okay.  I understand.  But you
12 don't have any evidence and no one has ever
13 told you that Ken Upchurch also said as a
14 result of those $7 million fees, you shouldn't
15 be awarded the contract?
16            You just got through telling me
17 that.
18     A.     Yeah.
19     Q.     Is that correct?
20     A.     That's correct.
21     Q.     You go on to say in the next
22 sentence that this false communication was not
23 simply a mistake or misunderstanding since the

Page 566

1  plaintiffs had clearly set out the calculation
2  of anticipated fees in the memorandum.
3        Did you see that?
4    A.   Yes.
5    Q.   What do you base your allegation
6  on --
7    A.   I base my allegation on this was
8  calculations that were put together and
9  communicated to Mr. Upchurch by probably Arne
10 Goldman from Marous who had worked diligently
11 with Mr. Upchurch on trying to bring this to
12 some kind of resolution, and I believe that
13 the statements that Mr. Goldman made are
14 accurate statements.
15   Q.   Okay.  Mr. Goldman worked closely
16 with Ken Upchurch to come up with a schedule
17 of these fees, didn't he, and helped put them
18 in some order to submit to ASU?
19   A.   That is correct.
20   Q.   Okay.  And you're claiming then
21 that Mr. Upchurch, despite working with Arne
22 Goldman to set those fees out in such a way
23 that ASU could see what the fees were going to

Page 567

1  be, then turned around and misrepresented what
2  the fees would be to ASU?
3        Is that your allegation?
4    A.   That's my allegation.
5    Q.   Okay.  And you say it was not a
6  mistake or misunderstanding that Ken Upchurch
7  allegedly told ASU that you were going to get
8  $7 million in fees?
9    A.   That is correct.
10   Q.   What do you base your allegation
11 that it wasn't a mistake or a misunderstanding
12 on?
13   A.   I base my allegations on that
14 Mr. Arne Goldman worked closely with him and
15 gave him the proper fees, and that might not
16 have been relayed to the board.
17   Q.   It might not have been.  You
18 don't know, do you?
19   A.   I don't know.  I wasn't present.
20   Q.   The only thing you know is that
21 you claim at some point in time -- but you
22 can't remember when -- that somebody -- and
23 you can't remember who, either Buford Crutcher

Page 568

1  or Judge Wiggins, one of the two -- told you
2  that Ken Upchurch had said you were getting $7
3  million in fees, and that's not correct?
4    A.   That is correct.
5    Q.   None of the details can you
6  remember as we sit here today, can you?
7    A.   No.
8    Q.   You just know it happened, that
9  somebody told you at some time that that
10 happened, but you didn't hear it?
11   A.   Well, I think when you have Mr.
12 Goldman, I think maybe he might clear it up
13 for you.
14   Q.   Okay.  I can't wait to hear that.
15   A.   Yes.  I'm quite sure he can't
16 wait to be present.
17   Q.   Over on Page 10 in Paragraph 36
18 --
19   A.   I have to go to the men's room
20 before we get started.
21   Q.   Sure.  That's fine.
22        (Brief recess.)
23   Q.   Let me back up, back up to

Page 569

1  Paragraph 33.
2    A.   Uh-huh (affirmative).
3    Q.   It says following the vote by ASU
4  Board of Trustees that plaintiffs would not be
5  utilized -- do you see that?
6    A.   Yes, I see that.
7    Q.   The decision of whether or not to
8  hire you or Marous or Student Suites was the
9  decision of ASU's Board of Trustees, correct?
10       MR. LYONS:  If you know who made
11 the decision, you can answer.
12       THE WITNESS:  I would have to say
13 yes.
14   Q.   (By Mr. Lawson)  You know that's
15 not the decision of TCU, don't you?
16   A.   That's correct.
17   Q.   Okay.  Now, back over on the next
18 page in Paragraph 36 you state that it's your
19 belief that Upchurch, Thomas and TCU are
20 utilizing your proprietary work.  Do you see
21 that?
22   A.   Uh-huh (affirmative).
23   Q.   What evidence do you have of

Page 570

1  that?
2      A.    Well, they had -- they had the
3  work product.
4      Q.    Okay.
5      A.    And as I spoke to Mr. Thomas
6  yesterday, basically they had the opportunity
7  to review the work product to understand where
8  the penetrations would be made. They might be
9  able to -- it's easy after you see how
10 something is going to be performed that you
11 can -- you can deviate from that and kind of
12 get the same appearance.
13          The key is, as I know, that they
14 were previously working there on campus. If
15 it was so easy to do this project, I'm quite
16 sure that the president and the board would
17 have suggested that they look at the project
18 and ask them to back into the $25 million
19 number that we were mandated.
20          Why did they use all the services
21 of myself, Marous and them; and then after the
22 money was allocated, did they bring them on
23 then?

Page 571

1          Why didn't they use Mr.
2  Upchurch's talents and Mr. Thomas' talents and
3  say, hey, these guys are already here, they're
4  local, they're good contractors, why don't we
5  let them do the renovation project?
6      Q.    Okay. Well, my question was what
7  evidence do you have that they are using your
8  proprietary work?
9          The fact that they looked at it
10 and reviewed it, is that the evidence that you
11 have that they are, in fact, using it?
12     A.    I think Mr. Arne Goldman would be
13 better to answer that. I gave you my answer.
14     Q.    Well --
15     A.    I gave you my answer.
16     Q.    Okay. So, you don't have any
17 evidence that they are, in fact, using your
18 proprietary work, do you?
19     A.    I gave you my answer.
20     Q.    My question to you is: Do you
21 have any evidence that they are, in fact,
22 using it? Your answer to me --
23     A.    No, no.

Page 572

1      Q.    Okay. Thank you.
2          Paragraph 38. You say based on
3  plaintiffs' reliance on the assurances of ASU
4  and its representatives, including Upchurch,
5  TCU and Thomas, you performed all obligations
6  to-date and have not yet been compensated.
7          Do you see that?
8      A.    That is correct.
9      Q.    What reliance -- excuse me, what
10 assurances of Upchurch, TCU and Percy Thomas
11 are you talking about?
12     A.    Arne Goldman told me that
13 speaking to Mr. Upchurch that Mr. Upchurch
14 told him that he recommended to President Lee
15 that we get the project.
16     Q.    Okay. Is that it?
17     A.    Now, do you want me to talk about
18 ASU?
19     Q.    No.
20     A.    Okay.
21     Q.    Upchurch, TCU and Thomas.
22     A.    Yes. That's it.
23     Q.    That's it?

Page 573

1      A.    Uh-huh (affirmative).
2      Q.    Correct me if I'm wrong, but just
3  a few minutes ago you said you had already
4  submitted the proposals, revised proposals,
5  the scope of work, the invoices, all of those
6  things before TCU got involved. Correct?
7      A.    That is correct.
8      Q.    So, your allegation in Paragraph
9  38 is based upon the assurances of ASU and its
10 representatives, including Upchurch, Thomas
11 and TCU, you performed all of our obligations?
12     A.    Yeah. We answered his 87
13 questions that he sent us. And then I think
14 he sent us an additional ten or fifteen more
15 after that.
16     Q.    Okay.
17     A.    He then wanted -- and I went
18 around and passed it out to every one of the
19 board members. He wanted us to fudge some
20 numbers. He said just put some numbers in it
21 and get -- and I told, Arne, we are not doing
22 that.
23          I said the bottom line is we are

Page 574

1  not going to falsify any information to the
2  board.  And at the board meeting I personally
3  went around and gave every one of the board
4  members the letter indicating that we were not
5  going to falsify any numbers.
6          When I say falsify, not accurate,
7  without having time to do due diligence on
8  what it would cost to come up with the true
9  analysis.  He just -- said just put some
10  numbers in there.
11         The bottom line is when you send
12  someone 87-page changes, that is not what we
13  submitted for them to get the $25 million.
14  What he was doing, it was changing the
15  original agreement that we had with the
16  school.  He was using the 87 questions and all
17  of that that he came up with for us to deviate
18  from the original proposal that we had given
19  the school where they got the funding for the
20  $25 million to do the six dormitories.
21         Again, he had things in there
22  like removing the boiler down in the basement.
23  The only way -- seriously, and I know he's a

Page 575

1  very smart guy.  I looked at that boiler down
2  there.  The only way you could remove that
3  boiler is you would have had to underpin the
4  foundation, dig that out and remove the boiler
5  that way.  It would have probably cost you
6  about $100,000 to $150,000.
7      Q.   Okay.  So, the -- what you were
8  referring to when you were giving a list of
9  things to price and Arne Goldman -- I believe
10  we've seen correspondence from Mr. Goldman
11  where he says I don't have time to price it.
12         But he ended up pricing it,
13  anyway, didn't he, some contingencies and some
14  extras, correct?
15     A.   Yeah.  But for the board meeting
16  he wanted us to fudge some numbers.  This was
17  after the fact.
18     Q.   Whose word was "fudge," or is
19  that your word?
20     A.   Well, I'm trying to be nice here.
21  What I'm saying is if you say just put some
22  numbers in there, to me, that's fudging.
23     Q.   Okay.  But nobody --

Page 576

1      A.   I mean --
2      Q.   Mr. Upchurch did not say I want
3  you to fudge some numbers or falsify any
4  numbers, did he?
5      A.   He said just put numbers in
6  there.
7      Q.   Okay.
8      A.   The bottom line is we --
9      Q.   Your best guess or best estimate;
10  is that what he was telling you?
11     A.   Well, the -- no.  The bottom --
12     Q.   Was he telling you to falsify it?
13     A.   The bottom line is if you are --
14  have represented yourself in an open, honest
15  process with this University, we wanted to
16  continue to do that.  We didn't want to give
17  them numbers that might be not accurate
18  numbers.
19     Q.   I understand.
20     A.   I mean, Marous and them are a
21  very reputable firm, and were not going to
22  travel down that road.
23     Q.   So, you were told to give your

Page 577

1  best estimate or best guess of the numbers?
2      A.   No.  That wasn't -- that --
3      Q.   Well, you weren't told to falsify
4  numbers, were you?
5      A.   I didn't say falsify.
6      Q.   Well, you weren't told to fudge
7  numbers, were you?
8      A.   He said, hey, just put some
9  numbers in there.
10     Q.   Okay.
11     A.   You determine what your
12  determination is.  I call it fudge.
13     Q.   But Mr. Upchurch didn't tell you
14  to fudge numbers, did he?
15     A.   He never said that.
16     Q.   And he didn't tell you to falsify
17  numbers, did he?
18     A.   That's why --
19     Q.   Is that correct?
20     A.   Every one of the board members
21  can tell you I passed the document out that
22  was our reply back to Mr. Upchurch, that we
23  don't operate like that.

1    Q.    So, he didn't tell you to falsify
2 numbers?
3    A.    No.
4    Q.    Paragraph 38.  The only assurance
5 of Upchurch, TCU or Percy Thomas that you
6 relied on, again, is what?
7          You're identified one assurance
8 that you claimed you have relied on?
9    A.    That's all.
10    Q.    Okay.  What was it?
11    A.    That we were to get the project
12 if we answered the 87 questions and all the
13 other stuff.
14    Q.    That you would get it or that he
15 would recommend that you get it?
16    A.    That he would recommend it.  That
17 was the only thing holding it up.
18    Q.    Okay.  Now, that's not his
19 decision to make if you get it.  You're just
20 saying that he said he would recommend it?
21    A.    Yes, sir
22    Q.    The decision ultimately is the
23 Board of Trustees of ASU, right?

1    A.    Well, I think the board had
2 already given approval to the president to
3 make the decision.
4    Q.    But it's not Ken Upchurch's
5 decision?
6    A.    No.
7    Q.    I mean, you've already testified
8 that the proposals and scope of work and the
9 invoices and all the work that was associated
10 with all of that was done before TCU got
11 involved?
12    A.    That's correct.
13    Q.    Flipping over to Page 12 of the
14 first amended complaint, you have count two.
15 Let me back up.
16          Count One, Breach of Contract.
17 You don't make a breach of contract claim
18 against TCU, Upchurch or Thomas, do you?
19    A.    I would have to ask.
20    MR. LYONS:  No.
21    Q.    (By Mr. Lawson)  I mean, you
22 didn't have a contract with them, correct?
23    A.    No, we didn't have a contract

1 with them.
2    Q.    Count Two, Quantum Meruit.  In
3 Paragraph 48 you say at defendants' direction,
4 you expended numerous hours on the development
5 work for the design, building, renovation and
6 the procurement of financing.
7          Do you see that?
8    A.    Yes, sir.
9    Q.    Now, I believe we've already
10 established that the design and the proposal
11 and the scope of work and the financing were
12 already done before TCU got involved, correct?
13    A.    That is correct.
14    Q.    So, you didn't expend any hours
15 then at the direction of Ken Upchurch, Percy
16 Thomas or TCU on those things, did you?
17    A.    I didn't, no.
18    MR. LYONS:  Brooke, if you like,
19 I can get to the point.  Count Two does not
20 apply to your clients if you want to just --
21    MR. LAWSON:  Okay.  Well, it says
22 defendants.
23    MR. LYONS:  I know it does, but

1 I'm telling you on the record now --
2    MR. LAWSON:  On the record Count
3 Two --
4    MR. LYONS:  -- Count Two is not
5 to TCU, Upchurch or Percy Thomas.
6    MR. LAWSON:  All right.  Well,
7 we'll just skip right on over that then.
8    Q.    Count Three, I'm guessing, does
9 apply to my clients.  You say in Paragraph 55,
10 Mr. Berry, that Ken Upchurch, Percy Thomas and
11 TCU made false representations to you
12 regarding material facts in this matter.
13          Correct?
14    A.    That's what it says.
15    Q.    And those false material facts,
16 according to you, are that they said that they
17 believed that your proposal was the "best"
18 "most fair" proposal?
19    A.    Well, considering that it was the
20 only proposal --
21    Q.    Okay.
22    A.    -- and that we had got the
23 funding based on the $25 million mandate and

Page 582

1  that we had did all the work. And like I said
2  -- and everything was fine until we started
3  receiving 87 questions and --
4      Q.    Right.
5      A.    -- this fog was put up in the
6  air.
7      Q.    Who said that it was the best and
8  most fair? Who said that?
9      A.    I didn't say that.
10     Q.    You allege that Upchurch, Thomas
11 and TCU said that. Which one of them told you
12 that it was the best or most fair proposal?
13     A.    They told Arne Goldman that.
14     Q.    Who did?
15     A.    I don't know which one told Arne
16 Goldman.
17     Q.    So, you don't know anything about
18 that then?
19     A.    No.
20     Q.    You didn't hear them say it's the
21 best and most fair?
22     A.    I never worked with Mr. Upchurch.
23 I had one meeting with him.

Page 583

1      Q.    Okay. So, you never heard Ken
2  Upchurch or Percy Thomas tell you that it was
3  the best and most fair proposal?
4      A.    Percy told me that it was a fair
5  proposal.
6      Q.    Okay. So, you heard Percy say
7  that?
8      A.    Percy had said that.
9      Q.    And that was his opinion?
10     A.    That was his opinion.
11     Q.    You don't have any reason to
12 doubt that that was his opinion, do you?
13     A.    No. I have no reason to doubt
14 that.
15     Q.    He's entitled to his opinion?
16     A.    He's entitled to his opinion.
17     Q.    When did he tell you that?
18     A.    He told me that at the club, that
19 it was a fair and honest -- he told me over
20 the telephone that it was a good proposal.
21     Q.    Okay. So, he's told you that
22 more than one time, that it was fair --
23     A.    Yes, sir.

Page 584

1      Q.    -- and a good proposal?
2      A.    Yes, sir.
3      Q.    And you have no evidence that
4  that wasn't his opinion?
5      A.    That was his opinion.
6      Q.    Okay.
7      A.    He told us.
8      Q.    And he's entitled to his opinion,
9  right?
10     A.    He's entitled to his opinion.
11     Q.    Was your proposal the best and
12 most fair?
13     A.    It was the only -- it was the
14 only proposal, and it was based on information
15 provided by the University and under the
16 restraints of the $25 million. We worked with
17 what was given to us.
18     Q.    Was it fair?
19     A.    I think it was very fair.
20     Q.    Well, if Percy Thomas or Ken
21 Upchurch or TCU said it was the best and most
22 fair proposal, as you allege, and you're
23 claiming that it was the best and most fair,

Page 585

1  how are those misrepresentation of material
2  fact?
3      A.    Because what happened was --
4      Q.    Well, those statements
5  themselves, are they misrepresentations of
6  material fact when they said it's the best and
7  most fair?
8      A.    Yes.
9      Q.    How?
10     A.    But they changed our proposal.
11 They changed it.
12     Q.    You allege --
13     A.    They changed our proposal. The
14 proposal that we gave the University was a
15 fair and accurate, well thought out proposal
16 to renovate six dorms. It had nothing to do
17 with the changes that they started making on
18 the proposal that we gave to the University.
19     Q.    Okay.
20     A.    They made significant changes to
21 your our proposal.
22     Q.    I understand that. But in your
23 complaint in Paragraph 55 you say they made

Page 586

1  false representations to you, one of which is
2  that they believed that your proposal was the
3  best. Okay?
4      A.  It was only one proposal, and I
5  just want to put that on the record.
6      Q.  Well, you said it was the best.
7      A.  Okay.
8      Q.  So, their statement that it's the
9  best, is that false?
10      If it is the best and they've
11  told you it's the best, how is that
12  false?
13      A.  Our proposal was the best.
14      Q.  And they've told you that it was
15  the best. So, how was that a false statement?
16      A.  Well, they went to -- they went
17  to --
18      Q.  We're not talking about what they
19  did later. How is that statement, in and of
20  itself, false, that it's the best or most fair
21  proposal?
22      MR. LYONS: If you don't know,
23  it's okay to say that.

Page 587

1      THE WITNESS: I don't know.
2      Q.  (By Mr. Lawson) Okay. Well, is
3  it your belief as we sit here today that if
4  they told you your proposal was the best --
5  and you've already said it was the best
6  because it was the only one -- that that's a
7  false statement?
8      You said they're entitled to
9  their opinion.
10      A.  They're entitled to their
11  opinion.
12      Q.  And they've concurred with your
13  opinion, which was it was the best and most
14  fair proposal. So, is that a false statement?
15      A.  Well --
16      Q.  Or is your statement that it was
17  the best and most fair false? Help me
18  understand how it is --
19      A.  I was trying.
20      Q.  Okay.
21      A.  Because our proposal that we gave
22  the University was a fair and accurate one.
23  Okay. What happened was at -- with the

Page 588

1  changes that Mr. Upchurch wanted to implement
2  and the one that he wanted the school to
3  adopt, how it was articulated to the school, I
4  don't know if that proposal was a fair and
5  accurate proposal.
6      Q.  Okay. But he told you allegedly,
7  or he told Arne Goldman --
8      A.  But it goes back to we wasn't
9  dealing with our original proposal.
10      Q.  Well, I understand.
11      A.  We're dealing with a proposal
12  that he started making changes on.
13      Q.  Did he make changes or
14  suggestions or recommendations?
15      A.  Changes --
16      Q.  Did he actually change your
17  proposal, or did he suggest recommendations --
18  suggest changes or make recommendations?
19      A.  He made changes on -- on some of
20  the contents of what we were putting in the
21  building, yes.
22      Q.  Okay. He changed your proposal,
23  or he sat down with Arne Goldman and they came

Page 589

1  up with some changes together?
2      A.  I can't speak on that.
3      Q.  You don't know?
4      A.  I don't know.
5      Q.  Just as you don't know how it is
6  that them telling you that your proposal was
7  the best and most fair, how that's false or
8  fraudulent?
9      Because you, yourself, have said
10  that your proposal was the best and most fair.
11      A.  It was the only one.
12      Q.  And they've concurred with your
13  opinion?
14      A.  On that proposal.
15      Q.  Okay. And you have no evidence
16  as we sit here today that it was not their
17  opinion, when they allegedly said that yours
18  was the best and most fair, that they didn't
19  believe that, correct?
20      A.  On our proposal to ASU, correct.
21      Q.  As alleged in your complaint?
22      A.  Correct.
23      Q.  You go on to say that another

Page 590

1  false representation is that ASU should move
2  forward with the plaintiffs' proposal
3  immediately.  Do you see that?
4      A.   Which?
5      Q.   Paragraph 55.
6      A.   Yes, I see it.
7      Q.   And you've also alleged that
8  elsewhere in your complaint.  Who said that?
9      A.   These are conversations that --
10  these are conversation that were told to me by
11  Arne Goldman that he had with Ken Upchurch.
12      Q.   You never heard Ken Upchurch say
13  that he would recommend that ASU move forward?
14      A.   I have no -- I do not have any
15  doubt that Arne Goldman would make a statement
16  to me that would be a false statement.
17      Q.   I understand.  But you never
18  heard Ken Upchurch say that, did you?
19      A.   Repeat the question again, and
20  then I'll give you a true and accurate answer.
21      Q.   You, yourself, never heard Ken
22  Upchurch say that he would recommend or that
23  he thinks ASU should move forward with your

Page 591

1  proposal?
2      A.   He did tell me that over at
3  Kenny's office, but he prefaced it if I would
4  put in -- in our bid that I would pick up the
5  tab for the asbestos.
6          And I told him that there was no
7  money -- there was no money in there for the
8  asbestos, and we couldn't put it in there
9  because we -- we couldn't absorb that cost.
10          He said, I tell you what, I can
11  get this thing signed today.  He's sitting
12  right here.  He could tell you.  He said, I
13  could get this thing signed today, him and
14  Percy, if you add the asbestos into it.  I
15  said, we can't do that.
16      Q.   That's the only time you heard
17  him say that he -- he would recommend that ASU
18  move forward?
19      A.   He said he could get it signed
20  today.  That was his statement.
21      Q.   Do you know whether or not TCU
22  ever recommended to ASU that they move forward
23  with your proposal?

Page 592

1      A.   I don't know.
2      Q.   You don't know one way or
3  another, do you?
4      A.   I don't know.  I wasn't present.
5      Q.   Okay.  So, you don't know then
6  that it's a false statement to say that they
7  believe or would recommend that ASU move
8  forward?
9      A.   I don't know.
10      Q.   So, you don't know?
11      A.   I don't know.
12      Q.   You've alleged that they made a
13  false representation to you; i.e., that ASU
14  should move forward, but you don't know that
15  they ever told them otherwise?
16      A.   I told you he said that he could
17  get it signed today.
18      Q.   I understand.
19      A.   He said they would move forward.
20  He could get it signed today.
21      Q.   But you've never heard -- you
22  don't know whether or not they told ASU not to
23  move forward, do you?

Page 593

1      A.   But --
2      Q.   Do you?
3      A.   If someone says that they can get
4  it signed today, that means that they're in a
5  position to either get it signed or get it
6  unsigned.  He said I can get it signed today.
7      Q.   You don't know whether or not TCU
8  ever told ASU do not move forward with your
9  proposal, do you?
10      A.   I don't know.
11      Q.   So, you don't know that that's a
12  false statement, that they said ASU should
13  move forward?
14      A.   He did say that he could get it
15  signed today --
16      Q.   I understand.
17      A.   -- if I would adopt the cost of
18  the asbestos.
19      Q.   Okay.  We've heard that.  What we
20  haven't heard is an answer to my question,
21  which --
22      A.   I already said I don't know.
23      Q.   Okay.  So, you have no evidence

Page 594

1  whatsoever that that's a false statement?
2          MR. LYONS:  He's answered that,
3  Brooke.
4      Q.    (By Mr. Lawson)  Is that a yes,
5  you're right?
6      A.    I said I don't know.
7      Q.    Okay.  So, you have no evidence.
8  I'll take that to be your answer.  Correct?
9          Is moving forward the same as a
10 promise that ASU will hire you?
11     A.    What?
12     Q.    Well, you've alleged that they
13 said ASU should move forward with your
14 proposal.  Is that the same thing as saying
15 ASU will hire you or I guarantee they'll hire
16 you or I'll make sure they --
17     A.    Well, he told me sitting in
18 Kenny's office that he could get it signed
19 today.  He said, Gil, I can get this thing
20 signed today.
21         So, if he can get it signed, he
22 can get it unsigned.
23     Q.    Okay.  Now, you've already said

Page 595

1  that the decision of whether or not to hire
2  you or accept your proposal was a decision of
3  the Board of Trustees of Alabama State
4  University, correct?
5      A.    The bottom line is --
6      Q.    Is that correct?
7      A.    Well, he made the statement --
8      Q.    Is that correct?
9      A.    That's what I said.
10     Q.    In Paragraph 55 you claim you
11 relied on these representations, and the
12 representations that you've identified are
13 best, most fair and that ASU should move
14 forward.
15         Are there any other
16 representations that you believe were false
17 representations of material fact made by TCU,
18 Upchurch or Thomas that you relied on in any
19 way?
20     A.    Say that again, please.
21     Q.    You've alleged in Paragraph 55
22 that they made false representations to you
23 regarding material facts, and you identify

Page 596

1  three.
2          Number one, that they believed
3  your proposal was the best; number two, that
4  they believed your proposal was the most fair;
5  and number three, that they believed that ASU
6  should move forward with your proposal.
7          Are there any other false
8  representations of material fact that you
9  relied on in any way that were made by TCU,
10 Upchurch or Thomas?
11     A.    No.
12     Q.    Those are the only three?
13     A.    Yes, sir.
14     Q.    Paragraph 58.  You say in
15 reliance on these representations, plaintiffs
16 expended a great deal of time and resources in
17 furtherance of ASU's goal of the renovation of
18 the Student Residence Project.  Do you see
19 that?
20     A.    Yes, sir.
21     Q.    How much time and money did you
22 expend in reliance on their statements that
23 they believed your proposal was the best, most

Page 597

1  fair and that ASU should move forward?
2      A.    I need to take a break.
3      Q.    Sure.
4      A.    I just took that pill.
5      Q.    No problem.
6          (Brief recess.)
7      Q.    In reliance on their statements
8  to you --
9      A.    Where are we at?
10     Q.    Paragraph 58.
11     A.    Okay.  Thank you.
12     Q.    -- that you believed your
13 proposal was the best and most fair and that
14 ASU should move forward --
15     A.    Uh-huh (affirmative).
16     Q.    -- how much time or resources did
17 you expend in reliance on those statements?
18     A.    Are you talking about your
19 clients?
20     Q.    Yes, sir.
21     A.    Uh-huh (affirmative).
22     Q.    And we can take them one at a
23 time if you want to.  You've alleged that they

Page 598

1  made a false representation to you that they
2  believed that your proposal was the best and
3  that you relied on that statement.
4       Tell me what you did in reliance
5  on that statement.
6       A.   I relied on -- what did I do?
7       Q.   Yes.
8       A.   I prepared to get the project. I
9  came down for the next board meeting. I
10 continued to pursue a place to live, to stay
11 when I come down here.
12      Q.   Did you ever sign a lease
13 anywhere?
14      A.   No, I never signed a lease.
15      Q.   So, you never expended any monies
16 to get a place to live, did you?
17      A.   No. I mean, but I attended the
18 board meeting where it got rejected. So, if I
19 thought it wasn't going to get signed, why
20 would I have showed up at the board meeting
21 when it got rejected?
22      Q.   So, had Ken Upchurch, Percy
23 Thomas or TCU not told you that they believed

Page 599

1  that your proposal was the best, then you
2  would not have shown up at the September 22nd
3  board meeting; is that correct?
4       A.   If they would -- if the school
5  would have told me I wasn't going to get the
6  project, I definitely --
7       Q.   That's the school. I'm talking
8  about in reliance on something that Ken
9  Upchurch, Percy Thomas or TCU said.
10      If they told you that the
11 proposal was the best, what did you do in
12 reliance on that proposal?
13      And you've just said came down
14 and looked for an apartment and showed up at
15 the board meeting?
16      A.   That's correct.
17      Q.   Okay. So, if they had not said
18 your proposal's the best, would you have not
19 come to that September 22nd board meeting?
20      A.   Oh, yes, I would have still came.
21      Q.   So, you would have come, anyway?
22      A.   I would have come, anyway.
23      Q.   Okay. So, you didn't do anything

Page 600

1  then in reliance on their statement that they
2  believed that your proposal was the best?
3       A.   No.
4       Q.   Likewise, you claim that they
5  made the false representation that they
6  believed that your proposal was the most fair.
7  Okay?
8       A.   Uh-huh (affirmative).
9       Q.   What did you do in reliance on
10 that representation?
11      A.   Nothing.
12      Q.   Nothing. Okay. So, you didn't
13 -- had they not said that, you would have
14 still attended the board meeting?
15      A.   That's correct.
16      Q.   And you still would have come
17 down here and looked for a place to live?
18      A.   That's correct.
19      Q.   And you had already submitted
20 your proposal, scope of work and invoices and
21 done all of that work?
22      A.   That is correct.
23      Q.   So, none of that was done in

Page 601

1  reliance on anything that Ken Upchurch, Percy
2  Thomas or TCU said or didn't say?
3       A.   That is correct.
4       Q.   And, finally, you say that they
5  believed that your proposal -- or that ASU
6  should move forward. What did you do in
7  reliance on that?
8       A.   Showed up at the board meeting.
9       Q.   But you've already said you would
10 have showed up whether they said something or
11 not?
12      A.   Correct.
13      Q.   So, you didn't rely in any way on
14 their statement that they believed ASU should
15 move forward?
16      A.   Correct.
17      Q.   You didn't do anything
18 differently that you hadn't already done?
19      A.   That's correct.
20      Q.   Okay. So, when we look at
21 Paragraph 58 --
22      A.   I take that back.
23      Q.   Okay.

Page 602

1    A.    I mean, at the board meeting the
2  president said that --
3    Q.    The September 22nd board meeting?
4    A.    Yes.
5    Q.    Okay.
6    A.    That him and Ken had been working
7  on an alternate plan that Ken and Percy could
8  move forward very quickly with the project.
9  Ken never revealed to me or to -- as far as I
10 know, to Marous that Ken in his representation
11 as a -- to review our proposal, that Ken and
12 Percy were working on an alternate plan with
13 the president to be able to secure the job and
14 to be able to put together a time line, which
15 he did.
16        He made representation that there
17 would be a -- maybe a -- there would be a
18 delay from the time schedule that we had put
19 together.  He made a representation at the
20 board meeting when Judge Wiggins asked him the
21 question can he do it for the same price and
22 all that.  And he made a statement that it
23 would probably be, I think he said, a

Page 603

1  three-month delay.
2        So, he never told us that he and
3  Percy were working with the president on an
4  alternate plan that involved their company
5  with the president, that on the dismissal of
6  us that no other companies would -- you know,
7  I mean, they wasn't going to review or they
8  wasn't going to propose or wasn't going to put
9  an RFP out, they wasn't going to do nothing,
10 that they would receive the job.
11        He knew that going in, that the
12 president was going to make the recommendation
13 at the meeting not to use Gil Berry &
14 Associates and make the recommendation that he
15 had worked with Ken and that they had came up
16 with an alternate plan to secure the job and
17 put the -- and to do the job for the same
18 price as Gil Berry and Marous Brothers, do the
19 job for the same price, but there would just
20 be a small delay in ramping up and getting
21 prepared for the job.
22    Q.    You said he knew that you weren't
23 going to get the job before that board

Page 604

1  meeting?
2    A.    Well --
3    Q.    How do you know that?
4    A.    Why would he be preparing and
5  getting with the president and preparing a
6  schedule, preparing to hit the ground running
7  if he didn't know I wasn't going to get the
8  job?
9    Q.    You have no evidence that he knew
10 before that board meeting that ASU --
11   A.    Well, he --
12   Q.    Let me finish.
13   A.    Okay.  Yes, sir.
14   Q.    You have no evidence that Ken
15 Upchurch knew before that board meeting that
16 they were not going to accept your proposal,
17 do you?
18        You're assuming.  But you don't
19 have any evidence of that, do you?
20   A.    That's correct.
21   Q.    And, likewise, you don't have any
22 evidence of all of these alternate plans and
23 secondary plans that you claim TCU was cooking

Page 605

1  up before the September 22nd board meeting?
2    A.    The president stated on the
3  record that he had been working very close
4  with Ken and they had come up with a plan that
5  they could move this job forward and get the
6  job done and they wouldn't miss a step.
7    Q.    Okay.
8    A.    The president said that on the
9  record.
10   Q.    Well, you bring that up while
11 we're discussing your fraudulent
12 misrepresentation claim.  And let me ask you.
13        Again, you've said that the only
14 false representations made to you had to do
15 with it being the best, most fair proposal and
16 that ASU should move forward.
17        Now, what you've just described
18 to me, this alternate plan or this scheme,
19 that's not one of the false representations
20 that you claim were made by TCU to you, is it?
21   A.    No, not to me.
22   Q.    And in reliance on any false
23 representations, you've already said you

Page 606

1  didn't do anything any differently than you
2  would have otherwise done, correct?
3      A.    But if -- no.  But talking to Ken
4  and talking to Marous, Percy -- me and him
5  occasionally would communicate when we seen
6  each other.
7           He never said that they were
8  talking to the president about an alternate
9  plan for their company to take over the job
10 and to put together a schedule and to take the
11 job for the $25 million number.
12     Q.    Okay.  So, had they told you
13 that, what's the significance of that?
14     A.    It would -- the significance of
15 that is I would have knew I wasn't going to
16 get the job.
17     Q.    And what would you have done
18 differently?
19     A.    What I would have done
20 differently?
21     Q.    Yes.
22     A.    What I would have done
23 differently is to, first of all, probably

Page 607

1  contact the board members and ask why would
2  the president be working with -- with the
3  representatives that were supposed to just be
4  reviewing the documents.
5      Q.    But by that time you knew they
6  were the owner's representative.  By the time
7  of the board -- by the time of the September
8  --
9      A.    Like you said, I didn't -- I
10 don't know.
11     Q.    By the time --
12     A.    I didn't know.
13     Q.    Let me finish.  By the time of
14 the --
15     A.    I didn't know.
16     Q.    Let me finish.  By the time of
17 the September 22nd board meeting, you knew
18 they were the owner's representative.  You've
19 alleged it in your complaint.  Okay?
20     A.    But I alleged it.  I didn't know
21 for sure.
22     Q.    Okay.
23     A.    So, what would you have done

Page 608

1  differently?  What would you have changed that
2  you -- something you did.
3           Had Ken Upchurch, Percy Thomas or
4  TCU told you that they were allegedly working
5  on an alternate plan, had they told you that,
6  what would you have done differently,
7  something you did that you would not have
8  otherwise done?
9      A.    I would have contacted the
10 president --
11     Q.    No.  Something you did that you
12 would not otherwise have done.  You expended
13 time and resources that you wouldn't have
14 expended.
15     A.    Well, I would have expended some
16 more because I would have contacted the
17 president, the chairman of the Board, Mr.
18 Knight, the board members and I would have
19 asked Marous to attend the meeting and to find
20 out what their concerns were.
21     Q.    Okay.  So, you would have done
22 more things.  But you already had submitted
23 your proposal, as we have already established,

Page 609

1  your scope of work, your invoices.
2           None of those things would have
3  changed?
4      A.    None of those things would have
5  changed.
6      Q.    Okay.  So, the only thing you
7  would have done differently is you would have
8  called some board members and had Chip Marous
9  or Arne Goldman come down here?
10     A.    And find out what was the
11 problem.
12     Q.    Okay.
13     A.    And what changed from the time
14 that these meetings took place.  Was there
15 some clarity that we could have gave them?
16 Was there maybe a misunderstanding that they
17 had, a misunderstanding on something that was
18 communicated to them?  I would have did that.
19     Q.    Okay.  But as far as -- let's
20 stick to your fraudulent misrepresentation
21 claim.  The only misrepresentation we've
22 established, best, most fair and move forward.
23 And we've established that you didn't do

Page 610

1  anything differently in reliance on those
2  statements.
3         You can't identify any other
4  false representations made to you, can you,
5  statement made to you?
6         MR. LYONS: By the TCU
7  defendants?
8     Q.    (By Mr. Lawson) By the TCU
9  defendants. I'm not talking about ASU.
10    A.    No.
11    Q.    Okay. And the only evidence that
12 you have that TCU was working on some
13 alternate proposal is that President Lee said
14 in the board meeting that they'd been working
15 closely together on getting --
16    A.    And your client stood up and plus
17 President Lee said, Ken, tell them what we've
18 been working on.
19    Q.    Okay. And what did he say?
20    A.    And so -- and Ken stood up and
21 said, hey, we've been working on a plan that
22 we could basically hit the ground running.
23 There will be a small delay. And that's when

Page 611

1  Judge Wiggins asked Ken -- I'm standing right
2  by him.
3     Q.    Okay.
4     A.    Mr. Upchurch, can you do this job
5  for less money than Gil Berry & Associates?
6  He said, no, I can do it for around the same
7  price. And they then took a vote.
8     Q.    And that's when they rejected
9  your proposal?
10    A.    That's when they rejected my
11 proposal.
12    Q.    Would you have withdrawn your
13 proposal had they not said yours was the best
14 or most fair?
15    A.    No.
16    Q.    I didn't think so.
17          You say you were denied -- in
18 Paragraph 59 if you want to look at that.
19    A.    Uh-huh (affirmative).
20    Q.    That you were denied the
21 opportunity to complete your work based on the
22 representations made by the TCU defendants
23 that it's the most fair and best and that ASU

Page 612

1  should move forward.
2     Q.    How did those statements deny you
3  the opportunity to do any work? Those
4  statements. Not anything else that you've
5  been talking about. I'm talking about what
6  you allege to be fraudulent statements.
7     A.    Repeat that again.
8     Q.    In Paragraph 59 you say you
9  relied on their representations. Okay?
10    A.    Uh-huh (affirmative).
11    Q.    That it was the best, the most
12 fair and that ASU should move forward. Even
13 though you've already told me that you didn't
14 do anything differently in reliance on those
15 statements. You say you were denied the
16 opportunity to complete your work.
17          Okay. Based on the statement
18 that your project or your proposal was the
19 most fair, how were you denied the opportunity
20 to complete that work? Based on that
21 statement.
22    A.    I'm not trying to be funny. Read
23 it one more time.

Page 613

1     Q.    Okay. In Paragraph 59 you claim
2  you relied on their representations to you
3  that your proposal was the best, most fair and
4  that they believed ASU should move forward.
5  And you say in reliance on those
6  representations you were denied the
7  opportunity to complete the work.
8          How, based on those
9  representations, were you denied the
10 opportunity to complete the work?
11    A.    Again --
12    Q.    Not anything else but those
13 representations. I know you believe
14 ultimately you were denied for other reasons.
15          But can you tell me based on
16 those three representations how you were
17 denied the opportunity to complete the work?
18    A.    Well, I look at it if they were
19 the owner's rep and they knew that the owner
20 had some concerns that they would have called
21 us in to try to help the owner address the
22 concerns that he had.
23          If you are the owner's

Page 614

1  representation -- you know, owner's rep, if
2  there's a problem that you think that the
3  owner is having with the architect, the
4  construction manager or general contractor,
5  you bring the parties to the table, and you
6  have the owner address what his concerns are
7  and you might want to help articulate on a --
8  maybe a construction term or an architectural
9  term what the owner's concerns are.
10        That never happened.  I mean, it
11 was very obvious he knew that there were some
12 concerns that maybe the president was having
13 and some things he was wrestling with maybe.
14    Q.    And he sat down with Mr. Goldman
15 on several occasions to --
16    A.    No.  He talked to Mr. Goldman.
17    Q.    Okay.  He talked to Mr. Goldman
18 on --
19    A.    Mr. Goldman on the phone.
20    Q.    And so he raised concerns that
21 ASU was having.  He raised them with Mr.
22 Goldman, not with you?
23    A.    The bottom line is --

Page 615

1    Q.    Is that correct?
2    A.    The bottom line is -- that's
3  correct.
4        The bottom line is I think that
5  he -- that a meeting should have been called
6  with the owner's representative and said there
7  are some concerns that the owners are having.
8  I suggest that we come together to try to
9  answer their concerns.  And if nothing else, I
10 have done my job as the owner's rep.
11        If they want to go with you, I
12 can't force them to go with you, but I think
13 that maybe you can clarify some problems.
14 Instead of me relaying to the owner what
15 you're telling me, I think it would be best
16 coming from you.
17        And I think that they could have
18 -- that would have been with me in that
19 position and they were us, meaning Marous
20 Brothers and myself.  I would have scheduled a
21 meeting to address the concerns that President
22 Lee was having no matter what the concerns
23 were.

Page 616

1    Q.    Fair enough.  But the statement
2  that it was the best or most fair, those
3  statements themselves, having made those
4  statements, didn't deny you the opportunity to
5  complete that work, did they?
6    A.    No, sir.
7    Q.    You say in Paragraph 60 that the
8  TCU defendants received the contract to
9  perform services for the project that these
10 defendants -- I'm assuming you mean the TCU
11 defendants, or you're taking about all
12 defendants -- had led plaintiffs to believe
13 that they would receive.
14        Who are you talking about there
15 when you say these defendants?
16    A.    One more time.  Would you read
17 it?
18    Q.    Yes.  Furthermore, Defendants
19 Upchurch, Percy Thomas and TCU received the
20 contract to perform services for the Student
21 Residence Project that these defendants had
22 led plaintiffs to believe that they would
23 receive.

Page 617

1        Who are these defendants?
2    A.    That means us and Marous.
3    Q.    No, you're plaintiffs.
4    A.    Oh.
5    Q.    When it says these defendants,
6  who are you talking about?  Look at the second
7  sentence -- the second line.  Yeah, point it
8  out.
9        MR. LYONS:  He wants to know are
10 you talking about Upchurch, Percy Thomas and
11 TCU, or are you talking about Upchurch, Percy
12 Thomas, TCU and all of the Alabama State
13 defendants also?
14        THE WITNESS:  No.  I'm talking
15 about Upchurch, Percy Thomas and TCU.
16    Q.    (By Mr. Lawson)  Now, you've
17 already confirmed for me that it was not their
18 decision to hire you.  They couldn't make that
19 decision, and that was the decision of the
20 Board of Trustees?
21    A.    And I also told --
22    Q.    Correct?
23    A.    And I also told you --

Page 618

1     MR. LYONS: Let's just answer his
2  question.
3     Q.    (By Mr. Lawson)  Correct?
4     A.    Correct.
5     Q.    And you knew that that was the
6  decision of the Board of Trustees, correct?
7         You sent your proposal to the
8  Board of Trustees, you sent your scope of work
9  to the Board or Trustees, you sent the
10  resolution to the Board of Trustees.
11        You knew that was their decision,
12  correct?
13     A.    It was their decision.  But,
14  again, he said that he could get the contract
15  signed if I accepted the asbestos.  If he
16  could get it signed, he could also get it
17  unsigned.
18     Q.    Okay.  Now, that's your opinion?
19     A.    That's my opinion.
20     Q.    Okay.
21     A.    Thank you.
22     Q.    Of course, you didn't -- you
23  didn't agree to the asbestos payment, anyway,

Page 619

1  did you?
2     A.    No, sir.
3     Q.    So, he didn't tell you -- you
4  allege that he said he could get the contract
5  signed if you would agree to the asbestos
6  abatement?
7     A.    That is correct.
8     Q.    Okay.  He didn't tell you, well,
9  if you don't agree to it, I can still get it
10  signed, did he?
11     A.    No, he didn't.
12     Q.    So, then he didn't do anything --
13  he didn't lead you to believe then that you
14  were going to get the contract because you
15  didn't agree to the asbestos abatement?
16     A.    Well, the bottom line is our
17  proposal was based on the criteria we had in
18  there.  Asbestos abatement was never in the
19  original agreement.  So, I couldn't agree to
20  something that we didn't have plugged in
21  funding for.
22     Q.    So, the only time he told you
23  that he would recommend that ASU accept your

Page 620

1  proposal is --
2     A.    No.
3     Q.    -- if you agreed to the asbestos
4  abatement?
5     A.    He said she could get it signed
6  today.
7     Q.    Okay.
8     A.    He could get it signed today, the
9  contract signed today, if I agreed to the
10  asbestos --
11     Q.    And the only time he told you
12  that is if you would agree to the asbestos
13  abatement?
14     A.    Correct.
15     Q.    Which you didn't agree to?
16     A.    That is correct.
17     Q.    So, he never led you to believe
18  or told you that he would get that contract
19  signed by ASU on any other circumstance -- or
20  under any other circumstances, did he?
21     A.    No, sir.
22     Q.    Okay.  So, he never told you then
23  that your proposal, as submitted to ASU back

Page 621

1  in May of 2006, that he would recommend to ASU
2  that they sign it, as submitted by you and
3  Marous and Student Suites?
4     A.    No.
5     MR. LYONS:  Are you at a breaking
6  point?  We're about another hour and a half
7  into it.
8     MR. LAWSON:  We can if you need
9  one.
10     MR. LYONS:  Let's just take five
11  minutes.
12     MR. LAWSON:  Okay.
13     (Whereupon, the taking of the
14  deposition was recessed from approximately
15  11:55 a.m. to approximately 12:01 p.m., after
16  which the following proceedings were had and
17  done:)
18     A.    Are we still on Page 14 or 13?
19     Q.    Fourteen.
20     A.    Fourteen.  Okay.
21     Q.    All right.  Page 14, Count Four,
22  fraud claim.  I believe we established
23  yesterday that relates only to President Lee?

Page 622

1    A.    Uh-huh (affirmative).
2    Q.    Is that correct?
3    A.    Yes, sir.
4    Q.    Count 5, Tortious Interference
5  with Business Relations.  Paragraph 70.  You
6  say that Upchurch, Thomas and TCU knew of the
7  existence of the business relationship between
8  plaintiffs and ASU.
9            And what business relationship
10  are you talking about?
11    A.    The $25 million proposal that we
12  had given the school.
13    Q.    And you didn't have a contract as
14  we've already established?
15    A.    That is correct.
16          MR. LYONS:  Object to the form.
17  He said there wasn't a written contract.
18          THE WITNESS:  Yes.
19    Q.    (By Mr. Lawson)  What implied
20  contract are you talking about?
21    A.    Alliances -- of realliances of --
22  from Elton Dean and Judge Wiggins and Buford
23  Crutcher, President Lee, that he'd pay the

Page 623

1  invoices and when he got the $25 million, we
2  can move forward on the renovation.
3    Q.    The business relationship is the
4  proposal.  The implied contract there is the
5  promise by those gentlemen to pay your
6  expenses as detailed in your invoices of May
7  23rd and July 10?
8    A.    Yes.
9    Q.    Now, TCU, Upchurch and Thomas
10  didn't have anything to do with that implied
11  contract to pay your expenses, did they?
12    A.    Well, we had -- it was not only
13  to pay the expenses.  President Lee said when
14  he got the money that he would pay the
15  expenses and we could start the process of
16  renovating the dormitory.
17    Q.    Okay.  So, the implied contract
18  is not only to pay the expenses, but also to
19  accept your proposal for the $25 million
20  project?
21    A.    That is so correct.
22    Q.    Now, TCU, you claim, knew of the
23  existence of it and they knew of the existence

Page 624

1  of the business relationship and -- because
2  they were acting as the owner's
3  representative, correct?
4    A.    Well, it was my understanding
5  that they were acting as a review
6  representative, to review the documents and
7  relate to the president maybe some technical
8  terms or some construction terms or some
9  architectural or structural terms that maybe
10  he might not be familiar with.
11    Q.    What if -- what if they
12  determined that you had left out of the
13  proposal new plumbing for these bathrooms, are
14  they not supposed to relay that to the
15  president?
16    A.    Correct.
17    Q.    They are?
18    A.    Yeah.
19    Q.    Okay.  So, you knew that they
20  were serving as the owner's representative,
21  and you've alleged that over on Page 8 of your
22  amendment complaint in Paragraph 28 -- excuse
23  me, Paragraph 29, designated owner's

Page 625

1  representative.
2            So, you knew that's the capacity
3  they were serving in, correct?
4    A.    They were to review and then they
5  became the owner's rep.
6    Q.    Okay.
7    A.    They had told me that they didn't
8  have a contract.
9    Q.    Well --
10    A.    So, if they didn't have a
11  contract, you can't be somebody's owner's
12  representative -- owner's rep.
13    Q.    Okay.  Well, now, you didn't have
14  a contract, but you're claiming that you had
15  an implied contract from ASU to pay your
16  expenses and to give you the contract for the
17  $25 million renovation, correct?
18    A.    I had a -- yes, I had an implied
19  contract.
20    Q.    So, you don't know whether ASU
21  and TCU had a verbal agreement or not, do you?
22    A.    No, I don't know.
23    Q.    So, what you do know, because

Page 626

1  you've admitted it and alleged it in your
2  complaint, is TCU was involved in this
3  business relationship as the owner's
4  representative?  You knew that, didn't you?
5      A.    To review the documents.
6      Q.    Well, you knew -- whatever they
7  were doing --
8      A.    Okay.
9      Q.    -- you knew that they were
10  serving as the owner's representative.  You've
11  alleged it in Paragraph 29 of your complaint.
12      A.    Okay.
13      Q.    Is that correct?
14      A.    They were -- yes.
15      Q.    And you knew that they were
16  reviewing your proposal?
17      A.    Yes.
18      Q.    And you knew they were doing that
19  for ASU and President Lee, they were looking
20  at your proposal?
21      A.    They were doing it for President
22  Lee.
23      Q.    Okay.  Well, President Lee is the

Page 627

1  president of ASU?
2      A.    Yes.
3      Q.    And you welcomed TCU's
4  participation?
5      A.    To help with the review process
6  with President Lee.
7      Q.    You voluntarily provided that
8  proposal to TCU or allowed them to look at it?
9      A.    Yes.  Yes, that's true.
10      Q.    And Arne Goldman with Marous
11  Brothers had numerous at least phone calls
12  with Ken Upchurch or somebody at TCU?
13      A.    That's correct.
14      Q.    Discussing your proposal and your
15  business relationship with ASU?
16      A.    That's correct.
17      Q.    And Arne Goldman at least had
18  numerous discussions with Ken Upchurch about
19  the proposal, the scope of work and everything
20  that you were proposing to ASU to do, correct?
21          THE WITNESS:  I didn't knock your
22  wire out?  I'm about -- I kicked the cord.  I
23  just wanted to make sure I didn't knock it

Page 628

1  out.
2          COURT REPORTER:  You're fine.
3      Q.    (By Mr. Lawson)  But Arne Goldman
4  had numerous conversations, as you've said,
5  with TCU representatives about your business
6  relationship with ASU as you define it?
7      A.    Yes, with Mr. Upchurch.  Correct.
8      Q.    So, he's no stranger and TCU's no
9  stranger to the relationship between you and
10  ASU, is he?
11      A.    No.
12      Q.    Now, on this implied contract,
13  did you ever tell anybody at TCU that you had
14  an implied contract with ASU for them to pay
15  your expenses?
16      A.    Yeah, they knew that.
17      Q.    How did they know that?
18      A.    I told them.
19      Q.    So, they knew about your implied
20  contract --
21      A.    At the same time they said that
22  they had not -- their contract had not been
23  accepted by the president either.  They hadn't

Page 629

1  been paid either.  That's basically what they
2  said.  I said, we'll we're all in the same
3  boat.
4      Q.    So, they knew about that implied
5  contract because you told them?
6      A.    Yes.
7      Q.    And, again, the implied contract
8  was that they would pay your expenses and then
9  eventually accept your proposal?
10      A.    That is correct.
11      Q.    And they had a right to review
12  your proposal as we've just stated?
13      A.    That is correct.
14      Q.    So, again, they're not any sort
15  of stranger to your implied contract between
16  you and ASU, are they?
17      A.    That is correct.
18      Q.    Now, you claim in Paragraph 70
19  that they interfered with that business
20  relationship and implied contract by
21  misrepresenting to ASu and its board the fees
22  which you would receive.
23          Do you see that?

Page 630

```
 1      A.   We are on Page 15, Paragraph --
 2      Q.   Yeah.  It carries over to 16.
 3      A.   Okay.
 4      Q.   Paragraph 70.  And we've already,
 5 I believe, established that you never heard
 6 anybody from TCU misrepresent the fees you
 7 were going to receive?
 8      A.   That's correct.
 9      Q.   I think you said Arne Goldman may
10 have told you that?
11      A.   Arne Goldman and either Judge
12 Wiggins --
13      Q.   Either Mr. Wiggins or Crutcher?
14      A.   Yes.
15      Q.   One or the other?
16      A.   Yes.
17      Q.   And we don't know when, and we
18 don't know who?
19      A.   And that's true.
20      Q.   So, that's the misrepresentation
21 that you claim was made --
22      A.   That is true.
23      Q.   -- to ASU?
```

Page 631

```
 1      A.   That is correct.
 2      Q.   And you claim in Paragraph 71 --
 3      A.   We're now on Page 16?
 4      Q.   Yes.
 5      A.   Okay.
 6      Q.   That they used their confidential
 7 relationship as -- there's that phrase,
 8 "owner's representative," to gain information
 9 about the business relationship between you
10 and ASU.  Do you see that?
11      A.   Uh-huh (affirmative).
12      Q.   You voluntarily provided that
13 information to them, didn't you?
14      A.   We provided it to the school and
15 gave them permission to review the
16 information.
17      Q.   "Them" being the TCU defendants?
18      A.   That is correct.
19      Q.   And you say they used that
20 information to misrepresent your position with
21 respect to the work to be performed and the
22 fees to be charged?
23      A.   That is correct.
```

Page 632

```
 1      Q.   Now, couldn't ASU look at your
 2 proposal and see what work was to be
 3 performed?
 4      A.   That is correct.  They changed
 5 the scope of work that we were going to
 6 perform.
 7      Q.   Really.  So, did they take what
 8 was yesterday marked as Exhibit No. 8, the
 9 scope of work, which is labeled Bates stamp
10 GBA 1059, did they take that and change it?
11      A.   They didn't change that document,
12 no.
13      Q.   Did they take one that looks just
14 like this document and physically change it?
15 Did they insert things in there that you
16 didn't want inserted in there?
17      A.   No.
18      Q.   Okay.  So, they didn't change
19 your proposal, did they?
20      A.   They didn't change our original
21 proposal, no.
22      Q.   Okay.  And I believe we've
23 established that there were discussions with
```

Page 633

```
 1 Arne Goldman about maybe some extras or some
 2 contingencies and extra items that he -- that
 3 ASU wanted you-all to price, correct?
 4      A.   That's correct.
 5      Q.   Is that what you're talking about
 6 being changes to your proposal?
 7      A.   No.  Changes to the proposal are
 8 items that he had added that he wanted Arne
 9 and them to price but to make sure that it was
10 in the $25 million range.
11      Q.   Now, is that something that TCU
12 wanted, or is that something that ASU wanted?
13      A.   It was coming from us from TCU.
14 So --
15      Q.   As the owner's representative?
16      A.   As the owner's rep.
17      Q.   Okay.  But TCU didn't own the
18 project, did they?  That's ASU?
19      A.   They owned the project, yes.
20      Q.   So, the changes that are being
21 requested or -- to be priced by you were
22 things that ASU wanted priced.  It was just
23 relayed to you by TCU, correct?
```

Page 634

1    A.    Well, I don't know that.  I never
2  seen nothing in writing from the president or
3  any of the board members saying that this is
4  what we want, but we want our -- on the
5  president's letterhead or on the board's
6  letterhead saying this is what we want.  Would
7  you, please, Mr. Upchurch, present this to Mr.
8  Goldman and ask him to price this.
9    Q.    And that's because they were
10 serving as the owner's representative, and
11 they didn't need to get a letter from
12 President Lee first, did they?
13        MR. LYONS:  If you know.
14        THE WITNESS:  No.  I don't know
15 if that's the case or if that's the way their
16 arrangements were, that something in writing
17 came from the board or from the president sent
18 to Mr. Upchurch in the form of questions, in
19 the form of changes, in the form of -- and say
20 would you please review this.
21    Q.    (By Mr. Lawson)  Okay.  Now, the
22 things that you say that TCU on behalf of ASU
23 requested that you price, that's the change to

Page 635

1  your proposal, those items?
2        Is that how they changed your
3  proposal, by requesting that you price
4  additional items?
5    A.    Yes.
6    Q.    But the original proposal, as you
7  submitted it, was not changed by TCU or anyone
8  else, was it?
9    A.    Well, they made some requests
10 that they have -- that they indicated that the
11 school wanted to see.
12    Q.    And you priced those things,
13 didn't you, or Marous did?
14    A.    I think Marous did.
15    Q.    So, those were priced?
16    A.    Yes.
17    Q.    And they weren't going to be free
18 because Arne Goldman did, in fact, provide a
19 price, a dollar amount, for those additional
20 items or those requested changes, correct?
21    A.    That is correct.
22    Q.    And it's not unusual on a project
23 of this size or any size that there might be

Page 636

1  changes.  You have change orders all the time,
2  don't you?
3    A.    Change orders, yes.
4    Q.    And in this case you were pricing
5  it.  They weren't asking you to do it for
6  free, were they?
7    A.    No.
8    Q.    So, you provided a price?
9    A.    That's correct.
10   Q.    Have you ever seen correspondence
11 that Arne Goldman ultimately received
12 regarding these requested changes which states
13 that the University requests these changes --
14   A.    No.
15   Q.    -- or requests prices?
16   A.    I've never seen any.
17   Q.    You don't know that it's not
18 there.  You just haven't seen it?
19   A.    I've just never seen it.
20   Q.    Now, your proposal had a number
21 of exclusions in it, didn't it?
22   A.    As far as what?
23   Q.    Well, asbestos abatement being

Page 637

1  one.  Your proposal did not include that, did
2  it?
3    A.    No, it didn't.
4    Q.    And your proposal didn't include
5  cost of permits?
6    A.    I don't remember.
7    Q.    Okay.  Your proposal was only one
8  coat of paint, not two, right?
9    A.    Do you have something in front of
10 me that I can look at that we --
11   Q.    I'm just asking.  Do you know?
12   A.    No, I don't know.
13   Q.    Do you know whether or not your
14 proposal excluded things like transformers or
15 code compliance?
16   A.    I don't know.  I mean, I think
17 that's why we had hired the architect, to make
18 sure that we were in compliance and that our
19 documents and our work product was in
20 compliance with the State of Alabama.
21   Q.    Do you know if your proposal
22 excluded unforeseen conditions?
23   A.    We had a contingency in there.

Page 638

1    Q.    Do you know if your proposal
2  excluded the removal of rotten wood, except
3  for 20 percent of the rotten wood?
4    A.    I don't know that.
5    Q.    Do you know if your proposal had
6  any sort of allowance for ADA compliance, the
7  American with Disabilities Act?
8    A.    Uh-huh (affirmative).
9    Q.    Do you know if it had anything in
10 there for that excluded?
11   A.    I don't know, but it wouldn't
12 have -- it would be my understanding that the
13 state would not approve it if it didn't.
14   Q.    Well, the state never did approve
15 it, did they?  It was never submitted to the
16 building commission, was it?
17   A.    We hired an architect to do that.
18   Q.    It was never submitted to the
19 building commission, was it?
20   A.    We hired an architect to do that.
21   Q.    Well, my question is it was never
22 submitted to the building commission for
23 approval?

Page 639

1    A.    Well, if it got turned down, I
2  guess -- if we got rejected, we never got to
3  that, that far.
4    Q.    Okay.  So, no, it was never
5  submitted to the building commission for
6  approval?
7    A.    No, but it would have been.
8    Q.    That's your opinion.  But it was
9  never submitted --
10   A.    No.  That's what would have been.
11   Q.    That's your opinion.  But, no, it
12 was --
13         MR. LYONS:  That's his answer.
14         THE WITNESS:  Okay.
15   Q.    (By Mr. Lawson)  You don't work
16 for the building commission, do you?
17   A.    No.  No, I don't.
18   Q.    So, your proposal, as best you
19 can tell me sitting here today, did have a
20 number of exclusions in it or things that --
21 items that weren't included, correct?
22   A.    Based on what you've said here
23 today, yes.

Page 640

1    Q.    Your proposal excluded --
2    A.    But we had contingency money in
3  there for things that -- that might have
4  needed repaired or whatever.  We had a
5  contingency price in there.
6    Q.    And that included the $600,000
7  that you reduced from your fee.  That went
8  into the contingency fund, didn't it?
9    A.    That's correct.
10   Q.    If you have a number of
11 exclusions in your contract -- let's just say
12 rotten wood, for instance -- and you get in
13 there and you discover that there is a lot of
14 rotten wood -- or how about plumbing.  Because
15 you had proposed reusing the existing
16 plumbing.
17         If it turns out that you have a
18 lot more rotten wood or you can't reuse the
19 existing plumbing, those are items that are
20 going to cost Alabama State University, aren't
21 they?
22   A.    We had a contingency --
23   Q.    I understand.

Page 641

1    A.    -- in there for that.
2    Q.    And if it exceeded that
3  contingency, then what?
4    A.    We would have had to pick up the
5  cost.
6    Q.    You would have picked it up?
7    A.    If Marous bidded the job, they
8  would have picked up the cost I'm quite sure.
9  I mean, they do this -- they do this for a
10 living.
11         That's why I told Mr. Upchurch,
12 again, in front of the board and everything,
13 that I was so sure that we could do the job
14 for that price, what we had presented, that I
15 didn't have to get paid until the job was
16 complete.  I said that in front of the
17 attorney, I said that in front of Percy Thomas
18 and I said that in front of Mr. Upchurch.
19         And he told me legally that was
20 not possible.
21   Q.    Now, is it your testimony that
22 these -- that any exclusions from your
23 proposal, that if there was a cost associated

Page 642

1  with those items that they would be covered by
2  the contingency fee?
3      A.   Yes.
4      Q.   Even though you've excluded them
5  from your proposal?
6      A.   Would you repeat that again?
7      Q.   You've testified that there were
8  a number of exclusions from your proposal.
9  And we'll get into this with Arne Goldman, who
10 I gather can better testify to this.
11     A.   And I agree.
12     Q.   Is it your testimony that if you
13 have a number of exclusions in your proposal
14 -- and let's just say asbestos abatement.
15 That was one of the exclusions.  Well, as it
16 turns out, asbestos abatement isn't necessary.
17         Was that going to be paid for by
18 your contingency?
19     A.   Well, I had called a meeting.
20 I'm the one who made Chairman Dean, Judge
21 Wiggins and Leon Frazier very aware of the
22 asbestos issues.  They had got a -- they had
23 got a -- they had been notified that there was

Page 643

1  asbestos in the building.
2      Q.   But the cost of removal of that
3  asbestos wouldn't be paid for by your
4  contingency fee, would it?
5      A.   No.
6      Q.   So, that exclusion would not be
7  paid for --
8      A.   But there was --
9      Q.   -- by your contingency?
10     A.   There was a federal program that
11 they were under, the whole state was under
12 that --
13     Q.   I understand.
14     A.   -- that would have paid for the
15 asbestos removal.  They had to do a phase one
16 study, submit that information and then based
17 on that information determine a price.
18         And that they additionally would
19 have to pick up the tab, but then they would
20 be reimbursed by the federal government.
21     Q.   I've seen your correspondence to
22 that effect.  I'm not arguing with you about
23 that.

Page 644

1          But what I am asking you is
2  you've said that your contingency fee would
3  cover any of these exclusions, and we've just
4  identified one that it wouldn't cover.
5          Your contingency fee wasn't going
6  to pay for asbestos abatement, was it?
7      A.   It wasn't in -- in our pricing
8  because --
9      Q.   It was an exclusion?
10     A.   It was an exclusion because Dr.
11 Frazier had already told us that they had been
12 notified that that would be a reimbursable
13 item by the federal government.
14         So, why would we put that in our
15 pricing if they were going to get reimbursed
16 by the federal government?
17     Q.   Right.  You've excluded it?
18     A.   Excluded it?
19     Q.   If you exclude an item, you don't
20 then pick up the cost of it?
21     A.   But I kept them aware that
22 because of the black mold that was identified
23 early on in the building that if they didn't

Page 645

1  take care of this in a timely manner, if some
2  kid had asthma and got ill or even died from
3  it; or if the insurance company was aware that
4  they had black mold in there that they would
5  lose their insurance at the school there.
6      Q.   Okay.
7      A.   So, I kept -- and I brought it to
8  everybody's attention that would listen.
9      Q.   Okay.  But my question for you
10 is:  If you excluded it from your proposal,
11 you're not then going to pay for it?
12     A.   No.  That's correct, sir.
13     Q.   You also claim that the TCU
14 defendants encouraged ASU to not hire you.
15 What evidence do you have of that?
16         It's Paragraph 72 if you need to
17 see it.  The third line from the bottom of
18 that paragraph.
19     A.   Because it was very obvious that
20 if TCU was working with Dr. Lee on a
21 subsequent plan, that they would then be the
22 program managers on the project, that they
23 wasn't working in our behalf.

Page 646

1    Q.    What's a program manager?
2    A.    A program manager is a guy who
3 manages the project. It's like a construction
4 manager, but it's program specific.
5    Q.    Have you seen TCU's contract?
6    A.    I haven't seen it.
7    Q.    So, you don't know what their
8 role is, do you, other than owner's
9 representative?
10    A.    No.
11    Q.    You don't know that they're a
12 program manager, do you?
13    A.    No, I don't know that.
14    Q.    Okay. So, my question to you was
15 what evidence do you have that they encouraged
16 ASU to not hire you?
17    A.    Because they were working in
18 behalf of getting theirself hired.
19    Q.    So, you believe that the mere
20 fact that they're still working for ASU on
21 this and a number of other projects is
22 evidence that they encouraged ASU to not hire
23 you?

Page 647

1         Is that the only evidence you
2 have?
3    A.    They ended up with our project.
4    Q.    Well, is that the only evidence
5 that you have, the fact that --
6    A.    I think -- I think that's
7 significant evidence.
8    Q.    What did they end up with?
9    A.    They ended up with the contract.
10    Q.    What contract?
11    A.    To oversee the project, the --
12    Q.    You said you've not seen their
13 contract.
14    A.    Well, the board voted that they
15 were the contractor -- they were the -- they
16 were the choice of Dr. Lee to be the whatever,
17 construction manager or whatever.
18    Q.    When did they do that?
19    A.    At the meeting.
20    Q.    At what meeting?
21    A.    The meeting I was present where
22 -- where Judge Wiggins asked Mr. Upchurch
23 could he do the project for the same price as

Page 648

1 Gil Berry & Associates.
2    Q.    Okay. So --
3    A.    And he said, yes, I can do it for
4 not less, but I can do it for the same price,
5 the $25 million, but there's going to be a
6 time change. It's probably going to take me
7 three months to kind of ramp up to --
8    Q.    So, it's at that meeting that
9 they hired TCU as a construction manager?
10    A.    They hired him to take over my
11 project.
12    Q.    Okay. As what? As developer?
13    A.    I don't know what they hired him
14 for.
15    Q.    Exactly.
16    A.    But they hired him. That's the
17 key.
18    Q.    As on owner's representative.
19 And you've not seen their contract, and you
20 don't know as we sit here today what their
21 role is at that project, do you?
22    A.    I know they're getting paid to
23 oversee my project.

Page 649

1    Q.    You don't know what they are
2 doing at that project, do you?
3    A.    I'm quite sure they are acting as
4 the owner's representative.
5    Q.    Which they were doing back in
6 August of 2006, correct?
7    A.    I don't know what the date was
8 their contract was with the --
9    Q.    You knew they were serving as an
10 owner's representative before the September
11 22nd board meeting?
12    A.    I know they were hired to review
13 our documents.
14    Q.    And the only thing thing you know
15 as we sit here today is that they serve as the
16 owner's representative?
17    A.    I'm quite sure that we will find
18 out what their capacity was at that time.
19    Q.    But as we sit here today --
20    A.    I don't know.
21    Q.    -- you have zero evidence of what
22 their role is other than serving as an owner's
23 representative, which they were doing before

Page 650

1  the September 22nd board meeting when the
2  trustees elected not to accept your proposal?
3      A.    I'm quite sure my attorney --
4      Q.    Is that correct?
5      A.    I'm quite sure my attorney at
6  their deposition will find out what their
7  capacity was.
8      Q.    But to answer my question, as we
9  sit here today --
10     A.    No, I don't -- no, I don't know.
11     Q.    Okay.  If you had gotten -- or if
12  ASU had accepted your proposal on September
13  22nd, TCU could still serve as the owner's
14  representative, couldn't they?
15     A.    Yeah.
16     Q.    ASU was free to hire them as its
17  owner's representative, and they could still
18  be using them today even if you and Marous had
19  gotten that job?
20     A.    I'm quite sure they can do
21  whatever they want.
22     Q.    So, the fact that you didn't get
23  the job doesn't mean TCU can't still serve as

Page 651

1  an owner's representative, does it?
2      A.    I guess if the school chooses
3  them, they can do whatever they want to do.
4      Q.    Okay.  You said yesterday it was
5  your opinion that this project is going to
6  cost -- and I don't want to say however many
7  millions more you said, but you said a whole
8  lot of millions more.  You remember that?
9      A.    That is correct.
10     Q.    What accounts for those many
11  millions?
12     A.    Well, what accounts for it is
13  that; one, when we proposed our project back
14  in 2005 -- I get reports from various
15  suppliers.  Cost of materials are going up.
16  Manpower is going up.  As we see hurricanes
17  and tornadoes around the country, a lot of the
18  good subcontractors go and chase those jobs.
19  The last report that I got materials have gone
20  up a little over 1.2 percent per month.
21         Plus as the time -- they have
22  kids living in alternative housing, which is
23  costing the school money to house the kids,

Page 652

1  security, RAs over there.  There are probably
2  changes that were made from our $25 million
3  mandate that we had to stay in that budget
4  area.
5      Q.    The natural disasters that you
6  identified as driving up material costs, those
7  occurred when?
8      A.    Starting with Katrina.
9      Q.    Which was '05?  '04?
10     A.    '05.
11     Q.    So, that occurred before you
12  submitted your proposal?
13     A.    That's correct.
14     Q.    So, that would have affected the
15  cost of materials for you?
16     A.    Somewhat.
17     Q.    Now, students would have had to
18  live in alternative housing whether you got
19  the job or not, wouldn't they?
20     A.    Well, under our original
21  proposal, they wouldn't have.
22     Q.    But they didn't elect to accept
23  your original proposal, correct?

Page 653

1      A.    That's why they're paying the
2  cost for it now.  Yes, that's correct.
3      Q.    The work that you proposed to do,
4  what was the earliest that you could have
5  started this work?
6      A.    Well, it all depends on what
7  proposal they would have accepted.
8      Q.    When were you ready to get
9  started?
10     A.    In 2005.
11     Q.    As what entity?
12     A.    Indicating?
13     Q.    As what entity?  You weren't
14  licensed.  So, you weren't ready, were you?
15     A.    All we would have had to do is
16  get licensed.
17     Q.    I think we already established
18  you didn't get licensed until August 31, 2006.
19     A.    That's because none of the
20  proposals besides the $25 million was
21  accepted.  That's why.
22     Q.    And when was that accepted?
23     A.    When we were at -- when they were

Page 654

1  getting ready to go up to New York and take
2  our materials to get funded. It was suggested
3  that we needed to go and get licensed as
4  developers.
5      Q.    All right. Back to Paragraph 72.
6  The only evidence then that you have that TCU
7  encouraged the ASU Board of Trustees not to
8  hire plaintiffs is none?
9          You've said your lawyer will
10 establish it, but you don't have any evidence
11 of that?
12     A.    That's correct.
13     Q.    Count Six is a count for
14 conversion. You claim in Paragraph 75 that
15 the defendants -- and what defendants are you
16 talking about there?
17     A.    What paragraph are you on?
18     Q.    Paragraph 75. Throughout that
19 entire count you say defendants, and I'm
20 trying to figure out which defendants. Which
21 defendants are you referring to?
22     A.    It would be TCU.
23     Q.    Okay. Are you referring to --

Page 655

1      A.    To Mr. Upchurch and Mr. Percy
2  Thomas.
3      Q.    You say the defendants wrongfully
4  appropriated your proprietary work product to
5  their own use and beneficial enjoyment, an
6  exclusion of your rights and ownership.
7          What did they wrongfully
8  appropriate?
9      A.    Again, if they reviewed the work
10 product, it's very easy to make changes to the
11 work product to convert how we were going to
12 do the buildings, to be able to change a few
13 things to make it accessible to -- to
14 suite-style units.
15     Q.    Well, let's -- let's just assume
16 that you're correct, that it would be very
17 easy to make a few changes to your proposal
18 and your scope of work.
19     A.    Uh-huh (affirmative).
20     Q.    Do you have any evidence that
21 they did that and they are currently doing
22 that?
23     A.    No, I don't.

Page 656

1      Q.    So, your claim that they
2  wrongfully appropriated your proprietary work,
3  you have no evidence of that?
4          You're just saying it's easy to
5  do, but you have no evidence that any of the
6  TCU defendants have, in fact, done that, do
7  you?
8      A.    You fail to realize that on the
9  day of the board meeting when they rejected us
10 and approved Mr. Upchurch, they approved him
11 to take over the $25 million project.
12     Q.    Okay.
13     A.    Because that's what Judge Wiggins
14 asked him. Judge Wiggins asked him could he
15 do the project for the $25 million or less.
16 He said, I can do it for the $25 million, the
17 same price as Gil Berry.
18          So, let's just say that we were
19 -- that they had be talking about the same
20 project.
21     Q.    Well, do you --
22     A.    Because the only way that we're
23 talking about a different one now, if the

Page 657

1  scope of -- the price has changed. Because
2  Judge Wiggins personally asked him can you do
3  it for the same price.
4      Q.    Okay. Do you have any evidence
5  that they're using your work product?
6      A.    No, I don't.
7      Q.    Do you know what the scope of
8  work on this project is as it is today?
9      A.    No, I don't.
10     Q.    You don't know what they're over
11 there renovating or building, do you?
12     A.    I haven't been over there.
13     Q.    You don't know if they're
14 building suites or different kinds of suites
15 or just single rooms, do you, with a common
16 bathroom?
17     A.    All I --
18     Q.    Do you know?
19     A.    No.
20     Q.    So, you have no idea as we sit
21 here today what it is that's being built over
22 there and whether or not the TCU defendants
23 are currently using anything that was your

Page 658

1  material?
2      A.   All I can go by is what Judge
3  Wiggins asked him.  On the $25 million that
4  Gil Berry was going to do the project, can you
5  do it for less?  He said, no, I can do the job
6  for the same price as Gil Berry.
7      Q.   But you --
8      A.   I just take it for granted that
9  we're talking about the same thing.
10     Q.   But you don't have any evidence
11 of that fact, do you?
12     A.   So, that means that it had to be
13 a totally new project.
14     Q.   Well, do you know that it's not a
15 totally new project?
16     A.   I don't know.  I'm just telling
17 you what I was --
18     Q.   Well --
19     A.   -- privy to that day.
20     Q.   -- I'm trying to defend my
21 clients --
22     A.   Yes, sir.
23     Q.   -- and you've made the

Page 659

1  allegations in here that they've wrongfully
2  appropriated your proprietary work product and
3  that they're using it to their benefit and
4  excluding you from using it.
5          And I want to know what evidence
6  do you have that they're using your work
7  product today.  And the only thing that you've
8  been able to tell me is that Judge Wiggins
9  asked if he could do the job.
10         Is that it?
11     A.   For the same price as Gil Berry.
12     Q.   Okay.
13     A.   So, we've got to be talking about
14 the same job.
15     Q.   Is that the only evidence you
16 have?
17     A.   That's the only I have.
18     Q.   Okay.  And you --
19     A.   Maybe Marous and them might have
20 other evidence.  I can only speak about me.
21     Q.   And you have no evidence of
22 what's being built over there?
23     A.   No.

Page 660

1      Q.   You don't know what they're
2  doing, do you?
3      A.   I have -- I have never set foot
4  on the campus since --
5      Q.   You haven't seen the designs,
6  have you?
7      A.   I never asked to see them.
8      Q.   Okay.  So, you don't know what
9  they're doing?
10     A.   No, I don't.
11     Q.   So, if they changed the scope of
12 work significantly, that could account for a
13 cost increase, couldn't it?
14         MR. LYONS:  Just answer that
15 question.
16         THE WITNESS:  Okay.  Yes.
17     Q.   (By Mr. Lawson)  Okay.  Likewise,
18 if they changed the scope of work -- you
19 showed me what suite style means.
20         What if they changed it to be
21 nothing but regular suites as I identified
22 them, bedroom, bathroom in the middle,
23 bedroom, would that change the scope of work?

Page 661

1      A.   Yeah.
2      Q.   You don't own suite, do you?  I
3  mean, other people can -- anybody can build a
4  suite, can't they?
5      A.   Yeah, anybody can build a suite.
6      Q.   So, you don't know what they're
7  doing over there?
8      A.   No, I don't.
9      Q.   And you don't know whether or not
10 they're using your proprietary material?
11     A.   No, I don't.
12     Q.   In fact, we've looked at
13 Defendant's Exhibits 20 and 21, which were
14 letters from ASU returning your proprietary
15 materials to you, correct?
16     A.   And we didn't get all of the
17 materials back.
18     Q.   And Mr. Thomas, I believe, has
19 said if you didn't, they'll search for those.
20     A.   I just want to put it on the
21 record that we didn't --
22     Q.   I understand.
23     A.   -- that we didn't get it.

Page 662

```
 1    Q.    And they said if we still have
 2  anything that somehow didn't get sent to you,
 3  they're going to send it to you.  But you did
 4  receive those letters, didn't you?
 5    A.    I received the letter.
 6    Q.    And your scope of work right here
 7  that Marous prepared, which was Exhibit No. 8,
 8  now --
 9    A.    Uh-huh (affirmative).
10    Q.    -- you did get did back, didn't
11  you?
12    A.    I didn't get them all back.
13    Q.    Well --
14    A.    That's what is -- is
15  questionable.
16    Q.    But you got this?
17    A.    I'm quite sure that ASU has sent
18  it to our previous attorneys.
19    Q.    You had this because you produced
20  it to me, Exhibit No. 8 --
21    A.    Yeah.
22    Q.    -- GBA 1059?
23    A.    Yes.
```

Page 663

```
 1    Q.    You had that in your possession?
 2    A.    Yes.  There were several of
 3  those.
 4    Q.    Okay.  Several copies of it, is
 5  what you're saying?
 6    A.    Yes.
 7    Q.    But you had this in your
 8  possession.  You didn't give ASU your only
 9  copy?
10    A.    No.  No, no, no.
11    Q.    You didn't give TCU your only
12  copy?
13    A.    I didn't give TCU no copy.
14    Q.    Okay.  Well, then they didn't
15  even have your proprietary work product?
16    A.    They were given our proprietary
17  --
18    Q.    By ASU?
19    A.    Yes.
20    Q.    Okay.  Well, you didn't give them
21  your only copy?
22    A.    No.
23    Q.    You had copies.  Did you have it
```

Page 664

```
 1  on Autocad?
 2    A.    Marous had it on Autocad.
 3    Q.    Okay.  So, they had copies.  You
 4  could have used your extra copies for other
 5  work or other projects if you wanted to.  You
 6  could have?
 7    A.    I guess I could have.
 8    Q.    So, you weren't denied the
 9  opportunity to use the material contained in
10  Exhibit No. 8 elsewhere if you wanted to use
11  it on another student housing renovation
12  project at some other school, correct?
13    A.    That's correct.
14    Q.    All right.  So, you -- when you
15  say that -- in Paragraph 76 you say defendants
16  wrongfully appropriated your proprietary work
17  product after representing that plaintiffs
18  would be compensated for their work product.
19        Well, you've already testified
20  that the TCU defendants never told you you'd
21  be compensated.  So, are you referring to the
22  ASU defendants when you say that you were told
23  you'd been compensated?
```

Page 665

```
 1    A.    Being compensated is being
 2  awarded the contract.
 3    Q.    Okay.
 4    A.    But based on our work product.
 5    Q.    TCU never said they'd pay you,
 6  did they?
 7    A.    No.
 8    Q.    In 77 you say wrongfully withheld
 9  possession of plaintiffs' proprietary work
10  product.  You said you never provided a copy
11  to TCU, correct?
12    A.    No.
13    Q.    And you've already admitted that
14  ASU has returned some of it at least to you?
15    A.    Yes.
16    Q.    So, you don't know that TCU has
17  anything in their possession belonging to you,
18  do you?
19    A.    No, I don't.
20    Q.    Okay.  So, you have no evidence
21  that they've wrongfully withheld possession of
22  any of your work product, correct?
23    A.    Any of mine, no.
```

Page 666

```
 1    Q.   Or Marous'?
 2    A.   I can't speak for Marous.
 3    Q.   Well, you don't know, do you?
 4    A.   I don't know.
 5    Q.   Because you never gave it --
 6    A.   I answered for me.  No, they
 7 don't of mine.  I can't speak for Marous.
 8    Q.   Okay.  And, again, you have no
 9 evidence that they're using your work product
10 in the renovation of the ASU dormitories?
11    A.   That's correct.
12    Q.   The proprietary materials, what
13 are you referring to exactly?  Is that the
14 scope of work, Exhibit 8, or is there
15 something more?
16         I know you said there's not a
17 cover on this, but this is how Exhibit 8 was
18 produced to us.  You said yesterday there may
19 have been a blue cover.
20    A.   There are blue covers.
21    Q.   Okay.  Well, we didn't get a blue
22 cover in discovery.
23    A.   Okay.
```

Page 667

```
 1    Q.   So, all I'm telling you is this
 2 is what you gave us.  Is this the proprietary
 3 material that you're talking about?
 4    A.   Yes.  For what it can see, yes.
 5    Q.   Okay.  Absent the blue cover.
 6 But, otherwise, this is what you're talking
 7 about when you saw proprietary material?
 8    A.   I'm saying that it looks like the
 9 material.  I don't know.  I didn't go through
10 every page.  I couldn't tell you.
11    Q.   I'll represent to you this is
12 exactly what you provided to me in discovery.
13    A.   Okay.  Well, we provided the ones
14 with the blue cover also to the attorneys.  I
15 think --
16    Q.   Okay.  Well, they didn't give me
17 a blue copy.
18    A.   I think they might have made a
19 copy.  I don't know, but I personally gave the
20 original blue copies.
21    Q.   Okay.  I don't doubt that for a
22 minute.  We just didn't get it.
23    A.   Okay.
```

Page 668

```
 1    Q.   But is this what you're talking
 2 about is the --
 3    A.   That's --
 4    Q.   -- proprietary material?
 5    A.   That is it.
 6    Q.   Who else did you give copies of
 7 it to other than ASU?
 8    A.   John Chambless.
 9    Q.   Anyone else?
10    A.   That's the only person.
11    Q.   Anybody with underwriters or --
12    A.   No.
13    Q.   You never provided it to Alfred
14 Seawright?
15    A.   No.
16    Q.   So, none of the underwriters,
17 bond counsel, nobody up in New York got a copy
18 of it?
19    A.   Not that I know of.  I didn't go
20 to New York.
21    Q.   What about James Harold?
22    A.   No.
23    Q.   You didn't?
```

Page 669

```
 1    A.   I didn't.
 2    Q.   You don't know that Marous did or
 3 didn't?
 4    A.   No.
 5    Q.   Over on Page 18, Count Eight,
 6 Loss of Business Opportunity, you allege that
 7 as a result of the defendants' actions, you
 8 were caused to lose business opportunities.
 9 Which defendants are you talking about?
10    A.   Which paragraph are we on?
11    Q.   Well, the entire count is loss of
12 business opportunities.
13    A.   Okay.
14    Q.   In Paragraph 85, you say
15 defendants' actions directly and proximately
16 caused plaintiffs to lose significant business
17 opportunities.
18         Which defendants are you
19 referring to there?
20         MR. LYONS:  Let me interject.  He
21 doesn't know the legal claims, and I don't --
22         MR. LAWSON:  Well --
23         MR. LYONS:  He hired lawyers to
```

Page 670

1  make these claims.
2       MR. LAWSON: Well, we need to
3  know --
4       MR. LYONS: And you can ask him
5  what it says, but --
6       MR. LAWSON: In order to defend
7  our clients, we need to know --
8       MR. LYONS: I understand that,
9  but I think it pretty clearly --
10      MR. LAWSON: Well, it says
11 defendants.
12      MR. LYONS: -- says all.
13   Q.  (By Mr. Lawson) Okay. Well,
14 that's my question. Does that include
15 everybody or just some of the defendants?
16   A.  I guess it includes everybody.
17   Q.  Now, what actions do you believe
18 were caused by the TCU defendants, TCU,
19 Upchurch and Thomas, that caused you to lose
20 business opportunities?
21   A.  Well, again, going over that,
22 they worked with President Lee to receive the
23 job. And I know what you're saying about

Page 671

1  business opportunities.
2       Q.  Which business opportunities did
3  you lose as a result of anything that the TCU
4  defendants did or didn't do?
5       MR. LYONS: In addition to what
6  he testified about yesterday?
7       MR. LAWSON: Well, I'm not sure
8  he testified to any yesterday.
9       Q.  Can you --
10      A.  I did. I did testify.
11      Q.  Which one?
12      A.  I told you at Alabama A&M.
13      Q.  Now, you said yesterday that
14 President Jennings at Alabama A&M called you
15 about this lawsuit?
16      A.  Yes.
17      Q.  And he didn't tell you that TCU,
18 Upchurch or Thomas called him to tell him
19 about that lawsuit, did he?
20      A.  No, he didn't tell me who,
21 period.
22      Q.  So, what did they -- what
23 business opportunities have you lost as a

Page 672

1  result of anything that --
2       A.  That would be the only one that
3  I'm talking about. And he didn't tell me who.
4       Q.  Okay. So, the only business
5  opportunity that you might have lost as a
6  result of anything that the TCU defendants did
7  is the Alabama A&M job?
8       A.  That's correct.
9       Q.  And you claim that Alabama A&M's
10 president, President Jennings --
11      A.  Uh-huh (affirmative).
12      Q.  -- knew about the lawsuit?
13      A.  Uh-huh (affirmative).
14      Q.  And you think that's why you lost
15 that job?
16      A.  I would have to say so.
17      Q.  Okay. Now, you haven't lost the
18 job because you said you're still talking to
19 them?
20      A.  Exactly.
21      Q.  So, really at this point in time,
22 you have no lost business opportunities then,
23 do you?

Page 673

1       A.  No.
2       Q.  And the lawsuit -- correct me if
3  I'm wrong -- but it was filed by you, not by
4  the defendants?
5       A.  Yes.
6       Q.  So, if you lost something as a
7  result of the lawsuit having been filed, that
8  lawsuit was filed by you?
9       A.  That's correct.
10      Q.  None of these other projects that
11 you identified yesterday, Oakwood, Allen,
12 Meharry, none of those -- you didn't lose any
13 of those jobs a result of anything the TCU
14 defendants did or didn't do, did you?
15      A.  That is correct.
16      Q.  The only one that you've
17 identified as being a possible lost business
18 opportunity is Alabama A&M, even though you're
19 still talking to them?
20      A.  That is correct.
21      Q.  What are your damages in this
22 case?
23      A.  My damages are my $197,000 that

Page 674

1  were unpaid expenses. My damages are my
2  developer's fee.
3      Q.    Anything else?
4      A.    No.
5      Q.    Now, those invoices that you sent
6  for your expenses, those were, again, sent
7  before TCU?
8      A.    That is correct.
9      Q.    And TCU never said they'd pay you
10 for those?
11     A.    That is correct.
12     Q.    So, they're not obligated in this
13 lawsuit then to pay you. You're not trying to
14 collect that from TCU, are you?
15     A.    No, I'm not.
16     Q.    So, what are you trying to
17 collect from TCU?
18         MR. LYONS: Let me -- again, the
19 damages are something that the -- that are up
20 to the lawyers to present to the Court. And
21 you can ask him his understanding of what any
22 evidence might be to support any damages.
23     Q.    (By Mr. Lawson) Okay. Well, do

Page 675

1  you have any evidence of any damages that you
2  experienced or suffered as a result of
3  anything that the TCU defendants did or didn't
4  do?
5      A.    I lost the opportunity at ASU.
6      Q.    So, you think that's the result
7  of --
8      A.    Yes.
9      Q.    -- what they did?
10     A.    Yes.
11         MR. LYONS: And as the complaint
12 clearly states, we claim punitive damages.
13     Q.    (By Mr. Lawson) Nothing in any
14 of your invoices, none of your travel-related
15 expenses, none of those things were incurred
16 as a result of anything that ASU did -- excuse
17 me, the TCU defendants did?
18     A.    No, sir.
19     Q.    You didn't expend any time or
20 resources or anything else preparing the
21 proposal or preparing the scope of work or
22 coming down here back in '05 to meet with ASU
23 officials or any of that other stuff, none of

Page 676

1  that was incurred as a result of anything that
2  the TCU defendants did or didn't do?
3      A.    Repeat that again.
4      Q.    Your meetings back in '05 with
5  ASU, the original proposal, your revised
6  proposal, your scope or work, the invoices
7  that you submitted in May and July 10, 2006,
8  any of the work associated with any of those
9  items, none of that was directed by TCU, and
10 you're not seeking to recover any of those
11 amounts from TCU?
12     A.    I don't know about that.
13     Q.    Okay. What work did TCU direct
14 you to do back in May of 2005 before they were
15 involved this this project?
16     A.    Well, before they got involved in
17 the project, we had a contract, and those
18 would have been paid.
19     Q.    Well, I believe you said that the
20 work that you did which was represented by
21 those invoices was all done before TCU got
22 involved?
23     A.    That is correct.

Page 677

1      Q.    And you said TCU never promised
2  to pay you that money?
3      A.    That's correct.
4      Q.    You said that that was promised
5  to you by, I believe, Wiggins and Crutcher and
6  and maybe Lee?
7      A.    Correct. President Lee.
8      Q.    TCU never promised to pay you
9  that?
10     A.    That's correct.
11     Q.    You incurred those expenses
12 before TCU became involved in this project?
13     A.    If TCU hadn't interfered with our
14 contract, we probably would have got paid and
15 we would have our job.
16     Q.    Okay. So, but for the
17 interference, then you would have gotten paid
18 those things?
19     A.    I truly believe that.
20     Q.    So, you're seeking then to
21 recover your expenses from the TCU defendants?
22     A.    That would be up my attorney --
23     Q.    Well, it's up to you.

Page 678

1    A.    No.  It's up to my attorney.
2    Q.    Okay.  Well, I guess then we'll
3  have to assume that you are since we have you
4  here for a deposition.
5          (Whereupon, said document was
6          marked for identification as
7          Defendant's Exhibit No. 37 to the
8          deposition of Gilbert C. Berry.)
9    Q.    So, let's then look at
10  Defendant's Exhibit No. 37.  And it may have
11  already been marked as an exhibit.  I don't
12  know, but we'll look at it again.
13         May 23rd, 2006.  Invoice from
14  you.  Value engineering supervision, $24,810.
15  Is that you?
16    A.    That is me.
17    Q.    Okay.  What --
18    A.    No, no.  Wait a minute.  No.
19  This is not mine.
20    Q.    That's not you?
21    A.    No.  This is Marous'.
22    Q.    Okay.  So, are any of the items
23  on this $374,229.49 invoice yours?

Page 679

1          MR. LYONS:  A through E is for
2  you.
3          THE WITNESS:  Yes.  A through E
4  -- excuse me -- is for me.
5          These are, if you notice,
6  different glasses.  Everybody see me keep
7  switching today.  I have to look down to see.
8  They're regular glasses up at the top.
9    Q.    (By Mr. Lawson)  Did TCU ever
10  agree to pay you for value engineering
11  supervision?
12    A.    No.
13    Q.    Did they ever agree to pay you
14  for overview of plans and details?
15    A.    No.
16    Q.    Cost estimating?
17    A.    No.
18    Q.    Presentation materials?
19    A.    No.
20    Q.    Travel expenses?
21    A.    No.
22    Q.    All of those items were -- all of
23  those costs were incurred before TCU got

Page 680

1  involved, correct?
2    A.    That is correct.
3    Q.    What value engineering did you
4  do?
5    A.    What value engineering did we do?
6    Q.    Yes.  You personally.  What sort
7  of value engineering?  You have a charge of
8  $24,810.
9    A.    Well, Mr. Upchurch -- we use a
10  company called Block House Furniture.  Mr.
11  Upchurch uses a different company.  Block
12  House has always been successful for us.  We
13  shop different prices with different
14  companies.  That's what I do.
15    Q.    Okay.  So, shopping prices for
16  various parts of your proposal amounted to
17  $24,810.  Is that what you're telling me?
18    A.    And value engineering, of course,
19  is -- is actually saving the client money by
20  getting different pricing from subcontractors,
21  suppliers, whatever.  That's value
22  engineering.
23    Q.    Isn't all of this part of a

Page 681

1  proposal?
2    A.    Yeah, it's all part of a
3  proposal.
4    Q.    It's the cost of doing business,
5  isn't it?
6    A.    Yeah.  But who does -- who does
7  free work for 15 months?
8    Q.    Have you ever submitted a
9  proposal where you didn't get the job?
10    A.    I never worked on one for 15
11  months where I didn't get one.
12    Q.    I believe yesterday you
13  identified several projects --
14    A.    Yes, but --
15    Q.    -- where you didn't get the job
16  and didn't get paid?
17    A.    Yeah.  But they didn't work me
18  for 15 months.  I didn't -- I didn't travel --
19    Q.    So, you worked for free on those
20  jobs, didn't you?
21    A.    Yes.
22    Q.    So, in the construction industry
23  it happens all the time.  You submit a

Page 682

1   proposal, and you may or may not get the job,
2   correct?
3       A.    Sometime.  That's correct.
4       Q.    And part or your proposal
5   requires you to do some work to come up with
6   the -- to estimate the job, doesn't it?
7       A.    That is correct.
8       Q.    And you don't get paid for those
9   things?
10      A.    Sometimes.
11      Q.    Unless you get the job?
12      A.    Sometimes.
13      Q.    Okay.  Well, what times do you --
14  when did you get paid for submitting a
15  proposal?
16      A.    When you asked me yesterday if
17  you can get paid --
18      Q.    You never asked TCU that?
19      A.    No.
20      Q.    So, these items that you have
21  listed here in Exhibit No. 37, those are not
22  items that you asked TCU to pay you, and they
23  never told you they would?

Page 683

1       A.    That is correct.
2       Q.    What sort of travel expenses did
3   you have for $21,000?
4       A.    I've been coming here for 15
5   months.  I drive.  Everyone knows that.  It is
6   approximately 1,400 miles from Pennsylvania
7   and 1,400 miles back.  You figure it at three
8   dollars a gallon, hotels.
9       Q.    Fourteen hundred miles?  Because
10  I -- I did a little search --
11      A.    Go ahead.  Do one now.
12      Q.    Well, I did one from Jefferson,
13  Pennsylvania.
14      A.    Okay.
15      Q.    And what I found was 800 miles
16  one way.  So, what I found was 1,600 miles
17  round trip, not 1,400 miles one way.
18      A.    You could be correct.
19            (Whereupon, said document was
20            marked for identification as
21            Defendant's Exhibit No. 38 to the
22            deposition of Gilbert C. Berry.)
23      Q.    I'm going to show you Defendant's

Page 684

1   Exhibit No. 38.  This appears to be an E-mail
2   from you dated October 3rd, 2006, and you sent
3   it to Judge Wiggins.
4       A.    Uh-huh (affirmative).
5       Q.    You had previously -- you're
6   attaching an E-mail you sent to President Lee.
7       A.    Uh-huh (affirmative).
8       Q.    And that E-mail was October 3rd,
9   2006 as well.  And you're attaching invoices
10  being submitted October 3, 2006.  And you say
11  that's the total to-date?
12      A.    That is correct.
13      Q.    At that point in time you weren't
14  doing anymore work for ASU because they had
15  already said they weren't accepting your
16  proposal, right?
17      A.    Yes.  And the president wanted --
18  Judged Wiggins asked me for a breakdown.
19      Q.    Now, I believe what we just saw
20  in Exhibit 37 was value engineering of
21  $24,810, correct?
22      A.    Uh-huh (affirmative).
23      Q.    And now what I see on October 2nd

Page 685

1   is value engineering supervision of $75,550.
2   What have you done since May for value
3   engineering?  How have you gotten that up by
4   $50,000?
5             You had already submitted your
6   proposal and scope of work.  That seems like a
7   lot of value engineering to me.
8       A.    I don't know.  I have a
9   breakdown.  You know, I don't have it with me,
10  but there should have been a breakdown
11  attached to this.
12      Q.    Okay.
13      A.    Because I'm actually looking at
14  my partner, Dick Davis.  He has travel
15  expenses, $17,925, and he keeps great records.
16      Q.    We're not talking about Dick
17  Davis.
18      A.    Yeah.  Well, I'm telling -- I'm
19  telling you.  We have $95,975 total.  And as
20  we know, Dick is a finance guy.  So --
21            But like I said, I have a
22  breakdown, and I'll be glad to supply it to
23  you.

Page 686

1    Q.    Well, his is not part of the
2    lawsuit here, but you are. And your value
3    engineering supervision has gone -- from May
4    23rd, which is after the point in time you
5    submitted your proposal, your revised proposal
6    and your scope of work for this project, your
7    value engineering has gone from $24,810 to
8    $75,550.
9         And I want to know what on earth
10   you were doing between May 23rd and October
11   2nd that would account for $50,000 in value
12   engineering.
13   A.    Well, at the same time, if you
14   remember, it was not until President Lee said
15   in July that the new housing was never going
16   to be built, even though we were doing it.
17        We worked with John Chambless on
18   several plots of land to determine that the
19   building that we had designed for him and
20   given the president renderings and floor plans
21   and everything was going to fit that
22   footprint. So, there was a lot of other
23   things.

Page 687

1    Q.    Is that value engineering?
2    A.    Yeah, it's value engineering.
3    Q.    Is it?
4    A.    Yeah.
5    Q.    To look at a piece of property,
6    that's value engineering?
7    A.    Yeah.
8    Q.    Is it?
9    A.    Yes, sir.
10   Q.    Okay. So, you were doing that
11   between May 23rd and October 2nd?
12   A.    He didn't tell us until July. Go
13   get his meeting minutes. He didn't tell --
14   not until they went up to New York and they
15   came back.
16        And the bond market told them
17   that they could not build any new housing
18   until the housing that they had on campus was
19   filled, the renovated housing.
20        So, that's when he scratched it
21   after they came back and he heard the news
22   from -- given to him by the mandate of the
23   bond -- of the bonding people up there.

Page 688

1         Until then, he can tell you, we
2    were running around that campus finding a
3    place to put -- with John, finding a place to
4    put the 388 beds, that he asked us to go down
5    to Savannah, look at and bring him back
6    something that was similar to what --
7         So, there was a lot of activity
8    going on still.
9    Q.    Okay. So, between July 2005 and
10   May 23rd, 2006, when you submitted a proposal
11   originally for renovating six dormitories plus
12   constructing a new dormitory?
13   A.    Uh-huh (affirmative).
14   Q.    So, you had already contemplated
15   doing that. And during that period, July 2005
16   to May 2006, you had $24,810 in value
17   engineering.
18        And you would have us believe
19   that between May 23rd and August 1st, which is
20   when the bond was finally approved, between
21   May 23rd and August 1st you incurred another
22   $50,000 in value engineering supervision?
23   A.    We had --

Page 689

1    Q.    Is that what you're telling us?
2    A.    The new housing had been going on
3    from day one. He'll tell you, when he sent us
4    down to Savannah --
5    Q.    And you sent an invoice for value
6    engineering dated May 23rd, 2006.
7    A.    I have a breakdown. I'll be glad
8    to --
9    Q.    Did you just not include it all
10   in here? Is that what you're telling me?
11   A.    It probably wasn't included all
12   in there.
13   Q.    Okay. So, Exhibit 37, that
14   invoice is incomplete?
15        Because by what you're telling
16   me, just before they went to New York to meet
17   with the underwriters and bond counsel, which
18   was August 1st I believe, between May 23rd,
19   2006, and August 1, 2006, you had another
20   $50,000 in value engineering.
21   A.    I probably didn't put it all in
22   the -- in the first invoice.
23   Q.    So, this first invoice then is

Page 690

1  not accurate?
2      A.    Can I see the invoice?
3      Q.    Sure.  It's Exhibit 37, right
4  there in front of you.
5      A.    I'll have to say that's correct.
6      Q.    Okay.  Correct, that it's not
7  accurate?
8      A.    That's correct, that it's not the
9  full invoice, yes.
10     Q.    Okay.  So, that would account
11 then for the increase by $50,000 of your value
12 engineering?
13     A.    That is correct.
14     Q.    And you say you have backup for
15 that?
16     A.    Yes, sir.
17     Q.    And that apparently hasn't been
18 produced.
19     A.    I thought we sent it to Judge
20 Wiggins.
21     Q.    Well, we'll look at this next
22 exhibit, and you can maybe tell me if that's
23 what -- what you're referring to.

Page 691

1          (Whereupon, said document was
2          marked for identification as
3          Defendant's Exhibit No. 39 to the
4          deposition of Gilbert C. Berry.)
5      Q.    Defendant's Exhibit No. 39.  Is
6  that what you're talking about, a breakdown of
7  expense invoice?
8      A.    Uh-huh (affirmative).
9      Q.    So, that tells us then if we look
10 at that -- what does it tell us?
11     A.    It gives you the breakdown.
12     Q.    Well, I'm looking at it and -- it
13 says breakdown of expenses, July 2005 to
14 September 2006, but it doesn't tell me why it
15 is that on May 23rd, 2006, you had $24,000
16 plus in value engineering and why that went up
17 by $50,000 four months later.
18     A.    I'm looking at this breakdown,
19 and it doesn't tell me that.
20     A.    Well --
21     Q.    Does it tell you that?
22     A.    No.
23     Q.    So, we don't have anything as we

Page 692

1  sit here today that can explain?
2      A.    As we sit here today, no.
3      Q.    Okay.  But you're saying that you
4  do have something?
5      A.    I should have something.
6      Q.    You're not -- I mean, you have it
7  already.  You're not going to go home and
8  create it, are you?
9      A.    No.
10     Q.    Okay.  So, whatever you have that
11 can explain these invoices and any backup you
12 have for these invoices, we would ask that you
13 provide that to your lawyer to provide to us.
14     A.    That will be fine.
15     Q.    Okay.  Because I'm looking at 39
16 and it doesn't tell me.
17     A.    Well, I said I don't have it.
18     Q.    It doesn't tell you either but --
19     A.    It doesn't tell me.
20     Q.    What I do see on here is that
21 you're seeking reimbursement of both mileage
22 and fuel costs?
23     A.    Correct.

Page 693

1      Q.    Is that generally the way it's
2  done?  Is that accepted by the IRS that you
3  get reimbursement of both mileage and fuel
4  costs?
5      A.    No.
6      Q.    But that's just what you want?
7      A.    Exactly.
8      Q.    Okay.  And you show 44,800 miles;
9  is that right?
10     A.    That's correct.
11     Q.    By my math if you take 800 miles
12 one way, that's 28 trips to Montgomery.
13     A.    I'm quite sure I have been here
14 that many times.
15     Q.    Okay.
16     A.    I'm quite sure I have been here
17 that many times.
18     Q.    A number of your trips were
19 combined with trips to Alabama A&M, weren't
20 they?
21     A.    I only was at Alabama A&M three
22 times.
23     Q.    Okay.

Page 694

1    A.    I told you that Rodney Morse,
2  when Mr. Thomas did my -- conducted that whole
3  presentation and spent the times at --
4    Q.    All of your trips to Alabama
5  State were not just to Alabama State.  You
6  didn't come here and go home.  You combined
7  those with trips elsewhere.
8          You described one trip yesterday
9  when you went to Nashville from here, correct?
10   A.    That is correct.
11   Q.    So, there are trips that you took
12  where you went to multiple locations, not just
13  Montgomery?
14   A.    That is correct.
15   Q.    Did you exclude those miles from
16  your calculations?
17   A.    Yes, I did.
18   Q.    Did you?  Where is the breakdown
19  on that?  I'd like to see that, too.  How did
20  you keep track of it?
21   A.    We wrote it down.
22   Q.    When?
23   A.    When we left home.

Page 695

1    Q.    Okay.  What did you write it down
2  on?
3    A.    On a piece of paper.
4    Q.    Do you have that piece of paper?
5    A.    No, I don't.
6    Q.    Well, how did you come up with
7  this breakdown of expenses on October 5, 2006,
8  if you don't have those pieces of paper?  Or
9  did you just guess?
10   A.    Averaged.  It was an average.
11   Q.    Okay.  You show Gil Berry, $50 an
12  hour, 2,400 hours, $120,000; is that right?
13   A.    That's right.
14   Q.    If you divided that out over the
15  course of a year, that would be 46 hours per
16  week that you spent on this job; is that
17  right?
18   A.    Go ahead.  Say that again.
19   Q.    Well, if you take your -- take
20  your 2,400 hours and the 1,920 hours of your
21  office manager, whoever that is, that totals
22  4,320 hours.  Okay?
23   A.    Okay.

Page 696

1    Q.    Over 52 weeks that's 46 hours per
2  week.  What were you doing for 46 hours per
3  week on this job?
4    A.    I can't answer that right now.
5    Q.    Did you keep any sort of time
6  records or billing records to show what it was
7  you were doing?
8    A.    I do have some.
9    Q.    Okay.  We'd like to see those,
10  too --
11   A.    That will be fine.
12   Q.    -- because I have not seen those.
13          So, you did keep some record of
14  what it was you were doing in order to come up
15  with the 2,400 hours that you claim to have
16  been on this job and the 1,920 that your
17  office manager spent on this job?
18   A.    That is correct.
19   Q.    Okay.  Well, we'd like to see
20  those, too.
21   A.    That will be fine.
22        MR. LAWSON:  And, again, we'll
23  keep the deposition open --

Page 697

1        THE WITNESS:  That will be fine.
2        MR. LAWSON:  -- due to production
3  of any additional documents that we've already
4  requested.
5        MR. LYONS:  The same objection
6  from earlier.
7    Q.    (By Mr. Lawson)  Do you believe
8  that TCU provided illegal kickbacks to
9  anybody?
10   A.    It is my opinion that -- it was
11  insinuated to me by Mr. Elton Dean that TCU --
12  that's why he introduced me to him.  I had no
13  other reason to meet him at Prattville.
14        Mr. Thomas, Percy Thomas, that I
15  was to contact him, and that he would let
16  Elton know whatever the arrangements that me
17  and him come together on on being put on the
18  job, placed on the job, subcontractors that he
19  supplied me.  He told me he had all of the
20  subcontractors that I needed to keep the cost
21  where the cost needed to be and that I would
22  work everything through Mr. Thomas.
23   Q.    And that stands to reason since

Page 698

1  he is the local contractor, that he would know
2  the subcontractors, doesn't it?  That's not
3  surprising, is it?
4      A.    Well --
5      Q.    Do you know the local
6  subcontractors?
7      A.    It was -- our -- the way we had
8  it set up is that every one of the
9  subcontractors would be a prime sub that would
10 be a bonded prime sub on the project.
11     Q.    Okay.  But you didn't know who
12 you were going to use as a prime contractor,
13 did you?
14            You didn't know the tradespersons
15 in the local area, did you?
16     A.    Well, I told you that we were
17 going to do an RFP and choose a qualified
18 contractor.  We had John Chambless who had a
19 wealth of knowledge of who in the area were
20 capable.  We had Marous Brothers who had --
21 that belonged to a network where --
22     Q.    But Marous is not a local
23 contractor and wasn't licensed to do business

Page 699

1  down here and wasn't a general contractor in
2  Alabama.
3      A.    They are licensed in --
4      Q.    Now?
5      A.    Yeah.
6      Q.    Okay.
7      A.    But the bottom line is they had
8  contacts to be able to contact other
9  contractors in the area that was under their
10 group.
11     Q.    But is it unusual or surprising
12 that they may have suggested that you talk to
13 Percy Thomas, who is a successful local
14 contractor about who you might want to use?
15            MR. LYONS:  Object to the form.
16     Q.    (By Mr. Lawson)  Is that unusual?
17     A.    I don't know.  I mean, you know,
18 I can't say that -- they never suggested any
19 other contractors.  And I understand that he
20 might -- he might have had -- there had been
21 -- he might have had some problems on the
22 building of the baseball field for the
23 Biscuits.

Page 700

1      So, you know, the bottom line is
2  I don't -- it's my opinion that it was
3  suggested that Percy Thomas be the guy, and
4  Percy told me that he would identify all of
5  the subcontractors that would be used on the
6  project.
7      Q.    Now, on this job were you going
8  to choose qualified subcontractors, or were
9  you going to bid that out?
10     A.    It would have to be a bid
11 process.
12     Q.    So, Percy Thomas wasn't going to
13 choose anybody, wasn't he?
14     A.    Well, the bottom line is --
15            MR. LYONS:  Only answer if you
16 know what Percy Thomas was going to do.
17            THE WITNESS:  No.
18     Q.    (By Mr. Lawson)  Now, we'll get
19 back to the question that I originally asked
20 you.
21            Do you believe that TCU provided
22 any illegal kickbacks to anyone associated
23 with this project?

Page 701

1      A.    It is my opinion that --
2      Q.    And when I say TCU, I mean TCU,
3  Percy Thomas and Ken Upchurch.
4      A.    It is my opinion that Percy
5  Thomas led me to believe that I had to work
6  through Elton Dean and John Knight to make
7  sure that whatever was suggested by Elton at
8  that meeting -- that whatever was suggested
9  that I had to go through him.
10     Q.    Okay.
11     A.    He was given -- he gave me his
12 card.  I called him on one occasion to ask him
13 about the 87 questions, and at that time he
14 said that all questions on any work that dealt
15 with the 87 questions went through Ken.
16            So, I immediately called Ken to
17 get a time on when the questions would be
18 prepared.  He said he was working on them, I'd
19 have them in a day or two.
20            And then at that point I really
21 put Ken with Ken Upchurch -- I mean, with Arne
22 Goldman.  I really never dealt with Ken
23 besides when Chairman Dean asked me to -- and

Page 702

1  Ken and Percy to go over to Kenny's office to
2  sit with their firm to work out the details of
3  how -- work out the details on the stumbling
4  blocks on this project.
5       Q.    Okay.  Let me ask you one more
6  time.  Do you believe that TCU, Upchurch or
7  Thomas provided illegal kickbacks to anyone
8  associated with the the Alabama State
9  University project?
10      I can't ask that anymore clearly
11 or in any other way.  That's a straightforward
12 question that I need a yes or no answer from
13 you.
14      A.    It was my opinion -- and I felt
15 very uncomfortable with how it was presented
16 to me.  And Mr. Thomas can tell you, I have
17 never tried to contact him anymore past that
18 point because of how I felt.
19      In my opinion this whole scheme
20 of meeting at a disclosed place, we can't talk
21 on the phone, I'll just give you directions on
22 how to get there, you've got to go through me.
23 Well, I really didn't want to know anymore.

Page 703

1       Q.    Now, yesterday you said you
2  didn't want to go through them and why did you
3  have to go through them and why on earth did
4  you have to go through Percy and he didn't
5  impress you.  Those were things that you said.
6       A.    That is so correct.
7       Q.    Okay.  So, you tell me how that
8  has anything to do with the question that I
9  asked you.  Do you believe that they provided
10 any illegal kickbacks of any kind to any ASU
11 official or anyone associated with the ASU
12 project?  Yes or no?
13      I don't care whether you like
14 Percy or not or whether you're impressed with
15 Percy or not.
16      Do you believe they provided
17 illegal kickbacks?
18      A.    They led me to believe, Elton
19 Dean, Percy Thomas, at that meeting that if I
20 was to get anywhere -- get the project, that I
21 had to deal with Percy, that then would deal
22 with Elton and that everything would be all
23 right.

Page 704

1       Q.    Okay.  Is that --
2       A.    Then at -- the last night at the
3  gentleman's club -- Percy was there.  Elton
4  was there.  Mr. Knight was there.
5       Mr. Dean leaving said, did you
6  talk to Percy?  I said, no.  He said, Mr.
7  Berry -- he said, Gil -- and he ripped off a
8  piece of a bar napkin.  He said, before you
9  leave town, he said, you need to call John
10 Knight and work out something with John
11 Knight.
12      He said either go to breakfast or
13 go to lunch, but do not leave here if you want
14 the project.  Do not leave here unless you do
15 that.
16      I never called Mr. Knight.  I
17 never talked to Mr. Knight.  I only seen Mr.
18 Knight on the one occasion I told you after a
19 board meeting, and it was a cordial meeting.
20 That was it.
21      Q.    Okay.  Tell me --
22      A.    To this day I have never talked
23 to Mr. Knight.

Page 705

1       Q.    I know you have bad feelings
2  about Percy and you have bad feelings about --
3       A.    I don't have bad feelings about
4  Percy.
5       Q.    Well, you were telling me you
6  were unimpressed --
7       A.    I was unimpressed --
8       Q.    -- and you didn't like going
9  through somebody -- let me finish.
10      A.    I didn't --
11      Q.    Let me finish.
12      A.    Unimpressed and bad feelings are
13 two different things.
14      Q.    Okay.  Well, unimpressed.  And
15 it's apparent to me that you don't like them.
16 And that's fine.
17      A.    I like Ken.
18      Q.    Okay.  Well --
19      A.    I think Ken is a very intelligent
20 guy.  I like Percy socially.
21      Q.    Maybe that accounts for your
22 hesitancy then to answer by question yes or
23 no.  I don't care about your being

Page 706

1 uncomfortable. I don't care about what John
2 Knight may have done or what you were supposed
3 to talk to him about.
4        Do you believe that Ken Upchurch,
5 Percy Thomas or TCU provided illegal kickbacks
6 to anyone associated with this project? Yes
7 or no? I don't want to hear anything else.
8 Yes or no?
9    A.   It is my opinion that I felt --
10   Q.   Uncomfortable. We got that.
11   A.   -- uncomfortable, that there was
12 some type of kickbacks being --
13        MR. LAWSON: Okay. I'm going to
14 ask your counsel because we will sit here the
15 rest of the day.
16        MR. LYONS: Mr. Berry, if you
17 have some evidence --
18        MR. LAWSON: Yes or no?
19        MR. LYONS: -- or knowledge of
20 them paying kickbacks, then your answer is
21 yes. If you don't have any such evidence, the
22 answer is no.
23        THE WITNESS: Do I have any

Page 707

1 evidence? No.
2    Q.   (By Mr. Lawson) Okay. Do you
3 believe that they did?
4    A.   It is my opinion that -- I
5 believe that the meeting was orchestrated at
6 the Holiday Inn for some kind of kickback to
7 be given, yes.
8    Q.   So, you believe that there were
9 kickbacks provided by --
10   A.   I believe that --
11   Q.   -- Percy Thomas or Ken Upchurch
12 or TCU to ASU officials, even though you have
13 no evidence of that fact?
14   A.   That is correct.
15   Q.   Who did you ever communicate that
16 to?
17   A.   My lawyers.
18   Q.   Other than your lawyers, who did
19 you communicate that fact to or that
20 assertion?
21        I mean, I know you already told
22 Chairman Dean that you thought they were
23 trying to steal your project.

Page 708

1        So, who did you ever tell that
2 you believed that they had provided illegal
3 kickbacks to ASU officials or anyone
4 associated with the ASU job?
5        MR. LYONS: If there is anyone
6 else.
7    Q.   (By Mr. Lawson) Other than your
8 lawyers?
9    A.   Nobody else.
10   Q.   Really. Did you ever tell Josh
11 Moon that? And you know Josh Moon, don't you?
12   A.   I know Josh Moon.
13   Q.   Did you ever tell Josh Moon that
14 TCU provided illegal kickbacks to ASU or ASU
15 officials?
16   A.   I told Josh Moon after the
17 September 22nd board meeting when he followed
18 me outside that I had documents in my
19 briefcase -- because I always carried all of
20 the information at that time dealing with --
21 in case there was a question asked because I
22 never thought that we wasn't going to get the
23 project.

Page 709

1        Because I made a statement after
2 that board meeting that -- he asked was I
3 upset with ASU -- was I upset with ASU. And I
4 said, no, I'm upset with some unethical people
5 from ASU. And he said, well, why would you
6 make that statement? And I said, I made that
7 statement because on several occasions that I
8 was asked to meet with people privately. He
9 said, who? I said, Elton Dean contacted me
10 and asked me to meet him in Prattville, and he
11 had Percy Thomas.
12        Reading the article after, the
13 next day he went and asked Percy Thomas did
14 they meet Gil Berry privately in Prattville.
15 Percy said, yes, we did.
16   Q.   Okay.
17   A.   And I also told him that I was
18 given a note to call John Knight, which I
19 never did. I also told him about rides to the
20 dog track, yes.
21   Q.   And you also told Josh Moon that
22 you thought TCU provided illegal kickbacks to
23 ASU officials or people associated with this

Page 710

```
 1  project, didn't you?
 2      A.   I told him what?
 3      Q.   That you believed that TCU or
 4  Percy Thomas or Ken Upchurch provided illegal
 5  kickbacks to people associated with this
 6  project.
 7      A.   I told Josh Moon it was my
 8  opinion that they were trying to set me up for
 9  some illegal kickbacks through Percy Thomas
10  back to ASU officials.
11      Q.   And you also told him that you
12  believed that TCU provided illegal kickbacks
13  to ASU officials to get that job?
14      A.   That's not true.  I told him it
15  was my opinion.
16           Because what was interpreted to
17  me at that private meeting, that I was to go
18  through Percy Thomas to supply whatever
19  resources back to -- to Percy Thomas to give
20  to other people.
21      Q.   And you did tell Josh Moon that
22  you thought there were kickbacks involved with
23  TCU?
```

Page 711

```
 1      A.   I never used the word --
 2      Q.   So, if we ask Josh Moon and he
 3  says you did, in fact, tell him that TCU
 4  provided illegal kickbacks, is he a liar?
 5      A.   I told Josh Moon it was my
 6  opinion that I was asked at that private
 7  meeting to go through Percy Thomas to give
 8  resources back to certain officials.
 9      Q.   Okay.  So, if Josh Moon says that
10  you told him that TCU provided kickbacks to
11  ASU officials, then he's lying?
12      A.   That is Josh Moon's opinion like
13  I just gave you my opinion.
14      Q.   Would he be lying?
15      A.   That is Josh Moon's -- that would
16  be Josh Moon's opinion.
17      Q.   Okay.
18      A.   Until Josh Moon would say that, I
19  -- I can't really answer that.
20      Q.   I said if.  If he says that you
21  told him TCU provided illegal kickbacks, is he
22  lying?
23      A.   I think what I said he put --
```

Page 712

```
 1  you've seen what I said.
 2      Q.   I have seen what you said.
 3      A.   I said that I had a problem, not
 4  with ASU, with some unethical people from ASU.
 5  I said that directly after the September 22nd
 6  board meeting where it was no -- no pie in the
 7  sky, nothing going on.  That's what I said.
 8      Q.   So, if he --
 9      A.   So, it is well quoted on record
10  what I said that day.
11      Q.   If he says that you said
12  kickbacks, then he misinterpreted what you
13  said?
14      A.   I said that I was asked -- it was
15  my opinion that I was asked to go through
16  Percy Thomas.
17      Q.   I understand.  You've said that.
18      A.   Well --
19      Q.   Did you use the word "kickback"?
20      A.   I didn't use the word "kickback."
21      Q.   Okay.  So, if he says that you
22  did, then he's either mistaken or lying?
23      A.   Well, if you say that by me
```

Page 713

```
 1  saying that money is to be given to Percy
 2  Thomas to give to other officials, if some
 3  people want to call it kickbacks, that's their
 4  word.
 5      Q.   What would you call that?
 6      A.   I just said what I called it.
 7      Q.   What?  I not sure I heard you.
 8  What would you call it?
 9      A.   Passing money on to Percy Thomas
10  to give to other -- other people.
11      Q.   Well, what is that?  Is that
12  illegal?
13      A.   I don't know.  I call it passing
14  money on.
15      Q.   Okay.  Passing money on, is that
16  illegal?
17      A.   I guess for work that wasn't
18  performed by those people it would be.
19      Q.   Okay.  So, you did say that he
20  took a kickback.  You may not have used that
21  word, but you said he took money that he
22  shouldn't have gotten and passed it on to
23  other officials?  Is that what you said?
```

1    A.    That's what was insinuated at --
2    Q.    So, that's what you told Josh
3  Moon?
4    A.    That's what was insinuated at the
5  meeting.
6    Q.    At the Holiday Inn.  And that's
7  what you told Josh Moon?
8        MR. LYONS:  Object to the form.
9  Let him finish his answer.
10    Q.    (By Mr. Lawson)  Is that correct?
11    A.    I said what I stated.
12    Q.    Okay.  So, you told Josh Moon
13  that Percy Thomas provided money to ASU
14  officials?
15    A.    That's right.
16    Q.    And whether you want --
17    A.    No.  I said that they were
18  suggesting that I give money to Percy Thomas
19  to give money to different officials.
20    Q.    Okay.
21    A.    I never stated --
22    Q.    They suggested that you do that?
23    A.    Yes.

1    Q.    So, you didn't suggest that Percy
2  Thomas did that?
3    A.    Percy Thomas was with Elton Dean
4  in the conversation by saying that -- Elton
5  Dean said we're all family.  Percy's my man.
6  He went on to say about -- I thought he had a
7  relative or something of that sort.
8    Q.    Right.  Did you ever suggest that
9  Percy Thomas provided money to ASU officials
10  in order to secure any sort of work --
11    A.    No.
12    Q.    -- at ASU?
13    A.    No.
14    Q.    Did you ever suggest that Percy
15  Thomas or anybody with TCU provided any sort
16  or payments or illegal kickbacks, whatever you
17  want to call it, to anyone associated with TCU
18  to get any sort of work at ASU?
19    A.    Repeat that again.
20    Q.    Did you ever tell Josh Moon or
21  anyone else that Percy Thomas, Ken Upchurch or
22  TCU provided cash payments, provided money,
23  provided kickbacks, whatever you want to call

1  it, to anyone associated with the ASU project
2  or ASU in general in order to get work at ASU?
3    A.    No.
4    Q.    So, if Josh Moon tells us that
5  you did, then he's lying?
6    A.    I never told him that.
7    Q.    Did you tell anybody that --
8    A.    I told him about the meetings
9  that --
10    Q.    Where they wanted you to pay
11  money?
12    A.    Yes.
13    Q.    And that's it?
14    A.    I told him about the meetings
15  that occurred, the private meetings that were
16  -- that occurred.  That's what I told him.
17    Q.    Okay.  And that was on the day of
18  the September 22nd board meeting?
19    A.    That is on the day of the
20  September 22nd board meeting when he came
21  outside.  I had already left.
22    Q.    I understand.  Did you tell
23  anybody else?

1    A.    Percy came out later.  He stood
2  out there for a while.
3    Q.    You were asked to leave that
4  meeting, weren't you?
5    A.    No, I was never asked to leave.
6    Q.    You weren't?
7    A.    No.
8    Q.    Okay.
9    A.    I mean, the chairman and the
10  president's here.  They never asked me to
11  leave.
12    Q.    Didn't you start screaming and
13  hollering in the meeting?
14    A.    No.
15    Q.    You didn't?
16    A.    I was trying to be heard and
17  Elton said, Gil, Gil, come on.  You've got to
18  be heard.  Yeah.
19    Q.    And you've never told anybody
20  other than Josh Moon?  Anyone else?
21    A.    My lawyer.
22    Q.    That you believe they were taking
23  kickbacks or providing kickbacks?

Page 718

1    MR. LYONS: Object to the form.
2  Answer.
3    THE WITNESS: Huh?
4    Q.    (By Mr. Lawson) Have you told
5  anybody? Now, we've talked about Josh Moon.
6    Have you told anybody else that
7  Percy Thomas or TCU provided kickbacks or
8  received kickbacks?
9    MR. LYONS: He's never used that
10  terminology. Object to the form.
11    Q.    (By Mr. Lawson) That's what I'm
12  asking. Have you ever used that terminology?
13    A.    No.
14    Q.    Have you ever told anyone that
15  Percy Thomas or TCU received illegal kickbacks
16  or received money that they weren't entitled
17  to?
18    A.    No.
19    Q.    Have you ever said that they gave
20  money to ASU officials, whether you called it
21  a kickback or not?
22    A.    No.
23    Q.    You've never told anybody that?

Page 719

1    A.    Huh-uh (negative).
2    (Whereupon, said document was
3    marked for identification as
4    Defendant's Exhibit No. 40 to the
5    deposition of Gilbert C. Berry.)
6    Q.    Defendant's Exhibit No. 40.
7  That's a letter from your previous counsel
8  where you denied making any of the allegedly
9  defamatory statements that we claim you made,
10  and you deny uttering any statements that
11  anyone was provided kickbacks.
12    Do you see that?
13    A.    That is correct.
14    Q.    Do you stand behind that
15  statement?
16    A.    I stand behind that statement.
17    Q.    Did you see this letter before it
18  went out?
19    A.    I think I did.
20    (Whereupon, said document was
21    marked for identification as
22    Defendant's Exhibit No. 41 to the
23    deposition of Gilbert C. Berry.)

Page 720

1    Q.    Exhibit No. 41 is another letter
2  from your previous counsel. Have you ever
3  seen that letter? It's dated August 8th.
4    Have you ever seen that letter?
5  It's copied to you.
6    A.    Uh-huh (affirmative).
7    Q.    And this is in response to a
8  demand for a retraction that we had sent to
9  your lawyers demanding that you retract
10  various defamatory statements. Do you
11  remember that?
12    A.    That is true.
13    Q.    Did you see that letter?
14    A.    Yes, I did.
15    Q.    In this letter, Exhibit 41, you
16  deny making any false or defamatory statements
17  as alleged in our letter. Do you see that?
18    A.    That is correct.
19    Q.    Now, my reading of it is you
20  don't deny making the statements, you just
21  deny that they were false or defamatory; is
22  that correct?
23    Or do you deny making the

Page 721

1  statements?
2    A.    I made the statement that I met
3  Elton Dean and Percy Thomas. And as you well
4  noted, that I said in the newspaper on
5  September 22nd that -- was asked are you --
6  are you upset with Alabama State. I said, no,
7  I'm upset with unethical people from Alabama
8  State. I have no problem with Alabama State.
9    Q.    Okay. Well, let me show you the
10  August 3rd, 2007, demand for retraction that
11  we sent to your lawyers that you say you've
12  seen.
13    (Whereupon, said document was
14    marked for identification as
15    Defendant's Exhibit No. 42 to the
16    deposition of Gilbert C. Berry.)
17    Q.    This is Exhibit No. 42. And if
18  you'll look down in the second paragraph for
19  me --
20    First, tell me if you've seen
21  that letter. That's the demand for
22  retraction.
23    A.    Yeah, I have seen it.

Page 722

1    Q.    Okay.  Down in the second
2  paragraph, we demand that you retract various
3  false and defamatory statements, number one
4  being that TCU, Upchurch and Thomas stole or
5  used unethical or illegal means to take the
6  dorm renovation project from you.
7          Now, in your response you deny
8  making any false or defamatory statements as
9  alleged in this August 3rd letter from me.
10  Okay?
11    A.    Uh-huh (affirmative).
12    Q.    Now, you've already testified
13  yesterday under questioning from Kenny Thomas
14  that, in fact, you did tell people that they
15  stole your job, stole your project.
16          You told Elton Dean that, didn't
17  you?
18    A.    Yeah.
19    Q.    So, when you in your August 8
20  letter deny making that statement, that's not
21  true, is it, because you did make that
22  statement?
23    A.    I did.

Page 723

1    Q.    Okay.  So, when I look at Exhibit
2  41, your August 8, 2007, letter denying making
3  any false or defamatory statements, that's
4  inaccurate, isn't it, because you, in fact,
5  did say that they stole your job?
6    A.    I said they're trying to steal my
7  job.
8    Q.    And then you told Elton Dean, I
9  believe you said, that they did steal your
10  job?
11    A.    I said that they were trying to
12  steal --
13    Q.    Okay.
14    A.    -- my job.
15    Q.    Okay.  Trying to?
16    A.    I mean, the bottom line is that's
17  why I called Elton, to stop them from stealing
18  my job.
19    Q.    And you deny ever saying that
20  they used unethical or illegal means to get
21  that project from you?
22          Coming out of that September 22nd
23  meeting, you didn't tell Josh Moon that they

Page 724

1  used unethical or illegal means to get that
2  project from you?
3    A.    It was my opinion based on --
4  President Lee said these guys have been
5  working with me.  I feel comfortable with Ken.
6  We're moving on.  Ken has been very
7  supportive.  Ken has come up with a way that
8  we can move this project forward.  Ken says
9  that we can get this project going, in about
10  three months get it jump started.
11          And Judge Wiggins says, can you
12  do it for the $25 million or less?  And he
13  said, I can do it for the same price as Gil.
14  Yes.
15    Q.    Okay.  So, yes, you did tell Josh
16  Moon that they used unethical or illegal means
17  to get the dorm renovation project that you
18  believed was yours?
19    A.    Well, if you were supposed to be
20  reviewing the documents.  It's my opinion --
21    Q.    I'm looking for a yes or no
22  answer.
23    A.    Yes.

Page 725

1    Q.    Did you tell him that?
2    A.    Yes.  It's my opinion, yes.
3    Q.    Yes, you told Josh Moon that?
4    A.    Yes, I did.
5    Q.    And you told him that on
6  September 22nd, 2006?
7    A.    That is correct.
8    Q.    Okay.  And the second statement
9  that we allege you made and that you deny
10  making is that they provided kickbacks or
11  other improper and illegal payments to ASU
12  Trustees Elton Dean and John Knight.  Do you
13  see that?
14    A.    Correct.
15    Q.    Do you deny ever making that
16  statement to anyone?
17    A.    Yes, I deny that.
18    Q.    So, you've never said that Elton
19  Dean or John Knight received kickbacks or
20  other improper or illegal payments from TCU?
21    A.    Yeah.  I never said that.
22    Q.    So, you do deny saying that?
23    A.    That's correct.

Page 726

1    Q.    And we've established part one,
2  you don't deny saying that they stole or used
3  unethical or illegal means to take your
4  project, even though you denied it in your
5  August 8th, 2007, letter from your lawyer.
6         But, number two, you do deny
7  saying that Elton Dean or John Knight received
8  illegal kickbacks or other improper or illegal
9  payments from TCU?
10    A.    That is correct.
11    Q.    Number three, that they lied or
12  fraudulently misrepresented facts concerning
13  Marous and Berry to the ASU Board of Trustees.
14         You told Josh Moon that, didn't
15  you, on September 22nd, 2006?
16    A.    Read that again even though I'm
17  looking at it.
18    Q.    Number three, that they lied or
19  fraudulently misrepresented facts concerning
20  Marous and Berry to the ASU Board of Trustees.
21    A.    Yeah, I said that.
22    Q.    And you had told Josh Moon that,
23  didn't you?

Page 727

1    A.    I told Josh Moon that --
2    Q.    So --
3    A.    -- it is my opinion.
4    Q.    I understand it's your opinion --
5    A.    Yeah.
6    Q.    -- but you told him that?
7    A.    It's my opinion, yes.
8    Q.    So, when we demand that you
9  retract that statement and then your August 8
10  response to our demand you deny making any
11  false or defamatory statements, you don't deny
12  making that statement, though, do you?
13    A.    It is my opinion --
14    Q.    I understand --
15    A.    -- based on --
16    Q.    -- it's your opinion.
17    A.    -- what I seen there that day.
18    Q.    So, that's why I said when I read
19  your letter from your lawyer, Stephen Arnold,
20  denies making any false or defamatory
21  statements.
22         You're not denying making the
23  statement.  You're just denying that it's

Page 728

1  false or defamatory, correct?
2    A.    That's right.
3    Q.    So, you did make the statement in
4  number three?
5    A.    That is correct.
6    Q.    Number three being number three
7  of Exhibit No. 42.
8         Number four, that TCU, Upchurch,
9  and Thomas secured ASU jobs by illegal means.
10  Do you see that?
11    A.    That is correct.
12    Q.    And you told Josh Moon that, too,
13  didn't you?
14    A.    Well, if you are supposed to be
15  reviewing documents and you end up with the
16  job by saying that -- by President Lee saying
17  that me and Ken have been working diligently
18  to get this job moving, you aren't reviewing
19  our documents.  You are working to get
20  yourself a contract with ASU.
21    Q.    So, that's a yes then?  You did
22  say --
23    A.    That is a yes.

Page 729

1    Q.    Okay.  You did say they secured
2  ASU jobs by illegal means?
3    A.    That is my opinion, yes.
4    Q.    So, your August 8, 2007,
5  response, which is Exhibit 41, where you deny
6  making false and defamatory statements, you're
7  merely denying that they are false and
8  defamatory, not that you didn't make those
9  that we allege you made?
10    A.    That is correct.
11    Q.    Okay.  Have many times have you
12  talked to Josh Moon?
13    A.    Four or five times.
14    Q.    Four or five?
15    A.    Uh-huh (affirmative).
16    Q.    In person, on the phone, both?
17    A.    On the phone.  And I seen him --
18  are you talking about -- Josh Moon has been at
19  every board --
20    Q.    Josh Moon, the reporter.
21    A.    -- meeting that I have ever been
22  involved with even before the wheels fell off
23  the cart.

Page 730

```
 1     Q.    Okay.  Since September 22, and
 2  including September 22nd, 2006, how many times
 3  have you met with him in-person?
 4     A.    I don't think I had seen Josh
 5  Moon.
 6     Q.    Just on that day?
 7     A.    Yes.
 8     Q.    How many times have you spoken to
 9  him?
10     A.    I have probably spoken to him
11  three maybe.
12     Q.    Now, let me back up real quick.
13  The statements that are in Exhibit 42, our
14  letter of August 3rd to you that you've
15  admitted making --
16     A.    Uh-huh (affirmative).
17     Q.    -- that TCU stole or used
18  unethical or illegal means to take your
19  project, that they lied or fraudulently
20  misrepresented facts, that they secured ASU
21  jobs by illegal means, you've admitted making
22  all of those statements, and you've admitted
23  making those statements to Josh Moon.
```

Page 731

```
 1        Who else have you made those
 2  statement to?
 3     A.    My lawyers.
 4     Q.    Anybody else?  Any other
 5  reporters?
 6     A.    No.
 7     Q.    Okay.  Anybody at ASU?
 8     A.    Besides Elton Dean and Buford and
 9  Judge Wiggins when I thought that they were
10  trying to steal the job, yes.  I haven't
11  talked to them after they stole the job.
12     Q.    Anyone else?
13     A.    No.
14     Q.    Did you ever make any of those
15  statements that I just identified in Exhibit
16  42 to Alfred Seawright?
17     A.    I told Alfred that they were
18  stealing the job, and he said that he was
19  going to try to talk to Mr. Knight.  He said
20  he was going to go try to talk to John
21  Chambless.
22     Q.    Is that before September 22nd or
23  after?
```

Page 732

```
 1     A.    Probably after.  We had several
 2  phone calls after that.
 3     Q.    So, you have told Alfred
 4  Seawright that they stole your job or used
 5  unethical or illegal means to take your job?
 6     A.    I have told him that Ken Upchurch
 7  and them were negotiating behind the scenes to
 8  get the job, yes.
 9     Q.    They stole your job.  You told
10  Alfred that?
11     A.    I told him that they were working
12  behind the scenes to get the job.
13     Q.    Did you tell Alfred that they
14  stole or used unethical or illegal means to
15  take your job, what you thought was your job?
16     A.    I told him that they were
17  supposed to be negotiating with the president,
18  and I said -- I told -- remember, Alfred, I
19  told you that Ken and Percy were working to
20  get the job prior to them getting the job.  I
21  did tell him that.
22     Q.    Did you tell him that they lied
23  or fraudulently misrepresented facts?  Did you
```

Page 733

```
 1  tell Alfred that?
 2     A.    I don't know if I told him that.
 3     Q.    Did you tell him --
 4     A.    I mean, if you're -- if you're
 5  working behind the scenes to get the job when
 6  you're supposed to be negotiating in good
 7  faith because Alfred is telling me, Gil, don't
 8  worry.
 9     Q.    Okay.
10     A.    There's nothing going on.
11     Q.    Did you tell him that they used
12  illegal means to secure ASU jobs?
13     A.    Did they use illegal means?
14     Q.    Illegal, unethical.
15     A.    You say unethical.  Well, I think
16  that they --
17     Q.    Did you tell Alfred that?
18     A.    I think -- yeah.
19     Q.    Okay.  Because we can ask Alfred
20  of course.
21     A.    Yeah.  I think --
22     Q.    We can ask him all of these
23  questions.
```

79 (Pages 730 to 733)

1    A.    Oh, well, that's fine.  But I
2  told him I think it -- it was unethical.  If
3  you are supposed to be reviewing documents,
4  but as President Lee got up and eloquently
5  said me and Ken have been working on this for
6  weeks.  We've got it where we can hit the
7  ground running.  We ain't going to lose no --
8  no speed on this thing.  We'll have the
9  dormitories --
10         Well, you're not reviewing the
11  documents.  What you're doing is behind the
12  scenes negotiating to get yourself another
13  contract, agreement, extension or whatever you
14  want to call it on what you've already got
15  going on at ASU.
16    Q.    So, when we ask Alfred if you
17  told him that they lied or stole your job or
18  used unethical or illegal means, he's going to
19  say, yeah, you did?
20    A.    I don't know what Alfred's going
21  to say.
22    Q.    You know you told him those
23  things, didn't you?

1    A.    I told him just what I told you.
2    Q.    How about James Harold, did you
3  tell him that TCU lied or misrepresented facts
4  or stole your job or used unethical or illegal
5  means or get your job or other ASU jobs?
6    A.    I don't know if I told James or
7  not.
8    Q.    You don't remember?
9    A.    I don't remember.
10    Q.    Okay.  So, we'll just ask him if
11  he remembers --
12    A.    Yeah.
13    Q.    -- you telling him things like
14  that.
15    A.    Uh-huh (affirmative).
16    Q.    Other than Alfred Seawright and
17  you can't remember on James Harold, have you
18  told anybody else that TCU, Upchurch or Thomas
19  stole or used illegal or unethical means to
20  take your job?
21    A.    I just --
22    Q.    Other than Josh Moon.
23    A.    I can't remember --

1    Q.    Okay.
2    A.    -- telling anybody else.
3    Q.    Now, when you told Josh Moon
4  these things, who else was present?
5    A.    My cousin, Lorren Berry, who was
6  with me that day.
7    Q.    Any other Montgomery Advertiser
8  employees?
9    A.    I don't know.
10    Q.    Where were you?
11    A.    I was at ASU.
12    Q.    You never went to the Montgomery
13  Advertiser offices?
14    A.    No, I have never -- I don't even
15  know where their offices are.
16    Q.    So, the only person who heard you
17  would be your cousin and Josh Moon?
18    A.    And Percy came out and stood for
19  a while.
20    Q.    Anyone else?
21    A.    The young guy -- I guess he was a
22  -- he was an ASU -- like a student president
23  or something maybe of the student body or

1  something.
2    Q.    Male or female?
3    A.    Male.
4    Q.    And he --
5    A.    I don't know who he was.  He was
6  just present there.
7    Q.    He heard you say it, too?
8    A.    Yeah.  He heard what I said.
9    Q.    Which was that they used illegal
10  or unethical means to steal your project?
11  We've already gone through all of these other
12  that --
13    A.    No.
14    Q.    -- you say you told Josh Moon.
15    A.    Yeah.  I said that it is my
16  opinion that they used --
17    Q.    I understand.
18    A.    -- unethical --
19    Q.    I know you don't have any
20  evidence of it.  But it's your opinion?
21    A.    It's my opinion.
22    Q.    And you told Josh that was your
23  opinion?

Page 738

1    A.    And you were asking me who was
2  out there, and I'm telling you.  It was -- I
3  don't know who this kid was --
4    Q.    But that guy heard you tell Josh
5  Moon these things?
6    A.    Yes.  He stood there for a
7  minute, yeah.
8    Q.    But you said you've talked to
9  Josh Moon on the phone.  Why have you talked
10 to him on the phone?
11   A.    As you can see there, we were
12 trying to secure a bingo license down in --
13 which everybody here knows about -- down in
14 Tuskegee, Alabama.
15   Q.    Okay.  At VictoryLand?
16   A.    No.
17   Q.    Elsewhere?
18   A.    Elsewhere.
19         (Whereupon, said document was
20         marked for identification as
21         Defendant's Exhibit No. 43 to the
22         deposition of Gilbert C. Berry.)
23   Q.    Let me show you Defendant's

Page 739

1  Exhibit 43 and ask if you've ever seen that
2  newspaper article?
3    A.    My lawyer sent this.  I think one
4  of your guys sent it to my lawyer, and he sent
5  it to us.
6    Q.    So, you've seen it?
7    A.    Yes, sir.
8    Q.    And you understand that was
9  written in July '07?
10   A.    That is correct.
11   Q.    On the second column, the first
12 column just underneath that photograph, it
13 says in a lawsuit against ASU and TCU
14 Services, Berry and his collaborator, Marous
15 Brothers Construction, allege that TCU owners
16 Ken Upchurch and Percy Thomas are giving
17 kickbacks to some individuals associated with
18 the jobs and that illegal activity played a
19 major role in TCU landing the jobs.
20         Do you see that?
21   A.    Uh-huh (affirmative).
22   Q.    I've looked and looked and looked
23 in that lawsuit.  I don't see that.  Did you

Page 740

1  say that in the lawsuit?
2    A.    Say what?
3    Q.    Well, that TCU is giving
4  kickbacks to some individuals associated with
5  the jobs and that illegal activity played a
6  major role in TCU landing the jobs.  Did you
7  say that --
8    A.    No.
9    Q.    -- in the lawsuit?
10   A.    I think the key word here is
11 "allege."  I mean --
12   Q.    Well, do you allege that in the
13 complaint?
14   A.    I alleged to him that it was my
15 opinion.
16   Q.    Right.  I understand it's your
17 opinion.
18   A.    So, I mean, the bottom line is I
19 -- it's very obvious I didn't say that.
20   Q.    What I'm trying to clear up is
21 the lawsuit doesn't say that.  I don't see
22 anywhere in that complaint where it says that
23 you've alleged in the complaint that TCU is

Page 741

1  giving kickbacks.
2    A.    No, I never said that.
3    Q.    Okay.  But what I do see in the
4  newspaper article is that he's attributing
5  those statements to you because you talked to
6  him on September 22nd, 2006, and other times?
7    A.    That is correct.
8    Q.    So, he didn't get that out of the
9  complaint.  He's gotten it from you, this
10 information, these allegations, correct?
11   A.    That it was my opinion --
12   Q.    It's your opinion, but he's
13 gotten these --
14   A.    Yeah.
15   Q.    These allegations are coming from
16 you, not from the complaint?
17   A.    That's correct.
18   Q.    Okay.  And you go on to claim
19 over in the second from the last column on the
20 right --
21   A.    Are we talking about right here?
22   Q.    Uh-huh (affirmative).  The second
23 full paragraph.  He attributes a quote to you:

Page 742

1  "I don't think it's hard to figure out what's
2  happening. The only big-time jobs (TCU) has
3  gotten has been connected to these same
4  people."
5          You don't know what jobs TCU has
6  and hasn't gotten, do you?
7      A.   Elton told me that he had got the
8  jail job. Me and him, Percy, personally had
9  talked about it at that meeting. Elton told
10 me that him and John were trying to secure
11 them a job at the school --
12     Q.   Sure.
13     A.   -- with the superintendent.
14     Q.   But do you know what all jobs
15 they've done?
16     A.   No, I don't know what jobs.
17     Q.   So, you don't --
18     A.   So, that's what I say.
19     Q.   Okay. Down at the bottom of that
20 column -- the paragraph begins "in the
21 lawsuit." And then it goes on to say that
22 Marous claims in a letter forwarded to
23 Governor Bob Riley's office that Upchurch lied

Page 744

1  that Upchurch lied repeatedly to get the job?
2  Do you agree?
3      A.   Until -- I would have to
4  understand what Marous is saying that he's
5  lied about before --
6      Q.   Okay. That's fine.
7      A.   -- I could agree to anything.
8      Q.   That's fair.
9      A.   I mean, seriously.
10     Q.   Fair enough.
11          (Whereupon, said document was
12          marked for identification as
13          Defendant's Exhibit No. 44 to the
14          deposition of Gilbert C. Berry.)
15     Q.   Exhibit No. 44, which I've just
16 passed your way, is more newspaper articles
17 out of The Montgomery Advertiser.
18     A.   Uh-huh (affirmative).
19     Q.   And you've seen those, and you've
20 already said your lawyers provided copies of
21 to them after we provided them to your
22 lawyers. Correct?
23     A.   Correct.

Page 743

1  repeatedly to get Marous Brothers and Berry
2  removed from the job.
3          Do you see that?
4      A.   No, I don't. Could you point
5  that out?
6      Q.   At the very bottom, right there
7  (pointing).
8      A.   Okay.
9      Q.   Have you seen that letter that
10 Marous sent to Governor Riley's office?
11     A.   If I did, I don't remember.
12     Q.   Did Marous talk to you about
13 sending that letter before they sent it?
14     A.   I don't remember if they did.
15     Q.   Would you have agreed with
16 Marous' assertion that they lied repeatedly?
17     MR. LYONS: Object to the form.
18     Q.   (By Mr. Lawson) You can answer
19 the question.
20     A.   I refuse to answer. I don't know
21 what --
22     Q.   Well, you can't refuse. Do you
23 agree with the assertion attributed to Marous

Page 745

1      Q.   Down at the bottom --
2      A.   Where are you?
3      Q.   At the very bottom where it says
4  housing.
5      A.   Oh, okay.
6      Q.   That part of the article.
7      A.   Okay.
8      Q.   Over in the second from the last
9  column --
10     A.   Second from the last column. I
11 imagine that's right here?
12     Q.   Yes. On that last paragraph that
13 begins Dean has called the claims by Berry
14 lies. Do you see that?
15     A.   Yes.
16     Q.   And then it goes on to say
17 Upchurch and Percy Thomas, who Berry claimed
18 provided Dean and Knight with the kickbacks
19 they were after, also denied any wrongdoing.
20          Do you see that?
21     A.   Uh-huh (affirmative).
22     Q.   So, Josh Moon in this newspaper
23 article has said that you claimed Dean and

Page 746

1  Knight were provided illegal kickbacks from
2  TCU, Upchurch and Thomas. Do you see that?
3      A.    That's what I see here.
4      Q.    Okay. And did you tell Josh Moon
5  that?
6      A.    No. I told Josh Moon what I told
7  you earlier.
8      Q.    So, Josh Moon is mistaken then
9  when he puts this in this article?
10     A.    If Josh Moon called it kickbacks,
11 that's Josh Moon's opinion. I told you what I
12 call it.
13     Q.    Okay. So, did you tell Josh Moon
14 that Upchurch and Percy Thomas provided
15 illegal or unethical money or payments to
16 Elton Dean or to John Knight? Did you tell
17 him that?
18     A.    I told him that at that meeting
19 that it was suggested that I give monies --
20 insinuated that I give monies to Percy Thomas
21 to do whatever Percy Thomas is supposed to do
22 with individuals.
23     Q.    I understand what it was

Page 747

1  insinuated you do.
2      A.    Yeah.
3      Q.    Did you tell Josh Moon what you
4  believed Upchurch and Thomas did do, which is
5  provide illegal or unethical or improper
6  payments of any kind to Elton Dean or John
7  Knight?
8      A.    No.
9      Q.    So, where he says that you told
10 him, that you claimed that Percy Thomas or Ken
11 Upchurch provided Elton Dean and John Knight
12 with the kickbacks they were after, then Josh
13 Moon is mistaken or he's lying?
14     A.    Or he's misquoted it, took my
15 words out of context and --
16     Q.    Well, did you --
17     A.    No. I never said that, no.
18     Q.    Did you ever say that any money,
19 any money changed hands between Percy Thomas
20 and Elton Dean, Percy Thomas and John Knight,
21 Ken Upchurch and Elton Dean or Ken Upchurch
22 and John Knight that had anything to do with
23 the ASU project or any other projects?

Page 748

1      A.    No.
2      Q.    So, Josh Moon is mistaken in this
3  article?
4      A.    That is correct.
5      Q.    Okay. Glad we got that cleared
6  up.
7      A.    Are these --
8      Q.    Yeah.
9            (Whereupon, said document was
10           marked for identification as
11           Defendant's Exhibit No. 45 to the
12           deposition of Gilbert C. Berry.)
13     Q.    I'm going to show you what I'm
14 marking as Defendant's Exhibit No. 45. I'm
15 going to ask you to take a look at that for me
16 if you will.
17     A.    (Complies).
18     Q.    That's your E-mail address, isn't
19 it?
20     A.    That is it.
21     Q.    Gilberry@verizon.net.
22     A.    Uh-huh (affirmative).
23     Q.    And that's from Josh Moon dated

Page 749

1  July 21, 2007, at 6:18 p.m.?
2      A.    Uh-huh (affirmative).
3      Q.    Is that a yes?
4      A.    That is correct.
5      Q.    And these articles were published
6  a week later? These newspaper articles that
7  we just looked at, correct?
8      A.    Correct.
9      Q.    Okay. Josh Moon sent you drafts
10 of those newspaper articles for you to review
11 before they were published, correct?
12     A.    Can I tell you something?
13     Q.    Sure.
14     A.    Anybody in this room can tell you
15 I couldn't pull up an E-mail. I don't have a
16 computer. I don't have even access at my
17 location for a computer. If he had to send
18 them, he sent it over to my office manager who
19 pulls up my E-mails.
20           Any E-mails that Mr. Thomas, Mr.
21 Dean, Mr. Upchurch, anybody who's ever got an
22 E-mail from me, has come from my office
23 manager. I don't have a cell phone that can

Page 750

1   even get an E-mail.
2        I am one of those kind of guys
3   that when it comes to something of that kind
4   of magnitude -- I had -- my daughter bought me
5   a Blackberry phone a couple of years ago.  I
6   gave it away because, you know what, I
7   couldn't even use the thing.  I had to go to a
8   flip phone.
9        Q.    Okay.  That's fine.  That's fine
10  and well.  But that is your E-mail address,
11  isn't it?
12       A.    That is my E-mail address.
13       Q.    And somebody in your office
14  pulled that E-mail up if it wasn't you and
15  showed it to you, didn't they?
16       You saw these draft newspaper
17  articles before they were published because --
18       A.    No.
19       Q.    -- Josh Moon sent them?
20       A.    He might have sent them, but I
21  didn't see them.
22       Q.    Okay.  So, he sent this E-mail to
23  you, and you did not review those newspaper

Page 751

1   articles before he sent them --
2        A.    That is correct.
3        Q.    -- before he published them?
4        A.    That is --
5        Q.    That's your testimony?
6        A.    That is correct.
7        Q.    So, if Josh Moon says that he
8   sent you these newspaper articles --
9        A.    Wait a minute.
10       Q.    If Josh Moon says that he sent
11  you these newspaper articles via E-mail to
12  what is admittedly your E-mail address --
13       A.    Uh-huh (affirmative).
14       Q.    -- it is your testimony that you
15  never saw the articles?
16       A.    I never seen the articles.
17       Q.    You never had seen this E-mail?
18       A.    I never had seen it.
19       Q.    Okay.
20       A.    I don't -- I don't pick up
21  E-mails.
22       Q.    Did he fax them to you?
23       A.    No.

Page 752

1        (Whereupon, said document was
2        marked for identification as
3        Defendant's Exhibit No. 46 to the
4        deposition of Gilbert C. Berry.)
5        Q.    I'm going show you Defendant's
6   Exhibit No 46, which is another E-mail, also
7   dated July 21, from Josh Moon to you attaching
8   drafts of the newspaper articles that ran a
9   week later in The Montgomery Advertiser that
10  we just looked at.
11       A.    Okay.
12       Q.    And your testimony is you never
13  saw that; is that correct?
14       A.    I have never seen this.
15       Q.    So, if Josh Moon says that you
16  have, then he's not telling the truth?
17       A.    That would be correct.
18       Q.    Okay.  You had a number of phone
19  conversations with Josh Moon about these very
20  newspaper articles, didn't you, before they
21  were published?
22       A.    I have talked to Josh Moon about
23  our project down there in Alabama.

Page 753

1        Q.    Okay.  You talked to Josh Moon
2   about these newspaper articles before they
3   were published and the allegations that are
4   contained in those newspaper articles, didn't
5   you?
6        A.    I disagree.
7        Q.    Okay.  So, if I talk to Josh Moon
8   and look at his phone records and I find
9   multiple phone calls from you to Josh Moon --
10       A.    Uh-huh (affirmative).
11       Q.    -- and Josh Moon to you on or
12  about the time that these articles were
13  drafted and published, your testimony as we
14  sit here today is going to be not one time did
15  you talk about these articles in advance of
16  their publication?
17       A.    That's correct.  I think he even
18  made a statement that I read in the paper that
19  I wasn't allowed to talk to him.  My attorneys
20  had --
21       Q.    Your attorneys recommended that
22  you not talk to him?
23       A.    Not talk to him.  So, I think he

Page 754

1 even published that in the paper if I do
2 remember.
3     Q.    On July 21 when he sent you this
4 first E-mail at 5:48 p.m. and then the second
5 one at 6:18 p.m., if I look at his phone
6 records, am I going to find one, two, three,
7 four phone calls after he sent you those
8 E-mails?
9     A.    You probably would.
10     Q.    Okay.  And it's your testimony
11 that despite the fact that he'd just sent you
12 these articles, which contained defamatory
13 statements about my clients, that you did not
14 discuss anything in those articles --
15     A.    I--
16     Q.    -- in those E-mails?
17         MR. LYONS:  Hold on.  Object to
18 the form.
19     Q.    (By Mr. Lawson)  Is that your
20 testimony?
21     A.    Yes.
22     Q.    Okay.  So, it's just shear
23 coincidence that he sends you two E-mails

Page 755

1 attaching drafts of articles that he publishes
2 a week later that attribute all sorts of
3 statements to you, all of which are defamatory
4 and false statements about my clients, he
5 sends those to you late in the afternoon of
6 7-21-07 and it's shear coincidence that right
7 after that you get on the telephone with him
8 and talk to him four times and not one time
9 did you mention those articles or did he
10 mention those articles --
11         MR. LYONS:  Object to the form.
12         MR. LAWSON:  -- or any of the
13 allegations or statements contained in them?
14         MR. LYONS:  Object to the form.
15     Q.    (By Mr. Lawson)  Is that your
16 testimony as we sit here today?
17     A.    That is my testimony.
18     Q.    Well, we'll clear that up with
19 Josh Moon because I can assure you he has a
20 different story to tell about all that.
21         You telephone number is
22 412-965-0466, isn't it?
23     A.    That is correct.  That's the

Page 756

1 number I gave you today when I gave you my
2 testimony.
3     Q.    And is it also a coincidence that
4 on the day before he sends you those articles
5 for your approval and your review that the day
6 before you also talked to Josh Moon?  Is that
7 a coincidence, too?
8         MR. LYONS:  Object to the form.
9     Q.    (By Mr. Lawson)  What were you
10 talking about to Josh Moon all of these times
11 around the time he's sending you articles
12 containing defamatory statements attributable
13 to you about my clients?
14         MR. LYONS:  Object to the form.
15     Q.    (By Mr. Lawson)  What were you
16 talking to him about?
17     A.    I am talking to him about a vote
18 that's getting ready to happen.  On or around
19 the time of July down there in Alabama they
20 have a board meeting that is -- meets every --
21 on the 10th of every month down there in that
22 area, county commissioners meetings that they
23 meet, a lot of things.

Page 757

1     Q.    Okay.  Not one time did you talk
2 to him about TCU, Ken Upchurch or Percy Thomas
3 or the ASU project?
4     A.    I have never given him any
5 information besides that day about these guys.
6     Q.    And you did not read or approve
7 in advance the articles that he's published on
8 July 28th?
9     A.    Tell him to send you one E-mail
10 that I ever -- I can't -- I don't -- I can't
11 even pull up an E-mail.
12     Q.    He didn't discuss with you --
13     A.    If you gave me a million dollars
14 today and said, Mr. Berry, pull up your
15 E-mail.  No.  I'm just trying to explain to
16 him.  I don't --
17     Q.    That's fine.  You didn't E-mail
18 him.  I got that.
19     A.    Okay.
20     Q.    You didn't discuss with him on
21 the telephone, in-person, by written letter,
22 by E-mail, by fax, none of these means of
23 communications did you have with Josh Moon

Page 758

1  about the allegations contained the two
2  articles that he published on July 28th, 2007,
3  about TCU, Upchurch or Thomas?
4      A.    That is --
5      Q.    That's your testimony?
6      A.    That is my testimony.
7      Q.    So, if I look at his phone
8  records and I see 28 phone calls by my count
9  between you and Josh Moon in and around the
10 time that he's drafted these articles and
11 published them containing allegations about my
12 clients and quotes attributable to you, not
13 one of those phone calls had anything to do
14 with those two articles, Ken Upchurch, Percy
15 Thomas or TCU?
16     A.    I have an ongoing project --
17     Q.    Is that correct?
18     A.    -- in Tuskegee.
19     Q.    I don't care about your other
20 projects.  Is that correct?
21     A.    That is correct.
22     Q.    Okay.  Well, we'll clear all that
23 up with Mr. Moon.  Have you ever sent him a

Page 759

1  letter of any kind?
2      A.    Never.
3      Q.    How did he get your phone number?
4      A.    He had my phone number when we
5  were down there at Alabama State prior to.
6      Q.    So, the only time you've made
7  defamatory statements about my clients to Josh
8  Moon was September 22nd, 2006?
9           MR. LYONS:  Object to the form.
10          THE WITNESS:  That's correct.
11     Q.    (By Mr. Lawson)  And you did not
12 review those two newspaper articles, Exhibits
13 43 and 44, in advance of their publication?
14     A.    That is correct.
15     Q.    You didn't approve them?
16     A.    No.
17     Q.    You didn't tell Josh they're
18 good, go ahead and publish them?
19     A.    That is correct.
20     Q.    You didn't say, yeah, that's
21 right, what you've put in that article is
22 correct, the quotes you've attributed to me,
23 those are correct, publish away?

Page 760

1      A.    I never read them.
2      Q.    He didn't read them to you?
3      A.    My lawyer --
4      Q.    He didn't read them to you?
5      A.    No.  My lawyer sent me a copy.
6      Q.    I understand.  That's of the
7  published article.  I'm talking about the
8  drafts that he sent you via E-mail.
9           Did he ever talk to you or tell
10 you what he was putting in these articles
11 before he did it?
12     A.    No.
13     Q.    So, you didn't change one word in
14 any of those articles?
15     A.    No.
16     Q.    You didn't tell him that he had
17 misspelled a certain word in one of those
18 articles?
19     A.    No.
20     Q.    You didn't?
21     A.    No.
22     Q.    Okay.  So, if he tells me under
23 oath that, in fact, you did look at those

Page 761

1  articles and you did change one word in those
2  articles, he's lying?
3      A.    That's correct.
4      Q.    All right.  Who's your office
5  manager?
6      A.    Johnette Anderson.
7      Q.    Did Johnette ever mention these
8  articles to you or the E-mails?
9      A.    I don't know.
10     Q.    You said she pulls your E-mails
11 up for you because you can't do it.
12     A.    Yeah.  She has another job now,
13 and she works full-time.
14     Q.    Now?
15     A.    Yes.
16     Q.    What about on July 21st, 2007?
17     A.    She was working there at her new
18 job.
19     Q.    She wasn't working for you?
20     A.    Huh-uh (negative).  She works --
21 she does a little work for me in the evenings.
22     Q.    Was she pulling up your E-mails?
23     A.    No.

Page 762

```
 1    Q.    So, if you had a hot deal came
 2 through on the E-mail, what do you do?
 3    A.    I guess I've got do wait until I
 4 get it.
 5    Q.    So, you have an E-mail account,
 6 but you don't know how to check it?
 7    A.    That's right.
 8    Q.    And you didn't have anybody there
 9 to check your E-mail account for you?
10    A.    That is correct.  If you check
11 right now, my E-mail account is paid for
12 through her deposits at her -- her bank.  They
13 take it out of there.  I don't even do that.
14       I don't -- I don't check E-mails.
15 I don't have E-mails.  I have no access to
16 E-mails.
17       And I think everyone here at this
18 table can tell you I have never E-mailed them,
19 only by the way of my secretary sending them
20 something out.
21    Q.    Okay.  So, these E-mails then
22 dated July 21, 2007, from Josh Moon to you
23 just languished in your in box and they've
```

Page 763

```
 1 never been picked up or received?
 2    A.    I don't know.
 3    Q.    And it's your testimony that
 4 nobody on your behalf picked them up?  You've
 5 said you didn't see them.
 6    A.    I didn't see them.
 7    Q.    Did Johnette ever speak to Josh
 8 Moon about these articles and then convey that
 9 to you?
10    A.    She's never, to my knowledge,
11 spoke to Josh Moon.
12    Q.    So, not only have you not spoken
13 to Josh Moon, you did not speak to Josh Moon
14 in advance of these articles being published
15 in The Montgomery Advertiser, you didn't speak
16 to anyone else about the articles and no one
17 on your behalf spoke to Josh Moon about the
18 articles?
19       Are you telling us you had no
20 idea that Josh Moon was writing those
21 articles?
22    A.    No.
23    Q.    And no one on your behalf knew?
```

Page 764

```
 1    A.    No.
 2    Q.    And you never had any discussion
 3 with anybody, be it Josh Moon or anyone else,
 4 about these two articles?
 5    A.    That is correct.
 6    Q.    How often did your assistant,
 7 Johnette, check your E-mail account?
 8    A.    Sometime on a daily basis.
 9 Sometime every few days.
10    Q.    Okay.  So, back on July 21, 2007,
11 when she was working at night, she certainly
12 would have checked and seen within a few days
13 those two E-mails?
14    A.    She might have.
15    Q.    You just don't know?
16    A.    I don't know.
17    Q.    And it's your claim that despite
18 getting those two E-mails from Josh Moon that
19 she didn't tell you that they'd come in or
20 print them out for you?
21    A.    I don't remember seeing them.
22    Q.    Do you remember her telling you
23 about them?
```

Page 765

```
 1    A.    Not right offhand, no.
 2    Q.    Not offhand?
 3    A.    No.  It's not ringing a bell with
 4 me.
 5    Q.    Okay.  So, as we sit here today,
 6 you don't remember that she may or may not
 7 have -- whether she told you about those two
 8 E-mails?
 9    A.    That's correct.
10    Q.    She could have, you just don't
11 remember?
12    A.    I don't remember.
13    Q.    And the day that you got those
14 two E-mails -- and you spoke to Josh Moon
15 several times after they were sent.
16       It's just coincidence that he
17 happened to send those two articles and then
18 you spoke to him several times on the phone
19 afterwards?
20    A.    I would have to say so.
21    Q.    And you didn't speak about the
22 E-mails or about the articles to Josh Moon?
23    A.    That's correct.
```

Page 766

```
 1        MR. LAWSON:  If I might have a
 2 couple of minutes, Champ.  I might be
 3 finished.  Let's take a five-minute break.
 4        (Whereupon, the taking of the
 5 deposition was recessed from approximately
 6 1:59 p.m. to approximately 2:04 p.m., after
 7 which the following proceedings were had and
 8 done:)
 9    Q.    Mr. Berry, you said that you
10 didn't talk to Josh Moon about those E-mails
11 and that you didn't talk to him about the
12 articles and you didn't talk to him about the
13 draft articles; is that correct?
14    A.    That is correct.
15    Q.    Did Josh Moon ever ask you about
16 the E-mails or ever ask you about the articles
17 or ever ask you if you received his E-mails?
18        MR. LYONS:  Brooke, let me --
19 Craig's not back, and I don't know if we need
20 to wait on him.
21        MR. LAWSON:  We can.
22        MR. LYONS:  I mean, I don't care.
23 I'm just --
```

Page 767

```
 1        MR. LAWSON:  All right.  We'll
 2 wait.
 3        (Brief recess.)
 4    Q.    All right.  Mr. Berry, I had just
 5 asked you -- you've said that you didn't talk
 6 to Josh Moon about the E-mails and you didn't
 7 talk to him about the draft articles attached
 8 to those E-mails and that you didn't talk to
 9 him about the articles before they were
10 published or anything in them, correct?
11    A.    Correct.
12    Q.    Did Josh Moon ever ask you if you
13 received those E-mails?
14    A.    No.
15    Q.    Did Josh Moon ever ask you about
16 the articles or what was contained in the
17 articles?
18    A.    No.
19    Q.    He's never mentioned the articles
20 to you at all?
21    A.    No.
22    Q.    Never?
23    A.    Never.
```

Page 768

```
 1    Q.    How did you get to Josh Moon?
 2 Who directed you to him?
 3    A.    What do you mean?
 4    Q.    Well, how did you know who he
 5 was?
 6    A.    He was at every one of their
 7 board meetings.
 8    Q.    Okay.  So, you knew him from
 9 prior board meetings --
10    A.    Uh-huh (affirmative).
11    Q.    -- prior to the September 22nd?
12    A.    Uh-huh (affirmative).
13        MR. LAWSON:  That's it.
14        MR. THOMAS:  Well, I've got one
15 thing.  Just one or two.
16 EXAMINATION BY MR. THOMAS:
17    Q.    I didn't incorporate your LLC,
18 did I?
19    A.    No, sir.
20    Q.    Okay.  And I never presented you
21 any papers to sign or anything, right?
22    A.    No, sir.
23    Q.    Okay.  One other question I want
```

Page 769

```
 1 to ask you real quick.  And I'll try to be
 2 brief.
 3        On your exhibit here -- and I'll
 4 just come around here real quick.  I just want
 5 to make it very clear.
 6        On this project you had reduced
 7 your developer's fee to $1.9 million, right?
 8    A.    Yes, sir.
 9    Q.    And you also were going to get a
10 referral fee from the Marous Brothers
11 estimated almost at $374,000, right?
12    A.    I think that's the number that
13 was used.
14    Q.    And you also were seeking from
15 the University expenses totaling almost
16 $196,000?
17    A.    That is correct.
18    Q.    So, if this deal had gone
19 through, you would have gotten $2.4 million,
20 you?
21    A.    I mean, if you add the figures up
22 or --
23    Q.    Yeah.
```

Page 770

1    A.    Yeah, somewhere in that
2  neighborhood.
3    Q.    Okay.
4    A.    I don't have a calculator, but I
5  -- yeah, I believe what you're saying.
6    Q.    And you had discussed with ASU
7  officials that in addition to your developer's
8  fee, you were going to get a referral fee and
9  your expenses reimbursed to you, right?
10    A.    I don't -- I didn't understand
11  that question.
12    Q.    You had discussed with the ASU
13  officials, Dean, Lee, Wiggins and Buford
14  Crutcher, that in addition to your developer's
15  fee of $1.9 million, you would also be seeking
16  a referral fee from the Marous Brothers,
17  right?
18    A.    No, I never -- I never talked to
19  them about that.
20    Q.    And you also told them that you
21  would be seeking reimbursement of all of your
22  expenses, too?
23    A.    That is true.

Page 771

1    Q.    Since you don't do E-mails --
2    A.    Yes.
3    Q.    -- who would send the E-mails to
4  Judge Wiggins?
5    A.    That was Johnette Anderson.
6    Q.    She would do them?
7    A.    She would do them.  Johnette
8  would send them to Buford.  Any correspondence
9  that ever went out of my office Johnette did
10  it.  Even any correspondence to Dick Davis,
11  Johnette did it.  Any correspondence to Marous
12  Brothers, Johnette did it.
13            And they all knew.  It was a
14  little joke with Dick and everybody that Gil
15  doesn't -- I'm not computer literate.
16    Q.    And how do you pronounce the
17  name, Johnette?
18    A.    Johnette.
19    Q.    Johnette.  And if some for reason
20  she failed to send an E-mail, you would never
21  know, would you?
22    A.    You're right.  I'm at her mercy.
23  You got it.

Page 772

1            MR. THOMAS:  I have no further
2  questions.
3  EXAMINATION BY MR. ALLRED:
4    Q.    Mr. Berry, I've got just a couple
5  of questions.  I represent Marous Brothers on
6  the counterclaim only filed by TCU against
7  yourself and Marous Brothers.  I think you
8  understand that.
9            You're not an employee of Marous
10  Brothers, are you?
11    A.    No.
12    Q.    Not an agent?
13    A.    No.
14    Q.    And these statements that you
15  allegedly made to Josh Moon, those weren't
16  made under any direction by anybody from
17  Marous Brothers, were they?
18    A.    That is correct.
19    Q.    In other words, they didn't have
20  anything to do with that.  They didn't tell
21  you to make those statements?
22    A.    No.  I don't even think they knew
23  that I made the statements.

Page 773

1    Q.    Okay.  And it wasn't based on any
2  information that you got from anybody at
3  Marous Brothers, right?
4    A.    That is totally correct.
5    Q.    Okay.  Now, the work that you did
6  on this project, you were working in
7  furtherance of Gil Berry & Associates and not
8  Marous Brothers, right?
9    A.    That is so correct.
10            MR. ALLRED:  Okay.  Thank you,
11  sir.
12            MR. LAWSON:  All right.
13            FURTHER DEPONENT SAITH NOT
14
15
16
17
18
19
20
21
22
23

Page 774

```
 1        C E R T I F I C A T E
 2  STATE OF ALABAMA
 3  JEFFERSON COUNTY
 4        I hereby certify that the above
 5  and foregoing deposition was taken down by me
 6  in stenotype, and the questions and answers
 7  thereto were reduced to typewriting under my
 8  supervision, and that the foregoing represents
 9  a true and correct transcript of the
10  deposition given by said witness upon said
11  hearing.
12        I further certify that I am
13  neither of counsel nor kin to the parties to
14  the action, nor am I in any way interested in
15  the result of said cause.
16        Given under my hand and seal this
17  the 14th day of February, 2008.
18
19        _____
          Belinda S. Brewster, RPR
20        Alabama License #335
21
22
    My Commission Expires:
23  September 1, 2009
24
```

# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | |
|---|---|
| MAROUS BROTHERS ) | |
| ) | |
| CONSTRUCTION, LLC, a ) | |
| ) | |
| corporation, and GIL ) | |
| ) | |
| BERRY, an individual ) | |
| ) | |
| d/b/a GIL BERRY & ) | |
| ) | |
| ASSOCIATES, ) | CIVIL ACTION NO. |
| ) | |
|      Plaintiffs, ) | 2:07-CV-384-ID-CSC |
| ) | |
| -vs- ) | |
| ) | |
| ALABAMA STATE UNIVERSITY,) | |
| ) | |
| a public corporation, ) | |
| ) | |
| et al., ) | |
| ) | |
|      Defendants. ) | |

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition of:

ARNE F. GOLDMAN,

may be taken before Belinda S. Brewster,

Commissioner and Notary Public for the State

of Alabama at Large, on the 20th day of

Page 2

1  February, 2008, commencing at approximately
2  10:25 a.m., at the law offices of Capell &
3  Howard, P.C., 150 South Perry Street,
4  Montgomery, Alabama; said deposition taken
5  pursuant to the Federal Rules of Civil
6  Procedure.
7        IT IS STIPULATED AND AGREED, by
8  and between the parties through their
9  respective counsel, that the reading of and
10  signature to the deposition by the witness is
11  waived, said deposition to have the same force
12  and effect as if full compliance had been had
13  with all laws and rules of Court relating to
14  the taking of depositions.
15        IT IS STIPULATED AND AGREED that
16  it shall not be necessary for any objections
17  to be made by counsel to any questions, except
18  as to form or leading questions, and that
19  counsel for the parties may make objections
20  and assign grounds at the time of the trial,
21  or at the time said deposition is offered in
22  evidence, or prior thereto.
23        In accordance with Rule 5(d) of

Page 3

1  The Alabama Rules of Civil Procedure, as
2  amended, effective May 15, 1988, I, Belinda S.
3  Brewster, am hereby delivering to Kenneth L.
4  Thomas the original transcript of the oral
5  testimony of Arne F. Goldman taken on the 20th
6  day of February, 2008, along with exhibits.
7        Please be advised that this is the
8  same and not retained by the Court Reporter,
9  nor filed with the Court.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1        A P P E A R A N C E S
2  CHAMP LYONS, III, Attorney-at-Law, of the law
3        firm of KING, HORSLEY & LYONS,
4        LLC, 1 Metroplex Drive, Suite 280,
5        Birmingham, Alabama 35209;
6        appearing as counsel for the
7        Plaintiff Gil Berry & Associates.
8  D. CRAIG ALLRED, Attorney-at-Law, of the law
9        firm of DAVID E. ALLRED, P.C.,
10        7030 Fain Park Drive, Suite 9,
11        Montgomery, Alabama 36117;
12        appearing as counsel for the
13        Plaintiff Marous Brothers
14        Construction, LLC (counterclaim).
15  KENNETH L. THOMAS and RAMADANAH M. JONES,
16        Attorneys-at-Law, of the law firm
17        of THOMAS, MEANS, GILLIS & SEAY,
18        P.C., 3121 Zelda Court,
19        Montgomery, Alabama 36103;
20        appearing as counsel for the
21        Defendant Alabama State
22        University.
23

Page 5

1        A P P E A R A N C E S (Cont'd.)
2  R. BROOKE LAWSON, III, Attorney-at-Law, of the
3        law firm of CAPELL & HOWARD,
4        P.C., 150 South Perry Street,
5        Montgomery, Alabama 36104;
6        appearing as counsel for the
7        Defendant TCU Consulting
8        Services, LLC.
9  ALSO PRESENT:
10  JOE A. LEE, President, Alabama State
11        University
12  W. KEN UPCHURCH, III, TCU Consulting Services,
13        LLC
14  PERCY THOMAS, TCU Consulting Services, LLC
15
16
17
18
19
20
21
22
23

Page 6

1                   I N D E X
2   Witness:                    Page
3   ARNE F. GOLDMAN
4       Examination by Mr. Lawson        11
5       Examination by Mr. Allred       421
6       Examination by Ms. Jones        425
7       Further Examination by Mr. Lawson   559
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
9            E X H I B I T S
10  Defendant's
11  Exhibit No.   Description          Page
12      1    Notice of Deposition of    15
13           Marous Brothers
14           Construction (4 Pages)
15      2    Letter Dated 12-5-07       22
16           (2 Pages)
17      3    Letter Dated 6-5-05       110
18      4    Letter Dated 4-24-06      116
19      5    Letter Dated 11-23-05     165
20           (2 Pages)
21      6    Letter Dated 4-12-06 with  168
22           Attachments (3 Pages)
23      7    E-Mail Dated 7-28-06      186

Page 7

1          E X H I B I T S (Cont'd.)
2   Defendant's
3   Exhibit No.   Description          Page
4       8    E-Mails Dated 7-28-06     188
5           (2 Pages)
6       9    E-Mails Dated 7-29-06     190
7           and 7-28-06 (3 Pages)
8      10    Student Housing           199
9           Redevelopment Master Plan,
10          MAR 269 through MAR 319
11          (51 Pages)
12     11    Letter Dated 11-9-05      201
13          with Attachments (7 Pages)
14     12    Plans, Marous Brothers    204
15          Construction, GBA 1059
16          through GBA 1197
17          (139 Pages)
18     13    E-Mail Dated 6-29-06      222
19     14    Final Development         226
20          Agreement: Features and
21          Benefits (2 Pages)
22     15    Revised Project Timeline  228
23          Dated 7-11-06

Page 8

1          E X H I B I T S (Cont'd.)
2   Defendant's
3   Exhibit No.   Description          Page
4      16    E-mail Dated 7-11-06 with  231
5           Attachments (5 Pages)
6      17    E-mail Dated 5-15-06      236
7           with Attachment (2 Pages)
8      18    Letter Dated 5-15-06      237
9      19    Agency Construction       246
10          Management Fee Schedule
11          Prepared 7-10-06
12     20    Agency Construction       248
13          Management Fee Schedule
14          Prepared 7-10-06
15     21    E-Mail Dated 7-12-06      251
16     22    Handwritten Notes, MAR 10  254
17     23    E-mail Dated 8-15-06 with  256
18          Attachment (2 Pages)
19     24    Development Cost Summary   260
20          Dated 9-3-06 (3 Pages)
21     25    E-mail Dated 9-5-06       263
22          (2 Pages)
23     26    Letter Dated 9-5-06       264

Page 9

1          E X H I B I T S (Cont'd.)
2   Defendant's
3   Exhibit No.   Description          Page
4      27    TCU Project Analysis      266
5           Dated 9-7-06
6      28    E-mail Dated 9-19-06 with  268
7           Attachment (3 Pages)
8      29    E-Mail Dated 9-19-06 with  271
9           Attachment (4 Pages)
10     30    E-Mail Dated 9-19-06 with  274
11          Attachment (4 Pages)
12     31    Project Analysis Dated    278
13          9-19-06 (2 Pages)
14     32    Letter Dated 9-19-06      285
15          (2 Pages)
16     33    E-Mail Dated 9-21-06      292
17     34    Various E-Mails Dated     301
18          September 2006 (5 Pages)
19     35    E-Mails Dated 9-11-06     307
20          (2 Pages)
21     36    Letter Dated 9-25-06      308
22          (2 Pages)
23

1      E X H I B I T S (Cont'd.)
2  Defendant's
3  Exhibit No.   Description            Page
4    37      First Amended Complaint   309
5            Filed 2-11-08 (22 Pages)
6    38      E-Mails Dated 9-25-06     389
7    39      Letter Dated 10-2-06      391
8    40      Letter Dated 5-23-06 with  395
9            Attachments (4 Pages)
10   41      Letter Dated 1-22-08 with  398
11           Attachments (58 Pages)
12   42      News Article by Josh Moon  411
13   43      E-Mail Dated 9-20-06      530
14           (2 Pages)
15   44      E-Mail Dated 7-28-06      531
16           (2 Pages)
17   45      E-Mail Dated 8-28-06      534
18   46      Letter of Intent (3 Pages)  536
19
20
21
22
23

1        I, Belinda S. Brewster, as
2  Commissioner and Notary Public for the State
3  of Alabama at Large, certify that pursuant to
4  Rule 30 of the Alabama Rules of Civil
5  Procedure and the foregoing stipulations of
6  counsel, there came before me at the law
7  offices of Capell & Howard, P.C., 150 South
8  Perry, Montgomery, Alabama 36104, on the 20th
9  day of February, 2008, commencing at
10 approximately 10:25 a.m., Arne F. Goldman,
11 witness in the above cause, for oral
12 examination and the following proceedings were
13 had:
14         ARNE F. GOLDMAN,
15 a witness of lawful age, having sworn or
16 affirmed to tell the truth, the whole truth,
17 and nothing but the truth, was examined and
18 testified as follows:
19 EXAMINATION BY MR. LAWSON:
20     Q.    Mr. Goldman, my name is Brooke
21 Lawson. I'm with the law firm Capell &
22 Howard, and I represent three of the
23 defendants in this matter. I represent TCU,

1  Ken Upchurch and Percy Thomas.
2          I'm going to ask you a number of
3  questions today; and if you've answered my
4  question, I'm going to assume you understood
5  the question.
6          If you don't understand my
7  question, please ask me, and I'll rephrase it
8  or restate it until you do understand it.
9          Is that fair?
10     A.    Yes.
11     Q.    If you need a break at any point,
12 just speak up. If you need to go to the
13 bathroom, talk to your lawyer, just need a
14 break, that's fine. Just let me know, and
15 we'll accommodate you on that as well.
16         Could you state your full name
17 for the record, please.
18     A.    Arne Frederick Goldman.
19     Q.    What is your address, Mr.
20 Goldman?
21     A.    5511 Grace Drive, Mentor, Ohio
22 44060.
23     Q.    Mentor, Ohio. Could you spell

1  that, please?
2      A.    M-E-N-T-O-R.
3      Q.    Is that in the Cleveland area?
4      A.    It's in the Greater Cleveland
5  area.
6      Q.    How long have you resided in
7  Mentor, Ohio?
8      A.    Since 1996. Twelve years.
9      Q.    Where are you originally from?
10 Where did you grow up?
11     A.    From Shaker Heights, Ohio.
12     Q.    Could you tell me what your
13 office telephone number is?
14     A.    440-951-3904.
15     Q.    Is that the main number, or is
16 that your direct dial?
17     A.    That's the main number. My
18 extensions's 257.
19     Q.    That's the main number for Marous
20 Brothers Construction?
21     A.    Yes.
22     Q.    And what is your cell phone
23 number?

Page 14

```
 1    A.    216-570-7584.
 2    Q.    How long have you had that cell
 3  phone number?
 4    A.    I think five years.
 5    Q.    Okay. How about your E-mail
 6  address?
 7    A.    Nine years.
 8    Q.    Well, what is your E-mail
 9  address?
10    A.    Oh, I'm sorry. It's
11  agoldman@marousbrothers.com.
12    Q.    Is that the only E-mail address
13  that you use for work purposes?
14    A.    Yes.
15    Q.    Have you ever given a deposition
16  before?
17    A.    Yes.
18    Q.    How many times have you given
19  depositions, approximately?
20    A.    Seven or eight at least.
21    Q.    So, you understand that your
22  testimony is under oath here?
23    A.    Yes.
```

Page 15

```
 1    Q.    We noticed the deposition of
 2  Marous Brothers Construction, and you, Arne
 3  Goldman.
 4         Are you here today testifying on
 5  behalf of Marous Brothers Construction?
 6    A.    Yes.
 7    Q.    Okay. So, your testimony then is
 8  binding on Marous Brothers?
 9    A.    Yes.
10    Q.    You have the authority to sit
11  here and testify on behalf of Marous Brothers?
12    A.    Yes.
13    Q.    And you're also testifying as an
14  individual, as Arne Goldman. So, when I ask
15  you a question today, I'm asking you what is
16  your personal knowledge of a particular
17  subject, but I'm also asking you what does the
18  company know about a particular subject.
19         Is that fair? Do you understand
20  that?
21    A.    Yes.
22         (Whereupon, said document was
23         marked for identification as
```

Page 16

```
 1         Defendant's Exhibit No. 1 to the
 2         deposition of Arne F. Goldman.)
 3    Q.    I'm going to show you what we
 4  have marked as Defendant's Exhibit No. 1 and
 5  ask you to take a look at that. Have you ever
 6  seen that document?
 7    A.    Yes.
 8    Q.    That is a notice of deposition of
 9  Marous Brothers Construction. In this
10  deposition notice over on Page 2 we have
11  listed a number of matters upon which
12  examination was requested.
13         And would you take a look at that
14  list of topics?
15    A.    Yes.
16    Q.    I'm going to go through these
17  real quickly and ask you just a couple of
18  questions about them. Number one, it says
19  Marous' complaint in each of the allegations
20  contained therein.
21         Now, are you the person at Marous
22  Brothers most familiar with the complaint and
23  each of the allegations contained therein?
```

Page 17

```
 1    A.    I'm one of the two people most
 2  familiar.
 3    Q.    Who would that other person be?
 4    A.    Robert Simpson.
 5    Q.    Who is Robert Simpson?
 6    A.    Corporate counsel.
 7    Q.    In-house?
 8    A.    Yes.
 9    Q.    Was he involved in any way with
10  the proposal or any of the work that Marous
11  may have done between the period of roughly
12  September 2005 and September 2006?
13    A.    No.
14    Q.    Was his involvement -- did he
15  only get involved after September of 2006?
16    A.    Yes.
17    Q.    So, he wouldn't have, then, any
18  direct knowledge of any proposals or
19  discussions with Gil Berry or TCU or ASU,
20  would he?
21         Or would he? I'm asking.
22    A.    No.
23    Q.    Would he have any knowledge of
```

Page 18

1  any of those topics?
2      A.   No.
3      Q.   The second matter states the
4  proposal and scope of work submitted by Marous
5  to Alabama State on the project at issue
6  herein.
7            Are you the person at Marous most
8  familiar with the proposal and scope of work
9  submitted?
10     A.   Yes.
11     Q.   The third is the relationship
12 between Marous and Gil Berry, Gil Berry &
13 Associates, Student Suites, Inc. and Student
14 Suites Gil Berry and Associates Alabama, LLC.
15           Are you the person at Marous
16 Brothers who's most knowledgeable with that
17 relationship?
18     A.   Myself and Chip Marous.
19     Q.   Okay.  Would there be things that
20 Chip Marous might know about the relationship
21 that you perhaps would not know?
22     A.   At this point, no.
23     Q.   Was he involved in some way in

Page 19

1  developing the relationship between Marous and
2  Gil Berry before you got involved?
3      A.   Yes.
4      Q.   What do you know about that?
5  Tell me what you know that Chip Marous was
6  doing prior to your involvement with Gil Berry
7  with this project.
8      A.   I need to understand your
9  question.
10     Q.   Well --
11     A.   The relationship between Marous
12 and Gil Berry relative to this project or any
13 other projects?
14     Q.   Well, how about this project?
15 We'll start with that.
16     A.   Restate the question.
17     Q.   I think you said that Chip Marous
18 was involved with or had some knowledge of the
19 relationship between Marous and Gil Berry,
20 something more than you may know.
21           Is that correct?
22     A.   That's not what I said.
23     Q.   Okay.  Well, tell me what you

Page 20

1  said.  I asked if you're the person at Marous
2  Brothers most knowledgeable about the
3  relationship between Marous and Gil Berry.
4            And your testimony is what?
5      A.   And I said that my -- that Chip
6  Marous and I would have the most knowledge.
7      Q.   And what does Chip know or have
8  knowledge of that you may not have knowledge
9  of?
10     A.   At this point -- at this point
11 nothing.
12     Q.   Okay.  So, as we sit here today,
13 then, you are the person who can testify
14 regarding the relationship between Marous and
15 Gil Berry?
16     A.   Yes.
17     Q.   Number four is the licenses and
18 registrations held by Marous in the State of
19 Alabama for the years 2005 through 2008.
20           Are you the person most
21 knowledgeable about that subject?
22     A.   Yes.
23     Q.   The damages Marous claims in this

Page 21

1  matter.  Are you the person most knowledgeable
2  about that subject?
3      A.   Yes.
4      Q.   Number six is communications of
5  any kind between Marous and Dick Davis or
6  Student Suites, Inc.
7            Are you the person most
8  knowledgeable about that subject?
9      A.   Yes.
10     Q.   Number seven is communications of
11 any kind between Marous and Gil Berry
12 regarding this project.
13           Are you the person most
14 knowledgeable of that subject?
15     A.   Yes.
16     Q.   Number eight is communications of
17 any kind between Marous and any of the
18 defendants.
19           Are you the person most
20 knowledgeable of that subject?
21     A.   Yes.
22     Q.   Number nine is Marous' original
23 estimates, bid preparations, bids, budgets and

Page 22

```
 1   cost analyses for this project.  Are you the
 2   person --
 3       A.    Yes.
 4       Q.    Okay.  If we want to
 5   short-circuit this, if you want to read 10,
 6   11, 12, 13 and 14 and tell me if you're the
 7   person most knowledgeable of each of those
 8   subjects from Marous Brothers Construction?
 9       A.    Yes.
10       Q.    So, other than number three,
11   there's no one at Marous Brothers Construction
12   who may have more knowledge than you about any
13   of these subjects?
14       A.    Yes.  Would you like your exhibit
15   back?
16       Q.    Yeah.  Just put it right there.
17           (Whereupon, said document was
18            marked for identification as
19            Defendant's Exhibit No. 2 to the
20            deposition of Arne F. Goldman.)
21       Q.    Let me show you what we've marked
22   as Defendant's Exhibit No. 2 and ask you to
23   take a look at that.  Have you ever seen that
```

Page 23

```
 1   document?
 2       A.    I don't believe so.
 3       Q.    Okay.  This is a letter written
 4   on December 5, 2007.  It was sent to Brian
 5   Strength, who was at that point counsel for
 6   Marous Brothers, and to Champ Lyons, who is
 7   still counsel for Marous Brothers; is that
 8   correct?
 9       A.    Yes.
10       Q.    In this letter we requested that
11   Marous Brothers review its files again to try
12   to locate additional documents that we believe
13   may not have been produced in the original
14   production.
15       A.    I believe that Robert Simpson
16   would be the person in our office would have
17   reviewed this.  And I, in fact, gave Robert
18   Simpson the information that he was looking
19   for.
20       Q.    Okay.  When you say you gave him
21   the information he was looking for, what did
22   you give him?
23       A.    I gave him Xerox copies of my
```

Page 24

```
 1   E-mail file.  I gave him my entire project
 2   file.
 3       Q.    Okay.  So, when the original
 4   production was made, when you-all provided
 5   documents to your counsel -- and I believe at
 6   that time it was the White, Arnold firm if I'm
 7   not mistaken -- you gathered those documents,
 8   gave them to Robert Simpson, who then provided
 9   them to your lawyer?
10       A.    Robert Simpson wasn't working for
11   us at the time.
12       Q.    Well, then, who gathered the
13   original set of documents produced in this
14   case by Marous Brothers?
15       A.    I did with our CFO, Kevin
16   Campany.
17       Q.    What did you-all do to try to
18   locate the documents that were requested by
19   the TCU defendants?
20           And when I refer to TCU
21   defendants, that's TCU, Upchurch and Thomas.
22       A.    We gave all the information we
23   had to White, Arnold, Andrews, Dowd.  And what
```

Page 25

```
 1   I did for Mr. Simpson is he asked me for this
 2   information, and I just re-Xeroxed from our
 3   files that we had already provided White,
 4   Andrews -- whatever that -- WAAD.
 5       Q.    Right.
 6       A.    So, this information is no
 7   different than what we had already provided.
 8       Q.    Okay.  So, after you originally
 9   provided documents to White, Arnold, Mr.
10   Simpson asked you to again go back and look at
11   your files?
12       A.    Yes.
13       Q.    Did you locate anything that had
14   not previously been produced?
15       A.    Not that I -- not to my
16   recollection.
17       Q.    What did you do to try to locate
18   all of the E-mails that were requested and
19   that had anything to do with this project?
20       A.    I save all of my E-mails.  So, I
21   just printed them.
22       Q.    So, you went through your own
23   sent box and --
```

Page 26

```
1       A.      Sent and in box and out box.
2       Q.      Okay.  What did you do to try to
3   locate E-mails that may have been sent to or
4   from Chip Marous regarding this project?
5       A.      If I sent them, they were -- they
6   were copied.  Chip Marous, I don't believe,
7   sent any E-mails on this project.
8       Q.      He was copied on a number of
9   E-mails, correct?
10      A.      Yes.
11      Q.      So, the only E-mails that would
12  have been sent from anyone at Marous would
13  have been from you regarding this project?
14      A.      No.
15      Q.      Who else would have sent E-mails?
16      A.      Internal to Marous, Glenn
17  Scherba, Dave Gutfranski.
18      Q.      Dave what?
19      A.      Gutfranski.
20      Q.      Spell that for the court
21  reporter.
22      A.      G-U-T-F-R-A-N-S-K-I.  Glenn
23  Scherba is S-C-H-E-R-B-A.  Richard Cooper,
```

Page 27

```
1   C-O-O-P-E-R.  Tony Lazar, L-A-Z-A-R.  Kirk
2   Schuttenburg.  I'm not sure I can spell that
3   one.  S-C-H-U-T-T-E-N-B-U-R-G.
4       Q.      Anyone else?
5       A.      Chuck Johns, J-O-H-N-S.  That's
6   my -- that's my best recollection.
7       Q.      What is Mr. Scherba's position
8   with Marous Brothers?
9       A.      He's no longer employed with
10  Marous Brothers Construction.
11      Q.      What was his position?
12      A.      He was a general manager.
13      Q.      Why is he no longer employed by
14  them?
15      A.      I think his -- there were some
16  personality conflicts between he and the
17  ownership.
18      Q.      Was he terminated?
19      A.      He was.
20      Q.      What about Mr. Gutfranski?
21      A.      Mr. Gutfranski left to pursue an
22  opportunity in Florida.  He was project
23  manager and chief estimator at the time.
```

Page 28

```
1       Q.      What about Mr. Cooper?
2       A.      Mr. Cooper is no longer at
3   Marous.  He was the director of design
4   services.
5       Q.      What does the director of design
6   services do?
7       A.      The director of design services
8   on our design/build projects and on general
9   contracting projects where we need some kind
10  of further architectural drawings support,
11  Mr. Cooper would provide that, those drawings
12  and that support.
13      Q.      Tony Lazar, what did he do for
14  Marous?
15      A.      He's an intern architect.
16      Q.      Intern architect?
17      A.      Intern architect.
18      Q.      Is he still with the company?
19      A.      Yes, he is.
20      Q.      What about Kirk Schuttenburg?
21      A.      He is a draftsman/job captain.
22      Q.      Is he still with the company?
23      A.      Yes, he is.
```

Page 29

```
1       Q.      What is a job captain?
2       A.      He is a draftsman who has some
3   project oversight in terms of the technical
4   drawings, but does not have an architectural
5   degree; and, therefore, is not eligible for
6   licensure.
7       Q.      How about Chuck Johns?
8       A.      Chuck Johns is an estimator,
9   senior estimator.
10      Q.      Still with the company?
11      A.      Yes, he is.
12      Q.      And you identified all of these
13  employees of Marous, some former employees, in
14  response to my question about what you did to
15  try to locate E-mails.  In particular, you
16  mentioned internal E-mails.
17          Did you do anything to try to
18  locate a copy and provide internal E-mails
19  that may have been sent to or from Mr.
20  Scherba, Gutfranski, Cooper, Lazar,
21  Schuttenburg or Johns?
22      A.      No.
23      Q.      And we requested any and all
```

Page 30

1  internal E-mails regarding this project in our
2  original request for production of documents,
3  and I'll represent to you that I've not seen
4  any internal documents between you and any of
5  these individuals or between any of these
6  individuals regarding this project.
7         And we would request that you
8  search your computer files and make those
9  E-mails available to your counsel for
10 production in this case.
11     A.    Okay.
12     Q.    Okay. And you maintain, I take
13 it, copies of their E-mails or you maintain on
14 your hard drive their E-mails?
15     A.    That's a question our IT person
16 has to answer. I'm not real computer
17 literate.
18     Q.    Is that company policy to
19 maintain E-mails regarding a project?
20     A.    I don't -- I think so, but I'm
21 not sure.
22     Q.    You maintain yours?
23     A.    Yes, I do.

Page 31

1      Q.    It's your testimony that Mr.
2  Marous would not have had any E-mails -- sent
3  any E-mails regarding the project internally?
4      A.    I believe that he wouldn't have,
5  no.
6      Q.    You believe that, but you haven't
7  checked with him?
8      A.    I have not checked with him.
9      Q.    If you would, check with Mr.
10 Marous as well regarding any E-mails that he
11 may have sent or received regarding this
12 project and provide those to your counsel,
13 please.
14         And we'll keep this deposition
15 open pending production of all internal
16 E-mails as previously requested in our request
17 for production of documents.
18         Could you tell me about the
19 history of Marous Brothers Construction, when
20 it began, where it formed?
21     A.    Chip and Scott Marous graduated
22 from high school, and in 1981 they formed
23 Marous Brothers Construction licensed in Ohio

Page 32

1  as a corporation, as a C corporation. They
2  did carpentry projects. They were both union
3  trade trained carpenters. They started doing
4  residential remodeling.
5         One of their first clients
6  retained them to do a commercial project.
7  They enjoyed doing the commercial apartment
8  construction. They did well at it. They were
9  laid off because -- because they came under
10 the employ -- this is prior to them forming
11 Marous Brothers. They were working for this
12 developer/contractor, and the
13 developer/contractor laid them off.
14         So, they started their own
15 company. The developer/contractor had a small
16 project that he gave to them. They completed
17 the project successfully and decided that they
18 would keep going on their own.
19         As they grew through the '80s,
20 they became the largest carpentry contractor
21 in the State of Ohio.
22     Q.    The largest what? I'm sorry.
23     A.    Carpentry contractor in the State

Page 33

1  of Ohio. They worked with most of the major
2  construction managers and general contractors
3  in Cleveland and surrounding areas. They
4  traveled throughout the south, southeast,
5  midwest and northeast providing carpentry
6  services to various developers and other
7  contractors.
8         In 1997 -- prior to 1997, they
9  did a few jobs in and around Willoughby, Ohio
10 where they're from as a general contractor,
11 including buying pieces of real estate in
12 downtown Willoughby, doing historic
13 renovations to the property using historic tax
14 credits or not and sold those properties for a
15 profit.
16         They continued to do smaller
17 general contracting projects outside of
18 Cleveland and in 1997 had the opportunity to
19 be the general contractor for the Central
20 YMCA, which was the historic tax credit
21 project done in Cleveland.
22         They realized at that time that
23 when they emerged as general contractor in

Page 34

1  Cleveland that they would probably lose the
2  opportunity and the ability to work for the
3  general contractors they had previously worked
4  for because now they would be seen as
5  competition.  So, they took that challenge on.
6         And shortly before I arrived
7  there in October of 1999, they were doing
8  about $18 to $20 million in revenue, and they
9  were awarded two larger projects as a general
10 contractor, significant historic renovation
11 projects.
12     Q.    And what were those projects?
13     A.    The old arcade power adaptive
14 reuse restoration.  It was a $30 million
15 project.  And the Otis terminals conversion to
16 the Bridgeview Loft warehouse apartments in
17 Cleveland's warehouse district.  That was a
18 $27 million project.
19         I came on board at about that
20 time, and I was retained not only as an
21 architect to help build design/build business,
22 but as their director of business development
23 to help create more business opportunities.

Page 35

1         Because Chip Marous and Scott as
2  they grew to now over 160 employees in the
3  field -- and I think I was the 19th person
4  hired in the office -- he couldn't do the
5  business development because he wanted to
6  really grow the company.
7      Q.    And you were hired in 1997?
8      A.    1999.
9      Q.    '99.  Okay.  What would you
10 describe the focus of Marous' work to be
11 today?
12     A.    We concentrate on four areas of
13 core competency, historic rehab or historic
14 renovation.  That's number one.
15         Number two is multifamily
16 residential of all aspects, affordable market
17 rate luxury housing, student housing.
18         Number three is hospitality and
19 hospitality related projects; hotels,
20 associated restaurants and spas, and
21 institutional health care.
22     Q.    Currently what sort of projects
23 does Marous Brothers Construction have

Page 36

1  ongoing?
2      A.    Would you like -- there's a lot
3  of projects.
4      Q.    Approximately how many?
5      A.    Twenty-five.
6      Q.    Okay.
7      A.    We still work as a subcontractor
8  for our competitors because we self-perform.
9  We have 500 people in the field.  We do our
10 on-site and concrete work, and we do work for
11 other contractors and other awarding
12 authorities doing mostly drywall and other
13 divisions.
14     Q.    So, Marous Brothers today still
15 serves in -- still serve as a subcontractor on
16 some projects?
17     A.    Yes.
18     Q.    Self-performing --
19     A.    Yes.
20     Q.    -- work?
21         Do you also serve in any other
22 capacity as a general contractor?
23     A.    Yes.

Page 37

1      Q.    You serve as a design/builder?
2      A.    Yes.
3      Q.    Construction manager?
4      A.    Yes.
5      Q.    So, you serve in each of those
6  roles?
7      A.    Yes.
8      Q.    Any others?
9      A.    We have served as owner's
10 representative.  We have done program
11 management and feasibility consulting.  And we
12 have a sister company that does development.
13     Q.    What is the name of that company?
14     A.    Vintage Development Group.
15     Q.    Vintage Development?
16     A.    (Whereupon, the witness indicated
17 an affirmative response by nodding his head up
18 and down.)
19     Q.    Did Vintage Development have any
20 role in the project at issue here?
21     A.    None whatsoever.
22     Q.    What does an owner's
23 representative do?

Page 38

1     A.    Are you asking me for a
2  definition?
3     Q.    Sure.
4     A.    My understanding is that the
5  owner's representative can perform services,
6  such as project delivery, method selection,
7  prequalification of contractors and
8  construction managers and subcontractors,
9  depending on the project delivery system
10 selected.
11          They can provide advice and
12 guidance to owners and awarding authorities as
13 to architect selection, the processes, as to
14 program, as to budgeting, scheduling,
15 feasibility, marketability.
16    Q.    Anything else as you understand
17 it?
18    A.    That covers a wide gamut.
19    Q.    How many projects, in your
20 opinion, can Marous Brothers work on at any
21 one time in any of these roles, either as a
22 subcontractor, owner's rep, construction
23 manager, design/builder or general contractor?

Page 39

1     A.    We're a company that's structured
2  to do about 300 plus million dollars worth of
3  work in any given year, and we're currently
4  not near that capacity.
5     Q.    Why not?  Why are you not near
6  that capacity?
7     A.    Because we have --
8     Q.    Just because of slowdown or
9  because you try not to get to that capacity?
10    A.    We're being strategic in our
11 growth.  We do have the capacity this year to
12 meet or achieve that because we were just
13 awarded a very large project in Cleveland.
14          We're going to be agents to the
15 master construction manager, and then we'll be
16 doing some of the work as a general
17 contractor.
18    Q.    And what project was that?
19    A.    The Flats East Bank
20 redevelopment.
21    Q.    The what?  I'm sorry.
22    A.    The Flats East Bank
23 redevelopment.

Page 40

1     Q.    How large a contract is that?
2     A.    $500 million.
3     Q.    And you're going to serve in what
4  role?
5     A.    Our primary role is as the master
6  construction manager, Master CM for the
7  project, agency.  And our secondary role is
8  vintage development.  We'll be a codeveloper
9  on a couple of the residential towers and will
10 be building.  Marous Brothers Construction
11 will be retained to build those.
12    Q.    Back in 2005, approximately how
13 many projects did Marous have ongoing, either
14 by number or by total contract amount?
15    A.    Seventy-five to $90 million worth
16 of work.
17    Q.    What about in 2006?
18    A.    Approximately the same.
19    Q.    Is that what Marous targets,
20 about $75 to $100 million in any one year, or
21 does it vary from year to year?
22    A.    Our revenue is what I'm
23 expressing.  Our contracted sales need to be

Page 41

1  higher.  We negotiate well over 90 percent of
2  our work.  We're not -- our self-performing
3  divisions competitively bid, but for the most
4  part our reputation and our business model is
5  relationship-based so that most of the
6  projects that we work on are on a negotiated
7  basis and they're very complex projects.
8           A lot of times there's an
9  18-month gestation period from the time we get
10 involved until it goes to contract and becomes
11 billable revenue.
12          So, my numbers in terms of
13 contracted sales, which is what I'm
14 accountable for, are different than our
15 revenue numbers.  Our contracted sales numbers
16 need to be closer to $200 million in any given
17 year to generate rate that $100 to $150
18 million in revenue that we strive for.
19    Q.    When you were describing what
20 Marous Brothers concentrates on -- and you
21 listed a number of areas, historic renovation,
22 multi-family, et cetera -- one of them was
23 student housing?

Page 42

1   A.   Yes.
2   Q.   What is Marous Brothers'
3   experience with student housing?  Describe
4   that for me, if you will.
5        New construction?  Is it
6   renovation, both?
7   A.   It's both.
8   Q.   When did Marous Brothers get
9   started with student housing projects?
10  A.   I know certainly after I joined
11  in '97.  I can't -- in '99.  I can't speak
12  before.
13  Q.   Since 1999, do you know how many
14  student housing projects Marous Brothers has
15  been involved in in some capacity?
16  A.   We're the general trades
17  contractor at the Case North Residential
18  buildings, a huge student housing village at
19  Case Western Reserve University.  We're the
20  general trades contractor at Lake Erie
21  College.  We worked at Hawken Preparatory
22  School.
23  Q.   What is that one?  I'm sorry.

Page 43

1   A.   Hawken.
2   Q.   Hawken?
3   A.   H-A-W-K-E-N.  We worked on
4   several smaller projects at Case Western
5   Reserve University.  We were just awarded a
6   very large student housing project at
7   Cleveland State University.
8   Q.   When you say just, just this year
9   or 2007?
10  A.   Well, the official award.  We
11  presented in early 2008.  We proposed in 2007.
12  Q.   And you've been awarded that
13  contract?
14  A.   Yes.
15  Q.   Can you think of any other
16  student housing projects you've been involved
17  in?
18  A.   None that I can recall off the
19  top of my head.  That doesn't mean there
20  aren't others.
21  Q.   I understand.  As a percentage of
22  Marous' business, do you have any estimate as
23  to what percentage is attributable to student

Page 44

1   housing, be it new construction or renovation?
2   A.   Be it new?
3   Q.   New or -- when you were
4   identifying --
5   A.   Yes.
6   Q.   -- Case Western, Lake Erie
7   College, Hawken Prep and Cleveland State, is
8   that new construction or renovation or both?
9   A.   Both.  The volume varies year --
10  the percentage is purely a function of volume
11  in any year so.
12  Q.   When was the Case Western project
13  that you served as a general contractor, when
14  did that start?
15  A.   It started in 2005.
16  Q.   Is it completed?
17  A.   2006 and a half.
18  Q.   How about the Lake Erie College
19  project, when did you start that?
20  A.   2004.
21  Q.   When did you finish?
22  A.   2005.
23  Q.   How about Hawken Prep?

Page 45

1   A.   2005.
2   Q.   Started and finished in '05?
3   A.   I believe it finished in 2006.
4   Q.   How about some of these smaller
5   projects for Case Western?
6   A.   Case Alumni House started 2007,
7   started and finished.  Enamore Residence, 2006
8   into 2007.  Fribley Commons, 2007, started and
9   finished.
10  Q.   Were each of those at Case
11  Western?
12  A.   Yes, they were.
13  Q.   And Cleveland State, you're going
14  to start in 2008?
15  A.   A $33 million project that will
16  be --
17  Q.   When do you anticipate to
18  complete?
19  A.   It's two phases.  We're
20  delivering 60 percent of the bids in 2009
21  school year, which is August 1st, and
22  delivering the balance August 1st, 2010.  Plus
23  a parking garage.

Page 46

```
 1     Q.    Is that new construction or
 2 renovation?
 3     A.    New construction.
 4     Q.    Are there other student residence
 5 projects that you've bid on and haven't been
 6 awarded the contract or that you've submitted
 7 a proposal on and weren't awarded the
 8 contract?
 9     A.    There was a couple that we've
10 prepared on, but nothing -- it was pre -- you
11 know, it was pre-proposal presentations.
12     Q.    Which projects were those?
13     A.    A couple of years ago, Alabama
14 A&M.
15     Q.    What else?
16     A.    We're in the process of doing a
17 proposal now for Shippensburg University.
18     Q.    Shickensburg?
19     A.    Shippensburg.
20     Q.    Where is that?
21     A.    It's in south central
22 Pennsylvania.
23     Q.    Any other projects?
```

Page 47

```
 1     A.    Nothing else.  Nothing else
 2 pending.
 3     Q.    What have you done for
 4 Shippensburg University?
 5     A.    We're working with American
 6 Campus Communities.  We're just right now
 7 providing prequalification information about
 8 our team and about our experience.
 9     Q.    What is the team?
10     A.    American Campus Communities is
11 the developer, Weber Murphy Fox are the
12 architects and Marous Brothers Construction is
13 the contractor.
14     Q.    Have you submitted any sort of
15 proposal yet?
16     A.    It's not due yet.
17     Q.    What about for Alabama A&M, what
18 did you do for that project?
19     A.    We did a presentation and some
20 very, very preliminary pricing several years
21 ago.
22     Q.    What sort of preliminary pricing
23 did you do?
```

Page 48

```
 1     A.    For two buildings we -- for two
 2 buildings we did a square footage number that
 3 we gave to the developer, and we did a
 4 PowerPoint presentation upfront.
 5     Q.    What did you base the pricing on?
 6     A.    Our historic knowledge of
 7 renovation costs.
 8     Q.    Okay.  Did you prepare any sort
 9 of architectural drawings or schematics?
10     A.    Very minimal.  We did a couple of
11 pretty picture floor plans that we revised
12 once at the request of the college president.
13     Q.    How many dormitories?
14     A.    (Indicating)?
15     Q.    How many dormitories were there?
16     A.    Two.  We also looked at an
17 existing building that had some very
18 significant structural breaches and some mold
19 infiltration problems and made some
20 recommendations.
21     Q.    And what year was this?
22     A.    2006.
23     Q.    Who did you work with on that
```

Page 49

```
 1 project?
 2     A.    Gil Berry and Dick Davis.
 3     Q.    Have you been paid for any of
 4 your work on that project?
 5     A.    We didn't ask to be paid for
 6 that.
 7     Q.    Why not?
 8     A.    Because we just did a
 9 presentation, a very, very preliminary work.
10     Q.    And floor plans and pricing?
11     A.    We did -- it was more -- it was
12 for that project more marketing.
13     Q.    How do you make the distinction
14 between marketing and anything else that you
15 might do on a project?
16           When does marketing end and your
17 actual work on a project for which you receive
18 compensation begin?
19     A.    We have a pretty -- we have a
20 pretty extensive process for hard pricing
21 renovation work in particular.  We do video
22 surveys, digital photography of existing
23 conditions.  We do constructability analyses.
```

1 We do on-screen digital takeoffs whereby we
2 digitize floor plans so that we can get very
3 accurate information.
4          We key our video surveys and our
5 digital photography so that -- we key them to
6 areas of the floor plan to get a very -- a
7 very specific definition scope. We'll provide
8 -- we'll prepare written scope narratives that
9 go division by division. We'll create
10 construction schedules.
11          By the time we're doing that,
12 that's preconstruction.
13     Q.    By the time you get to which
14 aspect?
15     A.    By the time we start with the
16 video surveying we're way beyond marketing.
17     Q.    So, you define that as being
18 preconstruction, video surveying, digital
19 photography, constructability analyses,
20 on-screen digital takeoff, written scope
21 narrative?
22     A.    Preparation of architectural
23 plans if none are available.

1     Q.    All of those things you would
2 consider to be preconstruction services?
3     A.    I would.
4     Q.    And what would you consider to be
5 simple marketing then?
6     A.    A PowerPoint presentation, very
7 broad overview. It might include if we're
8 working with the developer a very broad
9 overview, financial feasibility,
10 marketability.
11     Q.    When you say marketability, a
12 marketability study to determine if there's a
13 need for adding beds or if it's --
14     A.    If it's student housing
15 marketability, has to do with current rent
16 structure versus what the traffic could afford
17 to bear if there's additional financial burden
18 because of a capital improvement project and
19 if there's a demand for those beds or what
20 kind of beds there's demands for.
21     Q.    So, a PowerPoint presentation
22 would be part of your marketing efforts?
23     A.    Yes.

1     Q.    What would the PowerPoint
2 presentation include?
3     A.    It varies project by project,
4 depending on how -- on what's asked of us and
5 what the scope of the overall project is.
6     Q.    How about for Alabama A&M, did
7 you do a --
8     A.    Alabama A&M. I'm sorry.
9     Q.    Did you present a PowerPoint
10 presentation?
11     A.    Yes.
12     Q.    What sort of presentation did you
13 make?
14     A.    It's been a while so. We
15 prepared information about -- we prepared
16 information and slides about Gil Berry and
17 about Student Suites, their affiliation on
18 projects that they have done together.
19          We had images of projects that
20 we've done. We talked about inclusion
21 programs that we've employed really
22 successfully to get disadvantaged minority
23 business enterprises involved in our projects.

1 We described the types of services that we're
2 able to provide.
3          I don't recall much else about
4 what was in Alabama A&M.
5     Q.    Did you provide a similar
6 PowerPoint presentation for the Alabama State
7 project?
8     A.    We did several PowerPoint
9 presentations for Alabama State. We did one
10 for marketing that was done -- marketing
11 purposes that was done in September of 2005.
12     Q.    Okay.
13     A.    And that's after Chip Marous and
14 I came to the -- came to Alabama State in
15 July, and then I returned in August.
16          In July, we met with Dr. Lee, we
17 met with Dr. Frazier, Dr. Smith. I think Gil
18 Berry was there in July and Dick Davis as
19 well. We had a meeting in the board room and
20 talked about the needs of Alabama State.
21          We were invited back to do this
22 PowerPoint presentation, which I would still
23 characterize in September as marketing just to

1  kind of show them our stuff.
2      Q.    So, in order to prepare some sort
3  of Powerpoint presentation, you do have to
4  actually meet with the owners of the project
5  and learn what it is that they seek and what
6  it is they're interested in, don't you?
7      A.    Some -- I mean, our standard
8  course of business, we would count on the
9  developer to meet with them if we couldn't or
10  we wouldn't meet with them.
11      Q.    So, your meetings then with ASU
12  officials prior to September of 2005, you
13  would characterize that as part of your
14  marketing efforts?
15      A.    Yes.
16      Q.    These PowerPoint presentations
17  that you prepare is it pretty much standard or
18  can language?  It doesn't differ greatly from
19  project to project, does it?
20      A.    It differs greatly project to
21  project.
22      Q.    Does it?  Okay.
23      A.    Yes.

1      Q.    But you would have language
2  that's pretty similar with respect to what
3  Marous has to offer and what it can offer and
4  the background of Gil Berry or Student Suites,
5  wouldn't you?
6          I mean, that's not going to
7  change from project to project, is it?
8      A.    Yes, that changes.
9      Q.    Does it?
10      A.    It changes.  I mean, we've only
11  done -- we've only done PowerPoints with Gil
12  Berry and Student Suites for Alabama State and
13  ASU, but we do a lot of PowerPoint
14  presentations for a lot of different clients
15  and a lot of different sectors.
16          We're a big, very diverse company
17  with a lot of different areas of focus.  So,
18  the PowerPoints are different.
19      Q.    Okay.  So, depending on what type
20  of project you've making a proposal for, that
21  dictates what your PowerPoint presentation
22  would include?
23      A.    Yes.

1      Q.    So, your PowerPoint presentation
2  that you made to Alabama A&M, would that then
3  be similar to the presentation you made to
4  Alabama State?
5      A.    In terms -- I don't understand
6  your question.
7      Q.    Well, I'm trying --
8      A.    In terms of content?  In terms of
9  --
10      Q.    I'm trying to understand what
11  exactly is included in this presentation
12  because it sounds to me like what you're doing
13  is trying to sell the owner on hiring Marous
14  or Gil Berry or Student Suites.  Is that fair
15  to say?
16      A.    I would -- I would characterize
17  it differently.
18      Q.    Well, but you're touting your
19  experience and your expertise in an effort to
20  convince the owner that they should consider
21  hiring you, correct?
22      A.    I would characterize it
23  differently.

1      Q.    How would you characterize it?
2      A.    Marous Brothers' business
3  development strategy is not to convince
4  anybody anything.  Marous Brothers' strategy
5  in business development is to provide owners
6  an awarding authorities with enough
7  information so that they can make an informed
8  decision about retaining us.
9      Q.    Okay.  So, what sort of
10  information is it that you would provide to an
11  owner so that they can make that informed
12  decision about retaining you?
13      A.    We talk about the features and
14  benefits of the services we provide and how
15  those features -- how that value proposition
16  translates to benefit that the owners would
17  directly receive.
18      Q.    That's part of your marketing
19  effort?
20      A.    Yes.
21      Q.    That's included in your
22  PowerPoint presentation?
23      A.    Yes.

Page 58

1   Q.   This broad overview that you
2   described, what is included in that?
3         How does that differ in any way
4   from your PowerPoint presentation?
5   A.   The broad overview, that is part
6   of the --
7   Q.   Is that part of the presentation?
8   A.   Yes.
9   Q.   So, the broad overview would then
10  be sort of a narrative description of what you
11  envision the project being for the owner and
12  how it would be accomplished?  Is that --
13  A.   It would be -- in very broad
14  terms it would provide a basic structure.
15        Of course, we're presenting
16  sometimes without the benefit of meetings, you
17  know, of additional meetings.  If it's
18  marketing, it's early on in the process.
19  Q.   What about the financial
20  feasibility, what exactly does that entail?
21  A.   We didn't -- for Alabama A&M and
22  ASU we didn't --
23  Q.   You didn't provide that?

Page 59

1   A.   The first PowerPoint we didn't do
2   that.  That was from Gil or Dick, Gil Berry or
3   Dick Davis.
4   Q.   Okay.  So, the financial
5   feasibility study that may have been provided
6   to A&M or ASU was provided by Dick Davis at
7   Student Suites and/or Gil Berry?
8   A.   It was prepared and provided by
9   them, yes.
10  Q.   Did Marous Brothers review it
11  before it was provided to ASU?
12  A.   We saw it.  We wouldn't say we
13  reviewed it.
14  Q.   Did you make any changes to it?
15  A.   Not to their financials.
16  Q.   Would you consider that to be
17  part of the marketing effort as well?
18  A.   That was part of -- I think it's
19  part of their marketing effort I guess.  You'd
20  have to ask them.
21  Q.   So, what did -- what exactly did
22  Marous Brothers provide ASU that you would
23  consider to be marketing?

Page 60

1   A.   Originally in September of '06,
2   we provided them information about our
3   company.  I don't -- without looking at the
4   presentation, I can't tell you specifics.
5   Q.   We'll get into that in a little
6   while, but I'm just asking if you can recall
7   without looking at the proposal.
8   A.   I think we gave them some overall
9   time parameters.  I meant September '05, not
10  September '06.  I apologize.  I need to back
11  up there.
12        We gave them overall information
13  about the company.  We talked about Marous and
14  our experience in that presentation and the
15  possibility of getting students involved in
16  the project as part of an apprenticeship or
17  training program.  That's what I recall about
18  that.
19  Q.   Okay.
20  A.   That was our part of the
21  presentation.  Then Gil and Dick did different
22  parts.
23  Q.   And that was back in September

Page 61

1   '05?
2   A.   September of '05.
3   Q.   When did you start work on the
4   Alabama A&M presentation?
5   A.   I think in early 2006.
6   Q.   What's the status of that
7   project?
8   A.   I have no idea.
9   Q.   Do you know if it's still under
10  consideration by Alabama A&M?
11  A.   I have no idea.
12  Q.   Have you talked to Gil Berry
13  about it?
14  A.   Not in months.
15  Q.   What was the last conversation
16  you had with Mr. Berry about that project?
17  A.   I don't even recall.  I just
18  asked whatever happened to that project.
19  Q.   What did he tell you?
20  A.   He said that they were not going
21  forward.  He didn't think they were going
22  forward with it.  This was a long -- this is
23  many, many months ago.

Page 62

1    Q.    Has he mentioned to you that he
2  believes that there's still a possibility of
3  getting that project?
4    A.    I don't believe so.
5    Q.    When was the last time you spoke
6  to Mr. Berry?
7    A.    He called last week.
8    Q.    What did he want?
9    A.    He wanted to know if we were
10 interested in looking at a project that we had
11 provided a PowerPoint presentation for, if we
12 wanted to go any further.
13   Q.    What project?
14   A.    It was a Peoples Bank building in
15 McKeesport, Pennsylvania.
16   Q.    What did you tell him?
17   A.    We have no interest.
18   Q.    Why not?
19   A.    We don't think the project's
20 viable, and we've got plenty of work that
21 we're doing for other clients right now.
22   Q.    Did you discuss this case with
23 him?

Page 63

1    A.    He started telling me about his
2  deposition, that he had a long deposition that
3  went two days. I told him I'm not interested
4  in hearing about it.
5    Q.    You told him what?
6    A.    I have no interest in hearing
7  about it.
8    Q.    Prior to this discussion or
9  conversation with Mr. Berry, when was the last
10 time you talked to him?
11   A.    A few months ago I think.
12   Q.    And what was the subject of that
13 conversation?
14   A.    Oh, he called me up and told me
15 that -- maybe last month. Maybe he -- left
16 me a voice mail. I didn't call him back.
17 That Dr. Lee had resigned or something.
18   Q.    You never called him back?
19   A.    No. He told me to look at
20 something in The Montgomery Advertiser.
21   Q.    Did you do it?
22   A.    I looked at the article.
23   Q.    Have you had any E-mail

Page 64

1  communications with him?
2    A.    No. He's -- he's not real good
3  with E-mail, anyway.
4    Q.    What do you mean?
5    A.    I don't know -- during the whole
6  project that we were doing with Gil, I think
7  he had a woman working for him that had to do
8  his E-mails for him. I don't know if he knows
9  how to work E-mail or not. I'm not being
10 disrespectful.
11   Q.    I understand.
12   A.    I don't believe he knows how to
13 do that.
14   Q.    You've received a number of
15 E-mails from him, haven't you?
16   A.    But I don't know that he's not
17 dictating them to his office person.
18   Q.    But it does come from an address
19 line that indicates that it's from Gil Berry?
20   A.    Yeah, but I don't know that it's
21 not somebody sitting at his computer typing
22 what he tells them.
23   Q.    Has he ever told you that he

Page 65

1  doesn't know how to open an E-mail?
2    A.    He told me that a long time ago.
3  I mean, it was evident because anything we
4  sent him that had an attachment, he couldn't
5  ever open so.
6    Q.    You said he left you a voice mail
7  regarding Dr. Lee's resignation recently?
8    A.    Yes.
9    Q.    And that you had a conversation
10 with him about a bank renovation project in
11 Pennsylvania?
12   A.    Well, it was for student housing.
13 It was a bank building that was going to be
14 purportedly renovated for student housing.
15   Q.    What college or university was
16 that?
17   A.    Penn State University, Allegheny
18 region.
19   Q.    Prior to that conversation, when
20 was the last time you spoke to Mr. Gil Berry?
21   A.    It's been months.
22   Q.    When you say months, six months,
23 a year?

Page 66

1    A.    No.  I think maybe in -- I think
2  October or November when there was some issue
3  with White, Andrew, Arnold, Dowd and he needed
4  to find a new attorney or something.  I
5  referred him to Mr. Simpson to deal with.
6    Q.    Mr. Simpson being in-house
7  counsel for Marous?
8    A.    Yes.
9        MR. LYONS:  Let me interject
10  here.  Don't talk about any conversations with
11  Mr. Simpson or with the White, Arnold firm.
12        THE WITNESS:  Okay.
13        MR. LYONS:  That would be
14  privileged communications.  I don't think
15  Brooke is going to ask you about them, but
16  just -- just so we'll careful about it.
17    Q.    (By Mr. Lawson)  Do you have any
18  ongoing projects with Gil Berry?
19    A.    No.
20    Q.    Do you have any projects that are
21  in the proposal or presentation stage or
22  marketing stage with Mr. Berry?
23    A.    No.

Page 67

1    Q.    How about with Dick Davis or
2  Student Suites?
3    A.    No.
4    Q.    What's your opinion of Gil Berry?
5        MR. LYONS:  In what regard?
6    Q.    (By Mr. Lawson)  In any regard.
7  Professionally.  Do you have an opinion of him
8  professionally?
9    A.    I don't -- I can't answer that
10  question.  It's too broad.
11    Q.    Do you think that Gil Berry is
12  knowledgeable when it comes to student housing
13  renovations or construction of new student
14  housing?
15        Do you think he has the
16  background necessary to be a developer of such
17  projects or to benefit Marous Brothers in any
18  way?
19    A.    I think we understood that he
20  worked with Student Suites to do student
21  housing at North Carolina A&T, and I think
22  that he has some baseline requisite knowledge
23  of development.

Page 68

1        I think Gil Berry knows a lot of
2  people and delegates to find people that he
3  can surround himself with that have experience
4  that he may lack.
5    Q.    Okay.  So, do you consider his
6  strong point to be the fact that he knows a
7  lot of people and is willing to delegate to
8  others?
9    A.    I think -- I didn't say it's a
10  strong point.  I said it was a characteristic.
11    Q.    Well, is that a strong point?
12    A.    It's a characteristic.  I'm not
13  one to judge peoples' character or not judge
14  peoples' character.
15    Q.    Well, what do you understand
16  Mr. Berry's background to be?
17    A.    As he has reported to me and us
18  at Marous, he had a construction business in
19  Allegheny County, which is, you know,
20  Pittsburgh, the surrounding area of
21  Pittsburgh, that he came from the trades.
22        I believe he was either a roofer
23  or a carpenter, that he was in the trade

Page 69

1  unions, that he developed some minority
2  apprenticeship programs which helped him get
3  involved in the jail project in Allegheny
4  County, that he had operated this construction
5  business for some period of time and that he
6  had worked as a developer on several
7  university projects for student housing.
8    Q.    Did he tell you what university
9  projects he worked or student housing projects
10  he worked on?
11    A.    He mentioned one -- the biggest
12  one was North Carolina A&T, something about
13  Central State in Ohio.  Those are two that
14  come to mind.
15    Q.    Is it your opinion that Mr. Berry
16  overstated his experience in any way when he
17  came to Marous to try to partner with you on
18  the A&M or ASU projects?
19    A.    He didn't try to partner with us.
20    Q.    Is it your opinion that Mr. Berry
21  has overstated his experience to you or to
22  Marous in any way?
23    A.    I think -- I think he may have

Page 70

1  mischaracterized his -- the extent of his
2  experience in student housing.
3      Q.    How so?
4      A.    Yes.
5      Q.    How so? Why do you think that?
6  Why do you think he mischaracterized it?
7      A.    I think that he's got extensive
8  experience in minority inclusion programs,
9  which is something that's very near and dear
10 to Marous Brothers Construction since -- I
11 helped write our plan, and our plan uses the
12 model of diversity in the City of Cleveland
13 and Cuyahoga County, which is one of our major
14 local areas in terms of Cleveland.
15     So, I think he had a lot of
16 experience at that. I think he's less
17 adaptive in the design and construction of
18 student housing.
19     Q.    Okay. How would you characterize
20 the present relationship between Marous and
21 Gil Berry?
22     A.    I would say -- I would
23 characterize it as strained.

Page 71

1      MR. LYONS: Object to the form.
2      Q.    (By Mr. Lawson) Why do you say
3  that?
4      A.    Because I think that Marous
5  Brothers Construction has invested a lot of
6  time and effort and energy and skill in
7  resources on behalf of Alabama State and Gil
8  Berry and Dick Davis.
9      And we have nothing to show for
10 it but a lot of aggravation, a lot of broken
11 promises and a lot of wasted time, including
12 today.
13     Q.    You say you have invested a lot
14 of resources on behalf of ASU, and we'll get
15 to that. But what sort of resources have you
16 invested on behalf of Mr. Berry or Dick Davis
17 and Student Suites?
18     MR. ALLRED: Object to the form.
19     THE WITNESS: Well, I'm a senior
20 executive in the company, and I've got a lot
21 of time invested at Alabama State, certainly
22 much less than I was willing to invest from a
23 marketing standpoint at Alabama A&M with the

Page 72

1  understanding it was marketing. But just too
2  many projects that he surfaced for us that
3  never came to fruition.
4      Q.    (By Mr. Lawson) What do you mean
5  he surfaced for you? What do you mean by
6  that?
7      A.    Well, I mean, he found projects
8  or heard about projects and knew about
9  projects and he asked us to invest time and
10 send him corporate information and cover
11 letters on projects that didn't happen.
12     Q.    What other project besides
13 Alabama A&M and ASU?
14     A.    Meharry College, Concordia
15 College, Oakwood, McKeesport -- I think
16 Peoples Bank, McKeesport.
17     Q.    That's the Penn State?
18     A.    Yes, sir. A casino in -- I don't
19 know, somewhere in Alabama. Somewhere between
20 here and Mobile that he's involved in
21 apparently.
22     Q.    What did Gil Berry ask you to do
23 for Meharry College?

Page 73

1      A.    He asked us to provide
2  preliminary pricing and a couple of drawings,
3  floor plans and a pretty picture, corporate --
4      Q.    Did you provide those things?
5      A.    We provided -- we didn't provide
6  the pretty picture. We provided some sketch
7  floor plans, some colored sketch floor plans
8  and some very base pricing information.
9      Q.    Were you paid for your work?
10     A.    No.
11     Q.    Did Mr. Berry promise --
12     A.    No.
13     Q.    -- to pay you?
14     How about for Concordia?
15     A.    We did several pretty pictures
16 and a couple of floor plans and some pricing.
17     Q.    Any sort of preliminary proposal
18 or PowerPoint presentation?
19     A.    No.
20     Q.    Were you paid for that work?
21     A.    No.
22     Q.    What about Oakwood College?
23     A.    We did -- I think we did just a

Page 74

1  pretty picture for that.
2     Q.    Were you paid for that?
3     A.    No.
4     Q.    When you say a pretty picture,
5  what is that?
6     A.    A colored rendering, a rendering
7  of the exterior perspective.
8     Q.    Only of the exterior?
9     A.    Yes.
10    Q.    What about Penn State, what did
11 you provide Mr. Berry on that?
12    A.    We did a -- we went to Penn State
13 and did a PowerPoint.
14    Q.    Have you been paid for that?
15    A.    No.  It was marketing.
16    Q.    What about this casino project
17 somewhere between here and Mobile, what did
18 you provide Mr. Berry?
19    A.    Just corporate information that
20 we sent to the attorneys in Las Vegas.
21    Q.    Did Mr. Berry retain your
22 services on each of these projects, the
23 Meharry, Concordia, Oakwood, Penn State and

Page 75

1  the casino?
2     A.    Retain in what regard?
3     Q.    Well, you provided various things
4  to -- I'm assuming to Mr. Berry on these
5  projects?
6     A.    Yes.
7     Q.    Did he retain your services?  Did
8  he tell you that you would be paid for your
9  services on --
10    A.    No.
11    Q.    So, were these all marketing
12 efforts on your part?
13    A.    Yes.
14    Q.    And you understood these to be
15 just the cost of doing business, the cost of
16 trying to get new contracts?
17    A.    The understanding is that if we
18 would get the business, then we would --
19    Q.    You'd be paid?
20    A.    We would be paid.
21    Q.    But if you didn't get the
22 business, you understood that you wouldn't be
23 paid?

Page 76

1     A.    Yes.
2     Q.    Did Mr. Berry promised that he
3  would pay you if the contract was ultimately
4  awarded to Mr. Berry --
5     A.    He did not.
6     Q.    -- or to Student Suites?
7     A.    He did not make that promise.
8     Q.    Who did?
9     A.    Nobody did.
10    Q.    You just understood that to be
11 the arrangement?
12    A.    It was a -- he stated that we
13 would be paid.  You asked me if he would pay
14 us.  He did not say he would pay us.  He said
15 we would be paid.
16    Q.    Okay.  So, you would be paid by
17 someone, be it Mr. Berry or the owner?
18    A.    We would be paid not for the
19 marketing efforts.  We would be paid through
20 getting the construction of the project.
21    Q.    On this Meharry project, was it
22 contemplated that Mr. Berry would serve as
23 developer and you would be under contract with

Page 77

1  Mr. Berry or with Meharry College?
2     A.    I don't think it got that far to
3  determine the project delivery system.
4     Q.    How about on the Concordia?
5     A.    The same thing.
6     Q.    Oakwood?
7     A.    The same thing.
8     Q.    Penn State?
9     A.    At Penn State we would be the
10 general contractor, and he would be the
11 private developer.
12    Q.    What about on the Alabama A&M
13 project?
14    A.    Originally, he and Dick Davis
15 would be the developer, and we would be
16 working for them.
17    Q.    So, if the contract had been
18 awarded, then Gil Berry and Dick Davis would
19 have paid you on that project --
20    A.    We would have --
21    Q.    -- for your construction
22 services?
23    A.    We would have been under contract

Page 78

1  to them.  I believe they were looking to
2  finance the project differently than Alabama
3  State was financed.
4      Q.    So, if on these -- on the
5  Meharry, Concordia, Oakwood, Penn State
6  projects and the Alabama A&M projects, you
7  haven't been paid on any of those, correct?
8      A.    Correct.
9      Q.    For any of the work that Marous
10 Brothers provided on those projects?
11     A.    Correct.
12     Q.    Then what sort of broken promises
13 are there by Gil Berry or Dick Davis to Marous
14 Brothers?  Did they promise to pay you on any
15 of those projects?
16     A.    The broken promises have nothing
17 to do with payment for marketing efforts
18     Q.    Okay.  Then what were those
19 broken promises?
20     A.    The promises are that he was
21 well-positioned, that he'd be getting the work
22 and we'd be getting all of this construction
23 work.

Page 79

1      Q.    So, Mr. Berry told you that he
2  was well-positioned to get these projects?
3      A.    Yes.
4      Q.    He led Marous Brothers to believe
5  that he would, in fact, get these projects?
6      A.    He led us to believe that he had
7  a high degree of certainty that he would be
8  successful in being able to be awarded these
9  projects and, therefore, our marketing effort
10 was worth the time.
11     Q.    Is that true of the Alabama A&M
12 and ASU projects as well?  Did he lead you to
13 believe that he was positioned or
14 well-positioned to get those projects?
15            MR. LYONS:  And if you need to
16 answer those separately --
17            THE WITNESS:  Yeah I do.
18            MR. LYONS:  That's two questions
19 in one.
20            THE WITNESS:  Alabama A&M, yes,
21 he led us to believe that he was
22 well-positioned.  ASU, he and others led us to
23 believe he was well-positioned.

Page 80

1      Q.    (By Mr. Lawson) He and who, Dick
2  Davis?
3      A.    Dick Davis.
4      Q.    Who else?
5      A.    Ken Upchurch.
6      Q.    Ken Upchurch led you to believe
7  that Gil Berry was well-positioned?
8      A.    Ken Upchurch led us to believe
9  that our proposal was one that he would
10 favorably recommend to Dr. Lee for approval.
11     Q.    He didn't tell you that you would
12 be awarded the contract, did he?
13     A.    He said that -- the last time
14 that I spoke to Ken Upchurch before the
15 September or whatever 22nd vote, he was going
16 to make a favorable recommendation about our
17 team to Dr. Lee.
18     Q.    I understand.  My question was he
19 didn't tell you that you would be awarded the
20 contract, did he?
21     A.    I don't recall.  He said he would
22 make a favorable recommendation.
23     Q.    Okay.  Is making a favorable

Page 81

1  recommendation telling Marous Brothers, who
2  has been in business, as I understood it,
3  since the 1980s and who does hundreds of
4  millions of dollars worth of work each year,
5  is that the same thing as telling you that you
6  will be awarded the contract?
7      A.    That's an impossible question for
8  me to answer.
9      Q.    No, no.  You can answer --
10     A.    And I think you know why.
11     Q.    No, I don't -- I don't really
12 think it is.
13     A.    Yes, you do, sir.
14     Q.    A favorable --
15     A.    Mr. Upchurch was not in a
16 position to be able to -- he was not the
17 awarding authority.
18     Q.    Okay.  So, that answers my
19 question.
20            He couldn't tell you that you
21 would be awarded that contract because he or
22 TCU Construction was not the party responsible
23 for awarding the contract, was it?

Page 82

1    A.    No, but he represented that he
2  had considerable say-so and that he had the
3  president's ear. I'm characterizing not using
4  exact words.
5            But that he had the president's
6  ear, which is why we worked so diligently to
7  provide him in short order a lot of
8  information over the last couple of months
9  prior to September.
10           So, that's -- that's my answer.
11   Q.    Well, my question is did he ever
12  tell you that you would be awarded the
13  contract?
14   A.    No.
15   Q.    And you knew that TCU was not the
16  party responsible for awarding that contract,
17  correct?
18   A.    Yes.
19   Q.    You knew that decision was a
20  decision for ASU? That was the owner of the
21  project, right?
22   A.    Yes.
23   Q.    And it was ASU's decision as to

Page 83

1  whether or not to award that contract to Gil
2  Berry or to Marous?
3    A.    Yes.
4    Q.    That was not TCU's or Ken
5  Upchurch's or Percy Thomas' decision, was it?
6    A.    It was just represented -- it was
7  represented to me and us that Ken Upchurch was
8  in an advisory capacity and he would give us a
9  favorable recommendation.
10   Q.    Okay. But they didn't tell you
11  that you would be awarded, and you knew that
12  they weren't the party who would award that
13  contract?
14   A.    I already answered that question.
15   Q.    Was that a yes?
16   A.    I've already answered the
17  question.
18   Q.    Well, you can answer it again.
19  Is that a yes?
20   A.    Yes.
21   Q.    So, on all of these projects
22  where you had broken promises from Mr. Berry
23  where he allegedly told you he was

Page 84

1  well-positioned to get this work, did you
2  later discover that he was not so
3  well-positioned?
4    A.    I think since the projects never
5  went his way, one may conjecture that he
6  wasn't as well-positioned as he may have
7  otherwise led us to believe.
8    Q.    What did Marous do in response to
9  its discovery that Mr. Berry was not so
10  well-positioned as to get the Meharry,
11  Concordia, Oakwood, Penn State or A&M
12  projects?
13   A.    We just don't do more work for
14  him.
15   Q.    So, after six or seven proposals,
16  you finally learned that he's not going to get
17  these projects?
18   A.    Yes.
19        MR. LYONS: Object to the form.
20   Q.    (By Mr. Lawson) Have you made a
21  demand on Mr. Berry for payment for any of
22  your services that you provided?
23   A.    Not as of yet.

Page 85

1    Q.    Do you intend to?
2    A.    That's still in discussion.
3    Q.    Who is it in discussion with?
4    A.    Our in-house counsel and the
5  owners of the company.
6    Q.    What is your opinion as to what
7  Marous should do?
8        MR. LYONS: Let me interject. If
9  your opinion is based on what your lawyers
10  have told you, then I'm going to ask you not
11  to answer the question.
12        THE WITNESS: No, I can't answer.
13   Q.    (By Mr. Lawson) Not what your
14  lawyers have told you. What's your opinion?
15        MR. LYONS: If you have an
16  opinion independent of what your lawyers have
17  told you, you can answer.
18        But if your opinion is based on
19  the advice of counsel, don't answer.
20        THE WITNESS: I can't -- I can't
21  answer because they're linked. My opinion is
22  reflective and intertwined with advice of
23  counsel so.

Page 86

1    Q.    (By Mr. Lawson)  What do you mean
2  intertwined with?
3    A.    Well, it's privileged, and I'm
4  not going to --
5    Q.    When you say intertwined with,
6  does that mean that your opinion is based on
7  something that you counsel may have told you
8  or that your discussions with counsel,
9  in-house counsel, led you to the opinion that
10  you currently hold?
11        MR. LYONS:  He's answered that
12  his opinions are based on advice of counsel
13  and --
14    Q.    (By Mr. Lawson)  Okay.  That's
15  what I'm asking you.  Is your opinion based --
16    A.    Yes.
17    Q.    -- on your advice?
18    A.    Yes.
19    Q.    That you received from your
20  counsel?
21    A.    Yes.
22    Q.    What is your position with Marous
23  Brothers?

Page 87

1    A.    The director of business
2  development.
3    Q.    And how long have you had that
4  position?
5    A.    Since October 18th, 1999.
6    Q.    Prior to that, prior to 1999,
7  what did you do?
8    A.    I worked for a company that
9  specialized in the design and construction of
10  long-term care facilities.
11    Q.    And what's the name of that
12  company.
13    A.    Entasis, E-N-T-A-S-I-S.
14    Q.    Why did you leave Entasis?
15    A.    Because I had an opportunity to
16  go to Marous Brothers.
17    Q.    Would you be the person at Marous
18  Brothers who had the most contact with Gil
19  Berry since you first started providing
20  pricing and floor plans and other preliminary
21  or marketing information?
22    A.    Yes.
23    Q.    Would there be anybody else at

Page 88

1  Marous Brothers that Mr. Berry had contact
2  with?
3    A.    On which project?
4    Q.    Any project.
5    A.    Dick Cooper had a little bit of
6  contact.  Glenn Scherba had very minimal
7  contact.  It was mainly me.
8    Q.    What is your educational
9  background?
10    A.    Starting from when?
11    Q.    Well, college.
12    A.    A graduate of Cornell University
13  with a Bachelor of architecture.
14    Q.    What year did you graduate?
15    A.    1981.
16    Q.    Do you have any other degrees?
17    A.    I don't -- I have really bad
18  hearing in my left ear so.
19    Q.    Do you have any other degrees?
20    A.    I do not.
21    Q.    So, you graduated from Cornell in
22  1981, and you've not gone on for any sort of
23  Master's or a Doctorate or anything?

Page 89

1    A.    No.
2    Q.    Where did you go to work after
3  graduating from Cornell?
4    A.    I worked for two architectural
5  firms in Boston.
6        And then after I was registered
7  as an architect in the Commonwealth of
8  Massachusetts in 1984, I went to work for a
9  contractor, a design/builder in 1985 based in
10  Boston with satellite offices in New
11  Hampshire.
12    Q.    What states are you a registered
13  architect in?
14    A.    Massachusetts is my home state of
15  registration, Ohio, Pennsylvania, Connecticut,
16  Alabama, New York pending.  And I'm NCARB
17  certified.  So, I can get reciprocal
18  registration anywhere.
19    Q.    When were you first licensed or
20  registered in Alabama?
21    A.    On June 7th, 2006.
22    Q.    Why did you seek registration or
23  a license in Alabama?

Page 90

1    A.    For a couple of reasons.  One, we
2  weren't sure at that time whether we were
3  going to be providing design/build services or
4  whether we could provide design/build services
5  to Alabama State.
6          And, also, we were pursuing a
7  couple of other projects.  I was -- I have a
8  freelance business as well that I -- you know,
9  I do architectural services on the side.
10   Q.    What's the name of that business?
11   A.    What's that?
12   Q.    What's the name of that business?
13   A.    Focus Planning, Inc.
14   Q.    Is that in any way affiliated
15  with Marous Brothers?
16   A.    No.
17   Q.    What other projects in Alabama
18  did you have that were ongoing or that you
19  were considering?
20   A.    (Indicating)?
21   Q.    You said when you got the --
22   A.    Oh, I was -- Gil had a relative
23  or a friend who was looking to do a house

Page 91

1  addition so.
2    Q.    In Alabama?
3    A.    In Alabama.
4    Q.    So that was the only other
5  project in Alabama that you thought you might
6  need --
7    A.    Yes.
8    Q.    -- your architectural license
9  for?
10   A.    Well, in Alabama, you know, we --
11  at that point, you know, we didn't know what
12  was going on with Alabama A&M so.
13   Q.    Did you provide any sort of
14  architectural services for the Alabama State
15  project?
16   A.    I provided some oversight just in
17  terms of the schematic design and design
18  development drawings that we did so that we
19  could base our work product on.
20   Q.    Who actually did that work, the
21  schematic design?  You said you had oversight
22  of it.
23   A.    I worked with Dick Cooper and

Page 92

1  with Kirk Schuttenburg and Tony Lazar.
2    Q.    They were in-house for Marous?
3    A.    Yes.  And then when we -- then we
4  met with John Chambliss several times.  So, I
5  was the courier of the Autocad files and the
6  -- and I met with John and we discussed the
7  aspects of our design.
8    Q.    Where any of these other
9  individuals licensed or registered architects
10  in Alabama?
11   A.    Not in Alabama.
12   Q.    So, that's why you provided the
13  oversight then?
14   A.    Yes.
15   Q.    When was the schematic design
16  prepared by Marous Brothers for the ASU
17  project?
18   A.    The schematic design was prepared
19  sometime between January -- well, during the
20  times of January to May.
21   Q.    Of 2006?
22   A.    Yes.
23   Q.    Was that schematic design

Page 93

1  ultimately included and made a part of the
2  scope of work that was submitted for the ASU
3  project?
4    A.    Yes, part of our proprietary work
5  product.
6    Q.    Do you have any other sort of
7  licenses or registrations?  You've identified
8  a few states where you are a registered
9  architect.
10          Any other sort of licenses that
11  you hold?
12   A.    NCARB certified.
13   Q.    And what --
14   A.    N-C-A-R-B.  Member of the
15  American Institute of Architects.  That's our
16  licensed professional affiliation.  About to
17  be LEED certified.
18   Q.    What does that mean?
19   A.    LEED is the certification given
20  for extra training and education with regard
21  to sustainable design that is administered by
22  the United States Green Building Council.
23   Q.    Are you involved in any sort of

Page 94

1  civic or church activities back in Ohio?
2      A.    Yes.
3      Q.    What are those?
4      A.    A member of Kirtland Club, the
5  local Kirtland area Kiwanis, the City Club of
6  Cleveland, on the building committee for Saint
7  Mary's Church where my daughter -- Saint Mary
8  of the Assumption Church and school my
9  daughter attends, member of the Green Building
10 Coalition, member of the National Historic
11 Preservation -- National Trust for Historic
12 Preservation.
13          I'm on a subcommittee of the
14 Cleveland AIA Chapter of American Institute of
15 Architects for political lobbying and action
16 regarding architectural issues, architectural
17 registrations and rules and regulations.
18     Q.    Anything else?
19     A.    That's enough.
20     Q.    That's a lot.  Let me go back to
21 your oversight of the schematic design for the
22 ASU project.
23          What does that entail?  The

Page 95

1  schematic design, what sort of work goes into
2  that?
3      A.    Well, starting early 2006 we sent
4  a team down to Alabama State and spent a
5  considerable amount of time videoing and
6  doing digital photography and room-by-room
7  laser measurements to document existing
8  conditions.
9          We were accompanied by people
10 from Alabama State because we had to go, you
11 know, dorm by dorm, floor by floor in the six
12 buildings that we looked at.  That's the
13 beginning foundation of our schematic design
14 work because our approach at this point was
15 not just design for design sake.  We had to
16 create -- we were to create a scope of work
17 and a definition that could be supplemented by
18 this design.
19          So, our efforts in cost
20 estimating and scope definition were linked to
21 schematic design and existing base documents
22 we were providing.
23     Q.    Cost estimating, would you

Page 96

1  consider that to be part of the architectural
2  services or general contracting services?
3      A.    Part of preconstruction services.
4      Q.    That would be more closely
5  related to what a general contractor or
6  builder would do, not toward what an architect
7  would do?
8      A.    At that point we were still
9  looking at serving as a design/builder on the
10 project so that in design/build the
11 architecture and the construction are linked.
12     Q.    Right.  As far as architectural
13 services that you were providing or that
14 Marous was providing, other than providing or
15 preparing the schematic design, was anything
16 else done in-house by you or by any other --
17     A.    Well, we did presentation
18 drawings.  We did, you know, colored rendered
19 floor plans.
20          Because, you know, we came back
21 to the school, and we did another -- a very
22 extensive presentation with floor plans and
23 elevations, a pretty significant scope review.

Page 97

1      Q.    Would you consider those to be
2  architectural services?
3      A.    No.  I'd consider them to be part
4  of the whole preconstruction services.  At
5  that point we hadn't really differentiated --
6  it was part of the whole design/build package.
7  So, I'd call that preconstruction.
8      Q.    Okay.  You're talking about
9  videotaping of interior, I guess, and probably
10 the exterior of buildings?
11     A.    Yes.
12     Q.    And the digital photographs that
13 were taken?
14     A.    Uh-huh (affirmative).
15     Q.    Have you maintained those?
16     A.    Yes, somewhere.
17     Q.    In what form?
18     A.    I'm sure there's an archived
19 file, and I'm sure they're absolutely enormous
20 files.  There's probably a hard -- a server
21 dedicated to that.
22     Q.    Are they on disks?  Can they be
23 copied to disks?

25  (Pages 94 to 97)

1    A.    Maybe DVD or maybe a hard --
2  maybe an external hard drive.  That's the kind
3  of stuff I know we would archive.  We always
4  archive our video stuff.
5    Q.    Would you consider those sorts of
6  services to be marketing or preconstruction?
7    A.    Preconstruction.
8    Q.    So, the development of the floor
9  plans and the presentation drawings and the
10 elevations, are those marketing or
11 preconstruction?
12   A.    Preconstruction.  We would never,
13 ever spend the time -- we would never spend,
14 you know, hundreds and hundreds of hours of
15 time, travel expense, drafts people,
16 architectural, estimating, project management,
17 scheduler, we would never spend that time in
18 terms of marketing.
19   Q.    Why did you spend all that time
20 preparing floor plans and presentation
21 drawings and elevations and schematic design
22 and cost estimating?
23   A.    Because based on the conduct of

1  Gil Berry, Dick Davis, representatives of
2  Alabama State University, Ken Upchurch, we had
3  no reason to believe they wouldn't be signing
4  a contract with us.
5    Q.    When did Ken Upchurch get
6  involved in the project?
7    A.    In July.  Near the end of July of
8  2006.
9    Q.    What you just described for me,
10 doing the videotaping and the digital
11 photographs and floor plans and presentation
12 drawings, the elevation, the schematic design,
13 you did all of that before Ken Upchurch was
14 got involved?
15   A.    Absolutely.
16   Q.    Okay.  So, what led you to do
17 that work?
18   A.    Well, I mean, you know, Alabama
19 State, when we described the process that we
20 needed to use, they invited us down.
21         Dr. Frazier made drawings
22 available to us, gave us -- basically, gave us
23 a gentlemen by the name of Dorsey Smith for

1  the better part of two weeks to shepherd a
2  team of four or five of Marous employees,
3  whose names I've already given you, dorm by
4  dorm, floor by floor and basically chaperoned
5  us for the better part of two weeks.
6          And it was clearly implied that
7  we were doing a hell of a lot more -- I'm
8  sorry, a heck of a lot more work than just
9  marketing at that point.
10   Q.    What do you mean it was implied
11 that you were doing more than just marketing?
12   A.    Well, I mean, they -- we were
13 told by Dick Davis and Gil Berry, based on the
14 conversations that they purportedly had with
15 various members of the building committee,
16 that we needed to provide a very comprehensive
17 scope of work so that bond -- so that they
18 could develop or provide information for the
19 bond counsel and for the bond underwriters
20 regarding the project because the bond counsel
21 needed to underwrite to something in terms of
22 renovation.
23         So, we spent all of that time and

1  money preparing all of this work with the
2  understanding that it was integral to getting
3  the financing on the bonds for this project,
4  which was integral to us being able to do the
5  construction work.
6    Q.    Gil Berry told you that?
7    A.    Gil and Dick.
8    Q.    Anyone else tell you that?
9    A.    They told us that they were told
10 that by Judge Wiggins, by Buford Crutcher, by
11 Elton Dean, by Freddie Gallot, by -- I don't
12 know.  By those people.
13   Q.    Did you ever here Mr. Crutcher or
14 Dean or Gallot or President Lee say that we
15 need all of these floor plans and
16 presentations drawings and elevations and
17 schematic designs as part of its financing
18 package?
19   A.    I did not hear directly from
20 them.  I heard -- as I said, it was reported
21 to us and to me at Marous that those
22 conversations took place.
23         And it's usual and customary,

Page 102

1  given my 25 years of experience in the
2  business, that bonds don't get underwritten
3  for large renovation projects or capital
4  improvement projects on the basis of nothing.
5      Q.   Gil Berry told you all of this,
6  correct?
7      A.   And Dick.
8      Q.   And Dick Davis?
9      A.   Well, they asked us -- you know,
10 in June or -- I think in June, they asked us
11 -- they said that bond counsel needed to see a
12 draw schedule, a construction draw schedule,
13 so they could interpolate the interest, the
14 bond interest.
15          So, you know, we had to stop what
16 we were doing and, you know, prepare these
17 pretty comprehensive, very detailed
18 construction draw schedules so that the bond
19 counsel and the underwriters could model
20 interest projections.
21     Q.   That was in June of 2006?
22     A.   Absolutely. June 2nd. Because I
23 had -- I cancelled a trip where I was supposed

Page 103

1  to go somewhere else in Chicago with a client
2  so that I could stay to prepare it because it
3  took hours.
4      Q.   What was your understanding of
5  how this project would be contracted or
6  awarded?
7          Did you understand it to be
8  competitively bid, or did you have any
9  understanding back in January when you say you
10 started the videotaping and the digital
11 imaging and prepared the schematic design and
12 floor plans and elevations?
13     A.   Based on the presentation we did
14 in September to the University where we said
15 these are -- this is how -- this is what we're
16 going to do. This is our standard operating
17 procedures.
18          That we would work with the
19 developer, we would do extensive surveys and
20 we would create a very good set of documents
21 so we could create price and schedule
22 certainty for the University to help them
23 manage their risk, which is what we do on

Page 104

1  every project we do that's renovation. Every
2  project. We told them this back in September
3  of 2005 when we did the presentation.
4          Our understanding in January of
5  2006 is that Gil Berry and Dick Davis and
6  whatever entity they were going to form would
7  be retained as the developer, and we would be
8  retained either as the design/build, if
9  Alabama law permitted, or under a professional
10 services agreement as a construction manager
11 agency and that we would administer some
12 formal bid process.
13     Q.   So, your understanding back in
14 September was that you were either going to
15 serve as a design/builder under contract with
16 who?
17     A.   Under contract to this entity of
18 Gil and Dick.
19     Q.   Okay.
20     A.   Or we were going to serve under a
21 professional services agreement.
22     Q.   As a construction manager?
23     A.   To Gil Berry under contract to

Page 105

1  Alabama State.
2      Q.   Would you be construction manager
3  at risk?
4      A.   No, agency.
5      Q.   As agent. Did you have any
6  understanding of what Alabama law required
7  with respect to competitively bid contracts?
8      A.   At that time, no, not in January.
9      Q.   Did you do any research or
10 investigation into that?
11     A.   We had outside counsel to
12 research that far later.
13     Q.   What did you learn?
14     A.   We learned that we could be
15 working under a professional services
16 agreement under Gil Berry who could be
17 retained as -- or Gil Berry/Student Suites who
18 would be retained by Alabama State as the
19 developer for the project and that we would
20 have to administer a public bid process but
21 that we could serve without going through --
22 we could be serving as a agency construction
23 manager without competitively bidding for the

Page 106

1  work.
2      Q.    You would serve as a construction
3  manager under contract with ASU; isn't that
4  what your understanding was?
5      A.    We were told we could do one or
6  two things.  We would either be under contract
7  to ASU, or we would be under contract to Gil
8  Berry as a developer under a professional
9  services agreement that Alabama state law
10  purportedly allowed.
11      Q.    And it was your understanding
12  that you would not have to competitively bid
13  that professional services contract under
14  Alabama law?
15      A.    Yeah.  That we could be appointed
16  or assigned the contract.  That was our
17  understanding.
18          MR. LYONS:  Are you at a stopping
19  point, Brooke?
20          MR. LAWSON:  If you want to be,
21  sure.
22          MR. LYONS:  We've been going
23  about an hour and a half.

Page 107

1          MR. LAWSON:  That's fine.
2          MR. LYONS:  Do you need to use
3  the restroom or --
4          THE WITNESS:  No, I'm fine.
5          MR. LYONS:  All right.  Let's
6  keep going.
7          THE WITNESS:  Unless you need --
8          MR. LYONS:  Let's keep going.
9      Q.    (By Mr. Lawson)  How did Marous
10  meet Gil Berry?
11      A.    I'm not sure of all of the
12  details.  There was a gentleman by the name of
13  Mike -- and I don't remember his last name --
14  who we had worked with on a project that we
15  had done in the Pittsburgh area who introduced
16  Chip Marous to Gil Berry, I think, in 2004.  I
17  believe in 2004 or 2003.
18      Q.    Mike being somebody at Marous?
19      A.    No.  Mike, he owns a -- some
20  high-tech digital communications business or
21  something.  I don't know.
22      Q.    So, he was introduced to Chip
23  Marous?

Page 108

1      A.    Yes.
2      Q.    How about Dick Davis or Student
3  Suites, Inc., how did Marous get introduced to
4  Mr. Davis?
5      A.    Through Gil Berry.
6      Q.    Prior to meeting Gil Berry,
7  Marous Brothers did not know Dick Davis or
8  Student Suites?
9      A.    Not at all.
10      Q.    What's your opinion of Dick
11  Davis?
12          MR. LYONS:  In what regard?
13      Q.    (By Mr. Lawson)  Professionally.
14  Do you have an opinion about him?
15          MR. LYONS:  As to his integrity,
16  his capability?  I mean, what --
17      Q.    (By Mr. Lawson)  All right.
18  Well, start with capability.  Do you have an
19  opinion regarding Mr. Davis' capabilities?
20      A.    Only that apparently that he got
21  other -- he has gotten several other student
22  housing projects developed successfully.
23      Q.    How about his integrity, do you

Page 109

1  have an opinion regarding Mr. Davis'
2  integrity?
3      A.    I found him to be -- I never had
4  a problem with his integrity.
5      Q.    Did you have a problem with Mr.
6  Berry's integrity?
7      A.    I have a problem with the amount
8  of time we've invested with Mr. Berry, that I
9  personally have and that other people have
10  invested in my company with things that have
11  not come to fruition.
12      Q.    Okay.
13      A.    So, I don't know if that
14  questions his integrity.  I have a problem
15  with how much time we've chosen to spend.
16      Q.    I understand that.  But do you
17  have a problem with Mr. Berry's integrity, or
18  do you question his integrity?
19      A.    I don't -- I wouldn't say I
20  question his integrity.
21      Q.    Do you think he's been upfront
22  with you or honest with you one hundred
23  percent of the time?

Page 110

1    A.    Well, I'd like to believe he has.
2    Q.    Do you believe he has?
3    A.    I'm not sure.
4    Q.    Do you have some question as to
5    whether or not he has?
6    A.    I'm not really -- I'm not really
7    sure yet.
8    Q.    When was the last time --
9    A.    The jury's out.
10    Q.    The jury's out.  When was the
11    last time you spoke to Dick Davis?
12    A.    Oh, God, I don't even remember.
13    Q.    Within the last year?
14    A.    The year being in --
15    Q.    In 2007, do you recall having
16    spoken to Mr. Davis?
17    A.    I'm not sure I've -- I don't
18    think I spoke to Dick Davis in 2007.
19        (Whereupon, said document was
20        marked for identification as
21        Defendant's Exhibit No. 3 to the
22        deposition of Arne F. Goldman.)
23    Q.    Let me show you what I have

Page 111

1    marked as Defendant's Exhibit No. 3 and ask
2    you to take a look at that.  Have you ever
3    seen that document?
4    A.    Yes.
5    Q.    What is it?
6    A.    It's a term for an advance
7    payment we made to Gil Berry for his referral
8    fee.
9    Q.    This is dated June 5, 2006.
10    Adelbert Marous, is that also Chip Marous, the
11    same thing?
12    A.    Adelbert.  And that's -- yes,
13    that's Chip.
14    Q.    Paragraph one states that Marous
15    Brothers will advance Gil Berry & Associates
16    $60,000.  Why did you advance Mr. Berry
17    $60,000?
18    A.    Mr. Berry was -- came to Chip
19    apparently saying that he was having some
20    severe financial difficulties.  And we are a
21    family values company, and Chip advanced him
22    the money.
23    Q.    When you say you're a family

Page 112

1    values company, what does that mean?
2    A.    It means that we take care of --
3    that we're compassionate people and we treat
4    our clients, we treat our associates
5    compassionately.  And apparently he came to
6    Chip with a very compelling story of a man in
7    need.
8    Q.    What sort of association did you
9    have with Mr. Berry at this time?  Were you
10    under any sort of contractual relationship
11    with him, or did you merely know him from --
12    A.    No.
13    Q.    -- having submitted proposals for
14    various projects?
15    A.    No.  Mr. Berry was paid for some
16    short period of time to scout work out for us
17    around the country, to look for projects that
18    we may want to be considered for construction
19    on.
20    Q.    So, you didn't have any sort of
21    contractual arrangement with Mr. Berry whereby
22    he would receive an advance of any kind, this
23    $60,000 advance --

Page 113

1    A.    Well, this -- I don't know.  Is
2    this a contract?  I mean, that is a --
3    Q.    Well, I'm asking you if you had
4    one other than this document?
5    A.    I don't -- I don't know because
6    that's something -- I know we were paying Gil
7    $6,000 a month to scout work for us.  It was
8    just totally independent.
9        You know, like an independent
10    contractor to go look for work for us because
11    he told Chip he could find us a lot of work
12    so.
13    Q.    Is that down in Paragraph 5 where
14    you reference a $2 million contingency?
15    A.    No.
16    Q.    Excuse me.  The referral fee,
17    rather.  I'm sorry.  In Paragraph 2.
18    A.    Paragraph 2.  That's something
19    different.
20    Q.    What is that?
21    A.    We agreed like we do with real
22    estate agents -- for instance, if a real
23    estate agent comes to us with a deal or -- you

Page 114

1  know, a real estate broker and says, hey, I
2  have a project I think I can position you to
3  get the construction work for. We'll pay them
4  -- we call it a success fee or a referral fee.
5  And we'll pay them, you know, one, two -- I
6  don't think it's ever been higher than two or
7  two and a half percent, but one to two and a
8  half percent of the contract value, you know,
9  for the business.
10        We've done it several times with
11 -- typically with real estate brokers who have
12 brought deals to us.
13     Q.    So, in addition to the fees that
14 are outlined in your analysis of the fees for
15 the ASU project, he would also get, as
16 Paragraph 2 says, $347,200 as a referral fee
17 from Marous?
18     A.    It's not -- it's not in addition
19 to the fees.
20     Q.    But it's out of your fees?
21     A.    It's out of our fee. But we
22 could --
23     Q.    Right. But he would get --

Page 115

1      A.    We could give that money to
2  charity. We could give it to Gil Berry. WE
3  could -- you know, God knows we wouldn't give
4  it to Arne Goldman. But we could -- you know,
5  it's our money, it's our fee and that's what
6  Chip chose to do.
7      Q.    So, the monthly stipend then,
8  what is that?
9          I don't see that referred to in
10 this exhibit, but can you tell me again what
11 that was?
12     A.    Yeah. We were paying him -- and
13 I guess stipend is -- I don't know if that's
14 the right --
15          We were paying a $6,000 monthly
16 fee, and I believe we did it for six to eight
17 months to go out and try and find us
18 opportunities, you know, around the country,
19 especially in our core areas of expertise,
20 which was housing or hospitality, historic
21 rehab or institutional health care.
22     Q.    Did he ever find any projects for
23 Marous Brothers that you were ultimately

Page 116

1  awarded a contract on?
2      A.    No.
3          (Whereupon, said document was
4          marked for identification as
5          Defendant's Exhibit No. 4 to the
6          deposition of Arne F. Goldman.)
7      Q.    Let me show you Defendant's
8  Exhibit No. 4 and ask you to take a look at
9  that. Down in the bottom paragraph --
10         Well, first, let me ask if you've
11 ever seen that letter?
12     A.    Well, I was copied on it. I'm
13 sure I saw it.
14     Q.    Okay. He refers to his monthly
15 fee. Is that what you're talking about --
16     A.    That's what I'm talking about.
17     Q.    -- the $6,000?
18     A.    Yeah. And that went on for six
19 to eight months. But his projects in 2006
20 just were not materializing.
21     Q.    Why did they not materialize?
22     A.    We're not sure. I mean, it was
23 -- again, it goes back to the projects that we

Page 117

1  were looking at, especially with historically
2  black colleges and universities. The work
3  just wasn't happening. We're not sure of all
4  of the dynamics why, but it just -- you know,
5  we're in a results arena business.
6      Q.    Did you ever seek reimbursement
7  of this monies that you advanced Mr. Berry,
8  the $60,000?
9      A.    I'm sorry.
10     Q.    Did you ever seek reimbursement
11 from Mr. Berry?
12     A.    Did we see?
13     Q.    Seek?
14     A.    Not yet.
15     Q.    Are you considering it?
16     A.    Yes.
17     Q.    How about the monthly fee, have
18 you ever sought to collect the monthly fees
19 that you paid?
20     A.    Not yet.
21     Q.    Are you considering that as well?
22     A.    We might be.
23     Q.    Do you have any sort of contract

Page 118

1  with Mr. Berry of any kind?
2      A.   No, not that I'm aware of.
3      Q.   Looking back at Exhibit No. 3 --
4          MS. JONES:  Brooke, what's the
5  date on the letter of Exhibit 4?
6          MR. LAWSON:  April 24, 2006.
7          THE WITNESS:  Go to number three?
8      Q.   (By Mr. Lawson)  Yes.  Looking at
9  Paragraph 4, it states: "If for any reason
10  the Alabama State University transaction fails
11  to close and/or Marous Brothers Construction,
12  Inc. does not receive the contract for the
13  design and construction for the renovation
14  work, then Gil Berry & Associates shall
15  immediately remit the $60,000 advance back to
16  Marous Brothers Construction, Inc."
17          Did I read that correctly?
18      A.   Yes.
19      Q.   Did Mr. Berry ever offer to remit
20  that $60,000 advance?
21      A.   Not that I'm aware of.
22      Q.   Was it -- it was Marous'
23  understanding, then, as of June 5, 2006, that

Page 119

1  the possibility existed that it would not get
2  the Alabama State project, correct?
3      A.   At that time we had no reason to
4  believe we wouldn't get the project.  We put
5  that as a -- I'm sure our attorneys put that
6  in as a CYA.
7      Q.   But you understood that the
8  possibility existed, didn't you?
9      A.   No.
10      Q.   You didn't?
11      A.   Actually, at that point I didn't
12  understand.
13      Q.   Okay.  And so the fact that it
14  says if for any reason the Alabama State
15  University transaction fails to close and/or
16  Marous does not receive the contract, that
17  doesn't suggest to you that the possibility
18  existed that Marous would not, in fact, get
19  the contract for work on the ASU project?
20      A.   No.  At that point our concerns
21  had nothing to do with whether or not Gil
22  Berry would be selected or we'd be selected.
23  We had more concerns about the bonds being

Page 120

1  issued at that point.
2      Q.   So, that language then really has
3  no meaning; is that what you're telling me?
4      A.   I didn't -- those are your words.
5  I didn't say that.
6      Q.   I'm asking.
7      A.   I think it has --
8      Q.   Well, what does it mean?
9      A.   I think it means that no matter
10  what he owes us $60,000.
11      Q.   Okay.  No matter what.  That
12  being whether you get the contract or not?
13          MR. LYONS:  Object to the form.
14          THE WITNESS:  Well, if we got --
15  if we got the work, that $60,000 was coming
16  off of the total success fee or referral fee
17  he would have gotten.
18      Q.   (By Mr. Lawson)  And if you
19  didn't get the work?
20      A.   He owed us $60,000.
21      Q.   So, you understood then that if
22  you didn't get the work, he'd owe you $60,000?
23      A.   Yes.

Page 121

1      Q.   So, you understood that you might
2  not get the work?
3      A.   I did not say that.
4      Q.   Well, I'm asking you.
5      A.   I told you at that point in time
6  -- and I answered at that point in time we had
7  no reason to believe, except for the
8  creditworthiness or creditability of Alabama
9  State University that Dick Davis and Gil Berry
10  would not be awarded this project.
11          And we had an understanding that
12  if they got award of the project, we were
13  going to be doing the work.
14      Q.   And that was based on the fact
15  that Mr. Berry and Mr. Davis kept telling you
16  that they were well-positioned to get the
17  Alabama State project?
18      A.   Yes.  And that Alabama State --
19  and that we were -- and purportedly they were
20  being told by various members of the board and
21  building committee and in apparent
22  conversations with Wyatt Haskell and other
23  people who needed more and more information

Page 122

```
1   from us.  They requested our -- you know, that
2   we send them a book, one of our proprietary
3   books.  They wanted construction draw
4   schedules.  They wanted to see actual
5   construction schedules for how the dorms would
6   be taken off line because it affects revenue
7   stream and further expense to Alabama State
8   because they had to put these students
9   somewhere in other off-campus housing and how
10  new dorms came on line.
11          Does that answer your question?
12      Q.   It does.  Paragraph 5 of Exhibit
13  3.  Gil Berry warrants that he will be the
14  owner's sole representative -- or the sole
15  owner's representative.  What does that mean?
16      A.   We want -- we always want one
17  point of contact from when we have -- whether
18  it's American Campus Communities, which is a
19  multi-billion dollar -- we always want one
20  go-to contact.
21          And we told Dick and Steve Pappa
22  and Gil Berry choose one person because we're
23  not going to deal with all three.  We're not
```

Page 123

```
1   going to wait for quorum.  So, choose one
2   person that we're going to deal with, and Gil
3   was chosen as it.
4       Q.   So, he's not warranting that he
5   will under contract with ASU be the sole
6   representative.  He's representing to you that
7   he's going to be the sole contact for Marous
8   among the Dick Davis, Student Suites, Gil
9   Berry & Associates?
10          MR. LYONS:  Object to the form.
11          THE WITNESS:  I think if I
12  understand what you're asking me, it is my
13  understanding that Gil was going to be the
14  owner's representative representing the
15  development entity, that's exactly what it
16  says there.  So, that's my understanding.
17      Q.   (By Mr. Lawson)  Okay.  And Mr.
18  Berry told you that?
19      A.   Yes.
20      Q.   Nobody at ASU told that you, did
21  they?
22      A.   No.
23      Q.   Mr. Berry goes on to warrant that
```

Page 124

```
1   he will agree to Marous' access to the $2
2   million contingency fee whenever Marous
3   encounters an unforeseen, unavoidable and/or
4   concealed condition.
5           What does that mean?
6       A.   Because at that point in time we
7   understood the contract would be between
8   Alabama State and Gil Berry and we'd be under
9   contract to Gil Berry, we did not want to be
10  left holding risks if we ran into concealed
11  conditions and that he would not block us from
12  being able to access contingency if we ran
13  into an unforeseen or unavoidable condition as
14  sometimes happens in the renovation work.
15      Q.   What did you anticipate -- or did
16  you anticipate any sort of unforeseen,
17  unavoidable or concealed conditions on this
18  project?
19      A.   I think it would be a given that
20  I've worked on about a billion dollars -- well
21  over a billion dollars worth of historic
22  renovation in my career that it would not be
23  prudent for me to ever not anticipate -- you
```

Page 125

```
1   know, you've got to anticipate in any
2   renovation, historic or otherwise, that you're
3   going to run into something, whether it be
4   plumbing that we are counting on connecting to
5   that's in the street that's breached to
6   previously undetected asbestos-containing
7   materials.
8           I mean, so, of course, we would
9   always insist that there be a contingency and
10  that we have access to it.
11      Q.   Did you have a similar
12  arrangement or agreement with Dick Davis or
13  Student Suites for referral fees or monthly
14  fees or advances?
15      A.   No.
16      Q.   Why not?
17      A.   Because Gil Berry brought us the
18  deal, not Dick Davis.
19      Q.   What did Dick Davis bring to the
20  project?
21      A.   As I understand it, Dick Davis
22  had more of the financial sophistication and
23  that he also had a contractor that he liked
```

Page 126

1  working with who was paying him a referral fee
2  on the new construction work out of Missouri.
3  And that's who they used to build the North
4  Carolina A&T project.
5       So, as originally contemplated,
6  this project was going to have new
7  construction component and renovation, and we
8  would be doing the renovation component. And
9  I don't remember unfortunately -- I apologize.
10  I don't remember the name of that other
11  contractor would be working on the new
12  construction.
13      Q.    Would you describe or
14  characterize the relationship between Marous,
15  Gil Berry and Dick Davis/Student Suites on
16  this project to be a team of some sort?
17      A.    We were all independent entities
18  working together for a common purpose. So, if
19  that makes us part of the same team, I would
20  say, yes, we were part of a team, a project
21  team.
22      Q.    And you've said that Dick Davis
23  or Student Suites brought some financial

Page 127

1  expertise --
2      A.    Uh-huh (affirmative).
3      Q.    -- to the team or to the project?
4      A.    Yes.
5      Q.    And Dick Davis also knew of a
6  contractor back in Missouri that he trusted
7  who would work on the new dorm construction if
8  that part of the project had gone forward; is
9  that correct?
10      A.    Yes.
11      Q.    What did Gil Berry bring to this
12  project? What was his role?
13      A.    Gil reported to us that he had
14  good working relationships with various board
15  members and representatives of Alabama State
16  University; that he understood local politics,
17  that -- he also had --
18       He and Lorren, his cousin, had
19  put together a pretty interesting program to
20  include students, to find a way to get
21  students at Alabama State involved in
22  mentoring programs during the construction,
23  which we thought was pretty cool and that we

Page 128

1  were willing to engage in where we would take
2  students from Alabama State who were ready,
3  willing and able and pay them a very
4  meaningful wage to learn the construction
5  trades from either project management, project
6  engineering or a hard construction standpoint.
7      Q.    Did he bring anything else to the
8  project or to the team or contribute anything
9  else as you saw it?
10      A.    I think that's the sum total.
11      Q.    How about Marous, what role did
12  Marous intend to serve or what function would
13  Marous serve in for the ASU project? That's
14  not a very good question.
15       What did Marous understand its
16  role to be on the ASU project back in
17  September '05?
18      A.    In September '05 we thought that
19  we'd be doing the design and the construction
20  for the project.
21      Q.    Okay. So, the original proposal
22  or presentation that was made back in
23  September of '05, Marous contemplated serving

Page 129

1  as the design/builder back then?
2      A.    Originally.
3      Q.    Did that change over time?
4      A.    Yes.
5      Q.    Okay. When did Marous -- when
6  did its role change from that of a
7  design/builder to something else, and what did
8  it change to?
9      A.    Well, it changed, I think, in the
10  spring because we started having conversations
11  -- I believe we asked Dick Davis to have
12  conversations with local counsel about
13  contract structures and project delivery
14  modes.
15       And the services we were
16  providing from January -- from January until,
17  you know, essentially September of '06 were
18  really no different because the type of due
19  diligence we were doing whether we're the
20  design/builder or the general contractor or
21  construction manager, we used exactly the same
22  process. We'd still videotape. We'd still
23  prepare our own plans.

Page 130

1      The difference is, hopefully,
2  we'd have an architect -- you know, we would
3  have an outside architect that we'd be feeding
4  information to.  But we would still do all of
5  the same digital takeoff that we always did.
6      So, the roles weren't that
7  different.  But we did want to know if
8  design/build was permissible in Alabama for
9  publicly-funded colleges.
10      But, also, the financing, as we
11  understood, the modality of financing for the
12  project was going from a privatized model to a
13  model that relied upon the creditworthiness of
14  Alabama State in the issuance of sort of
15  bonds, some form of bonds.
16      That was not the original
17  contemplation as reported to us.
18      Q.   Did that in any way change the
19  role that Marous saw itself in on this
20  project, the financing -- the way the project
21  financing was structured?
22      A.   Yes.
23      Q.   How?

Page 131

1      A.   Because public -- if the funds
2  were not pulling for a not-for-profit
3  foundation, but instead were funded directly
4  through Alabama State University, we could not
5  serve at risk on the project.  We would have
6  to serve in an agency role.
7      Q.   So, beginning in approximately
8  January of 2006, Marous' role changed from
9  that of design/builder to construction manager
10  agent?
11      A.   I didn't say that --
12      Q.   Well, I'm asking.
13      A.   You're asking -- no.  You've made
14  a statement.
15      Q.   Well, is that a correct
16  statement?
17      A.   No.
18      Q.   Okay.  When?
19      A.   I think in March or April.
20      Q.   So, up to March or April then you
21  were -- before that point in time you still
22  considered yourself a design/builder on the
23  ASU project?

Page 132

1      A.   I think we -- yeah.  The due
2  diligence was the same.  So, it really didn't
3  matter.
4      I think more was the question of
5  were we going to be working at risk in bonding
6  the job ourselves, or were we going to be
7  working as agent in which we're not bonding
8  the job and we're not at risk.
9      Q.   So, sometime around April is when
10  Marous understand its role on the project to
11  have changed from that of design/builder to
12  construction manager agent?
13      A.   When the financing changed, yes.
14      Q.   Up to September 22nd, 2006, did
15  you still believe that you would serve as
16  construction manager agent, or did your role
17  change again?
18      A.   We assumed that we were -- we
19  absolutely counted on and assumed that we
20  would be the agency construction manager on
21  the project, up to and including September
22  22nd, till I talked to Mr. Upchurch at about
23  3:30 or 4:00 o'clock in the afternoon our

Page 133

1  time.
2      Q.   On September 22nd?
3      A.   Yes.
4      Q.   Describe for me, if you will, the
5  specific activities or tasks that Marous did
6  in furtherance of its role as a design/builder
7  on the ASU project.
8      A.   We have previously covered video
9  survey, digital photographic documentation,
10  laser field measurement, room by room, floor
11  by floor, building by building, Alabama Code
12  review in terms of constructability.
13      We prepared schematic drawings so
14  that we could prepare digital on-screen
15  takeoffs for area quantity takeoffs.  We went
16  to the Associated General Contractors -- it's
17  a group that we belong to; I believe Mr.
18  Upchurch belongs to it as well and Mr. Thomas
19  -- to get a list of potential subcontractors
20  in the area.
21      We met with a contractor out of
22  North Carolina who had done some student
23  housing work and had previously worked with

34  (Pages 130 to 133)

Page 134

1  Dick Davis and Gil Berry on a project to find
2  out about pricing. Because we wanted to get a
3  little more flavor of local pricing. We'd
4  worked down south, but we wanted to know a
5  little bit more specific about pricing down
6  here.
7       We did very, very comprehensive
8  estimating. We went through historical
9  databases. We did extensive material of
10 quantity takeoffs. We went through scheduling
11 exercising and various scenarios.
12      I'm glad I'm keeping Mr. Thomas
13 up. And various -- sorry, I'm boring you,
14 sir.
15      MR. THOMAS: No, you're okay.
16 I'm fine.
17      THE WITNESS: Various scheduling
18 scenarios to see how Alabama State University
19 could be delivered student beds in the most
20 expeditious manner without defeating their
21 income stream too badly.
22      We did draw schedules. We redid
23 draw schedules so that bond counsel could do

Page 135

1  their interest calculations. We prepared
2  written scope of work narratives that we
3  worked and reworked.
4       Then when Mr. Upchurch and Mr.
5  Thomas were involved, we had lengthy phone
6  calls regarding scope items and scope
7  clarifications, inclusions, exclusions,
8  breakdowns of fees, representations of what
9  was fee and what was cost.
10      And I'm sure you've probably seen
11 all of that documentation.
12      Q.    Okay. So, all of the activities
13 that you described for me that Marous provided
14 on this project, up to the point in time when
15 financing was ultimately provided through
16 bonds, those were -- would you characterize
17 those as preconstruction services?
18      A.    I would.
19      Q.    Now, after TCU got involved, you
20 said the activities or the work that was
21 provided by Marous included phone calls
22 regarding exclusions, fees, costs. What else?
23      A.    Schedule.

Page 136

1       Q.    Anything else?
2       A.    Presentation format in terms of
3  what Mr. Upchurch needed to go to the board
4  with.
5       Q.    Did you consider it unusual that
6  you would be having discussions with an
7  owner's representative regarding exclusions or
8  fees or costs or schedules?
9       A.    Would I find it unusual?
10      Q.    Uh-huh (affirmative).
11      A.    No.
12      Q.    Okay. Those are questions that
13 ASU prior to TCU's involvement didn't ask of
14 you; is that correct?
15      A.    They didn't ask. They'd had the
16 documents since May so they --
17      Q.    I understand. But they didn't
18 ask you questions?
19      A.    No.
20      Q.    They didn't seek clarification of
21 --
22      A.    No. We welcomed the
23 clarification and responded.

Page 137

1       Q.    I understand. And you didn't
2  have a problem with TCU asking you for
3  clarification of various things in your
4  proposal or scope of work, did you?
5       A.    No. That's not what I had a
6  problem with TCU --
7       Q.    I understand. I'm just asking if
8  you had a problem with that.
9       A.    No.
10      Q.    It's not unusual that an owner
11 would want answers to those questions?
12      A.    I had a problem with the time
13 constraints that were placed upon us to react
14 to numerous items that required costing or
15 clarification and told we had 24 or 48 hours
16 to respond to it.
17      Because, you know, from a risk
18 management standpoint, we're trying to look
19 out for Alabama State and for the developer
20 and manage peoples' risks. And we don't want
21 to just throw numbers outside Willie Nilly.
22 We'd like a chance to contemplate. We're a
23 planful company and one that stands by the

Page 138

1  costs that we provide.
2       And we wanted to make sure that
3  we had the requisite time to do our job
4  professionally and properly.
5       Q.    So, other than what you thought
6  might have been a pretty narrow time frame to
7  provide answers to some of the questions, you
8  didn't have a problem with the question, in
9  and of itself, about some of your proposals or
10  exclusions or scope of work?
11       A.    I had no problem with the
12  questions because I thought I understood what
13  the intent of the questions being asked were
14  for.
15       Q.    Would you characterize the phone
16  conversations that you had with TCU regarding
17  exclusions, fees, costs, scheduling, et
18  cetera, to also be preconstruction services?
19       A.    Yes.
20       MR. LYONS:  Are you at a point to
21  take five?
22       MR. LAWSON:  Sure.
23       MR. LYONS:  Okay.  We've been

Page 139

1  going a couple of hours.
2       (Whereupon, the taking of the
3  deposition was recessed from approximately
4  12:21 p.m. to approximately 12:37 p.m., after
5  which the following proceedings were had and
6  done:)
7       Q.    (By Mr. Lawson) Mr. Goldman,
8  when we left off, I believe we were discussing
9  what role Marous expected to serve in on this
10  project, that it had changed somewhat from
11  serving as a design/builder to CM agent on the
12  project.
13       Is that right?
14       A.    That's my understanding, yes.
15       Q.    Okay.  And I believe you said
16  that once it was decided that you would serve
17  as a CM agent that you would be under contract
18  either with ASU or with Gil Berry as the
19  developer; is that right?
20       A.    I said Gil Berry, Student Suites.
21       Q.    Yeah.  The Gil Berry entity,
22  whatever that might be?
23       A.    Yes.

Page 140

1       Q.    Was Marous going to perform any
2  work on the project as the CM agent?
3       A.    We would not be allowed to.  We'd
4  be precluded from from self-performing.  We'd
5  provide supervisory personnel, as I understand
6  it, but we would not be self-performing.
7       Q.    So, you wouldn't do any cleanup
8  or concrete or anything?
9       A.    No.
10       Q.    Was it ever contemplated that you
11  would?
12       A.    Not as an agency CM.
13       Q.    Would you provide any sort of
14  on-site services as an agency CM?
15       A.    We would provide on-site
16  supervision, project management, project
17  engineering.  We would have foremen that
18  wouldn't be nonworking.
19       Q.    Anything else?
20       A.    Scheduling.  I think that's it.
21       Q.    Okay.  Define for me, if you
22  will, what you believe a construction manager
23  to be.

Page 141

1       A.    At risk or --
2       Q.    Well, let's --
3       A.    At risk or agency?
4       Q.    Let's do agency.
5       A.    Agency construction manager
6  serves in a capacity to preserve and protect
7  fiduciary and contract responsibilities of an
8  awarding authority or owner in a capital
9  improvement project.
10       Q.    Is that all that a CM does?  Is
11  that --
12       A.    No.
13       Q.    Okay.  What else would a CM agent
14  do or an agency CM?
15       A.    A CM agency could provide,
16  depending on their engagement, the types of
17  preconstruction services that we -- exactly
18  the preconstruction services that we performed
19  for Alabama State.
20       Q.    So, a CM agent would, in addition
21  to protecting the fiduciary and contract
22  responsibilities owed to the owner or the
23  awarding authority, would also provide

Page 142

1  preconstruction services?
2      A.    Yes.  If requested, sure.
3      Q.    Okay.  Well, once you took on the
4  role of CM agent on this project, you've
5  changed from serving as a design/builder to a
6  CM agent, what role --
7          Or define for me, if you will,
8  what it was that a CM agent was going to
9  provide on this project.
10     A.    We were going to provide budget,
11 schedule -- budget and schedule controls.  We
12 were going to assist with the oversight or
13 review of contract documents, assist with the
14 administration of the bid process, assist with
15 evaluating applications for payment to each of
16 the vendors and subcontractors.
17     Q.    Anything else that the CM agent
18 would provide or Marous contemplated providing
19 to either ASU or Gil Berry --
20     A.    Schedule coordination, attendance
21 at weekly meetings once construction started.
22     Q.    Anything else?
23     A.    Those are the general services.

Page 143

1      Q.    And how do you go about
2  protecting the fiduciary and contract
3  responsibilities owed to the owner?
4          You described that as one of the
5  functions or duties of the CMA.
6      A.    During any bidding stages we make
7  sure that the scope of work is consistent with
8  the contract documents.  We actually as the CM
9  agency always write our own written scope of
10 work narratives that go with the bid documents
11 because if there's gaps -- you know, being an
12 architect, I can kick architect.
13         So, lots of times there's scope
14 misses or gaps in the drawings and
15 specifications that don't adequately or
16 accurately portray the intended work so that
17 we write written scopes of work as a standard
18 operating procedure to go along with each bid
19 package.
20         We would prequalify or evaluate
21 subcontractors on the basis of their financial
22 capacity to perform their responsibilities as
23 per their contract.  We would author contracts

Page 144

1  between subcontractors and -- whether it was
2  the development entity or Alabama State,
3  depending on who our contract ultimately sat
4  with.
5      Q.    What I -- early today I asked you
6  what roles Marous Brothers Construction serves
7  in for the various projects that it has
8  ongoing around the country, and you said it
9  self-performed some of the work as a general
10 contractor or a subcontractor.
11     A.    I also said we were a
12 construction manager agency and at risk and a
13 design/builder.
14     Q.    And an owner's representative?
15     A.    Yes.
16     Q.    And I asked you to describe what
17 it is that an owner's rep does.  What are the
18 distinctions between an owner's rep and a
19 construction management agency?
20     A.    Owner's reps typically would not
21 write the written scope of work narratives for
22 instance.  Owner's reps would not necessarily
23 prepare contracts between subcontractor and

Page 145

1  the awarding entity.  Owner's reps may not be
2  involved in the specifics of constructability
3  analysis and review.  Owner's reps --
4          Well, I'll stop there.
5      Q.    Anything else?  Any other
6  distinctions between how you'd characterize or
7  define an owner's rep and a construction
8  manager agency?
9      A.    Owner's reps may or may not
10 define the distinction in their service as
11 preconstruction or construction.  It depends
12 upon their engagement.
13         Owner's reps typically don't have
14 AIA standard contracts for owner's
15 representation that I'm aware of as
16 construction manager agency does.  It
17 separates preconstruction and construction.
18     Q.    So, they're not then the same
19 thing -- in listening to you describe the two,
20 there are distinctions and differences between
21 them?
22     A.    I think there are distinctions.
23     Q.    Yes, there are?

Page 146

1    A.    I think there can be
2 distinctions.
3    Q.    You mentioned the bond
4 underwriters on this project. Do you know who
5 that is or who that was?
6    A.    Ultimately, no.
7    Q.    Did they ever make --
8    A.    It think it was Excel or -- I
9 think Excel.
10    Q.    Did bond counsel or bond
11 underwriters ever make any specific requests
12 to Marous for any information?
13    A.    Not directly. Only through -- as
14 I understand it, through Dick Davis or Gil
15 Berry.
16    Q.    So, you didn't have any direct
17 communications, either telephone, E-mail or
18 meetings, with bond counsel or bond
19 underwriters?
20    A.    Marous did not.
21    Q.    Is Marous considering filing a
22 complaint of any kind against bond counsel or
23 bond underwriters on this project?

Page 147

1    MR. LYONS: If you know.
2    THE WITNESS: I have no idea.
3    Q.    (By Mr. Lawson) Let me follow up
4 something. You mentioned that Gil Berry
5 called you regarding his deposition. When was
6 that?
7    A.    Last week sometime. I think -- I
8 don't remember. He called me -- I called him
9 back at 5:30 in the evening, and I don't
10 remember what day it was.
11    Q.    And you said that he described
12 his deposition as long?
13    A.    Long. He said it was two days.
14    Q.    Did he tell you anything about
15 it?
16    A.    No.
17    Q.    Did he tell you any of the
18 questions that were asked of him?
19    A.    I didn't want to hear it. It
20 wasn't -- I'm not interested in hearing those
21 questions.
22    Q.    So, he did not tell you, hey,
23 Arne, they asked me this question or that

Page 148

1 question? He didn't mention any topics?
2    A.    The only thing he started to get
3 into was -- I don't even remember. I don't
4 even think it was -- he said -- I don't even
5 remember. It was --
6    I was not interested. You know,
7 what he has to say about his deposition is --
8 that's up to him.
9    Q.    Is there any sort of written
10 contract or agreement of any kind on any
11 project, ASU included, between Marous and Gil
12 Berry or Gil Berry and Associates or Student
13 Suites or Gil Berry Student Suites &
14 Associates, Inc.?
15    A.    One contract is that -- that
16 letter about the $60,000 advance. I mean, I
17 think that could be construed as a contract.
18    Q.    That was Exhibit 3?
19    A.    Yes. I'm unaware of any other
20 signed instrument specific to this, project
21 specific.
22    Q.    If you do come across any kind of
23 signed contract of any kind, if you would,

Page 149

1 provide that to your counsel.
2    A.    Absolutely.
3    Q.    Did you ever see any sort of
4 letter of intent that Mr. Berry provided to
5 Marous, a draft of a letter of intent or any
6 other --
7    A.    Not one that he provided to us.
8    Q.    Did you provide one to him?
9    A.    Yes, we did.
10    Q.    Did he ever execute it?
11    A.    I don't believe so.
12    Q.    Did you ever request that he
13 execute it?
14    A.    Yes, we did.
15    Q.    What did he tell you was his
16 reason for not signing it?
17    A.    He told me that he couldn't sign
18 it until the deal's financing was closed. And
19 then he'd be -- then we'd be under agreement.
20    Q.    After you understood financing to
21 have closed on the project, did you go back to
22 Mr. Berry and ask that he sign the letter of
23 intent?

Page 150

1    A.    No.
2    Q.    Why not?
3    A.    Because we tendered a -- I
4  believe we tendered an agreement, a CM -- an
5  agency construction management agreement to
6  him at that time.  The letter of intent, we
7  had already done all the work on the letter of
8  intent.
9    Q.    Did Mr. Berry ever tell you I'll
10 get you paid or I'll see to it that you get
11 paid for your preconstruction services?
12   A.    Absolutely.
13   Q.    When did he tell you that?
14   A.    He told us --
15         MR. LYONS:  Which question are
16 you answering there?  There are two questions.
17 I want to make sure it's clear for the record.
18         He asked whether he would get you
19 paid or you would get paid.  Or he would pay
20 you, I think is what he said.
21   Q.    (By Mr. Lawson) Did Mr. Berry
22 ever tell you that he would pay you for your
23 preconstruction services?

Page 151

1    A.    No.
2    Q.    Did he ever tell you that he
3  would ensure that you were paid for your
4  preconstruction services?
5    A.    He did not use that language,
6  ensure.
7    Q.    What did he tell you?
8    A.    He said that we should submit
9  invoices, that we were requested -- in fact, I
10 saw an E-mail from Judge Wiggins to Gil Berry
11 saying we should get invoices in.
12         Mr. Upchurch told us to submit an
13 invoice.  Mr. Upchurch told us he'd help --
14 you know, he would submit our invoice for
15 payment.  He agreed that we did all of this
16 work and that we deserved to be paid.  Those
17 are his words, not mine.
18         He suggested after the 22nd,
19 after the unfortunate incidents of September
20 22nd, that we author a letter to Dr. Lee,
21 which I did with Chip Marous that we both
22 sent, and we also sent a letter to Gil Berry
23 about how much work we had done.

Page 152

1         We had -- purportedly there were
2  other committee members who had asked for his
3  invoice and Dick Davis' invoices and our
4  invoices and that purportedly Fred Gallot told
5  Gil that as soon as the bond deal would close
6  they'd be in a position to pay us.
7         Purportedly Dr. Lee had
8  conversations with Gil Berry on at least one
9  occasion where Dr. Lee said that we would --
10 that we would be paid.
11   Q.    Okay.  So, Gil Berry told you
12 that he would help you get paid or that he
13 would see to it that you did get paid or what?
14 Help me understand what he told you.
15   A.    He told us to submit invoices so
16 we could get paid.
17   Q.    And you submitted invoices to Gil
18 Berry?
19   A.    Yes, we did.
20   Q.    You said Ken Upchurch told you to
21 submit invoices?
22   A.    Yes, he did.
23   Q.    Did you submit to Mr. Upchurch

Page 153

1  any invoices?
2    A.    We sent him a preconstruction fee
3  --
4    Q.    Fee schedule?
5    A.    We sent him the whole fee
6  schedule and we also -- and we submitted the
7  invoices to Gil Berry.
8    Q.    Did Mr. Upchurch tell you that
9  TCU would pay you?
10   A.    No.
11   Q.    Did Mr. Upchurch tell you that he
12 would ensure that ASU paid you?
13   A.    No.
14   Q.    You understood that TCU didn't
15 contract or agree to pay Marous for any
16 preconstruction services, didn't you?
17   A.    Absolutely.
18   Q.    The --
19   A.    I did understand that Mr.
20 Upchurch would -- based on his statements to
21 me that he would represent to Dr. Lee that we
22 should be paid.
23   Q.    Do you know if he did or didn't?

1     A.    No, I don't know what I can
2  believe or not believe.
3     Q.    Do you --
4     A.    So, I have no idea.
5     Q.    You don't know?
6     A.    I do not know.
7     Q.    The layout for these dormitories
8  are described in various documents that I've
9  seen as suite style.  Have you seen that in
10  some of these documents generated by Gil Berry
11  or Marous?
12     A.    Yes.
13     Q.    What does that mean?  It doesn't
14  stay suite.  It says suite style.  What does
15  that mean?
16     A.    Suite style can mean a lot of
17  different things.
18     Q.    What does it mean with respect to
19  the ASU project?
20     A.    With respect to ASU is that we
21  would be able to eliminate the gang shower or
22  gang bathrooms at the end of the hall and
23  create some units that would be described as

1  semiprivate where they had bathroom facilities
2  and in some cases small living areas within
3  the units themselves.
4     Q.    So, some of the units would have
5  a living area and some would not?
6     A.    Excuse me.  It was -- what we
7  did, we designed units that were flexible
8  enough based on ASU's desired bed count, which
9  we left them the flexibility that they could
10  use singles.  They could have single
11  occupancy.  They could have double occupancy.
12           We had some units that had the
13  ability to be single units with their own
14  bathroom or with two beds with one bathroom.
15  We left a lot of flexibility in the plan by
16  design.
17     Q.    So, some units would have living
18  areas and some would not?
19     A.    Yeah.  But we made sure there
20  were lounge spaces on every floor as well.
21     Q.    Right.  But not every suite unit
22  had its own separate living area or lounge?
23     A.    Yeah.  I don't know that makes it

1  a suite or not a suite.
2     Q.    I'm just asking.
3     A.    Yes.
4     Q.    Is that correct?
5     A.    Yes.
6     Q.    Did all of the suite-style units
7  that you included in the layout have a
8  restroom facility, shower, bathroom?
9     A.    Every unit, I believe, had a
10  bathroom.
11     Q.    So, there were no common
12  bathrooms on the floors for showering and --
13     A.    I don't believe so.  I mean, it's
14  been a while since I looked at them.
15     Q.    Did some of the suite-style units
16  designed by Marous or allowed in the layout
17  have two separate suite bedrooms sharing a
18  bathroom?
19     A.    Yes.
20     Q.    Were there also -- and I believe
21  you already said that there were some designed
22  where one single bedroom would have its own
23  bathroom?

1     A.    Yes.
2     Q.    Whether there was one or two
3  students in that bedroom, they had their own
4  bathroom that they didn't share with another
5  bedroom?
6     A.    It was entirely up to how many
7  beds Alabama State wanted to put in any
8  particular dwelling unit.
9     Q.    Some of these suites where there
10  were two bedrooms sharing a bathroom -- and
11  there were some of those, right?
12     A.    Yes.
13     Q.    Some of those were laid out in
14  such a way -- if I looked at your scope of
15  work correctly, you would have a bedroom and
16  that bathroom would access into another
17  bedroom through a door?
18     A.    Uh-huh (affirmative.  Yes.
19     Q.    And then the bathroom would be on
20  the far end, correct?
21     A.    Correct.
22     Q.    So that students in the bedroom
23  would have to walk through bedroom number two

Page 158

1  to get to the bathroom?
2      A.    Correct.
3      Q.    The bathroom, in other words, was
4  not in between the two bedrooms?
5      A.    Correct.
6      Q.    Why was that included as part of
7  the layout or the design?
8      A.    Because given the budget
9  constraints we were working to and the
10 existence of the masonry demising partitions
11 that existed and to minimize the amount of
12 demolition we had to do and be able to back
13 and stack the plumbing to minimize the number
14 of risers and the expense in that
15 construction, we chose to use that as a
16 foundation for our design.
17          Now, subsequent to that, you
18 know, we talked to John Chambliss who told us
19 there may be another way to do it whereby you
20 could locate the bathrooms.  The question and
21 the challenge if we had stayed involved would
22 have been to still minimize a number of
23 vertical risers to make sure that we stayed

Page 159

1  within the budget.
2      Q.    When did you last speak to Mr.
3  Chambliss?
4      A.    Oh, I don't know.  September or
5  after Mr. Berry was no longer engaged.
6      Q.    Do you know what the layout for
7  the dormitory renovations at ASU look like
8  today?
9      A.    I don't.
10     Q.    Do you know whether or not
11 they're using single bedrooms or double
12 bedrooms or quads?
13     A.    John showed -- actually, I want
14 to back up.  John showed them to me when I was
15 in Montgomery on something -- on another
16 matter several months after.  I think -- I
17 think January/February of 2007.
18          I met with John just to say
19 hi and catch up.  And he did show me the
20 layouts, but I don't really recall them.
21     Q.    What other matter were you in
22 Montgomery for?
23     A.    I was meeting with Judge Kennedy.

Page 160

1      Q.    Why?
2      A.    He wanted to get us involved in
3  some downtown riverfront development, a
4  parking garage.
5      Q.    Have you pursued that project?
6      A.    No.
7      Q.    You said you met with John
8  Chambliss.  Did you meet in his office?
9      A.    We did.  He wanted to show me his
10 office.
11     Q.    What did he show you with respect
12 to the ASU project?
13     A.    He just showed me where he was in
14 terms of the drawings.
15     Q.    Did he show you what the layout
16 for the various dormitories looked like, the
17 room configuration?
18     A.    He did.  I just -- and I don't --
19 it wasn't that noteworthy.  It was similar to
20 ours, although he had eliminated the
21 pass-through bedroom situation I think.
22     Q.    The pass-through bedroom
23 situation being where students in one bedroom

Page 161

1  have to walk through another bedroom to reach
2  the bathroom?
3      A.    Yeah.  Understand, though, that
4  in between that bedroom was a living area
5  based on -- and, again, entirely on how many
6  beds Alabama State wanted to sandwich into any
7  particular dwelling area.  That could -- that
8  situation was not a given.
9          It could have been their walking
10 from -- two students are walking from their
11 bedroom through a living area to go into the
12 bathroom.  It just depends on how many beds
13 Alabama State wanted to put in.
14     Q.    What sort of work had John
15 Chambliss done on this project prior to
16 September 22nd, 2006?
17     A.    We had sent -- I sent John an
18 Autocad disk just to take a look at the
19 drawings.  I'm not sure -- I'm not sure if he
20 was formally engaged at that time with Gil
21 Berry and Student Suites or not.  We had
22 talked --
23     Q.    Why did you send him an Autocad

Page 162

1  file?
2      A.    He asked for it because it was
3  our understanding that he was going to be
4  doing the architecture for Gil Berry and
5  Student Suites.
6            He was going to be taking our
7  design, you know, modifying it, and that we'd
8  be working with them within our budget to
9  create the construction documents for the
10 project.
11     Q.    And what did you understand his
12 role to be after September 22nd, 2006?
13     A.    I understood that he went through
14 a process and was the architecture of record
15 for the project.
16     Q.    And you've looked at his designs?
17     A.    Just -- you know, they were -- I
18 don't know if they were the bid documents or
19 not.  It was, you know, several months after I
20 did.
21     Q.    I think you said that was around
22 January of 2007?
23     A.    I think so.  January or February.

Page 163

1      Q.    Is that after you filed a lawsuit
2  against Alabama State and the TCU defendants?
3      A.    It was before.
4      Q.    Was there any discussion at
5  Marous --
6      A.    Oh, was it before?  I don't know.
7  I have to back up.  It was after.  But before
8  we filed the lawsuit.  We filed the lawsuit
9  after.
10     Q.    Was there any discussion at
11 Marous -- or has there been any discussion at
12 Marous about filing suit against John
13 Chambliss?
14     A.    No.
15     Q.    You don't have a problem with
16 anything John Chambliss has done?
17     A.    No.  At this point, no.
18     Q.    Has anybody ever contemplated or
19 considered filing suit against Mr. Chambliss?
20          MR. LYONS:  At Marous?
21     Q.    (By Mr. Lawson)  At Marous.
22     A.    Not that I'm aware of.
23     Q.    You've not had any discussions or

Page 164

1  been a part of any discussions about that?
2      A.    No.
3      Q.    And you don't know as we sit here
4  today exactly what it is that is being
5  constructed at ASU?
6            In other words, you don't know
7  what the floor layouts look like for each of
8  the dormitories at Alabama State?
9      A.    I don't know that anything's been
10 constructed at ASU.
11     Q.    Okay.  So, you have no idea
12 what's going on there, if anything, with
13 respect to dorm renovation?
14     A.    I have no idea where the project
15 stands.
16     Q.    Did you ever see any resolution
17 that was passed by Alabama State with respect
18 to this dorm renovation project?
19     A.    I saw the resolution that Dick
20 Davis and Gil Berry presented to us.
21     Q.    Presented to you?
22     A.    Presented to Marous.
23     Q.    What did it say?

Page 165

1      A.    I'd like to see a copy of it.
2      Q.    You have seen one, though?
3      A.    Yes.
4            (Whereupon, said document was
5            marked for identification as
6            Defendant's Exhibit No. 5 to the
7            deposition of Arne F. Goldman.)
8      Q.    Let me show you Defendant's
9  Exhibit No. 5.  And this appears to be a
10 letter from Leon Frazier at Alabama State to
11 Dick Davis referencing a resolution.  Have you
12 ever seen that letter?
13     A.    I have.
14     Q.    And he says, per those
15 discussions -- and that's discussions about a
16 proposed student residence project -- this
17 will confirm the following.  And he outlines
18 various things with respect to the resolution.
19          Is that your understanding of
20 what the resolution was to provide?  You can
21 take your time to read it if you need to.
22     A.    What are you asking me?
23     Q.    Well, under section a, the second

Page 166

1  full paragraph, it says: "It is mutually
2  understood that if final agreement is not
3  reached on more detailed design and financing
4  structures that this Resolution will become
5  void with no expense to Alabama State
6  University."
7        Do you see that?
8     A.   Yeah.  That's the whole problem.
9  Because we did have more defined design and we
10  absolutely -- the project absolutely was
11  financed.  Otherwise, we wouldn't be sitting
12  here.
13     Q.   So, you were aware then, as of
14  November 23rd, 2005, that the resolution
15  provided by Gil Berry and/or Student Suites to
16  Alabama State included that language that I've
17  just read?
18     A.   I was aware -- I was aware it had
19  that language, and that language was part of
20  the inducement, we think, for us to do the due
21  diligence and the expense so that we could
22  make sure we designed a project that could be
23  financed.

Page 167

1        I mean, at that point -- at that
2  point we saw that they had a resolution, that
3  they were named as the developer.  And
4  implicit is that if the agreement was reached
5  on more detailed design and financing
6  structures.  We did reach that.  We assumed --
7  and it's certainly implied -- that they were
8  the developer, that the conditions of their
9  engagement were to do more detailed design and
10  financing structure.
11        The project was designed and it
12  -- God knows it was financed.  So as far as
13  we're concerned, and why we're -- I think why
14  we're here and why we're -- why we feel
15  aggrieved and injured in this matter is that
16  we are of the opinion that Gil Berry and
17  Student Suites as their entity and Marous did
18  or cause to happen what it is that this
19  resolution stipulated.
20        And, therefore, we should be
21  paid.
22     Q.   Okay.  So, the answer then in a
23  round about way to my question is, yes, you

Page 168

1  did understand, as of November 23rd, 2005,
2  that the resolution proposed by Gil Berry and
3  Student Suites on behalf of those entities and
4  Marous Brothers would include language that
5  said it is mutually understood that if final
6  agreement is not reached on more detailed
7  design and financing structures that this
8  Resolution will become void with no expense to
9  Alabama State University?
10     A.   Yes.
11        (Whereupon, said document was
12        marked for identification as
13        Defendant's Exhibit No. 6 to the
14        deposition of Arne F. Goldman.)
15     Q.   Let me show you what's been
16  marked as Defendant's Exhibit No. 6 and ask if
17  you've ever seen that?
18        And it appears to be a letter
19  from Dick Davis and Gil Berry dated April --
20     A.   I'm not sure I've ever --
21     Q.   -- 12, 2006.
22     A.   I'm not sure I've seen the second
23  page.

Page 169

1     Q.   Okay.  How about the first and
2  third page?
3     A.   I've seen the third page.
4     Q.   The third page is a copy of the
5  resolution submitted by Davis and Berry for
6  adoption by ASU, correct?
7     A.   I don't know.  It's not signed.
8  So, I don't know if it was -- I have no idea
9  if it was submitted or not.  It's not signed
10  by anybody.
11     Q.   I understand that.  I said
12  submitted by with signature.
13     A.   I don't know if it was --
14     Q.   You don't know?
15     A.   I have no idea.
16     Q.   The markings on that third page,
17  the resolution says Student Suites in the far
18  left at the bottom.  Do you see that?
19     A.   Uh-huh (affirmative).
20     Q.   And it appears to me, even though
21  this copy is not very legible, that that's
22  Marous'?
23     A.   That looks like our logo.

1    Q.    You do believe that's your logo
2  in the middle?
3    A.    We didn't put it on there.
4    Q.    Well, who did?
5    A.    I have no idea.
6    Q.    And that's Gil Berry on the far
7  right?
8    A.    It looks like it.
9    Q.    Was Gil Berry authorized to put
10 your logo on a proposed resolution?
11   A.    Not to my understanding, no.
12   Q.    Did you have knowledge that he
13 was -- he or Dick Davis was going to put
14 Marous' logo on a proposed resolution?
15   A.    No.
16   Q.    But you did know, as you just
17 admitted, that the resolution would state that
18 if final agreement was not reached that no
19 monies would be owed by ASU?
20   A.    Well, that is a different
21 resolution than the --
22   Q.    I understand.  But I'm just
23 asking you.  You understood that, correct?

1    A.    No, because it's a different --
2  this resolution is different than this
3  resolution.
4    Q.    I understand.  But you understood
5  that Gil Berry had submitted a resolution to
6  ASU for acceptance by ASU or passage by ASU,
7  Exhibit No. 5, that included language as I've
8  just read?
9    A.    This -- this was submitted way in
10 advance --
11   Q.    I understand that.  My last --
12 I'm going back to Exhibit 5.  You understood
13 that had been submitted by Gil Berry and Dick
14 Davis?
15   A.    No.  I understand that this is a
16 letter about -- this references discussions.
17 It doesn't reference a resolution in November
18 that I can read.
19   Q.    Okay.  Well, I believe my
20 question a few minutes ago with respect to
21 Exhibit No. 5 asked if you understood that a
22 resolution would be passed by ASU which
23 included the language that I read, it is

1  mutually understood that if final agreement is
2  not reached on more detailed design and
3  financing structures that this resolution will
4  become void with no expense to Alabama State
5  University.
6         And your answer then was yes?
7    A.    The answer then.  But you asked
8  me a different question.
9    Q.    Well --
10   A.    So, it's no.
11   Q.    All right.  I'll ask you yet
12 again so just the record will be clear.
13        You understood in November of
14 2005 that a proposed resolution had been
15 submitted by Gil Berry and Dick Davis or
16 Student Suites that would include that
17 language that I've just read?
18   A.    I understood -- I did not
19 understand that they submitted a resolution.
20 I understood that the board of trustees would
21 approve a resolution.
22   Q.    That contained that language?
23   A.    That contained that language.

1    Q.    Okay.  So, whether or not Gil
2  Berry and Dick Davis submitted it, you don't
3  know --
4    A.    I don't know.
5    Q.    -- but you knew the resolution
6  would include that language?
7    A.    Your question was whether or not
8  I knew about Gil Berry and Dick Davis.  And I
9  don't.  I just --
10   Q.    But you knew the resolution, no
11 matter who submitted it, would include that
12 language?
13   A.    Yes.  That's what that letter
14 says.
15   Q.    You don't know whether or not Gil
16 Berry provided it.  You just know that it
17 would include which language?
18   A.    Yeah.  I have no idea who
19 provided it.
20   Q.    Was Gil Berry authorized to
21 submit anything to ASU with the Marous logo on
22 it --
23   A.    Not that I --

Page 174

1    Q.    -- be it a resolution or anything
2  else?
3    A.    Only -- only articles or
4  information that we generated -- that we
5  originated could have our logo on it.  That's
6  our company policy.
7    Q.    Do you know whether Gil Berry
8  ever submitted anything with your logo on it
9  without your knowledge?
10   A.    I have no idea.
11   Q.    What did you understand the
12  language of the resolution to mean where it
13  said if final agreement is not reached?  What
14  did that mean to you?
15   A.    This one?
16   Q.    Yes.  Exhibit 5.
17       MR. LYONS:  Let's keep them
18  separate.
19       THE WITNESS:  Okay.
20       Final agreement on more detailed
21  design and financing.  Well, final agreement
22  would be successful financing, which they
23  achieved.  And final agreement on more

Page 175

1  detailed design, we certainly provided it.
2       And through our discussions with
3  Mr. Upchurch in terms of scope and design, it
4  was never brought up, for instance, about
5  pass-through bedrooms as being any issue.
6    Q.    (By Mr. Lawson)  Well, what was
7  the final agreement that you understood was
8  reached?
9    A.    The final agreement was when this
10  project could get -- as I understood it, was
11  when the project could be in such a form that
12  it could achieve financing and that based on a
13  specific design and a specific scope, which is
14  what we had.
15   Q.    Okay.  What agreement did you
16  have on detailed design?  What final agreement
17  did you have?
18   A.    We had -- when we asked Mr.
19  Upchurch in September -- around Labor Day over
20  the weekend when I talked to him, I talked to
21  Mr. Upchurch, and we discussed any other
22  outstanding issues.  And design was never
23  raised.

Page 176

1       So, by implication I assumed that
2  there were no other issues.
3    Q.    Did anybody tell you, yes, we
4  have reached final agreement on the design of
5  this project or we have achieved final
6  agreement or there is a final agreement?
7    A.    Mr. Upchurch and I, when we
8  discussed prior to him going to the board
9  meeting with his recommendation, told me that
10  it was -- that we had final agreement on the
11  scope and the definition, which has a lot to
12  do with the design for the project, and that
13  he would recommend a favorable recommendation.
14   Q.    He couldn't himself award you
15  that contract as we have already discussed,
16  correct?
17   A.    Previously answered.
18   Q.    And that's correct, right?
19   A.    Previously answered.  Yes.
20   Q.    You need to answer it again.
21       MR. LYONS:  He doesn't have to
22  answer it again.  He's already testified.
23   Q.    (By Mr. Lawson)  Well, I'm not

Page 177

1  sure that he's already previously answered
2  that.  But you say you have and that the
3  answer was yes?
4    A.    Ask me the question again,
5  please.
6    Q.    TCU could not, itself, award you
7  that contract?
8    A.    Yes.  That's my understanding.
9    Q.    Okay.
10   A.    As previously testified.
11   Q.    What do you understand TCU's role
12  or position on this project to be?  I believe
13  you said they came to the project late July of
14  2006.
15   A.    They were -- I was told that they
16  were working on several other projects at
17  Alabama State University's campus and they
18  were asked to provide some review and that
19  they would be retained as the owner's
20  representative on the project.
21   Q.    Who told you that?
22   A.    What?
23   Q.    Who told you all of this?

Page 178

1    A.    Ken Upchurch. I've never spoken
2 to Percy Thomas.
3    Q.    Well, I didn't know if Gil Berry
4 maybe told you or somebody at ASU.
5    A.    No. This was Ken Upchurch. So
6 then --
7        MR. LYONS: Let him ask you a
8 question.
9    Q.    (By Mr. Lawson) Did he call you
10 out of the blue and say, hey, Mr. Goldman, we
11 have been retained as an owner's
12 representative, or did Gil Berry tell you
13 beforehand that ASU had decided to hire TCU?
14    A.    I think Gil Berry told me that I
15 needed to be on a phone call with -- I needed
16 to call a number -- I think was Kenny Thomas'
17 office -- because I needed to speak to Percy
18 Thomas and a Mr. Upchurch who were going to be
19 doing owner's rep work on the project.
20    Q.    And what did you understand
21 owner's rep work to be?
22    A.    That he would represent Alabama
23 State in their interest in the project and

Page 179

1 provide some review and oversight of the work
2 that we had done so far, make recommendations
3 to the -- on behalf of the board.
4    Q.    Did you understand them to be
5 providing a level of expertise that perhaps
6 ASU board members or trustees did not have?
7    A.    I don't know. I wasn't privy to
8 what those conversations were about, why they
9 were engaged.
10    Q.    Did you object to TCU serving as
11 an owner's representative?
12    A.    I objected to providing Mr.
13 Upchurch with detailed proprietary work until
14 such time as he assured me that it would be
15 unlawful for TCU to take the project from us,
16 which is in his words.
17        When I said to him, why should I
18 send you all our proprietary work? How do I
19 know you're not going to steal the project
20 from us? He says we -- first of all, I'm a
21 gentleman, I wouldn't do it. And second of
22 all, we cannot by law do that because we're
23 being retained as the owner's rep, which

Page 180

1 precludes us from being able to serve as
2 construction manager on the project.
3        Otherwise, we never would have
4 sent a thing to Upchurch. We wouldn't have
5 had any discussions.
6    Q.    Okay. So --
7    A.    We relied upon that
8 representation that he was going to be the
9 owner's rep and engaged in active and spirited
10 and productive dialogue for the next two and a
11 half months. And it was productive -- it was
12 very productive dialogue.
13    Q.    So, you did not, then, object to
14 TCU serving as an owner's representative?
15    A.    Once he told me that, I didn't.
16 We didn't -- we had to make clear what his
17 role was going to be and what the parameters
18 of the role were going to be. And when we
19 understood that, we had no objection.
20    Q.    And you understood, again, his
21 role to be what?
22    A.    Providing review of our work
23 to-date and to provide -- serve in an advisory

Page 181

1 capacity to the board and to President Lee.
2    Q.    What is your understanding of
3 what TCU is presently doing on this project?
4    A.    My understanding was that at that
5 board meeting on the 22nd Mr. Upchurch was
6 asked if he could do the project for the same
7 -- for less than the $25 million that Gil
8 Berry, as developer, was proposing.
9        And he said I can't do it for
10 less, but I can do it for the same.
11    Q.    Okay.
12    A.    And from that point forward that
13 he was retained -- he actually took the
14 project over as the construction manager,
15 whatever you want to call it.
16    Q.    Your understanding is based on
17 what? You weren't present for that board
18 meeting, were you?
19    A.    I wasn't.
20    Q.    So, I am to assume that Mr. Berry
21 said that those statements were made at the
22 board meeting?
23    A.    Mr. Upchurch told me when I

Page 182

1    called him at 4:00 o'clock because he didn't
2    call me and tell me what happened. I called
3    him.
4            And he told me -- he gave me the
5    recounting, which absolutely coincided later
6    when I talked to Gil Berry with what Gil Berry
7    told me.
8    Q.    What did Mr. Upchurch tell you?
9    A.    He told me that they asked him if
10   he could do the project for less. He told me
11   -- and he said he couldn't. And they asked
12   him if he could do the project for the same
13   amount of money. And he said he could and --
14           Which by the way is curious
15   because he only had our work product to go by.
16   So, if he's agreeing that he could do the
17   project for $25 million, he must have been
18   using our work product unless he spent --
19   unless he was really quick and did six months'
20   worth of due diligence in, you know, six
21   weeks, which is unlikely.
22           And he told us that -- he told me
23   -- when I asked him where does this stand for

Page 183

1    Gil Berry, he told me Gil Berry was -- that
2    Dr. Lee made a statement that he could not
3    award the job to Gil Berry.
4    Q.    So, your understanding then,
5    based on that discussion or conversation with
6    Ken Upchurch, is that TCU is serving as a
7    construction manager on this project?
8    A.    That's my understanding.
9    Q.    Based on what? Did he tell you
10   that as of today we're going to be
11   construction manager?
12   A.    He told me we're taking over the
13   project. That's quote, unquote. That we are
14   taking over the project.
15   Q.    As construction manager?
16   A.    He said we are taking over the
17   project.
18   Q.    So, you don't know in what
19   capacity?
20   A.    I assumed and was also told by --
21   subsequently by Mr. Berry and as reported in
22   The Montgomery Advertiser that they were
23   serving as the construction -- I believe it

Page 184

1    was the construction manager.
2    Q.    Okay. Now, I believe you told me
3    a little while ago that you have no idea what
4    sort of renovation have occurred, if anything,
5    at this project, correct?
6    A.    Yes.
7    Q.    So, you don't know whether or not
8    TCU has served in any capacity with respect to
9    the renovation project since September 22nd,
10   2006, do you?
11   A.    I know that John Chambliss was
12   retained as the architect. I know that
13   Chambliss was working with Mr. Upchurch. This
14   is based on my conversation from a year or so
15   ago at that time. And they were looking to do
16   demolition and window replacement. And that's
17   -- that's the extent of my knowledge.
18   Q.    So, other than they were looking
19   to do demolition and window replacements, you
20   have no idea what, if anything, TCU has done
21   on this project --
22   A.    No.
23   Q.    -- since September --

Page 185

1    A.    No.
2    Q.    Let me finish. Since September
3    22nd, 2006; is that correct?
4    A.    Yes. I have no clear
5    understanding.
6    Q.    Okay. What did you understand
7    Ken Upchurch and Percy Thomas' roles to be in
8    this project prior to September 22nd, 2006?
9    A.    I think I previously answered
10   that.
11   Q.    Ken Upchurch and Percy Thomas --
12       MR. LYONS: Separately from --
13   Q.    (By Mr. Lawson) They're
14   individuals. You've named as a defendant in
15   this lawsuit each of them.
16           What did you understand their
17   roles to be on this project prior to September
18   22nd, 2006?
19   A.    That Ken Upchurch was taking the
20   lead on the owner's representation on behalf
21   of TCU and that Percy had a secondary role.
22   Q.    On behalf of TCU?
23   A.    They work for -- I mean, that's

Page 186

1 their company.
2    Q.    Did you understand them to at all
3 times be employed by or working for TCU on
4 this project?
5    A.    Yes.  That's my -- that's how it
6 was presented to me.
7    Q.    Let me go to when you say you
8 were notified that TCU would serve as the
9 owner's rep on this project.
10        You did, in fact, approve of
11 their reviewing your materials, correct?
12    A.    I don't think it was up to me to
13 approve or disapprove.  I think we agreed to
14 it.
15        (Whereupon, said document was
16        marked for identification as
17        Defendant's Exhibit No. 7 to the
18        deposition of Arne F. Goldman.)
19    Q.    Let me show you Defendant's
20 Exhibit No. 7 and ask if you've ever seen
21 that?
22    A.    I saw a copy of it.  But, you
23 know, he's speaking for the development team.

Page 187

1 We're not the development team.  We're like
2 the construction entity.  He and Dick Davis
3 are the development team.
4    Q.    Okay.  It's an E-Mail from Gil
5 Berry to Buford Crutcher and others --
6    A.    Uh-huh (affirmative).
7    Q.    -- at ASU.  You're copied on it,
8 correct?
9    A.    Absolutely.
10    Q.    And it talks about proprietary
11 information review.  That's the subject line?
12    A.    Yes.
13    Q.    And it says the development team
14 and I have no problem with the University
15 reviewing the scope of work and other
16 documents left in their possession in order to
17 allow them due diligence.
18        Do you see that?
19    A.    Yes.
20    Q.    And it says we welcome the
21 program manager on board and look forward to
22 his input.  Did you ever send an E-mail in

Page 188

1 response to this E-mail saying we, Marous,
2 object to ASU or anyone associated with ASU
3 reviewing the scope of work and other
4 documents left in their possession?
5    A.    I believe that Dick Davis and/or
6 Gil called me/Marous ahead of time before this
7 and said do you have a problem.  And I said as
8 long we don't -- as long as the job doesn't
9 get snaked away from us.  They're certainly
10 entitled to do their due diligence.
11        And if they have a program
12 manager that we would call -- up north we
13 would call it an owner's rep.  But if they
14 have a program manager in place, that's
15 certainly -- that can be unusual and
16 customary.
17    Q.    So, you did not then send out an
18 E-mail objecting after Mr. Berry sent this
19 July 28th, 2006, E-mail?
20    A.    No.
21        (Whereupon, said document was
22        marked for identification as
23        Defendant's Exhibit No. 8 to the

Page 189

1        deposition of Arne F. Goldman.)
2    Q.    Defendant's Exhibit No. 8, have
3 you ever seen that E-mail?
4    A.    Yes.
5    Q.    It's from Kenny Thomas to Gil
6 Berry and others, a copy to you, dated July
7 28th, 2006, wherein he is confirming a
8 telephone conversation, which according to
9 this E-mail permission has been given for a
10 due diligence review of the documents and the
11 development agreement on this project.
12        Do you see that?
13    A.    Yes.  What are you asking me?
14    Q.    Well, I'm asking if you see that
15 first?
16    A.    I see that.
17    Q.    Okay.  After this E-mail was
18 sent, did you ever send any E-mails or make
19 any phone calls objecting to anyone reviewing
20 the development agreement or any of the other
21 documents as part of the due diligence review?
22    A.    Excuse me. I want to look at an
23 exhibit.  Please, repeat the question.

Page 190

1    Q.    Did you ever object to this
2 E-mail or did you ever send a response to Mr.
3 Thomas saying, no, that is -- we don't agree
4 to TCU reviewing as part of the due diligence
5 for ASU any of the documents or development
6 agreement provided by SSGBA?
7        MR. LYONS:  If you know.  The
8 question is did he object to that?
9        MR. LAWSON:  Yeah.
10        THE WITNESS:  No.
11    Q.    (By Mr. Lawson)  It's copied to
12 you.
13    A.    No.
14    Q.    You didn't have any objection
15 then, did you?
16    A.    No.  I thought it was -- I
17 thought the way it was worded was -- I didn't
18 understand the tone of that E-mail --
19    Q.    Well --
20    A.    -- from Kenny to Gil.  That was
21 the only thing.
22        (Whereupon, said document was
23        marked for identification as

Page 191

1        Defendant's Exhibit No. 9 to the
2        deposition of Arne F. Goldman.)
3    Q.    Well, let me show you Defendant's
4 Exhibit No. 9.  And it's an E-mail from Gil
5 Berry to Kenny Thomas and others, copied to
6 you, dated July 29, 2006.
7        And he says I have no problem
8 with Ken and Percy -- and that would be TCU --
9 assisting the president with reviewing the
10 scope of work that the development team will
11 be performing for ASU.
12        Do you see that?
13    A.    Yes.
14    Q.    The very first sentence.
15        The last sentence of that
16 paragraph, again, I have no objection to Ken
17 and Percy reviewing the scope of work outlined
18 by MBC -- and that would be Marous Brothers
19 Construction I'm assuming?
20    A.    Yes.
21    Q.    With President Lee.
22    A.    Yes.
23    Q.    You were copied on this E-mail?

Page 192

1    A.    Yes.
2    Q.    Did you object to those
3 statements made by Mr. Berry?
4    A.    Not to those statements, no.
5    Q.    Is there a statement in here that
6 you do object to?
7    A.    I just -- we tend to not be as
8 shamelessly self-promoting.
9    Q.    As who?
10    A.    As Mr. Berry.
11    Q.    And how is he self-promoting
12 here?
13    A.    Well, we would not -- we don't
14 need to -- I don't know that we're who's who
15 worldwide.  I do believe we're one of the
16 larger CM general contractors.  We have won
17 numerous awards.
18    Q.    So, where he's promoting Marous
19 Brothers?
20    A.    Yeah.  I mean, we tend not to
21 promote ourselves, and we let our work speak
22 for itself.  It is true that we -- we also
23 never represented we could bid on any size job

Page 193

1 there is in the State of Alabama.  What we
2 were granted was unlimited bonding capacity
3 because we're financially solvent, but --
4    Q.    He says in that paragraph that
5 you're looking at, the second full paragraph,
6 they have received their general contracting
7 license in the State of Alabama, scoring
8 extremely high on the exam.
9        How does he know that?
10    A.    Well, I think he talked to Glenn
11 Scherba who took the test for us who actually
12 did apparently score well on the exam but -- I
13 mean, you either pass or you don't pass.
14    Q.    Okay.  So --
15    A.    We're just not -- my point here
16 is that -- you asked me if I object to
17 anything in the second part.  I object to kind
18 of the shameless Marous promotion that he was
19 doing.  I mean, I think he did it with the
20 best of intentions, but it's just not how we
21 choose to promote ourselves.
22    Q.    More specifically, I guess, for
23 today's deposition, you did not object to his

Page 194

1  granting permission to ASU and TCU to review
2  the scope of work and any other documents
3  prepared by Marous or Berry or Student Suites
4  on this project?
5      A.    To review the documents, we had
6  no objection.
7      Q.    Did you ever provide any
8  documents yourself to TCU?
9      A.    Yes.
10      Q.    What?
11      A.    Construction schedules, fee
12  breakdowns, clarification on scopes of work I
13  believe.  We sent E-mails about the need for
14  the University to do an asbestos survey or
15  surveys on the buildings.  So, there was
16  significant amount of correspondence back and
17  forth.
18      Q.    And you wouldn't consider
19  correspondence proprietary, would you?  You
20  keep saying proprietary with the E-mail.
21          The E-mails that you're sending,
22  do you consider that proprietary?
23      A.    I didn't say that the E-mails

Page 195

1  were --
2      Q.    I'm asking.
3      A.    I'm saying the information.  I
4  think the information going to the owner's rep
5  if it's used against us is -- I mean, the
6  intention was -- the intention was to provide
7  Mr. Upchurch with all the information he
8  needed so that he could gives us a favorable
9  recommendation.
10      Q.    If he thought one was deserving?
11      A.    Which he told me it was.
12      Q.    Okay.
13      A.    I wouldn't have given up my Labor
14  Day weekend to work on stuff --
15      Q.    You didn't have any sort of
16  contracts with TCU or Upchurch or Thomas, did
17  you?
18      A.    No.
19      Q.    No agreements of any kind with
20  them?
21      A.    No.
22      Q.    Your proposal and scope of work
23  were submitted to ASU?

Page 196

1      A.    They were submitted to Mr. Berry
2  and Mr. Davis who submitted them to, as we
3  understand, the bound counsel and Dr. Lee and
4  several other people who had asked for copies
5  of them.
6      Q.    When was the first time you met
7  Mr. Upchurch in person?
8      A.    Today.
9      Q.    So, prior to today, all of your
10  dealing with Mr. Upchurch were either via
11  telephone or E-mail?
12      A.    Yes.
13      Q.    And when was the first time you
14  met Percy Thomas?
15      A.    I met him at one of the the board
16  meetings.
17      Q.    Okay.  When was that?
18      A.    Well, I believe in August of
19  2006.
20      Q.    Did you have any discussions with
21  him at that time?
22      A.    No.
23      Q.    You just knew he was there?

Page 197

1      A.    I was introduced to him.  Hi,
2  this is Percy Thomas.  Hi, hello.
3      Q.    How many phone calls did you have
4  with Ken Upchurch prior to September 22nd,
5  2006?
6      A.    I don't have a specific number.
7  Numerous.
8      Q.    More than ten?
9      A.    Yes.
10      Q.    More than 20?
11      A.    Yes.
12      Q.    More than 50?
13      A.    I'm not sure.
14      Q.    How about E-mails, did you send
15  him more than ten E-mails?
16      A.    Yes.
17      Q.    More than 50?
18      A.    I assume that you --
19      Q.    We would have all of the E-mails
20  that you did send --
21      A.    Yes, you would.
22      Q.    -- in the production that you
23  provided?

Page 198

1    A.    Yes, you would.
2    Q.    So, if they aren't in there, then
3  there are no more?
4    A.    Yes.
5    Q.    This first conversation that you
6  say you had with TCU when they were introduced
7  to you as the owner's representative, do you
8  know when that would have occurred?
9    A.    I believe late July of 2006.
10    Q.    What exactly was said during that
11  conversation?
12    A.    Mr. Upchurch had reviewed at that
13  point a development agreement and our scope of
14  work, and he had a number of questions about
15  the development agreement and a number of
16  specific scope questions about what we had
17  proposed that he wanted clarification on.
18    Q.    Is that it?
19    A.    And then he followed it up with
20  an E-mail.
21    Q.    Did you provide clarification or
22  answers to his questions?
23    A.    Yes. Well, after we had a chance

Page 199

1  to look at it over a period of a few days.
2        MR. LAWSON: Do y'all want to
3  break for lunch real quick?
4        MR. LYONS: We might as well.
5        MR. LAWSON: Twenty minutes?
6        MR. LYONS: That's fine.
7        (Whereupon, the taking of the
8  deposition was recessed from approximately
9  1:32 p.m. to approximately 2:00 p.m., after
10  which the following proceedings were had and
11  done:)
12        (Whereupon, said document was
13        marked for identification as
14        Defendant's Exhibit No. 10 to the
15        deposition of Arne F. Goldman.)
16    Q.    Mr. Goldman, you've described for
17  me your marketing efforts and your
18  preconstruction efforts.
19        When did the marketing end and
20  the preconstruction begin on this project?
21    A.    As far as we're concerned, when
22  that resolution marked --
23    Q.    Exhibit 5, I believe?

Page 200

1    A.    When that exhibit -- around that
2  time. But say starting in December of 2005,
3  into January and then on.
4    Q.    Now I'm going to show you
5  Defendant's Exhibit No. 10 and ask if you can
6  identify that for me, please?
7    A.    This is the original PowerPoint
8  presentation that we assembled for Alabama
9  State that we presented on September 20th.
10    Q.    It says Student Housing
11  Redevelopment Master Plan. This is, though,
12  the PowerPoint presentation that you
13  referenced earlier?
14    A.    That's one of the PowerPoint
15  presentations.
16    Q.    You would consider any work that
17  went into this to be marketing efforts?
18    A.    You've got -- I'm not sure that
19  this -- I need to check. I want to make sure
20  that this was the original thing we presented.
21        Yes, this was -- yes, this was
22  the initial -- this was the initial
23  presentation.

Page 201

1    Q.    And it was submitted to ASU by
2  Student Suites, Marous Brothers and Gil Berry?
3  At least by the cover page it shows the logo
4  for each of those entities?
5    A.    Yes. It was presented by all
6  three of us with us as the design/builder at
7  this point and Student Suites and Gil Berry as
8  the developer.
9        (Whereupon, said document was
10        marked for identification as
11        Defendant's Exhibit No. 11 to the
12        deposition of Arne F. Goldman.)
13    Q.    I'll show you Defendant's Exhibit
14  No. 11 and ask if you can identify that for
15  me?
16    A.    I haven't seen this.
17    Q.    You don't know what that is?
18  Okay. It was produced by Marous. If you look
19  at the bottom of the first page, it has --
20    A.    It wasn't --
21    Q.    -- a Bates stamp number MAR,
22  which your counsel put on there as having come
23  from Marous' files.

Page 202

1    A.    Yeah.
2    Q.    You don't know what that is?
3    A.    I can read what it is. It's a
4  follow-up letter.
5    Q.    It indicates in the first line
6  it's a revised plan to the proposal. Do you
7  recognize this document?
8    A.    I don't recognize -- you're
9  asking me -- the cover letter I don't
10  recognize.
11    Q.    How about any of the other pages?
12    A.    The second page, we didn't
13  produce this. So, I don't know. Our logo's
14  on the bottom, but we did not produce this.
15  We didn't produce the --
16    Q.    You're looking at MAR 188, Page 2
17  of that exhibit?
18    A.    Yeah, 188. Gil may have sent
19  this to us. I think this was from -- I
20  believe we have a copy of this stuff, but we
21  didn't produce this document.
22    Q.    Were you --
23    A.    Produce meaning we didn't

Page 203

1  generate it. This is not something we
2  generated.
3    Q.    I understand you didn't generate
4  it. Did you know that it was being provided
5  by Gil Berry or Student Suites to ASU at the
6  time?
7    A.    I think afterwards. Maybe
8  during. They were preparing. I think we may
9  have given them the renovation number, but
10  that's it. We didn't generate any of the
11  proforma or anything.
12    Q.    If you look over at the last page
13  -- and it's referenced on the first page an
14  attachment. There is a resolution attached to
15  that with your logo at the bottom. Do you see
16  that?
17    A.    I do see that.
18    Q.    Were you --
19    A.    I see it now.
20    Q.    Were you aware that Mr. Berry or
21  Student Suites was submitting this to ASU on
22  your behalf?
23    A.    I don't think -- it doesn't say

Page 204

1  they're submitting it on our behalf. It says
2  they're submitting it on their behalf. They
3  just happened to put our logo on it.
4    Q.    Okay. Were you aware that they
5  were submitting --
6    A.    No.
7    Q.    -- it to ASU with your logo?
8    A.    No.
9        (Whereupon, said document was
10        marked for identification as
11        Defendant's Exhibit No. 12 to the
12        deposition of Arne F. Goldman.)
13    Q.    Defendant's Exhibit No. 12, can
14  you tell me what that is, Mr. Goldman?
15    A.    This appears to be the
16  proprietary work product that we produced for
17  the project that documented our intended scope
18  of work, drawings, there are some on-screen
19  takeoffs, there's general program information,
20  some very detailed on-screen takeoffs that
21  helped us in our estimating, as well as
22  existing conditions, demo plans, proposed
23  plans.

Page 205

1    Q.    When was this prepared by --
2    A.    Between January and May of --
3  January and the end of April of 2006.
4    Q.    Between January and April of 2006
5  this was prepared by Marous Brothers?
6    A.    By Marous Brothers.
7    Q.    Did Gil Berry have any input into
8  this?
9    A.    Very little. I mean, we knew
10  what we were -- we understood that we had been
11  given a budget that we had to design and build
12  to. So, I don't -- I don't recall that Gil
13  had much input in the preparation of this
14  document at all.
15    Q.    When was it provided to Gil
16  Berry? Or was it provided to Gil Berry?
17    A.    It was provided to him, I
18  believe, the end of April.
19    Q.    Was it ever provided to ASU?
20    A.    They asked us for -- Dr. Lee
21  apparently had asked Gil Berry for copies
22  because he didn't have one.
23        But in May we attended a meeting,

Page 206

1  either a board meeting or a building committee
2  meeting, and we brought some copies for -- I
3  know Judge Wiggins. I handed Judge Wiggins
4  one, and so I know he had it. We brought
5  several.
6      Q.    So, this document then, Exhibit
7  No. 12, was provided to Gil Berry and then
8  ultimately provided to ASU --
9      A.    Yes.
10     Q.    -- by May of 2006?
11     A.    Yes.
12     Q.    Does this -- and I refer to it as
13  the scope of work. Is that how you refer to
14  this document? Or do you call it something
15  else? That's just what I've called it.
16     A.    Whatever you want to say.
17     Q.    How does Marous refer to it?
18     A.    Scope of work documents. It's
19  our work product, our deliverable.
20     Q.    This deliverable or the scope of
21  work, does it include the schematic or the
22  architectural work that you described earlier
23  as having been done by Marous?

Page 207

1      A.    Some of it, sure.
2      Q.    Does it also include any of the
3  work that you've described as having been
4  preconstruction services? Does it --
5      A.    Yeah, some of it.
6      Q.    -- include that?
7      A.    Some of it.
8      Q.    And this was prepared and
9  submitted to ASU before TCU was involved in
10 the project?
11     A.    Yes.
12     Q.    TCU didn't have any role or any
13 input into the development of Exhibit 12, did
14 it?
15     A.    Yes, I believe they had no input.
16     Q.    Yes, you believe they had no
17 input?
18     A.    Yes. We have no bananas.
19     Q.    So, no, they did not have any
20 input?
21     A.    I'm agreeing with you.
22     Q.    Okay.
23     A.    You asked me a question.

Page 208

1      Q.    I know. So, they did not have
2  input into Exhibit 12?
3      A.    They did not have input.
4      Q.    Okay. What was not included or
5  what was specifically excluded in your
6  proposal or your scope of work?
7      A.    We had some colored renderings.
8  We had color rendered floor plans that we had
9  prepared that were pictorial in nature. We
10 didn't put them in this book.
11     Q.    When were those prepared?
12     A.    Between January and April.
13     Q.    Okay. Were those produced in
14 discovery to your counsel, the colored
15 renderings and the pictorials?
16     A.    I believe so.
17     Q.    I'm not sure that I've seen it in
18 the production.
19     A.    They're in the May PowerPoint
20 presentation or whatever. They're in there.
21     Q.    So, the September 20, 2005,
22 PowerPoint presentation?
23     A.    No. There's a later -- I believe

Page 209

1  there's a later presentation --
2      Q.    Okay.
3      A.    -- and it would be in there along
4  with the costs. You know, their schedule --
5  advanced schedule information. There was
6  other information besides this for format
7  reasons that didn't go in here.
8      Q.    I'm not sure that those have been
9  produced in discovery in this case.
10     A.    If they haven't, I'll make sure
11 that they are.
12     Q.    And, in fact, this scope of work
13 was not produced by Marous in this case. And
14 if you'll look at the Bates stamp number, this
15 is GBA, Gil Berry & Associates.
16          So, in saying that, I believe
17 there may be some work product generated by
18 Marous that you've just described that has
19 not, in fact, been provided by you to your
20 counsel. And we would ask that that be made
21 available and produced to us.
22     A.    I will be happy to look for and
23 produce anything.

Page 210

1    Q.    And if you want to put it on --
2  in disk format, that's fine.
3    A.    Okay.
4    Q.    This project, as I understand it,
5  was for the renovation of six dormitories.  Is
6  that what you proposed?
7    A.    Our engagement, as we understand
8  it, was for six dormitories.
9    Q.    Your proposal had a number of
10  exclusions, didn't it?
11    A.    We had -- define a number of.
12    Q.    Well, you had some?
13    A.    Several.
14    Q.    Okay.
15    A.    Yes.
16    Q.    Can you tell me what some of
17  those exclusions were?
18    A.    Sure.
19    Q.    And if you can, reference Exhibit
20  12 for some of those exclusions.  What page --
21  are you looking at some exclusions in Exhibit
22  12?
23    A.    I'm looking at this exhibit.  Go

Page 211

1  to general clarifications, Page 1.5 or Section
2  1.5.
3    Q.    Okay.
4    A.    Because of our current and prior
5  bonding commitments, we're not allowed to have
6  anything to do with environmental remediation,
7  the investigation of, the removal of
8  environmental or hazardous materials so that
9  we included -- we excluded that work.
10        We indicated to the University
11  and Mr. Upchurch that they needed to -- and I
12  know correspondence was sent to Judge Wiggins
13  by Mr. Berry because we sent numerous
14  correspondence from January to April to Gil,
15  and I know that he forwarded it to the
16  building committee that they had to engage
17  services of an environmental survey company to
18  examine the possibility -- perform a phase one
19  environmental survey and examine the
20  possibility of ACM, asbestos-containing
21  materials, and any other known hazards.
22        We indicated -- our standard
23  disclaimer is major dewatering, which is if

Page 212

1  we're digging foundations and we hit a river,
2  we're not going to dewater the Gulf of Mexico.
3        If we hit rock excavation -- none
4  of which is applicable here because we weren't
5  doing -- short of elevator installation, we
6  weren't going to be doing any kind of mass
7  excavation.  But rock excavation or hard shale
8  excavation we don't -- we exclude.
9        Testing beyond normal testing,
10  which we would call concrete.  Testing would
11  be normal testing or soil bearing capacity
12  testing would be normal, but X-ray refraction
13  of steel connections or moment connections
14  would be considered abnormal.
15        All power company charges should
16  be paid by others, meaning the power that we
17  use during the renovation the University or
18  someone else would have to pay for.
19        Furnishings, artwork, window
20  treatments, mailboxes, directory and
21  protection screens, that was by others.  The
22  furniture was to be provided by the
23  developers, we understand, under an FF&E

Page 213

1  package, but not by Marous.
2        We did not include the cost of a
3  performance bond.  We do not carry builders
4  risk insurance.  We assume the owner or the
5  developer would carry that.
6        We don't have any penalties for
7  liquidated damages.  We do not include
8  overtime or winter conditions work.  Winter
9  conditions are probably less of a factor here
10  than it is up north.
11        Any unknown underground
12  conditions, such as we go to connect to the
13  water line and the water line doesn't exists
14  because there's a well providing water to
15  Abercrombie, would be excluded.
16        We disclosed that we have not yet
17  reviewed the drawings at this point with the
18  local building department so that if there's
19  any other code items, they have not been
20  included as part of the work.
21        We excluded any sewer tap fees
22  and soil and geotechnical.
23        And that's going to be a pretty

Page 214

1  standard disclaimer for all six buildings.
2      Q.    Were there any other exclusions
3  or items not included in your proposal that
4  aren't identified in the general
5  clarifications?
6      A.    That's a broad question that I
7  can't answer. Are there any other items --
8      Q.    Well --
9      A.    -- specific to this scope of
10 work?
11     Q.    Yes.
12     A.    For this scope of work everything
13 in here is what we were prepared to do, and
14 everything that's excluded is what we weren't
15 prepared to do.
16          If the University wanted other
17 things that aren't in here, which later Mr.
18 Upchurch relayed some things that we thought
19 we should add, we went ahead and modified.
20     Q.    So, for instance, the asbestos
21 abatement, that would be at an additional cost
22 to ASU, correct?
23     A.    Yes.

Page 215

1      Q.    Permits, those would be at an
2  additional cost to ASU or permit compliance?
3      A.    We did not -- I don't think we
4  said permits were excluded. We did not
5  exclude permits.
6      Q.    How about utilities, all
7  utilities would be at additional cost to ASU
8  for the renovation project?
9      A.    We excluded sewer tap fees. We
10 excluded power company charges. Those are the
11 utility costs that we excluded.
12     Q.    Okay. So, those would be at
13 additional cost to ASU on the project?
14     A.    Yes.
15     Q.    What was the guaranteed not to
16 exceed price?
17     A.    Of the construction or of the
18 whole development?
19     Q.    The whole development.
20     A.    The whole development.
21 Ultimately, I believe it was $24.6 million.
22     Q.    How did you arrive at the $24.6
23 million?

Page 216

1      A.    I worked with Mr. Upchurch and we
2  broke down what his understanding was of --
3  and what my understanding was of the hard
4  construction costs, the developer fee, the
5  construction management fee, an amount of
6  money carried for contingency and the FF&E,
7  furnishings, fixtures and equipment package
8  offered by the developer at the University.
9      Q.    So, the amount of money that
10 would be paid to Marous, Gil Berry, Student
11 Suites for renovation of the six dormitories
12 would be $24.6 million as you understood it?
13     A.    It would not be paid to us
14 jointly. It would be paid to us --
15     Q.    Well, as --
16     A.    -- based on responsibility of the
17 roles because they were independent of each
18 other.
19     Q.    But the total amount paid to
20 those three entities however you-all divided
21 it up would be --
22     A.    That's my understanding.
23     Q.    -- $24.6 million?

Page 217

1      A.    I believe that was the final
2  number.
3      Q.    But the actual renovation could
4  not be completed for $24.6 million, could it,
5  because other things, such as asbestos
6  abatement and utilities would have to be paid
7  for, correct?
8          ASU couldn't get those --
9      A.    We don't know if there was
10 asbestos. We excluded it. That was up to
11 ASU.
12     Q.    We know there are utilities?
13     A.    Absolutely --
14     Q.    So --
15     A.    -- but we have no idea of
16 assessing what those costs could be.
17     Q.    I understand, but my question to
18 you --
19     A.    Those costs would be over and
20 above.
21     Q.    Over and above the $24.6 million?
22     A.    Yes.
23     Q.    So, the total project would cost

1  ASU more. Now, they may not pay you more, but
2  it would cost them more than $24.6 million?
3      A.    Illogical assumption. We had a
4  contingency in there so that --
5      Q.    Did your contingency cover
6  utilities?
7      A.    No, but it could have if there
8  was money available to do so.
9      Q.    Well, was there anything in your
10  proposal that said if there is any money
11  available we'll pay for utilities?
12     A.    We have -- we sent -- I sent an
13  E-mail to Ken Upchurch about the usage of that
14  contingency late in the process -- by late, I
15  mean in September before it went to the board
16  -- that said that any unused amounts of the
17  contingency could be used to fund other scope
18  items in the project at their discretion.
19     Q.    Was utility a scope item?
20     A.    I think -- it could be. We
21  excluded it, but it could be. It could be --
22  however ASU wanted to spend the money. It was
23  their contingency.

1      Q.    If there was any money left over
2  in the contingency?
3      A.    If there was money left over.
4      Q.    Would that cover anything such as
5  plaster repair?
6      A.    Over and above what we assumed,
7  yes, but we assumed that we would be doing
8  some plaster repair.
9      Q.    How much?
10     A.    I've got to go look. It's been a
11  while.
12            You've got a division -- I'm
13  missing Page 1.2. Let's see. Unless it's out
14  of order. I've got two pages 1.1 and no Page
15  1.2. But if you go to Page 1.2 --
16     Q.    That's where we'd find it.
17     A.    You would find that. And then
18  you would find -- it's not the amount. We say
19  on 1.3 furnish and install drywall patches to
20  match existing walls to remain.
21     Q.    Drywall patches. Okay. Well,
22  how about -- do you consider drywall patches
23  to be the same as plaster?

1      A.    We would match the surface in
2  plain as we always have on all our work.
3      Q.    How about plumbing, did you
4  intend to reuse the existing plumbing?
5      A.    Only if the -- for instance, the
6  vent piping would be reused only if it was
7  deemed to be in good condition. We'd be
8  putting in waste -- new waste piping for all
9  the toilets, sinks and showers, the existing
10  rises or the existing waste pipe. And we
11  would air test. If it holds the air test, we
12  would reuse if the layout permits.
13     Q.    What if the layout did not
14  permit, would that be an additional cost?
15     A.    No.
16     Q.    What about rotten wood
17  replacement, was that provided for?
18     A.    We provided for some percentage
19  of rotten wood originally, and then we came
20  back and modified our -- that was one of the
21  items, I believe, that Mr. Upchurch questioned
22  in his 60 something items that he had
23  questioned between the development agreement

1  and the scope. And we did respond to that.
2      Q.    Did your proposal -- in your
3  response to Mr. Upchurch's query, did you
4  represent that Marous would replace any rotten
5  wood on the project or --
6      A.    I don't --
7      Q.    -- were there limitations?
8      A.    I don't recall without seeing it.
9      Q.    You never got approval from the
10  building commission for your scope of work or
11  any of the design --
12     A.    We never submitted it to the
13  building commission.
14     Q.    Okay. Why not?
15     A.    It wasn't time to yet.
16     Q.    When would the time have been to
17  submit that?
18     A.    When we did construction
19  documents, sat down with the building
20  commissioner during the time when John
21  Chambliss would be preparing construction
22  documents, have a meeting with them, go
23  through any other outstanding potential code

1  issues.
2      Q.    When would that have been in this
3  time sequence?
4          We're looking at a proposal that
5  you submitted -- or rather a scope of work
6  that you submitted in May.
7          When did you anticipate or expect
8  to sit down and draft contract documents and
9  get approval from the building commission?
10     A.    Between September and December.
11  And we had --
12     Q.    Of '06?
13     A.    Of '06 so that we could start in
14  '07. Are we done with this document?
15     Q.    Yes.
16         (Whereupon, said document was
17         marked for identification as
18         Defendant's Exhibit No. 13 to the
19         deposition of Arne F. Goldman.)
20     Q.    I'm going to show you Exhibit No.
21  13. It appears to be an E-mail from Dick
22  Davis dated June 29, 2006, to Marvin Wiggins,
23  Dr. Frazier, Joe Lee, Glen Scherba, Gil Berry

1  and you're in the address line as well.
2          Do you recall ever seeing this?
3      A.    Yes.
4      Q.    Mr. Davis states down in that
5  second paragraph that they will be responsible
6  for all architectural drawings. Is that your
7  understanding of --
8      A.    This was a discussion. That was
9  just a decision they had that was changed
10  subsequently.
11     Q.    It also says that they'll provide
12  all of the necessary environmental removal.
13  Do you see that?
14     A.    Again, that was in June, and I
15  think that's not -- I'm fairly certain that
16  that -- that they redefined what they would
17  accept as their responsibility subsequent to
18  that.
19     Q.    Okay. Defendant's Exhibit No.
20  12 you said excluded environmental removal
21  earlier for remediation, asbestos removal?
22     A.    Absolutely.
23     Q.    Subsequent to that, Mr. Davis has

1  said that they will be responsible for
2  necessary environmental removal. Is he just
3  mistaken or --
4      A.    No. He's saying -- he's a
5  separate entity from Marous Brothers. Marous
6  Brothers because of our bonding requirements
7  are not allowed to have anything to do with
8  environmental.
9          So, he can do whatever he wants.
10  We, unfortunately, are not allowed to touch
11  anything having to do with environmental
12  abatement because our bonding company doesn't
13  want the exposure.
14     Q.    Was it your understanding that
15  Gil Berry or Dick Davis or Student Suites
16  would provide for environmental removal?
17     A.    Ultimately, no. I remember
18  speaking with Dick and Gil telling them
19  there's no way that you can be -- you can
20  accept that responsibility.
21         You're not a licensed abatement
22  contractor. You can't supervise. You're not
23  licensed in the State of Alabama to supervise

1  the removal or the remediation of ACM or
2  hazardous material and that it's
3  inappropriate.
4      Q.    What is your opinion regarding
5  their understanding of the requirements of the
6  law in the State of Alabama with respect to
7  licensing of contractors?
8      A.    I think that they had a shallow
9  understanding, and I think we insisted that
10  they speak to local counsel so that they get a
11  good understanding.
12     Q.    Now, Exhibit 12, does that
13  include architectural services for the
14  project, or was it your understanding at the
15  time you submitted the scope of work in May
16  that Mr. Chambliss or some other architect
17  would be hired?
18     A.    At this point we were pretty
19  certain that the construction documents would
20  be going to somebody else.
21     Q.    For the architectural services?
22     A.    The architectural services.
23         # # # # #

Page 226

1      (Whereupon, said document was
2      marked for identification as
3      Defendant's Exhibit No. 14 to the
4      deposition of Arne F. Goldman.)
5      Q.    This is Defendant's Exhibit No.
6  14. Will you identify that for me?  Can you
7  identify that document?  Do you know what that
8  is?
9      A.    It's a restatement of the
10 features and benefits of the development
11 agreement that Gil Berry and Student Suites
12 were proposing.
13     Q.    Who prepared this, do you know?
14     A.    I did.
15     Q.    Do you know when you prepared
16 this?
17     A.    I don't know.  July or August I
18 believe.
19     Q.    Was this provided to Gil Berry or
20 to Gil Berry and ASU or --
21     A.    It was provided to Gil Berry and
22 to Dick Davis, and I believe it was sent to
23 Ken Upchurch as well.

Page 227

1      Q.    Okay.  How do we know this?  I
2  don't see anywhere on this document that says
3  it was provided to --
4      A.    Just recollection.  This was the
5  draft document, anyway.
6      Q.    So, this is not a final?
7      A.    I don't believe it's the final
8  document.
9      Q.    You state that the CMA, which
10 would be Marous I suppose, and developer,
11 which would be Gil Berry, have negotiated a
12 professional services agreement with John
13 Chambliss down in Paragraph C.
14          Is that accurate?  Had you at
15 that time negotiated a --
16     A.    We had negotiated a fee
17 arrangement, yes.
18     Q.    Okay.  What was the schedule on
19 this project?  What was your anticipated start
20 date and completion date?
21     A.    We assumed -- well, it was a
22 phase schedule.  We were working on -- we had
23 several scenarios.

Page 228

1      We had scenarios that anticipated
2  starting in January on -- I want to say Bibb
3  Graves and Abercrombie and then -- because we
4  had to time it with the school year occupancy.
5  So, it was phased, and it was complicated.
6      (Whereupon, said document was
7      marked for identification as
8      Defendant's Exhibit No. 15 to the
9      deposition of Arne F. Goldman.)
10     Q.    Okay.  And I'm looking at
11 Defendant's Exhibit 15.  Can you identify that
12 for me?
13     A.    Yes.  It was just -- it was a
14 time line that we put together.
15     Q.    On July 11, 2006?
16     A.    On July 11, 2006.
17     Q.    And according to this time line,
18 it contemplates a start date of July '06 and a
19 completion date of January '08.  Am I reading
20 that correctly?
21     A.    No.
22     Q.    No?
23     A.    It contemplates a start date of

Page 229

1  December '06 of construction.
2      Q.    Okay.  So, December of '06 would
3  be the start of actual construction?
4      A.    Uh-huh (affirmative).
5      Q.    So, anything prior to December
6  '06 you would consider that to be
7  preconstruction services?
8      A.    Once our construction management
9  -- no, because bidding -- bid packages and
10 bidding, I would look at not preconstruction.
11 I would throw that into construction services.
12     Q.    Okay.  So, the start date would
13 be prior to December of '06 --
14     A.    Yeah.
15     Q.    -- then, wouldn't it?
16     A.    Yeah.
17     Q.    And the anticipated completion
18 date was in January of '08?
19     A.    Well, I can't read the third -- I
20 can't see the third one because of the shading
21 that we used.  I don't know when the -- we
22 have Bib Graves and Abercrombie, December to
23 August.  We have Bessie Benson and Willease

Page 230

1 Simpson, May to January. I don't know when
2 William Benson and George Card is on my copy.
3 It looks like July '08.
4    Q.    I don't see one on my copy
5 either.
6    A.    Okay. Well, it's beyond that.
7 Because they're obviously staggered. It's
8 probably July '08.
9    Q.    Was this ever provided to ASU?
10    A.    I have no idea. It was provided
11 -- it was provided to Ken Upchurch. It was
12 provided -- you know, later, subsequently, we
13 had more detail.
14         This copy was provided to Gil
15 Berry and to Dick Davis. And I don't know --
16    Q.    For what purpose?
17    A.    I believe Gil or Dick or both
18 were having conversations with the building
19 committee about what's possible in terms of
20 delivery dates.
21    Q.    Was this possible?
22    A.    Yes.
23    Q.    This being Exhibit 15?

Page 231

1    A.    At that time, yes, as of July.
2    Q.    Okay. So, it was a workable or
3 achievable schedule?
4    A.    I think so. It was aggressive,
5 but achievable.
6         (Whereupon, said document was
7         marked for identification as
8         Defendant's Exhibit No. 16 to the
9         deposition of Arne F. Goldman.)
10    Q.    Let me show you Defendant's
11 Exhibit No. 16 and ask if you can identify
12 that for me?
13    A.    It's the same -- I think it's the
14 same document.
15    Q.    So, it's attaching the same
16 project time line dated July 11, 2006,
17 correct?
18    A.    Uh-huh (affirmative).
19    Q.    And that's an E-mail from you to
20 Gil Berry and Dick Davis?
21    A.    Yeah.
22    Q.    In your E-mail you've attached
23 that time line and you state, Gil, this is the

Page 232

1 most aggressive possible schedule per your
2 request, Arne. (Not likely to occur).
3    A.    Absolutely.
4    Q.    Okay. Well, you just got through
5 telling me that it was doable and/or
6 achievable.
7    A.    The construction was achievable.
8    Q.    Well, I asked you about the time
9 line, not about the construction. I said --
10    A.    Then I need to back up. The
11 construction durations -- I thought your
12 question was about the construction durations
13 in the time line. Those were achievable.
14    Q.    Okay. Well, what's not likely to
15 occur?
16    A.    The development -- getting the
17 development agreement signed, you know,
18 getting -- in order for this time line to --
19 in order for us to get to construction, there
20 were a number of things that had to occur
21 sequentially, concurrently and consecutively.
22         And I just -- given how things
23 had been going up to that point, I didn't see

Page 233

1 it possible that that would be occurring --
2    Q.    Well, I don't see that in your
3 E-mail. Your E-mail just talks about the
4 schedule and says it's not likely to occur.
5 You don't elaborate and say all of these other
6 conditions need to be met first.
7         But that's what you're telling me
8 you meant by that?
9    A.    Absolutely.
10    Q.    Did anybody ever communicate that
11 to ASU when they provided the time line?
12         When Gil Berry or you or Dick
13 Davis provided the time line dated July 11,
14 2006, did anybody ever tell ASU that it's not
15 likely to occur?
16    A.    I don't know what -- I wasn't
17 part of those conversations. What I do know
18 is ASU was told without question that they
19 needed to get an environmental survey done
20 because that was going to hold up everything.
21    Q.    But did anybody tell them the
22 time line that Marous prepared and that was
23 being provided to ASU was not likely to occur?

Page 234

1    A.    You have to ask Gil or Dick. I
2 have no --
3    Q.    You don't --
4    A.    -- way of knowing that.
5    Q.    You didn't notify anybody at ASU
6 or Ken Upchurch or anyone else --
7    A.    No.
8    Q.    -- to that fact, did you?
9    A.    Ken Upchurch wasn't involved when
10 this time line was prepared.
11    Q.    But you didn't notify anybody
12 else that the time line that Marous prepared
13 was unlikely to be met?
14    A.    I told Dick and Gil.
15    Q.    Okay. So, only Dick and Gil?
16    A.    Yeah.
17    Q.    Is that correct?
18    A.    Yes.
19    Q.    Do you consider that to be an
20 important fact to an owner, to know that the
21 time line that's being provided to that owner
22 is likely to be met?
23    A.    I made -- I made a value judgment

Page 235

1 based on how I saw Alabama State and how I saw
2 their process proceeding.
3        So, my value judgment is my value
4 judgment, and I don't know if it's important
5 or not. It depends if you value my opinion or
6 not.
7    Q.    Okay. In your experience, do you
8 think that an owner would consider it
9 important to know whether or not the time line
10 or the schedule they're being provided can be
11 met?
12    A.    It's important that an owner
13 understands their obligations in that --
14 within that time line. That's what I think is
15 important.
16    Q.    Okay. So, whether or not the
17 time line can be met or the schedule can be
18 met, you don't have an opinion one or another
19 as to whether or not that's important?
20    A.    I think it's -- I think it's
21 important that the developer share that
22 information. The developer in this case being
23    Q.    The developer in this case being

Page 236

1 Mr. Berry?
2    A.    And Mr. Davis.
3    Q.    And Mr. Dick Davis.
4        (Whereupon, said document was
5        marked for identification as
6        Defendant's Exhibit No. 17 to the
7        deposition of Arne F. Goldman.)
8    Q.    You submitted a number of
9 invoices in this case, or at least a couple of
10 invoices, didn't you?
11    A.    Yes, we did.
12    Q.    Defendant's Exhibit No. 17, can
13 you identify that for me?
14    A.    That's an invoice that we had
15 prepared at the request of Gil Berry for the
16 work we had performed to-date.
17    Q.    So, as of May 15, 2006, Marous
18 Brothers contends that it provided
19 preconstruction and design/build services in
20 the amount of $297,500?
21    A.    Contends we have provided at that
22 point Part 1 design/build and preconstruction
23 services. And that's not even inclusive of

Page 237

1 my time, which up to that point was several
2 hundred hours.
3    Q.    Okay. But whatever you may
4 believe should have been included, at this
5 point in time what was included totaled
6 $297,500?
7    A.    Yes.
8    Q.    And it was submitted to Gil
9 Berry?
10    A.    I guess, yeah.
11    Q.    Well, it's Marous -- is that a
12 Marous invoice?
13    A.    Yes.
14    Q.    So, you guess. Is that -- is
15 that the correct number?
16    A.    I didn't -- yes.
17    Q.    And this was for work performed,
18 up to and including, May 15, 2006?
19    A.    That's -- I believe so.
20        (Whereupon, said document was
21        marked for identification as
22        Defendant's Exhibit No. 18 to the
23        deposition of Arne F. Goldman.)

Page 238

1    Q.    Defendant's Exhibit 18, can you
2  identify that for me?
3    A.    We took our -- we had taken our
4  preconstruction services, and we just broke it
5  down into elements.
6    Q.    So, 18, then, is merely a further
7  breakdown of what was shown in Defendant's
8  Exhibit 17?
9    A.    I believe so.
10   Q.    It shows $297,500 being the total
11  amount due as of May 15, 2006?
12   A.    I believe so.
13   Q.    So, all of these items, a through
14  m, shown on Exhibit 18 are preconstruction
15  services --
16   A.    Yes.
17   Q.    -- for which Marous believes it
18  should be compensated?
19   A.    Yes.
20   Q.    Do you have any sort of backup or
21  detailed information to support each of these
22  line items in this invoice?
23   A.    I don't know.

Page 239

1    Q.    Well, how did you arrive at
2  on-site field video and survey work, $27,550?
3    A.    We have -- we know how much time
4  we spent here.
5    Q.    How do you know that?
6    A.    Well, we have -- we have, I'm
7  sure, time cards that --
8    Q.    So, there is some backup to
9  corroborate this?  Because we haven't seen it.
10  All we've seen is this invoice.
11   A.    Okay.  I'm not -- I was unaware
12  that you haven't seen that.
13   Q.    So, there is information then to
14  back up each and every one of these line item
15  charges?
16   A.    I believe there is.  I believe
17  there is.
18   Q.    Preparation of existing
19  conditions base plans, $42,940.  What is that?
20   A.    It's drawings of all of the
21  existing floor plans, demo plans -- I'm sorry,
22  all of the floor plans, elevations, site
23  layout plans I guess.

Page 240

1    Q.    None of that would be marketing?
2    A.    No.  My time is in the marketing.
3    Q.    Would any of the existing floor
4  plans be included as part of that, that are
5  included here in your Exhibit No. 10, which
6  was your master plan dated September 20, 2005?
7    A.    No, because we wanted -- we went
8  and field measured and found discrepancies
9  between the as-built conditions and the --
10  those were prepared from drawings that were
11  provided to us by Alabama State University.
12   Q.    So, when I see existing floor
13  plans on layouts in the September 20, 2005,
14  master plan, Exhibit No. 10, which you say was
15  marketing efforts, those are inaccurate?
16        I mean, you had to go back to the
17  tune of $42,940 and prepare existing
18  conditions base plans?
19   A.    What I said was based on the
20  information we had at the time prior to a
21  field survey, we relied on information
22  provided by Alabama State and prepared
23  drawings that were dimensionally different.

Page 241

1    Q.    I understand.  But they're not
2  accurate, is what you're telling me, what's
3  contained in Exhibit 10?
4    A.    They're accurate based on the
5  information we had at the time.  We went and
6  got more accurate information based on field
7  conditions.
8    Q.    So, you went back later and
9  determined that what's in Exhibit 10 is not
10  accurate based upon your field measurements,
11  correct?
12   A.    There is elements of the floor
13  plans that aren't depicted accurately.  I
14  wouldn't say the document's inaccurate.
15   Q.    Well, I'm just trying to figure
16  out why it is that in Exhibit 10 the existing
17  floor plans and the existing conditions, which
18  you said this was a marketing effort, why
19  sometime after that there is line item c,
20  which is preparation of existing conditions
21  base plans for $42,940.
22        It looks to me like Exhibit 10
23  contains those existing conditions.

Page 242

1     A.    No.  We were looking for the
2  location of plumbing risers.  We dimensioned
3  -- there are no dimensions, no interior
4  dimensions, on those drawings.
5          We went back so that we could
6  create accurate interior dimensions and
7  exterior dimensions and whole dimensions and
8  locate structural elements, which are not
9  reflected in that -- as you characterized
10  marketing package.
11     Q.    So, not as detailed?
12          Well, I didn't characterize it
13  that way.  You told me this was part of your
14  marketing.
15     A.    Right.
16     Q.    Okay.  So, there's not as much
17  detailed information in Exhibit 10 as you --
18     A.    There was not enough detailed
19  information for us to provide a guaranteed
20  price on the project.
21     Q.    And so that's where line item c
22  comes in?
23     A.    Yes.

Page 243

1     Q.    Preliminary suite layouts,
2  $39,750, what is that?
3     A.    That's all the drawings we did,
4  the colored renderings and everything we did
5  for a design and redesigning the suite layouts
6  for each of the six buildings.
7     Q.    Okay.  That wouldn't be anything
8  that's included in this Exhibit No. 10, which
9  shows suite layout --
10     A.    No.  We modified the layouts
11  somewhat from that based on the existing --
12  the actual existing conditions that we
13  determined.
14     Q.    So, what was a marketing effort
15  in Exhibit 10 for suite layout later you had a
16  preliminary suite layout to the tune of
17  $39,750?
18     A.    That's --
19     Q.    Is that correct?
20     A.    That's not a marketing effort.
21     Q.    Well, I think you've said Exhibit
22  10 is part of your marketing.
23     A.    But that's not what's reflected

Page 244

1  in this.
2     Q.    Well, I understand that.  What
3  I'm saying is in your Exhibit 10 you show
4  suite layouts, preliminary suite layouts,
5  correct?
6     A.    We do.
7     Q.    Okay.
8     A.    Not based -- yeah.  They're based
9  on the information provided to us by Alabama
10  State.
11     Q.    Later you go back and do it
12  again, provide more detail I suppose?
13     A.    We provided a lot more detail and
14  worked the layouts so that they were workable
15  based on the existing conditions.
16     Q.    So, none of the work then that
17  went into the preparation of Exhibit 10, the
18  preliminary suite layout, none of that time or
19  work or effort is included in line item e, is
20  it --
21     A.    No.
22     Q.    -- $39,750?
23     A.    No.

Page 245

1     Q.    How do we know that?  Do we have
2  any time records that would support lime item
3  e?
4     A.    We can go back and look for that
5  because we -- the stuff that I had our guys do
6  that supported the marketing effort was done
7  under a business development job code that's
8  different than the -- the job wasn't set up at
9  that point.
10          Internally from the accounting
11  standpoint, we had not yet assigned a job
12  number as a job that was moving forward that
13  we could assess time to.
14     Q.    Okay.  So, you didn't go back and
15  look at that job number then and try to
16  capture those costs and include those in your
17  invoice, Exhibit No. 18?
18     A.    No.
19     Q.    And we could look at some of the
20  records that you have -- if you printed your
21  time records and the job code records for this
22  invoice, we could look at that and determine
23  that from December of '05 up to May 15th,

Page 246

1  2006, you had $297,500 in preconstruction
2  services?
3      A.    I would assume so.
4      Q.    Well, we haven't been provided
5  that information.  So, we'd like to see that.
6      A.    We'll be happy to provide that
7  information.
8      Q.    That invoice, Exhibit No. 18,
9  dated May 15, 2006, was provided before TCU
10 was involved in the project, correct?
11     A.    Yes.
12           (Whereupon, said document was
13           marked for identification as
14           Defendant's Exhibit No. 19 to the
15           deposition of Arne F. Goldman.)
16     Q.    Exhibit No. 19, can you tell me
17 what that is?
18     A.    Based on Dick Davis and Gil
19 Berry's query to us and based on how we had to
20 break -- how the bond underwriting was going
21 tying back to how we had to prepare a draw
22 schedule for the job and keep modifying in a
23 construction schedule, they wanted us to take

Page 247

1  our total CM, fee post -- you know, during
2  construction, preconstruction, $455,000, and
3  then the other million and a half plus dollars
4  and show how we'd allocate it to each of the
5  six buildings because these buildings occurred
6  over an extended period of time.
7           That's what that reflects.
8      Q.    As of July 10, 2006, your
9  preconstruction services fee is now $455,000?
10     A.    No.  As of July 10th, our total
11 -- we assumed that we were going all the way
12 through preconstruction that our total fee was
13 $455,000 as agreed to by Gil Berry and Dick
14 Davis.
15     Q.    So, you're not representing then
16 in Exhibit No. 19 that your total
17 preconstruction services fees to-date was
18 $455,000?
19     A.    We were not representing that at
20 that time.
21     Q.    That was what you anticipated the
22 total preconstruction services fees would be
23 --

Page 248

1      A.    Up to award.
2      Q.    Okay.  But you had not incurred
3  that amount at that point?
4      A.    At that point, no.
5      Q.    Okay.  Did you ever submit
6  another invoice separate from Exhibit 18, the
7  May 15, 2006, invoice?
8      A.    I don't recall.
9           (Whereupon, said document was
10          marked for identification as
11          Defendant's Exhibit No. 20 to the
12          deposition of Arne F. Goldman.)
13     Q.    Exhibit No. 20, can you tell me
14 what that is?
15     A.    Yeah.  I'm going to compare this
16 to that.  Well, that's a fee difference of
17 $50,000 in -- of $60,000 in preconstruction.
18     Q.    It shows a preconstruction fee of
19 $395,000?
20     A.    Yes.
21     Q.    Now, it's dated the same as
22 Exhibit No. 19, though, right?
23     A.    Yes.

Page 249

1      Q.    Why does it show a different
2  preconstruction fee?
3      A.    Because the question was, I
4  believe, at the time whether we would
5  recapture my time spent on the project or not
6  for preconstruction, which was extensive.  And
7  my time --
8      Q.    Sixty thousand dollars worth?
9      A.    And my time get billed more than
10 some of the other people.  Sure.
11     Q.    Was Exhibit No. 20 ever provided
12 to Gil Berry?
13     A.    I'm not sure.
14     Q.    It says Gil Berry and --
15     A.    I believe -- I believe either 20
16 or 19 were -- I know one of them was provided.
17 I don't know if both were provided.
18     Q.    You said Gil Berry and Student
19 Suites agreed to preconstruction fees of
20 $455,000?
21     A.    Yes, they did.
22     Q.    ASU didn't agree to
23 preconstruction fees of $455,000, did it?

Page 250

```
 1      A.    I don't know that or not.
 2      Q.    They never told you that they
 3  agreed to that, did they?
 4      A.    They never told me.  Yes.  They
 5  never told me.
 6      Q.    Okay.  TCU never told you that it
 7  agreed to $455,000 in preconstruction service
 8  fees, did it?
 9      A.    No, but he said that they were --
10  he came to the conclusion that they were
11  reasonable preconstruction fees.
12      Q.    I understand that that's your
13  contention.  But TCU never told you that TCU
14  would pay your preconstruction fees of
15  $455,000, did it?
16      A.    Yes.  They never told me that.
17      Q.    And any fees or expenses or costs
18  incurred by Marous up to this May 15, 2006,
19  invoice were incurred before TCU was involved
20  in the project, correct?
21      A.    Yes.
22      Q.    And you don't recall whether or
23  not you ever submitted another invoice to
```

Page 251

```
 1  Mr. Berry?
 2      A.    Short of the letter that I think
 3  that we submitted that said we want our full
 4  -- the amount of our preconstruction services,
 5  which I believe we sent in September, I'm not
 6  sure there was another invoice.
 7           (Whereupon, said document was
 8            marked for identification as
 9            Defendant's Exhibit No. 21 to the
10            deposition of Arne F. Goldman.)
11      Q.    This is Defendant's Exhibit No.
12  21.  Tell me what that is.  What is that?
13      A.    I have -- this is Gil math.
14      Q.    It appears to be an E-mail from
15  Gil Berry to you dated July 12, 2006.
16      A.    Yeah.  I have no idea what --
17  this was some finagling Gil was trying to do.
18      Q.    What do you mean by finagling?
19      A.    I don't know.  There's some -- he
20  was trying to -- I think he was trying to get
21  -- this was like getting an advance on his
22  referral fee or something.  I have no idea.
23  All I know is I don't think anything ever came
```

Page 252

```
 1  of this.  I have no idea what that is about.
 2      Q.    And he's talking about splitting
 3  fees?
 4      A.    And I don't know what fees he's
 5  --
 6      Q.    Twenty-five percent profit share,
 7  what is that?
 8      A.    I have no idea because I -- I
 9  know it's something -- whatever it was never
10  happened.
11      Q.    Were you aware that Dick Davis
12  didn't want you to have anything?
13      A.    Yeah.  I don't understand what
14  any of this -- this was some of the
15  meanderings of Dick and Gil that we just
16  didn't want any part of.  I don't...
17      Q.    So --
18      A.    I don't even remember what this
19  was about.  I just remember that, you know, I
20  ignored it.
21      Q.    These preconstruction fees that
22  Marous incurred on this project were incurred
23  at the direction of Gil Berry; is that
```

Page 253

```
 1  correct?
 2      A.    I don't understand your question.
 3      Q.    Well, you have an invoice dated
 4  May 15, 2006, for preconstruction and service
 5  fees?
 6      A.    Yes.
 7      Q.    Did you incur those things at the
 8  direction of Gil Berry and Student Suites?
 9  Did they tell you to do these things?
10      A.    To prepare the invoices?
11      Q.    Well, obviously to prepare the
12  invoice.  But to do the work that is shown in
13  those invoices?
14      A.    I think Alabama State certainly
15  induced us to do that work.  Gil Berry and
16  Dick Davis certainly induced us to do that
17  work.
18      Q.    TCU didn't induce you to do that
19  work, did it?
20      A.    They weren't involved in the
21  process at that time.
22      Q.    Okay.  So, that would be a no?
23      A.    No, since they weren't involved
```

1  at that time.
2      Q.    What were the fees that Marous
3  expected to earn on this project?
4      A.    I would need to see a breakdown
5  to refresh my memory, but we have --
6      Q.    Just generally. I'll show it to
7  you, but just generally what do you recall?
8      A.    I think $455,000 in
9  preconstruction, a million five in
10 construction management agency. Those were
11 our fees.
12      And then on top that there was
13 reimbursable, which isn't a fee. There's
14 general conditions and reimbursables for our
15 project management and supervision and those
16 kind of expenses against which we have costs.
17 So, I wouldn't call those fees.
18      (Whereupon, said document was
19      marked for identification as
20      Defendant's Exhibit No. 22 to the
21      deposition of Arne F. Goldman.)
22      Q.    Defendant's Exhibit 22, do you
23 know what that is? It was produced out of

1  Marous' documents?
2      A.    Yes.
3      Q.    What is that?
4      A.    We were given -- and I wrote it
5  because this is my notepad with my doodles on
6  it.
7      We were asked to back into and
8  look at if it's possible using a $25 million
9  for total development costs that Dick Davis
10 and Gil Berry gave to us. If you backed off
11 the components of the development, what would
12 that leave for hard construction and was that
13 reasonable.
14      That's what this represents.
15      Q.    Okay. At this point in time
16 whenever you prepared that, was it expected
17 that developments fees, architecture fees, CM
18 fees, reimbursables and furniture would be
19 $8.7 million?
20      Is that -- am I reading that
21 correctly?
22      A.    We were just taking the numbers
23 that Gil and Dick gave us and that we knew

1  would be your our CM fee in reimbursables,
2  what we anticipated. And they gave me $1.9
3  million in furniture. We didn't create that
4  number. And just see what was left for hard
5  construction. It was a reasonableness test to
6  see if that made sense.
7      (Whereupon, said document was
8      marked for identification as
9      Defendant's Exhibit No. 23 to the
10     deposition of Arne F. Goldman.)
11     Q.    I'm going to show you Defendant's
12 Exhibit No. 23, which is an E-mail from Ken
13 Upchurch to President Lee, Percy Thomas and
14 Kenny Thomas with an attached analysis
15 breakdown. And it says it's very preliminary.
16     Do you see that down in the
17 second to the last paragraph? And over on the
18 next page it has that breakdown.
19     A.    Uh-huh (affirmative).
20     Q.    And it says project budget of $25
21 million. Do you see that?
22     A.    Yeah.
23     Q.    Less developer fee, $2.5 million?

1      A.    Uh-huh (affirmative).
2      Q.    Construction manager fee, $1.5
3  million; architectural fee, $1.5 million;
4  FF&E, $1.4 million?
5      A.    Yeah.
6      Q.    Other costs, one million;
7  previous technology expense, $868,000.
8      Do you see that?
9      A.    Uh-huh (affirmative).
10     Q.    Do those numbers appear to be the
11 numbers that you provided to TCU?
12     A.    Are these numbers that we
13 provided to them as of what date?
14     Q.    Well, as of July 31, 2006.
15     A.    Well, I didn't --
16     Q.    You provided numbers and cost
17 breakdowns to TCU of the fees --
18     A.    Right.
19     Q.    -- and expenses, didn't you?
20     A.    I believe so, yes.
21     Q.    Okay. And do those numbers that
22 were transmitted on July 31, 2006, appear to
23 be the same numbers that you provided to TCU?

Page 258

1     A.    I have no idea.  I haven't seen
2  what I transmitted.
3     Q.    Well, do they look out of line
4  with what you provided to TCU?
5     A.    I don't -- I'm not being coy.  I
6  don't remember because a lot of numbers went
7  back and forth between us and TCU, and I don't
8  have the document in front of me that I sent
9  to --
10    Q.    Is it your contention that at any
11 point TCU misrepresented the numbers for fees
12 that you provided to TCU?
13    A.    I have no idea what they
14 represented or didn't represent.  I have no
15 idea what they represented.
16          I know that Ken Upchurch said to
17 me you've got $7 million in fees.  You've got
18 too much in fees on this project.  And I said,
19 we don't have $7 million in fees, and I
20 provided breakdowns.  That's the basis.
21          And he said, well, Kenny Thomas
22 thinks that there's $7 million in fees, too.
23 And I said, there isn't $7 million because

Page 259

1  general conditions and reimbursables aren't
2  fee.  We have costs against it.
3     Q.    Okay.  Well, do you know where
4  those numbers came from?
5     A.    Where which numbers?  These
6  numbers?
7     Q.    Uh-huh (affirmative).
8     A.    I don't know.  We didn't have
9  technology, $868,000.  I don't know -- we
10 didn't put in a million for --
11    Q.    How about the developer fee or
12 the CM fee or the architectural fee or the
13 FF&E, do you know where that came from?
14    A.    I don't know where the FF&E fee
15 came from unless Ken Upchurch thought he could
16 do the FF&E for less money than Dick Davis and
17 Gil Berry, the developers, were going to do.
18          But I imagine they got the CM fee
19 and the architectural fee from us.
20          In about 15 minutes I just want
21 to break and call my wife because I've got to
22 get my ticket home.
23    A.    Just let me know whenever you're

Page 260

1  ready.
2          (Whereupon, said document was
3          marked for identification as
4          Defendant's Exhibit No. 24 to the
5          deposition of Arne F. Goldman.)
6     Q.    Exhibit 24, can you tell me what
7  that is?
8     A.    Yes.
9     Q.    What is it?
10    A.    Mr. Upchurch said that given the
11 financing structure that Alabama State had
12 chosen to use or the bonds that were issued
13 that there was a sales tax abatement possible
14 for all material suppliers on the project.
15          So, he and I talked through what
16 happens based on -- if the schedule gets
17 lengthened by 12 months, what happens if we
18 add the technology upgrades that ASU
19 apparently asked for, asked what would happen
20 if we add $100,000, which is Alabama State's
21 administrative costs internally to administer
22 their part of the contract.  It included our
23 preconstruction fees of $455,000.

Page 261

1          He put in a million and a half
2  for abatement, which we dialogued may or may
3  not be the right number, and we took $15,300
4  as the hard construction costs.  We came up
5  with -- if we assumed that 35 percent of all
6  the hard costs is materials, applied ten
7  percent sales tax in Montgomery, we came up
8  with -- and then used the fudge factor, we
9  came up with a deduct of $428,400, which is
10 the value of the sales tax abatement on the
11 project.
12    Q.    Did you prepare this exhibit?
13    A.    I did, yes, based on
14 conversations with Ken.
15    Q.    So, your preconstruction fees,
16 which we've already established you contend
17 are $455,000; is that correct?
18    A.    Yes.
19    Q.    You show a CM agency fee of
20 $1.645 million?
21    A.    Yes.
22    Q.    You show CM reimbursable expenses
23 of $945,945?

Page 262

1    A.   Yes.
2    Q.   What is that?
3    A.   That's 24 months of project
4  management, project supervision, travel,
5  oversight, scheduling.  All the things that a
6  CM agency would be doing.
7    Q.   Okay.  Developer fee, $2.5
8  million?
9    A.   That was going to Dick Davis and
10 Gil Berry.
11   Q.   Architectural fees, $800,000?
12   A.   That was to John Chambliss.
13   Q.   Now, if I look back at Exhibit
14 No. 23, I believe it was, the attachment, it
15 appears that the developer fee is $2.5 million
16 on both, correct?
17   A.   Yes.
18   Q.   The CM fee, you in fact show it
19 to be more than what was provided in the
20 breakdown in Exhibit 23, right?
21   A.   Yes.
22   Q.   The architectural fee, $1.5
23 million, you show it to be $800,000, right?

Page 263

1    A.   Uh-huh (affirmative).  Well, he
2  doesn't include -- I don't know if he was
3  combining the $1.5 million under architectural
4  fee with our preconstruction services.
5    Q.   Okay.  So, if you add the
6  architectural and the preconstruction
7  services, you get close to that, don't you?
8    A.   Yes, sir.
9         (Whereupon, said document was
10        marked for identification as
11        Defendant's Exhibit No. 25 to the
12        deposition of Arne F. Goldman.)
13   Q.   Exhibit No. 25 is an E-mail from
14 you.  And if you look down at the bottom of
15 the page, there's an E-mail dated September 5,
16 2006, where you've -- you've sent Ken Upchurch
17 a copy of the E-mail that you sent to Chip
18 Marous, Glenn Scherba and Marie Shaw.
19   A.   Uh-huh (affirmative).
20   Q.   Where you've detailed the deal
21 you've worked out.  You said you developed a
22 good rapport with Ken; is that correct?
23   A.   We spent a lot of time on the

Page 264

1  phone Labor Day weekend.  I thought we had a
2  good rapport worked out, yes, at the time.
3    Q.   All right.  This is the deal that
4  you say you've worked out.  Preconstruction
5  services, $455,000; A&E, $800,000;
6  construction manager fee, $1.545 million?
7    A.   Uh-huh (affirmative).
8    Q.   CM reimbursables, $945,945; is
9  that right?
10   A.   Yeah.
11   Q.   Developer fee down there is $2.5;
12 is that right?
13   A.   Uh-huh (affirmative).
14        (Whereupon, said document was
15        marked for identification as
16        Defendant's Exhibit No. 26 to the
17        deposition of Arne F. Goldman.)
18   Q.   Now, look at Exhibit No. 26 dated
19 September 5, 2006.  That's an analysis of the
20 SSGBA proposal as per Arne Goldman.  Do you
21 see that?
22   A.   Uh-huh (affirmative).
23   Q.   Do those numbers differ from what

Page 265

1  you provided to Ken Upchurch?  Are the numbers
2  provided by TCU to ASU different than what you
3  provided to TCU?
4    A.   The numbers match.
5    Q.   Okay.  So, it appears that TCU
6  has provided the exact numbers that you
7  provided to TCU, correct?
8    A.   As of September --
9    Q.   As of September 5, 2006?
10   A.   As of September 5.
11   Q.   Okay.  And, in fact, you asked
12 Ken to provide these numbers to ASU, didn't
13 you?
14   A.   Yes, I did.
15   Q.   Do you have any evidence --
16   A.   No.  I asked for his review prior
17 to this meeting with Dr. Lee.  That's what it
18 says.  I didn't say review.  I said prior to
19 your meeting with Dr. Lee.  It was per his
20 request.
21   Q.   Did you expect that he would
22 provide to ASU the numbers that you provided
23 to TCU?

Page 266

1    A.    I was hopeful.
2    Q.    And as far as you've seen, those
3 numbers were provided by TCU to ASU, correct?
4    A.    I don't know that. I just know
5 that he produced the document. I don't know
6 that he handed it to him or not.
7    Q.    Okay. Well, the document that
8 you see appears to accurately reflect the
9 numbers that you gave TCU?
10    A.    It absolutely does, but I do not
11 -- again, it's not on his letterhead to --
12        (Whereupon, said document was
13        marked for identification as
14        Defendant's Exhibit No. 27 to the
15        deposition of Arne F. Goldman.)
16    Q.    Well, let's look at Exhibit 27.
17    A.    Okay.
18    Q.    That is on their letterhead dated
19 September 7, 2006.
20    A.    I still don't know if he gave it
21 to Dr. Lee or not.
22    Q.    Well, you don't know. But if we
23 show you a document dated September 7, 2006,

Page 267

1 which is a project analysis, it's on TCU
2 Consulting Services letterhead.
3    A.    Uh-huh (affirmative).
4    Q.    And, again, it breaks down the
5 proposal, and it gives the exact numbers that
6 you provided to TCU, doesn't it?
7    A.    Yeah. But excuse me for not
8 being trusting but because this does not --
9 this is not addressed to anybody. I don't
10 know that this wasn't produced sometime
11 thereafter and Xeroxed.
12        I have no way of knowing that.
13 It's not date stamped like mine, like an
14 E-mail. I have no way of knowing when that
15 was produced.
16    Q.    Do you have any evidence as we
17 sit here today that TCU ever provided
18 inaccurate numbering or deliberately provided
19 inaccurate information to ASU regarding your
20 proposal?
21    A.    I have information that Ken
22 Upchurch told me that our $7 million in fee
23 was too high and he discussed it with Dr. Lee.

Page 268

1 And that's when we got into discussion about
2 what fee is and what fee isn't. So, if he --
3        So, from that supposition or from
4 that information he provided, I assume that he
5 provided inaccurate information. Now, whether
6 or not he corrected that later is anybody's
7 guess.
8        (Whereupon, said document was
9        marked for identification as
10        Defendant's Exhibit No. 28 to the
11        deposition of Arne F. Goldman.)
12    Q.    Exhibit No. 28, can you tell me
13 what that is?
14    A.    Yes. I sent Gil -- I sent a
15 blind copy to Ken Upchurch as a courtesy. I
16 sent him a copy of the letter that I put
17 together that I was sending to Gil that
18 restated basically his fee, justifying his --
19 the size of his fee, justifying why he can
20 reduce his fee, reminding him that we have
21 been on the project for a long time, restating
22 what's fee and what isn't fee and gave him
23 information so that he understood what the

Page 269

1 financial -- what the overall financial
2 picture was and that he saw that there was a
3 benefit inuring to Alabama State.
4        And I gave -- I sent that to Ken
5 as a courtesy.
6    Q.    And so did you send that to Ken
7 so that he would then provide that to ASU?
8    A.    No, I sent to it Ken because I
9 told him I would. Because at that time I
10 thought I had a good rapport with Ken and that
11 I could provide him information so that he
12 knew that Gil Berry was -- was seeing the
13 information based on discussions that Ken and
14 I had.
15    Q.    Okay. Well, it says to use this
16 instead. What does that mean? What do you
17 mean by this, use it for what?
18    A.    Review.
19    Q.    Review with ASU?
20    A.    I don't know. It was just for
21 him to review.
22    Q.    Well, did you think he was just
23 reviewing it out of his own curiosity or just

Page 270

1   because he wanted to know what your fees were
2   or was it because he was reviewing it for ASU?
3       A.    No.  This was the letter to Gil
4   Berry.  I was stating -- I told him to review
5   it because I was providing information to Gil
6   restating the deal that Ken and I had further
7   worked out as of September 19, which is prior
8   to the board meeting, because Ken and I were
9   having lengthy discussions about what would it
10  take in terms of fee reduction and other
11  things so that he could make a favorable
12  recommendation to the board.
13      Q.    So, you wanted him to use this
14  letter that you had written to Gil Berry?  I
15  mean, you say use this instead and you attach
16  the letter.
17          What do you want Ken to do with
18  that letter?
19      A.    It's his to have.
20      Q.    To do what with?  Did you want
21  him to review it with ASU?
22      A.    Quite frankly, I thought it
23  restated the deal and he could do whatever he

Page 271

1   wanted with it.  I wanted him to see that I
2   sent it to Gil so that we -- he and I had
3   stated to the developer what the deal was that
4   we thought made sense.
5       Q.    Were you concerned that Gil Berry
6   didn't understand what the arrangement was
7   that you had with Mr. Berry regarding the fee
8   breakdown and the proposal?
9       A.    I was concerned that Mr. Berry
10  was nervous at this point about getting the
11  project approved, and I wanted to make
12  absolutely sure, since we certainly had a lot
13  to gain or lose by the board's action, that he
14  was very clear about the deal.
15          (Whereupon, said document was
16          marked for identification as
17          Defendant's Exhibit No. 29 to the
18          deposition of Arne F. Goldman.)
19      Q.    All right.  Defendant's Exhibit
20  No. 29 is from Gil Berry to President Lee
21  attaching an E-mail from you to Ken Upchurch
22  and Gil Berry.  Your E-mail was dated
23  September 19th, 2006.  Ken, for your review

Page 272

1   with Dr. Lee at ASU.
2           So, now whatever you've attached,
3   you're attaching it for Ken, not for his own
4   curiosity, but to review with ASU.  And,
5   again, it's that letter that you've written to
6   Gil Berry, correct?
7       A.    I don't know if this -- I don't
8   know if I was saying for your review with Dr.
9   Lee to review this document or for your review
10  after.  I don't --
11          MR. LYONS:  If you don't remember
12  what it was for --
13      Q.    (By Mr. Lawson)  Well, you
14  drafted it.  You tell me what it means.
15      A.    I don't remember.  Maybe I gave
16  it to Ken so that he could see that we made it
17  clear to Gil what the deal was.
18      Q.    Okay.  It includes a summary of
19  the development costs, doesn't it, over on the
20  last page of that exhibit?
21      A.    It does.
22      Q.    And that breaks down the
23  contingency, the A&E and preconstruction,

Page 273

1   FF&E, the CM, general conditions, the CMA fee
2   and the developer's fee?
3       A.    Yes.
4       Q.    Those are your numbers?
5       A.    Well, they're not just mine.
6   It's something that Ken and I had talked
7   through and worked through.  I typed it.
8       Q.    Well, you agreed to those
9   numbers, didn't you?
10      A.    Absolutely.
11      Q.    They're on your letterhead?
12      A.    Absolutely.
13      Q.    And those numbers were obviously
14  provided to President Lee, John Chambliss,
15  Buford Crutcher, Marvin Wayne Wiggins and
16  Elton Dean, correct?
17          Because Gil Berry has sent it to
18  them; is that right?
19      A.    I can't control who --
20      Q.    I didn't say you could control,
21  but --
22      A.    -- Gil Berry sends stuff to.
23      Q.    But those numbers were provided

Page 274

1  to those persons?
2      A.    Apparently they were, yeah.
3      Q.    So, they can see what Marous
4  contend were the development costs, correct?
5      A.    Yes, they can.
6      Q.    Your own analysis is not
7  misleading is any way, is it?
8      A.    No.
9      Q.    All right.
10     A.    I just...
11          MR. LYONS:  Do you need to make
12 your phone call?
13          THE WITNESS:  Yeah.  I just want
14 to -- I need to call my wife real quick.
15          MR. LAWSON:  Sure.  Help
16 yourself.
17          (Whereupon, the taking of the
18 deposition was recessed from approximately
19 3:12 p.m. to approximately 3:17 p.m., after
20 which the following proceedings were had and
21 done:)
22          (Whereupon, said document was
23               marked for identification as

Page 275

1               Defendant's Exhibit No. 30 to the
2               deposition of Arne F. Goldman.)
3          THE WITNESS:  Okay.  I've seen
4  this before.
5      Q.    (By Mr. Lawson)  All right.  I've
6  shown you Exhibit No. 30.  And you have seen
7  that before?
8      A.    From Joe Lee to Ken Thomas.
9      Q.    And Ken Upchurch.  It's an
10 E-mail.  In that string of E-mails it includes
11 your E-mail from Arne Goldman to Ken Upchurch
12 and Gil Berry dated September 19, 2006.
13     A.    E-Mail is an amazing thing, isn't
14 it?
15     Q.    Isn't it?  And included as a part
16 of your E-mail is the letter --
17     A.    Okay.
18     Q.    -- that you wrote to Gil Berry,
19 which includes a breakdown or a summary of the
20 development costs.
21     A.    Okay.
22     Q.    So, looking at Exhibit 30, it's
23 apparent to you, is it not, that Joe Lee and

Page 276

1  Kenny Thomas and various of the trustees have
2  seen your breakdown, your analysis of the
3  development fees?
4      A.    On September 19th they have seen
5  it.
6      Q.    All right.  So, they now know
7  what you contend are your fees on this
8  project?
9      A.    As of September 19th, they now
10 know.
11     Q.    All right.  You haven't seen any
12 evidence prior to September 19th that they
13 were given anything that was inaccurate, have
14 you?
15     A.    I was told by Ken -- just what I
16 previously testified to, about what I was told
17 by Mr. Upchurch.
18     Q.    He said that there were $7
19 million in fees?
20     A.    Yes.  A long string of E-mails.
21     Q.    If one adds up the construction
22 contingency, the A&E and preconstruction, the
23 general conditions, the CMA fee and

Page 277

1  developer's fee, you get pretty close to $7
2  million, don't you?
3      A.    Well, you're mixing apples and
4  wheelbarrows.
5      Q.    I'm just asking.
6      A.    No.  Fee is fee.  Fee is fee.
7  Fee is profit.  All those other things have
8  costs associated against them.
9      Q.    Okay.
10     A.    So, it's not fee.
11     Q.    Okay.  So, your contention, then,
12 is the total fees for the project would be
13 $2.445 million -- excuse me, $3.445 million?
14     A.    $3.45 million.
15     Q.    Is that what you contend are the
16 fees in the project?
17     A.    That's what I contend.
18     Q.    And everything else is a hard
19 cost on the project?
20     A.    Hard or soft costs.
21     Q.    Now, if there are monies left
22 over in the construction contingency, are
23 those paid back to ASU, or does ASU get to

Page 278

1  keep --
2      A.    Well, they never would have --
3      Q.    ASU keeps them?
4      A.    Yeah, they would keep them.
5  Absolutely.
6      Q.    Okay.
7      A.    That's our standard operating
8  procedure in any construction management
9  agency job we've ever done.
10          (Whereupon, said document was
11          marked for identification as
12          Defendant's Exhibit No. 31 to the
13          deposition of Arne F. Goldman.)
14     Q.    Exhibit No. 31 is a project
15  analysis, which includes a proposal breakdown
16  as per Arne Goldman.  Do you see that?
17     A.    Yes.
18     Q.    Okay.  Does that accurately
19  reflect the numbers that you provided to TCU?
20     A.    The top part does.
21     Q.    Okay.  That's what I'm asking
22  you.  Per Arne Goldman.  Are those numbers
23  accurate?

Page 279

1      A.    Yes, I believe they are.
2      Q.    It shows developer fee and CM
3  fee.  Are those numbers accurate?
4      A.    I believe they are.
5      Q.    Where there is a construction
6  cost, it doesn't call that a fee, does it?
7  The only two fees that it shows in that
8  breakdown or analysis are developer fee and --
9      A.    Yes.
10     Q.    There's nothing in there from TCU
11  to ASU that says they're fees other than what
12  you've identified as a fee, correct?
13     A.    Nothing in here.
14     Q.    Well, have you seen any other
15  document where TCU calls something a fee that
16  you did not identify as a fee?
17     A.    I've not seen any other document.
18     Q.    Well, we've looked at several.
19  Have you seen --
20     A.    I have no idea if this is all of
21  the documents that TCU provided Alabama State.
22  I just see what I see.
23     Q.    Well, you have not seen anything?

Page 280

1      A.    I have not seen anything.
2      Q.    All right.  Now, in looking at
3  Exhibit No. 22, this is your handwriting as
4  you've said, you show a developer fee of $2.5
5  million, architectural fees --
6      A.    That's not --
7      Q.    That's what you call it, correct?
8      A.    Fees, yes.
9      Q.    Okay.  And you call it that.  And
10  you show CM fee and reimbursables, $3 million?
11     A.    Uh-huh (affirmative).
12     Q.    And furniture, $1.9 million?
13     A.    Uh-huh (affirmative).
14     Q.    That's your breakdown, and those
15  are your words, aren't they?
16     A.    Yeah, but architectural fees is
17  an industry-accepted usual and customary term
18  that everyone knows that architectural fees
19  are not profit.  Architectural fees are a cost
20  item.
21     Q.    And if you back out the $1.9
22  million in furniture, what you have listed on
23  there approximates the $7 million, doesn't it,

Page 281

1  that you've --
2      A.    Anyone who understands usual and
3  customary construction, as I believe that Mr.
4  Upchurch would in his position, would know
5  that $1.3 million of architectural -- that was
6  a poor choice of words by me.  It should have
7  been architectural costs, not fees.
8      Q.    Okay.  Well, you made the mistake
9  then of calling it an architectural fee?
10     A.    I called it fees.
11     Q.    Okay.  The plural.  Architectural
12  fees, correct?
13     A.    Yes.
14     Q.    Okay.
15     A.    I didn't make a mistake.  It's
16  just what I used for nomenclature --
17     Q.    Okay.
18     A.    -- because this document was
19  produced well in advance of this document.
20  And this document did not go to Ken Upchurch.
21  Just so we're clear.  As far as I know.
22     Q.    The first time you heard that ASU
23  was of the belief that there were $7 million

Page 282

1 in fees, was that relayed to you by Kenny
2 Thomas?
3    A.    It was relayed to me by Ken
4 Upchurch about their belief --
5    Q.    Their belief, "their" being ASU's
6 belief.
7    A.    ASU's belief by Kenny Thomas.
8    Q.    So, Mr. Upchurch conveyed to you
9 that Kenny Thomas and ASU were of the belief
10 that your fees, yours and Gil Berry's and Dick
11 Davis' fees, on this project were $7 million?
12    A.    Yes.  As well as Gil Berry called
13 me and Dick Davis -- I think at this point Gil
14 Berry I believe called to say the same thing.
15    Q.    TCU didn't tell you that they
16 believed your fees were $7 million, did they?
17    A.    I believe he did.  I believe I
18 testified earlier that he said your fees are
19 $7 million and they seem excessive.  And then
20 we got into a discussion about fees.
21    Q.    So, you believe that Mr. Upchurch
22 was also -- and TCU was of the opinion that
23 your fees on the project were $7 million?

Page 283

1    A.    Based on that conversation, yes,
2 absolutely.
3    Q.    When was that conversation?
4    A.    Beginning of -- beginning or
5 middle of August I think.  I don't even
6 remember, but it was in -- I think it was --
7 it was ahead of this flurry of E-mails.
8    Q.    So, do you have any record of
9 that phone call?
10    A.    I don't -- I don't know.
11    Q.    Do you have any E-mail or letter
12 where you wrote TCU and said you're mistaken,
13 we don't have $7 million in fees, here are our
14 fees?
15    A.    I believe there was a E-mail in
16 all the stuff that we provided that restated
17 that.
18    Q.    Okay.  And as we've seen, ASU was
19 provided with a breakdown or analysis of your
20 fees after this alleged phone call --
21    A.    Yes.
22    Q.    -- where you said Mr. Upchurch or
23 TCU was confused about the total dollar amount

Page 284

1 on your fees where ASU was provided accurate
2 information as given by Marous to TCU,
3 correct?
4    A.    ASU on September 19th should have
5 been in receipt of that information.
6    Q.    If not before, correct?
7          We've seen a number of E-mails
8 and a number of pieces of paper as we've sat
9 here in the last few minutes which show an
10 analysis or a breakdown of the fees that you
11 provided to TCU, correct?
12          And they all came after this
13 alleged phone call where you said --
14    A.    Yes.
15    Q.    -- Mr. Upchurch was confused
16 about the dollar amount of your fees?
17    A.    Yes.  In fact, I believe that the
18 phone call from Upchurch was in September.  It
19 was the predecessor to this flurry.
20    Q.    Prior to all of these E-mails
21 that we've been looking at?
22    A.    Yes.
23          # # # # #

Page 285

1          (Whereupon, said document was
2          marked for identification as
3          Defendant's Exhibit No. 32 to the
4          deposition of Arne F. Goldman.)
5    Q.    Exhibit No. 32, what is that?
6    A.    It's an exhibit that we've
7 previously numbered as something else.
8    Q.    Okay.  Again, this is another
9 copy of your September 19th, 2006, letter,
10 correct?
11    A.    Yes.
12    Q.    And that's from you?
13    A.    It's from me.
14    Q.    And you have an analysis of the
15 fees.  In B you say developer's fee of $1.9
16 million?
17    A.    Uh-huh (affirmative).
18    Q.    You've moved $500,000 to the
19 construction contingency; is that right?
20    A.    Yeah.
21    Q.    So, the total $25 million price
22 has not been reduced by $500,000.  You've just
23 moved that to the contingency?

1    A.    Yeah, with the understanding that
2  -- Mr. Upchurch and I had spoken about what
3  should the contingency really be to protect
4  Alabama State and to protect the developer.
5        And we wanted to beef it up, and
6  the way to beef it up was to reduce -- but
7  keep it within that $25 million overall
8  construct, was to take it out of Gil Berry's
9  fee, which he agreed to do.
10    Q.    Now, in Section C of Exhibit 32
11 you say architectural design, engineering and
12 preconstruction services fees total $1.455
13 million.  Do you see that?
14    A.    Yes.
15    Q.    You've called it fees there,
16 haven't you?
17    A.    You're playing word games with
18 me.
19    Q.    No, I'm not.  That's your letter,
20 correct?
21    A.    Yes.
22    Q.    Okay.
23    A.    I think we all know that -- that

1  profit -- that it was represented to us that
2  the $7 million was profit fee as opposed to
3  nomenclature fee, which would include other
4  costs against it.
5    Q.    My point being that you have used
6  the word "fee," and if that was confusion on
7  the part of anyone, ASU, TCU or anyone else
8  with respect to what your fees were to be on
9  this project, some of that confusion could
10 have been the result of your use of the word
11 "fee," correct?
12    A.    Maybe.  But if there was any
13 confusion, I would expect that that confusion
14 would be clarified by Mr. Upchurch before
15 relating any information in any way, shape or
16 form to the University.
17    Q.    And we've seen, as you've already
18 admitted, a number of E-mails and other
19 documents where your exact numbers and fees
20 were provided to ASU.
21        So, apparently it was clarified
22 at some point, correct?
23    A.    At some point it was clarified,

1  yes.
2    Q.    Are you aware that TCU told ASU
3  that Marous and your proposal and Gil Berry's
4  proposal met each of ASU's five criteria?
5    A.    I'm sorry?
6    Q.    Are you aware that TCU informed
7  ASU that your proposal met each of ASU's five
8  criteria?
9    A.    I don't believe I'm aware of
10 that.  I don't know.  Who was told that?
11    Q.    Do you believe that -- I believe
12 you've alleged in your complaint that TCU told
13 you that they were going to inform ASU or
14 recommend to ASU that they accept your
15 proposal.  Is that your allegation?
16    A.    Yes.
17    Q.    And they told you that?
18    A.    Yes.
19    Q.    Okay.  Who told you?
20    A.    Mr. Upchurch.
21    Q.    What exactly did he say?
22    A.    After we had gone through the
23 E-mails, the letters, the negotiating, the fee

1  breakdown, he said -- I asked him, are you
2  comfortable that we've covered the scope --
3  and I'm paraphrasing -- that we've covered the
4  scope and that we have a project that you can
5  favorably recommend to Alabama State
6  University.
7        And he said, yes, I'm satisfied,
8  or something to that effect.
9    Q.    And is it your contention that
10 TCU did not recommend to ASU or tell ASU that
11 your proposal was acceptable?
12    A.    We didn't get the job.  So, I
13 don't -- whatever happened.  Mr. Upchurch
14 represented that he had the president's ear to
15 us and that he was a trusted advisor to the
16 president.
17    Q.    Okay.
18    A.    So, we don't know what other
19 kinds of backroom dealings may have been going
20 on.
21    Q.    If any.  You don't know, do you?
22    A.    If any.  If any.  But all I know
23 is ultimately -- the University still had the

Page 290

1    option to hire us, anyway, and instead they
2    didn't. We weren't -- we're a separate entity
3    from Gil Berry. We're a separate entity from
4    Student Suites.
5         And the University, I think, was
6    extraordinarily remiss and disrespectful in
7    not ever engaging us in a conversation. Mr.
8    Upchurch to his credit a week or so later said
9    would you be interested in doing this project
10   direct for ASU. And we said, of course, we
11   would. And nothing ever came of that.
12        Q.    Well, you've admitted that ASU
13   was the party ultimately responsible for
14   making the decision as to whether or not to
15   accept your proposal, correct?
16        A.    I previously testified to that.
17        Q.    Okay. And in your complaint you
18   allege that TCU said ASU should move forward
19   with your proposal, right?
20        A.    I was told that.
21        Q.    That's not a guarantee by TCU
22   that ASU will hire you or accept your
23   proposal, is it?

Page 291

1        A.    Absolutely not.
2        Q.    TCU never guaranteed or said we
3    will ensure that ASU accept your proposal or
4    hire Marous?
5        A.    They never said that.
6        Q.    TCU can't predict what might or
7    might not happen in the future, can it?
8        A.    That's a rhetorical question.
9        Q.    Can it?
10       A.    I don't think anybody can.
11       Q.    Okay. And it couldn't guarantee
12   with any certainty what ASU would do with your
13   proposal, and you understood that, correct?
14       A.    No, not -- I don't agree with
15   that characterization.
16       Q.    You understood that once the
17   proposal went to ASU and went to the trustees
18   meeting on September 22nd that it was out of
19   your hands and out of TCU's hands, didn't you?
20       A.    No.
21       Q.    You didn't understand that?
22       A.    I did not understand that was the
23   process.

Page 292

1        Q.    Did you believe at that point
2    that it was in TCU's hands as to whether or
3    not you were hired?
4        A.    I think it was in TCU's hands to
5    recommend strongly and favorably as Mr.
6    Upchurch said he would as a man of honor, that
7    he would recommend that approval and
8    acceptance.
9         And we had no reason to believe
10   at that point that ASU would not abide by
11   their trusted advisor and paid program
12   manager/owner's representative recommendation.
13             (Whereupon, said document was
14             marked for identification as
15             Defendant's Exhibit No. 33 to the
16             deposition of Arne F. Goldman.)
17       Q.    Defendant's Exhibit 33 is an
18   E-mail from Ken Upchurch to Joe Lee and Kenny
19   Thomas dated September 21, 2006. Do you see
20   that?
21       A.    Okay.
22       Q.    This E-mail is the day before the
23   meeting of the board of trustees, correct?

Page 293

1        A.    Apparently.
2        Q.    And Mr. Upchurch states as I have
3    previously stated, a deal -- and he summarizes
4    a deal -- is what the University should be
5    working toward.
6         He goes on to say that the
7    development agreement as modified by
8    negotiations, in my opinion, meets the five
9    criteria noted above as follows. And he
10   spells it out.
11        So, it appears that TCU has, in
12   fact, informed ASU that the proposal submitted
13   by Marous, Gil Berry, Student Suites met the
14   five criteria that ASU had, correct?
15       A.    At the top, yes.
16       Q.    Mr. Upchurch informed you that he
17   was going to send this E-mail to ASU before he
18   sent it, didn't he?
19             He spoke to you on the telephone
20   about it, didn't he?
21       A.    He did speak to me on the
22   telephone.
23       Q.    And he told you what was going to

74 (Pages 290 to 293)

Page 294

1   be included in that E-mail, didn't he?
2       A.    He did not tell me the last
3   paragraph was going to be included.
4       Q.    He told you that he was going to
5   tell them that the five criteria had been met,
6   correct?
7       A.    Yes.
8       Q.    And he did it, didn't he?
9       A.    Yes.
10      Q.    And he, in fact, asked you if you
11  wanted anything included in there, and you
12  said yes.
13            And in the second to the last
14  paragraph, as the owner's rep, we have agreed
15  to help Marous recruit and prequalify trade
16  contractors.
17            That's language that you wanted
18  in that E-mail?
19      A.    Absolutely because we absolutely
20  were hoping to collaborate with TCU on the
21  project and would count on their assistance as
22  we have with owner's reps in other markets
23  we've worked at.

Page 295

1       Q.    And you raised the last
2   paragraph?
3       A.    Yeah.
4       Q.    What about the last paragraph?
5       A.    I'm really disturbed by the last
6   paragraph.
7       Q.    Are you?  Well, tell me what
8   you're disturbed about.
9       A.    Well, how can the decision go
10  literally either way?  What's the other way
11  that decision can go?  We never knew there was
12  another way.
13      Q.    It was accept or reject your
14  proposal.
15            You've said that it's ASU's
16  decision as to whether or not to accept or
17  reject your proposal, correct?
18      A.    How do I know it's -- how do I
19  know that's what that means?  How do I know
20  that means there wasn't a different proposal
21  on the table that was never disclosed to us?
22      Q.    Well, we can float any conspiracy
23  theory we want out there, but --

Page 296

1       A.    It's not a conspiracy.
2       Q.    -- have you seen another
3   proposal?
4       A.    I know that Mr. Upchurch stood at
5   the meeting and said he could do the project
6   for the same amount of money we did so...
7       Q.    Well, you really don't know that
8   because you weren't there, were you?  You
9   weren't there to hear that, were you?
10      A.    He told me --
11      Q.    Were you there?
12      A.    -- that's what he said.
13      Q.    Were you there?
14      A.    I think it's --
15            MR. LYONS:  He's answered that
16  already.
17      Q.    (By Mr. Lawson)  No, you weren't
18  there.
19            And you can suggest that all of
20  these other possibilities might exist, but you
21  don't know that.  You've not seen another
22  proposal, have you?
23            In fact, you've said you don't

Page 297

1   know what work is going on out there, if
2   anything.
3            You've not seen any contracts
4   between TCU and ASU, have you?
5       A.    No.
6       Q.    You don't know what is going on
7   at that project.
8            As we sit here today looking at
9   this E-mail, the only thing that you can say
10  is that TCU did what it told you it was going
11  to do over the telephone, which is tell ASU
12  that your proposal met each of the five
13  criteria, correct?
14      A.    No.  Mr. Upchurch -- that's not
15  correct.
16      Q.    Okay.  Well, tell me what's not
17  correct about that statement.
18      A.    Mr. Upchurch also stated that he
19  would recommend approval of our proposal.
20            Where in this document -- and I
21  know you're the one asking the questions.  So,
22  here's my statement.
23            Nowhere in this document does it

1  state I believe that it's in the best interest
2  of Alabama State University to move forward
3  with this proposal, and that's what he told me
4  would be in the document.
5     Q.   Do you know that he didn't do
6  that in conversations with the trustees or --
7     A.   It's not in the document.
8     Q.   Do you know that he -- you don't
9  know, do you?
10    A.   You just got done saying if I
11  wasn't there, I don't know.  Well, you don't
12  know either.  It's not in the document, and
13  only Mr. Upchurch knows if he had those
14  conversations with people from Alabama State.
15    Q.   That's right.  Only Mr. Upchurch
16  knows.
17         You don't know whether or not TCU
18  ever recommend to ASU that they retain the
19  services of Marous, do you?
20    A.   No.
21    Q.   Now, you've made the allegation
22  in your compliant, but you have no evidence to
23  support that allegation, do you?

1     A.   Based on my conversations with
2  Mr. Upchurch and what he said he would
3  represent, we have no evidence to say that he
4  did what he said he would do.
5     Q.   But you've already admitted that
6  it's the decision of ASU, not TCU, as to
7  whether or not to accept your proposal,
8  correct?
9     A.   It was Mr. -- yes.
10    Q.   Okay.
11    A.   And it was also Mr. Upchurch's
12  statement that he would do something that he
13  didn't do.
14    Q.   What did he not do?
15    A.   He did not put in his letter that
16  he recommends the approval.  He said he would
17  put that in the letter, and it's not in the
18  letter.
19    Q.   Did he say that you met the five
20  criteria?
21    A.   Yes.
22    Q.   Did he say that you didn't meet
23  the five criteria?

1     A.   I've already answered the
2  question.
3     Q.   Did he say that he doesn't
4  recommend that they hire you?
5     A.   No.  He said he would recommend
6  that they do hire us in writing.  It's not in
7  the letter.
8     Q.   Okay.  So, he didn't write it and
9  so he didn't do it.  You have no evidence that
10 he didn't do it verbally, though, do you?
11    A.   I have evidence --
12    Q.   The only evidence --
13    A.   I wasn't at the meeting.
14    Q.   -- you have is that you weren't
15 hired?
16    A.   We weren't hired and that he did
17 not make that statement in front of the board
18 purportedly.
19    Q.   Purportedly?
20    A.   Because I wasn't there as we've
21 previously --
22    Q.   Purported by Gil Berry?
23    A.   Purported by Gil Berry.

1         (Whereupon, said document was
2         marked for identification as
3         Defendant's Exhibit No. 34 to the
4         deposition of Arne F. Goldman.)
5     Q.   Defendant's Exhibit No. 34 is an
6  E-mail from you to Gil Berry dated September
7  8, 2006; is that correct?
8     A.   Correct.
9     Q.   Why do you say on the sly?  What
10 are you referring to?  What's on the sly?
11    A.   This was something between myself
12 and Ken that I sent to Gil Berry.
13    Q.   Why did you tell him on the sly?
14    A.   Because it's something that -- I
15 don't know if it was supposed to be shared or
16 not.  So, it was on the sly.
17    Q.   In the next E-mail down from you
18 dated September 8, 2006, to Ken Upchurch, you
19 state since you and I are not part of the
20 proceedings.
21         Do you see that?  You said you
22 hoped that Kenneth Thomas will accurately
23 portray the facts to the president, and I hope

Page 302

1  that calm heads prevail since you and I are
2  not part of the proceedings.  Arne.
3      A.    Uh-huh (affirmative).
4      Q.    Now, earlier when I said you were
5  aware that Marous and TCU were not going to be
6  part of the proceedings and that it was out of
7  your hands once the proposal was to ASU, you
8  disputed that.
9          What does that mean right there?
10     A.    I don't know what -- which
11  proceedings this was.  I don't know if there
12  was other proceedings, if they was -- if they
13  were having proceedings.  I don't know if this
14  was the board meeting on the 22nd or if it was
15  some interim meeting.  I don't remember at
16  this point.
17     Q.    So, there was some proceeding of
18  which you and TCU were not a part of --
19     A.    Yes.
20     Q.    -- as you're referring to it in
21  this E-mail?
22     A.    Yes.
23     Q.    Logic would suggest that that

Page 303

1  would be the board meeting because you can't
2  sit here -- as we sit here today, you can't
3  identify any other proceedings or any other
4  board meetings, can you, after September 8?
5      A.    I don't know if I could say that
6  or not because obviously Mr. Upchurch --
7      Q.    Can you identify another one?
8      A.    Well, he was at the proceeding
9  so.
10     Q.    Which proceedings are you
11  referring to?
12     A.    He was at the board meeting
13  proceedings if this is what this is talking
14  about.  So, he was part of the proceedings.
15     Q.    Well, being present -- Gil Berry
16  was present.  Was he part of the proceedings?
17     A.    He was present at the
18  proceedings.
19     Q.    Is present the same thing as
20  being part of?
21          MR. LYONS:  Object to the form.
22     Q.    (By Mr. Lawson)  Were you
23  concerned that Kenny Thomas wouldn't

Page 304

1  accurately convey your fees and costs to ASU?
2      A.    I was concerned that he didn't
3  understand what our -- the accurate fees.  I
4  was concerned that he didn't understand; and,
5  therefore, couldn't convey.
6      Q.    Were you concerned that Mr.
7  Upchurch didn't understand it?
8      A.    I was --
9      Q.    You don't state that in your
10  E-mail.
11     A.    I state that I hope that he would
12  -- that Mr. Thomas would accurately portray
13  the facts.
14     Q.    You weren't concerned as of
15  September 8th that Mr. Upchurch and TCU didn't
16  understand it, were you?
17     A.    I was hoping at that point that
18  we had established a rapport and an
19  understanding of what those fees -- what
20  profit and fees and costs were.
21     Q.    And we've looked at any number of
22  documents that suggest that those fees were
23  accurately portrayed to ASU, correct?

Page 305

1      A.    As of September 19th, yes.
2      Q.    And earlier -- and we can go back
3  through them if you'd like, but there is that
4  number in there, correct?
5      A.    Yes.
6      Q.    If you look over at the second
7  page, an E-mail from Ken Upchurch to you dated
8  September 8.
9          As with you, my work is now done,
10  and it is ASU's decision time.  The last
11  paragraph of his E-mail.
12          Do you see that?
13     A.    Uh-huh (affirmative).
14     Q.    Do you know what he meant by
15  that?
16     A.    No, but it sure is inaccurate
17  because he's sending E-mails to Joe Lee on
18  September 21st.  So, clearly his job wasn't
19  done because he was still working on it as
20  September 21st.
21     Q.    Was he supposed to not send any
22  E-mails?
23     A.    Well, this --

Page 306

1    Q.    You're sending information after
2  this date to TCU, aren't you?
3        And we've looked at the exhibits
4  that are dated well after September 8th. So,
5  you're continuing to send information to TCU,
6  correct, as the owner's representative?
7    A.    Sure. Information that he asked
8  for.
9    Q.    Okay. So, is he not to convey
10 that to ASU?
11   A.    That's not what I said.
12   Q.    Well, you're suggesting that his
13 work should be done and that he's making an
14 inaccurate statement --
15   A.    That's not what I'm suggesting at
16 all.
17   Q.    What are you suggesting?
18   A.    I'm suggesting that he states as
19 with you, my work is now done and it is ASU's
20 decision time on September 8th.
21       And clearly there was more work
22 to be done.
23   Q.    Well, you understood and agreed

Page 307

1  with Mr. Upchurch that it was ASU's decision?
2    A.    Ultimately, yes.
3        (Whereupon, said document was
4        marked for identification as
5        Defendant's Exhibit No. 35 to the
6        deposition of Arne F. Goldman.)
7    Q.    Exhibit 35 is an E-mail from you
8  to Gil Berry attaching an E-mail from you to
9  Ken Upchurch dated September 11, 2006. What
10 was the purpose of that E-mail?
11   A.    I wanted to let Gil know that we
12 informed Ken Upchurch that there was -- that
13 as the project delayed, it would jeopardize
14 getting the first two dorms done on time for
15 the next school year.
16   Q.    Thanking Mr. Upchurch and TCU for
17 their support and for their help. What help
18 are you thanking them for?
19   A.    He was going to be advising us as
20 -- or informing us if he got some news.
21 That's the help.
22       (Whereupon, said document was
23       marked for identification as

Page 308

1        Defendant's Exhibit No. 36 to the
2        deposition of Arne F. Goldman.)
3    Q.    Exhibit 36 is a letter from
4  Marous to President Lee dated September 25,
5  2006.
6        You state in that first paragraph
7  that you understand that ASU has decided to
8  proceed with the project without Gil Berry and
9  Associates, Student Suites and the developer;
10 is that right?
11   A.    Yes.
12   Q.    Was it your understanding that
13 you were then going to contract with Gil
14 Berry/Student Suites?
15   A.    I don't understand the question.
16   Q.    Well, we've discussed a couple of
17 scenarios, one where you would be under
18 contract with ASU and another where you would
19 be under contract with Gil Berry.
20       So, as of September 25, did you
21 -- was it your understanding that Marous would
22 have contracted with Gil Berry --
23   A.    Yes.

Page 309

1    Q.    -- as opposed to with ASU?
2    A.    Yeah. Will Gil Berry or Student
3  Suites, whatever the --
4    Q.    Right. Whatever their name is
5  called, whatever that is?
6    A.    Yes.
7    Q.    So, you understood that you would
8  not have been hired by or contracted by ASU?
9    A.    We just understood that -- that
10 wasn't -- at that point wasn't discussed
11 whether we were or weren't going to be hired
12 by ASU. They certainly had that opportunity.
13   Q.    The proposal as submitted was for
14 them to hire Gil Berry as developer who would
15 then hire you, right?
16   A.    Yes.
17       (Whereupon, said document was
18       marked for identification as
19       Defendant's Exhibit No. 37 to the
20       deposition of Arne F. Goldman.)
21   Q.    Let me show you Exhibit No. 37,
22 and ask you to take a look at that for me, if
23 you will.

Page 310

1      MR. LYONS:  You want him to read
2  the whole thing or --
3      MR. LAWSON:  No, no.
4      MR. LYONS:  -- is there a part
5  you want to ask him about?
6      Q.    (By Mr. Lawson)  Well, I'm going
7  to.  But if you'll look at it and tell me if
8  you know what that document is and if you're
9  familiar with it.
10     A.    Okay.  I am.
11     Q.    Did you review the document
12 before it was filed?
13     A.    Yes.
14     Q.    Did you approve it?
15     A.    I reviewed it.
16     Q.    Well, did you approve of it being
17 filed?
18     A.    It's not a document that I would
19 sign.
20     Q.    Well --
21     A.    I think --
22     Q.    -- it was filed on your behalf.
23           Does Marous adopt the allegations

Page 311

1  contained in the first amendment complaint
2  that was filed on behalf of Marous Brothers
3  Construction, LLC?
4      A.    Our corporate counsel would have
5  approved it.
6      Q.    You're here speaking on behalf of
7  Marous Brothers?
8      A.    Yes, Marous Brothers.
9      Q.    And you've seen this document
10 before?
11     A.    Yes, I have.
12     Q.    Looking at Paragraph 13 of the
13 amendment complaint, the last sentence in
14 there says the resolution stated that its
15 terms would become null and void if a final
16 agreement was not reached on the design of and
17 financing for the Student Residence Project.
18           Is that what it says?
19     A.    Yes.
20     Q.    The resolution also provided that
21 there would be no expense to ASU if final
22 agreement was not reached, correct?
23     A.    If the final agreement on design

Page 312

1  and financing was not reached.
2      Q.    Correct.  The resolution provides
3  that there would be no expense or cost to ASU,
4  right?
5      A.    If there was no -- only if there
6  was no final agreement on design and
7  financing.
8      Q.    That's correct.  Your allegation
9  in the complaint says it would be null and
10 void if a final agreement was not reached on
11 the design of and financing.
12           But, in fact, the resolution says
13 more than that, doesn't it?  It says there's
14 no costs to ASU, correct?
15           MR. LYONS:  If you recall the
16 language of the resolution, you can answer the
17 question.
18     Q.    (By Mr. Lawson)  We can get it
19 out.
20     A.    Yes.
21           MR. LYONS:  If you need to look
22 at it, feel free to look at it.
23           THE WITNESS:  Yes, it said that.

Page 313

1      Q.    (By Mr. Lawson)  Down in
2  Paragraph 15 you say in late May 2006, you
3  submitted proprietary work to ASU.  Is that --
4  are you referring to Exhibit No. 12?
5      A.    Yes.
6      Q.    Is that what you're referring to?
7           And that was before TCU was
8  involved in the project, correct?
9      A.    Yes.
10     Q.    In Paragraph 16 there's a
11 reference to the invoices.  And, again, those
12 were submitted before TCU's involvement in the
13 project?
14     A.    Yes.
15     Q.    Paragraph 17 -- excuse me.
16 Paragraph 18.  ASU instructed GBA and Student
17 Suites to assist ASU's bond counsel.
18           Were you ever instructed -- "you"
19 being Marous.  Were you ever instructed to
20 help, or was that an instruction that came
21 from Gil Berry & Associates?
22     A.    That would have come from Gil
23 Berry or Student Suites.

1    Q.    So, ASU or its bond counsel
2 didn't instruct Marous to help --
3    A.    No.
4    Q.    -- or assist with financing; is
5 that correct?  Is that correct?
6    A.    They did not directly ask us for
7 our assistance.
8    Q.    Did you provide the proposal or
9 the scope of work to bond counsel?
10    A.    We provided it to Dick Davis and
11 to Gil Berry at their request to be given to
12 bond counsel.
13    Q.    So, you knew they were providing
14 it to bond counsel?
15    A.    Yes.
16    Q.    And you consented to that?
17    A.    Yes.  At that point we had no
18 reason to believe that we wouldn't be doing
19 the project as long as it got financed.
20    Q.    In Paragraph 23 you say ASU,
21 Marous and Student Suites continued to revise
22 the Development Agreement, even after funding.
23 Do you see that?

1    A.    Yes.
2    Q.    Plaintiffs suggested changes in
3 the agreement and their E-mail of suggested
4 changes dated July 20, 2006.  What are you
5 referring to there?
6    A.    I think this is Student Suites,
7 Gil Berry.
8    Q.    What suggested changes are you --
9 do you know --
10    A.    I think that --
11    Q.    You think that applies only to
12 Student Suites and Gil Berry?
13    A.    Yes.
14    Q.    So, you don't know of any changes
15 that were suggested by Marous?
16    A.    Other than the ones that we had
17 discussed after Mr. Upchurch got involved in
18 the project.  Those are the changes that we
19 know about.
20    Q.    Now, Paragraph 25 -- and you can
21 skim through it if you'd like.  The allegation
22 is that Elton Dean informed Berry that Percy
23 Thomas was like family.  And you can read

1 that.  Do you have any knowledge about those
2 conversations?
3    A.    Gil told us at the time.  I'm not
4 interested in any of that.  That's between
5 Mr. Berry and whoever.
6    Q.    So, that has nothing to do with
7 Marous or any of your allegations against any
8 of these defendants?
9    A.    That's Mr. Berry's -- that's his
10 --
11    Q.    Okay.  Well, sometimes it's a
12 little confusing when you have multiple
13 parties and so --
14    A.    I understand.  That's why I want
15 to be --
16    Q.    -- we're asking for
17 clarification.
18    A.    That's why I want to be explicit.
19 This is -- you know, we don't want any part of
20 any of this.  We don't know about that.
21    Q.    Okay.  Marous --
22    A.    We weren't there.
23    Q.    And that's my question.  Marous

1 was not present for any of these alleged
2 conversations, was it?
3    A.    No.
4    Q.    On July 28th -- this is Paragraph
5 26.  July 28th plaintiffs were informed by
6 Kenneth Thomas that Upchurch, Percy Thomas and
7 TCU had been selected by ASU to assist
8 President Lee.
9        Is that your best recollection of
10 when that was that TCU came on?
11    A.    I believe so.
12    Q.    To serve as the owner's
13 representative?
14    A.    Uh-huh (affirmative).
15    Q.    Is that what you understood them
16 to serve as, the owner's representative?
17    A.    The owner's representative,
18 program manager.  That's my understanding.
19    Q.    When you use the word "program
20 manager," are you using that interchangeably
21 with an owner's representative?
22    A.    Yes, I am.
23    Q.    In Paragraph 35 you claim that

1 President Lee promised to pay invoices. Is
2 that an allegation made by Marous, or is that
3 an allegation made by Gil Berry?
4     A.    A representation made by Gil
5 Berry based on his conversations with
6 President Lee.
7     Q.    Nobody ever told you that those
8 invoices would be paid other than Gil Berry,
9 correct?
10     A.    Gil Berry told us the third --
11 you know, of his conversations with a number
12 of people.
13          We assume, as is usual and
14 customary in the industry, if you're going to
15 do this amount of work -- you know, we weren't
16 doing that for free. We expected to get paid.
17     Q.    But no representations were made
18 by President Lee or ASU or TCU to Marous that
19 those invoices would be paid?
20     A.    Not directly to us. Just
21 purportedly through Gil Berry.
22     Q.    And Gil Berry never represented
23 to you that TCU told him that TCU would pay

1 have gone to this effort.
2     Q.    Well, the effort that you point
3 to in this stack of exhibits, which is Exhibit
4 12, you did that long before TCU was involved
5 in this project?
6     A.    Absolutely.
7     Q.    So, you didn't create Exhibit 12
8 in reliance on anything that TCU did or didn't
9 do, did you?
10     A.    Not this document, but all the
11 subsequent work we did, schedules, rehashing
12 schedules, schedule of values, negotiations
13 regarding fee, we did all of that after TCU
14 got involved.
15          So, never did we think that we
16 weren't going to get paid until we didn't get
17 paid.
18     Q.    Because Mr. Berry told you you
19 would?
20     A.    Well, because Mr. Berry and
21 Marvin Wiggins asked -- you don't ask somebody
22 to prepare invoices unless you intend to pay
23 them.

1 those invoices, did he?
2     A.    No, he did not.
3     Q.    Paragraph 38. You say based on
4 plaintiffs' reliance on the assurances of ASU
5 and its representatives. What representatives
6 are you talking about?
7     A.    Again, this is Gil Berry. This
8 is something you'd have to talk to Gil about.
9     Q.    We have. I'm asking you. Is
10 that a contention made by Marous?
11     A.    Yeah. Well, we relied on Gil
12 Berry's representations, not only of his
13 conversations with various board members and
14 President Lee. We had seen an E-mail from
15 Marvin Wiggins asking us -- asking Gil to
16 submit invoices for the project. We did see
17 that E-mail.
18          And, again, we had no reason to
19 believe ever, based on the behavior of Alabama
20 State or Mr. Upchurch toward Marous Brothers,
21 that we wouldn't -- that this project wouldn't
22 come to fruition and we wouldn't get paid. We
23 would never have done this -- we would never

1     Q.    Who asked you to prepare
2 invoices?
3     A.    Marvin Wiggins asked Gil Berry to
4 prepare invoices, and Gil Berry asked us to
5 prepare invoices.
6     Q.    Anyone else?
7     A.    Directly, no.
8     Q.    Well, indirectly?
9     A.    Indirectly Gil Berry told us that
10 Freddie Gallot on several occasions -- Dr. Lee
11 represented to him that -- communication,
12 submit our invoices.
13          Freddie Gallot purportedly told
14 Gil Berry that once the bond closed that we
15 would be paid, and that's why he wanted our
16 invoices. So, we started preparing invoices.
17     Q.    Did you ever confirm any of what
18 Gil Berry was telling you?
19     A.    Well, at that point once we saw
20 judge -- the Honorable Judge Wiggins' E-mail,
21 we had no reason to doubt it. I'm not in the
22 habit of doubting judges.
23     Q.    Count Two is a quantum meruit

Page 322

1  claim, and your counsel previously stated that
2  does not apply to the TCU defendants. Is that
3  true --
4      A.    It's not --
5      Q.    -- for Marous as well?
6      A.    Yes, yes.
7      Q.    I mean, I can look at your
8  counsel, but --
9      A.    Yes.
10     Q.    Count Three is a fraudulent
11 misrepresentation claim. Marous alleges in
12 Count Three that Upchurch, Percy Thomas and
13 TCU made false representations to plaintiffs
14 regarding material facts in this matter. Do
15 you see that in Paragraph 55?
16     A.    I do see it.
17     Q.    Okay. What discussions or
18 conversations did you ever have with Percy
19 Thomas?
20     A.    I had none about this project.
21     Q.    Okay. Well, if you had none with
22 Percy Thomas, then how did he make a false
23 representation to you?

Page 323

1      A.    I think this is a Gil Berry --
2      Q.    So, the entire fraudulent
3  misrepresentation claim is only Gil Berry's
4  claim? Does Marous not maintain --
5      MR. LYONS: Well, he's testified
6  about conversations he's had with Mr.
7  Upchurch.
8      MR. LAWSON: I understand.
9      MR. LYONS: And you're asking
10 about Percy Thomas.
11     Q.    (By Mr. Lawson) Well, I'm asking
12 him about Percy Thomas.
13     But are you saying that the
14 allegation against Percy Thomas is only made
15 by Gil Berry, or are you saying that the
16 entire Count Three is only by Gil Berry?
17     THE WITNESS: I need to break
18 because I've got to ask a question.
19     MR. LAWSON: I mean, we have to
20 know that in order to proceed with the
21 deposition.
22     THE WITNESS: Okay.
23     (Brief recess.)

Page 324

1      THE WITNESS: Will you ask me the
2  question again, please?
3      Q.    (By Mr. Lawson) Yes. In Count
4  Three, Paragraph 55, the allegation is made
5  that Percy Thomas made false representations
6  to plaintiffs.
7      My question for you is what false
8  representation was made by Percy Thomas to
9  Marous?
10     A.    I'm not aware of any false
11 allegations.
12     Q.    Or representations --
13     A.    Or representations that Percy
14 Thomas made unless Mr. Berry has had some.
15 But Marous is not aware of it.
16     Q.    So, as far as Marous is
17 concerned, then, Count Three, the fraudulent
18 misrepresentation claim, does not apply to
19 Percy Thomas individually?
20     A.    That's what I believe.
21     Q.    Okay.
22     MR. LYONS: Just to Marous only?
23     MR. LAWSON: That's correct.

Page 325

1  We've already examined Mr. Berry about it.
2      MR. LYONS: I know. I know.
3      MR. LAWSON: And he said what he
4  said.
5      Q.    But as far as Marous is
6  concerned, there is no fraudulent
7  misrepresentation claim against Percy Thomas?
8      I just want to make sure that's
9  clear on the record. Is that -- is that
10 clear?
11     A.    Yes.
12     Q.    You also allege that Upchurch and
13 TCU made false representations to Marous; is
14 that correct?
15     A.    Yes.
16     Q.    Okay. Is it your contention
17 still as we sit here today that Upchurch and
18 TCU made false representations to Marous?
19     A.    Yes.
20     Q.    In Paragraph 55 you state that
21 TCU and Upchurch falsely represented that they
22 believed that the plaintiffs' proposal was the
23 best and most fair proposal. Do you see that?

Page 326

1    A.    I see that.
2    Q.    And that ASU should move forward
3    with the plaintiffs' proposal immediately. Do
4    you see that? Paragraph 55.
5    A.    Yes.
6    Q.    Are there any other false
7    representations that you claim TCU or Upchurch
8    made to Marous?
9    A.    Previously testified.
10   Q.    I have to know. If you
11   previously testified, I'm sorry.
12         But with respect to fraudulent
13   misrepresentation, Count Three, I need to know
14   what those are.
15   A.    It was represented to us -- to me
16   that Mr. Upchurch would be putting in his
17   recommendation that Marous be -- that the
18   Marous proposal -- the Gil Berry/Student
19   Suites/Marous proposal be approved.
20         And that did not appear. So, I
21   would say that was fraudulently misrepresented
22   to us.
23   Q.    Okay. TCU would recommend -- let

Page 327

1    me see if I have this right -- to ASU that the
2    Marous/Gil Berry/Student Suites proposal --
3    A.    Be approved.
4    Q.    -- be approved?
5    A.    And I did not see that language
6    in the letter.
7    Q.    Okay. So, you're hanging your
8    hat now on one E-mail dated September 21 that
9    you had not previously before today seen. Is
10   that what your allegation is based on?
11   A.    Absolutely.
12   Q.    Okay. When did Mr. Upchurch tell
13   you or TCU tell you that TCU would recommend
14   to ASU that the proposal be accepted?
15   A.    On the 20th of September.
16   Q.    On September 20th?
17   A.    Yes.
18   Q.    How was that conveyed to you?
19   How was that statement made to you?
20   A.    A phone call.
21   Q.    Okay.
22   A.    At that point I was under a lot
23   of pressure from my boss, Chip Marous, since

Page 328

1    we had expended so much money. He wanted to
2    know what the status of the project was so we
3    knew if we had to hire additional personnel.
4         And I pushed Mr. -- I pressed
5    Mr. Upchurch in the phone call. And that's
6    what he told me.
7    Q.    Okay. So, on September 20th,
8    2006, TCU told you in a phone call -- with you
9    or with somebody else at Marous?
10   A.    With me.
11   Q.    With Arne Goldman that TCU would
12   recommend to ASU that the proposal be
13   accepted?
14   A.    Yes.
15   Q.    And you allege that that is a
16   false statement?
17   A.    I allege that it never happened.
18   Q.    Okay. So --
19   A.    That he never -- he did put that
20   in his written -- he said he would do
21   something, and he didn't do it.
22   Q.    Did he tell you he was going to
23   put it in his E-mail, or did he say he would

Page 329

1    just tell ASU or recommend to ASU --
2    A.    No. It was part of that whole
3    letter that we -- that I previously testified
4    about. In his written recommendation to ASU,
5    what he would provide.
6    Q.    And you allege you were misled as
7    a result of that statement?
8    A.    Yes.
9    Q.    Now, prior to today you made the
10   allegation that you were misled by TCU. What
11   did you base that allegation on?
12         You hadn't seen the E-mail that
13   you're now referring to on September 21.
14   A.    Based on Mr. Berry's statements
15   from his attendance and based on Mr.
16   Upchurch's representation of the activities
17   that happened at the board meeting and his
18   subsequent selection.
19   Q.    Did he tell you that he did not
20   recommend to ASU that Marous' proposal be
21   accepted?
22   A.    He did not tell me that. Gil
23   Berry told me.

Page 330

```
 1    Q.   So, Mr. Berry because he was at
 2  the board meeting concluded that because Mr.
 3  Berry was not retained as the developer that
 4  TCU must not have recommended that Marous'
 5  proposal be accepted; is that correct?
 6    A.   It wasn't just the Marous
 7  proposal.  It was the -- it was the
 8  development agreement.
 9    Q.   Well, now, you told me earlier
10  that ASU could have hired Marous without
11  hiring Gil Berry.
12    A.   Absolutely.  Subsequent to that
13  board meeting, sure.
14    Q.   So, Mr. Berry then concluded
15  because ASU did not accept his proposal at the
16  September 22nd board meeting that TCU must not
17  have ever recommended that Marous' proposal be
18  accepted by ASU?
19    A.   You're separating the Marous --
20    Q.   You've separated them.  You've
21  said ASU could have accepted your proposal and
22  not --
23    A.   They could have -- they could
```

Page 331

```
 1  have accepted us as the construction manager
 2  separate and apart.  They could have elected
 3  to hire us.  Instead, they elected to hire
 4  Mr. Upchurch.
 5    Q.   Did TCU tell you that it would
 6  recommend to ASU that the entire proposal,
 7  that being Student Suites, Gil Berry and
 8  Marous, be accepted?
 9    A.   Yes.
10    Q.   Okay.  And Gil Berry concluded
11  that since it wasn't accepted by ASU, that TCU
12  must not have recommended to ASU that it
13  accept it?
14    A.   Mr. Berry reported that at that
15  meeting Mr. Upchurch never once said to Dr.
16  Lee or the board members present I recommend
17  that you accept their proposal.
18    Q.   Mr. Berry was not present for any
19  discussions that may have been had between TCU
20  and ASU prior to the open board meeting, was
21  he?
22         MR. LYONS:  If you know.
23         THE WITNESS:  I don't know.  I
```

Page 332

```
 1  wasn't there.
 2    Q.   (By Mr. Lawson)  He never told
 3  you that he was, did he?
 4    A.   I don't believe so.
 5    Q.   And Marous certainly was not
 6  present or privy to any of the conversations
 7  between TCU and ASU prior to the open board
 8  meeting, was it?
 9    A.   No.
10    Q.   Now, you state in Paragraph 55
11  that TCU and Upchurch falsely represented that
12  they believed that plaintiffs' proposal was
13  the best and most fair proposal.  Do you see
14  that?  Paragraph 55.
15    A.   Yeah.
16    Q.   Who told you that?
17    A.   Ken Upchurch.
18    Q.   When did he tell you that?
19    A.   The 20th of September.
20    Q.   So, on September 20th, he told
21  you that it's TCU's opinion that your proposal
22  was the best and most fair?
23    A.   Yes.
```

Page 333

```
 1    Q.   Was that TCU's opinion?
 2    A.   I'm assuming since Mr. Upchurch
 3  is one of the principals of TCU that that
 4  would be their opinion.
 5    Q.   TCU and Ken Upchurch are entitled
 6  to their opinions, aren't they?
 7    A.   They sure are.
 8    Q.   And you'll admit, won't you, that
 9  stating that your proposal is the "best" and
10  "most fair" proposal is a matter of opinion,
11  wouldn't you?
12    A.   It's certainly a matter of
13  opinion.
14    Q.   And you've already said they're
15  entitled to their opinion.  Was your proposal
16  the best and most fair proposal?
17    A.   Given the circumstances at the
18  time, the scope of work, the definition, I
19  think it was.
20    Q.   Okay.  So, if TCU or Ken Upchurch
21  said that your proposal was the best and most
22  fair, then it's not a misrepresentation of
23  fact, is it?
```

Page 334

1        It's not a false statement to say
2  that your proposal is the best and most fair,
3  is it?
4        A.    If they had said that.
5        Q.    Well, you said they said it.
6        THE WITNESS:  It's just the way
7  it's written, right?
8        MR. LYONS:  You have to answer to
9  question.
10       THE WITNESS:  If they had said
11 that ours was the best and most fair proposal
12 and that they should move forward with our
13 proposal; immediately --
14       He said that he would be saying
15 -- he would be saying that.  And the fact that
16 he didn't is a misrepresentation of what he
17 would do.
18       Q.    (By Mr. Lawson)  All right.
19 You're going to have to clarify for me.  Your
20 allegation is that Upchurch and TCU made false
21 representations to Marous, one being that
22 they, TCU, believed that the plaintiffs'
23 proposal was the best and most fair proposal.

Page 335

1        And you said Ken Upchurch told
2  you that?
3        A.    Yeah.  You know what?  This is --
4  this is -- there's a problem with the way it's
5  worded.
6        The fact is he told us that's
7  what he believed.  Now, whether he told that
8  to ASU is a different story.
9        Q.    Okay.
10       A.    So, that particular thing is not
11 worded accurately.
12       Q.    All right.  He told you that he
13 believed it was the best and most fair
14 proposal?
15       A.    And that ASU should move forward
16 with it.
17       Q.    And you've said that TCU and
18 Upchurch are entitled to their opinion?
19       A.    Yes.
20       Q.    And you've said that it was the
21 best and most fair proposal?
22       A.    Yes.
23       Q.    So, where -- what is the false

Page 336

1  statement?
2        A.    There is no false statement here.
3        Q.    Okay.  So, the fact that they
4  told you that it's the best and most fair
5  proposal is not a false statement?
6        A.    Yes, that is not a false -- it is
7  -- I agree with you.  It's not a false
8  statement.
9        Q.    Okay.  You go on to say that TCU
10 and Upchurch made a false representation to
11 Marous that ASU should move forward with the
12 plaintiffs' proposal immediately.  Do you see
13 that?  Paragraph 55.
14       A.    Yes.
15       Q.    What is false about that?
16       A.    Nothing.
17       Q.    Okay.  So, help he out here.
18 Count Three, fraudulent misrepresentation,
19 Paragraph 55, you said the false
20 representations made by TCU and Upchurch are
21 that they believed that the plaintiffs'
22 proposal was the best and most fair proposal
23 and that ASU should move forward with the

Page 337

1  plaintiffs' proposal immediately.
2        A.    That's not fraudulent.
3        Q.    Okay.  None of that is
4  fraudulent?
5        A.    None of that is fraudulent.
6        Q.    Then what is fraudulent?  I'm at
7  a loss to figure out what exactly is
8  fraudulent.
9        A.    Mr. Upchurch stated to me that
10 under no circumstances could TCU be retained
11 to do the construction of the project.
12       In fact, at the board meeting
13 when -- allegedly and per his recounting of
14 the situation to me when I asked him, that the
15 University asked him if he could do the job
16 for less than our number.  He said, no, he
17 could do it for the same number.  And that he
18 -- and I asked him, well, what did they do?
19 He said, they elected to give me the project.
20       That's what he -- those are his
21 words.  So, on one hand you're saying it
22 couldn't -- you know, a couple -- you know, a
23 month and half earlier when I asked him why

Page 338

1  should I give you proprietary information
2  because how do I know you're not going to
3  steal the job.
4       And then apparently, surprisingly
5  enough, on September 22nd he tells me that he
6  was awarded the job that he said he couldn't
7  have awarded. That's fraudulent.
8       Q.   Where -- I don't see that. Where
9  is that?
10      A.   Well, if you look under 57, they
11 intentionally made false statements without
12 just cause.
13      Q.   What false statements did they
14 intentionally make without just cause?
15      A.   The statement that they could not
16 be hired to do the project when, in fact, they
17 were hired to do the project.
18      Q.   I don't see that. Is that what
19 you're interpreting that to mean?
20      A.   Yes.
21      Q.   When was that statement made?
22      A.   When was which statement made?
23      Q.   Tell me each and every allegation

Page 339

1  that you claim -- summarize for me, if you
2  will, each and every fraudulent statement made
3  by TCU or Ken Upchurch to Marous Brothers
4  Construction, LLC.
5       A.   The most noteworthy --
6       Q.   No, not most noteworthy. Every
7  single one upon which you base Count Three,
8  fraudulent misrepresentation.
9       A.   Number one --
10      Q.   Okay.
11      A.   -- Upchurch when asked how I knew
12 he couldn't steal the project from us if we
13 give him -- share all of this proprietary
14 information with him, his response was it
15 would be against the law. I can't get the
16 project. It's your project. You know, it's
17 your work and you -- it's against the law
18 because we've serving as the owner's rep,
19 strictly as the owner's rep.
20      Q.   Okay. Why would it be against
21 the law --
22      A.   I have no --
23      Q.   And what law did he say?

Page 340

1       A.   Against Alabama state law.
2       Q.   Because TCU didn't hold a license
3  to serve in a particular capacity?
4       A.   No, because TCU would have had a
5  conflict -- he said because they had a
6  conflict of interest because they were the
7  owner's rep on the project.
8       Q.   And I believe you have already
9  testified that you have no evidence that TCU
10 is serving in a role other than as owner's
11 representative, which it was doing prior to
12 September 22nd, 2006, correct?
13      A.   I have Mr. Upchurch's statement
14 that he was awarded the project. He wouldn't
15 be awarded the project if he already had the
16 project as an owner's rep.
17      Q.   Well, what was he awarded? Was
18 it competitively bid and then TCU won it?
19      A.   No.
20      Q.   Well, then how was it awarded to
21 him?
22      A.   He's -- he's the one who said it.
23 Ask him.

Page 341

1       Q.   I'm asking you.
2       A.   I understand that, but he's the
3  one who made the claim --
4       Q.   So, your claim is that TCU told
5  you that it couldn't take your project from
6  you because it would be against the law?
7       A.   Yes.
8       Q.   And that that statement is false?
9       A.   Because he got the project.
10      Q.   Okay.
11      A.   He told me he got -- they gave --
12 they voted to give him the project instead.
13      Q.   Okay. What other false
14 statements were made to you? What other
15 fraudulent misrepresentations were made by TCU
16 or Upchurch to you?
17      A.   Well, that's -- that's one that I
18 recollect.
19      Q.   Well, I have to know every single
20 one.
21      A.   Well, that's the one that I
22 recollect.
23      Q.   Okay. So, there are no others?

Page 342

1    A.    None that I recollect at this
2  time.
3    Q.    That's not good enough.  We are
4  deposing Marous Brothers Construction right
5  now asking about your allegations in your
6  complaint that you filed trying to understand
7  each and every allegation that you're making
8  against my clients.
9          I need to know each and every
10 allegation against Ken Upchurch or TCU.  With
11 respect to Count Three, I need to know what
12 statements you claim they made to you that
13 were false and that were fraudulently
14 misleading.
15         And you've identified one, that
16 TCU said it couldn't take the job or couldn't
17 be retained to build the project or construct
18 the project because it would be against the
19 law and that it was later hired.
20   A.    In so inducing us to release
21 proprietary information to them so that they
22 could fulfill their capacity as owner's
23 representative.

Page 343

1    Q.    Well --
2    A.    That's enough.  There's the --
3  there's the false misrepresentation.
4    Q.    All right.  So, that's it?
5    A.    That's it.
6    Q.    That's the only false
7  misrepresentation?
8    A.    Yes.
9    Q.    And your reliance on that
10 statement that was allegedly made when?
11   A.    On September 22, 2006.
12   Q.    So, It was on September 22nd that
13 TCU told you that it couldn't take your
14 project?
15   A.    No.
16   Q.    Well, when was it?
17   A.    He told me the end of July or end
18 of August that -- end of July or beginning of
19 August that he couldn't take the project.  And
20 on September 22nd, he in fact stated that he
21 was awarded the project.
22   Q.    Have you ever seen the contract
23 between TCU and ASU?

Page 344

1    A.    No.
2    Q.    You have no idea what it says, do
3  you?
4    A.    No.
5    Q.    So, you don't know in what
6  capacity TCU is working for ASU, do you?
7    A.    No.
8    Q.    What did you do in reliance on
9  that statement that Mr. Upchurch allegedly
10 made to you?
11   A.    We released -- I continued to
12 talk to him in great detail of the inner
13 workings of the project, the details of the
14 scope, details of the schedule.  I shared with
15 him the information we had prepared.
16   Q.    That information had already been
17 provided to ASU, hadn't it?
18   A.    There's additional information
19 about developer's fees and other -- and
20 profits and costs and asbestos and other scope
21 items that Mr. Upchurch stated that Alabama
22 State thought should be added, like hard tile
23 and electronic locks to doors, scope items.

Page 345

1    Q.    So, on behalf of ASU, TCU had
2  then requested that you price additional
3  items, additional scope of work?
4    A.    No.  At first he asked why they
5  weren't included in the first place.
6    Q.    And you gave him a response as to
7  why they weren't, and then --
8    A.    Absolutely.
9    Q.    Okay.  How were you damaged by
10 TCU asking on behalf of ASU for additional
11 scope of work?
12   A.    We're not damaged by that.
13   Q.    Well, tell me how were you
14 damaged by the statement allegedly made by TCU
15 that it couldn't take your project because it
16 would be against the law?
17   A.    Because we gave him information.
18 In order for him to have then -- for Alabama
19 State to have allegedly awarded him the work
20 on September 22 and to make the statement that
21 he could do the project for the same price we
22 could, means that he was relying upon the work
23 that we had done because he couldn't have

1 possibly done the due diligence to know that
2 in and of his own due diligence.
3     Q.    Do you know what the price of the
4 current renovation project is?
5     A.    I have no idea.  I know that -- I
6 know what our price was.
7     Q.    But you don't know what the
8 current price is, do you?
9     A.    No.  It's immaterial to me.  We
10 knew what our price was to do the work.
11    Q.    Well, you make the allegation or
12 the claim that TCU took your project and is
13 building the project out using your price, but
14 you don't know what the current --
15    A.    I did not -- I did not say that.
16    Q.    All right.  Well, tell me what
17 you said.
18    A.    I said that Mr. Upchurch stated
19 that the board -- he stated at the board
20 meeting that he could do the project for our
21 price.  That's what he said.
22           Now, in order for him to have
23 known -- to make that bold statement in front

1 of the Board of Alabama State University and
2 its President, he would have had to have prior
3 knowledge, pretty extensive knowledge, of the
4 project and the scope, which he only could
5 have gotten from the conversations and
6 information that was provided to him by and
7 through us.
8           That's how we were injured.
9     Q.    In his capacity as an owner's
10 representative of ASU?
11    A.    Yes.
12    Q.    So, in reliance on this alleged
13 false statement that they couldn't take the
14 project because it would be illegal, you
15 provided various information, cost analyses,
16 schedules, to TCU who was serving as owner's
17 representative of ASU?
18    A.    Yes.
19    Q.    ASU would be entitled to that
20 information whether they hired TCU or not,
21 wouldn't they?
22    A.    If they asked -- certainly, if
23 they asked for it.

1     Q.    And they could use that
2 information as they saw fit, couldn't they?
3     A.    No.
4     Q.    They couldn't?
5     A.    No.  It was proprietary.
6     Q.    Okay.
7     A.    It was proprietary to our doing
8 the project.
9     Q.    Did you do anything else in
10 reliance on this statement allegedly made by
11 TCU?
12    A.    We continued to price, reprice,
13 further define scopes, schedules.  So, we
14 incurred additional costs.
15    Q.    How much in costs?
16    A.    I don't know exactly.
17    Q.    I need to know.
18    A.    Well, I can tell you that I spent
19 44 hours, me personally, 44 hours in the month
20 of September on this project.  And 44 hours at
21 a hundred and fifty bucks an hour is how much
22 money?  And that's just my time.
23    Q.    Okay.  Well, we need to know.

1     A.    Okay.  I will provide that to
2 you.
3     Q.    Well, can you -- as we sit here
4 today, is that all you can tell me is 44 hours
5 of your time and in the month of September
6 that you expended in reliance on the statement
7 by TCU that it couldn't take your project
8 because it would be illegal?
9     A.    I could go back and tell you the
10 time I spent from the time that statement was
11 made in August and September and approximate
12 that to be about or $10,000 to $12,000 of my
13 time at $150 an hour.
14    Q.    Would any of that time have been
15 expended on this project and in furtherance of
16 your proposal to ASU had TCU not told you that
17 it couldn't take your project because it would
18 be illegal?
19    A.    I don't -- I don't think I
20 understand your question.
21    Q.    Well, you've expended time after
22 TCU allegedly told you that it couldn't take
23 your project because it would be illegal.

1    A.    If I knew they were going to take
2  -- if I knew that there was a possibility, I
3  never would have spent the time.  I would have
4  stopped at that point and asked for a full
5  release from TCU.  I would have asked for a
6  nondisclosure agreement.
7    Q.    Well --
8    A.    I could have done any number of
9  things, but I certainly wouldn't have kept
10  feeding him information.  I would have
11  stopped.  I would have just said to Gil Berry
12  and Dick Davis, guys, you know what --
13    Q.    Let me ask you this.
14    A.    -- I've not at confidence at this
15  point that we're going to have a project here
16  that somebody else isn't going to steal.  So,
17  you deal with it.
18    Q.    What did you do differently in
19  reliance on TCU's statement to you that you
20  would not, otherwise, have done?
21    A.    We dropped our -- we were willing
22  to drop our fee.  We were willing to
23  incorporate additional scope items.  We were

1  willing to price.
2    Q.    Well, did you drop your fee or
3  incorporate additional scope items in reliance
4  on the statement that TCU couldn't take your
5  project or because ASU wanted you to do those
6  things?
7    A.    Both.
8    Q.    Okay.  How in reliance on TCU's
9  statement that they can't take your project
10  did you drop your fee?
11    A.    Well, we were -- I was willing to
12  negotiate with Mr. Upchurch about fee and
13  scope and costs.
14        And if I didn't have the
15  assurance from him, I wouldn't have negotiated
16  anything with him.  I would have stopped
17  communicating with him.
18        It is unheard of in the
19  construction industry that an owner's
20  representative all of a sudden ends up doing
21  the construction or allegedly doing the
22  construction on a project after being privy to
23  otherwise confidential information.

1    Q.    Now, you just said allegedly
2  doing the construction.  Because you don't
3  have any evidence that they are doing it?
4    A.    I was told by John Chambliss.  I
5  was told --
6    Q.    What did John Chambliss tell you?
7    A.    That he's the construction
8  manager on the project.  That was way --
9  months and months ago.
10    Q.    So, John Chambliss has said that
11  TCU is the construction manager?
12    A.    Yes.  And so did Ken Upchurch.
13  He told me they retained him.  They hired us
14  to do the project, to build the project.
15  Building the project is different than being
16  the owner's representative on the project.
17    Q.    Are there any --
18    A.    I didn't say that.  Mr. Upchurch
19  said it.
20    Q.    Any other false representations
21  other than TCU telling you that it couldn't
22  take your project because it would be illegal?
23    A.    False representations from TCU?

1    Q.    Yeah.
2    A.    No.
3    Q.    And it was never explained to you
4  how or why it would be illegal to take the
5  project, was it?
6    A.    He told me it was a conflict of
7  interest.
8    Q.    And in reliance on that
9  statement, you provided information to TCU, as
10  the owner's representative, what you would not
11  otherwise have provided had that information
12  not --
13    A.    Absolutely.
14    Q.    And you don't know as we sit here
15  today how much in additional fees or expenses
16  were incurred by Marous, do you, as a result
17  of these statements that you've contributed to
18  TCU or Upchurch?
19    A.    I can estimate in terms of time
20  expenditure --
21    Q.    Well, we'll need --
22    A.    -- my time.
23    Q.    We will need a breakdown of that

Page 354

1  and leave your deposition open because we have
2  a right to examine you regarding the damages
3  that you claim as a result of anything that
4  TCU did or did not do.
5      So, you'll need to provide that
6  to your counsel, and I will need to keep your
7  deposition open.
8      MR. LYONS: If you can give your
9  best estimate today, go ahead and do that.
10     THE WITNESS: My best estimate is
11  -- I already said it's $12,000.
12     Q.    (By Mr. Lawson) Well, we'd still
13  like to break down the specific numbers that
14  you attribute to TCU and that you claim from
15  TCU as a result of this statement that they
16  allegedly made to you.
17     That's the only fraudulent or
18  false statement that you claim TCU made to
19  you?
20     A.    That was enough.
21     Q.    Is that a yes?
22     A.    Yes.
23     Q.    So, no longer a part of Count

Page 355

1  Three is the allegation that TCU or Upchurch
2  made a false representation to Marous that
3  they believe that the plaintiffs' proposal was
4  the best and most fair proposal and that ASU
5  should move forward with the plaintiffs'
6  proposal immediately; is that correct?
7      It's Paragraph 55.
8      A.    Yes.
9      Q.    Your decision to submit the
10  master plan back in September or the scope of
11  work in May or to perform the preconstruction
12  services that are shown in your May 15, 2006,
13  none of those things were done on reliance on
14  anything that TCU, Upchurch or Thomas said or
15  didn't say, correct?
16     A.    Any work that was performed prior
17  to July 28th, 2006, had no part and parcel
18  relationship to TCU or Upchurch or Thomas.
19     Q.    Paragraph 32 of your complaint.
20  You state that the Board hired its previously
21  designated owner's representative to perform
22  all of the services required for the project
23  that were to be provided by plaintiffs.

Page 356

1      Do you see that?
2      A.    Uh-huh (affirmative).
3      Q.    And that Upchurch, Percy Thomas
4  and TCU are using Marous' proprietary work
5  product. What evidence do you have to support
6  those allegations?
7      MR. LYONS: Other than what he's
8  already testified about?
9      Q.    (By Mr. Lawson) Well, that Ken
10  Upchurch told you that they had been hired; is
11  that the evidence you have?
12     A.    That, and the simple fact is our
13  work product went to bond counsel. It helped
14  substantiate a bond ask so that any work done
15  with the monies from those bonds, as far as
16  we're concerned, is done in violation of our
17  proprietary work because we're not doing the
18  work.
19     And, yet, they -- funds were
20  secured using part and parcel to secure those
21  funds the scope of work defined in these
22  documents that we were never paid for so that
23  any work that anybody does, as far as we're

Page 357

1  concerned, is in violation.
2      Q.    Well, what evidence do you have
3  that TCU, Upchurch or Thomas is using your
4  proprietary work product?
5      Not ASU, but TCU, Upchurch or
6  Thomas.
7      A.    Because if they are performing
8  any work, they are performing work on a
9  project that was funded using our work
10  product.
11     Q.    So, the mere fact that ASU
12  secured funding using your scope of work --
13  that's your allegation, right?
14     A.    Absolutely.
15     Q.    The mere fact that ASU received
16  funding means that if TCU, Upchurch or Thomas
17  is doing any work on this project that they're
18  using your proprietary work product?
19     A.    Absolutely. Because they're
20  using -- the benefit is inuring to them from
21  our proprietary work product.
22     Q.    Well, when they were serving as
23  the owner's representative, they were being

Page 358

1  paid for work on this project. Were they then
2  using your proprietary work product?
3      A.    I don't know that they were -- I
4  don't know that they were paid when they were
5  working --
6      Q.    You don't know that they're paid
7  now, do you?
8      A.    I know that -- I do not know.
9      Q.    You don't have any evidence that
10  they're using your work product, your scope of
11  work, Exhibit 12, do you?
12      A.    I didn't say that.
13      Q.    Well, do you?
14      A.    It's been represented to -- we
15  are of the belief that Upchurch was retained
16  by Alabama State to do the dorm project.
17      Q.    You're of the belief. Do you
18  have evidence?
19          MR. LAWSON: And there is a
20  distinction, Champ.
21          MR. LYONS: I understand that --
22          MR. LAWSON: I'm looking for
23  evidence.

Page 359

1          MR. LYONS: -- but he's already
2  testified that Mr. Upchurch told him and that
3  Chambliss told him.
4          I mean, how many times do we have
5  to go through this?
6      Q.    (By Mr. Lawson) Mr. Upchurch
7  told you allegedly on September 22nd that they
8  had been retained to do what?
9      A.    Build the project. And John
10  Chambliss told me when I met -- when I met
11  with him when he gave me a tour of his office
12  months later that Upchurch was proceeding.
13  They were doing the bidding. They were
14  currently bidding out the work for -- that
15  Upchurch was bidding out work for window
16  replacement or something at the dorms.
17          Again, that monies came from a
18  bond offering that was in part supported by
19  our work product.
20      Q.    Was Marous going to bid out
21  window replacement?
22      A.    Would we have.
23      Q.    Were you going to? Was that part

Page 360

1  of your scope of work?
2      A.    Yeah.
3      Q.    Who were you going to bid that
4  out to?
5      A.    Local vendors.
6      Q.    So, as a CM agent, you were going
7  to bid that work out?
8      A.    Absolutely. It's our job.
9      Q.    Were they going to contract with
10  you?
11      A.    What's that?
12      Q.    Were those subcontractors going
13  to contract with you or contract directly with
14  ASU?
15      A.    Trick question. You know that
16  those -- you know that an agency CM can't hold
17  those contracts just as well as I do, sir.
18      Q.    So, the only evidence, then, you
19  have that TCU, Upchurch or Thomas is using
20  your scope of work is the fact that Ken
21  Upchurch told you on September 22nd that they
22  had been hired and that John Chambliss told
23  you that they're the construction manager?

Page 361

1      A.    And that Gil Berry also told us
2  that, but I'm not relying upon what Gil Berry
3  said. I'm relying upon what Ken Upchurch said
4  and what John Chambliss said.
5      Q.    Okay. Why aren't you relying on
6  what Gil Berry tells you?
7      A.    I'm just -- I choose not to rely
8  on what he told us about that from September
9  22nd on.
10      Q.    Count Five, tortious interference
11  with business relations. Paragraph 70.
12      A.    Yeah. I think you have to talk
13  -- this is more a Gil Berry issue, except for
14  item -- under 71.
15          Well, item 70, again, we went
16  through the fees. I previously testified
17  about the fees.
18      Q.    Well, we talked about the fees,
19  and we looked at E-mails where your fees were
20  provided by you to TCU and by TCU to ASU.
21          Your allegation in Paragraph 70
22  is that Upchurch, Thomas and TCU
23  misrepresented to ASU and its board the fees

Page 362

1 which plaintiffs were to receive on the
2 project.
3        What do you base that allegation
4 on that they misrepresented your fees?
5     A.    That goes back to when they --
6 there was a misunderstanding or a
7 misrepresentation that our fees were $7
8 million -- we were making $7 million profit on
9 this job.
10    Q.    Well, I believe we've already
11 looked at a number of exhibits where you
12 called certain things fees that you now say
13 were not fees, right?
14    A.    Yeah, but the things that -- that
15 one document that -- the one document where I
16 called something fees, which was handwritten,
17 Mr. Upchurch would not have seen until
18 discovery.
19        The other document, which was
20 typed out, usual customary language in our
21 industry is to call what architects charge
22 fees as opposed to architectural services
23 contract.

Page 363

1     Q.    Well, that may be your
2 explanation now.  But you do refer to certain
3 things as fees that you now say are costs,
4 correct?
5     A.    Yes.
6     Q.    You have admitted that ASU was
7 provided with the correct breakdown on
8 analysis of your fees and costs?
9     A.    Yes.
10    Q.    By TCU?
11    A.    Yes.
12    Q.    So, if there was a
13 misunderstanding, as you called it, it was
14 cleared up and clarified, correct?
15    A.    By September 19th it was cleared
16 up and clarified.
17    Q.    Well, look at, for instance,
18 Exhibit No. 27, which is an analysis of your
19 fees prepared by TCU.  And it's on TCU
20 letterhead and that's dated September 7th,
21 2006.  That's an accurate --
22    A.    Yeah.  I also testified that I
23 have no idea, nor do you, that that document

Page 364

1 ever went to Dr. Lee.
2     Q.    I may have an idea, but you say
3 you don't have an idea.
4     A.    Well, you can't show me --
5     Q.    But looking at --
6     A.    You can't show me on that
7 document any evidence that it went to Dr. Lee.
8     Q.    Looking at the face of that
9 document, however, that is an accurate
10 representation of your fees and costs --
11    A.    Yes.
12    Q.    -- dated September 7, 2006?
13    A.    Yes.
14    Q.    So, Paragraph 70, they did not
15 interfere with your business relationship then
16 by misrepresenting your fees because you've
17 just said that any misunderstanding with
18 respect to your fees was cleared up.
19    A.    Ultimately, I believe that it was
20 cleared up.
21    Q.    In Paragraph 71 you say they used
22 their confidential relationship and using that
23 information misrepresented plaintiffs'

Page 365

1 position with respect to the work to be
2 performed and the fees to be charged for the
3 performance of that work.
4        Again, that's been cleared up,
5 correct?
6     A.    With respect to the fees and the
7 scope described, yes.
8     Q.    Is there anything that has not
9 been cleared up as alleged in Paragraph 71?
10        I need testimony of the witness,
11 not of counsel telling you what the answer
12 should be.
13    A.    I'm not -- I'm not asking him
14 what the answer should be.  I'm asking him --
15 I'd like to ask him for clarification.
16        MR. LYONS:  You want to take a
17 break?
18        THE WITNESS:  Yeah.
19        (Whereupon, the taking of the
20 deposition was recessed from approximately
21 4:38 p.m. to approximately 4:40 p.m., after
22 which the following proceedings were had and
23 done:)

Page 366

1    Q.    (By Mr. Lawson) I think my
2  question to you was as alleged in Paragraph 71
3  what has not been cleared up?
4          You've said any misunderstanding
5  with respect to the fees or the scope of work
6  to be performed was cleared up.
7          Is there anything --
8    A.    Yeah.  As far as we're concerned,
9  we had an implied agreement with Alabama State
10  to do a significant amount of work and that
11  ultimately Mr. Upchurch was given this as well
12  as additional information on behalf of TCU in
13  his purported role as owner's rep.
14          And, ultimately, he ended up with
15  the work and we didn't.
16    Q.    So, wasn't your business
17  relationship or your implied agreement with
18  Gil Berry/Student Suites?
19    A.    I think given the fact that
20  Alabama State invited us down, accommodated us
21  in our request to do due diligence, provided
22  information, there was certainly no possible
23  misunderstanding that they were -- we were

Page 367

1  there doing some very significant
2  preconstruction services on their behalf.
3          And, ultimately, we ended up not
4  getting paid for it.  And, ultimately, we
5  produced work documents that helped them get
6  funded to do the job that we were -- we were
7  injured.
8          And insofar as Mr. Upchurch was
9  awarded the project, we gave him information.
10  And at the end of the day we ended up not
11  getting the job.  He did.
12    Q.    Your business relationship was
13  with Student Suites/Gil Berry & Associates.
14          And I think you've testified
15  already that at the time the decision was made
16  by ASU not to accept your proposal, the
17  arrangement was that you were going to be
18  under contract with Student Suites/Gil Berry &
19  Associates.
20    A.    At that point, yes.
21    Q.    How did TCU interfere with that
22  business relationship?
23    A.    I have already testified about

Page 368

1  TCU, and Ken Upchurch stated he would be
2  making a written recommendation to Dr. Lee and
3  to the board that they approve our agreement,
4  which was not approved, which was not ever
5  issued to them as we can see.
6    Q.    So, that's how --
7    A.    In writing.
8    Q.    So, that's how they interfered
9  with your business relationship, by not
10  recommending to ASU that they accept your
11  proposal?
12    A.    By representing to us that they
13  would do one thing and representing to -- and
14  then doing something else.  And, ultimately,
15  ending up with the contract to do the work.
16    Q.    So, help me understand then.  The
17  only means by which -- or the only way in
18  which TCU interfered with your business
19  relationship with either ASU or Student Suites
20  was by not affirmatively recommending to ASU
21  that it accept your proposal?
22          That's how they interfered?
23    A.    After representing to us that

Page 369

1  they would and by representing to us that they
2  could -- that we would send them all of the
3  information and that they were acting only in
4  the capacity of owner's rep and they could not
5  be hired to do the work.
6    Q.    That sounds an awful lot like
7  your fraud claim.  I'm trying to figure out
8  what your tortious interference claim is.
9    A.    Well --
10    Q.    You've alleged that they
11  interfered with your business relationship.
12    A.    I believe they did.  I think
13  there was absolutely an implied agreement
14  contract with Alabama State.
15    Q.    And that was interfered with by
16  TCU by doing what?
17    A.    What I just previously described.
18    Q.    All right.  By telling you that
19  they couldn't take the project because it
20  would be illegal?
21    A.    Yes.  And by failing to recommend
22  us as they said they would.
23    Q.    Any other way in which TCU

Page 370

1  allegedly interfered with your business
2  relationship?
3      A.    No.
4      Q.    Now, you knew TCU was involved in
5  the business relationship between you, Gil
6  Berry, Student Suites and ASU because you knew
7  they were the owner's representative, didn't
8  you?
9      A.    Yes.
10     Q.    So, you knew they had some role
11 in all of this, that they were going to help
12 perform a due diligence review of your scope
13 of work and proposal, didn't you?
14     A.    Yes.
15     Q.    And you knew that they were
16 looking at all of this information that you
17 claim is proprietary, correct?
18     A.    Yes.  And they wouldn't have been
19 looking at any of it if they didn't make that
20 representation to us.  They wouldn't have seen
21 that information.
22     Q.    You had numerous discussions and
23 E-mails with TCU about the project and the

Page 371

1  proposal, didn't you?
2      A.    Yes.
3      Q.    And you used the word
4  "intertwined" a little while ago in discussing
5  another relationship.  Would you characterize
6  the relationship between ASU, TCU, Gil Berry &
7  Associates, Student Suites, Inc. and Marous
8  Brothers as intertwined?
9      A.    No.
10     Q.    You wouldn't?
11     A.    No.  We're all separate entities.
12     Q.    Okay.  I didn't say you related.
13 Intertwined, the relationships.  All the
14 parties were all working on the same project
15 and working towards a student renovation
16 project?
17     A.    I'm not sure we were all working
18 on the same -- for the same ends.  Clearly
19 since we didn't end up with the project,
20 neither did Mr. Berry, we weren't all working
21 for the same ends.
22     Q.    Well, you don't know why Mr.
23 Berry was not retained, do you?

Page 372

1      A.    I do not.  To this day, I do not
2  know.
3      Q.    In Paragraph 30 of your complaint
4  -- just so we can put this little issue to
5  rest -- you say Upchurch, Thomas and TCU
6  abused their position as owner's rep by
7  advising the ASU board that fees ultimately
8  earned by plaintiffs would be $7 million.
9          Do you see that?
10     A.    Yes, I see that.
11     Q.    We've cleared that up that any
12 misunderstanding with respect to your fees
13 was, in fact, cleared up sometime prior to ASU
14 making its decision?
15     A.    We have seen communication from
16 Upchurch to Dr. Lee that clarified those fees.
17     Q.    All right.  You state in
18 Paragraph 30 in the very next sentence that
19 Upchurch, Thomas and TCU recommended to the
20 ASU Board that Student Suites, Gil Berry &
21 Associates and Marous should not be awarded
22 the professional services contracts.
23          Do you see that?

Page 373

1      A.    I do see that.
2      Q.    The second sentence.  Do you have
3  any evidence that --
4      A.    I think this is -- this is
5  something you have to ask Gil Berry.  I do not
6  have the evidence of that.
7      Q.    Okay.  Back in Paragraph 72 under
8  your tortious interference claim, the second
9  to the last sentence, you say defendants
10 Upchurch, Thomas and TCU abused their position
11 as owner's representative by encouraging the
12 ASU board not to hire plaintiffs.
13         Do you have any evidence to that
14 fact?
15     A.    They were hired.
16     Q.    Is that the only evidence you
17 have that they encouraged ASU not to hire you?
18     A.    They were -- the evidence I have
19 is that Mr. Upchurch said he would do one
20 thing, did another and they were hired.  We
21 weren't.
22     Q.    Well, I've heard all of that
23 testimony, but do you have any testimony -- or

Page 374

1  any evidence, rather, that TCU encouraged ASU
2  as you specifically alleged --
3      A.    There's not --
4      Q.    -- not to hire you?
5      A.    That's not my piece.  That's --
6  you have to ask Mr. Berry about that one.
7      Q.    So, that's a Gil Berry
8  allegation?
9      A.    Yes.
10     Q.    The second sentence of -- excuse
11 me.  The third sentence of Paragraph 72.
12     A.    Yes.
13         MR. LYONS:  I think the
14 allegation applies to both plaintiffs, but Gil
15 is the one who has knowledge of it.
16     Q.    (By Mr. Lawson) Okay.  Well, you
17 have no knowledge or evidence as we sit here
18 today that TCU encouraged ASU to not hire you?
19     A.    The only evidence I have is that
20 they -- according to Mr. Upchurch, they hired
21 them.
22     Q.    That's your only evidence?
23     A.    That's my evidence.

Page 375

1      Q.    In Count Six you make a claim for
2  conversion.  What did TCU wrongfully
3  appropriate?
4         MR. LYONS:  And if you want to
5  read the allegations in the complaint.
6      Q.    (By Mr. Lawson) Sure.  Help
7  yourself.  Read the entire allegation
8  contained in Count Six if you need to.
9      A.    The defendants in this case being
10 Alabama State University, not necessarily TCU,
11 clearly -- our proprietary work product,
12 again, was used to help substantiate a bond
13 underwriting and offering, and we didn't get
14 paid for the use of that work.
15     Q.    I understand that.  But in
16 Paragraph 75 you allege that defendants
17 wrongfully appropriated your work product to
18 their own use.
19     A.    Yes.
20     Q.    What work product are you
21 referring to?
22     A.    This work product and everything
23 subsequent, schedules and everything else.

Page 376

1  But specifically this work product as pertains
2  to ASU's ability to obtain bond financing for
3  the project.
4      Q.    So, am I to understand that
5  Marous does not allege that the TCU defendants
6  wrongfully appropriated your proprietary work
7  product?
8      A.    I do not believe that they did.
9      Q.    So, the conversion claim in Count
10 Six, as far as Marous is concerned, does not
11 apply to TCU, Upchurch or Thomas?
12     A.    I can't -- I can't speak for Gil
13 Berry.
14     Q.    I know.  Not Gil Berry.  As far
15 as Marous is concerned.
16     A.    I think it's --
17         MR. LYONS:  If you understand the
18 claim, the legal nature of it, you can answer,
19 but --
20     Q.    (By Mr. Lawson) Well, I have to
21 know.  And you've already said you don't
22 believe that --
23     A.    I don't -- I don't understand the

Page 377

1  legal technical term of conversion because I'm
2  not an attorney so...
3      Q.    All right.  Well, let's do it
4  this way.  Do you think and do you have any
5  evidence that the TCU defendants wrongfully
6  appropriated your proprietary work product to
7  their own use and beneficial enjoyment?
8         Not ASU, but the TCU defendants.
9      A.    Only TCU?
10     Q.    Only TCU, Upchurch and Thomas.
11     A.    I believe no.
12     Q.    Let's go down to the next
13 paragraph.  You say defendants wrongfully
14 appropriated work product after representing
15 that plaintiffs would be compensated for their
16 work product.
17         And you've already said that the
18 TCU defendants didn't tell you that?
19     A.    They did not tell us that.
20     Q.    And you submitted invoices, but
21 those were submitted to Gil Berry for
22 submission to ASU?
23     A.    Yes.

Page 378

1    Q.    And you say defendants have
2  further wrongfully withheld possession of
3  plaintiffs' proprietary work product from you.
4  Does that apply to the TCU defendants?
5    A.    I do not believe so, no.
6    Q.    All right. You go on in Paragraph
7  78 to say that they are using your proprietary
8  work product in the renovation of the Student
9  Residence Project. Do you see that?
10    A.    Any work that is going on as far
11  as we're concerned paid for with bond funds
12  that were secured using our proprietary work
13  product we consider illegal because we have
14  not been compensated for that work product
15  that was used to get bond financing.
16    Q.    I understand. We've discussed
17  that. But as far as the conversion claim,
18  which requires the wrongful appropriation of
19  your work product, I've gone through these
20  paragraphs and you've said you don't believe
21  that those allegations apply to the TCU
22  defendants, TCU, Upchurch and Thomas.
23    A.    Marous does not believe that that

Page 379

1  does. I can't speak for Mr. Berry.
2    Q.    Correct. We've already deposed
3  Mr. Berry about this. I'm talking about just
4  Marous.
5       So, am I correct in understanding
6  that --
7    A.    Yes.
8    Q.    -- Marous does not believe that
9  the allegations of conversion, the wrongful
10  appropriation of its work product, apply to
11  the TCU defendants?
12    A.    Yes.
13    Q.    Okay. And we're not going to
14  come back later and here that that's changed,
15  are we?
16    A.    No.
17    Q.    Does Marous maintain its scope of
18  work and the work product that it developed in
19  this case in computer form?
20    A.    Yes.
21    Q.    You have Autocad?
22    A.    Yes.
23    Q.    And so you at all times had

Page 380

1  copies of all of this material?
2       You didn't provide your only
3  copies of this scope of work to ASU or TCU or
4  Gil Berry or anybody else?
5    A.    No.
6    Q.    So, you've always been able to
7  use this material for whatever purpose you
8  wanted, even during the pendency and after
9  this project?
10    A.    Question of clarification. What
11  other purpose besides building this project
12  would we --
13    Q.    Well, I don't know that there is
14  one. But you could at all times use this, and
15  you were never denied use of this material,
16  correct?
17    A.    No.
18    Q.    Count Eight is loss of business
19  opportunity.
20    A.    This is -- this is not a Marous
21  issue.
22    Q.    So, Count Eight is not a claim
23  made by Marous against the TCU defendants or

Page 381

1  ASU defendants? And we've deposed Gil Berry
2  about it. As far as --
3       MR. LYONS:  Marous doesn't have a
4  claim for loss of business opportunity other
5  than the project that's the subject of the
6  lawsuit obviously, but nothing separate.
7    Q.    (By Mr. Lawson) So, the
8  conversion --
9    A.    No likely claim. Okay.
10    Q.    So, conversion, which is Count
11  Six, I believe and Count Eight, which is loss
12  of business opportunity and I believe Count
13  Two, which is quantum meruit, those three
14  claims are not being made by Marous against
15  the TCU defendants; is that correct?
16       MR. LYONS:  Yes.
17       THE WITNESS:  Yes.
18    Q.    (By Mr. Lawson) The damages that
19  Marous claims in this case total what?
20    A.    You're asking for an exact
21  amount?
22    Q.    Yes.
23    A.    I've got to look. It's our

Page 382

```
 1  attorneys fees, plus our preconstruction
 2  services.
 3      Q.    Anything else?
 4      A.    Punitive damages if they're so
 5  awarded by a jury.
 6      Q.    Anything else?
 7      A.    Interest, interest on the money
 8  we haven't received.
 9          MR. LYONS:  We make our claim for
10  damages in the complaint.  And if you're
11  asking him to itemize those --
12          MR. LAWSON:  Well, let's look.
13  Where do --
14          MR. LYONS:  What I'm trying to
15  say is the answer to this question is not
16  conclusive of what our claimed damages are.
17  It doesn't list every element in the
18  complaint.
19          MR. LAWSON:  Well, we can -- if
20  you can point me to something in the complaint
21  that tells me exactly what the claimed damages
22  are.
23          MR. LYONS:  There's not an exact
```

Page 383

```
 1  figure, but he's given you categories of
 2  damages, and I don't want his list of
 3  categories to be conclusive of the issue.
 4      Q.    (By Mr. Lawson)  Well, is there
 5  anything we can look at that would tell us
 6  exactly what your claim for damages is?
 7      A.    I could tell you.  It's $455,000
 8  -- we're looking for our preconstruction
 9  services.
10      Q.    All right.  Of $455,000?
11      A.    Plus our attorneys fees.
12      Q.    All right.
13      A.    Plus interest.  Plus my lost time
14  for -- my lost time right now in deposition.
15          MR. LYONS:  We're not claiming
16  that, Brooke.
17          THE WITNESS:  Okay.
18          MR. LYONS:  That's part of the
19  cost of bringing a lawsuit.
20      Q.    (By Mr. Lawson)  Take that up
21  with your lawyer.
22      A.    Okay.  I will.
23      Q.    So, preconstruction, attorneys
```

Page 384

```
 1  fees, interest.
 2          MR. LYONS:  We're not claiming
 3  attorneys fees.
 4          THE WITNESS:  It says so in here
 5  we are.
 6          MR. LYONS:  Well, we're not going
 7  to get very far with that claim.
 8          THE WITNESS:  Okay.  What he
 9  said.  He is the attorney.  I'm just a dumb
10  architect.  Okay.
11      Q.    (By Mr. Lawson)  All right.  So,
12  now we're down to preconstruction fees and
13  interest?
14      A.    And any punitive damages.
15      Q.    And any punitive damages.
16          Now, the preconstruction fees, as
17  I understand it, were incurred prior to TCU's
18  involvement in this case?
19      A.    Some of them.
20      Q.    Most of them.  If you look at
21  your invoices --
22      A.    A substantial portion.  But we
23  feel like we are due the full $455,000 for
```

Page 385

```
 1  preconstruction, of which -- I actually forget
 2  what the number was incurred prior to TCU's
 3  involvement.
 4      Q.    Well, as of May 15th, $297,500
 5  was billed or invoiced by you?
 6      A.    Right.
 7      Q.    Between May 15 and July 28, are
 8  we to assume that there were more
 9  preconstruction fees incurred?
10      A.    Yes.
11      Q.    Do you know how much?
12      A.    We'll have to get back to you
13  with that.
14      Q.    Do we have any way of knowing?
15      A.    We will go back through time
16  records and other travel expenses and whatever
17  else we need to.
18      Q.    Well --
19          MR. LYONS:  You need to go ahead
20  and tell him your current understanding of
21  what it is to the best of your knowledge.
22          THE WITNESS:  Right now --
23          MR. LYONS:  This is his chance to
```

Page 386

1  find out.
2       THE WITNESS:  Right now we have
3  -- we are looking to be paid for 344 hours of
4  my time, okay, which is part of the whole
5  preconstruction thing, at $150 an hour.  So,
6  do the math of 344 times $150.
7       Plus the travel expenses incurred
8  by me in seven trips -- six or seven trips.
9  Obviously not this trip --
10      Q.    (By Mr. Lawson)  But that's part
11 of your preconstruction fees as I look at that
12 breakdown in your May --
13      A.    Yeah.  That's part of it, but
14 that's how we get up to the sum total of
15 $455,000.  Plus we're entitled to make a
16 profit on our preconstruction fees.
17      Q.    So, what we're looking for is an
18 itemization of your preconstruction fees from
19 whenever they began, December, January,
20 whenever that was, up to July 28th, 2006.
21      We haven't seen that, but we need
22 to see an itemization of the damages that
23 you're going to claim from the TCU defendants.

Page 387

1       A.    From TCU on or TCU prior?
2       Q.    Well, both.
3       A.    Post TCU?
4       Q.    Post TCU.  That would be
5  $455,000 minus something, wouldn't it?
6       A.    Yeah.  I would -- I would limit
7  that to a hundred thousand dollars.
8       Q.    Okay.  Well, we need to see a
9  specific itemization of those damages and any
10 backup information, time records --
11      A.    Okay.
12      Q.    -- and whatever you have to
13 support that.
14      But we want to keep the
15 deposition open for examination regarding your
16 specific damages that you're claiming from the
17 TCU defendants.
18      THE WITNESS:  Is that -- I know
19 you want me to give specifics to him right
20 now, though.
21      MR. LYONS:  Well, you already
22 have.
23      THE WITNESS:  Okay.  Well, we

Page 388

1  said $455,000 and --
2       Q.    (By Mr. Lawson)  Right.  You've
3  said $455,000 in preconstruction fees, but you
4  also --
5       A.    That's total.
6       Q.    -- already said -- certainly
7  $297,500 was incurred before TCU was involved,
8  and you don't claim that from TCU, those
9  preconstruction fees?
10      A.    We haven't separated out what
11 we're claiming from which defendant.  We have
12 lumped the defendants as a group, and we're
13 making our claim against and have filed a
14 lawsuit against the group.
15      Q.    I understand.
16      A.    Insofar as your interest is to
17 protect and dismiss as much you can, TCU, Ken
18 Upchurch and Percy Thomas, I understand that's
19 your role and responsibility.  But that is not
20 how we've broken down our claim.
21      Q.    Well, I would respectfully
22 suggest that it will have to be done because
23 if you're claiming damages for something that

Page 389

1  occurred prior to TCU's involvement -- and
2  you've already said that TCU was not
3  responsible for preconstruction fees incurred
4  before their involvement -- we have a right to
5  know what preconstruction fees you're claiming
6  from TCU after their involvement.  We need to
7  know that.
8       A.    Understood.
9       Q.    We have a right to see it, and we
10 do expect to see it.
11      A.    Understood.
12      (Whereupon, said document was
13           marked for identification as
14           Defendant's Exhibit No. 38 to the
15           deposition of Arne F. Goldman.)
16      Q.    Defendant's Exhibit No. 38, can
17 you tell me what that is, please?  And who is
18 Ron Colensick?
19      A.    Ron Colensick's the comptroller.
20      Q.    For Marous?
21      A.    Yes.
22      Q.    And this is printed off of your
23 E-mail?

Page 390

1    A.    Yeah.  And Debbie Kinder is one
2  of the staff accountants.
3    Q.    She says total cost to-date,
4  business development, $7,175?
5    A.    That's not my -- that's the
6  travel expenses we've charged, just the travel
7  for me to that date.
8    Q.    All right.
9    A.    That's not my time.  My time gets
10 coded differently.
11   Q.    So, travel time for you --
12   A.    This is air fare and hotel and
13 car rental --
14   Q.    All right.
15   A.    -- up to that point is $7,175.
16   Q.    For you?
17   A.    For me.
18   Q.    All right.  Job, Alabama State
19 University, up to September 25, 2006.
20   A.    That's the architectural fee.
21 That's the architectural department --
22 division of our design/build in terms of the
23 cost that they've accumulated of $211,000.

Page 391

1  They got $218,000 between those two line
2  items.
3    Q.    How do you know that's what that
4  is?
5    A.    Because 06-11 is our cost
6  classification for design/build department.
7    Q.    So, these are all of the
8  preconstruction services performed by who?
9    A.    This would be Tony Rich, Richard
10 Cooper, Tony Lazar, Kirk Schuttenburg.  This
11 does not include the general manager, the
12 project manager or the chief estimator for the
13 estimating time because that's a different
14 cost code.
15         So, this is basically our design,
16 field measurement, video survey, all of those
17 expenses to help develop this work product of
18 $211,816.
19         (Whereupon, said document was
20         marked for identification as
21         Defendant's Exhibit No. 39 to the
22         deposition of Arne F. Goldman.)
23   Q.    Defendant's Exhibit 39, have you

Page 392

1  seen that before?
2    A.    Yes.
3    Q.    Dated October 2nd, 2006, from
4  Marous to Gil Berry, invoice for
5  preconstruction services.
6         Why didn't you send that to ASU
7  or TCU?
8    A.    We asked -- Gil asked us for this
9  and we asked him to forward it to ASU for
10 payment.
11   Q.    Now, in looking at Exhibit No.
12 38, which was the E-mail, you said that
13 includes all preconstruction services except
14 what?
15         If we look at 39, can we look at
16 that breakdown and tell what's not included in
17 38?
18   A.    You don't have any overhead and
19 profit.  You don't have project executive.
20         This doesn't have any of
21 everybody else's air fare, all the guys who
22 came down here on trips, their meals and
23 lodging.  This does not have -- this $218,000

Page 393

1  doesn't have the estimator.
2         This has the design development
3  details, the principal architect's
4  supervision.  This has the elevations.  It has
5  -- so, if you go and you add up $27,550 and
6  $42,940, you add up all of those other things,
7  plus $211,000, I think you're going to come
8  pretty close to the number that we're talking
9  about.
10   Q.    Well, all of what other -- we
11 have the $211,000.  What's not included?  If
12 you can just check those off A, B, C, D and
13 tell me which ones are not included in the
14 $211,000 as shown in Exhibit 38?
15   A.    S --
16   Q.    These are not included?
17   A.    Not included.
18   Q.    All right.
19   A.    S and T.
20   Q.    We don't have to add these up.
21 If you can just tell me line items because you
22 can look at --
23   A.    Well, the $26,565.

Page 394

1    Q.    Travel expenses. But some
2 portion of that's included, isn't it, already
3 because $7,000 of your travel expenses --
4    A.    Seven thousand of mine is, but
5 not the -- you've got $19,000.
6    Q.    Okay. Anything else?
7    A.    General manager supervisions,
8 that would be item N, project executive
9 review. And I believe item K, which is
10 preparation of scope of work and item L and
11 item M because that was -- that's done on the
12 project management side.
13    Q.    So, K, L, M, N, P, Q, S and T,
14 none of those items are included in Exhibit
15 38, which shows a total of $218,000?
16    A.    Yeah. I'm not sure -- I don't
17 believe R, which is -- our scheduler is a
18 separate function.
19         So, it would be items K, L, M, N,
20 P, Q, R, S and T would not be included with
21 the two eleven. However, presentation
22 materials, Item O, would be included because
23 that's part of the architectural.

Page 395

1    Q.    When was each line item cost
2 incurred? Is there any way to tell?
3    A.    Well, I mean, starting when this
4 -- when we set up the job would be January.
5    Q.    And we're going to get some sort
6 of backup for this that will explain when
7 these items were incurred?
8    A.    Yes. I mean, none of this --
9 this is the time that was accumulated once we
10 had set up the job number, which would be once
11 ASU granted the resolution to Gil Berry and
12 Student Suites because that's in our minds
13 when we went from just doing marketing work to
14 try and get a job to doing preconstruction
15 services.
16         (Whereupon, said document was
17         marked for identification as
18         Defendant's Exhibit No. 40 to the
19         deposition of Arne F. Goldman.)
20    Q.    Exhibit No. 40, can you tell me
21 what that is?
22    A.    Certificate of authority granting
23 us to do business in Alabama.

Page 396

1    Q.    Have you ever seen this before?
2    A.    Yes.
3    Q.    And so this is from the Secretary
4 of State's office in the State of Alabama
5 giving you authority to transact business in
6 the State of Alabama as of May 15, 2006?
7    A.    Yes.
8    Q.    "You" being Marous Brothers
9 Construction?
10    A.    Yes.
11    Q.    Did you make the application?
12    A.    No.
13    Q.    Who did?
14    A.    I'm sorry?
15    Q.    Who did?
16    A.    Allen Bundy, assistant
17 controller.
18    Q.    As of May 15, 2006, you had
19 already submitted your proposal and scope of
20 work in this project, hadn't you?
21    A.    Yes.
22    Q.    And you had made numerous trips
23 to Alabama, hadn't you?

Page 397

1    A.    Yes.
2    Q.    You had done architectural work,
3 preconstruction services, correct?
4    A.    We had done work in support of
5 our developing a scope of work.
6    Q.    At least $297,000 worth of
7 preconstruction services, correct?
8    A.    Yes.
9    Q.    All without being qualified or
10 authorized to transact business in the State
11 of Alabama; isn't that right?
12         MR. LYONS: Object to the form.
13    Q.    (By Mr. Lawson) Well, your
14 invoice is dated May 15, 2006, for $297,500
15 for work performed prior to that date,
16 correct?
17    A.    Yes.
18    Q.    And you did all of that work
19 prior to the date that you were granted
20 authority to transact business in the State of
21 Alabama, which was May 15, 2006,
22 coincidentally, correct?
23    A.    So?

Page 398

1    Q.    So, my question is you transacted
2  -- you performed all of that preconstruction
3  work prior to being granted authority by the
4  State of Alabama to transact business,
5  correct?
6    A.    That authority to transact
7  business doesn't mean we couldn't do the work.
8        MR. LYONS:  Are you asking does
9  the invoice predate the license?  Is that --
10       MR. LAWSON:  Well, was the
11 preconstruction --
12       THE WITNESS:  The invoice
13 predates the license, yes.
14    Q.    (By Mr. Lawson) So, the work
15 covered by that invoice also predates the
16 license, doesn't it?
17    A.    Yes.
18       (Whereupon, said document was
19       marked for identification as
20       Defendant's Exhibit No. 41 to the
21       deposition of Arne F. Goldman.)
22    Q.    Defendant's Exhibit No. 41 is a
23 copy of your file with the Alabama Licensing

Page 399

1  Board for General Contractors.
2        Other than the first few pages,
3  which is a cover letter to me and a subpoena
4  requesting this information, if you'll flip
5  through that and tell me if you've ever seen
6  those documents?
7    A.    I have seen the license document.
8  I didn't see the renewal forms.  I've seen
9  this document, "this" being the Alabama great
10 seal for -- where we can continue to be
11 licensed.  I've clearly seen our financials.
12 I'm aware of our financials.
13       And I have not seen the rest of
14 these documents, except the licenses.
15    Q.    Okay.  Well, about halfway
16 through that stack -- and I'll find it for you
17 if you want, it would be easier -- is a
18 license certifying that Marous Brothers
19 Construction is hereby licensed as a general
20 contractor in the State of Alabama as of
21 August 16, 2006.
22       That's the first time that Marous
23 Brothers Construction was a licensed general

Page 400

1  contractor in the State of Alabama, correct?
2    A.    Yes.
3    Q.    So, prior to April -- excuse me,
4  August 16, 2006, Marous was performing
5  preconstruction services and other
6  construction work in the State of Alabama
7  without being licensed by the board of general
8  contractors?
9    A.    That is incorrect.
10    Q.    Well, did you have a license?
11    A.    We were not performing
12 construction work in Alabama.
13    Q.    What were you -- were you
14 performing preconstruction services?
15    A.    Yes.
16    Q.    Do you know what the state
17 licensing board for general contractors, how
18 they define construction work?
19    A.    I do not.
20    Q.    Okay.  So, all of these things
21 that you've described for me as
22 preconstruction services -- and we've gone
23 through quite a few of those today -- you were

Page 401

1  performing all of that work prior to being
2  licensed by the licensing board for general
3  contractors in Alabama?
4    A.    We were -- any work that they we
5  performed prior to August 16th, 2006, was
6  performed prior to our obtaining the license.
7    Q.    You knew you had to be a licensed
8  general contractor, didn't you?
9    A.    When we were doing the -- I
10 assumed we would be when we were planning to
11 do the construction, yes.
12    Q.    You also performed architectural
13 work in the State of Alabama prior to being a
14 registered certified architect in the State of
15 Alabama, didn't you?
16    A.    We performed the architectural
17 work in Cleveland, Ohio for a project in
18 Alabama.
19    Q.    For a project in Alabama prior to
20 being a registered architect in the State of
21 Alabama, correct?
22    A.    Yes.
23    Q.    Are you aware that it's a

Page 402

1  criminal violation in Alabama to perform work
2  as a general contractor without a license?
3      A.    I previously testified that I
4  wasn't sure of the contractor requirements and
5  what's defined as construction work.
6      Q.    So, you're not -- you don't know
7  whether or not it is a criminal violation to
8  perform construction -- or perform work as a
9  general contractor without a license in
10 Alabama?
11     A.    I'm not the designated
12 representative in Alabama for our company.
13     Q.    Well, you're here today
14 testifying as Marous, at least as I understood
15 at the beginning.
16         The application which is at the
17 end of that exhibit, the application for the
18 general contractor's license --
19     A.    Uh-huh (affirmative).
20     Q.    -- on what is listed as Page 5 --
21 noted as Page 5 of that application under
22 accounts receivable, uncompleted contracts and
23 then other accounts receivables.  Do you see

Page 403

1  that?
2      A.    Yes.
3      Q.    I don't see anything in there
4  that list any of the monies that you claim
5  were owed for preconstruction services for
6  your work on this project.  Why is that?
7      A.    I didn't prepare the schedule.
8  So, I can't --
9      Q.    You're here today as Marous.
10     A.    But I'm not the accountant for
11 Marous.
12     Q.    Do you see it listed on there as
13 an account receivable?
14     A.    I don't.
15     Q.    If you'll flip over the Page 12
16 for me.  Actually, let's look at Page 14
17 first, which is the very last page, affidavit
18 for corporation.  It says the president.  Is
19 that Chip Marous?
20     A.    Yes.
21     Q.    So, he has verified under oath
22 that the statements made in this application
23 are accurate; is that correct?

Page 404

1      A.    Yes.
2      Q.    Now, if you'll look at Page 12,
3  it says list major projects you currently have
4  under contract.  I don't see anything in there
5  that list this ASU project.  Is there a reason
6  for that?
7      A.    I don't know.
8      Q.    There are a number of other
9  projects listed.  Can you, as Marous, tell me
10 why it is that you don't list the ASU project?
11 It didn't ask for --
12         MR. LYONS:  If you don't know,
13 don't guess.
14     Q.    (By Mr. Lawson) It didn't ask
15 for some of the projects.  It says list major
16 projects you currently have under contract.
17     A.    I don't know.
18     Q.    Could it be perhaps because you
19 were performing services --
20         MR. LYONS:  He said he doesn't
21 know.
22     Q.    (By Mr. Lawson) -- services in
23 Alabama without being a licensed contractor?

Page 405

1          MR. LYONS:  If you don't know,
2  don't guess.
3          THE WITNESS:  First of all, I
4  don't like the insinuation that you're making
5  because that would say we're lying by
6  omission.  And the fact is that that's not
7  anything -- or any attribute that anybody
8  would ever accuse Marous of, which I object to
9  strenuously.
10         So, I don't know why it was left
11 off.
12     Q.    (By Mr. Lawson) Well, a number
13 of allegations are made in this lawsuit and in
14 this deposition today about the truthfulness
15 of various parties, and I'm not suggesting
16 anything.  I'm simply asking why it is that --
17     A.    I didn't prepare the document.  I
18 said I don't know.
19     Q.    So, you don't know.  Who would
20 know?
21     A.    The controller, Ron Colensick or
22 the accountant.  Kennedy Cowall was the
23 outside accountant.

Page 406

1    Q.    Or Chip Marous since he verified
2  under oath the accuracy of the information
3  provided?
4    A.    I would assume.
5        MR. LAWSON:  Well, we asked for a
6  30(b)(6) representative who is most
7  knowledgeable about these various topics, one
8  of which would be this.
9        So, I'm assuming that Chip Marous
10 would be made available to testify with
11 respect to the application to the Alabama
12 Licensing Board for General Contractors?
13       MR. LYONS:  I will undertake to
14 determine who is most knowledgeable about
15 that.  And if you decide to pursue that
16 testimony, we'll talk about it.
17       MR. LAWSON:  So, whoever that
18 might be, whether it's Chip Marous or anyone
19 else.
20   Q.    Have you seen the counterclaims
21 made by the TCU defendants against Marous and
22 Gil Berry?
23   A.    Yes.

Page 407

1    Q.    Have you ever -- "you" being Arne
2  Goldman or Marous, ever told anyone that TCU
3  provided illegal kickbacks?
4    A.    No.
5    Q.    Have you ever told anyone that
6  TCU, Upchurch or Thomas used unethical or
7  illegal means to take a job?
8    A.    Never.
9    Q.    Have you ever told anyone that
10 TCU, Upchurch or Thomas fraudulently
11 misrepresented facts regarding you to ASU
12 other than what you allege in your complaint?
13   A.    Never.
14   Q.    Have you told anybody that TCU,
15 Upchurch or Thomas used illegal means to get
16 other ASU jobs?
17   A.    Never.
18   Q.    If a witness says that you did,
19 you or somebody at Marous, is that witness not
20 telling the truth?
21   A.    Absolutely lying.
22   Q.    Have you ever spoken to Josh
23 Moon?

Page 408

1    A.    Once.  I think once a long time
2  ago.
3    Q.    When did you speak to Mr. Moon?
4    A.    Sometime after an article
5  appeared in The Montgomery Advertiser.
6    Q.    When would that have been?
7    A.    Oh, man.  May of --
8    Q.    Was it before filing the lawsuit
9  or after?
10   A.    I think after.  He called me.  I
11 wasn't even sure how he got our phone number.
12 And I believe it was after the lawsuit was
13 filed, and I don't know if it was before or
14 after the newspaper article came out in May.
15       But prior to that, Gil Berry had
16 asked me to send pictures to him of the
17 existing dorms because Josh was doing an
18 article on Alabama State's housing.  And we
19 just happened to have a lot of pictures.
20       So, I think we sent it, but I
21 don't believe I ever talked to him.  My
22 conversation with Josh Moon was very short.
23   Q.    What exactly did Josh Moon ask

Page 409

1  you?
2    A.    He asked us about -- he asked us
3  about the lawsuit, about what the content and
4  the substance of the lawsuit was, which I
5  immediately said that -- I mean, we don't talk
6  to -- we don't talk to reporters unless it's
7  for good stuff.  We have never, ever -- you
8  know, it's so rare we're ever in litigation.
9        So, we don't have to worry about
10 this very often, but we'd never talk about a
11 case to anybody, especially a reporter.  And
12 we referred him to -- I referred him, I think,
13 to Steve Arnold.
14   Q.    And who is Steve?
15   A.    Who was our --
16   Q.    At White, Arnold?
17   A.    At White, Arnold, Andrews, Dowd.
18   Q.    So, that was the only time you
19 ever spoke to Josh Moon?
20   A.    I believe so.
21   Q.    Have you ever spoken to any other
22 reporter about --
23   A.    No.

Page 410

1    MR. LYONS: Let him finish.
2 About?
3    THE WITNESS: Oh, I'm sorry.
4    Q.    (By Mr. Lawson) About TCU,
5 Upchurch or Thomas?
6    A.    No.
7    Q.    He only called you that one time?
8    A.    I believe so.
9    Q.    Did you ever call him?
10    A.    I don't recollect that I did.
11 Maybe if he left me a message, I may have
12 called him back that one -- about that one
13 time.
14    Q.    Did he ever E-mail you anything?
15    A.    I don't believe so.
16    Q.    Did you ever E-mail him?
17    A.    We E-mailed him the photos that
18 he was asking for, I believe.
19    Q.    Okay. Did you ever send a letter
20 to Governor Riley's office regarding TCU,
21 Upchurch or Thomas?
22    A.    No. That's complete crap. I
23 don't even -- I didn't even know who the

Page 411

1 Governor of Alabama was until I read that
2 complaint. I didn't know his name. We never
3 sent anything to anybody, never would.
4    Q.    Did you ever authorize Gil Berry
5 to speak to Josh Moon on your behalf?
6    MR. ALLRED: Object to the form.
7    THE WITNESS: Never.
8    (Whereupon, said document was
9    marked for identification as
10    Defendant's Exhibit No. 42 to the
11    deposition of Arne F. Goldman.)
12    Q.    Exhibit No. 42. Have you ever
13 seen that newspaper article that appeared in
14 The Montgomery Advertiser written by Josh
15 Moon?
16    A.    Yes.
17    Q.    Did you see it -- how did you see
18 it?
19    A.    I think Gil Berry sent us an
20 E-mail that said look at -- look at The
21 Montgomery Advertiser.
22    Q.    He does that a lot. In the
23 second column that's just under that

Page 412

1 photograph it says in a lawsuit. Do you see
2 that?
3    A.    Yeah.
4    Q.    Berry and his collaborator,
5 Marous Brothers Construction, alleged that TCU
6 owners Ken Upchurch and Percy Thomas are
7 giving kickbacks to some individuals
8 associated with the jobs and that illegal
9 activity played a major role in TCU landing
10 jobs.
11    A.    That is absolutely nothing that
12 ever would have, could have, ever come out my
13 mouth, Chip Marous' mouth or anybody.
14    We don't know that to be true.
15 We were never part of any discussions or
16 anything about this. We have nothing to do
17 with this, and this is complete, like I said,
18 pardon, poppycock. That's better than the
19 previous word.
20    Q.    So, did Marous distance itself
21 from --
22    A.    Absolutely.
23    Q.    -- those allegations?

Page 413

1    A.    Absolutely.
2    MR. LYONS: Let him finish.
3    Q.    (By Mr. Lawson) Does Marous
4 believe or have any evidence that any of those
5 individuals were given kickbacks?
6    A.    No.
7    Q.    Did you -- and "you" being Marous
8 or Arne Goldman -- ever tell Josh Moon or
9 anybody at The Montgomery Advertiser that TCU,
10 Upchurch and Thomas were providing kickbacks?
11    A.    Never.
12    Q.    Did Gil Berry ever talk to you
13 about the facts?
14    A.    Yeah.
15    Q.    What did he say?
16    A.    He said that there was some
17 meeting -- he was driving to Montgomery -- he
18 was leaving Montgomery and he got a call from
19 Percy Thomas. I don't even recall. I mean, I
20 just paid so little attention.
21    He had a call from somebody. He
22 was supposed to turn around, go to Prattville,
23 with Elton Dean, with Percy and something

Page 414

1  about steak eating, everybody's got to eat
2  steak and Percy's family.
3        And none of it matters because we
4  don't want to deal with that.  That has
5  nothing to do with Marous.  We don't want
6  anything --
7        Q.    So, are you of the opinion, "you"
8  being Arne Goldman or Marous Brothers
9  Construction, that TCU, Upchurch and Thomas
10 ever provided any illegal kickbacks as claimed
11 in this newspaper article?
12       A.    We have no evidence that supports
13 that.  We have no information that supports
14 that.
15       Q.    And you never made any statement
16 to anyone that you believed that to be true?
17       A.    Never.
18       Q.    Over in the second --
19       A.    Nor would we ever make that
20 statement, whether it was true or not.
21       Q.    Over in the second to the last
22 column at the very bottom it says Marous
23 Brothers Construction claims in a letter

Page 415

1  forwarded to Governor Bob Riley's office.  Do
2  you see that?
3        A.    Yeah.
4        Q.    Did you ever forward any letter
5  to Bob Riley's office?
6        A.    No.  Chip and I were trying to
7  figure out how Bob Riley -- first of all,
8  after we figured out how Bob Riley was, we
9  were trying to figure out how he got that
10 letter because not only did we not authorize
11 it, the only letter we ever sent was to Dr.
12 Lee and we sent the letter to Gil that -- who
13 both have been entered as exhibits.
14       Q.    So, you never provided anything
15 to Riley's office?
16       A.    No.
17       Q.    It says dated September 27 from
18 you.  It states that Upchurch intentionally
19 misrepresented how much the job would cost,
20 made last minute requests for changes to drive
21 up the price and never indicated to Marous and
22 Berry that there were problems.
23       A.    I've never seen that letter.

Page 416

1        Q.    So, you don't know what it is
2  that Josh Moon's talking about?
3        A.    I have no idea.  I mean, this
4  says in the last --
5        MR. LYONS:  Wait for a question.
6        THE WITNESS:  Sorry.
7        Q.    (By Mr. Lawson)  What part of the
8  article were you referring to?
9        A.    Withdraw.
10       Q.    Has Berry ever told you that he
11 was offered money?
12       A.    No.  That he offered money?
13       Q.    If he was offered money as part
14 of this project or that he offered anyone else
15 money to --
16       A.    No.
17       Q.    -- secure this project?
18       A.    No.
19       Q.    Do you know if Gil Berry ever
20 took any of the trustees to dinner?
21       A.    He said he had -- I don't know
22 that he took them to dinner.  He said he went
23 to dinner -- he told us he had dinner with

Page 417

1  trustees or board members.
2        Q.    Did he tell you whether or not he
3  paid for it?
4        A.    No.
5        Q.    So, as we sit here today, Marous
6  Brothers Construction denies ever making any
7  allegation or ever claiming to anyone that
8  TCU, Upchurch or Thomas used unethical or
9  illegal means to take this job or any other
10 job; is that correct?
11       A.    That's my recollection, yes.
12       Q.    And it's your testimony that no
13 one at Marous told anyone else that TCU,
14 Upchurch or Thomas provided illegal kickbacks?
15       A.    Absolutely without equivocation.
16       Q.    And other than what you allege in
17 your complaint, it's your testimony that
18 Marous Brothers Construction never told anyone
19 that TCU, Upchurch or Thomas lied or
20 fraudulently misrepresented facts regarding
21 you to ASU?
22       A.    Yes.  That's what I'm saying.
23       MR. LAWSON:  I may be finished,

105  (Pages 414 to 417)

Page 418

1  but while I'm looking at this stuff, if you
2  want them to go so you're not waiting on me.
3          MR. LYONS:  You want to take five
4  while you --
5          MR. LAWSON:  That's fine.
6          (Whereupon, the taking of the
7  deposition was recessed from approximately
8  5:30 p.m. to approximately 5:48 p.m., after
9  which the following proceedings were had and
10  done:)
11      Q.    Mr. Goldman, you testified when I
12  was asking you about the fraudulent
13  misrepresentation claim that the fraudulent
14  statement allegedly made by TCU was that it
15  promised that it wouldn't take your -- or
16  wouldn't take the job or take the project; is
17  that correct, because it would be illegal?
18      A.    Yes.
19      Q.    Okay.
20      A.    That they couldn't take the job
21  from us.
22      Q.    Couldn't or wouldn't?
23      A.    Well, he said he wouldn't, and he

Page 419

1  said they couldn't.
2      Q.    Okay.  And me made that statement
3  allegedly end of July or first of August?
4      A.    Yes, in a phone conversation
5  between Ken and I.
6      Q.    Okay.  Was anybody else on the
7  phone?
8      A.    No.  Ken and I.
9      Q.    When Mr. Upchurch allegedly made
10  the statement, do you have any evidence that
11  he had no intent to fulfill that promise not
12  to take the job at that time?
13      A.    I have no idea one way or the
14  other.
15      Q.    Okay.  So, you as we sit here
16  today, don't have any evidence that at the
17  time Mr. Upchurch allegedly made that
18  statement to you he had no intent to fulfill
19  that promise?
20      A.    I have no idea one way or the
21  other.
22      Q.    You did not send any E-mail or
23  letter or prepare any document confirming Mr.

Page 420

1  Upchurch's alleged promise to you that he
2  wouldn't or couldn't take that job?
3      A.    I took Mr. Upchurch at his word
4  as a fellow AGC member, as a person who had
5  done his due diligence on Marous Brothers
6  Construction and who told me of his due
7  diligence.  And I took him at his word that he
8  would be honorable.
9      Q.    I understand.  But you didn't
10  confirm that in writing, correct?
11      A.    I didn't feel like I needed to.
12      Q.    But is that correct?
13      A.    I already said yes.
14      Q.    I don't think you did.  That's
15  why I asked you again.  Did you confirm that
16  in writing?
17      A.    No.
18      Q.    And there were conditions to Gil
19  Berry's E-mails or included in Gil Berry's
20  E-mails granting permission to TCU to review
21  on behalf of ASU the proposal or scope of
22  work?
23      A.    No.

Page 421

1      Q.    And you didn't object to Mr.
2  Berry's E-mails?
3      A.    No.  Once I received that
4  assurance from Mr. Upchurch, I had no
5  objection?
6      Q.    So --
7      A.    I'm listening.  I apologize.  Go
8  ahead.
9      Q.    No.  I'm pausing not for you but
10  because I'm thinking.
11      A.    Smelled wood burning.
12      Q.    So, there's no evidence then that
13  at the time Mr. Upchurch allegedly made that
14  statement to you he did not intend to fulfill
15  that promise; is that correct?
16      A.    I have no evidence one way or the
17  other.
18          MR. LAWSON:  Okay.  That's all I
19  have.
20  EXAMINATION BY MR. ALLRED:
21      Q.    Mr. Goldman, one of the purposes
22  of the TCU defendants taking your deposition
23  today was to find out what the relationship is

Page 422

1  between you and Gil Berry or Marous and Gil
2  Berry.
3        Is it safe to say that Gil Berry
4  is not an agent of Marous Brothers?
5     A.    He is not an agent of Marous
6  Brothers.
7     Q.    And the inverse would be true as
8  well, correct?
9     A.    We are not an agent of Gil Berry.
10    Q.    Okay.  You're not his agent, and
11 he's not your agent?
12    A.    Correct.
13    Q.    And you haven't authorized him to
14 do anything on your behalf; is that right?
15    A.    Not without our consent.
16    Q.    Okay.  Specifically, have you
17 ever authorized him to speak to the media on
18 behalf of Marous Brothers?
19    A.    Never.
20    Q.    Okay.  And in this case, did you
21 do that?
22    A.    We never gave him any consent to
23 speak on our behalf to anybody.

Page 423

1     Q.    Okay.  In the dealings that
2  you've had with Gil Berry, and specifically
3  with this job -- I know y'all have worked on
4  some other jobs or he's done some work with
5  you in the past.
6        But specifically on this job, did
7  you tell him how to do any of the work that he
8  was hired to do?  Did you direct him in any
9  way?
10    A.    We didn't direct him.  We offered
11 advice if he asked questions.
12    Q.    Okay.  But you didn't tell him
13 specifically we want you to do this and do it
14 this way?
15    A.    No.
16    Q.    Okay.  So, that was up to him as
17 to how he did his job?
18    A.    He was a developer.  We were, you
19 know, called a design/builder first and
20 construction manager later.
21    Q.    Okay.  Can you think of --
22 regarding the statements that were made or
23 allegedly made by Mr. Berry, can you think of

Page 424

1  any way that would have benefited Marous?
2     A.    I can think of no way.
3     Q.    Okay.  Before reading that
4  newspaper article, were you aware that the
5  statements were made allegedly?
6     A.    I heard from our attorney -- our
7  attorneys at the time.  I heard from Steve
8  Arnold, you know, a phone call to me, have you
9  seen The Montgomery Advertiser.
10       I said, well, I'm in Cleveland.
11 So, I haven't seen The Montgomery Advertiser.
12 And he goes I need to send --
13       MR. LYONS:  Don't talk about your
14 conversation with your lawyers.
15       THE WITNESS:  Okay.  The answer
16 is our attorney alerted us to the article.
17    Q.    (By Mr. Allred) But before then
18 you had never heard that any of these
19 statements had been made?
20    A.    No.
21       MR. ALLRED:  Okay.  Thank you,
22 sir.
23       # # # # #

Page 425

1  EXAMINATION BY MS. JONES:
2     Q.    Mr. Goldman, my name is Ramadanah
3  Jones, and I represent Alabama State
4  University and Chairman Elton Dean and
5  President Joe Lee in this action.  And Kenneth
6  L. Thomas represents those same defendants.
7        Earlier you testified about your
8  relationship with Gil Berry and Student
9  Suites.
10       Tell me how Gil Berry, Student
11 Suites and the Marous Brothers came together
12 to present a proposal to Alabama State
13 University for dormitory renovation.
14    A.    Gil Berry contacted Chip Marous
15 in 2005.  He said that he had a project, a
16 potential student housing project, in Alabama
17 and did we have an appetite or desire to be
18 involved in the project.
19       And Chip and I talked about the
20 opportunity and Chip told me you handle this
21 with Mr. Berry and get some information about
22 it.  And I spoke with Gil for -- I think the
23 first time I had ever talked to him.  And we

Page 426

1  talked about the opportunity.
2         You know, we had a conference
3  call subsequently with -- who he identified as
4  his partner, who was Dick Davis and Steve
5  Pappa. We all got on the phone and we talked.
6  They told me about their prior experience
7  working together on student housing. Steve
8  Pappa came to Cleveland with Gil Berry to tour
9  our offices.
10        Q.   When was this? When did they
11 come to Cleveland, do you remember?
12        A.   Oh, it was early in 2005. Before
13 -- I want to say April or May maybe of 2005.
14        He toured our offices -- both of
15 them toured our offices, and we talked about
16 the potential to make a presentation at
17 Alabama State and how that might happen.
18        Q.   So, from there, after your
19 initial meeting, they came to Cleveland.
20 You-all agreed to proceed in presenting a
21 proposal to Alabama State for the dormitory
22 renovations?
23        A.   We agreed to do a presentation to

Page 427

1  Alabama State to the building committee -- I
2  believe the building committee. And there
3  were some board members present I believe.
4         Q.   And when did that presentation
5  take place?
6         A.   I believe -- well, first, Chip
7  Marous and I made a trip to Alabama State.
8  And that's when we met Dr. Lee, Dr. Frazier,
9  Dr. Smith. That was in July of 2005.
10        Q.   Who accompanied you? Was it just
11 you and Chip alone, or was it you, Chip and
12 Gil?
13        A.   Well, I mean, we traveled -- Gil
14 is from Pittsburgh. So, he traveled
15 separately and --
16        Q.   Well, I'm not saying traveled
17 together. But representatives from Marous
18 were there at that July 2005 meeting?
19        A.   Yes.
20        Q.   Were representatives from Gil
21 Berry & Associates there?
22        A.   Yes.
23        Q.   And were representatives from

Page 428

1  Student Suites there?
2         A.   I believe so.
3         Q.   Okay. And what was the purpose
4  of that July 2005 meeting?
5         A.   That was a basic meeting to
6  introduce ourselves and to get an overview of
7  the needs, the potential student housing needs
8  that Alabama was looking at, aging dorms.
9         Alabama State had received
10 information I guess prior that you couldn't
11 renovate those dorms, they need to be torn
12 down. For a company like us that specialize
13 in historic renovation, we just said that we
14 would want to look at the dorms. And Dr. Lee,
15 I believe, asked us do you still believe the
16 dorms need to be torn down. And we said no.
17 I mean, the dorms, while they're in kind of
18 tough shape, can absolutely be renovated.
19        And that was -- and then in July
20 we agreed that we would come back subsequently
21 to do a presentation regarding kind of a
22 master plan overview of how we saw the
23 project, the possibilities for the project.

Page 429

1         Q.   And at that July 2005 meeting,
2  did the officials from ASU tell you anything
3  about what they needed as far as renovations?
4         A.   They talked to us more about -- I
5  need a clarification on your question.
6         Q.   Well, did they tell you that we
7  have these six dormitories that we want
8  renovated and this is how we want it done?
9         Was any of that discussed at the
10 July 2005 meeting?
11        A.   Dr. Smith and Dr. Frazier gave us
12 some input or some guidance as to how -- more
13 of the beds and the immediate needs of Alabama
14 State in terms of creating better student
15 housing because they felt that they were
16 losing students because the housing was of
17 substandard quality compared to other HBCUs
18 that had already renovated -- undergone
19 housing renovations and new construction.
20        So, they provided some
21 programmatic information at that -- in a
22 preliminary basis.
23        Q.   At the conclusion of this July

Page 430

1  2005 meeting, what stage did you deem this ASU
2  dormitory project to be in?
3      A.    Infancy.
4      Q.    Infancy.  So, at that time, you
5  didn't think that either you or Gil Berry and
6  Student Suites had any type of contract with
7  Alabama State University?
8      A.    Not in July.
9      Q.    Not in July.
10     A.    Of 2005.
11     Q.    Now, after that July 2005
12 meeting, when is the next time that you or
13 anyone at Marous had contact with anyone from
14 ASU?
15     A.    I came back in August of 2005.
16     Q.    To do what?
17     A.    We wanted to walk through the
18 dorms and take some photographs and to look
19 through some existing conditions drawings just
20 so we could prepare the presentation we
21 promised ASU that we would do in September.
22         So, I came, along with Glen
23 Scherba, who was our general manager at the

Page 431

1  time.  And we were introduced to Dorsey Smith.
2  Dr. Frazier met us.  Dr. Smith met us short --
3  briefly.  And we spent a considerable amount
4  of time on a very hot day walking around
5  campus and then looking at the drawings.
6      Q.    So, the August 2005 visit was to
7  prepare for the September presentation?
8      A.    Yes.
9      Q.    So, after August 2005, was the
10 next time that you came to meet with anyone at
11 ASU in September?
12     A.    September -- I believe the
13 presentation date was September 20th.
14     Q.    September 20th, 2005?
15     A.    2005.
16     Q.    And you-all met there at ASU's
17 campus?
18     A.    Yes.
19     Q.    And who did you meet with?
20     A.    We did a presentation in front of
21 Judge Wiggins, there was a woman who was with
22 the U.S. Department of Defense and the Navy.
23 I believe she was identified as a board

Page 432

1  member.
2         Elton Dean was present, Chairman
3  Dean, I believe, was present.  A man by the
4  name of Buford Crutcher was present.  Dr.
5  Frazier was present.  Dr. Smith was present.
6  There was several other women from, I believe,
7  the student affairs department at ASU.
8         And we did a presentation.
9      Q.    And this presentation --
10     A.    And Freddie Gallot was present.
11     Q.    Mr. Gallot was present.  And I
12 think you've already testified that
13 Defendant's Exhibit 10 was the presentation
14 done on September 20th, 2005; is that correct?
15     A.    Yes.
16     Q.    And in this presentation you
17 included pictures and information that you
18 obtained during that August visit?
19     A.    We included pictures or
20 architectural drawings that we generated and
21 renderings that we generated from the base
22 drawings that we had obtained in August, yes.
23     Q.    Okay.  Now, after the September

Page 433

1  20th, 2005, presentation, at what state did
2  you then deem the ASU dormitory project to be
3  in?
4      A.    At that point we deemed -- did I
5  deem or did Gil Berry or --
6      Q.    Marous.
7      A.    Marous deemed that the project
8  was in a stage where we could then do some
9  further -- a little bit of further due
10 diligence so that the developers, Gil Berry &
11 Associates and Student Suites, could produce a
12 development proforma to be presented sometime,
13 I think, in November to Mr. Gallot and to Dr.
14 Lee and to the board and the building
15 committee showing that the project was in fact
16 reality.
17         So, at that time there was strong
18 interest expressed by everyone in the room
19 that we should keep going, that they wanted to
20 see more information and they -- Mr. Gallot
21 asked us some very specific questions about
22 the financing, which Mr. Davis addressed, as
23 to how the financing could occur.

Page 434

1    They were relieved in our
2 presentation that we were advocating saving
3 the buildings and renovating the buildings and
4 that we thought we could do so in a cost
5 effective and efficient manner.  They were
6 intrigued by the minority participation plan,
7 the student internship plan, that we discussed
8 briefly, and they seemed genuinely
9 appreciative of our efforts at that meeting.
10    Q.   Now, after the September 20th,
11 2005, meeting, did you believe that Marous had
12 a contract with Alabama State at that time?
13    A.   No.
14    Q.   Did you believe that Student
15 Suites/Gil Berry had a contract with Alabama
16 State at that time?
17    A.   Not at that time.
18    Q.   Did you expect to be paid for
19 that presentation --
20    A.   No.
21    Q.   -- on September 20th, 2005?
22    A.   I already testified, no.
23    Q.   Okay.  At that September 20th,

Page 435

1 2005, meeting, what then did you think your
2 next steps would be?
3    A.   We did some very preliminary cost
4 estimating and provided that information to
5 Dick Davis and to Gil Berry so that Dick,
6 specifically, could run proforma to see if the
7 rental rate, the current rental rate at
8 Alabama State, was sufficient to support
9 additional debt that would be incurred to do
10 the capital improvement project.
11    Q.   Now, did anyone from ASU instruct
12 you to do this preliminary cost estimating?
13    A.   At the presentation on September
14 20th, they said that -- Mr. Gallot said that
15 he would need to see the additional -- the
16 development proforma to see on behalf of
17 Alabama State if the debt could be supported.
18    So, he did ask that -- for
19 additional information.
20    Q.   Now, at that time you didn't
21 believe that the board had made any decision
22 as to hiring Student Suites/Gil Berry as a
23 developer?

Page 436

1    A.   On September 20th, no.
2    Q.   When Mr. Gallot stated that he
3 needed this additional information for the
4 proforma, did you believe that this would be
5 done at the cost of ASU?
6    A.   No.
7    Q.   Now, you testified that there was
8 a point in time -- you stated that Marous was
9 just doing basic marketing with ASU, and then
10 it turned into where you would be doing
11 preconstruction services and you were
12 expecting to be paid for it.
13    Is that correct?
14    A.   At some point we were expecting
15 to be paid when -- once we started
16 preconstruction, yes.
17    Q.   And I think you identified that
18 time period to be somewhere around December
19 '05 and January '06?
20    A.   Yes.  I think I identified that
21 time as after the resolution was passed
22 conditionally naming Student Suites and Gil
23 Berry as developer.

Page 437

1    Q.   Okay.  Now, did you express to
2 anyone at ASU that you deemed the stage now to
3 be beyond marketing and that you were in
4 preconstruction services, Marous would be
5 performing preconstruction service?
6    A.   No.  We expressed it to Gil Berry
7 and to Dick Davis.
8    Q.   Did you express to anyone at ASU
9 how much your preconstruction services would
10 cost?
11    A.   At that time, no.
12    Q.   Did you express or discuss with
13 anyone at ASU what your preconstruction
14 services would entail?
15    A.   Yes.
16    Q.   Who did you speak with at ASU
17 about that?
18    A.   At our presentation on September
19 20th, we were quite clear as to the extensive
20 process that we use to protect the risk or our
21 clients on renovation projects, in terms of
22 risk management, in terms of assessing
23 existing conditions, to provide ASU and any of

Page 438

1  our clients with comfort. We would provide a
2  very clear and complete scope for a very
3  definite price and over a very specific time
4  period.
5      Q.    So, at that September 20th
6  meeting, you told officials or representatives
7  from ASU that Marous would be preparing an
8  extensive scope?
9      A.    We told them that if the project
10  were -- if the project were to proceed to the
11  stage where they needed to obtain financing,
12  we would need to be undergoing the process
13  that I previously described.
14     Q.    And did you discuss with them how
15  much that would cost them?
16     A.    At that point, we didn't know how
17  much that would cost.
18     Q.    Is there anything in writing from
19  Marous to ASU stating that we will be
20  preparing an extensive scope for the
21  University at such time you-all will be
22  obtaining financing?
23     A.    No.

Page 439

1      Q.    No. And I guess along those same
2  lines, was there anything in writing to ASU
3  about how much your preparation of the
4  extensive scope would cost them?
5      A.    Not at that time, no.
6      Q.    Let me bring you back to what was
7  previously marked as Defendant's Exhibit 5.
8  And if I'm not mistaken, you said that you
9  have seen a copy of that letter?
10     A.    Yes.
11     Q.    And it's your testimony that it
12  was after this letter where Dr. Frazier is
13  saying that the property committee passed a
14  resolution in principle that you now deemed
15  Marous to be in preconstruction phase?
16     A.    Yes. Because in order for ASU
17  and Gil Berry and Student Suites to achieve
18  financing success, they would need to have
19  scope definition and cost definition and
20  schedule definition as a basis for which to
21  ask for financing.
22     Q.    Now, in that letter Dr. Frazier
23  does state that this resolution, which was

Page 440

1  passed in principle, also contained language
2  that services would be done -- let me give the
3  exact language. "It is mutually understood
4  that if final agreement is not reached on more
5  detailed design and financing structures that
6  this Resolution will become void with no
7  expense to Alabama State University."
8          You saw that in that letter?
9      A.    I saw that.
10     Q.    And what did that mean to you?
11     A.    That meant to me that if Alabama
12  State and/or Gil Berry and Student Suites
13  could not obtain financing and did not have an
14  approved design, then any work that would be
15  done that -- that the agreement would become
16  null and void and there would be no cost to
17  Alabama State.
18     Q.    So, did you read this to mean
19  that if a final agreement was not reached on
20  detailed design and financing structures, that
21  your preconstruction services would not be
22  paid for by Alabama State University?
23     A.    I just -- I read that if there

Page 441

1  was no agreement on finalizing the design and
2  the project wasn't financed that there would
3  be no cost to Alabama State.
4      Q.    Okay. And that included your
5  preconstruction -- Marous' preconstruction
6  services?
7      A.    We didn't write the resolution
8  so.
9      Q.    You didn't write the resolution.
10  But after you received this letter, did you
11  send anything to Dick Davis or to Dr. Frazier
12  saying that you disagreed with this?
13     A.    I called Dick Davis and said,
14  well, you know, we better work very hard to
15  make sure this gets -- that we get everything
16  done and you better get this project financed
17  because we're not -- you know, we're not
18  working for free. It's unreasonable to assume
19  that we'd work for free.
20     Q.    Okay. But you never withdraw
21  from, I guess, the "team" that you, Student
22  Suites and Gil Berry had for ASU's dormitory
23  renovation after you saw this?

Page 442

1    A.    We did not withdraw.
2    Q.    You did not.  And you did not
3 then attempt to work out something with
4 Alabama State where you would be paid for your
5 preconstruction services or anything that you
6 would be doing during this time, regardless of
7 whether a final agreement was reached?
8    A.    We did not.
9    Q.    And, again, in this letter in the
10 resolution language it mentions that the
11 University is to engage Student Suites,
12 Incorporated and Gil Berry & Associates as
13 developer.
14        Does the resolution mention
15 anything about Marous Brothers Construction?
16    A.    We're not the developer, and that
17 was a developer resolution.  So, we wouldn't
18 be mentioned.
19    Q.    Did Marous Brothers Construction
20 have any type of resolution for ASU to pass as
21 it relates to ASU and Marous Brothers
22 Construction's relationship?
23    A.    No.

Page 443

1    Q.    Was there ever any independent
2 relationship -- well, any relationship between
3 Alabama State University and Marous Brothers
4 Construction that was independent of the
5 arrangement with Student Suites and Gil Berry?
6        MR. LYONS:  Object to the form.
7        THE WITNESS:  I think there's an
8 implied relationship because they invited us
9 to come down and perform the due diligence we
10 needed to do.
11        And as I previously testified,
12 Alabama State was kind enough to provide
13 several personnel and access to -- free access
14 to the dormitories.  So, I think there was an
15 implied relationship outside of Student Suites
16 and Gil Berry.
17    Q.    (By Ms. Jones)  When did they --
18 when did Alabama State University invite you
19 to come down and look at dormitories?
20    A.    When Gil Berry and Dick Davis
21 said that we needed to come down there,
22 Alabama State -- Dr. Frazier -- Gil Berry put
23 me in touch with Dr. Frazier who told me that

Page 444

1 we were welcome to come down, but before we
2 came down we needed to call him because we
3 were going to be going into students' dorm --
4 you know, dorm rooms that were occupied and
5 that we needed to coordinate that and that --
6        And we told him that we would
7 like -- you know, a chaperone is probably not
8 the right term.  We'd like a representative
9 from Alabama State to accompany us at all
10 times so there would be no liability issues,
11 to which they agreed.
12    Q.    So, Dr. Frazier said you were
13 welcome to come.  But Did Dr. Frazier call you
14 or anybody at Marous in Ohio and say, hey, we
15 need you guys to come down here and assess our
16 dormitories?
17    A.    We told -- in the September 20th
18 presentation, we told Dr. Frazier and everyone
19 present that we would need to do that, and
20 they said that would be great at the September
21 20th.
22    Q.    So, you needed to do this as --
23 you needed to view the dormitories as a part

Page 445

1 of your due diligence?
2    A.    We need to -- no.  As a part of
3 of creating a definite scope and a hard budget
4 for the project, we needed to view all the
5 dormitories and do measured drawings and all
6 the services I previously testified about.
7    Q.    But that's not something that
8 anyone from ASU specifically requested that
9 you do, correct?
10    A.    After we told them that that was
11 our process and that we expected to do that,
12 they thought that was -- they told us they
13 thought that was a great process and it made
14 sense.  And they said you could do that.
15    Q.    And you've already testified that
16 you never told them that this process -- what
17 this process would cost them or that it would
18 cost them, correct?
19    A.    At that time we did not.
20    Q.    When you came down and visited
21 the dormitories, did you then tell somebody
22 that what I'm doing here today will cost the
23 University?

Page 446

1    A.    No.
2    Q.    No?
3    A.    Not that I'm aware of.  I think
4    it's usual and customary in the construction
5    industry, though.  It seems, to me, painfully
6    obviously that nobody's going to do this level
7    of work without getting compensation or
8    seeking compensation.
9    Q.    But you were aware during this
10   time that there -- that the resolution had
11   passed?
12   A.    I was also aware that -- I was
13   pretty confident that we could get it to a
14   design that could be approved and --
15         The project certainly got
16   financed, didn't it?
17   Q.    You were pretty confident.  But
18   you had no resolution from the board --
19   Alabama State University Board of Trustees
20   stating that you would be paid for
21   preconstruction services at XYZ amount, did
22   you?
23   A.    We did not.

Page 447

1    Q.    You did not.  Let me take you to
2    what was marked as Defendant's Exhibit 37,
3    which is the first amended complaint.
4          Now, Mr. Goldman, you spoke
5    earlier about what's customary in the
6    construction industry and practice?
7    A.    Uh-huh (affirmative).
8    Q.    The people that you mentioned
9    that you met from Alabama State University,
10   that you talked with from Alabama State
11   University, were they members of the
12   construction industry?
13         Were they knowledgeable of the
14   construction industry?
15   A.    I have -- I don't know what their
16   backgrounds were.
17   Q.    Was Gil Berry knowledgeable of
18   the construction industry?
19   A.    I think some aspects.
20   Q.    Some aspects.  Was he
21   knowledgeable of what Marous processes would
22   be as it relates to the renovation of the
23   dormitories?

Page 448

1    A.    We made sure he was aware of the
2    processes.  We spent a lot of time talking
3    about it with him and with Dick Davis.
4    Q.    So, Gil Berry would have known
5    that when you were preparing this scope of
6    work that you expected to be paid for it?
7    A.    Yes.
8    Q.    He knew that?
9    A.    Yes.
10   Q.    Do you know whether he related
11   that to -- relayed that to anyone at Alabama
12   State?
13   A.    He relayed that when he started
14   sending invoices purportedly at the request of
15   several people, including Dr. Lee and by Judge
16   Wiggins, whose E-mail I saw to Gil Berry.
17         So, they knew -- you don't ask
18   for invoices if you don't expect to be paying
19   for something.
20   Q.    And those invoices -- the first
21   invoices were sent when?
22   A.    In May.
23   Q.    In May.  So, from -- but you said

Page 449

1    you expected to be paid for services beginning
2    in January -- excuse me, in December of '05,
3    beginning in December of '05.
4    A.    Uh-huh (affirmative).
5    Q.    In December of '05, did you send
6    any invoices --
7    A.    No.
8    Q.    -- to anyone?
9    A.    No.
10   Q.    January '06?
11   A.    We were accumulating invoices
12   until such time that we knew that -- we were
13   accumulating costs until such time that the
14   project's financing was going to close, at
15   which time assurances were made to Gil Berry
16   that we relied upon that when the bond
17   financing closed that we would be compensated
18   for our preconstruction services.
19   Q.    So, if the bond financing never
20   closed, did you expect to be paid for your --
21   A.    No.
22   Q.    -- preconstruction services?
23   A.    No.

Page 450

1    Q.    So, the trigger was the obtaining
2  of bond financing?
3    A.    Bond financing and the completion
4  of our schematic design and our scope to help
5  get the bond financing.
6    Q.    And was that relayed to Alabama
7  State University --
8    A.    Yes.
9    Q.    -- that Marous Brothers expected
10  to be paid --
11    A.    Yes.
12    Q.    -- for preconstruction services?
13    A.    Yes.
14    Q.    Once the bond financing closed?
15    A.    Yes.
16    Q.    And when was that relayed to
17  Alabama State?
18    A.    It was relayed to Alabama State
19  through the invoices that were submitted by
20  Student Suites, by Gil Berry and by Marous
21  Brothers.
22    Q.    But you said that that wasn't --
23  those invoices, those first invoices, were not

Page 451

1  sent until May of '06, correct?
2    A.    Gil told us that there was no way
3  to invoice until the bond financing would
4  close.
5        But then apparently he had
6  conversations with people -- purportedly he
7  had conversations with people at Alabama State
8  that said we could submit the invoices prior.
9  And so we did.
10    Q.    Who did he tell you that he had
11  conversations with at Alabama State that said
12  submit the invoices?
13    A.    Mr. Gallot.
14    Q.    Mr. Gallot. Let's stop right
15  there. Did he tell you exactly what Mr.
16  Gallot said as it relates to the invoices?
17    A.    He told us submit the invoices
18  and that Mr. Gallot would submit them for
19  payment.
20    Q.    And do you know what Mr. Gallot's
21  title is at Alabama State University?
22    A.    I don't know that he's still at
23  Alabama State. I believe he was a vice --

Page 452

1    Q.    At the time that he was there, do
2  you know what his position was?
3    A.    I believe he was vice president
4  of finance.
5    Q.    Vice president of finance?
6    A.    That's what I thought.
7    Q.    And do you know whether he had
8  the authority to approve payment on any
9  invoices?
10    A.    No.
11    Q.    So, relying on this statement
12  from Gil, you thought that Freddie Gallot
13  would get your invoices paid?
14    A.    I thought that -- I didn't say
15  that. I said that we were told to submit the
16  invoices to Gil and he would submit them to
17  Fred Gallot, Mr. Gallot, who said that he
18  would submit them for payment. That's what I
19  said.
20    Q.    Mr. Gallot said that he would
21  submit them for payment?
22    A.    Yes.
23    Q.    But Mr. Gallot didn't say that

Page 453

1  Alabama State will pay for these -- will pay
2  these invoices?
3    A.    I wasn't part of that
4  conversation. So, I can only -- I can only
5  say what was relayed to me. And I just told
6  you what was relayed to me.
7    Q.    So, you really don't even know if
8  Mr. Gallot told Gil Berry that or not, do you?
9        You don't know if Mr. Gallot
10  actually told Gil Berry tell Marous to send
11  their invoices?
12    A.    Gil Berry sent me copies of
13  E-mails that he sent to Fred Gallot where
14  these invoices were attached. I know that.
15    Q.    Did you ever see any E-mails from
16  Mr. Gallot to Gil Berry saying send me your
17  invoices --
18    A.    No.
19    Q.    -- and Marous Brothers
20  Construction?
21    A.    I saw an E-mail from judge -- the
22  Honorable Judge Wiggins that said submit me
23  your invoices.

Page 454

1    Q.    Okay.  And the E-mail from Judge
2  Wiggins said submit me your invoices?
3    A.    Yeah.  Submit me the invoices.
4  And Gil, again, purportedly had talked with
5  Judge Wiggins.
6         Because at that point the bond
7  financing either had closed or was ready to
8  close.  So, there would be monies available to
9  pay us.
10    Q.    Did the E-mail say that Alabama
11  State University had approved the payment of
12  these invoices?
13    A.    I don't -- I don't recall what
14  that E-mail said.
15    Q.    And did you, yourself, have any
16  conversations with Trustee Wiggins about the
17  invoices?
18    A.    No.
19    Q.    And who else did Gil say told him
20  that you-all should submit your invoices?
21    A.    Gil said that Dr. Lee told him to
22  submit invoices.
23    Q.    And did Dr. Lee just say submit

Page 455

1  the invoices?  Did Dr. Lee say that the
2  University had approved the invoices to be
3  paid?
4    A.    Gil represented to me that Dr.
5  Lee said that he would get us paid, "us"
6  meaning Gil Berry, Student Suites and Marous
7  Brothers.
8    Q.    Did --
9    A.    For those expenses.
10    Q.    Did Dr. Lee say they he had a
11  resolution from the board to do this, to pay
12  these invoices?
13    A.    I wasn't part of the
14  conversation.
15    Q.    Why do you keep saying
16  purportedly.  Do you not believe what Gil
17  Berry relayed to you?
18    A.    I wasn't part of the
19  conversation.  So, I'm a third-party observer.
20  That's -- there's no implication one way or
21  another to be drawn.  It's just a word I'm
22  using because I did not hear it firsthand.
23    Q.    Did you see any E-mails from Dr.

Page 456

1  Lee requesting the invoices?
2    A.    I don't recall.
3    Q.    In the facts section of this
4  first amended complaint, Paragraph 12 --
5  excuse me.  It's substantive averments,
6  Paragraph 12.
7    A.    Yes.
8    Q.    There's a statement Gil Berry and
9  Student Suites were hired by ASU and at ASU's
10  request began working as developer for the
11  purpose of designing, building, renovating and
12  financing the Student Residence Project.
13         When was GBA and Student Suites
14  hired by ASU to your knowledge?
15    A.    I don't know what the date of
16  hire is.
17    Q.    Do you know about when they were
18  hired?
19    A.    I don't know if this refers to
20  the resolution that conditionally authorized
21  -- appointed them as developer.  That's
22  speculation.
23    Q.    Okay.  So, you really don't know

Page 457

1  when they were hired or if they were hired or
2  not?
3    A.    I know that they did a lot of
4  work, as did we, based on the resolution that
5  was passed.
6    Q.    The resolution that said if no
7  final agreement is reached on detailed design
8  and financing that the resolution will become
9  null and void --
10    A.    Uh-huh (affirmative).
11    Q.    -- and there would be no cost to
12  the University?
13    A.    The same resolution that says
14  that we appoint you as the developer to design
15  and finance and blah, blah, blah that this
16  relates to.
17         Blah, blah, blah is an
18  industry-accepted term.
19    Q.    Paragraph 14.  At the request of
20  ASU and GBA, Marous was hired to document
21  existing conditions, prepare design documents
22  and prepare documents outlining the intended
23  scope of the renovation work.

Page 458

1      When did ASU request that Marous
2  be hired to perform these duties?
3      MR. LYONS: If you don't know,
4  don't guess.
5      THE WITNESS: I don't know. What
6  I do know is at the presentation on September
7  20th, we talked about the process, and they
8  invited us -- the ASU people at that meeting
9  invited us to go ahead and do our thing.
10     So, it was already implied that
11 they wanted us to continue with the process
12 and do some due diligence?
13     Q.   (By Ms. Jones) They wanted you
14 to do due diligence, correct?
15     A.   Yes.
16     Q.   And you said they wanted you to
17 go ahead and do your thing. And what was your
18 thing?
19     A.   Well, they wanted to get work
20 product from the developers, from the
21 development team, that had a more detailed
22 cash flow and development proforma analysis.
23     Q.   Did you consider this to be ASU

Page 459

1  hiring Marous?
2      A.   No.
3      Q.   No. So, this would be an
4  incorrect statement that ASU requested -- at
5  ASU's request Marous was hired to do these
6  duties, to perform these duties?
7      A.   I would change the word "hired."
8      Q.   To?
9      A.   Encouraged, induced.
10     Q.   In what way did ASU induce Marous
11 to perform these duties?
12     A.   Because ASU needed a development
13 proforma to assess the financial viability of
14 the capital improvement project. We had the
15 expertise certainly to do that, the work that
16 would substantiate the hard construction cost
17 or some approximation of the hard construction
18 cost and scope.
19     And ASU was certainly cooperative
20 in giving us access to areas that we needed to
21 do.
22     Q.   And for that, you expected to be
23 paid?

Page 460

1      A.   Not until after -- we expected to
2  be paid once the bond financing closed because
3  we -- once the bonds were issued we felt that
4  since they were -- the bonds were issued in
5  part and parcel based upon the work product
6  that we had produced, that we would be paid
7  our preconstruction fee.
8      Q.   And where is that -- where is
9  that agreement laid out, that once the bond
10 financing is closed Marous Brothers would
11 receive its preconstruction fee from Alabama
12 State University?
13     A.   We were -- that was represented
14 to us by Gil Berry.
15     Q.   That was represented by Gil
16 Berry?
17     A.   Yes.
18     Q.   But no one from ASU?
19     A.   Not to my knowledge. Well, only
20 in conversations with Gil Berry --
21     Q.   Relaying to you --
22     A.   Relayed to me.
23     Q.   Okay.

Page 461

1      A.   "Me" meaning Marous because it
2  was related to Chip Marous, the president of
3  the company.
4      Q.   Now, in Paragraph 15 you state --
5  well, the complaint states in late May 2006,
6  upon reliance on the representations and
7  resolution of the Board of ASU and President
8  Lee, Marous provided its proprietary work
9  product to ASU in spiral bound 11x17 format.
10     And if I'm not mistaken, this is
11 what you're calling the work product, Marous'
12 work product?
13     A.   That's a copy. I mean --
14     Q.   A copy of it?
15     A.   The original work product is
16 color, full color. It's bound. It's spiral
17 bound. And we presented that.
18     Q.   How did you provide it to Alabama
19 State?
20     A.   I hand-delivered it. I was here
21 for a presentation in May.
22     Q.   And since Alabama State is an
23 entity, you had to give it to a physical

116 (Pages 458 to 461)

Page 462

1  person. Who did you give it to?
2      A.    The Honorable Judge Wiggins. We
3  gave -- we gave several copies to Gil Berry to
4  be distributed. He gave one to Elton Dean
5  that I physically saw. I'm not sure if Dr.
6  Lee was handed one or we sent a copy. When we
7  got back to Cleveland, they made more --
8  several more copies. But we gave that to Dr.
9  Lee.
10     And we left copies with Dave and
11 Mr. Berry for the purposes of financing.
12     Q.    So, you left additional copies
13 with Gil Berry and Dick Davis?
14     A.    Yes.
15     Q.    That were not given at Alabama
16 State?
17     A.    I don't know what they did with
18 them.
19     Q.    You don't know what they did with
20 them. When you gave these -- this
21 "proprietary work" to Alabama State, did you
22 give them any type of terms and conditions
23 under which they could possess it or use it?

Page 463

1      A.    I believe the work is
2  copyrighted. So, the copyright on the front
3  page -- I would have to look, but typically
4  our work product is a copyrighted on the front
5  page, on the title page.
6      Q.    But did Marous provide any type
7  of written explanation to the University as to
8  how it was to possess and use this proprietary
9  work?
10     A.    We conveyed to Gil Berry that
11 this is proprietary work product and it was to
12 remain only in the hands of the people that
13 they chose to give it to.
14     Q.    And you depended on Gil Berry to
15 relay that?
16     A.    And Dick Davis, yes.
17     Q.    But you don't know whether they
18 relayed that to anybody from Alabama State
19 University or not, do you?
20     A.    I do not, no.
21     Q.    In Paragraph 16 you talk about
22 the first invoice related to Part One
23 Preconstruction Services and that total amount

Page 464

1  for Gil Berry and Student Suites and Marous
2  being $374,229.49, correct?
3      A.    Yes.
4      Q.    And you say that these invoices
5  were not paid. Now, this first invoice, who
6  instructed Marous to send these?
7      A.    Gil Berry.
8      Q.    Gil Berry instructed Marous to
9  send these?
10     A.    At the -- as relayed -- as he
11 relayed to us, through conversations with
12 people who I previously testified to.
13     Q.    Did you ever have a subsequent
14 conversation with Gil Berry about why the
15 invoices were not paid?
16     A.    Uh-huh (affirmative). Yes.
17     Q.    And what did he say?
18     A.    He said that he was told that we
19 had to wait until -- the payment would be
20 forthcoming but -- he talked to, I believe,
21 Dr. Lee and/or Mr. Gallot and they said at
22 some point payment would be forthcoming. And
23 that Gil said, in any event, we know once bond

Page 465

1  financing is closed, you're going to get paid.
2  We're going to get paid.
3      Q.    And that came from Gil?
4      A.    That came from Gil.
5      Q.    Did Student Suites submit an
6  invoice at this time?
7      A.    I don't know. I just submitted
8  our invoice.
9      Q.    You just submitted yours.
10     A.    To Gil.
11     Q.    To Gil.
12     A.    Can we break for just -- I need
13 five minutes. I just want to call my little
14 girl.
15     Q.    Sure.
16     A.    Is that okay?
17     Q.    Yes.
18     A.    Thank you.
19         (Whereupon, the taking of the
20 deposition was recessed from approximately
21 6:37 p.m. to approximately 6:42 p.m., after
22 which the following proceedings were had and
23 done:)

Page 466

1    Q.    In Paragraph 18 --
2    A.    Yes.
3    Q.    Are you there?  Okay.
4         It says as noted, ASU received
5    copies of Marous' proprietary work product in
6    late May 2006.  Thereafter, and utilizing
7    Marous' proprietary work for which Marous has
8    never been paid.
9         When did ASU use Marous'
10   proprietary work after late May 2006?
11   A.    For bond financing purposes.
12   Q.    And how did ASU use Marous'
13   proprietary work for bond financing?
14   A.    You can't issue bonds without a
15   -- you can't do a capital improvement project
16   without a scope of work that you're
17   specifically asking for.  And so our documents
18   become the basis for that ask.
19   Q.    So, is it your contention that
20   ASU supplied this scope of work to bond
21   counsel or --
22   A.    I know --
23   Q.    -- to underwriters?

Page 467

1    A.    I know it was supplied to bond
2    counsel.
3    Q.    Okay.  And do you know what bond
4    counsel did, what, if anything, they did with
5    it?
6    A.    I have no idea.
7    Q.    Okay.  It says Marous'
8    proprietary work product is referenced as an
9    exhibit in the bond documents.  Have you seen
10   the bond documents?
11   A.    That's not something -- you have
12   to talk to Gil Berry about that.  We have not
13   seen -- we did not see the final bond
14   documents.
15   Q.    Okay.  But it says Marous'
16   proprietary work product.  Marous doesn't know
17   that to be a fact?
18   A.    That was something that Gil Berry
19   and Dick Davis -- that Gil Berry added.
20   Q.    Okay.  In reliance upon
21   representations made by ASU, including
22   President Lee, GBA and Marous permitted the
23   use of Marous' proprietary work product to

Page 468

1    procure the financing.
2         What representations did
3    President Lee make to Marous?
4    A.    You have to ask Gil Berry.
5    Q.    Okay.  So, President Lee didn't
6    make any representations to Marous?
7    A.    He did not make representations
8    to Marous.
9    Q.    Regarding the use of its
10   proprietary work?
11   A.    Only as related by Gil Berry.
12   Q.    In Paragraph 19 -- well, if you
13   look on the second sentence of Paragraph 19,
14   we have a reference from the Bond's
15   Preliminary Official Statement.
16        And then there's a sentence as
17   confirmed by the language of the bond, the
18   suite-style renovations proposed by Marous and
19   GBA were within the scope of the bond issue?
20   A.    Correct.
21   Q.    What in this reference represents
22   the proposal by Marous and GBA?
23   A.    The schedule for completion of

Page 469

1    each of the dorms.
2    Q.    Okay.  So, this --
3    A.    For one.
4    Q.    And would that schedule be
5    considered proprietary work?
6    A.    It was part of our proprietary
7    work product.
8    Q.    Was that schedule ever presented
9    in the September 20th proposal?
10   A.    It was.
11   Q.    It was.  And you did not consider
12   that to be proprietary work, did you, that
13   September 20th, 2005, presentation to some of
14   the board members --
15   A.    Oh, that schedule was not -- that
16   was not the schedule I'm talking about.  That
17   schedule had changed based on -- I'm sorry.  I
18   thought you meant September 2006.  I
19   apologize.
20   Q.    No.
21   A.    The schedule that we presented
22   was just a bar chart.  It was a simple
23   duration bar chart in 2005.  In 2006, we

Page 470

1  presented a much more comprehensive
2  construction bar chart.
3      Q.    So, the statement, the University
4  expects to complete the first two dormitories
5  by fall semester 2007, that is something that
6  was created by Marous?
7      A.    It was from a schedule that was
8  created by Marous.  The description of
9  suite-style accommodations featuring modern
10  communications, wireless Internet, enhanced
11  security and other amenities was from our
12  scope of work.  It was items that were
13  described in our scope of work.
14      Q.    The items described in the scope
15  of work.  But were these things that were
16  identified by the University that they wanted
17  in their dormitory renovation?
18      A.    Yes.
19      Q.    So, the University said that they
20  wanted modern communications?
21      A.    Yes.
22      Q.    And they said they wanted
23  wireless Internet?

Page 471

1      A.    Yes.
2      Q.    And they said they wanted
3  enhanced security?
4      A.    Enhanced security was one of the
5  single highest priorities from our September
6  20th, 2005, presentation.
7      Q.    That was forwarded to you-all by
8  representatives from ASU?
9      A.    It was verbally stated that we
10  incorporate it back in our work product and
11  our pricing.
12      Q.    But these items that are listed
13  here are nothing unique to Marous' proprietary
14  work?
15      A.    They couldn't have created the
16  schedule that's in here unless they used our
17  work product to produce it.
18      Q.    Okay.  We talked about the
19  schedule.  But I'm talking about this list of
20  what the suite-style accommodations would
21  feature.
22          I think we both know that there
23  is no way any issuer or bond underwriter would

Page 472

1  ever issue bonds without having a pretty
2  definite scope of work because they've got to
3  be able to sell those bonds and there has to
4  be something behind those bonds that conveys
5  intent to produce a project for which people
6  will purchase those bonds and expect to get
7  repaid.
8          So, I think it's not only by -- I
9  think it's easily inferred that to come up
10  with these dates and these representations and
11  this scope, these simple scope items, that
12  they used our work product.
13      Q.    So --
14      A.    Especially because they asked for
15  our work product, and we sent it to them.
16      Q.    Okay.  You're saying they asked
17  for the work product, and you sent it to them?
18      A.    Uh-huh (affirmative).
19      Q.    But what I'm asking you, are
20  these items unique to this scope of work?
21      A.    The schedule was.
22      Q.    The schedule was.  We went over
23  that.  But you also told me that this modern

Page 473

1  communications, wireless Internet, enhanced
2  security were things that the University
3  conveyed to you that they wanted in their
4  renovated dorms?
5      A.    And that we put in the scope of
6  work.
7      Q.    And that you would put in the
8  scope of work?
9      A.    Uh-huh (affirmative).
10      Q.    So, it was not anything that was
11  independently created by Marous Brothers?
12      A.    We didn't say that it was
13  independently created.  We said this work
14  product was independently created.
15      Q.    But you don't know whether this
16  was incorporated in any presentation that ASU
17  did to go to the bond market, do you?
18      A.    That, I don't know.
19      Q.    And you don't know whether this
20  scope of work is actually in any of the bond
21  documents?
22      A.    I have not seen the bond
23  documents.  So, I don't know if it is or

Page 474

1  isn't.
2      Q.    And since May 2006, you've never
3  tried to verify or learn whether your
4  proprietary work was used as an exhibit?
5          You haven't?
6      A.    No, I haven't. Are you asking
7  me? I have not.
8      Q.    You have not. But you still use
9  that as a basis for your claims against
10  Alabama State University, although you don't
11  know whether it's true or not?
12      A.    We know that their schedule,
13  which was proprietary to this project, was
14  used and they didn't -- they had to come up
15  with that from us. So, that's enough.
16      Q.    So, if bond counsel for Alabama
17  State stated that at no time did they use
18  Marous' scope of work in preparing bond
19  documents, will you have anything to dispute
20  that?
21      A.    I can't -- I don't know if we
22  have anything to dispute it. I don't know
23  what Gil Berry does or doesn't have, that he

Page 475

1  may have or Dick Davis may have.
2      Q.    Okay. But at this time, you
3  don't know of anything that Marous may have?
4      A.    At this time I don't.
5      Q.    In Paragraph 20 you stated the
6  Preliminary Official Statement listed the
7  University's Residence Halls, the type of
8  accommodations, the capacity and the person
9  semester cost for each.
10          Was the University's residence
11  halls, the listing of the residence halls, was
12  that part of Marous' proprietary work?
13      A.    The type of accommodations, the
14  capacity and the per semester cost that we --
15  that Dick Davis came up with with Gil Berry,
16  that was all proprietary to our whole -- to
17  our work.
18      Q.    So, now what Dick Davis did is
19  also a part of Marous' proprietary work?
20      A.    No. It's part of what the bond
21  counsel relied on. But in order for Dick
22  Davis to do his work, he needed information
23  from us.

Page 476

1      Q.    Is Marous the exclusive provider
2  of suite-style accommodations?
3      A.    I wish we were.
4      Q.    So, that's a no?
5      A.    That's a no.
6      Q.    Did Marous create suite-style
7  accommodation, were y'all the first to
8  introduce that in the market?
9      A.    No.
10      Q.    When you-all came to visit the
11  University in September, did officials from
12  from the University already represent that
13  they were interested in suite style?
14      A.    Yes.
15      Q.    Okay.
16      A.    No, they -- well, they asked us
17  what options. What they told us -- I want to
18  back up.
19          What they told us was they --
20  there are too many historically black colleges
21  and universities that were offering
22  suite-style, semiprivate, in suite bathroom
23  type dormitories and that your student

Page 477

1  retention -- their student retention was
2  declining rapidly because people could go to
3  other HBCUs and get comparable education to
4  Alabama State and have much better living
5  accommodations for similar money.
6      Q.    But they already had an interest
7  in suite-style accommodations?
8      A.    I think they had an interest in
9  improving the quality of life for their
10  students as any -- as any good college like
11  Alabama State should have.
12      Q.    And they mentioned suite-style
13  accommodations?
14      A.    I think we used the term suite
15  style. I don't know if they did.
16      Q.    But they described something
17  similar to suite style?
18      A.    I think they did.
19      Q.    In Paragraph 23 is the statement
20  that ASU, Marous and SSBGA continued to revise
21  the development agreement, even though the
22  Student Residence Project had received full
23  funding through the issuance of the bond.

Page 478

1        Now, this development agreement,
2   was Marous supposed to be a party to this
3   agreement?
4        A.    We are not a party to the
5   agreement.  We were an interested -- we were
6   an interested party because we had a fiduciary
7   interest in the project going forward, but we
8   were not a developer on the project.
9        Q.    And Marous was a fiduciary to
10  what entity?
11       A.    As far as we're concerned,
12  Alabama State.
13       Q.    And how did the fiduciary
14  relationship between Alabama State and Marous
15  Brothers come into existence?
16       A.    Because they received financing
17  on work product that we did.  And so the
18  benefit from our work product inured to
19  Alabama State that they obtain bond financing.
20       Q.    But you just said you don't know
21  whether or not your scope of work was actually
22  used in bond documents or a presentation in
23  the bond market.

Page 479

1        A.    Based on representations made to
2   me by Dick Davis and Gil Berry, bond counsel
3   requested and received our work product
4   because they said they needed to use our work
5   documents to justify the ask for the $25
6   million portion of the bonds.
7        So, based on that statement, and
8   coming from Dick Davis who I previously
9   testified is a person of integrity, I would
10  have no doubt that that request was valid and
11  that it happened.
12       Q.    You know about the request, but
13  you don't know -- did Dick Davis say it was
14  actually done, that your scope of work was
15  actually used?
16       A.    They both -- both Gil and Dick
17  did, said that.
18       Q.    What revisions did Marous propose
19  to the development agreement?
20       A.    There was items -- once Mr.
21  Upchurch got involved, there were some items
22  in the development agreement that tied to the
23  scope, specific scope items of the project

Page 480

1   that he wanted clarification for that we
2   provided.
3        Q.    Okay.  Go to Paragraph 28.
4        A.    Okay.
5        Q.    Judge Marvin Wiggins, an ASU
6   board member, instructed Marous, GBA an
7   Student Suites send invoices for the work they
8   had performed to Freddie Gallot, ASU's vice
9   president for fiscal affairs.
10       And you've already testified that
11  you or anyone from Marous never had direct
12  conversations with Judge Wiggins?
13       A.    Yes.
14       Q.    And this is based on what was
15  relayed to you by Gil Berry, correct?
16       A.    Yes.
17       Q.    Go to Paragraph 32.  The last
18  sentence in that paragraph, upon information
19  and belief these representatives are using
20  Marous' proprietary work product to perform
21  the work on the Student Residence Project
22  outlined in the bond offering.
23       What is the basis of your belief?

Page 481

1        A.    Our belief is based on what we
2   believe to be financing that was procured
3   using our work product in part and parcel so
4   that any work that's done using our work
5   product for which we weren't paid is something
6   that we're claiming is wrong.
7        Q.    So, if we go back to -- I think
8   it was Paragraph 19.  We looked at that
9   excerpt from the preliminary official
10  statement.
11       And your statement was the
12  schedule detailed there was something that
13  Marous created, correct?
14       A.    Yes.
15       Q.    Does Marous have a value that it
16  can place on this schedule?  I mean, how much
17  is this schedule worth to Marous?
18       A.    The schedule is -- can't be
19  separated from the rest of the work because
20  the schedule ties to work that we described
21  and the sequence thing.
22       So, I think it would be
23  impossible for us to assess -- to separate out

Page 482

1  the schedule.
2      Q.    So, the inclusion of the one
3  sentence in the preliminary official statement
4  then obligates Alabama State to Marous
5  Brothers for a total -- your total
6  preconstruction services?
7      A.    That's not what I said.
8      Q.    Okay.
9      A.    I think the implied contract
10  between Alabama State and Marous, the work
11  that we performed clearly was not something
12  that anyone in their right mind would do for
13  free without hope or expectation of
14  compensation.
15          The fact that ASU fully knew that
16  we were doing this work, that they asked for
17  and received changes to the scope of work,
18  changes to the drawings that they wanted to
19  see, the fact that we made those changes in
20  good faith, the fact that we made numerous
21  trips to Alabama State, the fact that we went
22  -- we were asked to go to building property
23  meetings.

Page 483

1          And Alabama State was so
2  disrespectful knowing that we spent thousands
3  of dollars, you know, at that point out of
4  pocket to come would put us last on the
5  agenda. And, nevertheless, we still kept
6  doing our work.
7      Q.    Did you think you were so
8  important you needed to be first or second?
9      A.    No, no. But I think out of -- I
10  just -- I think common courtesy --
11      Q.    Did you request to be placed on
12  the --
13          MR. LYONS: Let him finish his
14  answer, Ramadanah.
15          MS. JONES: Okay.
16          THE WITNESS: Yes, we did. And
17  we were told by Gil Berry that he had made
18  the request and that we would be heard early.
19      Q.    (By Ms. Jones) You were told by
20  Gil Berry?
21      A.    That he spoke with Elton Dean and
22  that we would be placed earlier. I think it
23  would be -- it would make sense. Certainly,

Page 484

1  if any of you came up north, came to
2  Cleveland, Ohio, we would accommodate you to
3  the best extent possible out of respect for
4  the fact that you'd be traveling. And we
5  would expect the same in kind. I think that
6  would have been simple common courtesy.
7      Q.    But, again, you're basing this on
8  statements from Gil Berry that you didn't try
9  to check out on your own did, you? Did you
10  ask --
11      A.    No. We relied upon his
12  representation because common sense would
13  dictate -- Gil Berry shouldn't have had to ask
14  as far as we're concerned.
15          And this is a minor issue. I
16  mean -- but it's just -- it's certainly an
17  issue having to do with respect. But
18  certainly I would expect the officials at
19  Alabama State have the class, and certainly
20  they have the education, that they would at
21  least give us the consideration to know that
22  we're doing a lot of work on their behalf and
23  that they would accommodate -- be a little bit

Page 485

1  more accommodating in terms of meeting
2  schedule.
3      Q.    Now, you spoke about an implied
4  contract with Alabama State University?
5      A.    Uh-huh (affirmative).
6      Q.    What were the terms of that
7  contract?
8      A.    That we would produce -- provide
9  enough work to support the efforts to get
10  financing and to get a design that could be
11  done within the budget as stipulated.
12      Q.    And did you negotiate this
13  implied contract? Did you negotiate any terms
14  of this contract with anybody from Alabama
15  State?
16      A.    We didn't -- we thought the terms
17  were pretty clear. We thought the terms were
18  that Gil Berry and Student Suites were
19  authorized by a board resolution, that we were
20  the developer unless final agreement and
21  financing could not be obtained.
22      Q.    But you reference the implied
23  contract in preparing, utilizing all the time

Page 486

1 and hours that you spent putting into this
2 proprietary work, correct?
3        Did you negotiate the terms and
4 conditions of what this would cost, how it
5 would be delivered? Did you negotiate that
6 with anybody at Alabama State?
7    A.    We told Alabama State in the
8 presentation in September exactly what we
9 would expect to do and how we would deliver
10 the information in September. We did outline
11 terms at that meeting.
12    Q.    And you never told them how much
13 it would cost?
14    A.    No.
15    Q.    And that's the basis of the
16 implied contract that Alabama State owes for
17 this --
18    A.    That's the start of the implied
19 contract.
20    Q.    Okay. And what's the next part
21 of the implied contract?
22    A.    That we came to Alabama State
23 with their full knowledge and cooperation

Page 487

1 surveying six dormitory buildings inside and
2 out over considerable amount of time, that
3 resources from Alabama State were made
4 available to us by representatives from
5 Alabama State in terms of people and drawings
6 and information so that clearly Alabama State
7 knew we were doing a lot of work.
8    Q.    Isn't that all a part of the
9 presentation aspect of you showing Alabama
10 State what Marous can do for it?
11    A.    No. I think we showed what
12 Marous can do for it on September 20th in the
13 preliminary presentation. That was our
14 marketing effort.
15        I think by the time -- it would
16 be difficult for anyone to argue by the time
17 you're putting together detailed scopes of
18 work and drawings and digital takeoffs and
19 video surveys, it would be hard to argue that
20 is marketing. That's certainly well beyond
21 marketing.
22    Q.    So, after seeing this, this was
23 enough alone for Alabama State University to

Page 488

1 say, hey, we're going with GBA and Student
2 Suites and we're going to also authorize
3 Marous Brothers Construction to devise a scope
4 of work and they can spend whatever money they
5 want to?
6    A.    Nobody ever said we could spend
7 whatever money we wanted to. We were given a
8 budget for the whole project. Preconstruction
9 was part of the budget for the whole project.
10    Q.    And when was that budget approved
11 by Alabama State University?
12    A.    I don't know the date. I know
13 that -- that Dick Davis and Gil Berry had
14 conversations with Mr. Gallot. Is it Dr.
15 Gallot or Mr. Gallot?
16    Q.    Well --
17    A.    Is it doctor?
18        MR. THOMAS: He is a doctor of
19 law.
20        MS. JONES: Okay.
21        THE WITNESS: Doctor?
22        MS. JONES: Yes, Dr. Gallot.
23        THE WITNESS: No disrespect

Page 489

1 intended.
2        MR. THOMAS: No problem.
3        THE WITNESS: That after working
4 through the proforma apparently Dick Davis and
5 Fred Gallot had conversations and that $25
6 million seemed to be the maximum amount of
7 debt that Alabama State could incur for the
8 renovation portion of the project.
9    Q.    (By Ms. Jones) So, Alabama State
10 University telling Dick Davis how much money
11 that it could spend on renovations was them
12 approving a budget for your preconstruction
13 services?
14    A.    I think it was them implying that
15 -- at the time back to -- at this point
16 Student Suites and Gil Berry were already
17 declared the developer conditionally upon two
18 terms being -- two conditions being met.
19        And in order for those conditions
20 to be met so they could fulfill their
21 obligations to Alabama State University, we
22 had to do a lot of work that would benefit
23 Alabama State as well as the developers.

Page 490

1    Q.    And those two conditions, if
2  we're on the same page, is the detailed
3  design, correct, agreed upon detailed design?
4    A.    And the financing.
5    Q.    And the financing structures?
6    A.    Yes.
7    Q.    Was there a detailed design
8  agreed upon by Alabama State University, Gil
9  Berry and Student Suites?
10   A.    As far as we're concerned, yes.
11   Q.    And what was that detailed design
12 agreed upon?
13   A.    That was once Mr. Upchurch
14 entered the picture by the time we got -- by
15 the time that September 22nd board meeting
16 happened.
17         Prior to that, in conversations I
18 had with Mr. Upchurch and through a very
19 productive process with him we asked is the
20 features and the design and the scope of work
21 now where -- is this what Alabama State
22 expects.  And he said yes.
23         And as far as we were concerned,

Page 491

1  because the financing was already in place, by
2  the time that September 22nd, 2006, board
3  meeting happened those obligations had been
4  fulfilled.
5    Q.    So, it's your contention that a
6  conversation with Mr. Upchurch about what
7  Alabama State wanted was binding as a
8  financial agreement between ASU, Student
9  Suites and Gil Berry on a detailed design?
10   A.    Listen, we didn't hire Upchurch.
11 Alabama State hired Ken Upchurch, Percy Thomas
12 and TCU as their owner's rep.  So, the owner's
13 rep, as far as we're concerned, speak for the
14 owner.  If they --
15         I know he had been in contact
16 with people at Alabama State because he
17 relayed, you know, scope items that they
18 thought should be changed.
19   Q.    Okay.  How many projects at
20 universities has Marous worked on prior to the
21 one at Alabama State?
22   A.    I previously testified that we
23 worked at Lake Erie College in Lake County,

Page 492

1  Painesville, Ohio; worked at Case Western
2  Reserve University on numerous projects.
3    Q.    Quite a few universities prior to
4  Alabama State University?
5    A.    Uh-huh (affirmative).
6    Q.    And in dealing with those
7  universities, did their board of trustees have
8  to pass resolutions before anything could be
9  binding upon the university or agreement could
10 be reached upon the university?
11   A.    No.  Those universities have
12 departments that are empowered to make
13 decisions on behalf of the university.
14   Q.    So, how many universities in the
15 -- public universities in the State of Alabama
16 has Marous worked with prior to Alabama State
17 University?
18   A.    None.  Can I just talk to my
19 daughter real quick?
20   Q.    Sure.
21         (Whereupon, the taking of the
22 deposition was recessed from approximately
23 7:09 p.m. to approximately 7:11 p.m., after

Page 493

1  which the following proceedings were had and
2  done:)
3    Q.    I was asking you about your
4  involvement with public universities in the
5  State of Alabama prior to Alabama State
6  University.
7    A.    Zero.
8    Q.    Zero.  So, are you aware of how
9  public universities are required to operate
10 under statutes of the State of Alabama?
11   A.    Not in Alabama.
12   Q.    Not in Alabama.  So, you're not
13 aware of the fact that Alabama State
14 University or any other public university
15 can't make certain decisions without their
16 board of trustees' approval?
17   A.    I don't know what decisions they
18 can and can't make.
19   Q.    Okay.  If a final agreement was
20 reached on the design of the dormitory
21 renovation, why were there continuous
22 negotiations about that scope of work up until
23 September 21st of '06?

Page 494

1    A.    That's a good question. We don't
2  -- until Mr. Upchurch was engaged, we're not
3  sure who at Alabama State -- we know we
4  provided our work product to Gil Berry, Dick
5  Davis and the people at Alabama State. We're
6  not sure who was reviewing what.
7          We know that once Mr. Upchurch
8  got involved, he wanted to make sure that
9  there were certain items considered, most of
10 which were relatively minor. In fact, the
11 pricing breakdown is not for very much money.
12 They were what I would characterize minor, and
13 they were scope items. They were not
14 substantive design changes in terms of the
15 layout at all.
16         In fact, they were really not
17 even design related. They were the difference
18 between using vinyl tile or ceramic tile in
19 the bathrooms, which is more a finish issue
20 than -- a scope finish issue than a design
21 issue.
22    Q.    But you do acknowledge that there
23 were still negotiations about the design --

Page 495

1    A.    No.
2    Q.    -- up until September 21st?
3          So, when did the negotiations end
4  about the design of the dormitories?
5    A.    By September 19th, once we had
6  our last conversations with Mr. Upchurch, we
7  were in agreement that the scope -- that the
8  design and the layout was where it needed to
9  be. And so what Mr. Upchurch told us and
10 speaking, as we assume, on behalf of the
11 University.
12    Q.    But that was you and Mr. Upchurch
13 came to an agreement about the terms of the
14 design, correct?
15    A.    Uh-huh (affirmative).
16    Q.    And to your knowledge, did the
17 design then go on to Alabama State
18 University's Board of Trustees for approval?
19    A.    To us it was immaterial because
20 Mr. Upchurch had represented to us that he was
21 the owner's rep and that he was an agent and
22 representative of Alabama State.
23    Q.    And did Mr. Upchurch tell you

Page 496

1  that he could make a final decision on behalf
2  of the University?
3          As far as the design, did he tell
4  you he could make the final decision?
5    A.    He didn't say one way or the
6  other. He said that he was comfortable,
7  comfortable enough to state that he would give
8  us a favorable recommendation to the board.
9    Q.    So, really, you just assumed that
10 because Mr. Upchurch felt comfortable with the
11 design that you had a final agreement and it
12 wouldn't be a problem with the board of
13 trustees?
14    A.    We relied upon Mr. Upchurch's
15 statement that -- when asked if the design is
16 where it needs to be, is the scope where it
17 needs to be, and he said yes. We're assuming
18 that he's speaking on behalf of Alabama State
19 University for whom he was working.
20    Q.    But you knew that prior to Gil
21 Berry and Student Suites being able to serve
22 as the conditional developers they needed a
23 resolution from the board, correct?

Page 497

1    A.    Uh-huh (affirmative).
2    Q.    You didn't think that the same
3  type of resolution was needed for a final
4  agreement on the design of those dormitories?
5    A.    I had no idea. I didn't know
6  that the building committee couldn't make that
7  determination. I had no idea. I relied upon
8  the information that was provided to me by Mr.
9  Upchurch and supplemented by conversations
10 with Mr. Berry.
11    Q.    And Mr. Berry told you that the
12 board of trustees of the University was happy
13 with the design?
14    A.    Yes.
15    Q.    And that there was a final
16 agreement on the design?
17    A.    He told me that the design was
18 set.
19    Q.    Now, define for me financing
20 structures, your definition of what financing
21 structures would be.
22    A.    Financing structures are the
23 conduits or vehicles that provide equity to

Page 498

1 fund capital improvement projects.
2     Q.    Would financing structures not
3 include how a developer would be paid?
4     A.    Financing structure -- as I
5 understand it, financing structures is the
6 financing for the project.
7     Q.    Okay.
8     A.    Sources and uses and income and
9 expenses is how developers and people -- how
10 those -- and cost accounting. That's how you
11 would account for that.
12         The resolution didn't say we have
13 to approve the sources and use income and
14 expenses development proforma. It said the
15 financial structures. So, we assumed that
16 financial structures is the financing of the
17 project.
18         And, in fact, they received
19 funding. Their bonds closed.
20     Q.    And when that resolution passed
21 -- and what we were referencing was the
22 property committee. Do you know when Alabama
23 State University's full board passed the

Page 499

1 actual resolution?
2     A.    I don't know.
3     Q.    Okay. I'll come back to that
4 one. The breach of contract claim. That
5 would be Paragraphs 41 through 46.
6         Paragraph 42. Plaintiffs and
7 Defendant ASU entered into an agreement
8 whereby ASU would pay plaintiffs for
9 development work to design, build, renovate
10 and procure financing for the Student
11 Residence Project.
12         Does that apply to Marous
13 Brothers Construction?
14     A.    It applies to the implied -- what
15 we think is an implied agreement.
16     Q.    Okay. And so when did Marous
17 Brothers Construction enter into an implied
18 agreement with Alabama State for development
19 work to design, build, renovate and procure
20 financing?
21     A.    After that resolution was --
22 after the committee resolution was passed and
23 we stated our intentions to come down and we

Page 500

1 were given access and stewardship around the
2 Alabama State University campus and invited to
3 present at a May 2006 board meeting our work
4 product and the extent and the extensive work
5 that we had done.
6         All during that time. I think
7 all of those occurrences support an implied
8 contract.
9     Q.    I'm trying to get a specific date
10 or time frame when ASU supposedly entered into
11 an implied contract. Is it when the property
12 committee met and passed the resolution?
13     A.    Yes. And then we -- and then we
14 began work as a result of that resolution so
15 that we could help Alabama State, Gil Berry
16 and Student Suites meet their obligation.
17     Q.    And the terms of that contract
18 are what?
19     A.    The terms are that we would be --
20     Q.    What was Alabama State to receive
21 out of the implied contract?
22     A.    They were to receive final design
23 and work sufficient to secure financing for

Page 501

1 the project, which they received.
2     Q.    And Marous Brothers Construction
3 was to receive what?
4     A.    Our preconstruction and our
5 construction services because we were to be
6 the construction manager for the project.
7     Q.    Now, the property committee
8 passed its resolution back in November of
9 2005. At that time was Marous Brothers
10 Construction licensed to serve as a contractor
11 in the State of Alabama?
12     A.    I previously testified, no.
13     Q.    No. So, how were you-all going
14 to perform this implied contract without being
15 a licensed contractor?
16     A.    Because were were doing pre -- we
17 weren't doing actual construction. We weren't
18 bidding or contracting or subcontracting the
19 work during that time period.
20         We were preparing due diligence
21 at our home office after doing field work, due
22 diligence videotaping, field measuring. We
23 were doing that work at Alabama State and

126 (Pages 498 to 501)

1 preparing all the rest of the work at our home
2 office in Ohio where we are licensed to
3 practice.
4     Q.    Were you licensed to transact any
5 business in the State of Alabama at the time
6 that the property committee passed the
7 resolution?
8     A.    Previously testified.
9         MR. LYONS: Object to the form.
10        THE WITNESS:  Previously
11 testified.  No.
12    Q.    (By Ms. Jones)  No.  Your quantum
13 meriut claim.  Let's look at Paragraph 48.
14 There's a statement plaintiffs have, at
15 defendants' direction, expended numerous hours
16 on the development work for the design,
17 building, renovation and procurement of
18 financing of the Student Residence Project at
19 ASU.
20        Are these plaintiffs, does that
21 include Marous Brothers Construction?
22    A.    Yes.
23    Q.    And at which defendant's

1 direction did Marous Brothers Construction
2 expend numerous hours on development work?
3     A.    Per conversation with Dick Davis
4 and Gil Berry, the Alabama State University
5 building committee, everyone who is named in
6 the front also, TCU, Upchurch.  Everyone who's
7 named.
8     Q.    So President Lee directed Marous
9 Brothers Construction to undertake numerous
10 hours to design -- to develop work for the
11 design, building, renovation and procurement
12 of financing of the Student Residence Project?
13    A.    By inference through Gil Berry,
14 President Lee and all of the defendants named
15 induced us to do work so that we could provide
16 the basis upon which bond financing could be
17 issued.
18    Q.    Okay.  But President Lee did not
19 directly communicate these instructions to
20 Marous Brothers Construction?
21    A.    He did not directly convey.
22    Q.    And you're relying on what Gil
23 Berry told you?

1     A.    And Dick Davis.
2     Q.    And Dick Davis.  Who's not a
3 party to this lawsuit.  Is Dick Davis/Student
4 Suites a party to this lawsuit?
5     A.    As I understand it, no.
6     Q.    Do you know why they chose --
7     A.    No.
8     Q.    Did you ask them to be a party to
9 this lawsuit?
10    A.    We didn't.  I don't know if Gil
11 did or didn't.
12    Q.    Okay.  Did you ask Gil Berry to
13 be a part of this lawsuit?
14    A.    We had mutual conversations about
15 whether or not we would pursue legal action.
16    Q.    And you-all didn't include Dick
17 Davis and Student Suites in that?
18    A.    It was up to Gil to ask him, and
19 I'm not sure what the deal is.
20    Q.    Did Chairman Elton Dean direct
21 Marous Brothers Construction to expend
22 numerous hours on the development work?
23    A.    Again, through/via Gil Berry.  By

1 -- Gil Berry's representations.
2     Q.    In Paragraph 50 when we refer to
3 because of the representations made by the
4 defendants to plaintiffs as set out more fully
5 above, plaintiffs had a reasonable expectation
6 of compensation.
7         These representations, these are
8 the same representations that Gil Berry said
9 that Chairman Dean told him, President Lee
10 told him?
11    A.    And the board and the building
12 committee in passing that resolution set out
13 two conditions that we met, that we helped
14 meet and helped ASU meet.
15        So, we expected compensation.
16 Again, it's -- and I've said it several times
17 before, and I'll restate it for the record.
18 It is implausible that anyone at Alabama State
19 would be so naive in this fine education of
20 higher learning that anyone would do this
21 amount of work and not expect to get paid for
22 it.
23    Q.    Is it plausible that anyone would

Page 506

1 do this mount of work and expect to get paid
2 and not have a clear definition of how much
3 you're going to get paid, what the rate of
4 payment is?
5    A.   We had a very clear expectation.
6 We laid out numerous times what our fee
7 structure was going to be.  Certainly by the
8 time Mr. Upchurch got involved, we had
9 numerous discussions about our preconstruction
10 fees, and we were still providing those
11 services.
12    Q.   But you said all of this was done
13 prior to Mr. Upchurch coming on board?
14    A.   Absolutely.
15    Q.   So, the officials at Alabama
16 State University, they knew that your fees was
17 $150 an hour?
18    A.   I don't know what Mr. Berry -- it
19 was up -- we left it to Mr. Berry to convey
20 our terms.
21    Q.   So, is Gil Berry your agent?
22    A.   No.
23    Q.   Was he your agent for this

Page 507

1 project?
2    A.   No.  He was the developer on the
3 project who asked us to come with him to
4 Alabama, along with Dick Davis, and make a
5 presentation.  And then -- you know, we're all
6 independent people.  We're all independent
7 parties.
8    Q.   But you relied on Mr. Berry to
9 inform Alabama State University about what
10 your compensation was to be, what your rate of
11 payment was to be?
12    A.   It was our understanding that
13 communication was to be through Mr. Berry
14 and/or Mr. Davis because they were the
15 development entity named in the resolution.
16       So, therefore, they would -- they
17 would be the contact point.
18    Q.   So, any duty owed to Marous
19 regarding the payment for its services would
20 actually come from Gil Berry and Student
21 Suites, wouldn't it?
22    A.   That's not what I'm saying.
23 Alabama State received the benefit of what we

Page 508

1 did.  That's what we think and that's what we
2 maintain and that's why we want to get paid.
3    Q.   So, if Mr. Berry failed to
4 communicate to Alabama State University the
5 terms and the conditions of what Marous was
6 supposed to do and how much it was supposed to
7 get paid, that's really your claims against
8 Gil Berry, isn't it?
9    A.   No.  It's our claims against
10 Alabama State.
11    Q.   So, Alabama State should be
12 responsible for a break in communication
13 between you and Gil Berry?
14    A.   Alabama --
15       MR. LYONS:  Object to the form.
16       THE WITNESS:  Alabama State
17 should be responsible for their clear
18 undeniable  knowledge that we were performing
19 work for their benefit to help them finance a
20 project for the renovation of six dormitories
21 that were in desperate need of renovation.
22       And still once Mr. Upchurch got
23 involved, it was absolutely clear what our

Page 509

1 fees and what the expectations were.  They
2 couldn't be made clearer as previously
3 testified and as evinced by documentation that
4 eventually made its way to Dr. Lee through a
5 long E-mail chain of commands as well as
6 through direct communication by Mr. Upchurch.
7    Q.   So, it's your statement that
8 Alabama State didn't have any clear
9 understanding about what Marous' fees were to
10 be until Mr. Upchurch came on board?
11    A.   I think -- I don't know what Gil
12 Berry did or didn't say prior.  What I do know
13 is that Mr. Upchurch made it abundantly clear
14 what our fees were.
15    Q.   So, if you don't know what Gil
16 Berry communicated to Alabama State
17 University, how do you know that there was a
18 final agreement reached on the design package
19 that you had put together?
20    A.   Because Mr. Upchurch told us.
21 Mr. Upchurch told us there was final agreement
22 prior to the September 22nd board meeting.
23 And clearly the project was financed.  I think

Page 510

1  the bonds were issued in July or August.
2       So, clearly as far as we were
3  concerned, Gil Berry and Dick Davis and Marous
4  Brothers -- well, with Marous Brothers'
5  support had fulfilled their obligations under
6  the resolution.
7       Q.  But you told me that there was an
8  implied contract as far as back as November
9  23rd, 2005, with Alabama State University,
10  correct?
11       A.  I'm saying that once -- I'm
12  saying that -- what I testified to is that
13  once we started going to Alabama State and
14  with their help did due diligence we believe
15  that there was an implied contract and a clear
16  acknowledgement and understanding that we were
17  doing work for them and on their behalf.
18       Q.  I guess the breakdown where I'm
19  missing it is you testified it was a clear
20  understanding of the fees and compensation
21  once Mr. Upchurch came on board, and we
22  identified that as being sometime in July,
23  July forward in 2006.  But, yet, you say

Page 511

1  there's an implied contract as far back as
2  November of 2005.
3       And I'm trying to understand how
4  there can be a contract between you and
5  Alabama State University without a clear
6  understanding of what the terms would be.  And
7  so still --
8       A.  The terms were -- I think the
9  terms were made clear as time evolved that we
10  had to deliver a project that could -- wherein
11  our construction cost was part of the total
12  development cost that had to be less than $25
13  million.  I think that term was abundantly
14  clear.
15       And that became clear sometime
16  between January and May.  And certainly by the
17  time we got to May.  And we did our
18  presentation to the board where there was very
19  clear costs understanding and statements of
20  costs that -- as part of our presentation that
21  there could be no doubt that we had performed
22  a lot of work.
23       Q.  So, in May 2006, you were still

Page 512

1  doing presentations to the Alabama State
2  University Board of Trustees?
3       A.  We were doing -- we were
4  presenting our work product.
5       Q.  You were presenting your work
6  product.  But in May 2006, had the board
7  approved an agreement between Alabama State
8  University and Marous Brothers Construction?
9       A.  Not that I'm aware of.
10       Q.  And had the board approved an
11  agreement between Student Suites and Gil Berry
12  and Associates?
13       A.  All that we're aware of is that
14  resolution.
15       Q.  Count Three, fraudulent
16  misrepresentation.  Is this a claim that
17  Marous Brothers is asserting against Alabama
18  State University, Chairman Dean and President
19  Lee?
20       MR. LYONS:  I think that the
21  count is clearly stated in the complaint, and
22  it doesn't -- I don't think we need to go any
23  further on that question.

Page 513

1       MS. JONES:  It says what now,
2  Champ?
3       MR. LYONS:  Count Three does not
4  speak to the Alabama State defendants.
5       Q.  (By Mr. Jones)  Okay.  Count
6  Four, fraud, Paragraph 63.  Defendant
7  President Lee made false representations to
8  plaintiffs regarding material facts in this
9  matter, that they would be compensated for
10  completing work for ASU on the Student
11  Residence Project.
12       Did President Lee make
13  representations to Marous Brothers
14  Construction that they would be compensated
15  for completing work on ASU's Student Residence
16  project?
17       A.  That's a Gil Berry issue because
18  we spoke apparently to Gil Berry and not to
19  Marous Brothers.
20       MS. JONES:  Okay.  Count Five,
21  tortious interference with business
22  relationship.  Not an ASU, President Lee,
23  Chairman Dean claim?

Page 514

1      MR. LYONS: That's correct.
2      Q.    (By Ms. Jones) Count Six,
3  conversion, Paragraph 75. Defendants
4  wrongfully appropriated plaintiffs'
5  proprietary work product to their own use and
6  beneficial enjoyment in exclusion of
7  plaintiffs' rights of ownership and to
8  compensation.
9          How did Alabama State University,
10 President Lee and/or chairman Dean use Marous
11 Brothers Construction's proprietary work for
12 their own use and enjoyment?
13     A.    We contend that the defendants
14 used our work product to help obtain bond
15 financing for the project for which we
16 received no compensation.
17     Q.    In exclusion of plaintiffs'
18 rights of ownership and to compensation.
19         I think you testified earlier
20 that you could still use this scope of work
21 and the items contained therein; is that
22 correct?
23     A.    At Alabama State we can. But

Page 515

1  we're not working at Alabama State, are we?
2      Q.    Okay. But there is nothing that
3  anybody at Alabama State University, President
4  Lee or Chairman Dean did to prevent you from
5  using what was contained in this scope of work
6  at any other university?
7      A.    We wouldn't use the scope of work
8  at any other university. So, it's kind of a
9  trick question. This is a proprietary product
10 developed specifically and discreetly for
11 Alabama State University's project.
12     Q.    But really you could do anything
13 you wanted to do with it? Nobody prevented
14 Marous Brothers --
15     A.    Yeah. We were prevented --
16     Q.    -- from having access to it?
17     A.    No. We were prevented from doing
18 the work using our work product. We didn't --
19         MR. LYONS: Are you talking about
20 doing something other than submitting it for
21 this project?
22         MS. JONES: Yes, something other
23 than submitting it for this project.

Page 516

1      MR. LYONS: He's testified that
2  wouldn't be necessary. But if you can answer.
3      Q.    (By Ms. Jones) You said it
4  wouldn't be necessary. But there was nothing
5  that would prevent you from doing so?
6      A.    Well, since it was developed
7  specifically and distinctly for Alabama State,
8  unless we're doing the work at Alabama State
9  that's described in those documents, there's
10 no reason for us to use it anywhere else.
11     Q.    And the wrongful appropriation
12 that you speak of is simply that Alabama State
13 University allegedly used this scope of work
14 to obtain bond financing?
15     A.    Yes.
16     Q.    And I think you testified that
17 Count Eight, loss of business opportunities,
18 is not a Marous Brothers claim?
19     A.    That is not a Marous.
20     Q.    The injunctive and other relief
21 claim, Paragraph 88. Plaintiffs seek
22 injunctive and other relief to which they may
23 equitably be entitled, including, but not

Page 517

1  limited to, the enjoinment of defendants from
2  using plaintiffs' work product.
3          Do you contend that the
4  defendants are currently using Marous Brothers
5  Construction's work product?
6      A.    We contend that they obtained
7  financing so that the use of those funds --
8  that they obtained, in part, using our work
9  product to obtain said funds is wrong, and
10 that we were never compensated.
11         If we were paid for our work
12 product, this wouldn't be an issue.
13     Q.    So, Alabama State University
14 should not using those bond proceeds but it
15 included a sentence about scheduling of
16 dormitory renovation?
17     A.    That's not what I said. I think
18 -- I think you know what I meant. I think it
19 was --
20     Q.    I really don't.
21     A.    -- very clear based on my prior
22 testimony that Alabama State -- that bond
23 counsel requested and received from Marous

130  (Pages 514 to 517)

Page 518

1  Brothers our work product so that they could
2  go to bond market and underwrite bonds for a
3  comprehensive renovation project, only a small
4  portion of which encapsulated -- we
5  encapsulated and put in this complaint but
6  that was, I'm sure, a very lengthy document.
7       Q.    Okay.  But then I asked you have
8  you seen the bond documents which include your
9  work product as an exhibit, and you said no?
10      A.    I have not.
11      Q.    And you haven't tried to find out
12 if Alabama State University included it as an
13 exhibit to --
14      A.    It doesn't matter -- it doesn't
15 matter if they included it as exhibit.  Bond
16 counsel reviewed our -- as we were told, they
17 reviewed our work product to develop as part
18 of the offering a description of the work to
19 be performed at Alabama State.
20      Q.    But don't know whether bond
21 counsel actually used it to develop its bond
22 documents or not.  You're saying they reviewed
23 it, but you can't tell me what they did with

Page 519

1  it, correct?
2       A.    I don't --
3       Q.    You don't know what bond counsel
4  did with it?
5       A.    All I know is what -- you know
6  what I do know is what Gil remember and Dick
7  Davis told us, that they were going to using
8  our documents to help prepare the -- that's
9  why we provided it to them.  They wanted to
10 use our documents to help prepare the bond
11 offering.
12            Otherwise, there would be no
13 reason for us to provide it to bound counsel.
14 Why does bond counsel need our documents?  Let
15 them just write what they think the
16 renovations are about.
17            So, clearly they had to -- they
18 wanted our documents for some reason.
19      Q.    But did they use your scope of
20 work to write what the project was about?
21      A.    It was reported to us that they
22 did.
23      Q.    And Marous Construction never

Page 520

1  independently verified whether they did or
2  not?
3       A.    We did not independently verify
4  it, no.
5       Q.    Subsection b, the return of
6  plaintiffs' proprietary work product.
7            Who does Marous Brothers contend
8  is in possession of its proprietary work
9  product?
10      A.    We don't know that -- we had
11 issued in total 21 copies of that work product
12 at varies times.  We received 17 back.  And we
13 have no idea how many copies or reproductions
14 were made of it against the copyrighted
15 document.  So, we don't know where the other
16 four are.
17      Q.    And who did Marous Brothers
18 Construction give 21 copies to?
19      A.    We provided 21 copies -- we
20 provided some copies at the May 6th meeting,
21 and I previously testified who I saw get them.
22 We gave Dick Davis and Gil Berry the remaining
23 copies, but there have been 21 copies.

Page 521

1       Q.    So, did ask Gil Berry and Dick
2  Davis what happened to the remaining copies?
3       A.    Yeah.
4       Q.    And what did they say?
5       A.    They're said they're going --
6  they've tried to bet them back.  We got one
7  back a couple of months ago that somebody --
8  that Dr. Lee apparently found or somebody
9  found that they had in their possession.
10      Q.    Okay.
11      A.    Which we appreciated.  That was
12 number 17 that was returned.
13      Q.    But it's your statement, if I
14 remember your testimony correctly earlier,
15 that you saw Judge Wiggins get a copy?
16      A.    Uh-huh (affirmative).
17      Q.    And that you saw Chairman Dean
18 get a copy?  Did you see Chairman Dean get a
19 copy?
20      A.    Chairman Dean got a copy.
21      Q.    Who else -- who all at Alabama
22 State University did you see get a copy?
23      A.    We sent a copy to Gil Berry for

Page 522

1  delivery to Dr. Lee.
2      Q.    Okay.  But we don't know whether
3  Gil Berry gave that to Dr. Lee or not, do we?
4  Do you know that?
5      A.    Well, we got a copy back from Dr.
6  Lee's office.  So, we assume that he got a
7  copy.
8      Q.    Okay.  So, you got that one back
9  from Dr. Lee.  And then we have Judge Wiggins?
10      A.    I believe that Mr. Berry gave us
11  a list of people that he was going to be
12  giving them to.  He was going to give a copy
13  to but Buford -- is it Crutcher?
14      Q.    Crutcher.
15      A.    To Mr. Mr. Crutcher.  Mr. -- is
16  he Herbert Young?
17      Q.    Young, yes.
18      A.    The people that were present in
19  that May meeting.  I believe most, if not all
20  of them, received that document.
21      Q.    And did Gil Berry ever share with
22  you a letter from President Lee transmitting
23  and enclosing copies of the work product?

Page 523

1      A.    Yes, he did.
2      Q.    He did.  So, you got those back?
3      A.    Yes.
4      Q.    And I think sometime after this
5  lawsuit was filed did you happen to see a
6  letter from me to your former counsel
7  enclosing a copy of work product?
8      A.    I don't -- I don't know.
9      Q.    You don't know?
10      A.    I don't recall.
11      Q.    Okay.  So, you really don't know
12  where your work product went that Gil Berry
13  had, do you?
14            You don't know what Gil Berry did
15  with the 21 copies that you gave to him.
16            MR. LYONS:  Object to the form.
17            THE WITNESS:  We know -- all we
18  know is that we don't have 21 copies returned.
19      Q.    (By Ms. Jones)  But you don't
20  know that anyone at Alabama State University
21  has those copies?
22      A.    We know that Dick Davis retained
23  a copy and that Gil Berry retained a copy.

Page 524

1  So, we know that -- in all if we count those
2  out of the four because we didn't -- you know,
3  we didn't ask for them to return those.  We
4  know there's two outstanding copies.  So, who
5  has it, we don't know.
6      Q.    But you gave them to Gil Berry to
7  distribute, correct?
8      A.    We gave some to Gil Berry.  Some
9  we distributed ourselves at that May board
10  meeting.
11      Q.    And you've gotten 17 back?
12      A.    We've gotten, I believe, 17 of 21
13  back.
14      Q.    Count Ten is failure to authorize
15  payment.  In Paragraph 90 the first sentence,
16  Defendants Dean and Lee had the responsibility
17  to follow established procedures for the
18  payment of ASU's contractual obligations and
19  debts due and owing.
20            What are these established
21  procedures for the payment of ASU's
22  contractual obligations and debts due and
23  owing?

Page 525

1      A.    This is a Gil Berry -- Gil Berry
2  handled so many of invoice.  So, I don't know
3  what those procedures were.  That was
4  something that Gil was handling.
5            We submitted our invoices to Gil,
6  and then he would, in turn, submit them to Dr.
7  Lee or Dr. Gallot or whoever else he submitted
8  it to.
9      Q.    So, this is -- but you're
10  claiming that Alabama State University owes
11  you payment on those invoices submitted,
12  correct?
13      A.    Yes.
14      Q.    But you don't know what
15  procedures Alabama State should have
16  undertaken to pay those?
17      A.    We don't know -- we just know
18  that we should have been paid.  We don't know
19  -- and we don't care how we get paid or what
20  Alabama State's procedures are.  We just
21  wanted to be paid, and we want to be paid.
22      Q.    And you relied on Gil Berry to
23  handle the whole payment situation for you,

Page 526

1  Marous Brothers?
2      A.    Gil Berry represented to us that
3  he was going to handle that because he was --
4  he was the developer's contact.
5      Q.    If Gil Berry was to give you
6  amount of money owed in that invoice submitted
7  to Alabama State -- well, supposedly submitted
8  to Alabama State University, would you be
9  happy?  Would you be okay?
10     A.    Would I be happy?  We would be --
11 we would be content that we have been paid.  I
12 wouldn't --
13          Would we be happy?  It would be
14 silly for a cancer survivor like me to say I
15 wasted hundreds of hours of earnest time
16 knowing that I can never get that time back
17 trying to do something right for the students
18 and the board of Alabama State and that my
19 company expended undue amount of time, you
20 know, with the hope and desire to do a
21 wonderful project for Alabama State like we
22 have done for many other clients.
23          So, to ask if I'm happy is a

Page 527

1  difficult question for me to answer.  I'm not
2  happy at all.  Be I be content that we got
3  paid, would we go away if magically that money
4  appeared?  Sure.
5      Q.    Are you under pressure from your
6  employer to recover --
7      A.    No.
8      Q.    -- this money expended?
9      A.    No.  I wouldn't say that I'm
10 under pressure.  We think -- I happen to be
11 very close to my employer, as I should be
12 after nine years, and we both feel like we've
13 been -- you know, like Marous Brothers
14 Construction's been wronged and we're owed the
15 money.
16     Q.    You testified earlier that you
17 felt like Gil Berry mischaracterized his
18 experience in student housing.  Is that --
19     A.    Are we done with this?
20     Q.    Sure.  Is that is a correct, I
21 guess, synopsis of what you stated?
22     A.    I think -- what I said that I
23 think he may have overstated how much student

Page 528

1  housing he did as an individual.  I do know
2  for a fact that he was the codeveloper with
3  Dick Davis on North Carolina A&T.  So, he does
4  have experience we know of verified.  And he's
5  done one very successfully.
6      Q.    And when did you learn or form
7  the opinion that Gil Berry may have overstated
8  his own personal experience?
9      A.    We got that impression in
10 October/November of 2006 because when we
11 started asking about some of the other
12 projects that we had provided some marketing
13 services for and some preliminary estimating
14 services for, nothing ever came of the
15 project.  And we just couldn't figure out how
16 -- how it was possible.
17     Q.    So, you didn't have any concerns
18 about Mr. Berry's experience in 2005?
19     A.    No.
20     Q.    Is it possible that Mr. Berry may
21 have circulated Marous' proprietary work to
22 people or individuals outside of Alabama State
23 University?

Page 529

1          MR. LYONS:  Unless you know,
2  don't speculate what is possible.
3          THE WITNESS:  I don't know.  I
4  wasn't going to counsel.  Calm down.
5      Q.    (By Ms. Jones)  Okay.  Let's go
6  to -- I'm showing what was previously marked
7  as Defendant's Exhibit 3.
8      A.    Yes.
9      Q.    And that is an advancement of a
10 referral fee to Gil Berry and Associates; is
11 that correct?
12     A.    Yes.
13     Q.    Now, was ASU a party to this --
14 and you characterized it as a contract.  Was
15 ASU a party to this contract?
16     A.    No.
17     Q.    And what about President Lee --
18     A.    No.
19     Q.    -- or Chairman Dean?
20          Or Chairman Dean?
21     A.    No.
22     Q.    No.  Okay.
23     A.    You attorneys kill a lot of

1  trees, man.
2      Q.    Don't we.  Just so ungreen.
3          (Whereupon, said document was
4          marked for identification as
5          Defendant's Exhibit No. 43 to the
6          deposition of Arne F. Goldman.)
7      Q.    Have you seen this E-mail before
8  today?
9      A.    Yes.
10     Q.    And this is an E-mail from you to
11  Gil Berry, correct?
12     A.    Yeah.  Gil Berry sent us this
13  letter that -- he asked us to verify the
14  dollars, help with spelling, punctuation.  And
15  we did that, and we sent it back to him.
16     Q.    So, you didn't draft this in
17  whole for Mr. Berry?
18     A.    No, not in whole.  We just --
19  there were spellings mistakes and stuff that
20  we cleaned up.
21     Q.    Do you know why he would send it
22  to you?  Do you know why he would send it to
23  to revise and edit?

1      A.    He probably thought I was a good
2  letter writer.
3      Q.    Okay.  Do you know if he sent to
4  Dick Davis to look over?
5      A.    I have no idea.
6      Q.    Let me show I will have marked as
7  Defendant's Exhibit No. 44.
8          (Whereupon, said document was
9          marked for identification as
10         Defendant's Exhibit No. 44 to the
11         deposition of Arne F. Goldman.)
12     Q.    Have you seen this E-mail before?
13     A.    Yes.
14     Q.    And this is an E-mail from you to
15  Gil, correct?
16     A.    Yes.
17     Q.    Do you know if Gil Berry then
18  forwarded this to anybody at Alabama State?
19     A.    I don't know.
20     Q.    Okay.  In this E-mail you're
21  saying so there is no  about the use of your
22  drawings, scope of work narratives and related
23  cost estimates, please be advised of the

1  following.
2          And you then you go on the list
3  various conditions that you want to work
4  product to be used in, correct?
5      A.    Uh-huh (affirmative).
6      Q.    Did you ever communicate this to
7  anyone at Alabama State University?
8      A.    We gave it to Gil Berry and Dick
9  Davis to be -- to communicate with them.
10     Q.    And you saw the exhibits earlier
11  where Gil Berry was telling -- this is
12  Defendant's Exhibit 9 -- was E-mailing various
13  people at Alabama State University giving them
14  permission to have the proprietary work of
15  Marous Brothers Construction to be reviewed?
16     A.    No.  I think he's giving Ken
17  Upchurch and Percy Thomas permission to use
18  the work.
19     Q.    And do you see any of your
20  thoughts in this E-mail incorporated in Gil
21  Berry's E-mail?
22     A.    No.
23     Q.    You don't.  Did you ever ask him

1  why he never incorporated any of these
2  conditions when he gave that permission for
3  Ken and Percy to review the proprietary work?
4      A.    I don't know what other
5  conversations he had verbally.  So, I don't
6  know that he didn't say verbally, but I did
7  not ask him.
8      Q.    And In Paragraph B of that same
9  exhibit you state that we understand that
10  you're close to signing your development
11  agreement with Alabama State University, at
12  which time we will execute our construction
13  management contract and receive compensation
14  for the extensive preconstruction services we
15  have rendered on behalf of ASU and your
16  development team.  And this is dated July
17  28th, 2006.
18         So, at that time there was no
19  signed development agreement between ASU and
20  Gil Berry; is that correct, July 28th?
21     A.    That's my understanding, yes.
22     Q.    And the construction management
23  contract would have been a contract between

Page 534

1  Marous Brothers Construction and what entity?
2      A.    At that time we were assuming --
3  I'm not sure if we were -- I don't know if we
4  were assuming Gil Berry and Student Suites
5  development entity or Alabama State.
6      Q.    But as of July 28th, 2006, Marous
7  Construction had not executed a construction
8  management contract?
9      A.    We had not.
10     Q.    Okay.  And so you would not have
11  received compensation for the extensive
12  preconstruction services, correct?
13     A.    At that point, we had not
14  received compensation.
15     Q.    But the way I read this after you
16  executed your construction management
17  contract, then you would receive your
18  preconstruction services, the payment on your
19  preconstruction service?
20     A.    And that's what was represented
21  to us by Mr. Berry.
22           (Whereupon, said document was
23           marked for identification as

Page 535

1           Defendant's Exhibit No. 45 to the
2           deposition of Arne F. Goldman.)
3      Q.    Let me show you what I have
4  marked as Defendant's 45.  Have you seen this
5  E-mail prior to today?
6      A.    Uh-huh (affirmative).
7      Q.    And Gil is telling you that the
8  school is now being pressured into signing the
9  development agreement and beginning work.
10           Did you have a conversation with
11  him about how the school was being pressured?
12     A.    I didn't even -- I dismiss
13  something like this.  When he would say
14  something based -- I read some article he
15  sent, and I didn't see any pressure or -- I
16  conjectured no pressure from the school at
17  all.
18     Q.    Did you know what the -- do you
19  remember what the article was about?
20     A.    Something about -- I think this
21  was the article that someone wrote in The
22  Montgomery Advertiser about Alabama State
23  having to house students in a hotel downtown

Page 536

1  that had a plumbing problem or something.
2           Again, I did not conjecture any
3  pressuring or anything from the article.  I
4  just said, well, it's a shame, you know.
5           (Whereupon, said document was
6           marked for identification as
7           Defendant's Exhibit No. 46 to the
8           deposition of Arne F. Goldman.)
9      Q.    Let me show you what I have
10  marked as Defendant's 46.  Have you seen this
11  document before?
12     A.    I have.
13     Q.    Did you draft this document?
14     A.    Yes, I did.
15     Q.    If you turn to the last page of
16  this document, there are no signatures on
17  this, correct?
18     A.    That's correct.
19     Q.    Is there one with signature?
20     A.    No.
21     Q.    No.  This agreement was never --
22  well, this letter of intent was never signed?
23     A.    It was never signed.

Page 537

1      Q.    Was it forwarded to Student
2  Suites and Gil Berry?
3      A.    Yes.
4      Q.    And did Marous Brothers request
5  that they sign this letter of intent?
6      A.    Yes.
7      Q.    And their response was?
8      A.    They could not sign it because
9  until they had -- they wanted to wait until
10  they had a resolution from the committee
11  before they would consider signing it, and
12  they wanted to see if there would be
13  conditions on their resolution.
14           I don't think that resolution was
15  signed until -- it was declared until after we
16  did this.  So, we said, okay, we'll wait a
17  little while and we'll see what the conditions
18  of the resolution are, if there's any.
19     Q.    And the resolution you're
20  referring to, is that the same resolution
21  referred to in November of 2005?
22     A.    Yes.
23     Q.    Okay.  So, after November 23rd,

Page 538

1  2005, did you-all -- did Marous Construction
2  no longer want this of intent to be
3  executed?
4      A.    We thought that that resolution
5  gave us protection to the extent that as long
6  as we did our job and helped get the project
7  financed and helped create a design that was
8  agreed to by ASU and the developers, that we
9  were reasonably confident that we would get
10  paid as a result of being awarded the protect
11  as a result of their being awarded the
12  projected.
13     Q.    And so what did you think this
14  document would assist Marous Brothers
15  Construction in accomplishing?  What was the
16  purpose of this document?
17     A.    This was so that somehow -- a
18  couple of things.  One, we wanted to state
19  what we thought our role was going to be,
20  which in this case was design/builder, and
21  what kind of construction costs estimate we
22  do, And we tried to determine what our
23  preconstruction expenses might be and lay them

Page 539

1  out.
2          And it makes provision that they
3  pay us.
4      Q.    And Alabama State was never a
5  proposed party or signatory to this letter of
6  intent?
7      A.    Not to this letter of intent.
8      Q.    Okay.  But according to this
9  letter of intent Student Suites and Gil Berry
10  and Associates would be responsible for
11  compensating Marous Brothers Construction for
12  its preconstruction services?
13     A.    If they had signed it.  That was
14  the intent.
15     Q.    If they had signed it?
16     A.    I mean that was the intent at
17  that time, as of November 18th, 2005.
18          (Whereupon, said document was
19          marked for identification as
20          Defendant's Exhibit No. 47 to the
21          deposition of Arne F. Goldman.)
22     Q.    Let's go back to this document
23  46, Exhibit No. 46, Paragraph 8.

Page 540

1          That lays out the payment travel
2  expenses, preconstruction services, also an
3  indemnity clause for Marous Brothers
4  Construction.
5          What happened after November
6  18th, 2005, that made Marous Brothers
7  Construction no longer want this type of
8  protection from Gil Berry and Student Suites?
9      A.    We felt comfortable that we would
10  be able to help them meet the conditions,
11  their obligations under their -- the
12  conditions under that resolution, and we felt
13  comfortable that we could help them put
14  together a deal that Alabama State could
15  finance with a design that was agreeable and
16  that we were -- at that point we were
17  reasonably -- and we received assurances from
18  them that they would work diligently so that
19  the project would go forward and that we had a
20  reasonable left of comfort, for better or
21  worse, that the project would go forward and
22  we'd get paid.
23     Q.    Is this something that -- is this

Page 541

1  a form type thing that Marous Brothers
2  Construction keeps around, or is this
3  something that was specifically drafted for
4  this project?
5      A.    No, that's a form.  Well, it's
6  it's not a -- I mean we modify it for each
7  project and add or subtract, but it's a form
8  we created on a projects especially where
9  we're going to be the design/builder.
10     Q.    So, you have operated with other
11  entities under this type of structure before?
12     A.    Yes, we have.
13     Q.    So, back in November, on November
14  18th, 2005, Marous Brothers Construction
15  really believed that its preconstruction
16  expenses or services should be paid for by
17  Student Suites and Gil Berry?
18     A.    Under that letter of intent.  And
19  this is prior to seeing the board -- prior to
20  the understanding the finances and everything.
21  That was our original understanding, yes.
22     Q.    But normally this is how Marous
23  Construction would operate when its -- when

Page 542

1  someone else is the developer and its the
2  construction management -- well, the
3  design/builder?
4      A.    Yes.
5      Q.    And had this document been signed
6  you would have been able to get all your
7  preconstruction services paid for by Student
8  Suites and Gil Berry & Associates?
9      A.    At least to the limit that's
10  specified in there.
11      Q.    Yes.  Let me show what was
12  previously marked as Defendant's Exhibit 18.
13  And these were your preconstruction services
14  as of May 15th --
15      A.    Yes.
16      Q.    -- 2006, correct?
17      A.    Yes.
18      Q.    And you said that -- you
19  previously testified that this was addressed
20  to Gil Berry & Associates and Student Suites
21  because --
22      A.    Yes.
23      Q.    -- Gil Berry requested that you

Page 543

1  send the invoice?
2      A.    Yes.
3      Q.    And you also testified that you
4  thought there was an implied contract between
5  Marous Brothers Construction and Alabama State
6  University whereby you would be compensated
7  for these preconstruction services, correct?
8      A.    Uh-huh (affirmative).
9      Q.    Who at Alabama State University
10  authorized you to -- or authorized Marous
11  Brothers Construction to conduct on-site video
12  and survey work for the tune $27,550?
13      A.    That's two questions.  Are you
14  asking who authorized us to do the work or
15  authorized us to do the -- and who authorized
16  the amount.
17      Q.    Well, you answer it in two
18  separate portions.  But who authorized you to
19  do the work?
20      A.    We asked to do the work and
21  Alabama State facilitated our doing the work.
22  That would be the student affairs people
23  facilitated with Mr. Dorsey Smith, I believe,

Page 544

1  was his name, and through Dr. Smith and Dr.
2  Frazier.
3          Nobody as far as -- I don't know
4  who authorized the $27,550.  That's -- this
5  was the amount of money that we allocated for
6  that.
7      Q.    When these people "authorized"
8  Marous Brothers Construction to conduct
9  on-site field video and survey work, did
10  Marous Brothers Construction tell them how
11  much it would cost --
12      A.    No.
13      Q.    -- or what rate it would be
14  charged at?
15      A.    No.
16      Q.    Item B --
17      A.    It's going to be the same all the
18  way down.
19      Q.    All the way down.
20      A.    I'll Save you the time.
21      Q.    Okay.  But all the way down
22  someone at Alabama State University authorized
23  you to perform these duties.  And I want to

Page 545

1  know who.
2      A.    We told Alabama State what we
3  needed to do to be able provide the
4  information they needed.  We told them that in
5  September, and then we -- told them in the
6  presentation in September what we needed to do
7  and what we would produce for them.
8      Q.    And at that presentation
9  September 20th, 2005, did you say the
10  preparation of scope of work narrative is
11  going to cost you $14,850?
12      A.    No, we didn't because we didn't
13  have -- at that point we did did have an idea
14  of what these service would cost.
15      Q.    So, if didn't have an idea of
16  what the services would cost, how would
17  Alabama State have an idea of what the
18  services would cost?
19      A.    At that point they wouldn't, nor
20  did I say they would.
21      Q.    Okay.  So, when did they have an
22  idea of how much the services would cost?
23  When did Alabama State --

Page 546

```
 1     A.   I don't know when Gil Berry did
 2  or didn't tell them.  I mean, Gil Berry had
 3  this letter of intent back in November.
 4        So, clearly he knew that we were
 5  going to spending at least $248,000.  So, a
 6  question for him is did he.  I can't answer
 7  what he did or didn't do.
 8        Our understanding was that he
 9  would be presenting this information to
10  Alabama State.  Again, he was the -- he was,
11  as far as we were concerned, the focal point
12  of the communication between the development
13  side, Dick Davis and Gil Berry and Alabama
14  State.
15        And he was our single point of
16  contact just like we wanted a single point of
17  contact at Alabama State, we wanted a single
18  point of contact with the developer.  And that
19  was Gil.
20     Q.   So, Gil Berry was supposed to
21  inform Alabama State University of what Marous
22  Brothers Construction's preconstruction
23  services were and how much it would cost?
```

Page 547

```
 1     A.   Yes.
 2     Q.   Okay.  So, if he didn't do that,
 3  it's your that ASU is still responsible for
 4  paying this cost?
 5     A.   I think that ASU encouraged,
 6  assisted and was in full awareness that we
 7  going all of this work.  So, I think -- they
 8  had to know we weren't doing it for free.
 9  Again, it would be silly to think that they
10  would think we were doing it for free.
11     Q.   But they didn't know how much you
12  were doing it for, how much it would cost?
13     A.   I don't know.  I don't know what
14  Gil Berry did or didn't tell them.  But we
15  relied on Gil to do that.
16     Q.   And this invoice is dated May
17  15th, 2006, correct?
18     A.   Yes.
19     Q.   And is it safe to say that many
20  of these items were performed well before May
21  15th, 2006?
22     A.   It's safe to say that -- I don't
23  know well before.  This was performed between
```

Page 548

```
 1  -- sometime between December 2005 and and May
 2  of 2006.
 3     Q.   And during that time Marous
 4  Brothers Construction was not a licensed
 5  contractor in the State of Alabama, correct?
 6     A.   Previously testified.  Yes.
 7     Q.   Yes.  And it was not licensed to
 8  transact any business in the State of Alabama?
 9        MR. LYONS:  I object to the form.
10        THE WITNESS:  I'm not sure of the
11  date we were licensed to transact business.  I
12  think that date was in May.
13     Q.   (By Ms. Jones)  It was in May.
14  But the things that you -- Marous Brothers
15  Construction may have performed prior to May
16  are included in this invoice, correct?
17     A.   Yes.
18     Q.   And that would have been before
19  Marous Brothers Construction was licensed to
20  transact business in the State of Alabama?
21     A.   I don't --
22        MR. LYONS:  Let me object because
23  you can transact business without performing
```

Page 549

```
 1  contractor service.  You are order supplies.
 2  You can do any of that.
 3        And I think that's a confusing
 4  question for that reason.
 5     Q.   (By Ms. Jones)  Well, did Marous
 6  Brothers Construction have a business license
 7  in the State of Alabama prior to May '06,
 8  2006?
 9     A.   I think we received the license
10  in May of '06.
11     Q.   You received it in May of '06?
12     A.   Yes.
13     Q.   And --
14     A.   The question is I don't know that
15  we needed to have a license to do the
16  services, either as a contractor or as a
17  business to perform those services.
18     Q.   Because you don't -- you don't
19  know what Alabama's licensing board precluded
20  you from doing?
21     A.   I don't in terms of construction.
22     Q.   As far as construction services?
23     A.   No.
```

Page 550

```
 1      Q.    But you still wanted to invoice
 2  Alabama State University for these services,
 3  and you don't know whether you were lawfully
 4  performing them?
 5      A.    We did the work.  We don't know
 6  that -- we had no reason to believe that we
 7  were doing anything that was unlawful, and we
 8  expected to get paid.
 9      Q.    And you never checked to see if
10  it was -- what you were doing was --
11      A.    I don't know that somebody at
12  Marous didn't check.  I didn't check.
13      Q.    But you are a corporate rep here
14  today for Marous, correct?
15      A.    Yes.  That doesn't mean that I
16  have knowledge of every single part and
17  participle of every business dealing that has
18  anything to do with State of Alabama.
19      Q.    But you were supposed to have
20  knowledge of the preconstruction services,
21  correct?
22      A.    Yes.
23      Q.    And about Marous Brothers
```

Page 551

```
 1  Construction being licensed as a general
 2  contractor in the State of Alabama?
 3      A.    I have knowledge of when we got
 4  licensed.  I was not the designated
 5  representative as I previously testified who
 6  took the -- sat for the exam and studied for
 7  the exam in the State of Alabama.
 8      Q.    Okay.  I don't know if this exact
 9  document was entered.  Let me show it to you
10  and I'll -- I want offer it.
11          I think you've already -- well,
12  you've seen that document before?
13      A.    Yes, I have.
14      Q.    And that is an invoice dated
15  October 2nd, 2006, correct?
16      A.    Yes.
17      Q.    And at that time Marous Brothers
18  Construction stated that its invoice for
19  preconstruction services was in the amount of
20  $454,777, correct?
21      A.    Yes.
22      Q.    So, between May 15th, 2006, and
23  October 2nd, 2006, Marous Brothers
```

Page 552

```
 1  Construction performed another $250,000 worth
 2  of services?
 3      A.    That would be $147,000 --
 4      Q.    Thank you.
 5      A.    -- but if you notice, the
 6  overhead and profit is not included in the
 7  invoice.  We were billing our overhead and
 8  profit at the end.
 9          So, you've got $61,000 of that
10  $157,000 we just talked.  So, it is absolutely
11  conceivable to spend $90,000 in four or five
12  months -- in four months on a project.
13      Q.    So, is profit something that is
14  normally billed as a preconstruction service?
15      A.    Well, we're --
16      Q.    And I don't know.
17      A.    We're entitled to make money on
18  our preconstruction services.  We chose to
19  defer it until the of the preconstruction
20  phase.
21      Q.    You wanted the cost of the
22  preconstruction services and then you wanted a
23  profit on it as well?
```

Page 553

```
 1      A.    Sure.  It's just similar to --
 2  you've got costs in running your law firm, but
 3  you also want to make the profit as well
 4  because that's how you can market for new
 5  business and do the things that lawyers do
 6  that attract new clients and other things.
 7      Q.    And that is billed to the client?
 8      A.    Profit is billed to the client.
 9      Q.    And did Alabama State University
10  know and agreed to being billed for profit at
11  ten percent?
12      A.    Mr. Upchurch saw that document.
13  Mr. Upchurch saw our preconstruction services
14  fees prior to that date so -- and ten percent
15  is certainly usual and customary in the
16  construction business.
17      Q.    And did Mr. Upchurch tell you
18  that ASU had agreed to pay Marous Brothers
19  Construction profit at ten percent --
20      A.    No.
21      Q.    -- for its preconstruction
22  services?
23      A.    No.
```

Page 554

1    Q.    And, again, like we did on the
2  last one, when I asked you who at Alabama
3  State University authorized Marous Brothers
4  Construction to perform these duties, you gave
5  me an answer basically that various people at
6  the presentation that you-all gave in
7  September, you were authorized to do these
8  preconstruction services?
9    A.    Well, I'm not sure that's what I
10 said exactly.
11   Q.    Well, what did you say?  Who
12 authorized you on --
13   A.    Are you asking me about these
14 now?
15   Q.    On these.
16   A.    Okay.  Can I see that again?
17   Q.    Sure.
18   A.    At this point --
19   Q.    Exhibit 39.
20   A.    At this point, we had relied upon
21 the representations made by Mr. Berry and Mr.
22 Davis through this time, and especially Mr.
23 Berry, that Alabama State was aware that we

Page 555

1  were doing extensive preconstruction services.
2  And we know they were, in fact, aware that we
3  were -- because in May we produced this work
4  product.  So, obviously we're doing some work.
5         And that no one authorized the
6  specific dollar amounts from Alabama State.
7    Q.    And, again, it was up to Gil
8  Berry -- you left Gil Berry in charge of
9  relaying what Marous Brothers Construction was
10 doing and at what cost to Alabama State?
11   A.    Yes.  Mr. Berry made it very
12 clear to us that he was in communication with
13 a number of people at Alabama State throughout
14 the process.
15        So, we thought that -- based on
16 his representations, that there was very full
17 disclosure about the work that was being
18 performed to help out Alabama State.
19        MS. JONES:  Let take a break.
20        (Whereupon, the taking of the
21 deposition was recessed from approximately
22 8:18 p.m. to approximately 8:25 p.m., after
23 which the following proceedings were had and

Page 556

1  done:)
2    Q.    Mr. Goldman, when did you become
3  a licensed architect in the State of Alabama?
4    A.    On July 7th, 2006.
5    Q.    And so these preconstruction
6  services that we saw in Exhibit 18 and Exhibit
7  39, did those include architectural services?
8    A.    To the extent that they were
9  supporting our work, yes.
10   Q.    And those were -- those services
11 were performed prior to July 2006?
12   A.    They were performed in our office
13 in the State of Ohio where I'm a licensed
14 architect and by other licensed -- and a
15 number of other licensed architects in the
16 State of Ohio and in support of our work
17 product.
18   Q.    But they were supposedly done for
19 Alabama State University, which is an Alabama
20 public institution?
21   A.    There was done in support of our
22 -- to develop our work product, in support of
23 our work product whose benefit would inure to

Page 557

1  Alabama State University.
2    Q.    So, why did you get an Alabama --
3  become licensed to be an architect in Alabama?
4    A.    As testified previously, Mr.
5  Berry told me that I had an opportunity to do
6  a house addition for someone he knew in
7  Alabama.  I was -- I wanted to be licensed,
8  anyway, in case we work at Alabama A&M through
9  a private foundation in a privatized deal
10 where we could be a design/builder because
11 there were would no public funds involved.
12        So, for those two reasons I
13 sought licensure.
14   Q.    So, it nothing to do with the ASU
15 to dorm renovation project?
16   A.    Around -- sometime in April or
17 May we had already decided that we'd be hiring
18 -- that we couldn't provide both construction
19 and architectural services as the architect
20 director on the project.
21        So, that's when we made to
22 decision to look for another architect.  John
23 Chambliss came highly recommended, and so I

1  got -- I had the privilege of speaking with
2  him and checked out his work.
3      Q.    You testified earlier about Judge
4  Wiggins E-mailing Gil Berry asking him to send
5  invoices?
6      A.    Yes.
7      Q.    Do you have a copy of that
8  E-mail?
9      A.    I don't.
10     Q.    Did you receive a copy of it?
11     A.    I believe I received it via fax
12 or something. I thought we produced that as
13 well. I don't think -- I don't think -- or
14 else the E-mail was forward to me.
15         And I don't know if I deleted
16 that or not because typically -- I mean, I'm
17 pretty good about saving my E-mails, but I
18 don't know if I still have a copy of that.
19         But I did see it as I testified.
20     Q.    Well, can you look in your
21 documents, again, to see if you do, in fact,
22 have an E-mail mail from Marvin Wiggins
23 requesting that Gil Berry send to him copies

1  of the invoices?
2      A.    Yes, I will look.
3      Q.    Were you ever informed by the
4  building commission that they had questions
5  about your certification as an architect in
6  the State of Alabama?
7      A.    No.
8      Q.    And questions about Marous
9  Brothers Construction being a licensed
10 contractor in the State of Alabama?
11     A.    I was never informed of that.
12     MR. JONES: We don't have
13 anything else.
14 FURTHER EXAMINATION BY MR. LAWSON:
15     Q.    Under questioning from counsel
16 for ASU on the quantum meruit claim, I thought
17 I heard you say that some of this work was
18 done at the direction of the TCU defendants.
19         But under examination by me, I
20 believe you said quantum the meruit claim does
21 not apply to TCU.
22     A.    It does not apply to TCU.
23     Q.    I just wanted to make sure I got

1  that straight.
2          You stated that Mr. Upchurch
3  indicated to you that he was comfortable with
4  your design and that he told you there was a
5  final agreement on the design. When did he
6  tell you that?
7      A.    Well, I think what I testified to
8  is I asked him is the design where needs to be
9  and is the scope where needs to be and are you
10 satisfied. He said yes.
11     Q.    But he didn't tell you there was
12 a final agreement such that ASU had approved
13 your design and was going to award you the
14 contract?
15     A.    I assumed that he's as an agent
16 and owner's representative representing
17 Alabama State, that when he that to me that he
18 had that consent or agreement from Alabama
19 State.
20     Q.    Okay. So, again, he told you
21 that you're where you're needed to be?
22         And in the E-mail that we've
23 already looked at he said you had met the

1  criteria?
2      A.    Yes.
3      Q.    And he told ASU that?
4      A.    Yes.
5      Q.    But he didn't tell you that ASU
6  had decided to accept your proposal, did he?
7  He didn't use those words, did he?
8      A.    He did not use those words.
9      Q.    Okay. He just told you --
10     A.    Nor did I testify to that.
11     Q.    Okay. I'm just clarifying making
12 sure that I didn't misunderstand something you
13 said because I thought I heard you say that he
14 told you that there was a final agreement on
15 the design.
16     A.    I think he told me -- I think
17 what I testified to several hours ago was that
18 I asked Mr. Upchurch if the design was where
19 it needed to be, did it have the components in
20 it that needed to be there and was the scope
21 where it needed to be. And he said yes.
22     Q.    Okay. And you've also testified
23 that he then told you that he would recommend

Page 562

1  that ASU accept your proposal; is that
2  correct?
3      A.    Yes.
4      Q.    You testified that that statement
5  was made by TCU on September 20th, 2006, and
6  in a phone conversation; is that correct?
7      A.    The 19th or 20th. I don't
8  remember --
9      Q.    So, either September -- it was
10 either September --
11     A.    The 19th or 20th, yes.
12     Q.    2006?
13     A.    Yes.
14     Q.    TCU allegedly told you that it
15 would recommend that ASU accept Marous/Gil
16 Berry/Student Suites proposal?
17     A.    Yes.
18     Q.    And THAT was in a phone
19 conversation with you?
20     A.    Yes.
21     Q.    Did you confirm that in writing?
22     A.    No.
23     Q.    Do you have any evidence that at

Page 563

1  the time TCU allegedly promised to you to
2  recommend that ASU accept your proposal that
3  TCU or Upchurch had no intention of actually
4  making that recommendation?
5      A.    I have no idea one way or the
6  other. I took -- like I said, I took Mr.
7  Upchurch at his word.
8      Q.    You testified, I believe, that
9  sometime after September 22nd, TCU or Ken
10 Upchurch called you to ask if you would be
11 interested as serving as the CM on the
12 project?
13     A.    We talked if we consider -- if
14 that was something that -- you know, that
15 independent of Gil Berry and Student Suites,
16 something to the effect of would we consider
17 or want to be considered serving as the CM for
18 the project.
19     Q.    When did that conversation occur?
20     A.    After the board meeting?
21     Q.    On that day or just some day
22 afterward?
23     A.    I don't know if it -- I don't

Page 564

1  believe it was that day. I think it was a few
2  days later. I needed a days for the shock to
3  settle out.
4      Q.    Okay. If TCU, as you said,
5  approached you or asked you if you would
6  interested in serving as the CM sometime after
7  September 22nd, how is it that, as you allege,
8  or September 22nd, 2006, TCU had already taken
9  the project and would be performing the
10 renovation work?
11     A.    I don't know. You have to ask
12 them.
13     Q.    Those two statements seem to be
14 at odds?
15     A.    There's a lot of things seem to
16 be at odds in this -- in our dealings with
17 Alabama State University.
18     Q.    Who recommended John Chambliss to
19 you?
20     A.    Gil Berry mentioned to us that
21 John Chambliss was an architect who was doing
22 other work at Alabama State. So, we went on
23 their website.

Page 565

1          I really liked their website,
2  that they had done a lot of historic
3  renovation because as people specialize in
4  that work, we would want somebody who had
5  experience, who knew the local landscape,
6  understood regulations and codes locally and
7  who was -- and it was particularly appealing
8  that John not only had requisite experience,
9  he had experience at Alabama State. So, he
10 was a pretty obvious choice for us.
11     Q.    That recommendation would have
12 been based on Gil Berry's initial
13 recommendation, I guess, and then your
14 follow-up?
15     A.    Yes. And Chip Marous had asked
16 me to check out John Chambliss. And we had
17 some conversations after looking at their
18 website, and I was pretty comfortable.
19          MR. LAWSON: All right. I
20 believe that's all.
21          MS. JONES: If there is no
22 objection, can we attach these exhibits to the
23 deposition?

Page 566

1    MR. LYONS:  No objection.
2    FURTHER DEPONENT SAITH NOT
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 567

1       C E R T I F I C A T E
2    STATE OF ALABAMA
3    JEFFERSON COUNTY
4         I hereby certify that the above
5    and foregoing deposition was taken down by me
6    in stenotype, and the questions and answers
7    thereto were reduced to typewriting under my
8    supervision, and that the foregoing represents
9    a true and correct transcript of the
10   deposition given by said witness upon said
11   hearing.
12        I further certify that I am
13   neither of counsel nor kin to the parties to
14   the action, nor am I in any way interested in
15   the result of said cause.
16        Given under my hand and seal this
17   the 26th day of February, 2007.
18
19   _____
     Belinda S. Brewster, RPR
20   Alabama License #335
21
22
     My Commission Expires:
23   September 1, 2009
24

# EXHIBIT

# 3

STATE OF MISSOURI            )
                             )
COUNTY OF _Jackson_          )

### AFFIDAVIT OF DICK DAVIS

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared **DICK DAVIS**, who first being duly sworn, deposed and stated as follows:

1.      My name is Dick Davis. I am of sound mind, over the age of nineteen and a resident of the State of Missouri.

2.      I have personal knowledge of the facts set forth in this affidavit, and I am competent to testify to these facts.

3.      I am the Director of Development. Acquisition and Finance for Student Suites, Inc. ("Student Suites"). Student Suites is a Missouri corporation that develops and finances new student housing for universities across the country.

4.      Sometime in the fall of 2005, Gil Berry of Gil Berry and Associates, Inc. informed me that he had some leads on Historically Black Colleges and Universities ("HBCU's") that were in need of new student housing. One of those HBCU's was Alabama State University ("ASU"). Based upon this information, Student Suites, Gil Berry and Associates, Inc., and Marous Brothers Construction partnered to present a proposal to ASU to renovate six of its dormitories and to build a new student housing facility on the campus.

5.      Prior to our actual presentation, Student Suites, Gil Berry and Associates, Inc. and Marous Brothers Construction completed a comprehensive study of ASU's

1

dormitories to assess the needs of the University and to explore possible ways of providing those needs to the University.

6. On September 20, 2005, Student Suites, Gil Berry and Associates, Inc. and Marous Brothers Construction gave a power point presentation to several ASU officials and members of the Board of Trustees. The presentation gave background information on our companies, details of past projects, and brief details of what the companies envisioned for the renovation and construction of student housing at ASU.

7. The representatives from ASU seemed interested in our presentation. However, the companies needed a resolution from the Board of Trustees authorizing us to serve as developers before we could begin any additional planning. On November 9, 2005, I wrote a letter to Judge Marvin Wiggins, a member of the ASU Board of Trustees, requesting that the Board of Trustees pass a resolution to that effect.

8. The resolution that I forwarded to Judge Wiggins stated the following:

BE IT RESOLVED that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developer for the purpose of Designing, Building, Renovating, and Financing a proposed Student Housing Redevelopment Master Plan per the proposal submitted October 28, 2005.

It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.

9. The language in this resolution is commonly used by Student Suites when engaged by universities. I forwarded this resolution to Judge Wiggins with the knowledge and consent of both Gil Berry & Associates and Marous Brothers Construction.

10. Dr. Leon Frazier informed me that the property committee voted to recommend the resolution for passage by the full board of ASU. The team of companies

began further discussions with ASU officials and planning of the dormitory renovation and construction at ASU in hopes of entering into a development agreement with ASU.

11.    On January 24, 2006, I again wrote a letter to Dr. Frazier requesting that the ASU Board of Trustees pass a resolution at its February meeting authorizing Student Suites and Gil Berry and Associates to develop a plan to renovate and build student housing at ASU. This resolution also included similar language that "if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University." This resolution was forwarded to Dr. Frazier with the knowledge and consent of Gil Berry and Associates and Marous Brothers Construction.

12.    The ASU Board of Trustees met in February but it still did not pass our resolution. However, the team of companies continued to revise our plan for ASU so that we could obtain a development agreement.

13.    Gil Berry & Associates and Student Suites consulted the law firm of Haskell, Slaughter, Young & Gallion to advise us on the specifics of the Alabama bid law and how we could comply with those laws. Upon the advice of counsel, we decided that if a development agreement was reached with ASU Student Suites and Gil Berry and Associates would serve as the developers on the ASU project. The Marous Brothers Construction would then be employed by the developers as a construction management agent.

14.    At the May 2006 meeting of the ASU Board of Trustees passed our resolution. I understood that resolution passed included the provision voiding the resolution with no cost to ASU if a final agreement was not reached between the parties.

3

15.     At my direction and through my efforts, Student Suites and Gil Berry and Associates formed an Alabama corporation as Student Suites and Gil Berry and Associates, LLC.    This is a common practice of Student Suites to form a local corporation to transact business in the state where the university is located.    Kenneth L. Thomas, Esq. of Thomas, Means, Gillis & Seay, P.C. did not advise me to form Student Suites and Gil Berry and Associates, LLC.

16.     In May/June 2006, I remember meeting with ASU's bond counsel and others selected to handle the bond issue for ASU.    It was also around this time that ASU decided to renovate only and not construct new student housing.    ASU also decided not to pursue private financing through my company since it had an excellent credit rating.

17.     Although I met the individuals charged with handling the ASU bond issue, I never accompanied those individuals to New York, I was not involved in drafting any bond documents, and I am not aware of any scope of work prepared by the team of companies being used in the bond documents.

18.     In July 2006, I forwarded a draft of the development agreement to Dr. Frazier.    Around this same time, ASU informed us that it had engaged TCU Consulting Services to help in its due diligence in reviewing the development agreement and the scope of work.    The development agreement and the scope of work went through several revisions during this time.

19.     At its September 22, 2006 meeting, the ASU Board of Trustees voted not to accept the proposal of Student Suites and Gil Berry and Associates to renovate its dormitories.

20. On October of 2006, Gil Berry told me that a trustee at ASU said that we should send our invoices to him and that ASU would pay us for the work that we had done on our proposal. I was never personally told by anyone at ASU or any of the trustees that the companies would get paid for their work.

21. I never told anyone at Marous Brothers Construction that the company would be paid for any pre-construction services or any other work done prior to a signed development agreement with ASU.

22. From September 2005-September 2006, I always believed that the companies were in a proposal and subsequently contract negotiation phases with ASU.

**FURTHER AFFIANT SAITH NOT.**

Sworn to and subscribed before me on this the 3rd day of _____March_____ 2008.

NOTARY PUBLIC
My Commission Expires: May 25, 2009

TONI PINE
Notary Public-Notary Seal
State of Missouri, Jackson County
Commission # 05718008
My Commission Expires May 25, 2009

5

# EXHIBIT

# 4

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



# ALABAMA STATE UNIVERSITY

## STUDENT HOUSING REDEVELOPMENT MASTER PLAN

SEPTEMBER 20, 2005

Marous Brothers
CONSTRUCTION

Gil Berry
and Associates
CONFIDENTIAL

DEFENDANT'S EXHIBIT

10-GOLDMAN

MAR 000269

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



## MISSION:

To offer Alabama State University a comprehensive 3-4 year plan to modernize and renovate all existing housing as well as adding new beds for future growth.







CONFIDENTIAL

MAR 000270



**ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN**

# AGENDA

- Introduction of our Project Team
- ASU's Challenges and Opportunities
- Design Features and Benefits
  - Renovations
  - New Housing
- Financial Discussion
- Project Schedule
- Question and Answer Session







**CONFIDENTIAL**

MAR 000271



ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

# STUDENT SUITES
## Our Development Approach



## Single Source Solution



CONFIDENTIAL



**ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN**

## North Carolina A&T State University
Greensboro, North Carolina



CONFIDENTIAL





MAR 000273

## ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

# Central State University
Wilberforce, Ohio



CONFIDENTIAL





# University of Arkansas at Pine Bluff
Pine Bluff, Arkansas

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

CONFIDENTIAL






**ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN**

Gib Berry and Associates

CONFIDENTIAL

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## MINORITY PARTICIPATION PROGRAM

- Student Internship Program
- Prime Contractor Interaction
- Direct Support to MBE/WBE

CONFIDENTIAL

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



# Marous Brothers
## CONSTRUCTION

*Leaders in Historic Renovation and Neighborhood Redevelopment*

CONFIDENTIAL

MAR 000278

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



## Marshall Place Apartments
Cleveland, Ohio





CONFIDENTIAL

Marcus Brothers
CONSTRUCTION

MAR 000279



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## Marshall Place Apartments
Cleveland, Ohio







CONFIDENTIAL





Marcus Brothers
CONSTRUCTION

MAR 000280

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

**Arbor Park Village**
Cleveland, Ohio





CONFIDENTIAL

**ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN**

## Arbor Park Village
Cleveland, Ohio





CONFIDENTIAL

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## Quay 55
Cleveland, Ohio





CONFIDENTIAL

Marous Brothers
CONSTRUCTION

MAR 000283

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

**Hyatt Regency at the Arcade**
Cleveland, Ohio



CONFIDENTIAL

   

MAR 000284



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



**Hyatt Regency at the Arcade**
Cleveland, Ohio







CONFIDENTIAL

Marous Brothers
CONSTRUCTION

MAR 000285

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



# ASU'S CHALLENGES AND OPPORTUNITIES

- Growing Enrollment
- Aging Student Housing
- Historic Buildings
- Land Use
- Schedule
- Costs
- Student Retention





CONFIDENTIAL

MAR 000286

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## DESIGN FEATURES AND BENEFITS
### Candidates for Renovation:

* Bibb Graves Hall          (172 Students)

| | |
|---|---|
| J.W. Abercrombie Hall | (97 Students) |
| William Benson Hall | (94 Students) |
| Bessie Pearson Hall | (108 Students) |
| George N Cain Hall | (192 Students) |
| Wiltese Stinson H | (90 Students) |

Marous Brothers
CONSTRUCTION

Gil Berry
and Associates

CONFIDENTIAL

MAR 000287



# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## DESIGN FEATURES AND BENEFITS
### Candidates for Remodel:



- C. Johnson Dunn Hall (476 Students)
- Bessie Laster Hall (274 Students)
- Peyton Finley Towers (356 Students)
- William R. Gray Apartments (62 Students)
- Martin L. King (84 Students)



Marous Brothers
CONSTRUCTION

CONFIDENTIAL

MAR 000288

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



# WHY RENOVATE?
## Key Renovation Opportunities:

- National Historic Register
- Wide Corridors
- Masonry Bearing Walls
- Non-Bearing Demising Partitions
- Structurally Sound
- Substantial Clear-Ceiling Heights
- Concrete Floor Structure
- Excellent Sound Insulation
- Schedule
- Cost Management







CONFIDENTIAL

**ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN**



# QUALITY OF LIVING
## Key Features After Renovation:

- Suite-Style Living
- Semi-Private Bathrooms
- New Interior Finishes
- Improved Security
- Living/Learning Center on First Floor
- Student Study Lounges/Laundry on Each Floor
- Upgraded Electrical/Fire Alarm/Fire Protection/Wi-Fi
- ADA Compliance
- New HVAC
- Increased Energy Efficiency
- Restored/Replaced Windows





**Marous Brothers**
CONSTRUCTION

*Gil Berry*
*and Associates*

CONFIDENTIAL

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

Insert Coops rendering here

CONFIDENTIAL

MAR 000291





EXISTING FIRST FLOOR PLAN

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

CONFIDENTIAL

ALABAMA STATE
UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS

MAR 000292



ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

Alabama Brothers
CONSTRUCTION

PROPOSED FIRST FLOOR PLAN

CONFIDENTIAL

ALABAMA STATE
UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS

ASU

MAR 000293







ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

EXISTING SECOND FLOOR PLAN

CONFIDENTIAL

ALABAMA STATE UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS





PROPOSED SECOND FLOOR PLAN

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

CONFIDENTIAL



ALABAMA STATE
UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS





EXISTING THIRD FLOOR PLAN

CONFIDENTIAL

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

ALABAMA STATE UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS

MAR 000296



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

PROPOSED THIRD FLOOR PLAN

CONFIDENTIAL

ALABAMA STATE UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS











ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

SHARED STUDIOS

SINGLE STUDIOS

TYPICAL STUDENT STUDIO OPTIONS

CONFIDENTIAL

ALABAMA STATE UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS

Clarkus Brothers
CONSTRUCTION

MAR 000298







ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

SINGLE SUITES

SHARED SUITES

TYPICAL STUDENT SUITE OPTIONS

CONFIDENTIAL

ALABAMA STATE UNIVERSITY
BIBB GRAVES HALL
INTERIOR RENOVATIONS

MAR 000299

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



# FIRST FLOOR SUMMARY:

**EXISTING CONDITIONS**

1 Director Suite
1 RA Suite
22 Student Rooms

**PROPOSED CONDITIONS**

1 Director Suite
4 Student Suites
6 Student Studios
2 Student Lounges
1 Laundry Room

# SECOND FLOOR SUMMARY:

**EXISTING CONDITIONS**

1 RA Suite
36 Student Rooms
2 Gang Toilet & Shower Rooms

**PROPOSED CONDITIONS**

4 Student Suites
12 Student Studios
5 Student Lounges
1 Laundry Room

# THIRD FLOOR SUMMARY:

**EXISTING CONDITIONS**

1 RA Suite
36 Student Rooms
2 Gang Toilet & Shower Rooms

**PROPOSED CONDITIONS**

6 Student Suites
10 Student Studios
3 Student Lounges
1 Laundry Room

CONFIDENTIAL

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



## BUILDING SUMMARY

**EXISTING CONDITIONS**

1 Director Suite
3 RA Suites
94 Student Rooms

**PROPOSED CONDITIONS**

1 Director Suite
14 Student Suites
28 Student Studios
10 Student Lounges
3 Laundry Rooms

## BUILDING OCCUPANCY SUMMARY

**EXISTING OCCUPANCY**

Min 1 Per Room = 94 Students
Max 2 per Room = 188 Students
Current Load = 172 Students
**Total = 175 Sq. Ft. Per Student**

**PROPOSED OCCUPANCY**

Min 2 Per Room = 84 Students
Max 4 Per Room = 168 Students
Recommended = 137 Students
**Total = 220 Sq. Ft. Per Student**

CONFIDENTIAL

MAR 000301

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



# BIBB GRAVES HALL CENSUS RECONCILIATION

## BEFORE RENOVATIONS

| | |
|---|---|
| Shared Units | 147 Students |
| Private Units | 25 Students |
| Total Count | 172 Students |

## AFTER RENOVATIONS

Flexible layout allows varying student rooms

| | |
|---|---|
| | 84 Students (min) |
| | 183 Students (max) |
| Recommended Count | 137 Students |

## NET CHANGE: Reduction of 35 Students

CONFIDENTIAL



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

Marcus Brothers
CONSTRUCTION

SITE PLAN

CONFIDENTIAL

ALABAMA STATE
UNIVERSITY
DORMATORY RENOVATIONS
ROOM RENOVATION ANALYSIS





**BIBB GRAVES HALL:**

Current Capacities
172 Students

Proposed Capacities:
137 Students

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

SITE PLAN    BIBB GRAVES HALL

CONFIDENTIAL

ALABAMA STATE UNIVERSITY

DORMATORY RENOVATIONS
ROOM RENOVATION ANALYSIS

MAR 000304





**WILLIAM BENSON HALL:**

Current Capacities
341 Students

Proposed Capacities:
186 Students

SITE PLAN          WILLIAM BENSON HALL

CONFIDENTIAL

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

Marcus Brothers
CONSTRUCTION

ALABAMA STATE
UNIVERSITY

DORMATORY RENOVATIONS
ROOM RENOVATION ANALYSIS

MAR 000305



# ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

## WILLEASE SIMPSON HALL:

**Current Capacities**
205 Students

**Proposed Capacities:**
166 Students

## J.W. ABERCROMBIE HALL:

**Current Capacities**
97 Students

**Proposed Capacities:**
87 Students



Marcus Brothers
CONSTRUCTION

SITE PLAN

WILLEASE SIMPSON HALL
J.W. ABERCROMBIE HALL

## CONFIDENTIAL



ALABAMA STATE
UNIVERSITY
DORMITORY RENOVATIONS
ROOM RENOVATION ANALYSIS

MAR 000306

# ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



## Marous Brothers
### CONSTRUCTION

## BESSIE BENSON HALL:

**Current Capacities**
205 Students

**Proposed Capacities:**
186 students

## GEORGE N. CARD HALL:

**Current Capacities**
192 Students

**Proposed Capacities:**
172 Students

SITE PLAN

BESSIE BENSON HALL
GEORGE N. CARD HALL

## CONFIDENTIAL



ALABAMA STATE
UNIVERSITY

DORMATORY RENOVATIONS
ROOM RENOVATION ANALYSIS

MAR 000307

# ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



| | CURRENT | PROPOSED |
|---|---|---|
| C. Johnson Dunn Hall | 478 Students | 478 Students |
| Bessie Estell Hall | 214 Students | 214 Students |
| Peyton Finley Dorms | 59 Students | 59 Students |
| William McGinty Apartments | 60 Students | 60 Students |
| Martin L. King Apartments | 214 Students | 214 Students |
| Bibb Graves Hall | 172 Students | 137 Students |
| New Housing #1 | 0 Students | 380 Students |
| William Benson Hall | 341 Students | 307 Students |
| J.W. Abercrombie Hall | 97 Students | 87 Students |
| Willease Simpson Hall | 205 Students | 186 Students |
| New Housing #2 | 0 Students | 260 Students |
| Bessie Benson Hall | 205 Students | 186 Students |
| George N. Card Hall | 192 Students | 172 Students |
| New Housing #3 | 0 Students | 260 Students |
| **TOTAL CAPACITY** | **2237 Students** | **3000 Students** |





**Marous Brothers** CONSTRUCTION

CONFIDENTIAL



# ALABAMA STATE UNIVERSITY

New Housing

CONFIDENTIAL



# ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

MAR 000309

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## Suite Layout – Shared & Private

CONFIDENTIA





MAR 000310



1st Floor Plan

CONFIDENTIAL

Courtyard/Rec Area

ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

MAR 000311

**2nd & 3rd Floor Plan**

**ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN**



CONFIDENTIAL

MAR 000312

# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## Project Overview for New Student Housing:

### Facility Description

- Exterior appearance designed to blend easily within campus architectural integrity
- Keycard access at front entrance and room entrance
- Security entry monitor central Lobby
- Security cameras
- Wireless Internet Ready
- Automatic fire sprinkler system
- Beverage/Snack Vending
- Computer Lounge/Learning Center
- Laundry Center

### In-Suites Description



CONFIDENTIAL



MAR 000313



# ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

## FINANCIALS
### Estimated Budget Including FF&E

**RENOVATIONS**    $19,362,000

**REMODEL**    $ 2,000,000

**NEW BEDS**    $21,600,000

| | |
|---|---|
| Project Fund | $42,962,000 |
| FF&E | $ 3,400,000 |
| Legal & Issuance | $ 1,500,000 |
| Capitalized Interest | $ 2,500,000 |
| Contingency | $ 1,000,000 |
| **Total** | **$51,362,000** |

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

# FINANCIALS
## Financial Summary



| | Current 2005 | Proposed (9000 Beds) |
|---|---|---|
| Income: | $4,842,075 | $9,752,400 |
| Expenses: | $2,452,110 | $2,800,000 |
| Gross Revenue: | $2,389,965 | $6,952,400 |
| Less Debt Service: | $2,477,698 | $6,209,091 |
| Net Revenue: | <$87,733> | $ 743,309 |



Marous Brothers
CONSTRUCTION

CONFIDENTIAL

MAR 000315

ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN



# ADVANTAGES
## The SS/GBA/MBC Team Advantage:

- Retain Historic Character
- Aggressive Timeline - 2006 Occupancy
- Meets all State of Alabama Codes and Regulations
- No Capital Required from ASU
- Project Pays for Itself
- MBE/FBE Subcontractor Participation
- ASU Maintains Management Role
- Students Housed in Modern, Suite-Style Units
- New Housing Plan Helps with Student Recruiting and Retention
- Single Source Responsibility







CONFIDENTIAL



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN

# NEW HOUSING AND RENOVATION SCHEDULE

BIBB GRAVES HALL

WILLIAM BENSON HALL

J.W. ABERCROMBIE HALL

WILLEASE SIMPSON HALL

GEORGE N. CARD HALL

BESSIE BENSON HALL

NEW STUDENT HOUSING

JAN 06    JAN 07    JAN 08    JAN 09

Marous Brothers
CONSTRUCTION

CONFIDENTIAL



ALABAMA STATE UNIVERSITY • STUDENT HOUSING PLAN



REMODEL SCHEDULE

MAY 06

AUGUST 06

C. JOHNSON DUNN HALL

MARTIN L. KING JR. HALL

BESSIE ESTELL HALL

WILLETTA MONK? APTS

PEYTON FINLEY DORMS



Marous Brothers
CONSTRUCTION

Gil Berry
and Associates
CONFIDENTIAL



# ALABAMA STATE UNIVERSITY · STUDENT HOUSING PLAN

## QUESTION & ANSWER SESSION

# Thank You!





Marous Brothers
CONSTRUCTION

CONFIDENTIAL

MAR 000319

# EXHIBIT

# 5



November 9, 2005

Circuit Judge Marvin Wayne Wiggins
Hale County Courthouse
2nd Floor Room 52
Main Street
Greensboro, AL 36744

Dear Judge Wiggins:

We are pleased to submit to you our revised plan as follow up to last week's conversations regarding the proposal to redevelop the student housing at Alabama State University.

Following the meeting our team has discussed and refined our original proposal to offer the board a phased in approach to allow for total renovation of the six older style student housing units as well as construction of 388 new beds in Phase I. Phase II would represent the new construction of approximately 600 new beds to bring the total bed count on campus to 3,000 beds.

This work can begin early in 2006 if the board approves the attached resolution to allow our team to work with the Alabama State University Staff to further define the exact scope of work along with the most attractive financing packages available. To begin this aggressive schedule we would request the Board of Trustees to pass the attached resolution by November 25, 2005. This will allow us to have the new beds in Phase I open by the Fall of 2006.

We welcome your questions and are anxious to begin the steps necessary to bring first class student housing that attracts students as well as provides financial rewards back to Alabama State University. This approach will in our opinion bring excitement to the campus showing students both the new construction and renovation.

Best Regards

Dick Davis
Director
Development, Acquisitions & Finance

Gil Berry
Construction Manager &
Developer

**DEFENDANT'S EXHIBIT**

*11- GOLDMAN*

cc: Alabama State University Board of Trustees

MAR 000187

*CONFIDENTIAL*

1132 Luttrell, Suite A • Blue Springs, MO 64015 • (816) 228-3040 • (800) 765-1011



# STUDENT HOUSING PLAN

## ALABAMA STATE UNIVERSITY
## STUDENT HOUSING REDEVELOPMENT MASTER PLAN
## PHASE I

**PROJECT SCOPE:**

I.    Total renovation to modern suite-style student housing:

1. Bibb Graves Hall
2. William Benson Hall
3. J.W. Abercrombie Hall
4. Willease Simpson Hall
5. Bessie Benson Hall
6. George N. Card Hall

II.   Build approximately 388 beds as a Living Learning Center on land provided by Alabama State University. These beds will allow staging of the needed beds during the renovation as well as stimulate recruitment and retention.

**ESTIMATED PROJECT BUDGET:**

| | |
|---|---|
| Renovation | $20,036,200 |
| New Construction | $10,958,000 |
| Furniture, Fixture & Equipment | $ 1,925,000 |
| Capitalized Interest | $ 3,500,000 |
| Legal & Issuance Cost | $ 1,500,000 |
| Contingency | $ 2,000,000 |
| **Total** | **$39,919,200** |

CONFIDENTIAL

MAR 000188




Marous Brothers
CONSTRUCTION


Gil Berry
and Associates

# ...HOUSING REDEVELOPMENT MASTER PLAN PHASE I PROFORMA

**BED TOTALS**
Existing: 1000
Renovated: 1100
New: 388
Total: 2488

**ASSUMPTIONS**
Cost of Project $39,919,200
30 Year Surplus $69,118,111

Interest Rate 6.00%
Term 30
Rent Inflation 3%

**Rent Rates**
Shared (70%) $3,200
Private (30%) $4,100
occupancy 90%

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | |
| New / Renovated Beds On line | 832 | 832 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 |
| New Project Rents | 2,596,336 | 2,676,286 | 4,847,198 | 4,992,614 | 5,142,392 | 5,296,664 | 5,455,564 | 5,619,231 |
| Misc Income | 129,917 | 133,814 | 242,360 | 249,631 | 257,120 | 264,833 | 272,778 | 280,962 |
| Total Revenue | 2,728,253 | 2,810,100 | 5,089,558 | 5,242,245 | 5,399,512 | 5,561,497 | 5,728,342 | 5,900,193 |
| **EXPENSES** | | | | | | | | |
| Utilities | $250,000 | $250,000 | $530,450 | $546,364 | $562,754 | $579,637 | $597,026 | $614,937 |
| Maintenance | $150,000 | $150,000 | $318,270 | $327,818 | $337,653 | $347,782 | $358,216 | $368,962 |
| Management | $175,000 | $175,000 | $318,270 | $327,818 | $337,653 | $347,782 | $358,216 | $368,962 |
| Misc | $100,000 | $100,000 | $265,225 | $273,182 | $281,377 | $289,819 | $298,513 | $307,468 |
| Total Expenses | $675,000 | $675,000 | $1,432,215 | $1,475,181 | $1,519,437 | $1,565,020 | $1,611,971 | $1,660,330 |
| Avail for Debt Serv. | $2,053,253 | $2,135,100 | $3,657,343 | $3,767,063 | $3,880,075 | $3,996,477 | $4,116,372 | $4,239,863 |
| Bond Payments | $1,700,000 | $1,700,000 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 |
| Coverage | 1.21 | 1.26 | 1.29 | 1.33 | 1.37 | 1.41 | 1.46 | 1.50 |
| Surplus | $353,253 | $435,100 | $829,905 | $939,625 | $1,052,637 | $1,169,039 | $1,288,934 | $1,412,425 |
| Less Maintenance Reserve | $200,000 | $206,000 | $212,180 | $218,545 | $225,102 | $231,855 | $238,810 | $245,975 |
| Net to University | $153,253 | $229,100 | $617,725 | $721,080 | $827,535 | $937,185 | $1,050,123 | $1,166,450 |

CONFIDENTIAL

MAR 000189

## ... HOUSING REDEVELOPMENT MASTER PLAN PHASE I PROFORMA

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | |
| *New / Renovated Beds On line* | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 |
| New Project Rents | 5,787,808 | 5,961,442 | 6,140,285 | 6,324,494 | 6,514,229 | 6,709,656 | 6,910,945 | 7,118,274 | 7,331,822 |
| Misc Income | 289,390 | 298,072 | 307,014 | 316,225 | 325,711 | 335,483 | 345,547 | 355,914 | 366,591 |
| Total Revenue | 6,077,198 | 6,259,514 | 6,447,300 | 6,640,719 | 6,839,940 | 7,045,138 | 7,256,493 | 7,474,187 | 7,698,413 |
| **EXPENSES** | | | | | | | | | |
| Utilities | $633,385 | $652,387 | $671,958 | $692,117 | $712,880 | $734,267 | $756,295 | $778,984 | $802,353 |
| Maintenance | $380,031 | $391,432 | $403,175 | $415,270 | $427,728 | $440,560 | $453,777 | $467,390 | $481,412 |
| Management | $380,031 | $391,432 | $403,175 | $415,270 | $427,728 | $440,560 | $453,777 | $467,390 | $481,412 |
| Misc | $316,693 | $326,193 | $335,979 | $346,058 | $356,440 | $367,133 | $378,147 | $389,492 | $401,177 |
| Total Expenses | $1,710,140 | $1,761,444 | $1,814,287 | $1,868,716 | $1,924,777 | $1,982,521 | $2,041,996 | $2,103,256 | $2,166,354 |
| Avail for Debt Serv. | $4,367,059 | $4,498,070 | $4,633,013 | $4,772,003 | $4,915,163 | $5,062,618 | $5,214,496 | $5,370,931 | $5,532,059 |
| Bond Payments | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 |
| Coverage | 1.54 | 1.59 | 1.64 | 1.69 | 1.74 | 1.79 | 1.84 | 1.90 | 1.96 |
| Surplus | $1,539,621 | $1,670,632 | $1,805,575 | $1,944,565 | $2,087,725 | $2,235,180 | $2,387,058 | $2,543,493 | $2,704,621 |
| Less Maintenance Reserve | $253,354 | $260,955 | $268,783 | $276,847 | $285,152 | $293,707 | $302,518 | $311,593 | $320,941 |
| **Net to University** | $1,286,267 | $1,409,678 | $1,536,791 | $1,687,718 | $1,802,573 | $1,941,473 | $2,084,541 | $2,231,900 | $2,383,680 |

CONFIDENTIAL   MAR 000190

## STUDENT HOUSING REDEVELOPMENT MASTER PLAN PHASE I
### PROFORMA

| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | |
| New / Renovated Beds On line | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 | 1488 |
| New Project Rents | 7,551,777 | 7,778,330 | 8,011,880 | 8,252,030 | 8,499,591 | 8,754,579 | 9,017,216 | 9,287,733 | 9,566,365 |
| Misc Income | 377,589 | 388,916 | 400,584 | 412,602 | 424,980 | 437,729 | 450,861 | 464,387 | 478,318 |
| Total Revenue | 7,929,365 | 8,167,246 | 8,412,264 | 8,664,632 | 8,924,571 | 9,192,308 | 9,468,077 | 9,752,119 | 10,044,683 |
| **EXPENSES** | | | | | | | | | |
| Utilities | $826,424 | $851,217 | $876,753 | $903,056 | $930,147 | $958,052 | $986,793 | $1,016,397 | $1,046,889 |
| Maintenance | $495,854 | $510,730 | $526,052 | $541,833 | $558,088 | $574,831 | $592,076 | $609,838 | $628,133 |
| Management | $495,854 | $510,730 | $526,052 | $541,833 | $558,088 | $574,831 | $592,076 | $609,838 | $628,133 |
| Misc | $413,212 | $425,608 | $438,377 | $451,528 | $465,074 | $479,026 | $493,397 | $508,199 | $523,444 |
| Total Expenses | $2,231,344 | $2,298,285 | $2,367,233 | $2,438,250 | $2,511,398 | $2,586,740 | $2,664,342 | $2,744,272 | $2,826,600 |
| Avail for Debt Serv. | $5,698,021 | $5,868,962 | $6,045,031 | $6,226,381 | $6,413,173 | $6,605,568 | $6,803,735 | $7,007,847 | $7,218,083 |
| Bond Payments | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 |
| Coverage | 2.02 | 2.08 | 2.14 | 2.20 | 2.27 | 2.34 | 2.41 | 2.48 | 2.55 |
| Surplus | $2,870,583 | $3,041,524 | $3,217,593 | $3,398,943 | $3,585,735 | $3,778,130 | $3,976,297 | $4,180,409 | $4,390,645 |
| Less Maintenance Reserve | $330,570 | $340,487 | $350,701 | $361,222 | $372,059 | $383,221 | $394,717 | $406,559 | $418,756 |
| Net to University | $2,540,014 | $2,701,037 | $2,866,89 | $3,037,721 | $3,213,676 | $3,394,909 | $3,581,580 | $3,773,850 | $3,971,889 |

CONFIDENTIAL    MAR 000191

| | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|
| **REVENUES** | | | | |
| *New / Renovated Beds On line* | *1488* | *1488* | *1488* | *1488* |
| New Project Rents | 9,853,356 | 10,148,956 | 10,453,425 | 10,767,028 |
| Misc Income | 492,668 | 507,448 | 522,671 | 538,351 |
| Total Revenue | 10,346,023 | 10,656,404 | 10,976,096 | 11,305,379 |
| **EXPENSES** | | | | |
| Utilities | $1,078,296 | $1,110,645 | $1,143,964 | $1,178,283 |
| Maintenance | $646,977 | $666,387 | $686,378 | $706,970 |
| Management | $646,977 | $666,387 | $686,378 | $706,970 |
| Misc | $539,148 | $555,322 | $571,982 | $589,141 |
| Total Expenses | $2,911,398 | $2,998,740 | $3,088,702 | $3,181,363 |
| Avail for Debt Serv. | $7,434,625 | $7,657,664 | $7,887,394 | $8,124,016 |
| Bond Payments | $2,827,438 | $2,827,438 | $2,827,438 | $2,827,438 |
| **Coverage** | 2.63 | 2.71 | 2.79 | 2.87 |
| Surplus | $4,607,187 | $4,830,226 | $5,059,956 | $5,296,578 |
| Less Maintenance Reserve | $431,318 | $444,258 | $457,586 | $471,313 |
| **Net to University** | $4,175,869 | $4,385,968 | $4,602,370 | $4,825,264 |

CONFIDENTIAL     MAR 000192

# Resolution

On motion duly made and seconded at a regular/special Board of Trustees meeting of Alabama State University held on _____, 20___, the following Resolution was passed:

BE IT RESOLVED that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developer for the purpose of Designing, Building, Renovating, and Financing a proposed Student Housing Redevelopment Master Plan per the proposal submitted October 28, 2005.

It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.

APPROVED THIS _____ day of _____, 20___, by a vote of _____.

Ayes_____                                    Nays_____

By:_____

Title:_____

CONFIDENTIAL

MAR 000193



# EXHIBIT

# 6

## Alabama State University
## Renovations to Student Housing

## LETTER OF INTENT

Whereas Student Suites and Gil Berry & Associates, hereinafter referred to as the **Developer**, have selected Marous Brothers Construction, Inc., hereinafter referred to as the **Design/Builder**, to join their project team to provide due diligence, pre-construction, and design/build services for the proposed renovations to six existing student dormitory buildings located within the historical district on the campus of Alabama State University (ASU) in Montgomery, Alabama, hereinafter referred to as the **Project**, agree to the following terms and conditions as stated below:

1) The **Design/Builder** shall provide certain preconstruction services as necessary, including but not limited to field measurement, verification of existing conditions, preliminary design, design development and construction drawings with a corresponding written scope of work narrative sufficient to delineate the construction materials, methods and technologies input, hereinafter referred to as the **Scope of Design Services**, on behalf of and in the best interests of the development team and in conjunction with the addressing the stated programmatic goals and objectives of the Board of Trustees of ASU

2) The **Design/Builder** and the **Developer** agree to proceed on the basis of good faith, trust and understanding.

3) The **Developer** shall initiate the issuance of a resolution passed by the Alabama State University Board of Trustees that guarantees payment to the **Design/Builder** in the event that the project is abandoned for any reason, of an amount sufficient to cover the costs of all pre-construction services provided by the **Design/Builder** up to the date of the project's abandonment.

4) The **Design/Builder** shall perform pre-construction services and shall defer compensation from the **Developer** for these services until the project proceeds to construction with the **Design/Builder** (see Section 5 below).

5) During various stages of the pre-construction phase of the **Project**, the **Design/Builder** shall present to the Developer a guaranteed maximum price (GMP) for the hard construction cost for the **Project**. The GMP shall include the **Design/Builder's** fee, general conditions and a contingency amount that reflects the level of uncertainty due to concealed or unforeseeable conditions of the required renovation work, along with the value of the scope of work as detailed in a written proposal to be submitted to the **Developer** along with the GMP. The **Design/Builder** shall issue the GMP to coincide with the completion of their schematic



DEFENDANT'S
EXHIBIT

46. Goldman

MAR 000410

design work. If the **Developer** or Alabama State University elect to abandon the **Project** at that time for any reason, then the **Developer** and/or Alabama State University will be responsible for paying the **Design/Builder** only for pre-construction services rendered by the **Design/Builder** up to the time that the GMP has been issued. The total amount due to the **Design/Builder** in this event shall be capped to a maximum amount of $87,600.00 plus travel expenses, which shall cover the **Design/Builder's** direct and indirect labor costs as incurred during the performance of the pre-construction scope of services.

6) If, after receiving the **GMP**, the **Developer** elects to proceed with the **Project**, the **Design/Builder** shall continue to provide pre-construction services through the design development phase. During this time, the **Design/Builder** shall work with their related consultants to further refine the **GMP**. At the conclusion of the design development phase, the **Design/Builder** shall issue a revised **GMP** to the **Developer** that reflects the refinements made to the design during the design development phase. If the **Developer** or Alabama State University elect to abandon the **Project** at this time for any reason, then the **Developer** and/or Alabama State University shall promptly remit $115,800.00 plus travel expenses as payment-in-full for pre-construction services to the **Design/Builder**, and then the **Developer** and **Design/Builder** shall have no further mutual obligations for performance under the terms of this Letter of Intent for the **Project** at Alabama State University.

7) If the **Developer** elects to proceed with the project and proceed to the construction document phase, then the **Design/Builder** shall continue to provide pre-construction services in conjunction with the efforts of their related consultants. When the construction documents are sufficiently complete, the **Design/Builder** shall commence a formal hard bid period lasting four weeks in duration. At the end of this four-week period, the **Design/Builder** shall modify the **GMP** (if necessary) to establish the lump sum, fixed fee contract amount to be used as the basis for the construction contract to be entered into by the parties.

8) If the **Developer** or Alabama State University elect to abandon the **Project** after the lump sum, fixed-fee contract amount has been determined by the **Design/Builder** and prior to construction for any reason, or if the **Developer** elects to select another entity for the construction of the **Project**, then the **Developer** shall promptly remit payment of $248,000.00 plus travel expenses to the **Design/Builder** for pre-construction services rendered as payment-in-full. Additionally, the **Developer** in this instance will agree to indemnify and hold the **Design/Builder** harmless for any and all value engineering suggestions rendered by the **Design/Builder** and incorporated into the construction documents for the **Project**.

9) Both parties to this Letter of Intent agree to act in good faith and in the best interests of the **Project**.

MAR 000411

Agreed to on this day, November 18th, 2005


_____

Developer:              Dick Davis, Director of Development, Acquisitions
                        and Finance, Student Suites, Inc.



_____

Developer:              Gil Berry, President
                        Gil Berry & Associates



_____

Design/Builder:         Adelbert Marous Jr., President
                        Marous Brothers Construction, Inc.

MAR 000412

# EXHIBIT

# 7



OFFICE OF THE
VICE PRESIDENT FOR
ADMINISTRATIVE SERVICES

November 23, 2005

Mr. Dick Davis, Director
Development, Acquisition and Finance
Student Suites, Inc.
1132 Luttrell, Suite A
Blue Springs, MO 64015

**Subject: *Proposed Project at Alabama State University***

Dear Mr. Davis:

    Reference is being made to our recent discussions about a proposed Student Residence Project at Alabama State University. Per those discussions this will confirm the following:

a.    The ASU Board of Trustees Property Committee at its meeting on November 15, 2005, approved **in principle** for presentation to the full Board, a proposed resolution which reads in part as follows:

    " . . . that the Board of Trustees hereby authorizes the President of the University to engage Student Suites, Inc., and Gil Berry and Associates as developer for the purpose of developing a Student Housing Redevelopment Master Plan for designing, building, renovating and financing student housing on campus. It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.

b.    This office has agreed to meet with your party and key university personnel on November 29, 2005, on the campus of ASU to begin working out details of procedure.

    We look forward to the meeting on November 29th.

ALABAMA
STATE
UNIVERSITY
P.O. Box 271
MONTGOMERY,
ALABAMA
36101-0271
334 229 6994
www.alasu.edu

Sincerely,

Leon Frazier, Vice President
for Administrative Services

DEFENDANT'S
EXHIBIT

5-GOLDMAN

*Mr. Dick Davis*
*23 – November – 05*
*Page -2-*


lc

cc:    President Joe A. Lee
       Mr. Freddie Gallot, VP for Fiscal Affairs
       Dr. Charles N. Smith, VP for Student Affairs

MAR 000013

# EXHIBIT

# 8





January 24, 2006

Dr. Leon Frazier
Vice President Administrative Services
Alabama State University
915 South Jackson Street
Montgomery, AL 36101-0271

Dear Dr. Frazier:

Gil Berry and I are pleased to submit for your review our findings to date regarding certain issues related to the Student Housing Redevelopment Master Plan previously submitted.

We have discussed with Wyatt Haskell of Haskell Slaughter Attorney's at Law a development plan that would conform to the Alabama law regarding public bidding of state projects. Mr. Haskell is working with Fred Gray to determine the proper structure necessary to conform. I have attached a recent memo from Mr. Haskell outlining a possible structure.

After discussions with Mr. Gallot and Bill Blount of Blount Parrish we are proposing a financial plan that we feel would minimize the overall effect of the total project costs as it relates to the debt capacity and the excellent credit rating of the University.

We have worked with George K. Baum and Company on many privatized student housing financings over the past few years and greatly value their experience with creative structures for revenue based financing. We have asked George K. Baum and Company to submit a Plan of Finance for our proposal, which I have included for your review.

We would envision a team effort to provide the required $39,919,200 with George K. Baum and Company, Blount Parrish and others participating in the underwriting efforts. This financing plan should isolate the University from direct debt on the new housing portion of our proposal thus reducing the direct debt portion to approximately $25,000,000 rather than the entire $39,919,200.

Realizing that there are still items to be finalized, we feel that these issues can be resolved and we hope that the University and the Board are ready to proceed to allow us to raise funds based on the plan of finance, enter into a ground lease to begin construction of the new facility as well as the renovation of the proposed six existing buildings.

---

1132 Luttrell, Suite A • Blue Springs, MO 64015 • (816) 228-3040 • (800) 765-1011 • Fax (816) 228-4442



GBA 000019

CONFIDENTIAL





We feel that we can open the new facility during the fall semester of 2006 if the Board will allow us to proceed by the attached resolution at the upcoming February Board Meeting. With this opening of the new facility the renovation process can be expedited without creating a shortage of beds on campus.

Gil and I welcome your questions and stand ready to proceed at your direction.

Best Regards

Dick Davis
Director
Development, Acquisitions & Finance

Gil Berry
Construction Manager & Developer

GBA 000020
CONFIDENTIAL

# Resolution

On motion duly made and seconded at a regular/special Board of Trustees meeting of Alabama State University held on _____, 20___, the following Resolution was passed:

BE IT RESOLVED that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developer for the purpose of Designing, Building, Renovating, and Financing a proposed Student Housing Redevelopment Master Plan per the proposal submitted October 28, 2005.

It is mutually understood that if final agreement is not reached on more detailed design and financing structures that this Resolution will become void with no expense to Alabama State University.

APPROVED THIS _____ day of _____, 20___, by a vote of_____.

Ayes_____                          Nays_____

By:_____

Title:_____

  

*Gil Berry and Associates*

GBA 000021
CONFIDENTIAL

# EXHIBIT

# 9



*Alabama State University*

# BOARD OF TRUSTEES
## MINUTES

### May 5, 2006

LAM000408

DEFENDANT'S
EXHIBIT

9-BERRY

President Lee informed the Board that after a thorough examination of the Hardy Center, it was determined that it would be in the best interest of the University to raze the building and construct a new Student Union.

Trustee Wiggins moved, seconded by Trustee Parker, to approve the resolution submitted by the Administration declaring the official intent of the University to reimburse itself from Bond proceeds (not to exceed $41M) for capital expenditures funded from revenues or other sources. The motion passed with majority vote. Voting Aye – Trustees Parker, Wright, Dean, Wiggins, Crutcher, Crawley and Hodge; Voting Nay – Trustee Reed; Abstaining – Trustees Young and Figures.

After the motion, Trustee Reed expressed his concern about the University's desire to secure a $41M dollar Bond Issue. He stated that the University was already in to much debt and enrollment numbers were uncertain. He objected the demolishing of the Hardy Center and suggested that a second opinion about razing the center be obtained.

A brief presentation was given by Mr. Bill Blount and Mr. Rush Rice of Blount Parrish Investment Bankers about their long standing relationship with the University and their willingness to continue the partnership by assisting with securing the necessary funds for campus enhancement projects. The following motion was placed on the floor:

Trustee Crutcher moved, seconded by Trustee Crawley, to authorize the University to move forward with engaging Blount Parrish Investment Bankers to execute a Bond Issue not to exceed $41 million for the purpose of capital expenditure projects on campus. The University is to issue a RFP for Bond Counsel on future investment matters. The motion carried with majority vote. Voting Aye – Trustees Dean, Reed, Wiggins, Crutcher, Crawley, Hodge, Parker and Wright; Abstaining – Trustees Young and Figures.

Trustee Wright recognized Mr. Dick Davis and Mr. Gil Berry of Student Suites to give a briefing of the proposal for dormitory renovations and construction of a new suite style residence hall. After their presentation, a motion was placed on the floor.

Trustee Crutcher moved, seconded by Trustee Parker, to accept the recommendation of the Administration to engage Student Suites as the contractor to renovate six University residence Halls, and build one new suite style residence hall at Alabama State University. The motion carried with majority vote. Voting Aye – Trustees Parker, Wiggins, Crutcher, Crawley, Wright, Hodge, Dean; Voting Nay – Trustees Reed and Figures; Abstaining – Trustee Young

LAM000413

# Resolution

**BE IT RESOLVED:** that the Board of Trustees designates Student Suites, Inc. and Gil Berry and Associates as its developers for the purpose of presenting a plan to design, build, renovate, and finance a proposed Student Housing Redevelopment Master Plan per the proposal presented on October 28, 2005 and revised November 9, 2005. All of the services, which will be performed by said developers, will be without cost to the University.

It is mutually understood that the Board will incur no financial obligation by adoption of this Resolution but will review the Proposal when finally submitted.

APPROVED THIS _____ day of _____, 2006, by a vote of_____.

Ayes_____                                           Nays_____

By:_____

Title:_____

      

# EXHIBIT

# 10

**From:** Arne Goldman
**To:** gilberry@verizon.net
**Date:** Monday, May 15, 2006 3:27:15 PM
**Subject:** ASU Invoice

Gil...please see attached per your request...Arne

Arne F. Goldman, AIA, NCARB
Director of Business Development
Marous Brothers Construction, Inc.
440.951.3904 phone
440.942.7884 fax
216.570.7584 mobile

### Confidentiality Notice

This electronic message is intended to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication in error, please notify the sender immediately and permanently delete the original message from your e-mail system.



DEFENDANT'S
EXHIBIT

*17-GOLDMAN*

CONFIDENTIAL

GBA 000535

**INVOICE**



## Marous Brothers
### CONSTRUCTION

1702 Joseph Lloyd Parkway · Willoughby, OH 44094
440.951.3904 · fax 440.951.3781
www.marousbrothers.com

INVOICE NO.: **7705**

DATE: May 15, 2006

CUSTOMER NO.: 11035

INVOICE TO: Student Suites
Gil Berry & Associates
c/o Gil Berry, President
721 Acorn Lane
Jeferson Hills, Pa 15025

| PROJECT | Alabama State University Student Dormitory Renovations | JOB NO. | 06013 |
|---|---|---|---|

| YOUR ORDER NO. | SPECIAL INSTRUCTIONS | TERMS: Net 15 Days |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| For work performed to date at Montgomery, Alabama . Alabama State University Student Dormitory Renovations. | |
| For Part 1 Design Build & Preconstruction Services Rendered to Date: | $ 297,500.00 |
| **Total Amount Due** | $ 297,500.00 |

ORIGINAL

CONFIDENTIAL

GBA 000536

# EXHIBIT

# 11



May 23, 2006

Freddie Gallot, Jr.
Vice President of Fiscal Affairs
C/o Alabama State University
915 South Jackson Street
Montgomery, AL, 36101

**Re: Alabama State University- Student Dormitory Renovations**

**INVOICE FOR PART 1 SUPERVISION OF DESIGN/BUILD
PRECONSTRUCTION SERVICES**

| | |
|---|---|
| a) Value engineering supervision | 24,810.00 |
| b) Overview of plans and details | 20,215.00 |
| c) Cost estimating | 9,025.00 |
| d) Presentation materials | 1,305.00 |
| e) Travel expenses | 21,374.49 |

TOTAL AMOUNT NOW DUE          $ 76,729.49

Please remit payment to Gil Berry for the amount now due for
preconstruction services

Thank you,

Gil Berry and Associates, Inc.



CONFIDENTIAL

GBA 000189

# EXHIBIT

# 12

STATE OF ALABAMA

LICENSE NO: 41183

TYPE: ORIGINAL

BID LIMIT: U

AMOUNT: UNLIMITED



# State Licensing Board for General Contractors

## THIS IS TO CERTIFY THAT

MARCUS BROTHERS CONSTRUCTION

WILLOUGHBY, OH 44094

is hereby licensed a General Contractor in the State of Alabama and is authorized to

perform the following type(s) of work:

BC, BUILDING CONSTRUCTION

until    April 30, 2007    when this Certificate expires.

Witness our hands and seal of the Board, dated Montgomery, Ala.,

16 th    day of AUGUST

SECRETARY-TREASURER

CHAIRMAN

021318

*Released 7/24/06*
*KW*

## Prime Contractor

## General Contractors Board Review
### New

License Number:

Payment Via: Cashiers Chk

License Date:

Check No: 5051177094

Application Date:     6/07/2006     License Specialist:  Kristi

Name:               MAROUS BROTHERS CONSTRUCTION

Address:            1702 JOSEPH LLOYD PARKWAY

City St Zip:         WILLOUGHBY, OH  44094

Classification Requested: BC:  BUILDING CONSTRUCTION
                          Building Structures, Excavation & Foundations
                          1981 OH Corp

Staff Review:

Board Approved:

| | | | | |
|---|---|---|---|---|
| Net Worth | $10,702,057.00 | | Line Credit: | $0.00 |
| Working Capital: | $12,764,117.00 | | Personal Statement: | ☐ |
| Bid Limit: | U | | | |

5. What is the experience of the principal individuals of your organization?

| NAME | POSITION | YEARS EXPERIENCE | AGE | MAGNITUDE & TYPE WORK | CAPACITY |
|---|---|---|---|---|---|
| delbert P. Marous | President | 30 | 45 | General Construction | |
| cott P. Marous | Vice President | 30 | 49 | General Construction | |
| enneth J. Marous | Secretary / Treasurer | 30 | 46 | Site Excavating and Concrete | |

a. List major projects your organization completed in the last 3 years.  If this is a new company indicate ( U )
experience gained under other than your company.  Give name of contractor (rather than owner) when new
company. Document only the experience for the classification(s) you marked on your application. List only
the work you did and the amount you were paid. (Example: Building Construction indicates new construction
(ground up) as opposed to Additions or Remodeling)

| DESCRIPTION OF WORK YOU PERFORMED | LOCATION | YEAR | OWNER/CONTRACTOR NAME | AMOUNT YOU WERE PAID |
|---|---|---|---|---|
| S Federal Courthouse - Carpentry | Cleveland, Ohio | 2005 | General Services Administration | $  8,606,035 |
| uay 55 - General Contractor | Cleveland, Ohio | 2005 | Quay 55 Ltd. | 18,708,933 |
| rbor Park Phase II - Gen Contractor | Cleveland, Ohio | 2005 | Longwood Phase One Assoc. | 25,695,710 |
| ainbow Terrace Apartments - Gen Contractor | Cleveland, Ohio | 2005 | Vesta Cleveland LLC | 30,487,489 |
| aMalfa Centre - General Contractor | Mentor, Ohio | 2005 | Michael LaMalfa Jr. | 2,585,194 |
| ries & Schele - General Contractor | Cleveland, Ohio | 2005 | New Village Corporation | 7,205,139 |
| est Tech - Construction Manager | Cleveland, Ohio | 2005 | West Tech LP | 2,402,006 |
| idtown Business Park - Gen Contractor | Cleveland, Ohio | 2005 | Market Square CUP | 2,064,955 |
| an Roy Building - General Contractor | Cleveland, Ohio | 2005 | 2900 Detroit Ltd. | 2,052,257 |
| almart Middlefield - Site Contractor | Middlefield, Ohio | 2005 | Perry Construction Group | 2,005,758 |
| ongwood Apartments - General Contractor | Cleveland, Ohio | 2004 | Longwood Phase One Assoc. | 26,484,583 |
| entral Cadillac - General Contractor | Cleveland, Ohio | 2004 | Central Cadillac | 2,950,792 |

b. List Major projects you currently have under contract.

| ITY/ OUNTY | OWNER OF CONTRACT ADDRESS | DESCRIPTION OF WORK | % COMPLETE | % TIME CONSUMED | AMOUNT OF YOUR CONTRACT |
|---|---|---|---|---|---|
| ittsburgh / Allegheny (PA) | The Parchill Group | General Contractor | | | $  47,905,613 |
| leveland / Cuyahoga (OH) | Cleveland Housing Network | General Contractor | | | 5,041,795 |
| epper Pike / Cuyahoga (OH) | KM Yarus, Inc. | General Contractor | | | 13,891,460 |
| leveland / Cuyahoga (OH) | Arbor Park Phase III Assoc. | General Contractor | | | 18,117,148 |
| leveland / Cuyahoga (OH) | Case Western Reserve University | Interiors Finishes Contractor | | | 7,764,007 |
| leveland / Cuyahoga (OH) | STL Housing Inc. | Site Contractor | | | 1,881,406 |
| leveland / Cuyahoga (OH) | Cleveland School Board | Site Contractor | | | 1,363,278 |
| leveland / Cuyahoga (OH) | Emerald Alliance LP | General Contractor | | | 5,528,530 |
| leveland / Cuyahoga (OH) | Detroit Shoreway Community Deve. | General Contractor | | | 5,951,463 |
| leveland / Cuyahoga (OH) | The Coral Company | General Contractor | | | 5,842,632 |
| hicago / Cook (IL) | ABLA Homes LLC | General Contractor | | | 3,864,373 |
| leveland / Cuyahoga (OH) | City of Cleveland | Site Contractor | | | 3,699,717 |
| leveland / Cuyahoga (OH) | Care Alliance LP | General Contractor | | | 1,297,515 |
| orth Ridgeville / Lorain (OH) | Pulte Homes Inc. | General Contractor | | | 4,095,433 |
| niversity Hts. / Cuyahoga (OH | Bellefaire Jewish Children's Burea | General Contractor | | | 2,703,110 |
| leveland / Cuyahoga (OH) | Cleveland Clinic Foundation | Interior Finishes Contractor | | | 18,500,000 |

JN/08/2006/THU 07:43 AM    GEN CONT BD              FAX No. 3343955336              P. 001/001

# STATE OF ALABAMA
# LICENSING BOARD FOR GENERAL CONTRACTORS

DENK AND ASSOCIATES, INC

MIKE DENK

503 EAST 200TH STREET

EUCLID, OH 44119

THE FOLLOWING CONTRACTOR HAS SUBMITTED AN
APPLICATION TO BE LICENSED AS A *PRIME CONTRACTOR*
IN THE STATE OF ALABAMA. THE INFORMATION REQUESTED
IS STRICTLY OF A CONFIDENTIAL NATURE AND IS INTENDED
ONLY FOR USE OF OFFICIALS OF THE LICENSING BOARD.

MAROUS BROTHERS CONSTRUCTION
NAME OF APPLICANT

**DUE BACK**    07. 12. 2006

1702 JOSEPH LLOYD PARKWAY  WILLOUGHBY, OH 44094
ADDRESS              CITY/STATE        ZIP

PLEASE COMPLETE THE FOLLOWING WORK VERIFICATION BASED UPON YOUR PERSONAL KNOWLEDGE (COMPLETED
CONTRACTS UNDER YOUR PERSONAL SUPERVISION  OR FOR YOU PERSONALLY).

| OWNER FOR WHOM WORK WAS PERFORMED | AMOUNT OF CONTRACT | WORK PERFORMED (TYPE CONSTRUCTION) |
|---|---|---|
| 1. LANDMARK (OTIS TERMINAL) | $25,000,000. (EST.) | ADAPTIVE REUSE & RENOVATION |
| 2. COFFIN (QUAYES) | $20,000,000. (EST.) | " |
| 3. LR DEVELOPPERS (HYATT ARCADE) | $50,000,000. (EST.) | " |
| 4. BURNSIDE (BINGHAM) | $35,000,000. (EST.) | " |

WAS PERFORMANCE OF THE ABOVE REFERENCED CONSTRUCTION SATISFACTORY?
YES ✓   NO_____ (COMMENT)_____
IN ACCORDANCE WITH TERMS OF CONTRACT?    YES ✓   NO_____

INSOFAR AS YOU KNOW, HAS THE CONTRACTOR EVER FAILED TO QUALIFY AS A RESPONSIBLE BIDDER?  YES____
____ NO ✓

WHAT IS YOUR BUSINESS OPINION OF THE ABOVE ?  GOOD ✓  FAIR_____  POOR_____
PLEASE PROVIDE PARTICULARS OF ANY UNFAVORABLE CIRCUMSTANCES_____

NOTE: THE FOREGOING ARE MY BEST OPINION, AND GIVEN AS SUCH, SOLEY AS A MATTER OF COURTESY AND
FOR WHICH NO RESPONSIBILITY, IN ANY WAY, IS ATTACHED TO THE WRITER, THIS FIRM OR ANY OF ITS
OFFICERS

Michael T. Denk                PRINCIPAL                6/9/06
SIGNATURE                      TITLE                    DATE

Joseph C. Rogers Jr.
*Executive Secretary*
*State Licensing Board For General Contractors*

PLEASE RETURN FORM TO:
Jackie Zeigler  Ext.243
2525 Fairlane Drive
MONTGOMERY, ALABAMA 36116
(334) 272-5030  FAX (334) 395-5336

RE: ARCH

RECEIVED
JUL 13 2006

JUL-18-2006  16:10                                                    P.01/01

# STATE OF ALABAMA
# LICENSING BOARD FOR GENERAL CONTRACTORS

ARCHITECTURE

K DODDS

EUCLID AVENUE STE 100

ELAND, OH 44115

16-881-6713

THE FOLLOWING CONTRACTOR HAS SUBMITTED AN
APPLICATION TO BE LICENSED AS A *PRIME CONTRACTOR*
IN THE STATE OF ALABAMA. THE INFORMATION REQUESTED
IS STRICTLY OF A CONFIDENTIAL NATURE AND IS INTENDED
ONLY FOR USE OF OFFICIALS OF THE LICENSING BOARD.

OUB BROTHERS CONSTRUCTION
2 JOSEPH LLOYD PARKWAY
LOUGHBY, OH 44094

*2nd Request*
**DUE BACK**  07.12.2006

PLEASE COMPLETE THE FOLLOWING WORK VERIFICATION BASED UPON YOUR PERSONAL KNOWLEDGE (COMPLETED
CONTRACTS UNDER YOUR PERSONAL SUPERVISION OR FOR YOU PERSONALLY).

| NER FOR WHOM WORK WAS PERFORMED | AMOUNT OF CONTRACT | WORK PERFORMED (TYPE CONSTRUCTION) |
|---|---|---|
| e Finch Group | 89,000,000 | General Construction 628 apartments |
| hait Skyway Dev. Corp | 4,500,000 | General Renovation apartment |
| ley 55 Nicholson | 17,800,000 | General Cons. & Ren. 140 apartments |
| uthal Cadillac | 3,800,000 | Gen. Renovation Auto Dealership |

PERFORMANCE OF THE ABOVE REFERENCED CONSTRUCTION SATISFACTORY?
____ NO _____ (COMMENT)
CCORDANCE WITH TERMS OF CONTRACT?    YES __✓__    NO _____

FAR AS YOU KNOW, HAS THE CONTRACTOR EVER FAILED TO QUALIFY AS A RESPONSIBLE BIDDER?    YES ____
____    NO __✓__

AT IS YOUR BUSINESS OPINION OF THE ABOVE?    GOOD __✓__    FAIR _____    POOR _____
ASE PROVIDE PARTICULARS OF ANY UNFAVORABLE CIRCUMSTANCES _____

E: THE FOREGOING ARE MY BEST OPINION, AND GIVEN AS SUCH, SOLEY AS A MATTER OF COURTESY AND
WHICH NO RESPONSIBILITY, IN ANY WAY, IS ATTACHED TO THE WRITER, THIS FIRM OR ANY OF ITS
CERN

_____                 Secretary / Treasurer          6/18/06
SIGNATURE                            TITLE                        DATE

oh C. Rogers Jr.
ative Secretary
Licensing Board For General Contractors

PLEASE RETURN FORM TO:
Jackie Zeigler  Ext.243
2525 Fairlane Drive
MONTGOMERY, ALABAMA 36116
(334) 272-5030  FAX (334) 395-5336

ARCH

J .. 13. 2006  4:15PM    FIRSTMERIT BANK MENTOR                    NO. 6529    P. 1



### State Licensing Board For General Contractors
2525 Fairlane Drive ▪ Montgomery, Alabama 36116
Phone: 334-272-5030 Fax: 334-395-5336

### BANK and TRUST COMPANIES

FIRST MERIT

STEVE BALDINI, VICE PRESIDENT

7800 REYNOLDS ROAD                                    **DUE BACK** 07, 18, 2006

MENTOR, OH 44060

**Inquiry Relating To:** MARCUS BROTHERS CONSTRUCTION
**Address:**              1702 JOSEPH LLOYD PARKWAY
                          WILLOUGHBY, OH 44094
**City, State Zip:**

Dear Sir(s):

With reference to the granting of License for General Contractors in Alabama.

Previous to granting of license certificate, we require that a Questionnaire containing certain information relative to finances, equipment, etc., be filed by filed by the prospective applicant, in the office of the State Licensing Board For General Contractors, Montgomery, AL.

The applicant filing the Questionnaire understands the statements made will be verified. The verification pertaining to the individual, partnership or corporation whose identity appears at the top of this sheet, is now in progress. You can greatly assist both the applicant to whom this letter refers, and the Board, by furnishing the information requested.

Please answer questions fully and return this sheet to us at your earliest convenience.

### (NOTE - WE SUGGEST THAT YOU READ ALL QUESTIONS CAREFULLY BEFORE STARTING TO ANSWER)

How long have you known the above _____ *20 years*

What, if any, has Been your general experience with above *Valued customer.*
*handles all bank dealings in a satisfactory manner*

When did above open an account with you? *November 1995*

JUL. 13. 2006  4:15PM    FIRSTMERIT BANK MENTOR                NO. 6529    P. 2

Give bank balance for each month covering Six-Month Period next preceding the last day of the month nearest to date of this letter.  Bank balance of :

| | | |
|---|---|---|
| (Date)12-31-05 | $ | mod 7 figures |
| (Date)1-31-06 | $ | low 7 figures |
| (Date)  2-28-06 | $ | low 7 figures |
| (Date)  3-31-06 | $ | low 7 figures |
| (Date)  4-30-06 | $ | low 7 figures |
| (Date)  5-31-06 | $ | high 7 figures |

Average bank balance for six month period _____  $ mod 7 figures

Notes due bank _____

To bank for certified checks ___ 0 ___ To bank regular _____

Please state largest recent credit extended above without collateral or endorsement  mid 6 figures

Has above met all obligations or agreed?  yes

Insofar as you know, has above completed his or their construction contracts promptly and in accordance with the terms of contracts?  yes

Do you know of any pending claims or suits which, if successfully prosecuted, would materially affect the credit of above?  no  If so, give particulars _____

Do you know of any unfavorable circumstances regarding above?  no  If so, give particulars _____

What is your business opinion of above? Successful business ; ability to overcome many challenges

Remarks: _____

Note - The foregoing answers are my (our) best opinion, and given as much, solely as a matter of courtesy and for which no responsibility, in any way, is attached to the writer, this firm or any of its officers.

| _____ | VICE PRESIDENT | 07-12-06 |
|---|---|---|
| Signature | Title | Date |

This information requested is strictly of a confidential nature and is intended only for use of Officials of the State Licensing Board For General Contractors.

Joseph C. Rogers Jr.
Executive Secretary
State Licensing Board For General Contractors

PLEASE RETURN FORM TO:
Jackie Zeigler  Ext. 243
2525 Fairlane Drive
Montgomery, Alabama 36116
(334) 272-5030  FAX (334) 395-5336

FROM :                    FAX NO. :4122794112          Tun. 29 2006 02:41PM  P2



**State Licensing Board For General Contractors**
2525 Fairlane Drive • Montgomery, Alabama  36116
Phone: 334-272-5030 Fax 334-395-5336

### FURNISHER OF MATERIAL

WHOLE BUILDERS SUPPLY

GREG BRONSON

1261 D INDUSTRIAL PARKWAY                    **DUE BACK**    07, 18, 2006

BRUNSWICK, OH 44121

**Inquiry Relating To:**    MAROUS BROTHERS CONSTRUCTION
                            1702 JOSEPH LLOYD PARKWAY
**Address:**                WILLOUGHBY, OH 44094

**City, State, Zip**

**Dear Sir(s):**

*With reference to the granting of License for General Contractors in Alabama.*

Previous to granting of license certificate, we require that a Questionnaire containing certain information relative to finances, equipment, etc., be filed by the prospective applicant, in the office of the State Licensing Board For General Contractors, Montgomery, Al.

The applicant filing the Questionnaire understands the statements made will be verified.  The verification pertaining to the individual, partnership or corporation whose identity appears at the top of this sheet, is now in progress.  You can greatly assist both the applicant to whom this letter refers, and the Board, by furnishing the information requested.

Please answer questions fully and return this sheet to us at your earliest convenience.

**(NOTE - WE SUGGEST THAT YOU READ ALL QUESTIONS CAREFULLY BEFORE STARTING TO ANSWER)**

Name of Individual, Firm or Company  *Wholesale Builders Supply Co. Inc. 200 1st St.*

Location  *Carnegie, Pa 15106*                    How long have you known the above

*Since inception as a Customer on    7-26-00.*

What if any has been your general experience with the above  *We are a Bldg Material*

*Supplier For Marous, a very creditworthy customer.*

Has the above purchased road building material from you during the past three years  *Not Road Bldg Material*

If so, kind of material  *Plenty of Bldg Materials*

*But   Not specifically designated For Roads.*

F JM :                                FAX NO. :4122794112                    'un. 29 2006 02:42PM  P3

Approximate amount of business  $500,000  per Year

Where, to the best of your knowledge ; was material used? Throughout  Cleveland Oh  area

How long  have you sold material to above?  7-26-00

Has line of credit been established?  High  Credit  was  $400,000

What is the largest recent credit you have extended to above?  400,000

A. Unsecured ___✓___                              B. Secured ___

How much does the above owe you on open account?  405 435

How much, if any, is overdue?  $85,000  (only  is  Days  or  so)

Have you ever limited credit to above?  No.

Has above always met purchase obligations promptly or in accordance with terms of sale?  Yes

If not give particulars ___

Do you know of any pending claims or suits which, if successfully prosecuted, would materially affect the credit of above?  No.

If so, please give particulars ___

What amount of credit would you extend with furnisher's lien released?  Over  $500,000

Do you know of any unfavorable circumstances regarding above?  No.

If so, please give particulars ___

What is your business opinion of above?  Very  large  Volume  Contractor  whose  creditworthiness  is  excellent  For  a  Company  doing  this  Volume.

Remarks:  Very  good  solid  large  Contractor.  Any  past  Dues  are  Negligible,  very  brief,  and  with  good  Cause.  Avg.  Days  To  Pay = 40  From  Invoice.

Note - The foregoing answers are my (our) best opinion, and given as much, soley as a matter of courtesy and for which no responsibility, in any way, is attached to the writer, this firm or any of its officers.

_Josh L. Smith_                  _Credit Mgr._                  6-29-06
Signature                        Title                          Date

This information requested is strictly  of a confidential nature and is intended only for use of Officials of the State Licensing Board For General Contractor

Joseph C. Rogers Jr.                      PLEASE RETURN FORM TO:
Executive Secretary                       Jackie Zeigler  Ext.243
State  Licensing Board For General Contractors    2525 Fairlane Drive
                                          Montgomery, Alabama  36116
                                          (334) 272-5830  FAX (334) 395-5336

2525 Fairlane Drive
Montgomery, AL 36116
334/272-5030 phone
334/395-5336 fax
www.genconbd.state.al.us

**Alabama Licensing
Board for General
Contractors**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Contractors  *Marous Brothers  Deborah Vender* | **FROM:** | Kristi Whynott, ext. 236 |
| **Fax:** | See attached  *440-942-7884* | **# pages** | 2, including cover |
| **Ph:** | | **Date:** | *8/17/06* |
| **RE:** | Your Contractors License  *# 41183* | **cc:** | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

## Congratulations!

*Kristi*

Kristi Whynott,

License Specialist

Extension 236

STATE OF ALABAMA

LICENSE NO. 41183
TYPE: ORIGINAL

BID LIMIT:
AMOUNT: UNLIMITED

### State Licensing Board for General Contractors



## THIS IS TO CERTIFY THAT

MAROUS BROTHERS CONSTRUCTION

WILLOUGHBY, OH 44094

is hereby licensed a General Contractor in the State of Alabama and is authorized to

perform the following type(s) of work:

BC: BUILDING CONSTRUCTION

until  April 30, 2007    when this Certificate expires.

Witness our hands and seal of the Board, dated Montgomery, Ala.,

16 th  day of AUGUST

SECRETARY-TREASURER



CHAIRMAN

021318

## TRANSACTION REPORT

P.01/01

AUG/17/2006/THU 10:50 AM

AX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 001 | AUG/17 | 10:48AM | 14409427884 | 0:01:37 | 2 | OK | SG3 | 1808 |

2525 Fairlane Drive
Montgomery, AL 36116
334/272-5030 phone
334/395-5336 fax
www.genconbd.state.al.us

**Alabama Licensing Board for General Contractors**

# Fax

*Marous Brothers*

| To: | Contractors *Deborah Vender* | FROM: | Kristi Whynott, ext. 236 |
|-----|-----|-----|-----|
| Fax: | See attached *440-942-7884* | # pages | 2, including cover |
| Ph: | | Date: | 8 / 17 / 06 |
| RE: | Your Contractors License *# 41183* | cc: | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

## Congratulations!

*Kristi*

Kristi Whynott,

License Specialist

Extension 236

**WAYNE GORDON**
Chairman
BIRMINGHAM

**FOY TATUM**
Vice Chairman
MONTGOMERY

**KEITH ANDREWS**
Secretary/Treasurer
TUSCALOOSA

**CHIP GRIZZLE**
Member
BIRMINGHAM

**ALEX WHALEY, SR.**
Member
TROY



# ALABAMA LICENSING BOARD FOR GENERAL CONTRACTORS

**(www.genconbd.state.al.us)**

**JOSEPH C. ROGERS JR**
**EXECUTIVE SECRETARY**

2525 FAIRLANE DRIVE
MONTGOMERY, ALABAMA 36116

TELEPHONE NO. 334-272-5030
FAX NO. 334-395-5336

## MEMORANDUM

TO:     MAROUS BROTHERS CONSTRUCTION
        1702 JOSEPH LLOYD PARKWAY
        WILLOUGHBY, OH 44094
        FAX: 440-942-7884

FROM:   KRISTI WHYNOTT
        LICENSING SPECIALIST  EXT 236

DATE:   ___07/18/2006_____

### RE:  ADDITIONAL INFORMATION REQUIREDFOR BOARD REVIEW

The General Contractors Licensing Board will meet in Montgomery on August 16th, 2006. Each application that meets the board's 30 day on file requirement may be reviewed if all information is obtained. To comply with Alabama law, the meeting agenda must be released to the public two weeks prior to the board meeting. Additional information is needed in order to complete your file and place it on the agenda for the August 16th Board Meeting.

Please note that all four questionnaires sent to references listed on your application must be **completed** and **returned** to our office by August 8th, 2006 before your application is eligible to be reviewed at this meeting. References that have not yet replied are listed below. You **must** also have successfully completed the required examination by the August 8th deadline.

**(Marked items not received):**
☐ ARCHITECT (and/or) ENGINEER
☐ BANK
☐ MATERIAL SUPPLIER
☐ GENERAL CONTRACTOR
☐ EXAMINATION  call 1-800-733-9267 PSI - WWW.PSIEXAMS.COM for scheduling
                                              WWW.NASCLA.ORG for study guide
☑ FINANCIAL STATEMENT BOOKLET
☒ CERTIFICATE OF EXISTENCE – AL SECRETARY OF STATE  334-242-5324 WWW.SOS.STATE.AL.US
   CURRENT CERTIFICATION - ☐ ELECTRICAL ☐ HVAC ☐ PLUMBERS/GAS FITTERS

**Additional Information Required**  THE ABOVE CERTIFICATE MUST BE FROM THE STATE OF AL,
**NOT OHIO**

**\*\*Please contact references submitted on your application and ask them to return the questionnaires in a timely manner.\*\***

# TRANSACTION REPORT
## JUL/18/2006/TUE 03:52 PM

AX(TX)

| # | DATE | START T. | RECEIVER | CON.TIME | PAGE | TYPE/NOTE | FILE |
|---|------|----------|----------|----------|------|-----------|------|
| 001 | JUL/18 | 03:51PM | 14409427884 | 0:00:23 | 1 | OK | SG3 | 0244 |

**WAYNE GORDON**
*Chairman*
BIRMINGHAM

**FOY TATUM**
*Vice Chairman*
MONTGOMERY

**KEITH ANDREWS**
*Secretary/Treasurer*
TUSCALOOSA

**CHIP GRIZZLE**
*Member*
BIRMINGHAM

**ALEX WHALEY, SR.**
*Member*
TROY



# ALABAMA LICENSING BOARD FOR GENERAL CONTRACTORS
(www.gencobd.state.al.us)

**JOSEPH C. ROGERS, JR**
**EXECUTIVE SECRETARY**

2525 FAIRLANE DRIVE
MONTGOMERY, ALABAMA 36116

TELEPHONE NO. 334-272-5030
FAX NO. 334-395-5336

## MEMORANDUM

TO:     MAROUS BROTHERS CONSTRUCTION
        1702 JOSEPH LLOYD PARKWAY
        WILLOUGHBY, OH 44094
        FAX: 440-942-7884

FROM:   KRISTI WHYNOTT
        LICENSING SPECIALIST  EXT 236

DATE:   ___07/18/2006_____

### RE: ADDITIONAL INFORMATION REQUIRED FOR BOARD REVIEW

The General Contractors Licensing Board will meet in Montgomery on August 16th, 2006. Each application that meets the board's 30 day on file requirement may be reviewed if all information is obtained. To comply with Alabama law, the meeting agenda must be released to the public two weeks prior to the board meeting. Additional information is needed in order to complete your file and place it on the agenda for the August 16th Board Meeting.

Please note that all four questionnaires sent to references listed on your application must be completed and returned to our office by August 8th, 2006 before your application is eligible to be reviewed at this meeting. References that have not yet replied are listed below. You must also have successfully completed the required examination by the August 8th deadline.

(Marked items not received):
- [ ] ARCHITECT (and/or) ENGINEER
- [ ] BANK
- [ ] MATERIAL SUPPLIER
- [ ] GENERAL CONTRACTOR
- [ ] EXAMINATION   call 1-800-733-9267 PSI - WWW.PSIEXAMS.COM for scheduling
WWW.NASCLA.ORG for study guide
- [ ] FINANCIAL STATEMENT BOOKLET
- [x] CERTIFICATE OF EXISTENCE – AL SECRETARY OF STATE 334-242-5324 WWW.SOS.STATE.AL.US
CURRENT CERTIFICATION - [ ] ELECTRICAL  [ ] HVAC  [ ] PLUMBERS/GAS FITTERS



## APPLICATION FOR PRIME TO PRACTICE GENERAL CONTRACTING

NOTE: ALABAMA LAW DOES NOT ALLOW FOR THE REFUND OF APPLICATION FEES (1986 Legislative Amendment; Section 34-8-2(b);

*Application Fees are for Administration and Enforcement)*
Application Forms may be downloaded @ GENCONBD.STATE.AL.US

2525 FAIRLANE DRIVE
NTGOMERY, ALABAMA 36116

PHONE (334) 272-5030
FAX (334) 395-5336

TO THE STATE LICENSING BOARD FOR GENERAL CONTRACTORS: Application is hereby made for license to
gage in the practice of GENERAL CONTRACTING in Alabama, under the provisions of Title 34, Chapter 8, Code of Alabama,
75, and the *Rules and Regulations* adopted and promulgated by the State Licensing Board for General Contractors under authority
ted in it by the said act. This application is accompanied by a Certified Check, Cashier's Check or Money Order for $300 dollars.
/able to the order of the State Licensing Board for General Contractors, the application fee as provided for by the Act. I understand
t failure to fully answer all of the following questions and/or to furnish the required supporting papers, completely executed, will be
ficient grounds for rejecting this application. I further understand that submission of this application fee provides me one year
·m date of receipt by Board) to meet the above requirements.

The Undersigned hereby represent(s) that the following statements and answers to interrogatories are true to the best of his
·wledge, information and belief:

LE PROPRIETORSHIP: _____
(owner's signature)

RTNERSHIP: _____        MEMBERS: _____ (company name)
(name of firm)                                                (signature)   (signature)

RPORATION: Marcus Brothers Construction    BY: _____
(corporate name)                                   (President's signature)

·plicant's Trade Name Marcus Brothers Construction        Phone (440) 951-3904    Fax (440) 942-7884
·eet Address 1702 Joseph Lloyd Parkway        City Willoughby    State OH Zip 44094

E BOARD SHALL CLASSIFY CONTRACTORS ACCORDING TO THE TYPE OR TYPES OF CONTRACTS ON
HICH THEY MAY PERFORM , WITHIN MAXIMUM BID LIMITS AND BASED UPON DOCUMENTED WORK
PERIENCE (see page 13 *Confidential Financial Statement, Work Experience & Equipment Booklet*) Classification of licenses
st be requested within the four MAJOR CLASSIFICATIONS of Building Construction, Highways & Streets, Municipal &
lity and Heavy & Railroad. Applicants must have a minimum of three projects completed for each
B-CLASSIFICATION listed in order to qualify for that Major Classification. Applicants not qualifying for a Major Classification
uld request specific sub-classifications and/or Specialty Classifications (below) for which their work experience qualify.

ILDING CONSTRUCTION: Construction of commercial or industrial *building structures* intended for use for shelter, protection,
·fort or convenience; *Excavation and Foundations* for building construction; and *work incidental to Building Construction.*
·lding Structures _____ /Excavation & Foundations ____ /*work incidental to Building Construction*

GHWAYS & STREETS: Construction of *Roads, Streets, Alleys, Sidewalks, Curb & Gutter, Guardrails, Fences, Parkways, Parking
·as, Runways, Bridges, Grading, Drainage, Landscaping, and all work incidental to Highway and Street Construction*
_____ / _____ / _____

NICIPAL & UTILITY: *Clearing, grubbing, grading, paving, curbs, gutters, walks, driveways, swimming pools, sewer projects, water
·ects, gas projects, electric projects, telephone projects, and all work incidental to Municipal and Utility Construction*
_____ / _____ / _____

·AVY & RAILROAD: Construction of *Railroads, Bridges, Foundations, Pile Driving, Piers, Abutments, Retaining Walls, Viaducts,
·nels, Subways, Drainage Projects, Aqueducts, Irrigation Projects, Flood Control Projects, Water Power Development, Hydro-Electric
·elopment, Transmission Lines, Pipe Lines, Locks, Dams, Dikes, Levees, Revetments, Channels, Breakwaters, Docks, Harbors, Industrial
·ects, Excavation, Clearing, Grubbing, and all work incidental Heavy and Railroad Construction..*
_____ / _____ / _____

·ECIALTY CLASSIFICATIONS are assigned for construction, erection, alteration, modifications or additions requiring specific
·ls and/or trade or crafts for any particular part of the work, and work incidental thereto. Applicants with qualifying work
·erience may request one or more Specialty(s) (below) or a specific sub-classification(s) (above).

| | |
|---|---|
| ❏ Mechanical | ❏ Drainage |
| ❏ HVAC | ❏ Concrete |
| ❏ Electrical | ❏ Clearing/Grubbing |
| ❏ Plumbing | ❏ Earthwork |
| ❏ Swimming Pools | ❏ Excavation |
| ❏ Sprinkler Systems | ❏ ROW Maintenance |
| ❏ Sheet Metal | ❏ Traffic Control and Safety |
| ❏ Roofing/Siding | ❏ Erection of Structural Steel |
| ❏ Painting | ❏ Miscellaneous Steel |
| ❏ Masonry | ❏ POL Dispensing Systems |
| ❏ Underground Piping | ❏ Environmental |
| ❏ Construction Manager | ❏ Metal Buildings |
| ❏ Demolition | ❏ Equip. Handling Systems |
| ❏ Golf Course | ❏ Structural Concrete |
| ❏ Recreational Areas | ❏ Other_____ |
| ❏ Landscaping | |
| ❏ Remodeling | |
| ❏ Renovations | |
| Asbestos | |
| Maintenance, Repair and Alterations | |
| Bridges | |
| Streets | |

RECEIVED

JUN 0 6 2006

2006 0426

ENT'D JUN 0 7 2006

ADDITIONAL
COMMENTS: _____
_____
_____

License No.( if previously licensed by this Board) _____     State and License No. of each general
contractors license you currently hold: _____

## LIST ALL MAJOR CONTRACTS CURRENTLY BEING PERFORMED

| CLASSIFICATION OF WORK | CONTRACT AMOUNT | OWNER - CITY, STATE | % OF WORK COMPLETED |
|---|---|---|---|
| General Contractor | $47,905,613.00 | The Ferchill Group/ Pittsburgh, PA | 95% |
| General Contractor | $18,117,148.00 | Arbor Park Ph III / Cleveland, OH | 95% |
| Interior Finishes Contractor | $18,500,000.00 | Cleve. Clinic Foundation / Cleveland, OH | 2% |
| General Contractor | $13,891,460.00 | KM Yarus, Inc. Pepper Pike / OH | 95% |

**REFERENCES WILL SERVE AS A MEANS FOR THE BOARD TO VALIDATE THE WORK EXPERIENCE YOU HAVE PROVIDED ON PAGE 13 OF THE** *CONFIDENTIAL FINANCIAL STATEMENT, WORK EXPERIENCE & EQUIPMENT QUESTIONNAIRE* **BOOKLET. Please identify below reference contacts for each reference requirement. Address, Phone and Fax information must be provided for each.**

Architect    Name: City Architecture
OR    Contact Person: Mark Dodds
Engineer    Address: 3634 Euclid Avenue Suite 100    City: Cleveland    State: OH Zip: 44115
    Phone ( 216) 881-2444    Fax (216)  881-6713

BANK: First Merit
Holder Of  Contact Person: Steve Baldini Vice President
Current  Address: 7800 Reynolds Road    City: Mentor    State: OH Zip: 44060
Assets  Phone ( 440) 953-2227    Fax ( 440 ) 953-3690
Of Applicant

Material Supply Dealer:   Whole Builders Supply
    Contact Person: Greg Bronson
    Address:  1261D Industrial Parkway    City: Brunswick    State: OH Zip: 44121
    Phone (330) 350-1993    Fax (330) 220-0654

General Contractor:    License No: _____
    Address: _____    City: _____    State: _____ Zip: _____
    Phone ( ) _____    Fax ( ) _____

Are there any liens for labor or materials filed on any of your work anywhere?  YES____    NO  X
If so, statement of particulars MUST be attached.

Have you ever defaulted on a contract?    YES____    NO  X
If so, statement of particulars MUST be attached.

If you furnish bonds, give the names and addresses of your sureties:  Hotaling and Associates
5000 Rockside Road Suite 250  Independence, OH 44131

**IF AN INDIVIDUAL** - State your contracting experience, giving number of years:
As a contractor:  Where: _____    When: _____
As a superintendent::  For Whom: _____    Where: _____    When: _____
As an engineer::  Where: _____    When: _____
Other:    Explain: _____

Have you attended any scientific, professional or technical school?  If so, give name of school, years attended and whether or not you graduated.
_____
_____

Have you ever compromised with any of your creditors, become bankrupt, or in any way been discharged from your debts otherwise than by payment in full?  YES ____    NO ____  If so, state full details in confidential letter and attach.

**IF A PARTNERSHIP:** (list each Co-Partner's name, age, and address below)    DATE FORMED: _____
_____
_____
_____

Is Partnership General ___ or Limited ____    If Limited, explain fully: _____
Are any members engaged in any other line of business?  YES ___    NO ___    If so, give particulars. (attach details)
State the technical training of each partner

State the contracting experience of each partner, giving the number of years

As a contractor: ____ yrs.          Where: _____     For Whom: _____
As a superintendent: ____ yrs.    For Whom: _____    Where: _____
As an engineer: ____ yrs. Where: _____
Other: ____ yrs. Explain: _____
_____

Has the firm, or any member thereof, ever compromised with its or his creditors, become bankrupt, or in any way become discharged from his debts other than by payment thereof in full? YES ____ NO ____ If so, full details must be stated in confidential letter and attached.

**CORPORATE INFORMATION:** State of Incorporation __OH__ , County __Lake__ , Date of Incorporation 1/21/1981

| OFFICERS | ADDRESS |
|---|---|
| President  Adelbert Marous Jr. | 7190 Eagle Road Waite Hills, OH  44094 |
| Vice President   Scott Marous | 7480 Mountain Quail Place  Concord, OH  44077 |
| Secretary  Ken Marous | 10240 Sawmill Drive  Chardon, OH  44024 |
| Treasurer  Ken Marous | 10240 Sawmill Drive  Chardon , OH  44024 |

Major Stock Holder's  Adelbert  /  45 %  Scott  /  45  %  Ken  / 10 %  _____ %

Has the Corporation, any of its officers, or any corporation, firm /individual of which this corporation is a successor ever compromised with creditors, become bankrupt, or in any way become discharged from  debt other than by payment in full?
YES _____   NO __X__   If yes, attach details in  confidential letter.

Has the corporation, any of its officers, or any corporation, firm or individual of which this corporation is a successor, ever compromised with creditors, become bankrupt, or in any way become discharged from debts other than by payment in full.
YES ____ NO _X_    If YES, give details in full confidential letter attached.

List each surety company that has paid a loss on: You as an Individual__ Any firm member __ Any Corporate Officer __ and provide full particulars including amount ($) and Name/Address of Banks in an attached statement.

Does applicant have an established (bank) line of credit:  YES _X_    NO ____   If so, indicate amount $ 12,000,000.00
Name of Bank  First Merit _____     Address 7800 Reynolds Road Mentor, OH  44060

Are applicant's financial statements audited by a certified public accountant or a public accountant? YES _X_  NO ____
Name of Accountant    Kowall & Company _____     Date of last Audit, Review or Compilation  12/31/2005

Provide the name(s) of any Individual, Responsible Managing Employee, Officer, or Member of the Executive Staff of your Organization who has plead guilty or been convicted of any charges relating to bid rigging.  Full details must be attached in a confidential letter to the Board.

None
_____

Act No. 91-473, Acts of Alabama (1991), requires the collection of $100 fee to " be distributed by the State Licensing Board for General Contractors at the end of each licensing period to all accredited public institutions of higher education of American Council for Construction Education accredited courses in building science and to all accredited public institutions of higher education offering courses in building science who are in the candidate status of the American Council for Construction Education and to institutions of higher education offering courses leading to a Bachelor of Civil Engineering degree which offers courses in highway engineering and construction of the undergraduate and graduate levels whose civil engineering program is accredited by the Engineering Accreditation Commission of the Accreditation Board for Engineering and Technology (ABET)".

PLEASE SELECT (✗) ONE OF THE FOLLOWING TO INDICATE THE PROGRAM
YOU WISH YOUR $100 FEE TO SUPPORT:
_X_ Building Science  (general construction)    _____ Civil Engineering  (highway engineering and/or construction)

**The Undersigned hereby represent(s) that the foregoing statements and answers to interrogatories are true to the best of his knowledge, information and belief.**

5-31-06
Date                                   Signature                        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
                                                                        Social Security No. of Signer

**AFFIDAVIT**

STATE OF  Ohio _____     CITY OF  Willoughby _____     COUNTY OF ___Lake___

Subscribed and sworn to before me, the undersigned Notary Public, in and for the State and City or County aforesaid
this  31st  day of  May  in the year  2006 .  My commission expires: _____

Notary Public

MICHELLE L. ROOF
Notary Public
In and for the State of Ohio
My Commission Expires
June 15, 2008

JUL.25.2006   7:58AM    MAROUS BROTHERS ACCT                                    NO.881    P.3

NANCY L. WORLEY
SECRETARY OF STATE



First Floor, State Capitol
Suite S-105
600 Dexter Avenue
P.O. Box 5616
Montgomery, Alabama 36103-5616

## State of Alabama
### May 23, 2006

**RECEIVED**

MAY 26 2006

MAROUS BROTHERS

Marous Brothers Construction
1702 Joseph Lloyd Pkwy
Willoughby OH  44094

Re: Marous Brothers Construction, Inc.,
    an Ohio Corporation

Dear Sir or Madam:

   This letter acknowledges receipt of your Application for
Certificate of Authority and $175.00 filing fee.  Your authority
to transact business in the State of Alabama has been granted as
of May 15, 2006.

   Enclosed you will find a certified copy of your Application
for Certificate of Authority.  Thank you for doing business in
Alabama.

   You are required to file the Business Privilege Tax Return
(BPT) with the Alabama Department of Revenue.  You have two and a
half months from the date the Certificate of Authority is
granted in the State of Alabama to file the BPT forms.  You may
download a copy of the BPT forms from the Alabama Department of
Revenue website address located at www.ador.state.al.us.  For
additional information or specific instructions, please call the
Alabama Department of Revenue at (334) 353-7923.

   If you are unable to download a copy of the BPT forms
or if you do not have Internet access, you may obtain the BPT forms
from the Alabama Department of Revenue, Privilege Tax Division or
from the Corporations Division of the Alabama Secretary of State's
Office.

   For further assistance in this or any other matter, please
feel free to contact this office at (334) 242-5324.

                                   Sincerely,

                                   Nancy L. Worley
                                   Secretary of State

NLW/rb
Enclosures

OFFICE (334) 242-7206, FAX (334) 242-4993, E-MAIL sos@sos.al.gov • ELECTIONS (334) 242-7210, FAX (334) 242-2444
CORPORATIONS (334) 242-5324, FAX (334) 240-3138 • UCC (334) 343-5231, FAX (334) 353-8269 • LEGAL (334) 242-7476, FAX (334) 242-4993
LANDS & TRADEMARKS (334) 242-5325, FAX (334) 240-3138

FILED IN OFFICE

MAY 15 2006

SECRETARY OF STATE

# STATE OF ALABAMA

## APPLICATION FOR CERTIFICATE OF AUTHORITY
## OF A FOREIGN CORPORATION TO TRANSACT BUSINESS IN ALABAMA

### TO THE SECRETARY OF STATE OF THE STATE OF ALABAMA:

PURSUANT TO THE PROVISIONS OF THE ALABAMA BUSINESS CORPORATION ACT, THE UNDERSIGNED CORPORATION HEREBY APPLIES FOR A CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS IN ALABAMA AND, FOR THAT PURPOSE, SUBMITS THE FOLLOWING STATEMENTS.

1. The exact name of the corporation:
   Marous Brothers Construction, Inc.

2. If your corporate title does not include "Corporation," "Corp," "Incorporated" or "Inc.", one of these must be added for use in Alabama. Please list your exact corporate title with the addition of one of these words.

3. State or Country of incorporation:    Ohio

4. Date of incorporation:    1/12/1981    Duration of corporation:    Perpetual

5. Street address of principal office:
   1702 Joseph Lloyd Parkway    Willoughby, OH  44094

6. Name and street address (NO PO BOX) of registered agent in Alabama:
   The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, AL 36109

7. The names and addresses of its directors and officers are:

| NAME | OFFICE/TITLE | MAILING ADDRESS |
|------|-------------|-----------------|
| Adelbert Marous Jr. | President | 7190 Eagle Rd. Waite Hills, OH  44094 |
| Scott P. Marous | Chief Oper. Officer | 7480 Mountain Quail Pl. Concord OH  44060 |
| Ken J. Marous | Vice President | 10240 Sawmill Dr. Chardon, OH  44024 |

8. This application is accompanied by a copy of articles of incorporation and all amendments thereto, duly certified by the proper official of the state under the laws of which it is incorporated, together with the filing fee of $175.00. The non-profit corporation filing fee is $75.00. The certification by the Secretary of State or the equivalent in your state must be an **original** and "current" (**within six months**).

9. Date:    May 9, 2006

Adelbert Marous Jr.    President
Type or Print Corporate Officer's Name and Title

Signature of Officer

RECEIVED
MAY 11 2006
SECRETARY
OF STATE

MAIL DUPLICATE ORIGINALS OF THIS APPLICATION, A CERTIFIED COPY OF THE CHARTER AND THE FILING FEE TO:
SECRETARY OF STATE, CORPORATIONS DIVISION, POST OFFICE BOX 5616, MONTGOMERY, ALABAMA 36103-5616
(334)242-5324

CD.2 Rev. 4/2000

AL015 - 6/05/2002 C T System Online

Nancy L. Worley
Secretary of State

P.O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

I, Nancy L. Worley, Secretary of State of the State of Alabama, having custody
of the Great and Principal Seal of said State, do hereby certify that

the foreign corporation records on file in this office
disclose that Marous Brothers Construction, Inc., an Ohio
corporation, qualified in the State of Alabama on May 15,
2006. I further certify that the records do not disclose
that said Marous Brothers Construction, Inc. has been
withdrawn.



In Testimony Whereof, I have hereunto set my hand
and affixed the Great Seal of the State, at the Capitol,
in the City of Montgomery, on this day.

May 24, 2006

Date

_Nancy L. Worley_

Nancy L. Worley                              Secretary of State

JUL.25.2006    7:58AM    MARCUS BROTHERS ACCT                                    NO.031    P.1



**1702 Joseph Lloyd Parkway    Willoughby, Ohio  44094**
**Phone (440) 951-3904        Fax:  (440) 942-7884**

# Fax Cover Sheet

DATE:        ~~7/24/2006~~    7/25/06

TO:          Kristi Whynott

COMPANY:     Alabama Board for G.C.

FAX:         334-395-5336

RE           Additional information required for Board review

FROM:        Deborah Kender

PAGES:       25

---

Attached please find the Alabama Certificate of Authority as issued by the Secretary of State of Alabama.

Please advise if the "Certificate of Existence" is the same document as the "Certificate of Authority".

I am not sure what it is that I need to supply to your office.

Thank you for your time.

UL/18/2006/TUE 03:51 PM   GEN CONT BD                    FAX No. 3343955336                    P. 001/001

| WAYNE GORDON | ROY TATUM | KEITH ANDREWS | CHIP GRIZZLE | ALEX WHALEY, SR. |
|---|---|---|---|---|
| *Chairman* | *Vice Chairman* | *Secretary/Treasurer* | *Member* | *Member* |
| BIRMINGHAM | MONTGOMERY | TUSCALOOSA | BIRMINGHAM | TROY |



# ALABAMA LICENSING BOARD FOR GENERAL CONTRACTORS

(www.gencoabd.state.al.us)

JOSEPH C. ROGERS JR.
EXECUTIVE SECRETARY

2525 FAIRLANE DRIVE
MONTGOMERY, ALABAMA 36116

TELEPHONE NO. 334.272.5090
FAX NO. 334-395-5336

## MEMORANDUM

TO:     MAROUS BROTHERS CONSTRUCTION
        1702 JOSEPH LLOYD PARKWAY
        WILLOUGHBY, OH 44094
        FAX: 440-942-7884

FROM:   KRISTI WHYNOTT
        LICENSING SPECIALIST  EXT 236

DATE:   ___07/18/2006_____

### RE:  ADDITIONAL INFORMATION REQUIRED FOR BOARD REVIEW

The General Contractors Licensing Board will meet in Montgomery on August 16th, 2006. Each application that meets the board's 30 day on file requirement may be reviewed if all information is obtained. To comply with Alabama law, the meeting agenda must be released to the public two weeks prior to the board meeting. Additional information is needed in order to complete your file and place it on the agenda for the August 16th Board Meeting.

Please note that all four questionnaires sent to references listed on your application must be completed and returned to our office by August 8th, 2006 before your application is eligible to be reviewed at this meeting. References that have not yet replied are listed below. You must also have successfully completed the required examination by the August 8th deadline.

(Marked items not received):
☐ ARCHITECT (and/or) ENGINEER
☐ BANK
☐ MATERIAL SUPPLIER
☐ GENERAL CONTRACTOR
☐ EXAMINATION   call 1-800-733-9267 PSI - WWW.PSIEXAMS.COM for scheduling
                                              WWW.NASCLA.ORG for study guide
☐ FINANCIAL STATEMENT BOOKLET
☒ CERTIFICATE OF EXISTENCE – AL SECRETARY OF STATE  334-242-5324 WWW.SOS.STATE.AL.US
☐ CURRENT CERTIFICATION - ☐ ELECTRICAL ☐ HVAC ☐ PLUMBERS/GAS FITTERS

Additional Information Required  THE ABOVE CERTIFICATE MUST BE FROM THE STATE OF AL, NOT OHIO

**Please contact references submitted on your application and ask them to return the questionnaires in a timely manner.**

JUN. 7.2006  12:40PM   MARCUS BROTHERS ACCT                    NO.062   P.1



**1702 Joseph Lloyd Parkway    Willoughby, Ohio  44094**
**Phone (440) 951-3904          Fax:  (440) 942-7884**

# Fax Cover Sheet

| | |
|---|---|
| DATE: | 6/7/2006 |
| TO: | Jackie Ziegler |
| COMPANY: | |
| FAX: | 334-395-5336 |
| RE | General Contractors License |
| FROM: | Deborah Kender |
| PAGES: |  |

Per your request, please do not hesitate to call me with any questions.

Additional reference:

Engineer :

Denk and Associates, Inc.
503 East 200th Street
Euclid, OH  44119

Contact: Mike Denk
Phone: (216) 531-8880
Fax: (216) 531-5144

# United States of America
# State of Ohio
# Office of the Secretary of State

*I, J. Kenneth Blackwell, do hereby certify that I am the duly elected, qualified and present acting Secretary of State for the State of Ohio, and as such have custody of the records of Ohio and Foreign corporations; that said records show MAROUS BROTHERS CONSTRUCTION, INC., an Ohio corporation, Charter No. 567486, having its principal location in Willoughby Hills, County of Lake, was incorporated on January 12, 1981 and is currently in GOOD STANDING upon the records of this office.*



*Witness my hand and the seal of the Secretary of State at Columbus, Ohio this 1st day of May, A.D. 2006*

**Ohio Secretary of State**

Validation Number: V2006121M90116

State of Alabama

# STATE LICENSING BOARD FOR GENERAL CONTRACTORS
2525 Fairlane Drive
Montgomery, Alabama 36116
website: www.genconbd.state.al.us

## CONFIDENTIAL FINANCIAL STATEMENTS

## EQUIPMENT QUESTIONNAIRE

## EXPERIENCE STATEMENT

*Used in Licensing and Classifying General Contractors*

### Type of Organization:

_____ An Individual

_____ Partnership

_____ C Corporation

____X____ S Corporation

_____ LLC a Limited Liability Company

_____ LLP a Limited Liability Partnership

Organization Name:    **Marous Brothers Construction, Inc.**
Address:              **1702 Joseph Lloyd Parkway**
                     **Willoughby, OH  44094**

General Contractor Number, If Currently Licensed By This Board:    _____

General Contractor Number As Previously Licensed By This Board:    _____

Applicant Holds Current GC Licenses In The Following States:    _____

Contractor's E Mail Address:    **info@marousbrothers.com**    _____

Phone #:  _____**440-951-3904**_____        Fax #:   ____**440-951-3781**____

RECEIVED

## SIGNATORY

Corporation, Partnership Or An Individual

The undersigned hereby declares that the following is a true statement of the financial condition and experience of the individual, partnership, or corporation herein first named, as of the date herein first given; that this statement is for the express purpose of inducing the State Licensing Board For General Contractors license; and that any depository, vendor or the agency herein named is hereby authorized to supply such party with any information necessary to verify this statement.

Dated This _____ *31st* _____ Day Of *May* , *2006*

Name of Organization:

**Marous Brothers Construction, Inc.**

BY:

*Signature* _____  Social Security No.: **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**

Adelbert P. Marous                      Title:  **President**

Affix Corporate Seal

*Michelle L. Roof*
*Notary Public*

**MICHELLE L. ROOF**
Notary Public
In and for the State of Ohio
My Commission Expires
June 15, 2008

2

**CONTRACTOR'S FINANCIAL STATEMENT AS OF:**    *December 31, 2005*

month          day,          year

| Sch # | | Omit Cents | Sch # | | Omit Cents |
|---|---|---|---|---|---|
| **ASSETS** | | | | **LIABILITIES & NET WORTH** | |
| **Current Assets** | | | **Current Liabilities** | | |
| 1. | Cash | | 13. Notes Payable | | |
| | Unrestricted | $ 714,895 | | Banks | $ |
| | Restricted | - | | Current Maturities of long- | |
| 2. | Notes Receivable | | | Term Debt | |
| | Less Notes Receivable | | | Other Notes Payable | |
| | Discounted | 151,134 | 14. Accounts Payable | | 1,655,150 |
| 3. | Accounts Receivable from | | 15. Due To Subcontractors | | 6,697,908 |
| | completed contract | 2,169,471 | 16. Accrued Taxes | | 194,435 |
| 4. | Accounts Receivable from | | 7. Billings in excess of costs | | |
| | uncompleted contracts | | | and estimated earnings on | |
| | (a) Current | 10,710,798 | | uncompleted contracts | 5,885,534 |
| | (b) Retainage | 2,682,336 | 17. Other Current Liabilities | | 975,319 |
| 5. | Other Accounts Receivable. | 353,213 | | | |
| 6. | Marketable Securities | 8,588,419 | | | |
| 7. | Costs and estimated | | | | |
| | earnings in excess of billings | | | | |
| | on uncompleted contracts | 2,499,363 | | | |
| 8. | Inventory | - | | | |
| 9. | Investments - Current | - | | | |
| 10. | Other Current Assets | 302,834 | | | |
| | **Total Current Assets    (A)** | 28,172,463 | **Total Current Liabilities    (B)** | | 15,408,346 |
| | | | | | |
| **Property and Equipment** | | | **Other Liabilities** | | |
| | | | 13. Long-Term Debt(*) | | |
| 11. | Property & Equipment | | 18. Other | | 3,921,000 |
| | Less Accumulated | | | | |
| | Depreciation (*) | 1,258,632 | **Total Other Liabilities** | | 3,921,000 |
| | | | | | |
| **Other Assets** | | | **Net Worth** | | |
| | | | 19. Individual or Partnership | | |
| | | | Capital | | |
| 9. | Investments-Non-Current | - | 19. Capital Stock | | 625 |
| 12. | Other Assets | 600,308 | 19. Paid-in-Capital | | 4,701,188 |
| | | | 19. Retained Earnings (Deficit) | | 6,000,244 |
| | | | Total Net Worth | | 10,702,057 |
| | | | 19. Treasury Stock | | - |
| | | | | | |
| | | | **TOTAL NET WORTH** | | 10,702,057 |
| | | | | | |
| | | | **TOTAL LIABILITIES AND** | | |
| **TOTAL ASSETS** | | $ 30,031,403 | **NET WORTH** | | $ 30,031,403 |

| Book Value of Equipment | $ 1,258,632 | |
|---|---|---|
| Less Equipment debt | $ - | **WORKING CAPITAL   (A) - (B)** |
| Net Equipment value | $ 1,258,632 | $ 12,764,117 |

*KtK*

CPA Initial Here

(*)Equipment debt portion of #11 is shown on #13 & #17

## DETAILS RELATIVE TO ASSETS

| SCHEDULE 1 - CASH | | | |
|---|---|---|---|
| NAME OF BANK | LOCATION | ACCT NAME | AMOUNT |
| UNRESTRICTED: | | | |
| First Merit Bank | Mentor, OH | Checking | $ 713,658 |
| First Merit Bank | Mentor, OH | Payroll | 1,237 |
| | | | |
| TOTAL: | | | $ 714,895 |
| RESTRICTED: | | | |
| | | | |
| | | | |
| | | | |
| TOTAL: | | | |

| SCHEDULE 2 - NOTES RECEIVABLE | | | |
|---|---|---|---|
| 1. Due Within 90 Days | | | $ 41,565 |
| 2. Due After 90 Days | | | 109,569 |
| 3. Past Due | | | |
| TOTAL: | | | $ 151,134 |

| NAME AND ADDRESS | FOR WHAT/MATURITY | SECURITY | AMOUNT |
|---|---|---|---|
| LaMalfa Center | Convert Accts Receivable | | $ 151,134 |
| | to Note - Matures 12/2008 | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SCHEDULE 3 - ACCOUNTS RECEIVABLE - COMPLETED CONTRACTS | | | |
|---|---|---|---|
| NAME & ADDRESS OF OWNER | CONTRACT NATURE | CONTRACT AMOUNT | ACCT. REC. |
| Various Customers | Construction Contracts | | $ 2,169,471 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Less: Allowance for Doubtful Accounts | | | |
| TOTAL: | | | $ 2,169,471 |
| Have any of the above been assigned, sold, or pledged?  Yes | | No | X |
| If yes, state amount | | | |

4

## SCHEDULE 4 - ACCOUNTS RECEIVABLE - UNCOMPLETED CONTRACTS

| CONTRACT OWNER ADDRESS | CONTRACT AMOUNT | AMOUNT BILLED | RETAINAGE | CURRENT PORTION | BALANCE DUE |
|---|---|---|---|---|---|
| Landmark Indiana LTD - Cleveland, Oh | | | $ 923,534 | $ 647,550 | $ 1,571,084 |
| AVI Food Systems, Inc. - Warren, Oh | | | - | 971,759 | 971,759 |
| City of Cleveland - Cleveland, Oh | | | 136,654 | 499,077 | 635,731 |
| Cleveland Housing Network - Cleveland, Oh | | | 503,210 | 126,725 | 629,935 |
| The Coral Company - Beachwood, Oh | | | 153,403 | 703,352 | 856,755 |
| KM Yarus, Inc. - Lyndhurst, Oh | | | - | 696,801 | 696,801 |
| Progress Street Partners, LTD - Cleveland, Oh | | | - | 2,685,027 | 2,685,027 |
| Whiting Turner Contracting - Cleveland, Oh | | | 358,549 | 888,907 | 1,247,456 |
| Arbor Park Village Phase 2 - Cleveland, Oh | | | - | 881,942 | 881,942 |
| | | | | | |
| All Other Customers | | | 606,986 | 2,609,658 | 3,216,644 |
| | | | | | |
| | | | | | |
| Less: Allowance for Doubtful Accounts | | | | | |
| TOTAL: | | | $ 2,682,336 | $ 10,710,798 | $ 13,393,134 |

(totals for retainage and current portion carried forward from pg.3)

Have any of the above been assigned, sold or pledged?      Yes _____      No _____   X

If yes, state amount: _____

## SCHEDULE 5 - OTHER ACCOUNTS RECEIVABLE

| NAME AND ADDRESS | DATE DUE | SECURITY | DUE |
|---|---|---|---|
| Marous Brothers Construction - Urban Quest Joint Venture | | | |
| Willoughby, Oh | Feb 2006 | | 124,648 |
| Related Party Transactions | Various | | 228,565 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Less: Allowance for Doubtful Accounts | | | |
| TOTAL: | | | $ 353,213 |

Have any of the above been assigned, sold, or pledged?      Yes _____      No _____   X

If yes, state amount: _____

## SCHEDULE 6 - MARKETABLE SECURITIES

| | | | | | |
|---|---|---|---|---|---|
| 1.  Unrestricted | | | | $ | 8,588,419 |
| 2.  Restricted | | | | | |
| TOTAL: | | | | $ | 8,588,419 |

| ISSUING COMPANY | TYPE SECURITY | DATE ACQUIRED | MATURITY DATE | FAIR MKT VALUE | COST |
|---|---|---|---|---|---|
| Numerous - held by Merrill Lynch | stocks, bonds | various | various | $8,858,697 | $ 8,588,419 |
| | | | | | |
| | | | | | |

## SCHEDULE 7 -
## COST OF BILLINGS IN EXCESS OF COST AND ESTIMATED EARNINGS

| | | |
|---|---|---:|
| Costs incurred on uncompleted contracts | | $ 199,575,441 |
| Estimated earnings | | 15,692,040 |
| | Subtotal | 215,267,481 |
| Less: Billings to Date | | 218,653,652 |
| | | $ (3,386,171) |
| Comprised of: | | |
| Costs and estimated earnings in excess of billing on uncompleted contracts | | $ 2,499,363 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | | 5,885,534 |
| | | $ (3,386,171) |

## SCHEDULE 8 - INVENTORY

| | |
|---|---:|
| 1. For Uncompleted Contracts | |
| 2. Other Material | |
| TOTAL: | $ - |

| DESCRIPTION | LOCATION | QUANTITY | FOR UN-COMPLETED CONTRACTS | OTHER MATERIAL |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| TOTAL: | | | $ - | $ - |

## SCHEDULE 9 - INVESTMENTS

| | |
|---|---:|
| 1. Current Investments | $ - |
| 2. Non-Current Investments | $ - |

| FACE VALUE | ISSUING COMPANY | TYPE SECURITY | AMOUNT PLEDGED | COST NON-CURRENT | COST CURRENT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL: | | | | $ - | $ - |

## SCHEDULE 10 - OTHER CURRENT ASSETS

| DESCRIPTION | AMOUNT |
|---|---:|
| Equity in Joint Venture | $ 111,983 |
| Prepaid Expenses, Construction Deposits | 190,851 |
| TOTAL: | $ 302,834 |

| SCHEDULE 11 - PROPERTY AND EQUIPMENT | | | | |
|---|---|---|---|---|
| DESCRIPTION | COST | ACCUMULATED DEPRECIATION | BOOK VALUE | EQUIPMENT DEBT | HELD IN WHOSE NAME |
| (A) LAND | | | $ - | | |
| (B) | | | - | | |
| (A) BUILDING | | | - | | |
| (B) | | | - | | |
| (A) LEASEHOLD IMPROVEMENTS | 1,121,344 | 117,058 | 1,004,286 | - | |
| (B) | | | - | | |
| (A) AUTOMOTIVE | 265,466 | 262,311 | 3,155 | - | |
| (B) | | | - | | |
| (A) EQUIPMENT | 84,042 | 55,190 | 28,852 | - | |
| (B) | | | - | | |
| (A) FURNITURE & FIXTURES | 869,833 | 647,494 | 222,339 | - | |
| (B) | | | - | | |
| (A) OTHER | | | - | | |
| (B) | | | - | | |
| (A) TOTAL | $     2,340,685 | $     1,082,053 | $     1,258,632 | $     - | |
| (B) TOTAL | $     - | $     - | $     - | $     - | |
| (A) + (B) TOTAL | $     2,340,685 | $     1,082,053 | $     1,258,632 | $     - | |

* (A) USED FOR BUSINESS PURPOSES ONLY     (B) NOT USED FOR BUSINESS PURPOSES

If depreciation schedule is too lengthy to attach it must be maintained on file and made available upon request of the

General Contractors Board.  Is Schedule attached?                    Yes                              No

| SCHEDULE 12 - OTHER ASSETS | | |
|---|---|---|
| DESCRIPTION | REMARKS | AMOUNT |
| Long Term Notes Receivable - LaMalfa Center | | $     593,213 |
| Cash Surrender Value of Life Insurance | | 7,095 |
| | | |
| TOTAL: | | $     600,308 |

| | |
|---|---|
| TOTAL ASSETS | $     30,031,403 |

## DETAILS RELATIVE TO LIABILITIES AND NET WORTH

| SCHEDULE 13 - NOTES PAYABLE | | |
|---|---|---|
| 1.  Banks. | | $     - |
| 2.  Other Notes Payable | (see Schedule 11 Equipment Debt above) | - |
|     Total Notes Payable. | | - |
| 3.  Less: Current Portion | | - |
|     Total Long-Term Debt | | $     - |

| NAME & ADDRESS | COLLATERAL | CURRENT | LONG TERM |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL: | | $     - | $     - |

## SCHEDULE 14 - ACCOUNTS PAYABLE

| PAYABLE TO (payables may be grouped together) | FOR WHAT | PAST DUE | CURRENT |
|---|---|---|---|
| Misc. Vendors: | Insurance, Bonds, Legal & Professional | | $       364,487 |
| Suppliers: | Office, Tools, Rentals, Blueprints | | 214,847 |
| Materials: | Lumber, Concrete, Fasteners, Drywall | | 953,686 |
| | Stone, Appliances, etc. | | |
| Equipment: | | | |
| Fuel: | Diesel, Propane | | 84,425 |
| Other: | | | 37,705 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| SUBTOTAL: | | $            - | $     1,655,150 |
| TOTALS | | | $     1,655,150 |

## SCHEDULE 15 - DUE TO SUBCONTRACTORS

| | | | |
|---|---|---|---|
| 1.  Current Amounts | | $ | 3,309,019 |
| 2.  Retainage Due | | $ | 3,388,889 |
| TOTAL: | | $ | 6,697,908 |

| NAME OF SUBCONTRACTOR | AMOUNT EARNED BY SUBCONTRACTOR | AMOUNT OF CONTRACT | RETAINAGE | CURRENT |
|---|---|---|---|---|
| The Shelley Company | $       1,135,180 | $       1,794,764 | $       105,692 | $       373,705 |
| McKamish, Inc. | 6,649,039 | 6,649,039 | 332,452 | 8,021 |
| Northern Ohio Plumbing | 2,251,140 | 2,397,821 | 106,023 | 209,453 |
| Doan/Pyramid Electric | 2,260,895 | 2,260,895 | 182,786 | 122,623 |
| Ullman Electric | 458,876 | 613,428 | 45,888 | 246,088 |
| Geauga Mechanical | 1,761,737 | 1,807,237 | 139,926 | 107,544 |
| Miller Electric | 4,236,961 | 4,236,961 | 211,848 | - |
| Gateway Electric | 1,386,356 | 1,534,726 | 76,340 | 130,645 |
| Remaining Subcontractors (151) | | | 2,187,934 | 2,110,940 |
| TOTAL: | $     20,140,184 | $     21,294,871 | $     3,388,889 | $     3,309,019 |

## SCHEDULE 16 - ACCRUED TAXES

| NATURE OF TAX | DATE PAYABLE | PAYABLE TO | PERIOD COVERED | AMOUNT |
|---|---|---|---|---|
| St. Unemployment: | 1st Qtr 06 | | | $         7,945 |
| Fed. Unemployment: | 1st Qtr 06 | | | 936 |
| Sales Tax: | | | | - |
| City Income Tax | | City of Willoughby | 2005 Activity | 103,555 |
| St. Taxes: | 1st - 2nd Qtr | Ohio | 2005 Activity | 81,999 |
| Other: | | | | |
| TOTAL: | | | | $       194,435 |

## SCHEDULE 17 - OTHER CURRENT LIABILITIES

| PAYABLE TO | NATURE | DUE DATE | AMOUNT |
|---|---|---|---|
| Various | Accrued Insurance, Services, Union | Various | $ 975,319 |
| | Benefits, Payroll Withholdings | | |
| | | | |
| | | | |
| | | | |
| TOTAL: | | | $ 975,319 |

## SCHEDULE 18 - OTHER LIABILITIES

| PAYABLE TO | NATURE | DUE DATE | AMOUNT |
|---|---|---|---|
| First Merit Bank | Line of Credit | April, 2007 | $ 3,921,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL: | | | $ 3,921,000 |

## SCHEDULE 19 - NET WORTH
### INDIVIDUAL, MEMBER OR PARTNERSHIP CAPITAL

| NAME | ADDRESS | AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL: | | $ |

## CORPORATION

| | | |
|---|---|---|
| 1. Common Stock | | $ 625 |
| 2. Preferred Stock | | |
| 3. Paid-in-capital | | 4,701,188 |
| 4. Retained Earnings | | 6,000,244 |
| 5. Treasury Stock | | |
| TOTAL: | | $ 10,702,057 |

| | | |
|---|---|---|
| TOTAL LIABILITIES & CAPITAL | $ | 30,031,403 |

## CONTINGENT LIABILITIES

| | |
|---|---|
| 1. Liability as Bondsman | |
| 2. Liability as Guarantor | |
| 3. Pending Litigation | |
| 4. Other Contingent Liabilities | |
| 5. Estimated reserve for income taxes  - (S Corporation) | |
| (Attach explanation if necessary) | |
| TOTAL: | $ |

9

## INDEPENDENT AUDITOR'S REPORT

We have audited the accompanying Contractor's Financial Statement of    *Marous Brothers Construction, Inc.*
as of                                           12/31/05                          . This financial statement is the responsibility of the
Company's management.  Our responsibility is to express an opinion on the financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards.  Those standards require that we plan and perform
the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes
examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement.  An audit also includes
assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial
statement presentation.  We believe our audit provides a reasonable basis for our opinion.

In our opinion, the financial statement referred to above presents fairly, in all material respects, the financial position of
*Marous Brothers Construction, Inc.*                                        at,                  12/31/05
in conformity with generally accepted accounting principles.

Our audit was made for the purposes of forming an opinion on the financial statement taken as a whole.  The schedules on
pages 4 through 13 are presented for the purposes of additional analysis and are not a required part of the financial statement.
Such information has not been subjected to the auditing procedures applied to the financial statement, and, we express no
on it.

Firm Name:                              *Kensell + Company*

Signature (Firm Signatures Not Acceptable):    *Kay L Kensell CPA*

Certificate Number:        01 - 10130

State of Certification:        OH

Federal Identification Number:    34-1682343

## ACCOUNTANT'S COMPILATION REPORT

We have compiled the Contractor's Financial Statement of    *Marous Brothers Construction, Inc.*
as of                                           12/31/05                          and the accompanying supplementary information contained
the schedules on pages 4 through 13, which are presented for supplementary analysis purposes only, included in the
accompanying prescribed form in accordance with Statement of Standards for Accounting and Review Services issued
by the American Institute of Certified Public Accountants.

Our compilation was limited to presenting in the form prescribed by the State of Alabama STATE LICENSING BOARD FOR
GENERAL CONTRACTORS, information that is the representation of management.  I have not audited or reviewed the
financial statement and, accordingly, do not express an opinion or any other form of assurance on it.

The financial statement and the supplementary information contained in the schedules on pages 4 through 13, is
presented in accordance with the requirements of the State of Alabama STATE LICENSING BOARD FOR GENERAL
CONTRACTORS, which differ from generally accepted accounting principles.  Accordingly, these financial statements
are not designed for those who are not informed about such differences.

Firm Name:

Signature (Firm Signatures Not Acceptable):

Certificate Number:

State of Certification:

Federal Identification Number:

## EXPERIENCE QUESTIONNAIRE

**The signing of this Questionnaire guarantees the truth and accuracy of all answers to interrogatories hereinafter made.**

1. How many years has your organization been in business as a general contractor under your present business name?                26

2. How many years experience in _____ construction work has your organization had:

   (a) As a general Contractor              26          (b) As a Sub-Contractor              26

## CORPORATION

| | | |
|---|---|---|
| Total authorized Capital | $          625 | When Incorporated            16-Jan-81 |
| | | (Date) |
| Capital Paid | $          625 | Where Incorporated            Ohio |
| | | (State) |

| Officer | Name | Shares Owned | % | Address |
|---|---|---|---|---|
| President | Adelbert P. Marous | 225 | 45.00% | 7190 Eagle Rd.  Waite Hill, OH |
| V-President | Scott P. Marous | 225 | 45.00% | 7480 Mt. Quail  Concord, OH |
| Secretary | Kenneth J. Marous | 50 | 10.00% | 10240 Sawmill Dr.  Chardon, OH |
| Treasury | Kenneth J. Marous | | | |

Major Stockholders

1. Adelbert P. Marous                    3.    Kenneth J. Marous
2. Scott P. Marous                        4.

## PARENT, SUBSIDIARY AND AFFILIATED COMPANIES

| NAME AND ADDRESS | EXPLAIN DETAILS OF YOUR AFFILIATION |
|---|---|
| Marous Brothers Construction/Urban Quest Joint Venture, LLC | Joint Venture |
| 1702 Joseph Lloyd Parkway | |
| Willoughby, OH  44094 | |
| | |
| | |
| | |
| | |

**3. What is the experience of the principal individuals of your organization?**

| NAME | POSITION | YEARS EXPERIENCE | AGE | MAGNITUDE & TYPE WORK | CAPACITY |
|------|----------|------------------|-----|------------------------|----------|
| Adelbert P. Marous | President | 30 | 45 | General Construction | |
| Scott P. Marous | Vice President | 30 | 49 | General Construction | |
| Kenneth J. Marous | Secretary / Treasurer | 30 | 46 | Site Excavating and Concrete | |

**4 a. List major projects your organization completed in the last 3 years. If this is a new company indicate ( U ) experience gained under other than your company. Give name of contractor (rather than owner) when new company. Document only the experience for the classification(s) you marked on your application. List only the work you did and the amount you were paid. (Example: Building Construction indicates new construction (ground up) as opposed to Additions or Remodeling)**

| DESCRIPTION OF WORK YOU PERFORMED | LOCATION | YEAR | OWNER/CONTRACTOR NAME | AMOUNT YOU WERE PAID |
|-----------------------------------|----------|------|------------------------|----------------------|
| US Federal Courthouse - Carpentry | Cleveland, Ohio | 2005 | General Services Administration | $ 8,606,035 |
| Quay 55 - General Contractor | Cleveland, Ohio | 2005 | Quay 55 Ltd. | 18,708,933 |
| Arbor Park Phase II - Gen Contractor | Cleveland, Ohio | 2005 | Longwood Phase One Assoc. | 25,695,710 |
| Rainbow Terrace Apartments - Gen Contractor | Cleveland, Ohio | 2005 | Vesta Cleveland LLC | 30,487,489 |
| LaMalfa Centre - General Contractor | Mentor, Ohio | 2005 | Michael LaMalfa Jr. | 2,595,194 |
| Fries & Schuele - General Contractor | Cleveland, Ohio | 2005 | New Village Corporation | 7,205,139 |
| West Tech - Construction Manager | Cleveland, Ohio | 2005 | West Tech LP | 2,402,006 |
| Midtown Business Park - Gen Contractor | Cleveland, Ohio | 2005 | Market Square CUP | 2,064,355 |
| Van Roy Building - General Contractor | Cleveland, Ohio | 2005 | 2900 Detroit Ltd. | 2,052,257 |
| Walmart Middlefield - Site Contractor | Middlefield, Ohio | 2005 | Perry Construction Group | 2,005,758 |
| Longwood Apartments - General Contractor | Cleveland, Ohio | 2004 | Longwood Phase One Assoc. | 26,484,583 |
| Central Cadillac - General Contractor | Cleveland, Ohio | 2004 | Central Cadillac | 2,950,792 |

**4 b. List Major projects you currently have under contract.**

| CITY/ COUNTY | OWNER OF CONTRACT ADDRESS | DESCRIPTION OF WORK | % COMPLETE | % TIME CONSUMED | AMOUNT OF YOUR CONTRACT |
|--------------|----------------------------|---------------------|------------|------------------|--------------------------|
| Pittsburgh / Allegheny (PA) | The Ferchill Group | General Contractor | | | $ 47,905,613 |
| Cleveland / Cuyahoga (OH) | Cleveland Housing Network | General Contractor | | | 5,041,795 |
| Pepper Pike / Cuyahoga (OH) | KM Yarus, Inc. | General Contractor | | | 13,891,460 |
| Cleveland / Cuyahoga (OH) | Arbor Park Phase III Assoc. | General Contractor | | | 18,117,148 |
| Cleveland / Cuyahoga (OH) | Case Western Reserve University | Interiors Finishes Contractor | | | 7,764,007 |
| Cleveland / Cuyahoga (OH) | STL Housing Inc. | Site Contractor | | | 1,881,406 |
| Cleveland / Cuyahoga (OH) | Cleveland School Board | Site Contractor | | | 1,383,278 |
| Cleveland / Cuyahoga (OH) | Emerald Alliance LP | General Contractor | | | 5,528,530 |
| Cleveland / Cuyahoga (OH) | Detroit Shoreway Community Deve. | General Contractor | | | 5,951,463 |
| Cleveland / Cuyahoga (OH) | The Coral Company | General Contractor | | | 5,642,632 |
| Chicago / Cook (IL) | ABLA Homes LLC | General Contractor | | | 3,864,373 |
| Cleveland / Cuyahoga (OH) | City of Cleveland | Site Contractor | | | 3,699,717 |
| Cleveland / Cuyahoga (OH) | Care Alliance LP | General Contractor | | | 1,297,515 |
| North Ridgeville / Lorain (OH) | Pulte Homes Inc. | General Contractor | | | 4,095,433 |
| University Hts. / Cuyahoga (OH) | Bellefaire Jewish Children's Burea | General Contractor | | | 2,703,110 |
| Cleveland / Cuyahoga (OH) | Cleveland Clinic Foundation | Interior Finishes Contractor | | | 18,500,000 |

5. Give names and address of all banks with whom you have done business during the last three years, exclusive of those shown in the Financial Statement.

| NAME OF BANK | LOCATION | ADDRESS |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |

6. Give names and addresses of material or equipment suppliers with whom you have established a line of credit or purchased material and equipment during the past 3 years.

| NAME | STREET ADDRESS | CITY & STATE |
|---|---|---|
| Stark Forest Products | 1556 Perry Dr. SW | Canton, OH  44708 |
| Cuyahoga Valley Trucking | PO Box 33095 | North Royalton, OH  44133 |
| Wholesale Builders Supply | 200 First Street | Carnegie, PA  15106 |
| Cleveland Vicon | 4550 Willow Parkway | Cleveland, OH  44191 |
| Functional Building Supply | 18598 Cranwood Parkway | Cleveland, OH  44128 |
| LaFarge North America | 555 Frost Road #10 | Streetsboro, OH  44241 |
| Dougherty Lumber Co. | 6000 Harvard Road | Cleveland, OH  44105 |
| Julian Supply Company | 16300 S. Waterloo Road | Cleveland, OH  44110 |

7. List surety companies with whom you have done business during the past 3 years.

| PROJECT NO. | COUNTY | OWNER | DATE OF CONTRACT | DATE WORK COMPLETED | SURETY COMPANY |
|---|---|---|---|---|---|
| Quay 55 | Cuyahoga (OH) | Quay 55 LTD. | 10/14/02 | 3/26/05 | Westfield Insurance |
| Arbor Park Phase II | Cuyahoga (OH) | Longwood Phase One Asso | 6/10/03 | 12/25/04 | Continental Insurance |
| Rainbow Terrace | Cuyahoga (OH) | Vesta Cleveland LLC | 12/21/01 | 8/21/04 | Continental Insurance |
| Block Building | Marion (IN) | Landmark Indiana Ltd.  P | 12/20/01 | 4/24/04 | Continental Insurance |
| HJ Heinz Lofts | Allegheny (PA) | Progress Street Ltd | 7/1/03 | 1/14/06 | Continental Insurance |
| Park East Synagogue | Cuyahoga (OH) | KM Yarus Inc. | 2/15/04 | 12/3/05 | Continental Insurance |
| Arbor Park Phase III | Cuyahoga (OH) | Arbor Park Phase III Asso | 6/8/04 | 4/22/06 | Continental Insurance |
| Bingham Apartments | Cuyahoga (OH) | Bingham Burnside LLC | 1/23/03 | 2/5/05 | Continental Insurance |
| West Side Homes | Cuyahoga (OH) | Cleveland Housing Networ | 12/22/03 | 1/28/06 | Continental Insurance |
| Weiss Field | Cuyahoga (OH) | City of Avon Lake | 6/14/04 | 10/23/04 | Continental Insurance |
| Case Western Reserve Univer | Cuyahoga (OH) | Case Western Reserve Uni | 3/31/04 | 9/30/05 | Continental Insurance |
| Brainard Road | Cuyahoga (OH) | City of Pepper Pike | 7/10/04 | n/a | Continental Insurance |

## AFFIDAVIT FOR CORPORATION

STATE OF _____ Ohio _____

COUNTY OF _____ Lake _____

_____ Adelbert P. Marous _____, being duly sworn, deposes and says that he is

President _____ of the Marous Brothers Construction, Inc. _____, the corporation described in and

which executed the foregoing statement; that he is familiar with the books of the said corporation showing its

financial condition; that the foregoing financial statement, taken from the books of the said corporation, is a true

and accurate statement of the financial condition of said corporation as of the date thereof, and that the answers

to the interrogatories of the foregoing plant and equipment questionnaire are correct and true as of the date of

this affidavit; and, that the statements and answers to the interrogatories of the foregoing experience

questionnaire are correct and true as of the date of this affidavit.

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

(Principal/Officer must also *sign* and *enter Social Security No.* here)

Sworn to and subscribed before me this 31st day of May 2006

_____
Notary Public

MICHELLE L. ROOF
Notary Public
In and for the State of Ohio
My Commission Expires
June 15, 2008

14

# EXHIBIT

# 13

**From:** Dick Davis
**To:** Tom Saunders; Gil Berry
**Date:** Sunday, July 9, 2006 2:35:08 PM
**Subject:** ASU Development Agreement

Hi Gil And Tom:

I have attached a draft of the development agreement to be used on the
Alabama State project. Please review and let me know your thoughts and any
comments or changes that you might have.

I think that it might be a good idea if you agree to get this in the hands
of Kenny Thomas as well as a draft to Dr. Frazier as early as possible in
the week in order to have them review and hopefully get ready for the
Property Committee next Monday the 18th.

Let me know your thoughts/

Best regards


Dick Davis
Director Development, Acquisitions & Finance
Student Suites
1132 SW Luttrell, Suite A
Blue Springs, MO 64015
816-874-4543 - direct
816-228-4442 - fax
816 516-1123 - cell
davis@discoverynet.com
www.studentsuites.com
--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.9.10/383 - Release Date: 7/7/2006

CONFIDENTIAL
GBA  000653

# DEVELOPMENT AGREEMENT
## DATED JULY 10, 2006

**THIS DEVELOPMENT AGREEMENT** ("Agreement") entered into by and between **Student Suites Gil Berry and Associates, Alabama LLC,** a Missouri Limited Liability Corporation, whose principal place of business is located at 1132 Luttrell, Suite A, Blue Springs, Missouri ("SSGBA) and the **Board of Trustees for Alabama State University, a public corporation and instrumentality of the State of Alabama** ("the University") whose principal place of business is located at 915 S. Jackson St., Montgomery, Alabama, on the last date set forth below by the authorized representatives of the parties hereto, upon their execution of this Agreement;

**WHEREAS,** The University, has a significant need for renovation of existing student housing and addition of new student housing at its campus located in Montgomery, Alabama (the "Campus") and has undeveloped land on the Campus on which new student housing could be constructed; and,

**WHEREAS,** SSGBA desires to undertake a project by which it would: manage and administer, as the Developer, professional services and offer a Guaranteed not to Exceed Price (GMP), based on the prepared scope of work, for the renovation of six residence halls on the (Campus) those halls listed as: Bibb Graves, J.W. Abercrombie, William Benson, Willease Simpson, Bessie Benson and George Card Hall and secure a long term lease of vacant ground on the Campus from ASU and the State of Alabama; finance, design, construct and manage a new residence hall on the Campus designed to accommodate three hundred, eighty (380) students and staff (the "Residence Hall") of ASU; (the lease, financing, construction, management and occupation by ASU students and staff of the Residence Hall are hereinafter sometimes referred to cumulatively as the "Project")

**WHEREAS,** SSGBA has experience in the assembly of a capable team of financial advisors, architects, engineers, contractors, construction managers and related parties and to secure financing for and the design and construction of projects similar to the Project; and

**WHEREAS,** The University is desirous of SSGBA undertaking the Project, is willing to allow SSGBA to do so on the Campus and is willing to secure, from the State of Alabama, by and through the Alabama Department of Administration Services, on behalf of The University, a long term lease, from the State of Alabama to SSGBA or assigns, of vacant ground at the Campus, as described at **Exhibit "A",** a copy of which is attached hereto and incorporated herein, (the "Project Site") for the purpose of allowing SSGBA to undertake the Project; and

**WHEREAS,** The University is desirous of contracting with SSGBA, for those entities to secure the necessary financing and to perform or to engage others to perform all work that is necessary to complete the Project in a timely and cost-efficient manner; and

**WHEREAS, The University** is desirous of contracting with SSGBA to undertake the Project; and

**WHEREAS,** the parties all wish to set forth in this Agreement their respective rights and responsibilities in the undertaking and completion of the Project;

CONFIDENTIAL

**NOW THEREFORE,** in consideration of the mutual covenants and the terms and conditions set forth herein, the sufficiency and receipt of which is acknowledged by each party, the parties agree as follows:

1.   **RESPONSIBILITIES OF SSGBA**

A.   **Design, Construction Management, Bidding and Related Activities**

1)   **Developer's Proposal.** The Developer will perform certain services for the University to advise and administer for the University all necessary tasks to assure the completion of the proposed renovation scope of work, **Exhibit "A"**, in a timely fashion and within the Guaranteed Maximum Price "GMP". The Developer will coordinate with the Project Architect to prepare necessary bidding documentation to comply with Alabama Public Bidding Laws. The Developer will coordinate with the Construction Manager to select and qualify sub-contractors to perform the scope of work .

The Developer shall also provide to The University, at the Project Site, the completed New Residence Hall, which shall consist of the structure described in the Developer's proposals related to the Project dated _____copies of the pertinent portions of which are attached hereto and hereby incorporated herein as **Exhibit "B"**, constructed in strict conformance with all applicable Federal, State of Alabama and local laws, ordinances, regulations and codes.

2)   **Project Schedule.** The Developer acknowledges that, in light of the special circumstances faced by a university, completion of the Project in a timely fashion is critical and that The University will face significant costs for temporary, substitute housing for students and staff, should the Project not be completed in a timely fashion.

3)   **The Architect.** The Developer will coordinate with Brown Chambless Architects, whose principal place of business is located at 260 Market St. Montgomery, AL, (the "Architect") to provide all design, architectural, engineering and sub -contractor bid package services required to complete the Renovation Project.

4)   **The Construction Manager.** The Developer will coordinate with Marous Brothers Construction, Inc., whose principal place of business is located at 1702 Josrph Lloyd Parkway,Willoughby, OH (the "Construction Manager") to serve as Construction Manager for the Project and to provide all services including bid preparation, negotiation with sub-contractors and review of the construction process  necessary to complete the renovation project, in a timely fashion.

7)   **Insurance.** The Developer/Construction Manager will cause adequate insurance coverage to be in place following the award of the sub-contracts, the categories and amounts as follows :

| | |
|---|---|
| Commercial General Liability | $1,000,000 |
| Automobile Liability | $1,000,000 |
| Umbrella Covering | $5,000,000 |
| Worker's Compensation | $  500,000 |
| Builder's Risk | $1,000,000 |

CONFIDENTIAL

In addition, the Developer will, upon the execution of this Agreement, provide The University with certificates of insurance from the Architect and any other person or party who will provide any design, architectural or engineering services to the University or the Construction Manager, for the Project, verifying that the Architect and any other party providing design services, each has in place design liability insurance in a coverage amount of at least Ten Million ($10,000,000) Dollars which will pay any valid claim made within ten (10) years after the Renovation Project is complete and accepted and that the Developer is entitled to at least thirty (30) days written notice of any cancellation or reduction of such coverage. The Developer agrees to notify The University, in writing, immediately upon its receipt of any notice of cancellation or reduction of any such insurance coverage.

8)    **Bond.** The Developer will provide The University and Assigns with a fully executed copies of payment and performance bonds from all Sub- Contractors, issued by a surety authorized to do business in Alabama and acceptable to The University, which acceptance shall not be unreasonably withheld, which bond will guarantee completion of the sub contractor's obligations under this Agreement and payment in full of all contractors, material suppliers and others who contribute to the design or construction of the Project.

9)    **Inspection of the Site.** The University's representatives,  will be entitled to inspect the Project Sites at any time provided such inspections are conducted in a reasonable fashion and are coordinated with the Construction Manager or the Developer.

10)    **Liens.** The Developer will not permit any mechanic's lien nor lien on public funds to be filed against the Project, or the University. Should any such lien be filed, the Developer will immediately cause it to be removed from all public records by securing a bond for such purpose.

2.    **RESPONSIBILITIES OF THE UNIVERSITY** The University wills arrange for appropriate access to and use of the Project Sites for the Developer, the Construction Manager and Architect and their subcontractors and will assist in any necessary coordination in this regard.

B.    **The University**  will cooperate with the Developer, Construction Manager, Sub-Contractors and the Architect in the completion of any applications, notifications, certificates or other documents necessary for the timely completion of the Project.

3.    **THE DEVELOPER'S FEE AND GUARANTEED MAXIMUM PRICE**

A.    **The University** will pay to the Developer the sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (the "Developer's Fees") in full and final payments for all of the Developer's services provided hereunder.

CONFIDENTIAL



GBA  000656

B.    The Developer's Fee will be paid as follows:

    1)    Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) to be paid from funds generated from the Financing and to be paid at the closing of the Financing;

    2)    Seven Hundred Fifty Thousand and 00/100 ($750,000) to be paid upon obtaining project Certificate of Occupancies and the completion of the "punch lists ".

C.    The Developer will offer a Guaranteed Maximum Price (GMP) of $25,000,000 based on the attached Scope of Work (Exhibit A).As additional incentive any project savings from the GMP will be split between The University (1/3) the Construction Manager (1/3) and the Developer (1/3).

4.    **REPRESENTATIONS AND WARRANTIES**

A.    The Developer hereby represents and warrants to The University;

    1)    The execution, delivery and performance of this Agreement has been duly and validly authorized by all necessary actions, corporate and otherwise, on the part of SSGBA;

    2)    The execution, delivery and performance of this Agreement will not result in a breach or violations of or a default under Developer's articles of organization, operating agreement or under any other agreement or instrument by which Developer is bound, or of any law, order or regulation;

    3)    SSGBA is a Missouri Limited Liability Corporation, duly organized, validly existing, in good standing under the laws of Missouri and authorized to do business in Alabama;

    4)    There is no claim, action, litigation, judgment, ruling, suit or proceeding, pending or to the best of Developer's knowledge, threatened, including, without limitation, bankruptcy or other insolvency proceedings, by or against Developer which, if determined adversely to Developer, would adversely affect Developer's ability to perform its obligations hereunder;

    5)    Neither the Developer, nor any related party will purchase any of the bonds issued pursuant to the Financing;

    6)    During the term of such bonds, the Project will consist only of housing and related facilities and all of the residents of the Project shall be persons who are students, faculty or staff of the University.

B.    The University hereby represents and warrants to the Developer as follows:

    1)    The execution, delivery and performance of this Agreement has been duly and validly authorized by all necessary action, corporate or otherwise, on the part of Alabama State University;

CONFIDENTIAL

2)    The execution, delivery and performance of this Agreement will not result in a breach or violation of or a default under Alabama State University's Operating Statement or under any other agreement or instrument by which The University is bound, or of any law, order or regulation;

3)    There is no claim, action, litigation, judgment, ruling, suit or proceeding actual, pending, or to the best of The University's knowledge, threatened including, without limitation, bankruptcy or other insolvency proceedings, by or against The University which, if determined adversely to The University , would adversely affect The University's ability to perform its obligations hereunder;

5.    **MISCELLANEOUS**

**A.    Indemnification.** To the fullest extent permitted by law, the Developer will indemnify and hold harmless The University and their respective consultants, agents, directors and employees, from and against any and all claims, damages, losses, and expenses, including, but not limited to attorney's fees arising out of or resulting from the actions or failure to act of the Developer , the General Contractor, the Architect or any subcontractor, consultant or agent of either the General Contractor or the Architect related in any way to the Project.

**B.    Notice.** To be effective, any notice given by any party to this Agreement must be sent by U.S. Mail, certified, return receipt requested, commercial express mail service or by facsimile and in each case, will be effective only upon the date of receipt. Notice may only be given to each party, as follows:

To The University

Dr. Leon Frazier
Vice President for Admin. Services.
Box 271
Montgomery, AL 36101-0271

To SSGBA

Richard D. Davis and Gil Berry
Student Suites Gil Berry Alabama LLC
1132 Luttrell Suite A
Blue Springs, MO 64015

**C.    Successors and Assigns.** No party to this Agreement will assign its rights or responsibilities hereunder without the express written consent of the other parties hereto.

**D.    Disputes; Choice of Laws; Venue.** The parties agree that any dispute arising hereunder will be resolved first by consultation and negotiation among the parties. Failing a resolution by consultation and negotiation, all disputes hereunder will be resolved before the Circuit Court of Montgomery County, Alabama  with such court applying the law of the State of Alabama.

**E.    Entire Agreement.** This Agreement constitutes the entire Agreement among the parties and supercedes all prior agreements whether oral or written



F.  **Binding Agreement.** This Agreement shall be binding on the parties hereto, their heirs, executors, personal representatives, successors and assigns.

G.  **Headings.** All section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any section.

H.  **Terminology.** All personal pronouns used in the Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa as the context may require.

I.  **Benefits of Agreement.** The obligations and undertakings of the Developer set forth in this Agreement are made for the benefit of The University and except as further provided herein shall not inure to the benefit of any creditor of the Project, notwithstanding any pledge or assignment of this Agreement or any rights hereunder.

J.  **No Other Contractual Relationship.** Nothing herein shall create a contractual relationship between The University or any person or entity other than the Developer.

K.  **Counterparts.** This Agreement may be executed in counterpart originals, each such original, when fully executed, constituting an original Agreement.

L.  **Project Draws** The Developer acknowledges that all project draws are covered by procedures set forth in the Loan Agreement and Indenture as a part of the Financing and that it shall be subject to such procedures.

6.  **TERMINATION RIGHTS**

    The University at its option, may terminate this Agreement in the event of an uncured material breach of this Agreement by the Developer in accordance with the following procedure. First, The University, as applicable, must give written notice to the Developer, which specifies in reasonable detail the breach upon which termination is based. After the Developer receives the notice, the Developer has thirty (30) days to cure the breach described in the notice unless the breach cannot, with due diligence, be cured within this thirty-day period. If the breach cannot, with due diligence, be cured within the thirty-day period, the Developer has not more than sixty (60) days from the date of the notice to cure the breach. If the breach set forth in the relevant notice from The University is not cured within the applicable cure period described in the preceding two sentences, then this Agreement shall terminate upon The University giving separate written notice of such termination to the Developer.

CONFIDENTIAL

**IN WITNESS WHEREOF,** the parties, by their authorized representatives, have caused this Development Agreement to be executed on the last date set forth beneath the signatures of the parties representatives.

**ALABAMA STATE UNIVERSITY**

**STUDENT SUITES GIL BERRY ALABAMA , LLC.**

By _____

(Signature)

_____

(Name Printed)

_____

(Title Printed)

Date _____

By _____

(Signature)

_____

(Name Printed)

_____

(Title Printed)

Date _____

CONFIDEN

GBA 000660

# **EXHIBIT A**

### **The Project Site**

CONFIDENTIA

# <u>EXHIBIT B</u>

The Developer's Proposed Scope of Work

CONFIDENTIAL

# EXHIBIT

# 14



A.S.U.
Program

$2.5 M  Devel Fee
1.3 M  Arch Fees
$3.0 M  CM Fee + Reimb
1.9 M  Furniture

$8.7 M  Subtotal

$16,300,000.00
HARD Construction
Cost



DEFENDANT'S
EXHIBIT

22-GOLDMAN

CONFIDENTIAL

# EXHIBIT

# 15

PRELIMINARY OFFICIAL STATEMENT DATED JULY 25, 2006

NEW ISSUE – BOOK ENTRY ONLY

Ratings:
Moody's Aaa
Standard & Poor's AAA
See "RATINGS" herein.

*In the opinion of Bond Counsel, under existing statutes, regulations, rulings and court decisions, interest on the Series 2006 Bonds will be excluded from gross income for federal income tax purposes. Bond Counsel is also of the opinion that under existing law interest on the Series 2006 Bonds will be exempt from State of Alabama income taxation. For a discussion of other possible tax consequences of receiving interest on the Series 2006 Bonds, see "TAX MATTERS" herein.*

**$42,080,000\***

**BOARD OF TRUSTEES FOR**

**ALABAMA STATE UNIVERSITY**

**General Tuition and Fee Revenue Bonds**

**Series 2006**

Dated: August 1, 2006

Due: August 1, as shown
on the inside cover hereof

This Official Statement of the Board of Trustees for Alabama State University, an agency and instrumentality of the State of Alabama (the "University"), which includes this cover page and the appendices hereto, sets forth certain information for use in connection with the offering by the University of $42,080,000\* principal amount of its General Tuition and Fee Revenue Bonds, Series 2006 (the "Series 2006 Bonds"). The Series 2006 Bonds will be issued under the provisions of a Fourth Supplemental Indenture dated as of August 1, 2006, between the University and U.S. Bank National Association, Birmingham, Alabama, as Trustee (the "Trustee"). The Series 2006 Bonds will be special obligations of the University secured by a pledge of and payable solely from the general tuition, fees and dormitory revenues payable by students enrolled at the University on a parity of lien with the pledge thereof in favor of certain outstanding bonds of the University. Neither the Series 2006 Bonds nor the pledge of the said revenues and other agreements provided in the Indenture shall be or constitute an obligation of any nature whatsoever of the State of Alabama, or be payable out of any moneys appropriated by the State to the University.

Interest on the Series 2006 Bonds is payable semiannually on February 1 and August 1 of each year, commencing February 1, 2007. The Series 2006 Bonds are being issued in fully-registered form, registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Series 2006 Bonds. Individual purchases will be made in book-entry form only, in denominations of $5,000 or any integral multiple thereof, and purchasers will not receive securities representing their beneficial ownership interest in the Series 2006 Bonds purchased. Payments of principal and interest on the Series 2006 Bonds will be paid by the Trustee to DTC, which is obligated in turn to remit such principal and interest to the DTC Participants for disbursement to the beneficial owners of the Series 2006 Bonds. The Series 2006 Bonds are subject to optional and mandatory redemption prior to maturity as described herein.

Payment of the principal of and interest on the Series 2006 Bonds will be insured by a financial guaranty insurance policy to be issued simultaneously with the delivery of the Series 2006 Bonds by XL Capital Assurance Inc.

**XL CAPITAL ASSURANCE**

The Series 2006 Bonds are offered when, as and if issued, subject to the approving opinion of Maynard Cooper & Gale, P.C., Birmingham, Alabama, Bond Counsel. Certain legal matters will be passed upon for the Underwriter by Waldrep Stewart & Kendrick, LLC., Montgomery, Alabama and for the University by its counsel, Thomas, Means, Gillis & Seay, P.C., Montgomery, Alabama. It is expected that the Series 2006 Bonds in definitive form will be available for delivery in New York, New York, on or about August ___, 2006.

**Blount Parrish & Company**
Incorporated

**The Frazer Lanier Company**            **Sterne, Agee & Leach, Inc**
Incorporated

\* Preliminary, subject to change.

July 24, 2006

Maturity Schedule

$42,080,000*
Board of Trustees for
Alabama State University
General Tuition and Fee Revenue Bonds
Series 2006

[maturity schedule to be added]

(accrued interest to be added)

No dealer, broker, salesman or any other person has been authorized by Alabama State University or the Underwriters to give any information or to make any representations other than those contained in this Official Statement, and, if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2006 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from sources which are believed to be reliable, but such information is not guaranteed as to accuracy or completeness, and is not to be construed as a representation of the Underwriters. The information and expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Alabama State University since the date hereof.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 2006 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

* Preliminary, subject to change.

## TABLE OF CONTENTS

Introduction _____ 1
Estimated Sources and Uses of Funds_____ 2
The Series 2006 Bonds _____ 3
Book-Entry System_____ 5
Security for the Series 2006 Bonds_____ 7
Bond Insurance _____ 8
Alabama State University_____ 12
Outstanding and Proposed Indebtedness _____ 15
Financial Information _____ 17
Risk Factors_____ 20
Summary of the Indenture _____ 21
Legality of the Series 2006 Bonds for Investment _____ 27
Tax Matters _____ 28
Legal Matters _____ 28
Ratings _____ 28
Absence of Litigation _____ 29
Underwriting _____ 29
Continuing Disclosure _____ 29
Authorization _____ 31

Appendix A – Audited Financial Statements of the University
Appendix B - Form of Opinion of Bond Counsel
Appendix C - Form of Bond Insurance Policy

[this page intentionally left blank]

MAR 000525

OFFICIAL STATEMENT

$42,080,000*
Board of Trustees for
Alabama State University
General Tuition and Fee Revenue Bonds
Series 2006

## INTRODUCTION

This Official Statement of the Board of Trustees (the "Board") for Alabama State University, an agency and instrumentality of the State of Alabama (the "University"), which includes the cover page and the appendices hereto, sets forth certain information for use in connection with the offering by the University of $42,080,000* principal amount of its General Tuition and Fee Revenue Bonds, Series 2006 (the "Series 2006 Bonds").

The University is a public corporation and instrumentality of the State of Alabama existing under the provisions of Chapter 50 of Title 16 of the Code of Alabama of 1975, as amended. The Series 2006 Bonds are authorized to be issued under provisions of Section 16-3-28 of the Code of Alabama of 1975, as amended. The Series 2006 Bonds will be issued under the provisions of a Trust Indenture dated as of January 1, 2002 (the "Original Indenture"), between the University and SouthTrust Bank, Birmingham, Alabama, as trustee (the "Original Trustee"), as amended and supplemented by a Second Supplemental Indenture dated as of March 1, 2003 (the "Second Supplemental Indenture"), a Third Supplemental Indenture dated as of August 1, 2004 (the "Third Supplemental Indenture") and a Fourth Supplemental Indenture between U.S. Bank National Association, as successor trustee, and the University, dated as of August 1, 2006 (the "Fourth Supplemental Indenture"). The Original Indenture, the Second Supplemental Indenture, the Third Supplemental Indenture and the Fourth Supplemental Indenture are referred to collectively herein as the "Indenture." See "OUTSTANDING AND PROPOSED INDEBTEDNESS" and "SUMMARY OF THE INDENTURE" herein.

The University has authorized the issuance of the Series 2006 Bonds for the purpose of providing funds (i) to pay a portion of the costs of acquiring, constructing and renovating certain capital improvements to the facilities of the University, including reimbursement to the University of funds already expended for such purposes (the "2006 Capital Improvements"), (ii) to pay the premium on a surety bond to be furnished by XL Capital Assurance Inc. in respect of a debt service reserve fund and (iii) to pay the costs incurred in connection with the issuance of the Series 2006 Bonds.

The Series 2006 Bonds are payable solely from, and are secured by a pledge of, the Pledged Revenues, as defined in the Indenture and more fully described below under "THE SERIES 2006 BONDS - Source of Payment and Security." The pledge of the Pledged Revenues in favor of the Series 2006 Bonds will be on a parity of lien with the pledge thereof in favor of certain outstanding bonds of the University. The Series 2006 Bonds will not constitute a charge against the general credit of the University, and will not be payable from moneys appropriated to the University by the State of Alabama. Neither the State of Alabama nor any political subdivision thereof will be liable in any manner for the payment of the principal and interest on the Series 2006 Bonds.

---

* Preliminary, subject to change.

## Campus Housing

The following table shows the University's residence halls, the type of accommodations, capacity and per-semester cost for each, plus the occupancy statistics for both the Fall 2005 and Spring 2006 semesters. The residence halls denoted by an asterisk (*) will be renovated and reconfigured into "suite-style" residences as a component of the 2006 Capital Improvements.

| Residence Hall | Capacity | Fall 2005 Occupancy | % Occupied | Spring 2006 Occupancy | % Occupied | Semester Cost |
|---|---|---|---|---|---|---|
| Abercrombie Hall (single) * | 97 | 97 | 100% | 95 | 98% | $ 1,485 |
| Bessie Benson Hall * | 205 | 202 | 99% | 192 | 94% | 990 |
| William Benson Hall * | 341 | 325 | 95% | 315 | 92% | 990 |
| George Card Hall * | 192 | 187 | 97% | 172 | 90% | 990 |
| C. Johnson Dunn Tower | 478 | 430 | 90% | 375 | 78% | 1,190 |
| Bessie Estelle Hall | 214 | 210 | 98% | 208 | 97% | 1,090 |
| Peyton Finley Apartments | 59 | 45 | 76% | 36 | 61% | 1,090 |
| Bibb Graves Hall * | 151 | 144 | 95% | 124 | 82% | 990 |
| Bibb Graves Hall (single) * | 21 | 21 | 100% | 21 | 100% | 1,485 |
| Martin Luther King Hall | 214 | 214 | 100% | 199 | 93% | 1,090 |
| Willetta McGinty Apartments | 60 | 60 | 100% | 55 | 92% | 1,090 |
| Willease Simpson Hall * | 205 | 190 | 93% | 170 | 83% | 990 |
| **Total** | 2,237 | 2,125 | 95% | 1,962 | 88% | n/a |

## OUTSTANDING AND PROPOSED INDEBTEDNESS

### Outstanding Indebtedness

At the time of the issuance of the Series 2006 Bonds, the following will constitute the entire funded indebtedness of the University, all of which is payable from the Pledged Revenues (except as noted below):

| | |
|---|---|
| Series 1965 Bonds | $ 47,000 |
| Series 1969 Bonds | 180,000 |
| Series 1982 Bonds | 725,000 |
| Series 2002A Bonds | 24,795,000 |
| Series 2002B Bonds | 6,775,000 |
| Series 2003B Bonds | 3,565,000 |
| Series 2004 Bonds | 24,200,000 |
| Series 2005 Bonds (capital lease) | 3,190,000 |
| Series 2006 Bonds | 42,080,000* |
| **Total** | 105,557,000 |

---

\* Preliminary, subject to change.

15

MAR 000540

In October 2005 the Montgomery Public Educational Building Authority issued its $3,190,000 Revenue Bonds (Alabama State University Project), Series 2005 (the "Series 2005 Bonds"). The Series 2005 Bonds were issued to construct a backup electrical plant and the renovation of internal and external lighting systems, which improvements were leased to the University pursuant to a lease agreement dated as of October 1, 2005 (the "Lease Agreement"). The rental obligations of the University under the Lease Agreement are payable from the University's general revenues, other than from moneys appropriated to the University by the State of Alabama, and are not secured by a specific pledge, including the Pledged Revenues.

## Debt Service Requirements

The following table reflects debt service payable ($ in 000s) in the fiscal years shown with respect to each of the bonds specified above under "Outstanding Indebtedness":

| Fiscal Year | 1965 | 1969 | 1982 | 2002A | 2002B | 2003B | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | $ 7 | $ 66 | $ 57 | $ 2,316 | $ 576 | $ 466 | $ 1,117 | $ 72 | $ - | $ 4,677 |
| 2007 | 7 | 65 | 56 | 2,313 | 576 | 469 | 1,139 | 143 | 2,015 | 6,783 |
| 2008 | 7 | 63 | 55 | 2,316 | 576 | 471 | 1,148 | 256 | 2,015 | 6,907 |
| 2009 | 6 | 61 | 59 | 2,314 | 576 | 471 | 1,143 | 257 | 2,015 | 6,902 |
| 2010 | 6 | - | 58 | 2,313 | 576 | 474 | 1,152 | 258 | 2,015 | 6,852 |
| 2011 | 6 | - | 57 | 2,317 | 576 | 470 | 1,146 | 253 | 2,015 | 6,840 |
| 2012 | 6 | - | 55 | 2,316 | 576 | 475 | 1,154 | 253 | 2,015 | 6,850 |
| 2013 | 6 | - | 59 | 2,312 | 576 | 475 | 1,166 | 252 | 2,015 | 6,861 |
| 2014 | 6 | - | 58 | 2,313 | 576 | 478 | 1,158 | 257 | 2,015 | 6,861 |
| 2015 | 6 | - | 56 | 2,314 | 576 | 479 | 1,164 | 256 | 2,015 | 6,866 |
| 2016 | - | - | 55 | 2,316 | 576 | - | 1,621 | 255 | 2,015 | 6,838 |
| 2017 | - | - | 59 | 2,312 | 576 | - | 1,609 | 253 | 2,015 | 6,824 |
| 2018 | - | - | 57 | 2,314 | 576 | - | 1,605 | 256 | 2,015 | 6,823 |
| 2019 | - | - | 56 | 2,316 | 576 | - | 1,616 | 253 | 2,015 | 6,832 |
| 2020 | - | - | 59 | 2,313 | 1,055 | - | 820 | 255 | 2,015 | 6,517 |
| 2021 | - | - | 57 | 150 | 3,406 | - | 818 | 252 | 2,015 | 6,698 |
| 2022 | - | - | 56 | 150 | 3,414 | - | 807 | 253 | 2,015 | 6,695 |
| 2023 | - | - | - | 3,075 | - | - | 1,295 | 252 | 2,015 | 6,637 |
| 2024 | - | - | - | - | - | - | 1,952 | 252 | 4,425 | 6,629 |
| 2025 | - | - | - | - | - | - | 1,953 | 254 | 4,426 | 6,633 |
| 2026 | - | - | - | - | - | - | 1,945 | 251 | 4,427 | 6,623 |
| 2027 | - | - | - | - | - | - | 1,942 | - | 4,426 | 6,368 |
| 2028 | - | - | - | - | - | - | 1,931 | - | 4,423 | 6,354 |
| 2029 | - | - | - | - | - | - | 1,921 | - | 4,424 | 6,345 |
| 2030 | - | - | - | - | - | - | 1,910 | - | 4,423 | 6,333 |
| 2031 | - | - | - | - | - | - | 1,920 | - | 4,425 | 6,345 |
| 2032 | - | - | - | - | - | - | 1,904 | - | 4,424 | 6,328 |
| 2033 | - | - | - | - | - | - | 1,884 | - | 4,426 | 6,310 |
| 2034 | - | - | - | - | - | - | - | - | 4,425 | 4,425 |
| 2035 | - | - | - | - | - | - | - | - | 4,426 | 4,426 |
| 2036 | - | - | - | - | - | - | - | - | 4,423 | 4,423 |
| Total | $ 63 | $ 255 | $ 969 | $ 38,090 | $ 15,939 | $ 4,728 | $ 40,940 | $ 5,043 | $ 91,778 | $ 197,805 |

---

* Estimated, based on market conditions as of July 24, 2006.

16

Proposed Indebtedness

The University does not have any present plans for incurring additional indebtedness.

## FINANCIAL INFORMATION

### Major Sources of Revenue

*State Appropriations.* The largest single source of revenue of the University is appropriations by the State of Alabama, although the University's overall reliance on such funding source has generally declined, as a percentage of the University's total budget, over the past several years. A substantial portion of the State tax revenues is paid into the Alabama Special Educational Trust Fund (the "SETF") and is appropriated for educational purposes, including appropriations for the University and other institutions of higher learning. The SETF was established in 1927 by Act of the Legislature, and revenues are paid into the SETF pursuant to constitutional provisions and continuing appropriations of the Legislature. Among the State taxes paid into the SETF are the utilities gross receipts and use taxes, lease taxes, sales taxes, income taxes, and a portion of the State ad valorem taxes.

The fiscal 2007 appropriation from SETF for the University, approved by the Alabama Legislature for fiscal 2007, is $42,571,425. The actual appropriation for fiscal year 2006 was $34,562,593. The University has experienced proration in a number of past fiscal years, most recently in 2001. There can be no assurance that appropriations to the University from the SETF or from the other sources can or will be held at present levels. State appropriations for the University have been as follows as a percent of total revenues (both restricted and unrestricted) for the fiscal years shown ($ in 000s):

| Fiscal Year | Operating Revenues | State Appropriation | Total | State % of Total |
|---|---|---|---|---|
| 2002 | $ 57,534 | $ 29,242 | $ 86,776 | 33.7% |
| 2003 | 65,498 | 30,039 | 95,537 | 31.4% |
| 2004 | 61,883 | 31,371 | 93,254 | 33.6% |
| 2005 | 67,803 | 32,211 | 100,014 | 32.2% |
| 2006 | n/a | 34,563 | n/a | n/a |
| 2007 | n/a | 42,571 | n/a | n/a |

Beginning with the fiscal year ended September 30, 2002, the University (like the vast majority of public colleges and universities) changed its accounting method to comply with rules promulgated by the Governmental Accounting Standards Board (GASB 34 and 35). Among other things, GASB 34 and 35 require the reporting of revenues "net" of certain items previously reported as costs or expenses elsewhere in the financial statements. Due to these accounting changes, certain ratios and other quantitative measures derived from the audited financial statements of the University may not correlate directly with the corresponding measures derived from audited financial statements in prior fiscal years.

*SETF Proration.* Under the Constitution of Alabama, if in any Fiscal Year there are insufficient funds of the State to pay all claims, a proration of claims is required. The SETF is subject to this constitutional requirement and, if moneys in the fund are insufficient to pay all amounts appropriated therefrom by the Legislature, each appropriation must be reduced pro rata. On February 2, 2001, then-Gov. Don Siegelman announced a 6.2% reduction in certain State spending due to lower than expected revenues from sales tax and income tax, with such reduction affecting appropriations in the fiscal year which ended September 30, 2001. The revenues are deposited into the SETF and are allocated among several State agencies, including the Department of Education. State law requires that, when actual

17

revenues fall short of estimates, the Governor must declare proration and reduce allocations proportionally among beneficiaries of the SETF. Since such declaration in 2001, the Governor of Alabama has not declared proration.

*Student Tuition and Fees.* Student tuition and fees are payable by students in advance of attendance of any classes. In certain instances, the University makes available a deferred payment plan for students meeting certain qualifying criteria. These funds may be used for any purposes designated by the Board of Trustees, but historically the funds have been expended primarily for instructional purposes. The Board has the sole authority to establish the student tuition and fees, which it may set at whatever level it considers appropriate and in the best interests of the University. State appropriations are not increased or reduced based on, or otherwise offset against, revenues from student tuition and fees.

## Significant Accounting Policies

The financial statements of the University included herewith at Appendix A have been prepared on the accrual basis of accounting. In accordance with GASB Statement No. 20, the University is required to follow all applicable GASB pronouncements. In addition, the University applies all applicable Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principle Board Opinions (APB) and Accounting Research Bulletins of the Committee on Accounting Procedures issued on or before November 30, 1989 unless those pronouncements conflict with or contradict GASB pronouncements. The impact of adopting GASB Statement No. 39 resulted in changes in the presentation of the financial statements and providing additional disclosures in the statements.

GASB issued Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries.* This statement establishes accounting and financial reporting standards for impairment of capital assets. A capital asset is considered impaired when its service utility has declined significantly and unexpectedly. This statement also clarifies and establishes accounting requirements for insurance recoveries. This statement is effective for financial statements for periods beginning after December 31, 2004. The University is evaluating the effects, if any, these statements will have on its financial statements.

Operating revenues of the University consist of tuition and fees, grants and contracts, and sales and services of auxiliary enterprises. For purposes of the statement of cash flows, the University considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents. Cash and cash equivalents include cash on hand and demand deposits. Receivables are reported at their gross value when earned and are reduced by the estimated portion that is expected to be uncollectible. The allowance for uncollectible amounts is based on collection history. When continued collection activity results in receipt of amounts previously written off, revenue is recognized for the amount collected.

State statutes authorize the University to invest in U.S. government obligations, or in bonds of the State of Alabama or in any county or municipality therein, or in certificates of deposit collaterally secured by a pledge of U.S. government obligations. The current and noncurrent portfolios of investments are marketable debt securities and are carried at cost plus amortized premium at the balance sheet date. Related premiums are amortized to income over the terms of the investments. Interest income on investments is accrued as earned.

Restricted assets consist of monies and other resources which are restricted legally as described below:

18

MAR 000543

*Grants and Contracts.* These assets represent federal, state and local government grants and contract revenues restricted for student aid, research and development and other educational programs.

*Capital Projects and Debt Service.* These assets represent capital debt proceeds that are restricted for designated capital projects and portions of bond proceeds deposited in the Debt Service Reserve Account or Capital Projects Account, pursuant to the terms of trust indentures.

Property, plant and equipment are valued at cost. Donated fixed assets are valued at their estimated value on the date donated. Depreciation has been provided over the estimated useful lives using the straight-line method. Cost of constructed fixed assets includes interest during the construction period. No depreciation is provided on construction in progress until construction is substantially complete and the asset is placed in service. When property and equipment are disposed of, the related cost and accumulated depreciation are removed from the accounts with gains or losses on disposition being reflected in current operations. Maintenance and repairs are expended as incurred.

Interest cost related to construction financing is capitalized, net of interest revenue earned on the borrowed proceeds, from the time of borrowing until construction is substantially complete and the asset is placed in service. Bond issue costs, original issue discount and deferred loss on refunding on long-term indebtedness are deferred and amortized using the effective interest method over the life of the debt to which it relates.

The University's employees earn vacation leave at graduated rates based on their length of service (one day per month of service initially) and up to 36 days of unused leave may be carried over to the following year. Sick leave is earned at the rate of eight hours for each month of service and can accumulate up to 180 days. The University funds sick leave as taken. An accrual is recorded for accumulated unpaid vacation pay.

The preparation of financial statements in conformity with generally accepted accounting principles requires the University to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

## Knight v. State of Alabama

*Background.* In 1981, John F. Knight Jr. and 19 University alumni, students and faculty members filed Civil Action No. 81-52-N in the United States District Court, Middle District of Alabama. The lawsuit (referred to herein as the "Knight case") attacked alleged vestiges of segregation and discrimination in the State of Alabama's funding and administration of its public colleges and universities. After many years of litigation, in 1995 the University generally prevailed and the outcome of the Knight case has resulted in certain beneficial financial occurrences for the University.

*Endowments.* The court decree ending the Knight case required the establishment of The Alabama State University Trust for Educational Excellence (the "Permanent Endowment") and required that the State of Alabama provide funds on an annual basis to augment the University's endowment. The University was awarded $1 million annually for 15 years (1995-2010). Further, the State of Alabama is required to annually match University-raised contributions to the Permanent Endowment in an amount of up to $1 million per year. As of September 30, 2005 the market value of the University's Permanent Endowment (which is accounted for as a separate accounting entity from the University) was approximately $33 million. Court-ordered payments from the State of Alabama to the University to fund the Permanent Endowment are not subject to State budget proration.

19

MAR 000544

*Modification of Funding Formula and Award for Capital Expenditures.* As a result of the Knight case, the Alabama Commission on Higher Education modified its formula for the awarding of state appropriations. This caused an increase in the University's annual funding from the SETF. The University was also awarded more than $15 million for capital expenditures on its Montgomery campus.

*Diversity.* As a result of the Knight case, other-race scholarships were awarded to the University to help it diversify its student body (which is now approximately 8% white). The scholarships were required to be funded annually through 2005, with the University is reimbursed up to $1 million a year for these diversity scholarships. The University was directed to develop and implement a recruitment policy targeting white students and an advertising campaign focusing on institutional quality and openness to students of all racial backgrounds. Court-ordered payments from the State of Alabama to the University to fund the diversity scholarships are not subject to State budget proration.

*Award of Academic Programs and Protection from Competing Institutions.* The court awarded a number of high-demand programs to the University to materially assist in its development. The University was directed to develop and implement a curriculum and program of study in allied health sciences and was awarded up to two Ph.D. programs and a master's degree in accounting. Troy University - Montgomery was enjoined from expanding its physical plant without court approval. Program duplication in business and education at the University and Auburn University at Montgomery was reduced by establishing cooperative programs of study.

*Outlook.* The University expects that additional financial compensation and remedies will be awarded from the court in connection with the Knight case, however the extent to which this will occur is uncertain.

## Retirement Benefits

Most employees participate in the Teachers' Retirement System of Alabama, and payments under these plans are funded as they accrue. The University pays the employer's share of Federal Insurance Contribution Act taxes and provides for retirement benefits under the Teachers' Retirement System of Alabama for most employees of the University.

## Financial Statements

There is attached to this Official Statement as Appendix A the audited financial statements of the University for the fiscal year ended September 30, 2005. The University is periodically audited by the State of Alabama Department of Examiners of Public Accounts. As of the date of this Official Statement, the state audits for the 2003 and 2004 fiscal years are pending release. Commencing with the fiscal year ended September 30, 1999, the University has employed the Birmingham, Alabama accounting firm Banks, Finley, White & Company to perform an annual audit.

## RISK FACTORS

### Legislative Appropriations

The Legislature of the State of Alabama (the "Legislature") annually appropriates funds from the SETF and other sources which are used by the State's universities for payment of capital costs and operating expenses incurred in connection with their various activities. Appropriated funds to the various universities are subject to re-allocation each fiscal year. There is no assurance that the Legislature will

MAR 000545

continue to make appropriations to the State's universities in amounts commensurate with appropriations from prior fiscal years. Further, funds appropriated by the Legislature are not included in the Pledged Revenues.

## Budget Proration

The SETF budget for the State of Alabama was last placed in proration to the extent of 6.2 percent for the fiscal year ended September 30, 2001 and proration has been declared, to varying degrees, in a number of prior years. There can be no assurance that appropriations to the University from the SETF or from other sources can or will be held at present levels. See also "FINANCIAL INFORMATION – Major Sources of Revenue – SETF Proration" herein.

## Remedies

Purchasers of the Series 2006 Bonds should understand that, in the event of default by the University, the remedies provided in the Indenture may be unenforceable due to the application of principles of equity or State and Federal laws relating to bankruptcy, moratorium, reorganization and creditor's rights generally, or may require the expenditure of considerable money and time to enforce.

## SUMMARY OF THE INDENTURE

The following constitutes a summary of certain portions of the Indenture pursuant to which the Series 2006 Bonds and any Additional Bonds will be issued. This summary should be qualified by reference to other provisions of the Indenture referred to elsewhere in this Official Statement, and all references and summaries pertaining to the Indenture in this Official Statement are, separately and in whole, qualified by reference to the exact terms of the Indenture, a copy of which may be obtained from the University. All references herein to the "Bonds" include the Series 2002A Bonds, the Series 2002B Bonds, the Series 2003B Bonds, the Series 2004 Bonds, the Series 2006 Bonds and any Additional Bonds that may be issued.

## Security Provided

In the Indenture the University has pledged for payment of all Bonds issued thereunder so much as may be necessary therefor of the Pledged Revenues. All Bonds issued under the Indenture are equally and ratably secured by such pledge, but the University may, in any supplemental indenture by which Additional Bonds are issued, (a) provide bond insurance, letters of credit or other credit enhancement applicable solely to such series of Bonds or a portion of such series, or (b) deny to such series of Additional Bonds or portion of such series the benefit of the security provided for by the Reserve Fund established under the Indenture. The Indenture does not create a lien or other charge on any assets, funds or properties of the University other than the Pledged Revenues.

## Additional Bonds

The Indenture permits the University to issue Additional Bonds, not limited in aggregate principal amount, for one or both of the following purposes:

> (a)    To acquire, by construction or otherwise, capital improvements to the facilities of the University (or to refund securities or notes of the University issued for such purpose), or

(b)    To refund or retire all or any portion of any one or more series of Bonds then outstanding under the Indenture.

As a condition precedent to the issuance of any such Additional Bonds, the University is required by the Indenture to furnish to the Trustee a certificate of the University's Vice President for Fiscal Affairs to the effect that, (i) the Pledged Revenues received during the Fiscal Year next preceding the Fiscal Year during which such Additional Bonds are issued were not less than 120% of the Maximum Annual Debt Service Requirement during the then current or any subsequent bond year (a period beginning on January 2 of one calendar year and ending on January 1 of the next calendar year) immediately following the issuance of such Additional Bonds and (ii) the Maximum Annual Debt Service Requirement during the then current or any subsequent bond year (a period beginning on January 2 of one calendar year and ending on January 1 of the next calendar year) immediately following the issuance of such Additional Bonds may not exceed a sum equal to 12% of the University's total unrestricted current fund revenues as reflected in its most recent audit. The following terms used in the preceding sentence or elsewhere in this Official Statement have the following meanings:

"Annual Debt Service Requirement" means, as of any time, the amount of principal and interest maturing with respect to the Bonds and all other bonds or obligations secured by a pledge of all or a portion of the Pledged Revenues during a bond year, provided, that, (a) the principal amount of any Bonds subject to a mandatory redemption requirement during a bond year are considered as maturing in the bond year during which such redemption is required rather than in the year of stated maturity, (b) in the case of Bonds (whether outstanding or proposed to be issued) that bear interest at a variable or adjustable rate, the interest payable on such Bonds is calculated on the assumption that such Bonds bear interest at a fixed rate of interest estimated by the Vice President for Fiscal Affairs of the University on the date such computation is required by reference to bonds of similar credit rating and maturity and (c) Bonds for the payment of which an escrow agreement of the type described below under "Defeasance" are not deemed to be outstanding.

"Maximum Annual Debt Service Requirement" means, as of any date of determination, the maximum Annual Debt Service Requirement during the then current or any then succeeding bond year; provided, however, that in computing the Maximum Annual Debt Service Requirement for any purposes pertaining directly to the Reserve Fund, the Annual Debt Service Requirement with respect to Bonds not entitled to the benefit of the security provided by the Reserve Fund shall be excluded.

## The 2006 Capital Improvements

A portion of the proceeds from the sale of the Series 2006 Bonds will be used to pay the costs of completing certain construction projects on the University's campus, as more specifically described elsewhere in this Official Statement, as well as reimbursing the University for a portion of such costs already expended for such purposes.

## Creation of Funds

*Costs of Issuance Fund.* The Indenture creates a trust fund which shall be designated the "Costs of Issuance Fund". A deposit to the Costs of Issuance Fund is to be made pursuant to the Indenture. Moneys in the Costs of Issuance Fund shall be paid out by the Trustee from time to time for the purpose of paying Costs of Issuance with respect to the Series 2006 Bonds and upon delivery to the Trustee of a requisition substantially in the form set forth in the Indenture, executed by an Authorized University Representative. After an Authorized University Representative certifies to the Trustee that moneys

MAR 000547

remaining in the Costs of Issuance Fund are not needed to pay Costs of Issuance with respect to the Series 2006 Bonds, any balance remaining in the Costs of Issuance Fund shall be deposited in the Acquisition Fund.

*Acquisition Fund.* There shall be deposited in the Acquisition Fund (the "Acquisition Fund") all proceeds of issuance of the Series 2006 Bonds net of the Underwriters' discount and deposit to the Reserve Fund (if required, as described below). Moneys in the Acquisition Fund shall be used solely for payment of the costs of acquiring, constructing, improving and equipping the 2006 Capital Improvements, all as more fully set forth in the Indenture. The Trustee is authorized to make disbursements from the Acquisition Fund for payment of all costs of construction, acquisition and equipping specifically authorized by the Indenture, which shall include reimbursement of the University for certain prior capital expenditures.

*Bond Fund.* The Indenture creates a Tuition and Fee Revenue Bond Principal and Interest Fund (the "Bond Fund") for the purpose of providing for the payment of the principal of and the interest on the Series 2006 Bonds as they mature and the redemption price of Bonds called for mandatory redemption. In order to provide funds for the payment of the principal of and the interest on the Series 2006 Bonds, there shall be deposited by the University into the Bond Fund, out of Pledged Revenues [except as otherwise provided in clause (1) below], the following amounts at the following times:

      (1)    simultaneously with the issuance and sale of the Series 2006 Bonds and out of the proceeds derived therefrom, into the Bond Fund that portion of such proceeds allocable to premium (if any) and accrued interest;

      (2)    on or before two Business Days prior to the end of August 2006, and on or before two Business Days prior to the end of each calendar month thereafter until and including July 2036, into the Bond Fund an amount equal to one-sixth (1/6) of the interest becoming due with respect to the then outstanding Bonds on the next succeeding Interest Payment Date, provided, however, that the University's required payment for August 2006 shall be credited by an amount equal to the accrued interest on the Series 2006 Bonds from their date to the date of delivery; and

      (3)    on or before two Business Days prior to the end of August 2023, and on or before two Business Days prior to the end of each calendar month thereafter until and including July 2036, into the Bond Fund an amount equal to one-twelfth (1/12) of the principal amount of Bonds maturing or due to be redeemed on the next succeeding August 1.

*Reserve Fund.* There is created pursuant to the Indenture a debt service reserve fund (the "Reserve Fund"). Under the terms of the Indenture, the University is required to deposit funds into the Reserve Fund in an amount equal to the Maximum Annual Debt Service Requirement. The Indenture provides that the University may satisfy the Reserve Requirement by the deposit of cash or by the delivery and deposit of a "qualified surety bond," or a combination of the two. A "qualified surety bond" means a surety bond issued by an insurance company rated in the highest rating category by Standard & Poor's and Moody's and, if rated by A.M. Best & Company, must also be rated in the highest rating category by A.M. Best & Company. The Insurer (as described herein in the section entitled "BOND

23

INSURANCE") will, simultaneously with the delivery of the Series 2006 Bonds, deliver a surety bond in the amount of the Maximum Annual Debt Service Requirement.

**Investment of Funds**

The Indenture requires that the Trustee, to the extent practical, cause all moneys on deposit in the Acquisition Fund, the Costs of Issuance Fund, the Bond Fund and the Reserve Fund (if any) to be kept continuously invested in Permitted Investments (as defined in the Indenture). Interest income on investments in the Bond Fund is credited on Bond Fund payments.

**Audits**

The University will maintain complete books and records pertaining to the Pledged Revenues. It will also cause an audit of its books and records to be made at least once each two years either by an independent auditor or by an auditor that is an employee of the State of Alabama but not of the University. Each such audit is required to contain a separate statement of the amount of Pledged Revenues during each Fiscal Year, or sufficient information from which such amount may be readily determined. Within ten days following the receipt of each audit report, the University will furnish a copy to the Trustee and the original purchasers of each series of Bonds from the University.

**Agreements Respecting Maintenance of Pledged Revenues**

The University will agree in the Indenture that, so long as the principal of or the interest on any of the Series 2006 Bonds remain unpaid or until payment thereof shall have been provided for, the University will place in effect and maintain such parietal rules and regulations with respect to its student housing facilities (including, without limitation, rules and regulations imposing upon students on-campus residency requirements), and will place in effect such dormitory rental rates, tuition charges and fees as will produce Pledged Revenues during each Fiscal Year which will be sufficient to pay the Maximum Annual Debt Service Requirement on the Series 1965 Bonds, the Series 1969 Bonds, the Series 1982 Bonds, the Series 2002A Bonds, the Series 2002B Bonds, the Series 2003B Bonds, the Series 2004 Bonds, the Series 2006 Bonds and any Additional Bonds, as well as to cover current fund expenditures and current auxiliary expenditures in an amount not less than the current fund expenditures and the current auxiliary expenditures for the prior Fiscal Year. The University will from time to time make such increases and other changes in such rates and charges as may be necessary to produce said amounts.

**Events of Default and Remedies on Default**

The following are events of default under the Indenture:

(a)    failure by the University to pay the principal of, the interest on or the premium (if any) on any of the Series 2006 Bonds as and when the same become due (whether such shall become due by maturity or otherwise);

(b)    failure by the University to perform and observe any of the agreements and covenants on its part contained in the Indenture (other than in the manner described in (a) above) which such failure continues for a period of not less than 30 days after written notice of such failure has been given to the University by the Trustee or by the holders of not less than 25% in principal amount of the Bonds then outstanding and secured by the Indenture, unless during such period or any extension thereof the University has commenced and is diligently pursuing appropriate corrective action;

24

MAR 000549

The information contained in this Official Statement does not purport to be comprehensive or definitive. All references herein to, or summaries of, the Indenture, or any contract, resolution or other document or official act related to the Series 2006 Bonds are qualified in their entirety by the exact terms of such documents or official acts, which are items of public record available from the University. All references herein to, or summaries of, the Series 2006 Bonds are qualified in their entirety by the definitive forms thereof and the information with respect thereto included in the Indenture. Inquiries regarding the University may be directed to the Office of the Vice President for Fiscal Affairs, Alabama State University, 915 South Jackson Street, Montgomery, Alabama 36104 (334) 229-4223.

## ESTIMATED SOURCES AND USES OF FUNDS

It is estimated that the principal proceeds from the Series 2006 Bonds, including accrued interest, will be applied substantially as follows:

| Sources of funds: | |
|---|---|
| Par amount of Series 2006 Bonds | $ 42,080,000* |
| Original issue discount (net) | |
| Accrued interest | |
| **Total sources of funds** | **$** |

| Uses of funds: | |
|---|---|
| 2006 Capital Improvements (see below) | $41,000,000 |
| Accrued interest | |
| Issuance expenses (including bond insurance and surety premiums) | |
| **Total uses of funds** | **$** |

### The 2006 Capital Improvements

*Student Center* .  Approximately $15,000,000 of the proceeds from the sale of the Series 2006 Bonds will be used to pay a portion of the cost of acquiring, constructing and equipping buildings comprising the University's Student Center. When the acquisition, construction and equipping of the Student Center is completed, the Student Center will house meeting rooms, recreational facilities, campus post office, bookstore, office space for student organizations and other amenities. Significant expansion and renovation to dining facilities and other student amenities is nearing completion as part of the overall Student Center complex.

*Campus Housing Facilities.* Approximately $25,000,000 of the proceeds from the sale of the Series 2006 Bonds will be used to pay a portion of the cost of renovations to six (6) existing student housing facilities on the University's campus. The campus housing facilities being renovated with a portion of the proceeds of the Series 2006 Bonds will be converted to "suite-style" accommodations and will feature modern communications, wireless internet, enhanced security and other amenities currently favored by college students. The University has closed two dormitories for renovation and has acquired a nearby apartment complex to house students displaced by the dormitory renovation project, which is expected to take place in three phases. While there can be no assurance thereof, the University expects to complete the first two dormitories by fall semester 2007 and to complete two additional dormitories by the beginning of each semester thereafter until all six are fully renovated by fall semester 2008. See "ALABAMA STATE UNIVERSITY – Campus Housing" herein.

---

\* Preliminary, subject to change.

2

MAR 000527

# THE SERIES 2006 BONDS

**General**

The Series 2006 Bonds will be issued in fully registered form and, when issued, will be registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"). DTC will act as securities depository of the Series 2006 Bonds. Individual purchases of ownership interests in the Series 2006 Bonds will be made in book-entry form only in the denomination of $5,000 or any integral multiple thereof under the provisions of the Indenture and will become payable on the dates and will bear interest at the rates shown on the cover and on the inside cover page hereof. See "BOOK-ENTRY SYSTEM" herein. The Series 2006 Bonds will be dated August 1, 2006.

**Payment of Principal of and Interest on the Series 2006 Bonds**

Principal and interest on the Series 2006 Bonds will be payable by the Trustee to DTC, which is obligated, in turn, to remit such principal and interest to DTC Participants for subsequent disbursement to the Beneficial Owners of the Series 2006 Bonds. Interest on the Series 2006 Bonds (computed on the basis of a 360-day year of twelve consecutive 30-day months) is payable semiannually each February 1 and August 1, commencing February 1, 2007.

**Redemption Provisions Pertaining to the Series 2006 Bonds**

*Optional Redemption with Premium.* Series 2006 Bonds with stated maturities after August 1, 20__ may be redeemed in whole or in part at the option of the University on or after August 1, 20__ at the applicable redemption price (expressed as a percentage of principal amount redeemed) set forth in the table below plus accrued interest to the redemption date:

| Redemption Dates (Dates Inclusive) | Redemption Prices |
|---|---|
| August 1, 20__ through July 31, 20__ | 10_% |
| August 1, 20__ and thereafter | 100% |

*Scheduled Mandatory Redemption of 20__ Term Bonds.* The Series 2006 Bonds maturing on August 1, 2026 (the "2026 Term Bonds") shall be redeemed, at the redemption price equal to 100% of the principal amount to be redeemed plus accrued interest thereon to the redemption date, on August 1 in the years and principal amounts (after credit as provided below) as follows:

| August 1 | Amount |
|---|---|
| | $ |

20__ Term Bonds in the aggregate principal amount of $_____ will be scheduled to remain to be paid at their maturity on August 1, 20__.

---

* Preliminary, subject to change.

MAR 000528

Not less than 45 or more than 60 days prior to each such scheduled mandatory redemption date with respect to the 20__ Term Bonds (the "Term Bonds"), the Trustee shall proceed to select for redemption, by lot, Term Bonds or portions thereof in an aggregate principal amount equal to the amount required to be redeemed and shall call such Term Bonds or portions thereof for redemption on such scheduled mandatory redemption date. The University may, not less than 60 days prior to any such scheduled mandatory redemption date, direct that any or all of the following amounts be credited against the principal amount of Term Bonds scheduled for redemption on such date: (A) the principal amount of Term Bonds delivered by the University to the Trustee for cancellation and not previously claimed as a credit; (B) the principal amount of Term Bonds previously redeemed (other than Term Bonds redeemed pursuant to this paragraph) and not previously claimed as a credit; and (C) the principal amount of Term Bonds otherwise deemed "Fully Paid" and not previously claimed as a credit.

**Selection of Bonds to be Redeemed**

Whenever less than all the outstanding Bonds maturing on any one date are called for redemption at any one time, the Trustee shall select the Series 2006 Bonds to be redeemed, from the outstanding Series 2006 Bonds maturing on such date not previously selected for redemption, by lot in any manner which the Trustee in its discretion deems fair.

**Notice of Redemption**

Notice of redemption shall be mailed by the Trustee not less than 30 nor more than 60 days prior to the redemption date, (i) to the respective owners of any Bonds (i.e., Cede & Co., as nominee for DTC, so long as the DTC book-entry system is used for the Series 2006 Bonds) designated for redemption at their addresses appearing on the bond registration books of the Trustee, (ii) to the Information Services (as defined in the Indenture), and (iii) to the Securities Depositories (as defined in the Indenture).

Failure by the Trustee to give notice to any one or more of the Information Services or Securities Depositories, or the insufficiency of any such notice or the failure of any owner to receive any redemption notice mailed to such owner or any immaterial defect in the notice so mailed shall not affect the sufficiency of the proceedings for the redemption of any Series 2006 Bonds. So long as the book-entry system is used for the Series 2006 Bonds, the Trustee will give any notice of redemption or any other notices required to be given to registered owners of Bonds only to Cede & Co., as nominee for DTC.

Any failure of DTC to advise any DTC Participant or of any DTC Participant to notify the Beneficial Owner, of any such notice and its content or effect will not affect the validity of the redemption of the Series 2006 Bonds called for redemption or any other action premised on such notice. Beneficial Owners may desire to make arrangements with a DTC Participant that all notices of redemption or other communications to DTC which affect such Beneficial Owners, including notification of all interest payments, will be forwarded in writing by such DTC Participant. See "BOOK-ENTRY SYSTEM" herein.

**Effect of Redemption**

From and after the date fixed for redemption of any Series 2006 Bonds or any portions thereof, if notice of such redemption shall have been duly given and funds available for the payment of such redemption price of the Series 2006 Bonds or such portions thereof so called for redemption shall have

MAR 000529

been duly provided, no interest shall accrue on such Series 2006 Bonds or such portions thereof from and after the redemption date specified in such notice.

## BOOK-ENTRY SYSTEM

DTC will act as securities depository for the Series 2006 Bonds. The ownership of one fully registered Series 2006 Bond for each maturity as set forth on the inside cover page hereof, each in the aggregate principal amount of such maturity, will be registered in the name of Cede & Co., as nominee for DTC. DTC is a limited-purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC was created to hold securities of its participants (the "DTC Participants") and to facilitate the clearance and settlement of securities transactions among DTC Participants in such securities through electronic book-entry changes in accounts of the DTC Participants, thereby eliminating the need of physical movement of securities certificates. DTC Participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations, some of whom (and/or their representatives) own DTC. Access to the DTC system is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly.

Ownership interests in the Series 2006 Bonds, in the denomination of $5,000 principal amount or any integral multiple thereof, may be purchased by or through DTC Participants. Such DTC Participants and the persons for whom they acquire interests in the Series 2006 Bonds as nominees will not receive certificated Series 2006 Bonds, but each such DTC Participant will receive a credit balance in the records of DTC in the amount of such DTC Participant's interest in the Series 2006 Bonds, which will be confirmed in accordance with DTC's standard procedures. Each such person for which a DTC Participant has an interest in the Series 2006 Bonds, as nominee, may desire to make arrangements with such DTC Participant to receive a credit balance in the records of such DTC Participant, and may desire to make arrangements with such DTC Participant to have all notices of redemption or other communications of the University or the Trustee, to DTC, which may affect such persons, to be forwarded in writing by such DTC Participant and to have notification made of all interest payments.

With respect to Series 2006 Bonds registered in the registration books kept by the Trustee in the name of Cede & Co., as nominee of DTC, the University, the Underwriters, and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of which a DTC Participant holds an interest in the Series 2006 Bonds with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Series 2006 Bonds, (ii) the delivery to any DTC Participant or any other person, other than a Bondholder, as shown in the registration books kept by the Bond registrar, of any notice with respect to the Series 2006 Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other person, other than a bondholder, as shown in the registration books kept by the Trustee, of any amount with respect to principal of or interest on the Series 2006 Bonds. The University and the Trustee may treat and consider the person in whose name each Bond is registered in the registration books kept by the Trustee as the holder and absolute owner of such Bond for the purpose of payment of principal, premium and interest with respect to such Series 2006 Bond, for the purpose of giving notices of redemption and other matters with respect to such Series 2006 Bond, for the purpose of registering transfers with respect to such Series 2006 Bond, and for all other purposes whatsoever. For the purposes of this Official Statement, the term "Beneficial Owner" shall hereinafter be defined to include the person for whom the DTC Participant acquires an interest in the Series 2006 Bonds.

MAR 000530

DTC will receive payments from the Trustee to be remitted by DTC to the DTC Participants which will in turn remit to the Beneficial Owners. The ownership interest of each Beneficial Owner in the Series 2006 Bonds will be recorded on the records of the DTC Participants, whose ownership interests will be recorded on a computerized book-entry system operated by DTC.

When reference is made to any action which is required or permitted to be taken by the Beneficial Owners, such reference shall only relate to those permitted to act (by statute, regulation or otherwise) on behalf of such Beneficial Owners for such purposes. When notices are given, they shall be sent by the Trustee to DTC only.

Beneficial Owners will receive from the DTC Participants a written confirmation of their purchase detailing the terms of the Series 2006 Bonds acquired. Transfers of ownership interests in the Series 2006 Bonds will be accomplished by book entries made by DTC and the DTC Participants who act on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in the Series 2006 Bonds, except as specifically provided in the Indenture. Interest and principal will be paid by the Trustee to DTC, then paid by DTC to the DTC Participants and thereafter paid by the DTC Participants to the Beneficial Owners when due.

For every transfer and exchange of the Series 2006 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax, fee or other governmental charge that may be imposed in relation thereto, and any reasonable fees and expenses of the Trustee and costs incurred in preparing bond certificates.

DTC's services with respect to the Series 2006 Bonds may be discontinued or terminated at any time under the following circumstances:

    (i)    DTC may determine to discontinue providing its services with respect to the Series 2006 Bonds at any time by giving notice to the University and discharging its responsibilities with respect thereto under applicable law.

    (ii)    The University, in its sole discretion and without the consent of any other person, may terminate the services of DTC with respect to the Series 2006 Bonds if the University determines that DTC is unable to discharge its responsibilities with respect to the Series 2006 Bonds or that a continuation of the requirement that all of the Outstanding Bonds be registered in the registration books kept by the Bond Trustee in the name of Cede & Co., or any other nominee of DTC, is not in the best interests of the Beneficial Owners of the Series 2006 Bonds.

In the event that DTC's services are so discontinued or terminated because it is unwilling or is determined to be unable to discharge its responsibilities, and no substitute securities depository willing to undertake the functions of DTC under the Indenture can be found which, in the opinion of the University, is willing and able to undertake such functions upon reasonable and customary terms, or in the event it is so determined that continuation of the system of book-entry transfers is not in the best interests of the Beneficial Owners, the University is obligated to deliver Bond certificates, at the expense of the Beneficial Owners, as described in the Indenture.

The information in this section concerning DTC has been obtained from sources the University and the Underwriters believe to be reliable, but neither the University nor the Underwriters take responsibility for the accuracy thereof.

MAR 000531

## SECURITY FOR THE SERIES 2006 BONDS

The Series 2006 Bonds will constitute special limited obligations of the University, payable, as to both principal and interest, solely out of (i) the revenues and receipts to be derived by the University from the general tuition and other fees payable by students enrolled at the University (the "Tuition Revenues") and (ii) the revenues to be derived by the University from the operation of its student housing facilities, as such facilities may exist from time to time (the "Housing Revenues"); (see "SECURITY FOR THE SERIES 2006 BONDS - Pledged Revenues" below). The aforesaid pledge of the Tuition Revenues and the Housing Revenues (collectively, the "Pledged Revenues") is on a parity of lien with the prior pledge and agreements with respect thereto for the benefit of (i) the University's Faculty Housing Revenue Bonds of 1965, of which $47,000 aggregate principal amount is now outstanding (the "Series 1965 Bonds"), (ii) the University's Housing Revenue Bonds of 1969, of which $180,000 aggregate principal amount is now outstanding (the "Series 1969 Bonds"), (iii) the University's Dormitory Revenue Bonds of 1982, of which $725,000 aggregate principal amount is now outstanding (the "Series 1982 Bonds"), (iv) the University's General Tuition and Fee Revenue Bonds, Series 2002A, of which $24,795,000 aggregate principal amount is now outstanding (the "Series 2002A Bonds"), (v) the University's General Tuition and Fee Revenue Bonds, Series 2002B, of which $6,775,000 aggregate principal amount is now outstanding (the "Series 2002B Bonds"), (vi) the University's General Tuition and Fee Revenue Bonds, Series 2003B, of which $3,565,000 aggregate principal amount is now outstanding (the "Series 2003B Bonds"), and (vii) the University's General Tuition and Fee Revenue Bonds, Series 2004, of which $24,200,000 aggregate principal amount is now outstanding (the "Series 2004 Bonds") (see "OUTSTANDING AND PROPOSED INDEBTEDNESS"). The Series 2006 Bonds will be secured, pro rata one with the other and with the Series 1965 Bonds, the Series 1969 Bonds, the Series 1982 Bonds, the Series 2002A Bonds, the Series 2002B Bonds, the Series 2003B Bonds and the Series 2004 Bonds (collectively, the "Outstanding Parity Bonds" or, in certain descriptions herein, including the description of the Indenture, the "Bonds"), and with any of the Additional Bonds (hereinafter referred to) that may be issued, by a pledge of the revenues out of which they are payable and by the Indenture.

Payment of the principal of and interest on the Series 2006 Bonds when due will be insured by a municipal bond insurance policy to be issued by XL Capital Assurance Inc. simultaneously with the delivery of the Series 2006 Bonds (see "BOND INSURANCE" herein).

**Additional Bonds**

The Indenture permits the University to issue under the Indenture additional bonds (the "Additional Bonds") on a parity with the Series 2006 Bonds and the Outstanding Parity Bonds as respects the pledge of Pledged Revenues for either or both of the following purposes: (i) the acquisition (by construction or otherwise) of capital improvements to the facilities of the University (or the refunding of obligations of the University issued for such purpose) or (ii) refunding any Bonds then outstanding under the Indenture, provided that the University can meet certain required conditions precedent to such issuance, which conditions are summarized herein under the heading "SUMMARY OF THE INDENTURE - Additional Bonds."

**Pledged Revenues**

The following table sets forth Pledged Revenues for the five (5) most recent fiscal years ended September 30 (the "Fiscal Year"):

7

MAB 000532

| Fiscal Year | Pledged Revenues |
|---|---|
| 2001 | 23,096,425 |
| 2002 | 25,850,117 |
| 2003 | 29,059,435 |
| 2004 | 28,243,906 |
| 2005 | 30,060,570 |

Combined maximum annual debt service with respect to the Series 1965 Bonds, the Series 1969 Bonds, the Series 1982 Bonds, the Series 2002A Bonds, the Series 2002B Bonds, the Series 2003B Bonds, the Series 2004 Bonds and the Series 2006 Bonds is approximately $6,651,000* occurring in fiscal year 2008* as shown in the table under "OUTSTANDING AND PROPOSED INDEBTEDNESS – Debt Service Requirements" herein. Pledged Revenues for the fiscal year ended September 30, 2005 cover this amount 4.52 times.

---

\* Estimated, based on market conditions as of July 24, 2006.

## Reserve Fund

Simultaneously with the issuance of the Series 2006 Bonds, XL Capital Assurance Inc. will issue and deliver a surety bond which will insure payment of principal and interest on the Series 2006 Bonds in the event there are insufficient funds otherwise available for such purpose up to the amount of the Maximum Annual Debt Service Requirement with respect to the Series 2006 Bonds. See "SUMMARY OF THE INDENTURE – Creation of Funds – Reserve Fund" herein.

## BOND INSURANCE

The following information has been supplied by the Insurer for inclusion in this Official Statement. No representation is made by University or the Underwriter as to the accuracy or completeness of the information.

The Insurer accepts no responsibility for the accuracy or completeness of this Official Statement or any other information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the Insurer and its affiliates set forth under this heading. In addition, the Insurer makes no representation regarding the Series 2006 Bonds or the advisability of investing in the Series 2006 Bonds.

## General

XL Capital Assurance Inc. (the "Insurer" or "XLCA") is a monoline financial guaranty insurance company incorporated under the laws of the State of New York. The Insurer is currently licensed to do insurance business in, and is subject to the insurance regulation and supervision by, all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Singapore.

The Insurer is an indirect wholly owned subsidiary of XL Capital Ltd, a Cayman Islands exempted company ("XL Capital Ltd"). Through its subsidiaries, XL Capital Ltd is a leading provider of insurance and reinsurance coverages and financial products and services to industrial, commercial and professional service firms, insurance companies and other enterprises on a worldwide basis. The ordinary shares of XL Capital Ltd are publicly traded in the United States and listed on the New York Stock

Exchange (NYSE: XL). **XL Capital Ltd is not obligated to pay the debts of or claims against the Insurer.**

The Insurer was formerly known as The London Assurance of America Inc. ("London"), which was incorporated on July 25, 1991 under the laws of the State of New York. On February 22, 2001, XL Reinsurance America Inc. ("XL Re") acquired 100% of the stock of London. XL Re merged its former financial guaranty subsidiary, known as XL Capital Assurance Inc. (formed September 13, 1999) with and into London, with London as the surviving entity. London immediately changed its name to XL Capital Assurance Inc. All previous business of London was 100% reinsured to Royal Indemnity Company, the previous owner at the time of acquisition. Effective July 1, 2006, XL Re transferred its ownership in XLCA to XL Insurance (Bermuda) Ltd.

XL Capital Ltd announced on April 7, 2006 that Security Capital Assurance Ltd ("SCA"), a newly-created holding company for XL Capital Ltd's financial guaranty insurance and reinsurance businesses conducted through XLCA and XL Financial Assurance Ltd. ("XLF A"), had filed a registration statement on Form S-l (the "Registration Statement") with the U.S. Securities and Exchange Commission relating to a proposed initial public offering of a portion of its common shares. For further information, investors should refer to the Registration Statement.

Under the registration statement, a portion of SCA's shares will be issued and sold by SCA and a portion will be sold by SCA' s parent, XL Insurance (Bermuda) Ltd, as selling shareholder. After the consummation of the offering, XL Capital Ltd is expected to beneficially own approximately 65% of SCA's outstanding shares.

SCA expects to use the proceeds it receives from the offering primarily for capital contributions to its financial guaranty subsidiaries to support future business growth. SCA intends to apply to have its shares listed on the New York Stock Exchange under the ticker symbol "SCA."

A copy of the registration statement is available on the U.S. Securities and Exchange Commission website at www.sec.gov under Filings & Forms (EDGAR).

**Reinsurance**

The Insurer has entered into a facultative quota share reinsurance agreement with XLFA, an insurance company organized under the laws of Bermuda, and an affiliate of the Insurer. Pursuant to this reinsurance agreement, the Insurer expects to cede up to 75% of its business to XLFA. The Insurer may also cede reinsurance to third parties on a transaction-specific basis, which cessions may be any or a combination of quota share, first loss or excess of loss. Such reinsurance is used by the Insurer as a risk management device and to comply with statutory and rating agency requirements and does not alter or limit the Insurer's obligations under any financial guaranty insurance policy. With respect to any transaction insured by XLCA, the percentage of risk ceded to XLFA may be less than 75% depending on certain factors including, without limitation, whether XLCA has obtained third party reinsurance covering the risk. As a result, there can be no assurance as to the percentage reinsured by XLFA of any given financial guaranty insurance policy issued by XLCA, including the Policy.

Based on the audited financials of XLFA, as of December 31, 2005, XLFA had total assets, liabilities, redeemable preferred shares and shareholders' equity of $1,394,081,000, $704,007,000, $39,000,000 and $651,074,000, respectively, determined in accordance with generally accepted accounting principles in the United States ("US GAAP"). XLFA's insurance financial strength is rated

9

"Aaa" by Moody's and "AAA" by S&P and Fitch Inc. In addition, XLFA has obtained a financial enhancement rating of "AAA" from S&P.

The rating agencies have taken certain actions with respect to XL Capital Ltd and various insurance operating subsidiaries of XL Capital Ltd, as described below. On November 22, 2005, Moody's downgraded the senior debt rating of XL Capital Ltd from "A2" to "A3" and downgraded the other insurance financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "Aa2" to "Aa3." On November 28, 2005, Standard & Poor's downgraded the senior debt rating of XL Capital Ltd from "A" to "A-" and downgraded the counterparty credit and financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "AA-" to "A+." On February 28, 2006, Fitch revised the long term University rating of XL Capital Ltd from "A-" to "A." On October 26, 2005, Fitch downgraded the insurer financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "AA" to "AA-."

The ratings of XLFA or any other member of the XL Capital Ltd group of companies are not recommendations to buy, sell or hold securities, including the Series 2006 Bonds and are subject to revision or withdrawal at any time by Moody's, Standard & Poor's or Fitch.

Notwithstanding the capital support provided to the Insurer described in this section, the Bondholders will have direct recourse against the Insurer only, and XLFA will not be directly liable to the Bondholders.

**Financial Strength and Financial Enhancement Ratings of XLCA**

The Insurer's insurance financial strength is rated "Aaa" by Moody's and "AAA" by Standard & Poor's and Fitch, Inc. ("Fitch"). In addition, XLCA has obtained a financial enhancement rating of "AAA" from Standard & Poor's. These ratings reflect Moody's, Standard & Poor's and Fitch's current assessment of the Insurer's creditworthiness and claims-paying ability as well as the reinsurance arrangement with XLFA described under "Reinsurance" above.

The above ratings are not recommendations to buy, sell or hold securities, including the Series 2006 Bonds and are subject to revision or withdrawal at any time by Moody's, Standard & Poor's or Fitch. Any downward revision or withdrawal of these ratings may have an adverse effect on the market price of the Series 2006 Bonds. The Insurer does not guaranty the market price of the Series 2006 Bonds nor does it guaranty that the ratings on the Series 2006 Bonds will not be revised or withdrawn.

**Capitalization of the Insurer**

Based on the audited financials of XLCA, as of December 31, 2005, XLCA had total assets, liabilities, and shareholder's equity of $953,706,000, $726,758,000, and $226,948,000, respectively, determined in accordance with U.S. GAAP.

Based on the audited statutory financial statements for XLCA as of December 31, 2005 filed with the State of New York Insurance Department, XLCA has total admitted assets of $328,231,000, total liabilities of $139,392,000, total capital and surplus of $188,839,000 and total contingency reserves of $13,031,000 determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities ("SAP").

10

**Incorporation by Reference of Financials**

For further information concerning XLCA and XLFA, see the financial statements of XLCA and XLFA, and the notes thereto, incorporated by reference in this Official Statement. The financial statements of XLCA and XLFA are included as exhibits to the periodic reports filed with the Securities and Exchange Commission (the "Commission") by XL Capital Ltd and may be reviewed at the EDGAR website maintained by the Commission. All financial statements of XLCA and XLFA included in, or as exhibits to, documents filed by XL Capital Ltd pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 on or prior to the date of this Official Statement, or after the date of this Official Statement but prior to termination of the offering of the Series 2006 Bonds, shall be deemed incorporated by reference in this Official Statement. Except for the financial statements of XLCA and XLFA, no other information contained in XL Capital Ltd's reports filed with the Commission is incorporated by reference. Copies of the statutory quarterly and annual statements filed with the State of New York Insurance Department by XLCA are available upon request to the State of New York Insurance Department.

**Regulation of the Insurer**

The Insurer is regulated by the Superintendent of Insurance of the State of New York. In addition, the Insurer is subject to regulation by the insurance laws and regulations of the other jurisdictions in which it is licensed. As a financial guaranty insurance company licensed in the State of New York, the Insurer is subject to Article 69 of the New York Insurance Law, which, among other things, limits the business of each insurer to financial guaranty insurance and related lines, prescribes minimum standards of solvency, including minimum capital requirements, establishes contingency, loss and unearned premium reserve requirements, requires the maintenance of minimum surplus to policyholders and limits the aggregate amount of insurance which may be written and the maximum size of any single risk exposure which may be assumed. The Insurer is also required to file detailed annual financial statements with the New York Insurance Department and similar supervisory agencies in each of the other jurisdictions in which it is licensed.

The extent of state insurance regulation and supervision varies by jurisdiction, but New York and most other jurisdictions have laws and regulations prescribing permitted investments and governing the payment of dividends, transactions with affiliates, mergers, consolidations, acquisitions or sales of assets and incurrence of liabilities for borrowings.

THE FINANCIAL GUARANTY INSURANCE POLICIES ISSUED BY THE INSURER, INCLUDING THE INSURANCE POLICY, ARE NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

The principal executive offices of the Insurer are located at 1221 Avenue of the Americas, New York, New York 10020 and its telephone number at this address is (212) 478-3400.

11

# ALABAMA STATE UNIVERSITY

The University began as the Lincoln Normal School established in 1866. The school opened in the following year. In the early 1950s, the name was changed to Alabama State College. The school achieved university status when the name was changed to the Alabama State University in 1969. The mission of the University is to provide quality programs of undergraduate and graduate instruction, residential life, continuing education, public service and research provided at the most reasonable cost to individual students and taxpayers.

## Constituency and Enrollment

In the fall of 2005, approximately 5,469 students were enrolled at the University. A significant segment of the enrollment is from Alabama and the adjacent states of Mississippi, Georgia and Florida, together with significant enrollment from the Chicago, Illinois and Detroit, Michigan areas. Within Alabama, virtually all areas of the state are represented in the enrollment. This representation is particularly strong, however, in the central third of the state. Montgomery, Montgomery County, and Jefferson County are dominant as sources of students. Enrollment at the University during the fall semester of the past 15 academic years was as follows:

| Year | Headcount Enrollment | Full-Time Equivalent |
|------|---------------------|----------------------|
| 1991 | 4,822 | 4,491 |
| 1992 | 5,490 | 5,163 |
| 1993 | 5,608 | 5,221 |
| 1994 | 5,041 | 4,676 |
| 1995 | 5,416 | 4,967 |
| 1996 | 5,554 | 5,026 |
| 1997 | 5,274 | 4,767 |
| 1998 | 5,553 | 4,997 |
| 1999 | 5,666 | 5,066 |
| 2000 | 5,269 | 4,698 |
| 2001 | 5,590 | 5,073 |
| 2002 | 6,038 | 5,510 |
| 2003 | 6,024 | 5,431 |
| 2004 | 5,653 | 5,210 |
| 2005 | 5,469 | 5,012 |

Source: Alabama State University Office of Institutional Research

The University's faculty serve thousands of state residents every year through research and public service activities in a wide range of programs. The University provides 62 degree programs in undergraduate (41 programs) and graduate (21 programs) fields of study in its School of Graduate Studies, University College, School of Music, College of Business Administration, College of Education, College of Health Sciences, College of Arts and Sciences, Division of Continuing Education and Division of Aerospace Studies. In 2004, the University's Doctoral Program in Educational Leadership, Policy and Law received accreditation and the University awarded its first Doctor of Education (Ed.D.) degree in the 2005 academic year.

The following table shows the number and type of degrees awarded by the University over the past five academic years:

12

MAR 000537

| Degree | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Associate | 1 | 2 | 0 | 0 |
| Bachelor | 447 | 601 | 560 | 562 |
| Master | 226 | 227 | 261 | 295 |
| Education Specialist | 9 | 7 | 10 | 26 |
| Doctoral | n/a | n/a | 1 | 5 |
| Total | 683 | 837 | 832 | 888 |

Source: Alabama State University Office of Institutional Research. Degree statistics for the 2006 academic year have not been completed as of the date of this Official Statement.

The number of applications received and accepted by the University, along with the number of beginning freshmen enrolled for the fall semester of the past 15 academic years was as follows:

| Year | Applications Received | Applications Accepted | Freshmen Enrolled |
|---|---|---|---|
| 1991 | 4,639 | 3,272 | 1,293 |
| 1992 | 5,075 | 3,825 | 1,512 |
| 1993 | 4,788 | 3,506 | 1,322 |
| 1994 | 5,377 | 3,623 | 1,071 |
| 1995 | 5,135 | 3,513 | 1,158 |
| 1996 | 4,637 | 3,136 | 1,075 |
| 1997 | 4,604 | 3,059 | 957 |
| 1998 | 4,925 | 3,258 | 1,146 |
| 1999 | 5,816 | 3,968 | 1,169 |
| 2000 | 5,422 | 3,571 | 1,070 |
| 2001 | 6,236 | 4,322 | 1,280 |
| 2002 | 8,148 | 5,837 | 1,426 |
| 2003 | 11,462 | 5,774 | 1,249 |
| 2004 | 8,827 | 4,476 | 1,163 |
| 2005 | 6,202 | 4,274 | 1,213 |

Source: Alabama State University Office of Institutional Research

## Tax Support

As a four-year public university, the University is supported in part by an annual appropriation of the State of Alabama from the Alabama Special Education Trust Fund. However, about 32% of the University's annual operating budget is funded from such tax dollars; the remaining 68% of the University's revenues are generated from tuition charges, fees, sales of services of various auxiliary enterprises, the U.S. government and other external sources.

## Governance

The University is governed by a Board of Trustees, consisting of the Governor of Alabama as an ex-officio member and 12 additional members appointed by the Governor (subject to the advice and consent of the State Senate) for 12 year terms. The Board delegates to the President of the University by explicit policy sufficient authority to administer the affairs of the University and he, in turn, delegates authority to other University officials. Institutional decision-making, however, is effected by means of a system of internal governance, featuring extensive faculty and student involvement in policy and priority-setting.

13

MAR 000538

The following persons constitute the Board of Trustees of the University:

|  | Term Expires |
|---|---|
| Governor Bob Riley, President of the Board | Ex officio |
| Dr. Joe A. Lee, President, Secretary of the Board |  |
| Hon. Elton N. Dean, Sr., Chairman | 2011 |
| Mrs. Catherine W. Wright, Vice-Chair | 2008 |
| Oscar Crawley | 2014 |
| Buford Crutcher | 2008 |
| Thomas H. Figures | 2014 |
| Taylor Hodge, Jr. | 2017 |
| Hon. Bobby M. Junkins | 2011 |
| Dr. Lawrence J. Lemak | 2014 |
| Patsy B. Parker | 2008 |
| Dr. Joe L. Reed | 2011 |
| Hon. Marvin W. Wiggins | 2017 |
| Herbert Young | 2017 |

## Organization and Administration

The President of the University, Dr. Joe A. Lee, is responsible to the Board of Trustees for the overall administration of the institution. Reporting to him for that purpose are the heads of six major divisions: Academic Affairs, Fiscal Affairs, Student Affairs, Administrative Services, Planning & Institutional Development and Athletics. The Academic Affairs Division includes Colleges of Arts & Sciences, Business Administration, Education, Music, Health Sciences, Continuing Education and Graduate Studies. Each college is headed by a dean who reports to the Vice-President for Academic Affairs.

## Tuition and Fees

The following schedule of tuition, room and board for students enrolled at the University (which does not reflect special fees) was established by the Board of Trustees effective as of the fall semester of 2005 and in effect as of the date of this Official Statement:

| Full-time: | Per Semester |
|---|---|
| Undergraduate - Resident | $ 2,004 |
| Undergraduate - Non-Resident | 4,008 |
| Graduate - Resident (12 hours) | 2,304 |
| Graduate - Non-Resident | 4,608 |

| Part-time: | Per Credit Hour |
|---|---|
| Undergraduate - Resident | $ 167 |
| Undergraduate - Non-Resident | 334 |
| Graduate - Resident | 192 |
| Graduate - Non-Resident | 384 |

14

MAR 000530

(c)     determination by a court having jurisdiction that the University is insolvent or bankrupt, or appointment by a court having jurisdiction of a receiver for the University or for a substantial part thereof, or approval by a court of competent jurisdiction of any petition for reorganization of the University or rearrangement or readjustment of the obligations of the University under any provisions of the bankruptcy laws of the United States.

The Indenture provides that upon the occurrence of an event of default, the Trustee shall have the following rights and remedies (provided, however, that the Insurer shall be entitled to control and direct the enforcement of all rights and remedies granted to the holders of the Bonds, or to the Trustee for the benefit of the holders of the Bonds, under the Indenture):

(a)     Acceleration.    The Trustee may, by written notice to the University, declare the principal of and accrued interest on all the Bonds forthwith due and payable, and such principal and accrued interest shall thereupon become and be immediately due and payable (provided, however, that the Bonds may not be declared due and payable without the prior written consent of the Insurer). If, however, the University makes good that default and every other default under the Indenture (except for those installments of principal and interest declared due and payable that would, absent such declaration, not be due and payable), with interest on all overdue payments of principal and interest, and makes reimbursement of all the reasonable expenses of the Trustee, then the Trustee may (and if requested in writing by the holders of a majority in principal amount of the then outstanding Bonds, shall), by written notice to the University, waive such default and its consequences, but no such waiver shall affect any subsequent default or right relative thereto; and

(b)     Mandamus and Other Remedies.    The Trustee shall have the right of mandamus or other lawful remedy in any court of competent jurisdiction to enforce its rights and the rights of the holders of the Bonds against the University and any officers, agents, or employees of the University, including but not limited to the right to require the University and its officers, agents or employees to perform and observe all of its or their duties under Section 16-3-28 of the Code of Alabama of 1975, as amended.

All remedies under the Indenture are vested exclusively in the Trustee for the equal and pro rata benefit of all holders of the Bonds, unless the Trustee refuses or neglects to act within a reasonable time after written request so to act addressed to the Trustee by the holders of twenty-five percent (25%) of the Bonds, accompanied by indemnity satisfactory to the Trustee, and no direction inconsistent with such request shall have been given by the Insurer, in which event the holder of any of the Bonds may thereupon so act in the name and behalf of the Trustee or may so act in his own name and behalf in lieu of action by or in the name and behalf of the Trustee. Except as provided in the preceding sentence, no holder of any of the Bonds shall have the right to enforce any remedy under the Indenture, and then only for the equal and pro rata benefit of the holders of all the Bonds.

## Concerning the Trustee

*Limitation of Liability.*    The Trustee shall not be liable under the Indenture except for its noncompliance with the provisions thereof, its willful misconduct or its gross negligence.

25

*Notice of Default.* The Trustee need not notice any default under the Indenture except a default in the payment of the principal of and the interest on the Bonds, unless requested so to do by the holders of twenty-five percent in principal amount of the then outstanding Bonds.

*Institution of Suit.* The Trustee may, in its own name and at any time institute or intervene in any suit for the enforcement of all rights under the Indenture without the necessity of joining as parties to such suit or proceedings any holders of the Bonds. The holders of the Bonds appoint the Trustee as their irrevocable agent and attorney in fact for the purpose of enforcing all such rights of action, but such appointment does not include the power to agree to accept new securities of any nature in lieu of the Bonds or to alter or amend the terms of the Indenture except as therein provided.

*Resignation and Discharge.* The Trustee may resign and be discharged by written notice given to the University and the holders of the Bonds. The Trustee may at any time be removed by a written instrument signed by the holders of a majority in principal amount of the Bonds.

*Appointment of Successor Trustee.* If the Trustee resigns, is removed or is otherwise incapable of acting, a successor may be appointed by the holders of a majority in principal amount of the Bonds and in the interim by the University.

## Modifications of the Indenture

*Supplemental Indentures Without Bondholder Consent.* The University and the Trustee may at any time and from time to time enter into such Supplemental Indentures as shall not be inconsistent with the terms and provisions of the Indenture, for any one or more of the following purposes:

(a)    to add to the covenants and agreements of the University contained in the Indenture other covenants and agreements thereafter to be observed and performed by the University, provided that such other covenants and agreements shall not either expressly or impliedly limit or restrict any of the obligations of the University contained in the Indenture; or

(b)    to cure any ambiguity or to cure, correct or supplement any defect or inconsistent provision contained in the Indenture or in any Supplemental Indenture or to make any provisions with respect to matters arising under the Indenture or any Supplemental Indenture for any other purpose if such provisions are necessary or desirable and are not inconsistent with the provisions of the Indenture or any Supplemental Indenture and do not adversely affect the interests of the holders of the Bonds.

*Supplemental Indentures Requiring Bondholder Consent.* In addition to those Supplemental Indentures not requiring bondholder consent, the University and the Trustee may, at any time and from time to time, with the written consent of the holders of not less than 66% in principal amount of Bonds then outstanding, and with consent of the Insurer, enter into such Supplemental Indentures as shall be deemed necessary or desirable by the University and the Trustee for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Indenture or in any Supplemental Indenture; provided that without the written consent of the holder of each Bond affected, no reduction in the principal amount of, rate of interest on, or the premium payable upon redemption of, any Bond shall be made; and provided, further, that, without the written consent of the holders of all the Bonds, none of the following shall be permitted: (a) an extension of the maturity of any installment of principal of or interest on any Bond; (b) any change in the schedule of required sinking

26

MAR 000551

fund or other similar payments with respect to any series of the Bonds; (c) the creation of a lien or charge on the Pledged Revenues ranking prior to or (except in connection with the issuance of Additional Bonds) on a parity with the lien or charge thereon contained in the Indenture; (d) the establishment of preferences or priorities as between the Bonds; or (e) a reduction in the aggregate principal amount of Bonds the holders of which are required to consent to such Supplemental Indenture.

### Defeasance

Whenever the entire indebtedness secured by the Indenture shall have been fully paid, the Trustee shall cancel, satisfy and discharge the Indenture. For purposes of the Indenture, any of the Bonds shall be deemed to have been paid when there shall have been irrevocably deposited with the Trustee for payment thereof the entire amount (principal, interest and premium, if any) due or to be due thereon until and at maturity, and, further, any of the Bonds shall also be deemed to have been paid when the University shall have deposited with the Trustee the applicable redemption price of such Bonds, including the interest that will accrue thereon to the date on which they are to be redeemed.

In addition, any Bonds shall, for purposes of the Indenture, be considered as fully paid when there shall have been filed with the Trustee each of the following:

(1)    a trust agreement between the University and the Trustee making provision for the retirement of such Bonds by creating for that purpose an irrevocable trust fund sufficient to provide for payment and retirement of such Bonds (including payment of the interest that will mature thereon until and on the dates they are retired, as such interest becomes due and payable), either by redemption prior to maturity, by payment at maturity or by payment of part thereof at maturity and redemption of the remainder prior to maturity, which trust fund shall consist of (i) Federal Securities which are not subject to redemption prior to their respective maturities at the option of the issuer and which, if the principal thereof and the interest thereon are paid at their respective maturities, will produce funds sufficient so to provide for payment and retirement of such Bonds, or (ii) both cash and such Federal Securities which together will produce funds sufficient for such purpose, or (iii) cash sufficient for such purpose;

(2)    a certified copy of a resolution calling for redemption those of such Bonds that, according to said trust agreement, are to be redeemed prior to maturity; and

(3)    evidence satisfactory to the Trustee that there has been published one time in a financial journal or a newspaper published in the City of New York, New York and in a newspaper published in the City of Montgomery, Alabama, a notice briefly describing said trust agreement and its consequences.

## LEGALITY OF THE SERIES 2006 BONDS
## FOR INVESTMENT

Section 16-3-28 of the Code of Alabama of 1975, as amended, provides that bonds, notes and other securities issued under such section shall be eligible for the investment of trust or other fiduciary funds in the exercise of prudent judgment by those making such investment.

MAR 000552

## TAX MATTERS

In the opinion of Maynard Cooper & Gale, P.C, Birmingham, Alabama, Bond Counsel, under existing statutes, regulations, rulings and court decisions, interest on the Series 2006 Bonds (including any original issue discount properly allocable to an owner thereof) will be excluded from gross income for federal income tax purposes and will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. In the opinion of Bond Counsel, interest on the Series 2006 Bonds will be exempt from income taxation by the State of Alabama under existing statutes.

Under Section 265 of the Code, any banks, thrifts or other financial institutions that acquire any of the Series 2006 Bonds may not deduct that portion of their interest expense that is allocable to the Series 2006 Bonds.

Although interest on the Series 2006 Bonds will be excluded from gross income for federal income tax purposes as discussed in the preceding paragraphs, the Social Security Amendments of 1983 provide that, under certain circumstances, receipt of such tax-exempt interest could be subject to federal income taxation a portion of Social Security or railroad retirement benefits received by a bondholder that would not otherwise be taxable. A prospective purchaser of the Series 2006 Bonds should consult his personal tax advisor in this regard in connection with his decision to purchase any of the Series 2006 Bonds.

## LEGAL MATTERS

Legal matters incident to the authorization and issuance of the Series 2006 Bonds by the University are subject to the approval of Maynard Cooper & Gale, P.C., Birmingham, Alabama, Bond Counsel, whose approving opinion will be delivered with the Series 2006 Bonds. Such opinion is expected to be in substantially the form attached hereto as Appendix B. Certain legal matters will be passed upon for the Underwriters by their counsel, Waldrep Stewart & Kendrick, LLC, Montgomery, Alabama and for the University by its counsel, Thomas, Means, Gillis & Seay, P.C., Montgomery, Alabama.

## RATINGS

Moody's Investors Service ("Moody's) and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") have assigned the Series 2006 Bonds the ratings of "Aaa" and "AAA," respectively, with the understanding that, upon delivery of the Series 2006 Bonds, a policy insuring the payment when due of the principal of and interest on the Series 2006 Bonds will be issued by XL Capital Assurance. The underlying ratings of the University by Moody's and S&P are "A2 (stable)" and "A-(positive)."

Each of the above-referenced ratings on the Series 2006 Bonds reflects only the opinion of the respective rating agency, and any explanation of the significance of such rating may be obtained only from that rating agency.

Neither rating constitutes a recommendation to buy, sell or hold the Series 2006 Bonds, and there is no assurance that either rating will continue for any given period of time or that either rating will not be lowered or withdrawn entirely if, in the judgment of the applicable rating agency, circumstances so warranted.

A downward change in or withdrawal of either rating may have an adverse effect on the market price of the Series 2006 Bonds.

## ABSENCE OF LITIGATION

There is no suit, action or proceeding of any nature, pending or threatened, (1) to restrain or enjoin the issuance, sale, execution or delivery of the Series 2006 Bonds or (2) to contest validity of the Series 2006 Bonds, or the proceedings of the University taken with respect to the issuance or sale of the Series 2006 Bonds, the pledge or application of any moneys, revenues, or security provided for the payment of the Series 2006 Bonds, or the existence or powers of the University.

## UNDERWRITING

Blount Parrish & Company, Incorporated, The Frazer Lanier Company, Incorporated and Sterne, Agee & Leach, Inc. (the "Underwriters") have agreed to purchase the Series 2006 Bonds at an aggregate price $_____ (which price reflects an underwriting discount of $_____ and a net original issue _____ of $_____) plus accrued interest on the Series 2006 Bonds from their date to the date of their initial delivery. The Underwriters may offer and sell the Series 2006 Bonds to certain dealers (including dealers depositing the Series 2006 Bonds into investment trusts) and others at prices lower than those stated on the front page hereof.

## CONTINUING DISCLOSURE

The University has covenanted, for the benefit of holders of the Series 2006 Bonds, to provide certain annual financial information (the "Annual Report") relating to the University within 180 days after the end of each fiscal year of the University, to provide audited financial statements for the University (if and when any such financial statements become available), and to provide notices of the occurrence of certain events specified in Rule 15c2-12 under the Securities Exchange Act of 1934 (the "Specified Events"), if deemed by the University to be material to holders of the Series 2006 Bonds.

The Annual Report shall include (i) financial information and operating data of the kind set forth in this Official Statement under the caption "FINANCIAL INFORMATION" and in Appendix A hereto, (ii) the receipts from the Pledged Revenues during the immediately preceding fiscal year, (iii) a summary of the revenues and expenditures for the immediately preceding fiscal year for the State's General Fund and the SETF, (iv) summary information respecting the then current budgets for the aforesaid funds of the State of Alabama, (v) summary information concerning the then outstanding general obligation indebtedness of the State of Alabama and the then outstanding limited obligation indebtedness of the State of Alabama and its various agencies and instrumentalities, and (vi) a summary of any pending or threatened litigation deemed material to the Holders of the Series 2006 Bonds. The University may, solely as a matter of administrative convenience, provide the Annual Report in a format that includes other information in addition to the items identified in the preceding sentence, it being understood that any such provision of any such additional information one year shall not result in an obligation to provide such additional information in any subsequent year.

The Specified Events currently include the following:

(1)  Principal and interest payment delinquencies;
(2)  Non-payment related defaults;
(3)  Unscheduled draws on debt service reserves reflecting financial difficulties;
(4)  Unscheduled draws on credit enhancements reflecting financial difficulties;
(5)  Substitution of credit or liquidity providers, or failure of any such provider to perform;
(6)  Adverse tax opinions or events affecting the tax-exempt status of the Series 2006 Bonds;
(7)  Modifications to rights of holders of the Series 2006 Bonds;
(8)  Calls for redemption of any of the Series 2006 Bonds;
(9)  Defeasances;
(10)  Release, substitution, or sale of property securing repayment of the Series 2006 Bonds; and
(11)  Rating changes.

The Annual Report and audited financial statements (if any) of the University will be filed by the University with each nationally recognized municipal securities information repository and with the appropriate state information depository (if any such state depository exists). The notices of Specified Events will be filed by the University, in a timely manner, with each nationally recognized municipal securities information repository or with the Municipal Securities Rulemaking Board and with the appropriate state information depository (if any such state depository exists). At this time no state information depository has been established in Alabama, and the University has no knowledge of any plans for the establishment of such a depository.

The foregoing covenants of the University have been made for the express purpose of complying with the requirements of the aforesaid Rule 15c2-12 and shall be deemed to be revised and amended if and to the extent that the pertinent provisions of said Rule are hereafter amended. Such covenants, and the University's obligations pursuant thereto, shall automatically terminate (a) upon the payment in full of all of the Series 2006 Bonds or (b) when all of the Series 2006 Bonds shall be deemed to be paid within the meaning of the Indenture and the pledge of the Indenture with respect to the Series 2006 Bonds has been discharged and satisfied.

Any Holder of a Bond may take such action as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the University to comply with its covenants respecting continuing disclosure. Under the provisions of the Indenture, the sole remedy available in the event of a failure to comply with such covenants shall be an action to compel performance.

30

MAR 000555

## AUTHORIZATION.

This Official Statement has been approved by the University and the execution and delivery hereof by the undersigned have been duly authorized by the University.

_____/s/_____
President
Alabama State University

_____/s/_____
Vice President for Fiscal Affairs
Alabama State University

Dated:  July 24, 2006

31

[this page intentionally left blank]

APPENDIX A

Financial Statements of the University

MAR 000558

[this page intentionally left blank]

MAR 000559

ALABAMA STATE UNIVERSITY

FINANCIAL STATEMENTS

September 30, 2005

With Independent Auditor's Report

# ALABAMA STATE UNIVERSITY
Montgomery, Alabama

## TABLE OF CONTENTS

| | Page |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1-2 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS | 3-16 |
| **FINANCIAL STATEMENTS** | |
| Statements of Net Assets | 17-18 |
| Statements of Revenues, Expenses and Changes in Net Assets | 19-20 |
| Statements of Cash Flows | 21-22 |
| Notes to the Financial Statements | 23-40 |
| **SINGLE AUDIT** | |
| Report on Internal Control Over Financial Reporting and on Compliance and Other Matters Based On an Audit of Financial Statements Performed In Accordance with Government Auditing Standards | 41-42 |
| Report on Compliance with Requirements Applicable to Each Major Program and Internal Control Over Compliance in Accordance with OMB Circular A-133 | 43-44 |
| Schedule of Expenditures of Federal Awards | 45-46 |
| Notes to the Schedule of Expenditures of Federal Awards | 47 |
| Schedule of Findings and Questioned Costs | 48 |

MAR 000561



**BANKS, FINLEY,
WHITE & CO.**
CERTIFIED PUBLIC ACCOUNTANTS

## INDEPENDENT AUDITOR'S REPORT

To the Board of Trustees of
 Alabama State University
Montgomery, Alabama

We have audited the accompanying financial statements of Alabama State University ("the University") a component unit of the State of Alabama, as of and for the years ended September 30, 2005 and 2004, as listed in the table of contents. These financial statements are the responsibility of the University's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of the Trust for Educational Excellence at Alabama State University ("the Trust"), which represent 17.8%, 30.0%, and 12.8%, respectively, of the assets, net assets and revenues of the University. Those financial statements were audited by other auditors whose report thereon has been furnished to us, and our opinion, insofar as it relates to the amounts included for the University, is based on the report of the other auditors.

Except as discussed in the following paragraph, we conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinions.

The financial statements of the Alabama State University Foundation, Inc. ("the Foundation"), a component unit of the University have not been audited, and we were not engaged to audit the Foundation's financial statements as part of our audit of the University's basic financial statements. Consequently, the financial activities of the Foundation are not included in the University's basic financial statements as a discretely presented component unit.

In our opinion, except for the effects of the inclusion of the Foundation as a discretely presented component unit, the financial statements referred to above present fairly, in all material respects, the financial position of the University, as of September 30, 2005 and 2004, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.



To the Board of Trustees of
 Alabama State University
Page 2

In accordance with Government Auditing Standards, we have also issued our report dated June 1, 2006, on our consideration of the University's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements and other matters for the year ended September 30, 2005. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with Government Auditing Standards and should be considered in assessing the results of our audits.

The management's discussion and analysis on pages 3 through 16 is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurements and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was performed for the purpose of forming an opinion on the financial statements taken as a whole. The accompanying Schedule of Expenditures of Federal Awards is presented for purposes of additional analysis as required by U. S. Office of Management and Budget Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations, and is not a required part of the financial statements. Such information has been subjected to the auditing procedures applied in the audits of the financial statements and, in our opinion, is fairly stated, in all material respects, in relation to the financial statements taken as a whole.

June 1, 2006

*Banks, Finley White & Co.*

2



ALABAMA STATE UNIVERSITY

P. O. BOX 271 · MONTGOMERY, ALABAMA 36101-0271 · 334 / 229-4223, FAX: 334 / 229-4948

VICE PRESIDENT FOR FINANCE

## ALABAMA STATE UNIVERSITY
### Comprehensive Annual Financial Report
### Fiscal Year Ended September 30, 2005

## Management's Discussion and Analysis

This section of the Alabama State University ("the University") annual financial report presents a discussion and analysis of the financial performance of the University during the fiscal year ended September 30, 2005. This discussion has been prepared by management along with the financial statements and related footnote disclosures. This report should be read in conjunction with, and is qualified in its entirety by, the financial statements and footnotes. The discussion and analysis is designed to focus on current activities, resulting change and current known facts. The financial statements, footnotes and this discussion are the responsibility of management.

## Using the Annual Report

This annual report consists of a series of financial statements, prepared in accordance with the Governmental Accounting Standards Board Statement No. 35, Basic Financial Statements-and Management's Discussion and Analysis-for Public Colleges and Universities. The financial statements focus on the financial condition of the University, the results of operation, and cash flows of the University as a whole.

One of the most important questions asked about university finances is whether the University as a whole is better off or worse off as a result of the year's activities. The key to understanding this question is the Statement of Net Assets, Statement of Revenues, Expenses and Changes in Net Assets and the Statement of Cash Flows. These statements present financial information in a form similar to that used by corporations. The University's net assets are one indicator of its financial health. Over time, increases or decreases in net assets is one indicator of the improvement or erosion of the University's financial health when considered with non-financial facts such as enrollment levels and the condition of the facilities.

The Statement of Net Assets includes all assets and liabilities. It is prepared under the accrual basis of accounting, whereby revenues and assets are recognized when the service is provided and expenses and liabilities are recognized when others provide the service, regardless of when cash is exchanged.

3

ALABAMA STATE UNIVERSITY
Comprehensive Annual Financial Report
Fiscal Year Ended September 30, 2005

The Statement of Revenues, Expenses and Changes in Net Assets presents the revenues earned and the expenses incurred during the year. Activities are reported as either operating or nonoperating. The utilization of long-lived assets, referred to as Capital Assets, is reflected in the financial statements as depreciation, which amortizes the cost of an asset over its expected useful life.

Another important factor to consider when evaluating viability is the University's ability to meet financial obligations as they mature. The Statement of Cash Flows presents the information related to cash inflows and outflows summarized by operating, capital and noncapital financing and investing activities.

The University is considered a discretely presented component unit of the State of Alabama and as such, the University's financial activity is also included within the State of Alabama's Comprehensive Annual Financial Report.

The Trust for Educational Excellence (Trust) is a discretely presented component unit of the University that is reported in a separate column on the University's financial statements to emphasze that it is legally separate from the University. Since the focus of this discussion is on the University, the Trust is not included in the amounts below.

## Condensed Financial Information

|  | 2005 | 2004 |
|---|---|---|
| **ASSETS** |  |  |
| Current Assets | $ 74,484,150 | $ 66,070,436 |
| Noncurrent Assets |  |  |
| Capital | 72,865,137 | 73,392,935 |
| Other | 4,530,589 | 4,671,374 |
| Total Assets | 151,879,876 | 144,134,745 |
|  |  |  |
| **LIABILITIES** |  |  |
| Current Liabilities | 17,508,094 | 15,253,686 |
| Noncurrent Liabilities | 57,815,288 | 58,762,483 |
| Total Liabilities | 75,323,382 | 74,016,169 |
|  |  |  |
| **NET ASSETS** |  |  |
| Invested in Capital Assets, net of Related Debt | 46,959,953 | 48,288,661 |
| Restricted |  |  |
| Expendable | 200,000 | 200,000 |
| Loans | 2,489,316 | 2,381,663 |
| Other | 11,326,112 | 6,211,425 |
| Unrestricted | 15,581,113 | 13,036,827 |
|  |  |  |
| Total Net Assets | $ 76,556,494 | $ 70,118,576 |

4

**ALABAMA STATE UNIVERSITY**
Comprehensive Annual Financial Report
Fiscal Year Ended September 30, 2005

## ASSETS

## CURRENT ASSETS

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash in the University's bank accounts and investments in cash equivalents of operating funds held by investment managers. The investments are recorded at fair market value.

### Accounts Receivable

Accounts receivable relate to several transactions including State appropriations, student tuition and fee billings and auxiliary enterprise sales, such as food service, bookstore and residence halls. In addition, receivables arise from grant awards and financial aid. The receivables are shown net of allowance for doubtful accounts in the amount of $8.1 million.

### Inventories

The University maintains inventories of resale merchandise as well as items for internal consumption. Books, food, student supplies and institutional memorabilia make up the majority of the resale inventory and total $.83 million. Included in this amount is bookstore inventory of $.82 million. Inventories maintained for internal departmental use would be postage, office supplies and building and maintenance supplies. They make up the balance of the recorded inventory.

### Other Assets

Prepaid expenses are costs that relate to activities applicable to future periods. Examples are insurance and rent.

## NONCURRENT ASSETS

### Endowment Investments

Endowment investments include marketable securities relating to the Endowment funds. These investments are recorded at fair market value. The investments are managed and are held by investment managers.

### Loans Receivables, net

Loans receivable relate primarily to student loans from the Federal Perkins Loan program. As payments are collected, the funds become available to be loaned to new students.

5

MAR 000566

**ALABAMA STATE UNIVERSITY**
Comprehensive Annual Financial Report
Fiscal Year Ended September 30, 2005

Other Short-Term Investments

Other short-term investments include marketable securities held and managed by investment managers and banking institutions. These investments are recorded at fair market value.

Capital Assets, Net

Capital assets, net of related debt, consist of land, infrastructure, buildings, equipment, collections, library holdings and construction in progress and totals $72.9 million at September 30, 2005. The amount reported is net of accumulated depreciation of $64.5 million.

**LIABILITIES**

**CURRENT LIABILITIES**

Accounts Payable and Accrued Liabilities

Accounts payable and accrued liabilities represent amounts due at September 30, 2005, for goods and services received prior to the end of the fiscal year.

Deferred Revenue

Deferred revenue represents payments received for services, goods, tuition and fees, room and board, or property damage liability charges and totals $8.7 million net of deferred scholarships allowances and discounts of $2.1 million relating to a future period. Examples of deferred revenue are fall tuition and fees, fall room and board, and grants where funding has been received but not expended.

Deposits

Deposits represent assets belonging to an individual or organization for which the University acts as custodian. An example would be damage deposits.

Current Portion of Debt Obligations

This represents the portion of the University's long-term debt which is payable within the next fiscal year. This amount, at September 30, 2005, totals $1.7 million and when added to the relating portion of long-term debt, totals $57.8 million and represents the outstanding debt of the University at September 30, 2005.

6

MAR 000507

**ALABAMA STATE UNIVERSITY**
**Comprehensive Annual Financial Report**
**Fiscal Year Ended September 30, 2005**

## NONCURRENT LIABILITIES

### Long-Term Debt and Other Obligations

Long-term debt and other obligations consist of bonds and other obligations for which the principal is due more than one year from the balance sheet date. Included in this amount are accrued compensated absences. Compensated absences represent the amount payable to employees for earned but unpaid absences, such as vacation and totals $1.8 million.

## NET ASSETS

Net assets represent the difference between University assets and liabilities. Total net assets at September 30, 2005 are $76.6 million.

For the 2004-2005 fiscal year, the University's continued financial strength resulted in the increase of its net assets by $6.4 million.

### Analysis of Net Assets

Restricted non-expendable net assets consist of endowment gifts and other grants with specific permanent restrictions on spending.

Restricted expendable net assets consist of income from endowment funds, gifts and pledges with specific temporary restrictions, grants from third party agencies with expenditure restrictions and certain loan funds.



7

**ALABAMA STATE UNIVERSITY**
**Comprehensive Annual Financial Report**
**Fiscal Year Ended September 30, 2005**

The following is a breakdown of the restricted net assets:
(In millions of dollars)

| | |
|---|---|
| Expendable Endowment Funds | $ 0.2 |
| Loan Funds | 2.5 |
| Scholarships and other funds | 11.3 |
| **Total Restricted Net Assets** | **$14.0** |

Unrestricted net assets represent those balances from operational activities that have not been restricted by parties external to the University, such as donors or grant agencies. This includes funds that have been designated by the governing board for specific purposes as well as amounts that have been contractually committed for goods and services which have not yet been received. Also included are normal working capital balances maintained for departmental and auxiliary enterprise activities. None of the unrestricted net assets were designated as of year end.

| | 2005 | 2004 |
|---|---|---|
| **Operating Revenues** | | |
| Tuition and Fees | $  25,364,355 | $  23,330,961 |
| Grants and Contracts | 31,621,637 | 27,497,603 |
| Auxiliary Enterprises | 9,225,818 | 9,728,984 |
| Other Operating Revenues | 1,591,177 | 1,325,845 |
| **Total Operating Revenues** | 67,802,987 | 61,883,393 |
| **Operating Expenses** | 91,562,559 | 86,110,029 |
| **Operating (Loss)** | (23,759,572) | (24,226,636) |
| **Nonoperating Revenues** | | |
| State Appropriations | 32,210,927 | 31,371,022 |
| Other Nonoperating Revenues (Expenses) | (2,014,135) | (2,690,664) |
| **Net Nonoperating Revenues** | 30,196,792 | 28,680,358 |
| **Income Before Other Revenues** | 6,437,220 | 4,453,722 |
| Capital Appropriations | 699 | 170,672 |
| **Total Increase in Net Assets** | 6,437,919 | 4,624,394 |
| **Net Assets** | | |
| Net Assets at Beginning of Year, as restated | 70,118,575 | 65,494,182 |
| **Net Assets at End of Year** | $  76,556,494 | $  70,118,576 |

8

### ALABAMA STATE UNIVERSITY
#### Comprehensive Annual Financial Report
#### Fiscal Year Ended September 30, 2005

Total operating revenues for fiscal year 2005 were $67.9 million. Tuition and fees were $25.4 million. Operating expenses including depreciation of $3.6 million totaled $91.6 million. Of this total $23.7 million or 25% was for instruction.

<u>REVENUES</u>



<u>OPERATING REVENUES</u>

<u>Tuition and Fees and Services of Educational Activities</u>

Tuition and fees assessed for educational purposes totaled $29.5 million. The tuition discounts and allowances was $4.1 million.

<u>Grants and Contracts</u>

This includes all restricted revenues made available by government agencies as well as private agencies. Grant revenues are recorded only to the extent the funds have been expended for exchange transactions. Non-exchange revenues are recorded when received, or when eligibility criteria have been met.

MAR 000570

**ALABAMA STATE UNIVERSITY**
**Comprehensive Annual Financial Report**
**Fiscal Year Ended September 30, 2005**

The following table details the University's grant and contract awards for the fiscal year ended September 30, 2005:

| FEDERAL SOURCES | 2005 | 2004 |
|---|---|---|
| Financial Aid (Excludes Loan Programs) | $12,432,693 | $12,820,480 |
| Department of Education | 4,780,110 | 4,729,075 |
| Department of Health and Human Services | 2,643,147 | 1,820,330 |
| Other Federal Agencies | 1,735,389 | 977,170 |
| Total Federal Sources | 21,591,339 | 20,347,055 |
| **STATE SOURCES** | | |
| Grants and Contracts | 8,441,414 | 5,616,326 |
| Other Sources | 1,588,884 | 1,534,222 |
| Total All Sources | $31,621,637 | $27,497,603 |

The following is a graphic illustration of grant awards by source:



Auxiliary Enterprises

Auxiliary enterprises consist of various enterprise entities that exist predominantly to furnish goods or services to students, faculty, staff or the general public and charge a fee directly related to the cost of those goods or services. They are intended to be self-supporting.

Auxiliary enterprises include residence halls, apartments, food services, university bookstore, and ticket sales.

ALABAMA STATE UNIVERSITY
Comprehensive Annual Financial Report
Fiscal Year Ended September 30, 2005

## OPERATING EXPENSES

Operating expenses totaling $91.6 million include salaries and benefits of $48.4 million, materials and services of $10.8 million and depreciation of $3.6 million.

### Expenses by Function

|  | 2005 | 2004 |
|---|---|---|
| **Educational and General:** |  |  |
| Instruction | $ 23,671,499 | $ 21,606,044 |
| Research and development | 2,221,378 | 2,413,256 |
| Public service | 5,094,919 | 2,349,004 |
| Academic support | 6,163,313 | 6,664,294 |
| Student services | 8,437,474 | 7,931,160 |
| Operation and maintenance of plant | 7,554,198 | 6,648,127 |
| Institutional support | 14,091,853 | 13,075,017 |
| Depreciation | 3,649,560 | 3,783,461 |
| Student aid | 12,615,644 | 13,516,855 |
| Other general expenses | 535,973 | 543,836 |
| **Auxiliary enterprises:** |  |  |
| Residential life | 5,136,195 | 5,374,177 |
| Bookstore | 1,469,516 | 1,296,517 |
| Other auxiliary expenses function | 921,037 | 908,281 |
| Total operating expenses | 91,562,559 | 86,110,029 |
| Operating loss before nonoperating revenue (expense) | $ (23,759,572) | $ (24,226,636) |



Figure 1

MAR 000573

**ALABAMA STATE UNIVERSITY**
**Comprehensive Annual Financial Report**
**Fiscal Year Ended September 30, 2005**

## NONOPERATING REVENUES (EXPENSES)

State Appropriations

Annually, the State of Alabama appropriates funding for higher education. The University received $32.2 million for fiscal year 2004-2005. Of this total, $28 million was for operations and maintenance.

Investment Income, Net

Included in investment income are the earnings from pooled cash and plant investments and the unrealized gains and losses on those and other operating investment accounts.

Interest on Capital Assets Related Debt

This includes the interest paid for fiscal year 2004-2005 on bond debt.

## OTHER REVENUES

Capital Appropriations

Capital appropriations consist primarily of payments from the State of Alabama Public School and College Authority for capital expenditures.

## STATEMENT OF CASH FLOWS

Another way to assess the financial health of the University is to look at the Statement of Cash Flows. Its primary purpose is to provide relevant information about the cash receipts and cash payments of the University during a period. The Statement of Cash Flows also helps users assess:

- The ability to generate future net cash flows

- The ability to meet obligations as they come due, and

- A need for external financing

MAR 000573

### ALABAMA STATE UNIVERSITY
### Comprehensive Annual Financial Report
### Fiscal Year Ended September 30, 2005

|  | 2005 | 2004 |
|---|---|---|
| Cash and cash equivalents provided (used) by: |  |  |
| Operating activities | $ (17,173,228) | $ (20,395,910) |
| Noncapital financing activities | 34,116,002 | 33,234,393 |
| Capital and related financing activities | (7,860,001) | (3,100,305) |
| Investing activities | (5,632,950) | (9,462,732) |
| Net increase in cash and cash equivalents | 3,449,823 | 275,446 |
| Cash and cash equivalents - Beginning of the year | 12,613,735 | 12,338,289 |
| Cash and cash equivalents - End of the year | $  16,063,558 | $  12,613,735 |

Major sources of funds included in operating activities include student tuition and fees of $23.6 million, auxiliary enterprises $10.4 million and grants and contracts $33.2 million. Major uses of funds were payments made to employees $39.1 million, suppliers $33.2 million, and debt service payments $4.5 million.

The largest inflow of cash in the non-capital financing activities group is the State appropriation of $32.2 million.

## ENROLLMENT

On-Campus: The following table indicates the total historical on-campus enrollment of undergraduate and graduate students for the 2001 through 2005 academic years. Also indicated are the full-time equivalent students and the total number of on-campus credit hours taken by the students attending the University.

### (Fall Headcount Enrollment and Annual Full Time Equivalent)

| Year Ending September 30 | Undergraduate | Graduate | Total | Annual Full-Time Equivalent | Annual Total Credit Hours Taken |
|---|---|---|---|---|---|
| 2005 | 4,485 | 984 | 5,469 | 5,013 | 67,588 |
| 2004 | 4,689 | 964 | 5,653 | 5,401 | 70,159 |
| 2003 | 5,020 | 1,004 | 6,024 | 5,431 | 72,986 |
| 2002 | 5,125 | 913 | 6,038 | 5,510 | 76,596 |
| 2001 | 4,711 | 879 | 5,590 | 5,073 | 69,931 |

Student Admissions

The following table shows the total of new freshmen and transfer applications received, the number accepted, and the number who enrolled for the fall semesters of 2001 through 2005:

13

# ALABAMA STATE UNIVERSITY
## Comprehensive Annual Financial Report
### Fiscal Year Ended September 30, 2005

## Fall Semester First-Year Student Admissions

| Year Ending September 30 | Number of Applicants | Percent Accepted | Number Accepted | Percent Enrolled | Number Enrolled |
|---|---|---|---|---|---|
| 2005 | 6,202 | 67.0% | 4,154 | 29.2% | 1,213 |
| 2004 | 8,827 | 50.7% | 4,476 | 25.9% | 1,163 |
| 2003 | 11,462 | 50.3% | 5,774 | 21.6% | 1,248 |
| 2002 | 8,148 | 71.6% | 5,837 | 24.4% | 1,426 |
| 2001 | 6,236 | 69.3% | 4,322 | 29.6% | 1,280 |

## Fall Semester Transfer Student Admissions

| Year Ending September 30 | Number of Applicants | Percent Accepted | Number Accepted | Percent Enrolled | Number Enrolled |
|---|---|---|---|---|---|
| 2005 | 951 | 29.1% | 277 | 59.9% | 166 |
| 2004 | 586 | 62.5% | 366 | 39.6% | 145 |
| 2003 | 652 | 63.2% | 412 | 45.4% | 187 |
| 2002 | 626 | 65.3% | 409 | 50.6% | 207 |
| 2001 | 536 | 64.9% | 348 | 49.1% | 171 |

## Student Cost per Credit Hour

Student fees are based on a student's classification, full or part time, instate or out-of-state. Tuition for graduate and part-time students is based on the number of credit hours taken. The fees for an on-campus student, for the academic years indicated, are set forth below.

| Student Classification | Student Cost Per Hour | | | | |
|---|---|---|---|---|---|
| | 2004-05 | 2003-04 | 2002-03 | 2001-02 | 2000-01 |
| Undergraduate, resident | $ 167 | $ 150 | $ 121 | $ 105 | $ 105 |
| Undergraduate, nonresident | 334 | 300 | 242 | 210 | 210 |
| Graduate, resident | 192 | 172 | 138 | 120 | 120 |
| Graduate, nonresident | 384 | 344 | 276 | 240 | 240 |

| Student Classification | Annual Full-Time | | | | |
|---|---|---|---|---|---|
| | 2004-05 | 2003-04 | 2002-03 | 2001-02 | 2000-01 |
| Undergraduate, resident | $ 4,008 | $ 3,600 | $ 2,904 | $ 2,520 | $ 2,520 |
| Undergraduate, nonresident | 9,016 | 7,200 | 5,808 | 5,040 | 5,040 |
| Graduate, resident | 4,608 | 4,128 | 3,312 | 2,880 | 2,880 |
| Graduate, nonresident | 9,216 | 8,256 | 6,624 | 5,760 | 5,760 |

14

MAR 000575

ALABAMA STATE UNIVERSITY
Comprehensive Annual Financial Report
Fiscal Year Ended September 30, 2005

Room and Board and Estimated Total Cost

The annual cost of room and board and the estimated cost for two semesters for a resident undergraduate student for five academic years are set forth below:

### Annual Room and Board and Estimated Total Costs

| Year Ending September 30 | Room and Board | | Estimated Tuition, Fees, Books and Miscellaneous | | Estimated Total Costs | |
|---|---|---|---|---|---|---|
| 2005 | $ | 3,600 | $ | 7,318 | $ | 10,918 |
| 2004 | | 3,600 | | 7,318 | | 10,918 |
| 2003 | | 3,600 | | 7,038 | | 10,638 |
| 2002 | | 3,580 | | 6,014 | | 9,594 |
| 2001 | | 3,500 | | 5,630 | | 9,130 |

### Residence Hall Occupancy Analysis

| Fall Semester | Number of Occupants | Percent of Occupancy |
|---|---|---|
| 2005 | 1,996 | 87.69% |
| 2004 | 2,107 | 92.13% |
| 2003 | 2,259 | 94.00% |
| 2002 | 2,369 | 99.54% |
| 2001 | 2,285 | 98.07% |

Bonds Payable

At September 30, 2005 the University had outstanding general revenue bonds totaling $62.1 million. Bonds payable is the University's largest liability at September 30, 2005, representing 82% of total University liabilities.

15

**ALABAMA STATE UNIVERSITY**
**Comprehensive Annual Financial Report**
**Fiscal Year Ended September 30, 2005**

Capital Budget

The Board of Trustees approved the capital budget for fiscal year 2004-2005. The sources of funds available for the capital needs are state capital outlay and tax-exempt bond proceeds. During fiscal year 2005, the University expended approximately $3.1 million on plant related projects.

The University has developed a long-range funding plan to address the deferred maintenance needs on the campus. Funding will be from a variety of available sources, including the capital budgets, general revenues and auxiliary revenues.

Factors Impacting Future Periods

The level of State support, compensation increases, student tuition and fee increases, energy cost increases, insurance cost increases, and the need to constantly upgrade existing technology and acquire new state of the art technology to remain competitive, impact the University's ability to expand programs, undertake new initiatives, and meet its core mission and ongoing operational needs.

The need to continue to address priority needs and requirements for deferred maintenance, new technology, repairs and new construction projects is a large challenge facing the University in the years to come.

Various committees and individuals are assessing the University's performance toward identified goals, use of energy resources and ways to achieve greater efficiencies and reduce expenditures in an effort to assist in meeting the future challenges of the University.

Freddie Gallot, Jr.
Vice President for Finance
June 1, 2006

16

MAR 000577

ALABAMA STATE UNIVERSITY
STATEMENTS OF NET ASSETS
September 30, 2005 and 2004

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | University | Trust | University | Trust |
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Unrestricted Assets:** | | | | |
| Cash and cash equivalents | $ 13,358,232 | $ 3,879,381 | $ 11,472,512 | $ 3,109,715 |
| Short-term investments | 10,472,563 | 28,701,412 | 8,021,988 | 25,060,290 |
| Accounts receivable, net | 7,328,117 | | 6,104,430 | |
| Prepaid expenses | 301,585 | | 411,600 | |
| Inventories | 830,628 | | 869,674 | |
| Accrued interest and dividends | | 203,903 | | 180,860 |
| Total unrestricted assets | 32,291,125 | 32,784,696 | 26,880,204 | 28,350,865 |
| | | | | |
| **Restricted Assets:** | | | | |
| **Grants and Contracts:** | | | | |
| Cash and cash equivalents | 2,377,962 | | 777,490 | |
| Short-term investments | 285,409 | | 131,329 | |
| Grants receivable | 788,919 | | 2,381,813 | |
| | | | | |
| **Student Loans:** | | | | |
| Cash and cash equivalents | 158,453 | | 3,705 | |
| | | | | |
| **Endowments:** | | | | |
| Short-term investments | 7,141,225 | | 2,892,085 | |
| | | | | |
| **Capital Projects and Debt Service:** | | | | |
| Cash and cash equivalents | 155,632 | | 348,763 | |
| Short-term investments | 31,061,226 | | 32,457,851 | |
| | | | | |
| **Agency Funds:** | | | | |
| Cash and cash equivalents | 13,279 | | 11,265 | |
| Short-term investments | 210,920 | | 185,931 | |
| Total restricted assets | 42,193,025 | | 39,190,232 | |
| Total current assets | 74,484,150 | 32,784,696 | 66,070,436 | 28,350,865 |
| | | | | |
| **Non-current Assets** | | | | |
| Student loans receivable - net | 2,577,557 | | 2,639,942 | |
| Bond issuance costs | 1,953,032 | | 2,031,432 | |
| Capital assets, net | 72,865,137 | | 73,392,935 | |
| Total non-current assets | 77,395,726 | | 78,064,309 | |
| | | | | |
| **Total Assets** | $151,879,876 | $ 32,784,696 | $144,134,745 | $ 28,350,865 |

See Accompanying Notes to the Financial Statements.

17

## ALABAMA STATE UNIVERSITY
### STATEMENTS OF NET ASSETS (CONT'D)
#### September 30, 2005 and 2004

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | University | Trust | University | Trust |
| **LIABILITIES** | | | | |
| **Current Liabilities** | | | | |
| **Payable from Unrestricted Assets:** | | | | |
| Accounts payable and accrued liabilities | $ 4,482,674 | | $ 2,563,214 | |
| Student accounts payable | 391,036 | | 399,247 | |
| Deferred revenue | 8,561,021 | | 9,036,669 | |
| Total payable from unrestricted assets | 13,434,731 | | 11,999,130 | |
| | | | | |
| **Payable from Restricted Assets:** | | | | |
| Grants and contracts accounts payable | 1,235,425 | | 330,601 | |
| Deferred revenue | 179,945 | | 199,945 | |
| Agency funds payable | 947,993 | | 1,049,010 | |
| Current portion of long-term liabilities | 1,710,000 | | 1,675,000 | |
| Total payable from restricted assets | 4,073,363 | | 3,254,556 | |
| Total current liabilities | 17,508,094 | | 15,253,686 | |
| | | | | |
| **Non-current Liabilities** | | | | |
| Compensated absences | 1,768,717 | | 1,733,008 | |
| Long-term liabilities, net | 56,046,571 | | 57,029,475 | |
| Total non-current liabilities | 57,815,288 | | 58,762,483 | |
| Total liabilities | 75,323,382 | | 74,016,169 | |
| | | | | |
| **NET ASSETS** | | | | |
| Invested in capital assets, net of related debt | 46,959,953 | | 48,288,661 | |
| **Restricted for:** | | | | |
| Expendable | 200,000 | $ 28,834,308 | 200,000 | $ 26,109,561 |
| Loans | 2,489,316 | | 2,381,663 | |
| Other | 11,326,112 | 3,950,388 | 6,211,425 | 2,241,304 |
| Total restricted | 14,015,428 | 32,784,696 | 8,793,088 | 28,350,865 |
| | | | | |
| Unrestricted | 15,581,113 | | 13,036,827 | |
| | 15,581,113 | | 13,036,827 | |
| Total net assets | $ 76,556,494 | $ 32,784,696 | $ 70,118,576 | $ 28,350,865 |

MAR 000579

## ALABAMA STATE UNIVERSITY
## STATEMENTS OF REVENUES, EXPENSES
## AND CHANGES IN NET ASSETS
### For the years ended September 30, 2005 and 2004

|  | 2005 | | 2004 | |
| --- | --- | --- | --- | --- |
|  | University | Trust | University | Trust |
| **OPERATING REVENUES** | | | | |
| Student tuition and fees (net of scholarship allowance of $4,091,538 and $4,841,752) | $ 25,364,355 | | $ 23,330,961 | |
| Federal grants and contracts | 21,591,339 | | 20,347,055 | |
| State grants and contracts | 8,441,414 | | 5,616,326 | |
| Nongovernmental grants and contracts | 1,588,884 | | 1,534,222 | |
| Sales and services of auxiliary enterprises | 7,653,218 | | 8,012,538 | |
| Intercollegiate athletics | 1,250,285 | | 931,558 | |
| Bookstore - net | 1,572,600 | | 1,716,446 | |
| Other operating revenues | 340,892 | | 394,287 | |
| Total operating revenues | 67,802,987 | | 61,883,393 | |
| **OPERATING EXPENSES** | | | | |
| **Educational and General:** | | | | |
| Instruction | 23,671,499 | | 21,606,044 | |
| Research and development | 2,221,378 | | 2,413,256 | |
| Public service | 5,094,919 | | 2,349,004 | |
| Academic support | 6,163,313 | | 6,664,294 | |
| Student services | 8,437,474 | | 7,931,160 | |
| Operation and maintenance of plant | 7,554,198 | | 6,648,127 | |
| Institutional support | 14,091,853 | | 13,075,017 | |
| Depreciation | 3,649,560 | | 3,783,461 | |
| Student aid | 12,615,644 | | 13,516,855 | |
| Other general expenses | 535,973 | | 543,836 | |
| **Auxiliary Enterprises:** | | | | |
| Residential life | 5,136,195 | | 5,374,177 | |
| Bookstore | 1,469,516 | | 1,296,517 | |
| Other auxiliary expenses | 921,037 | | 908,281 | |
| Total operating expenses | 91,562,559 | | 86,110,029 | |
| Operating loss before non-operating income (expenses) | (23,759,572) | | (24,226,636) | |

See Accompanying Notes to the Financial Statements.

19

MAB 000580

# ALABAMA STATE UNIVERSITY
## STATEMENTS OF REVENUES, EXPENSES
## AND CHANGES IN NET ASSETS (CONT'D)
### For the years ended September 30, 2005 and 2004

|  | 2005 | | 2004 | |
|---|---|---|---|---|
|  | University | Trust | University | Trust |
| **NON-OPERATING REVENUE (EXPENSES)** |  |  |  |  |
| State appropriations | 32,210,927 |  | 31,371,022 |  |
| Investment income - net | 966,255 | $ 922,453 | 595,228 | $ 709,980 |
| Interest expense on capital assets | (2,842,314) |  | (3,082,282) |  |
| Amortization of bond issuance expense | (146,964) |  | (200,160) |  |
| Other non-operating revenues (expenses) | 8,888 |  | 8,885 |  |
| Contributions |  | 2,155,052 |  | 3,167,226 |
| Realized and unrealized gains on investments |  | 1,427,016 |  | 965,030 |
| Gain/loss on asset disposition |  |  | (12,335) |  |
| Trustee fees (expenses) |  | (70,690) |  | (89,462) |
| Net non-operating revenues | 30,196,792 | 4,433,831 | 28,680,358 | 4,752,774 |
| Income before other expenses | 6,437,220 | 4,433,831 | 4,453,722 | 4,752,774 |
| Capital appropriations | 699 |  | 170,672 |  |
| **CHANGE IN NET ASSETS** |  |  |  |  |
| Increase in net assets | 6,437,919 | 4,433,831 | 4,624,394 | 4,752,774 |
| Net assets, beginning of the year, as adjusted | 70,118,575 | 28,350,865 | 65,494,182 | 23,598,091 |
| Net assets, end of the year | $ 76,556,494 | $ 32,784,696 | $ 70,118,576 | $ 28,350,865 |

See Accompanying Notes to the Financial Statements.

20

MAR 000581

ALABAMA STATE UNIVERSITY
STATEMENTS OF CASH FLOWS
For the years ended September 30, 2005 and 2004

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | University | Trust | University | Trust |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Cash received from tuition and fees | $ 23,645,020 | | $ 24,464,525 | |
| Cash received from grants and contracts | 33,214,531 | | 26,927,005 | |
| Cash received from auxiliary enterprises | 10,476,103 | | 10,660,542 | |
| Cash collections of loans to students | 62,385 | | 77,573 | |
| Cash received from other sources | 340,892 | $ 2,983,772 | 394,287 | $ 3,758,605 |
| Cash paid to suppliers for goods and services | (33,197,989) | | (31,188,424) | |
| Cash paid to employees for services | (39,098,526) | | (38,214,563) | |
| Cash paid for scholarships and fellowships | (12,615,644) | | (13,516,855) | |
| Net cash used by operating activities | (17,173,228) | 2,983,772 | (20,395,910) | 3,758,605 |
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES** | | | | |
| State appropriations | 32,210,927 | | 31,371,022 | |
| Gifts and grants for other than capital purposes: | | | | |
| FFEL lending receipts | 34,733,212 | | 33,620,782 | |
| FFEL lending disbursements | (32,956,156) | | (31,653,270) | |
| SEOG lending receipts | 409,689 | | 274,985 | |
| SEOG lending disbursements | (409,689) | | (274,985) | |
| Agency transactions | 128,019 | | (104,141) | |
| Net cash provided from noncapital financing activities | 34,116,002 | | 33,234,393 | |
| **CASH FLOWS FROM CAPITAL FINANCING ACTIVITIES** | | | | |
| Purchases of capital assets | (3,121,763) | | (2,488,855) | |
| Net proceeds from issuance of bonds | | | 24,425,000 | |
| Reacquisition price of defeased bonds | | | (20,170,000) | |
| Principal paid on capital debt and leases | (1,675,000) | | (1,801,982) | |
| Interest paid on capital debt and leases | (3,063,238) | | (3,064,468) | |
| Net cash provided (used) by capital financing activities | (7,860,001) | | (3,100,305) | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Proceeds from sales and maturities of investments | 1,276,409 | 5,836,993 | | 2,890,491 |
| Interest on investments | 966,255 | | 595,228 | |
| Purchase of investment securities | (7,875,614) | (8,051,099) | (10,057,960) | (6,253,869) |
| Net cash provided (used) by investing activities | (5,632,950) | (2,214,106) | (9,462,732) | (3,363,378) |
| Net increase in cash | 3,449,823 | 769,666 | 275,446 | 395,227 |
| Cash and cash equivalents, beginning of the year | 12,613,735 | 3,109,715 | 12,338,289 | 2,714,488 |
| Cash and cash equivalents, end of the year | $ 16,063,558 | $ 3,879,381 | $ 12,613,735 | $ 3,109,715 |

See Accompanying Notes to the Financial Statements.

21

MAR 000583

ALABAMA STATE UNIVERSITY
STATEMENTS OF CASH FLOWS (CONT'D)
For the years ended September 30, 2005 and 2004

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | University | Trust | University | Trust |
| **RECONCILIATION OF OPERATING INCOME TO NET CASH PROVIDED BY OPERATING ACTIVITIES** | | | | |
| Operating income | $(23,759,575) | $  4,433,831 | $(24,226,639) | $  4,752,774 |
| **Adjustments to reconcile operating income (loss) to net cash provided (used) by operating activities:** | | | | |
| Depreciation | 3,649,560 | | 3,783,461 | |
| Change in assets and liabilities: | | | | |
| Unrealized and realized gains on investments, net | | (1,427,016) | | (965,030) |
| Accounts receivables, net | (1,223,687) | | 274,671 | |
| Grants and notes receivable | 1,655,279 | | (493,025) | |
| Prepaid expenses | 110,015 | | (260,554) | |
| Inventories | 39,046 | | 6,513 | |
| Accrued interest and dividends | | (23,043) | | (29,139) |
| Compensated employee absences | 35,709 | | 111,301 | |
| Accounts payable | 2,816,073 | | (450,531) | |
| Deferred revenue | (495,648) | | 858,893 | |
| Net cash flows from operating activities | $(17,173,228) | $  2,983,772 | $(20,395,910) | $  3,758,605 |
| **NON-CASH TRANSACTIONS** | | | | |
| Equipment | $      (699) | $ | $   (170,672) | $ |
| State appropriation | 699 | | 170,672 | |

See Accompanying Notes to the Financial Statements.

22

MAR 000583

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

---

NOTE 1     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies followed by Alabama State University ("the University") are described below to enhance the usefulness of the financial statements to the reader.

A.     **Reporting Entity**

The University is a component unit of the State of Alabama. A component unit is a legally separate organization for which the elected officials of the primary government are financially accountable. The Governmental Accounting Standards Board (GASB) in Statement No. 14, *The Financial Reporting Entity*, as amended by Statement No. 39, *Determining Whether Certain Organizations Are Component Units*, states that a primary government is financially accountable for a component unit if it appoints a voting majority of the organization's governing body and (1) it is able to impose its will on that organization, and (2) there is a potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the primary government. In this case, the primary government is the State of Alabama and the Governor appoints the University's Board of Trustees. In addition, the University receives a substantial portion of its funding from the State of Alabama (potential to impose a specific financial burden). Based on these criteria, the University is considered for financial reporting purposes to be a component unit of the State of Alabama.

Furthermore, in accordance with GASB Statement No. 39, normally two discretely presented component units are reported in a separate column on the University's financial statements to emphasize that they are legally separate from the University. The Alabama State University Foundation, Inc. (Foundation) and the Trust for Educational Excellence at Alabama State University (Trust) are not-for-profit organizations supporting the University. The Foundation primarily receives and holds gifts, grants, bequests, money, property and other things for the benefit of the University, its faculty and its students, and to give the University such resources for educational and research purposes. The Trust primarily receives public funds, gifts, grants income, interest, dividends, real estate and any and all property rights of every kind and character to be held, invested and reinvested for educational purposes at the University.

23

MAR 000584

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

Although the University does not control the timing or amount of receipts from the Foundation and Trust, the majority of resources, or income thereon, which they hold and invest are restricted to support the activities of the University. Because these restricted resources held by the Foundation and Trust can only be used by, or for the benefit of, the University, they are considered component units of the University. As previously noted on page 1, the financial activities of the Foundation are not included in the University's basic financial statements as a discretely presented component unit.

The fiscal years of the Trust is different from that of the University. The fiscal year of the Trust is July 31, 2005 and 2004.

B.    **Basis of Accounting**

The financial statements of the University have been prepared on the accrual basis of accounting.

In accordance with GASB Statement No. 20, the University is required to follow all applicable GASB pronouncements. In addition, the University applies all applicable Financial Accounting Standards Board (FASB) Statements and Interpretations, Accounting Principle Board Opinions (APB) and Accounting Research Bulletins of the Committee on Accounting Procedures issued on or before November 30, 1989 unless those pronouncements conflict with or contradict GASB pronouncements.

C.    **Recently Issued Accounting Standards**

The GASB issued Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. This statement establishes accounting and financial reporting standards for impairment of capital assets. A capital asset is considered impaired when its service utility has declined significantly and unexpectedly. This statement also clarifies and establishes accounting requirements for insurance recoveries. This statement is effective for financial statements for periods beginning after December 31, 2004. The University does not expect the adoption of this statement to have a material effect on its financial statements.

D.    **Revenue Recognition**

Operating revenues of the University consist of tuition and fees, grants and contracts, and sales and services of auxiliary enterprises.

24

MAR 000585

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

E.    Cash and Cash Equivalents

For purposes of the statement of cash flows, the University considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents. Cash and cash equivalents include cash on hand and demand deposits.

F.    Investments

State statutes authorize the University to invest in U.S. government obligations, or in bonds of the State of Alabama or in any county or municipality therein, or in certificates of deposit collaterally secured by a pledge of U.S. government obligations.

The current and noncurrent portfolios of investments are marketable debt securities and are carried at cost plus amortized premium at the balance sheet date. Related premiums are amortized to income over the terms of the investments. Interest income on investments is accrued as earned.

G.    Receivables

Receivables are reported at their gross value when earned and are reduced by the estimated portion that is expected to be uncollectible. The allowance for uncollectible amounts is based on collection history. When continued collection activity results in receipt of amounts previously written off, revenue is recognized for the amount collected.

H.    Restricted Assets

Restricted assets consist of monies and other resources which are restricted legally as described below:

Grants and Contracts - These assets represent federal, state and local government grants and contract revenues restricted for student aid, research and development and other educational programs.

Capital Projects and Debt Service - These assets represent capital debt proceeds that are restricted for designated capital projects and portions of bond proceeds deposited in the Debt Service Reserve Account or Capital Projects Account, pursuant to the terms of trust indentures.

25

MAR 000586

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

I.    **Capital Assets**

Property, plant and equipment are valued at cost. Donated fixed assets are valued at their estimated value on the date donated. Depreciation has been provided over the estimated useful lives using the straight-line method.

Estimated useful lives by asset category are as follows:

| | |
|---|---|
| Building | 10-35 years |
| Infrastructure improvements | 5-30 years |
| Machinery and equipment | 5-15 years |
| Furniture and fixtures | 5-15 years |

Cost of constructed fixed assets includes interest during the construction period. No depreciation is provided on construction in progress until construction is substantially complete and the asset is placed in service.

When property and equipment are disposed of, the related cost and accumulated depreciation are removed from the accounts with gains or losses on disposition being reflected in current operations. Maintenance and repairs are expended as incurred.

J.    **Interest Capitalization**

Interest cost related to construction financing is capitalized, net of interest revenue earned on the borrowed proceeds, from the time of borrowing until construction is substantially complete and the asset is placed in service.

K.    **Deferred Revenue**

Deferred revenue represents payments received for services, goods, tuition and fees, room and board, or property damage liability charges relating to a future period. Deferred revenue also includes amounts received in advance from grant and contract sponsors that have yet been earned under the terms of the agreement. The amounts, which are deferred, are recognized as revenue in the following fiscal year.

L.    **Bond Issue Costs and Deferred Loss on Bond Refunding**

Bond issue costs, original issue discount and deferred loss on refunding on long-term indebtedness are deferred and amortized using the effective interest method over the life of the debt to which it relates.

26

MAR 000587

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS
――――

M.    **Compensated Absences**

The University's employees earn vacation leave at graduated rates based on their length of service (one day per month of service initially) and up to 36 days of unused leave may be carried over to the following year. Sick leave is earned at the rate of eight hours for each month of service and can accumulate up to 180 days. The University funds sick leave as taken.

An accrual is recorded for accumulated unpaid vacation pay. As of September 30, 2005 and 2004, accrued vacation pay totaled $1,768,717 and $1,733,008, respectively. Because sick pay does not vest and will only be paid to employees on approved sick leave, no accrued liability has been recorded.

N.    **Scholarship Allowances and Student Aid**

Financial aid to students is reported under the alternative method as prescribed by the National Association of College and University Business Officers (NACUBO). Certain aid, such as loans, funds provided to students as awarded by third parties, and Federal Direct Lending is accounted for as a third party payment (credited to the student's account as if the student made the payment). All other aid is reflected as operating expenses, or scholarship allowances, which reduce revenues. The amount reported as operating expense represents the portion of aid that was provided to the student in the form of cash. Scholarship allowances represent the portion of aid provided to the student in the form of reduced tuition. Under the alternative method followed by the University, scholarship allowances are computed by allocating the cash payments to students, excluding payments for services, on the ratio of using aid not considered to be third party aid to total aid.

O.    **Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

NOTE 2    **CASH AND CASH EQUIVALENTS AND INVESTMENTS**

The University's cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date acquisition.

27

MAR 000588

## ALABAMA STATE UNIVERSITY
## NOTES TO THE FINANCIAL STATEMENTS

—————

In accordance with the *Policies of the Board of Trustees of the University*, the types of investments, which may be purchased, include United States government securities, federal agency securities, obligations of commercial banks, including certificates of deposits, money markets, repurchase agreements, banker's acceptances, treasury bills, and commercial paper, obligations of corporations, municipal notes and bonds, investment programs offered through the Pooled Endowment Fund ("the Fund"). The Fund, which includes the Alabama State University Trust for Educational Excellence, as well as other endowment holdings of the University, is subject to review by the Board of Trustees.

GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, requires certain investments to be recorded at fair value. The University's investments, with a remaining maturity of more than one year at the time of purchase, are reported at fair value in accordance with GASB Statement No. 31.

GASB Statement No. 3, *Deposits with Financial Institutions, Investments (including Repurchase Agreements), and Reverse Repurchase Agreements, as amended by GASB Statement No. 40, Deposit and Investment Risk Disclosures*, require certain disclosures related to interest rate and credit risk. Interest rate risk exists when there is a possibility that changes in interest rates could adversely affect an investment's fair value. Credit risk exists when there is a possibility that the issuer or other counterparty to an investment may be unable to fulfill its obligations.

The University's cash and investments are subject to several types of risk, which are examined in more detail below:

### Custodial Credit Risk of Bank Deposits

At year end, the bank balance of the University's funds was either covered by federal depository insurance or secured by collateral through the Alabama State Treasury's Security for Alabama Funds Enhancement (SAFE) Program. Under the SAFE program, the University's funds are protected through a collateral pool administered by the Alabama State Treasury.

Certain banks holding deposits belonging to the state, counties, cities, or agencies of any of these entities must pledge securities as collateral against these deposits. In the event of the failure of a bank, securities pledged by that bank would be liquidated by the State Treasurer to replace the public deposits. If the securities pledged failed to produce adequate funds for that purpose, every bank participating in the pool would share the liability for the remaining balance. At September 30, 2005, all of the University's depositories are participating in the SAFE program, with a bank balance of $18,710,557 and a carrying balance of $16,063,558.

28

MAR 000589

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

———

### Custodial Credit Risk of Investments

| Type of Investment | Fair Value |
|---|---|
| U.S. Government Guaranteed Securities | $ 5,368,286 |
| U.S. Agency Securities | 5,976,374 |
| Mortgage Backed Securities | 77,985 |
| Corporate Bonds | 4,435,770 |
| Other: Mutual Funds - Bonds Only | 84,387 |
| Total | $ 15,942,802 |

### Credit Quality Ratings of Debt Securities

| Rating (Moody's) | Fair Value |
|---|---|
| AAA | $ 148,329 |
| Aa3 | 51,439 |
| Aa3 | 25,880 |
| Aa3 | 205,756 |
| Aa3 | 181,158 |
| Aa2 | 51,080 |
| Aa2 | 28,848 |
| Aa2 | 153,240 |
| Aa2 | 115,393 |
| Aa1 | 101,799 |
| A3 | 203,208 |
| A2 | 26,527 |
| A2 | 150,549 |
| A2 | 176,456 |
| A2 | 205,506 |
| A2 | 185,691 |
| A2 | 187,775 |
| A2 | 501,830 |
| A2 | 197,420 |
| A1 | 15,849 |
| A1 | 263,238 |
| A1 | 38,971 |
| A1 | 26,051 |
| A1 | 260,520 |
| A1 | 42,265 |
| A1 | 103,687 |
| A1 | 122,481 |
| A1 | 186,209 |
| Baa1 | 478,615 |
| Total | $ 4,435,770 |

29

MAR 000590

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

## Interest Rate Risk

| Type of Investment | Investment Maturities at Fair Value (In Years) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less Than 1 | 1-5 | 6-10 | More Than 10 | Totals |
| **Debt Securities:** | | | | | |
| U. S. Government Guaranteed Securities | $ 495,080 | $1,639,107 | $2,082,294 | $1,151,805 | $ 5,368,286 |
| U. S. Agency Securities | 1,023,113 | 2,971,147 | 1,648,472 | 333,642 | 5,976,374 |
| Mortgage Backed Securities | | 77,985 | | | 77,985 |
| Corporate Bonds | 482,575 | 1,459,438 | 2,493,757 | | 4,435,770 |
| Mutual Funds - Bonds Only | | 84,387 | | | 84,387 |
| Total Debt Securities | $2,000,768 | $6,232,064 | $6,224,523 | $1,485,447 | 15,942,802 |

| | |
| --- | --- |
| **Equities:** | |
| Domestic Common and Preferred Stocks | 20,578,478 |
| Mutual Funds - Bond and Equity Mix or Equity Only | 84,750 |
| | |
| Total Investments - Interest Rate Risk | $36,606,030 |
| | |
| **Reconciliation to Balance Sheet:** | |
| Certificates of Deposit | 1,130,820 |
| Money Market Accounts - Savings | 39,790,336 |
| Other Cash Equivalents | 60,160 |
| Investment Classified as Restricted Assets | 285,409 |
| | |
| Investments as Reported on Balance Sheet | $77,872,755 |

NOTE 3    ## CHANGE IN CAPITAL ASSETS

Capital assets of the University are stated at cost at date of acquisition or fair market value at the date of donation in the case of gifts. A summary of the changes in capital assets for the year ended September 30, 2005, is as follows:

| | Balance 10/01/04 | Additions | Deductions | Balance 9/30/05 |
| --- | --- | --- | --- | --- |
| Land | $ 13,029,016 | $ 220,412 | | $ 13,249,428 |
| Construction in Progress | 248,643 | 1,116,777 | | 1,365,420 |
| Buildings | 86,589,868 | | | 86,589,868 |
| Equipment | 19,374,754 | 1,488,368 | | 20,863,122 |
| Library Holdings | 8,467,518 | 296,206 | | 8,763,724 |
| Infrastructure | 6,542,612 | | | 6,542,612 |
| Total | 134,252,411 | 3,121,763 | | 137,374,174 |

30

MAR 000591

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

| | Balance 10/01/04 | Additions | Deductions | Balance 9/30/05 |
|---|---|---|---|---|
| Less: Accumulated Depreciation | | | | |
| Buildings | $ 42,713,859 | $ 1,972,461 | | $ 44,686,320 |
| Equipment | 13,708,676 | 1,472,680 | | 15,181,356 |
| Infrastructure | 4,436,938 | 204,423 | | 4,641,361 |
| Total | 60,859,473 | 3,649,564 | | 64,509,037 |
| Capital Assets, Net | $ 73,392,938 | $ (527,801) | $ | $ 72,865,137 |

**NOTE 4    STUDENT RECEIVABLES**

Accounts receivable include State appropriations, federal grants and contracts, local grants and contracts, uncollected student tuition, fees, room and board charges. Student accounts receivable are reported net of allowance for doubtful accounts of $7,901,976.

**Accounts Receivable**

| | |
|---|---|
| Tuitions, fees, room and board | $13,189,474 |
| Federal grants and contracts | 788,919 |
| State grants and contracts | 58,386 |
| Other | 1,982,233 |
| | 16,019,012 |
| Allowance for doubtful accounts | (7,901,976) |
| Total | $ 8,117,036 |

**Loans Receivable**

**Perkins Loan:**

| | |
|---|---|
| Loans advanced | $ 7,129,140 |
| Less: | |
| Loans assigned to U.S. Government | (538,908) |
| Principal collected | (3,396,488) |
| Principal cancellations | (616,186) |
| | (4,551,582) |
| Total | $ 2,577,558 |

31

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

———

NOTE 5      **INVENTORIES**

The inventories are comprised of consumable supplies and items held for resale. Inventories are valued at the lower of cost or market on the first in, first out (FIFO) basis.

NOTE 6      **LONG-TERM DEBT**

On August 27, 2004, the University issued $24,425,000 in Alabama State University General Tuition and Fee Revenue Bonds, Series 2004 (the Series 2004 Bonds). The Series 2004 Bonds were issued for the purpose of providing funds to, 1) advance refund a portion of the General Fee Revenue Bonds, Series 2003B, 2) pay a portion of the costs of certain capital improvement projects, and 3) pay the costs associated with the issuance of the bonds. The Series 2004 Bonds were initially issued as auction rate securities (variable rate bonds). The auction rate securities are a form of variable rate bonds, where the interest rate is periodically set by an auction bid by investors. The auction rate bonds can be auctioned every seven (7) days or every thirty-five (35) days. The University entered into an interest rate swap agreement (the "Swap Agreement") with a swap counterparty on a notional amount equal to the aggregate principal amount of the Series 2004 Bonds. This was for the purpose of hedging the exposure of the University against interest rate fluctuations arising from the variable rates borne by the Series 2004 Bonds. Under the Swap Agreement, the University will be the fixed rate payer, and the swap counterparty will be the floating rate payer, paying a floating rate based on the USD-LIBOR-BBA Index, which may vary from the actual rate payable by the University on the Series 2004 Bonds.

On March 6, 2003, the University issued $25,000,000 in Alabama State University General Tuition and Fee Revenue Bonds, Series 2003B (the Series 2003B Bonds). The Series 2003B Bonds were issued for the purpose of providing funds to, 1) pay a portion of the costs of acquiring certain capital improvements to the facilities of the University, and 2) pay the costs associated with the issuance of the Bonds.

The Series 2003B Bonds mature annually on March 1, beginning in 2004 and will be fully matured by March 1, 2033. Principal payments are due semiannually on March 1 and September 1 of each year, beginning on September 1, 2003 at rates ranging from 1.10% to 4.87%.

The Series 2003B Bonds constitute a special limited obligation of the University, payable solely out of, 1) the revenues and receipts to be derived by the University from the general tuition and other fees, and 2) revenues derived from the operation of student housing facilities.

On August 27, 2004, the University refunded $20,170,000 of the Series 2003B, as described above, leaving an unrefunded balance of $4,370,000.

32

MAR 000593

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

On January 22, 2002, the University issued the Alabama State University General Tuition and Fee Refunding Revenue Bonds, Series 2002A (Tax Exempt) (the Series 2002A Bonds) and 2002B (Taxable) (the Series 2002B Bonds), in the amounts of $29,125,000 and $6,775,000, respectively.

The Series 2002A Bonds were issued for the purpose of providing funds to, 1) pay a portion of the costs of acquiring certain capital improvements to the facilities of the University, including reimbursement to the University of funds previously expended for such purposes, 2) refund a portion of the Series 1993 Bonds, 3) refund the Series 1995 Bonds, 4) refund the Series 2002 Bonds, 5) refund the Series 2001B Bonds, 6) repay the Southern Normal Mortgage debt, and 7) pay the costs of issuing the Series 2002A Bonds.

The Series 2002B Bonds were issued for the purpose of providing funds to, 1) refund the remaining portion of the Series 1993 Bonds not refunded by the Series 2002A Bonds, and 2) pay the costs incurred in connection with the issuance of the Series 2002B Bonds.

The net proceeds from the issuance of the Series 2002A and 2002B Bonds of $34,664,211 (after an original issue discount of $330,729 and payment of $1,004,750 of issuance cost) plus an additional $4,412,187 of the Series 1993, 1995 and 2001 sinking fund deposits with trustee were used to establish a new capital projects account to be used for future capital expenditures, pay off the Southern Normal Mortgage Note outstanding in the amount of $653,209 and to defease the Series 1993, 1995 and 2001 bonds in an advance refunding.

To effect the advance refunding of the Series 1993, 1995 and 2001, a portion of the proceeds were deposited into an irrevocable trust with an escrow agent to purchase government securities to provide for future debt service payment on the Series 1993, 1995 and 2001 bonds. As a result, the liability for those bonds has been removed from the financial statements (defeasance).

The University incurred a loss on defeasance of approximately $3,069,048 that was deferred and is being amortized over the life of the new debt in accordance with GASB 23. The Series 2002A Bonds mature no later than January 1, 2023 and require semi-annual interest payments on January 1 and July 1, beginning July 1, 2002, at rates ranging between 1.90 and 5.00 percent. Principal payments on the Series 2002A Bonds are due annually, beginning January 1, 2003.

The Series 2002B are Term Bonds that mature no later than January 1, 2022 and require semi-annual interest payments on January 1 and July 1, beginning July 1, 2002 at rates ranging between 4.65 and 8.50 percent. Principal payments on the Series 2002B Bonds are due no earlier than January 1, 2020.

33

MAR 000594

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS
_____

The University, through the defeasance, reduced its aggregate debt service payments by approximately $8,858,134 over the next 10 years and will obtain an economic gain (difference between the present value of debt service of the refunded bonds and the Series 2002 Revenue Refunding Bonds) of approximately $2,508,377.

Long-term debt includes the following:

| | Balance 10/01/04 | Additions | Deductions | Balance 9/30/05 |
|---|---|---|---|---|
| 1965 Revenue Bonds, Faculty Housing, 3.75% interest, due semi-annually through 2010, on November 1 and May 1 | $ 57,000 | | $ 5,000 | $ 52,000 |
| 1969 Series CH-91 Revenue Bonds, 3% interest, due semi-annually through 2009 | 237,000 | | 55,000 | 182,000 |
| 1982 Dormitory Revenue Bonds, 3% interest, due semi-annually through 2009 | 795,000 | | 35,000 | 760,000 |
| 2002 Series A General Tuition and Fee Revenue Bonds, 1.9% - 5% interest, due semi-annually through 2023 on July 1 and January 1 | 27,085,000 | | 1,060,000 | 26,025,000 |
| 2002 Series B General Tuition and Fee Revenue Bonds, 8.5% interest, due semi-annually through 2023 on July 1 and January 1 | 6,775,000 | | | 6,775,000 |
| 2003 Series B General Fee Revenue Bonds, 5.25% interest, due semi-annually through 2033 on March 1 and September 1 | 4,370,000 | | 470,000 | 3,900,000 |
| 2004 Series B General Fee Revenue Bonds, auction rate due through March 1, 2033 | 24,425,000 | | 50,000 | 24,375,000 |
| | 63,744,000 | | 1,675,000 | 62,069,000 |
| Unamortized Bond Discount | (299,395) | $ 12,995 | | (286,400) |
| Unamortized Bond Premium | 128,238 | 550,000 | 27,707 | 650,531 |
| Unamortized Deferred Loss on Refunding | (4,870,958) | 194,398 | | (4,676,560) |
| Bonds Payable, net | 58,701,885 | 757,393 | 1,702,707 | 57,756,571 |
| Capital Lease Obligations | 2,590 | | 2,590 | |
| Total Debt | $ 58,704,475 | $ 757,393 | $ 1,705,297 | $ 57,756,571 |

34

MAR 000595

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

A trustee holds sinking fund deposits, including earnings on investments of these deposits. Revenues from student tuition and fees sufficient to pay the annual debt service are pledged to secure the bonds. Principal and interest maturity requirements on bond debt are as follows:

|      | Principal | Interest | Total |
|------|-----------|----------|-------|
| 2006 | $ 1,710,000 | $ 2,726,743 | $ 4,436,743 |
| 2007 | 1,835,000 | 2,667,978 | 4,502,978 |
| 2008 | 1,895,000 | 2,600,772 | 4,495,772 |
| 2009 | 1,902,000 | 2,528,424 | 4,430,424 |
| 2010 | 1,995,000 | 2,450,791 | 4,445,791 |
| 2011 | 2,070,000 | 2,366,591 | 4,436,591 |
| 2012 | 2,250,000 | 2,274,654 | 4,524,654 |
| 2013 | 2,340,000 | 2,175,837 | 4,515,837 |
| 2014 | 2,456,000 | 2,071,057 | 4,527,057 |
| 2015 | 2,556,000 | 1,960,169 | 4,516,169 |
| 2016 | 2,675,000 | 1,844,898 | 4,519,898 |
| 2017 | 2,790,000 | 1,725,447 | 4,515,447 |
| 2018 | 2,910,000 | 1,600,616 | 4,510,616 |
| 2019 | 3,135,000 | 1,470,104 | 4,605,104 |
| 2020 | 2,765,000 | 1,325,350 | 4,090,350 |
| 2021 | 3,255,000 | 1,115,756 | 4,370,756 |
| 2022 | 3,530,000 | 840,975 | 4,370,975 |
| 2023 | 3,725,000 | 611,060 | 4,336,060 |
| 2024 | 1,425,000 | 501,424 | 1,926,424 |
| 2025 | 1,450,000 | 455,108 | 1,905,108 |
| 2026 | 1,500,000 | 407,583 | 1,907,583 |
| 2027 | 1,550,000 | 358,448 | 1,908,448 |
| 2028 | 1,600,000 | 307,701 | 1,907,701 |
| 2029 | 1,650,000 | 255,344 | 1,905,344 |
| 2030 | 1,700,000 | 201,375 | 1,901,375 |
| 2031 | 1,750,000 | 145,796 | 1,895,796 |
| 2032 | 1,800,000 | 88,605 | 1,888,605 |
| 2033 | 1,850,000 | 29,804 | 1,879,804 |
|      | $62,069,000 | $37,108,410 | $ 99,177,410 |

35

MAR 000596

## ALABAMA STATE UNIVERSITY
## NOTES TO THE FINANCIAL STATEMENTS

### Interest Earnings on Sinking Fund Deposits

Monthly principal and interest payments are forwarded by the University and held by the trustee until such payments are due. Normally, these deposits would earn interest income and increase the amount of deposits held by the trustee. However, on June 6, 1995, the University received $400,000 and entered into a forward purchase agreement for the use of the rights to use all principal and interest payments forwarded to the trustee in advance of the actual due date. The rights to use these advances extend through fiscal year 2015. The forward purchase agreement is accounted for in the Retirement of Indebtedness Fund and revenues will be amortized over a period of twenty years with the remaining unrecognized amount recorded as Deferred Credits.

NOTE 7    ### INTEREST RATE SWAP AGREEMENT

On February 6, 2004, the Board adopted a resolution, which authorizes the University to enter into an interest rate swap agreement (the "Swap Agreement") with JPMorgan Chase Bank as the swap provider (the "Swap Provider") in the maximum notional amount of $31,000,000. Under the Swap Agreement, the University (a) will be obligated to make monthly fixed payments to the Swap Provider calculated by reference to the applicable notional amount and at a fixed rate of 3.222% and (b) will be entitled to receive monthly floating payments from the Swap Provider calculated by reference to the same notional amount and 68% of one month LIBOR, based on a notional amount of $24,425,000, which notional amount will be reduced as principal on the Series 2004 Bonds is paid. The Swap Agreement has a stated termination date of March 1, 2033; however, the University and the Swap Provider have the right to terminate the Swap Agreement prior to such date upon the occurrence of certain extraordinary events, and further, the Swap Provider has retained an option to terminate the Swap Agreement at any time on or after March 1, 2012 for any reason with no obligation to make any termination payment other than the amount of any regular periodic payment accruing to the termination date. The Swap Agreement will be a "Qualified Derivative Agreement" for purposes of the Indenture.

Under the Swap Agreement, the University is entitled to receive payments calculated by reference to the one-month LIBOR, an index of taxable obligations. Therefore, although the University expects that the periodic payments it will receive will approximate (both in amount and date of payment) the payments of interest due on the Series 2004 Bonds, no assurances can be given that the University will not be adversely affected by factors which may have an impact on the spread between taxable and tax-exempt rates, including without limitation, a legislative change in marginal tax brackets.

MAR 000597

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

NOTE 8    **BOND ISSUANCE COST**

The University incurred bond issuance cost upon issuance of its Series 2004 General Tuition and Fee Revenue Bonds. The issuance cost is being amortized using the straight line-method over a total period of twenty-nine years.

| | |
|---|---|
| Balance of Unamortized Bond Issuance Cost, 10/1/2004 | $ 2,031,432 |
| Amount amortized - current | (78,400) |
| Balance of Unamortized Bond Issuance Cost, 9/30/2005 | $ 1,953,032 |

NOTE 9    **OPTION AGREEMENT**

During fiscal year 2005, the Board of Trustees of the University authorized the University to enter into an option agreement relating to a forward-starting interest rate swap in the notional amount of $6,775,000 and relating to the University's Series 2002B Bonds. Under the agreement, the University received a cash payment in the amount of $550,000 from Bear Stearns Capital Markets, Inc. (BSCM) which may, at its option, execute the swap agreement within one year of January 1, 2012 ("the Exercise Period"). In the event that BSCM elects to exercise its option to enter into the swap agreement during the Exercise Period, BSCM would be required to pay the University an exercise payment in the amount of $138,400 (up to, but excluding the expiration date of the Exercise Period) or $70,650 on January 1, 2013 (the expiration date of the Exercise Period). If exercised, the swap agreement would require the University to pay a fixed rate to BSCM, which would, in turn, be obligated to pay the University a variable rate priced at the Bond Market Association Municipal Swap Index plus 0.25%. In the even that BSCM elects not to exercise its option, the University would be free to refund or otherwise retire the Series 2002B Bonds.

NOTE 10    **DEFINED PENSION BENEFIT PLAN**

A.    **Plan Description**

The University contributes to the Teachers' Retirement System of Alabama, a cost-sharing multiple-employer public employee retirement system for the various state-supported educational agencies and institutions. This plan is administered by the Retirement Systems of Alabama.

Substantially all employees of the University are members of the Teachers' Retirement System. Membership is mandatory for covered or eligible employees of the University. Benefits vest after 10 years of creditable service.

37

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

———

Vested employees may retire with full benefits at age 60 or after 25 years of service. Retirement benefits are calculated by two methods with the retiree receiving payment under the method which yields the highest monthly benefit. The methods are (1) Minimum Guaranteed, or (2) Formula, of which the Formula method usually produces the highest monthly benefit. Under this method, retirees are allowed 2.0125% of their average final salary (best three of the last ten years) for each year of service. Disability retirement benefits are calculated in the same manner. Pre-retirement death benefits, in the amount of the annual salary for the fiscal year preceding death, are provided to plan members.

The Teachers' Retirement Systems was established as of October 1, 1941, under the provisions of Act Number 419, Acts of Alabama 1939, for the purpose of providing retirement allowances and other specified benefits for qualified persons employed by state-supported educational institutions. The responsibility for general administration and operating of the Teachers' Retirement System is vested in the Board of Control (currently 14 members). Benefit provisions are established by the Code of Alabama 1975, Sections 16-25-1 through 16-25-113, as amended, and Sections 36-27B-1 through 36-27B-6, as amended.

The Retirement Systems of Alabama issues a publicly available financial report that includes financial statements and required supplementary information for the Teachers' Retirement System of Alabama. That report may be obtained by writing to The Retirement Systems of Alabama, 135 South Union Street, Montgomery, Alabama 36130-2150.

**B.**   <u>**Funding Policy**</u>

Employees are required to contribute 5 percent of their salary to the Teachers' Retirement System. The University is required to contribute the remaining amounts necessary to fund the actuarially determined contributions to ensure sufficient assets will be available to pay benefits when due. Each year, the Teachers' Retirement System recommends to the Legislature the contribution rate for the following fiscal year, with the Legislature setting this rate in the annual appropriation bill. The percentages of the contributions and the amount of contributions made by the University and its employees equal the required contributions for 2005 as follows:

38

MAR 000599

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

———

| | |
|---|---|
| Total Percentage of Covered Payroll | 12.03% |
| **Contributions:** | |
| Percentage contributed by Alabama State University | 7.03% |
| Percentage contributed by Employees | 5.00% |
| Contributed by Alabama State University | $ 2,402,991 |
| Contributed by Employees | 1,716,269 |
| Total Contributions | $ 4,119,260 |

**NOTE 11    ADDITIONAL BENEFIT PLAN**

Regular full-time employees who have completed one year of continuous service as of the first of October are eligible for an optional supplemental retirement program, Teachers' Insurance and Annuity Association-College Retirement Equities Fund (TIAA-CREF). During fiscal year 2005, employees' contributions to the Fund were $148,055. Retirement payments under the plan are obligations of TIAA-CREF and not the University.

**NOTE 12    ACCUMULATED UNPAID ANNUAL AND SICK LEAVE**

The Board of Trustees determines annual and sick leave policies for the University's employees. The annual and sick leave policies adopted by the University are as follows:

No liability is recorded for sick leave. Substantially, all employees of the University earn twelve days of sick leave each year with accumulation limited to 180 days.

Faculty members employed on a nine or ten-month contract do not earn annual leave. All twelve-month employees (faculty and staff) earn annual leave as follows:

| Months of Continuous Service | Annual Leave Earned Per Month |
|---|---|
| Less than 60 months | 1 day |
| 60-119 months | 1.25 days |
| 120-239 months | 1.5 days |
| 240-over months | 2 days |

The maximum accumulation of annual leave is 36 days. Payment is made to employees for unused annual leave at termination or retirement. The liability for unused annual leave for the year ended September 30, 2005, is included on the financial statements as a compensated absence liability in the Current Fund Unrestricted.

39

MAR 000600

ALABAMA STATE UNIVERSITY
NOTES TO THE FINANCIAL STATEMENTS

NOTE 13    INCOME TAX STATUS

The University is considered a political subdivision of the State of Alabama. Accordingly, it is exempt from federal income taxes under Section 115 of the Internal Revenue Code.

NOTE 14    LITIGATION

The University is a defendant in a number of legal actions. While the final outcome cannot be determined at this time, management is of the opinion that the liability, if any for these actions, will not have a material effect on the University's financial position.

NOTE 15    ADJUSTMENT TO PRIOR PERIOD FINANCIAL STATEMENTS

The financial statements for the 2004 year have been adjusted to reflect a decrease in accounts payable and accrued liabilities in the amount of $5,762 and an increase in cash and cash equivalents in the amount of $5,884. The effect of the adjustment was to increase total net assets by $11,646.

The prior year's financial statements include reclassifications of certain revenues and expenses to conform to the 2005 year presentation. The reclassification has no impact on the University's net assets.

NOTE 16    SUBSEQUENT EVENTS

On October 1, 2005, the University entered into an agreement with Destin Energy to design and to supervise construction and equipping of various electrical infrastructure enhancements ("the Project"). In order to reduce its cost of electricity, the University proposes to lease the Project from the Public Educational Building Authority of the the City of Montgomery ("the Authority"). The Project consist of a 2,250 kilowatt per hour back-up electricity plant and all necessary interconnections, the rerouting of the system through a single master electric meter and the renovation of all external and internal lighting systems on the campus. The Authority proposes to pay the costs of the Project by the issuance of its Revenues Bonds, Alabama State University Project, Series 2005, to be dated October 1, 2005 ("the Series 2005 Bonds") in the principal amount of $3,190,000 of which $2,871,744 is attributed to the direct cost of the Project. The Series 2005 Bonds shall mature as to principal over a period of twenty (20) years from that date.

40



BANKS, FINLEY,
WHITE & CO.
CERTIFIED PUBLIC ACCOUNTANTS

REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND
ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF
FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH
GOVERNMENT AUDITING STANDARDS

To the Board of Trustees of
  Alabama State University
Montgomery, Alabama

We have audited the accompanying financial statements of Alabama State University
("the University") as of and for the year ended September 30, 2005, and have issued our
report thereon dated June 1, 2006. We conducted our audit in accordance with auditing
standards generally accepted in the United States of America and the standards
applicable to financial audits contained in Government Auditing Standards, issued by
the Comptroller General of the United States.

Internal Control Over Financial Reporting
In planning and performing our audit, we considered the University's internal control
over financial reporting in order to determine our auditing procedures for the purpose of
expressing our opinions on the financial statements and not to provide an opinion on the
internal control over financial reporting. Our consideration of the internal control over
financial reporting would not necessarily disclose all matters in the internal control that
might be material weaknesses. A material weakness is a reportable condition in which
the design or operation of one or more of the internal control components does not
reduce to a relatively low level the risk that misstatements caused by error or fraud in
amounts that would be material in relation to the financial statements being audited may
occur and not be detected within a timely period by employees in the normal course of
performing their assigned functions. We noted no matters involving the internal control
over financial reporting and its operation that we consider to be material weaknesses.

Compliance and Other Matters
As part of obtaining reasonable assurance about whether the University's financial
statements are free of material misstatement, we performed tests of its compliance with
certain provisions of laws, regulations, contracts, and grant agreements, noncompliance
with which could have a direct and material effect on the determination of financial
statement amounts. However, providing an opinion on compliance with those
provisions was not an objective of our audit, and accordingly, we do not express such an
opinion. The results of our tests disclosed no instances of noncompliance or other
matters that are required to be reported under Government Auditing Standards.

MAR 000602



To the Board of Trustees of
  Alabama State University
Montgomery, Alabama
Page 2

We noted certain matters that we reported to management of the University, in a separate letter dated June 1, 2006.

This report is intended solely for the information and use of the audit committee, management, the University, and federal awarding agencies and pass-through entities and is not intended to be and should not be used by anyone other than these specified parties.

June 1, 2006                    *Banks, Finley White & Co.*

42

MAB 000603



**BANKS, FINLEY, WHITE & CO.**
CERTIFIED PUBLIC ACCOUNTANTS

REPORT ON COMPLIANCE WITH REQUIREMENTS
APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL
OVER COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133

To the Board of Trustees of
 Alabama State University
Montgomery, Alabama

Compliance

We have audited the compliance of Alabama State University (the University) with the types of compliance requirements described in the U. S. Office of Management and Budget (OMB) Circular A-133 Compliance Supplement that are applicable to each of its major federal programs for the year ended September 30, 2005. The University's major federal programs are identified in the summary of auditor's results section of the accompanying schedule of findings and questioned costs. Compliance with the requirements of laws, regulations, contracts, and grants applicable to each of its major federal programs is the responsibility of the University's management. Our responsibility is to express an opinion on the University's compliance based on our audit.

We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States; and OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations. Those standards and OMB Circular A-133 require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred. An audit includes examining, on a test basis, evidence about the University's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion. Our audit does not provide a legal determination on the University's compliance with those requirements.

In our opinion, the University, complied, in all material respects, with the requirements referred to above that are applicable to each of its major federal programs for the year ended September 30, 2005.

MAR 000604



To the Board of Trustees of
  Alabama State University
Montgomery, Alabama
Page 2

Internal Control Over Compliance
The management of the University, is responsible for establishing and maintaining effective internal control over compliance with requirements of laws, regulations, contracts, and grants applicable to federal programs. In planning and performing our audit, we considered the University's internal control over compliance with requirements that could have a direct and material effect on a major federal program in order to determine our auditing procedures for the purpose of expressing our opinion on compliance and to test and report on the internal control over compliance in accordance with OMB Circular A-133.

Our consideration of the internal control over compliance would not necessarily disclose all matters in the internal control that might be material weaknesses. A material weakness is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that noncompliance with applicable requirements of laws, regulations, contracts, and grants caused by error or fraud that would be material in relation to a major federal program being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. We noted no matters involving the internal control over compliance and its operation that we consider to be material weaknesses.

This report is intended solely for the information and use of the audit committee, management, the University, and federal awarding agencies and pass-through entities and is not intended to be and should not be used by anyone other than these specified parties.

June 1, 2006                      *Banks, Finley White & Co.*

44

MAR 000605

ALABAMA STATE UNIVERSITY
SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS
For the year ended September 30, 2005

| Federal Grantor/Pass-Through Grantor/Program Title | CFDA Number | Contract Number | Expenditures |
|---|---|---|---|
| **U.S. Department of Education** | | | |
| **Student Financial Aid Cluster:** | | | |
| Federal Supplemental Education Opportunity Grant | 84.007A | P007A040006 | $ 206,589 |
| Federal Supplemental Education Opportunity Grant | 84.007A | P007A050006 | 203,100 |
| Federal Work-Study Program (FWS) | 84.033A | P033A040006 | 1,148,437 |
| Federal Work-Study Program (FWS) | 84.033A | P033A050006 | 228,774 |
| Federal PELL Grant Program | 84.063P | P063P041031 | 5,438,495 |
| Federal PELL Grant Program | 84.063P | P063P051031 | 5,097,907 |
| Federal Perkins FCC | 84.038A | P038A030006 | 109,391 |
| Federal Perkins Loan Program | 84.038 | | 271,611 |
| Federal Family Education Loan | 84.032 | | 32,956,156 |
| Total Student Financial Aid | | | 45,660,460 |
| | | | |
| **Trio Cluster:** | | | |
| TRIO-Talent Search | 84.044A | P044A020337 | 5,775 |
| TRIO-Talent Search | 84.044A | P044A020337 | 263,109 |
| TRIO-Talent Search | 84.044A | P044A020337 | 24,982 |
| TRIO-Student Support Services | 84.042A | P042A010169 | 4,167 |
| TRIO-Student Support Services | 84.042A | P042A010169 | 216,864 |
| TRIO-Student Support Services | 84.042A | P042A050206 | 16,411 |
| TRIO-Upward Bound | 84.047A | P047A990304 | 477 |
| TRIO-Upward Bound | 84.047A | P047A031083 | 259,016 |
| TRIO-Upward Bound | 84.047A | P047A031083 | 9,746 |
| TRIO-Upward Bound Math/Science | 84.047M | P047M030076 | 4,098 |
| TRIO-Upward Bound Math/Science | 84.047M | PO47M030076 | 194,382 |
| TRIO-Upward Bound Math/Science | 84.047M | P047M030076 | 7,348 |
| Total TRIO | | | 1,006,375 |
| | | | |
| **Other Direct Programs:** | | | |
| Child Care Access Means Parents in School | 84.335A | P335A010035 | 61,629 |
| Minority Science and Engineering Improvement | 84.120A | P120A000012 | 3,220 |
| Minority Science and Engineering Improvement | 84.120A | P120A010034 | 48,084 |
| Special Education Personnel Preparation to Improve Services and Results for Children with Disabilities | 84.325E | H325E000021 | 151,503 |
| Higher Education-Institutional Aid (Title III) | 84.031B | P031B970066 | 3,418,539 |
| Total Other Direct Programs | | | 3,682,975 |
| | | | |
| Total U.S. Department of Education | | | 50,349,810 |
| | | | |
| **U.S. Department of Health and Human Services** | | | |
| **Research and Development Cluster:** | | | |
| Minority Access to Research Careers (MARC) | 93.880 | 5T34GM008167 | 252,296 |
| Health Career Opportunity Program (HCOP) | 93.822 | 6D18HP03038 | 385,501 |
| Minority Biomedical Research Support (MBRS) | 93.375 | 5S06GM00821919 | 413,594 |
| Minority Health and Health Disparities Research | 93.307 | 1 P20 MD000547-1 | 596,586 |
| Total Research and Development | | | 1,647,977 |

45

# ALABAMA STATE UNIVERSITY
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS (CONT'D)
### For the year ended September 30, 2005

| | CFDA Number | Contract Number | Expenditures |
|---|---|---|---|
| **Other Direct Programs** | | | |
| Head Start and Early Head Start | 93.600 | 90YH004301 | 41,703 |
| Scholarships for Health Professions Students from | | | |
| Disadvantaged Backgrounds | 93.342 | 5570951-04 | 12,493 |
| Adolescent Family Life Demonstration Projects | 93.235 | 1APH PA002058-01 | 263,516 |
| Maternal and Child Health Federal Consolidated Programs | 93.110 | H1DMC03226A0 | 924,363 |
| Total Other Direct Programs | | | 1,242,075 |
| | | | |
| **Passed-Through the University of Alabama at Birmingham:** | | | |
| Reproductive Health Disparity Awareness Prevention | 93.375 | R24MD00147 | 21,650 |
| Reproductive Health Disparity Awareness Prevention | 93.375 | R24MD00147 | 145,038 |
| Total Passed-Through UAB | | | 166,688 |
| | | | |
| Total U.S. Department of Health and Human Services | | | 3,056,740 |
| | | | |
| **National Science Foundation** | | | |
| **Direct Programs:** | | | |
| Education and Human Resources | 47.076 | HRD9817296 | 140,000 |
| | | | 140,000 |
| | | | |
| **Passed-Through Montgomery Public Schools:** | | | |
| Education and Human Services | 47.076 | DUE-012331 | 54,292 |
| Total National Science Foundation | | | 194,292 |
| | | | |
| **U.S. Department of Housing and Urban Development** | | | |
| Historically Black Colleges and Universities Program | 14.237 | HBCUAL04236 | 157,282 |
| Total U.S. Department of Housing and Urban Development | | | 157,282 |
| | | | |
| **Small Business Administration** | | | |
| **Passed-Through the University of Alabama at Birmingham:** | | | |
| Small Business Development Center | 59.037 | SBAHQ-03-C-0005 | 52,285 |
| Total Small Business Administration | | | 52,285 |
| | | | |
| **U.S. Department of Agriculture** | | | |
| **Direct Program:** | | | |
| Initiative for Future Agriculture and Food Systems | 10.302 | 00-52100-9705 | 184,001 |
| | | | 184,001 |
| | | | |
| **Passed-through State of Alabama:** | | | |
| Summer Food Program for Children | 10.559 | | 5,262 |
| Total U. S. Department of Agriculture | | | 189,263 |
| | | | |
| **National Aeronautics and Space Administration** | | | |
| **Direct Programs:** | | | |
| Aerospace Education Services Program | 43.001 | NAG8-1936 | 79,747 |
| | | | 79,747 |
| | | | |
| **Passed-Through Sub-Prime SAIC:** | | | |
| Technology Transfer | 43.002 | 4400092782 | 183,895 |
| Total National Aeronautics and Space Administration | | | 183,895 |
| | | | |
| **U.S. Department of Defense** | | | |
| ROTC UNIFORM | 12 | DET 019 | 27,025 |
| Total U.S. Department of Defense | | | 27,025 |
| | | | |
| **Congressional Museum** | | | |
| National Leadership Grants | 45.312 | CM-00-04-0071-04 | 39,632 |
| Total Congressional Museum | | | 39,632 |
| | | | |
| Total Federal Awards | | | $  54,329,971 |

46

**ALABAMA STATE UNIVERSITY**
**NOTES TO THE SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS**

NOTE 1     **BASIS OF PRESENTATION**

The accompanying schedule of expenditures of federal awards includes the federal grant activity of Alabama State University (the University) and is presented on the accrual basis of accounting. The information in this schedule is presented in accordance with the requirements of OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations.

NOTE 2     **LOANS OUTSTANDING**

The University had the following loan balances outstanding at September 30, 2005. The loan balances outstanding are not included in the federal expenditures presented in the schedule.

| Program Title | Federal CFDA Number | Amount Outstanding |
|---|---|---|
| Federal Perkins Loan Program | 84.038 | $ 2,577,557 |

47

MAR 000608

ALABAMA STATE UNIVERSITY
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
For the year ended September 30, 2005

**Section I--Summary of Auditor's Results**

<u>Financial Statements</u>
Type of auditor's report issued: unqualified

Internal control over financial reporting:
- Material weakness(es) identified?                    _____Yes    _X_No
- Reportable condition(s) identified that are not
  considered to be material weaknesses?               _____Yes    _X_None reported

Noncompliance material to financial statements noted?    _____Yes    _X_No

<u>Federal Awards</u>
Internal control over major programs:
- Material weakness(es) identified?                    _____Yes    _X_No
- Reportable condition(s) identified that are not
  considered to be material weaknesses?               _____Yes    _X_None reported

Type of auditor's report issued on compliance for major programs: unqualified

Any audit findings disclosed that are required to be reported
in accordance with section 510(a) of Circular A-133?    _____Yes    _X_No

Identification of major programs:

| <u>CFDA Numbers</u> | <u>Name of Federal Program or Cluster</u> |
|---|---|
| 84.007, 84.033, 84.063, 84.038, 84.032 | Student Financial Aid Cluster |
| 93.375, 93.822, 93.880 | Research and Development Cluster |
| 84.044, 84.042, 84.047 | Trio Cluster |
| 84.031 | Higher Education Institutional Aid (Title III) |
| 93.110 | Maternal and Child Health Federal Consolidated Programs |

Dollar threshold used to distinguish between
  Type A and type B programs:                    $629,784

Auditee qualified as low-risk auditee?                    _____Yes    _X_No

**Section II--Federal Award Findings and Questioned Costs**

No matters were reported.

**Section III--Financial Statement Findings**

48

No matters were reported.

49

MAR 000610

[this page intentionally left blank]

MAR 000611

APPENDIX B

Form of Opinion of Bond Counsel

MAR 000643

[this page intentionally left blank]

[Closing Date]

Holders of the Series 2006 Bonds
referred to below

Re:    $41,000,000 General Tuition and Fee Revenue Bonds, Series 2006, issued by the
       Board of Trustees of Alabama State University

We have acted as bond counsel in connection with the issuance of the above-referenced bonds (the "Series 2006 Bonds") by the Board of Trustees of Alabama State University, a public corporation organized under the laws of the State of Alabama (the "University"), including particularly Chapter 50, Title 16, Section 16-3-28 of the Code of Alabama 1975 (the "Enabling Law"). The Series 2006 Bonds are being issued pursuant to a Trust Indenture dated January 1, 2002 between the University and U.s. Bank, National Association, as successor to SouthTrust Bank, as trustee, as amended and supplemented by a Second Supplemental Indenture dated as of March 1, 2003, a Third Supplemental Indenture dated as of August 1, 2004 and a Fourth Supplemental Indenture dated as of July 1, 2006 (collectively, the "Indenture")

The Series 2006 Bonds will be special obligations of the University secured by a pledge of and payable solely from the general tuition, fees and dormitory revenues payable by the students enrolled at the University ("Pledged Revenues").

Pursuant to the Indenture, the University has heretofore issued its (i) $29,125,000 principal amount of General Tuition and Fee Revenue Bonds, Series 2002A (the "Series 2002A Bonds"); (ii) $6,775,000 principal amount of General Tuition and Fee Refunding Revenue Bonds, Series 2002B (the "Series 2002B Bonds"); (iii) $25,000,000 principal amount of General Tuition and Fee Revenue Bonds, Series 2003B (the "Series 2003B Bonds"); and (iv) $24,425,000 principal amount of General Tuition and Fee Revenue Bonds, Series 2004 (the "Series 2004 Bonds").

The University has also heretofore issued its Faculty Housing Revenue Bonds of 1965 (the "Series 1965 Bonds), its Housing Revenue Bonds of 1969 (the "Series 1969 Bonds"), and its Dormitory Revenue Bonds, Series 1982 (the "Series 1982 Bonds"), which bonds are secured by a pledge of the Pledged Revenues that is on parity with the pledge thereof made in the Indenture (the outstanding Series 1965 Bonds, the outstanding Series 1969 Bonds, the outstanding Series 1982 Bonds, the outstanding Series 1982 Bonds, the outstanding Series 2002A Bonds, the outstanding Series 2002B Bonds, the outstanding Series 2003B Bonds, and the outstanding Series 2004 Bonds being herein together called the "Outstanding Parity Bonds").

MAR 00004

Additional bonds may be issued pursuant to the Indenture, secured on a parity with the Outstanding Parity Bonds and the Series 2006 Bonds.

We have examined executed counterparts of the Indenture and such other certificates, proceedings, proofs and documents as we have deemed necessary in connection with the opinions hereinafter set forth.

In connection with the issuance of the Series 2006 Bonds and the delivery of this bond opinion, we have acted as bond counsel to the University.

As to various questions of fact material to our opinion, we have relied upon the representations made in the documents described above and upon certificates of certain public officials and officers of the University and the Trustee (including without limitation certificates by the University as to the use of the proceeds of the Series 2006 Bonds which are material to our opinion in paragraph 5 below), without undertaking to verify the same by independent investigation.

In rendering this opinion, we have relied upon the opinion of even date by Thomas, Means, Gillis & Seay, P.C. Montgomery, Alabama, counsel for the University, with respect to, among other matters, the corporate status of the University, the corporate power and authority of the University to enter into and perform its obligations under the Indenture, the authorization, execution and delivery of such instruments, and the binding effect and enforceability of such instruments upon the University.

Based upon the foregoing, and upon such investigation as we have deemed necessary, we are of the opinion that:

1.  The University has been duly organized and is validly existing as a public corporation under the Enabling Law.

2.  The University has corporate power and authority to enter into and perform its obligations under the Indenture and to issue and deliver the Series 2006 Bonds. The execution, delivery and performance of its obligations under the Indenture and the issuance and delivery of the Series 2006 Bonds by the Authority have been duly authorized by all requisite corporate action, and the Indenture and the Series 2006 Bonds have been duly executed and delivered by the University.

3.  The Series 2006 Bonds constitute legal, valid and binding special obligations of the University, payable solely out of Pledged Revenues.

4.  The Indenture constitutes a legal, valid and binding obligation of the University and is enforceable against the University in accordance with the terms of such instrument. The Indenture creates a valid pledge and assignment of the Pledged Revenues for the security of the Series 2006 Bonds on parity with the Outstanding Parity Bonds.

5.  Under existing law, interest on the Series 2006 Bonds (including any original issue discount properly allocable to an owner thereof) will be excluded from gross income of the holders thereof for purposes of federal income taxation and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; it should be noted, however, that for the purpose of computing the alternative minimum tax imposed on certain corporations (as defined for federal income tax purposes), such interest is taken into account in determining adjusted current earnings. The opinion set forth in the preceding sentence is subject to the condition that the University comply with all requirements of the Internal Revenue Code of 1986, as amended, that must be satisfied subsequent to the issuance of the Series 2006 Bonds in order that interest thereon be, or continue to be, excluded from

01348612.1

gross income for federal income tax purposes. The University has covenanted to comply with all such requirements. Failure to comply with certain of such requirements may cause interest on the Series 2006 Bonds to be included in gross income for federal income tax purposes retroactive to the date of issuance of the Series 2006 Bonds.

6.     Under existing law, interest on the Series 2006 Bonds is exempt from all present income taxation within the State of Alabama.

We express no opinion regarding federal tax consequences arising with regard to the Series 2006 Bonds, other than the opinions expressed in paragraph 5 above.

The rights of the holders of the Series 2006 Bonds and the enforceability of the Series 2006 Bonds and the Indenture may be limited by (1) bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights and (2) general principles of equity, including the exercise of judicial discretion in appropriate cases.

We express no opinion herein as to the accuracy, adequacy or completeness of the Official Statement relating to the Series 2006 Bonds.

This opinion is given as of the date hereof and we assume no obligation to update, revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention or any changes in law that may hereafter occur.

Faithfully yours,

MAYNARD, COOPER & GALE, P.C.

By:_____

[this page intentionally left blank]

APPENDIX C

Form of Bond Insurance Policy

MAR 000618

[this page intentionally left blank]

MAR 000619

# XL CAPITAL ASSURANCE

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 478-3400

## MUNICIPAL BOND
## INSURANCE POLICY

ISSUER: [        ]

Policy No: [        ]

BONDS: [        ]

Effective Date: [        ]

**XL Capital Assurance Inc. (XLCA),** a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy (which includes each endorsement attached hereto), hereby agrees unconditionally and irrevocably to pay to the trustee (the "Trustee") or the paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the benefit of the Owners of the Bonds or, at the election of XLCA, to each Owner, that portion of the principal and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment.

XLCA will pay such amounts to or for the benefit of the Owners on the later of the day on which such principal and interest becomes Due for Payment or one (1) Business Day following the Business Day on which XLCA shall have received Notice of Nonpayment (provided that Notice will be deemed received on a given Business Day if it is received prior to 10:00 a.m. New York time on such Business Day; otherwise it will be deemed received on the next Business Day), but only upon receipt by XLCA, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in XLCA. Upon such disbursement, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of payment of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by XLCA hereunder. Payment by XLCA to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy.

In the event the Trustee or Paying Agent has notice that any payment of principal or interest on a Bond which has become Due for Payment and which is made to an Owner by or on behalf of the Issuer of the Bonds has been recovered from the Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law, such Owner will be entitled to payment from XLCA to the extent of such recovery if sufficient funds are not otherwise available.

The following terms shall have the meanings specified for all purposes of this Policy, except to the extent such terms are expressly modified by an endorsement to this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment", when referring to the principal of Bonds, is when the stated maturity date or a mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity, unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration; and, when referring to interest on the Bonds, is when the stated date for payment of interest has been reached. "Nonpayment" means the failure of the Issuer to have provided sufficient funds to the Trustee or Paying Agent for payment in full of all principal and interest on the Bonds which are Due for Payment. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to XLCA which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

XLCA P-005 Form of Municipal Policy [Specimen]

1

XLCA may, by giving written notice to the Trustee and the Paying Agent, appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy. From and after the date of receipt by the Trustee and the Paying Agent of such notice, which shall specify the name and notice address of the Insurer's Fiscal Agent, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XCLA and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due hereunder.

Except to the extent expressly modified by an endorsement hereto, (a) this Policy is non-cancelable by XLCA, and (b) the Premium on this Policy is not refundable for any reason. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Bond, other than at the sole option of XLCA, nor against any risk other than Nonpayment. This Policy sets forth the full undertaking of XLCA and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.

THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, XLCA has caused this Policy to be executed on its behalf by its duly authorized officers.

Name: _____          Name: _____
Title:                                   Title:

XLCAP-005
Form of Municipal Policy [Specimen]

2

# XL CAPITAL ASSURANCE

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 478-3400

## DEBT SERVICE RESERVE
## INSURANCE POLICY

ISSUER:                          Policy No.:

BONDS:                           Effective Date:

                                 Premium:

XL CAPITAL ASSURANCE INC. ("*XLCA*"), a New York stock insurance company, for consideration received, hereby unconditionally and irrevocably agrees to pay the trustee or the paying agent (the "*Beneficiary*") under the documentation (the "*Bond Document*") providing for the issuance of and securing the Bonds, for the benefit of the Owners, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

XLCA will make payment as provided in this Policy to the Beneficiary on the later of the Business Day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which XLCA shall have received Notice of Nonpayment, in a form reasonably satisfactory to it. A Notice of Nonpayment will be deemed received on a given Business Day if it is received by XLCA prior to 10:00 a.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by XLCA is incomplete or does not conform to the terms and conditions of this Policy, it shall be deemed not to have been received by XLCA for purposes of the preceding sentence and XLCA shall promptly so advise the Beneficiary, who may thereupon submit an amended Notice of Nonpayment. Payment by XLCA to the Beneficiary for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy. Upon such payment, XLCA shall become entitled to reimbursement of the amount so paid (together with interest and expenses) pursuant to the Financial Guaranty Agreement. Upon disbursement in respect of a Bond, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond and all insurance policies in respect of the Bond, to the extent of any payment by XLCA hereunder.

The amount available under this Policy for payment shall not exceed the Policy Limit. The amount available at any particular time to be paid to the Beneficiary under the terms of this Policy shall automatically be reduced by any payment under this Policy. However, after such payment, the amount available under this Policy shall be reinstated in full or in part, but only up to the Policy Limit, to the extent of the reimbursement of such payment (exclusive of interest and expenses) to XLCA by or on behalf of the Issuer. Within three Business Days of such reimbursement, XLCA shall provide the Beneficiary and the Issuer with notice of the reimbursement and reinstatement.

Payment under this Policy shall not be available with respect to (a) any Nonpayment that occurs prior to the Effective Date or after the Termination Date of this Policy or (b) Bonds that are not outstanding under the Bond Document. If the amount payable under this Policy is also payable under another insurance policy or surety bond insuring the Bonds, payment first shall be made under this Policy to the extent of the amount available under this Policy up to the Policy Limit. In no event shall XLCA incur duplicate liability for the same amounts owing with respect to the Bonds that are covered under this Policy and any other insurance policy or surety bond that XLCA has issued.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "*Business Day*" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York are, or the Insurer's Fiscal Agent is, authorized or required by law or executive order to remain closed. "*Due for Payment*" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or on a mandatory sinking fund redemption date stated in the Bond or the Bond Document and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the date stated in the Bond for payment of interest. "*Financial Guaranty Agreement*" means the Financial Guaranty Agreement dated as of the effective date hereof in respect of this Policy, as the same may be amended or supplemented from time to time. "*Nonpayment*" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer that has been recovered from such Owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "*Notice*" means telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from the Beneficiary to XLCA substantially in the form of Attachment I which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "*Owner*" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment of principal or interest thereunder, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds. "*Policy Limit*" shall be the dollar amount of the debt service reserve fund required to be maintained for the Bonds by the Bond Document from time to time (the "*Debt Service Reserve Requirement*"), but in no event shall the Policy Limit exceed $XXXXXX. The Policy Limit shall automatically and irrevocably be reduced from time to time by the amount of each reduction in the Debt Service Reserve Requirement, as provided in the Bond Document. "*Termination Date*" means the earlier of (i) XXXXXXX and (ii) the date the Bonds are no longer outstanding under the Bond Document.

XLCA may appoint a fiscal agent (the "*Insurer's Fiscal Agent*") for purposes of this Policy by giving written notice to the Beneficiary specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Beneficiary, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XLCA pursuant to this Policy and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, XLCA agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud) whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to XLCA to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy shall be governed by and interpreted under the laws of the State of New York, and any suit hereunder in connection with any amount due hereunder may be brought only by the Issuer or the Beneficiary and only within one year after the date on which the applicable Notice of Nonpayment can be made pursuant to the terms of this Policy.

This Policy sets forth in full the undertaking of XLCA, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.

THIS POLICY IS NOT COVERED BY THE PROPERTY CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

MAR 000624

In witness whereof, XL CAPITAL ASSURANCE INC. has caused this Policy to be executed on its behalf by its duly authorized officers.

**XL CAPITAL ASSURANCE INC.**

**SPECIMEN**
Name:
Title:

**SPECIMEN**
Name:
Title:

Attachment I
Policy No. _____

### NOTICE OF NONPAYMENT

XL CAPITAL ASSURANCE INC.
1221 Avenue of the Americas
New York, New York 10020

Attention:

Reference is made to the Policy No. _____ (the "*Policy*") issued by XL Capital Assurance Inc. ("*XLCA*"). The terms which are capitalized herein and not otherwise defined have the meanings specified in the Policy unless the context otherwise requires.

The Beneficiary hereby certifies that:

1. $_____ became [will become] Due for Payment on _____;

2. The amount on deposit in the [Bond Fund] available to pay such amount is $_____, which is $_____ less than the amount due (the "*Deficiency Amount*");

3. The Beneficiary hereby demands payment of $_____ which amount does not exceed the lesser of (i) the Deficiency Amount and (ii) the amount available to be drawn under the Policy which in no event shall exceed the Policy Limit;

4. The Beneficiary has not heretofore made demand under the Policy for the amount specified in 3. above or any portion thereof; and

5. The Beneficiary hereby requests that payment of the amount specified in 3. above be made by XLCA under the Policy and directs that payment under the Policy be made to the following account by bank wire transfer of federal or other immediately available funds in accordance with the terms of the Policy:

_____ [Beneficiary's Account]

[*Any Person Who Knowingly And With Intent To Defraud Any Insurance Company Or Other Person File An Application For Insurance Or Statement Of Claim Containing Any Materially False Information; Or Conceals For The Purpose Of Misleading, Information Concerning Any Fact Material Thereto, Commits A Fraudulent Insurance Act, Which Is And Shall Also Be Subject To A Civil Penalty Not To Exceed Five Thousand Dollars And The Stated Value Of The Claim For Each Such Violation.*] [*Foregoing language to be included in the case of issuers in certain states.*]

[Beneficiary]


By: _____

Its: _____

# XL CAPITAL ASSURANCE

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 478-3400

## DEBT SERVICE RESERVE
## INSURANCE POLICY

ISSUER:                                          Policy No.:

BONDS:                                           Effective Date:

                                                 Premium:

     XL CAPITAL ASSURANCE INC. ("*XLCA*"), a New York stock insurance company, for consideration received, hereby unconditionally and irrevocably agrees to pay the trustee or the paying agent (the "*Beneficiary*") under the documentation (the "*Bond Document*") providing for the issuance of and securing the Bonds, for the benefit of the Owners, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

     XLCA will make payment as provided in this Policy to the Beneficiary on the later of the Business Day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which XLCA shall have received Notice of Nonpayment, in a form reasonably satisfactory to it. A Notice of Nonpayment will be deemed received on a given Business Day if it is received by XLCA prior to 10:00 a.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by XLCA is incomplete or does not conform to the terms and conditions of this Policy, it shall be deemed not to have been received by XLCA for purposes of the preceding sentence and XLCA shall promptly so advise the Beneficiary, who may thereupon submit an amended Notice of Nonpayment. Payment by XLCA to the Beneficiary for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy. Upon such payment, XLCA shall become entitled to reimbursement of the amount so paid (together with interest and expenses) pursuant to the Financial Guaranty Agreement. Upon disbursement in respect of a Bond, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond and all insurance policies in respect of the Bond, to the extent of any payment by XLCA hereunder.

     The amount available under this Policy for payment shall not exceed the Policy Limit. The amount available at any particular time to be paid to the Beneficiary under the terms of this Policy shall automatically be reduced by any payment under this Policy. However, after such payment, the amount available under this Policy shall be reinstated in full or in part, but only up to the Policy Limit, to the extent of the reimbursement of such payment (exclusive of interest and expenses) to XLCA by or on behalf of the Issuer. Within three Business Days of such reimbursement, XLCA shall provide the Beneficiary and the Issuer with notice of the reimbursement and reinstatement.

Payment under this Policy shall not be available with respect to (a) any Nonpayment that occurs prior to the Effective Date or after the Termination Date of this Policy or (b) Bonds that are not outstanding under the Bond Document. If the amount payable under this Policy is also payable under another insurance policy or surety bond insuring the Bonds, payment first shall be made under this Policy to the extent of the amount available under this Policy up to the Policy Limit. In no event shall XLCA incur duplicate liability for the same amounts owing with respect to the Bonds that are covered under this Policy and any other insurance policy or surety bond that XLCA has issued.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "*Business Day*" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York are, or the Insurer's Fiscal Agent is, authorized or required by law or executive order to remain closed. "*Due for Payment*" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or on a mandatory sinking fund redemption date stated in the Bond or the Bond Document and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the date stated in the Bond for payment of interest. "*Financial Guaranty Agreement*" means the Financial Guaranty Agreement dated as of the effective date hereof in respect of this Policy, as the same may be amended or supplemented from time to time. "*Nonpayment*" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer that has been recovered from such Owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "*Notice*" means telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from the Beneficiary to XLCA substantially in the form of Attachment I which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "*Owner*" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment of principal or interest thereunder, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds. "*Policy Limit*" shall be the dollar amount of the debt service reserve fund required to be maintained for the Bonds by the Bond Document from time to time (the "*Debt Service Reserve Requirement*"), but in no event shall the Policy Limit exceed $XXXXXX. The Policy Limit shall automatically and irrevocably be reduced from time to time by the amount of each reduction in the Debt Service Reserve Requirement, as provided in the Bond Document. "*Termination Date*" means the earlier of (i) XXXXXXX and (ii) the date the Bonds are no longer outstanding under the Bond Document.

XLCA may appoint a fiscal agent (the "*Insurer's Fiscal Agent*") for purposes of this Policy by giving written notice to the Beneficiary specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Beneficiary, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XLCA pursuant to this Policy and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

MAB 000629

To the fullest extent permitted by applicable law, XLCA agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim setoff or otherwise) and defenses (including, without limitation, the defense of fraud) whether acquired by Subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to XLCA to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy shall be governed by and interpreted under the laws of the State of New York, and any suit hereunder in connection with any amount due hereunder may be brought only by the Issuer or the Beneficiary and only within one year after the date on which the applicable Notice of Nonpayment can be made pursuant to the terms of this Policy.

This Policy sets forth in full the undertaking of XLCA, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked.

THIS POLICY IS NOT COVERED BY THE PROPERTY CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, XL CAPITAL ASSURANCE INC. has caused this Policy to be executed on its behalf by its duly authorized officers.

**XL CAPITAL ASSURANCE INC.**

## SPECIMEN
Name:
Title:

## SPECIMEN
Name:
Title:

SPECIMEN

Attachment I

Policy No. _____

## NOTICE OF NONPAYMENT

XL CAPITAL ASSURANCE INC.
1221 Avenue of the Americas
New York, New York 10020

Attention:

Reference is made to the Policy No. _____ (the "*Policy*") issued by XL Capital Assurance Inc. ("*XLCA*"). The terms which are capitalized herein and not otherwise defined have the meanings specified in the Policy unless the context otherwise requires.

The Beneficiary hereby certifies that:

1. $_____ became [will become] Due for Payment on _____;

2. The amount on deposit in the [Bond Fund] available to pay such amount is $_____, which is $_____ less than the amount due (the "*Deficiency Amount*");

3. The Beneficiary hereby demands payment of $_____ which amount does not exceed the lesser of (i) the Deficiency Amount and (ii) the amount available to be drawn under the Policy which in no event shall exceed the Policy Limit;

4. The Beneficiary has not heretofore made demand under the Policy for the amount specified in 3. above or any portion thereof; and

5. The Beneficiary hereby requests that payment of the amount specified in 3. above be made by XLCA under the Policy and directs that payment under the Policy be made to the following account by bank wire transfer of federal or other immediately available funds in accordance with the terms of the Policy:

_____  [Beneficiary's Account]

[*Any Person Who Knowingly And With Intent To Defraud Any Insurance Company Or Other Person File An Application For Insurance Or Statement Of Claim Containing Any Materially False Information; Or Conceals For The Purpose Of Misleading, Information Concerning Any Fact Material Thereto, Commits A Fraudulent Insurance Act, Which Is And Shall Also Be Subject To A Civil Penalty Not To Exceed Five Thousand Dollars And The Stated Value Of The Claim For Each Such Violation.*] [*Foregoing language to be included in the case of issuers in certain states.*]

[Beneficiary]


By: _____

Its: _____

# EXHIBIT

# 16

Print

**From:** Thomas, Kenneth
**To:** gil berry; Dr.Charles Smith; Freddie Gallot Jr.; John Chambless; Leon Frazier; Marvin Wayne Wiggins; President Lee; Wyatt Haskell
**Date:** Friday, July 28, 2006 7:04:57 PM
**Cc:** Arne Goldman; Dick Davis
**Subject:** RE: Proprietary Information Review

Gill: This e-mail will further confirm our telephone conference this evening during which I advised you that President Lee has engaged W. Ken Upchurch and Percy Thomas, TCU Consultant Service LLC, to assist him as a part of his due diligence/review of the documents and the Development Agreement provided by SSGBA. You informed me that you had no objection to the President moving forward as planned. If I have failed to accurately state our understanding and your approval, please advise immediately. Thanks. KLT

**From:** gil berry [mailto:gilberry@verizon.net]
**Sent:** Friday, July 28, 2006 2:52 PM
**To:** Thomas, Kenneth ; Dr.Charles Smith; Freddie Gallot Jr.; John Chambless; Leon Frazier; Marvin Wayne Wiggins; President Lee; Wyatt Haskell
**Cc:** Arne Goldman; Dick Davis
**Subject:** Re: Proprietary Information Review

Kenny,

If it is not a Program Manager that is reviewing our documents I would like you to supply me with a list of who is reviewing the documents, as well as what company they may be working for or with, and what their affiliation is with the University. I also would like to ensure that our documents are being reviewed there at the University.

I look forward to working with you and the administration on this project. If there are any questions that you, the administration, or the board may have please feel free to contact me or any member of the development team.

Sincerely,

Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills , Pa. , 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com

----- Original Message ----
From: " Thomas, Kenneth " <KLThomas@tmgslaw.com>
To: gilberry@verizon.net; buford@jbladi.com; charlessmith@alasu.edu; fgallot@alasu.edu; jchambless@brownchambless.com; frazier@alasu.edu; marvin.wiggins@alacourt.gov; leejo@alasu.edu;

http://us.f842.mail.yahoo.com/dc/launch?action=welcome&YY=897441817&.rand=8mri0e...   3/9/2007

DEFENDANT'S EXHIBIT
8-GOLDMAN

CONFIDENTIAL    GBA 000308

Print                                                          Page 2 of 2

wrh@hsy.com
Cc: agoldman@marousbrothers.com; davis@discoverynet.com
Sent: Friday, July 28, 2006 12:06:43 PM
Subject: Re: Proprietary Information Review

Gill: I am headed to my meeting with the President to further discuss your earlier e-mail and brief him on our telephone conference. At no time during our discussion did I say or represent to you that the University had hired a program manager for this proposed project. The reference to a program/progect manager was illustrative of the types of consultants that could review the documents in light of your e-mail. As I stated to you, once I have consulted with the President I will advise you accordingly of the University's response to the e-mail. Thanks. KLT
------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: gil berry <gilberry@verizon.net>
To: Buford Crutcher <buford@jbladi.com>; Dr.Charles Smith <charlessmith@alasu.edu>; Freddie Gallot Jr. <fgallot@alasu.edu>; John Chambless <jchambless@brownchambless.com>; Thomas, Kenneth <KLThomas@tmgslaw.com>; Leon Frazier <frazier@alasu.edu>; Marvin Wayne Wiggins <marvin.wiggins@alacourt.gov>; President Lee <leejo@alasu.edu>; Wyatt Haskell <wrh@hsy.com>
CC: Arne Goldman <agoldman@marousbrothers.com>; Dick Davis <davis@discoverynet.com>
Sent: Fri Jul 28 10:33:17 2006
Subject: Proprietary Information Review

Good Afternoon Gentlemen:

I have spoken with Attorney Kenny Thomas, and assured him that the development team and I have no problem with the University reviewing the scope of work, and other documents left in their possession in order to allow them due diligence. Again, the development team and I are giving permission to Alabama State University, or those affiliated with the University, to review all documents in their possession pertaining to the renovation project, allowing them due diligence. We welcome the Program Manager on board and look forward to his input.

Sincerely,

Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills , Pa. , 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com

CONFIDENTIAL   GBA 000309

# EXHIBIT

# 17

Print   ,                                                              Page 1 of 3

**From:** gil berry
**To:** Thomas, Kenneth; Dr.Charles Smith; Freddie Gallot Jr.; John Chambless;
Leon Frazier; Marvin Wayne Wiggins; President Lee; Wyatt Haskell
**Date:** Saturday, July 29, 2006 9:18:30 AM
**Cc:** Arne Goldman; Dick Davis
**Subject:** Re: Proprietary Information Review

Good Morning Kenny,

I have no problem with Ken and Percy assisting the President with reviewing the scope of work that
the Development Team will be performing for ASU. This falls under professional services, which was
voted on by the board, and does not fall under any bid process. Again, I have no objections to Ken and
Percy reviewing the scope of work outlined by MBC with President Lee.

 I would also like to suggest that you, President Lee, Ken, and Percy use the following link
www.marousbrothers.com and review the long list of major projects and wide scope of construction
management services provided by MBC.  They are one of Ohio's largest Construction Manager/
General Contractors and have won numerous awards including the Prestigious Award for Who's Who
Worldwide. They have received their general contracting license in the state of Alabama, scoring
extremely high on the exam. With their large bonding capacity they can bid any size job there in the
state of Alabama. I would match their credentials against anyone.

If you have any further questions please aways feel free to reach me on my cell phone.

Sincerely,

Gil


Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, Pa., 15025
412-965-0466(cell)
412-720-1448
1-866-813-9854
412-384-5980 (fax)
gilberry@verizon.net
www.gb-and-assocs.com



DEFENDANT'S
EXHIBIT

23-BERRY

----- Original Message ----
From: "Thomas, Kenneth" <KLThomas@tmgslaw.com>
To: gil berry <gilberry@verizon.net>; Dr.Charles Smith <charlessmith@alasu.edu>; Freddie Gallot Jr.
<fgallot@alasu.edu>; John Chambless <jchambless@brownchambless.com>; Leon Frazier
<frazier@alasu.edu>; Marvin Wayne Wiggins <marvin.wiggins@alacourt.gov>; President Lee
<leejo@alasu.edu>; Wyatt Haskell <wrh@hsy.com>
Cc: Arne Goldman <agoldman@marousbrothers.com>; Dick Davis <davis@discoverynet.com>

http://us.f842.mail.yahoo.com/dc/launch?action=welcome&YY=897441817&.rand=8mrj0g...   3/9/2007

# EXHIBIT

# 19

Print

**From:** Arne Goldman
**To:** gil berry
**Date:** Friday, July 28, 2006 7:44:47 AM
**Cc:** Chip Marous; Glenn Scherba
**Subject:** Proprietary Information



DEFENDANT'S
EXHIBIT

44- Goldman

Dear Gil:

So that there is no misunderstanding about the use of our drawings, scope of work narratives and related cost estimates, please be advised of the following...

a) Any and all work prepared by Marous Brothers Construction, Inc. is proprietary, and remains solely our property. The information was prepared under my direct supervision as an Architect registered in the State of Alabama, and any reproduction, distribution and/or re-publication of our work by anyone without our express written consent constitutes a violation of Alabama State laws and Federal Copyright statutes. We have prepared our work product in good faith based upon our verbal agreement with you and Richard Davis, knowing that as of this date, we have received no compensation for our efforts.

b) We understand that you are close to signing your Development Agreement with Alabama State University, at which time we will execute our Construction Management contract and receive compensation for the extensive pre-construction services we have rendered on behalf of ASU and your development team; however, until that time, no one is authorized to use our work product without our permission.

c) We do not expect to receive any calls from our substantial contacts in the Alabama construction community that our work product has been distributed to local contractors for any reason or purpose; if we do hear of such obvious violations of Alabama State law, we intend to pursue every possible legal remedy available to us.

We have always acted in good faith and in the best interests of Alabama State University and your development team since our involvement began in August of 2005. We have been careful and exacting in our due diligence efforts, and we would like to be shown the courtesy and respect that we expect and do receive from each of our many clients. Thank you for your continued cooperation, and we look forward to working with you on this and many other projects. If you have any questions regarding the above information, please call me at your convenience.

CONFIDENTIAL

Sincerely,


Arne F. Goldman, AIA, NCARB
Director of Business Development

Marous Brothers Construction, Inc.
440.951.3904 phone
440.942.7884 fax
216.570.7584 mobile

### Confidentiality Notice

This electronic message is intended to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication in error, please notify the sender immediately and permanently delete the original message from your e-mail system.

CONFIDENTIAL

# EXHIBIT

# 20



*Gil Berry and Associates*

August 18, 2006

Sent Via E-Mail

Dr. Joe A. Lee
President
Alabama State University
915 South Jackson Street
Montgomery, AL 36101-0271

Dear Dr. Lee:

Gil Berry and I wanted to get back with you as soon as possible with our responses to the e-mail that was sent by Kenny Thomas this past Wednesday (August 16, 2006) regarding the development agreement between Student Suites Gil Berry and Associates, Alabama LLC (SSGBA) and Alabama State University (ASU).

We feel that most of the revisions offered by Kenny Thomas in the development agreement will be satisfactory. However, there are some issues that we do feel that are not acceptable. The first issue is that of SSGBA being responsible for the fees and expenses of consultants or project managers hired by ASU working for ASU. Any such expenses have not been included in our guaranteed not to exceed price.

The second issue that is not acceptable is the delay of the initial four percent to SSGBA until construction commencement. To begin all our necessary work and to keep the project on schedule as promised we will need funds in our budget to make this happen. Therefore we feel this payment should be made upon execution of this development agreement. The remaining six percent payments we would like to negotiate with the University to be paid on a monthly basis throughout the remainder of the project.

We wish to remind the University the advantages of our project delivery system we are using. The role of the developer would be directly responsible for managing the project including:

- **Project Coordination** – assist with the timing and availability of rooms as dorms come on and off line, assist with relocation plans, assist the University with public relations and information on progress and benefits of new renovations (University marketing program?).

- **Project Budget** – Based on extensive previous similar experience, the management team is able to deliver the entire suite conversion project, including all costs, furnishings, etc. for $87/sf a significantly lower cost than a typical similar scope renovation. Compare to Dodge Means FY 2006 new construction cost of $149.35/sf.

- **Project Quality** – Manage, maintain and assure high quality and finish standards equal to the University's specified requirements.

- **Project Contracting** – using a CMa (Construction Manager, advisor – Marous Brothers) experienced in Historic and complex renovations and in accordance with State of Alabama bid

DEFENDANT'S EXHIBIT

15-BERRY

 

law, - bid packages can be issued early and combined with all 6 dorms to produce larger scale buy out packages resulting in saving 15 to 20% of the typical cost.

- **Project Schedule** – Deliver in 24 months – typical turn around on a conventional project would be 36 to 48 months. This also allows **early project delivery**, saving on extended overhead and increasing annual inflation – (currently running at a 6-7% rate) and providing the University with an accelerated revenue stream.

- **Guaranteed maximum not to exceed price**

We hope the above responses are satisfactory to you and ASU and we look forward expeditiously executing the development agreement and beginning work.

Sincerely

*Dick Davis*

**Dick Davis**
**Director**
**Development, Acquisitions & Finance**

*Gil Berry*

**Gil Berry**
**Construction Manager & Developer**

# EXHIBIT

# 21

## Arne Goldman

**From:**   Gil Berry [gilberry@verizon.net]
**Sent:**   Tuesday, September 19, 2006 6:18 PM
**To:**   Arne Goldman
**Subject:** Fw: ASU Dorms


**Gil Berry**
President
**Gil Berry and Associates**
721 Acorn Lane
Jefferson Hills, Pa., 15025
cell: 412-965-0466
tel: 412-720-1448
24 hrs: 1-866-813-9854
fax: 412-384-5980
gilberry@verizon.net
www.gb-and-assocs.com


----- Forwarded Message ----
From: "Thomas, Kenneth" <KLThomas@tmgslaw.com>
To: gilberry@verizon.net
Cc: leejo@alasu.edu
Sent: Tuesday, September 19, 2006 5:55:31 PM
Subject: ASU Dorms

I left you a message on your cell phone around 4:40 pm this evening. The President was expecting a total reduction of the developer's fee in an amount of 1 Million Dollars (not the 600K suggested yesterday). Also, the President remains concerned about the lack of financial security to guarantee the MNEP. It is imperative that I receive in writing your responses to these two matters ASAP but not later than 12:00 noon on Wed.,9/20th. Thanks. KLT
--------------------------
Sent from my BlackBerry Wireless Handheld



DEFENDANT'S
EXHIBIT

25- BERRY

CONFIDENTIAL

# EXHIBIT

# 22

Print                                                          Page 1 of 2

**From:** Arne Goldman
**To:** Gil Berry
**Date:** Wednesday, September 20, 2006 9:13:57 AM
**Subject:** Response Letter 9.20.06



DEFENDANT'S
EXHIBIT

43 - Goldman

Dear Attorney Thomas:

I received your e-mail yesterday, and thought long and hard about my responses, which are offered as follows:

First of all, regarding the additional developer fee reduction beyond the $600k that I already agreed to in my previous conversation with President Lee, I want to say that there is no more room for me to reduce my fee further. I have already conceded on the issue of shared savings and my reimbursables, and I have agreed to reduce my fee from $2.5M to $1.9M. I have done so in the spirit of getting the deal closed so that we can move on with the business at hand of renovating the ASU dorms so your students can enjoy the benefits of modern housing that they deserve and demand. So, I am unable to further reduce my fee beyond the substantial concessions that I have already made.

Secondly, you have raised questions about the "lack of financial security to guarantee the MNEP". In order to provide you with some comfort in this regard, I would like to state that I am willing that ASU holds $1.0M of my fee in an interest-bearing escrow account, to be released in thirds on the recommendations of your Owner's Representative as each pair of dorms is completed. If Mr. Upchurch thinks that the University is still at risk for the uncompleted work, then you will withhold release of my money until ASU has more comfort at the direction of Mr. Upchurch. Also, the reason that I chose Marous Brothers Construction to be the Construction Manager is that they are a nationally-recognized and awarded firm that specializes in these types of difficult renovation projects. ASU should be pleased and proud of their involvement, because they will help to manage the risk using their extensive experience. Furthermore, we have now built in a contingency in the deal of over $750k to be used for unforeseen conditions, cost overruns, etc. which gives the University further protection. So, I hope that this explanation gives a clearer picture of how ASU receives additional financial security for the dormitory renovations. Also, we chose Marous because they are truly committed to running a minority participation/diversity program for the construction work. I'm not sure that you are aware of the fact that they have been recognized nationally by the NAACP and by many regional and local Black Trades Councils for their consistent efforts to give meaningful employment on all of their projects to underprivileged or out-of-work minorities and subtrades.

I hope that this letter addresses the President's concerns. Please call me to

GBA 000217

discuss this after you have the opportunity to review it.

Respectfully,

Gil Berry

## Confidentiality Notice

This electronic message is intended to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication in error, please notify the sender immediately and permanently delete the original message from your e-mail system.

CONFIDENTIAL

GRA 000172

# EXHIBIT

# 23



*Alabama State University*

# BOARD OF TRUSTEES
# MINUTES

*September 22, 2006*

GB-ASU 1044

**Trustee Wright moved, seconded by Trustee Parker, to adopt the 2006-2007
Budget as presented by the administration with the recommendation to freeze the
position of Retention Director.  The motion passed by majority vote; Trustee
Wiggins opposed; Trustee Reed abstained.**

### D.  Student Affairs Committee

Trustee Marvin Wiggins, Chair of the Student Affairs Committee, reported that the Committee
met on September 15, 2006.  He stated that the 2005-2006  Yearbook is in circulation. Also the
campus is now completely wireless with the exception of Bibb Graves Hall.  Computer labs
have been completed in the dormitories.  The Committee has some concerns about housing
students at the Guest House Inn. He concluded his report by commending the President for the
work he has done.

### E.  Property Committee

Trustee Crutcher, Chair of the Property Committee, reported that the Property Committee
met on August 31, 2006. He pointed out that the University has several construction projects in
progress at this time.

- √ The Dining Hall construction is on schedule and beneficial occupancy is on schedule
  for January 2007.
- √ Forensic Sciences construction is moving slightly ahead of schedule.
  Ralph Abernathy Education Building architectural renderings are 75% complete and are
  presently being reviewed by the University.
- √ Library Expansion drawings are 75% complete at this time.
- √ Dormitories were renovated prior to students returning for the fall.  Girard apartments
  were not ready for occupancy because of the need to retrofit windows to meet safety
  codes.
- √ Master Planner gave an update on the progress of the University's Master Plan.
- √ Window replacements in Council Hall will commence in October.

Other property matters include the acquisition of property in the Bel Aire area.  Attorney
Thomas responded by distributing a map indicating the property acquisitions in Bel Aire.  A
report from Attorney Billy Carter indicated approximately 30 properties remaining to purchase.

Dr. Lee stated that the Property Committee approved the Brick Project and needs to have Board
approval.

**Trustee Crutcher moved, seconded by Trustee Reed, to approve the Brick
Project as presented by the Administration.  The motion passed by unanimous vote.**

### Renovation of Residence Halls

Dr. Lee stated that he was not going to make a recommendation to sign a development
agreement with Student Suites and Gill Berry and Associates for student housing renovations.
He informed the Board that University Counsel, Ken Upchurch, and the University's

administration worked diligently to work out the issues of the agreement with Student Suites. Dr. Lee further stated that the University has to be fiscally responsible and exhibit sound judgment in dealing with this project. He therefore, recommended for Board approval a more traditional method of design to address the residence halls renovation project with the assistance of Ken Upchurch.

**Trustee Parker moved, seconded by Trustee Crawley, to accept the President's recommendation to present a more traditional method for dormitory renovations and not engage Students Suites and Gil Berry for the project. The motion passed by majority vote; Voting yea were: Trustees Crawley, Figures, Hodge, Junkins, Parker, Reed, Young, and Wiggins. Trustee Crutcher abstained; Mrs. Wright was absent.**

XI.    **OTHER ACTION ITEMS**
1.    Resolution on Harassment Policy

**Trustee Parker moved, seconded by Trustee Wiggins, to approve the Administration's resolution on the University's Harassment Policy. The motion passed by unanimous vote.**

2.    Resolution to change the name of Personnel to Human Resources

**Trustee Reed moved, seconded by Trustee Parker, to approve the Administration's resolution to change the name of the Office of Personnel to the Office of Human Resources.  The motion passed by unanimous vote.**

XII.    **EXECUTIVE SESSION**
**The Board convened into Executive Session**

XIII.    **REPORT FROM THE EXECUTIVE SESSION**
**There was no report from the Executive Session.**

XIV.    **PERSONNEL ACTIONS**
**Trustee Wiggins moved, seconded by Trustee Parker, to approve the personnel actions as presented on the Board Report.  The motion passed by unanimous vote.**

XV.    **OTHER BUSINESS**
Trustee Reed recommended a motion to approve a rate increase of $200.00 per hour. for University Counsel.

**Trustee Wiggins moved, seconded by Trustee Reed, to approve a rate increase of $200.00 per hour for the University Counsel.  The motion passed with majority vote; Trustee Figures abstained.**

# EXHIBIT

# 24

Print                                                                 Page 1 of 2

**From:** Gil Berry
**To:** Marvin Wayne Wiggins
**Date:** Tuesday, October 3, 2006 4:47:30 PM
**Subject:** Fw: Expenses for Renovation Project

**Gil Berry**
President
**Gil Berry and Associates**
721 Acorn Lane
Jefferson Hills, Pa., 15025
cell: 412-965-0466
tel: 412-720-1448
24 hrs: 1-866-813-9854
fax: 412-384-5980
gilberry@verizon.net
www.gb-and-assocs.com

----- Forwarded Message -----
From: Gil Berry <gilberry@verizon.net>
To: President Lee <leejo@alasu.edu>
Cc: Elton Dean <endeansr@aol.com>
Sent: Tuesday, October 3, 2006 4:39:09 PM
Subject: Expenses for Renovation Project

Good Afternoon Dr. Lee:

I am forwarding expense invoices from Gil Berry and Associates, Inc., Student Suites, and Marous
Brothers Construction, Inc. These bills are for out of pocket expenses that were incurred while working
on the Alabama State University Dormitory Renovation Project. These invoices represent the total
expenses for GBA/SS/MBC; included in these invoices is the expenses from the previous invoices you
received on May 23, 2006, and then again on July 10, 2006. Again, these invoices being
submitted October 03, 2006 represent the total expenses to date. Please remit payment in full as soon as
possible.

Thank you,

**Gil Berry**
President
**Gil Berry and Associates**
721 Acorn Lane
Jefferson Hills, Pa., 15025
cell: 412-965-0466
tel: 412-720-1448
24 hrs: 1-866-813-9854
fax: 412-384-5980


DEFENDANT'S EXHIBIT
3B BERRY(T)

http://us.f842.mail.yahoo.com/dc/launch?action=welcome&YY=1207305513&.rand=2gm...   12/3/2006

CONFIDENTIAL   GBA 000191

Print

gilberry@verizon.net
www.gb-and-assocs.com

CONFIDENTIAL    GBA 000192



*Gil Berry and Associates*

October 2, 2006

Freddie Gallot, Jr.
Vice President of Fiscal Affairs
C/O Alabama State University
915 South Jackson Street
Montgomery, Alabama, 36101

Re: Alabama State University- Student Dormitory Renovations

This invoice is for expenses to Gil Berry and Associates to date:

**INVOICE FOR SUPERVISION OF DESIGN/BUILD
PRECONSTRUCTION SERVICES**

| | |
|---|---|
| A) Value Engineering Supervision | $75,550.00 |
| B) Overview of Plans and Details | $44,450.00 |
| C) Overhead Expenses | $42,770.00 |
| D) Travel Expenses | $33,815.68 |
| **TOTAL AMOUNT NOW DUE** | **$196,585.68** |

Please remit payment immediately to Gil Berry and Associates for the
total amount due for preconstruction services already performed.

Thank you,

Gil Berry
President
Gil Berry and Associates, Inc.
721 Acorn Lane
Jefferson Hills, Pa., 15025

CONFIDENTIAL                    GBA 000193



# Invoice #1

**Invoice #: ASU100206**
**Date: October 2, 2006**

*Student Suites, LLC*
1132 SW Luttrell, Suite A
Blue Springs, MO 64015
816-228-3040
816-228-4442 Fax

**To:**   **Dr. Joe A. Lee**
**President**
**Alabama State University**
**915 South Jackson Street**
**Montgomery, AL 36101-0271**

| PRE DEVELOPMENT EXPENSES FOR ALABAMA STATE UNIVERSITY STUDENT HOUSING REDEVELOPMENT MASTER PLAN | |
|---|---|
| Travel & Lodging (14 trips) | $ 17,925.00 |
| ct Hours Billed | $ 76,300.00 |
| Copies – Postage – Shipping | $ 1,750.00 |
| Total Amount Due This Invoice | $ 95,975.00 |

Please Remit Payment to:

Student Suites
Attn: Richard Davis
1132 SW Luttrell, Suite A
Blue Springs, MO 64015

 *THANK YOU!*

GBA 000194
CONFIDENTIAL



October 2, 2006

Gil Berry & Associates and Student Suites, Co-Developers
c/o Gil Berry, President
Gil Berry & Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Re: Alabama State University - Student Dormitory Renovations

**INVOICE FOR PRECONSTRUCTION SERVICES**

| | | |
|---|---|---:|
| a) | On-site field video and survey work | $ 27,550.00 |
| b) | General Manager's supervision | 12,900.00 |
| c) | Preparation of existing conditions base plans | 42,940.00 |
| d) | Principal Architect's supervision | 18,655.00 |
| e) | Preliminary suite layouts | 39,750.00 |
| f) | Principal Architect's supervision | 15,800.00 |
| g) | Exterior elevations documentation | 21,125.00 |
| h) | Design development plans and revisions | 42,625.00 |
| i) | Design development details and revisions | 21,225.00 |
| j) | Principal Architect's supervision | 14,500.00 |
| k) | Preparation of scope of work narrative | 14,850.00 |
| l) | Cost estimating | 18,650.00 |
| m) | Preparation of scope of work packages | 14,200.00 |
| n) | General Manager's supervision | 19,500.00 |
| o) | Presentation materials | 4,105.00 |
| p) | Travel expenses (airfare, meals, lodging) | 26,565.00 |
| q) | Project Executive review, coordination, conference calls | 33,400.00 |
| r) | Scheduler time spent on schedules | 5,345.00 |
| s) | General and Administrative Overhead | 19,842.00 |
| t) | Profit @ 10% | 41,250.00 |

**TOTAL AMOUNT NOW DUE**                    **$454,777.00**

Please forward to ASU for payment on the above amount now due for
Preconstruction Services. Thank you for your kind assistance.

Marous Brothers Construction, Inc.

General Contractor

Design/Build

Special Projects Group

Construction Manager

Site Contractor

Concrete Contractor

Carpenter Contractor

Interior Finishes Contractor

1702 Joseph Lloyd Parkway

Willoughby, OH 44094

440.951.3904

fax 440.951.3761

www.marousbrothers.com

GBA 000195
CONFIDENTIAL

# EXHIBIT

# 25

 **ALABAMA STATE UNIVERSITY**

MONTGOMERY, ALABAMA 36101 · 334 / 229-4200

OFFICE OF THE PRESIDENT

September 28, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As President of Alabama State University, I am charged with the stewardship of both public and private funds in the execution of my fiduciary responsibility. One immediate and challenging responsibility is the renovation of selected student housing units here on the ASU campus.

As you are already aware, because you were in voluntary attendance, I made a recommendation to the Alabama State University Board of Trustees, at its September 22, 2006 meeting, that we not engage Student Suites/Gill Berry & Associates for this proposed project.

Under separate cover, I am returning all documents provided ASU relating to your proposals regarding this project. I sincerely regret that we could not arrive at acceptable terms on matters associated with this project.

Thank you so much for your interest in student housing at Alabama State University.

Sincerely,

Joe A. Lee
President

Cs:     Mr. Elton Dean
        Mr. Kenneth Thomas, Esq.
        Mr. Ken Upchurch

**DEFENDANT'S EXHIBIT**

20-BERRY

GBA 000185

# EXHIBIT

# 26



# ALABAMA STATE UNIVERSITY

MONTGOMERY, ALABAMA 36101 · 334/229-4200

OFFICE OF THE PRESIDENT

October 23, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As previously advised, we have collected all documents you forwarded or otherwise
delivered to Alabama State University relative to the proposed student housing projects.
Please find enclosed those documents.

If there are other items that you feel should be enclosed, please contact us.

Sincerely,

Joe A. Lee
President

JAL:edh

Enclosures:   (3) Student Housing Redevelopment Master Plan Binders 9/20/05
              (1) Student Housing Redevelopment Master Plan Binder 11/9/05
              (2) Blueprint Sheets 9/9/05
              (3) Scope of Work Binders

cc: Kenneth Thomas, Esq.
    Mr. Willie McCladdie



RECEIVED

OCT 26 2006

THOMAS, MEANS, GILLIS & SEAY, P.C.
ATTORNEYS AND COUNSELORS AT LAW
ATLANTA, GA.



DEFENDANT'S
EXHIBIT

21- BERRY

# EXHIBIT

# 27

# THOMAS, MEANS, GILLIS & SEAY, P.C.

*ATTORNEYS AND COUNSELORS AT LAW*
*ESTABLISHED IN 1981*
*WEBSITE: www.tmgslaw.com*

KENNETH L. THOMAS [1,3]
TYRONE C. MEANS [1,2,4]
H. LEWIS GILLIS [1]
QUINTON S. SEAY [2]
C. WADE ROBINSON [1]
EUGENE FELTON, JR. [2]
JACQUELINE C. SMOKE [1]
CHRISTOPHER K. WHITEHEAD [1]
LATASHA A. MEADOWS [1]
FREDERIC A. BOLLING [1]
ROSLYN CREWS [1]
AFRIKA C. PARCHMAN [1]
CHRISTOPHER S. GENEREUX [1]
CHARLES JAMES, II [1]
APRIL W. ROBINSON [1]
RAMADANAH M. SALAAM-JONES [1]
KELVIN W. HOWARD [1]
CYNTHIANTHER L. MAY [1]

OF COUNSEL:

ROBERT SIMMS THOMPSON [1], P.C.
308 N. ELM STREET
TUSKEGEE, AL 36083

ADMITTED:
[1] ALABAMA
[2] GEORGIA
[3] DISTRICT OF COLUMBIA
[4] KANSAS

MONTGOMERY OFFICE:
3121 ZELDA COURT
P.O. DRAWER 5058
MONTGOMERY, AL 36103-5058
TELEPHONE: (334) 270-1033
FACSIMILE: (334) 260-9396

BIRMINGHAM OFFICE:
505 - 20TH STREET NORTH
SUITE #400 - FINANCIAL CENTER
P.O. DRAWER 11365
BIRMINGHAM, AL 35202-1365
TELEPHONE: (205) 328-7915
FACSIMILE: (205) 214-6160

ATLANTA OFFICE:
191 PEACHTREE STREET, N.E.
SUITE #3550
ATLANTA, GA 30303
TELEPHONE: (404) 222-8400
FACSIMILE: (404) 222-0080

LIVINGSTON OFFICE:
112 MARSHALL STREET
P.O. BOX 907
LIVINGSTON, AL 35470-0907
TELEPHONE: (205) 652-6106
FACSIMILE: (205) 652-2177

HAYNEVILLE OFFICE:
307 HAYNEVILLE PLAZA
HAYNEVILLE, AL 36040
TELEPHONE: (334) 548-5008
FACSIMILE: (334) 548-5010

*Montgomery Office*
*Sender's Direct Dial:  (334) 213-4447*
*Sender's E-mail Address:*
*rsjones@tmgslaw.com*

July 10, 2007

**Via Federal Express Overnight Service**
Augusta S. Dowd, Esq.
**WHITE, ARNOLD, ANDREWS & DOWD**
2025 Third Avenue, North
Suite 600
Birmingham, AL 35203

*Re:  ASU: Marous Brothers Construction, LLC; Gil Berry Associates*
*Civil Action No.: CV-07-384*
*In United District Court for the Middle District of Alabama*
*Our File Number:  2210-278.02*

Dear Mr. Dowd:

In response to your letter, please find enclosed one (1) spiral bound Student Housing Redevelopment Master Plan dated 9/20/05 and one (1) spiral bound Student Housing Redevelopment Master Plan dated 11/9/05.

These additional documents were located in storage boxes containing materials of the former Vice President of Administrative Services, Dr. Leon Frazier, who separated from the University in September 2006.  I have verified with the administration that there are no other binders in their possession and no other possible locations which may contain any property belonging to your clients.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

**THOMAS, MEANS, GILLIS & SEAY, P.C.**

Ramadanah M. Salaam-Jones

Cc:    President Joe A. Lee
       Chairman Elton N. Dean, Sr.
       Kenneth L. Thomas, Esq.
       J. Lister Hubbard, Esq.

# EXHIBIT

# 28

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Marous Brothers Construction, LLC,    )
a corporation, and Gil Berry, an       )
individual d/b/a                        )
Gil Berry & Associates,                 )
             Case 2:07-cv-00384-ID-CSC    Document 59    Filed 02/11/2008    Page 1 o
    Plaintiffs,                        )
                       )
v.                                      ) Civil Action No.:
                       )
Alabama State University, a public      )    JURY TRIAL DEMANDED
corporation; W. Ken Upchurch, III, an   )
individual; Percy Thomas, an individual; )
TCU Consulting Services, LLC, a         )
corporation; Joe A. Lee, individually and )
in his official capacity as President of )
Alabama State University; Elton N. Dean, )
Sr., individually and in his official   )
Capacity as Chairman of the Board of    )
Trustees of Alabama State University,   )
                       )
    Defendants.                        )

## FIRST AMENDED COMPLAINT

## PARTIES

1.     Plaintiff Marous Brothers Construction ("Marous") is a limited liability

corporation organized to do business in the State of Ohio with its principal place of

business in Willoughby, Ohio.

2.     Plaintiff Gil Berry ("Berry") is an individual over the age of 19 years, is

a citizen and resident of Jefferson Hills, Pennsylvania, and does business as Gil Berry &

Associates ("GBA").



DEFENDANT'S
EXHIBIT

37. Goldman

3.       Defendant Alabama State University ("ASU") is a public corporation and instrumentality of the State of Alabama with its principal place of business in Montgomery, Alabama.

4.       Defendant W. Ken Upchurch, III ("Upchurch") is an individual over the age of 19 years and upon information and belief is a citizen and resident of Montgomery

County, Alabama. Upchurch is and, at all times material to this Complaint, was a principal of Defendant TCU Consulting Services, LLC.

5.       Defendant Percy Thomas is an individual over the age of 19 years and upon information and belief is a citizen and resident of Montgomery County, Alabama. Percy Thomas is and, at all times material to this Complaint, was a principal of Defendant TCU Consulting Services, LLC.

6.       Defendant TCU Consulting Services, LLC ("TCU") is an Alabama limited liability corporation organized to do business in the State of Alabama with its principal place of business in Montgomery, Alabama.

7.       Defendant Joe A. Lee ("President Lee") is an individual over the age of 19 years and upon information and belief is a citizen and resident of Montgomery County, Alabama. President Lee is and, at all times material to this Complaint, was the President of ASU.  President Lee is a Defendant in this civil lawsuit both individually and in his official capacity as the President of ASU.

8.       Defendant Elton N. Dean, Sr. ("Dean") is an individual over the age of 19 years and upon information and belief is a citizen and resident of Montgomery County, Alabama. Dean is and, at all times material to this Complaint, was the Chairman

of the Board of Trustees of ASU. Dean is a Defendant in this civil lawsuit both

individually and in his official capacity as the Chairman of the Board of Trustees of ASU.

## JURISDICTION

9.      Diversity jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332

Case 2:07-cv-00384-ID-CSC     Document 59     Filed 02/11/2008     Page 3 o

in that the parties are citizens of different states and the amount in controversy with

respect to each defendant exceeds Seventy-Five Thousand Dollars ($75,000.00),

exclusive of interest and costs.

10.      Venue is proper in the Middle District of Alabama, Northern Division,

because all of the defendants are subject to personal jurisdiction in the Middle District. In

addition, the events and omissions giving rise to the claims occurred primarily in the

Northern Division of the Middle District.

## SUBSTANTIVE AVERMENTS

11.      In 2005, ASU decided to undertake the renovation of six student housing

buildings on its campus: Bibb Graves, Abercrombie Hall, Bessie Benson, George N. Card

Hall, Willease Simpson, and William Benson. The project was known as the Student

Residence Project at ASU ("Student Residence Project"). ASU intended to obtain

financing for the Student Residence Project by offering general revenue bonds.

12.      GBA and Student Suites, Inc. ("Student Suites") were hired by ASU and

at ASU's request began working as developer for the purpose of designing, building,

renovating, and financing the Student Residence Project. Student Suites is a Missouri-

based student housing development company that works with colleges and universities to

design, build, and assist in the procurement of financing for the finance suite-style student housing. Student Suites is not a party to this civil action.

13.     On November 15, 2005, the ASU Trustees Property Committee passed a resolution naming GBA and Student Suites, Inc. as developers to design, build, renovate, and assist in the procurement of financing for the Student Residence Project. The resolution stated that its terms would become null and void if a final agreement was not reached on the design of and financing for the Student Residence Project.

14.     At the request of ASU and GBA, Marous was hired to document existing conditions, prepare design documents, and prepare documents outlining the intended scope of the renovation work. Marous's initiatives included, but were not limited to, several field visits to ASU with the full cooperation, encouragement, knowledge, and assistance of ASU. Marous incurred significant expenses and hours of design time, and at ASU's request prepared floor plans, elevations, and detailed cost estimates for each of the six subject dormitory buildings included in the Student Residence Project, as well as corresponding subject scope of work narratives.

15.     In late May 2006, upon reliance on the representations and resolution of the Board of ASU and President Lee, Marous provided its proprietary work product to ASU in spiral-bound 11x17 format. Marous's proposals addressed renovations to the six dormitories included in the Student Resident Project.

16.     On May 23, 2006, Gil Berry submitted to Freddie Gallot, Jr., Vice President of Fiscal Affairs for ASU, an invoice related to Part One Preconstruction Services. The invoice represented the work performed by GBA and Marous on preconstruction work to date for the Student Residence Project. It also included a copy of

the invoice submitted by Marous to GBA and Student Suites for Part One-Design/Building Services performed by Marous as of May 15, 2006. The total for the invoices was $374,229.49. These invoices were not paid.

17.     On June 15, 2006, Gil Berry had a telephone discussion with President Lee concerning the May 23, 2006 invoice and the invoice submitted by Marous. In

reliance upon representations made by President Lee that payment in full on the invoices would be forthcoming, Berry agreed to wait for payment until the bond issue financing the Student Residence Project closed in early July 2006. Berry confirmed this agreement in an email dated June 5, 2006.   President Lee did not deny the agreement as confirmed by Berry.   Indeed, President Lee did not respond to the email at all, leading Berry and Marous to reasonably believe and rely upon the representations made by President Lee concerning payment.

18.     As noted, ASU received copies of Marous's proprietary work product in late May 2006. Thereafter, and utilizing Marous's proprietary work product for which Marous has never been paid, ASU instructed GBA and Student Suites to assist ASU's bond counsel in obtaining financing for the Student Residence Project. Marous's proprietary work product is referenced as an exhibit in the bond documents. In reliance upon representations made by ASU, including President Lee, GBA and Marous permitted the use of Marous's proprietary work product to procure the financing.

19.     ASU obtained $42,080,000.00 of Series 2006 bond issue (the "Bond"), dated August 1, 2006. The Bond's Preliminary Official Statement outlined estimated services and uses of funds for the Campus Housing Facilities Renovation. The Bond stated that approximately $25,000,000 of the proceeds from the sale of the Series 2006

bonds would be used to pay for a portion of the cost of renovations to six existing student

housing facilities on the University's campus. It referenced the following:

> . . . . The campus housing facilities being renovated with a portion of the
> proceeds of the Series 2006 bonds will be converted to "suite-style"
> accommodations and will feature modern communications, wireless
> internet, enhanced security and other amenities currently favored by
> college students. The University will close two dormitories for renovation
> and has acquired a nearby apartment complex to house students displaced
> by the dormitory renovation project, which is expected to take place in
> three phases. While there can be no assurance thereof, the University
> expects to complete the first two dormitories by fall semester 2007 and to
> complete two additional dormitories by the beginning of each semester
> thereafter until all six are fully renovated by fall semester 2008.

As confirmed by the language of the Bond, the suite-style renovations proposed by

Marous and GBA were within the scope of the Bond issue.

   20.  Further, the Preliminary Official Statement listed the University's

Residence Halls, the type of accommodations, the capacity and the per semester cost for

each. It also specified which residence halls would be renovated and configured into

"suite-style" residences as a component of the 2006 capital improvements. The targeted

residence halls were the same ones on which plaintiffs performed preconstruction

services at ASU's request. The work performed by Plaintiffs was the work upon which

ASU relied in representing the purpose of the bond proceeds in the Preliminary Official

Statement. Upon information and belief, ASU has used and continues to use Plaintiffs'

work product.

   21.  As stated, the November 15, 2005 resolution provided that its terms

would become null and void if a final agreement was not reached on the design of and

financing for the Student Residence Project. Marous furthered the interests of ASU by

providing its proprietary work product to ASU, and ASU used this proprietary work

product to its benefit in that this proprietary work product was used to obtain financing for the Student Residence Project.

22.     After Marous provided its proprietary work product to assist ASU in obtaining funding for the Student Residence Project, ASU's attorney, Kenneth Thomas, instructed GBA and Student Suites to form a single development entity that would be the

developer-of-record for the transaction.  This entity was known as Student Suites Gil Berry and Associates, Alabama, LLC ("SSGBA").

23.     ASU, Marous, and SSGBA continued to revise the Development Agreement, even after the Student Residence Project had received full funding through the issuance of the bond. Plaintiffs suggested changes in the agreement and their email of suggested changes, dated July 20, 2006.

24.     Notwithstanding the representations of President Lee and ASU, GBA, Student Suites, and Marous remained unpaid even after the Bond issue financing the Student Residence Project closed.

25.     During or about July 2006, Dean requested that Berry meet with him and Percy Thomas at the Holiday Inn in Prattville, Alabama.  During the meeting, Dean informed Berry, among other things, that Percy Thomas was "family" and "like his brother" and that Dean intended to make Percy Thomas and Upchurch, principals of TCU, the project managers for the ASU Student Residence Project.  Dean stated to Berry, among other things, that Berry "needed to learn that we keep all this in the family," they were all "family sitting at the table," and if "one of us eats steak, we should all be eating steak." Berry rejected Dean's entrée.

26.      On July 28, 2006, Plaintiffs were informed by Kenneth Thomas, counsel for ASU, that Upchurch, Percy Thomas and their company, TCU, had been selected by ASU to assist President Lee as a part of the due diligence/review of the documents and the Development Agreement provided by the Plaintiffs.

27.      On August 16, 2006, ASU's counsel Kenneth Thomas, via his associate Ramadanah M. Salaam-Jones, sent revised comments to the Development Agreement to the interested parties, including Berry, President Lee, and Dick Davis of Student Suites.

28.      Judge Marvin Wiggins, an ASU Board Member, instructed Marous, GBA, and Student Suites send invoices for the work they had performed to Freddie Gallot, Jr., ASU's Vice-President for Fiscal Affairs. Notwithstanding that these invoices were submitted as instructed, Marous, GBA and Student Suites have received no payment for the extensive work that they performed for ASU and which ASU and others have used for their benefit.

29.      Marous's Arne Goldman had extensive communication with Upchurch, ASU's designated owner's representative. Communications between Goldman and Upchurch included discussions related to Plaintiffs' fees and costs and a Memorandum from Marous to Upchurch setting forth in detail how the project fees were to be determined, the industry standard for such fees, and the amount of fees that Plaintiffs would agree to "give-back" on the Student Residence Project. Plaintiffs agreed to this "give-back" because ASU represented that such a concession in the negotiations would bring about the final approval of the Student Residence Project.

30.      On information and belief, Upchurch, Percy Thomas, and TCU took the information from the Marous memorandum and, abusing their position as the owner's

representatives, advised the ASU Board that the fees ultimately earned by Plaintiffs would be approximately Seven Million Dollars ($7,000,000.00). Upchurch, Percy Thomas, and TCU recommended to the ASU Board that SSGBA and Marous should not be awarded the professional services contracts due to this alleged abusive fee submission set out above.   This false communication was not simply a mistake or a

misunderstanding, since Plaintiffs had clearly set out the calculation of anticipated fees in the Memorandum: the construction management fee would be $1.545 million (6.32% of the total development cost) and the developer's fee would be $1.9 million (7.77% of the total development cost), for a total of $3.445 million in total fees, which is far less than the $7,000,000 fee amount that Upchurch, Percy Thomas, and TCU advised the ASU Board SSGBA and Marous would receive.

31.     The false communication by Upchurch, Percy Thomas, and TCU to the ASU Board was in direct contradiction to their representations to the Plaintiffs at or about the same time, which were that they believed that the Plaintiffs' proposal was the best and most fair proposal and that they would recommend that ASU move forward with the Plaintiffs' proposal immediately.   In reliance on these representations, Plaintiffs expended time and resources in furtherance of ASU's goal of the renovation of the Student Residence Project.

32.     On September 22, 2006, the Plaintiffs were informed that the ASU Board had voted not to continue to utilize Plaintiffs' services on the Student Residence Project. Instead, the Board hired its previously designated owner's representatives to perform all of the services required for the Student Residence Project that were to be provided by Plaintiffs: Upchurch, Percy Thomas, and TCU. Upon information and belief

these representatives are using Marous's proprietary work product to perform the work on the Student Residence Project outlined in the bond offering.

33.     Following the vote by ASU's Board of Trustees that the Plaintiffs would not be utilized for the Student Residence Project, on September 25, 2006, Marous's Arne Goldman and Adelbert Marous, Jr. wrote a letter to President Lee outlining why the Board erred in making this decision.

Case 2:07-cv-00384-ID-CSC     Document 59     Filed 02/11/2008     Page 10 o

34.     When President Lee failed to respond to Plaintiff Marous's letter, Gil Berry emailed ASU Board member Judge Wiggins on September 28, 2006, informing him that ASU was wrongfully in possession of Marous's work product. In the same email, ASU was put on notice that no other architect was permitted to be hired on this project until all outstanding bills and invoices for work previously performed were settled.

35.     Receiving no response, Berry sent President Lee invoices representing total expenses incurred to date on the Student Residence Project. Berry's email specified that these invoices included previous invoices which had been sent to ASU on May 23, 2006, and again on July 10, 2006. These invoices had never been paid notwithstanding representations to the contrary by President Lee and others. The invoice for supervision of design/preconstruction services from Gil Berry and Associates was $196,585.68. The invoice for Marous for the preconstruction services was $454,777.00.

36.     Upon information and belief, ASU, Upchurch, Percy Thomas, and TCU are, in fact, performing the renovation work for the Student Residence Project, and are utilizing to their advantage the information that is Plaintiffs' proprietary work product for which Plaintiffs have not been paid.

37.     Despite non-payment, Plaintiffs remained committed to doing the work that they had agreed to perform and, up to the point at which ASU decided not to award a written professional services contract for renovations to Plaintiffs, Plaintiffs had completed their obligations in good faith and in full and complete reliance on the promises, representations, resolution and actions of the Board of ASU, President Lee, Upchurch, Dean, TCU, and Percy Thomas.

Case 2:07-cv-00384-ID-CSC     Document 59     Filed 02/11/2008     Page 11 c

38.     Based on Plaintiffs' reliance on the assurances of ASU and its representatives, including but not limited to the Board of ASU, President Lee, Upchurch, Dean, TCU, and Percy Thomas, Plaintiffs performed all obligations to date and have not yet been compensated.  Plaintiffs are due to be compensated, and they are due to have their proprietary work product returned.

39.     As a result of the wrongful conduct of Defendants, Plaintiffs have been denied compensation due and owing, the opportunity to complete the project for which they expended great efforts, and undertook significant preparation. In addition, upon information and belief, Defendants continue to utilize Plaintiffs' proprietary work product and Defendants have converted said work product to their own use.

40.     Plaintiffs have been denied and hereby demand the full amount of their time, expenses, fees, and costs for their work on the Student Housing Project.

## COUNT ONE
## BREACH OF CONTRACT

41.     Plaintiffs incorporate by reference paragraphs 1 through 40 as if fully stated herein.

42.     Plaintiffs and Defendant ASU entered into an agreement whereby ASU would pay Plaintiffs for development work to design, build, renovate, and procure financing for the Student Residence Project.

43.     The circumstances of this matter are such that, according to the ordinary course of dealing and the common understanding of men, they show a mutual intent to contract.

Case 2:07-cv-00384-ID-CSC     Document 59     Filed 02/11/2008     Page 12 o

44.     All contracting parties had the legal capacity to enter into this implied contract.

45.     Plaintiffs gave consideration for the agreement in that they fully performed the agreed-upon work.  Plaintiffs submitted invoices to ASU totaling $651,362.68 (Six Hundred and Fifty-One Thousand, Three Hundred and Sixty-Two Dollars and Sixty-Eight cents) which remain unpaid.

46.     Defendant ASU accepted Plaintiffs' work product and has since used it to its benefit in securing the bond financing for the Student Residence Project and in the actual design and construction work on the project.  However, Defendant ASU has failed to compensate Plaintiffs, thus breaching the implied contract between Defendant ASU and Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment and compensatory damages against Defendant ASU, plus attorneys' fees, interest, and costs, and any other relief which Plaintiffs may be entitled.

## COUNT TWO
## QUANTUM MERUIT

47.     Plaintiffs incorporate by reference paragraphs 1 through 46 as if fully stated herein.

48.     Plaintiffs have, at Defendants' direction, expended numerous hours on the development work for the design, building, renovation, and procurement of financing for the Student Residence Project at ASU.

49.     Defendants have knowingly accepted services rendered by the Plaintiffs, and have also knowingly accepted the benefits and results thereof.

50.     Because of the representations made by Defendants to Plaintiffs as set out more fully above, Plaintiffs had a reasonable expectation of compensation.

51.     Defendants' receipt of Plaintiffs' services without compensating Plaintiffs would be unjust.

52.     Based on the principle of quantum meruit, Defendants must compensate Plaintiffs for the reasonable value to Defendants of the services that Plaintiffs rendered.

53.     Plaintiffs have fully performed their work and submitted invoices to ASU for their work totaling $651,362.68 (Six Hundred and Fifty-One Thousand, Three Hundred and Sixty-Two Dollars and Sixty-Eight cents), which remain unpaid.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment and compensatory damages against Defendants, plus attorneys' fees, interest, and costs, and any other relief to which Plaintiffs may be entitled.

## COUNT THREE
## FRAUDULENT MISPRESENTATION

54.     Plaintiffs incorporate by reference paragraphs 1 through 53 as if fully stated herein.

55.     Defendants Upchurch, Percy Thomas, and TCU made false representations to Plaintiffs regarding material facts in this matter: that they believed that

the Plaintiffs' proposal was the best and most fair proposal and that ASU should move forward with the Plaintiffs' proposal immediately.

56.    Defendants Upchurch, Percy Thomas, and TCU made these false representations intentionally or, if they made the false representations mistakenly, Defendants were so reckless in their conduct that they knew or should have known that

Plaintiffs would rely on their misrepresentations and be injured as a result.

57.    Defendants Upchurch, Percy Thomas, and TCU made these false representations with malice, in that they intentionally made the false statements without just cause or excuse either with an intent to injure Plaintiffs or under such circumstances that the law will imply an evil intent to their actions.

58.    In reliance on these representations, Plaintiffs expended a great deal of time and resources in furtherance of ASU's goal of the renovation of the Student Residence Project.

59.    Plaintiffs relied on these representations to their detriment, in that Plaintiffs performed work, expended time, effort, and money for which they have not yet been compensated, and they were denied the opportunity to complete work and services on the Student Residence Project.

60.    Furthermore, Defendants Upchurch, Percy Thomas, and TCU received the contract to perform services for the Student Residence Project that these Defendants had led Plaintiffs to believe that they would receive.

61.    Furthermore, Defendant ASU continues to benefit from Plaintiffs' efforts to this day, and has not compensated Plaintiffs for their efforts or returned their proprietary work product at Plaintiffs' request.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees, interest, costs, interest, and other relief to which Plaintiffs may be entitled.

## COUNT FOUR
## FRAUD

62.    Plaintiffs incorporate by reference paragraphs 1 through 61 as if fully stated herein.

63.    Defendant President Lee made false representations to Plaintiffs regarding material facts in this matter: that they would be compensated for completing work for ASU on the Student Residence Project.

64.    Defendant President Lee made these false representations intentionally or, if he made the false representations mistakenly, Defendant President Lee was so reckless in his conduct that he knew or should have known that Plaintiffs would rely on his misrepresentations and be injured as a result.

65.    Defendant President Lee made these false representations with malice, in that he intentionally made the false statements without just cause or excuse either with an intent to injure Plaintiffs or under such circumstances that the law will imply an evil intent to his actions.

66.    Plaintiffs reasonably relied upon President Lee's false representations. In reliance on these representations, Plaintiffs expended a great deal of time and resources in furtherance of ASU's goal of the renovation of the Student Residence Project.

67.    Plaintiffs relied on these representations to their detriment, in that Plaintiffs performed work, expended time, effort, and money for which they have not yet

been compensated, and they were denied the opportunity to complete work and services on the Student Residence Project.

68.    Plaintiffs suffered damage as a proximate consequence of President Lee's false representation in that Plaintiffs have fully performed their work and submitted invoices to ASU for their work totaling $651,362.68 (Six Hundred and Fifty-One Thousand, Three Hundred and Sixty-Two Dollars and Sixty-Eight cents), which remain unpaid.

Case 2:07-cv-00384-ID-CSC    Document 59    Filed 02/11/2008    Page 16 c

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees, interest, costs, interest, and other relief to which Plaintiffs may be entitled.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

69.    Plaintiffs incorporate by reference paragraphs 1 through 68 as if fully stated herein.

70.    Defendants Upchurch, Percy Thomas, and TCU knew of the existence of the business relationship between Plaintiffs and ASU. These Defendants intentionally interfered with the business relations and implied contract between the Plaintiffs and ASU by misrepresenting to ASU and its board that the fees which Plaintiffs were to receive on the Student Residence Project.

71.    Defendants Upchurch, Percy Thomas, and TCU used their confidential relationship as owner's representatives to gain information about the business relationship between Plaintiffs and ASU, and using that information misrepresented

Plaintiffs' position with respect to the work to be performed and fees to be charged for the performance of that work.

72.    There was no justification for the Defendants' interference with this business relationship and contract. Having misrepresented the facts concerning the fees to be charged by Plaintiffs, Defendants Upchurch, Percy Thomas, and TCU then undertook the work which Plaintiffs were to perform on the renovation of the student housing at ASU. Defendants Upchurch, Percy Thomas, and TCU abused their position as owner's representatives by encouraging the ASU Board of Trustees not to hire to Plaintiffs but, instead to hire them.  On information and belief, they continue to do the work, utilizing the confidential work product of Plaintiffs.

73.    As a result of these tortious interferences with business relations, Plaintiffs have been damaged.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, interest, attorneys' fees, costs, interest, and other relief to which Plaintiffs may be entitled.

## COUNT SIX
## CONVERSION

74.    Plaintiffs incorporate by reference paragraphs 1 through 73 as if fully stated herein.

75.    Defendants wrongfully appropriated Plaintiffs' proprietary work product to their own use and beneficial enjoyment in exclusion of Plaintiffs' rights of ownership and to compensation.

76.     Defendants wrongfully appropriated Plaintiffs' proprietary work product after representing that Plaintiffs would be compensated for their work product. Plaintiffs have submitted invoices for payment, but have not yet been compensated.

77.     Defendants have further wrongfully withheld possession of Plaintiffs' proprietary work product from Plaintiffs, without compensation, after Plaintiffs requested the return of their proprietary work product.

78.     Upon information and belief, Defendants are now using illegally using Plaintiffs' proprietary work product to their own use and beneficial enjoyment in that they are using Plaintiffs' proprietary work product in the renovation of the Student Residence Project without properly compensating Plaintiffs.

79.     Defendants have illegally converted ownership of Plaintiffs' proprietary work product as if it were their own.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees, interest, costs, interest, and other relief to which Plaintiffs may be entitled.

## COUNT SEVEN
### CONSPIRACY

80.     Plaintiffs incorporate by reference paragraphs 1 through 79 as if fully stated herein.

81.     Defendants Upchurch, Percy Thomas, TCU, President Lee, and Dean conspired together to intentionally interfere with the business relationship and implied contract between Plaintiffs and ASU and to cause injury and harm to Plaintiffs.

82.     Defendants Upchurch, Percy Thomas, TCU, President Lee, and Dean so interfered with the full knowledge and intent that their unlawful actions would result in harm to Plaintiffs, in the Plaintiffs being deprived of compensation due and owing under the business relationship, and in Plaintiffs further being deprived of the business opportunity of performing the remaining work on the Student Residence Project.

83.     The actions of Defendants Upchurch, Percy Thomas, TCU, President Lee, and Dean were designed with the intent to achieve the goal of procuring benefit to themselves while causing detriment to Plaintiffs.  Defendants Upchurch, Percy Thomas, TCU, President Lee, and Dean were successful in this endeavor.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees, interest, costs, interest, and other relief to which Plaintiffs may be entitled.

**COUNT EIGHT**
**LOSS OF BUSINESS OPPORTUNITY**

84.     Plaintiffs incorporate herein by reference paragraphs 1 through 83 as if fully stated herein.

85.     Defendants' actions directly and proximately caused Plaintiffs to lose significant business opportunities.

86.     Defendants' actions injured and damaged Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees, interest, costs, interest, and other relief to which Plaintiffs may be entitled.

## COUNT NINE
### INJUNCTIVE AND OTHER RELIEF

87.    Plaintiffs incorporate herein by reference paragraphs 1 through 86 as if fully stated herein.

88.    Plaintiffs seek injunctive and other relief to which they may equitably be entitled, including, but not limited to:

Case 2:07-cv-00384-ID-CSC    Document 59    Filed 02/11/2008    Page 20 o

a.  the enjoinment of Defendants from using Plaintiffs' work product; and

b.  the return of Plaintiffs' proprietary work product.

## COUNT TEN
### FAILURE TO AUTHORIZE PAYMENT

89.    Plaintiffs incorporate herein by reference paragraph 1 through 88 as if fully stated herein.

90.    Defendants Dean and Lee had the responsibility to follow established procedures for the payment of ASU's contractual obligations and debts due and owing, and also to follow guidelines and established accounting procedures to ensure that established obligations, such as those owed to Plaintiffs, were paid. Dean and Lee failed to meet these responsibilities or follow these guidelines and established accounting procedures. These acts and omissions constitute violations of ministerial, rather than discretionary, duties.

91.    To the extent that these acts and omissions could have conceivably been done while Dean or Lee was exercising a discretionary function, then the act or omission was done willfully, maliciously, intentionally, fraudulently, in bad faith, beyond the authority of Dean or Lee, or under a mistaken interpretation of the law. Otherwise, the

acts or omissions complained of herein involved ministerial acts that were improperly performed by Dean or Lee, or at their direction.

   WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request the equitable remedy of enjoining ASU, Lee, and Dean to pay the debt owed, compensatory damages in an amount to be determined by a jury, plus punitive damages, attorneys' fees,

interest, costs, interest, and other relief to which Plaintiffs may be entitled.

   Respectfully submitted this the __7TH__ day of February, 2008.

CHAMP LYONS, III (LYO007)
Attorneys for Plaintiffs
Marous Brothers Construction, Inc. and Gil Berry

OF COUNSEL:

KING, HORSLEY & LYONS, LLC
One Metroplex Drive
Suite 280
Birmingham, AL 35209
205.871.1310 - p
205.871.1370 - f

Jock M. Smith
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
306 North Main Street
P.O. Box 830419
Tuskegee, Alabama 36083

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on the following counsel of record via the ECF system on this the _____ day of February, 2007.

J. Lister Hubbard
R. Brooke Lawson, III
Capell & Howard, P.C.
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama 36102-2069
jlh@chlaw.com
rbl@chlaw.com

Kenneth L. Thomas
Christopher K. Whitehead
Ramadanah M. Salaam-Jones
Thomas, Means, Gillis, & Seay, P.C.
Post Drawer 5058
3121 Zelda Court
Montgomery, Alabama 36103-5058
klthomas@tmgslaw.com
ckwhitehead@tmgslaw.com
rsjones@tmgslaw.com

Stanley Murphy
MURPHY & MURPHY, LLC
P.O. Box 3163
Tuscaloosa, AL 35403-3163

Jock M. Smith
Brian P. Strength
COCHRAN, CHERRY, GIVENS & SMITH, P.C.
306 North Main Street
P.O. Box 830419
Tuskegee, Alabama 36083

_____
OF COUNSEL

# EXHIBIT

# 29

STATE OF ALABAMA        )
                                        )

COUNTY OF MONTGOMERY   )

## AFFIDAVIT OF M. FREDRICK SIMPLER, JR.

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared **M. FREDRICK SIMPLER, JR.**, who first being duly sworn, deposed and stated as follows:

1.     My name is M. Fredrick Simpler Jr. I am of sound mind, over the age of nineteen and a resident of the State of Alabama.

2.     I have personal knowledge of the facts set forth in this affidavit, and I am competent to testify to these facts.

3.     I am an attorney who is duly licensed to practice law in the State of Alabama.

4.     My law firm, Waldrep Stewart & Kendrick, LLC served as underwriter's counsel for Alabama State University's ("ASU") General Tuition and Fee Revenue Bonds, Series 2006 Bond Issue. As underwriter's counsel, my law firm was responsible for drafting a portion of the bond documents including the Preliminary Official Statement ("POS").

5.     The 2006 Bond Issue financed several capital improvements at ASU, including renovations to six of its dormitories. The total amount of the bond issue was $41,810,000 with $25 million being designated for the dormitory renovation portion.

6.     To prepare the POS, I needed general information regarding ASU's plan to renovate its dormitories. The POS simply gave a listing of the technology and security

1

improvements proposed by ASU and a description that the dormitories would be renovated into suite-style rooms similar to that on other university campuses. I acquired this information from employees of ASU.

7.    I remember a meeting of the ASU Board of Trustees during which Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction were present and the group made a presentation to the Board. I never received a copy of their presentation.

8.    As underwriter's counsel, I never personally consulted with anyone from Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction to draft the bond documents. I never relied upon documents and/or a scope of work prepared by Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction to draft the POS. Nowhere in the POS is there a reference to a scope of work prepared by Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction.

9.    ASU was able to obtain bond financing based upon its credit rating and its ability to repay the money borrowed. There was no need to provide a scope of work for the dormitory renovation to obtain financing for ASU.

**FURTHER AFFIANT SAITH NOT.**

M. FREDRICK SIMPLER, JR.

Sworn to and subscribed before me on this the 4th day of March 2008.

NOTARY PUBLIC

My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 22, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

2

STATE OF ALABAMA       )
                                ) .

COUNTY OF MONTGOMERY   )

## AFFIDAVIT OF M. FREDRICK SIMPLER, JR.

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared **M. FREDRICK SIMPLER, JR.**, who first being duly sworn, deposed and stated as follows:

1.      My name is M. Fredrick Simpler Jr. I am of sound mind, over the age of nineteen and a resident of the State of Alabama.

2.      I have personal knowledge of the facts set forth in this affidavit, and I am competent to testify to these facts.

3.      I am an attorney who is duly licensed to practice law in the State of Alabama.

4.      My law firm, Waldrep Stewart & Kendrick, LLC served as underwriter's counsel for Alabama State University's ("ASU") General Tuition and Fee Revenue Bonds, Series 2006 Bond Issue. As underwriter's counsel, my law firm was responsible for drafting a portion of the bond documents including the Preliminary Official Statement ("POS").

5.      The 2006 Bond Issue financed several capital improvements at ASU, including renovations to six of its dormitories. The total amount of the bond issue was $41,810,000 with $25 million being designated for the dormitory renovation portion.

6.      To prepare the POS, I needed general information regarding ASU's plan to renovate its dormitories. The POS simply gave a listing of the technology and security

improvements proposed by ASU and a description that the dormitories would be renovated into suite-style rooms similar to that on other university campuses. I acquired this information from employees of ASU.

7.    I remember a meeting of the ASU Board of Trustees during which Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction were present and the group made a presentation to the Board. I never received a copy of their presentation.

8.    As underwriter's counsel, I never personally consulted with anyone from Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction to draft the bond documents. I never relied upon documents and/or a scope of work prepared by Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction to draft the POS. Nowhere in the POS is there a reference to a scope of work prepared by Student Suites, Gil Berry & Associates and/or the Marous Brothers Construction.

9.    ASU was able to obtain bond financing based upon its credit rating and its ability to repay the money borrowed. There was no need to provide a scope of work for the dormitory renovation to obtain financing for ASU.

**FURTHER AFFIANT SAITH NOT.**

M. FREDRICK SIMPLER, JR.

Sworn to and subscribed before me on this the 4th day of March 2008.

NOTARY PUBLIC

My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 22, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

2