IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAROUS BROTHERS CONSTRUCTION, LLC, a Corporation, and GIL BERRY, an Individual d/b/a GIL BERRY & ASSOCIATES,

*Plaintiffs,*

ALABAMA STATE UNIVERSITY, *et al.,*

*Defendants.*

CIVIL ACTION NO. 2:07cv384-ID

**MEMORANDUM BRIEF AND ARGUMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NOW COMES **MAROUS BROTHERS CONSTRUCTION, LLC** (hereinafter "MAROUS") and submits the following brief and argument in support of its motion for summary judgment:

## I. INTRODUCTION

While the underlying claims in this case asserted by Marous and Co-Plaintiff Gil Berry concern a dispute regarding payment for pre-construction services undertaken for the benefit of Alabama State University regarding the renovation of six dormitories, this brief will address the counterclaim for defamation filed by TCU Consulting Services, LLC, W. Ken Upchurch, III, and Percy Thomas (hereinafter "the TCU Defendants") filed on September 5, 2007. (See Doc. 60, Doc. 1, Doc. 29). Specifically, the TCU Defendants claim

that they were damaged by alleged defamatory statements published in the Montgomery Advertiser on July 22, 2007. (Doc. 60, p. 3)

Counterclaim Defendant Marous specifically denies making any of the alleged defamatory statements complained of and further states that any statements, if such statements were actually made, were communicated by Gil Berry doing business as Gil Berry and Associates and were, in no way, attributable to Marous. Furthermore, Marous also specifically states that it neither ratified nor approved any statement made by Gil Berry and also specifically denies that Gil Berry was acting as an agent or employee of Marous at the time these statements were made or at any other time.

As it is, in fact, undisputed that Berry and not Marous made the alleged defamatory statements, in order to affix liability upon Marous, it is the counterclaim plaintiffs' burden to show that either: 1) these statements were, somehow, attributable to Marous, or 2) Marous is vicariously liable for statements made by Berry. To establish the latter, counterclaim plaintiffs must also show that: a) Berry was Marous' agent or employee, b) the statements were made within the line and scope and in furtherance of the employment relationship. See, *Mills v. Wex-Tex Industries, Inc.* 991 F.Supp. 1370 (M.D.Ala.1997). Counterclaim defendant Marous says that, as it is undisputed that the statements are attributable to Berry only and that it is also undisputed that Berry was not Marous' agent or employee, Marous is entitled to judgment as a matter of law.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." FED. R. CIV. P. 56 advisory committee's note, cited in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 857 (11th Cir. 1998).

The party seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.317, 324 (1986). **The moving party may discharge this burden by "pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."** *Celotex Corp.*, 477 U.S. at 325 (*emphasis added*). Once the moving party meets that burden, the non-moving party must set forth **specific facts** demonstrating that there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (*emphasis added*). A genuine issue of material fact exists for trial if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To avoid an adverse ruling on a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [their] pleadings." Fed.R.Civ.P. 56(e). A non-movant does not create a genuine issue of material fact by relying on "conclusory allegations based on mere subjective beliefs." *Plaisance v. Travelers Ins. Co.*, 880 F.Supp. 798, 804 (N.D.Ga.1994), *aff'd*, 56 F.3d 1391 (11th Cir.1995) (citing *Carter*, 870 F.2d at 585). Nor may the non-moving party defeat a summary judgment motion by simply providing a mere "scintilla" of evidence. *Burger King Corp. v. Weaver*, 169 F.2d 1310, 1321 (11th Cir. 1999). Instead, there must be a **genuine factual conflict** in the evidence to support a jury question. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).

The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Flemming v. Corrections Corp. of America*, 143 Fed. Appx. 921, 924 (10th Cir.2005) (quoting *Anderson*, 477 U.S. at 247-48). The substantive law applicable to the case determines which facts are material. *Harris*, 2005 WL at *1; *Flemming*, 143 Fed.Appx. at 924 (both citing *Anderson*, 477 U.S. at 248). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes that are irrelevant or unnecessary will not be counted. *Flemming*, 143 Fed.Appx. At 924 (quoting *Anderson*, 477 U.S. at 248, and citing *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000) ("A 'material fact' is one which could have an impact on the outcome of the lawsuit, while

a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented.")).

## III. ARGUMENT

### I. MAROUS NEITHER MADE NOR PUBLISHED THE ALLEGED DEFAMATORY STATEMENTS AT ISSUE IN THIS CASE; RATHER, IT IS UNCONTROVERTED THAT THOSE STATEMENTS WERE MADE BY GIL BERRY.

It is axiomatic that, in order to affix liability for defamation, there must be a defamatory statement made by the party so accused. To establish a *prima facie* case of defamation, it is the plaintiff's burden to show[1]:

> "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication of the statement."
>
> *Mills v. Wex-Tex Industries, Inc.* 991 F.Supp. 1370, 1387 (M.D.Ala.1997), citing *Brassfield v. Jack McClendon Furniture, Inc.*, 953 F.Supp. 1438, 1457 (M.D.Ala.1996)

"The question of whether the communication is reasonably capable of a defamatory meaning is a question, in the first instance, for the court and if the communication is *not reasonably capable of a defamatory meaning*, there is no issue of fact, and summary judgment

---

[1]While the *Mills* opinion sets out the elements of the *prima facie* tort of defamation, Marous contends that the counterclaim plaintiffs are limited purpose public figures which would require a showing by them that Marous acted with actual malice (as opposed to a showing of "fault amounting to at least negligence"). As such, Marous adopts the arguments set forth in its *Brief In Support of Marous Brothers Construction's Motion To Dismiss* filed on September 25, 2007 and incorporates those arguments by reference as though set out fully herein. A copy of that brief in attached hereto as "Exhibit A."

is proper." *Drill Parts and Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280, 1289-90 (Ala.1993). [*Emphasis supplied*]

It is undisputed in this case that Marous neither made nor published the alleged defamatory statements. Rather, it is undisputed that the alleged defamatory statements of which the counterclaim plaintiffs complain which were authored by Josh Moon and printed in the July 22, 2007 edition of the *Montgomery Advertiser* were made by Gil Berry doing business as Gil Berry and Associates and were, <u>in no way</u>, attributable to Marous and were not based on any information that came from Marous. Josh Moon, the *Montgomery Advertiser* reporter who wrote the article that is the basis of the subject counterclaim confirmed this in his deposition testimony:

> "Q. . . . Would it be safe to say that the statements that were printed in these newspaper articles, they're attributable only to Gil Berry, aren't they?
>
> None of these statements were actually made by Marous?
>
> A. No.
>
> Q. Okay. And these are all based on your conversations with Gil Berry over these numerous meetings that you have had with him?
>
> A. Yes."

*Dep. of J. Moon*, p. 142.

> "Q. . . . none of the statements that are written in these articles come from any information from Marous Brothers; is that right?
>
> A. Right."

*Dep. of J. Moon*, p. 147.

Gil Berry himself testified that the alleged defamatory statements were not made under the direction of and were not based on any information that came from Marous:

> Q. And these statements that you allegedly made to Josh Moon, those weren't made under any direction by anybody from Marous Brothers, were they?
>
> A. That is correct.
>
> Q. In other words, they didn't have anything to do with that. They didn't tell you to make those statements?
>
> A. No. I don't even think they knew that I made the statements.
>
> Q. Okay. And it wasn't based on any information that you got from anybody at Marous Brothers, right?
>
> A. That is totally correct.

*Dep. of G. Berry*, pp. 772-773.

As a fallback position and an alternative theory for trying to establish that Marous made defamatory statements, it is expected that the counterclaim plaintiffs' will offer as evidence in support thereof a letter from Marous' Arne Goldman to Gil Berry dated September 27, 2006 (Attached as "*Exhibit A*"). This letter was written after Marous learned that ASU had awarded the dorm renovation project to Upchurch and Goldman recounts the tortured history of the negotiations and highlights the questionable manner in which the relationship terminated. The letter was sent to Gil Berry by Goldman and, although it

stated that Berry may share it with Malcolm Thomas in the Governor's office, the accompanying e-mail transmittal requested that it remain in confidence until the appropriate time. (See, e-mail transmittal from Arne Goldman to Gil Berry dated September 29, 2006, attached as "*Exhibit B*"). Despite Goldman's request regarding confidentiality, Berry did forward the letter to the Governor's office and, apparently, to Josh Moon with the *Montgomery Advertiser*. No defamatory statements are made in this letter.

Josh Moon conceded in his deposition that none of the statements published in the article were attributable to the September 27, 2006 letter from Arne Goldman. Rather, Moon testified that the statements published in the article were actually made by Gil Berry:

> "Q. In that next paragraph, when you - - dated September 27th, 2006, you state that in that letter Marous claims Ken Upchurch intentionally misrepresented how much the job would cost.
> Where in that letter does he say that?
>
> A. Wait a minute. Where - -
>
> Q. I'm sorry. On Exhibit 6, which that second newspaper article, in the paragraph that says dated September 27th, 2006. You write that Marous states that Ken Upchurch intentionally misrepresented how much that job would cost.
> And I'm just curious where in that letter it says that.
>
> A. This paragraph here where - -
>
> Q. Which paragraph are you referring to?
>
> A. The top paragraph on the letter says Mr. Upchurch assured me that he was entirely comfortable with the information. We exchanged numerous E-mails. Now I can't help

but wonder about whether or not President Lee and/or the Board members were shown the information that MBC generated. If the information was accurately portrayed, then we cannot fathom how Dr. Lee and the Board reached the decision they made last Friday.

Q.    Okay. So, Mr. Goldman says if the information was accurately portrayed.

A.    Uh-huh (affirmatively).

Q.    And then in the next sentence he says if the information was not properly represented, then there is a whole different problem; is that right?

A.    Yes.

Q.    How did you take from that paragraph that Marous had said Upchurch did, in fact, intentionally misrepresent how much the job would cost?

A.    Well, I would assume that in <u>speaking with Mr. Berry</u> we also got that, but . . ."

*Dep. of J. Moon*, pp. 112-114.

Moon also conceded that he had mischaracterized the subject matter of the letter:

"Q.    Okay. So, that would be something - - and I'm not arguing with you, but I don't see in that paragraph that you just cited me to where Marous has said that Ken Upchurch intentionally misrepresented how much the job would cost.

So, is that something that Gil Berry told you?

A.    Oh, yeah. I mean, that's something he told me, yeah, several times. But I mean, it still doesn't change the fact we shouldn't have attributed it

that way, or that I should not have attributed it that way.

Q. So, in looking back at the September 27 letter that you were told was sent to Governor Riley's office, it appears that the statement in the July 22nd article which says that Marous Brothers' Arne Goldman states that Ken Upchurch intentionally misrepresented how much the job would cost is not an accurate - -

A. Right.

Q. - - summary of his letter?"

*Dep. of J. Moon*, pp. 114-115.

Additionally, Moon agreed that the letter was from Goldman to Berry and that he had no knowledge of how it was obtained by the Governor's office:

"Q. Now, Marous Brothers during their deposition testified under oath that they never provided any letters to Governor Bob Riley's office.

A. Okay.

Q. Now, have you ever seen any sort of forwarding cover letter or a transmittal letter or anything that would indicate that that letter was sent by Marous to Governor Riley's office, and specifically Malcolm Thomas?

A. No. I have not."

*Dep. of J. Moon*, p. 111.

. . . . .

"Q. You don't know how he received it, just that he had it?

A. Right. No, I don't. I have no idea."

*Dep. of J. Moon*, p. 112.

Even assuming, arguendo, that the counterclaim plaintiffs do make a showing that the statements contained in the September 27, 2006 letter were defamatory in some way, Marous was conditionally privileged to make such statements. Alabama case law has established such a conditional privilege:

> "Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is *one in which the party has an interest*, and it is *made to another having a corresponding interest*, the communication is privileged, if made in good faith and without actual malice. * * * The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or *moral* in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken."

*Hoover v. Tuttle*, 611 S.2d 290, 293 (Ala.1992). [*Emphasis supplied*]

Here, the totality of the evidence in this case shows that both Marous and Gil Berry had, at the time this letter was written on September 27, 2006 and still have, an interest in its subject matter. The details recounted in that letter and the ensuing litigation, wherein both are plaintiffs, support this fact. Furthermore, both at the time that this letter was written and at the present time, it is Marous' position that the information in the letter was conveyed with a good faith belief in its truthfulness and accuracy. Moreover, it is also Marous' present belief that the information conveyed in that letter is accurate.

Given all of this testimony, it is wholly uncontroverted that: 1) the defamatory statements complained of were made by Gil Berry and not Marous, and 2) that there was no publication of any defamatory statement by Marous (even those made by Gil Berry). As such, Marous is entitled to judgment as a matter of law.

## II. BERRY WAS NEITHER MAROUS' AGENT NOR EMPLOYEE AND MAROUS MAY NOT BE HELD VICARIOUSLY LIABLE FOR STATEMENTS MADE BY BERRY.

"For an employer to be held liable for an employee's tortious conduct under Alabama law, a plaintiff must show that: (1) employee's wrongful acts were committed in line and scope of employment; or (2) that acts were committed in furtherance of employer's business; or (3) that employer participated in, authorized, or ratified wrongful acts." *Mills v. Wex-Tex Industries, Inc.* 991 F.Supp. 1370 (M.D.Ala.1997). "[I]t is a 'well-settled rule that a principal is not ordinarily liable for the torts of its independent contractor." *Lincoln Log Home Enterprises, Inc. v. Autrey*, 836 S.2d 804 (Ala.2002). "[W]hen a defendant's liability is based on the theory of agency, agency may not be presumed, and ... to [support a finding of liability] the plaintiff must present substantial evidence of an agency relationship. *Carlton v. Alabama Dairy Queen, Inc.*, 529 So.2d 921 (Ala.1988); See also, *Battles v. Ford Motor Credit Co.*, 597 So.2d 688, 689 (Ala.1992). "The test to be applied in determining the existence of an agency relationship under the doctrine of respondeat superior is whether the alleged principal reserved a right of control over the manner of the alleged agent's performance. *Williams v. Tennessee River Pulp & Paper Co.*, 442 So.2d 20 (Ala.1983)."

Alabama courts have applied the same rules of law regarding agency in defamation actions:

> "Basic principles of agency law operate within the area of defamation law, of course, and this Court has held that if 'publication is sought to be shown by an agent, it does not bind the principal as a publication ..., unless the act of such agent was within the line and scope of the agent so acting or employed.' Weir [*v. Brotherhood of Railroad Trainmen* ], *supra,* 221 Ala. [494] at 498, 129 So. [267] at 270. Furthermore, 'where the evidence is undisputed, agency vel non, its character and extent, are questions of law for the court." *Clark & Barker v. Eufaula Brick Works,* 205 Ala. 545, 547, 88 So. 669, 670 (1921). [Emphasis Supplied].

*Walton v. Bromberg & Co.,* 514 S.2d 1010, 1012 (Ala.1987).

In this case, it is undisputed that Gil Berry was neither an agent nor employee of Marous and that Marous neither authorized Gil Berry to make any statements on its behalf nor ratified those statements or the actions of Gil Berry in making those statements. Gil Berry acknowledged as much in his deposition:

> "Q. You're not an employee of Marous Brothers, are you?
>
> A. No.
>
> Q. Not an agent?
>
> A. No.
>
> Q. And these statements that you allegedly made to Josh Moon, those weren't made under any direction by anybody from Marous Brothers, were they?
>
> A. That is correct.

Q. In other words, they didn't have anything to do with that. They didn't tell you to make those statements?

A. No. I don't even think they knew that I made the statements.

Q. Okay. And it wasn't based on any information that you got from anybody at Marous Brothers, right?

A. That is totally correct.

Q. Okay. Now, the work that you did on this project, you were working in furtherance of Gil Berry & Associates and not Marous Brothers, right?

A. That is so correct."

*Dep. of G. Berry*, pp. 772-773.

Marous Brothers' Arne Goldman also confirmed that Gil Berry is neither an agent nor an employee of Marous:

"Q. Is it safe to say that Gil Berry is not an agent of Marous Brothers?

A. He is not an agent of Marous Brothers.

Q. And the inverse would be true as well, correct?

A. We are not an agent of Gil Berry.

Q. Okay. You're not his agent, and he's not your agent?

A. Correct.

Q. And you haven't authorized him to do anything on your behalf; is that right?

       A. Not without your consent."

*Dep. of A. Goldman*, pp. 422-424.

"Q. Okay. In the dealings that you've had with Gil Berry, and specifically with this job - - I know y'all have worked on some other jobs or he's done some work with you in the past. But specifically on this job, did you tell him how to do any of the work that he was hired to do? Did you direct him in any way?

A. We didn't direct him. We offered advice if he asked questions.

Q. Okay. But you didn't tell him specifically we want you to do this and do it this way?

A. No.

Q. Okay. So that was up to him as to how he did his job?

A. He was a developer. We were, you know, called a design/builder first and construction manager later.

Q. Okay. Can you think of - - regarding the statements that were made or allegedly made by Mr. Berry, can you think of any way that would have benefited Marous?

A. I can think of no way."

*Dep. of A. Goldman*, pp. 422-424.

Significantly, Goldman further testified that Berry was not authorized to speak to the media on Marous' behalf, which comports with Berry's testimony that no one from Marous was even aware that the statements had been made by Berry:

> "Q. Okay. Specifically, have you ever authorized him to speak to the media on behalf of Marous Brothers?
>
> A. Never.
>
> Q. Okay. And in this case, did you do that?
>
> A. We never gave him any consent to speak on our behalf to anybody.
>
> Q. Okay. Before reading that newspaper article, were you aware that the statements were made allegedly?
>
> A. I heard from our attorney - - our attorneys at the time. I heard from Steve Arnold, you know, a phone call to me, have you seen The Montgomery Advertiser.
>
> I said, well, I'm in Cleveland. So, I haven't seen The Montgomery Advertiser. And he goes I need to send - -
>
> MR. LYONS: Don't talk about your conversation with your lawyers.
>
> THE WITNESS: Okay. The answer is our attorney alerted us to the article.
>
> Q. (By Mr. Allred) But before then you had never heard that any of these statements had been made?
>
> A. No."

*Dep. of A. Goldman*, pp. 422-424.

As it is undisputed that Gil Berry was neither Marous' agent nor its employee, Marous may not be held vicariously liable for any statements made by Berry while acting

on his own behalf or at any other time for that matter. It is also undisputed that Marous neither ratified nor approved any statements made by Berry and, specifically, those statements made by Berry that were published in the July 22, 2007 edition of *The Montgomery Advertiser*. As such, Marous is entitled to judgment as a matter of law.

## CONCLUSION

Marous says that it is entitled to summary judgment on the following grounds:

1) It is undisputed that Marous neither made nor published the alleged defamatory statements at issue in this case; rather, it is uncontroverted that those statements were made by Gil Berry. Even assuming, arguendo, that the counterclaim plaintiffs do make a showing that the statements contained in the September 27, 2006 letter were defamatory in some way, Marous was conditionally privileged to make such statements.

2) Berry was neither Marous' agent nor employee and Marous may not be held vicariously liable for statements made by Berry.

WHEREFORE, THE PREMISES CONSIDERED, this counterclaim defendant says that there is no dispute as to any material fact and that it is entitled to judgment as a matter of law.

Respectfully submitted,

*/s/ David E. Allred*
DAVID E. ALLRED
D. CRAIG ALLRED
Attorneys for Above-Named Plaintiff/
Counterclaim Defendant

OF COUNSEL:

DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone: (334) 396-9200
Facsimile: (334) 396-9977

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 5th day of March, 2008 electronically filed the foregoing *Memorandum Brief and Argument in Support of Motion for Summary Judgment* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system, which will send notification of such filing to:

Jock M. Smith, Esq.
Brian P. Strength, Esq.
J. Lister Hubbard, Esq.
R. Brooke Lawson, III, Esq.
Kenneth L. Thomas, Esq.
Ramadanah M. Salaam-Jones, Esq.
Champ Lyons, III, Esq.

*/s/ David E. Allred*
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAROUS BROTHERS CONSTRUCTION, LLC, a Corporation, and GIL BERRY, an Individual d/b/a GIL BERRY & ASSOCIATES,

*Plaintiffs,*

ALABAMA STATE UNIVERSITY, *et al.,*

*Defendants.*

CIVIL ACTION NO. 2:07cv384-ID

**NARRATIVE SUMMARY OF UNDISPUTED FACTS**

1. The statements published in the July 22, 2007 edition of *The Montgomery Advertiser*, which statements gave rise to the defendants' counterclaim, were made by Gil Berry. (*Dep. of J. Moon*, p. 142)

2. None of the statements printed in that article were attributable to Marous nor were they based on any information that came from Marous. (*Dep. of J. Moon*, pp. 142, 147)

3. The alleged defamatory statements made by Gil Berry were not made under the direction nor were they based on any information from Marous. No one from Marous was aware that the statements had been made until after the fact. (*Dep. of G. Berry*, pp. 772-773; *Dep. of A. Goldman*, pp. 422-424)

4. Regarding a September 27, 2006 letter from Arne Goldman to Gil Berry, no where in that letter does it state that "Ken Upchurch intentionally misrepresented how much the job would cost". (*Dep. of J. Moon*, pp. 112-114)

5.      In a conversation with Josh Moon, Gil Berry made the statement that "Ken Upchurch intentionally misrepresented how much the job would cost." (*Dep. of J. Moon*, pp. 112-114)

6.      Gil Berry was neither an agent nor an employee of Marous Brothers and none of the statements made by Berry were under the direction of anybody from Marous. (*Dep. of G. Berry*, pp. 772-773)

7.      At all material times, in working on the ASU project, Gil Berry was working in furtherance of Gil Berry and Associates and not Marous Brothers. (*Dep. of G. Berry*, pp. 772-773)

8.      Marous has never authorized Gil Berry to act on its behalf and, specifically, never authorized Gil Berry to speak to the media on its behalf. (*Dep. of A. Goldman*, pp. 422-424)

9.      Marous did not attempt to direct Gil Berry's actions regarding the ASU project in any way. (*Dep. of A. Goldman*, pp. 422-424)

10.     Arne Goldman of Marous Brothers can think of no way that the statements made by Gil Berry would have benefitted Marous. (*Dep. of A. Goldman*, pp. 422-424)


                              */s/ David E. Allred*
                              DAVID E. ALLRED
                              D. CRAIG ALLRED
                              Attorneys for Above-Named Plaintiff/
                              Counterclaim Defendant

OF COUNSEL:

DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone: (334) 396-9200
Facsimile: (334) 396-9977

## CERTIFICATE OF SERVICE

I hereby certify that I have this 5th day of March, 2008 electronically filed the foregoing *Narrative Summary of Undisputed Facts* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system, which will send notification of such filing to:

Jock M. Smith, Esq.
Brian P. Strength, Esq.
J. Lister Hubbard, Esq.
R. Brooke Lawson, III, Esq.
Kenneth L. Thomas, Esq.
Ramadanah M. Salaam-Jones, Esq.
Champ Lyons, III, Esq.

*/s/ David E. Allred*
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Marous Brothers Construction, LLC, a corporation, and Gil Berry, an individual, d/b/a Gil Berry & Associates, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No.: 2:07-cv-00384-ID-CSC |
| Alabama State University, a public corporation; W. Ken Upchurch, III, an individual; Percy Thomas, an individual; TCU Consulting Services, LLC, a corporation; Joe A. Lee, individually and in his official capacity as President of Alabama State University; Elton N. Dean, Sr., individually and in his individual capacity as Chairman of the Board of Trustees of Alabama State University, | ) |
| Defendants. | ) |

**BRIEF IN SUPPORT OF MAROUS BROTHERS CONSTRUCTION'S MOTION TO DISMISS**

**COMES NOW** Plaintiff/Counterclaim Defendant Marous Brothers Construction (hereinafter "Marous") appearing by and through counsel, and submits this its Brief in Support of its Motion to Dismiss the Counterclaim against it for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Defendants/Counterclaim Plaintiffs are limited-purpose public figures, and they have failed to sufficiently allege in their Counterclaim that Marous acted with actual malice in the alleged publication of defamatory statements.

**INTRODUCTION**

Defendants/Counterclaim Plaintiffs TCU Consulting Services, LLC, W. Ken Upchurch, III, and Percy Thomas (collectively hereinafter referred to as "Counterclaim Plaintiffs") filed their

EXHIBIT
tabbies
A

Counterclaim against Plaintiffs/Counterclaim Defendants Marous and Gil Berry (hereinafter "Berry") on September 5, 2007. Marous asserts that it is under no obligation to raise all applicable affirmative defenses in this Motion to Dismiss as it does not constitute a responsive pleading for purposes of the federal rules. Chilivis v. S. E. C., 673 F.2d 1205, 1209 (11th Cir. 1982).

## STANDARD OF REVIEW

Dismissal is proper under Fed. R. Civ. P. 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994). As set out in more detail below, it is clear that the Counterclaim Plaintiffs are limited-purpose public figures and that they have not sufficiently alleged in their complaint that Marous acted with actual malice. It is further clear that no relief can be granted under any set of facts that the Counterclaim Plaintiffs can prove. Accordingly, the Counterclaim in this matter should be dismissed for failure to state a claim upon which relief can be granted.

## ARGUMENT

In defamation cases, plaintiffs can be characterized as either: 1) public officials or figures; 2) limited-purpose public figures; or 3) private individuals. Little v. Breland, 93 F.3d 755, 757 (11th Cir. 1996). The court must determine the plaintiff's characterization as a matter of law. White v. Mobile Press Register, Inc., 514 So. 2d 902, 904 (Ala. 1987).

In Silvester v. American Broadcasting Cos., Inc., the United States Court of Appeals for the Eleventh Circuit stated that:

> The test for determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern. If the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability.

839 F.2d 1491, 1493 (11th Cir. 1988).

1. **THE COUNTERCLAIM PLAINTIFFS ARE LIMITED-PURPOSE PUBLIC FIGURES IN THE PUBLIC CONTROVERSY AT ISSUE.**

There are two alternative bases upon which one will be considered to be a public figure to whom the actual malice standard will apply:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). Thus, under Gertz, there are two types of public figures: all-purpose public figures, and limited-purpose public figures. Rebozo v. Washington Post Co., 637 F.2d 375, 378 (5th Cir. 1981).

An otherwise private individual "is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 167 (1979). "[I]t is the plaintiff's role in the controversy, not the controversy itself, that determines whether a person is a limited-purpose public figure with regard to the alleged defamatory statements." Cottrell v. Nat'l Collegiate Athletic Ass'n, Civ. Nos. 1041858, 1050436, and 1050437, 2007 WL 1696564 at *20 (Ala. June 1, 2007). "In general, to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute. From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure." Id. at 25 (quoting Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1083 (3d Cir. 1985)).

In Little, the United States Court of Appeals for the Eleventh Circuit recognized that in Silvester, 839 F.2d 1491 (11th Cir. 1988) the court adopted the three-pronged test from Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C. Cir. 1980) to determine whether a plaintiff in a

defamation action is a limited-purpose public figure in regards to a public controversy. 93 F.3d at 757. The Alabama Supreme Court recognized that "[t]he three-pronged test applied in Little provides a workable means of determining whether a plaintiff in a defamation action is a limited-purpose public figure because of his role in a public controversy . . . ." and adopted the three-pronged test. Cottrell, 2007 WL 1696564 at *20. Under this test, a court determining whether a plaintiff is a limited-purpose public figure must "'(1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation [was] germane to the plaintiff's participation in the controversy.'" Little, 93 F.3d at 757 (quoting Silvester, 839 F.2d at 1494 (in turn citing Waldbaum, 627 F.2d at 1297)).

a. **The controversy surrounding the renovation of dormitories at Alabama State University is a public controversy.**

Speaking to the first prong of the three-prong test, "isolating the public controversy," the Waldbaum Court stated:

> As the first step in its inquiry, the court must isolate the public controversy. A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . . [A] public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants. To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice . . . [The Court] should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

Cottrell, 2007 WL 1696564 at *20 (quoting Waldbaum, 627 F.2d at 1296-98 (footnotes omitted)).

The controversy surrounding the renovation of student residences at Alabama State University (hereinafter "ASU") is clearly a matter of public concern. The Student Residence Project (hereinafter "SRP") was to include the renovation of six student dormitories, and was

designed to provide modern, suite-style living quarters for ASU students. (Doc. 1, pgs. 3-4). As a result of the controversy surrounding the SRP and the resulting delay in the renovation, according to the July 22, 2007 articles in *The Montgomery Advertiser* referenced in the Counterclaim (hereinafter the "July 22nd Articles," attached hereto as Exhibit "A") some ASU students are living off-campus in hotels. Clearly, the ramifications of this dispute are being felt by the students of ASU, who are not direct participants in the controversy. A reasonable person would have expected that the students who were scheduled to live in newly renovated dormitories would have felt the impact of a dispute that resulted in a delay of the opening of those dormitories. Furthermore, the increased cost of the project since the selection of the Counterclaim Plaintiffs to handle the SRP – according to the July 22nd Articles the initial bids were $13 million more than the Marous-Berry budget – will directly impact taxpayers. The housing of students in hotels off-campus has also increased security and transportation costs for ASU. The very newspaper articles cited by the Counterclaim Plaintiffs show that the issue was being debated publicly, and the dispute has unmistakably had substantial ramifications for non-participants, most notably, ASU students and taxpayers. Because the dispute surrounding the SRP is a public controversy, the Counterclaim Plaintiffs meet the first prong of the limited-purpose public figure test.

b. **The Counterclaim Plaintiffs voluntarily injected themselves into the public controversy.**

As to the second prong, the court in Waldbaum stated:

> Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of Gertz is clear that plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution . . . . They must have achieved a 'special prominence' in the debate . . . . The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of the press coverage, and the public reaction to his conduct and statements.

627 F.2d at 1297 (footnotes omitted).

An individual's position or actions can "voluntarily inject" the individual into a public controversy. See., e.g., Oaks v. City of Fairhope, 515 F. Supp. 1004 (S.D. Ala. 1981) (finding that a librarian voluntarily injected herself into a controversy by presenting her case in press); White, 514 So. 2d at 904 (finding the plaintiff to be a public figure because of "his choice of career as a high level executive in an industry that is the subject of much public interest and concern" where his choice of career was "a voluntary decision to place himself in a situation where there was a likelihood of public controversy"); Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F. Supp. 2d 158 (D. Me. 2007) (finding director of judicial affairs at state university to be a limited-purpose public figure in regards to a controversy about the student-disciplinary process at the university). In Greenbelt Co-op. Pub. Ass'n v. Bresler, the court found Bresler's counsel's concession that Bresler was a public figure in the community to be "clearly correct" where he was deeply involved in the future development of the city of Greenbelt, had entered into agreements with the city for zoning variances in the past and was again seeking variances, and was engaged in "negotiations of significant public concern" with school officials and the city council regarding construction of a school. 398 U.S. 6, 8 (1970).

Like Bresler, the Counterclaim Plaintiffs have voluntarily inserted themselves into this public controversy. They are "deeply involved" with the SRP at ASU, and have been since the time of their selection to serve as ASU's Owner's Representatives to act on behalf of ASU President Joe in matters related to the SRP, including but not limited to the review of the proposed Development Agreement provided by Marous and Berry. (Doc. 1, p. 7). Their position as Owner's Representatives also gave the Counterclaim Plaintiffs the opportunity to impact the resolution of the SRP controversy. The Counterclaim Plaintiffs' involvement deepened in September 2006, when

they began providing the very development and construction management services for the SRP that were to have been provided by Marous and Berry. (Id. at 9).

According to the July 22nd Articles, the Counterclaim Plaintiffs' past conduct included overseeing construction of a $75 million jail in Montgomery and managing the Montgomery school district's $300 million construction plan. Their past conduct of soliciting contracts and jobs that involve public funds, as well as the extent of the media coverage of this dispute, help to show that the Counterclaim Plaintiffs have gone beyond a "trivial or tangential participation" in this dispute. Because the Counterclaim Plaintiffs have voluntarily injected themselves into the public controversy surrounding the SRP, they meet the second prong of the limited-purpose public figure test.

c. **The alleged defamation was germane to the Counterclaim Plaintiffs' roles in the public controversy.**

In Cottrell, the court quoted the definition of "germane" from Black's Law Dictionary 708 (8th ed. 2004): "relevant" and "pertinent." Cottrell, 2007 WL 1696564 at *28. The Cottrell Court went on to find that statements made by the NCAA in the penalty-summary report "were germane to the public controversy because a central issue of the public dispute was the nature of the penalties imposed by the NCAA against The University, its employees, and its representatives." Id. The Silvester Court found it to be "self-evident" that the allegedly defamatory statements were "germane to the plaintiffs' participation in the controversy" as "[t]he primary concern" of the statements was the "alleged corruption in the jai alai industry and the plaintiffs' role in it." Silvester, 839 F.2d at 1497.

Similarly, the July 22nd Articles and the allegedly similar statements are germane to the issue of the public controversy surrounding the SRP at ASU. The July 22nd Articles identified in the Counterclaim address budgetary and timing concerns, as well as the fact that ASU students would

be living in hotel rooms off-campus because the SRP had not been completed. Furthermore, the July 22nd Articles outlined both the issues surrounding the Counterclaim Plaintiffs' selection for the SRP and also addressed some of the issues in the instant lawsuit. Because the allegedly defamatory statements in the July 22nd Articles and, any similar statements, are germane to the public controversy surrounding the SRP, the statements meet the third and final prong of the limited-purpose public figure test.

**2. THE COUNTERCLAIM PLAINTIFFS HAVE FAILED TO SUFFICIENTLY ALLEGE IN THEIR COMPLAINT THAT THE ALLEGED DEFAMATION WAS COMMITTED WITH ACTUAL MALICE.**

In New York Times Co. v. Sullivan, the United States Supreme Court held that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that the defendant acted with "actual malice" in publishing the defamatory statement, or "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279-280 (1964). The Sullivan Court further held that in order to prevail, the plaintiff must prove this "actual malice" with "convincing clarity," 376 U.S. 285-286, or through "clear and convincing evidence" Cottrell, 2007 WL 1696564 at *31. A defendant acts with "reckless disregard" if, at the time of the publication, he or she '"entertained serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of . . . [its] probable falsity."' Cottrell, 2007 WL 1696564 at *34 (quoting McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1508 (C.A.D.C. 1996)). "'The actual malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt.'" Cottrell, 2007 WL 1696564 at *34 (quoting McFarlane, 91 F.3d at 1508)).These Sullivan requirements have since been extended to libel suits brought by public figures as well as public officials. See, e.g., Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967).

Multiple courts across the country have applied the "actual malice" or Sullivan standard to non-media libel defendants. For example, in Barnett v. Mobile County Personnel Board the

Alabama Supreme Court applied the "actual malice" standard to a defamation claim by a former town clerk against the county personnel board, its director, and the town's mayor. 536 So. 2d 46, 47, 54 (Ala. 1988). In Woy v. Turner, the court held "that the non-media individual defendant could be accorded the rights provided in Sullivan" and that "[w]hether the standard is in fact applicable depends on whether the plaintiff is a public figure." 533 F. Supp. 102, 104 (N. D. Ga. 1981).

Because the Counterclaim Plaintiffs are limited-purpose public figures, the Sullivan or "actual malice" standard applies to the allegedly defamatory comments. The Counterclaim Plaintiffs fail to sufficiently allege in their Counterclaim any facts upon which to base the requisite "clear and convincing evidence of actual malice" on the part of Berry and Marous. The Counterclaim merely provides conclusory descriptions that the Counterclaim Defendants "falsely and maliciously accused the Counterclaim Plaintiffs" of various actions, without identifying the specific allegedly defamatory statements and without providing any evidence that the alleged publication was made with "actual malice." (Doc. 29, p. 2). Furthermore, there is nothing in either of the July 22nd articles that reflects a quote, letter, or reference to a prior discussion with Berry or Marous that refers to any of the four categories of statements (Id.) that the Counterclaim Plaintiffs allege Berry and Marous "falsely and maliciously" made.

The Counterclaim goes on to state that the Counterclaim Defendants "intentionally, recklessly, maliciously, and/or negligently published" the allegedly defamatory statements. Id. Again, the Counterclaim Plaintiffs make only conclusory allegations with no supporting factual assertions, fail to identify the specific statements contained within the July 22nd Articles which they allege are defamatory, and further fail sufficiently allege in their Counterclaim that Marous "entertained serious doubts as to the truth of their publication" or acted "with a high degree of awareness of the probable falsity" of the statements. Because the Counterclaim Plaintiffs have

failed to sufficiently allege in their Counterclaim that Marous acted with "actual malice" in allegedly publishing defamatory statements, the Counterclaim is due to be dismissed.

## CONCLUSION

Under the three-prong test adopted by the Eleventh Circuit, Counterclaim Plaintiffs TCU Consulting Services, LLC, W. Ken Upchurch, III, and Percy Thomas are properly classified as limited-purpose public figures. As limited-purpose public figures, the Counterclaim Plaintiffs fail to sufficiently allege in their Counterclaim that the allegedly defamatory statements were made with actual malice, and thus their claims must fail. Based on its Motion to Dismiss and this accompanying brief, Marous has demonstrated that the Counterclaim Plaintiffs have failed to state a claim upon which relief can be granted and furthermore can prove no set of facts in support of their claim which would entitle them to relief.

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Counterclaim Defendant Marous Brothers Construction respectfully requests that this Court grant its Motion to Dismiss the Counterclaim in this matter.

RESPECTFULLY SUBMITTED, this the 25th day of September 2007.

**/s/ KATHERINE R. BROWN**
AUGUSTA S. DOWD
STEVEN R. ARNOLD
JULIA S. ROTH
KATHERINE R. BROWN
Attorneys for Plaintiffs
Marous Brothers Construction, Inc. and Gil Berry

OF COUNSEL:
**WHITE ARNOLD ANDREWS & DOWD P.C.**
2025 Third Avenue North, Suite 600
Birmingham, Alabama 35203
Telephone: (205) 323-1888
Facsimile: (205) 323-8907
adowd@waadlaw.com

sarnold@waadlaw.com
jroth@waadlaw.com
kbrown@waadlaw.com

OF COUNSEL:
STANLEY J. MURPHY
Attorney for Plaintiffs
Marous Brothers Construction, Inc. and Gil Berry
**MURPHY & MURPHY LLC**
PO Box 3163
Tuscaloosa, AL 35403-3163
Telephone: (205) 349-1444
Facsimile: (205) 349-1445
murphyandmurphy@bellsouth.net

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on the following counsel of record via U.S. Mail and email on this the 25th day of September 2007.

J. Lister Hubbard
R. Brooke Lawson, III
Capell & Howard, P.C.
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama 36102-2069
jlh@chlaw.com
rbl@chlaw.com

Kenneth L. Thomas
Christopher K. Whitehead
Ramadanah M. Salaam-Jones
Thomas, Means, Gillis, & Seay, P.C.
Post Drawer 5058
3121 Zelda Court
Montgomery, Alabama 36103-5058
klthomas@tmgslaw.com
ckwhitehead@tmgslaw.com
rsjones@tmgslaw.com

**/s/ KATHERINE R. BROWN**
OF COUNSEL



General Contractor

Design/Build

Special Projects Group

Construction Manager

Site Contractor

Concrete Contractor

Carpenter Contractor

Interior Finishes Contractor

702 Joseph Lloyd Parkway

Willoughby, OH 44094

440.951.3904

fax 440.951.3781

www.marousbrothers.com

September 27, 2006

Gil Berry, Gil Berry and Associates
Richard Davis, Student Suites
721 Acorn Lane
Jefferson Hills, PA 15025
(Sent via e-mail)

**Re: ALABAMA STATE UNIVERSITY DORM RENOVATIONS**

Dear Gil:

Now that we have had a little time to reflect upon last Friday's unfortunate and disappointing decision rendered by Dr. Lee and the Board, and based upon several lengthy conversations that Chip Marous and I have had about the chain of events, we would like to share with you our company position. As far as we are concerned, you may share this letter with Alabama State Commissioner Malcolm Thomas, because we have found him to be a man of high integrity who is entrusted with preserving and improving the academic and social standards for Alabama Institutions of higher learning. I am quite certain that he will be appalled by the treatment that we have received from Alabama State University when he reviews the material facts surrounding this unfortunate turn of events.

It has now been over fifteen months since Chip Marous and I met with the Board of ASU and did a presentation about how our project team will work toward finding viable solutions to ASU's student housing challenges. Since that time, we prepared sets of design documents, written narrative scope of work summaries, cost estimates, conducted numerous site visits, video-surveyed and field measured each of the six buildings, and expended an enormous amount of time and financial resources to create a project that will serve both the programmatic and budgetary needs and constraints of ASU. In fact, our work product was used to secure the financing necessary to complete the project. We proceeded with this work after the Board passed a resolution naming you and Student Suites as the Developer for the project. We continued to develop our work product so that the renovation costs could be determined to help structure the size of the bond deal required to fund the work. We provided ASU with the same high level of professional preconstruction services for which we have earned national recognition. We remain unpaid for our pre-construction services, even though we submitted invoices as far back as May 23, 2006.



I spent many hours on the phone with Mr. Upchurch, ASU's designated Owner's Representative, including time spent during the Labor Day weekend to address concerns, recast the development cost structure, and review other pertinent deal issues. Mr. Upchurch assured me that he was "entirely comfortable" with the information we provided. We also exchanged numerous e-mails with attachments documenting our discussions. Now I can't help but wonder about whether or not President Lee and/or the Board members were shown the information that MBC generated. If the information was accurately portrayed, then we cannot fathom how Dr. Lee and the Board reached the decision they made last Friday. If the information was not properly represented exactly as MBC prepared it, then there is a whole different problem concerning ethics that needs to be, and will be addressed by us in short order.

Gil, I am sure that you know Marous Brothers Construction to be as good a company to which our reputation speaks; we operate ethically and fairly with each and every one of our many, many clients. I'm also quite certain that you know that the Better Business Bureau presented our company with the International Torch Award for Ethical Business practices in 2004. We are the first and only general contractor to ever receive such an international award. So, as you might surmise, we are particularly disappointed, discouraged and disgusted by the events of last week at ASU. The University should know that we are wonderful business allies; they also might want to consider that we are formidable adversaries, and since we know that we have acted with honor and integrity, we are fully prepared to fight for not only our Preconstruction Fees, but also for our lost opportunity costs, represented by our CM Fee of $1,545,000.00, since we could have been pursuing other work in lieu of focusing on the ASU renovations work. The longer this issue remains unresolved by ASU, the more likely we are to pursue our lost opportunity costs and other damages. We simply will not ignore this matter because it has become more than a matter of money; rather, we stand on the principle that we performed our services with a high degree of expertise, and we are quite certain that until we are compensated, ASU has received unjust enrichment.

Since Dr. Lee apparently (and wrongly) thinks that the fees on this deal were about $7M, I would like to share with you an excerpt from my memo sent to both you and Mr. Upchurch two weeks ago to clarify the fees issue:

**"I am writing this memo to you to provide additional information regarding the development costs and fees associated with the dormitory renovations project as summarized below:**



a) The overall project cost represents a price of about $87.00/sf, which is extremely competitive in today's marketplace.
b) The Developer's fee of $1,900,000.00 computes to about 7.77%, which is midrange for renovation projects of this complexity whereby the Developer holds the risk for completing the project within the stipulated budget. It has been our experience that the Developer's fee for these types of projects ranges from 5% to 15%. Since you agreed to reduce your Developer's Fee by $500,000.00 to $1,900,000.00, we have moved the $500,000.00 to the construction contingency to provide additional risk management for both you and ASU.
c) The Architectural Design, Engineering and Preconstruction Services fees total $1,455,000.00 which is well within the range for renovation projects of this size and scope. The hard construction cost plus contingency is about $16,100,000.00, making the A&E/Preconstruction Services fees about 9%, which is a fair and proper price structure for this work, since the A&E fees for this type of work will generally range from 7% to 10% before the Preconstruction Services fees are added.
Also, please remember that these fees do not represent profit; there is considerable expenses for wages, management, general and administrative overhead, supplies, and reprographics that must be covered by these fees.
d) The Construction Management Fee has been calculated at 6.32% of the total hard construction cost plus contingency, which is again within the range of 5% to 12% for complex renovation work of this nature.
e) The General Conditions and Reimbursables expenses are not profit; these items, including supervision, project management, coordination, scheduling, travel, etc will be billed on a monthly basis, and ASU is only responsible to pay for these items as the costs are incurred. In fact, if we do not incur the full value of expenses as scheduled, then ASU realizes the savings that the University is free to use for additional scope in the project.

The summary of Development costs is as follow:

| | | |
|---|---|---|
| 1) Hard Construction Cost | $15,550,000.00 | (incl. year 3) |
| 2) Construction Contingency | $ 1,365,000.00 | (incl $600k reduced dev fee) |
| 3) A&E and Preconstruction | $ 1,255,000.00 | |
| 4) FF&E | $ 1,400,000.00 | |
| 5) CM General Cond'ns | $ 1,445,945.00 | |
| SUBTOTAL CONSTRUCTION | $21,015,945.00 | (85.92% OF TOTAL) |
| 6) CMa Fee | $ 1,545,000.00 | (6.32% OF TOTAL) |
| 7) Developer's Fee | $ 1,900,000.00 | (7.77% OF TOTAL) |



> **As you can see, fees account for only 14% of the total project budget, which falls below the typical 20% range for projects of this type and complexity. So that everyone is clear, between the Developer give-back of $600,000.00 in fee reduction and Marous Brothers Construction CMa Fee give-back of $455,000.00, ASU has achieved over One Million Dollars in fee reductions prior to the start of this project. I hope and trust that this additional explanation will assist your efforts in getting final approval for the project to move forward. "**

Clearly, the fees on the project are nowhere near the $7M as previously and erroneously described.

The University needs to be aware of the laws in Alabama that have been enacted to protect architects registered in the State. In Alabama, until an architect has been paid in full for his or her services, a project cannot proceed with a different architect. So, not only is ASU unauthorized and unable to use our work product from this point forward without our express written consent, even if they choose to box up our work and send it back to us, they nonetheless are obligated to pay us. The simple material fact remains that our work was used to help them secure the financing for the project, and we expect and demand full payment.

One last point that we want to mention is the absurd request for us to bond the project. Certainly Attorney Thomas must have some grasp of Alabama State Law; he of all people should know that our involvement as the CMa meant that ASU would be holding all of the trade contracts. In fact, our engagement was under a professional services contract to be paid by ASU through you as the Developer. Any arrangement that made us the CM At-Risk, Design/Builder, or General Contractor would have been in direct violation of Alabama State Bid Laws because in those roles we would have to be selected through a competitive bid process. Therefore, since our role as CMa precludes us from holding any trade contracts, we cannot bond anything but our fees and reimbursables. Any other arrangement would mean that ASU, the Developer (you), and the CM (us) would have broken the law. Their request at the last minute for us to bond is utterly inappropriate and was asking us to break the law.

Gil, I think that you know by now how upset Marous Brothers Construction is about our treatment by the Board and President of Alabama State University; we have been gearing up for the start of construction on this project, and have been misled and induced by the numerous correspondences and requests for additional information we received from ASU and their Owner's Representative to keep working on the project. At our very first presentation, we informed everyone present that Phase I and Phase II environmental investigations should be conducted to determine the extent of asbestos abatement required prior to the start of any renovation work. Any intimation made by ASU that we should have included the costs for abatement in the total development cost is ludicrous, since we have no way of quantifying the dollars involved. However, the asbestos issue



is just another example of how ASU has blamed the development team for ASU's own lack of initiative and responsiveness. We are only willing to wait a short time for resolution to our unpaid invoices. We remain steadfast that our position in this matter is one based on integrity and steeped in principle. While our patience has been long in working toward a successful outcome for ASU on the dormitory renovations project, our tolerance has been tested to the limit, and we will use each and every avenue for remedy at our disposal.

Please keep in close communication with us, since we are preparing for our next courses for action to get resolution to this unfortunate problem.

Sincerely,

Arne F. Goldman, AIA, NCARB
Director of Business Development

cc: Adelbert Marous Jr., President
Glenn Scherba, General Manager

**From:** Arne Goldman
**To:** Gil Berry
**Date:** Friday, September 29, 2006 6:56:47 AM
**Subject:** ASU Letter

Gil...this is for your eyes only...hold onto it until we see where this thing is going...Arne

Arne F. Goldman, AIA, NCARB
Director of Business Development
Marous Brothers Construction, Inc.
440.951.3904 phone
440.942.7884 fax
216.570.7584 mobile

**Confidentiality Notice**

This electronic message is intended to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential and thereby exempt and protected from unauthorized disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is not authorized and is strictly prohibited. If you have received this communication in error, please notify the sender immediately and permanently delete the original message from your e-mail system.

EXHIBIT
tabbies
C

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAROUS BROTHERS )
CONSTRUCTION, LLC, a )
corporation, and GIL )
BERRY, an individual )
d/b/a Gil Berry & )
Associates, ) CIVIL ACTION NO.
Plaintiffs, ) 2:07-CV-384-ID
-vs- )
ALABAMA STATE UNIVERSITY,)
a public corporation, )
et al., )
Defendants. )

STIPULATIONS

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

JOSHUA P. MOON,

may be taken before Belinda S. Brewster, Commissioner and Notary Public for the State of Alabama at Large, on the 26th day of

February 2008, commencing at approximately 8:40 a.m., at the law offices of Rushton, Stakely, Johnston & Garrett, P.A., 184 Commerce Street, Montgomery, Alabama; said deposition taken pursuant to the Federal Rules of Civil Procedure.

IT IS STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Belinda S. Brewster, am hereby delivering to R. Brooke Lawson the original transcript of the oral testimony of Joshua P. Moon taken on the 26th day of February, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter,

nor filed with the Court.

APPEARANCES

CHAMP LYONS, III, Attorney-at-Law, of the law firm of KING, HORSLEY & LYONS, LLC, 1 Metroplex Drive, Suite 280, Birmingham, Alabama 35209; appearing as counsel for the Plaintiff Gil Berry & Associates.

D. CRAIG ALLRED, Attorney-at-Law, of the law firm of DAVID E. ALLRED, P.C., 7030 Fain Park Drive, Suite 9, Montgomery, Alabama 36117; appearing as counsel for the Plaintiff Marous Brothers Construction, LLC (counterclaim).

KENNETH L. THOMAS and RAMADANAH M. JONES, Attorneys-at-Law, of the law firm of THOMAS, MEANS, GILLIS & SEAY, P.C., 3121 Zelda Court, Montgomery, Alabama 36103; appearing as counsel for the Defendant Alabama State University.

lawsuit he was telling you that they had --
A. Yeah. I knew --
Q. -- provided kickbacks?
A. Because when he filed the lawsuit, I knew that -- about the car story, with Elton Dean and the car.
Q. And so sometime before the suit was filed he had already told you that TCU had provided illegal kickbacks to ASU officials?
A. Yes.
Q. In that same paragraph in Exhibit No. 6 you state that Marous Brothers claims in a letter forwarded to Governor Bob Riley's office that Upchurch lied repeatedly to get Marous Brothers and Berry removed from the job.
Have you ever seen such a letter, or is that something that Gil Berry told you?
A. No. I saw the letter, yes.
Q. What letter was that?
I'll show you, Mr. Moon, what I believe to be the remainder of the documents that you-all provided to us. Can you tell me

which letter -- and there is a letter, the second document in that stack, a September 27 letter.
A. Yes, this is the letter here.
Q. Okay. Let me mark that.
(Whereupon, said document was marked for identification as Defendant's Exhibit No. 7 to the deposition of Joshua P. Moon.)
Q. This is Defendant's Exhibit No. 7. This is a letter dated September 27, 2006, from Marous Brothers and Arne Goldman to Gil Berry, correct?
A. Yes.
Q. Now, it's your testimony that that document was provided by Marous to Governor Riley's office?
A. From what I -- okay, yeah. It was -- I'm not sure who provided it to them, but it was sent to Malcolm Thomas at Governor Riley's office.
Q. How do you know that?
A. After getting the letter, I also

went -- in the phone conversation with -- that I had with Malcolm, a brief conversation I had with Malcolm Thomas, I asked him if he had received the letter. And he said that he had -- yes, he had received the letter.
Q. How did you get that letter?
A. Gil Berry.
Q. Now, Marous Brothers during their deposition testified under oath that they never provided any letters to Governor Bob Riley's office.
A. Okay.
Q. Now, have you ever seen any sort of forwarding cover letter or a transmittal letter or anything that would indicate that that letter was sent by Marous to Governor Riley's office, and specifically Malcolm Thomas?
A. No, I have not.
Q. Malcolm Thomas just told you he had received that letter?
A. Well, from what I recall, my question to Malcolm Thomas was had you

received a -- did you receive a letter in which they, I want to say, complained about -- I'm not sure exactly how I phrased it, but -- you know, I don't -- yeah. It's not --
I did not go into great detail, but he said he had received the letter, yes.
Q. You don't know how he received it, just that he had it?
A. Right. No, I don't. I have no idea.
Q. In that next paragraph, when you -- dated September 27th, 2006, you state that in that letter Marous claims Ken Upchurch intentionally misrepresented how much the job would cost.
Where in that letter does he say that?
A. Wait a minute. Where --
Q. I'm sorry. On Exhibit 6, which is that second newspaper article, in the paragraph that says dated September 27th, 2006. You write that Marous states that Ken Upchurch intentionally misrepresented how much

the job would cost.
And I'm just curious where in that letter it says that.
A. This paragraph here where --
Q. Which paragraph are you referring to?
A. The top paragraph on the letter says Mr. Upchurch assured me that he was entirely comfortable with the information. We exchanged numerous E-mails. Now I can't help but wonder about whether or not President Lee and/or the Board members were shown the information that MBC generated. If the information was accurately portrayed, then we cannot fathom how Dr. Lee and the Board reached the decision they made last Friday.
Q. Okay. So, Mr. Goldman says if the information was accurately portrayed.
A. Uh-huh (affirmative).
Q. And then in the next sentence he says if the information was not properly represented, then there is a whole different problem; is that right?

A. Yes.
Q. How did you take from that paragraph that Marous had said Upchurch did, in fact, intentionally misrepresent how much the job would cost?
A. Well, I would assume that in speaking with Mr. Berry we also got that, but...
Q. Okay. So, that would be something -- and I'm not arguing with you, but I don't see in that paragraph that you just cited me to where Marous has said that Ken Upchurch intentionally misrepresented how much the job would cost.
So, is that something that Gil Berry told you?
A. Oh, yeah. I mean, that's something he told me, yeah, several times. But I mean, it still doesn't change the fact we shouldn't have attributed it that way, or that I should not have attributed it that way.
Q. So, in looking back at the September 27 letter that you were told was

sent to Governor Riley's office, it appears that the statement in the July 22nd article which says that Marous Brothers' Arne Goldman states that Ken Upchurch intentionally misrepresented how much the job would cost is not an accurate --
A. Right.
Q. -- summary of his letter?
A. Instead of state it should have been insinuated, is what we should have used there.
Q. Okay. I understand you need to get moving. So, I just want to real quickly look at a couple of things and have you tell me what they are.
(Whereupon, said document was marked for identification as Defendant's Exhibit No. 8 to the deposition of Joshua P. MOon.)
Let me show you what we've marked as Defendant's Exhibit No. 8. Can you tell me -- you may not know what the first page is, but the following pages, can you tell me what

those are.
A. They seem to be the media inquiry pages from ASU.
Q. Now, is this something that ASU drafted or you drafted?
A. It would be something that ASU drafted. That's not something I drafted.
Q. So, if we look at the second to the last page of that exhibit, it states reporter's name, Josh Moon, on the media inquiry cover page.
A. Uh-huh (affirmative).
Q. And there are questions. For instance, number one says ASU obtained funds for the ongoing dorm project. What was the total amount -- dollars and cents -- in the budget at the very beginning?
Is that a question that you posed to ASU? Is that your question?
A. Yeah, I guess so.
Q. There are several other questions asked of ASU, and then there are answers provided. So, are these questions that you

Q. Okay. Without being word-for-word, have you paraphrased or summarized the content of the conversation?
A. Summarized, yeah, I would -- yeah.
Q. I mean, there's no other -- there's no other topics y'all discussed that you haven't already told us about?
A. We talked about -- I mean, no. That was -- yeah, you know, that was extent of the -- I guess. As far as I can remember, that is all that we -- that was discussed there.
MR. LYONS: All right. Those are all the questions I have. Thank you, sir.
THE WITNESS: Uh-huh (affirmative).
EXAMINATION BY MR. ALLRED:
Q. Mr. Moon, I'm Craig Allred. I'm here for Marous Brothers Construction, and we represent Marous on the counterclaim for defamation filed by the TCU defendants.
A. Uh-huh (affirmative).

Q. And I've been listening to your testimony here today. Would it be safe to say that the statements that were printed in these newspaper articles, they're attributable only to Gil Berry, aren't they?
None of these statements were actually made by Marous?
A. No.
Q. Okay. And these are all based on your conversations with Gil Berry over these numerous meetings that you have had with him?
A. Yes.
Q. Okay. And these statements that are made in here -- and I think you made the statement earlier in this July 22nd, '07 article, the last -- well, the fourth from the last paragraph where you're talking about the letter was forwarded from Marous Brothers, a letter by Arne Goldman was forwarded to Bob Riley's office.
It's not correct that that was sent by Marous to the governor; is that right?
A. Right. And from what it says in

there, it says feel free to forward this to -- let me make sure that I'm --
Q. All right. Let's stick with the story here because this is -- we've been sued because of what's printed in here. So, let's stick with this.
The way this is worded it looks like it was sent from Marous Brothers to the governor's office. Would you agree with that, that's the way the story reads?
A. Let me find that. Which one is that?
Q. This is the July 22, '07, TCU Consulting Services locally owned.
A. Okay. I'm looking at the wrong one.
Q. This would be fourth from the last paragraph. Well, actually fifth.
A. No, I don't -- that's not what it says. It doesn't say that Marous Brothers forwarded the letter. It says in a letter that was forwarded to Governor Bob Riley's office. It doesn't say that Marous forwarded

the letter.
Q. But in here you write that it's written by ARne Goldman. Is there another reading that you would offer as to what this paragraph says other than it was written by Arne Goldman and forwarded to the governor's office?
Is there some other reasonable reading of that paragraph that I'm just missing?
MR. BAILEY: Object to the form. Answer as best you can as to what he's thinking.
Q. (By Mr. Allred) Well, how else should it be read in your opinion?
A. That Arne Goldman wrote the letter, and then it was then at some point forwarded to the governor's office. I think that would be correct.
Q. Okay. Do you think somebody just reading this story would think that it was forwarded from Marous Brothers to the governor's office?

A. No, I don't -- I don't think that would necessarily be what someone would conclude. I think that -- if it was forwarded by Marous Brothers, I think that it would be easy enough to say that.
Q. Okay. Well, let me ask you this. Did you put any information in here about how this letter got to the governor's office?
A. No.
Q. And you'll agree with me the letter is from Marous Brothers to Gil Berry, right?
A. Yes.
Q. So, it's not to the governor?
A. No.
Q. And you didn't include in here how it got from Marous Brothers to the governor?
A. No, but --
Q. Okay. And in that letter --
MR. BAILEY: What did you want to add?
THE WITNESS: It just says in the

very first paragraph you may share this letter with Alabama State Commissioner Malcolm Thomas.
Q. (By Mr. Allred) I'm sorry?
A. In the very first paragraph of the letter it says you may share this with Alabama State Commissioner Malcolm Thomas so.
Q. Okay. In that letter does it say anywhere that ASU intentionally misrepresented how much the job would cost, those statements?
A. No. As we covered, no.
Q. Okay. And I think you made the statement earlier that those statements are not attributable to Marous, correct, did you make --
A. Which --
Q. -- that statement earlier?
A. -- statements?
Q. The ones that I just read, intentionally misrepresented how much the job would cost, that top paragraph there.
A. Right. As I said before, what should have been -- what should have been said

is Arne Goldman insinuates Upchurch intentionally misrepresented how much the job would cost.
Q. Okay. But, again, that was just in a letter from Marous to Gil Berry?
A. Yes.
Q. Okay. And you say you have spoken with somebody from Marous Brothers before?
A. Yes.
Q. Okay. And you can't tell us who that is?
A. No.
Q. But, there again, none of the statements that are written in these articles come from any information from Marous Brothers; is that right?
A. Right.
MR. ALLRED: Thank you, sir.
EXAMINATION BY MR. THOMAS:
Q. Josh, I'm advised that you have to leave at 11:40.
A. Yes, sir.

Q. So, if you don't mind, queue me when you get to that point. And if we don't complete it, I'll seek through your attorney another opportunity to complete my examination.
A. That will be fine.
Q. My name is Kenneth Thomas, and in this lawsuit I represent Alabama State University, President Joe Lee, Chairman Elton Dean. I think those are the named defendants.
If I may, let me just follow-up on a few things that were asked of you earlier.
Your educational background, you have as Master's degree in what?
A. No, no, no. I'm sorry. I have a mass communications degree.
Q. Okay. So, that's just at a Bachelor's level?
A. Yes.
Q. And what have been some of your work experience other than The Advertiser in journalism?

FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAROUS BROTHERS )
CONSTRUCTION, LLC, a )
corporation, and GIL )
BERRY, an individual )
d/b/a Gil Berry & )
Associates, ) CIVIL ACTION NO.
Plaintiffs, ) 2:07-CV-384-ID
-vs- )
ALABAMA STATE UNIVERSITY,)
a public corporation, )
et al., )
Defendants. )

VOLUME II

DEPOSITION OF GILBERT C. BERRY

STIPULATIONS

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

GILBERT C. BERRY,

may be taken before Belinda S. Brewster, Commissioner and Notary Public for the State of Alabama at Large, on the 25th day of January, 2008, commencing at approximately 9:00 a.m., at the law offices of Capell & Howard, P.C., 150 South Perry Street, Montgomery, Alabama; said deposition taken pursuant to the Federal Rules of Civil Procedure.

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the reading of and signature to the deposition by the witness is waived, said deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS STIPULATED AND AGREED that

it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Belinda S. Brewster, am hereby delivering to Kenneth L. Thomas the original transcript of the oral testimony of Gilbert C. Berry taken on the 25th day of January, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

APPEARANCES

CHAMP LYONS, III, Attorney-at-Law, of the law firm of KING, HORSLEY & LYONS, LLC, 1 Metroplex Drive, Suite 280, Birmingham, Alabama 35209; appearing as counsel for the Plaintiff Gil Berry & Associates.

D. CRAIG ALLRED, Attorney-at-Law, of the law firm of DAVID E. ALLRED, P.C., 7030 Fain Park Drive, Suite 9, Montgomery, Alabama 36117; appearing as counsel for the Plaintiff Marous Brothers Construction, LLC (counterclaim).

KENNETH L. THOMAS and RAMADANAH M. SALAAM-JONES, Attorneys-at-Law, of the law firm of THOMAS, MEANS, GILLIS & SEAY, P.C., 3121 Zelda Court, Montgomery, Alabama 36103; appearing as counsel for the Defendant Alabama State University.

to ask you real quick. And I'll try to be brief.

On your exhibit here -- and I'll just come around here real quick. I just want to make it very clear.

On this project you had reduced your developer's fee to $1.9 million, right?

A. Yes, sir.

Q. And you also were going to get a referral fee from the Marous Brothers estimated almost at $374,000, right?

A. I think that's the number that was used.

Q. And you also were seeking from the University expenses totaling almost $196,000?

A. That is correct.

Q. So, if this deal had gone through, you would have gotten $2.4 million, you?

A. I mean, if you add the figures up or --

Q. Yeah.

A. Yeah, somewhere in that neighborhood.

Q. Okay.

A. I don't have a calculator, but I -- yeah, I believe what you're saying.

Q. And you had discussed with ASU officials that in addition to your developer's fee, you were going to get a referral fee and your expenses reimbursed to you, right?

A. I don't -- I didn't understand that question.

Q. You had discussed with the ASU officials, Dean, Lee, Wiggins and Buford Crutcher, that in addition to your developer's fee of $1.9 million, you would also be seeking a referral fee from the Marous Brothers, right?

A. No, I never -- I never talked to them about that.

Q. And you also told them that you would be seeking reimbursement of all of your expenses, too?

A. That is true.

Q. Since you don't do E-mails --

A. Yes.

Q. -- who would send the E-mails to Judge Wiggins?

A. That was Johnette Anderson.

Q. She would do them?

A. She would do them. Johnette would send them to Buford. Any correspondence that ever went out of my office Johnette did it. Even any correspondence to Dick Davis, Johnette did it. Any correspondence to Marous Brothers, Johnette did it.

And they all knew. It was a little joke with Dick and everybody that Gil doesn't -- I'm not computer literate.

Q. And how do you pronounce the name, Johnette?

A. Johnette.

Q. Johnette. And if some for reason she failed to send an E-mail, you would never know, would you?

A. You're right. I'm at her mercy. You got it.

MR. THOMAS: I have no further questions.

EXAMINATION BY MR. ALLRED:

Q. Mr. Berry, I've got just a couple of questions. I represent Marous Brothers on the counterclaim only filed by TCU against yourself and Marous Brothers. I think you understand that.

You're not an employee of Marous Brothers, are you?

A. No.

Q. Not an agent?

A. No.

Q. And these statements that you allegedly made to Josh Moon, those weren't made under any direction by anybody from Marous Brothers, were they?

A. That is correct.

Q. In other words, they didn't have anything to do with that. They didn't tell you to make those statements?

A. No. I don't even think they knew that I made the statements.

FREEDOM COURT REPORTING

773

Q. Okay. And it wasn't based on any information that you got from anybody at Marous Brothers, right?
A. That is totally correct.
Q. Okay. Now, the work that you did on this project, you were working in furtherance of Gil Berry & Associates and not Marous Brothers, right?
A. That is so correct.
MR. ALLRED: Okay. Thank you, sir.
MR. LAWSON: All right.
FURTHER DEPONENT SAITH NOT

774

CERTIFICATE

STATE OF ALABAMA
JEFFERSON COUNTY

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to typewriting under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor kin to the parties to the action, nor am I in any way interested in the result of said cause.

Given under my hand and seal this the 14th day of February, 2008.

Belinda S. Brewster, RPR
Alabama License #335

My Commission Expires:
September 1, 2009

# FREEDOM COURT REPORTING

1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MAROUS BROTHERS )
)
CONSTRUCTION, LLC, a )
)
corporation, and GIL )
)
BERRY, an individual )
)
d/b/a GIL BERRY & )
)
ASSOCIATES, ) CIVIL ACTION NO.
)
Plaintiffs, ) 2:07-CV-384-ID-CSC
)
-vs- )
)
ALABAMA STATE UNIVERSITY,)
)
a public corporation, )
)
et al., )
)
Defendants. )

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

ARNE F. GOLDMAN,

may be taken before Belinda S. Brewster, Commissioner and Notary Public for the State of Alabama at Large, on the 20th day of

2

February, 2008, commencing at approximately 10:25 a.m., at the law offices of Capell & Howard, P.C., 150 South Perry Street, Montgomery, Alabama; said deposition taken pursuant to the Federal Rules of Civil Procedure.

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the reading of and signature to the deposition by the witness is waived, said deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

In accordance with Rule 5(d) of

3

The Alabama Rules of Civil Procedure, as amended, effective May 15, 1988, I, Belinda S. Brewster, am hereby delivering to Kenneth L. Thomas the original transcript of the oral testimony of Arne F. Goldman taken on the 20th day of February, 2008, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

4

A P P E A R A N C E S

CHAMP LYONS, III, Attorney-at-Law, of the law firm of KING, HORSLEY & LYONS, LLC, 1 Metroplex Drive, Suite 280, Birmingham, Alabama 35209; appearing as counsel for the Plaintiff Gil Berry & Associates.

D. CRAIG ALLRED, Attorney-at-Law, of the law firm of DAVID E. ALLRED, P.C., 7030 Fain Park Drive, Suite 9, Montgomery, Alabama 36117; appearing as counsel for the Plaintiff Marous Brothers Construction, LLC (counterclaim).

KENNETH L. THOMAS and RAMADANAH M. JONES, Attorneys-at-Law, of the law firm of THOMAS, MEANS, GILLIS & SEAY, P.C., 3121 Zelda Court, Montgomery, Alabama 36103; appearing as counsel for the Defendant Alabama State University.

Q. And you didn't object to Mr. Berry's E-mails?
A. No. Once I received that assurance from Mr. Upchurch, I had no objection?
Q. So --
A. I'm listening. I apologize. Go ahead.
Q. No. I'm pausing not for you but because I'm thinking.
A. Smelled wood burning.
Q. So, there's no evidence then that at the time Mr. Upchurch allegedly made that statement to you he did not intend to fulfill that promise; is that correct?
A. I have no evidence one way or the other.
MR. LAWSON: Okay. That's all I have.
EXAMINATION BY MR. ALLRED:
Q. Mr. Goldman, one of the purposes of the TCU defendants taking your deposition today was to find out what the relationship is

between you and Gil Berry or Marous and Gil Berry.
Is it safe to say that Gil Berry is not an agent of Marous Brothers?
A. He is not an agent of Marous Brothers.
Q. And the inverse would be true as well, correct?
A. We are not an agent of Gil Berry.
Q. Okay. You're not his agent, and he's not your agent?
A. Correct.
Q. And you haven't authorized him to do anything on your behalf; is that right?
A. Not without our consent.
Q. Okay. Specifically, have you ever authorized him to speak to the media on behalf of Marous Brothers?
A. Never.
Q. Okay. And in this case, did you do that?
A. We never gave him any consent to speak on our behalf to anybody.

Q. Okay. In the dealings that you've had with Gil Berry, and specifically with this job -- I know y'all have worked on some other jobs or he's done some work with you in the past.
But specifically on this job, did you tell him how to do any of the work that he was hired to do? Did you direct him in any way?
A. We didn't direct him. We offered advice if he asked questions.
Q. Okay. But you didn't tell him specifically we want you to do this and do it this way?
A. No.
Q. Okay. So, that was up to him as to how he did his job?
A. He was a developer. We were, you know, called a design/builder first and construction manager later.
Q. Okay. Can you think of -- regarding the statements that were made or allegedly made by Mr. Berry, can you think of

any way that would have benefited Marous?
A. I can think of no way.
Q. Okay. Before reading that newspaper article, were you aware that the statements were made allegedly?
A. I heard from our attorney -- our attorneys at the time. I heard from Steve Arnold, you know, a phone call to me, have you seen The Montgomery Advertiser.
I said, well, I'm in Cleveland. So, I haven't seen The Montgomery Advertiser. And he goes I need to send --
MR. LYONS: Don't talk about your conversation with your lawyers.
THE WITNESS: Okay. The answer is our attorney alerted us to the article.
Q. (By Mr. Allred) But before then you had never heard that any of these statements had been made?
A. No.
MR. ALLRED: Okay. Thank you, sir.
#####