**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| MAROUS BROTHERS CONSTRUCTION, L.L.C., a corporation, and GIL BERRY, an individual and d/b/a GIL BERRY & ASSOCIATES, )))))) | |
| Plaintiffs, )) | |
| ALABAMA STATE UNIVERSITY, a public corporation; W. KEN UPCHURCH III, an individual; PERCY THOMAS, an individual; TCU CONSULTING SERVICES, L.L.C., a corporation; JOE A. LEE, individually and in his official capacity as President of Alabama State University; ELTON N. DEAN, SR., individually and in his officialcapacity as Chairman of the Board of Trustees of Alabama State University, ))))))))))))) | Case No. 2:07-CV-00384-ID-CSC |
| Defendants. )) | |

**DEFENDANTS' BRIEF IN SUPPORT OF RENEWED MOTION FOR**
**SUMMARY JUDGMENT AS TO PLAINTIFF GIL BERRY'S**
**COMPLAINT AND IN SUPPORT OF MOTION FOR FEES AND COSTS**

Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas (collectively the "TCU Defendants" unless otherwise noted) submit the following brief in support of their renewed motion for summary judgment on all claims asserted against them by Plaintiff Gil Berry ("Berry") in his First Amended Complaint (hereinafter the "Complaint) and in support of their motion for fees and costs, filed contemporaneously herewith.

## I. STATEMENT OF UNDISPUTED FACTS

1.    In 2005, defendant Alabama State University ("ASU") decided to study the possibility of renovating six of its student housing buildings. (Complaint, Doc. # 59, ¶ 11).

Plaintiff Gil Berry ("Berry"), working with Student Suites, Inc. entered into discussions with ASU about the renovation project. (*Id.* at ¶ 12).

2.      Berry hired plaintiff Marous Brothers Construction to assist him in the preparation of a formal proposal for the project. (Complaint, Doc. # 59, ¶ 14).   On or about September 20, 2005, Berry and Marous submitted their initial proposal to ASU. (Exhibit "A", Deposition of Gil Berry p. 156, lines 16-23; p. 157, lines 1-7; p. 158, lines 8-13).

3.      From the period December 2005 until May 15, 2006, Marous performed a number of preconstruction services for Berry on the ASU project. (Exhibit "B", Deposition of Arne Goldman, Marous' corporate representative, p. 199, lines 16-23; p. 200, lines 1-3).   On May 15, 2006, Berry and Marous submitted to ASU their Scope of Work for the project, which detailed the proposed renovations, including pricing and layout.  (Ex. B, p. 204, lines 13-23; p. 205, lines 1-6; p. 206, lines 6-11).

4.      On or about July 28, 2006, defendant TCU Consulting Services, LLC was retained by ASU to serve as the owner's representative. (Complaint, Doc. # 59, ¶ 26).

5.      On or about September 22, 2006, the ASU Board of Trustees elected not to accept the proposal submitted by Berry and Marous for the dorm renovation project. (Exhibit "C", letter from ASU to Berry).

## II.      ARGUMENT

In determining the propriety of summary judgment, the court must test the elements of each cause of action against the materials before it to determine whether genuine issues of material fact exist.  In the instant case, Berry asserts six claims against the TCU Defendants: Quantum Meruit (Count Two); Fraudulent Misrepresentation (Count Three); Tortious Interference with Business Relations (Count Five); Conversion (Count Six); Conspiracy (Count

Seven); and Loss of Business Opportunity (Count Eight). As established herein, the TCU Defendants are entitled to summary judgment as a matter of law on all claims asserted against them by Plaintiff Berry.

**A.    COUNT TWO (QUANTUM MERUIT): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S QUANTUM MERUIT CLAIM BECAUSE BERRY VOLUNTARILY RELINQUISHED SUCH CLAIM IN HIS DEPOSITION.**

During his deposition, Berry and his counsel of record voluntarily relinquished his claim for quantum meruit against the TCU Defendants. (Ex. A, p. 580, lines 18-23; p. 581, lines 1-7). Accordingly, the TCU Defendants are entitled to summary judgment as a matter of law as to Count Two of Berry's Complaint.

**B.    COUNT THREE (FRAUDULENT MISREPRESENTATION): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S FRAUDULENT MISREPRESENTATION CLAIM.**

The crux of Berry's claim for fraudulent misrepresentation is that the TCU Defendants represented "that they believed that the Plaintiffs' proposal was the best and most fair proposal and that ASU should move forward with the Plaintiffs' proposal immediately." (Complaint, Doc. # 59, ¶ 55).[1]

In order to survive a summary judgment on his fraud claim, Berry must present substantial evidence indicating that there is a genuine issue of material fact as to whether the TCU Defendants (1) made a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 463 (Ala. 2000) (quoting *Baker v. Bennett*, 603 So. 2d 928, 935 (Ala. 1992)). *See also Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997); *Ala. Code* § 6-5-101 (1975).

---

[1]  Berry admits that these are the <u>only</u> allegedly fraudulent statements made by the TCU Defendants. (Ex. A, p. 596, lines 7-11; p. 609, lines 19-23; p. 610, lines 1-10).

1.    **BERRY ADMITS TCU AND UPCHURCH MADE NO FALSE REPRESENTATIONS OF MATERIAL FACT.**

Berry admits in his deposition that he never heard TCU or Upchurch say his proposal was the "best" or "most fair" and that he knows nothing about such allegations. (Ex. A, p. 582, lines 10-19). Because TCU and Upchurch admittedly made no allegedly false reprsentations – the first element of a fraud claim – they are entitled to summary judgment as a matter of law as to Berry's fraud claim.

2.    **EXPRESSIONS OF OPINION CANNOT FORM THE BASIS OF A FRAUD CLAIM.**

Berry claims that defendant Thomas told him his proposal was "fair" or the "best" proposal, but such statements cannot form the basis of a fraud claim in Alabama. (*Id.* at p. 583, lines 1-8). The Alabama Supreme Court is clear that representations of "opinion" are not actionable under Alabama's fraud law and are due to be dismissed on summary judgment. As noted in *Jones v. McGuffin*, 454 So. 2d 509, 512 (Ala. 1984), "it is axiomatic that mere statements of opinion are not material facts upon which actions for a legal fraud can be maintained." *See also Crowne Investments, Inc. v. Bryant*, 638 So. 2d 873, 877 (Ala. 1994) ("expression of opinion is not treated as a statement of an 'existing fact' under the fraud statute"); *Ray v. Montgomery*, 399 So. 2d 230, 232 (Ala. 1980) (seller's representation to plaintiff buyer that house was "a nice house" and "in good condition" was mere opinion and not actionable fraud); *Cornelius v. Austin*, 542 So. 2d 1220, 1222 (Ala. 1989) (fraud action cannot be maintained where seller expressed opinion that there were "no problems" with house). The statements Berry claims were fraudulent misrepresentations of material fact are of a similar nature – mere expressions of opinion. In fact, Berry testified that the alleged misrepresentations by Thomas were matters of opinion and that he has no reason to doubt that Thomas held such opinions.

A:      Percy [Thomas] told me that it was a fair proposal.

Q:      Okay.  So, you heard Percy say that?

A:      Percy had said that.

Q:      And that was his opinion?

A:      That was his opinion.

Q:      You don't have any reason to doubt that that was his opinion, do you?

A:      No.  I have no reason to doubt that.

Q:      He's entitled to his opinion?

A:      He's entitled to his opinion.

(Ex. A, p. 583, lines 4-16).

Q:      Just as you don't know how it is that them telling you that your proposal was the best and most fair, how that's false or fraudulent?  Because you, yourself, have said that your proposal was the best and most fair.

A:      It was the only one.

Q:      And they've concurred with your opinion?

A:      On that proposal.

Q:      Okay.  And you have no evidence as we sit here today that it      was not their opinion, when they allegedly said that yours was the best and most fair, that they didn't believe that, correct?

A:      On our proposal to ASU, correct.

(Ex. A, p. 589, lines 5-20).  In *Jones*, the Alabama Supreme Court held that a plaintiff's testimony admitting that the defendant's representations were matters of "professional opinion" conclusively established that the plaintiff was not justified in treating such statements as material facts upon which he could rely.  *Jones*, 454 So. 2d at 512.  Thus, based on Berry's own

admissions, and the clear mandate of *Jones v. McGuffin*, Defendant Thomas is also entitled to summary judgment as a matter of law on Count Three of Berry's Complaint.

Similarly, Berry's claim that the TCU Defendants committed fraud by representing that ASU "should move forward" with Plaintiffs' proposal does not constitute actionable fraud. "A mere statement of opinion or prediction as to events to occur in the future is not a statement of a 'material fact' upon which individuals have a right to rely and, therefore, it will not support a fraud claim." *Bryant*, 638 So. 2d at 877; *see also Lawson v. Cagle*, 504 So. 2d 226, 227 (Ala. 1987) ("Ordinarily, a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely"); *Birmingham Broadcasting Co. v. Bell*, 68 So. 2d 314 (Ala. 1953). Berry admits he knew that the decision of whether or not to accept the proposal and hire Berry was ASU's, not TCU's, thus entitling the TCU Defendants to summary judgment on Count Three. (Ex. A, p. 569, lines 7-16).

### 3.    BERRY DID NOT REASONABLY RELY ON THE ALLEGED REPRESENTATIONS OF TCU, UPCHURCH OR THOMAS.

In order to satisfy the reliance element of a fraud claim, the plaintiff must show not only that he relied on the alleged misrepresentation, but also that the reliance was reasonable in light of the facts surrounding the transaction in question. *Brushwitz v. Ezell*, 757 So.2d 423, 429 (Ala. 2000). In the instant case, even assuming *arguendo* that the TCU Defendants made the alleged representations and that the representations concerned existing material facts, they are entitled to summary judgment on Berry's fraud claim because the facts and circumstances demonstrate that Berry did not rely (reasonably or otherwise) on the TCU Defendants' alleged representations. In fact, there is substantial and undisputed evidence to the contrary.

In particular, as conceded by Berry during his deposition, he did <u>nothing</u> in reliance on the alleged fraudulent misrepresentations made by the TCU Defendants.

Q:     Okay. So, you didn't do anything then in reliance on their statement that they believed that your proposal was the best?

A:     No.

Q:     Likewise, you claim that they made the false representation that they believed that your proposal was the most fair. Okay?

A:     Uh-huh (affirmative).

Q:     What did you do in reliance on that representation?

A:     Nothing.

Q:     Nothing. Okay. So, you didn't – had they not said that, you would have still attended the board meeting?

A:     That's correct.

Q:     And you still would have come down here and looked for a place to live?

A:     That's correct.

Q:     And you had already submitted your proposal, scope of work and invoices and done all of that work?

A:     That is correct.

Q:     So, none of that was done in reliance on anything that Ken Upchurch, Percy Thomas or TCU said or didn't say?

A:     That is correct.

*           *           *           *           *

Q:     So, you didn't rely in any way on their statement that they believed ASU should move forward?

A:     Correct.

Q:     You didn't do anything differently that you hadn't already done?

> A:    That's correct.

(Ex. A, p. 599, line 23; p. 600, lines 1-23; p. 601, lines 1-3, 13-19).

> Q:    Would you have withdrawn your proposal had they not said yours was the best or most fair?
>
> A:    No.

(Ex. A, p. 611, lines 12-15).

> Q:    Fair enough.  But the statement that it was the best or most fair, those statements themselves, having made those statements, didn't deny you the opportunity to complete that work, did they?
>
> A:    No, sir.

(Ex. A, p. 616, lines 1-6).

Based upon Berry's own admissions, a jury could not reasonably infer that Berry reasonably relied upon the TCU Defendants' alleged misrepresentations that his proposal was the best and most fair and that ASU should move forward with the proposal.  Accordingly, the TCU Defendants are entitled to summary judgment on Berry's fraud claim (Count Three).

**C.    COUNT FIVE (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S TORTIOUS INTERFERENCE CLAIM BECAUSE TCU WAS AT ALL TIMES ACTING AS AN AGENT AND REPRESENTATIVE OF ASU.**

Berry claims in his Complaint that the TCU Defendants tortiously interfered with the business relations and implied contract between Berry and defendant ASU to the detriment of Berry.

In order to survive a motion for summary judgment on his tortious interference claim, Berry must present substantial evidence of (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) the absence of justification for the

defendant's interference; and (5) damage to the plaintiff as a result of the interference. *Parsons v. Aaron*, 849 So. 2d 932 (Ala. 2002). After proving the existence of a contract or business relation, "it is essential to a claim of tortious interference . . . that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract [or business relation] with which the defendant allegedly interfered." *Parsons*, 849 So. 2d at 946 (quoting *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001). If the defendant is not a stranger to the contract or business relation, he cannot be liable for tortious interference.

### 1.    DEFENDANTS WERE NOT STRANGERS TO THE CONTRACT OR BUSINESS RELATIONSHIP.

In the present case, the TCU Defendants served as the owner's representative for ASU on the dorm renovation project. ASU retained the TCU Defendants to, among other things, review Berry's proposal, monitor schedules, review cost estimates, facilitate cost adjustment schedules, and review proposed contract documents. Berry admits he knew the TCU Defendants were involved in the business relationship between Berry and ASU and that, as ASU's owner's representative, the TCU Defendants would review Plaintiffs' proposal for ASU and make various recommendations to ASU.

> Q:    So, you understood then at the time they came on, "they" being TCU, that their role was to review the proposal, the scope of work and any other documents you and Marous had submitted for President Lee to enlighten him as to what was in those documents?
>
> A:    Yes, sir.

(Ex. A, p. 512, lines 3-10); (*see also* p. 513, lines 11-14; p. 625, line 23; p. 626, lines 1-17; p. 627, lines 3-9; p. 629, lines 7-13; Complaint, Doc. # 59, ¶¶ 26, 29, 71). Certainly, as owner's representatives, hired to review Berry's proposal and monitor the progress of the Project, the

TCU Defendants were not "strangers" to the business or contractual relationship between Berry and ASU, a fact Berry himself admits.

> Q:   So, he's no stranger and TCU's no stranger to the relationship between you and ASU, is he?
>
> A:   No.

(Ex. A, p. 628, lines 8-11).

> Q:   And they had a right to review your proposal as we've just stated?
>
> A:   That is correct.
>
> Q:   So, again, they're not any sort of stranger to your implied contract between you and ASU, are they?
>
> A:   That is correct.

(Ex. A, p. 629, lines 14-17).  Berry even admits that he "welcomed" TCU's involvement in the Project. (Ex. A, p. 513, lines 19-23; p. 514, lines 1-2).  Because Defendants were not strangers to the implied contract or business relation between Berry and ASU, they cannot be liable for allegedly interfering with such contract or business relation.  *See Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1156 (Ala. 2003) ("one cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract"); *BellSouth*, 814 So. 2d at 212 ("one is not a stranger to the contract just because one is not a party to the contract"); *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443 (Ala. 2004) (party to "interwoven set of contracts" or business relations cannot be liable for tortiously interfering with contract or business relation to which it is a party).

2.    DEFENDANTS WERE AT ALL TIMES ACTING AS AGENTS OF ASU.

Berry admits in his Complaint that all of the alleged acts of interference were done within the scope of the TCU Defendants' duties as agent of ASU. (*See* Complaint, Doc. # 59, ¶ 71 ("used their confidential relationships as owner's representatives") and ¶ 72 ("abused their position as owner's representatives")).  A defendant cannot be liable for the tort of tortious interference where all of his acts of interference were done within the scope of his duties as agent to a party to the contract or business relation.  *See Waddel*, 875 So. 2d at 1152, *quoting with approval, Atlanta Market Ctr. Mgmt. Co. v. McLane*, 503 S.E.2d 278, 282 (Ga. 1998) ("alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the *agent for one of the parties to the contract* . . . and all the purported *acts of interference were done within the scope of the interferer's duties as agent*") (emphasis added); *Parsons*, 849 So. 2d at 947 (agent for party to contract or business relation cannot be liable for tortiously interfering with such contract or business relation); *BellSouth*, 814 So. 2d at 214 (defendant is party in interest to a relationship if defendant has any beneficial or economic interest in, or control over, that relationship).

Based upon the undisputed facts and Alabama law, the TCU Defendants are entitled to summary judgment as a matter of law as to Berry's tortious interference claim (Count Five).

3.    THERE IS NO EVIDENCE THAT DEFENDANTS TORTIOUSLY INTERFERED WITH BERRY'S BUSINESS OR CONTRACTUAL RELATIONSHIP WITH ASU.

Berry claims in his Complaint that Defendants tortiously interfered with his business or contractual relationship with ASU by misrepresenting the fees Plaintiffs would receive under Plaintiffs' proposal. (Complaint, Doc. # 59, ¶¶ 30 and 70).  However, Berry admits in his deposition that he has <u>no</u> evidence that TCU, Upchurch or Thomas ever misrepresented to ASU the amount of fees Plaintiffs would earn.

Q:    Okay. So, the allegation then in the second sentence of Paragraph 30, that Ken Upchurch, Percy Thomas and TCU recommended to the ASU board that SSBGA [Gil Berry's company] and Marous should not be awarded the professional services contract due to this alleged abusive fee submission, you don't have any evidence whatsoever to support that allegation in your complaint, do you?

A:    I don't.

(Ex. A, p. 564, lines 11-20); (*see also* p. 559, lines 11-18; p. 630, lines 5-8). Based on Berry's admission that he has no evidence of interference by the TCU Defendants, they are entitled to summary judgment on Berry's tortious interference claim.

**D.    COUNT SIX (CONVERSION): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S CONVERSION CLAIM BECAUSE THERE IS NO EVIDENCE THAT DEFENDANTS WRONGFULLY APPROPRIATED PLAINTIFF'S PROPRIETARY WORK PRODUCT.**

Berry claims in Count Six of his Complaint that the Defendants "wrongfully appropriated Plaintiffs' proprietary work product to their own use and beneficial enjoyment in exclusion of Plaintiffs' rights of ownership and to compensation" after representing that Plaintiff would be compensated for such work. (Complaint, Doc. # 59, ¶¶ 75-78).

In order to survive a motion for summary judgment on a conversion claim, Berry must offer material evidence of a wrongful taking, wrongful detention, an illegal assumption of ownership, or an illegal use or misuse. *White v. Drivas*, 954 So. 2d 1119, 1123 (Ala. Civ. App. 2006). A conversion consists "either in the appropriation of the thing to the party's own use and beneficial enjoyment, or its destruction, or in exercising of dominion over it, in exclusion or defiance of the plaintiff's right, or in withholding the possession from the plaintiff, under a claim of title inconsistent with his own." *White*, 954 So. 2d at 1123 (quoting *Clardy v. Capital City Asphalt Co.*, 477 So. 2d 350, 352 (Ala. 1985)). However, the "bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal

assumption of ownership or illegal user or misuser, is not conversion." *Clardy*, 477 So. 2d at 352.

Berry admits he has <u>no</u> evidence that Defendants wrongfully appropriated his work product or that they are in any way using his proprietary work as alleged in the Complaint. (Ex. A, p. 571, lines 16-23; p. 655, lines 3-23; p. 657, lines 4-9; p. 661, lines 9-11). In fact, Berry admits he has no evidence that Defendants even have in their possession anything belonging to Plaintiffs.

> Q:     So, you don't know that TCU has anything in their possession belonging to you, do you?
>
> A:     No, I don't.
>
> Q:     Okay. So, you have no evidence that they've wrongfully withheld possession of any of your work product, correct?
>
> A:     Any of mine, no.
>
> \*          \*          \*          \*          \*
>
> Q:     Okay. And, again, you have no evidence that they're using your work product in the renovation of the ASU dormitories?
>
> A:     That's correct.

(Ex. A, p. 665, lines 16-23; p. 666, lines 8-11). Berry further admits the TCU Defendants did not appropriate his work product to the exclusion of Plaintiffs. In other words, Berry at all times had copies of his work product for use on the ASU project or any other project. (Ex. A, p. 663, lines 7-13; p. 664, lines 3-13). Finally, the evidence shows that the TCU Defendants returned Plaintiffs' work product to them after ASU elected not to accept their proposal. (Ex. A, p. 395, lines 8-19; Exhibit "D", letter transmitting materials to Plaintiffs).

Based upon the undisputed facts, the TCU Defendants are entitled to summary judgment as a matter of law on Berry's conversion claim (Count Six).

**E.    COUNT SEVEN (CONSPIRACY): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S CONSPIRACY CLAIM BECAUSE THE UNDERLYING TORT CLAIM FAILS.**

Berry claims in Count Seven of his Complaint that the Defendants "conspired together to intentionally interfere with the business relationship and implied contract between Plaintiffs and ASU." (Complaint, Doc. # 59, ¶ 81).

For the reasons stated above, Defendants are entitled to summary judgment as a matter of law as to Berry's claim for tortious interference. Under Alabama law, "[a] civil conspiracy cannot exist in the absence of an underlying tort," as the civil conspiracy itself furnishes no cause of action. *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006); *O'Dell v. State ex rel. Patterson*, 117 So. 2d 164, 168 (Ala. 1959). Because the underlying tortious interference claim fails, Defendants are entitled to summary judgment as a matter of law as to Berry's conspiracy claim (Count Seven). *See Massengill v. Malone Freight Lines, Inc.*, 538 So. 2d 784, 786 (Ala. 1988) (conspiracy claim fails where plaintiff failed to establish prima facie case of tortious interference).

**F.    COUNT EIGHT (LOSS OF BUSINESS OPPORTUNITY): DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BERRY'S LOSS OF BUSINESS OPPORTUNITY CLAIM BECAUSE PLAINTIFF HAS PRESENTED NO EVIDENCE OF LOST BUSINESS.**

Berry claims in Count Eight of his Complaint that "Defendants' actions directly and proximately caused Plaintiffs to lose significant business opportunities." Even if this were a legally cognizable claim under Alabama law,[2] Berry admits in his deposition that he experienced no lost business opportunities as a result of anything the TCU Defendants did or did not do.

---

[2] Defendants have been unable to locate any Alabama precedent for such a legal theory.

> Q:     So, really at this point in time, you have no lost business opportunities then, do you?
>
> A:     No.

(Ex. A, p. 672, lines 21-23; p. 673, line 1).  Based on Berry's admission, the TCU Defendants are entitled to summary judgment as a matter of law on his claim for loss of business opportunity (Count Eight).

## G.     DEFENDANTS ARE ENTITLED TO THEIR FEES AND COSTS PURSUANT TO THE ALABAMA LITIGATION ACCOUNTABILITY ACT.

The Alabama Litigation Accountability Act provides:

> (a) . . . [I]n any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, or interposed a defense, that a court determines to be without substantial justification, either in whole or in part;
>
> (c) The court shall assess attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action or any part thereof, or asserted any claim or defense therein, that is without substantial justification . . .

*Ala.Code* § 12-19-272(a) and (c).[3]

As discussed more fully above, the claims brought by Berry against the TCU Defendants were groundless both in law and in fact.  Accordingly, the TCU Defendants' fees and costs should be taxed against Berry pursuant to the Alabama Litigation Accountability Act.

## III.     CONCLUSION

For the foregoing reasons, the TCU Defendants are entitled to summary judgment on all claims asserted against them by Plaintiff Gil Berry in his First Amended Complaint:  Quantum

---

[3]  "Without substantial justification" means that such action or claim is frivolous or "groundless in fact or in law".  *Ala.Code* § 12-19-271.

Meruit (Count Two); Fraudulent Misrepresentation (Count Three); Tortious Interference with Business Relations (Count Five); Conversion (Count Six); Conspiracy (Count Seven); and Loss of Business Opportunity (Count Eight). Further, the TCU Defendants' fees and costs should be taxed against Berry pursuant to the Alabama Litigation Accountability Act.


/s/          R. Brooke Lawson III
**J. LISTER HUBBARD  (HUB007)**
**R. BROOKE LAWSON III  (LAW026)**

Attorneys for Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama  36102-2069
334/241-8000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the following was served on the following by electronic filing, on this the 29th day of August, 2008:

Kenneth L. Thomas, Esq.
Ramadanah M. Salaam-Jones, Esq.
Thomas, Means, Gillis & Seay, P.C.
P.O. Drawer 5058
Montgomery, Alabama 36103-5058

Champ Lyons, III
King, Horsley & Lyons, LLC
One Metroplex Drive
Suite 280
Birmingham, Alabama 35209

Jock M. Smith, Esq.
Cochran, Cherry, Givens & Smith, P.C.
306 North Main Street
P.O. Box 830419
Tuskegee, Alabama 36083

David E. Allred, Esq.
D. Craig Allred, Esq.
David E. Allred, P.C.
P.O. Box 241594
Montgomery, Alabama 36124-1594

Sherryl Snodgrass Caffey, Esq.
P.O. Box 1327
Normal, Alabama 35801


/s/        R. Brooke Lawson III
Of Counsel

# Exhibit A

## FREEDOM COURT REPORTING

1

1        IN THE UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4   MAROUS BROTHERS                )
                                    )
5   CONSTRUCTION, LLC, a            )
                                    )
6   corporation, and GIL           )
                                    )
7   BERRY, an individual           )
                                    )
8   d/b/a Gil Berry &              )
                                    )
9   Associates,                    )   CIVIL ACTION NO.
                                    )
10          Plaintiffs,            )   2:07-CV-384-ID
                                    )
11   -vs-                          )
                                    )
12   ALABAMA STATE UNIVERSITY,)
                                    )
13   a public corporation,         )
                                    )
14   et al.,                       )
                                    )
15          Defendants.            )

16

17                   VOLUME I

18

19

20       DEPOSITION OF GILBERT C. BERRY

21

22

23

# FREEDOM COURT REPORTING

156

1    because of the poor conditions of the housing

2    and that he -- he knew -- he felt in his heart

3    of hearts that if we could get it to where we

4    could make a presentation and get it in the

5    form that they would approve a request and we

6    could get started.

7            Q.    Now, is this the nature of a

8    presentation?  Is that what this is?

9            Because when we talked about your

10   other universities like Allen, Oakwood College

11   and A&M, you talked about making a

12   presentation.

13           Is this a presentation?

14           A.    Could I see the document, and

15   I'll be glad to answer that.

16           Q.    And when I speak in terms of

17   documents, that would be Defendant's Exhibit

18   4.

19           A.    This I would say is part of a

20   PowerPoint presentation where people could

21   follow.  It has schedules.  You know, this is

22   not -- this is not a -- I don't see any floor

23   plans.  I don't see any floor layouts.  I

# FREEDOM COURT REPORTING

157

1    don't see none of that. I just see schedules

2    right now.

3              So, I think it would be part of

4    just a PowerPoint presentation where if you're

5    sitting in the audience you can follow it, you

6    can take it with you, review it later, you

7    know, if you have any questions.

8         Q.    Got you. And for which you did

9    not expect any compensation for, this document

10   here?

11        A.    I would think not at that time.

12        Q.    Got you. Now, would the same

13   hold true, to your knowledge, for Student

14   Suites? Did they expect remuneration for

15   this?

16        A.    In all honesty, I can't speak for

17   Student Suites.

18        Q.    Well, you-all were a "team." I

19   mean, I see -- well, let me just ask you point

20   blank. This proposal, was it developed by Gil

21   Berry & Associates and the Marous Brother?

22        A.    This was prepared by Marous

23   Brothers.

## FREEDOM COURT REPORTING

158

1          Q.      Okay.  Prepared by Marous

2    Brothers?

3          A.      Yeah.

4          Q.      And if I'm not mistaken --

5          A.      Go ahead.

6          Q.      Let me take this.

7          A.      Uh-huh (affirmative).

8          Q.      And transmitted to Dr. Frazier

9    via a letter dated September 20th, 2005, from

10   Dick Davis, Student Suites?

11         A.      Correct.

12         Q.      This packet here?

13         A.      Yes, sir.

14         Q.      No --

15         A.      As far as -- I mean, on the --

16   for what I see the documentation of the dates

17   and everything, I would have to agree with

18   you.

19         Q.      And his letter says that we are

20   pleased to submit our findings.  "Our,"

21   plural.

22         A.      Uh-huh (affirmative).

23         Q.      All right.  Now, my question to

## FREEDOM COURT REPORTING

159

1    you, at this time was there a team consisting

2    of Gil Berry & Associates, Marous Brothers and

3    Student Suites for housing at ASU?

4            A.        There was a team assembled, yes.

5            Q.        And as a member of that team --

6    and I think you've just testified -- you were

7    not expecting any compensation or remuneration

8    or money for what was submitted on September

9    20th?

10           A.        Yes, me personally.

11           Q.        Okay.  Can you -- or do you have

12   any knowledge of what the expectations of

13   Marous Brothers would be?

14           A.        I have no idea.

15           Q.        Even though they were a team

16   member?

17           A.        Even though they were a team

18   member.

19           Q.        And what about Student Suites?

20           A.        I have no idea.

21           Q.        All right.  Now, when you-all did

22   the same thing up there at Allen University,

23   did you-all expect payment because y'all did a

# FREEDOM COURT REPORTING

395

1          (Whereupon, said document was

2          marked for identification as

3          Defendant's Exhibit No. 21 to the

4          deposition of Gilbert C. Berry.)

5     Q.     And if you and Mr. Lyons would

6  take a look at that.

7     A.     Okay.

8     Q.     That's 21.  That is a letter

9  dated October 23rd, 2006, from President Lee

10 to you?

11    A.     Uh-huh (affirmative).

12    Q.     And it says as previously

13 advised, we have collected all documents you

14 forwarded or otherwise delivered to ASU

15 relative to the proposed student housing

16 projects.  Please find enclosed those

17 documents.

18          Did you receive this letter?

19    A.     I received the letter.  Uh-huh

20 (affirmative).

21    Q.     Were there some documents

22 enclosed?

23    A.     Yes, there was.  But I knew they

# FREEDOM COURT REPORTING

1          Q.      Enlighten the president?

2          A.      Enlighten the president.

3          Q.      So, you understood then at the

4    time they came on, "they" being TCU, that

5    their role was to review the proposal, the

6    scope of work and any other documents you and

7    Marous had submitted for President Lee to

8    enlighten him as to what was in those

9    documents?

10         A.      Yes, sir.

11         Q.      And in enlightening President

12   Lee, were they to look at it critically?

13                 Were they to -- if they saw

14   something in there that jumped out at them

15   that just wasn't right, were they to enlighten

16   President Lee about that, or were they only to

17   enlighten President Lee about the good points

18   or the highlights of the documents in the

19   proposal?

20         A.      Well --

21         Q.      Or do you know?

22         A.      I don't -- I don't know.

23         Q.      You just know they were going to

**FREEDOM COURT REPORTING**

513

1     review those documents for whatever purposes?

2          A.     That's all that was told to me.

3          Q.     You don't know what the

4     arrangement really was because you weren't

5     privy to any of the discussions between ASU

6     and TCU, were you?

7          A.     No.  I was just told by Mr. Dean,

8     Judge Wiggins and Mr. Buford that they were

9     just going to review the documents so we can

10    get past the point of this delay.

11         Q.     And you knew that it was going to

12    review your documents, your proposal, your

13    scope of work?

14         A.     That's correct.

15         Q.     And you knew its role was to ask

16    questions and to critique it for President

17    Lee, correct?

18         A.     I assume that.

19         Q.     Okay.  And you welcomed TCU's

20    involvement if I remember correctly from your

21    E-mails, didn't you?

22         A.     I did.

23         Q.     And you consented to TCU's review

# FREEDOM COURT REPORTING

514

1    of your materials, your proposal, your scope

2    of work?

3        A.    I did.

4        Q.    Okay.  And we looked at exhibit

5    --

6        A.    On review.  On review --

7        Q.    I understand.

8        A.    -- only.

9        Q.    As opposed to what?

10       A.    As opposed to them taking our

11   project.

12       Q.    And we'll get to that.

13       A.    Yes, sir.

14       Q.    Exhibit 23, if you want to look

15   at it.  You don't have to.  But it was a bunch

16   of E-mails from you where you've consented and

17   welcomed TCU and --

18       A.    I know what you're --

19       Q.    You remember the E-mails?

20       A.    Yeah.

21       Q.    You had no problem with TCU

22   serving as a representative of ASU?

23       A.    No.  Serving as a review --

# FREEDOM COURT REPORTING

559

1    earning $7 million in fees?

2        A.      I can't say he said that they

3    abused, all that, but they said that Ken --

4        Q.      That's your terminology.

5        A.      No, that's not my terminology.

6        Q.      It's in your complaint.

7        A.      It's in the complaint, and I

8    signed off on it.

9        Q.      So, it's your terminology.

10       A.      Okay.  Then it's my terminology.

11       Q.      Okay.  And you never heard

12   anybody with TCU say you're going to get $7

13   million in fees, correct?

14       A.      No.

15       Q.      You've seen no document that they

16   generated where they told ASU you're getting

17   $7 million in fees, have you?

18       A.      No.

19       Q.      Is there a difference between

20   fees and profits?

21       A.      Is there a difference --

22       Q.      Yes.

23       A.      -- between fees and profits?

# FREEDOM COURT REPORTING

564

1    Upchurch had made representation that we were

2    going to make $7 million on this project.

3         Q.    Okay.  Did Mr. Upchurch say to

4    the ASU board that because of that they should

5    not award the contract to you?

6         A.    I don't know what he told them.

7    I wasn't present at the meeting.

8         Q.    Okay.  Did anybody tell you that

9    he said that?

10        A.    No.

11        Q.    Okay.  So, the allegation then in

12   the second sentence of Paragraph 30, that Ken

13   Upchurch, Percy Thomas and TCU recommended to

14   the ASU board that SSBGA and Marous should not

15   be awarded the professional services contract

16   due to this alleged abusive fee submission,

17   you don't have any evidence whatsoever to

18   support that allegation in your complaint, do

19   you?

20        A.    I don't.

21        Q.    Okay.  Well, it's included in

22   your complaint.

23        A.    Well, okay.

# FREEDOM COURT REPORTING

569

1    Paragraph 33.

2        A.      Uh-huh (affirmative).

3        Q.      It says following the vote by ASU

4    Board of Trustees that plaintiffs would not be

5    utilized -- do you see that?

6        A.      Yes, I see that.

7        Q.      The decision of whether or not to

8    hire you or Marous or Student Suites was the

9    decision of ASU's Board of Trustees, correct?

10            MR. LYONS:  If you know who made

11   the decision, you can answer.

12            THE WITNESS:  I would have to say

13   yes.

14       Q.      (By Mr. Lawson)  You know that's

15   not the decision of TCU, don't you?

16       A.      That's correct.

17       Q.      Okay.  Now, back over on the next

18   page in Paragraph 36 you state that it's your

19   belief that Upchurch, Thomas and TCU are

20   utilizing your proprietary work.  Do you see

21   that?

22       A.      Uh-huh (affirmative).

23       Q.      What evidence do you have of

# FREEDOM COURT REPORTING

571

1          Why didn't they use Mr.

2   Upchurch's talents and Mr. Thomas' talents and

3   say, hey, these guys are already here, they're

4   local, they're good contractors, why don't we

5   let them do the renovation project?

6          Q.     Okay.  Well, my question was what

7   evidence do you have that they are using your

8   proprietary work?

9              The fact that they looked at it

10  and reviewed it, is that the evidence that you

11  have that they are, in fact, using it?

12         A.     I think Mr. Arne Goldman would be

13  better to answer that.  I gave you my answer.

14         Q.     Well --

15         A.     I gave you my answer.

16         Q.     Okay.  So, you don't have any

17  evidence that they are, in fact, using your

18  proprietary work, do you?

19         A.     I gave you my answer.

20         Q.     My question to you is:  Do you

21  have any evidence that they are, in fact,

22  using it?  Your answer to me --

23         A.     No, no.

# FREEDOM COURT REPORTING

580

1    with them.

2         Q.    Count Two, Quantum Meruit.  In

3    Paragraph 48 you say at defendants' direction,

4    you expended numerous hours on the development

5    work for the design, building, renovation and

6    the procurement of financing.

7              Do you see that?

8         A.    Yes, sir.

9         Q.    Now, I believe we've already

10   established that the design and the proposal

11   and the scope of work and the financing were

12   already done before TCU got involved, correct?

13        A.    That is correct.

14        Q.    So, you didn't expend any hours

15   then at the direction of Ken Upchurch, Percy

16   Thomas or TCU on those things, did you?

17        A.    I didn't, no.

18             MR. LYONS:  Brooke, if you like,

19   I can get to the point.  Count Two does not

20   apply to your clients if you want to just --

21             MR. LAWSON:  Okay.  Well, it says

22   defendants.

23             MR. LYONS:  I know it does, but

# FREEDOM COURT REPORTING

581

1    I'm telling you on the record now --

2            MR. LAWSON:  On the record Count

3    Two --

4            MR. LYONS:  -- Count Two is not

5    to TCU, Upchurch or Percy Thomas.

6            MR. LAWSON:  All right.  Well,

7    we'll just skip right on over that then.

8        Q.      Count Three, I'm guessing, does

9    apply to my clients.  You say in Paragraph 55,

10   Mr. Berry, that Ken Upchurch, Percy Thomas and

11   TCU made false representations to you

12   regarding material facts in this matter.

13            Correct?

14       A.      That's what it says.

15       Q.      And those false material facts,

16   according to you, are that they said that they

17   believed that your proposal was the "best"

18   "most fair" proposal?

19       A.      Well, considering that it was the

20   only proposal --

21       Q.      Okay.

22       A.      -- and that we had got the

23   funding based on the $25 million mandate and

**FREEDOM COURT REPORTING**

582

1    that we had did all the work.  And like I said

2    -- and everything was fine until we started

3    receiving 87 questions and --

4            Q.      Right.

5            A.      -- this fog was put up in the

6    air.

7            Q.      Who said that it was the best and

8    most fair?  Who said that?

9            A.      I didn't say that.

10           Q.      You allege that Upchurch, Thomas

11   and TCU said that.  Which one of them told you

12   that it was the best or most fair proposal?

13           A.      They told Arne Goldman that.

14           Q.      Who did?

15           A.      I don't know which one told Arne

16   Goldman.

17           Q.      So, you don't know anything about

18   that then?

19           A.      No.

20           Q.      You didn't hear them say it's the

21   best and most fair?

22           A.      I never worked with Mr. Upchurch.

23   I had one meeting with him.

# FREEDOM COURT REPORTING

583

1          Q.        Okay.  So, you never heard Ken

2    Upchurch or Percy Thomas tell you that it was

3    the best and most fair proposal?

4          A.        Percy told me that it was a fair

5    proposal.

6          Q.        Okay.  So, you heard Percy say

7    that?

8          A.        Percy had said that.

9          Q.        And that was his opinion?

10         A.        That was his opinion.

11         Q.        You don't have any reason to

12   doubt that that was his opinion, do you?

13         A.        No.  I have no reason to doubt

14   that.

15         Q.        He's entitled to his opinion?

16         A.        He's entitled to his opinion.

17         Q.        When did he tell you that?

18         A.        He told me that at the club, that

19   it was a fair and honest -- he told me over

20   the telephone that it was a good proposal.

21         Q.        Okay.  So, he's told you that

22   more than one time, that it was fair --

23         A.        Yes, sir.

# FREEDOM COURT REPORTING

589

1    up with some changes together?

2        A.    I can't speak on that.

3        Q.    You don't know?

4        A.    I don't know.

5        Q.    Just as you don't know how it is

6    that them telling you that your proposal was

7    the best and most fair, how that's false or

8    fraudulent?

9            Because you, yourself, have said

10   that your proposal was the best and most fair.

11       A.    It was the only one.

12       Q.    And they've concurred with your

13   opinion?

14       A.    On that proposal.

15       Q.    Okay.  And you have no evidence

16   as we sit here today that it was not their

17   opinion, when they allegedly said that yours

18   was the best and most fair, that they didn't

19   believe that, correct?

20       A.    On our proposal to ASU, correct.

21       Q.    As alleged in your complaint?

22       A.    Correct.

23       Q.    You go on to say that another

**FREEDOM COURT REPORTING**

596

1    three.

2          Number one, that they believed

3    your proposal was the best; number two, that

4    they believed your proposal was the most fair;

5    and number three, that they believed that ASU

6    should move forward with your proposal.

7          Are there any other false

8    representations of material fact that you

9    relied on in any way that were made by TCU,

10   Upchurch or Thomas?

11        A.     No.

12        Q.     Those are the only three?

13        A.     Yes, sir.

14        Q.     Paragraph 58.  You say in

15   reliance on these representations, plaintiffs

16   expended a great deal of time and resources in

17   furtherance of ASU's goal of the renovation of

18   the Student Residence Project.  Do you see

19   that?

20        A.     Yes, sir.

21        Q.     How much time and money did you

22   expend in reliance on their statements that

23   they believed your proposal was the best, most

# FREEDOM COURT REPORTING

599

1    that your proposal was the best, then you

2    would not have shown up at the September 22nd

3    board meeting; is that correct?

4         A.    If they would -- if the school

5    would have told me I wasn't going to get the

6    project, I definitely --

7         Q.    That's the school.  I'm talking

8    about in reliance on something that Ken

9    Upchurch, Percy Thomas or TCU said.

10                If they told you that the

11    proposal was the best, what did you do in

12    reliance on that proposal?

13                And you've just said came down

14    and looked for an apartment and showed up at

15    the board meeting?

16         A.    That's correct.

17         Q.    Okay.  So, if they had not said

18    your proposal's the best, would you have not

19    come to that September 22nd board meeting?

20         A.    Oh, yes, I would have still came.

21         Q.    So, you would have come, anyway?

22         A.    I would have come, anyway.

23         Q.    Okay.  So, you didn't do anything

**FREEDOM COURT REPORTING**

600

1    then in reliance on their statement that they

2    believed that your proposal was the best?

3         A.    No.

4         Q.    Likewise, you claim that they

5    made the false representation that they

6    believed that your proposal was the most fair.

7    Okay?

8         A.    Uh-huh (affirmative).

9         Q.    What did you do in reliance on

10   that representation?

11        A.    Nothing.

12        Q.    Nothing.  Okay.  So, you didn't

13   -- had they not said that, you would have

14   still attended the board meeting?

15        A.    That's correct.

16        Q.    And you still would have come

17   down here and looked for a place to live?

18        A.    That's correct.

19        Q.    And you had already submitted

20   your proposal, scope of work and invoices and

21   done all of that work?

22        A.    That is correct.

23        Q.    So, none of that was done in

**FREEDOM COURT REPORTING**

601

1  reliance on anything that Ken Upchurch, Percy

2  Thomas or TCU said or didn't say?

3      A.    That is correct.

4      Q.    And, finally, you say that they

5  believed that your proposal -- or that ASU

6  should move forward.  What did you do in

7  reliance on that?

8      A.    Showed up at the board meeting.

9      Q.    But you've already said you would

10 have showed up whether they said something or

11 not?

12     A.    Correct.

13     Q.    So, you didn't rely in any way on

14 their statement that they believed ASU should

15 move forward?

16     A.    Correct.

17     Q.    You didn't do anything

18 differently that you hadn't already done?

19     A.    That's correct.

20     Q.    Okay.  So, when we look at

21 Paragraph 58 --

22     A.    I take that back.

23     Q.    Okay.

## FREEDOM COURT REPORTING

609

1    your scope of work, your invoices.

2                    None of those things would have

3    changed?

4        A.      None of those things would have

5    changed.

6        Q.      Okay.  So, the only thing you

7    would have done differently is you would have

8    called some board members and had Chip Marous

9    or Arne Goldman come down here?

10       A.      And find out what was the

11   problem.

12       Q.      Okay.

13       A.      And what changed from the time

14   that these meetings took place.  Was there

15   some clarity that we could have gave them?

16   Was there maybe a misunderstanding that they

17   had, a misunderstanding on something that was

18   communicated to them?  I would have did that.

19       Q.      Okay.  But as far as -- let's

20   stick to your fraudulent misrepresentation

21   claim.  The only misrepresentation we've

22   established, best, most fair and move forward.

23   And we've established that you didn't do

## FREEDOM COURT REPORTING

610

1    anything differently in reliance on those

2    statements.

3                You can't identify any other

4    false representations made to you, can you,

5    statement made to you?

6                MR. LYONS:  By the TCU

7    defendants?

8         Q.    (By Mr. Lawson)  By the TCU

9    defendants.  I'm not talking about ASU.

10        A.    No.

11        Q.    Okay.  And the only evidence that

12   you have that TCU was working on some

13   alternate proposal is that President Lee said

14   in the board meeting that they'd been working

15   closely together on getting --

16        A.    And your client stood up and plus

17   President Lee said, Ken, tell them what we've

18   been working on.

19        Q.    Okay.  And what did he say?

20        A.    And so -- and Ken stood up and

21   said, hey, we've been working on a plan that

22   we could basically hit the ground running.

23   There will be a small delay.  And that's when

## FREEDOM COURT REPORTING

611

1    Judge Wiggins asked Ken -- I'm standing right

2    by him.

3         Q.     Okay.

4         A.     Mr. Upchurch, can you do this job

5    for less money than Gil Berry & Associates?

6    He said, no, I can do it for around the same

7    price.  And they then took a vote.

8         Q.     And that's when they rejected

9    your proposal?

10        A.     That's when they rejected my

11   proposal.

12        Q.     Would you have withdrawn your

13   proposal had they not said yours was the best

14   or most fair?

15        A.     No.

16        Q.     I didn't think so.

17               You say you were denied -- in

18   Paragraph 59 if you want to look at that.

19        A.     Uh-huh (affirmative).

20        Q.     That you were denied the

21   opportunity to complete your work based on the

22   representations made by the TCU defendants

23   that it's the most fair and best and that ASU

# FREEDOM COURT REPORTING

616

1          Q.        Fair enough.  But the statement

2     that it was the best or most fair, those

3     statements themselves, having made those

4     statements, didn't deny you the opportunity to

5     complete that work, did they?

6          A.        No, sir.

7          Q.        You say in Paragraph 60 that the

8     TCU defendants received the contract to

9     perform services for the project that these

10    defendants -- I'm assuming you mean the TCU

11    defendants, or you're taking about all

12    defendants -- had led plaintiffs to believe

13    that they would receive.

14                   Who are you talking about there

15    when you say these defendants?

16         A.        One more time.  Would you read

17    it?

18         Q.        Yes.  Furthermore, Defendants

19    Upchurch, Percy Thomas and TCU received the

20    contract to perform services for the Student

21    Residence Project that these defendants had

22    led plaintiffs to believe that they would

23    receive.

# FREEDOM COURT REPORTING

625

1    representative.

2              So, you knew that's the capacity

3    they were serving in, correct?

4         A.    They were to review and then they

5    became the owner's rep.

6         Q.    Okay.

7         A.    They had told me that they didn't

8    have a contract.

9         Q.    Well --

10        A.    So, if they didn't have a

11   contract, you can't be somebody's owner's

12   representative -- owner's rep.

13        Q.    Okay. Well, now, you didn't have

14   a contract, but you're claiming that you had

15   an implied contract from ASU to pay your

16   expenses and to give you the contract for the

17   $25 million renovation, correct?

18        A.    I had a -- yes, I had an implied

19   contract.

20        Q.    So, you don't know whether ASU

21   and TCU had a verbal agreement or not, do you?

22        A.    No, I don't know.

23        Q.    So, what you do know, because

# FREEDOM COURT REPORTING

626

1    you've admitted it and alleged it in your

2    complaint, is TCU was involved in this

3    business relationship as the owner's

4    representative?  You knew that, didn't you?

5         A.    To review the documents.

6         Q.    Well, you knew -- whatever they

7    were doing --

8         A.    Okay.

9         Q.    -- you knew that they were

10   serving as the owner's representative.  You've

11   alleged it in Paragraph 29 of your complaint.

12        A.    Okay.

13        Q.    Is that correct?

14        A.    They were -- yes.

15        Q.    And you knew that they were

16   reviewing your proposal?

17        A.    Yes.

18        Q.    And you knew they were doing that

19   for ASU and President Lee, they were looking

20   at your proposal?

21        A.    They were doing it for President

22   Lee.

23        Q.    Okay.  Well, President Lee is the

# FREEDOM COURT REPORTING

627

1    president of ASU?

2         A.    Yes.

3         Q.    And you welcomed TCU's

4    participation?

5         A.    To help with the review process

6    with President Lee.

7         Q.    You voluntarily provided that

8    proposal to TCU or allowed them to look at it?

9         A.    Yes.  Yes, that's true.

10        Q.    And Arne Goldman with Marous

11   Brothers had numerous at least phone calls

12   with Ken Upchurch or somebody at TCU?

13        A.    That's correct.

14        Q.    Discussing your proposal and your

15   business relationship with ASU?

16        A.    That's correct.

17        Q.    And Arne Goldman at least had

18   numerous discussions with Ken Upchurch about

19   the proposal, the scope of work and everything

20   that you were proposing to ASU to do, correct?

21             THE WITNESS:  I didn't knock your

22   wire out?  I'm about -- I kicked the cord.  I

23   just wanted to make sure I didn't knock it

# FREEDOM COURT REPORTING

628

1    out.

2                     COURT REPORTER:  You're fine.

3         Q.      (By Mr. Lawson)  But Arne Goldman

4    had numerous conversations, as you've said,

5    with TCU representatives about your business

6    relationship with ASU as you define it?

7         A.      Yes, with Mr. Upchurch.  Correct.

8         Q.      So, he's no stranger and TCU's no

9    stranger to the relationship between you and

10   ASU, is he?

11        A.      No.

12        Q.      Now, on this implied contract,

13   did you ever tell anybody at TCU that you had

14   an implied contract with ASU for them to pay

15   your expenses?

16        A.      Yeah, they knew that.

17        Q.      How did they know that?

18        A.      I told them.

19        Q.      So, they knew about your implied

20   contract --

21        A.      At the same time they said that

22   they had not -- their contract had not been

23   accepted by the president either.  They hadn't

# FREEDOM COURT REPORTING

629

1    been paid either.   That's basically what they

2    said.   I said, we'll we're all in the same

3    boat.

4         Q.    So, they knew about that implied

5    contract because you told them?

6         A.    Yes.

7         Q.    And, again, the implied contract

8    was that they would pay your expenses and then

9    eventually accept your proposal?

10        A.    That is correct.

11        Q.    And they had a right to review

12   your proposal as we've just stated?

13        A.    That is correct.

14        Q.    So, again, they're not any sort

15   of stranger to your implied contract between

16   you and ASU, are they?

17        A.    That is correct.

18        Q.    Now, you claim in Paragraph 70

19   that they interfered with that business

20   relationship and implied contract by

21   misrepresenting to ASu and its board the fees

22   which you would receive.

23             Do you see that?

# FREEDOM COURT REPORTING

630

1          A.       We are on Page 15, Paragraph --

2          Q.       Yeah.  It carries over to 16.

3          A.       Okay.

4          Q.       Paragraph 70.  And we've already,

5    I believe, established that you never heard

6    anybody from TCU misrepresent the fees you

7    were going to receive?

8          A.       That's correct.

9          Q.       I think you said Arne Goldman may

10   have told you that?

11         A.       Arne Goldman and either Judge

12   Wiggins --

13         Q.       Either Mr. Wiggins or Crutcher?

14         A.       Yes.

15         Q.       One or the other?

16         A.       Yes.

17         Q.       And we don't know when, and we

18   don't know who?

19         A.       And that's true.

20         Q.       So, that's the misrepresentation

21   that you claim was made --

22         A.       That is true.

23         Q.       -- to ASU?

## FREEDOM COURT REPORTING

655

1          A.       To Mr. Upchurch and Mr. Percy

2     Thomas.

3          Q.       You say the defendants wrongfully

4     appropriated your proprietary work product to

5     their own use and beneficial enjoyment, an

6     exclusion of your rights and ownership.

7                   What did they wrongfully

8     appropriate?

9          A.       Again, if they reviewed the work

10    product, it's very easy to make changes to the

11    work product to convert how we were going to

12    do the buildings, to be able to change a few

13    things to make it accessible to -- to

14    suite-style units.

15         Q.       Well, let's -- let's just assume

16    that you're correct, that it would be very

17    easy to make a few changes to your proposal

18    and your scope of work.

19         A.       Uh-huh (affirmative).

20         Q.       Do you have any evidence that

21    they did that and they are currently doing

22    that?

23         A.       No, I don't.

# FREEDOM COURT REPORTING

657

1   scope of -- the price has changed.  Because

2   Judge Wiggins personally asked him can you do

3   it for the same price.

4           Q.      Okay.  Do you have any evidence

5   that they're using your work product?

6           A.      No, I don't.

7           Q.      Do you know what the scope of

8   work on this project is as it is today?

9           A.      No, I don't.

10          Q.      You don't know what they're over

11  there renovating or building, do you?

12          A.      I haven't been over there.

13          Q.      You don't know if they're

14  building suites or different kinds of suites

15  or just single rooms, do you, with a common

16  bathroom?

17          A.      All I --

18          Q.      Do you know?

19          A.      No.

20          Q.      So, you have no idea as we sit

21  here today what it is that's being built over

22  there and whether or not the TCU defendants

23  are currently using anything that was your

## FREEDOM COURT REPORTING

661

1          A.      Yeah.

2          Q.      You don't own suite, do you?  I

3   mean, other people can -- anybody can build a

4   suite, can't they?

5          A.      Yeah, anybody can build a suite.

6          Q.      So, you don't know what they're

7   doing over there?

8          A.      No, I don't.

9          Q.      And you don't know whether or not

10  they're using your proprietary material?

11         A.      No, I don't.

12         Q.      In fact, we've looked at

13  Defendant's Exhibits 20 and 21, which were

14  letters from ASU returning your proprietary

15  materials to you, correct?

16         A.      And we didn't get all of the

17  materials back.

18         Q.      And Mr. Thomas, I believe, has

19  said if you didn't, they'll search for those.

20         A.      I just want to put it on the

21  record that we didn't --

22         Q.      I understand.

23         A.      -- that we didn't get it.

## FREEDOM COURT REPORTING

663

1          Q.      You had that in your possession?

2          A.      Yes.   There were several of

3     those.

4          Q.      Okay.   Several copies of it, is

5     what you're saying?

6          A.      Yes.

7          Q.      But you had this in your

8     possession.   You didn't give ASU your only

9     copy?

10         A.      No.   No, no, no.

11         Q.      You didn't give TCU your only

12    copy?

13         A.      I didn't give TCU no copy.

14         Q.      Okay.   Well, then they didn't

15    even have your proprietary work product?

16         A.      They were given our proprietary

17    --

18         Q.      By ASU?

19         A.      Yes.

20         Q.      Okay.   Well, you didn't give them

21    your only copy?

22         A.      No.

23         Q.      You had copies.   Did you have it

**FREEDOM COURT REPORTING**

664

1    on Autocad?

2            A.      Marous had it on Autocad.

3            Q.      Okay.  So, they had copies.  You

4    could have used your extra copies for other

5    work or other projects if you wanted to.  You

6    could have?

7            A.      I guess I could have.

8            Q.      So, you weren't denied the

9    opportunity to use the material contained in

10   Exhibit No. 8 elsewhere if you wanted to use

11   it on another student housing renovation

12   project at some other school, correct?

13           A.      That's correct.

14           Q.      All right.  So, you -- when you

15   say that -- in Paragraph 76 you say defendants

16   wrongfully appropriated your proprietary work

17   product after representing that plaintiffs

18   would be compensated for their work product.

19                   Well, you've already testified

20   that the TCU defendants never told you you'd

21   be compensated.  So, are you referring to the

22   ASU defendants when you say that you were told

23   you'd been compensated?

## FREEDOM COURT REPORTING

665

1          A.        Being compensated is being

2    awarded the contract.

3          Q.        Okay.

4          A.        But based on our work product.

5          Q.        TCU never said they'd pay you,

6    did they?

7          A.        No.

8          Q.        In 77 you say wrongfully withheld

9    possession of plaintiffs' proprietary work

10   product.  You said you never provided a copy

11   to TCU, correct?

12         A.        No.

13         Q.        And you've already admitted that

14   ASU has returned some of it at least to you?

15         A.        Yes.

16         Q.        So, you don't know that TCU has

17   anything in their possession belonging to you,

18   do you?

19         A.        No, I don't.

20         Q.        Okay.  So, you have no evidence

21   that they've wrongfully withheld possession of

22   any of your work product, correct?

23         A.        Any of mine, no.

## FREEDOM COURT REPORTING

666

1        Q.      Or Marous'?

2        A.      I can't speak for Marous.

3        Q.      Well, you don't know, do you?

4        A.      I don't know.

5        Q.      Because you never gave it --

6        A.      I answered for me.  No, they

7    don't of mine.  I can't speak for Marous.

8        Q.      Okay.  And, again, you have no

9    evidence that they're using your work product

10   in the renovation of the ASU dormitories?

11       A.      That's correct.

12       Q.      The proprietary materials, what

13   are you referring to exactly?  Is that the

14   scope of work, Exhibit 8, or is there

15   something more?

16               I know you said there's not a

17   cover on this, but this is how Exhibit 8 was

18   produced to us.  You said yesterday there may

19   have been a blue cover.

20       A.      There are blue covers.

21       Q.      Okay.  Well, we didn't get a blue

22   cover in discovery.

23       A.      Okay.

**FREEDOM COURT REPORTING**

672

1    result of anything that --

2         A.      That would be the only one that

3    I'm talking about.  And he didn't tell me who.

4         Q.      Okay.  So, the only business

5    opportunity that you might have lost as a

6    result of anything that the TCU defendants did

7    is the Alabama A&M job?

8         A.      That's correct.

9         Q.      And you claim that Alabama A&M's

10   president, President Jennings --

11        A.      Uh-huh (affirmative).

12        Q.      -- knew about the lawsuit?

13        A.      Uh-huh (affirmative).

14        Q.      And you think that's why you lost

15   that job?

16        A.      I would have to say so.

17        Q.      Okay.  Now, you haven't lost the

18   job because you said you're still talking to

19   them?

20        A.      Exactly.

21        Q.      So, really at this point in time,

22   you have no lost business opportunities then,

23   do you?

# FREEDOM COURT REPORTING

673

1        A.       No.

2        Q.       And the lawsuit -- correct me if

3   I'm wrong -- but it was filed by you, not by

4   the defendants?

5        A.       Yes.

6        Q.       So, if you lost something as a

7   result of the lawsuit having been filed, that

8   lawsuit was filed by you?

9        A.       That's correct.

10       Q.       None of these other projects that

11   you identified yesterday, Oakwood, Allen,

12   Meharry, none of those -- you didn't lose any

13   of those jobs a result of anything the TCU

14   defendants did or didn't do, did you?

15       A.       That is correct.

16       Q.       The only one that you've

17   identified as being a possible lost business

18   opportunity is Alabama A&M, even though you're

19   still talking to them?

20       A.       That is correct.

21       Q.       What are your damages in this

22   case?

23       A.       My damages are my $197,000 that

# Exhibit B

## FREEDOM COURT REPORTING

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF ALABAMA
 3                   NORTHERN DIVISION
 4   MAROUS BROTHERS                )
                                    )
 5   CONSTRUCTION, LLC, a           )
                                    )
 6   corporation, and GIL          )
                                    )
 7   BERRY, an individual          )
                                    )
 8   d/b/a GIL BERRY &             )
                                    )
 9   ASSOCIATES,                    )   CIVIL ACTION NO.
                                    )
10           Plaintiffs,            )   2:07-CV-384-ID-CSC
                                    )
11   -vs-                           )
                                    )
12   ALABAMA STATE UNIVERSITY,)
                                    )
13   a public corporation,         )
                                    )
14   et al.,                        )
                                    )
15           Defendants.            )
16           S T I P U L A T I O N S
17           IT IS STIPULATED AND AGREED, by
18   and between the parties through their
19   respective counsel, that the deposition of:
20           ARNE F. GOLDMAN,
21   may be taken before Belinda S. Brewster,
22   Commissioner and Notary Public for the State
23   of Alabama at Large, on the 20th day of
```

COPY

# FREEDOM COURT REPORTING

199

1    to look at it over a period of a few days.

2              MR. LAWSON:  Do y'all want to

3    break for lunch real quick?

4              MR. LYONS:  We might as well.

5              MR. LAWSON:  Twenty minutes?

6              MR. LYONS:  That's fine.

7              (Whereupon, the taking of the

8    deposition was recessed from approximately

9    1:32 p.m. to approximately 2:00 p.m., after

10   which the following proceedings were had and

11   done:)

12              (Whereupon, said document was

13              marked for identification as

14              Defendant's Exhibit No. 10 to the

15              deposition of Arne F. Goldman.)

16   Q.    Mr. Goldman, you've described for

17   me your marketing efforts and your

18   preconstruction efforts.

19              When did the marketing end and

20   the preconstruction begin on this project?

21   A.    As far as we're concerned, when

22   that resolution marked --

23   Q.    Exhibit 5, I believe?

## FREEDOM COURT REPORTING

200

1        A.        When that exhibit -- around that

2    time.  But say starting in December of 2005,

3    into January and then on.

4        Q.        Now I'm going to show you

5    Defendant's Exhibit No. 10 and ask if you can

6    identify that for me, please?

7        A.        This is the original PowerPoint

8    presentation that we assembled for Alabama

9    State that we presented on September 20th.

10        Q.        It says Student Housing

11    Redevelopment Master Plan.  This is, though,

12    the PowerPoint presentation that you

13    referenced earlier?

14        A.        That's one of the PowerPoint

15    presentations.

16        Q.        You would consider any work that

17    went into this to be marketing efforts?

18        A.        You've got -- I'm not sure that

19    this -- I need to check.  I want to make sure

20    that this was the original thing we presented.

21                Yes, this was -- yes, this was

22    the initial -- this was the initial

23    presentation.

## FREEDOM COURT REPORTING

204

1    they're submitting it on our behalf.  It says

2    they're submitting it on their behalf.  They

3    just happened to put our logo on it.

4              Q.    Okay.  Were you aware that they

5    were submitting --

6              A.    No.

7              Q.    -- it to ASU with your logo?

8              A.    No.

9                    (Whereupon, said document was

10                   marked for identification as

11                   Defendant's Exhibit No. 12 to the

12                   deposition of Arne F. Goldman.)

13             Q.    Defendant's Exhibit No. 12, can

14   you tell me what that is, Mr. Goldman?

15             A.    This appears to be the

16   proprietary work product that we produced for

17   the project that documented our intended scope

18   of work, drawings, there are some on-screen

19   takeoffs, there's general program information,

20   some very detailed on-screen takeoffs that

21   helped us in our estimating, as well as

22   existing conditions, demo plans, proposed

23   plans.

FREEDOM COURT REPORTING

205

1    Q.      When was this prepared by --

2    A.      Between January and May of --

3    January and the end of April of 2006.

4    Q.      Between January and April of 2006

5    this was prepared by Marous Brothers?

6    A.      By Marous Brothers.

7    Q.      Did Gil Berry have any input into

8    this?

9    A.      Very little.  I mean, we knew

10   what we were -- we understood that we had been

11   given a budget that we had to design and build

12   to.  So, I don't -- I don't recall that Gil

13   had much input in the preparation of this

14   document at all.

15   Q.      When was it provided to Gil

16   Berry?  Or was it provided to Gil Berry?

17   A.      It was provided to him, I

18   believe, the end of April.

19   Q.      Was it ever provided to ASU?

20   A.      They asked us for -- Dr. Lee

21   apparently had asked Gil Berry for copies

22   because he didn't have one.

23          But in May we attended a meeting,

**FREEDOM COURT REPORTING**

206

1    either a board meeting or a building committee

2    meeting, and we brought some copies for -- I

3    know Judge Wiggins.  I handed Judge Wiggins

4    one, and so I know he had it.  We brought

5    several.

6          Q.    So, this document then, Exhibit

7    No. 12, was provided to Gil Berry and then

8    ultimately provided to ASU --

9          A.    Yes.

10          Q.    -- by May of 2006?

11          A.    Yes.

12          Q.    Does this -- and I refer to it as

13    the scope of work.  Is that how you refer to

14    this document?  Or do you call it something

15    else?  That's just what I've called it.

16          A.    Whatever you want to say.

17          Q.    How does Marous refer to it?

18          A.    Scope of work documents.  It's

19    our work product, our deliverable.

20          Q.    This deliverable or the scope of

21    work, does it include the schematic or the

22    architectural work that you described earlier

23    as having been done by Marous?

# Exhibit C



**ALABAMA STATE UNIVERSITY**

MONTGOMERY, ALABAMA 36101 · 334 / 229-4200

OFFICE OF THE PRESIDENT

September 28, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As President of Alabama State University, I am charged with the stewardship of both public and private funds in the execution of my fiduciary responsibility. One immediate and challenging responsibility is the renovation of selected student housing units here on the ASU campus.

As you are already aware, because you were in voluntary attendance, I made a recommendation to the Alabama State University Board of Trustees, at its September 22, 2006 meeting, that we not engage Student Suites/Gill Berry & Associates for this proposed project.

Under separate cover, I am returning all documents provided ASU relating to your proposals regarding this project. I sincerely regret that we could not arrive at acceptable terms on matters associated with this project.

Thank you so much for your interest in student housing at Alabama State University.

Sincerely,

Joe A. Lee
President

Cs:    Mr. Elton Dean
       Mr. Kenneth Thomas, Esq.
       Mr. Ken Upchurch

MAR 000014

# Exhibit D



# ALABAMA STATE UNIVERSITY

MONTGOMERY, ALABAMA 36101 • 334 / 229-4200

OFFICE OF THE PRESIDENT

October 23, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As previously advised, we have collected all documents you forwarded or otherwise
delivered to Alabama State University relative to the proposed student housing projects.
Please find enclosed those documents.

If there are other items that you feel should be enclosed, please contact us.

Sincerely,

Joe A. Lee
President

JAL:edh

Enclosures:     (3) Student Housing Redevelopment Master Plan Binders 9/20/05
                (1) Student Housing Redevelopment Master Plan Binder 11/9/05
                (2) Blueprint Sheets 9/9/05
                (3) Scope of Work Binders

cc: Kenneth Thomas, Esq.
    Mr. Willie McCladdie



RECEIVED

OCT 26 2006

THOMAS, MEANS, GILLIS & SEAY, P.C.
ATTORNEYS AND COUNSELORS AT LAW
ATLANTA, GA.