## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MAROUS BROTHERS CONSTRUCTION, INC.,** a corporation, and GIL BERRY, an individual and d/b/a GIL BERRY & ASSOCIATES, | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | |
| **ALABAMA STATE UNIVERSITY,** a public corporation; W. KEN UPCHURCH III, an individual; PERCY THOMAS, an individual; TCU CONSULTING SERVICES, L.L.C., a corporation; JOE A. LEE, individually and in his official capacity as President of Alabama State University; ELTON N. DEAN, SR., individually and in his officialcapacity as Chairman of the Board of Trustees of Alabama State University, | ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 2:07-CV-00384-ID-CSC** |
| **Defendants.** | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AS TO COUNTERCLAIM AGAINST GIL BERRY

Defendants TCU Consulting Services, LLC, W. Ken Upchurch III, and Percy Thomas (collectively the "TCU Defendants" unless otherwise noted) submit the following brief in support of their motion for summary judgment as to their counterclaim for defamation against Gil Berry ("Berry"), filed contemporaneously herewith.

## I. STATEMENT OF UNDISPUTED FACTS

1.    In 2005, defendant Alabama State University ("ASU") decided to study the possibility of renovating six of its student housing buildings. (Complaint, Doc. # 59, ¶ 11). Berry contacted ASU about the services he could provide as a developer specializing in the

design, construction, renovation, and financing of student housing such as that found at ASU. (*Id*. at ¶ 12).

2.  Berry hired plaintiff Marous Brothers Construction, Inc. ("Marous") to assist him in the preparation of a formal proposal for the project. (Complaint, Doc. # 59, ¶ 14). On or about September 20, 2005, Berry and Marous submitted their initial proposal to ASU. (Exhibit "A", Deposition of Gil Berry p. 156, lines 16-23; p. 157, lines 1-7; p. 158, lines 8-13).

3.  On May 15, 2006, Berry and Marous submitted to ASU their Scope of Work for the project, which detailed the proposed renovations, including pricing and layout. (Exhibit "B", Deposition of Arne Goldman, Marous' corporate representative, p. 204, lines 13-23; p. 205, lines 1-6; p. 206, lines 6-11).

4.  Berry proposed serving as the "Developer" of the dorm renovation project. (Ex. A, p. 483, lines 16-23; p. 484, lines 1-23). Marous was expected to serve as a design/builder and/or construction manager for the Project if ASU accepted their proposal. (Ex. A, p. 483, lines 16-20). Berry's primary role was to coordinate implementation of a diversity program and student internship program, while Marous actually performed or oversaw construction. (Ex. A, p. 85, lines 16-23; p. 86, lines 1-14; p. 87, lines 22-23; p. 88, lines 1-4; p. 91, lines 11-17; p. 470, lines 7-12).

5.  On or about July 28, 2006, TCU was retained by ASU to serve as the owner's representative. (Complaint, Doc. # 59, ¶ 26). TCU's agreement with ASU provides that TCU "shall not provide construction management services in any form", but, instead, will advise and make recommendations to ASU regarding ASU's various projects, including the dorm renovation project, the New Education Building project, and the Student Union Facility

project. (Exhibit "C", Standard Form of Owner's Representative Agreement and General Conditions Between Owner and Owner's Representative, Article 3.1.3 and attachment A). Berry and Marous' proposal only included the dorm renovation project.

6.      Berry understood that TCU's role on the dorm renovation project was to review Berry's proposal and scope of work and advise ASU regarding the content of such documents. (Ex. A, p. 512, lines 3-10; p. 513, lines 11-18). Berry consented to and welcomed TCU's involvement in the project. (Ex. A, p. 513, lines 19-23; p. 514, lines 1-3)

7.      On or about September 22, 2006, the ASU Board of Trustees elected not to accept the proposal submitted by Berry and Marous for the dorm renovation project. (Exhibit "D', letter from ASU to Berry). Berry admits that the decision of whether or not to hire Berry was for ASU, not TCU. (Ex. A, p. 569, lines 7-16).

8.      ASU eventually entered into a contract with Rabren Construction, a general contractor who had previously performed work for ASU, for the dorm renovation project. (Exhibit E, Deposition of Joe Lee, p. 62, lines 21-23; p. 63, lines 1-4).

## II.    ARGUMENT

The tort of defamation involves the protection of the reputation and good name of the plaintiff. A defamatory comment is one that "'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Harris v. School Annual Publ'g Co.*, 466 So. 2d 963, 964 (Ala. 1985) (quoting *Restatement (Second) of Torts* § 559 (1976)).

The elements of a cause of action for defamation are "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the

statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v. Talladega Publishing Co.*, 544 So. 2d 875, 877 (Ala. 1989). When examining the allegedly defamatory statements, a court must give the language used "that meaning that would be ascribed to the language by a reader or listener of 'average or ordinary intelligence, or by a common mind.'" *Camp v. Yeager*, 601 So. 2d 924, 927 (Ala. 1992) (quoting *Loveless v. Graddick*, 325 So. 2d 137, 142 (1975)). If the words employed in the allegedly defamatory publication "impute dishonesty or corruption to an individual, they are actionable per se," as are "words . . . which directly tend to prejudice anyone in his office, profession, trade or business, or in any lawful employment by which he may gain his livelihood." *Gray v. WALA-TV*, 384 So. 2d 1062, 1065 (Ala. 1980).

## A.    BERRY PUBLISHED FALSE AND DEFAMATORY STATEMENTS CONCERNING TCU, UPCHURCH, AND THOMAS WITH NO BASIS OR EVIDENCE TO SUPPORT HIS CLAIMS.

During his deposition, Berry admits he told several people, including Elton Dean, Buford Crutcher, Judge Marvin Wiggins, Josh Moon, and Alfred Seawright, that TCU stole his project and used illegal means to secure ASU jobs.

> Q:    Is that when you told Elton Dean that they were stealing your project?
>
> A:    Yes.
>
> Q:    Who else did you tell that to?
>
> A:    I told it to Mr. Buford, and I told it to Judge Wiggins. And they both said, no, that's not happening. I guarantee you that's not happening. I said, gentlemen, it is happening.
>
> Q:    So, you said that they were stealing your project?
>
> A:    That's correct.

(Ex. A, p. 516, lines 17-23; p. 517, lines 1-5).

Q:    Okay. So, yes, you did tell Josh Moon that they used unethical or illegal means to get the dorm renovation project that you believed was yours?

\*              \*              \*              \*              \*

A:    Yes.

(Ex. A, p. 724, lines 15-18, 23).

Q:    Number four, that TCU, Upchurch, and Thomas secured ASU jobs by illegal means. Do you see that?

A:    That is correct.

Q:    And you told Josh Moon that, too, didn't you?

\*              \*              \*              \*              \*

A:    That is a yes.

Q:    Okay. You did say they secured ASU jobs by illegal means?

A:    That is my opinion, yes.

(Ex. A, p. 728, lines 8-13, 23; p. 729, lines 1-3).

A:    I told Alfred [Seawright] that they were stealing the job …

(Ex. A, p. 731, lines 17-18).

Berry made such false and defamatory statements without any evidence that the TCU

Defendants are using Berry's work product.

Q:    Okay. So, you don't have any evidence that they are, in fact, using your proprietary work, do you?

\*              \*              \*              \*              \*

A:    No, no.

(Ex. A, p. 571, lines 16-18, 23; *see also* p. 657, lines 4-6).

> Q:    And, again, you have no evidence that they're using your work product in the renovation of the ASU dormitories?
>
> A:    That's correct.

(Ex. A, p. 666, lines 8-11).

Moreover, Berry made these outrageous statements about the TCU Defendants without ever having seen TCU's contract with ASU or even knowing what TCU does for ASU other than act as its "owner's representative".

> Q:    Have you seen TCU's contract?
>
> A:    I haven't seen it.
>
> Q:    So, you don't know what their role is, do you, other than owner's representative?
>
> A:    No.
>
> *              *              *              *              *
>
> A:    I don't know what they hired him [TCU] for.

(Ex. A, p. 646, lines 5-10; p. 648, lines 13-14).

> Q:    -- you have zero evidence of what their role is other than serving as an owner's representative, which they were doing before the September 22nd board meeting when the trustees elected not to accept your proposal?
>
> *              *              *              *              *
>
> A:    No, I don't – no, I don't know.

(Ex. A, p. 649, lines 21-23; p. 650, lines 1-2, 10).

Berry also has no knowledge or information about the renovation work currently being undertaken by ASU.

> Q:    Do you know what the scope of work on this project is as it is today?

A:    No, I don't.

\*        \*        \*        \*        \*

Q:    And you have no evidence of what's being built over there?

A:    No.

(Ex. A, p. 657, lines 7-9; p. 659, lines 21-23)

Berry admits that, whether or not ASU hired Berry and Marous, TCU could have continued in its role as owner's representative.

Q:    Okay. If you had gotten – or if ASU had accepted your proposal on September 22nd, TCU could still serve as the owner's representative, couldn't it?

A:    Yeah.

\*        \*        \*        \*        \*

Q:    So, the fact that you didn't get the job doesn't mean TCU can't still serve as an owner's representative, does it?

A:    I guess if the school chooses them, they can do whatever they want to do.

(Ex. A, p. 650, lines 11-15, 22-23; p. 651, lines 1-3).

It is undisputed that Berry falsely and wrongly accused the TCU Defendants of stealing and using illegal and unethical means to get his project. Berry made such accusations to numerous individuals with no evidence that the TCU Defendants are using his proprietary work product and with no evidence that TCU is serving as anything other than the owner's representative, a position TCU held prior to ASU's decision to not accept Berry's proposal.[1] Based upon these undisputed facts, the TCU Defendants are entitled to summary judgment as a matter of law on their counterclaim for defamation against Berry.

---

[1] As noted above, Berry proposed to serve as the "developer" of the project in partnership with Marous. Berry never proposed to serve as "owner's representative" for ASU.

**B.    I**T IS UNDISPUTED THAT **G**IL **B**ERRY COMMITTED THE TORT OF DEFAMATION PER SE**.**

Berry imputed dishonesty and corruption to TCU, Upchurch, and Thomas and prejudiced them in their trade, business, and profession. *See Gray*, 384 So. 2d at 1065. The Alabama Supreme Court has held that "falsely imputing the commission of a larceny to an individual is defamatory per se". *Drill Parts and Serv. Co., Inc. v. Joy Manuf. Co.*, 619 So. 2d 1280, 1289 (Ala. 1993); *see also Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091-92 (Ala. 1988) ("imputing a crime of larceny falls within" the definition of defamation per se). Likewise, falsely accusing another of "stealing" a project or otherwise using illegal and unethical means to secure jobs falls within the definition of defamation per se. "When a defamatory publication is actionable per se, the law infers injury to reputation as a natural consequence of the defamation and, as a result, the plaintiff is entitled to presumed damages." *Nelson*, 534 So. 2d at 1092. Accordingly, TCU, Upchurch, and Thomas do not have to prove actual harm to reputation or any other damage in order to recover nominal or compensatory damages from Berry. *Id.*

**C.    B**ERRY REFUSED TO RETRACT THE FALSE AND DEFAMATORY STATEMENTS, THUS ENTITLING THE TCU DEFENDANTS TO PUNITIVE DAMAGES**.**

On July 30 and August 3, 2007, the TCU Defendants, through their counsel, demanded that Berry retract the false and defamatory statements he made about them, including the allegation that they stole or used unethical means to take the dorm renovation project from Berry. (Exhibit F, demands for retraction). On August 1 and again on August 8, 2007, Berry denied making such defamatory statements, and, consequently, never retracted the statements. (Exhibit G, responses to demand for retraction). As noted above, however, Berry admitted in his deposition that he told many people that the TCU Defendants stole his project. He also admitted during his deposition that his August 8, 2007 denial was false.

Q:    Now, you've already testified yesterday under question-
ing from Kenny Thomas that, in fact, you did tell people that
they stole your job, stole your project.   You told Elton Dean
that, didn't you?

A:    Yeah.

Q:    So, when you in your August 8 letter deny making that
statement, that's not true, is it, because you did make that
statement?

A:    I did.

(Ex. A, p. 722, lines 12-23).

Berry's refusal to retract the defamatory statements as demanded by the TCU

Defendants entitles them to recover punitive damages from Berry.   *Ala.Code* § 6-5-186

(1975).

### III.    CONCLUSION

For the foregoing reasons, TCU, Upchurch, and Thomas are entitled to summary

judgment as a matter of law on their counterclaim for defamation against Gil Berry.  The TCU

Defendants request a hearing on the issue of the damages incurred as a result of the

defamatory statements made by Berry.

/s/          R. Brooke Lawson III
J. LISTER HUBBARD  (HUB007)
R. BROOKE LAWSON III  (LAW026)

Attorneys for Defendants TCU Consulting
Services, LLC, W. Ken Upchurch III, and Percy
Thomas

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama  36102-2069
334/241-8000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the following was served on the following by electronic filing, on this the 2nd day of September, 2008:

Kenneth L. Thomas, Esq.
Ramadanah M. Salaam-Jones, Esq.
Thomas, Means, Gillis & Seay, P.C.
P.O. Drawer 5058
Montgomery, Alabama 36103-5058

Champ Lyons, III
King, Horsley & Lyons, LLC
One Metroplex Drive
Suite 280
Birmingham, Alabama 35209

Jock M. Smith, Esq.
Cochran, Cherry, Givens & Smith, P.C.
306 North Main Street
P.O. Box 830419
Tuskegee, Alabama 36083

Sherryl Snodgrass Caffey, Esq.
P.O. Box 1327
Normal, Alabama 35801


                                    /s/          R. Brooke Lawson III
                                    Of Counsel

# Exhibit "A"

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               MIDDLE DISTRICT OF ALABAMA

 3                    NORTHERN DIVISION

 4    MAROUS BROTHERS              )
                                   )
 5    CONSTRUCTION, LLC, a         )
                                   )
 6    corporation, and GIL         )
                                   )
 7    BERRY, an individual         )
                                   )
 8    d/b/a Gil Berry &            )
                                   )
 9    Associates,                  )  CIVIL ACTION NO.
                                   )
10            Plaintiffs,          )  2:07-CV-384-ID
                                   )
11    -vs-                         )
                                   )
12    ALABAMA STATE UNIVERSITY,)
                                   )
13    a public corporation,        )
                                   )
14    et al.,                      )
                                   )
15            Defendants.          )
16
17                      VOLUME I
18
19
20        DEPOSITION OF GILBERT C. BERRY
21
22
23
```

# FREEDOM COURT REPORTING

85

1          Q.     Now, you use the date here of

2     2006.  So, if we use 2008, this project is

3     easily a year and half to two years old at

4     Alabama A&M; is that correct?

5          A.     I would have to say so.

6          Q.     Are you contemplating any

7     litigation against Alabama A&M University

8     board of trustees or to president -- Mr.

9     Jennings -- Dr. Jennings?  Excuse me.

10         A.     No.

11         Q.     Now, on both of these projects,

12    the Alabama A&M project and the Oakwood

13    College project student housing, what does Gil

14    Berry bring to the projects?

15         A.     What does Gil Berry bring to --

16         Q.     Gil Berry & Associates,

17    Incorporated, you.  What do you bring to those

18    two projects?

19         A.     A wealth of knowledge about

20    construction, a diversity work force,

21    implementing students to participate on the

22    projects so they can have knowledge when they

23    go out to the work force.  We pay a stipend,

## FREEDOM COURT REPORTING

86

1    and then they can say that they worked on a

2    multi-million dollar project when they go out

3    into the work force, to be able to participate

4    in the presentations, to be able to answer any

5    questions dealing with the project, to be able

6    to make presentations without anyone else

7    being involved to -- just like I did with Dr.

8    Jennings to let him have an understanding on

9    how we can proceed on these projects, you

10   know, by the way of foundation, being awarded

11   the ability to award us the contract and then

12   lease back to -- to the college.

13              I bring a host of things to the

14   project.

15              Q.     That lease back piece that you

16   just testified to --

17              A.     Uh-huh (affirmative).

18              Q.     -- has that been done anywhere in

19   the State of Alabama?

20              Has that particular type of lease

21   and buyback, whatever you were describing, has

22   that been done at any university in the State

23   of Alabama?

# FREEDOM COURT REPORTING

87

1          A.      It has been.

2          Q.      Which ones?

3          A.      Actually, I was sent by a

4    gentleman by the name of Charly Lynn down in

5    Birmingham where Alabama A&M had done it.

6          Q.      Got you.

7          A.      So, I have those documents, and

8    I'll be glad to give them to my attorney if

9    you want to review them.

10         Q.      Now, when you say you bring a

11   work force, I mean -- you say you bring work

12   force to the project.  What do you mean by

13   that?

14         A.      I said I bring a wealth of

15   knowledge.

16         Q.      I got that too now.

17         A.      Okay.

18         Q.      I was going to get to that next.

19         A.      Okay.

20         Q.      But you also said that you bring

21   a work force.

22         A.      Well, I usually partner with

23   someone who understands what the project is,

**FREEDOM COURT REPORTING**

88

1    if it's new construction or if it's

2    renovation.  That's why I felt it was very

3    important to bring a company like Marous

4    Brothers to Alabama A&M and to Alabama State.

5         Q.     And to -- so, Oakwood College,

6    they were on the project with you at Oakwood,

7    right?

8         A.     Yeah.  They made a presentation.

9         Q.     Yeah, okay.  So, in the work

10   force area you just partner with somebody?

11        A.     Correct.

12        Q.     All right.  Now, this wealth of

13   knowledge, okay, what areas are they in?

14        A.     I didn't hear you.

15        Q.     What's your wealth of knowledge

16   in, what areas?

17        A.     Diversity.

18        Q.     And when you say diversity, what

19   do you mean?

20        A.     Making sure that African

21   Americans, people of color, women, are

22   represented and meaningful relationships on

23   construction.

# FREEDOM COURT REPORTING

91

1    You don't have to be licensed.  You get

2    certified in the field of construction --

3    program management, general contracting and

4    subject as subcontracting electrical or

5    whatever.

6        Q.      Now, again, as a novice, though,

7    you're not going to be in there measuring

8    walls and water pipes?  You, Gil Berry, will

9    not be; am I correct?

10       A.      That's correct.

11       Q.      All right.  So, what you're doing

12   then is just coordinating and making sure that

13   those people or companies that do that would

14   be representative of everybody, African

15   Americans, minorities, disadvantaged groups

16   like women; am I correct?

17       A.      That is correct.

18       Q.      Got you.  Now, partnering with

19   work force, the wealth of knowledge with

20   diversity.  What else do you bring to a

21   project?

22       A.      Student involvement.

23       Q.      And is that the program by which

# FREEDOM COURT REPORTING

156

1    because of the poor conditions of the housing

2    and that he -- he knew -- he felt in his heart

3    of hearts that if we could get it to where we

4    could make a presentation and get it in the

5    form that they would approve a request and we

6    could get started.

7        Q.    Now, is this the nature of a

8    presentation?  Is that what this is?

9            Because when we talked about your

10   other universities like Allen, Oakwood College

11   and A&M, you talked about making a

12   presentation.

13           Is this a presentation?

14       A.    Could I see the document, and

15   I'll be glad to answer that.

16       Q.    And when I speak in terms of

17   documents, that would be Defendant's Exhibit

18   4.

19       A.    This I would say is part of a

20   PowerPoint presentation where people could

21   follow.  It has schedules.  You know, this is

22   not -- this is not a -- I don't see any floor

23   plans.  I don't see any floor layouts.  I

# FREEDOM COURT REPORTING

157

1    don't see none of that.  I just see schedules

2    right now.

3            So, I think it would be part of

4    just a PowerPoint presentation where if you're

5    sitting in the audience you can follow it, you

6    can take it with you, review it later, you

7    know, if you have any questions.

8        Q.    Got you.  And for which you did

9    not expect any compensation for, this document

10   here?

11       A.    I would think not at that time.

12       Q.    Got you.  Now, would the same

13   hold true, to your knowledge, for Student

14   Suites?  Did they expect remuneration for

15   this?

16       A.    In all honesty, I can't speak for

17   Student Suites.

18       Q.    Well, you-all were a "team."  I

19   mean, I see -- well, let me just ask you point

20   blank.  This proposal, was it developed by Gil

21   Berry & Associates and the Marous Brother?

22       A.    This was prepared by Marous

23   Brothers.

158

1          Q.      Okay.  Prepared by Marous

2    Brothers?

3          A.      Yeah.

4          Q.      And if I'm not mistaken --

5          A.      Go ahead.

6          Q.      Let me take this.

7          A.      Uh-huh (affirmative).

8          Q.      And transmitted to Dr. Frazier

9    via a letter dated September 20th, 2005, from

10   Dick Davis, Student Suites?

11         A.      Correct.

12         Q.      This packet here?

13         A.      Yes, sir.

14         Q.      No --

15         A.      As far as -- I mean, on the --

16   for what I see the documentation of the dates

17   and everything, I would have to agree with

18   you.

19         Q.      And his letter says that we are

20   pleased to submit our findings.  "Our,"

21   plural.

22         A.      Uh-huh (affirmative).

23         Q.      All right.  Now, my question to

# FREEDOM COURT REPORTING

470

1          A.      Yes, sir.

2          Q.      Would those same roles -- or

3    would those entities' roles be the same on the

4    Alabama State project?

5          A.      Would those same roles be the

6    same on --

7          Q.      Would the role of Student Suites

8    and Marous and Gil Berry & Associates be the

9    same on the Alabama State project as you

10   described them to be on the Alabama A&M

11   project?

12         A.      Yes.

13         Q.      Were there any differences

14   between your roles on one project versus the

15   other?

16         A.      No, because Dick does finance.

17   He does have a company that does new

18   construction.  Dick doesn't have a lot of

19   knowledge of renovations.  He's never done a

20   renovation.  When I say "he," the firm that he

21   uses to do his new construction, which is in

22   Missouri, has never did a renovation.

23         Q.      Has never what?

## FREEDOM COURT REPORTING

483

1      Q.      Okay.  So, they prepared the

2  drawings or the schematic that showed what

3  type of suite would be found in each of the

4  renovated dormitories, correct?

5      A.      That is correct.

6      Q.      Did any of the suites designed by

7  Marous or proposed by Marous have kitchens?

8      A.      I don't know.

9      Q.      That would be a question for

10  Marous?

11      A.      Yes.  That would be a question --

12      Q.      So, you're not really certain as

13  we sit here today what was included in Marous'

14  proposal as far as the layout of the suite

15  style units?

16      A.      My role as the developer is to

17  develop the project and to develop the team.

18  Marous Brothers' role were the design/builders

19  and the contractors or head of the

20  construction management team.

21          As the developer, you develop the

22  project, you put the team together and you

23  present the proposal.  That's what I did.

## FREEDOM COURT REPORTING

484

1        Q.        So, that was -- the role -- what

2    you would call yourself would be a

3    "developer"?

4        A.        Yes, I'm a developer.

5        Q.        And the role of the developer is

6    to put the team together, in this case Marous

7    and Student Suites --

8        A.        People that have an understanding

9    of -- in that case it's historical renovation.

10   That's why it was Marous.  It if it would have

11   been new construction, Dick had --

12                When we were going to do the 388

13   beds, Dick was going to actually bring his

14   team to do the 388 beds while Marous did the

15   renovation portion so that at the same time

16   there would actually be work going on

17   simultaneously on both projects.

18       Q.        I understand.  So, as the

19   developer, you were pulling these entities

20   together with their specialties, Davis in the

21   financial end of it and Marous in the

22   design/build end of it?

23       A.        Correct.

# FREEDOM COURT REPORTING

512

1        Q.        Enlighten the president?

2        A.        Enlighten the president.

3        Q.        So, you understood then at the

4   time they came on, "they" being TCU, that

5   their role was to review the proposal, the

6   scope of work and any other documents you and

7   Marous had submitted for President Lee to

8   enlighten him as to what was in those

9   documents?

10       A.        Yes, sir.

11       Q.        And in enlightening President

12  Lee, were they to look at it critically?

13                 Were they to -- if they saw

14  something in there that jumped out at them

15  that just wasn't right, were they to enlighten

16  President Lee about that, or were they only to

17  enlighten President Lee about the good points

18  or the highlights of the documents in the

19  proposal?

20       A.        Well --

21       Q.        Or do you know?

22       A.        I don't -- I don't know.

23       Q.        You just know they were going to

# FREEDOM COURT REPORTING

513

1    review those documents for whatever purposes?

2        A.    That's all that was told to me.

3        Q.    You don't know what the

4    arrangement really was because you weren't

5    privy to any of the discussions between ASU

6    and TCU, were you?

7        A.    No.  I was just told by Mr. Dean,

8    Judge Wiggins and Mr. Buford that they were

9    just going to review the documents so we can

10   get past the point of this delay.

11       Q.    And you knew that it was going to

12   review your documents, your proposal, your

13   scope of work?

14       A.    That's correct.

15       Q.    And you knew its role was to ask

16   questions and to critique it for President

17   Lee, correct?

18       A.    I assume that.

19       Q.    Okay.  And you welcomed TCU's

20   involvement if I remember correctly from your

21   E-mails, didn't you?

22       A.    I did.

23       Q.    And you consented to TCU's review

## FREEDOM COURT REPORTING

514

1    of your materials, your proposal, your scope

2    of work?

3          A.      I did.

4          Q.      Okay.  And we looked at exhibit

5    --

6          A.      On review.  On review --

7          Q.      I understand.

8          A.      -- only.

9          Q.      As opposed to what?

10         A.      As opposed to them taking our

11   project.

12         Q.      And we'll get to that.

13         A.      Yes, sir.

14         Q.      Exhibit 23, if you want to look

15   at it.  You don't have to.  But it was a bunch

16   of E-mails from you where you've consented and

17   welcomed TCU and --

18         A.      I know what you're --

19         Q.      You remember the E-mails?

20         A.      Yeah.

21         Q.      You had no problem with TCU

22   serving as a representative of ASU?

23         A.      No.  Serving as a review --

# FREEDOM COURT REPORTING

516

1        A.        -- and one is this high.  They

2    said yesterday -- Mr. Thomas said it was okay

3    because they've got thick skins.

4        Q.        Okay.

5        A.        So, I told the chairman that,

6    that I knew --

7        Q.        When did you tell him that?

8        A.        Over the telephone.

9        Q.        Well, when?

10        A.        Around the time that -- when Mr.

11    -- Mr. Upchurch sent 87 questions or somewhere

12    around there that had nothing to do with what

13    we had submitted and what they had got funded

14    for.

15        Q.        Was that in August of 2006?

16        A.        It was probably around that time.

17        Q.        Is that when you told Elton Dean

18    that they were stealing your project?

19        A.        Yes.

20        Q.        Who else did you tell that to?

21        A.        I told it to Mr. Buford, and I

22    told it to Judge Wiggins.  And they both said,

23    no, that's not happening.  I guarantee you

# FREEDOM COURT REPORTING

517

1    that's not happening.  I said, gentlemen, it

2    is happening.

3           Q.     So, you said that they were

4    stealing your project?

5           A.     That's correct.

6           Q.     What else did you say to them?

7           A.     I didn't say nothing negative as

8    far as -- they're still on the project.  What

9    else is there to say?

10          Q.     I don't know.  You tell me.  Did

11   you tell Elton Dean anything else?  Did you

12   say anything else about them other than they

13   were stealing your project?

14          A.     No.

15          Q.     You didn't have any sort of

16   contract or agreement with TCU, Ken Upchurch

17   or Percy Thomas, did you?

18          A.     No.

19          Q.     And you had nothing signed by

20   them?

21          A.     No, I didn't have anything signed

22   by them.

23          Q.     And you didn't submit your

# FREEDOM COURT REPORTING

569

1    Paragraph 33.

2         A.      Uh-huh (affirmative).

3         Q.      It says following the vote by ASU

4    Board of Trustees that plaintiffs would not be

5    utilized -- do you see that?

6         A.      Yes, I see that.

7         Q.      The decision of whether or not to

8    hire you or Marous or Student Suites was the

9    decision of ASU's Board of Trustees, correct?

10             MR. LYONS:  If you know who made

11   the decision, you can answer.

12             THE WITNESS:  I would have to say

13   yes.

14        Q.      (By Mr. Lawson)  You know that's

15   not the decision of TCU, don't you?

16        A.      That's correct.

17        Q.      Okay.  Now, back over on the next

18   page in Paragraph 36 you state that it's your

19   belief that Upchurch, Thomas and TCU are

20   utilizing your proprietary work.  Do you see

21   that?

22        A.      Uh-huh (affirmative).

23        Q.      What evidence do you have of

FREEDOM COURT REPORTING

571

1          Why didn't they use Mr.

2   Upchurch's talents and Mr. Thomas' talents and

3   say, hey, these guys are already here, they're

4   local, they're good contractors, why don't we

5   let them do the renovation project?

6          Q.    Okay.  Well, my question was what

7   evidence do you have that they are using your

8   proprietary work?

9          The fact that they looked at it

10  and reviewed it, is that the evidence that you

11  have that they are, in fact, using it?

12         A.    I think Mr. Arne Goldman would be

13  better to answer that.  I gave you my answer.

14         Q.    Well --

15         A.    I gave you my answer.

16         Q.    Okay.  So, you don't have any

17  evidence that they are, in fact, using your

18  proprietary work, do you?

19         A.    I gave you my answer.

20         Q.    My question to you is:  Do you

21  have any evidence that they are, in fact,

22  using it?  Your answer to me --

23         A.    No, no.

## FREEDOM COURT REPORTING

646

1          Q.      What's a program manager?

2          A.      A program manager is a guy who

3     manages the project.  It's like a construction

4     manager, but it's program specific.

5          Q.      Have you seen TCU's contract?

6          A.      I haven't seen it.

7          Q.      So, you don't know what their

8     role is, do you, other than owner's

9     representative?

10         A.      No.

11         Q.      You don't know that they're a

12    program manager, do you?

13         A.      No, I don't know that.

14         Q.      Okay.  So, my question to you was

15    what evidence do you have that they encouraged

16    ASU to not hire you?

17         A.      Because they were working in

18    behalf of getting theirself hired.

19         Q.      So, you believe that the mere

20    fact that they're still working for ASU on

21    this and a number of other projects is

22    evidence that they encouraged ASU to not hire

23    you?

# FREEDOM COURT REPORTING

648

1     Gil Berry & Associates.

2          Q.     Okay.  So --

3          A.     And he said, yes, I can do it for

4     not less, but I can do it for the same price,

5     the $25 million, but there's going to be a

6     time change.  It's probably going to take me

7     three months to kind of ramp up to --

8          Q.     So, it's at that meeting that

9     they hired TCU as a construction manager?

10         A.     They hired him to take over my

11    project.

12         Q.     Okay.  As what?  As developer?

13         A.     I don't know what they hired him

14    for.

15         Q.     Exactly.

16         A.     But they hired him.  That's the

17    key.

18         Q.     As on owner's representative.

19    And you've not seen their contract, and you

20    don't know as we sit here today what their

21    role is at that project, do you?

22         A.     I know they're getting paid to

23    oversee my project.

# FREEDOM COURT REPORTING

649

1        Q.      You don't know what they are

2    doing at that project, do you?

3        A.      I'm quite sure they are acting as

4    the owner's representative.

5        Q.      Which they were doing back in

6    August of 2006, correct?

7        A.      I don't know what the date was

8    their contract was with the --

9        Q.      You knew they were serving as an

10   owner's representative before the September

11   22nd board meeting?

12       A.      I know they were hired to review

13   our documents.

14       Q.      And the only thing thing you know

15   as we sit here today is that they serve as the

16   owner's representative?

17       A.      I'm quite sure that we will find

18   out what their capacity was at that time.

19       Q.      But as we sit here today --

20       A.      I don't know.

21       Q.      -- you have zero evidence of what

22   their role is other than serving as an owner's

23   representative, which they were doing before

# FREEDOM COURT REPORTING

650

1    the September 22nd board meeting when the

2    trustees elected not to accept your proposal?

3         A.    I'm quite sure my attorney --

4         Q.    Is that correct?

5         A.    I'm quite sure my attorney at

6    their deposition will find out what their

7    capacity was.

8         Q.    But to answer my question, as we

9    sit here today --

10        A.    No, I don't -- no, I don't know.

11        Q.    Okay.  If you had gotten -- or if

12   ASU had accepted your proposal on September

13   22nd, TCU could still serve as the owner's

14   representative, couldn't they?

15        A.    Yeah.

16        Q.    ASU was free to hire them as its

17   owner's representative, and they could still

18   be using them today even if you and Marous had

19   gotten that job?

20        A.    I'm quite sure they can do

21   whatever they want.

22        Q.    So, the fact that you didn't get

23   the job doesn't mean TCU can't still serve as

# FREEDOM COURT REPORTING

651

1    an owner's representative, does it?

2         A    I guess if the school chooses

3    them, they can do whatever they want to do.

4         Q    Okay.  You said yesterday it was

5    your opinion that this project is going to

6    cost -- and I don't want to say however many

7    millions more you said, but you said a whole

8    lot of millions more.  You remember that?

9         A.    That is correct.

10        Q.    What accounts for those many

11   millions?

12        A.    Well, what accounts for it is

13   that; one, when we proposed our project back

14   in 2005 -- I get reports from various

15   suppliers.  Cost of materials are going up.

16   Manpower is going up.  As we see hurricanes

17   and tornadoes around the country, a lot of the

18   good subcontractors go and chase those jobs.

19   The last report that I got materials have gone

20   up a little over 1.2 percent per month.

21             Plus as the time -- they have

22   kids living in alternative housing, which is

23   costing the school money to house the kids,

# FREEDOM COURT REPORTING

657

1    scope of -- the price has changed.  Because

2    Judge Wiggins personally asked him can you do

3    it for the same price.

4          Q.      Okay.  Do you have any evidence

5    that they're using your work product?

6          A.      No, I don't.

7          Q.      Do you know what the scope of

8    work on this project is as it is today?

9          A.      No, I don't.

10         Q.      You don't know what they're over

11   there renovating or building, do you?

12         A.      I haven't been over there.

13         Q.      You don't know if they're

14   building suites or different kinds of suites

15   or just single rooms, do you, with a common

16   bathroom?

17         A.      All I --

18         Q.      Do you know?

19         A.      No.

20         Q.      So, you have no idea as we sit

21   here today what it is that's being built over

22   there and whether or not the TCU defendants

23   are currently using anything that was your

# FREEDOM COURT REPORTING

659

1    allegations in here that they've wrongfully

2    appropriated your proprietary work product and

3    that they're using it to their benefit and

4    excluding you from using it.

5                     And I want to know what evidence

6    do you have that they're using your work

7    product today.  And the only thing that you've

8    been able to tell me is that Judge Wiggins

9    asked if he could do the job.

10                    Is that it?

11        A.      For the same price as Gil Berry.

12        Q.      Okay.

13        A.      So, we've got to be talking about

14   the same job.

15        Q.      Is that the only evidence you

16   have?

17        A.      That's the only I have.

18        Q.      Okay.  And you --

19        A.      Maybe Marous and them might have

20   other evidence.  I can only speak about me.

21        Q.      And you have no evidence of

22   what's being built over there?

23        A.      No.

# FREEDOM COURT REPORTING

666

1      Q.      Or Marous'?

2      A.      I can't speak for Marous.

3      Q.      Well, you don't know, do you?

4      A.      I don't know.

5      Q.      Because you never gave it --

6      A.      I answered for me.  No, they

7   don't of mine.  I can't speak for Marous.

8      Q.      Okay.  And, again, you have no

9   evidence that they're using your work product

10  in the renovation of the ASU dormitories?

11     A.      That's correct.

12     Q.      The proprietary materials, what

13  are you referring to exactly?  Is that the

14  scope of work, Exhibit 8, or is there

15  something more?

16             I know you said there's not a

17  cover on this, but this is how Exhibit 8 was

18  produced to us.  You said yesterday there may

19  have been a blue cover.

20     A.      There are blue covers.

21     Q.      Okay.  Well, we didn't get a blue

22  cover in discovery.

23     A.      Okay.

# FREEDOM COURT REPORTING

722

1         Q.    Okay. Down in the second

2    paragraph, we demand that you retract various

3    false and defamatory statements, number one

4    being that TCU, Upchurch and Thomas stole or

5    used unethical or illegal means to take the

6    dorm renovation project from you.

7              Now, in your response you deny

8    making any false or defamatory statements as

9    alleged in this August 3rd letter from me.

10   Okay?

11        A.    Uh-huh (affirmative).

12        Q.    Now, you've already testified

13   yesterday under questioning from Kenny Thomas

14   that, in fact, you did tell people that they

15   stole your job, stole your project.

16              You told Elton Dean that, didn't

17   you?

18        A.    Yeah.

19        Q.    So, when you in your August 8

20   letter deny making that statement, that's not

21   true, is it, because you did make that

22   statement?

23        A.    I did.

## FREEDOM COURT REPORTING

724

1   used unethical or illegal means to get that

2   project from you?

3        A.    It was my opinion based on --

4   President Lee said these guys have been

5   working with me.  I feel comfortable with Ken.

6   We're moving on.  Ken has been very

7   supportive.  Ken has come up with a way that

8   we can move this project forward.  Ken says

9   that we can get this project going, in about

10  three months get it jump started.

11             And Judge Wiggins says, can you

12  do it for the $25 million or less?  And he

13  said, I can do it for the same price as Gil.

14  Yes.

15       Q.    Okay.  So, yes, you did tell Josh

16  Moon that they used unethical or illegal means

17  to get the dorm renovation project that you

18  believed was yours?

19       A.    Well, if you were supposed to be

20  reviewing the documents.  It's my opinion --

21       Q.    I'm looking for a yes or no

22  answer.

23       A.    Yes.

# FREEDOM COURT REPORTING

728

1    false or defamatory, correct?

2         A.    That's right.

3         Q.    So, you did make the statement in

4    number three?

5         A.    That is correct.

6         Q.    Number three being number three

7    of Exhibit No. 42.

8              Number four, that TCU, Upchurch,

9    and Thomas secured ASU jobs by illegal means.

10   Do you see that?

11        A.    That is correct.

12        Q.    And you told Josh Moon that, too,

13   didn't you?

14        A.    Well, if you are supposed to be

15   reviewing documents and you end up with the

16   job by saying that -- by President Lee saying

17   that me and Ken have been working diligently

18   to get this job moving, you aren't reviewing

19   our documents.  You are working to get

20   yourself a contract with ASU.

21        Q.    So, that's a yes then?  You did

22   say --

23        A.    That is a yes.

**FREEDOM COURT REPORTING**

729

1          Q.        Okay.  You did say they secured

2     ASU jobs by illegal means?

3          A.        That is my opinion, yes.

4          Q.        So, your August 8, 2007,

5     response, which is Exhibit 41, where you deny

6     making false and defamatory statements, you're

7     merely denying that they are false and

8     defamatory, not that you didn't make those

9     that we allege you made?

10          A.        That is correct.

11          Q.        Okay.  Have many times have you

12     talked to Josh Moon?

13          A.        Four or five times.

14          Q.        Four or five?

15          A.        Uh-huh (affirmative).

16          Q.        In person, on the phone, both?

17          A.        On the phone.  And I seen him --

18     are you talking about -- Josh Moon has been at

19     every board --

20          Q.        Josh Moon, the reporter.

21          A.        -- meeting that I have ever been

22     involved with even before the wheels fell off

23     the cart.

# FREEDOM COURT REPORTING

731

1          Who else have you made those

2    statement to?

3          A.    My lawyers.

4          Q.    Anybody else?  Any other

5    reporters?

6          A.    No.

7          Q.    Okay.  Anybody at ASU?

8          A.    Besides Elton Dean and Buford and

9    Judge Wiggins when I thought that they were

10   trying to steal the job, yes.  I haven't

11   talked to them after they stole the job.

12         Q.    Anyone else?

13         A.    No.

14         Q.    Did you ever make any of those

15   statements that I just identified in Exhibit

16   42 to Alfred Seawright?

17         A.    I told Alfred that they were

18   stealing the job, and he said that he was

19   going to try to talk to Mr. Knight.  He said

20   he was going to go try to talk to John

21   Chambless.

22         Q.    Is that before September 22nd or

23   after?

# Exhibit "B"

# FREEDOM COURT REPORTING

1

```
1              IN THE UNITED STATES DISTRICT COURT
2                 MIDDLE DISTRICT OF ALABAMA
3                      NORTHERN DIVISION
4    MAROUS BROTHERS              )
                                  )
5    CONSTRUCTION, LLC, a         )
                                  )
6    corporation, and GIL         )
                                  )
7    BERRY, an individual         )
                                  )
8    d/b/a GIL BERRY &            )
                                  )
9    ASSOCIATES,                  )    CIVIL ACTION NO.
                                  )
10           Plaintiffs,          )    2:07-CV-384-ID-CSC
                                  )
11   -vs-                         )
                                  )
12   ALABAMA STATE UNIVERSITY,    )
                                  )
13   a public corporation,        )
                                  )
14   et al.,                      )
                                  )
15           Defendants.          )
16              S T I P U L A T I O N S
17              IT IS STIPULATED AND AGREED, by
18   and between the parties through their
19   respective counsel, that the deposition of:
20              ARNE F. GOLDMAN,
21   may be taken before Belinda S. Brewster,
22   Commissioner and Notary Public for the State
23   of Alabama at Large, on the 20th day of
```

COPY

# FREEDOM COURT REPORTING

204

1    they're submitting it on our behalf.  It says

2    they're submitting it on their behalf.  They

3    just happened to put our logo on it.

4         Q.     Okay.  Were you aware that they

5    were submitting --

6         A.     No.

7         Q.     -- it to ASU with your logo?

8         A.     No.

9                (Whereupon, said document was

10               marked for identification as

11               Defendant's Exhibit No. 12 to the

12               deposition of Arne F. Goldman.)

13        Q.     Defendant's Exhibit No. 12, can

14   you tell me what that is, Mr. Goldman?

15        A.     This appears to be the

16   proprietary work product that we produced for

17   the project that documented our intended scope

18   of work, drawings, there are some on-screen

19   takeoffs, there's general program information,

20   some very detailed on-screen takeoffs that

21   helped us in our estimating, as well as

22   existing conditions, demo plans, proposed

23   plans.

# FREEDOM COURT REPORTING

205

1        Q.     When was this prepared by --

2        A.     Between January and May of --

3  January and the end of April of 2006.

4        Q.     Between January and April of 2006

5  this was prepared by Marous Brothers?

6        A.     By Marous Brothers.

7        Q.     Did Gil Berry have any input into

8  this?

9        A.     Very little. I mean, we knew

10  what we were -- we understood that we had been

11  given a budget that we had to design and build

12  to. So, I don't -- I don't recall that Gil

13  had much input in the preparation of this

14  document at all.

15        Q.     When was it provided to Gil

16  Berry? Or was it provided to Gil Berry?

17        A.     It was provided to him, I

18  believe, the end of April.

19        Q.     Was it ever provided to ASU?

20        A.     They asked us for -- Dr. Lee

21  apparently had asked Gil Berry for copies

22  because he didn't have one.

23        But in May we attended a meeting,

# FREEDOM COURT REPORTING

206

1    either a board meeting or a building committee

2    meeting, and we brought some copies for -- I

3    know Judge Wiggins.  I handed Judge Wiggins

4    one, and so I know he had it.  We brought

5    several.

6         Q.      So, this document then, Exhibit

7    No. 12, was provided to Gil Berry and then

8    ultimately provided to ASU --

9         A.      Yes.

10        Q.      -- by May of 2006?

11        A.      Yes.

12        Q.      Does this -- and I refer to it as

13   the scope of work.  Is that how you refer to

14   this document?  Or do you call it something

15   else?  That's just what I've called it.

16        A.      Whatever you want to say.

17        Q.      How does Marous refer to it?

18        A.      Scope of work documents.  It's

19   our work product, our deliverable.

20        Q.      This deliverable or the scope of

21   work, does it include the schematic or the

22   architectural work that you described earlier

23   as having been done by Marous?

# Exhibit "C"



# T.C.U. CONSULTING SERVICES, LLC

## CONSTRUCTION CONSULTANTS

334-279-8765 • 334-272-5731 Fax
P.O. Box 230487
MONTGOMERY, ALABAMA 36123-0487

**RECEIVED**

SEP 2 6 2006

**Alabama State University
Office of the President**

# STANDARD FORM OF OWNER'S REPRESENTATIVE AGREEMENT AND GENERAL CONDITIONS BETWEEN OWNER AND OWNER'S REPRESENTATIVE

## TABLE OF ARTICLES

1. AGREEMENT
2. GENERAL PROVISIONS
3. OWNER'S REPRESENTATIVE'S BASIC SCOPE OF SERVICES
4. OWNER'S RESPONSIBILITIES
5. PARTIES' REPRESENTATIVES
6. CONTRACT DURATION
7. COMPENSATION
8. COST OF THE OWNER'S REPRESENTATIVE SERVICES
9. AMENDMENTS TO THE OWNER'S REPRESENTATIVE SERVICES
10. INDEMNITY AND INSURANCE
11. TERMINATION OF THE AGREEMENT AND OWNER'S RIGHT TO PERFORM OWNER'S REPRESENTATIVES SERVICES
12. DISPUTE RESOLUTION
13. MISCELLANEOUS PROVISIONS

This agreement has important legal and insurance consequences. Consultation with an Attorney and insurance consultant is encouraged with respect to its completion or modification.

1

TCU-00026

| STANDARD FORM OF OWNER'S REPRESENTATIVE AGREEMENT AND GENERAL CONDITIONS BETWEEN OWNER AND OWNER'S REPRESENTATIVE |
|---|

## ARTICLE 1

### AGREEMENT

This Agreement is made this    **26th**    day of  **September**       in the year    **2006** , by and between the


**OWNER:**                         **ALABAMA STATE UNIVERSITY**
(Name and Address)                 **POST OFFICE BOX 271**
                                   **MONTGOMERY, ALABAMA 36101-0271**

                                   **ATTENTION: DR. JOE LEE**


and the
**OWNER'S REPRESENTATIVE:**        **T.C.U. CONSULTING SERVICES, LLC**
(Name and Address)                 **1001 MONTICELLO COURT**
                                   **MONTGOMERY, ALABAMA 36117**


For services in connection with the following
**PROGRAM:**                       **STUDENT HOUSING RENOVATION PROJECT**
                                   **NEW EDUCATION BUILDING PROJECT**
                                   **STUDENT UNION FACILITY**
                                   **ALABAMA STATE UNIVERSITY**
                                   **MONTGOMERY, ALABAMA**


Notice to the parties shall be given at the above addresses.

2

TCU-00027

## ARTICLE 2

## GENERAL PROVISIONS

**2.1** The Owner retains the Owner's Representative to consult with and assist the Owner in developing and implementing the Owner's Program as defined in this Agreement. The Owner's Representative shall be the Owner's agent, shall exercise its skill and judgment in furnishing Owner's Representative services and shall not in any respect serve as a Construction Manager.

**2.2 TEAM RELATIONSHIP**   The Owner and the Owner's Representative agree to proceed with the Program on the basis of trust, good faith and fair dealing, and shall take all actions reasonably necessary to perform this Agreement in an economical and timely manner.

**2.3 EXTENT OF AGREEMENT**   This Agreement is solely for the benefit of the parties, represents the entire and integrated agreement between the parties, and supersedes all prior negotiations, representations or agreements, either written or oral. In the event of a conflict between this Agreement and any other contract entered into by the Owner in connection with the Program as between the Owner and the Owner's Representative, this Agreement shall govern.

**2.4 DEFINITIONS**

**2.4.1** The Owner's Representative Documents consist of:
    .1 written amendments to this Agreement signed by both
       the Owner and Owner's Representative;
    .2 this Agreement; and
    .3 the Owner's Program provided in Subparagraph 2.4.4.

In case of any inconsistency, conflict or ambiguity among the Owner's Representative Documents, the Documents shall govern in the order in which they are listed above.

**2.4.2** The services to be provided by the Owner's Representative are the Basic Services as set forth in Article 3 of this Agreement.

**2.4.3** The term Day shall mean calendar day.

**2.4.4** The Owner's Program is a description of the Owner's objectives, including budgetary and time criteria, space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements. The Program description is provided in Article 1, above.

**2.4.5** A Hazardous Material is any substance or material identified now or in the future as hazardous under any federal, state or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirements governing handling, disposal and/or clean-up.

## ARTICLE 3

**OWNER'S REPRESENTATIVE'S BASIC SCOPE OF SERVICES**

The Owner's Representative shall provide the services indicated in Paragraph 3.2 as the Owner's Representative's responsibility in the Basic Scope of Services during the Phases described below. These services may be provided in one or more of the phases of the Owner's program or in one or more phases of a discrete project within the overall program. The duration of the phases will be used as the basis of compensation of the Owner's Representative as described in Article 7. Portions of each of the Phases of Service may commence before the previous phase is completed, in which case both phases may proceed concurrently.

**3.1** The five Phases of Service are defined as follows:

**3.1.1 PROGRAM PLANNING PHASE**   The Program Planning Phase includes the development of the Owner's Program as defined in Subparagraph 2.4.4 and the preliminary evaluation of the Project(s) feasibility based on the Owner's Program and other relevant information.

**3.1.2 DESIGN PHASE**   The Design Phase includes services during the development of the design and specifications through the preparation of construction documents for a discrete project.

**3.1.3 CONSTRUCTION PHASE**   The Construction Phase commences upon the issuance of a written notice to the contractor to proceed with construction of a discrete project. The Owner's Representative shall not provide construction management services in any form. Owner has made arrangements with a separate contractor or consultant to provide supervision of the construction. During this phase, Owner's Representative shall serve as the Owner's agent, receiving information and making recommendations to the Owner. Owner's Representative shall have no authority to direct, stop or reject the work of construction. All trade or construction contracts shall reflect this status of Owner's Representative as the Owner's Representative.

**3.1.4 OCCUPANCY PHASE**   The Occupancy Phase commences when a project, or a designated portion, is sufficiently complete in accordance with the contract documents

so that the Owner can occupy or utilize the Project, or a designated portion, for the use for which it is intended.

~~3.1.5 FACILITIES MANAGEMENT PHASE  The Facilities Management Phase commences with final completion and occupancy of the project, or of a designated portion, and includes activities required to operate or support the facility. Facilities Management encompasses plant operations (energy plant, etc.), engineering and preventive maintenance, grounds and environs, security, housekeeping, and facilities renovation and reconfiguration.  Facilities Management can include full property management (e.g., landlord or leasing agent) services.~~

**3.2  DESCRIPTION OF SERVICES RENDERED UNDER BASIC SCOPE OF SERVICES:**  A description of basic services to be rendered by Owner's Representative under this Agreement is contained in Attachment A, hereto.
**The Compensation for the Basic Scope of Services to be rendered shall be a fixed amount of  $66,000.00 per month.**

**3.3  ROYALTIES, PATENTS & COPYRIGHTS**    The Owner agrees to defend, indemnify and hold the Owner's Representative harmless from any suits or claims of infringement of any patent rights or copyrights arising out of any patented or copyrighted materials, methods or systems specified by the Owner.

**3.4  MANAGEMENT  INFORMATION  SYSTEMS** Ownership of management information systems developed by the Owner's Representative in the performance of this agreement remain the property of the Owner's Representative.

**3.5 STANDARD OF CARE**

**3.5.1  OWNER'S REPRESENTATIVE'S SERVICES** The Owner's Representative shall perform its Services in accordance with the standard of care normally practiced by Owner's Representative firms in performing services of a similar nature at the time and place the Services are performed.

**3.5.2  EXCLUSIVITY**     Owner's Representative makes no warranties or guarantees relating to schedules, budgets, estimates, line items within such budgets or estimates, the Program Budget, estimated date of Substantial Completion, staffing, design or construction performance by separate contractors, performance or cost of operation of any facility, or any other warranties or guaranties, express or implied. Owner's Representative's sole and exclusive liability to Owner arising out of, relating to or under this Agreement shall be a refund of fees paid to the extent of any proven Owner loss directly attributable to a failure of the Owner's Representative to meet any of its expressed obligations under this Agreement. This Subparagraph 3.5.2 governs, modifies and supersedes any

other items in this Agreement that address the quality of the Services.

**3.6 TAX EXEMPTION**  If in accordance with the Owner's direction an exemption is claimed for taxes, the Owner agrees to defend, indemnify and hold the Owner's Representative harmless from any liability, penalty, interest, fine, tax assessment, attorney's fees or other expense or cost incurred by the Owner's Representative.

**ARTICLE 4**

**OWNER'S RESPONSIBILITIES**

**4.1 INFORMATION PROVIDED BY OWNER**

**4.1.1** The Owner shall provide full information in a timely manner regarding requirements for the Project, including the Owner's Program requirements and other relevant information necessary for the Owner's Representative to provide its services.

**4.1.2** The Owner shall provide reasonable evidence satisfactory to the Owner's Representative, prior to commencing the Owner's Representative Services and during the progress of the Owner's Representative Services, that sufficient funds are available and committed for Owner's Representative Services as may be approved in the course of this Agreement. Unless such reasonable evidence is provided, the Owner's Representative shall not be required to commence or continue the Owner's Representative Services.  The Owner's Representative may stop Owner's Representative Services after seven (7) days' written notice to the Owner if such evidence is not presented within a reasonable time.  The failure of the Owner's Representative to insist upon the providing of this evidence at any one time shall not be a waiver of the Owner's obligation to make payments pursuant to this Agreement, nor shall it be a waiver of the Owner's Representative's right to request or insist that such evidence be provided at a later date.

**4.1.3** The Owner's Representative shall be entitled to rely on the completeness and accuracy of the information required by this Paragraph 4.1.  After reasonable evidence of financial arrangements has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Owner's Representative.

**4.2 OWNER'S RESPONSIBILITIES DURING PHASES OF SERVICE**

4

TCU-00029

**4.2.1** The Owner shall contract directly with other firms for the provision of design, supervision, construction and other related services, work and goods required to implement the Program.

**4.2.1.1** All contracts let by or on behalf of the Owner in connection with the Program shall contain a provision providing that the Owner and the other party to the contract agree to defend, indemnify and hold the Owner's Representative harmless from all claims for bodily injury and property damage to the extent of the negligence attributed to such acts or omissions by the Owner or the other party to the contract or anyone employed directly or indirectly by them or by anyone for whose acts they may be liable. In addition, all such contracts shall contain a provision requiring the other party to include the Owner and the Owner's Representative as additional insured parties, primary and noncontributory, on their insurance policies for the Project. Finally, all such contracts and any subcontracts thereunder shall include the Owner's Representative expressly as a beneficiary of any "No Damage for Delay Clause" or other clause limiting the liability of the Owner for economic losses suffered by a contractor or subcontractor.

**4.2.1.2** The Owner's Representative shall not be responsible for, nor liable to the Owner for any damages arising out of, the failure of other persons providing services, work or goods to the Owner to carry out the performance, of their contracts with the Owner.

**4.2.1.3** The Owner shall direct that communications with the Owner's direct contractors shall be through the Owner's Representative as Owner's Representative.

**4.2.2** If the Owner becomes aware of any error, omission or failure of the Owner's Representative to meet the requirements of this Agreement the Owner shall give prompt written notice to the Owner's Representative.

### ARTICLE 5

### PARTIES' REPRESENTATIVES

**5.1** The Owner and the Owner's Representative agree that the success of their contractual relationship will depend in large part on the individuals designated to represent the Owner and the Owner's Representative for the purposes of this Agreement. In order to further the team relationship contemplated by this Agreement, the Owner and the Owner's Representative agree that their respective individual representatives will be mutually agreeable and that these representatives will not be changed except upon written consent, which will not be unreasonably withheld. The Owner and Owner's Representative shall each designate, in writing, two individuals, one as their primary representative and the second as an alternate to act in the absence of the primary representative. The primary representative and the alternate shall each have the authority to

bind the respective parties in all matters requiring the parties' approval, authorization or written notice.

**5.2 THE OWNER'S REPRESENTATIVE'S REPRESENTATIVES** The Owner's Representative's representatives shall be fully acquainted with the Owner's Representative's Scope of Services.

**5.3 OWNER'S REPRESENTATIVES** The Owner's representatives shall be fully acquainted with the Owner's Program.

**5.4** The primary representatives shall communicate with each other as often as needed during the term of this Agreement and, at a minimum, shall confer either personally or by telephone at least weekly.

### ARTICLE 6

### CONTRACT DURATION

**6.1 COMMENCEMENT OF THE OWNER'S REPRESENTATIVE SERVICES** The Owner's Representative Services shall commence on or about **AUGUST 11, 2006** upon written directive from Owner to Owner's Representative.

**6.2 DEVELOPMENT OF THE PROGRAM SCHEDULE** The Owner's Representative, based upon information provided in the Owner's Program, shall submit a Program Schedule to the Owner for review and approval.

**6.3 AMENDMENTS TO THE PROGRAM SCHEDULE** The Owner's Representative Services shall proceed in general accordance with the approved Program Schedule as such schedule may be amended from time to time, subject to Subparagraph 4.1.2. In the event delays to the implementation of Owner's Program are encountered for any reason, the parties agree to undertake reasonable steps to manage and mitigate the effect of such delays. If causes beyond the Owner's Representative's reasonable control delay, extend or change the time for performance of the Owner's Representative Services, the compensation for Owner's Representative's Service and the Schedule shall be equitably adjusted.

### ARTICLE 7

### COMPENSATION

**7.1 INITIAL PAYMENT** Upon execution of this Agreement an initial payment of _____
| Not Applicable | dollars |
| ($ | ) |
shall be made to the Owner's Representative. The amount of

5

the initial payment shall be credited to the Owner's account at final payment.

## 7.2 PROGRAM PLANNING PHASE COMPENSATION

**7.2.1** The Owner's Representative's Program Planning Phase compensation for each discrete project shall consist of the Cost of Owner's Representative's Services as defined in Article 8 plus a fee calculated as follows:

**Not Applicable**

(State whether a stipulated sum, actual cost, or other basis. If a stipulated sum, state what portion of the sum shall be payable each month.)

**7.2.2** Compensation for Program Planning Phase Services shall be equitably adjusted if such services extend beyond

from the date of this Agreement for reasons beyond the reasonable control of the Owner's Representative or as provided in Paragraph 6.3. For changes in Program Planning Phase Services, compensation shall be adjusted as follows:

**Not Applicable**

## 7.3 DESIGN PHASE SERVICES COMPENSATION

**7.3.1** The Owner's Representative's Design Phase Compensation for each discrete project shall consist of the Cost of Owner's Representative's Services as defined in Article 8 plus a fee calculated as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

(State whether a stipulated sum, actual cost, or other basis. If a stipulated sum, state what portion of the sum shall be payable each month.)

**7.3.2** Compensation for Design Phase Services shall be equitably adjusted if such services extend beyond

from the date of this Agreement for reasons beyond the reasonable control of the Owner's Representative or as provided in Paragraph 6.3. For changes in Design Phase Services, compensation shall be adjusted as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

## 7.4 CONSTRUCTION PHASE SERVICES COMPENSATION

**7.4.1** The Owner's Representative's Construction Phase Compensation for each discrete project shall consist of the cost of the Owner's Representative's Services as defined in Article 8 plus a fee calculated as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

(State whether a stipulated sum, actual cost, or other basis. If a stipulated sum, state what portion of the sum shall be payable each month.)

**7.4.2** Compensation for Construction Phase Services shall be equitably adjusted if such services extend beyond

from the date of this Agreement for reasons beyond the reasonable control of the Owner's Representative or as provided in Paragraph 6.3. For changes in Construction Phase Services, compensation shall be adjusted as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

TCU-00031

~~Services.~~

**7.5 OCCUPANCY ~~AND FACILITY MANAGEMENT~~ SERVICES COMPENSATION**

**7.5.1** The Owner's Representative's Occupancy ~~and Facility Management~~ Phases Compensation for each discrete project shall consist of the Cost of the Owner's Representative's Services as defined in Article 8 plus a fee calculated as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

(State whether a stipulated sum, actual cost, or other basis. If a stipulated sum, state what portion of the sum shall be payable each month.)

**7.5.2** Compensation for Occupancy and facility Management Phases Services shall be equitably adjusted if such services extend beyond _____ from the date of this Agreement for reasons beyond the reasonable control of the Owner's Representative or as provided in Paragraph 6.3. For changes in Occupancy and Facility Management Services, compensation shall be adjusted as follows:

**See Article 13.6 of this Agreement for Compensation terms.**

~~**7.5.3 OWNER'S REPRESENTATIVE'S FEE** If the compensation is based on the Cost of Services plus a fee, the Cost of Owner's Representative's Services are defined in Article 8, and the Owner's Representative's Fee includes the following:~~

~~.1 salaries and other mandatory or customary compensation of the Owner's Representative's employees at its principal and branch offices, except employees referenced in Article 8;~~

~~.2 general and administrative expenses of the Program Manger's principal and branch offices Other than the field office, except as may be Expressly included in Article 8; and~~

~~.3 the Owner's Representative's capital expenses, including interest on the Owner's Representative's capital employed for the Owner's Representative~~

~~**7.6 ADJUSTMENT IN THE OWNER'S REPRESENTATIVE'S FEE**~~

~~In addition to causes for fee adjustment noted, the Owner's Representative's Fee shall be adjusted as follows:~~

~~.1 for delays in the Owner's Representative Services not caused by the Owner's Representative, there will be an equitable adjustment in the Owner's Representative's Fee to compensate the Owner's Representative for increased expenses; and~~

~~.2 if the Owner's Representative is placed in charge of managing the replacement of an insured or uninsured loss, the Owner's Representative shall be paid an additional fee in the same proportion that the Owner's Representative's Fee bears to the estimated cost of the Owner's Representative Services.~~

**7.7 PAYMENTS** Payments for Owner's Representative Services shall be due and payable within ten (10) days following presentation of the Owner's Representative's monthly invoice to the Owner. If the Owner fails to pay the Owner's Representative as agreed, then the Owner's Representative shall have the right to stop the services. Payments due but unpaid shall bear interest at the rate the Owner is paying on its construction loan or at the current "prime rate" of _____ bank, whichever is higher, plus two (2) points.

**ARTICLE 8**

~~**COST OF THE OWNER'S REPRESENTATIVE SERVICES**~~

~~The Owner agrees to pay the Owner's Representative for the Cost of the Services as defined in this Article. This payment shall be in addition to the Owner's Representative's Fee stipulated in Article 7. The Cost of Services include:~~

~~**8.1** Wages paid for labor in the direct employ of the Owner's Representative in the performance of the Owner's Representative Services.~~

~~**8.2** Salaries of Owner's Representative's employees engaged in the performance of the Owner's Representative Services.~~

~~**8.3** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, Social Security, health, welfare, retirement and other fringe benefits as required by law, labor agreements, or paid under the Owner's Representative's standard personnel policy.~~

7

TCU-00032

8.4 Reasonable transportation, travel, hotel and moving expenses of the Owner's Representative's personnel incurred in connection with the Owner's Representative Services.

8.5 Cost of materials, supplies and equipment of any nature used, rented or consumed in providing Owner's Representative Services, including transportation and maintenance of same.

8.6 Payments made by the Owner's Representative to consultants and service contractors for performing a portion of the Owner's Representative Services, under arrangements approved by the Owner.

8.7 Cost of the premiums for all insurance which the Owner's Representative is required to procure or deems necessary.

8.8 Sales, use, gross receipts or other taxes, tariffs or duties related to the Owner's Representative Services for which the Owner's Representative is liable.

8.9 Permits, fees, licenses, tests, royalties, damages for infringement of patents and/or copyrights, including costs of defending related suits for which the Owner's Representative is not responsible, and deposits lost for causes other than the Owner's Representative's negligence.

8.10 Losses, expenses or damages to the extent not compensated by insurance or otherwise, including settlements made with the approval of the Owner, except to the extent any such loss or expense is solely due to the negligence of the Owner's Representative.

8.11 Management information and computer assisted design systems, reproduction costs, photographs, long distance telephone charges, facsimile transmissions, date transmission, data processing services, postage, express delivery charges, reasonable petty cash expenses, and record storage.

8.12 Legal, mediation and arbitration fees and costs, reasonably and properly resulting from the Owner's Representative's performance of the Owner's Representative Services, other than those arising from disputes between the Owner and Owner's Representative.

8.13 All costs directly incurred in the performance of the Owner's Representative Services or in connection with the Owner's Program, and not included in the Owner's Representative's Fee as set forth in Article 7, which are reasonably inferable from the Owner's Program as necessary to produce the intended results.

## ARTICLE 9

## AMENDMENTS TO THE OWNER'S REPRESENTATIVE SERVICES

**9.1 AMENDMENTS** Amendments to the Owner's Representative Services which are within the general scope of this Agreement may be accomplished by written amendment between the parties including adjustments in Compensation, Fee and Cost of Owner's Representative Services as applicable.

**9.2 NO OBLIGATION TO PERFORM** The Owner's Representative shall not be obligated to perform additional Owner's Representative Services until a written amendment has been executed by the Owner and Owner's Representative.

## ARTICLE 10

## INDEMNITY AND INSURANCE

**10.1 INDEMNITY** The Owner's Representative shall not be required to defend, indemnify or hold harmless the Owner for any acts, omissions or negligence of the Owner, Owner's employees, agents or separate contractors. The Owner's Representative agrees to defend, indemnify and hold the Owner Harmless from all claims for bodily injury and property damage (other than to the work constructed in connection with the Program) attributable to the sole negligence of the Owner's Representative. The Owner agrees to defend, indemnify and hold the Owner's Representative harmless from all claims, actions, fines, costs or damages, including but not limited to attorneys fees, arising out of or related to the ownership and development of any project property, including but not limited to the discovery or handling of any Hazardous Materials, project compliance with labor, employment and immigration laws, project compliance with safety laws  and all other matters of regulatory compliance.

**10.2 LIABILITY INSURANCE** Each party shall be responsible for obtaining and maintaining its own liability insurance. Insurance for claims arising out of the performance of this Agreement may be purchased and maintained at the Owner's discretion and is a cost of the Owner's Representative Services pursuant to Paragraph 8.7.

**10.3 PROJECT INSURANCE** The Owner shall provide insurance for all discreet Projects. The Owner's Representative shall be named an additional insured, primary and noncontributory, with a waiver of subrogation on all Builder's Risk or All Risk Policy(ies).

8

TCU-00033

## ARTICLE 11

**TERMINATION OF THE AGREEMENT AND OWNER'S RIGHT TO PERFORM OWNER'S REPRESENTATIVE'S SERVICES**

### 11.1 TERMINATION BY THE OWNER'S REPRESENTATIVE

**11.1.1** Upon seven (7) days' written notice to the Owner, the Owner's Representative may terminate this Agreement for any of the following reasons:

.1 if the Services have been stopped for a thirty (30) day period

    a. under court order or order of other governmental authorities having jurisdiction.

    b. as a result of the declaration of a national emergency or other governmental act; or

    c. because of the Owner's failure to pay the Owner's Representative in accordance with this Agreement;

.2 if the Services are suspended by the Owner for sixty (60) days;

.3 if the Owner materially delays the Owner's Representative in the performance of the Owner's Representative Services;

.4 if the Owner otherwise materially breaches this Agreement; or

.5 if the Owner fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project in accordance with Subparagraph 4.1.2 of this Agreement.

**11.1.2** Upon termination by the Owner's Representative in accordance with Subparagraph 11.1.1, the Owner's Representative shall be entitled to recover from the Owner payment for all Owner's Representative Services performed and for any proven loss, cost or expense in connection with the Owner's Representative Services, plus all demobilization costs and reasonable damages.

### 11.2 OWNER'S RIGHT TO PERFORM OWNER'S REPRESENTATIVE'S OBLIGATIONS AND TERMINATION BY THE OWNER FOR CAUSE

**11.2.1** If the Owner's Representative persistently fails to perform any of its material obligations under this Agreement, the Owner may, after seven (7) days' written notice, during which period the Owner's Representative fails to perform such obligation, undertake to perform such obligations.

**11.2.2** Upon seven (7) days' written notice to the Owner's Representative, the Owner may terminate this Agreement for any of the following reasons:

.1 if the Owner's Representative persistently fails to perform;

.2 if the Owner's Representative has received payment from the Owner but does not make proper payment to its consultants and service providers;

.3 if the Owner's Representative persistently fails to abide by the orders, regulations, rules, ordinances or laws of governmental authorities having jurisdiction; or

.4 if the Owner's Representative otherwise materially breaches this Agreement.

**11.2.3** If the Owner's Representative files a petition under the Bankruptcy Code, this Agreement shall terminate if the Owner's Representative or the Owner's Representative's trustee rejects the Agreement or, if there has been a default and the Owner's Representative is unable to give adequate assurance that the Owner's Representative will perform as required by this Agreement or otherwise is unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

**11.2.4** In the event the Owner exercises its rights under Subparagraph 11.2.1, 11.2.2, or 11.2.3, upon the request of the Owner's Representative, the Owner shall provide a detailed accounting of the cost incurred by the Owner.

**11.3 TERMINATION BY OWNER WITHOUT CAUSE** If the Owner terminates this Agreement other than as set forth in Paragraph 11.2, the Owner shall pay the Owner's Representative for (a) all Owner's Representative Services executed and (b) any proven loss, cost or expense in connection with the Owner's Representative Services, plus all demobilization costs.

The Owner shall also pay to the Owner's Representative fair compensation, either by purchase or rental at the election of the Owner, for any equipment retained. The Owner shall assume and become liable for obligations, commitments and unsettled claims that the Owner's Representative has previously undertaken or incurred in good faith in connection with the Services or as a result of the termination of this Agreement. As a condition of receiving the payments provided under this Article 11, the Owner's Representative shall cooperate with the Owner by taking all steps necessary to accomplish the legal assignment of the Owner's Representative's rights and benefits to the Owner, including the execution and delivery of required papers.

9

## 11.4 SUSPENSION BY THE OWNER FOR CONVENIENCE

**11.4.1** The Owner may order the Owner's Representative in writing to suspend, delay or interrupt all or any part of the Owner's Representative Services without cause for such period of time, not to exceed sixty (60) days, as the Owner may determine to be appropriate for its convenience.

**11.4.2** Adjustments caused by suspension, delay or interruption shall be made for increases in the Owner's Representative's Compensation and schedule adjustments as necessary. No adjustment shall be made if another provision of this Agreement is applied to render an equitable adjustment.

### ARTICLE 12

### DISPUTE RESOLUTION

**12.1 INITIAL DISPUTE RESOLUTION** If a dispute arises out of or relates to this Agreement or its breach, the parties shall direct their Representatives to endeavor to settle the dispute first through direct discussions. If the dispute cannot be resolved through direct discussions, the parties shall participate in mediation under the Construction Industry Mediation Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise before recourse to arbitration. The representatives designated pursuant to Paragraph 5.1 shall attend all mediation sessions. The location of the mediation shall be Montgomery, Alabama.

Once one party files a request for mediation with the other contracting party and with the American Arbitration Association, the parties agree to commence such mediation within sixty (60) days of filing of the request. Either party may terminate the mediation at any time after the first session, but the decision to terminate must be delivered in person by the party representative to the other party's representative and the mediator. Engaging in mediation is a condition precedent to arbitration.

**12.2 AGREEMENT TO ARBITRATE** Any controversy or claim arising out of or relating to this agreement or its breach not resolved by mediation, except for claims which have been waived by the making or acceptance of final payment, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise. Notwithstanding Paragraph 13.2, this agreement to arbitrate shall be governed by the Federal Arbitration Act. The Arbitration hearings shall take place in Montgomery, Alabama on consecutive workdays. Unless the parties mutually agree otherwise, the hearings shall conclude within two months of the first hearing date.

**12.3 NOTICE OF DEMAND** A written demand for arbitration shall be filed with the American Arbitration Association and the other party to this Agreement within a reasonable time after the dispute or claim has arisen, but in no event after the applicable statute of limitations for a legal or equitable proceeding would have run.

**12.4 AWARD** The arbitration award shall be final. Judgment upon the award may be confirmed in any court having jurisdiction.

**12.5 SERVICE CONTINUANCE AND PAYMENT** Unless otherwise agreed in writing, the Owner's Representative shall continue the Owner's Representative Services and maintain the approved schedules during any mediation or arbitration proceedings. If the Owner's Representative continues to perform, the Owner shall continue to make payments in accordance with this Agreement.

**12.6 COST OF DISPUTE RESOLUTION** The cost of any mediation proceeding shall be shared equally by the parties participating. The prevailing party in any dispute arising out of or relating to this Agreement or its breach that is resolved by arbitration or litigation shall be entitled to recover from the other party reasonable attorney's fees, costs and expenses incurred by the prevailing party in connection with such arbitration or litigation.

### ARTICLE 13

### MISCELLANEOUS PROVISIONS

**13.1 ASSIGNMENT** Neither the Owner nor the Owner's Representative shall assign their interest in this Agreement without the written consent of the other except as to the assignment of proceeds.

**13.2 GOVERNING LAW** This Agreement shall be governed by the law of the State of Alabama.

**13.3 SEVERABILITY** The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision.

**13.4 NO WAIVER OF PERFORMANCE** The failure of either party to insist, in any one or more instances, on the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right with respect to further performance.

**13.5 TITLES** The title given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any purpose.

TCU-00035

**13.6 OTHER PROVISIONS**

**COMPENSATION**

The Compensation for the Owner Representative Basic Scope of Services as listed in Attachment A to this Agreement shall be a fixed, stipulated sum amount of $66,000.00 per month. Payments will be due on the 10th of each month beginning with the initial Invoice to be submitted September 1, 2006 and monthly thereafter.

It is anticipated that the work will begin in August 2006 and be completed by August 2009.

If causes beyond the Owner Representatives's reasonable control delay, extend or change the time for performance of the Owner Representative services, the compensation for Owner Representative's Service and Schedule shall be equitably adjusted.

Payments will be due within fifteen (15) days of invoice submittal, beginning with the initial invoice to be submitted on or about October 1, 2006 and monthly thereafter.

This Agreement is entered into as of the date entered in Article 1.

OWNER:        ALABAMA STATE UNIVERSITY        ◆

ATTEST: _Sandra J. Malone_

BY: _____        ◆

PRINT NAME: _Joe A. Lee_        ◆

PRINT TITLE: _President_        ◆

OWNER'S REPRESENTATIVE:    TCU CONSULTING SERVICES, LLC    ◆

ATTEST: _____

BY: _____        ◆

PRINT NAME: _W. Ken Upchurch, III_        ◆

PRINT TITLE: _Managing Partner_        ◆

Owner's Rep Agreement ASU Combined.doc

# T.C.U. CONSULTING SERVICES, LLC

## CONSTRUCTION CONSULTANTS

334-279-8765 • 334-272-5731 Fax
P.O. Box 230487
MONTGOMERY, ALABAMA  36123-0487

## Attachment A

### STUDENT HOUSING RENOVATION PROJECT
### NEW EDUCATION BUILDING PROJECT
### STUDENT UNION FACILITY

### September 26, 2006

**TCU Consulting Services, LLC will consult with, assist and serve as
Alabama State University's Owner Representative in developing and
implementing the Program for the Student Housing Renovation
(approximately $25,000,000.00), the New Education Building
(approximately $30,000,000.00) and the Student Union Facility
(approximately $ 16,000,000.00) projects.  It is anticipated that the work
will begin in August 2006 and be completed by August 2009.**

## BASIC SCOPE OF SERVICES

### Design Phase

1) Finalize Project Scope Requirements and Responsibilities
2) Establish a Master Schedule for the Program
3) Monitor the Design Phase Schedule
4) Facilitate Design Progress Meetings
5) Provide limited design review.
6) Provide constructability review.
7) Assist Design Teams with Value Analysis studies
8) Review Design Development Phase Cost Estimate
9) Review 50% Construction Document Cost Estimate
10) Provide 95% construction document cost estimate.
11) Facilitate cost adjustment sessions, by phase, with design team if required.
12) Assist with Authority Reviews and Approval process
13) Monitor advertising and bidding procedures for compliance
14) Review proposed contract documents and trade agreements for compliance
15) Provide Owner with Phase Status report

TCU-00037

## Construction Phase

1) Assist architect with pre-qualification of bidders process, if implemented
2) Assist architect with bid process.
3) Participate in pre-bid conference.
4) Review addendum and RFI's during bid process.
5) Provide owner with bid evaluation.
6) Facilitate value-engineering process if required.
7) Facilitate construction contract negotiations.
8) Review and make recommendations to owner on construction contract.
9) Participate in pre-construction conference.
10) Monitor architect's construction administration.
11) Monitor architect's submittal review process.
12) Participate in job-site meetings as owner's representative.
13) Provide construction observation.
14) Advise architect of observed issues or non-conforming work.
15) Review contractor schedule of values.
16) Review construction progress.
17) Provide owner with monthly construction schedule updates.
18) Review monthly contractor payment applications.
19) Monitor construction schedule revisions.
20) Monitor the change order processing system.
21) Facilitate the negotiation of change order cost and time extension.
22) Provide owner with monthly change order reports.
23) Review contractor claims.
24) Provide owner with claims analysis.
25) Facilitate contractor claims negotiations.
26) Provide owner with monthly project status reports.
27) Review As-Built drawings.
28) Monitor job closeout process.
29) Assist architect with finalization of change orders.
30) Prepare a claim evaluation and resolution report.
31) Assist architect in warranty and punch list inspection process.
32) Issue final project report.

## Occupancy Phase

1) Assist owner with development of occupancy plan and schedule.
2) Assist owner with move-in coordination.

TCU-00038

# Exhibit "D"



# ALABAMA STATE UNIVERSITY

MONTGOMERY, ALABAMA 36101  ·  334 / 229-4200

OFFICE OF THE PRESIDENT

September 28, 2006

Mr. Gil Berry
President
Gil Berry and Associates
721 Acorn Lane
Jefferson Hills, PA 15025

Dear Mr. Berry:

As President of Alabama State University, I am charged with the stewardship of both public and private funds in the execution of my fiduciary responsibility. One immediate and challenging responsibility is the renovation of selected student housing units here on the ASU campus.

As you are already aware, because you were in voluntary attendance, I made a recommendation to the Alabama State University Board of Trustees, at its September 22, 2006 meeting, that we not engage Student Suites/Gill Berry & Associates for this proposed project.

Under separate cover, I am returning all documents provided ASU relating to your proposals regarding this project. I sincerely regret that we could not arrive at acceptable terms on matters associated with this project.

Thank you so much for your interest in student housing at Alabama State University.

Sincerely,

Joe A. Lee
President

Cs:    Mr. Elton Dean
       Mr. Kenneth Thomas, Esq.
       Mr. Ken Upchurch

MAR 000014

Exhibit "E"

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

CV-2:07cv384-ID-CSC


MAROUS BROTHERS CONSTRUCTION, LLC, a

corporation, and GIL BERRY, an individual,

d/b/a GIL BERRY & ASSOCIATES,

    Plaintiffs,

vs.

ALABAMA STATE UNIVERSITY, et al.,

    Defendants.


DEPOSITION TESTIMONY OF:

JOE LEE


July 28, 2008

10:15 a.m.


COURT REPORTER:

Gwendolyn P. Timbie, CCR



Page 62

1    agreement with Student Suite -- Gil

2    Berry/Student Suites.

3         Q.    Is that after Gil said that he

4    couldn't do it for the amount you were

5    looking for?

6         A.    It was after we had gone

7    through several back and forth

8    negotiations through legal counsel with

9    him.

10        Q.    And that Gil ultimately said

11   we can't do it for that price?  Is that

12   what -- is that how it happened?

13        A.    Said he couldn't drop it any

14   more.  He couldn't reduce the fee any

15   more.

16        Q.    And, again, just to be clear,

17   none -- you never had any such discussions

18   with anybody at Marous Brothers?

19        A.    I never discussed anything

20   with anyone from Marous Brothers.

21        Q.    So what did the university

22   ultimately do?  Who did it hire to do the

23   construction work?

**American Court Reporting**
**toll-free (877) 320-1050**

Page  63

1          A.       The construction work is being

2     done by Rayborn Construction Company.

3     Rayborn is doing the science building and

4     the education building.

5          Q.       So they were --

6          A.       We engaged -- we engaged the

7     owner representatives -- Upchurch and

8     Thomas as owner representatives to get

9     bids on some -- well, we engaged an

10    architectural firm to draw up some plans

11    for the project.  Chambless and

12    Associates.  And we engaged Upchurch and

13    Associates as owner representatives.

14          And we had several -- we took bids

15    on the project.  Companies out of

16    Birmingham and Auburn and Montgomery and

17    some other places bidded on the project.

18    And the best -- we accepted the best --

19    the best bid.

20          Q.       So Chambless did the plans?

21          A.       Yes.

22          Q.       What did you do with these

23    plans?  Did you send them to the different

**American Court Reporting**
**August 13, 2008**

# Exhibit "F"



FRANK H. McFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

J. L     HUBBARD
JAM     WALTER, JR.
JAMES H. McLEMORE
CONSTANCE SMITH BARKER
THOMAS M. EDEN III
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN

M. COURTNEY WILLIAMS
LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL P. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TODD H. COX
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
## ATTORNEYS AT LAW

July 30, 2007

Gil Berry                                                Via Electronic Mail and US Mail
Chip Marous
Arne Goldman
Marous Brothers Construction, LLC
c/o Augusta S. Dowd, Esq.
White Arnold Andrews & Dowd, P.C.
2025 Third Avenue North, Suite 600
Birmingham, Alabama 35203

Re:    *Marous Brothers Construction, et al. v. Alabama State University, et al.*
       United States District Court for the Middle District of Alabama
       Case No. CV-07-384-ID-CSC

Dear Messrs. Berry, Marous, and Goldman and Marous Brothers Construction, LLC:

As you know, we represent TCU Consulting Services, LLC ("TCU"), W. Ken Upchurch III ("Upchurch"), and Percy Thomas ("Thomas") in this matter.

It has come to the attention of our clients that one or more of you published false and defamatory statements about them to employees of *The Montgomery Advertiser* and other media representatives, members of the public who attended the September 22, 2006 meeting of the Board of Trustees of Alabama State University ("ASU"), and possibly others, including Alabama Governor Bob Riley and his staff and members of the ASU Board of Trustees. Specifically, you told such persons that TCU, Upchurch, and Thomas "stole" a project belonging to you or Marous Brothers Construction, that they provided "kickbacks" or other improper and illegal payments to Elton Dean and John Knight, that they fraudulently misrepresented facts to the ASU Board of Trustees, and that TCU obtained ASU jobs because of illegal activity committed by TCU, Upchurch, and Thomas. You have purposely and intentionally disparaged TCU, Upchurch, and Thomas' character and reputation by accusing them of dishonesty and criminal activity in their personal and professional dealings with others. Your statements and remarks are false and were published with knowledge of their falsity.

Your defamatory statements have caused my clients to lose business opportunities and to suffer damage to their reputations in the community. Therefore, pursuant to Section 6-5-

**MONTGOMERY · OPELIKA / AUBURN**

150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 *tel*    334 323 8888 *fax*    www.capellhoward.com

186 of the Code of Alabama, TCU, Ken Upchurch, and Percy Thomas demand that you publish a full and fair retraction of all such charges, accusations, and statements in a public and prominent place and manner within five (5) days of your receipt of this letter. Should you fail or refuse to retract your defamatory statements, TCU, Upchurch, and Thomas will seek punitive damages from you, in addition to other damages.

All communications regarding this matter should be directed to my attention.

Sincerely,

R. Brooke Lawson III

RBLIII/gf:

pc:   J. Lister Hubbard, Esq.
      W. Ken Upchurch, III
      Percy Thomas



| FRANK H. McFADDEN | J. LISTER HUBBARD | M. COURTNEY WILLIAMS |
| JOHN F. ANDREWS | JAMES N. WALTER, JR. | LEE M. RUSSELL, JR. |
| WILLIAM D. COLEMAN | JAMES H. McLEMORE | CHAD W. BRYAN |
| WILLIAM K. MARTIN | CONSTANCE SMITH BARKER | MICHAEL P. DALTON |
| GEORGE L. BECK, JR. | THOMAS M. EDEN III | CATY HOUSTON RICHARDSON |
| BRUCE J. DOWNEY III | W. HOLT SPEIR III | ARDEN REED PATHAK |
| HENRY C. BARNETT, JR. | CHRISTOPHER W. WELLER | TODD H. COX |
| K. PALMER SMITH | DEBRA DEAMES SPAIN | TERRIE SCOTT BIGGS |
| ROBERT T. MEADOWS III | C. CLAY TORBERT III | |
| HENRY H. HUTCHINSON | R. BROOKE LAWSON III | OF COUNSEL: |
| SHAPARD D. ASHLEY | J. SCOTT PIERCE | JAMES M. SCOTT |
| D. KYLE JOHNSON | ROBERT D. RIVES | THOMAS S. LAWSON, JR. |
| ROBERT F. NORTHCUTT | RICHARD H. ALLEN | |

# CAPELL & HOWARD P.C.
ATTORNEYS AT LAW

August 3, 2007

Stephen R. Arnold, Esq.                        Via Electronic Mail and US Mail
White Arnold Andrews & Dowd, P.C.
2025 Third Avenue North, Suite 600
Birmingham, Alabama 35203

      Re:   *Marous Brothers Construction et al. v. Alabama State University et al.*
            United States District Court for the Middle District of Alabama
            Case No. CV-07-384-ID-CSC

Dear Mr. Arnold:

      We are in receipt of your clients' August 1, 2007 response to TCU Consulting Services, LLC ("TCU"), W. Ken Upchurch III ("Upchurch"), and Percy Thomas' ("Thomas") demand for retraction. Messrs. Berry, Marous, and Goldman and Marous Brothers Construction failed to deny, retract or even address all of the allegations made by my clients, which leads us to conclude that they admit the accuracy of those allegations. Moreover, their denial of certain other allegations is particularly troubling in light of the evidence we have that they made such statements.

      I have enclosed for your review a copy of two articles that recently appeared in *The Montgomery Advertiser* (as well as a May 5, 2007 blog entry entitled "Now, the New Lawsuit") which you and your clients apparently have not seen. As evidenced by the newspaper articles, Gil Berry, Chip Marous, Arne Goldman, and/or Marous Brothers Construction did, in fact, make false and defamatory statements about TCU, Upchurch, and Thomas, including (i) that TCU, Upchurch, and Thomas stole or used unethical or illegal means to take the dorm renovation project from Berry and Marous Brothers Construction; (ii) that they provided "kickbacks" or other improper and illegal payments to ASU Trustees Elton Dean and John Knight; (iii) that they lied or fraudulently misrepresented facts concerning Marous and Berry to the ASU Board of Trustees; and (iv) that TCU, Upchurch, and Thomas secured ASU jobs by illegal means. TCU, Upchurch, and Thomas still expect your clients to publish a full and fair retraction of all such charges, accusations, and defamatory statements in a public and prominent place and manner within

**MONTGOMERY • OPELIKA / AUBURN**

150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 *tel*    334 323 8888 *fax*    www.capellhoward.com

five (5) days of receipt of the July 30 demand for retraction.   Otherwise, as previously stated, we will have no choice but to pursue all remedies and damages available, including the recovery of punitive and compensatory damages.

Sincerely,

R. Brooke Lawson III

RBLIII/gf:

pc:    Lister Hubbard, Esq.
       W. Ken Upchurch, III
       Percy Thomas

# Exhibit "G"

Aug-02-2007  09:12pm  From-                                    T-342  P.002/002  F-886

# WHITE ARNOLD ANDREWS & DOWD P.C.
### ATTORNEYS AT LAW

**STEPHEN R. ARNOLD**
FELLOW AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
CERTIFIED FAMILY LAW TRIAL ADVOCATE
NATIONAL BOARD OF TRIAL ADVOCACY

August 1, 2007

R. Brook Lawson, III, Esq.
**Capell & Howard P.C.**
P.O. Box 2069
Montgomery, Alabama 36102-2069

RE:   *Marous Brothers Construction, Inc. et al. v Alabama State University, et al.*
United States District Court for the Middle District of Alabama
Case No.: CV-07-384-ID-CSC

Dear Mr. Lawson:

As you know this office represents Gil Berry, and Marous Brothers Construction, LLC. We are in receipt of your July 30, 2007, correspondence demanding that our clients as named by you retract certain statements allegedly made individually or collectively about TCU Consulting Service, LLC; W. Ken Upchurch III; and Percy Thomas. For the purposes of your letter, we will accept notice on behalf of Arne Goldman and Chris Marous.

As an initial matter, each of the entities named by you in your letter denies making any of the allegedly defamatory statements you and your clients attribute to them. At no time did any of the entities named in your letter tell or state to any person that TCU Consulting Services, Upchurch, and Thomas "stole" a project belonging to them or Marous Brothers Construction and each denies making or uttering any statement that anyone was provided kick-backs or any other improper and illegal payments to Elton Dean and/or John Knight. Each of our clients denies misrepresenting any facts to the Alabama State University Board of Trustees about the subjects referenced in your letter.

All of the accusations contained in your letter of July 30, 2007 are categorically denied. Your clients' allegations have no basis in fact or in law. If your clients insist on continuing to pursue claims for defamation against the entities named in your letter, they will have no choice but to pursue all further legal remedies available to them and seek to recover all fees, costs, and damages resulting from these frivolous claims.

Sincerely,

*[signature]*

STEPHEN R. ARNOLD

SRA/bjc

2025 THIRD AVENUE NORTH, SUITE 600  •  BIRMINGHAM, ALABAMA 35203  •  205 323 1888  •  FAX 205 323 8907  •  sarnold@waadlaw.com

# WHITE ARNOLD ANDREWS & DOWD P.C.
### ATTORNEYS AT LAW

STEPHEN R. ARNOLD

FELLOW AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
CERTIFIED FAMILY LAW TRIAL ADVOCATE
NATIONAL BOARD OF TRIAL ADVOCACY

August 8, 2007

R. Brooke Lawson, III
150 South Perry Street
Montgomery, AL  36104

RE:    Marous Brothers Construction, Inc., et al v. Alabama State University

Dear Mr. Lawson:

Gil Berry, Chip Marous, Arne Goldman and Marous Brothers Construction, LLC have authorized this firm to respond to your letter of August 3, 2007.

Please be advised that each of the above named entities categorically and completely denies making any false or defamatory statements as alleged in your letter of August 3rd.

Thank you for your courtesies.

Sincerely,

STEPHEN R. ARNOLD

SRA/db

cc:    Gil Berry
       Arne Goldman

2025 THIRD AVENUE NORTH, SUITE 600  •  BIRMINGHAM, ALABAMA 35203  •  205 323 1888  •  FAX: 205 323 8907  •  sarnold@waadlaw.com